UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES-GENERAL

Case No.: **CV 18-7241-CAS (PLAx)**            Date: **January 8, 2020**

Title:   **Kevin Risto, etc. v. Screen Actors Guild-Am. Federation of Television and Radio Artists, et al.**

------

PRESENT: THE HONORABLE    **PAUL L. ABRAMS**
                                    **UNITED STATES MAGISTRATE JUDGE**

| **Christianna Howard** | **N/A** | **N/A** |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

**ATTORNEYS PRESENT FOR PLAINTIFF(S):**            **ATTORNEYS PRESENT FOR DEFENDANT(S):**
              NONE                                                                NONE

**PROCEEDINGS:**  **(IN CHAMBERS)**   **Defendants' Motion to Compel Plaintiff to Produce Documents (ECF No. 43)**

On December 23, 2019, the parties in this purported class action filed a Joint Stipulation (alternatively "JS" (ECF No. 44)) in support of their positions regarding defendants' Motion to Compel ("Motion" or "Mot." (ECF No. 43)) plaintiff Kevin Risto to produce any agreements between and among plaintiff, on the one hand, and Transparence Entertainment Group ("TEG") and its top three executives (Dennis Dreith; Shari Hoffman; and Bruce Waynne), on the other, as sought in defendants' Request for Production of Documents ("RFP") numbers 7-10. (JS at 3-5). Defendants also submitted the declaration of their counsel, Andrew J. Thomas ("Thomas Decl." (ECF No. 44-1)), and plaintiff submitted the declaration of his counsel, Mariana McConnell ("McConnell Decl." (ECF No. 44-2)). Having considered the pleadings submitted in connection with the Motion, the Court has concluded that oral argument will not be of material assistance in determining the Motion. Accordingly, the hearing scheduled for January 15, 2020, is **ordered off calendar**. See Local Rule 7-15.

**Background**

    **Defendants' Contentions**

Defendants assert that this action was filed on behalf of a putative class of non-featured musicians and vocalists, alleging, among other claims, "breach of fiduciary duty by the Trustees of the AFM & SAG-AFTRA Intellectual Property Rights Distribution Fund (the 'Fund'), as well as conversion by AFM and SAG-AFTRA (together, the 'Unions')." (JS at 3). They further assert the following:

> The crux of Plaintiff's allegations is that the Fund's Trustees acted based on a conflict of interest when they entered into a 2013 Data Purchase and Services Agreement with the Unions, pursuant to which the Fund pays a fee ("Service Fee") to compensate the Unions for providing information that the Fund uses to locate and pay royalties to non-featured performers, and for providing other services that advance the broader interests of non-featured performers.

(Id.). Defendants contend that plaintiff has close ties to TEG and its executives, and that absent from his allegations "is any reference to the individuals who appear to have orchestrated his involvement in this litigation," which they deem to be a "grudge match" with TEG "at the center of it." (Id.). This allegation is based on the fact that shortly after their "less-than-amicable departures from the Fund in 2017," the Fund's former Executive Director (Mr. Dreith) and former Chief Operating Officer (Ms. Hoffman) co-founded TEG, a business venture that directly competes with the Fund in securing performer royalties from foreign collective management organizations ("CMOs"). (Id.). Defendants explain that plaintiff is a client of TEG and is "longtime business partners with TEG Vice President" Waynne, having together formed a music producing duo called The MIDI Mafia in 2001. (Id. at 3-4 (citing Thomas Decl. ¶ 3, Ex. A)). Defendants also assert that Mr. Waynne was among the first executives hired by Mr. Dreith and Ms. Hoffman "just a month after they founded TEG in January 2018, and Mr. Risto became a client soon after." (Id. at 4 (citing Thomas Decl. ¶ 3, Ex. B)). Based on these relationships, defendants contend that plaintiff "is no ordinary class member, and his unique interests and incentives do not align with those of absent class members." (Id.).

