UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES-GENERAL

Case No.: **CV 18-7241-CAS (PLAx)**  Date: **July 8, 2020**

Title:   Kevin Risto, etc. v. Screen Actors Guild-Am. Federation of Television and Radio Artists, et al.

---

**PRESENT: THE HONORABLE   PAUL L. ABRAMS**
**UNITED STATES MAGISTRATE JUDGE**

| Christianna Howard | N/A | N/A |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

**ATTORNEYS PRESENT FOR PLAINTIFF(S):**
NONE

**ATTORNEYS PRESENT FOR DEFENDANT(S):**
NONE

**PROCEEDINGS: (IN CHAMBERS)   Plaintiff's Motion to Compel Discovery (ECF No. 54)**

On June 10, 2020, the parties in this purported class action filed a Joint Stipulation (alternatively "JS" (ECF No. 54-1)) in support of their positions regarding plaintiff's Motion ("Motion" or "Mot." (ECF No. 54)) seeking to compel defendants to produce the documents listed on lines 1-49 of their privilege log. (Mot. at 1). Plaintiff also submitted the declaration of his counsel, Mariana A. McConnell ("McConnell Decl."), along with exhibits; defendants submitted the declaration of their counsel, Andrew G. Sullivan ("Sullivan Decl."), along with exhibits.  Having considered the pleadings submitted in connection with the Motion, the Court has concluded that oral argument will not be of material assistance in determining the Motion.  Accordingly, the hearing scheduled for July 15, 2020, is **ordered off calendar**.  See Local Rule 7-15.

By way of background, plaintiff states that this case involves class claims against the Trustees of a non-profit royalty fund for musicians -- the American Federation of Musicians of the United States and Canada ("AFM") & Screen Actors Guild-American Federation of Television and Radio Artists ("SAG-AFTRA") Intellectual Property Rights Distribution Fund (the "Fund") -- for abusing their positions in order to enrich their primary employers, AFM and SAG-AFTRA (collectively, the "Unions"),[1] at the expense of the Fund's beneficiaries. (JS at 1).  Specifically, on July 22, 2013, pursuant to a "Services Agreement," the Fund agreed to start paying the Unions 3% of all royalty it collects in exchange for access to the Union's membership lists, which plaintiff asserts is "information already aggregated and paid for by the Unions as part of their day-to-day work, and which costs the Unions nothing to provide (which is why, prior to the Services Agreement, they had done so for free)." (Id.).  Plaintiff suggests that the Services Agreement was entered into "not out of any rational economic calculus, but as a pretext to give the Unions an unwarranted equity stake in the increasingly large royalty pool being collected by the Fund."  (Id.).

---

[1]   Defendants in this action are the two Unions, and the individually-named Fund Trustees who also held a "senior position" with the Union. (JS at 20 & n.15).

**The Dispute**

Plaintiff contends that because the Services Agreement "is so specious, the genesis of how it was drafted and approved is key to proving the claims of the class." (Id. at 2). He states that the Fund was "ostensibly represented in the transaction by Patricia Polach . . . who has a longstanding relationship with the Unions." (Id.). Because of this, he suggests that "the Fund's sole legal counsel had a perverse incentive to ensure that the Unions, rather than the Fund, were the primary beneficiaries of the deal." (Id.). He notes that defendants have withheld 49 documents responsive to plaintiff's requests for production of documents ("RFPs") on the ground of attorney-client privilege, and states that the privilege log reflects that "virtually all" of these documents reference Ms. Polach as the author or recipient, or mention her in the document's description/subject matter. (Id.; see also McConnell Decl. Ex. 1 (the privilege log)). Plaintiff further states that this is "particularly troubling in light of Defendants' representations that although Ms. Polach was 'the Fund's outside counsel,' she may have 'given advice to the unions in addition to the Fund.'"[2] (JS at 2). This alleged statement by defendants, together with defendants' refusal to "provide the name of counsel representing the Unions in the 'negotiation,'" indicates to plaintiff that "Ms. Polach and her law firm were responsible for papering all sides of the deal." (Id.). He states that "under the California Rules of Professional Conduct and applicable state law," Ms. Polach could under no circumstances ethically provide legal advice to the Fund given her "longstanding representation of the Unions stretching as far back as November 1997 and as recently as June 2019, *including during the period when the Fund and the Unions were entering into the Services Agreement*." (Id. at 3 (emphasis in original)). He contends that either Ms. Polach was representing the Unions and the Fund in an unwaivable (and unwaived) concurrent conflict, or the "Unions planted their longstanding outside counsel to act as if she was providing legal advice to the Fund to push through the Services Agreement." (Id.). Plaintiff asserts that defendants' "attempt to preserve the attorney client privilege in this matter should fail, including their resort to the inapposite 'common interest' doctrine." (Id.). Plaintiff submits that given Ms. Polach's conflicting interests, "the attorney-client privilege does not attach" to the 49 communications listed on defendants' privilege log. (Id.)

