JENNER & BLOCK LLP
Andrew J. Thomas (Cal. Bar No. 159533)
ajthomas@jenner.com
Andrew G. Sullivan (Cal. Bar No. 301122)
agsullivan@jenner.com
633 West 5th Street, Suite 3600
Los Angeles, CA 90071
Telephone: (213) 239-5100
Facsimile:  (213) 239-5199

*Attorneys for All Defendants*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEVIN RISTO, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>SCREEN ACTORS GUILD-AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS, a Delaware corporation; AMERICAN FEDERATION OF MUSICIANS OF THE UNITED STATES AND CANADA, a California nonprofit corporation; RAYMOND M. HAIR, JR., an individual, as Trustee of the AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund; TINO GAGLIARDI, an individual, as Trustee of the AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund; DUNCAN CRABTREE-IRELAND, an individual, as Trustee of the AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund; STEFANIE TAUB, | Case No. 2:18-cv-07241-CAS-PLA<br><br>Class Action<br><br>**DECLARATION OF STEFANIE TAUB IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>Date:   September 14, 2020<br>Time:   10:00 a.m.<br>Dept.:   8D<br>Judge:  Hon. Christina A. Snyder |

DECLARATION OF STEFANIE TAUB

| | |
|---|---|
| 1 | an individual, as Trustee of the AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund; JON JOYCE, an individual, as Trustee of the AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund; BRUCE BOUTON, an individual, as Trustee of the AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund; and DOE RESPONDING PARTY 1-10, |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | Responding Party. |

# DECLARATION OF STEFANIE TAUB

I, Stefanie Taub, declare as follows:

1. Since April 15, 2018, I have served as Chief Executive Officer of the AFM & SAG-AFTRA Intellectual Property Rights Fund ("the Fund"). Prior to that, I served as a Trustee of the Fund for approximately six years. I am also a Defendant in this action. I submit this declaration in support of the Defendants' opposition to the Motion for Class Certification filed by Plaintiff Kevin Risto in this action. If called to testify, I could and would testify as to the following facts based on my personal knowledge and based on information compiled by Fund staff at my direction.

2. The Copyright Act establishes a statutory license that allows certain digital music services (e.g., Sirius XM Satellite Radio), webcasts, and internet radio, to play copyrighted sound recordings so long as those services comply with the rates and terms of the statutory license. As part of this statutory scheme, the Fund is tasked with receiving from SoundExchange (a royalty collection organization) a portion of the royalties from music services that use the statutory license and distributing those royalties to non-featured performers who contributed to the recordings performed by those services.

3. Each annual influx of royalties received by the Fund from SoundExchange inaugurates a new "distribution cycle" in which the Fund determines how many of the tens of thousands of eligible recordings it will research and attempt to pay royalties on. In the past few distribution cycles, the songs in connection with which the Fund has distributed royalties ("Covered Recordings") have numbered from around 14,000 to 16,000 individual songs per cycle.

4. The Fund distributes royalties in connection with this substantial, but limited, number of Covered Recordings to ensure that it focuses its research efforts on recordings for which significant royalties are due to non-featured performers, rather than devoting time and energy to researching recordings that were scarcely

played on SiriusXM, for example, and thus have generated only a few pennies or dollars in statutory royalties.

5. After the scope of Covered Recordings is determined in connection with a distribution cycle, the Fund attempts to distribute royalty payments to the non-featured performers who appear on the Covered Recordings. The Fund's research department looks at multiple sources to identify and locate the correct non-featured performer(s) who performed on Covered Recordings, chief among them the information provided by the AFM and SAG-AFTRA (the "Unions") pursuant to the Data Purchase and Services Agreement (the "Agreement") entered into by the Fund and the Unions on July 22, 2013.

6. Pursuant to the Agreement, the Unions provide the Fund with access to session reports (also referred to by the AFM as B-Forms) and other information necessary to identify and contact royalty recipients. These session reports are originally submitted by the producers of Covered Recordings following the relevant recording session, and are designed to list all non-featured performers (both Union members and non-members) who appear on the Covered Recordings.

