JENNER & BLOCK LLP
Andrew J. Thomas (Cal. Bar No. 159533)
ajthomas@jenner.com
Alexander M. Smith (Cal. Bar No. 295187)
asmith@jenner.com
Andrew G. Sullivan (Cal. Bar No. 301122)
agsullivan@jenner.com
Anna K. Lyons (Cal Bar No. 324090)
alyons@jenner.com
633 West 5th Street, Suite 3600
Los Angeles, CA 90071
Telephone: (213) 239-5100
Facsimile:  (213) 239-5199

*Attorneys for All Defendants*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEVIN RISTO, on behalf of himself and all others similarly situated, <br><br> Plaintiff, <br><br> vs. <br><br> SCREEN ACTORS GUILD-AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS, a Delaware corporation, et al., <br><br> Defendants. | Case No. 2:18-cv-07241-CAS-PLA <br><br> Class Action <br><br> **DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES** <br><br> Hearing Date:    June 14, 2021 <br> Hearing Time :   10:00 a.m. <br> Courtroom:       8D (Telephonic) <br><br> [Separate Statement of Undisputed Facts and Declarations of Andrew G. Sullivan, Stefanie Taub, Duncan Crabtree-Ireland, Ray Hair, and Julie Sandell with Exhibits 1-43, filed concurrently] |

TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on Monday, June 14, 2021, at 10:00 a.m., or as soon thereafter as the Court is available, Defendants AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund, Screen Actors Guild-American Federation of Television and Radio Artists, American Federation of Musicians of the United States and Canada, Raymond M. Hair, Jr., Tino Gagliardi, Duncan Crabtree-Ireland, Stefanie Taub, Jon Joyce, and Bruce Bouton ("Defendants") will appear telephonically before the Honorable Christina A. Snyder in Courtroom 8D of the federal courthouse located at 350 West 1st Street, Los Angeles, CA 90012, where they will, and hereby do, move for summary judgment pursuant to Federal Rule of Civil Procedure 56, or, in the alternative, for partial summary judgment with respect to Plaintiff Kevin Risto's causes of action for breach of fiduciary duty, conversion, money had and received, and declaratory relief, as well as his prayer for punitive damages.

This motion is made following the conference of counsel pursuant to Local Rule 7-3, which took place on April 14, 2021.

Defendants' motion is based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, Defendants' Separate Statement of Undisputed Facts, the Declarations of Andrew G. Sullivan, Stefanie Taub, Duncan Crabtree-Ireland, Ray Hair, and Julie Sandell and all exhibits thereto, any additional briefing on this motion (including Defendants' reply brief), and any evidence or arguments that Defendants may present to the Court at the hearing on this matter or otherwise.

Dated:  April 23, 2021              JENNER & BLOCK LLP


                                    /s/ Andrew J. Thomas
                                    Andrew J. Thomas
                                    *Attorneys for All Defendants*

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS & AUTHORITIES

# **TABLE OF CONTENTS**

I.    INTRODUCTION ..................................................................................1

II.   LEGAL AND FACTUAL BACKGROUND ..............................................2

      A.    The Statutory and Regulatory Framework.........................................2

      B.    The Trust Agreement .......................................................................3

      C.    The Data Purchase and Services Agreement .....................................4

      D.    Data and Services Provided by the Unions.......................................5

III.  ARGUMENT ......................................................................................7

      A.    The Trustees' Approval of the Service Fee Was Entirely
            Reasonable ....................................................................................8

      B.    Plaintiff's Attacks on the Service Fee Are Factually Baseless..........11

            1.    Plaintiff's "No Value" Claim Is Objectively False .................11

            2.    The Union Data Benefits All Fund Participants.....................12

            3.    The Unions Owe No Duty to Provide Their Data for Free .....13

      C.    Federal Law Does Not Limit the Amount of the Service Fee
            to the Incremental Costs Incurred by the Unions in Providing Data.14

      D.    The Process Whereby the Trustees Approved the Service Fee
            Did Not Constitute a Breach of Fiduciary Duty ..............................16

      E.    Plaintiff's Secondary Claims Also Fail As A Matter Of Law...........19

      F.    Plaintiff's Request For Punitive Damages Should Be Stricken ........24

IV.   CONCLUSION .................................................................................25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Allen v. City of Beverly Hills*,
    911 F.2d 367 (9th Cir. 1990).........................................................................20

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ....................................................................................8

*Andrews v. Sirius XM Radio Inc.*,
    932 F.3d 1253 (9th Cir. 2019).....................................................................22

*Armenian Assembly of Am., Inc. v. Cafesijian*,
    772 F. Supp. 2d 20 (D.D.C. 2011) ..............................................................19

*Baumgardner v. Town of Ruston*,
    712 F. Supp. 2d 1180 (W.D. Wash. 2010) ...................................................23

*Bourget v. Allstate Ins. Co.*,
    2007 WL 9705900 (C.D. Cal. Jan. 4, 2007)..................................................24

*Byers v. Intuit, Inc.*,
    564 F. Supp. 2d 385 (E.D. Pa. 2008)............................................................16

*Doyle v. City of Medford*,
    606 F.3d 667 (9th Cir. 2010) .......................................................................21

*In re Estate of Janes*,
    681 N.E.2d 332 (1997) .................................................................................8

*Evanston Ins. Co. v. OEA, Inc.*,
    566 F.3d 915 (9th Cir. 2009) .........................................................................8

*In re First Alliance Mortg. Co.*,
    471 F.3d 977 (9th Cir. 2006) .......................................................................24

*Haley v. Cohen & Steers Cap. Mgmt., Inc.*,
    871 F. Supp. 2d 944 (N.D. Cal. 2012) ....................................................24, 25

*Jacobson v. Hannifin*,
    627 F.2d 177 (9th Cir. 1980) .......................................................................23

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS & AUTHORITIES

*Lee v. Hanley*,
  61 Cal. 4th 1225 (2015).........................................................................20

*Mains v. City Title Ins. Co.*,
  34 Cal. 2d 580 (1949)...........................................................................20

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) ...............................................................................8

*Nuwintore v. Mgmt. & Training Corp.*,
  2018 WL 3491676 (E.D. Cal. July 19, 2018) ....................................25

*Procentury Ins. Co. v. Slobodan Cuk*,
  2014 WL 11474652 (C.D. Cal. Apr. 29, 2014)...................................25

*Royal Park Invs. SA/NV v. HSBC Bank USA, Nat. Ass'n*,
  109 F. Supp. 3d 587 (S.D.N.Y. 2015) .........................................17, 18

*Shaterian v. Wells Fargo Bank, N.A.*,
  829 F. Supp. 2d 873 (N.D. Cal. 2011) ................................................20

*Smartmetric, Inc. v. Mastercard Int'l, Inc.*,
  2013 WL 12108250 (C.D. Cal. Oct. 2, 2013) ....................................18

*In re Software Toolworks Inc.*,
  50 F.3d 615 (9th Cir. 1994) ...................................................................8

