JENNER & BLOCK LLP
Andrew J. Thomas (Cal. Bar No. 159533)
ajthomas@jenner.com
Alexander M. Smith (Cal. Bar No. 295187)
asmith@jenner.com
Andrew G. Sullivan (Cal. Bar No. 301122)
agsullivan@jenner.com
Anna K. Lyons (Cal Bar No. 324090)
alyons@jenner.com
633 West 5th Street, Suite 3600
Los Angeles, CA 90071
Telephone: (213) 239-5100
Facsimile: (213) 239-5199

*Attorneys for All Defendants*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEVIN RISTO, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>SCREEN ACTORS GUILD-AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS, a Delaware corporation; et al.<br><br>Defendants. | Case No. 2:18-cv-07241-CAS-PLA<br><br>Class Action<br><br>**DECLARATION OF JULIE SANDELL IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

## DECLARATION OF JULIE SANDELL

I, Julie Sandell, declare as follows:

1. Since September 2009, I have served as an employee at the AFM & SAG-AFTRA Intellectual Property Rights Distribution Fund ("the Fund"), most recently in my current role as Associate Director of the Fund's Sound Recording Division. I submit this declaration in support of the Defendants' Motion for Summary Judgment in this action. If called to testify, I could and would testify as to the following facts based on my personal knowledge and based on information compiled by Fund staff at my direction.

2. In January and February of 2021, I managed a project aimed at identifying the impact of data provided by AFM and SAG-AFTRA (together, the "Unions") on the Fund's allocation of royalties to non-featured performers. The results of this project affirmed my understanding of the essential role that Union data plays in allowing the Fund to accurately allocate royalties.

3. As background, the Unions routinely provide the Fund with session reports (also referred to as B-Forms by the AFM) which are documents prepared in connection with sound recording sessions that list the performers who appear on song titles, and which include identifying information regarding those performers. Session reports provided by the Unions serve an essential role in the Fund's efforts to identify and locate non-featured performers on a given song title in order to distribute royalties in connection with that song title.[1]

4. The Fund's researchers seek out multiple sources of information to identify the non-featured performers that appear on a given song title. Aside from session reports, other sources of information include: liner notes and other information printed on album packaging; discographies available from online research; as well as individuals who are able to independently verify a performer's

---

[1] Song titles that have been subject to royalty allocations by the Fund are referred to by the Fund as "Covered Recordings".

appearance on a given song title. The Fund's practice is to seek out multiple independent sources of information to confirm that a performer appeared on a Covered Recording.

5. Session reports are the most reliably accurate source of information available to the Fund in identifying the non-featured performers who appeared on a given song title. This comparative level of accuracy is due in part to the fact that these session reports are generally prepared contemporaneously (or at least close in time) with the recording session at issue by individuals associated with the recording session. Because these documents are prepared to facilitate payment to the non-featured performers at issue, there is strong reason for accurate information to be provided in the preparation of these forms.

6. In addition to providing the Fund with session reports, the Unions also provide the Fund with performer information from their respective performer databases. This data (which relates to both Union member and non-member performers) includes identifying information such as the performer's last known address, which may be more up-to-date than information recorded in older session reports. This data is a valuable resource to the Fund in confirming the identities of and locating non-featured performers who appear on song titles that are subject to royalty allocations.

7. In January and February of 2021, I managed a project aimed at identifying the role that data provided by the Unions plays in ensuring the accuracy of performer royalty allocations in connection with Covered Recordings. This project involved analyzing a sample of Covered Recordings for which session report data had been made available by the Unions, and determining how royalties would have been allocated differently if Fund researchers had *not* had access to the Union session report data, but instead had relied solely on public sources of information to identify the non-featured performers on these Covered Recordings. The results of this exercise demonstrate that—absent the session report data

provided by the Unions—the Fund's researchers would have relied on inaccurate information in identifying non-featured performers on 60% of the song titles in the sample.

8. The specifics steps taken in connection with this project are as follows:

   a. The sampling process started by generating a list of 5,992 Covered Recordings that (i) were subject to royalty distributions in 2020; and (ii) had Union session reports available.

   b. I selected a random title approximately halfway through this list, and then selected the largest 50 of the next 100 sequential titles for inclusion in the sample.

   c. For clarification, the Fund's researchers had already identified the correct non-featured performers who appeared on each of these Covered Recordings with the use of the Union session report information prior to the start of this project. Following selection of the 50 title sample, I assigned several researchers with the task of trying to identify the correct non-featured performers who appeared on these song titles, this time without the use of session report data from the Unions.