In support of this contention, defendants note that (1) plaintiff has been a business partner with one of the top three executives (Mr. Waynne) at TEG, a direct competitor of the Fund; and (2) TEG directly competes with the Fund with respect to securing royalties from foreign CMOs by charging fees to musicians to register their international royalty mandates with foreign CMOs instead of with the Fund, thereby undermining the Fund's bargaining position with foreign CMOs and increasing the administrative burden for all fund participants -- "*i.e.*, many of the very performers who make up the proposed class in this litigation." (Id. at 3-4). Defendants contend that this "by itself creates a serious conflict of interest that undermines [plaintiff's] adequacy as a class representative." (Id.). Defendants further argue that "TEG is no mere marketplace competitor," as it is "controlled by Mr. Dreith . . . who approved of and implemented the service fee in 2013," and who "is no mere bystander, either." (Id.). Defendants note that Mr. Dreith is a "critical fact witness in the case," and "also has a direct, personal stake" as he is "***directly participating in this matter*** as a 'litigation consultant' retained by Plaintiff." (Id. (emphasis in original) (citing Thomas Decl. ¶ 4, Ex. B)).

Defendants submit that these connections "cannot be coincidental," and the "inescapable conclusion . . . is that . . . [Mr.] Dreith, likely with the involvement of Ms. Hoffman and Mr. Waynne, enlisted Mr. Risto to bring this lawsuit as payback after the Fund parted ways with Mr. Dreith and Ms. Hoffman in 2017." (Id. at 4-5). As such, "TEG's owners thus have incentives and motivations for bringing this litigation that almost certainly differ from those of the potential class of non-featured performers," and their "instigation of this lawsuit almost certainly has more to do with their settling old scores than it does with securing the best outcome for absent members of the putative class." (Id. at 5). It is against this backdrop that defendants propounded RFP numbers 7-10, seeking any agreements between and among plaintiff, on the one hand, and TEG and its top three executives, on the other. (Id.).

**Plaintiff's Response**

Plaintiff contends that defendants' statements reflect "little more than an overlong conspiracy theory, . . . completely removed from the operative facts of this case." (Id. at 6). He states that in 2013, the Trustees of the Fund, "acting purely for the benefit of their Union employers, implemented a Service Fee which increases year over year and has diverted millions of dollars from the beneficiaries of the Fund and to the Union coffers." (Id.). Plaintiff asserts that the implementation of the Service Fee was and is a breach of fiduciary duties owed by the Trustees to the Fund's beneficiaries and constitutes a conversion. (Id.). Plaintiff further asserts that the Service Fee was "decided unilaterally by the Trustees and concealed from the Fund's beneficiaries." (Id.). He states that Mr. Dreith "documented his concerns about the Service Fee, the amount of the Service Fee, and the Trustees' failure to disclose the Service fee to the Fund's beneficiaries." (Id. (citing McConnell Decl. ¶ 3, Ex. 1)). Nevertheless, the Union Trustees ignored Mr. Dreith's concerns and moved forward with the Service Fee,

resulting in millions of dollars being diverted to the Unions, with no benefit being provided to the Fund in return for the Service Fee, which has increased "exponentially."  (Id. at 6-7 (citing McConnell Decl. ¶ 4, Ex. 2)).

Plaintiff argues that without a justification for the Service Fee, defendants have turned to the question of plaintiff's incentive as a class representative, which is based on "pure speculation about the interests of various *non*-plaintiffs and *non*-class members." (Id. at 7 (emphasis in original)).  He notes that he is a "non-Union, non-featured performer who stands in the exact same position as any other non-featured performer when it comes to receiving royalties from the Fund." (Id.).  He acknowledges that he is also a client of TEG, whose services "exceed those that are provided by the Fund and TEG does not consider itself to be a competitor of the Fund, least of all because the Fund has an exclusive Congressional mandate to collect and administer the royalties at issue in this case." (Id.).  He asserts that he has "no financial interest in TEG, [and] TEG is not a party to this litigation and does not stand to benefit from this litigation." (Id.).  He argues that he has been harmed by the Service Fee in the same way as the other Fund beneficiaries, and defendants have "failed to explain" how plaintiff's recovery in this case would be any different from that of absent class members' recovery.  (Id. at 8).