Defendants respond that "[o]ne false premise at the center of Plaintiff's claims is his assertion . . . that the 'value of the Services Agreement . . . is specious.'" (Id. at 4 (ellipses in original)). They assert that the data provided by the Unions is essential for the Fund to locate and pay royalties to non-featured performers. (Id.). Defendants state that this data "is collected and maintained by the Unions at great effort and expense," and that the Unions

---

[2]   A review of the documents accompanying the Joint Stipulation and apparently relied on by plaintiff for this proposition, reveals that defendants did not *explicitly* state that Ms. Polach *was* providing "advice to the unions in addition to the Fund"; instead, defendants couched their statement (in their meet and confer response letter) to state that "*to the extent* [Ms. Polach] the Fund's outside counsel provided any advice to the unions in addition to the Fund, such communications would remain privileged." (McConnell Decl. Ex. 6, ECF No. 54-2 at 61 (emphasis added)). That is because, according to defendants, California's common interest (or joint defense) doctrine is applicable. They state that they informed plaintiff that "the emails at issue were sent while Ms. Polach was acting as a lawyer for the Fund" and that "*[t]o the extent* Ms. Polach took any steps on behalf of either union, this was done in furtherance of the Fund's interests and the common interests of the Fund and the unions," and "*to the extent* Ms. Polach was at any time providing advice to both the Fund and the unions regarding the Data Purchase and Services Agreement, any communications regarding this topic are privileged and protected from waiver by the attorney-client privilege and the common interest doctrine." (Id. Ex. 6, ECF No. 54-2 at 61-62 (emphases added)). However, other than providing legal advice to a number of the Fund's Trustees who held a dual role with the Unions, there is nothing on defendants' privilege log reflecting that Ms. Polach otherwise concurrently and separately provided legal advice to the Unions regarding the Services Agreement and, therefore, the Court finds no waiver of the attorney-client privilege with respect to the documents listed on the privilege log for this asserted reason.

have "fielded thousands of requests from the Fund's research team -- currently staffed with eleven full-time research associates and supervisors -- who request information on a year-round basis regarding the performers on individual song titles from representatives at the many local Union chapters where relevant documents are maintained." (Id.). Thus, plaintiff's assertion that the data provided by the Unions "costs the Unions nothing to provide," is erroneous. (Id. (internal quotation marks omitted)). Defendants explain that in the early years of the Fund's existence, the Unions provided the data and services for free because there was very little royalty money to distribute at that time. (Id. at 5). When "the number of songs and performers earning royalties increased due to the rise in popularity of digital music streaming, the burden on the Unions to provide this information also increased." (Id.; see also id. at 1 n.1). While this information provides background to the history of the Services Agreement, whether the Services Agreement is "specious" is not dispositive in the Court's determination regarding whether the documents on defendants' privilege log are attorney-client privileged.