7. The Data Purchase and Service Agreement, and the Service Fee paid to the Unions pursuant to the Agreement, has been disclosed in the Fund's Consolidated Financial Statements ("Annual Reports") for each year following implementation of the Service Fee.

8. To obtain session reports for Covered Recordings, Fund researchers make individual email inquiries to the Unions' local chapters, where the staff locate the requested records (which in some instances are still maintained by the locals in hard copy form) and transmit them to the Fund researchers. In addition, the Unions provide the Fund with identifying information from their member databases (e.g., Social Security numbers, addresses) for non-featured performers who appear on Covered Recordings. This data includes identifying information both for current

Union members as well as for non-members (e.g., former members, performers who have worked on Covered Recordings but have not joined, deceased performers, etc.).

9. When a performer who appears on a Covered Recording is located, the Fund's Research Department contacts the individual to confirm his or her participation on the given recording. Once the Fund confirms it has identified the correct individual, the performer completes a Participant Information Form to receive royalties. Another department within the Fund, Participant Services, then reviews and processes the performer's submitted information, verifies its accuracy, and ensures that a check is issued (or that a direct deposit is made). In each distribution cycle since the implementation of the Services Agreement, the checks and direct deposits that have been paid to participants have been subject to the 3% fee paid to the Unions pursuant to the Agreement.

10. The Fund is not able to locate all non-featured performers who performed on Covered Recordings. Often, session reports for Covered Recordings will list the full name of a non-featured performer on the track, but will lack additional identifying information (e.g., address, contact information) necessary to locate the performer. In other cases, the session report will list only a partial name or an apparent pseudonym of a non-featured performer, or a business entity associated with a non-featured performer. When the Fund is able to obtain partial identifying information for non-featured performers on Covered Recordings, the Fund's researchers use resources such as LexisNexis, as well as social media (e.g., Facebook, Twitter, LinkedIn, SoundCloud), the online White Pages, and the internet more generally to locate non-featured performers. Researchers also may consult the networks of Fund employees who have extensive contacts within the music industry.

11. In some instances, the Fund is unable to locate any session report for a Covered Recording, or else a session report can be located but doesn't list any non-featured performers, despite the fact that instruments or background vocalists are audible on the track. When no identifying information can be found from session

reports (and even when some information can be found), the Fund's researchers check numerous online music credits resources to find and/or verify sound recording credits, checking several sources if available.

12. If the Fund is unable to locate a performer after research is conducted, the information about the performer that is known by the Fund is entered into an Unclaimed Royalties list that is published on the Fund's website. When a performer's full name is not available, entries on the Unclaimed Royalties list include partial names, pseudonyms, and/or associated business entities.

13. The Fund engages in extensive outreach efforts to promote awareness among non-featured performers of the existence of the Unclaimed Royalties list, including but not limited to social media campaigns, advertising in trade publications, formal presentations and presence at industry events, and collaborations with other professional organizations. Fund staff routinely monitor the Unclaimed Royalties list and attempt to track down performers on the list.

14. In each distribution cycle, the Fund allocates royalties to non-featured performers whom the Fund has identified as having appeared on Covered Recordings, but whom the Fund has so far been unable to locate ("Unclaimed Royalties"). Unclaimed Royalties are allocated to any non-featured performer who is known by the Fund to have appeared on a Covered Recording, regardless of whether the Fund has any identifying information for the non-featured performer.

15. Beginning in 2018, the Fund began setting aside 1.5% of its royalty distributions for payment of any additional claimants not represented on the Unclaimed Royalties list who may have appeared on Covered Recordings, but about whom the Fund was not aware when allocating royalties during the relevant distribution cycle ("Unidentified Claimants"). To date, $1,791,905 has been allocated for the payment of Unidentified Claimants, which is separate from the pool of funds set aside to satisfy requests for Unclaimed Royalties.