*Stephens v. Nat'l Distillers & Chem. Corp.*,
  1996 WL 271789 (S.D.N.Y. May 21, 1996).......................................11

*Thomas v. Network Solutions Inc.*,
  176 F.3d 500 (D.C. Cir. 1999) .............................................................16

*Tovar v. Sessions*,
  882 F.3d 895 (9th Cir. 2018)..........................................................15, 22

*Town of Castle Rock v. Gonzales*,
  545 U.S. 748 (2005) .............................................................................23

*In re Walt Disney Co. Derivative Litig.*,
  907 A.2d 693 (Del. Ch. 2005)..............................................................18

*In re Wellington Trusts*,
  85 N.Y.S.3d 497 (2018) ..........................................................................8

## Statutes

17 U.S.C. § 114................................................................*passim*

17 U.S.C. § 115.................................................................7

26 U.S.C. § 501................................................................16

31 U.S.C. § 101................................................................16

2018 Music Modernization Act.............................................7, 13

Cal. Civ. Code § 3294(a) ..................................................24, 25

Copyright Act .............................................................*passim*

Independent Offices Appropriation Act, 31 U.S.C. § 9701 ...................15

N.Y. Bus. Corp. Law § 717(a)..............................................11

## Court Rules

Fed. R. Civ. P. 56(a) .........................................................7

Fed. R. Evid. 201 .............................................................15

## Other Authorities

IRS, *Types of Organizations Exempt under Section 501(c)(6)*, available at
https://www.irs.gov/charities-non-profits/other-non-profits/types-of-
organizations-exempt-under-section-501c6 .................................16

Restatement (Third) of Trusts § 77(1)–(2) (2007) .................8, 9, 17, 18

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS & AUTHORITIES

# I.   **INTRODUCTION**

The AFM & SAG-AFTRA Intellectual Property Rights Distribution Fund (the "Fund") is a trust established to collect, allocate, and distribute royalties to session musicians and background vocalists (together, "non-featured performers") who contributed to sound recordings played by certain digital music services.  In 2013, the Fund entered into a Data Purchase and Services Agreement (the "Data Agreement") with the American Federation of Musicians ("AFM") and the Screen Actors Guild-American Federation of Television and Radio Artists ("SAG-AFTRA") (together, the "Unions").  The Data Agreement requires the Fund to pay an annual fee (the "Service Fee") to compensate the Unions for providing critical information the Fund uses to locate and pay royalties to non-featured performers.

It is beyond dispute that the Fund acted within its authority when it executed the Data Agreement.  The Copyright Act expressly empowers royalty distribution entities, like the Fund, to incur "reasonable costs" associated with distributing statutory royalties and to deduct such costs from the funds disbursed.  17 U.S.C. § 114(g)(3).  Moreover, the Fund's Declaration of Trust expressly authorizes the Fund to incur necessary administrative expenses, and it specifically permits it to purchase from the Unions "any data helpful for the identification and location of artists eligible for remuneration."

It is also beyond genuine dispute that the information the Unions provide pursuant to the Data Agreement—including "session reports" that document which non-featured musicians or vocalists performed on a particular recording—is essential for the Fund to locate and pay royalties to non-featured performers.  This data continues to have value long after the time the Unions provide it to the Fund, as a particular recording may generate substantial royalties from services like Sirius XM radio for many years.  The Unions have collected and maintained this data at great effort and expense over decades of time.  As a practical matter, the information is simply not available from any other source.

Plaintiff cannot point to any facts that would suggest that the data provided by the Unions is unnecessary, has no value, or could be obtained elsewhere at a lower price.  Rather, he asserts that the Trustees breached their fiduciary duties by agreeing to pay *anything at all* to the Unions.  This claim rests on the false premise that—by virtue of their respective Union affiliations—the Trustees' decision to pay anything in exchange for essential information and services provided by the Unions was based on a conflict of interest and therefore constitutes fiduciary breach.

But there is zero evidence the Trustees acted based on a conflict of interest or personally benefited from the Service Fee.  The reality is that it was in the Fund's long-term best interest to secure access to a mission-critical source of information so it could distribute more royalties more accurately to Fund participants.  Relying on alternative, less reliable, sources of information likely would have resulted in the misallocation of millions of dollars in royalties to the wrong performers.

Nor has Plaintiff mustered any evidence that would establish that the Trustees' purportedly conflicted decision-making resulted in a Service Fee determination that was unreasonable.  To the contrary, the undisputed evidence shows that the Trustees—all of whom were fully aware of the importance of the data in the Union session reports, based on their long careers in the music business or the entertainment industry— acted reasonably, within their authority, and in the interest of Fund participants when they entered into the Data Agreement and agreed to pay the Service Fee.

Plaintiff's claims ignore the plain language of the Copyright Act, have no basis in fact, and fail as a matter of law.  Defendants respectfully request that this Court refrain from second-guessing the considered judgment of the Fund's experienced Trustees and grant summary judgment in Defendants' favor.

## II.   LEGAL AND FACTUAL BACKGROUND

### A.   The Statutory and Regulatory Framework

In 1995, Congress created a statutory license for certain services, such as

satellite radio, webcasters, and cable TV music channels, to broadcast certain sound recordings owned by copyright holders in exchange for a payment of royalties.  *See generally* 17 U.S.C. § 114.  The royalty collection organization SoundExchange is charged with collecting royalties due under the statutory license, distributing 50% of the receipts to the copyright owner and distributing another 45% to the featured recording artists.  *Id.* § 114(g)(2).  The remaining 5% is allocated to the non-featured artists, to be split equally between session musicians and background vocalists.  *Id.* Each 2.5% share is to be placed in "an escrow account managed by an independent administrator" appointed by the copyright owners and the relevant union.  *Id.*

The statute expressly designates AFM with overseeing the independent administrator's royalty distribution with respect to non-featured musicians, and SAG-AFTRA with respect to non-featured vocalists.  *Id.*  The Fund has been designated as the "independent administrator" to receive from SoundExchange and distribute to the non-featured performers their respective share of the royalties.  SUF 2.  While the Copyright Act requires the Fund to distribute royalties to both union and non-union performers alike, it otherwise places no limits on the Fund's operations.  SUF 3.  It also authorizes the Fund to "deduct from any of its receipts, prior to the distribution of such receipts to any person or entity entitled thereto … [its] reasonable costs."  SUF 4.

**B.    The Trust Agreement**

In 1998, the Unions and the Trustees executed the Agreement and Declaration of Trust that formed the Fund.  SUF 1; *see* Ex. 4 at Ex. 111.  The Declaration of Trust was amended and restated as of July 26, 2012.  SUF 5; *see* Ex. 3 at Ex. 1 ("Trust Agreement").  As explained in the Trust Agreement, the purpose of the Fund is to receive and distribute "royalties and remuneration" to eligible artists, including by receiving and distributing funds collected by SoundExchange for the non-featured performers under the statutory license.  SUF 6.