   d. I instructed researchers to keep notes on the sources of information (other than session reports) from which they were attempting to identify the non-featured performers who appear on the song titles in the sample (e.g., liner notes, discographies).

   e. I worked with the Fund's staff to compile the results of this exercise into a spreadsheet designed to allow a comparison between: (i) the royalties that were actually allocated with the use of session report data in connection with each of the 50 Covered Recordings in the sample; and (ii) the royalty allocations that would have occurred based on the non-featured performers identified by Fund researchers as having

appeared on each of the Covered Recordings based on sources other than session reports (e.g., liner notes, discographies). The final version of this spreadsheet is attached hereto as **<u>Exhibit 42</u>**. This spreadsheet appears in the first tab of the Microsoft Excel spreadsheet produced in this action with Bates label DEFS_00042027.

9. As shown in Exhibit 42, when the Fund's researchers attempted to locate the non-featured performers on each of these 50 song titles without the aid of session report data from the Unions, the results they found were inaccurate with respect to 30 of the 50 song titles in the sample. In other words, the results of the Fund's research efforts were incorrect 60% of the time when researchers lacked session report data from the Unions and were forced to rely only on public sources of information to identify the non-featured performers who appeared on song titles.

10. The rate of inaccuracy demonstrated in the above-described exercise—were it to take place in the actual course of the Fund's administration—would result in the widespread misallocation of royalties to non-featured performers. This misallocation would pose grave administrative difficulties to the Fund and would seriously compromise the Fund's mission of accurately allocating royalties to the correct non-featured performers who appeared on Covered Recordings.

11. The misallocation of royalties demonstrated by the above-described exercise can occur in different ways. Misallocations may occur if too few non-featured performers are identified on a Covered Recording than actually performed on the recording (i.e., performers who appeared on the recording are missing from the credits information located by researchers). Misallocations can also occur where too many participants are credited on a Covered Recording than actually performed on the recording (i.e., performers who did not actually appear on the recording are credited on the recording).

12. For an example of fewer participants being paid than actually performed on the relevant song title, consider the example of the song "My Heart

1 Will Go On" by Celine Dion. *See* Exhibit 42, Row 2. Without Union session report information, the Fund's researchers were able to identify a total of seven performers credited on this title, whereas the session report revealed a total of 65 performers that actually appear on the recording. In this instance, the total royalties distributed on this title would have been incorrectly divided among seven performers, resulting in improperly large payments to each of these seven performers, and the omission of payments to 58 otherwise unidentified performers. If the Fund had incorrectly distributed these larger royalty payments to just seven performers, this would have resulted in a total of $27,116.24 in misallocated royalties, which represents 45% of the total royalties allocated on this title.

13. For an example of too many participants being paid than actually performed on the relevant song title, consider the example of the song "Get Me Some of That" Thomas Rhett. *See* Exhibit 42, Row 25. Without Union session report information, the Fund's researchers would need to rely on album-wide credits to identify the performers on this song title, which would result in a total of 46 performers being credited as having performed on this song title. However, the session report for this song title shows that in fact only 12 of these performers were on this song title. This means that, absent Union session report information, a total of 34 performers would have been incorrectly paid for a track on which they did not perform, whereas the 12 performers that were actually on the track would have received significantly smaller royalty payments than they should have properly been allocated had the Fund had the benefit of Union session report information. In this instance, the lack of session report information would have resulted in a total of $108,053.81 in misallocated royalties, which represents 83% of the total royalties allocated in connection with this title.

14. Aside from assessing the value of <u>session report</u> data provided by the Unions, a separate portion of the project I managed in January and February analyzed the availability of information from the Unions' respective <u>performer</u>

5
DECLARATION OF JULIE SANDELL

1  <u>databases</u> in connection with the performers identified as having performed on these
2  Covered Recordings.  The results of this portion of the project are summarized in
3  the second tab of the Microsoft Excel spreadsheet produced in this action with Bates
4  label DEFS_00042027, which is attached hereto as **Exhibit 43**.

5      15.    The results of this exercise show that from among the 669 non-featured
6  performers credited as having performed on the 50 Covered Recordings in the
7  sample, a total of 629 (or 94%) were located in one of the respective Union
8  performer databases, allowing the Fund access to the performers' last known
9  address and Social Security number information.  Without the Unions' performer
10 database data, none of the participants had a readily-available address and Social
11 Security information accessible from public sources that would allow the Fund to
12 make a payment to the participant.  Instead, outreach efforts were required to locate
13 the remaining participants' relevant information.

14      I declare under penalty of perjury under the laws of the United States of
15 America that the foregoing is true and correct.

16      Executed this 23rd day of April, 2021.

*Julie B. Sandell*
Julie Sandell