Plaintiff also states that the "fact that [he] has asked TEG to collect royalties in areas where the Fund does not have an exclusive Congressional mandate is eminently reasonable considering his awareness of the breach of fiduciary duties of the Fund's Trustees," and this "does not create a conflict between [him] and other members of the class, as it is likely that other class members would do the same." (Id.).  He reiterates that his incentive to bring this action is the same as the incentive of the absent class members: "to have the Service Fees returned to the beneficiaries of the Fund who have earned and are entitled to those royalties." (Id.).

Plaintiff also contends that the fact that he and Mr. Waynne are both music producers who provide services "under the group The MIDI Mafia" -- which has nothing to do with collecting and reporting royalties to performers -- "has no consequence to this litigation or the allegations made against the Defendants." (Id.).  He further argues that Mr. Dreith's position as a litigation consultant for plaintiff "is also of no consequence" as "Mr. Dreith is not the class representative and is not being compensated by Mr. Risto," and "Mr. Risto is not a principal of TEG and does not stand to profit off TEG obtaining more clients." (Id. at 8-9).

Plaintiff submits that defendants seek the subject documents because "they consider TEG to be a competitor and because if other non-featured performers become clients of TEG, the Fund **and therefore the Unions** stand to lose income." (Id. at 9 (emphasis in original)).  Plaintiff concludes that defendants' "desire to obtain information for commercial benefit is not adequate justification to seek" the subject discovery in this case, and is "likewise apparent from the overbroad non-party subpoenas that were served on TEG, Mr. Dreith, Ms. Hoffman, and Mr. Waynne." (Id.).


**Legal Standard**

The Court will examine the issues in the Motion using the general standard set forth in Federal Rule of Civil Procedure 26 ("Rule 26").  Rule 26 provides that a party may obtain discovery "regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case[.]"  Fed. R. Civ. P. 26(b)(1).  Factors to consider include "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."  Id.  Information need not be admissible in evidence to be discoverable.  Id.  However, a court "must limit the frequency or extent of discovery otherwise allowed by [the Federal] rules" if "(i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity to

obtain the information by discovery in the action; or (iii) the proposed discovery is outside the scope permitted by Rule 26(b)(1)." Fed. R. Civ. P. 26(b)(2)(C). Finally, the Court is mindful of the imperative that the Federal Rules of Civil Procedure be "construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1 (emphasis added); see also Landis v. N. Am. Co., 299 U.S. 248, 254-55, 57 S. Ct. 163, 81 L. Ed. 153 (1936) (a court has the inherent power "to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants" and "[h]ow this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance").

Relevance "has been construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351, 98 S. Ct. 2380, 57 L. Ed. 2d 253 (1978) (citing Hickman v. Taylor, 329 U.S. 495, 501, 67 S. Ct. 385, 91 L. Ed. 451 (1947)). Even so, the scope of discovery is not without limits as Rule 26(b) (as amended in 2015) now provides that discovery is limited to information that is relevant to a claim or defense in the lawsuit *and* proportional to the needs of the case. The party seeking to compel discovery "has the initial burden of demonstrating relevance" under Rule 26. See Integon Preferred Ins. Co. v. Saavedra, 2019 WL 4228372, at *2 (C.D. Cal. July 12, 2019) (citations omitted). Thereafter, "[t]he party who resists discovery has the burden to show discovery should not be allowed, and has the burden of clarifying, explaining, and supporting its objections." Duran v. Cisco Sys., Inc., 258 F.R.D. 375, 378 (C.D. Cal. 2009) (citing Blankenship v. Hearst Corp., 519 F.2d 418, 429 (9th Cir. 1975); Sullivan v. Prudential Ins. Co. of Am., 233 F.R.D. 573, 575 (C.D. Cal. 2005)).