Defendants also assert that the ethical rules of professional responsibility relied on by plaintiff to suggest that Ms. Polach was "ethically barred from drafting the Services Agreement because she had at various times served as counsel to AFM," are inapposite, and that plaintiff has presented "no factual or legal basis to support a finding that the Fund's attorney-client privilege somehow evaporated when Ms. Polach communicated with *the Fund's own trustees* about the 2013 Services Agreement." (Id. at 6 (emphasis in original)). They state that plaintiff's position is "that because the Trustees are appointed by the Unions, and because they agreed to provide any compensation at all for the information and services provided by the Unions, the Trustees therefore must have been acting based on a conflict of interest." (Id. at 4). Defendants assert, however, that plaintiff points to no facts that the Service Fee is unreasonably high, or that the data provided by the Unions is unnecessary or has no value or could be obtained elsewhere at a lower price. (Id. at 4-5). They note that Congress explicitly provided that the Fund's administrators were to be appointed by the Unions, and contemplated that expenses related to the administration of distributing digital royalties would be deducted from the collected royalties prior to distribution. (Id. at 5 (citing 17 U.S.C. § 114(g)(2)(B)-(C), (g)(3))).

Defendants also state that the Fund and the Unions reached an agreement regarding compensating the Unions for their services, and that Ms. Polach "provided advice regarding the memorialization of those terms through the Services Agreement." (Id. at 6). They assert that the privilege log descriptions "make clear that the majority of these documents relate only to internal Fund matters, separate and apart from the preparation of the Services Agreement between the Unions and the Fund." (Id. at 7). They suggest that plaintiff's "true purpose is to try to obtain an early, back-door ruling from the Court on one of the central issues to be determined on summary judgment or at trial -- i.e., whether the Trustees acted based on a conflict of interest when agreeing to pay the Service Fee." (Id.).

### **Plaintiff's Arguments Regarding the Alleged Conflict and Waiver**

Plaintiff notes that documents 1-45 on defendants' privilege log refer to Ms. Polach as providing the basis for the attorney-client privilege designation, while documents 46-49 "anchor the privilege in Abigail Carter," a lawyer affiliated with Ms. Polach's law firm. Ms. Polach is listed on the privilege log as "formerly counsel at Bredhoff & Kaiser PLLC" and referred to as "'outside counsel,' though [it] is ambiguous if this meant to the Unions or to the Fund." (Id. at 8 (citing McConnell Decl. ¶ 4 Ex. 2)). According to plaintiff, Ms. Polach has been listed on the internet as "counsel to AFM, as far back as November 1997 and as recently as June 2019." (Id. (citing McConnell Decl. ¶¶ 6-7, Exs. 3-4)). She has also been listed as AFM's counsel in an August 2013 court filing "during the period when the Fund and the Unions were entering into the Services Agreement." (Id. (citing McConnell Decl. ¶ 7 Ex. 4)). Plaintiff requested that defendants clarify Ms. Polach's role and, on May 13, 2020, Ms. Polach was described by defendants has "having acted as both the Fund's outside counsel *and* an

advisor to the Unions." (Id. (citing McConnell Decl. ¶¶ 8-9 Exs. 5-6)). Plaintiff concludes that based on defendants' statement that Ms. Polach "was providing 'advice to the unions in addition to the Fund,' and because of Ms. Polach's longstanding relationship with the Unions, it appears that [she] was concurrently representing both the Fund and the Unions during the negotiation and implementation of the Services Agreement." (Id. at 9). Plaintiff argues that this is a conflict of interest that cannot be waived. (Id. (citing Cal. Code Prof. Conduct Rule 3-310 (in effect at the time and later renumbered as Rule of Conduct 1.7, which plaintiff notes is "functionally similar" to Rule 3-310))). He asserts that the negotiation of the Services Agreement "should have involved competing interests of the Unions seeking to maximize their compensation received from the Fund and the Fund seeking to minimize the compensation paid to the Unions, as every dollar paid to the Unions out of the Fund's royalty pool is a dollar taken from the Fund's beneficiaries." (Id. at 9-10). According to plaintiff, since the implementation of the Service Fee, the Fund's Trustees have "given away over $7,000,000.00 of the Fund's corpus to the Unions for nothing of value." (Id. at 10).