16. When an Unidentified Claimant or a non-featured performer eligible for Unclaimed Royalties is located, either through self-identification or through the Fund's ongoing research efforts, such performer undergoes the Fund's previously-explained participant intake process. Following calculation of the balance of the royalties due to the performer from previous cycles, the performer is paid by the Fund either via check or direct deposit. Since 2014, the Fund has processed requests for Unclaimed Royalties from a total of 13,897 non-featured performers who were once on the Unclaimed Royalties list.

17. The Fund deducts the Service Fee from the funds in the Unclaimed Royalty pool at the point when the funds are allocated to the pool, rather than at the point the funds are paid out from the pool. Likewise, the pool of funds allocated for the payment of Unidentified Claimants is subject to Service Fee deductions at the point these funds are set aside in this pool, rather than the point at which funds are distributed from the pool.

18. The current total number of entries on the Unclaimed Royalties list is 27,024. This is not a precise count of the individuals represented in the Unclaimed Royalty list. The figure is inexact because separate entries in the list may refer to the same performer. Where, for example, the entry consists of only a business entity name, or the instrument performed on a Covered Recording (e.g., "Bass 1"), it may be the case that multiple entries refer to the same individual. Additionally, entries referring to individuals with the same name (e.g., "John Jones") are itemized as separate entries in the list until there is sufficient information to tie those entries together to the same individual.

19. As described in Paragraph 14 above, the Fund maintains a pool of Funds to satisfy future claims for Unclaimed Royalties. In Figure A below, the column labeled "Unclaimed Performer Allocations" lists the number of non-featured performers to whom Unclaimed Royalties were allocated by the Fund in each year from 2011 to 2018, but whose royalties remain undistributed as of the time of this

filing. The column in Figure A labeled "Current Remaining Unclaimed Royalties" lists the corresponding amounts of royalties currently held by the Fund in order satisfy these Unclaimed Performer Allocations from each of the relevant years.[1]

**Figure A**

|  | Unclaimed Performer Allocations | Current Remaining Unclaimed Royalties |
|---|---|---|
| 2011 | 8,932 | $2,504,484.80 |
| 2012 | 8,582 | $3,322,507.13 |
| 2013 | 8,268 | $6,973,739.49 |
| 2014 | 8,471 | $8,765,147.21 |
| 2015 | 10,324 | $9,410,874.28 |
| 2016 | 17,297 | $7,886,950.63 |
| 2017 | 15,901 | $7,656,072.46 |
| 2018 | 15,065 | $7,293,569.00 |

20. Recent amendments to the Fund's Distribution Guidelines render all but certain that most performers currently on the Unclaimed Royalties list will not ultimately receive royalty distributions from the Fund. Pursuant to a March 2019 amendment to the Fund's Distribution Guidelines, funds that are allocated for the payment of Unclaimed Royalties will not remain indefinitely in this pool moving forward. Rather, any funds that remain in the Unclaimed Royalties pool six years after receipt are to be distributed on a pro rata basis to the non-featured performers that the Fund has previously paid successfully.

---

[1] In his motion, Plaintiff states that the Fund has identified 61,298 non-featured performers on the Unclaimed Royalties list. This number corresponds with the number of remaining Unclaimed Performer Allocations from the years from 2011-2016 as of November 30, 2019. This number is higher than the total number of entries currently on the Unclaimed Royalties list (27,024) because many performers on the Fund's Unclaimed Royalties list have been allocated Unclaimed Performer Allocations in multiple annual distribution cycles, and accordingly the total count of Unclaimed Performer Allocations across years is higher than the number of entries on the Unclaimed Royalties list.

21. The Fund has focused extensive efforts on identifying the non-featured performers referred to in the Unclaimed Royalties list, and is hopeful that an increasing portion of Unclaimed Royalties will be successfully paid in coming years. However, based on the current rate at which non-featured performers are being identified from the Unclaimed Royalties list, it is likely that after the six-year period is complete, most of these funds will be distributed to non-featured performers to whom the Fund has already located and successfully paid royalty distributions.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 3rd day of August, 2020.

_____
Stefanie Taub