The Trust Agreement vests the Trustees with broad discretion regarding the

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS & AUTHORITIES

distribution of royalty receipts collected by the Fund.  For example, it provides that
"[t]he Trustees shall have power to construe the provisions of this Agreement and
Declaration of Trust and the terms used herein, and any construction adopted by the
Trustees in good faith shall be binding upon the AFM, SAG-AFTRA, and artists
claiming benefits under the Fund."  SUF 14.  Similarly, the Trustees are empowered
"[t]o do all acts … which the Trustees may deem necessary to accomplish the
general objective of distributing remuneration to eligible artists in the most efficient
and economical manner."  SUF 15.   Of particular relevance, the Trust Agreement
specifically empowers the Trustees "[t]o purchase or obtain from the AFM [and/or]
SAG-AFTRA ... any data helpful for the identification and location of artists
eligible for remuneration or the identification of recorded or other performances
covered by an agreement for the receipt and distribution of remuneration."  SUF
18; *see* Ex. 4 at Ex. 111, § 3(O); Ex. 3 at Ex. 1, Art. IV, § 3(O).

## C.   **The Data Purchase and Services Agreement**

Since the Fund's inception, the Unions have provided information and other
services necessary to identify and compensate the non-featured performers entitled
to royalties.  For the first 15 years of the Fund's operation, the Unions provided this
information and these services at no charge.  SUF 44.  During this time, the amount
of royalties flowing through the Fund was so small that the Fund effectively
operated on a shoe-string.  It started with an uncompensated Administrator and one
full-time employee, was housed in cubicles set up in the break room of another
organization called the Film Musicians Secondary Markets Fund, and, in the words
of its Administrator at the time, operated with "a used fax machine, a taped-together
computer, and a crude database."  SUF 29-31.

As the use of digital streaming services such as Sirius XM Satellite Radio
and Pandora became more widespread, the number of digital performances—and
the amount of royalties to be distributed by the Fund—also increased substantially.
SUF 34.  Between 2010 and 2013, the Fund took a number of steps to become a

mature, free-standing organization: it acquired separate office space, eventually purchasing an office building of its own; increased the number of staff; established an independent database of non-featured performers; and caused its Executive Director to give up his duties as the administrator of the Secondary Markets Fund and become a full-time employee of the Fund. SUF 37-39.[1]

Based on the growth of digital streaming—and the corresponding increase in royalties to be distributed by the Fund—the Trustees concluded that it was no longer sensible for the information and administrative services to be provided *gratis* by the Unions. Consequently, on July 22, 2013, the Trustees entered into the Data Agreement with the Unions. SUF 76. Pursuant to this Agreement, the Unions agreed to provide the Fund with information from their member databases, as well as access to session reports, all of which enabled the Fund to accurately identify and contact both Union members and non-members entitled to receive royalties. SUF 77. In exchange for this information and other specified services, the Agreement provides that the Unions are each to receive an annual fee equal to 1.5% of the royalty receipts allocated for distribution by the Fund to non-featured artists each year. SUF 78.

**D.    Data and Services Provided by the Unions**

The Data Agreement requires the Unions to continue providing the Fund with information—which they compiled over several decades and continue to collect—regarding the non-featured performers to whom royalty payments have been

---

[1] In 2013, Dennis Dreith (who moon-lighted as the Fund's Administrator for over a decade while he ran the Secondary Markets Fund) requested increased compensation—even though he had "received no compensation whatsoever"—because "the duties of the … Fund have been escalating significantly between increased collections, [and] distribution responsibilities." SUF 35. He further testified that, even though he "donated" his time and services during his first years at the Fund, he did not believe that by doing so he was binding himself to work for free indefinitely. SUF 36. Mr. Dreith resigned from the Fund in 2017, helped to instigate this lawsuit in 2018, and now serves as a "consultant" to Plaintiff's class action counsel. SUF 40-42.

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS & AUTHORITIES

allocated in a given distribution cycle. SUF 48. This information is derived from session reports (also referred to as "B-forms") which contain information regarding the non-featured musicians and vocalists who performed on a given sound recording—including both Union and non-Union members. [2] SUF 49-50.

This valuable data is essential to the Fund's administration. There is no other source of information documenting the identities, work histories, and payment information associated with non-featured performers that is nearly as exhaustive as the repositories maintained by the Unions. SUF 51. Without this data, the Fund would be significantly constrained in its ability to perform its central task of identifying and locating the non-featured performer(s) to whom royalties are to be distributed—and, at a minimum, would need to expend significant resources to collect the information the Unions already compile. SUF 54.

In addition, Union representatives expend considerable effort supplying the data the Unions are obligated to provide under the Agreement. This data is housed across the various local affiliates of each Union, for the most part based on where the relevant recording session took place. SUF 59. Much of this information exists in records that are maintained by the local affiliates only in hard copy form. SUF 59. Because the records maintained by the Unions exist in decentralized repositories dispersed across the Unions' various locations, the Unions satisfy their obligations under the Agreement by making numerous representatives available across these locations in order to field requests from the Fund. SUF 60. [3] Between

[2] "B-form" is the AFM nomenclature for what SAG-AFTRA refers to as a "session report." These documents function essentially as contractual instruments, identifying which session musicians or vocalists performed on which tracks, reflecting how much they should be paid under the relevant Collective Bargaining Agreement (regardless of whether they were Union members or not), and including address and Social Security number information for each performer. SUF 49-51.

[3] The Fund's research team—currently staffed with ten full-time employees—works extensively with representatives in various Union locations on a year-round basis to obtain information regarding the non-featured performers associated with thousands of song titles. SUF 61. At local affiliates where such records exist in hard copy

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS & AUTHORITIES

2013 and the present, the number of requests from the Fund to the Unions, and the corresponding level of effort required to respond by investigating and providing session reports, has indisputably increased.  SUF 65, 93.

The Data Agreement also requires the Unions to provide other valuable services to the Fund.   Those services include legislative advocacy—both domestically and internationally—that benefits non-featured performers, whether or not they are Union members.  SUF 66, 68, 70.[4]  The Unions also meet with and negotiate with foreign performing rights organizations ("PROs") to secure better terms for the collection and distribution of international royalties.  SUF 67, 70.

### III.   ARGUMENT

A party is entitled to summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In resolving a motion for summary judgment, the Court must determine "whether . . . there are any genuine factual issues that can properly be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  To defeat summary judgment, Plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Instead, he must demonstrate that

form, Union representatives must locate the requested document within their hard copy filing system before scanning and sending a digital copy to the requestor at the Fund.  SUF 62.  It is not uncommon for a Union representative at one local affiliate to field dozens of requests from the Fund in any given week.  SUF 63.