**The Disputed Requests**

RFP number 7 seeks all agreements between plaintiff and TEG; RFP number 8 seeks all agreements to which plaintiff and Dreith are parties; RFP number 9 seeks all agreements to which plaintiff and Hoffman are parties; and RFP number 10 seeks all agreements to which plaintiff and Waynne are parties.

Plaintiff objected to each of the disputed requests on the following grounds: not relevant to any party's claim or defense and not proportional to the needs of the case; the burden and expense of the proposed discovery outweighs its likely benefit; the discovery has no bearing on the issues at stake in the action and there is no importance of this discovery in resolving the issues. (See, e.g., JS at 9, 16, 20, 22). Plaintiff also objected to each request as "overbroad, unduly burdensome, oppressive, [and] vexatious and harassing in that it is not reasonably limited as to scope." (Id.).

### RFP No. 7

Defendants assert that the requested documents are "directly relevant to [plaintiff's] adequacy as a class representative." (Id. at 10). They state that it appears that TEG and the TEG executives "have been involved in positioning [plaintiff] as the lead plaintiff in this action," and that the interests of TEG and its executives "are almost certainly divergent from those of class members, given that TEG's business model is premised on diverting the responsibility for foreign royalty distribution from the Fund to foreign CMOs -- which has the effect of reducing the Fund's negotiating leverage with foreign CMOs and increasing the Fund's administrative expenses, to the detriment of the Fund beneficiaries comprising the putative class." (Id.). They assert that plaintiff's relationship with TEG and with the former employees of the Fund, creates the potential for conflicts of interest and unusual incentives that call into question plaintiff's adequacy as a class representative. (Id. (citations omitted)). Defendants assert that they are requesting documents of specific contractual relationships -- including plaintiff's "*current[]* . . . contractual relationship with former employees who are current competitors

of the Fund." (Id. at 11 & n.8 (emphasis in original)). Defendants conclude that without seeing the requested agreements between plaintiff and TEG and/or TEG executives, they "cannot confirm whether the apparent conflicts exist and the extent to which they affect [plaintiff's] adequacy as a class representative." (Id. at 12).

Plaintiff responds that defendants' position "suffers from a fatal logical deficiency: that [plaintiff's] business relationship [with TEG] unrelated to the Fund and its Service Fee somehow ha[s] any bearing on the legality of the Service Fee and the Fund's decision to implement it." (Id.). He notes that in order to be qualified as a class representative, he needs only be qualified to receive royalties against which defendants have levied the Service Fee. (Id.). He observes that the other issues in the case turn on defendants' decision to implement the Service Fee and general legal principles relating to the propriety of defendants' decision, "that are not specifically tethered to [plaintiff] or any other class members." (Id.). He suggests that defendants are seeking to disqualify him "based purely on the downstream effect his efforts in this litigation may have on non-plaintiffs and non-class members (*i.e.*, TEG and its principals), which has nothing whatsoever to do with [plaintiff's] adequacy under Rule 23." (Id.). Plaintiff states that a class representative is adequate when his interests are not antagonistic to the class, and submits that his interests -- which are not antagonistic to the class -- are to "increase the royalties enjoyed by himself and the rest of the class through elimination of the unjustified Service Fee." (Id.). He also notes that "the Fund is actually already in possession of the two documents that would be responsive to this request: a power of attorney and agent designation which were attached to the February 2019 correspondence which counsel for Defendants has previously acknowledged," and there are "no other documents that are responsive to this Request." (Id. at 13).