Plaintiff also argues that "[e]ven if waiver [of the conflict] were permissible . . . [t]here is no record of a waiver in this case." (Id. at 11). He states that in their May 13, 2020, correspondence, "counsel for Defendants concede that Ms. Polach may have provided some advice to the Unions but only offers the justification [that] '[t]here is nothing improper in representing more than one party to a transaction, so long as the attorney discloses the consequences of the joint representation.'" (Id. at 11-12 (citation omitted)). He states that defendants repeatedly imply "that the Fund and the Unions had perfectly aligned interests," but that for purposes of the analysis under waiver, defendants have to show that Ms. Polach "disclosed, to each side of the transaction, her loyalties to the Unions and the Fund had to make an intelligent, informed decision to use a conflicted attorney to represent its interests." (Id. at 12). Plaintiff submits that such a "scenario did not occur here," and that absent informed written consent, Ms. Polach's "representation of the Fund in drafting the Services Agreement violates her distinct ethical duties to both parties." (Id. at 13). Because her actions violated the ethical rules regarding a conflict of interest and failure to obtain a waiver, plaintiff contends that "there is no valid attorney-client privilege assertion over the documents in lines 1-49" of the privilege log and they must be produced. (Id.).

Plaintiff also argues that the common interest doctrine (also known as the joint defense doctrine) relied on by defendants, does not apply here. (Id.). He notes that under this doctrine, "parties who possess common legal interests may share privileged information without losing the protection afforded by the privilege." (Id. (citation omitted)). Plaintiff points out that the Fund and the Unions "did not have a common legal interest -- they were on opposite ends of a transaction that should have been negotiated." (Id. at 13-14). Plaintiff states that "[b]oth sides of the transaction had fiduciary duties to their membership that could not be ignored," and the "application of the doctrine calls into question the loyalty of the Fund's Trustees, who instead of aligning themselves with the Fund Beneficiaries' interests, chose to align themselves to the Unions." (Id. at 14). He submits that "either the common interest doctrine is not applicable here or Ms. Polach and the Trustees explicitly violated the fiduciary duties they owed to the Fund and its beneficiaries." (Id.).

### Defendants' Arguments Regarding the Alleged Conflict and Waiver

Defendants respond that California law governs all issues of attorney-client privilege in this action because the case involves state law claims brought to this Court under the Class Action Fairness Act. (Id.). Defendants contend that plaintiff "concedes that Ms. Polach acted as outside counsel to the Fund," "a role that [she] maintained at all times relevant to the communications at issue, until her retirement in April 2018." (Id. at 16). Because of that, her "provision of legal advice to the Fund is . . . squarely privileged" and plaintiff has not presented evidence that this privilege has been waived. (Id.).

First, defendants note that -- despite plaintiff's repeated descriptions of Ms. Polach as the general counsel of AFM -- the only evidence that plaintiff offered consists of a "*Billboard* magazine photograph of Ms. Polach from 1997 that identifies her as an attorney for AFM in the (hearsay) caption, and a district court amicus brief that Ms. Polach signed in [August] 2013." (Id. at 17-18 & nn. 11, 12 (citing McConnell Decl. Exs. 3, 4)). They also state that plaintiff's "waiver argument is premised entirely on the presumption -- nowhere supported by any evidence or legal citation -- that the relationship between the Fund and AFM was inherently antagonistic" when, in fact, "their interests are largely aligned." (Id. at 18). Defendants state that plaintiff "largely ignores California law" with respect to privilege questions, and assert that because Ms. Polach is not a California attorney -- but instead licensed in the District of Columbia -- her conduct as a lawyer "presumptively is governed by the rules of professional responsibility applicable to D.C. lawyers." (Id. (citations omitted)). The District of Columbia Rules provide that "a lawyer is prohibited from representing two clients only when the matter involves 'a specific party or parties and a position to be taken by that client in that matter' would be 'adversely affected by the representation,'" and that "the clients may waive the conflict if the lawyer reasonably believes she can provide 'competent and diligent representation.'" (Id. at 19 (citing D.C. Rule of Prof. Conduct 1.7(c))). Under the District of Columbia rules, the waiver need not be in writing. (Id. (citing D.C. Rule of Prof. Conduct 1.7(c), (c)(1))).