[4] Some of these legislative changes directly and exclusively benefit Fund participants, such as the "escheat preemption" provision of the 2018 Music Modernization Act (MMA), which enables the Fund to distribute royalties due to performers from prior years without having to negotiate the intricacies of 50 different states' escheat laws, and the MMA's inclusion of pre-1972 sound recordings in the recordings subject to the statutory license that generates royalties the Fund receives from SoundExchange.  SUF 72-73.

the evidence would permit a reasonable jury to enter judgment in his favor. *Anderson*, 477 U.S. at 248. Here, because there can be no genuine dispute that the implementation of the Service Fee was both lawful and reasonable, this Court should enter summary judgment in Defendants' favor.[5]

## A.   The Trustees' Approval of the Service Fee Was Entirely Reasonable.

The Trustees' implementation of the Service Fee was entirely proper—under general trusteeship principles, under the statutory scheme that gave rise to the Fund, and pursuant to the Fund's governing documents. The Fund's Trustees have a "duty to administer the trust as a prudent person would, in light of the purposes, terms, and other circumstances of the trust," and this duty "requires the exercise of reasonable care, skill, and caution." *See* Restatement (Third) of Trusts ("Restatement") § 77(1)–(2) (2007); *In re Wellington Trusts*, 85 N.Y.S.3d 497, 501 (2018) (noting that a trustee has a duty to act with "reasonable care, skill and caution").[6] The Trustees also have a duty "to administer the trust, diligently and in good faith, in accordance with the terms of the trust and applicable law." Restatement § 76; *In re Estate of Janes*, 681 N.E.2d 332, 336 (N.Y. 1997) (noting that a "trustee is bound to employ such diligence and such prudence in the care and management [of the trust], as in general, prudent men of discretion and intelligence in such matters, employ in their own like affairs"). And it is well-settled that "[a] trustee can properly incur and pay expenses that are reasonable in amount and appropriate to the purposes and circumstances of the trust," where such expenses

---

[5] It is well-settled that the Court may resolve questions related to the reasonableness of the Service Fee on a motion for summary judgment. *See, e.g.*, *Evanston Ins. Co. v. OEA, Inc.*, 566 F.3d 915, 920 (9th Cir. 2009) (holding courts may properly determine reasonableness as a question of law at summary judgment); *see also In re Software Toolworks Inc.*, 50 F.3d 615, 621-22 (9th Cir. 1994).

[6] The Fund's Agreement and Declaration of Trust is governed by New York law. Ex. 4 at Ex. 111, Art. XII, § 1; Ex. 3 at Ex. 1, Art. XII, § 1.

are incurred "in accordance with *the terms of the trust* and *applicable law*." Restatement §§ 76, 88 (emphasis added).

Here, the statutory scheme that gave rise to the Fund allows nonprofit entities in charge of distributing royalties to "deduct from any of its receipts, prior to the distribution of such receipts to any person or entity entitled thereto . . . the reasonable costs" incurred in distributing those royalties. 17 U.S.C. § 114(g)(3). The Service Fee likewise was expressly authorized by the Fund's governing Trust Agreement, which empowers the Trustees to "purchase or obtain from the AFM [and/or] SAG-AFTRA . . . any data helpful for the identification and location of artists eligible for remuneration . . . ." SUF 18. That language—which has appeared in the Trust Agreement since the Fund's inception—expressly authorizes the Fund to implement the precise fee Plaintiff challenges here. *See* Restatement §§ 76, 88 (2007) ("A trustee can properly incur and pay expenses that are reasonable in amount and appropriate to the purposes and circumstances of the trust" where such expenses are incurred "in accordance with *the terms of the trust* and *applicable law*.") (emphasis added).

The Data Agreement and its Service Fee were the result of numerous discussions among the Trustees, the Fund's Executive Administrator (Dennis Dreith), and the Fund's legal counsel. SUF 79.[7] All of the current defendants who were Trustees at the time —including Duncan Crabtree-Ireland, Ray Hair, Stefanie Taub, Bruce Bouton, and Jon Joyce—concluded that the amount of the Fee was reasonable based on the value of the information and services the Unions provided to the Fund, which could not be obtained from any other source. SUF 92, 94-98, 100-103, 105-106, 108-109. In succeeding years, the Trustees continued to reasonably believe, based on their experience and familiarity with the data provided

---

[7] Mr. Dreith testified that the Fund's outside legal counsel confirmed to the Trustees that the Data Agreement was authorized by the Declaration of Trust and therefore was legally permissible. SUF 89.

by the Unions, that the 3% Service Fee was reasonable and justifiable.  SUF 93, 99, 104. 107, 110, 111.

The Trustees and Mr. Dreith, the Fund's Executive Director, carefully considered whether the 3% fee would cause the Fund's overall expense ratio to increase to a level that was out of step with administrative fees charged by similar royalty distribution organizations (which in some cases charge fees in excess of 25%), and thus might inhibit the Fund's ability to enter into bilateral agreements with such organizations.  SUF 84-85.  They concluded that the 3% fee did not pose that risk.  SUF 84-85.  The Trustees also considered whether to conduct a study of the time and effort expended by Union personnel in providing information to the Fund, but decided that such an analysis would be inappropriate, needlessly cumbersome, and unduly costly.  SUF _.

The fee was proposed to the Trustees during a Board meeting and discussed for at least 20 minutes prior to the Board's unanimous vote to implement it.  SUF 83.  Mr. Dreith, the Executive Director of the Fund and a man with decades of experience in the music industry—who had essentially set up the Fund, invented its procedures and guidelines, and run it day-to-day since 1998— spoke in favor of a 3% fee, opining that it would not impede the Fund's ability to reach bilateral agreements with other performing rights organizations.  SUF 84.  The Fund's Trustees all were well aware of the value of the data provided by the Unions pursuant to the Data Agreement and the essential role this data plays in allowing the Fund to achieve its goal of efficiently and accurately allocating royalties.  SUF 92, 94-98, 100-103, 105-106, 108-109.

No one at the Board meeting where the Service Fee was approved, including Mr. Dreith, raised concerns about the legality, propriety, or reasonableness of implementing the Service Fee.  SUF 86.  Mr. Dreith repeatedly expressed in contemporaneous emails that he "fully supported" the concept of a service fee, at one point describing it as "a completely justifiable expense."  SUF 75, 80, 90; 120.

At the June 2013 board meeting, Mr. Dreith did not object that the 3% fee was too high, did not object to the percentage structure of the fee, and did not raise any concerns regarding any alleged conflict of interest.   To the contrary, he proposed explaining to Fund participants that the Service Fee was "highly warranted" given the "valuable service" provided by the Unions.  SUF90  It is hard to fathom how the individual Trustees who approved the Service Fee could have acted recklessly or imprudently in relying on their own first-hand knowledge of session reports and on the expertise and recommendation of the Fund's seasoned Executive Director.  *See, e.g., Stephens v. Nat'l Distillers & Chem. Corp.*, No. 91 CIV. 2901 (JSM),  1996 WL 271789, at *6 (S.D.N.Y. May 21, 1996) (in making a business judgment, members of a board of directors "shall be entitled to rely on information, opinions, reports or statements . . . presented by officers" of the organization) (citing N.Y. Bus. Corp. Law §717(a)(1)-(3)).