Plaintiff suggests that defendants' discovery is attempting to "investigate an entity [TEG] which they have repeatedly (albeit misguidedly) identified as 'a director competitor of the Fund and the Unions[.]'" (Id. at 15). Plaintiff further notes that for defendants' conflict of interest allegations to have any merit, "they must argue that [*plaintiff*], not Mr. Dreith, has a conflict with members of the class," but plaintiff "is a non-featured, non-union performer with no financial interest in TEG, making TEG's personal services rendered for him irrelevant to the case and only of interest to Defendants due to their competitive instincts." (Id. at 15-16 (emphasis added)). He concludes that neither TEG nor Mr. Dreith are named class representatives, they have no financial interest in this case, and nothing about plaintiff's status as a client of TEG makes him an inadequate class representative under Rule 23(a). (Id. at 16).

### RFP No. 8

With respect to RFP number 8 -- seeking agreements to which plaintiff and Mr. Dreith are parties -- defendants assert that the fact that plaintiff is a client of TEG, Mr. Dreith's company, and is a longtime partner of Mr. Dreith's deputy at TEG, Mr. Waynne, "demonstrates that [plaintiff] was not chosen at random among tens of thousands of potential class representatives[] -- nor chosen, for that matter, based purely on considerations of traditional Rule 23 'adequacy' criteria." (Id. at 17). They suggest that Mr. Dreith "likely sought to install an individual whose interests would align with those of himself and TEG, interests which -- as discussed previously -- are potentially adverse to those of absent class members." (Id.). Defendants also believe that Mr. Dreith's direct participation in the action as a litigation consultant constitutes an "extraordinary" circumstance that should not be ignored. (Id. (citing Thomas Decl. ¶ 4)). They note that plaintiff alleges in his Amended Complaint that the Trustees of the Fund breached their fiduciary duties in approving and maintaining the Service Fee and that the Agreement was entered into by the Fund and the Unions "while Mr. Dreith was the Fund Administrator and Shari Hoffman was the Fund's Chief Operating Officer," and that both were present at the Board of Trustees meeting where the Service Fee was approved in June 2013. (Id. at 17-18). As such, "Mr. Dreith is assisting in prosecuting a lawsuit attacking the very Service Fee that he personally implemented, administered, and supported." (Id. at 18). Defendants contend that the requested agreements "will show how Mr. Dreith is being compensated for his role in this litigation, and potentially how some portion of that compensation is being

redistributed to Mr. Risto." (Id.). They also suggest that such agreements may show that "Mr. Dreith and [Ms.] Hoffman breached their own respective fiduciary duties as executives of the Fund by actively superintending the Trustees' alleged misappropriation of millions of dollars from the Fund" and, therefore, plaintiff "is working with former executives of the Fund to help them bring a lawsuit predicated on their own alleged misconduct." (Id. at 18-19).

Plaintiff responds that defendants are attempting to "weaponiz[e] the discovery process in this case against a non-litigant [Mr. Dreith] in an effort to (a) punish him for helping to reveal their conduct and (b) somehow make him a *de facto* party . . . despite the fact that he is not a non-featured performer and therefore would never see any recovery." (Id. at 19). Because Mr. Dreith is "neither class counsel, class representative, nor class member," plaintiff states that Mr. Dreith's alleged conflicts with defendants are immaterial to the proceedings. (Id.). He further notes that defendants' assertions are "based on pure speculation with no factual support," and that defendants have failed to explain how plaintiff being a class representative benefits Mr. Dreith "any more than a non-TEG performer in the role would, as each had the Service Fee assessed against their earnings, and the relief sought by any one of them as a class representative would be identical: eliminating or curtailing the Service Fee." (Id.). He observes that defendants' own documents reflect that the Service Fee was implemented *without* Mr. Dreith's approval, and show that Mr. Dreith objected to the Service Fee and "implored the Trustees to disclose the Service Fee to the Fund's beneficiaries." (Id. at 19-20). Plaintiff submits that all of this "palace intrigue" has nothing to do with the "propriety of the Fund continuing to assess the Service Fee or [plaintiff's] ability to challenge the same." (Id. at 20). He also notes that "[n]otwithstanding Defendants' failure to make a colorable argument to support this request, other than those documents described in the RFP No. 7 section [of the JS], there are no documents responsive" to RFP number 8. (Id.).