Second, defendants contend that even if Ms. Polach's prior representation of AFM created an obligation under the applicable conflict of interest rules not to represent the Fund, "a violation of the professional rules by an attorney cannot, by itself, waive privilege on behalf of a client," as that privilege "belongs to the client and can only be waived by the client." (Id. (citations omitted)). In short, defendants assert, the "idea that the Fund had no expectation of confidentiality during its entire relationship with Ms. Polach because of her prior work on behalf of AFM is without any factual or legal support and is antithetical to the public policy of California." (Id. (citation omitted)).

Third, defendants assert that the documents encompassed by entry numbers 1-16 on the privilege log are "communications with Ms. Polach that relate to the preparation and execution of the Services Agreement," and "all of the participants in these communications, aside from counsel, were affiliated with the Fund." (Id. at 20). Specifically, the parties to the communications listed in entries 1-16 of the privilege log include Ms. Polach, Fund Trustee Raymond Hair, Fund Trustee Duncan Crabtree-Ireland, Fund Executive Director Dennis Dreith, Fund Trustee Stefanie Taub, and Jeff Freund (another attorney at Ms. Polach's law firm). (JS at 20 & n.15). Defendants acknowledge that Mr. Hair and Mr. Crabtree-Ireland also held senior positions in AFM and SAG-AFTRA, respectively, and that Ms. Taub held a senior position at SAG-AFTRA. (Id. n.15). Defendants argue that despite the fact that some of the members of the Board of Trustees of the Fund also held positions in the Unions, this "does not mean that an organization's outside counsel could never have privileged communications that included the organization's trustees or directors if those trustees or directors . . . happen to be officers or directors of other companies." (JS at 20). According to defendants, this would mean that an organization's "outside counsel could never have privileged communications that included the organization's trustees or directors if those trustees or directors -- as is frequently the case with corporate boards in the business world -- happen to be officers or directors of other companies." (Id.). They point out that even if the communications among the Fund, Ms. Polach, and the Fund Trustees could be said to have involved the Trustees in their capacities as Union officials, "the communications nonetheless would be protected under California common interest doctrine," which provides that "the attorney-client privilege is not waived when multiple parties have retained the same counsel in furtherance of a common interest." (Id. at 21 (citation omitted)). They take issue with plaintiff's "false dichotomy" suggesting that either the common interest privilege is not applicable here, or Ms. Polach and the Trustees explicitly violated their fiduciary duties to the Fund, as a finding "that communications between the Fund and its legal counsel are privileged does not necessitate a finding one way or the other on the key fiduciary duty questions at the heart of this case." (Id.).