**B.     Plaintiff's Attacks on the Service Fee Are Factually Baseless.**

Despite undisputed evidence that the Fund and its Trustees made a considered, reasonable, good-faith decision to approve the 3% Service Fee, Plaintiff invites the Court to second-guess that decision by making sweeping factual claims that are demonstrably false and by raising legal arguments that are without support. We begin with two of Plaintiff's factual arguments:  (1) that the data provided by the Unions purportedly has no value; and (2) that the data provided by the Unions only benefits performers who are Union members.  Both fail as a matter of law.

**1.     Plaintiff's "No Value" Claim Is Objectively False.**

Throughout this litigation, Plaintiff has taken the position—despite mountains of undisputed evidence to the contrary—that the data the Unions provide to the Fund has "no value."  SUF 117.  That is false.  It is beyond dispute that the Unions have gathered and maintain the information they provide to the Fund— which is not maintained in a systematic way by any other entity—at tremendous effort and expense.  SUF 48, 52.  It is similarly beyond dispute that the Unions

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS & AUTHORITIES

continue to expend great effort in responding to thousands of requests for information from the Fund each year.  SUF 55-57.  It is beyond dispute that the session report data provided by the Unions has essential value in allowing the Fund to accurately allocate royalties to the correct artists who performed on a given song. SUF 53-54.  It is likewise undisputed that—separate from the provision of session report data—the Unions provide the Fund with information from their respective member databases that is then used by the Fund to locate performers.  SUF 77.[8]

In an effort to illustrate and quantify the importance of the session report data provided by the Unions, the Fund recently analyzed a sample of 50 song titles for which session report data was made available from the Unions.  SUF 74.  As part of this exercise, the Fund directed its researchers to locate accurate song title information *without* using the data provided by the Unions.  SUF 74.  The Fund found that when its researchers had access only to publicly available, non-Union sources of information, they were able to locate the accurate credits information (*i.e.*, who performed on a given song title) for just 20 out of the 50 tracks in the sample (*i.e.*, 40%).  SUF 74.  This rate of inaccuracy would have profound consequences if the Union were forced to rely solely on public, non-Union sources of information when allocating royalties.  SUF 74.

### 2.  The Union Data Benefits All Fund Participants.

Plaintiff also asserts that the data and services provided by the Unions do not benefit non-Union members—and that, as a result, the Service Fee effectively transfers money from non-Union performers to the Unions without justification. SUF 118.  That claim also is demonstrably false.  Undisputed evidence establishes

---

[8] Ultimately, Plaintiff admitted that, if the information the Unions provided to the Fund is largely accurate, then it has value.  SUF 119.  He even agreed that the Unions "*should be*" compensated for providing information and services to the Fund.  SUF 119.  And Dennis Dreith—the Fund's former Executive Director and now Plaintiff's "litigation consultant"—likewise conceded that the information the Unions provide to the Fund is valuable.  SUF 75; 80; 90; 120.

that the Fund uses session reports provided by the Unions to identify Union and non-Union performers alike.[9]   SUF 50.   Indeed, roughly half of the Fund participants are not Union members.  SUF 45.

### 3.   The Unions Owe No Duty to Provide Their Data for Free.

Pivoting, Plaintiff also has argued that, even if the Unions' data has some value, the Fund should not have paid for it.  He reasons that, because the Unions' services under the Data Agreement also benefit Union members, the Unions had an independent obligation to provide that data without compensation.  SUF123.

This argument is untenable.  Roughly half of the Fund's royalty participants are *not* members of AFM or SAG-AFTRA, and the Unions have no obligation to expend their members' dues to support the Fund's distribution of royalties to non-members.  SUF 45.  Furthermore, most *Union* members have no connection with the Fund.  Only a small fraction of SAG-AFTRA's roughly 160,000 members are background vocalists on sound recordings; most are film and TV actors.  SUF 46. And only a small subset of AFM's approximately 70,000 members work as session musicians on sound recordings; the vast majority of AFM members are musicians who perform live in orchestral, theatrical and concert venues, restaurants, nightclubs and bars, or perform for recording sessions in other media production, such as live television.  SUF 47.  The Service Fee ensures that the Union members who actually benefit from the Fund's activities are the ones who bear the reasonable costs of the Fund's operations.

Plaintiff asserts that, because the Trustees did not elect to compensate the Unions for their data and services prior to 2013, the Trustees breached their fiduciary duties by deciding to implement the Service Fee—and pay the Unions on a going forward basis—in 2013.  *See* FAC ¶ 16.  But the mere fact that the Unions

---

[9] Aside from the session reports and other data they provide, the Unions also undertake certain advocacy efforts, such as advocating for the Music Modernization Act and its escheat preemption provision, solely for the benefit of Fund participants, who include both Union members and non-members.  SUF 71-73.

provided information and services to the Fund without charge for the first decade
of the Fund's existence, when royalty distributions were minimal and the Fund had
limited resources,  does not mean it was reasonable to expect that the Unions would
continue to do so indefinitely.  *See* SUF 36.

While the Unions provided this information and these services at no cost
during this early period of the Fund's administration, the massive growth of digital
streaming—and the concomitant enlargement of the Union's administrative burden
in assisting with Fund administration—provided ample reason for the Trustees to
exercise their sound discretion in implementing the fee.  There is no fiduciary duty
to insist on receiving valuable data and services for free, and Plaintiff's argument
that the Fund acted unlawfully or unreasonably by doing so is meritless.

**C.**   **Federal Law Does Not Limit the Amount of the Service Fee  to the
Incremental Costs Incurred by the Unions in Providing Data.**

Plaintiff also argues that the Trustees' decision to approve the Service Fee
constituted a breach of fiduciary duty because the "reasonable costs" permitted by
the Copyright Act are limited to the incremental costs incurred *by the Unions* in
providing session report and database information to the Fund.  SUF 116.  This
argument fundamentally misreads the statute and makes no sense.

The Copyright Act permits nonprofit entities that distribute royalties, like the
Fund, to "deduct from any of its receipts, prior to the distribution of such receipts
to any person or entity entitled thereto . . . [its] reasonable costs."  17 U.S.C.
§ 114(g)(3).  Plaintiff asserts that the term "reasonable costs" in Section 114(g)(3)
somehow requires the Fund to purchase all of the goods and services it requires at
cost.  *See* SUF 116; Ex 23, at 23-24.  In other words, he contends that the Unions
must give away information accumulated over decades and may only be reimbursed
for the incremental costs of work initiated in response to the Fund's needs.

Plaintiff's argument ignores the language of the Copyright Act.  The term
"reasonable costs" in Section 114(g)(3) plainly refers to the expenses incurred *by*

*the royalty distributing body*—in this case, the Fund .  It does not say the Fund can purchase goods or services from a third party (such as computer equipment, a Lexis/Nexis subscription, or electricity) only if they are priced at the seller's marginal cost.  Such a restriction would make it impossible for the Fund to operate.  *E.g.*, *Tovar v. Sessions*, 882 F.3d 895, 904 (9th Cir. 2018) ("[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available.").[10]

There can be no dispute that many compensation arrangements are based on a percentage of the value of an underlying transaction—including those involving real estate agents, investment managers, talent agents, and contingency fee lawyers—a  proposition as to which the Court readily may take judicial notice.  *See* Fed. R. Evid. 201.  Indeed, that is precisely how the royalties due to the non-featured performers Plaintiff purports to represent are computed.  SUF 19.  The sale of data—for instance, through Lexis/Nexis or Westlaw subscriptions—is also commonly based on the value of the information to the purchaser rather than the (near-zero) incremental cost of providing the data electronically to one additional user.  Plaintiffs do not and cannot establish that agreeing to pay a percentage-based Service Fee is *per se* a breach of fiduciary duty.