### RFP No. 9

With respect to RFP number 9, defendants assert that Ms. Hoffman "appears to be operating in tandem with Mr. Dreith following her departure from the Fund . . . [and] [g]iven her close relationship with Mr. Dreith, it is highly likely that she is playing a direct or indirect role in supporting this litigation." (Id. at 21).

Plaintiff responds that defendants' position is "replete with speculative allegations with no factual support," and there is no evidence that Ms. Hoffman would profit from this lawsuit. (Id.). As he stated with respect to RFP number 8, plaintiff also asserts that "[n]otwithstanding Defendants' failure to make a colorable argument to support this request, other than those documents described in the RFP No. 7 section [of the JS], there are no documents responsive" to RFP number 9. (Id. at 22).

### RFP No. 10

With respect to RFP number 10, defendants assert that in his role as TEG Vice President, Mr. Waynne "also directly competes with the Fund," and "has had agreements with the Fund related to individuals on the Fund's unclaimed royalty list," thereby creating additional potential conflicts if Mr Waynne is assisting plaintiff "in any way in this litigation, due to confidentiality restrictions in those agreements." (Id. at 22-23).

Plaintiff asserts that there is no relevance to any agreements between himself and Mr. Waynne, and defendants' position is "replete with speculative allegations with no factual support," and "has nothing to do with [plaintiff's] adequacy to represent the class." (Id. at 23). He notes that The MIDI Mafia "is a creative endeavor that has nothing to do with collecting and reporting royalties to any performers," defendants have not related its business to any of the issues in this case, and it is "unclear what Defendants are referring to with regard to 'agreements

with the Fund related to individuals on the Fund's unclaimed royalty list.'" (Id.). Plaintiff states that any agreements that Mr. Waynne has with other unnamed class members would not be responsive to RFP number 10. (Id.).

**Analysis**

Defendants' various speculative allegations relating to the motives and actions of non-parties TEG, Mr. Dreith, Ms. Hoffman, and Mr. Waynne with respect to their purported involvement with plaintiff being named as a class representative in this action, or with respect to whether plaintiff's interests are antagonistic to the class simply by virtue of his relationship with them, have no bearing on *plaintiff's* adequacy as a class representative. As plaintiff points out, TEG, Mr. Dreith, Ms. Hoffman, and Mr. Waynne are neither class counsel, class representatives, nor class members of the purported class, and there is no evidence that they stand to benefit from any potential recovery in this action. It is plaintiff who would be litigating this action on behalf of himself and/or members of the purported class, and defendants have presented no evidence to suggest that plaintiff's interests in litigating this action are anything more than to "increase the royalties enjoyed by himself and the rest of the class through elimination of the unjustified Service Fee."

The Court determines, therefore, that defendants have not met their burden of showing that information related to agreements between plaintiff and TEG, Mr. Dreith, Ms. Hoffman, and Mr. Waynne is in any way relevant to the claims or defenses in this action or to plaintiff's adequacy as a class representative. As such, and in light of plaintiff's representations that he has already provided documents responsive to certain of the subject RFPs, the Court will not permit what appears to amount to a fishing expedition into documents with little to no apparent probative value. See Riveria v. NIBCO, 364 F.3d 1057, 1072 (9th Cir. 2004) (noting that district courts "need not condone the use of discovery to engage in fishing expeditions").

Accordingly, defendants' Motion to compel the production of documents responsive to RFP numbers 7, 8, 9, and 10 (ECF No. 43) is **denied**.

IT IS SO ORDERED.

cc: Counsel of Record

Initials of Deputy Clerk    ch