Fourth, defendants argue that there is no evidence to support a factual basis that the Unions and Funds were adverse to each other when Ms. Polach communicated with the Fund officers and Union-affiliated trustees in connection with drafting the Services Agreement, or that she participated on behalf of the two Unions or the Fund "in the determination of any material term of the Agreement in a manner that was adverse" to the two Unions or the Fund.  (Id.).  They point out that there is no evidence that Ms. Polach did anything other than "provide advice on how best to memorialize an agreement on material terms already reached by the Fund, AFM, and SAG-AFTRA."  (Id. at 20-21 (citation omitted)).  Defendants assert that "Rule 3-310 [of the California Rules of Professional Conduct] is inapplicable here, where the party's interests were aligned and they jointly sought Ms. Polach's counsel in connection with drafting an agreement the essential terms of which had been reached."  (Id. at 23-24).  Defendants also contend that plaintiff's case authority is factually inapposite as most of the cases cited "involve adversity in litigation."  (Id. at 22).  They argue that the common interest doctrine under California law "does not demand a perfect alignment of interests between the parties that communicated with the attorney," but courts have made clear that the common interest doctrine will nevertheless apply so long as the parties have a general alignment of interests, and "even when the clients also have . . . 'separate, dissimilar and at times adverse interests.'"  (Id. (citing Meza v. H. Muehlstein & Co., 176 Cal. App. 4th 969, 981 (Cal. App. 2 Dist. 2009))).

Fifth, defendants argue that entries 17-49 on the privilege log "exclusively involve the internal affairs of the Fund, including the preparation of financial documents," and that plaintiff has offered no explanation as to why those documents are not privileged.  (Id. at 25).  Defendants submit, therefore, that plaintiff has not met his burden to show why these documents should not be presumed privileged.  (Id. (citing Behunin v. Super. Ct., 9 Cal. App. 5th 833, 844 (Cal. App. 2 Dist. 2017))).

Finally, defendants conclude that plaintiff has brought this Motion for a strategic purpose: "to use a discovery-dispute tail to wag a merits-of-the-case dog."  (Id. at 26).  They state that the unsupported Motion was brought "in the hope of gaining a different prize -- a premature ruling from the Court on a key issue in the case involving alleged breach of fiduciary duty," i.e. "[w]hether the Fund's Trustees violated their fiduciary duties by acting with a conflict of interest," an "ultimate issue that is more properly decided by the Court on summary judgment or at trial, following the completion of discovery and the presentation of a full evidentiary record by both sides."  (Id.).

**Analysis**

"The attorney-client privilege protects confidential disclosures made by a client to an attorney in order to obtain legal advice, . . . as well as an attorney's advice in response to such disclosures."  United States v. Ruehle, 583 F.3d 600, 607 (9th Cir. 2009) (citation omitted).  "Because it impedes full and free discovery of the truth, the attorney-client privilege is strictly construed."  Id. (citation omitted).  The general rule is "that attorney-client communications made 'in the presence of, or shared with, third-parties destroys the confidentiality of the communications and the privilege protection that is dependent upon that confidentiality.'"  Nidec Corp. v. Victor Co. of Japan, 249 F.R.D. 575, 578 (N.D. Cal. 2007) (citation omitted).  For purposes of preserving the attorney-client privilege, the common interest doctrine applies where:  "(1) the communication is made by separate parties in the course of a matter of common interest; (2) the communication is designed to further that effort; and (3) the privilege has not been waived."  Resilient Floor Covering Pension Fund v. Michael's Floor Covering, Inc., 2012 WL 3062294, at *5 (N.D. Cal. July 26, 2012) (citation omitted).  A "common interest," however, means more than just "a shared desire to see the same outcome in a legal matter."  In re Pac. Pictures Corp., 679 F.3d 1121, 1129 (9th Cir. 2012) (as amended).  While the common interest does not need to be identical, "the overall interests of the parties who assert the common interest doctrine must be aligned to the