Finally, Plaintiff has asserted that the Trustees acted in violation of the Independent Offices Appropriation Act, 31 U.S.C. § 9701, by agreeing to pay a Service Fee that was not based on the Unions' incremental costs.  That Act is plainly inapposite, as it applies only to a "department, agency, or instrumentality of the United States Government."  31 U.S.C. § 101.  The Fund is not a federal government agency.  It is undisputed that the Fund's employees are not government employees, paid by the federal government.  Nor are the Fund's officers and

---

[10] Plaintiff's own witnesses admitted that the value (or "reasonable cost") of goods and services to a buyer is not necessarily equivalent to the incremental cost that a seller incurs to provide those goods and services.  SUF 121-122.

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS & AUTHORITIES

Trustees appointed by the federal government.  SUF 8-10.  The Fund, rather, is a Section 501(c)(6) organization, staffed with individuals who are private sector employees.  If the Fund were a government agency, it would have no need for tax-exempt status under 26 U.S.C. § 501c)(6).[11]  SUF 7.

Courts have extended the statute to private companies only in very limited circumstances not applicable here.[12]  In any event, the statute has no application here for the additional reason that it applies explicitly to *charges imposed*, not to *costs incurred* by an organization, and because the Fund distributes royalties to individual performers, not money "bound for the federal treasury."  *Thomas v. Network Sols., Inc.*, 176 F.3d 500, 511 (D.C. Cir. 1999); *accord Byers v. Intuit, Inc.*, 564 F. Supp. 2d 385 (E.D. Pa. 2008), *aff'd*, 600 F.3d 286 (3d Cir. 2010).

## D.  The Process Whereby the Trustees Approved the Service Fee Did Not Constitute a Breach of Fiduciary Duty.

Unable to establish that the amount of the Service Fee is unreasonable, Plaintiff has pivoted to alleging that the *process* of enacting the Service Fee—and agreeing to pay *any* amount for the data provided by the Unions—constituted a breach of fiduciary duty.  Plaintiff asserts that the Fee's implementation constitutes a *per se* breach of fiduciary duty because the Trustees, by virtue of their dual role with the Unions, had a conflict of interest.

The core flaw in this argument is that the Fund's Trust Agreement *expressly authorizes* the Trustees to "*purchase* or obtain from the AFM [and/or] SAG-

---

[11]*See* IRS, *Types of Organizations Exempt under Section 501(c)(6)*, available at https://www.irs.gov/charities-non-profits/other-non-profits/types-of-organizations-exempt-under-section-501c6.

[12] The Act applies to private government contractors "only if: (1) the private entity were tasked with performing a federal agency's statutory duty; (2) the federal agency effectively controlled the private entity's conduct; or (3) the federal agency contracted with the entity to provide a quintessential government service."  *Byers v. Intuit, Inc.*, 564 F. Supp. 2d 385, 408 (E.D. Pa. 2008) (citing *Thomas v. Network Solutions,* 176 F.3d 500, 511 (D.C. Cir. 1999)), *aff'd*, 600 F.3d 286 (3d Cir. 2010).

AFTRA . . .  any data helpful for the identification and location of artists eligible for remuneration."  SUF 18 (emphasis added).  That language is fatal to Plaintiff's conflict-of-interest theory, as "[a] fee arrangement expressly authorized by the trust's governing documents generally cannot create a conflict of interest."  *Royal Park Invs. SA/NV v. HSBC Bank USA, Nat. Ass'n*, 109 F. Supp. 3d 587, 598 (S.D.N.Y. 2015) ("A fee arrangement expressly authorized by the trust's governing agreements generally cannot create a conflict of interest."); *see also, e.g.*, Restatement § 78 (2005) cmt. c(1)-c(3) (where a "trust instrument contemplates, creates, or sanctions [a] conflict of interest," it is not a breach of a trustee's duty of loyalty to abide by the terms of the trust instrument) (internal citation omitted). Plaintiff cannot reasonably accuse the Trustees of breaching their fiduciary duties by engaging in the precise conduct—purchasing data from the Unions—that the Trust Agreement expressly authorized.

Plaintiff's conflict-of-interest theory also fails because Plaintiff has not mustered a shred of evidence that the Trustees failed to act reasonably in determining whether and how much to compensate the Unions for the essential data and services provided under the Data Agreement.  He continues to rely on the *ipse dixit* assertion that—because the Trustees have Union affiliations—they necessarily must have acted with "deep" and "significant conflicts of interest" when they implemented the Service Fee.  Compl. ¶¶ 13, 20, 56.  This assertion has not been borne out in discovery, and Defendants have provided extensive evidence showing the opposite – *i.e.*, that it was in the interest of both the Fund and the Unions to ensure that the mission-critical information in the Unions' possession was available for the Fund going forward, at a reasonable cost.  SUF 91.

Plaintiff's "bald assertions of conflict" cannot establish a breach of fiduciary duty absent evidence that any of the Trustees "personally benefited" from the implementation of the Service Fee.  *See Royal Park*, 109 F. Supp. 3d at 598; *see also* Restatement § 78(2) (fiduciary breach claim requires showing that trustee

"personal[ly]" benefited from the transaction at issue).  Plaintiff has not pointed to—and cannot point to—any facts to suggest that the Trustees benefited from the Service Fee in their personal capacities, or that they set the Service Fee at a rate that unfairly favors the Unions at the expense of Fund beneficiaries.  Plaintiff's baseless speculation that the Trustees engaged in self-dealing is woefully insufficient to establish a breach of fiduciary duty.

Without any *facts* showing that the Trustees acted based on a conflict of interest, Plaintiff will likely argue that the Fund's decision-making process fell short of best practices for non-profit governance.  But a plaintiff cannot "defeat summary judgment" by relying on "expert declarations that contain only conclusory allegations on the ultimate legal issue."  *Smartmetric, Inc. v. Mastercard Int'l, Inc.*, 2013 WL 12108250, at *2 (C.D. Cal. Oct. 2, 2013).  Absent any *facts* showing that the Trustees prioritized their self-interest over the interests of non-featured performers, Plaintiff cannot rely on expert testimony to attack the process whereby the Trustees decided to implement the Service Fee.