extent that they are 'maintaining substantially the same cause.'" Shenwick v. Twitter, Inc., 2019 WL 3815717, at *2 (N.D. Cal. Apr. 1, 2019) (citation omitted). "Instead, the parties must make the communication in pursuit of a joint strategy in accordance with some form of agreement -- whether written or unwritten." Id. Further, many courts have determined that the interest in question must relate to a "common legal, as opposed to commercial, interest." Nidec Corp., 249 F.R.D. at 579 (quoting Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A., 160 F.R.D. 437, 447 (S.D.N.Y. 1995)) (emphasis added); see also RKF Retail Holdings, LLC v. Tropicana Las Vegas, Inc., 2017 WL 229818, at *3-4 (D. Nev. May 25, 2017) (collecting cases and finding that the majority of courts require that "the communication at issue must be made in the course of formulating a common *legal* strategy" and the doctrine does not protect disclosures made for business purposes). In the context of the attorney-client privilege, the Ninth Circuit has recognized the common interest doctrine is "designed to allow attorneys for different clients pursuing a common *legal* strategy to communicate with each other." In re Pac. Pictures Corp., 679 F.3d at 1129 (emphasis added); Bruno v. Equifax Info. Servs., 2019 WL 633454, at *11 (E.D. Cal. Feb. 14, 2019).

Here, defendants never specifically identify the purported common interest in this matter. To the extent they suggest that the "common interest" was to memorialize "an arrangement whereby the Fund would compensate the Unions for locating and providing identifying information necessary for the Fund to pay royalties to non-featured performers, and for their lobbying, outreach, and other activities beneficial to nonfeatured performers," or that the Fund and the Unions jointly sought Ms. Polach's counsel in connection with memorializing and drafting the Services Agreement, "the essential terms of which had been reached" (JS at 21-22, 23-24), they provide no evidence that this was Ms. Polach's only role in arriving at the Services Agreement. Indeed, they also argue that her "provision of legal advice to the Fund is . . . squarely privileged," which implies that, as reflected on the privilege log, Ms. Polach was also providing legal advice in addition to drafting the terms of the Services Agreement. Additionally, the alleged "common interest," to the extent it exists, appears to relate at best to a common commercial, rather than a common legal, interest.

Moreover, defendants' argument as to why the common interest doctrine applies appears to reflect little more than a "shared desire [between the Unions and the Fund] to see the same outcome." Such interest is insufficient to entitle defendants to protection under the common interest doctrine. While the common goal may have been to arrive at an agreement to compensate the Unions for various tasks, the Unions and the Fund arguably have competing interests with respect to the *amount* of that compensation. Defendants have not shown that the attorney-client privileged communications numbered 1-16 and 48-49 on their privilege log were provided for the purpose of seeking or receiving *joint* legal advice by the Fund *and* the Unions on a common legal matter. See, e.g., First Pac. Networks, Inc. v. Atl. Mut. Ins. Co., 163 F.R.D. 574, 581 (N.D. Cal. 1995) ("most courts seem to insist that the two parties have in common an interest in securing legal advice related to the same matter -- and that the communications be made to advance their shared interest in securing legal advice on that common matter"). In any event, as noted by defendants, documents numbered 1-16 and 48-49 on the privilege log were to or from only individuals associated with the Fund (some of whom also held a position in a Union). With the exception of entry number 2 (discussed separately below), none of those emails was shared with any third-party, including, for example, someone who was *only* affiliated with one or both Unions -- which might destroy the confidentiality of the communications. The remaining documents (17-47) appear to be related to advice to the Fund regarding financial statements and/or tax issues with no relation to the Services Agreement.

Accordingly, under the circumstances herein, the Court finds that defendants have failed to establish that the common interest doctrine applies to any of the documents withheld on the basis of the attorney-client privilege.

The remaining question, therefore, is whether the attorney-client privilege has been waived either by virtue of Ms. Polach's alleged ethical violations, or by some of the Fund's Trustees having a dual role in a Union position.

"Once the party claiming the privilege establishes that the communication was made in the course of an attorney-client relationship . . . the opponent of the claim of privilege has the burden of proof to establish that the communication was not confidential or that the privilege does not apply for other reasons." Costco Wholesale Corp. v. Super. Ct., 47 Cal. 4th 725, 733 (2009). Plaintiff makes no assertion that the documents on the privilege log are *not* attorney-client privileged. Therefore, as a threshold matter, the Court finds that documents 1-49 on the privilege log are attorney-client privileged communications.