Just as importantly, any testimony as to the Fund's compliance with "best practices" of corporate governance is totally beside the point.  As a matter of law, conduct does not constitute a breach of fiduciary duty simply because it "fell significantly short of the best practices of ideal corporate governance."  *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 697 (Del. Ch. 2005).  The fact that the Fund may not have conducted robust training programs for new Trustees does not say anything about whether the decision to pay a 3% fee for mission-critical data was reasonable.  Courts routinely hold that defects in the process corporate (or non-profit) fiduciaries use to arrive at a decision does not, standing alone, amount to a breach of fiduciary duty.  *See, e.g.*, *Armenian Assembly of Am., Inc. v. Cafesijian*, 772 F. Supp. 2d 20, 107 (D.D.C. 2011) (holding that non-profit directors did not breach their fiduciary duties in promoting an architect for a project, even though they abandoned a competitive selection process for that architect).  Absent any

evidence that the amount of the Service Fee was unreasonable or that the Trustees engaged in self-dealing, Plaintiff cannot establish a breach of fiduciary duty by attacking the process the Trustees used in implementing that fee.

In sum, at the time the Fund approved the 2013 Data Agreement, its Board of Trustees was constituted in precisely the manner specified in the operative Declaration of Trust, and the purchase of data from the Unions was a transaction expressly contemplated by and authorized by the Declaration of Trust.  As a matter of trust law, the transaction was proper so long as the amount of the Service Fee payable under the Agreement was reasonable.  Despite 18 months of discovery, Plaintiff has adduced no facts to show that the 3% Service Fee was inherently unreasonable – i.e., that *no prudent Trustee* could have voted to pay that amount to the Unions in exchange for the important data provided by the Unions to the Fund.

Indeed, Plaintiff's theory threatens to set a dangerous precedent:  if any Fund participant could mount a class action attacking every prudent decision by the Fund's Trustees on the ground that it was not prudent enough, it would open the floodgates to lawsuits over every decision made by the Trustees.  One can easily imagine, for example, that if the Trustees had declined to approve the 3% Service Fee in 2013 to ensure access to the Unions' session report and database information, they would face a class action lawsuit on behalf of non-featured performers who would have received royalties but for the Fund's decision not to acquire the Unions' session report and database information at a reasonable cost.

**E.**     **Plaintiff's Secondary Claims Also Fail As A Matter Of Law.**

If Plaintiff cannot establish that the decision to approve the Service Fee constituted a breach of fiduciary duty, his other claims must also necessarily fail. For example, if Defendants did not breach their fiduciary duties by implementing the Service Fee, Plaintiff cannot establish a "wrongful" taking of property—as is necessary to prevail on a claim for conversion.  *See Lee v. Hanley*, 61 Cal. 4th 1225, 1240 (2015).  Nor could he establish that "equity and good conscience" requires the

return of the Service Fee, which is fatal to his claim for money had and received. *See Mains v. City Title Ins. Co.*, 34 Cal. 2d 580, 586 (1949). And if Plaintiff lacks any "viable underlying claim" against Defendants, he cannot be entitled to declaratory relief. *Shaterian v. Wells Fargo Bank, N.A.*, 829 F. Supp. 2d 873, 888 (N.D. Cal. 2011). Furthermore, even if this Court were to accept Plaintiff's core theory of fiduciary breach, his conversion claim nonetheless fails because he has not established a deprivation of property.

"Conversion is the wrongful exercise of dominion over the property of another." *Lee*, 61 Cal. 4th at 1240. Thus, for Plaintiff to prevail on his claim for conversion, he must establish that the imposition of the Service Fee deprived him of a property interest. *See id.* Plaintiff asserts that, because the Copyright Act requires the Fund to collect and distribute royalties to non-featured performers, those performers necessarily have a property interest in those royalties—and, by extension, the Service Fee. SUF 124. But even if the Copyright Act requires the Fund to collect and distribute royalties to non-featured performers as a class, that does not give Plaintiff—or any other particular performer—a cognizable property interest sufficient to sustain a claim for conversion.

As this Court noted at the motion to dismiss stage, the existence of a property interest hinges on the extent to which the Copyright Act restricts Defendants' discretion to distribute and allocate royalties. *See* Docket No. 25, at 14-15; *see also Allen v. City of Beverly Hills*, 911 F.2d 367, 370 (9th Cir. 1990) ("Whether an expectation of entitlement is sufficient to create a property interest 'will depend largely upon the extent to which the statute contains mandatory language that restricts the discretion of the [decisionmaker].") (alteration in original) (citations and internal quotation marks omitted). For that reason, a "regulation granting broad discretion to a decision-maker does not create a property interest." *Doyle v. City of Medford*, 606 F.3d 667, 672-73 (9th Cir. 2010).

Here, the Copyright Act grants the Fund not only the discretion to distribute

and allocate royalties, but also to incur "reasonable costs" associated with doing so. Those two layers of discretion fatally undermine Plaintiff's claim that he had a protected property interest in the money Defendants allegedly "converted."

The premise of Plaintiff's conversion claim is that, because the Copyright Act specifies the amount of royalties the Fund must collect and distribute, it gives each non-featured performers a corresponding property interest in their share of those royalties.  But even if the Copyright Act specifies the aggregate amount of royalties the Fund must collect and distribute, subject to the deduction or reasonable costs—that is, the 5% of royalties generated by the Section 114 statutory license that are no being paid to copyright owners or featured artists—it does not follow that each performer has a property interest in his or her pro rata share of those royalties.  To the contrary, the statute requires only that the royalties be distributed to "nonfeatured vocalists" and "nonfeatured musicians."  17 U.S.C. § 114(g)(2)(B)-(C).  Absent any textual basis for Plaintiff's claim that *each individual performer* is entitled to a distribution of royalties, there is no basis for Plaintiff's assumption that the Copyright Act gives each performer a property interest in those royalties.

It would be particularly absurd to read the Copyright Act to give each non-featured performer a property interest in his or her royalties because, as a practical matter, many of those royalties amount to mere pennies.  In those cases, the costs associated with identifying each such performer and distributing his or her pro rata share of royalties would greatly outstrip the *de minimis* royalties to which he or she is entitled.  If the Copyright Act gave each performer a property interest in his or her pro rata share of the royalties, no matter how large or small, the Fund would be forced to incur tremendous administrative costs—which, in turn, would greatly reduce the total royalty pool available for distribution.  Adopting Plaintiff's reading of the Copyright Act would accordingly "thwart the purpose of the overall statutory scheme" and "lead to an absurd result"—both of which counsel against concluding that the Copyright Act grants each individual performer a property interest in his or

her share of the royalties. *Andrews v. Sirius XM Radio Inc.*, 932 F.3d 1253, 1260 (9th Cir. 2019) (citations and internal quotation marks omitted); *see Tovar v. Sessions*, *supra*, 882 F.3d at 904.

Indeed, the Fund's former Executive Director, Dennis Dreith, admitted as much in his deposition. He agreed that there was a "group of recordings that the amount of money is too *de minimis* to really have a meaningful distribution," and he noted that the Fund accordingly implemented a "methodology whereby we could efficiently research enough sound recordings to make distributions that were meaningful to as many performers as possible." SUF 125.[13] Testimony from Fund managers confirms that the process of researching recordings, identifying non-featured performers, and allocating royalty payments necessarily requires judgment calls, discretionary decisions and trade-off at every stage of the process. SUF 20, 23, 28, 125, 127.