Plaintiff did not provide this Court, however, with any persuasive authority that the attorney-client privilege may be waived simply by virtue of the fact that an individual with a dual role -- in this case as a Trustee for the Fund, while concurrently holding a position in the Union -- initiated or received the attorney-client privileged communications. Accordingly, the Court finds that the attorney-client privilege was not waived for this reason.

The Court also finds that plaintiff has not met his burden of proving -- under either the ethical rules of California or the District of Columbia where Ms. Polach is a member of the bar[3] -- that Ms. Polach's alleged simultaneous representation of the Unions and the Fund without obtaining a waiver of the purported conflict (even assuming, without deciding, that she simultaneously represented both and that a conflict, therefore, exists, and that she did not obtain a waiver), means that "there is no valid attorney-client privilege assertion over documents in lines 1 through 49" of the privilege log. (JS at 13). Plaintiff has provided no authority to suggest that a violation of ethical rules by an attorney, per se results in a waiver of the attorney-client privilege by the attorney's client(s). See Melendrez v. Super. Ct., 215 Cal. App. 4th 1343, 1355 (Cal. App. 2 Dist. 2013) (holding that a company's attorneys cannot waive the privilege on the company's behalf); Roush v. Seagate Tech., LLC, 150 Cal. App. 4th 210, 223 (Cal. App. 6 Dist. 2007) (holding that "[t]here is no waiver in spite of communication to an additional person if that additional person is a 'joint client'").

In short, plaintiff has failed to demonstrate that *any* waiver of the attorney-client privilege has taken place for any reason.

That being said, defendants state that entry number 2 on the privilege log "reflects a communication between [Fund Trustee] Ray Hair [who also held a senior position in AFM] and Jennifer Garner, who was and is an in-house lawyer *at AFM*. As the log indicates, Ms. Polach was not a recipient of that email." (JS at 20 n.14 (emphasis added)). The log also indicates, however, that Mr. Hair's email to AFM's counsel, titled "FW: Data Purchase and Service Agreement -- AFM & SAG-AFTRA Fund," was described as an email "forwarding legal advice from outside counsel (P. Polach) regarding draft services agreement; attaches draft services agreement prepared by outside counsel." (McConnell Decl. Ex. 1). Indeed, entry number 5 on the log, also titled "Data Purchase and Service Agreement -- AFM & SAG-Aftra Fund," was sent on the same date *by Ms. Polach to Mr. Hair*, and was described as an email "from outside counsel containing legal advice regarding preparation of services agreement; attaches draft of services agreement prepared by outside counsel." (McConnell Decl. Ex. 1). Based on the foregoing, Mr. Hair, a Fund Trustee who is also affiliated with AFM, apparently shared Ms. Polach's legal advice and draft services agreement with counsel for AFM. As the Court has determined that the common interest doctrine does not apply, Mr. Hair's action waived the attorney-client privilege with respect to that communication.

---

[3] Rule 3-310(C) of the California Rules of Professional Conduct "require informed written consent when concurrent clients have actual or potential conflicts of interest." (JS at 12). The District of Columbia Rules of Professional Conduct provide that a conflict waiver need not be in writing. (Id. at 18-19 (citing D.C. Rule of Professional Conduct 1.7(a), (c)).

**No later than July 17, 2020**, defendants shall produce the forwarding email identified as entry number 2 on the privilege log, from Mr. Hair to Ms. Garner, and described as "Email forwarding legal advice from outside counsel (P. Polach) regarding draft services agreement; attaches draft services agreement prepared by outside counsel." To be clear, the forwarding email from Mr. Hair, as well as the forwarded email from Ms. Polach and its attachment, all must be produced. In all other respects, plaintiff's Motion (ECF No. 54) is **denied**.

IT IS SO ORDERED.


cc:     Counsel of Record




Initials of Deputy Clerk ___ch___