The degree of discretion inherent in this project is fatal to Plaintiff's claim that he had a property interest in the Service Fee. Consistent with this view, the Trust Agreement expressly provides that "[n]o artist or any person claiming by or through such artist … shall have any right, title, or interest in or to the Fund or any property of the Fund or any part thereof except as may be specifically determined by the Trustees." SUF 17.

Moreover, even assuming *arguendo* that the Copyright Act did not give the Fund discretion as to the allocation of royalties, it assuredly gave the Fund discretion to deduct "reasonable costs," including those associated with the

---

[13] When asked whether he viewed this approach as consistent with the Copyright Act, Mr. Dreith responded that the statute "just talks about non-featured performers as a group" and "didn't say to distribute to every non-featured performer." SUF 126. And he expressly disagreed that this approach served to deprive performers of "property ... that belonged to them"; to the contrary, Mr. Dreith explained, the Fund's goal was to "compensate as many non-featured … performers as ethically and fully as possible," even if it meant that the Service Fee would cause some performers to lose "micropennies" in royalties. SUF 127.

"collection, distribution and administration of the royalties." 17 U.S.C. § 114(g)(3).
The use of the phrase "reasonable costs"—particularly when contrasted with the
fixed 2.5% royalties provided by Section 114(g)(2)—makes clear that the statute
gives the Fund considerable discretion to set the *amount* of the Service Fee. Indeed,
many courts, including the Supreme Court, have held that the use of the term
"reasonable" in a statute or regulation suggests a degree of discretion inconsistent
with the existence of an enforceable property right.[14]

    *Baumgardner v. Town of Ruston*, 712 F. Supp. 2d 1180 (W.D. Wash. 2010),
is directly on point. There, the plaintiffs alleged that a local government unlawfully
charged excessive permitting fees, and they argued that they had "a protected due
process interest in the charge of 'reasonable fees' for their land use applications."
*Id.* at 1202. The court granted the defendants' motion for summary judgment. In
so holding, it reasoned that the statute the plaintiffs cited—which permitted the
collection of "reasonable fees"—"does not contain language that is sufficiently
'mandatory' to create a protected due process interest." *Id.* To the contrary, the
court explained, "[t]he phrase 'reasonable fees' gives cities a great deal of discretion
in the amount of fees they choose to charge, if they choose to do so at all." *Id.*

    That reasoning applies with equal force here. As explained above, the
Copyright Act's use of the phrase "reasonable costs" does not meaningfully restrict
the Fund's discretion as to the *amount* of the Service Fee—let alone with the degree
of precision necessary to create a legally cognizable property interest in that fee.
Plaintiff cannot evade this outcome by arguing, as he did at the motion to dismiss
stage, that his conversion claim hinges on a disputed question of whether the

---

[14] *See, e.g.*, *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 763 (2005) (holding
that statute requiring police to use "every reasonable means" to enforce a restraining
order did not give rise to a protected property right, as "[s]uch indeterminacy is not
the hallmark of a duty that is mandatory"); *Jacobson v. Hannifin*, 627 F.2d 177, 180
(9th Cir. 1980) (holding that statute empowering gaming commission to deny a
license for "any cause deemed reasonable" provided "wide discretion" that "negates
[plaintiff]'s claim to a protectable property interest created by the State").

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS &
AUTHORITIES

imposition of the Service Fee was "wrongful." Even if that were true (and it is not), that does not address the antecedent question of whether Plaintiff had a cognizable property interest in the Service Fee. Because the Copyright Act does not give Plaintiff a cognizable property interest in either his share of the royalties or in the Service Fee, his claim for conversion necessarily fails.

**F.      Plaintiff's Request For Punitive Damages Should Be Stricken.**

Finally, Plaintiff seeks punitive damages pursuant to section 3294(a) of the California Civil Code, under which "punitive damages are only available 'where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice.'" *Bourget v. Allstate Ins. Co.*, 2007 WL 9705900, at *6 (C.D. Cal. Jan. 4, 2007) (quoting Cal. Civ. Code § 3294(a)). "The 'clear and convincing' standard is applicable even on a motion for summary judgment." *Id.* at *6; *see also Haley v. Cohen & Steers Cap. Mgmt., Inc.*, 871 F. Supp. 2d 944, 962 (N.D. Cal. 2012) ("[E]vidence of fraud, malice, or oppression—as required before a basis for punitive damages may be established—must be supported by clear and convincing evidence, even at the summary judgment stage.").

Although the definitions of "oppression," "fraud," and "malice" differ in certain particulars, all three prongs require a showing of "despicable" conduct. *See In re First Alliance Mortg. Co.*, 471 F.3d 977, 998 (9th Cir. 2006) ("According to the definitions provided in section 3294(c), a plaintiff may not recover punitive damages unless the defendant acted with intent or engaged in 'despicable conduct.'"). "The adjective 'despicable' connotes conduct that is so vile, base, contemptible, miserable, wretched or loathsome that it would be looked down upon and despised by ordinary decent people." *Id.* (citation omitted).

Here, there is no evidence—let alone clear and convincing evidence—that the Fund or its Trustees engaged in "despicable" conduct. *See, e.g., Haley*, 871 F. Supp. 2d at 962 (granting summary judgment to defendant on plaintiff's request for punitive damages under section 3294 where "there [was] a paucity of evidence

establishing the type of conduct that would adequately support a finding of punitive damages").[15]  Even if the Plaintiff's quibbles with the amount of the Service Fee or the process whereby it was implemented had merit (which they do not), his conclusory allegations of wrongful motive do not come close to establishing that any Defendant acted with fraud, oppression, or malice.  Accordingly, the Court should grant summary judgment with respect to the request for punitive damages.

## IV.   CONCLUSION

For all of the foregoing reasons, the Court should grant Defendants' motion for summary judgment.

Dated:    April 23, 2021                    JENNER & BLOCK LLP

/s/ Andrew J. Thomas
Andrew J. Thomas
Alexander M. Smith
Andrew G. Sullivan
Anna K. Lyons

*Attorneys for All Defendants*

---

[15] *See also Procentury Ins. Co. v. Slobodan Cuk*, 2014 WL 11474652, at *9 (C.D. Cal. Apr. 29, 2014) (granting summary judgment to defendant on plaintiff's request for punitive damages under section 3294 where "there [was] no evidence that would allow a reasonable jury to conclude that [defendant] was not simply unreasonable, but acted with oppression, malice, or fraud"); *Nuwintore v. Mgmt. & Training Corp.*, 2018 WL 3491676, at *9 (E.D. Cal. July 19, 2018) (granting summary judgment on the prayer for punitive damages because "[w]ithout 'clear and convincing' evidence demonstrating malice on the part of [defendant], the Court cannot say that reasonable jurors could conclude punitive damages are warranted").

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS & AUTHORITIES