# Exhibit 1

Bruce Carlyle Bouton

```
 1                UNITED STATES DISTRICT COURT
                 CENTRAL DISTRICT OF CALIFORNIA
 2
 3                          - - -
 4
      KEVIN RISTO, on behalf of    :  CASE NO. 2:18-cv-
 5    himself and all others       :  07241-CAS-PLA
      similarly situated,          :
 6                 Plaintiff,      :
                                   :
 7         vs.                     :
                                   :
 8    SCREEN ACTORS GUILD-AMERICAN :
      FEDERATION OF TELEVISION AND :
 9    RADIO ARTISTS, et al.,
                 Defendants.
10
11                          - - -
12              Wednesday, October 21, 2020
13                          - - -
14
15         Remote videotaped stenographic deposition of
16    BRUCE CARLYLE BOUTON, conducted at the location of the
17    witness in Nashville, Tennessee, commencing at
18    approximately 9:03 a.m., on the above date, before
19    Rosemary Locklear, a Registered Professional Reporter,
20    Certified Realtime Reporter.
21
22                          - - -
23              GOLKOW LITIGATION SERVICES
            877.370.3377 ph | 971.591.5672 Fax
24                   deps@golkow.com
25
```

Bruce Carlyle Bouton

```
 1            So it's my understanding that you're a
 2   professional guitar player, specifically, a pedal steel
 3   guitar player; is that correct?
 4   A.      Yes.
 5   Q.      Can you talk to me a little bit about your
 6   educational background?
 7   A.      I went to high school in Virginia, Vienna,
 8   Virginia, and I moved to Richmond when I graduated, and
 9   took a few classes in school and practiced my
10   instruments, and dropped out of college my first
11   semester and joined a band.
12            And I've had -- my education has been, you know,
13   47 years of a career.
14   Q.      There you go.  And -- sorry.
15            And so you also have worked as a songwriter; is
16   that correct?
17   A.      Yes, I was a songwriter.  I've written a lot of
18   songs.  I've had songs recorded by different artists.
19   Yeah, I was lucky.
20   Q.      Were you the composer or the lyricist, or both,
21   or --
22   A.      Everything.  You write -- you get in a room with
23   somebody and you -- you do whatever you need to do to
24   make a good song.
25            I'm a musician, I'm a guitar player, you know,
```

Bruce Carlyle Bouton

1  but I'm a singer, and I'm -- you know, I -- and I write

2  words.

3  Q.      You do it all.

4         I have to say, in sort of looking into your

5  background, it was really impressive, everything that I

6  read about you.

7  A.      Thank you so much.

8  Q.      And are you -- are you currently married?

9  A.      No.  I'm divorced.

10  Q.      And you have -- how many children do you have?

11         MR. THOMAS:  Nico, I mean, I'm not sure how

12  relevant all this is, unless you're asking about

13  whether -- I know in the past you've asked about whether

14  people and their family have union affiliations, and so

15  forth.  And if that's where you're going, I suppose

16  that's relevant, but just asking about --

17         MR. BRANCOLINI:  That is where I was going.

18         MR. THOMAS:  -- family I think is not really

19  that relevant.

20         MR. BRANCOLINI:  That was where I was going,

21  Mr. Thomas.

22  BY MR. BRANCOLINI:

23  Q.      Are either -- are either of your kids in unions,

24  Mr. Bruce?

25  A.      No.

Bruce Carlyle Bouton

```
 1              THE WITNESS:  They just do -- they take care of

 2    business.  They pay us, they collect money for us,

 3    they -- they follow up when somebody doesn't pay us.

 4    They do research if something gets out, you know, on TV

 5    or whatever, and they -- and nobody has been paid.

 6              They -- you know, they run benefits if somebody

 7    gets sick.  They -- you know, I mean, they speak to

 8    leadership officials to try to get, you know, parking

 9    for the union.  I mean, it's the union.  You know,

10    you're looking out for the benefits for musicians.

11              MR. BRANCOLINI:  Great.

12    BY MR. BRANCOLINI:

13    Q.       And do the locals compile session reports?

14    A.       Yes.

15    Q.       And what are session reports?

16    A.       When we do a recording session, we fill out a

17    timecard, and they have to fill out, I guess it's a

18    B-Form.  I'm really not -- I don't know all the details,

19    all that.  I just know that we have -- we keep really

20    great records in Nashville.  We're very unique in that

21    sense.

22    Q.       I was -- I'm going to be honest.  I was going to

23    ask what the difference between a session report and a

24    B-Form was because I was a little unclear myself, but it

25    sounds --
```

Bruce Carlyle Bouton

1    A.        You're talking the same.   It's just paperwork.

2    Q.        Do you know what information is contained on a

3    session report?

4    A.        Yes.   The song that was recorded, the date of

5    the session, the artist, and the musicians that played

6    on the session.

7    Q.        And do you know what personal information is

8    collected by the musicians and artists on these -- on

9    the session reports?   Is there any?

10   A.        Yeah.   Social Security number.

11   Q.        And so the primary purpose of session reports is

12   to make sure artists get paid; is that correct?

13   A.        Right.   And to have the data for down the road.

14   Q.        And so how does the -- how do you know what --

15   well, how does the local come into custody of the

16   session reports?

17   A.        As I just said, we sign timecards, and we turn

18   it in to the local, and the local fills out the contract

19   and they mail it to the record label or they mail it to

20   the artist or they -- or they do whatever.

21             You know, I mean, not to the artist, but they

22   mail it to the record label and the record label pays

23   everybody.

24   Q.        So the artist fills out the form and brings it

25   to the --

Bruce Carlyle Bouton

1    A.       No, the artist doesn't have anything to do with

2    it.  The musicians fill out the form.

3             We fill out a timecard on the recording session

4    and we turn it in to the union, and then the union fills

5    out the contract, they do the more detailed paperwork

6    where they explain all the things, the components on it,

7    and health and welfare, and they send it to the record

8    label with the amount of money that they owe each

9    musician, and then the record labels write a check to

10   each individual musician.

11   Q.       Got it.  Okay.

12            So you did some work with the -- with Local 257,

13   but you still are primarily a full-time musician; is

14   that -- is that correct?

15   A.       Yeah, that's what I do.  I haven't -- I haven't

16   been on the executive board for Local 257 for ten years,

17   probably.

18   Q.       Got it.

19            And when were you appointed to -- trustee of the

20   Fund?

21   A.       I think you probably know that, but I'm

22   guessing, my estimate is 2011.

23   Q.       And what was the selection process like to

24   become a fund trustee?

25   A.       I think people knew that I had a good knowledge

Bruce Carlyle Bouton

```
 1    BY MR. BRANCOLINI:

 2    Q.       You talked a little bit about the conversation

 3    with Ray Hair.

 4             Can you elaborate on that, as best you can --

 5    A.       I just remember --

 6    Q.       -- that conversation --

 7    A.       I just remember having a conversation just

 8    saying that the union needed to be paid back or

 9    something for the money that they had put into this.

10             And that may have been -- yeah.  Yeah.  Yeah.

11    That's -- I'm trying to think.  Yeah.

12    Q.       When you say "just saying that the union needed

13    to be paid back," do you mean Mr. Hair -- that was

14    Mr. Hair's position?

15             MR. THOMAS:  Objection.

16             This whole line of -- this whole subject has

17    been asked and answered before, but I'll allow you to

18    continue.

19             So go ahead and answer.

20             THE WITNESS:  You know, I -- as I've said, I

21    think the union felt -- the union -- unions felt like

22    they had put money into, you know, establishing this

23    agreement between SoundExchange and the non-featured

24    musicians.

25             And then when the Fund was started, you know,
```

Bruce Carlyle Bouton

1    and money started coming in, you know -- I mean, they

2    did -- they did everything for, you know, all those

3    years just, you know, gratis.  So, I mean, they were

4    never compensated.  It came out of union dues.

5    BY MR. BRANCOLINI:

6    Q.    Do you recall what form this conversation took?

7    Was it in person, via email, over the phone?

8    A.    I think it was just a casual conversation at one

9    point, because I think everybody was just excited that

10   this fund was starting to -- getting ready to start

11   taking off.

12   Q.    And in that conversation did you express your

13   own opinion on the Service Agreement?

14   A.    If I can even remember the conversation, which I

15   can't really remember it exactly, as I said, it was --

16   it was very much in passing, I probably just

17   acknowledged with a, "yeah, okay," or something.  We

18   didn't have a conversation.

19   Q.    Did you help at all with the drafting of the

20   Services Agreement?

21   A.    No.

22   Q.    Was there any negotiation about the terms of the

23   Service Agreement?

24         MR. THOMAS:  Objection.  Vague.  Lacks

25   foundation.  Overbroad.

Bruce Carlyle Bouton

```
 1   questions.

 2   A.        (Witness reviews document.)  Yeah, I've read

 3   that.

 4   Q.        Okay.  So you were present at this meeting;

 5   correct?

 6   A.        Yes, sir.

 7   Q.        And so, prior to this meeting, were you provided

 8   a draft of the Services Agreement?

 9   A.        I don't think so.

10   Q.        It wasn't --

11   A.        Not that I recall.

12   Q.        You said that you received minutes prior to the

13   meeting sometimes.

14             Was there anything included at all about the

15   service fee?

16   A.        Really, I don't recall.  That was seven, eight

17   years ago and, you know, I'm pretty bad about keeping

18   all my records.  They're probably in a box somewhere,

19   but I think this is -- yeah.

20   Q.        Completely fair.

21             Do you recall what was presented at this meeting

22   about the service fee?

23   A.        Yeah.  Just that this is what they wanted and we

24   needed to approve it as a board.

25   Q.        Do you recall what was in that presentation?
```

Bruce Carlyle Bouton

1   A.      I'm sorry.  What was what?

2   Q.      Do you recall what was in that presentation?

3   A.      No.  I mean, it was just -- we just -- it was

4   brought up.  I think -- you know, I think probably, you

5   know, that Dennis, who ran the Fund, probably brought it

6   up and said, "Here's the proposal.  We need to vote on

7   it."

8   Q.      And when you say they want -- they wanted it to

9   be approved by the board, who was the "they" there?

10  A.      Well, it's the -- it's the -- it was -- since

11  the service fee was between the Fund and the unions, it

12  was the head of the Fund and the head of the unions.

13  The deal wasn't with me.

14  Q.      And they didn't -- did they discuss percentages

15  at all at this meeting, at this board meeting?

16          MR. THOMAS:  Object to the form.

17          THE WITNESS:  I don't remember what the

18  percentages that were discussed were, but this was the

19  percentage that was agreed upon.

20  BY MR. BRANCOLINI:

21  Q.      Beyond approval, did they ask for your opinions

22  on the Service Agreement?

23  A.      I think the way meetings worked, if you had an

24  opinion, you would just volunteer an opinion.  I don't

25  think anybody says, "Does anybody have an opinion?"  I

Bruce Carlyle Bouton

```
 1    think the conversation was open.

 2    Q.      Did you -- scratch that.

 3            Do you recall if any trustees expressed an

 4    opinion about the service fee?

 5    A.      I mean, I just -- I think we just discussed it

 6    and discussed that the unions provided research and the

 7    unions, you know, provided lobbying power and, you know,

 8    they -- there was a little bit of a clout in Congress

 9    and everything like that, and that -- and that they had

10    done a lot of work to get these -- get this Fund

11    established, so -- I mean, get the -- get the, you know,

12    Digital Millennium Act established.

13    Q.      Do you recall -- sorry.  Scratch that.

14            You said I think we discussed it and discussed

15    that the unions provided research.

16            When you say "we discussed it," do you recall if

17    it was a general conversation amongst all the trustees

18    or was it primarily the -- Mr. Dreith, Mr. Hair, and

19    Mr. Crabtree-Ireland as part of their presentation of

20    the service fee?

21    A.      We were just all there.  I don't know when and

22    how everybody spoke and what order everybody spoke in.

23    Q.      Of course.  I don't mean -- I don't expect you

24    to quote them from memory.

25            I'm more just meaning if you recall --
```

Bruce Carlyle Bouton

```
 1   A.      Everybody who was in that -- everybody that's

 2   listed was in the room.  I had forgotten that Jon Joyce

 3   was not at that meeting.  I assumed he was there.  So I

 4   guess it was -- it was whoever -- you know, whoever was

 5   the trustees, and it was -- I think it was in executive

 6   session.  I'm not sure.

 7           I guess we could go back on the minutes and see

 8   if we went into executive session.  I think it probably

 9   was executive session, because there was -- you know, I

10   wouldn't think they would have the accountants in there

11   and they wouldn't have had the tech people in there, and

12   everything else.  So it was pretty much, you know, the

13   trustees and the -- yeah, and the head of the Fund.

14   Q.      Do you know -- do you recall if, as part of that

15   conversation, there was a discussion of the reasonable

16   cost of services that were provided to the Fund by the

17   unions?

18           MR. THOMAS:  Objection to the form.  Vague as to

19   "reasonable cost."

20   BY MR. BRANCOLINI:

21   Q.      You may answer, Mr. Bouton.

22   A.      I'd defer to what Dennis Dreith explained at the

23   meeting.

24   Q.      Do you recall what he explained at the meeting?

25   A.      I think Dennis felt like at the time that was a
```

Bruce Carlyle Bouton

```
 1   reasonable way to do things.

 2   Q.      So, putting aside the concept of a service fee,

 3   if the service fee is reasonable, do you recall any

 4   specific conversation about the calculation of the

 5   amount that was decided on for the service fee?

 6           Does that distinction make sense?

 7   A.      Yeah.  But the amount was a percentage.  The

 8   amount was a percentage of distributions, and at the

 9   time distributions weren't that high.

10   Q.      Was there any conversation about why you should

11   do it as a percentage, instead of some other method of

12   assessing a fee?

13   A.      I don't recall.  I -- I -- you know.

14   Q.      So -- and this was approved at that meeting; is

15   that correct?

16   A.      The trustees -- wait a minute.  Well, let's see

17   if we -- was it approved?  Does it say in the meetings?

18   Or did we come back and approve it later?

19   Q.      It's sort of unclear from the meeting minutes,

20   but it was approved -- it was ratified in July of that

21   year.

22   A.      And this meeting was when?

23   Q.      June.

24   A.      Yeah.  Well, then it looks like it was approved.

25   Q.      Would that approval have to have occurred at a
```

# Exhibit 2

Duncan Crabtree-Ireland

1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3

4    KEVIN RISTO, on behalf          )

     of himself and all others      )

5    similarly situated,             )

                                     )

6              Plaintiffs,           )

                                     )

7       vs.                          )   Case No. 2:18-cv-

                                     )   07241-CAS-PLA

8    SCREEN ACTORS GUILD-AMERICAN    )

     FEDERATION OF TELEVISION AND    )

9    RADIO ARTISTS, a Delaware       )

     corporation; AMERICAN FEDERATION )

10   OF MUSICIANS OF THE UNITED STATES )

     AND CANADA, a California        )

11   nonprofit corporation; et al., )

                                     )

12             Defendants.           )

     _____)

13

14

15

16        DEPOSITION OF DUNCAN CRABTREE-IRELAND

17              CONDUCTED VIRTUALLY

18           TUESDAY, FEBRUARY 16, 2021

19                   9:05 a.m.

20

21   Job No. 269207

22   Pages: 248

23   Reported by:  Lorie Rhyne, CSR, RPR, CRR

24   Appearing remotely from San Diego, California

25

Duncan Crabtree-Ireland

```
 1            Q.    Well, after the organizations merged -- once
 2   the merger occurred, I just want to get a sense of the
 3   overall responsibilities that you had and whether or
 4   not those responsibilities include advocacy for
 5   performing rights after the merger occurred.
 6            MR. THOMAS:  Objection.  Vague.
 7            THE WITNESS:  Yes, they did.  Although, I
 8   would just note my responsibilities in that area
 9   existed prior to the merger as well, just not
10   specifically for the music part of our world but for
11   the audiovisual part where also performance rights can
12   be an issue.
13   BY MR. KIESEL:
14            Q.    Great.  And did your work also involve
15   advo- -- advocacy for intellectual property rights?
16            A.    Yes.
17            Q.    And after the merger, did you do any
18   lobbying with the US government?
19            A.    I don't know that I did lobbying -- it
20   depends on how you define the word "lobbying."  Did I
21   do advocacy with US government?  Yes.  Did I do
22   lobbying that would require registration as a lobbyist?
23   No.
24            Q.    I take it you've never done work that
25   required that you register as a lobbyist?
```

1      BY MR. KIESEL:

2           Q.   Got it.  Did you do any lobbying with

3      international governments?

4           A.   I did --

5                MR. THOMAS:  Objection.  Vague.

6                THE WITNESS:  Sorry.

7                MR. THOMAS:  Go ahead.

8                THE WITNESS:  I think I need to pause

9      longer.

10               I did advocacy with certain foreign

11     governments, yes.  Again, I would not define it as

12     lobbying.

13     BY MR. KIESEL:

14          Q.   What advocacy did you do with foreign

15     governments?

16          A.   For example, participated in programs and

17     workshops that were sponsored by the World

18     Intellectual Property Organization, which were designed

19     to encourage governments that had not established

20     performance rights to establish them and to help

21     educate them on how to set up a system by which those

22     performance rights would be collected and distributed

23     to artists.

24               Also to advocate for the enforcement of

25     existing performance rights regimes for the benefit of

Duncan Crabtree-Ireland

```
 1    US performers who, in many cases, are, in my view, not
 2    treated fairly by foreign governments' performance
 3    rights, administration systems.
 4         Q.    And for that -- that advocacy that you were
 5    doing for performance rights, did it actually sometimes
 6    require you travel to European countries?
 7         A.    Yes.  Yes.
 8         Q.    And what countries did you travel to?
 9         A.    At -- if we're talking about at any time
10    since 2000, quite a -- quite a few.  I should note that
11    some of that advocacy would occur in conjunction with
12    other performance rights-related business, such as
13    attending meetings of SCAPR, which is an umbrella group
14    for performance rights organizations, et cetera.
15              So I could try to give you a list of what
16    those trips were, what countries that involved.  But
17    there were a number of countries in Europe, also
18    Thailand, those jump out.  Probably a few others, if
19    that would be helpful.
20         Q.    Sure.
21         A.    Okay.  Well, I have a -- I have a little
22    list that I have prepared.
23         Q.    Okay.
24         A.    So is it all right if I refer to that?
25         Q.    That would be fine.  As long as we know
```

Duncan Crabtree-Ireland

1    you're referring to it, go for it.

2         A.   Okay.  So let's see.  If we -- my list

3    starts in 2013, and I understand your question to be

4    where outside of the United States did I go.  So -- is

5    that correct?

6         Q.   For advocacy purposes, sure.

7         A.   Right.  Okay.  So Germany, Berlin, in

8    December of 2013.  Geneva, Switzerland, same month.

9    Madrid, Spain, in March of 2014.  Again, to Geneva,

10   Switzerland, in June of 2014.  Amsterdam, Netherlands,

11   June of 2014.  Brussels, Belgium, September 2014.

12   Belgrade [sic], Estonia, June of 2015.  Toronto,

13   Canada, in June of 2016.

14        Sorry, I need to correct that.  There's an

15   error in my list, which is the one that I referenced in

16   Belgrade -- Belgrade is not in Estonia.  Belgrade is in

17   Serbia, so that was a mistake.  So Belgrade, Serbia, in

18   June of 2015.  Then in Tallinn, Estonia, in May of

19   2017.  Paris, France, in June of 2018.  Geneva,

20   Switzerland, again, in June of 2018.  São Paulo,

21   Brazil, in May of 2019.  And Bangkok, Thailand, in

22   October of 2018.

23        Q.   Thank you.

24        Going to the -- the Fund.  What was the

25   purpose of the creation of the Fund, to your

1   understanding?

2          A.   The purpose of the creation of the Fund was

3   to distribute royalties to nonfeatured performers

4   under -- well, and it was created in connection with

5   the establishment of the performance right for

6   noninteractive digital transmission of sound recordings

7   in Section 114(g) of the Copyright Act, and it's also

8   the purpose of the Fund to collect other performance

9   royalties for nonfeature performers, and it does so

10  outside the United States, which does -- obviously,

11  don't arise under the Copyright Act.  But the

12  fundamental purpose of the Fund is to collect and

13  distribute those royalty payments to nonfeatured

14  artists.

15          Q.   And a nonfeatured artist,

16  Mr. Crabtree-Ireland, could be both a union and a

17  nonunion member?

18          A.   Yes.

19          Q.   What year was the Fund created?

20          A.   I believe approximately 1998.

21          Q.   And when the Fund was originally created,

22  was there an organizing board that oversaw the Fund?

23          A.   There were trustees established to oversee

24  the Fund from its inception in 1998.

25          Q.   Do you know what the origin was of the

Duncan Crabtree-Ireland

```
 1        Q.    Thank you.

 2              So let's go back to Exhibit Number 1.  And

 3    I'd like to just start with the General Purpose.  And

 4    we're on page 3 of the Fund, and we're at Section 2.

 5    And Nico is highlighting that for us.

 6              Could you read for us, please, what --

 7    what -- what's been highlighted?

 8        A.    Sure.  Section 2.  General Purpose.  The

 9    Fund shall be a trust fund and shall be used for the

10    purpose of receiving and distributing royalties or

11    remuneration to artists in accordance with such

12    agreements for receipt and distribution of remuneration

13    as are entered into by the unions with the relevant

14    collecting societies, rights organizations or other

15    appropriate entities.  The Fund shall further provide

16    the means for financing the expenses of the trustees

17    and the operation and administration of the Fund in

18    accordance with this agreement and declaration of

19    trust.  The Fund is intended to satisfy the

20    requirements of Section 501(c)(6) of the

21    Internal Revenue Code and shall be construed in all

22    respects consistently with Section 501(c)(6).

23        Q.    Thank you.  Do you know if this is a trust

24    or a 501(c)(6) nonprofit corporation?

25        A.    I believe it is a trust.
```

Duncan Crabtree-Ireland

```
 1   distribution.  Because in some cases, the research for

 2   that takes a while.  And so we set up a committee, I

 3   believe, around maybe 2014ish to -- to look at that

 4   issue and to determine what, if anything, we should do

 5   about it and to, you know, take the necessary steps to

 6   bring a recommendation back to the trustees.

 7   BY MR. KIESEL:

 8        Q.   Got it.  If I were to ask you to describe

 9   what the Fund does, could you provide a brief

10   description of what the Fund does?

11             MR. THOMAS:  Objection.  Overbroad.

12             But you can answer.

13             THE WITNESS:  Sure.  The Fund collects

14   royalties, both domestically and internationally;

15   determines who is entitled to receive payment of those

16   royalties under our distribution guidelines and then

17   distributes the money to them.

18   BY MR. KIESEL:

19        Q.   Do you have an estimate as to how many new

20   performers the Fund has to research each year, just a

21   ballpark?

22             MR. THOMAS:  Objection.  Vague.

23             THE WITNESS:  How many new performers?  Is

24   that what you said?

25   BY MR. KIESEL:
```

```
 1    in exchange for those services and data.

 2         Q.   What would be a good way to describe the

 3    data coming from the unions as -- as we're going

 4    forward?  Do you just simply call it data?  Is that the

 5    best way to do it or something else?

 6              (Stenographer clarification.)

 7    BY MR. KIESEL:

 8         Q.   As regard to what the unions were providing?

 9         A.   Sure.  I mean, as a general term, yes.  I

10    mean, there's obviously specific pieces of it that we

11    could define more specifically.  But generally, that's

12    fine.

13         Q.   Okay.  When you had the conversation as you

14    were onboarding to become a trustee, what was your

15    understanding of the reason why they wanted to have a

16    service fee in place for the unions?

17              MR. THOMAS:  Objection.  Vague.  Calls for

18    speculation.

19              THE WITNESS:  I think the idea was that for

20    a long time now the unions had been sort of informally

21    and unofficially providing a lot of data and a lot of

22    services to the Fund that the Fund was extremely

23    reliant on and, in fact, was essential to the Fund.

24              And one of the things that was going on

25    during this time period was what I would call a sort of
```

Duncan Crabtree-Ireland

 1   professionalization of the operations of the Fund.  The

 2   Fund was going from being a small sort of

 3   mom-and-pop-type operation to a larger, more

 4   professional sort of type of environment.  And I think

 5   there was a concern that having, essentially, such a

 6   significant dependence on data and services that come

 7   from the union without any kind of agreement in place

 8   to assure the continued provision of those services was

 9   not wise.

10           I think there was also a sentiment that the

11   unions were starting to get to a place where they did

12   not wish to continue to subsidize the operations of the

13   Fund by providing services, et cetera, for free and

14   that it would be best to define how that was going to

15   work so that we didn't end up in some kind of a

16   situation where the services or the data were withdrawn

17   and leaving the Fund without access to that

18   information.

19   BY MR. KIESEL:

20       Q.   Did you have a conversation with either

21   Ray Hair or Dennis Dreith or anyone else connected to

22   the Fund before that service fee was voted on how the

23   unions would be reimbursed for the costs associated

24   with the data they were providing the Fund?

25           MR. THOMAS:  Object to the form.  Misstates

Duncan Crabtree-Ireland

```
 1          A.   When you say "any beneficiary of the Fund,"
 2   are you excluding a trustee who might have also been
 3   the beneficiary?
 4          Q.   Yes.
 5          A.   Okay.  Then not to my knowledge, no.
 6               THE VIDEOGRAPHER:  Counsel, this is the
 7   videographer --
 8               MR. KIESEL:  Videographer, go.
 9               THE VIDEOGRAPHER:  I -- I just need a break
10   in a couple of minutes just to put a break in between
11   the video.
12               MR. KIESEL:  Well, the good news is we're
13   approaching the hour, and so why don't we take a break
14   right now.  You can get the video recycled.  We'll come
15   back at 11:30 and continue with Mr. Crabtree-Ireland's
16   deposition.
17               THE VIDEOGRAPHER:  Thank you very much.
18               We are now going off the record.  The time
19   is 11:17 a.m.
20               (A recess is taken.)
21               THE VIDEOGRAPHER:  We are now going back on
22   the record.  This is the beginning of Media Number 2,
23   and the time is 11:33 a.m.
24   BY MR. KIESEL:
25          Q.   So a little bit earlier, you said the Fund
```

1    was reliant on the unions to provide them information

2    for the nonfeature performers so they could identify to

3    whom they should be paying royalty checks to; correct?

4           A.    Yes.

5           Q.    Okay.  Do you know what percentage of the --

6    in general, performers were identified by, say,

7    SAG-AFTRA in providing the data to the Fund they were

8    able to identify?

9                 MR. THOMAS:  Objection.  Vague.  Lack of

10   foundation.

11                THE WITNESS:  Well, I guess I'm

12   understanding your question to be of the performers

13   identified by the Fund, how -- you know, what

14   proportion of them were identified based on information

15   provided by SAG-AFTRA.  Is that what you're asking me?

16   BY MR. KIESEL:

17          Q.    That is what I'm asking, correct.

18          A.    I don't know.  Sorry -- sorry to clarify

19   that question only to tell you I don't know.  But I

20   don't know.

21          Q.    If I were to tell you that it was less than

22   30 percent of the performers were identified by the

23   data provided by SAG-AFTRA, would that surprise you?

24          A.    I -- it -- do you -- when you say "were

25   identified," do you mean were identified by -- as to

Duncan Crabtree-Ireland

```
 1    Bearing in mind that a minority of total performances
 2    would be vocalists, SAG-AFTRA would only retain or
 3    likely only have records for vocalists, since we don't
 4    represent nonvocalist musicians.
 5            And, of course, as -- as has been pointed
 6    out from the beginning of this process, the Fund is
 7    responsible for distributing royalties to all
 8    performers regardless of their union status, which
 9    means that they would be -- you know, the Fund
10    distributed -- distributes royalties for performances
11    that are not covered by the union, which means that for
12    those performances, there would be no session form;
13    there would be no B report.  Although the unions might
14    still, and probably often do, have contact information
15    and identifying information for those nonunion
16    individuals.
17            So I guess my answer to you is, yeah, I
18    would expect it to be a few percentage points higher,
19    but it doesn't shock me that it would be 26 percent in
20    the context of SAG-AFTRA.
21       Q.   Would you agree that SAG-AFTRA would want to
22    provide the Fund information about its union members
23    for the Fund to make the payment to the union members?
24            MR. THOMAS:  Objection.  Vague.
25            THE WITNESS:  I think SAG-AFTRA would like
```

Duncan Crabtree-Ireland

1    the Fund to make payment to its union members, for

2    sure.  I also think that SAG-AFTRA and SAG-AFTRA

3    members would like the costs of doing that to be borne

4    by the people receiving those royalties and not to be

5    subsidized by other members of the union who are not

6    part of that payment stream.

7    BY MR. KIESEL:

8         Q.   If you're paying union dues for your

9    membership within SAG-AFTRA, part of your union dues

10   would go towards having the union assist in getting you

11   compensated for the work that you performed.

12              Would you agree with that?

13        A.   If you are --

14              MR. THOMAS:  Objection.  Vague.

15              THE WITNESS:  I'm sorry.  I thought I was

16   pausing long enough.  I need to pause longer, I guess.

17              If you are receiving -- so the due structure

18   of SAG-AFTRA -- and I can't speak to AFM -- but the due

19   structure of SAG-AFTRA involves a base dues amount

20   that's a flat fee regardless of what amount of work you

21   do or if you have any earnings at all; and then there

22   is a percentage dues that's payable for all of your

23   earnings achieved under union contracts, which is

24   approximately 1.575 percent.

25              That dues is charged on, for example,

Duncan Crabtree-Ireland

1    residuals and other payments that flow from the union's

2    collective bargaining agreements, and so when a union

3    member receives a residual payment that's processed by

4    the union, they are paying the costs of that processing

5    by virtue of being charged dues on that money that

6    they've received as a percentage.

7            The royalties that are paid through the AFM

8    and SAG-AFTRA fund are not subject to any dues by the

9    union.  There is no fee charged by the union to the

10   members for receiving those payments.  And so from my

11   perspective, it's appropriate for the costs of

12   collecting and distributing those agreements to be

13   charged through the administrative fee rather than sort

14   of borne by the other members who are paying dues on

15   their earnings when these royalties are not subject to

16   dues.

17   BY MR. KIESEL:

18        Q.   Do you know what percentage of sessions are

19   union session, say, in 2020 versus nonunion session?

20        A.   In -- in -- I'm sorry.  In the overall

21   industry or --

22        Q.   Yes.

23        A.   Well, I mean, all of the sessions done for

24   major record labels are union sessions, and many

25   sessions done for indie labels are union sessions.  But

Duncan Crabtree-Ireland

1       Q.    Was there ever an effort to do an audit to

2   quantify the value of the services provided by the

3   unions to the Fund that you're aware of?

4       A.    Not to my knowledge.

5       Q.    Would you agree that a good practice would

6   have been to have done some sort of audit before -- I'm

7   going to use the words "arbitrarily selecting a

8   percentage for the services"?

9       A.    Well, I certainly understand the point

10   you're making.  I guess our thinking -- at least my

11   thinking at the time -- was we did not want to increase

12   the cost of providing the services by spending a bunch

13   of money having someone go do time and motion studies

14   or other extensive, you know, analytical procedures

15   when we felt like we could approximate that with the

16   knowledge of the people who were involved in the

17   discussions.

18            So -- so I -- I think that it was a

19   perfectly appropriate way to approach it, but I

20   recognize there could have been other ways to approach

21   it as well.

22       Q.    Was there ever a discussion about wanting to

23   perform some type of audit before establishing a set

24   percentage for the data being provided or the services

25   being provided?

Duncan Crabtree-Ireland

```
 1          A.   Yes.  We talked about it.

 2          Q.   And did the -- was the decision to reject

 3   that because it might be more expensive to do that type

 4   of audit to figure out what the proper percentage

 5   should be?

 6          A.   Well, I think -- I -- I somewhat disagree

 7   with the last part of that question.  It was an attempt

 8   to limit the costs associated with setting up the

 9   service fee agreement.  I don't think that it's

10   accurate to state that we could only figure out an

11   appropriate percentage by doing a time and motion study

12   or extensive and analysis procedures.

13               But in any event, that was the reason for

14   not doing that was we felt that it would actually add

15   to the costs of it in a way that was not necessary or

16   sustainable.

17          Q.   Was that a discussion that was held at the

18   board meeting where the decision was made to approve a

19   3 percent fee?

20          A.   It was discussed amongst the trustees, as

21   well as something that was discussed between myself and

22   David White.

23          Q.   And by "discussed amongst the trustees" and

24   you and David White, were those all before the board

25   meeting took place where the vote was made?
```

Duncan Crabtree-Ireland

```
 1          A.    The trustee discussion, yes, definitely.  I
 2    don't -- don't recall the timing of the discussion with
 3    David White as to whether it was prior to or after that
 4    vote was taken.
 5          Q.    Was there an effort to determine how much it
 6    would cost to perform a study to determine what an
 7    appropriate percentage would be?
 8          A.    We -- if you -- if by an effort to determine
 9    the cost -- I mean, I guess the answer is yes in the
10    sense that we consulted with our -- with people who
11    were knowledgeable in conducting time and motion
12    studies.  We did not go out and seek bids from any
13    companies to actually do that work.
14          Q.    So who did you discuss the time and motion
15    study concept with before the vote?
16          A.    To my recollection, with Dennis, with other
17    trustees, with counsel, I believe with the Fund's
18    outside accountants, and I think that's probably it.
19          Q.    Do you recall how much, in 2012, 3 percent
20    of the Fund's distributable amounts there were in the
21    year 2012?
22                MR. THOMAS:  Objection.  Vague.
23                THE WITNESS:  I think I have that.  Well, I
24    may not have 2012, actually.  Because we didn't
25    actually do that in 2012, but, you know, it would have
```

1    a way to track just the literal time spent by people

2    responding to research requests for the Fund and then

3    limit the service fee to that.

4              The Fund wanted and needed services beyond

5    that, and the unions have data that is hard to locate

6    for the Fund beyond just that information that's not

7    really tied to just looking up that data but also is

8    tied to collecting the data on the union side in the

9    first place.  So I really --

10   BY MR. KIESEL:

11        Q.    Is it fair to say, though -- sorry.

12        A.    Sorry.

13        Q.    Sorry.  Is it fair to say that you can't

14   really quantify what percentage of the data that's

15   provided to the Fund is, quote, hard to find the data,

16   can't quantify that?

17              MR. THOMAS:  Objection.  Vague.  And you

18   also cut him off.

19              I will let you finish your answer.

20              MR. KIESEL:  I apologize.  I didn't mean to

21   cut you off.

22   BY MR. KIESEL:

23        Q.    So let me -- let me back up.  I'm going to

24   withdraw that last question and let you finish your

25   response.  I apologize for that.  Then we'll get into

Duncan Crabtree-Ireland

```
 1    the other one.  So...
 2         A.   Well, I think that I was just trying to say
 3    that I -- I feel like the -- there's a lot of
 4    information that has value and is expensive to collect
 5    and administer that is hard to -- for the Fund to -- to
 6    get anywhere else.  And so that's -- that has both --
 7    there's both cost and there's also value associated
 8    with it, and I don't think a time and motion study
 9    would accurately encompass both of those elements.
10         Q.   And so can I just ask you what percentage of
11    the total data provided to the Fund is data that's
12    really hard to find but for the unions providing that
13    data to the Fund?
14         A.   Well --
15              MR. THOMAS:  Objection.  Vague.
16              THE WITNESS:  Sorry.
17              I think, Number 1, the identification of the
18    nonfeatured artists on tracks is actually a very
19    challenging and difficult thing to do.  I mean, we've
20    had that conversation many, many times with Dennis and
21    with others about how hard that is.  And Dennis and
22    others who have to do it or had to be involved with it
23    on a daily basis have told me that -- that the union
24    session reports and B-forms are among the best possible
25    way to find that information in a reliable form.
```

Duncan Crabtree-Ireland

```
 1    the AFM.
 2         Q.   Rank-and-file member?
 3         A.   Yes.
 4         Q.   Let's turn to page 2, Bates Number
 5    DEFS_40631A of Exhibit Number 3.  I've taken the
 6    liberty of prehighlighting it.  And this was the
 7    portion of the minutes that reflect the administrative
 8    fee vote.  Could I ask you to just read in what it says
 9    below Administrative Fee?
10         A.   Sure.  A discussion ensued regarding the
11    Fund entering into a service agreement with the
12    American Federation of Musicians and --
13         Q.   Little slower for the court reporter.
14    Sorry.
15         A.   -- with the American Federation of Musicians
16    and SAG-AFTRA for ongoing support including membership
17    data and other information and services to assist in
18    facilitating distributions.  It was moved, seconded and
19    carried that the Fund enter into a service agreement
20    with the two unions, pursuant to which the unions would
21    provide information and services important to the Fund,
22    and the Fund would pay a service fee consisting of an
23    amount equal to 3 percent of each distribution (after
24    the deduction of administrative fees), with one-half
25    payable to the AFM and one-half payable to SAG-AFTRA.
```

Duncan Crabtree-Ireland

```
 1                    Do you want me to keep going or stop there?

 2        Q.   No, that's good right there.  Thank you.

 3        A.   Okay.

 4        Q.   Do you believe it was Patricia Polach who --

 5   who actually wrote these minutes?

 6             MR. THOMAS:  Asked and answered.

 7             THE WITNESS:  Yes.

 8   BY MR. KIESEL:

 9        Q.   To the best of your recollection, what was

10   the discussion --

11        A.   I -- I apologize.  Could I just clarify?

12             I -- I believe that, but I do not know if

13   she might have had any kind of an associate or someone

14   else help her with them.  I don't know the answer to

15   that.  But I assume she was responsible for them being

16   drafted.

17        Q.   Thank you.  To the best of your

18   recollection, did anyone speak against the proposal on

19   June 4, 2013?

20        A.   The best of my recollection, no.

21        Q.   Do you recall whether there were questions

22   asked of -- by anybody, any trustees, before the vote?

23        A.   There was definitely some discussion.  I

24   don't recall if it was in the form of questions or more

25   just discussion.
```

Duncan Yrabotree-Ireland

1          Q.    And I realize it may be difficult to parse

2     out discussions that you had before the June 4, 2013

3     board meeting and what occurred at the June 24

4     [verbatim], 2013 board meeting.   But can you give us a

5     sense of what the discussions were that were having

6     about the administrative fee?

7          A.    As far as I can recall, the main discussions

8     were about the amount of the fee, how it would be

9     structured and what the percentage -- once it was

10    seemingly a consensus that there would be a percentage,

11    what the percentage would be.

12         Q.    At the June 4, 2013 meeting, do you recall

13    whether there were alternative percentages proposed or

14    simply the 3 percent was the number that had been

15    agreed to by consensus, and that was the number

16    presented to the board for consideration?

17         A.    I don't recall because the -- the

18    discussions about this kind of have blend -- blurred

19    together in my head, so I'm not really sure at that

20    meeting which of those is the case.

21         Q.    Was a written version of the service

22    agreement provided to the trustees prior to this

23    meeting, if you recall?

24         A.    I believe so.

25         Q.    Was a draft outline of the services

```
 1          Q.    That's an IRS form that the nonprofits file

 2     with the IRS?

 3          A.    Yes.

 4          Q.    And, in fact, there was an original 990 form

 5     which suggested there was a conflict of interest policy

 6     in place at the time the original 990 was filed in

 7     2014, but an amendment was made acknowledging that

 8     there was no conflict of interest policy in place;

 9     correct?

10          A.    Yes.  That's my understanding.

11          Q.    As a cochair of the Fund, would you agree

12     that you had a fiduciary duty to the beneficiaries to

13     the Fund?

14          A.    As a trustee of the Fund, I would agree I

15     had a fiduciary duty to the beneficiaries of the Fund.

16          Q.    And whether you're cochair or a trustee, you

17     have the same fiduciary duty?

18          A.    I believe so, yes.

19          Q.    Okay.  And so would you agree that one of

20     those fiduciary duties is to make sure that you are not

21     wasting Fund assets in whatever the expense is

22     connected to the Fund?  You have a fiduciary duty to

23     make sure the Fund dollars are properly spent?

24          A.    Yes.

25          Q.    Would you agree that there could be a
```

Duncan Crabtree-Ireland

```
1    conflict between the Fund and the money it was to be

2    paying to one of the unions and the hat you wear on

3    behalf of the union -- not the Fund, but the union --

4    to recover money that the union was purportedly ex- --

5    expending for the benefit of the Fund?

6              MR. THOMAS:  Object to the form.  Vague.

7    Calls for a legal conclusion.

8              THE WITNESS:  You mean in the sense that the

9    union would be trying to get more money out of the Fund

10   and the Fund would be trying to get -- to pay less

11   money to the union?  Is that what you mean?

12   BY MR. KIESEL:

13        Q.    Not necessarily.  So the -- the Fund wants

14   to make sure that it preserves as much of its money for

15   distribution to the beneficiaries as it possibly can;

16   right?

17        A.    Yes.

18        Q.    On the other hand, the union wants to make

19   sure it's being reimbursed or given money back for

20   whatever expenses it's incurring or value it's

21   providing to the Fund to get back paid money to the

22   union for the work it's doing; right?

23              MR. THOMAS:  Object to the form.

24              THE WITNESS:  I mean, yes, but I mean, I

25   guess I would also just point out.  I mean, as you --
```

Duncan Crabtree-Ireland

 1    as you noted earlier, these are two nonprofit

 2    organizations.  So the union is not trying to make

 3    money.  The union is not trying to get the most money

 4    it can get out of the Fund.

 5              The Fund is not trying to somehow wheedle

 6    the union into giving it stuff for free that it should

 7    reasonably pay for, just like it doesn't go and try to,

 8    you know, get other service providers to -- to do that.

 9              So I -- I -- I feel like there's a -- a

10    conflict that's presumed in the nature of the question

11    that doesn't really exist because both entities were --

12    had their targets set on the same result, which is a

13    reasonable arrangement that provided for services to be

14    provided that the Fund needed and that the union would

15    be fairly compensated for those services.

16              So I -- I guess I don't buy into the

17    presumption that there's a conflict the way there would

18    be with two for-profit entities whose objective is to

19    maximize the amount of money that they make and it's a

20    zero-sum game.

21    BY MR. KIESEL:

22         Q.    Would you agree that if money is taken from

23    the Fund and provided to the union, that that is less

24    money available to be distributed to the beneficiaries

25    of the Fund?

Duncan Crabtree-Ireland

```
 1              A.   Yes.

 2              Q.   And the beneficiaries want to maximize as

 3   much money as they can in the Fund to ensure their

 4   distribution of the distributable amount in the Fund?

 5              MR. THOMAS:   Object to the form.

 6              THE WITNESS:   Yes, but the beneficiaries

 7   also want the funds to be able to be distributed.

 8   Because having the maximum amount of money in the Fund

 9   without having a way of distributing it doesn't serve

10   the interests of the beneficiaries at all.

11   BY MR. KIESEL:

12              Q.   You would agree it depends, really, on the

13   value of the funds being paid to the union versus the

14   union -- the Fund's ability to make the payments to the

15   beneficiaries is a factor in determining whether or not

16   Fund dollars given to someone else is an appropriate

17   transfer of that money?

18              MR. THOMAS:   Objection.   Vague.   Ambiguous.

19   BY MR. KIESEL:

20              Q.   Hypothetic -- let me get you to answer that.

21   I'll give you a hypothetical.

22              A.   I mean, if we -- if we imagine for a moment

23   that the other party that the -- the Fund was trying to

24   get data from was a for-profit business of its own out

25   there and the Fund was seeking to get data that that
```

Duncan Crabtree-Ireland

1   entity had and that it needed, then the Fund would, I

2   presume, enter into an agreement with that entity and

3   would expect to pay the reasonable value of the

4   services or data or whatever that it was seeking to

5   acquire from that other organization.

6          So I guess I'm not really understanding -- I

7   mean, I don't think the beneficiaries of the Fund or

8   the trustees of the Fund expect that they would be able

9   to get services provided to the Fund for free as a way

10  of maximizing the -- the amount of money distributed to

11  the beneficiaries of the Fund.

12  BY MR. KIESEL:

13       Q.   But if you were a nonunion beneficiary of

14  the Fund, you would agree that paying money to the

15  union is not benefiting the nonunion beneficiary of the

16  Fund; right?

17       A.   I do not agree with that at all.  In fact, I

18  categorically reject that statement.

19       Q.   Okay.  So how does the nonunion beneficiary

20  benefit from the information provided from the union to

21  the Fund?

22       A.   Well, first of all, the union maintains data

23  on nonmembers of the union, including things like their

24  whereabouts, how to contact them, the information

25  needed to actually make payments to them.  So that's

Duncan Crabtree-Ireland

```
 1    paid for it instead of leaving my money tied up in a

 2    pool while someone tried to figure out that it was -- I

 3    was entitled to it and that it should be paid to me.

 4             I don't understand why anyone would object

 5    to that, the fact that the union is providing the data

 6    as opposed to some other party providing the data.  The

 7    bottom line is if you want to receive your royalty

 8    distributions, you want the data to be provided and you

 9    want it to be provided in as efficient and quick a

10    manner as possible so that money gets into your pocket.

11    BY MR. KIESEL:

12        Q.    Now, the Fund has a research team in place,

13    a full-time staff; right?

14        A.    Yes.  Yes, we --

15        Q.    The Fund has -- pardon.

16             So the Fund has an ability itself to do

17    research independent of the union to try to identify

18    beneficiaries to the funds?

19        A.    Yes, it does.

20        Q.    And those costs associated with the direct

21    employees from the Fund are withdrawn from the total

22    amount available to be distributed to the

23    beneficiaries.  The administrative costs and the funds

24    are taken out; right?

25        A.    Right.  So they're part of the
```

```
1    Misstates his testimony.

2              THE WITNESS:  You know, I was concerned that

3    it could be moving in that direction, and I wanted to

4    be out ahead of the issue.  So I did want us to take a

5    look at that.  And I think more so than me feeling

6    those numbers were, you know, unjustifiable or whatever

7    because I -- I don't think that; I think those numbers

8    are justifiable -- I was concerned that if we didn't

9    make a structural change to the formula, that as

10   streaming continued to grow and grow, as I expected it

11   to do, that we might enter into a territory that was of

12   concern.  So I wanted us to be out ahead of it and to

13   consider whether there was any kind of change that was

14   needed to keep it sort of aligned with a reasonable

15   standard.

16   BY MR. KIESEL:

17         Q.   As you sit here today, in 2021, is it your

18   view that the 3 percent is still aligned with a

19   reasonable standard for funds going to the union from

20   the Fund?

21         A.   As of today, yes.  Having said that, I also

22   am of the view that it would be wise for us to consider

23   putting additional parameters on the formula so that

24   additional growth in those numbers is constrained or

25   rationalized.
```

Duncan Crabtree-Ireland

```
 1            Q.    So what -- what is it about the fact that
 2       the Fund today is 450 percent larger than it was back
 3       in 2014 that moved you to conclude it's still a
 4       reasonable number today?
 5                  MR. THOMAS:  Objection.  Argumentative.
 6                  THE WITNESS:  Well, I -- I say it's based on
 7       my opinion about the amount of work that I believe is
 8       required in order to provide the data resources that
 9       the Fund needs, and I include in that all -- all stages
10       of the -- of the information gathering and sharing
11       process, as well as the other activities that the
12       unions engage in on behalf of the Fund.  And I base
13       that, again, not only on their costs but also on the
14       value of those services as I perceive them.
15                  And so from my perspective, at the -- you
16       know, at the time we entered into the agreement, it's
17       arguable that the percentage worked out to undervalue
18       the resources that were being provided to the Fund.  I
19       don't assume that at that time that was a full
20       accounting for all of the value and cost of the
21       services and data that was provided.  So I think we're
22       still within that reasonable bounds at this point.
23                  But I also acknowledge that, you know, if
24       over the next eight years the pattern of growth and
25       streaming were to continue the way it has over the last
```

Duncan Crabtree-Ireland

```
 1    extent he can provide an estimate on the fly here, you

 2    know, you're welcome to ask him about it.

 3            MR. KIESEL:  Sure.  The -- the witness --

 4    the -- the witness used the expression the amount of

 5    time -- "the amount of work required."  Those were his

 6    words, "the amount of work required."  And the

 7    3 percent being a reasonable fee.

 8            And I really want to just get a sense from

 9    this witness, as he uses the term "the amount of work

10    required," what goes into that statement.  Because it's

11    a broad statement.  But I need to understand what words

12    go into it for him to feel comfortable that the

13    percentage the -- the union is getting is a reasonable

14    amount.  That's all.

15            THE WITNESS:  So I -- I -- let me just

16    state -- I mean, I wouldn't base that on sort of trying

17    to calculate what the amount of hours are per person or

18    even in the aggregate because that's going to vary by

19    year, and I would need to do all kinds of research to

20    find out the answer to that.

21            But what I do know and I would love to share

22    is there are various steps that have to be carried out

23    by human beings throughout the course of the process of

24    bringing someone from being a new entrant into the

25    industry to someone collecting royalties from the Fund.
```

Duncan Crabtree-Ireland

```
 1    And among those processes are us onboarding them either

 2    as a member or as a nonmember fee payer or as someone

 3    who's in our database as a complete non- -- you know,

 4    unrelated to the institution but that we have on file.

 5             That information all has to be, you know,

 6    solicited, received, entered into data processing

 7    systems, categorized, et cetera, and then it has to be

 8    provided to the Fund.

 9             Then there's obviously the stage in which

10    someone is actively recording.  That means that now

11    session forms are being created, if they're working on

12    covered projects or B forms.  Those have to then be

13    processed, filed and accessed through the union.  That

14    all requires human time.

15             Then there's obviously the process of

16    actually responding to requests from the Fund because

17    those are not all an automated process.  So that's a

18    human being's time to go and identify, locate, find the

19    information, provide it back.

20             Then there's, of course, the other aspects

21    of the service fee agreement that aren't included in

22    that process.  So things like the time that we spent

23    lobbying for changes to the Music Modernization Act

24    that directly benefited the Fund and only the Fund at

25    the expense of the unions in terms of our time and
```

Duncan Crabtree-Ireland

```
1    costs spent lobbying for them.

2              So I mean, there's a whole bunch of things.

3    And then all of that just ties into your question about

4    cost, but I just want to reiterate what I said before,

5    which is it doesn't factor in the question of the value

6    of the data in particular.  That's independent of the

7    question of the incremental cost of gathering it.

8    BY MR. KIESEL:

9         Q.   Did you understand that AFM and SAG-AFTRA

10   were being repaid for the creation of the Fund?

11        A.   I know there were some comments made about

12   that by various people on the process.  I've never seen

13   it that way because I don't think there's any way of

14   really quantifying or knowing all of the resources that

15   were invested in the Fund from its inception all the

16   way until 2013.

17             So from my perspective -- and -- and I don't

18   rule out anyone else's view on this -- but from my

19   perspective, that's not what I'm looking at.  What I'm

20   looking at is what do I think the value, the cost and

21   value of the data and services that we're providing to

22   the Fund are and making sure that that's reasonable.

23        Q.   Did you understand that the AFM and

24   SAG-AFTRA were being repaid for lobbying changes to the

25   US Copyright Act?
```

Duncan Crabtree-Ireland

```
 1              A.    When --

 2                    MR. THOMAS:  Objection.  Vague and

 3      overbroad.

 4                    THE WITNESS:  Sorry.

 5                    When you say "repaid," do you mean from

 6      periods prior to 2013, or do you mean for work that

 7      we've been doing since the service fee agreement?

 8      BY MR. KIESEL:

 9              Q.    Let's break it up.  Initially, before, and

10      then after.

11              A.    Before, I would just refer you to my

12      previous answer.  I don't -- I do not view it as

13      repayment for funds expended prior to the entry into

14      force of the service agreement.  I understand some

15      other people may have said that.  I don't subscribe to

16      that view.

17                    As far as post the service fee agreement,

18      yes, I do believe that that advocacy work is part of

19      what is called for by the service agreement; and it is

20      for that reason that SAG-AFTRA did not ask the Fund to

21      absorb any of the cost of the work that was done, for

22      example, on the Music Modernization Act to benefit the

23      Fund.

24              Q.    Were a lot of the activities being done by

25      SAG-AFTRA and AFM work that the unions would otherwise
```

1    have done even if the Fund did not exist?

2                MR. THOMAS:  Objection.  Vague.  And

3    overbroad.

4                THE WITNESS:  Some of them may have been,

5    but the example I just mentioned to you twice is a

6    perfect example of one that was not.  There would have

7    been no reason for us to lobby for those changes to the

8    Music Modernization Act other than to benefit the Fund.

9    BY MR. KIESEL:

10        Q.   It's fair to say that the -- as you used the

11   term "the amount of work required," you've not done

12   a -- a -- a -- a -- a time -- use your words -- a time

13   and motion study to determine the actual hours that

14   went into that work; correct?

15        A.   Correct.

16        Q.   And as you sit here today, you still don't

17   think it's necessary to do a time and motion study to

18   determine the actual value -- actual cost of the

19   services provided by the unions to the Fund, given the

20   amount of money that's being paid to the funds --

21   strike that.  I'm going to start the question again.

22                As you sit here today, it's your testimony

23   that a time and motion study need not be done to

24   further support the 3 percent service fee being paid

25   from the Fund to the unions at the present time;

```
1    overbroad.

2              THE WITNESS:  My understanding is that it

3    was an effort that brought together the unions, so

4    AFTRA and AFM at the time, along with the record labels

5    to establish a mutually agreed approach to securing a

6    performance right in the noninteractive digital

7    transmission of performances.

8    BY MR. KIESEL:

9         Q.   Okay.  Were you involved in any effort to

10   amend 17 USC Section 114(g) at any point in time?

11        A.   No.

12        Q.   Were you involved in the efforts to pass the

13   Music Modernization Act?

14        A.   Yes.

15        Q.   Can you tell us what your involvement was

16   there?

17        A.   My involvement was to support proposed

18   changes in the Music Modernization Act that would

19   establish and did establish a federal preemption of

20   state escheat laws as they apply to royalties that were

21   subject to distribution by the Fund and to deploy

22   resources on behalf of SAG-AFTRA to support that

23   effort.

24        Q.   Okay.  Are you aware if the Music

25   Modernization Act made any changes to
```

Duncan Crabtree-Ireland

```
 1    17 USC Section 114 relevant to the Fund?

 2          A.    I'm actually not sure, off the top of my

 3    head, where that escheat preemption is codified, so I'm

 4    not sure about that.

 5          Q.    Okay.  I'd like to direct your attention now

 6    to 17 USC 114(g)(2), Subsection B and C.

 7          A.    Yes.

 8          Q.    This language dictates how the royalties for

 9    nonfeatured performers relevant to this case are to be

10    allocated and distributed; right?

11          A.    Yes.

12          Q.    These subjects both refer to an independent

13    administrator charged with managing the escrow accounts

14    for the royalties for nonfeatured performers are to be

15    deposited; correct?

16          A.    Yes.

17          Q.    Is it your understanding that the Fund

18    served as the independent administrator pursuant to

19    this subsection?

20          A.    Yes.

21          Q.    The subsections refer to the independent

22    administrator being, quote, jointly appointed by

23    copyright owners of sound recordings and the unions.

24                Who, to your knowledge, were the copyright

25    owners of sound recordings involved in so appointing
```

## AGREEMENT AND DECLARATION OF TRUST

**AFM and SAG-AFTRA**
**Intellectual Property Rights Distribution Fund**

**Established**
**September 16, 1998**

**Amended and Restated**
**July 26, 2012**

THIS AGREEMENT AND DECLARATION OF TRUST is made and entered into as of the 16th day of September, 1998, and is amended and restated as of July 26, 2012, in the City of New York, State of New York, by and between the American Federation of Musicians of the United States and Canada, AFL-CIO-CLC ("AFM") and the Screen Actors Guild - American Federation of Television and Radio Artists ("SAG-AFTRA"), hereinafter jointly known as the Unions.

### Preamble

WHEREAS, this Agreement and Declaration of Trust was originally established as of the 16th day of September, 1998, in the City of New York, State of New York, by and between the AFM and the American Federation of Television and Radio Artists ("AFTRA"); and

WHEREAS AFTRA merged with the Screen Actors Guild ("SAG") effective March 2012, and the merged unions are now constituted as SAG-AFTRA; and

WHEREAS, the Trustees now desire to amend and restate the Agreement and Declaration of Trust to reflect the merger of AFTRA into the merged union SAG-AFTRA, as well as to incorporate other amendments that the Trustees have made from time to time; and

WHEREAS, the Unions or their designated entities obtain and distribute to artists royalties and remuneration that are created by U.S. or foreign law and that are appropriate for collective administration; and

WHEREAS, the Unions have entered into a Reciprocal Agreement and an Annex for the Distribution of Record Rental Royalties Collected in Japan, pursuant to which they will receive and distribute record rental remuneration payable to non-featured instrumentalists and vocalists under the law of Japan; and

WHEREAS, the Unions have entered into other such agreements for the receipt and distribution of royalties or remuneration for the benefit of their members and other performing artists in the United States and Canada, and will continue to enter into such agreements; and

WHEREAS, to accomplish this purpose the Unions established a trust fund known as the AFM and AFTRA Intellectual Property Rights Distribution Fund for receiving and

1

EXHIBIT

Crabtree-Ireland Ex. 1

distributing royalties and remuneration; and

WHEREAS, the trust fund formerly known as the AFM and AFTRA Intellectual Property Rights Distribution Fund shall now be known as the AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund; and

WHEREAS, the Unions desire to restate the terms and conditions under which the said Fund is to be established and administered;

NOW, THEREFORE, in consideration of the premises, it is mutually understood and agreed as follows:

## Article I
## Definitions

*Section 1.* UNIONS. The term "Unions" as used herein shall mean the American Federation of the Musicians of the United States and Canada, AFL-CIO-CLC, and the Screen Actors' Guild – American Federation of Television and Radio Artists.

*Section 2.* AFM. The term "AFM" as used herein shall mean the American Federation of Musicians of the United States and Canada, AFL-CIO-CLC.

*Section 3.* SAG-AFTRA. The term "SAG-AFTRA" as used herein shall mean the Screen Actors Guild – American Federation of Television and Radio Artists, or, prior to March 2012, the American Federation of Television and Radio Artists.

*Section 4.* AGREEMENT AND DECLARATION OF TRUST. The term "Agreement and Declaration of Trust" as used herein shall mean this instrument including any amendments hereto and modifications hereof.

*Section 5.* FUND. The term "Fund" as used herein shall mean the AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund.

*Section 6.* AGREEMENT FOR THE RECEIPT AND DISTRIBUTION OF REMUNERATION. The term "agreement for the receipt and distribution of remuneration" as used herein shall mean any agreement entered into by the AFM, SAG-AFTRA or the Unions with a collecting society, rights organization or other appropriate entity to receive royalties or remuneration held by that entity and to distribute such royalties and remuneration to eligible artists.

*Section 7.* ARTISTS. The term "artists" as used herein shall mean instrumental musicians and vocalists.

## Article II
## Creation of Fund

*Section 1.* ESTABLISHMENT OF FUND. The AFM and AFTRA Intellectual Property Rights Distribution Fund, which was established on September 16, 1998. is hereby amended and restated as the AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund, to be used for the

2

Confidential

DEFS_00041368

purpose set forth in this Agreement and Declaration of Trust.

*Section 2.*  GENERAL PURPOSE.  The Fund shall be a trust fund and shall be used for the purpose of receiving and distributing royalties or remuneration to artists in accordance with such agreements for receipt and distribution of remuneration as are entered into by the Unions with the relevant collecting societies, rights organizations or other appropriate entities. The Fund shall further provide the means for financing the expenses of the Trustees and the operation and administration of the Fund, in accordance with this Agreement and Declaration of Trust. The Fund is intended to satisfy the requirements of section 501(c)(6) of the Internal Revenue Code and shall be construed in all respects consistently with section 501(c)(6).

### Article III
### Trustees

*Section 1.*  AFM AND SAG-AFTRA TRUSTEES.  The operation and administration of the Fund shall be the joint responsibility of six Trustees, three appointed by the AFM, of which no fewer than one shall be a rank-and-file representative, and three appointed by SAG-AFTRA, of which no fewer than one shall be a rank-and-file representative.

*Section 2.*  TERM OF TRUSTEES.  Each Trustee shall continue to serve as such until his or her death, incapacity, resignation, or removal by the appointing Union. Each Union may remove or replace its Trustee at will.

*Section 3.*  SUCCESSOR TRUSTEES.  Each Union shall appoint its successor Trustees.

*Section 4.*  FORM OF NOTIFICATION.  In case any Trustee shall be removed, replaced, or succeeded, a statement in writing by the relevant Union shall be sufficient evidence of its action, when forwarded to the Fund and to the remaining Trustees. Any resignation shall be evidenced in writing and forwarded by registered mail to the Fund and the remaining Trustees, and shall not be effective for two months following the date of mailing unless a successor Trustee has been appointed.

### Article IV
### Powers, Duties and Obligations of Trustees

*Section 1.*  PROPERTY AND ASSISTANCE.  The Trustees are authorized and empowered to lease or purchase such premises, materials, supplies and equipment, and to hire, employ and retain such legal counsel, investment advisor, administrative, accounting, actuarial, clerical and other assistants or employees as in their discretion they may find necessary or appropriate in the performance of their duties.

*Section 2.*  CONSTRUCTION OF AGREEMENT.  The Trustees shall have power to construe the provisions of this Agreement and Declaration of Trust and the terms used herein, and any construction adopted by the Trustees in good faith shall be binding upon the AFM, SAG-AFTRA, and artists claiming benefits under the Fund.

*Section 3.*  GENERAL POWERS.  The Trustees are hereby empowered, in addition to other such powers as are set forth herein or conferred by law:

3

DEFS_00041369

A.  To establish and administer the Fund on behalf of artists who may be entitled to payments pursuant to agreements for the receipt and distribution of remuneration entered into by the AFM, SAG-AFTRA or the Unions and determined by the Trustees to be appropriate for administration by the Fund.

B.  As to each agreement for the receipt and distribution of remuneration recommended by the AFM, SAG-AFTRA or the Unions, to decide whether or not to administer the agreement through the Fund.

C.  As to each agreement for the receipt and distribution of remuneration which is to be administered through the Fund, to establish governing rules and procedures for the distribution that are consistent with the relevant agreement.

D.  As to each agreement for the receipt and distribution of remuneration which is to be administered through the Fund, to pay all expenses necessary to the establishment, administration and operation of the agreement out of the receipts generated by the agreement.

E.  To enter into any and all contracts and agreements for carrying out the terms of this Agreement and Declaration of Trust and for the administration of the Fund and do all acts as they, in their discretion, may deem necessary and advisable.

F.  To compromise, settle, arbitrate, and release claims or demands in favor of or against the Fund or the Trustees on such terms and conditions as the Trustees may deem advisable.

G.  To establish and accumulate as part of the Fund a reserve or reserves, adequate, in the opinion of the Trustees, to carry out the purposes of the Fund.

H.  To pay out of the Fund all real and personal property taxes, income taxes and other taxes of any and all kinds levied or assessed under existing or future laws upon or in respect to the Fund or any money, property, or securities forming a part thereof.

I.  To make appropriate allocations of common administrative expenses and disbursements shared or to be shared with any other Plan or Fund, or among the various agreements for the receipt and distribution of remuneration.

J.  To receive contributions, payments, distributions or transfers from any source whatsoever to the extent permitted by law.

K.  To establish advisory committees composed of AFM and SAG-AFTRA representatives and/or other artists or artists' representatives, and to set forth the duties and functions of the members of such advisory committees.

L.  To do all acts, whether or not expressly authorized herein, which the Trustees may deem necessary or proper for the protection of the property held hereunder.

4

Confidential

M.    To establish such bank account or accounts as the Trustees deem necessary in their discretion, including escrow accounts pending the adoption of distribution rules governing the administration of an agreement for the receipt and distribution of remuneration.

N.    To do all acts, whether or not expressly authorized herein, which the Trustees may deem necessary to accomplish the general objective of distributing remuneration to eligible artists in the most efficient and economical manner.

O.    To purchase or obtain from the AFM, SAG-AFTRA, the AFM and Employers' Pension Fund, the AFTRA Health and Retirement Funds, the Phonograph Manufacturers' Special Payments Fund, the Motion Picture Special Payments Fund or any commercial source any data helpful for the identification and location of artists eligible for remuneration or the identification of recorded or other performances covered by an agreement for the receipt and distribution of remuneration.

P.    To invest the assets of the Fund with care, skill, prudence and diligence under circumstances then prevailing that a prudent person, acting in a like capacity and familiar with such matters, would use in the conduct of an enterprise of a like character and with such aims, without regard to state law restrictions on investments.

*Section 4.* COMPENSATION. The Trustees shall not receive compensation for the performance of their duties.

*Section 5.* PERSONAL LIABILITY. Neither the Trustees nor any individual or successor Trustee shall be personally answerable or personally liable for any liabilities or debts of the Fund contracted by them as Trustees, or for the non-fulfillment of contracts, but the same shall be paid out of the Fund and the Fund is hereby charged with a first lien in favor of such Trustee for indemnification for any amounts paid out by any such Trustee for any such liability and for indemnification against any liability of any kind which the Trustees or any of them may incur hereunder; provided, however, that nothing herein shall exempt any Trustee from liability arising out of his own willful misconduct, bad faith or gross negligence, or entitle such Trustee to indemnification for any amounts paid or incurred as a result thereof.

The Trustees and each individual Trustee shall not be liable for any error of judgment or for any loss arising out of any act or omission in the execution of their duties so long as they act in good faith and without gross negligence; nor shall any Trustee, in the absence of his own willful misconduct, bad faith or gross negligence, be personally liable for the acts or omissions (whether performed at the request of the Trustees or not) of any other Trustee, or of any agent or attorney elected or appointed by or acting for the Trustees.

The Trustees shall be fully protected in acting upon any instrument, certificate, or paper believed by them to be genuine and to be signed or presented by the proper person or persons, and shall be under no duty to make any investigation or inquiry as to any statement contained in any such writing, but may accept the same as conclusive evidence of the truth and accuracy of the statements contained therein.

5

Confidential

Neither the AFM nor SAG-AFTRA shall in any way be liable in any respect for any of the acts, omissions or obligations of the Trustees, individually or collectively.

The Trustees may from time to time consult with legal counsel and shall be fully protected in acting upon such advice of counsel to the Fund as respects legal questions.

*Section 6.* BOOKS OF ACCOUNT. The Trustees shall keep true and accurate books of account and records of all their transactions, which shall be audited at least annually by a certified public accountant selected by the Trustees. Such audits shall be available at all times for inspection by the AFM and SAG-AFTRA.

*Section 7.* EXECUTION OF DOCUMENTS. The Trustees may authorize and designate an employee or agent of the Fund to execute any notice or other instrument in writing.

*Section 8.* DEPOSIT AND WITHDRAWAL OF FUNDS. All moneys received by the Trustees hereunder shall be deposited by them in such bank or banks as the Trustees may designate for that purpose, and all withdrawals of moneys from such account or accounts shall be made only by checks signed by the Trustees, except that the Trustees may, in their discretion, designate and authorize an employee or agent of the Fund to sign checks upon such separate and specific bank account or bank accounts as the Trustees may designate and establish for such purpose.

*Section 9.* SURETY BONDS. The Trustees and any employees of the Trustees who are empowered and authorized to sign checks as aforesaid shall each be bonded by a duly authorized surety company in such amounts as may be determined from time to time by the Trustees. Each such employee employed by the Trustees who may be engaged in handling moneys of the Trust Fund shall also be bonded by a duly authorized surety company in the same manner. The cost of the premium on such bonds shall be paid out of the Fund.

**Article V**
**Selection of Remuneration Systems to Be Administered by the Fund**

*Section 1.* ACCEPTANCE FOR ADMINISTRATION THROUGH THE FUND. As to each agreement for the receipt and distribution of remuneration entered into by the AFM, SAG-AFTRA, or the Unions jointly, and referred by one of them to the Trustees for their consideration, the Trustees, in their sole discretion, may decide whether or not the agreement is appropriate for administration through the Fund. An agreement will be accepted for administration through the Fund only if the Trustees, voting in accordance with Article VII, Section 3, agree to accept it. The refusal of the AFM or SAG-AFTRA to accept an agreement for administration by the Fund shall not be subject to arbitration. The acceptance of an agreement for administration by the Fund shall be in writing.

*Section 2.* HOLDING MONEY PENDING ACCEPTANCE FOR ADMINISTRATION. The Fund may hold moneys received pursuant to an agreement for the receipt and distribution of remuneration in an escrow account pending the Trustees' decision whether to accept the agreement for administration through the Fund. If the Trustees refuse acceptance, the moneys will be returned with any interest accumulated thereon and minus any administrative costs incurred to the AFM, SAG-AFTRA or the Unions jointly in accordance with the agreement for the receipt and distribution of remuneration.

6

Confidential

Section 3.  CONTINUATION OF ADMINISTRATION.  Once an agreement for the receipt and distribution of remuneration has been accepted for administration through the Fund, it shall continue to be administered through the Fund until such time as the Trustees, voting in accordance with Article VII, Section 3, agree that such administration is no longer appropriate. If the Trustees, voting in accordance with Article VII, Section 3, disagree over whether continued administration is appropriate, they will attempt to resolve their difference on the matter. If they cannot resolve their difference on the matter, they agree to submit the dispute to mediation administered by the American Arbitration Association. If mediation fails to resolve the dispute, the agreement for the receipt and distribution of remuneration shall be discontinued for administration through the Fund upon the vote of the Trustees for one Union, voting in accordance with Article VII, Section 3.

## Article VI
### Plan of Payments and Distributions

Section 1.  PAYMENTS.  The Trustees shall have full authority to determine all questions of the nature and amount of payments to be provided to artists consistent with the relevant agreements for the receipt and distribution of remuneration.

Section 2.  ELIGIBILITY FOR PAYMENTS.  The Trustees shall have full authority to determine eligibility requirements for payments, consistent with the relevant agreements for the receipt and distribution of remuneration, and to adopt rules and regulations setting forth the same, which shall be binding on the artists.

Section 3.  METHOD OF PROVIDING PAYMENTS.  The payments shall be provided and maintained by such means as the Trustees in their sole discretion shall determine.

Section 4.  WRITTEN PLAN OF PAYMENTS AND DISTRIBUTIONS.  The detailed basis upon which payments are to be made pursuant to each agreement for the receipt and distribution of remuneration shall be specified in writing by appropriate action of the Trustees subject, however, to such changes or modifications by the Trustees from time to time as they in their discretion may determine. All such changes or modifications shall similarly be specified in writing by appropriate resolution of the Trustees.

Section 5.  DETERMINING CLAIMS FOR PAYMENTS.  The Trustees shall have full authority to determine all claims for payments, provided that they may delegate to the duly designated administrators of the Fund authority to determine such claims initially. The administrators' initial determination shall be submitted to the Trustees for final determination. An individual who believes that he or she has been adversely affected by the administrators' or Trustees' determinations regarding payment of benefits may submit a written appeal to the Trustees. The decision of the Trustees shall be final.

## Article VII
### Meetings and Decision of Trustees

Section 1.  MEETING OF TRUSTEES.  Meetings of the Trustees shall be held at such place or places as may be agreed upon by the Trustees.

7

DEFS_00041373

*Section 2.* ACTION BY TRUSTEES WITHOUT MEETING. The Trustees may also take action in writing without a meeting.

*Section 3.* AGREEMENT OF THE TRUSTEES. All actions of the Trustees shall be by agreement, with the AFM Trustees casting one vote, and the SAG-AFTRA Trustees casting one vote. In the event that any matter presented for decision cannot be decided because of a failure of agreement, the matter may be submitted for arbitration in accordance with Article VIII.

*Section 4.* MINUTES OF MEETINGS. The Trustees shall keep minutes of all meetings but such minutes need not be verbatim.

### Article VIII
### Arbitration

*Section I.* APPLICATION OF THIS ARTICLE. A Trustee may apply to the American Arbitration Association in the area where the Fund maintains its principal office for the designation of an arbitrator who will decide any disputes between the Trustees or any other matter submitted to arbitration in accordance with the provisions of Article VII, Section 3. The decision of the arbitrator shall be final and binding. Decisions to accept an agreement for the receipt and distribution of remuneration for administration through the Fund, pursuant to Article V, Section 1, shall not be subject to arbitration.

*Section 2.* EXPENSES OF ARBITRATION. The cost and expense incidental to any arbitration proceeding, including the fee, if any, of the impartial arbitrator, shall be a proper charge against the Fund and the Trustees are authorized and directed to pay such charges.

### Article IX
### Execution of Trust Agreement

*Section 1.* COUNTERPARTS. This Trust Agreement may be execute in counterparts.

### Article X
### Amendment to Trust Agreement

*Section 1.* AMENDMENT BY TRUSTEES. This Agreement and Declaration of Trust may be amended in any respect from time to time by the Trustees, provided that each amendment shall be duly executed in writing by the Trustees and annexed hereto. The Trustees shall have full discretion to fix the effective date of any amendment.

### Article XI
### Termination of Trust

*Section 1.* BY THE TRUSTEES. This Agreement and Declaration of Trust may be terminated by an instrument in writing executed by the Trustees when there is no longer in force and effect an agreement for the receipt and distribution of remuneration which is accepted for administration by the Fund.

*Section 2.* PROCEDURE ON TERMINATION. In the event of the termination of this Agreement and Declaration of Trust, the Trustees shall apply the Fund to pay or to provide for the payment

8

DEFS_00041374

of any and all obligations of the Fund and shall distribute and apply any remaining surplus in such a manner as will in their opinion best effectuate the purpose of the Fund; provided, however, that no part of the corpus or income of said Fund shall be used for or diverted to purposes other than for the benefit of the artists eligible for benefits under the agreements for the receipt and distribution of remuneration administered by the Fund, or the administrative expenses of the Fund or other payments in accordance with the provisions of the Fund.

Section 3.  NOTIFICATION OF TERMINATION.  Upon termination of the Fund, the Trustees shall notify each necessary party, and the Trustees shall continue as Trustees for the purpose of winding up the affairs of the Trust.

**Article XII**
**Miscellaneous Provisions**

Section 1.  GOVERNING LAW.  This Agreement and Declaration of Trust shall be construed under the laws of the State of New York applicable to contracts made and to be performed within the County and State of New York (without regard to any conflict of laws provision), and venue for any dispute arising under this Agreement and Declaration of Trust shall be in New York.

Section 2.  NOTIFICATION TO TRUSTEES.  The address of each of the Trustees shall be that stated on the signature page of this Agreement and Declaration of Trust. Any change of address shall be effected by written notice to the Trustees.

Section 3.  SEVERABILITY.  Should any provision in this Trust Agreement or in the rules and regulations adopted thereunder be deemed or held to be unlawful or invalid for any reason, such fact shall not adversely affect the provisions contained therein unless such illegality shall make impossible or impractical the functioning of the Trust and the Plan, and in such case the appropriate parties shall immediately adopt a new provision to take the place of the illegal or invalid provision.

Section 4.  VESTED RIGHTS.  No artist or any person claiming by or through such artist, including the artist's family, dependents, beneficiary and/or legal representative, shall have any right, title or interest in or to the Fund or any property of the Fund or any part thereof except as may be specifically determined by the Trustees.

Section 5.  ENCUMBRANCE OF PAYMENTS.  No moneys, property or equity, of any nature whatsoever, in the Fund, or policies or benefits or moneys payable therefrom, shall be subject in any manner by any artist or person claiming through such artist to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, garnishment, mortgage, lien or charge, and any attempt to cause the same to be subject thereto shall be null and void.

Section 6.  EXPENSES OF THE TRUSTEES.  All expenses of the Trustees incurred in the performance of their duties may be chargeable to the Fund at the discretion of the Trustees. All other expenses incurred pursuant to Article IV hereof shall be paid by the Fund.

Section 7.  NO EMPLOYER CONTRIBUTIONS PERMITTED.  The Fund shall not accept contributions from any employer or association of employers who employ artists represented by the AFM or SAG-AFTRA, and shall not enter into agreements for the receipt and distribution of remuneration with

9

such employers or associations of employers.

IN WITNESS HEREOF, in accordance with Article X, the Trustees sign this Agreement and Declaration of Trust, which amends and restates the original agreement and declaration of trust. The Trustees, by affixing their signatures at the end of this Agreement and Declaration of Trust, agree to accept the trusteeship and act in their capacity strictly in accordance with the provisions of this Agreement and Declaration of Trust.

_____  _____
Raymond M. Hair, Jr., AFM          Date
1501 Broadway, Suite 600
New York, NY  10036

_____  _____
Duncan Crabtree-Ireland, SAG-AFTRA  Date
5757 Wilshire Boulevard, 7th Floor
Los Angeles, CA  90036

_____  _____
Sam Folio, AFM          Date
1501 Broadway, Suite 600
New York, NY  10036

_____  _____
Stefanie Taub, SAG-AFTRA          Date
5757 Wilshire Boulevard, 7th Floor
Los Angeles, CA  90036

_____  _____
Bruce Bouton, AFM          Date
1501 Broadway, Suite 600
New York, NY  10036

_____  _____
Jon Joyce, SAG-AFTRA          Date
5757 Wilshire Boulevard, 7th Floor
Los Angeles, CA  90036

10

DEFS_00041376

such employers or associations of employers.

IN WITNESS HEREOF, in accordance with Article X, the Trustees sign this Agreement and
Declaration of Trust, which amends and restates the original agreement and declaration of trust. The
Trustees, by affixing their signatures at the end of this Agreement and Declaration of Trust, agree to
accept the trusteeship and act in their capacity strictly in accordance with the provisions of this
Agreement and Declaration of Trust.


| | | |
|---|---|---|
| Raymond M. Hair, Jr., AFM    Date<br>1501 Broadway, Suite 600<br>New York, NY 10036 | | Duncan Crabtree-Ireland, SAG-AFTRA  Date<br>5757 Wilshire Boulevard, 7th Floor<br>Los Angeles, CA 90036 |
| Sam Folio, AFM    Date<br>1501 Broadway, Suite 600<br>New York, NY 10036 | | Stefanie Taub, SAG-AFTRA    Date    11/13/12<br>5757 Wilshire Boulevard, 7th Floor<br>Los Angeles, CA 90036 |
| Bruce Bouton, AFM    Date<br>1501 Broadway, Suite 600<br>New York, NY 10036 | | Jon Joyce, SAG-AFTRA    Date<br>5757 Wilshire Boulevard, 7th Floor<br>Los Angeles, CA 90036 |

10

Confidential

such employers or associations of employers.

IN WITNESS HEREOF, in accordance with Article X, the Trustees sign this Agreement and
Declaration of Trust, which amends and restates the original agreement and declaration of trust. The
Trustees, by affixing their signatures at the end of this Agreement and Declaration of Trust, agree to
accept the trusteeship and act in their capacity strictly in accordance with the provisions of this
Agreement and Declaration of Trust.

Raymond M. Hair, Jr., AFM          Date
1501 Broadway, Suite 600
New York, NY  10036

Duncan Crabtree-Ireland, SAG-AFTRA   Date
5757 Wilshire Boulevard, 7th Floor
Los Angeles, CA  90036

Sam Folio, AFM                     Date
1501 Broadway, Suite 600
New York, NY  10036

Stefanie Taub, SAG-AFTRA           Date
5757 Wilshire Boulevard, 7th Floor
Los Angeles, CA  90036

Bruce Bouton, AFM                  Date
1501 Broadway, Suite 600
New York, NY  10036

Jon Joyce, SAG-AFTRA               Date
5757 Wilshire Boulevard, 7th Floor
Los Angeles, CA  90036

10

Confidential

DEFS_00041378

**Minutes**
**Meeting of the Trustees**
**AFM & AFTRA Intellectual Property Rights**
**Distribution Fund**

Approved as
amended
12-12-13

June 4, 2013

AFM & AFTRA Intellectual Property Rights Distribution Fund
11846 Ventura Blvd., Suite 300, Studio City, CA 91604

**Trustees Present:**   Bruce Bouton, AFM
Duncan Crabtree-Ireland, SAG-AFTRA (Via Telephone)
Sam Folio, AFM
Raymond M. Hair, Jr., AFM
~~Jon Joyce, SAG-AFTRA~~   Amendment 12-12-13
Stefanie Taub, SAG-AFTRA

**Present:**   Dennis Dreith, Fund Administrator
Nancy Carney, Fund Controller
Shari Hoffman, Manager, Audio-Visual Division (Via Telephone)
Jo-Anne McGettrick, Manager, Sound Recording Division
Patricia Polach, Bredhoff & Kaiser, PLLC (Via Telephone)
Grant Miller, Miller, Kaplan & Arase
Doug Waite, Miller, Kaplan & Arase

The meeting convened at 4:05 p.m. (PDT) in person and via teleconference.

**Minutes**

The minutes of the July 26, 2012 meeting had been previously approved via e-mail poll.

**Discussion of Studio Plaza Building**

Following up on written material sent to the Trustees earlier, the Administrator presented information regarding the possible purchase of the Studio City Plaza building, a 38,000 square foot property located in Studio City. The building is available at a purchase price of $9.9 million. The purchase price includes an adjacent parking lot valued at $2.2 million, which is zoned to allow a 30,000 square foot building. There currently is a note of $3.6 million on the building and parking lot which the AFM & SAG-AFTRA Fund could assume, reducing the initial cash outlay for the proposed purchase to $6.3 million. The building itself is fully leased to 2016; thereafter, it would serve as the home of the Fund, which is currently out of rentable space and which will need expanded space in the near future.

The Administrator presented further information about the financial aspects of the possible purchase. The initial cash outlay for the purchase would come from the long-term investment account; i.e., the long-term investment fund would invest in the building. The Administrator projected that over the next three years, the rental receipts from the building

**EXHIBIT**

**Crabtree-Ireland Ex. 3**

DEFS_00040629A

should exceed the costs of owning the building (the mortgage and operating expenses) by approximately $1.5 million per year. The Administrator anticipated that during or before 2016, the Fund would move in to the building (ultimately using one-third to one-half of the building) and pay a fair market value rent. The long-term investment account will be repaid from the net income derived from the building. The Administrator anticipated that the long-term investment account could be repaid within ten to twelve years, and that the Fund could be free of obligation after twelve to fourteen years (depending on the possibility of renegotiating the terms of the loan or loan buy-out with a reduced pre-payment penalty).

The Administrator reported that the purchase price is currently secured by a fully-refundable $300,000 deposit. He further advised the Trustees that no inspection has been performed on the building as of today, but that he was in the process of scheduling an inspection and appraisal. He asked for the views of the Trustees as to whether to move forward with the building purchase.

Various issues relating to ownership of the building were discussed. The accountants from Miller, Kaplan & Arase suggested that the Fund should establish a separate corporation to purchase the building in order to protect the Fund and the unions from any liabilities. A question was raised as to whether the title holding company would be tax exempt as well. Representatives of Miller, Kaplan & Arase advised that the title-holding corporation is tax-exempt, but not as to the mortgage. Because the debt on the building would be approximately 37% of the value of the building, 37% of the rental income and appreciation from the building would be taxable while the building is not being used for Fund purposes. However, if the Fund grew to occupy 85% usage of the building, no income tax would be owed.

Mr. Hair asked for clarification regarding repayment of the long-term investment account. The Administrator reiterated that the Fund would be paid back from the receipts of the current leases, and, after the Fund occupied the new building, from the revenue generated from the continuing leases and from the rent paid by the Fund. The Administrator said that he anticipated that continuing leases would provide sufficient income to fully pay the Fund back for all the costs of the building.

Mr. Duncan Crabtree-Ireland explored the benefits of an LLC structure for the new corporate entity to hold the title to the building. He further expressed his support for establishing a separate corporation for the purpose of purchasing the building.

# Privileged

Mr. Crabtree-Ireland moved that the Trustees approve the purchase of building, contingent upon receiving an appraisal at or over the purchase price, and contingent upon a favorable inspection of the building. Motion carried unanimously.

**Budget:**

2

Confidential

The Trustees continued the discussion from the last meeting regarding the Fund practice of preparing "expense only" budgets. Doug Waite of Miller, Kaplan & Arase explained that the Fund's practice is not unique, and that in organizations such as the Fund where collections cannot be fully predicted or routinized, expense-based budgets are appropriate. He further explained that expense-based budgets must be formulated based on actual expenses, track records of collections and expenditures, and sufficient oversight to assure that overall revenue is sufficient to meet expenses. He said that the Fund could add revenue projections to its proposed budgets, but that doing so was not a requirement for formulating an appropriate proposed budget. He suggested that further discussions of this topic could be taken up with Fund Auditor Jeff Goss if desired.

The Administrator presented the Fiscal Year 2014 Proposed Budget, which anticipates a complete separation from the Film Musicians' Secondary Markets Fund during the fiscal year. As a result, it included additional office space, new hires, and the establishment of FMSMF Administrative Assistant Johanna Medrano, IT Manager, Robert Rusek and Facilities Manager Tom Freas moving to the AFM & SAG-AFTRA Fund as full time employees. It also included the addition of a full-time paid Administrator, beginning mid-fiscal year. The Administrator noted that, consistent with past discussions of the Trustees, it is anticipated that he would move into that position at such point as an orderly transition can be made from his position at FMSMF.

Mr. Folio asked for additional detail on the proposed salaries for Fund staff. Mr. Crabtree-Ireland expressed the view that details as to staff salaries other than the Administrator's salary should be delegated to the Administrator for decision, but agreed that a detailed report should be provided. The Administrator agreed to provide that detailed report.

It was agreed that the Trustees would schedule a separate teleconference to review the proposed salary of the Administrator.

The Trustees approved the Fiscal Year 2014 Proposed Budget, contingent upon the resolution of the Administrator's salary in a subsequent meeting. It was agreed that Ms. Taub would arrange a meeting via teleconference for that purpose.

## Future Distributions and Future Collections:

The Administrator informed the Trustees that he anticipated that the 2013 distributions would total about $14 million, which will include a partial distribution of sound recordings (mostly DPR) for years 2009-2010 and approximately $4 million in audiovisual royalties from AIE (the Spanish collective) from 2011 and approximately 2012. He also reported that he projected collections in fiscal year 2014 of $32 million, the bulk of which will come from SoundExchange (including approximately $4 million from foreign royalties), other foreign agreements, and an additional $6 million from AIE for 2013 A-V royalties.

## Administrative Fee:

A discussion ensued regarding the Fund entering into a service agreement with the American Federation of Musicians and SAG-AFTRA for ongoing support including membership

3

DEFS_00040631A

data and other information and services to assist in facilitating distributions. It was moved, seconded and carried that the Fund enter into a service agreement with the two unions, pursuant to which the unions would provide information and services important to the Fund, and the Fund would pay a service fee consisting of an amount equal to 3% of each distribution (after the deduction of administrative fees), with one-half payable to the AFM and one-half payable to SAG-AFTRA.

The staff and MKA guests were excused. A discussion ensued with the Administrator regarding his leaving his position at the FMSMF and devoting his full time to the AFM & SAG-AFTRA Fund.

The meeting adjourned at 6:30 p.m. PDT.

4

Confidential

DEFS_00040632A

# Exhibit 3

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3

 4   KEVIN RISTO, on behalf          )

     of himself and all others      )

 5   similarly situated,            )

                                     )

 6           Plaintiffs,             )

                                     )

 7      vs.                          )   Case No. 2:18-cv-

                                     )   07241-CAS-PLA

 8   SCREEN ACTORS GUILD-AMERICAN    )

     FEDERATION OF TELEVISION AND    )

 9   RADIO ARTISTS, a Delaware       )

     corporation; AMERICAN FEDERATION )

10   OF MUSICIANS OF THE UNITED STATES )

     AND CANADA, a California         )

11   nonprofit corporation; et al.,   )

                                     )

12           Defendants.             )

     _____)

13

14

15

16          30(b)(6) DEPOSITION OF SAG-AFTRA

17             DUNCAN CRABTREE-IRELAND

18              CONDUCTED VIRTUALLY

19          WEDNESDAY, FEBRUARY 17, 2021

20                  1:03 p.m.

21

22   Job No. 269209

23   Pages:  101

24   Reported by:  Lorie Rhyne, CSR, RPR, CRR

25   Appearing remotely from San Diego, California
```

Duncan Crabtree-Ireland

```
 1    us Section B.

 2         A.   Sure.  B.  Organizing workers in the

 3    entertainment and media industries in order to maximize

 4    our bargaining strength.

 5         Q.   So what [sic] does SAG-AFTRA use "workers"

 6    here instead of "members"?  Do you see that?

 7         A.   Yes.

 8         Q.   Is there a reason why it's using "workers"

 9    and not "members"?

10         A.   Yes.  Because this particular piece of the

11    objectives is, in part, referring to going into

12    nonunion workplaces and organizing them, and the

13    workers in those nonunion workplaces would typically

14    not yet be members of the union.

15         Q.   So you would agree the union's objective

16    here is broader than helping actual union members?

17         A.   Yes.

18         Q.   Would nonfeatured performers qualify as

19    workers in the entertainment and media industry, as

20    used here?

21         A.   Yes.

22         Q.   Okay.  Let's go to Section C and have you

23    read Section C for us.

24         A.   Sure.  C.  Increasing our power in dealing

25    with the various governmental bodies that address the
```

Duncan Crabtree-Ireland

```
 1    significant public policy issues confronting our

 2    members.

 3          Q.    So what does the union mean here, if you

 4    know?

 5          A.    It means to take the necessary steps to have

 6    the maximum power and influence with respect to

 7    advocacy -- issue advocacy for issues that affect

 8    members of SAG-AFTRA.

 9          Q.    So what sorts of activities does the union

10    employ in service of these goals?

11          A.    By "these goals," you mean specifically C,

12    or you mean --

13          Q.    No; C in particular.

14          A.    C in particular.  Well, for example, we

15    engage in member outreach where we inform members about

16    various policy issues.  We do educational activities,

17    as well as engagement activities where we encourage

18    members to reach out to local, state, federal

19    government officials to urge them to take certain

20    actions.  We employ lobbyists to -- to advocate on

21    behalf of those issues with governments at all levels,

22    and even internationally.

23                And I do want to just note, however, we are

24    nonpartisan; so none of that includes any kind of

25    campaign contributions to candidates or any candidate
```

Duncan Crabtree-Ireland

```
 1    endorsements.

 2         Q.    Perfect.  Thank you for that.

 3               Okay.  Let's turn to Section E, and let me

 4    have you read for us Section E, please.

 5         A.    Sure.  E.  Cooperating, coordinating and

 6    combining with other organizations whose objectives

 7    include the advancement and improvement of members'

 8    compensation and working conditions whenever such

 9    action is in the best interest of our members.

10         Q.    So what example of organizations whose

11    objectives include the advance [sic] and improvement of

12    members' compensation and working conditions are there?

13         A.    Probably quite a few.  Do you want me to

14    just give you a few?

15         Q.    Yeah, please.

16         A.    The AFL-CIO would probably be the Number 1

17    on that list where we, you know, collaborate with other

18    unions in the labor movement to try and effectuate

19    change that advantages our members.

20               An example that you might find more targeted

21    to this case would be the musicFIRST alliance, which is

22    an alliance of la- -- record labels and unions and

23    performer organizations that is committed to the effort

24    to achieve a terrestrial broadcast performance right in

25    the United States.  Those are a couple of examples.  If
```

```
 1   you want, I can keep trying to think of some more.

 2           Q.    No; that's good.   So yesterday I asked you

 3   if it would be fair to say that one of the purposes of

 4   the Fund was to either work to improve royalty

 5   compensation for beneficiaries or advance their

 6   interests, and you said yes to that question; correct?

 7           A.    Yes.

 8           Q.    So if the Fund were not paying SAG-AFTRA the

 9   service fee, wouldn't SAG-AFTRA's constitution still

10   support provisions providing the data to the Fund for

11   compensation to its members?

12           A.    I certainly think that some of the

13   activities that we would engage in would be supported

14   by these objectives regardless of whether the Fund was

15   wanting us to do them or cooperating in paying for the

16   cost of doing them.

17                 There are some activities that wouldn't, and

18   the biggest example of that would be the -- or the most

19   easily thought of example of that would be the

20   provisions I mentioned to you yesterday regarding the

21   Music Modernization Act and the escheat preemption

22   provisions because I don't see how lobbying for those

23   provisions would fit into these objectives, since it's

24   purely for the benefit of the Fund.

25           Q.    But on the other hand, it's the benefit of
```

Duncan Crabtree-Ireland

```
 1    work together in a coalition to try and achieve goals
 2    that are important to all of them, there is some kind
 3    of appropriate division of the costs and efforts that
 4    are associated there.  It's not a -- E is not a license
 5    for other organizations to freeload on SAG-AFTRA.  E is
 6    an indication that we want to work collaboratively and
 7    do our fair share, just like the Fund should do its
 8    fair share of paying for the costs of those efforts.
 9         Q.   Understood.  All right.  Let's go to
10    Section G and have you -- well, highlight Section G and
11    then have you read that for us?
12         A.   Sure.  G.  Receiving, administering and
13    expending the union's funds in the interests of our
14    members.
15         Q.   So does the Fund benefit the interests of
16    SAG-AFTRA members?
17         A.   I believe so.
18         Q.   If SAG-AFTRA were losing money helping the
19    Fund, would that be consistent with its objectives?
20         A.   It would depend on what the purpose of
21    losing the money would be and what alternatives there
22    were to losing the money.  I think it's a -- it's a
23    little bit of a complicated question, but, again, I
24    mean, clearly part of our -- I mean, what we do with
25    the money that we raise for member dues and initiation
```

Duncan Crabtree-Ireland

1   fees, et cetera, is use them to advance the interests

2   of the members.  But it also needs to be done in a

3   manner that's equitable so that, you know, in the

4   totality of the circumstances, the resources are used

5   appropriately and -- and that we're not subsidizing

6   outside organizations to an extent that's not

7   warranted.

8        Q.   Got it.  If SAG-AFTRA were expending its own

9   resources to help the Fund, would that still not be in

10  the interest of its members?

11       A.   It could be.

12            MR. THOMAS:  Objection.  Vague.

13            THE WITNESS:  It could be.

14  BY MR. KIESEL:

15       Q.   Let's go to I.  And we'll highlight I, and

16  then have you read that for us.

17       A.   Sure.  I.  Without limitation, protecting

18  the rights of entertainment and media artists in all

19  other respects consistent with the overall objectives

20  of the union and doing all other things necessary and

21  proper to advance and promote their welfare and

22  interests.

23       Q.   So would you agree that being part of

24  collective rights organizations and advocating for

25  nonfeatured performers falls in this objective?

Duncan Crabtree-Ireland

```
 1    testifying.
 2              MR. KIESEL:  Fair enough.
 3    BY MR. KIESEL:
 4         Q.   And, in fact, it's -- it's -- it's fair
 5    because it's -- under the total amount of membership
 6    dues collected by the unions -- and that's a little bit
 7    of a different question, but -- so let me just say
 8    this:  If you know in 2020, what were the total number
 9    of membership in good standing?
10         A.   In 2020 -- I'm just giving you an
11    approximate number because that number fluctuates every
12    single day depending on when people pay dues or
13    whatever -- but roughly, 160,000.
14         Q.   And then how many are not active but just
15    awaiting removal?
16         A.   At any given point, that could fluctuate at
17    anywhere between 40- to 80,000.
18         Q.   Okay.
19         A.   And I'm sorry.  In that additional number,
20    I'm also including any members who aren't active but
21    may not be pending termination.  For example, members
22    on honorable withdraw or suspended payment status,
23    things like that.
24         Q.   Thank you.  We know that the number for dues
25    for 2020 was 95 million; is that right?  95,000,910?
```

Duncan Crabtree-Ireland

```
 1    structure of the entity that is serving as the
 2    independent administrator.
 3         Q.   Okay.  As you mentioned yesterday, the
 4    record industry does not appoint any officers from
 5    their ranks to participate on the Fund; right?
 6         A.   Correct.  Yes; that's right.
 7         Q.   Great.  Let's move to Exhibit 5.
 8         (Exhibit 5 was marked for identification.)
 9    BY MR. KIESEL:
10         Q.   And this is going to be the trust, the Fund
11    Trust Agreement.  So let's now turn to the 2012 Fund
12    Trust Agreement.  We discussed this document yesterday.
13    So I'm sure you're still familiar with what we talked
14    about.  And we read yesterday, but I'm going to have
15    you read again, Article III, Section 1 and 2, if you
16    could read that into the record.
17         A.   Sure.  Section 1.  AFM and SAG-AFTRA
18    Trustees.  The operation and administration of the Fund
19    shall be the joint responsibility of six trustees,
20    three appointed by the AFM, of which no fewer than one
21    shall be a rank-and-file representative, and three
22    appointed by SAG-AFTRA, of which no fewer than one
23    shall be a rank-and-file representative.
24         Section 2.  Term of Trustees.  Each trustee
25    shall continue to serve as such until his or her death,
```

Duncan Crabtree-Ireland

```
 1    initiator of that idea?

 2         A.   I don't know.

 3         Q.   Was that your idea?

 4         A.   I don't believe so.  I mean, to me, it seems

 5    pretty obvious because it is a very big part of what's

 6    being done by the unions then and now for the Fund.

 7    But I don't believe I was necessarily the first to

 8    articulate it.

 9         Q.   Okay.  Do you think that the unions should

10    be paid annually for providing the data to the Fund?

11         A.   I don't have a strong opinion about the

12    frequency of the payments.  I think that the -- I do

13    feel strongly that the unions should be paid for the

14    services and data that they provide to the Fund.

15         Q.   From the perspective of SAG-AFTRA, what was

16    the purpose of the service fee, now testifying as a

17    30(b)(6) witness?

18         A.   The purpose was to ensure that the members

19    of SAG-AFTRA were not subsidizing the cost of operating

20    the royalty distribution efforts that the Fund was

21    engaged in.  And to the extent that the union was

22    providing services to -- to the Fund, including data,

23    that was provided for that purpose that the Fund should

24    be paying for that rather than the members of

25    SAG-AFTRA.
```

Duncan Crabtree-Ireland

```
 1    or -- or state again that I was really more focused on

 2    the question of what -- whether that would continue to

 3    be appropriate if the revenues from streaming continued

 4    to escalate the way they had done over the past

 5    few years.  So I really don't want to endorse any idea

 6    that I thought or that I think the amount of fees

 7    currently paid are excessive.  I was really focused on

 8    what happens if this streaming growth continues to

 9    double and double and double year over year; that was

10    what I was concerned about.

11         Q.   But I am correct that going back to 2013,

12    you considered but rejected the idea of a time and

13    motion study because of the expense associated with a

14    time and motion study given the revenue that was being

15    paid from the Fund to the union; correct?

16         A.   Yes.

17         Q.   In 2017 when the memo comes, there's a

18    continued discussion that we might need to reevaluate

19    the money that's coming to the unions based upon the

20    work the unions are performing and whether or not it's

21    a reasonable payment to the unions for the work they're

22    doing; correct?

23              MR. THOMAS:  Objection.  Misstates his

24    testimony.

25              THE WITNESS:  I -- I mean, again, I was
```

# Exhibit 4

1  UNITED STATES DISTRICT COURT
   CENTRAL DISTRICT OF CALIFORNIA
2  CASE NO. 2:18-cv-07241-CAS-PLA
3  KEVIN RISTO, on behalf of himself
   And all others similarly situated,
4  Plaintiffs,
   vs.
5  SCREEN ACTORS GUILD - AMERICAN
   FEDERATION OF TELEVISION AND RADIO
6  ARTISTS, a Delaware corporation;
   AMERICAN FEDERATION OF MUSICIANS OF THE
7  UNITED STATES AND CANADA, a California
   Nonprofit corporation; RAYMOND M.
8  HAIR, JR., an individual, as Trustee of
   The AFM and SAG-AFTRA Intellectual
9  Property Rights Distribution Fund;
   TINO GAGLIARDI, an individual, as
10 Trustee of the AFM and SAG-AFTRA
   Intellectual Property Rights
11 Distribution Fund; DUNCAN
   CRABTREE-IRELAND, an individual, as
12 Trustee of the AFM and SAG-AFTRA
   Intellectual Property Rights
13 Distribution Fund; STEFANIE TAUB,
   an individual, as Trustee of the AFM
14 And SAG-AFTRA Intellectual Property
   Rights Distribution Fund; JON JOYCE,
15 An individual, as Trustee of the AFM
   And SAG-AFTRA Intellectual Property
16 Rights Distribution Fund; BRUCE
   BOUTON, an individual, as Trustee
17 Of the AFM and SAG-AFTRA Intellectual
   Property Rights Distribution Fund; and DOE
18 RESPONDING PARTY 1-10,
   Defendants.
19 *******************************************
   CORRECTED TRANSCRIPT OF
20 ZOOM VIDEOTAPED DEPOSITION OF DENNIS DREITH
21 February 11, 2021
22 9:00 a.m.
   *******************************************
23 REPORTED BY:
24 BELLE VIVIENNE, CRR,
25 JOB NO. 4420574

Page 1

```
 1                A P P E A R A N C E S
 2
    FOR THE PLAINTIFFS, KEVIN RISTO AND THE
 3  CLASS:
 4     KIESEL LAW LLP
       MARIANA A. MCCONNELL, ESQ.
 5     PAUL R. KIESEL, ESQ.
       NICHOLAS BRANCOLINI, ESQ.
 6     8648 Wilshire Boulevard
       Beverly Hills, California 90211-2910
 7     310.854.4444
       mcconnell@kiesel.law
 8     kiesel@kiesel.law
       brancolini@kiesel.law
 9
       JOHNSON & JOHNSON LLP
10     NEVILLE LAWRENCE JOHNSON, ESQ.
       DANIEL B. LIFSCHITZ, ESQ.
11     439 North Canon Drive, Suite 200
       Beverly Hills, California 90210
12     310.975.1080
       njohnson@jjllplaw.com
13     dlifschitz@jjllplaw.com
14
15  FOR THE DEFENDANTS:
       JENNER & BLOCK LLP
16     ANDREW J. THOMAS, ESQ.
       ANDREW G. SULLIVAN, ESQ.
17     ANNA K. LYONS, ESQ.
       633 West 5th Street, Suite 3600
18     Los Angeles, California 90071
       213.239.5100
19     ajthomas@jenner.com
       agsullivan@jenner.com
20     alyons@jenner.com
21
    VIDEOGRAPHER:
22     Terry Weiss
23
24
25

                                       Page  2
```

| | | |
|---|---|---|
| 1 | THE COURT REPORTER:  Can we go | 10:09:47 |
| 2 | off the record? | 10:09:48 |
| 3 | MR. THOMAS:  Sure.  Do you want | 10:09:51 |
| 4 | to take a break?  Let's go off the | 10:10:03 |
| 5 | record. | 10:10:04 |
| 6 | THE VIDEOGRAPHER:  We're now | 10:10:04 |
| 7 | going off the record.  The time is | 10:10:05 |
| 8 | 10:10. | 10:10:07 |
| 9 | (Whereupon, a brief recess is | 10:18:16 |
| 10 | taken.) | 10:18:25 |
| 11 | THE VIDEOGRAPHER:  We're now | 10:18:25 |
| 12 | back on the record.  The time is | 10:18:31 |
| 13 | 10:18. | 10:18:33 |
| 14 | BY MR. THOMAS: | 10:18:33 |
| 15 | Q.   Mr. Dreith, did you have any | 10:18:39 |
| 16 | role in setting up the IPRDF, the fund? | 10:18:40 |
| 17 | A.   Yes. | 10:18:46 |
| 18 | Q.   What was your role in getting | 10:18:47 |
| 19 | that set up? | 10:18:51 |
| 20 | A.    I -- it's a long explanation.  I | 10:18:57 |
| 21 | was -- I had -- at the end of 1999, I had | 10:19:02 |
| 22 | taken over the film musician secondary | 10:19:05 |
| 23 | market fund as their administrator which | 10:19:07 |
| 24 | is the same as a CEO.  And shortly after | 10:19:10 |
| 25 | assuming that position, I received a call | 10:19:16 |

Page 52

| | | |
|---|---|---|
| 1 | from Trish Polach and I believe Anne | 10:19:19 |
| 2 | Mayerson telling me that there had been | 10:19:27 |
| 3 | sort of a name-only fund established to | 10:19:28 |
| 4 | collect the digital royalties both | 10:19:32 |
| 5 | pursuant to the Audio Home Recording Act | 10:19:35 |
| 6 | and the Digital Millennium Copyright Act. | 10:19:39 |
| 7 | It was mentioned to me there was | 10:19:44 |
| 8 | a small amount of money and it -- they | 10:19:45 |
| 9 | were very desirous to do something to | 10:19:51 |
| 10 | distribute that money.  The union, both | 10:19:54 |
| 11 | AFM and AFTRA, which established that | 10:19:57 |
| 12 | fund, were concerned about lawsuits. | 10:20:03 |
| 13 | There had been a number of lawsuits in the | 10:20:03 |
| 14 | industry about non- -- about collection | 10:20:05 |
| 15 | without distribution of royalties.  And | 10:20:08 |
| 16 | SAG had been sued at that point, probably | 10:20:11 |
| 17 | the Director's Guild and maybe one or two | 10:20:13 |
| 18 | others had been sued, and the AFM were | 10:20:17 |
| 19 | concerned about it, and I was asked if I | 10:20:21 |
| 20 | could take a look at -- at what was there | 10:20:22 |
| 21 | and see if we just devise some sort of | 10:20:25 |
| 22 | mechanism to be able to effect the | 10:20:28 |
| 23 | distribution. | 10:20:31 |
| 24 | At that point I looked at the | 10:20:34 |
| 25 | finances.  There was very little | 10:20:36 |

Page  53

```
 1   documentation, but we decided we would try      10:20:40
 2   to at least establish a fund to be able to      10:20:43
 3   distribute these monies.  I called Jo-Anne      10:20:45
 4   McGettrick who was working for Sony Music       10:20:50
 5   at the time, an old friend of mine who I        10:20:52
 6   knew from the record business for many          10:20:55
 7   years and had been assistant to the head        10:20:56
 8   of ANR for a number of different                10:20:59
 9   executives and was very knowledgeable in        10:21:02
10   the record industry.  So I called Jo-Anne       10:21:04
11   and asked her if she would be willing to        10:21:07
12   take a job to help me put this fund             10:21:09
13   together.                                       10:21:12
14           She said yes.  She, sometime in,        10:21:14
15   I think right around the beginning of           10:21:16
16   2000, came over, and we basically ran the       10:21:18
17   fund with Jo-Anne as its only employee and      10:21:22
18   allocated services from the Film Musicians      10:21:27
19   Secondary Markets Fund.  So basically the       10:21:29
20   fund started with a -- a hand-me-down fax       10:21:32
21   machine, a computer we put together from        10:21:35
22   used parts, and a borrowed desk in the          10:21:38
23   corner of the Film Musicians Secondary          10:21:41
24   Markets Fund and began to try to put            10:21:44
25   together a computer system.  We did the         10:21:46
```

| | | |
|---|---|---|
| 1 | Q.    And an example of the foreign | 10:25:54 |
| 2 | territories would be the royalties that | 10:25:56 |
| 3 | you were getting from Japan, right? | 10:25:57 |
| 4 | A.    Initially. | 10:26:01 |
| 5 | Q.    Initially.  And then later | 10:26:03 |
| 6 | other -- other foreign royalties; is that | 10:26:04 |
| 7 | right? | 10:26:08 |
| 8 | A.    Correct, correct. | 10:26:08 |
| 9 | Q.    What relationship did you | 10:26:10 |
| 10 | understand the fund to have with the -- | 10:26:12 |
| 11 | with the DMCA, with Section 114 of the | 10:26:15 |
| 12 | Copyright Act? | 10:26:18 |
| 13 | A.    That there would be an | 10:26:22 |
| 14 | independent administrator established | 10:26:23 |
| 15 | under Section 114 to handle nonfeatured | 10:26:25 |
| 16 | performers' royalties. | 10:26:30 |
| 17 | Q.    And who was that independent | 10:26:31 |
| 18 | administrator? | 10:26:35 |
| 19 | A.    Would be named -- well, it was | 10:26:38 |
| 20 | going to be me.  I was -- I was named as | 10:26:42 |
| 21 | the administrator, but the Copyright Act | 10:26:44 |
| 22 | basically revised it as I recall -- | 10:26:46 |
| 23 | revised that the union name that I think | 10:26:52 |
| 24 | to be specific the act itself says that | 10:26:56 |
| 25 | the unions and representatives of the | 10:26:58 |

Page 58

| | | |
|---|---|---|
| 1 | you know, very shortly before that, but | 10:29:46 |
| 2 | there may have been -- I believe the very | 10:29:48 |
| 3 | first payments that came actually came | 10:29:50 |
| 4 | from some of the labels. | 10:29:52 |
| 5 | Q.    But by the early 2000s, 2002, | 10:29:54 |
| 6 | '3, '4 in there, SoundExchange was up and | 10:29:58 |
| 7 | running, and it was the entity that was | 10:30:02 |
| 8 | providing the Section 114 royalties to the | 10:30:04 |
| 9 | fund; isn't that right? | 10:30:07 |
| 10 | A.    That is correct. | 10:30:08 |
| 11 | Q.    Okay.  The Audio Home Recording | 10:30:09 |
| 12 | Act royalties, those were coming from a | 10:30:19 |
| 13 | different source, were those coming from | 10:30:20 |
| 14 | the labels directly or from where? | 10:30:22 |
| 15 | A.    Those were coming from the | 10:30:25 |
| 16 | copyright office. | 10:30:30 |
| 17 | Q.    Okay.  Got it, great. | 10:30:31 |
| 18 | A.    And -- | 10:30:34 |
| 19 | Q.    Go ahead, I'm sorry. | 10:30:34 |
| 20 | A.    Okay there was kind of another | 10:30:36 |
| 21 | part of that from the copyright office. | 10:30:38 |
| 22 | But that also gave rise to the ability to | 10:30:39 |
| 23 | negotiate bilateral agreements to collect | 10:30:42 |
| 24 | private copy monies from foreign | 10:30:44 |
| 25 | territories. | 10:30:46 |

Page 61

```
 1        Q.    Okay.  At the same time in 1999,      10:30:46
 2   you said you had become the executive           10:30:55
 3   director of the Film Musicians Secondary         10:30:58
 4   Markets Fund; is that right?                     10:31:01
 5        A.    That is correct, the technical        10:31:04
 6   phrase was administrator.                        10:31:05
 7        Q.    Administrator, okay.  Did your        10:31:06
 8   title at the Secondary Markets Fund ever         10:31:18
 9   change or were you the administrator the         10:31:22
10   entire time until 2014?                          10:31:24
11        A.    I believe by that time they had       10:31:28
12   changed the title to executive director if       10:31:29
13   I'm not mistaken.                                10:31:32
14        Q.    Okay.  And at the fund, the           10:31:32
15   IPRDF, your title initially was                  10:31:36
16   administrator, right?                            10:31:39
17        A.    Yes.                                  10:31:40
18        Q.    And then did that title change        10:31:41
19   as well to executive director or some            10:31:43
20   other title?                                     10:31:47
21        A.    Executive director.                   10:31:49
22        Q.    Okay.  And was it -- what was         10:31:50
23   the reason for that?                             10:31:53
24        A.    I think that the trustees felt        10:31:56
25   that it was more descriptive of what I was       10:31:59
```

Page 62

| | | |
|---|---|---|
| 1 | systems had to be put in place to affect | 10:34:33 |
| 2 | the distribution, coordinate with computer | 10:34:36 |
| 3 | programmers, software developers to | 10:34:39 |
| 4 | develop the systems necessary, oversee the | 10:34:41 |
| 5 | staff, be basically a head of all the | 10:34:45 |
| 6 | departments. | 10:34:50 |
| 7 | It was a robust fund with a lot | 10:34:50 |
| 8 | of departments.  There was an accounting | 10:34:52 |
| 9 | department and a IT department and a | 10:34:54 |
| 10 | compliance department and so on and so | 10:34:59 |
| 11 | forth.  So my job -- -- my job was oversee | 10:35:02 |
| 12 | all those departments. | 10:35:08 |
| 13 | Q.    Do you recall when you took the | 10:35:10 |
| 14 | job what the approximate size of the | 10:35:14 |
| 15 | Secondary Markets Fund was in terms of | 10:35:20 |
| 16 | number of employees? | 10:35:22 |
| 17 | A.    We had employees in both L.A. | 10:35:28 |
| 18 | and New York at that point.  Probably, I | 10:35:31 |
| 19 | would say combined maybe 15 employees or | 10:35:37 |
| 20 | so. | 10:35:39 |
| 21 | Q.    And in terms of the amount of | 10:35:40 |
| 22 | residuals paid out every year, what was -- | 10:35:44 |
| 23 | what was the magnitude of that? | 10:35:48 |
| 24 | A.    I believe when I took over at | 10:35:55 |
| 25 | the end of 1999, there was $25 million a | 10:35:57 |

Page 65

```
 1   year.                                          10:36:02
 2        Q.    Okay.  All right.  So you talked    10:36:03
 3   a minute ago about sort of how you got the     10:36:06
 4   job as administrator of the fund.  And I'm     10:36:12
 5   talking about the IPRDF now, our fund.         10:36:16
 6   Specifically how were you hired?  Was          10:36:20
 7   there a board of trustees that hired you?      10:36:27
 8        A.    Yes.                                10:36:31
 9        Q.    And did you have any discussions    10:36:32
10   about compensation at the time?                10:36:38
11        A.    Yes.                                10:36:42
12        Q.    What was -- what was agreed on?     10:36:43
13   Were you going to receive any compensation     10:36:45
14   from the fund itself?                          10:36:47
15        A.    No.                                 10:36:49
16        Q.    How were you going to be            10:36:49
17   compensated for your work as administrator     10:36:55
18   of the fund if at all?                         10:36:57
19        A.    I was basically donating my         10:36:58
20   services.  It was a fund that had no money     10:37:01
21   and a great deal of potential and I            10:37:04
22   believed in it, and I took it over             10:37:05
23   basically as a -- you know, an                 10:37:07
24   eleemosynary activity, I guess.  A             10:37:12
25   charitable activity.                           10:37:17
```

Page 66

```
 1              MS. McCONNELL:  Mr. Thomas,            10:37:22
 2      whenever is a good time, maybe we can          10:37:23
 3      take a break.                                  10:37:27
 4              MR. THOMAS:  Great.  And we'll         10:37:27
 5      spell eleemosynary for everybody.              10:37:28
 6              Just one or two more questions.        10:37:34
 7  BY MR. THOMAS:                                     10:37:36
 8      Q.    When you agreed to take over the         10:37:36
 9  job of administrator, and essentially              10:37:40
10  donate your services because you believed          10:37:45
11  in the fund, did you believe that by               10:37:48
12  agreeing to work out compensation                  10:37:49
13  initially, you were binding yourself to            10:37:51
14  work without compensation forever at the           10:37:53
15  fund?                                              10:37:56
16      A.    No.                                      10:37:56
17      Q.    Did you anticipate that at some          10:37:59
18  point as the fund got on its feet, got             10:38:01
19  more robust, that it would be able to              10:38:04
20  compensate its administrator?                      10:38:08
21      A.    You know, I didn't really think         10:38:13
22  of it at that point.  I really -- it was           10:38:14
23  too far down the road.  My main concern            10:38:17
24  was to be able to get this up and running          10:38:19
25  and to see what would happen with it.              10:38:21
```

Page 67

| | | |
|---|---|---|
| 1 | were not interested and had very little | 11:15:55 |
| 2 | sort of interest of what happened with the | 11:15:59 |
| 3 | 5 percent share.  It didn't really involve | 11:16:01 |
| 4 | their take. | 11:16:04 |
| 5 | Q.    If you could please turn to | 11:16:07 |
| 6 | article IV. | 11:16:12 |
| 7 | MR. THOMAS:  Do we have that? | 11:16:26 |
| 8 | BY MR. THOMAS: | 11:16:27 |
| 9 | Q.    If you look at section 1, it | 11:16:27 |
| 10 | says -- the title -- article 4 is titled | 11:16:29 |
| 11 | Powers, Duties and Obligations of the | 11:16:30 |
| 12 | Trustees.  Section 1 says Property and | 11:16:32 |
| 13 | Assistance.  It says "The Trustees are | 11:16:34 |
| 14 | authorized and empowered to lease or | 11:16:39 |
| 15 | purchase such premises, materials, | 11:16:40 |
| 16 | supplies and equipment and to hire" -- and | 11:16:46 |
| 17 | it goes on to say staff, legal counsel and | 11:16:50 |
| 18 | so forth. | 11:16:52 |
| 19 | Is that a power that you felt | 11:16:53 |
| 20 | that the fund was authorized to -- to | 11:16:57 |
| 21 | exercise? | 11:17:07 |
| 22 | MS. McCONNELL:  Objection, calls | 11:17:08 |
| 23 | for speculation, calls for a legal | 11:17:09 |
| 24 | conclusion, may call for expert | 11:17:11 |
| 25 | opinion.  You can answer if you know. | 11:17:12 |

Page 77

| | | |
|---|---|---|
| 1 | A.     My understanding was I was | 11:17:18 |
| 2 | engaged to carry that out.   So in other | 11:17:19 |
| 3 | words, I'm authorized to do those things | 11:17:23 |
| 4 | subject to obviously review and approval | 11:17:26 |
| 5 | of the trustees. | 11:17:29 |
| 6 | BY MR. THOMAS: | 11:17:33 |
| 7 | Q.     And while you were | 11:17:33 |
| 8 | administrator, did you exercise those | 11:17:34 |
| 9 | powers subject to approval of the | 11:17:38 |
| 10 | trustees? | 11:17:40 |
| 11 | A.     Yes. | 11:17:42 |
| 12 | Q.     You eventually hired more staff | 11:17:42 |
| 13 | and purchased more equipment and supplies, | 11:17:45 |
| 14 | right? | 11:17:48 |
| 15 | A.     Yes. | 11:17:50 |
| 16 | Q.     And at some point you separated | 11:17:50 |
| 17 | from the Film Musicians Secondary Markets | 11:17:53 |
| 18 | Fund and leased a building nearby; is that | 11:17:55 |
| 19 | right? | 11:17:58 |
| 20 | A.     That's correct. | 11:18:00 |
| 21 | Q.     The fund did, right? | 11:18:01 |
| 22 | A.     Yes. | 11:18:03 |
| 23 | Q.     And eventually the fund | 11:18:03 |
| 24 | purchased the building, correct? | 11:18:05 |
| 25 | A.     That is correct. | 11:18:08 |

Page  78

```
 1    them for each printer, but I would have a      11:23:26
 2    budget to say the equipment I could buy,       11:23:28
 3    for example.  Before I could buy anything,     11:23:30
 4    we have an annual budget.  I would have to     11:23:32
 5    get approval on the items, and then I          11:23:34
 6    would have discretion within that.             11:23:36
 7            Obviously, nobody told me what         11:23:37
 8    style printer to buy, you know, what --        11:23:40
 9    what size, what capacity.  If we had a         11:23:44
10    budget for X -- X dollars, I could spend       11:23:48
11    it on -- if I wanted to spend it on one        11:23:51
12    printer or four printers, as long as I did     11:23:53
13    it in a way that made sense and -- but was     11:23:56
14    within the budget, you know, I had a           11:23:59
15    budget to things, but it wasn't -- I           11:24:01
16    didn't have to, you know, you know,            11:24:03
17    justification of every paper clip.  I          11:24:05
18    didn't have to -- you know, paper and          11:24:07
19    supplies, of course not, you know, but I       11:24:11
20    would have -- but they were all subject to     11:24:12
21    budget and review.                             11:24:14
22    BY MR. THOMAS:                                 11:24:16
23        Q.    Okay.  And if we could turn to       11:24:16
24    the next item under section 3, General         11:24:18
25    Powers, this is item O.  And this states       11:24:23
```

Page 83

| | | |
|---|---|---|
| 1 | that, "The trustees are empowered to | 11:24:29 |
| 2 | purchase or obtain from the AFM, AFTRA | 11:24:32 |
| 3 | various other entities or any commercial | 11:24:38 |
| 4 | source any data helpful for the | 11:24:43 |
| 5 | identification and location of artists | 11:24:46 |
| 6 | eligible for remuneration or the | 11:24:48 |
| 7 | identification of recorded or other | 11:24:52 |
| 8 | performances covered by an agreement for | 11:24:55 |
| 9 | the receipt and description of | 11:24:59 |
| 10 | remuneration."  Do you see that? | 11:25:01 |
| 11 | A.    Yes. | 11:25:03 |
| 12 | Q.    And do you understand that this | 11:25:03 |
| 13 | provision of the Declaration of Trust | 11:25:05 |
| 14 | authorized the fund to purchase data that | 11:25:08 |
| 15 | it -- that could be useful in identifying | 11:25:14 |
| 16 | and paying performers? | 11:25:18 |
| 17 | MS. McCONNELL:  Objection, calls | 11:25:20 |
| 18 | for a legal conclusion, may call for | 11:25:21 |
| 19 | expert opinion, vague and ambiguous, | 11:25:23 |
| 20 | lacks foundation.  You can answer. | 11:25:25 |
| 21 | A.    Yes. | 11:25:30 |
| 22 | BY MR. THOMAS: | 11:25:30 |
| 23 | Q.    In fact it authorizes them to | 11:25:32 |
| 24 | buy data from AFM and AFTRA among others, | 11:25:34 |
| 25 | right? | 11:25:38 |

Page 84

```
 1            MS. McCONNELL:  Same objection.         11:33:23
 2            MR. THOMAS:  I think I said              11:33:24
 3       that the fund could exercise.                11:33:25
 4       A.    Yes.                                    11:33:32
 5   BY MR. THOMAS:                                    11:33:32
 6       Q.    All right.  I think we could put        11:33:55
 7   this exhibit aside.  I'd like to go back          11:33:56
 8   to some of your testimony earlier                 11:33:59
 9   regarding the -- the early years of the           11:34:00
10   fund.                                             11:34:08
11            You mentioned that some of the           11:34:13
12   money started to come in from                     11:34:18
13   SoundExchange in the early 2000s and --           11:34:20
14   and initially some of the DMCA royalty            11:34:24
15   money came in from the labels themselves.         11:34:28
16   Do you -- do you recall that by 2006 the          11:34:33
17   fund was getting about a million dollars          11:34:38
18   in the DMCA royalties from SoundExchange?         11:34:40
19       A.    I would have to look at the             11:34:45
20   revenue reports to give you an honest             11:34:53
21   answer.  It's possible.  It could be              11:34:58
22   correct.                                          11:35:00
23       Q.    Generally speaking, do you              11:35:00
24   remember that it was gradually growing            11:35:02
25   during that period from maybe 2002 or '4          11:35:03
```

Page 91

```
 1    up until 2007 or '8?                        11:35:07
 2        A.    Yes.                              11:35:10
 3        Q.    And what obligations did you      11:35:14
 4    understand the fund to have under Section   11:35:18
 5    114 from the Copyright Act?                 11:35:22
 6            MS. McCONNELL:  Objection, vague    11:35:24
 7        and ambiguous, calls for speculation,   11:35:25
 8        calls for a legal conclusion, may call  11:35:28
 9        for an expert opinion.                  11:35:29
10        A.    My nonexpert opinion would be     11:35:32
11    that Section 114 really established --      11:35:40
12    primarily established, you know, that       11:35:46
13    there would be an independent               11:35:48
14    administrator from our standpoint.          11:35:50
15            I mean, there's other aspects of    11:35:52
16    114 identifying, you know, the source of    11:35:54
17    revenue and those kinds of things, but my   11:35:58
18    opinion from my standpoint gave rise to     11:36:03
19    the existence of the independent            11:36:05
20    administrator and it set forth some -- set  11:36:07
21    forth some parameters for both the          11:36:21
22    establishment of the independent            11:36:23
23    administrator; it also set forth, you       11:36:25
24    know, some of the parameters of union       11:36:29
25    versus nonunion performers, how we had to   11:36:32
```

Page  92

| | | |
|---|---|---|
| 1 | treat them equally. | 11:36:36 |
| 2 | And it had loosely, I guess -- | 11:36:37 |
| 3 | basically we just said we had to pay | 11:36:44 |
| 4 | nonfeature performers.  It didn't identify | 11:36:47 |
| 5 | specifically the class of how that was to | 11:36:49 |
| 6 | be divided except for the percentages. | 11:36:55 |
| 7 | And it specified that we could -- there | 11:36:57 |
| 8 | could be certain administrative expenses | 11:37:02 |
| 9 | that could be borne by the independent | 11:37:04 |
| 10 | administrator. | 11:37:08 |
| 11 | BY MR. THOMAS: | 11:37:08 |
| 12 | Q.    And the independent | 11:37:08 |
| 13 | administrator in this case is the fund, | 11:37:09 |
| 14 | right? | 11:37:12 |
| 15 | A.    Correct. | 11:37:12 |
| 16 | Q.    So, for example, it was up to | 11:37:13 |
| 17 | the fund to decide which recordings to | 11:37:16 |
| 18 | research and -- and distribute royalties | 11:37:21 |
| 19 | on, right? | 11:37:24 |
| 20 | MS. McCONNELL:  Objection, vague | 11:37:26 |
| 21 | and ambiguous, may call for a legal | 11:37:27 |
| 22 | conclusion. | 11:37:33 |
| 23 | A.    And so, I mean, I'm not sure | 11:37:35 |
| 24 | how -- how to answer that question. | 11:37:37 |
| 25 | The -- | 11:37:39 |

Page  93

```
 1    BY MR. THOMAS:                              11:37:40
 2         Q.     Let me back up.    I'm sorry.   I   11:37:40
 3    think it might have been -- not been that  11:37:41
 4    clear.                                      11:37:43
 5              SoundExchange provided the        11:37:44
 6    royalty money to the fund and also certain 11:37:47
 7    information on an annual basis, right?      11:37:49
 8         A.     Initially on an annual basis.   11:37:54
 9         Q.     And thereafter on a more        11:37:57
10    frequent basis?                             11:37:59
11         A.     On a quarterly basis and then on 11:38:00
12    a monthly basis.                            11:38:03
13         Q.     Right.   And can you generally   11:38:04
14    describe what that information is?          11:38:05
15         A.     Well, what it was and what it is 11:38:10
16    has changed slightly.   So what it was in   11:38:12
17    the beginning was -- would be a report      11:38:15
18    that would show basically what I would      11:38:19
19    call, like, a frequency report.   In other  11:38:23
20    words, it showed how much each sound        11:38:25
21    recording had -- what its activity was.     11:38:28
22    So it showed the activity of a sound        11:38:32
23    recording in terms of its frequency of      11:38:35
24    use.   So how many times it had done a      11:38:37
25    webcast or -- or a subscription service.    11:38:40
```

Page  94

| | | |
|---|---|---|
| 1 | So there would be a weighted | 11:38:44 |
| 2 | formula.  So there was two columns of | 11:38:47 |
| 3 | activity, webcasting and subscription | 11:38:49 |
| 4 | services.  And then it also had -- it | 11:38:51 |
| 5 | included the name of the sound recording, | 11:38:53 |
| 6 | the artist, and the label.  And that was | 11:38:56 |
| 7 | all they had in the beginning. | 11:39:00 |
| 8 | Gradually, they added release | 11:39:02 |
| 9 | year of that to that report, and then some | 11:39:05 |
| 10 | limited ISRCs were added to -- to that | 11:39:16 |
| 11 | report.  But since that was incomplete | 11:39:20 |
| 12 | data, so that was on some recordings, not | 11:39:23 |
| 13 | others.  And subsequently, as foreign | 11:39:26 |
| 14 | territories were added through some of the | 11:39:29 |
| 15 | bilateral agreements, some foreign royalty | 11:39:31 |
| 16 | payments, those were reported not | 11:39:35 |
| 17 | necessarily by sound recording specific | 11:39:37 |
| 18 | but, just by territory.  In other words, | 11:39:40 |
| 19 | you with see a report that said X dollars | 11:39:42 |
| 20 | received from the Netherlands and what our | 11:39:44 |
| 21 | share of that would have been. | 11:39:47 |
| 22 | Q.    Okay.  On this frequency report, | 11:39:48 |
| 23 | during the, you know, pre-2010 period | 11:39:53 |
| 24 | let's say, do you recall approximately how | 11:39:57 |
| 25 | many song titles might appear on the | 11:39:59 |

Page 95

| | | |
|---|---|---|
| 1 | had devised.  But that was -- the first | 11:47:05 |
| 2 | one was probably -- the first draft of | 11:47:06 |
| 3 | that would have been around sometime in | 11:47:08 |
| 4 | 2001. | 11:47:10 |
| 5 | Q.    Okay.  You described a situation | 11:47:11 |
| 6 | where there would be so many unique | 11:47:21 |
| 7 | recordings that were listed on the | 11:47:26 |
| 8 | frequency report from SoundExchange after | 11:47:30 |
| 9 | you sort of scrubbed out the duplicates | 11:47:32 |
| 10 | and so forth.  There would still be too | 11:47:35 |
| 11 | many that it would be impossible to -- to | 11:47:37 |
| 12 | research them all, right? | 11:47:39 |
| 13 | MS. McCONNELL:  Objection, | 11:47:41 |
| 14 | misstates prior testimony, vague and | 11:47:41 |
| 15 | ambiguous. | 11:47:44 |
| 16 | BY MR. THOMAS: | 11:47:44 |
| 17 | Q.    I believe you said one reason | 11:47:49 |
| 18 | that you wouldn't be able to research them | 11:47:51 |
| 19 | all was because you just didn't have the | 11:47:53 |
| 20 | staff to do it, and the other was that | 11:47:55 |
| 21 | there might be de minimis situations where | 11:47:56 |
| 22 | the royalties due on a particular | 11:48:00 |
| 23 | recording were very, very low because it | 11:48:02 |
| 24 | didn't get very much air play, right? | 11:48:04 |
| 25 | A.    To be clear, there's a number of | 11:48:07 |

Page 102

| | | |
|---|---|---|
| 1 | factors.  One, we may have a group of | 11:48:09 |
| 2 | recordings that the amount of money is too | 11:48:13 |
| 3 | de minimis to really have a meaningful | 11:48:17 |
| 4 | distribution so we wouldn't research | 11:48:19 |
| 5 | those.  There's also time constraints, | 11:48:20 |
| 6 | staff constraints.  So it's a combination | 11:48:23 |
| 7 | of all those things. | 11:48:26 |
| 8 | I wouldn't want to say that it | 11:48:26 |
| 9 | was one or the other.  I wouldn't want to | 11:48:28 |
| 10 | say that we didn't have enough staff to | 11:48:30 |
| 11 | research enough recordings.  It's a factor | 11:48:32 |
| 12 | of staff, time, the amount of money that's | 11:48:34 |
| 13 | available.  And so we had to re-devise a | 11:48:36 |
| 14 | methodology whereby we could efficiently | 11:48:40 |
| 15 | research enough sound recordings to make | 11:48:44 |
| 16 | distributions that were meaningful to as | 11:48:46 |
| 17 | many performers as possible. | 11:48:48 |
| 18 | Q.    And I assume you considered that | 11:48:54 |
| 19 | to be a reasonable approach to dealing | 11:48:56 |
| 20 | with that -- those factors? | 11:49:01 |
| 21 | A.    Yes. | 11:49:04 |
| 22 | Q.    Did you -- did you consider it | 11:49:05 |
| 23 | to be consistent with Section 114 of the | 11:49:07 |
| 24 | Copyright Act? | 11:49:09 |
| 25 | MS. McCONNELL:  Objection, may | 11:49:11 |

Page 103

| | | |
|---|---|---|
| 1 | call for a legal conclusion and an | 11:49:12 |
| 2 | expert opinion, may call for | 11:49:13 |
| 3 | speculation.  You can answer. | 11:49:16 |
| 4 | A.    I would say that Anne, Trish | 11:49:20 |
| 5 | Polach and I had a number of discussions | 11:49:25 |
| 6 | about that because I was initially | 11:49:27 |
| 7 | concerned in the SoundExchange basically, | 11:49:29 |
| 8 | has to identify everybody who has a | 11:49:31 |
| 9 | performance, and there's no distinction | 11:49:36 |
| 10 | about that. | 11:49:38 |
| 11 | The Copyright Act just talks | 11:49:39 |
| 12 | about nonfeatured performers as a group. | 11:49:42 |
| 13 | So it didn't really say that I had to -- | 11:49:44 |
| 14 | the -- the language didn't say to | 11:49:48 |
| 15 | distribute to every nonfeatured performer. | 11:49:51 |
| 16 | It just said I had to makes distributions | 11:49:53 |
| 17 | to nonfeatured performers. | 11:49:56 |
| 18 | I realize that's, kind of, | 11:49:57 |
| 19 | splitting hairs here.  We're looking at -- | 11:49:59 |
| 20 | we're getting down in the weeds, but we | 11:50:01 |
| 21 | had a lot of discussions about that about | 11:50:03 |
| 22 | what those words actually meant and if it | 11:50:04 |
| 23 | really meant distributing to nonfeatured | 11:50:06 |
| 24 | performers if the -- if the -- if the act | 11:50:09 |
| 25 | had really meant every nonfeatured | 11:50:13 |

Page 104

```
 1   people going further down the list, each      11:52:27
 2   distribution, I certainly pushed the staff    11:52:30
 3   to research more recordings and as long as    11:52:33
 4   we weren't reaching into a de minimis         11:52:39
 5   category, in other words, I didn't want to    11:52:42
 6   spend more money to research and              11:52:44
 7   distribute money on a recording and was       11:52:46
 8   cost-effective.  I didn't want to spend       11:52:48
 9   more money to research a recording than       11:52:50
10   that recording actually gained, in other      11:52:52
11   words, taking money away from people and      11:52:54
12   not paying memory.                            11:52:55
13   BY MR. THOMAS:                                11:52:56
14       Q.    Okay.  Well, in this situation      11:52:56
15   where we described -- that we just            11:52:58
16   described where somebody that played on a     11:53:00
17   recording that was at the bottom of the       11:53:02
18   list and was not distributed on -- didn't     11:53:04
19   get any royalties on that recording, did      11:53:07
20   you -- did you believe that those             11:53:14
21   performers were being deprived of -- of       11:53:18
22   property that was -- that belonged to         11:53:21
23   them?                                         11:53:23
24           MS. McCONNELL:  Objection, calls      11:53:24
25       for a legal conclusion, may call for      11:53:26
```

Page 107

| | | |
|---|---|---|
| 1 | expert opinion, vague and ambiguous. | 11:53:28 |
| 2 | A.    I think the best way I can | 11:53:35 |
| 3 | answer you is to say it was constantly my | 11:53:37 |
| 4 | goal to include as many performers as | 11:53:39 |
| 5 | possible and as many genres.  We certainly | 11:53:43 |
| 6 | recognize that what happens you go down | 11:53:47 |
| 7 | that list a lot of things that were | 11:53:49 |
| 8 | different genres, you know, jazz, | 11:53:51 |
| 9 | classical music, chamber music, a lot of | 11:53:56 |
| 10 | those kind of things aren't as big of | 11:54:00 |
| 11 | money earners. | 11:54:02 |
| 12 | So unfortunately, they look at | 11:54:03 |
| 13 | it and they say, yeah, some of those | 11:54:04 |
| 14 | genres aren't monetizing the way that we | 11:54:05 |
| 15 | would otherwise wish they could.  I wish | 11:54:11 |
| 16 | that I could pay everybody.  And if I -- | 11:54:11 |
| 17 | if I could have, I would have tried to, | 11:54:13 |
| 18 | you know, allocate it and paid everybody. | 11:54:15 |
| 19 | But bear in mind some of those payments | 11:54:17 |
| 20 | would be micro-pennies.  So we had to | 11:54:19 |
| 21 | really weigh the benefit to the largest | 11:54:22 |
| 22 | group possible. | 11:54:23 |
| 23 | And at some point, we would have | 11:54:25 |
| 24 | spent, you know, the certain -- the | 11:54:29 |
| 25 | administrative costs of trying to identify | 11:54:30 |

Page 108

| | | |
|---|---|---|
| 1 | every single micro-penny that was due | 11:54:33 |
| 2 | somebody would have been astronomical. | 11:54:36 |
| 3 | And so in my mind, that would not have -- | 11:54:40 |
| 4 | it certainly wouldn't have serviced the | 11:54:44 |
| 5 | community appropriately, and in many ways, | 11:54:47 |
| 6 | I don't believe that was the spirit of the | 11:54:50 |
| 7 | Copyright Act. | 11:54:52 |
| 8 | BY MR. THOMAS: | 11:54:53 |
| 9 | Q.    What do you mean by that? | 11:54:53 |
| 10 | A.    I meant that the spirit of it | 11:54:55 |
| 11 | was really to try to compensate as many | 11:54:57 |
| 12 | nonfeatured -- well, as many performers as | 11:55:02 |
| 13 | ethically and fully as possible. | 11:55:07 |
| 14 | Q.    Okay.  So just going back to the | 11:55:10 |
| 15 | research function that you described a few | 11:55:22 |
| 16 | minutes ago.  What resources did the fund | 11:55:24 |
| 17 | consult to obtain information regarding | 11:55:26 |
| 18 | who performed on particular recordings? | 11:55:30 |
| 19 | MS. McCONNELL:  One second. | 11:55:35 |
| 20 | Objection, vague and ambiguous.  Just | 11:55:37 |
| 21 | at what particular time or just | 11:55:38 |
| 22 | generally? | 11:55:40 |
| 23 | MR. THOMAS:  Let's talk about | 11:55:41 |
| 24 | the -- the time period from '99 up | 11:55:42 |
| 25 | until, say 2010. | 11:55:49 |

Page 109

```
 1              MS. McCONNELL:  Objection,          12:04:29
 2       incomplete hypothetical, calls for        12:04:30
 3       speculation.                              12:04:32
 4       A.    I would say in some cases that's    12:04:42
 5  true.                                          12:04:45
 6  BY MR. THOMAS:                                 12:04:45
 7       Q.    And as I understand your            12:04:46
 8  testimony in some cases the converse is        12:04:47
 9  true, there may be more complete               12:04:51
10  information somewhere else.  But is it --       12:04:53
11  it is true, isn't it, that during this          12:04:57
12  time period and thereafter, you considered      12:05:01
13  the B forms and session reports to be at        12:05:03
14  least a valuable source of information to       12:05:06
15  aid the research function of the fund,          12:05:10
16  right?                                          12:05:11
17              MS. McCONNELL:  Objection, calls    12:05:12
18       for speculation, vague and ambiguous.      12:05:14
19       You can answer.                            12:05:16
20       A.    Certainly I would say, you know,    12:05:17
21  a source of information, you know, and a        12:05:21
22  convenient source of some information, but      12:05:25
23  as I said, we really couldn't look at that      12:05:27
24  as the only source.  And we looked at -- I      12:05:29
25  can say I looked at every source as            12:05:33
```

Page 117

| | | |
|---|---|---|
| 1 | valuable.  When we're looking at -- as the | 12:05:35 |
| 2 | business has changed over the years, if | 12:05:37 |
| 3 | you look at from 2008 to the present, we | 12:05:40 |
| 4 | see the industry's changed tremendously. | 12:05:43 |
| 5 | The advent of the urban market has | 12:05:46 |
| 6 | basically set the industry up on its ears. | 12:05:49 |
| 7 | So what -- when I made the first | 12:05:52 |
| 8 | distribution in say 2001, we had 90 -- 90 | 12:05:55 |
| 9 | percent-plus union members, AFM and AFTRA | 12:06:00 |
| 10 | members on that distribution.  When I left | 12:06:07 |
| 11 | in 2017 probably less than half were union | 12:06:08 |
| 12 | members.  So we saw the business change. | 12:06:14 |
| 13 | So valuable -- I would say that every | 12:06:15 |
| 14 | source of information is valuable to me. | 12:06:16 |
| 15 | As we had to find more and more of the | 12:06:19 |
| 16 | nonunion people, certainly the websites | 12:06:22 |
| 17 | became only the source of information that | 12:06:26 |
| 18 | was reliable that we could really count on | 12:06:28 |
| 19 | to get every bit of information from. | 12:06:30 |
| 20 | And also we had to rely in -- | 12:06:33 |
| 21 | more and more on the direct contact with | 12:06:35 |
| 22 | producers, independent labels.  So I don't | 12:06:37 |
| 23 | want to say that one source is more | 12:06:42 |
| 24 | valuable than the other.  I want to say | 12:06:45 |
| 25 | every piece of information we get is | 12:06:48 |

Page 118

| | | |
|---|---|---|
| 1 | service fee idea to the board, are you | 13:29:27 |
| 2 | talking about a particular board meeting? | 13:29:30 |
| 3 | A.   I'm sorry.  I missed part of it | 13:29:32 |
| 4 | because you were turned away from -- | 13:29:34 |
| 5 | Q.   I'm sorry.  When you said that | 13:29:34 |
| 6 | Ms. Polach and Ray Hair and Duncan | 13:29:35 |
| 7 | Crabtree-Ireland presented the service fee | 13:29:38 |
| 8 | idea to the board of trustees, are you | 13:29:42 |
| 9 | referring to a particular board meeting? | 13:29:44 |
| 10 | A.   Yes.  It was at a particular | 13:29:47 |
| 11 | board meeting.  I don't have that date | 13:29:50 |
| 12 | handy, but it was -- yeah. | 13:29:51 |
| 13 | Q.   Is that the date when it was | 13:29:53 |
| 14 | voted on? | 13:29:55 |
| 15 | A.   I believe it was the date that | 13:29:55 |
| 16 | it was voted on. | 13:29:57 |
| 17 | Q.   And when -- was that the first | 13:30:02 |
| 18 | time you heard about it? | 13:30:05 |
| 19 | A.   No. | 13:30:06 |
| 20 | Q.   You -- you knew that it was | 13:30:07 |
| 21 | under consideration for some time before | 13:30:10 |
| 22 | that, right? | 13:30:11 |
| 23 | A.   Not by the board of directors. | 13:30:15 |
| 24 | Q.   Well, you understood that it was | 13:30:17 |
| 25 | a concept that eventually was going to be | 13:30:22 |

Page 153

1   presented to the board of directors,          13:30:24

2   right?                                         13:30:26

3      A.    It was -- yes, it was presented       13:30:29

4   to me.  I got a call from Trish Polach         13:30:31

5   saying that Ray and Duncan were interested     13:30:34

6   in a service fee and that she would be         13:30:38

7   working on a document that they would be       13:30:40

8   presenting to the board of directors.          13:30:42

9      Q.    When do -- when was that phone        13:30:46

10  call, if you recall?                           13:30:47

11     A.    That started -- could have been       13:30:49

12  a month or two before the board meeting.       13:30:52

13  I don't recall the date.  There were           13:30:54

14  ongoing discussions that we had about          13:30:56

15  that.  The whole issue of a fee or a           13:30:58

16  service fee went back quite some time.         13:31:01

17        Almost from the time that Ray            13:31:05

18  became a trustee, he brought up several        13:31:09

19  times to me -- and I know others, but I        13:31:12

20  know to me several times -- that he felt       13:31:16

21  it was unfair that the unions had invested     13:31:18

22  a great deal of time and money and energy      13:31:20

23  to help pass the copyright law and             13:31:23

24  establish the fund, and that he felt that      13:31:26

25  the fund had all these resources and           13:31:28

Page 154

| | | |
|---|---|---|
| 1 | A.     I don't recall any. | 13:44:03 |
| 2 | Q.     Did you ever convey to either | 13:44:26 |
| 3 | Ray Hair or Duncan Crabtree-Ireland that | 13:44:29 |
| 4 | you thought it was unjustified to pay any | 13:44:32 |
| 5 | form of ongoing service fee to the unions? | 13:44:35 |
| 6 | A.     I raised a number of points to | 13:44:40 |
| 7 | the board.  Not to him directly.  We had | 13:44:52 |
| 8 | some discussion on the board meeting where | 13:44:55 |
| 9 | the service fees were voted on.  I will | 13:44:58 |
| 10 | say that before that, there were | 13:45:02 |
| 11 | numbers -- different percentages that had | 13:45:05 |
| 12 | been proposed.  At one point I believe | 13:45:07 |
| 13 | Trish said something like 10 percent, and | 13:45:10 |
| 14 | I reacted pretty strongly to that, saying | 13:45:11 |
| 15 | that would be far in excess of anything | 13:45:15 |
| 16 | that would be sort of acceptable under our | 13:45:19 |
| 17 | bilateral agreements. | 13:45:21 |
| 18 | That was modified to 5 percent | 13:45:23 |
| 19 | at the board of directors meeting, and | 13:45:26 |
| 20 | while I didn't speak directly to the issue | 13:45:29 |
| 21 | whether it was going to be ongoing, it | 13:45:32 |
| 22 | seemed to me it wasn't -- I didn't have a | 13:45:35 |
| 23 | vote.  I didn't get anything to decide. | 13:45:38 |
| 24 | At that point it wasn't a matter that I | 13:45:40 |
| 25 | felt that it was appropriate or fair that | 13:45:43 |

Page 164

| | | |
|---|---|---|
| 1 | they were going to do this, but what I | 13:45:45 |
| 2 | wanted to do at that point at least was | 13:45:47 |
| 3 | sort of mitigate the cost as much as I | 13:45:50 |
| 4 | could and I had to point out to them that | 13:45:52 |
| 5 | even -- if they were looking at something, | 13:45:55 |
| 6 | you know of a higher percentage, they were | 13:45:58 |
| 7 | looking at 1.5 percent and -- and, you | 13:46:01 |
| 8 | know, I did point out to them that the -- | 13:46:07 |
| 9 | the -- at 5 percent, we would be higher | 13:46:13 |
| 10 | than the amount that we agreed to under | 13:46:16 |
| 11 | different bilateral agreements. | 13:46:20 |
| 12 | The norm of the foreign | 13:46:21 |
| 13 | societies have requirements in their EU | 13:46:23 |
| 14 | law how much we can charge in | 13:46:26 |
| 15 | administrative expenses, and our bilateral | 13:46:31 |
| 16 | agreements had to be matched to theirs for | 13:46:33 |
| 17 | collection of foreign royalties so.  I did | 13:46:36 |
| 18 | point out that to have a higher | 13:46:38 |
| 19 | administrative fee would put us above the | 13:46:42 |
| 20 | allowable amount. | 13:46:45 |
| 21 | And there may have been some -- | 13:46:46 |
| 22 | I do remember an e-mail I might have | 13:46:48 |
| 23 | written to Trish Polach at this at one | 13:46:50 |
| 24 | point.  I don't remember the exact e-mail, | 13:46:52 |
| 25 | but I'm pretty sure that at one point, | 13:46:54 |

Page 165

| | | |
|---|---|---|
| 1 | there was some correspondence between | 13:46:57 |
| 2 | Trish and myself, and possibly between | 13:46:59 |
| 3 | Trish, Duncan, and myself leading up to | 13:47:02 |
| 4 | the board meeting just about the service | 13:47:05 |
| 5 | fee that they were going to propose.  And | 13:47:07 |
| 6 | I do know at that time, I raised issues | 13:47:10 |
| 7 | about the size of the fee. | 13:47:14 |
| 8 | Q.    Do you ever propose a percentage | 13:47:17 |
| 9 | of what the fee should be? | 13:47:24 |
| 10 | A.    I did suggest that the 5 percent | 13:47:29 |
| 11 | was too high and somebody asked me on the | 13:47:33 |
| 12 | board, possibly Duncan, I think, asked me | 13:47:36 |
| 13 | well, what would be a percentage that | 13:47:41 |
| 14 | would keep us at or below the threshold to | 13:47:43 |
| 15 | not trigger a problem with the foreign | 13:47:47 |
| 16 | CMOs.  And I had said at that point, I | 13:47:50 |
| 17 | believe 3 percent would keep us at the | 13:47:54 |
| 18 | threshold at or below that point. | 13:47:56 |
| 19 | Q.    And what was the nature of the | 13:48:00 |
| 20 | agreement -- the bilateral agreements with | 13:48:04 |
| 21 | the foreign CMOs that you're referring to | 13:48:06 |
| 22 | that would have limited the amount of the | 13:48:10 |
| 23 | fee?  Was it a provision that had to do | 13:48:12 |
| 24 | with overall overhead expense? | 13:48:14 |
| 25 | A.    Yes, generally speaking, each of | 13:48:22 |

Page 166

| | | |
|---|---|---|
| 1 | the bilateral agreements, whether -- | 13:48:24 |
| 2 | they'll have some provisions that are | 13:48:27 |
| 3 | different.  Almost all of them have | 13:48:29 |
| 4 | certain basically standard form agreements | 13:48:31 |
| 5 | that conform with either EU policy or, in | 13:48:33 |
| 6 | some cases, actual statute. | 13:48:38 |
| 7 | Most of those have provisions, | 13:48:40 |
| 8 | for example, that says you can't charge a | 13:48:42 |
| 9 | foreign performer a higher administrative | 13:48:45 |
| 10 | fee than you charge your own performers. | 13:48:52 |
| 11 | And many will have a limit in terms of | 13:48:54 |
| 12 | what the overall administrator's fees can | 13:48:57 |
| 13 | be.  So they'll set a ceiling -- | 13:49:00 |
| 14 | oftentimes they'll have a clause that says | 13:49:02 |
| 15 | you can charge a higher fee, but it has to | 13:49:04 |
| 16 | be justified.  You have to come back to | 13:49:07 |
| 17 | the foreign CMO and explain why it's going | 13:49:09 |
| 18 | to be higher and demonstrate like a, you | 13:49:13 |
| 19 | know, what costs lead to that.  And the | 13:49:15 |
| 20 | notion of the higher fee would be somehow | 13:49:23 |
| 21 | documented and somehow that you were | 13:49:26 |
| 22 | incurring some costs that you hadn't | 13:49:30 |
| 23 | anticipated just something in the | 13:49:33 |
| 24 | administration of the agreements. | 13:49:34 |
| 25 | Q.    So was your concern then that if | 13:49:36 |

Page 167

| | | |
|---|---|---|
| 1 | the fund began paying a 5 percent service | 13:49:40 |
| 2 | fee to the unions that it would cause the | 13:49:45 |
| 3 | overall expense ratio of the fund to climb | 13:49:48 |
| 4 | so high that the fund would be in | 13:49:50 |
| 5 | violation of these bilateral agreements; | 13:49:52 |
| 6 | is that the concern? | 13:49:54 |
| 7 | A.    That was one of my concerns. | 13:49:56 |

8    Q.    Well, let me just ask about that                    13:49:58

9    then.  Do you remember at this time                        13:50:01

10   2012/2013 what the expense ratio of the                    13:50:03

11   fund was?                                                  13:50:06

12   A.    I believe it was around 7                            13:50:08

13   percent at that time.                                      13:50:11

14   Q.    And isn't it true that the                           13:50:12

15   foreign collecting societies often had                     13:50:24

16   expense ratios that were much higher than                  13:50:26

17   7 percent?                                                 13:50:30

18   A.    Ask me one more time.                                13:50:32

19   Q.    Wasn't it -- was it true that at                     13:50:33

20   that time, the foreign collecting                          13:50:35

21   organizations had expense ratios that were                 13:50:36

22   much higher than 7 percent?                                13:50:39

23   A.    Some did, but that also                              13:50:44

24   precluded them to -- some of them did have                 13:50:46

25   a higher fee than that, but that also made                 13:50:52

Page 168

| | | |
|---|---|---|
| 1 | Yes. | 15:02:00 |
| 2 | MS. LYONS:  Yes, this is the | 15:02:01 |
| 3 | e-mail and the attachment. | 15:02:03 |
| 4 | MR. THOMAS:  And this is Exhibit | 15:02:06 |
| 5 | 117? | 15:02:07 |
| 6 | MS. LYONS:  Yes, that's correct. | 15:02:08 |
| 7 | MR. THOMAS:  Okay.  Sorry for | 15:02:10 |
| 8 | the confusion there. | 15:02:11 |
| 9 | BY MR. THOMAS: | 15:02:12 |
| 10 | Q.    Mr. Dreith, this is an e-mail | 15:02:12 |
| 11 | dated January 25, 2013.  It's from you to | 15:02:13 |
| 12 | Ray Hair and Duncan.  And I'm not going to | 15:02:19 |
| 13 | read the whole e-mail to you, but if you | 15:02:29 |
| 14 | read the first few lines -- | 15:02:31 |
| 15 | A.    Okay. | 15:02:33 |
| 16 | Q.    -- you are having a conversation | 15:02:33 |
| 17 | it looks like about your -- the overall | 15:02:36 |
| 18 | expense ratio of the fund, right? | 15:02:39 |
| 19 | A.    Uh-huh. | 15:02:43 |
| 20 | MS. McCONNELL:  Dennis, if you | 15:02:44 |
| 21 | want to take a few seconds to read it, | 15:02:45 |
| 22 | go ahead and do it. | 15:02:47 |
| 23 | BY MR. THOMAS: | 15:02:48 |
| 24 | Q.    Yes, please take as much time as | 15:02:48 |
| 25 | you want. | 15:02:50 |

Page 213

| | | |
|---|---|---|
| 1 | A.     Okay. | 15:04:06 |
| 2 | Q.     So in January of 2013, this is | 15:04:06 |
| 3 | still before the meeting where the | 15:04:09 |
| 4 | trustees voted on this service fee, right? | 15:04:11 |
| 5 | A.     I'm assuming it is.  I don't | 15:04:17 |
| 6 | know -- I see that the e-mail is | 15:04:20 |
| 7 | January 25.  So yeah, it makes sense, it | 15:04:22 |
| 8 | would be, yeah. | 15:04:28 |
| 9 | Q.     The trustee meeting where the | 15:04:30 |
| 10 | service fee was voted on was actually in | 15:04:32 |
| 11 | June of 2013; isn't that right? | 15:04:35 |
| 12 | A.     I -- if you say so.  I don't -- | 15:04:37 |
| 13 | I'm not looking at the dates here.  I | 15:04:41 |
| 14 | couldn't tell. | 15:04:42 |
| 15 | Q.     Okay.  At the time of this | 15:04:43 |
| 16 | e-mail, do you recall whether an agreement | 15:04:49 |
| 17 | had been reached on a 3 percent service | 15:04:52 |
| 18 | fee or was that still unresolved? | 15:04:54 |
| 19 | A.     I don't think it was reached.  I | 15:04:58 |
| 20 | think that was unresolved. | 15:04:59 |
| 21 | Q.     If you read down, maybe it's | 15:05:02 |
| 22 | three-fourths of the way down, there's a | 15:05:04 |
| 23 | sentence that starts on the left margin | 15:05:07 |
| 24 | that says "I understand that this may make | 15:05:09 |
| 25 | it more difficult." | 15:05:11 |

Page  214

| | | |
|---|---|---|
| 1 | Do you see that? | 15:05:12 |
| 2 | A.   Uh-huh. | 15:05:12 |
| 3 | Q.   "So you deduct a fixed service | 15:05:15 |
| 4 | fee for the unions and still maintain an | 15:05:17 |
| 5 | expense ratio of 10 percent, but I do | 15:05:20 |
| 6 | think there will be a way to accomplish | 15:05:24 |
| 7 | this while still providing the fund with | 15:05:27 |
| 8 | all of the resources necessary to | 15:05:30 |
| 9 | effectively service our participants." | 15:05:33 |
| 10 | What did you mean by that? | 15:05:40 |
| 11 | A.   Just that I was -- I hoped that | 15:05:41 |
| 12 | we could still continue to do the budget. | 15:05:43 |
| 13 | I'm not sure -- I'm assuming this was in | 15:05:53 |
| 14 | preparation for some of the budget talks. | 15:05:54 |
| 15 | My recollection is Duncan had asked me | 15:05:57 |
| 16 | to -- to explain, you know, the expense | 15:05:59 |
| 17 | ratios.  There had been a lot of confusion | 15:06:05 |
| 18 | about it. | 15:06:08 |
| 19 | As you pointed out earlier | 15:06:09 |
| 20 | today, you saw that there were a | 15:06:10 |
| 21 | distribution mon -- that would include | 15:06:13 |
| 22 | monies from 2005 for one organization or a | 15:06:14 |
| 23 | partial distribution from one year and not | 15:06:18 |
| 24 | a partial distribution from another year. | 15:06:21 |
| 25 | It may have -- backup royalties may come | 15:06:23 |

Page 215

```
 1    yet from a third -- or catch-up royalties          15:06:25
 2    from third-year, from a foreign collecting         15:06:29
 3    society.                                           15:06:31
 4             And the way we would handle              15:06:32
 5    those, since they would sometimes be               15:06:34
 6    making adjustments from people who had             15:06:38
 7    already received royalties in those same           15:06:40
 8    periods, is we actually had a blended rate         15:06:43
 9    that would basically take into account the         15:06:53
10    various expense ratios for different               15:06:57
11    distributions for different periods.  And          15:07:01
12    mind you, some of the expense ratio would          15:07:04
13    fluctuate from distribution to                     15:07:06
14    distribution, not just from year-to-year           15:07:08
15    based on the years for which we were               15:07:11
16    distributing royalties.                            15:07:14
17       Q.    Okay.  And one of the -- I think          15:07:15
18    partly because of --                               15:07:17
19       A.    If I could finish -- if I could           15:07:19
20    explain that some of this memo was in              15:07:21
21    large part to basically explain that to            15:07:24
22    them.  I don't remember the discussions            15:07:26
23    specifically about the amount of service           15:07:27
24    fee that might have been anticipated.              15:07:30
25    This might have been in the early stages           15:07:32
```

Page 216

| | | |
|---|---|---|
| 1 | of the discussion about how much the | 15:07:34 |
| 2 | traffic would bear. | 15:07:37 |
| 3 | This may have been in the first | 15:07:38 |
| 4 | discussions about that, but the main | 15:07:40 |
| 5 | portion of -- point of this e-mail was to | 15:07:42 |
| 6 | explain primarily to Duncan who had asked | 15:07:45 |
| 7 | the question about what the -- the actual | 15:07:47 |
| 8 | expense ratio was and how it was based on. | 15:07:50 |
| 9 | Q.     So your conclusion and this | 15:07:53 |
| 10 | refers to some of the bold -- bolded words | 15:07:59 |
| 11 | right above that sentence that I read was | 15:08:05 |
| 12 | that for the 2012 expense ratio, you felt | 15:08:07 |
| 13 | it was currently just under 9.8 percent | 15:08:12 |
| 14 | and it could go higher, but less than 12 | 15:08:16 |
| 15 | percent that you had mentioned earlier; is | 15:08:20 |
| 16 | that correct? | 15:08:24 |
| 17 | A.     Yes. | 15:08:25 |
| 18 | Q.     Okay.  And then going back to | 15:08:26 |
| 19 | that sentence that I did read, was it your | 15:08:30 |
| 20 | view that the -- the resources provided by | 15:08:35 |
| 21 | the unions were necessary to effectively | 15:08:39 |
| 22 | service the participants? | 15:08:43 |
| 23 | MS. McCONNELL:  Hold on one | 15:08:45 |
| 24 | second, Dennis.  Objection, vague and | 15:08:47 |
| 25 | ambiguous, calls for speculation, | 15:08:54 |

Page 217

```
 1        please mark the document at tab 26?           15:12:50
 2        And this should be Exhibit 118, I             15:12:56
 3        believe.                                      15:12:58
 4             (Exhibit 118, E-mail from Dennis         15:12:58
 5        Dreith to trustees dated May 30, 2013,        15:12:58
 6        marked for identification.)                   15:13:34
 7   BY MR. THOMAS:                                     15:13:34
 8        Q.    Mr. Dreith, this appears to be a        15:13:35
 9   e-mail from you to the trustees, May 30,           15:13:37
10   2013.  Is that -- do you recognize that?          15:13:43
11        A.    Let me just read it.  It looks          15:13:49
12   familiar to me.  Okay.                             15:13:51
13        Q.    Did you typically send around a         15:14:38
14   package of material before -- shortly              15:14:42
15   before board of trustee meetings?                  15:14:46
16        A.    Typically, yes, we would send an        15:14:51
17   agenda, if there's certain materials that          15:14:54
18   needed to be reviewed, and I would attach          15:14:57
19   a budget.                                          15:14:59
20        Q.    Okay.  And if you go to the last        15:15:00
21   page of the attachments here there's an            15:15:03
22   agenda for the June 4, 2013 board of               15:15:05
23   trustees meeting, correct?                         15:15:10
24        A.    Uh-huh, yes.                            15:15:14
25        Q.    How long did your board of              15:15:15
```

Page 221

| | | |
|---|---|---|
| 1 | trustees meetings typically last?  I | 15:15:18 |
| 2 | noticed this one is starting at 4:00 p.m. | 15:15:21 |
| 3 |    A.   They would be -- that's a late | 15:15:26 |
| 4 | start for us.  I'm surprised -- I don't | 15:15:31 |
| 5 | remember it starting that late, but if I | 15:15:33 |
| 6 | have it on the agenda, that must have been | 15:15:34 |
| 7 | correct.  You know, it depends.  Some | 15:15:38 |
| 8 | meetings, sometimes we'd have meetings | 15:15:41 |
| 9 | that would last for two days.  We'd have a | 15:15:42 |
| 10 | half a day meeting one day and a meeting | 15:15:46 |
| 11 | the next day. | 15:15:47 |
| 12 |    Sometimes we'd have a meeting | 15:15:48 |
| 13 | that might last two or three hours in the | 15:15:50 |
| 14 | afternoon, and we might have a subsequent | 15:15:53 |
| 15 | meeting in the morning.  And then there | 15:15:54 |
| 16 | were other meetings that literally would | 15:15:56 |
| 17 | last later on as -- as things got more | 15:15:58 |
| 18 | complicated, the meetings started earlier | 15:16:03 |
| 19 | in the day and last all day. | 15:16:06 |
| 20 |    Usually most meetings were, | 15:16:07 |
| 21 | like, a one-day meeting.  And I don't -- | 15:16:09 |
| 22 | and usually they would start around 10:00 | 15:16:13 |
| 23 | in the morning and be over by 4:00, | 15:16:15 |
| 24 | sometimes 5:00. | 15:16:18 |
| 25 |    Q.   Okay.  So item 5 is AFM and | 15:16:20 |

Page 222

| | | |
|---|---|---|
| 1 | SAG-AFTRA service fees.  Do you recall -- | 15:16:28 |
| 2 | this is the first board of trustees | 15:16:33 |
| 3 | meeting after you received the draft of | 15:16:35 |
| 4 | the services agreement in late December | 15:16:39 |
| 5 | 2012, right? | 15:16:40 |
| 6 | A.    Correct. | 15:16:41 |
| 7 | Q.    And in fact there's a reference. | 15:16:42 |
| 8 | Item 1 is minutes of the July 2012 | 15:16:44 |
| 9 | meeting.  That would have been the | 15:16:46 |
| 10 | immediately preceding meeting, right? | 15:16:48 |
| 11 | A.    I believe so. | 15:16:50 |
| 12 | Q.    Do you have any recollection of | 15:16:51 |
| 13 | any discussion of the service fee at the | 15:16:52 |
| 14 | July 2012 meeting? | 15:16:55 |
| 15 | A.    I don't.  If there was -- I | 15:17:01 |
| 16 | don't believe there was a discussion about | 15:17:05 |
| 17 | that at the time. | 15:17:06 |
| 18 | Q.    Okay. | 15:17:08 |
| 19 | A.    I'd have -- if you have some | 15:17:10 |
| 20 | notes that would reflect -- you know, | 15:17:12 |
| 21 | refresh my memory, but I don't -- I don't | 15:17:14 |
| 22 | recall it offhand. | 15:17:19 |
| 23 | Q.    Okay. | 15:17:19 |
| 24 | MR. THOMAS:  Why don't we -- | 15:17:28 |
| 25 | Anna, can you please mark the minutes | 15:17:32 |

Page 223

| | | |
|---|---|---|
| 1 | opinion taken into account, but you don't | 15:30:40 |
| 2 | have a vote.  As the administrator -- | 15:30:43 |
| 3 | BY MR. THOMAS: | 15:30:47 |
| 4 | Q.    Did you feel at the time that | 15:30:47 |
| 5 | the -- that the board, by approving the | 15:30:48 |
| 6 | service agreement, was doing something | 15:30:54 |
| 7 | unlawful? | 15:30:56 |
| 8 | MS. McCONNELL:  Objection, calls | 15:30:57 |
| 9 | for a legal conclusion, expert | 15:30:58 |
| 10 | opinion.  You can answer. | 15:31:00 |
| 11 | A.    Yeah, I'm not an attorney. | 15:31:04 |
| 12 | BY MR. THOMAS: | 15:31:04 |
| 13 | Q.    I'm just asking what your | 15:31:05 |
| 14 | opinion was at the time.  Did you think | 15:31:07 |
| 15 | that by approving the service fee, the | 15:31:09 |
| 16 | board of trustee was doing something | 15:31:13 |
| 17 | unlawful? | 15:31:14 |
| 18 | MS. McCONNELL:  Same objections, | 15:31:15 |
| 19 | calls for speculation. | 15:31:16 |
| 20 | A.    I didn't have a legal opinion. | 15:31:18 |
| 21 | BY MR. THOMAS: | 15:31:20 |
| 22 | Q.    Did you at the time think that | 15:31:20 |
| 23 | the trustees by approving the service fee | 15:31:24 |
| 24 | were violating their own fiduciary duties? | 15:31:27 |
| 25 | MS. McCONNELL:  Objection, calls | 15:31:30 |

Page 234

| | | |
|---|---|---|
| 1 | for a legal conclusion, expert | 15:31:32 |
| 2 | opinion. | 15:31:33 |
| 3 | A.    I did feel that it presented a | 15:31:35 |
| 4 | conflict of interest, which concerned me | 15:31:38 |
| 5 | about fiduciary obligations, but I have to | 15:31:41 |
| 6 | worry about my fiduciary obligations. | 15:31:43 |
| 7 | Theirs are a matter of their own | 15:31:45 |
| 8 | conscience. | 15:31:48 |
| 9 | I did feel that it was | 15:31:48 |
| 10 | probably -- I didn't have an opinion | 15:31:49 |
| 11 | whether it was legal or not.  Legal | 15:31:52 |
| 12 | counsel was saying this was legal, so I | 15:31:54 |
| 13 | had to rely on counsel's advice there.  So | 15:31:58 |
| 14 | I didn't make an opinion whether I thought | 15:32:01 |
| 15 | it was lawful or not.  I had my opinion | 15:32:03 |
| 16 | whether it was ethical and as appropriate | 15:32:05 |
| 17 | as it should.  I felt there were more | 15:32:10 |
| 18 | appropriate ways to deal with any kind of | 15:32:12 |
| 19 | reimbursements or expenses. | 15:32:15 |
| 20 | I certainly felt that if we | 15:32:17 |
| 21 | could identify specific expenses, I would | 15:32:19 |
| 22 | rather just pay the fund -- pay the unions | 15:32:21 |
| 23 | back for what they invested, but I also | 15:32:23 |
| 24 | recognized there could be a cost involved. | 15:32:26 |
| 25 | If the federation or a local union -- and | 15:32:29 |

Page 235

| | | |
|---|---|---|
| 1 | by the way, the local union has received | 15:32:32 |
| 2 | nothing in terms of a service fee.  But if | 15:32:34 |
| 3 | a local union or the federation or the | 15:32:37 |
| 4 | pension fund or anybody else that we | 15:32:41 |
| 5 | relied on to -- to get some data, if there | 15:32:43 |
| 6 | was a cost involved with that, I think | 15:32:48 |
| 7 | would be appropriate to reimburse them for | 15:32:50 |
| 8 | these costs. | 15:32:54 |
| 9 | BY MR. THOMAS: | 15:32:55 |
| 10 | Q.    Okay.  Well, let's take talk a | 15:32:55 |
| 11 | minute then about your own fiduciary duty. | 15:32:57 |
| 12 | You had a fiduciary duty to the | 15:32:59 |
| 13 | participants by virtue of being the | 15:33:01 |
| 14 | executive director, correct? | 15:33:03 |
| 15 | MS. MCCONNELL:  Objection, asked | 15:33:04 |
| 16 | and answered. | 15:33:05 |
| 17 | A.    Correct. | 15:33:05 |
| 18 | BY MR. THOMAS: | 15:33:06 |
| 19 | Q.    Do you think that it would -- | 15:33:06 |
| 20 | that you fulfilled -- let me rephrase | 15:33:08 |
| 21 | that. | 15:33:11 |
| 22 | Do you feel that, as the | 15:33:11 |
| 23 | executive director of the fund, you would | 15:33:14 |
| 24 | have a duty to speak up and try to stop | 15:33:19 |
| 25 | the trustees from doing something that you | 15:33:21 |

Page 236

| | | |
|---|---|---|
| 1 | felt was a breach of fiduciary duty or | 15:33:24 |
| 2 | unlawful? | 15:33:26 |
| 3 | MS. McCONNELL:   Objection, asked | 15:33:27 |
| 4 | and answered, lacks foundation, calls | 15:33:29 |
| 5 | for a legal conclusion and expert | 15:33:31 |
| 6 | opinion. | 15:33:32 |
| 7 | A.    All I would say I felt I did the | 15:33:38 |
| 8 | best that I could.   If something was going | 15:33:40 |
| 9 | to go forward, whether I agreed with it or | 15:33:44 |
| 10 | not, as the administrator, my job is to | 15:33:46 |
| 11 | either try to mitigate it to the best of | 15:33:50 |
| 12 | my ability, to accept it, or resign.   I | 15:33:53 |
| 13 | didn't have the power to say to somebody | 15:34:02 |
| 14 | you can't do this.   My job is not to tell | 15:34:03 |
| 15 | the trustee or the co-chairs what they can | 15:34:06 |
| 16 | and cannot do, especially given the advice | 15:34:09 |
| 17 | of legal counsel. | 15:34:12 |
| 18 | BY MR. THOMAS: | 15:34:14 |
| 19 | Q.    You never threatened to resign | 15:34:14 |
| 20 | over the decision to implement the service | 15:34:18 |
| 21 | fee; did you? | 15:34:21 |
| 22 | A.    I did not. | 15:34:21 |
| 23 | Q.    And at the meeting itself while | 15:34:22 |
| 24 | you spoke up on the issues you described, | 15:34:28 |
| 25 | you did not tell the trustees that you | 15:34:30 |

Page 237

```
 1    thought the service fee was unjustified,        15:34:33
 2    right?                                          15:34:35
 3            MS. McCONNELL:   Objection, asked       15:34:38
 4        and answered, misstates prior               15:34:41
 5        testimony.                                  15:34:42
 6        A.    No, I did not tell them that.         15:34:48
 7    Some of the trustees already knew my            15:34:50
 8    feelings about it before.   Others,             15:34:53
 9    probably the co-chairs in particular, it        15:34:54
10    wouldn't have mattered what my opinion          15:34:58
11    was.                                            15:35:00
12    BY MR. THOMAS:                                  15:35:01
13        Q.    And at the meeting where the          15:35:01
14    service fee was approved at this meeting,       15:35:10
15    you didn't tell the trustees that -- that       15:35:12
16    they should commission an outside              15:35:15
17    consultant to study the actual incremental      15:35:20
18    costs incurred by the unions to provide         15:35:22
19    data to the fund?                               15:35:25
20        A.    I didn't.   One would think that      15:35:29
21    the unions should be able to tell me            15:35:31
22    exactly what the real cost was.   Why would     15:35:35
23    they need an outside consultant to              15:35:37
24    determine what their costs were?   They         15:35:40
25    know what -- how many hours per day             15:35:42
```

Page 238

| | | |
|---|---|---|
| 1 | somebody would spend providing support to | 15:35:45 |
| 2 | the fund.  They would know what their | 15:35:47 |
| 3 | hourly rates were.  They would know what | 15:35:50 |
| 4 | other expenses they incurred, so I don't | 15:35:53 |
| 5 | know why an outside consultant would need | 15:35:55 |
| 6 | to be engaged to do that. | 15:35:57 |
| 7 | Q.    But you didn't tell the trustees | 15:35:58 |
| 8 | that you thought the union should be | 15:36:00 |
| 9 | required to provide that information in | 15:36:01 |
| 10 | order to get paid a service fee? | 15:36:03 |
| 11 | MS. McCONNELL:  Objection, | 15:36:05 |
| 12 | misstates prior testimony, lacks | 15:36:06 |
| 13 | foundation. | 15:36:08 |
| 14 | A.    I did not tell them that. | 15:36:10 |
| 15 | BY MR. THOMAS: | 15:36:11 |
| 16 | Q.    Do you recall any discussion | 15:36:11 |
| 17 | prior to the June 2013 meeting with either | 15:36:18 |
| 18 | Duncan or Ray in which there was a | 15:36:21 |
| 19 | discussion that -- about whether it would | 15:36:24 |
| 20 | be feasible or practical to try to measure | 15:36:30 |
| 21 | the actual incremental costs incurred by | 15:36:33 |
| 22 | the unions in providing data and services | 15:36:38 |
| 23 | to the fund? | 15:36:41 |
| 24 | A.    No. | 15:36:42 |
| 25 | MR. THOMAS:  All right.  Maybe | 15:36:48 |

Page 239

| | | |
|---|---|---|
| 1 | A.    That is correct. | 15:58:45 |
| 2 | Q.    And then on the preceding page | 15:58:46 |
| 3 | in the third full paragraph, about the | 15:58:49 |
| 4 | third sentence starts "In addition, it | 15:59:03 |
| 5 | bears mentioning" -- do you see that? | 15:59:06 |
| 6 | A.    Yes. | 15:59:10 |
| 7 | Q.    Can you please read that | 15:59:13 |
| 8 | sentence and the two that follow? | 15:59:17 |
| 9 | A.    Okay.    You're asking me to read | 15:59:21 |
| 10 | those? | 15:59:23 |
| 11 | Q.    Yes, please. | 15:59:23 |
| 12 | A.    In addition to bears mention -- | 15:59:24 |
| 13 | "In addition, it bears mentioning that | 15:59:34 |
| 14 | since the inception of the AFM and | 15:59:37 |
| 15 | SAG-AFTRA Fund, both the AFM and SAG-AFTRA | 15:59:39 |
| 16 | were responsible not only for the creation | 15:59:42 |
| 17 | of the Fund, but each union also invested | 15:59:44 |
| 18 | significant financial resources to bring | 15:59:47 |
| 19 | about the necessary changes in the U.S. | 15:59:50 |
| 20 | copyright legislation to make the fund a | 15:59:52 |
| 21 | reality.    Throughout the entire time, the | 15:59:55 |
| 22 | unions free of charge have provided data | 16:00:00 |
| 23 | necessary to identify and pay entitled | 16:00:03 |
| 24 | performers." | 16:00:05 |
| 25 | Do you want me to continue or -- | 16:00:06 |

Page 246

| | | |
|---|---|---|
| 1 | Q.    Just one more sentence. | 16:00:07 |
| 2 | A.    Okay.  "While in the early days | 16:00:08 |
| 3 | of the fund's operation it was impossible | 16:00:10 |
| 4 | to compensate the unions for their | 16:00:12 |
| 5 | valuable service, the fund has now grown | 16:00:14 |
| 6 | to the point where such compensation is | 16:00:16 |
| 7 | not only possible, but highly warranted." | 16:00:18 |
| 8 | Q.    Who wrote that language? | 16:00:22 |
| 9 | A.    I believe I wrote that language, | 16:00:27 |
| 10 | yes. | 16:00:28 |
| 11 | Q.    Okay.  And if the trustees had | 16:00:28 |
| 12 | voted for this letter, that's the language | 16:00:31 |
| 13 | that you would want to send out to the | 16:00:34 |
| 14 | participants over your signature, right? | 16:00:36 |
| 15 | A.    Yes. | 16:00:38 |
| 16 | Q.    Now, if we take a look at | 16:00:38 |
| 17 | version 2, look at the second page there, | 16:00:45 |
| 18 | that one provides a number of operating -- | 16:00:54 |
| 19 | a figure for the operating expenses of | 16:00:58 |
| 20 | $402,700 approximately.  So it -- it | 16:01:00 |
| 21 | doesn't break out the service fee, but it | 16:01:08 |
| 22 | includes it in the total amount of | 16:01:10 |
| 23 | expenses; isn't that right? | 16:01:12 |
| 24 | A.    That's correct. | 16:01:14 |
| 25 | Q.    And, again, version 2, if you | 16:01:14 |

Page 247

```
 1    look at the third paragraph on the first        16:01:18

 2    page, has the same language that you just        16:01:20

 3    read, right?                                     16:01:22

 4         A.    It looks to be the exact same         16:01:28

 5    language.                                        16:01:30

 6         Q.    And you were in favor of sending      16:01:37

 7    that version to the participants, right?         16:01:39

 8         A.    I was amenable to sending that        16:01:43

 9    version to the participants.                     16:01:45

10         Q.    Okay.  And in your cover letter       16:01:47

11    to the trustees -- excuse me, your cover         16:02:01

12    e-mail to the trustees, you say "I am,           16:02:03

13    however, concerned that the significant          16:02:11

14    cost increase in expenses will raise some        16:02:14

15    eyebrows from the membership or result in        16:02:19

16    needless and unwarranted criticism about a       16:02:22

17    completely justifiable expense."                 16:02:25

18              The completely justifiable             16:02:34

19    expense is the service fee, right?               16:02:35

20         A.    Yes.                                  16:02:38

21         Q.    And is it fair to say that your       16:02:40

22    concern was not that the participants            16:02:48

23    would never find out about the service           16:02:54

24    fee, but that they would see the increase        16:02:57

25    in cost and start asking questions and           16:02:59
```

Page 248

```
 1        Q.    And in fact in your e-mail at        16:10:12

 2   the top of exhibit to Jon, copying the         16:10:14

 3   other trustees, you say "Thanks, Jon.          16:10:18

 4   Looks like version 1 will be the               16:10:21

 5   consensus," right?                             16:10:23

 6        A.    It does.                            16:10:27

 7             MR. THOMAS:  Can you show --         16:10:44

 8        Anna please, can we mark and show the     16:10:46

 9        Exhibit at tab 33?                        16:10:48

10             (Exhibit 123, E-mail chain dated     16:10:50

11        September 9, 2019, marked for             16:10:50

12        identification.)                          16:11:50

13   BY MR. THOMAS:                                 16:11:50

14        Q.    Mr. Dreith, if we could take a      16:11:50

15   look at what's been mark as Exhibit 123,       16:11:52

16   this is an e-mail from you to Ray Hair --      16:11:56

17   actually all of the trustees, it looks         16:12:03

18   like.                                          16:12:05

19        A.    It looks like it.                   16:12:08

20        Q.    It concerns the allocation of       16:12:10

21   your salary as between the Film Musicians      16:12:14

22   Secondary Markets Fund and the fund,           16:12:17

23   right?                                         16:12:24

24        A.    I haven't read the entire e-mail    16:12:24

25   but --                                         16:12:27
```

Page 254

| | | |
|---|---|---|
| 1 | Q.    If you can take a look, please, | 16:12:27 |
| 2 | that would be fine. | 16:12:29 |
| 3 | A.    Okay. | 16:12:30 |
| 4 | MS. McCONNELL:   Take your time | 16:12:31 |
| 5 | and read it, Mr. Dreith, and then he | 16:12:32 |
| 6 | can ask you questions. | 16:12:35 |
| 7 | THE WITNESS:   Thank you. | 16:12:36 |
| 8 | BY MR. THOMAS: | 16:12:36 |
| 9 | Q.    Okay.  Have you had a chance to | 16:13:50 |
| 10 | look at it? | 16:13:51 |
| 11 | A.    I'm having some -- the print's | 16:13:52 |
| 12 | rather small here so I'm trying to slug | 16:13:54 |
| 13 | through this here.  It would be | 16:13:57 |
| 14 | actually -- that would be very helpful. | 16:13:58 |
| 15 | MR. THOMAS:   Yeah that would be | 16:14:02 |
| 16 | great. | 16:14:03 |
| 17 | THE WITNESS:   Okay, thank you. | 16:14:05 |
| 18 | BY MR. THOMAS: | 16:14:05 |
| 19 | Q.    Thanks for asking.  I needed the | 16:14:12 |
| 20 | enlargement too. | 16:14:14 |
| 21 | A.    Okay.  Yeah, the font seemed to | 16:14:16 |
| 22 | get smaller on my computer.  I don't | 16:14:21 |
| 23 | understand how that happened. | 16:14:24 |
| 24 | Q.    I don't know why they do that. | 16:14:25 |
| 25 | Can you explain generally -- | 16:14:27 |

Page 255

| | | |
|---|---|---|
| 1 | MS. McCONNELL:  Sorry, | 16:14:29 |
| 2 | Mr. Thomas -- | 16:14:30 |
| 3 | A.     Let me read the whole thing. | 16:14:32 |
| 4 | It's a long e-mail.  Sorry.  Okay.  Yeah | 16:14:40 |
| 5 | I'm done with it, yes. | 16:14:48 |
| 6 | Q.     So just to make sure I have the | 16:15:03 |
| 7 | gist of this right, there was an issue | 16:15:06 |
| 8 | that arose because of your transition | 16:15:08 |
| 9 | moving from the Film Musicians Secondary | 16:15:10 |
| 10 | Market Fund to the fund that several | 16:15:14 |
| 11 | months went by without you getting paid; | 16:15:17 |
| 12 | is that correct? | 16:15:20 |
| 13 | A.     That's correct. | 16:15:21 |
| 14 | Q.     And you made a proposal that | 16:15:21 |
| 15 | you'd be paid until everything got sorted | 16:15:28 |
| 16 | out, $12,000 a month retroactive to the | 16:15:32 |
| 17 | point where you were removed? | 16:15:36 |
| 18 | A.     Yes, I believe -- | 16:15:39 |
| 19 | (Crosstalk.) | 16:15:39 |
| 20 | Q.     How did you come up with the | 16:16:06 |
| 21 | proposal of $12,000 a month? | 16:16:07 |
| 22 | A.     I don't recall. | 16:16:12 |
| 23 | Q.     You felt it was a reasonable | 16:16:13 |
| 24 | proposal? | 16:16:30 |
| 25 | A.     I looked at the -- I don't know | 16:16:31 |

Page 256

| | | |
|---|---|---|
| 1 | what the numbers were from honestly.  At | 16:16:32 |
| 2 | the time, there must have been some | 16:16:33 |
| 3 | rationale for the number.  I just -- I | 16:16:35 |
| 4 | wouldn't have proposed it if I didn't feel | 16:16:39 |
| 5 | there was a rationale to the number and -- | 16:16:41 |
| 6 | but looking at it right now, I'm sorry, I | 16:16:44 |
| 7 | just don't recall. | 16:16:47 |
| 8 | Q.    Well, during this time, you were | 16:16:47 |
| 9 | essentially working more or less full-time | 16:16:59 |
| 10 | at the Fund; is that right? | 16:17:01 |
| 11 | A.    Yes I think it was safe to say I | 16:17:06 |
| 12 | was actually holding down two full-time | 16:17:09 |
| 13 | jobs at this point. | 16:17:12 |
| 14 | Q.    And that's because the Secondary | 16:17:14 |
| 15 | Markets Fund hadn't found a replacement | 16:17:17 |
| 16 | for you yet; is that right? | 16:17:19 |
| 17 | A.    That's correct. | 16:17:20 |
| 18 | Q.    Okay.  And the $12,000 figure | 16:17:20 |
| 19 | that you came up with was not based on | 16:17:23 |
| 20 | your actual out-of-pocket costs for | 16:17:25 |
| 21 | providing services to the fund, right, | 16:17:31 |
| 22 | like gas costs and commuting costs and | 16:17:33 |
| 23 | mileage, right? | 16:17:36 |
| 24 | A.    I wasn't aware that an | 16:17:37 |
| 25 | administrator had an out-of-pocket cost. | 16:17:39 |

Page 257

| | | |
|---|---|---|
| 1 | I mean, a salary is not an out-of-pocket | 16:17:41 |
| 2 | cost.  So, no, this would be to compensate | 16:17:45 |
| 3 | me for time spent. | 16:17:48 |
| 4 | Q.    And you believe that that was | 16:17:50 |
| 5 | a -- a fair value -- a fair compensation | 16:17:55 |
| 6 | for the services you were provided to the | 16:18:06 |
| 7 | fund, even though it wasn't based on the | 16:18:08 |
| 8 | incremental cost for you to be getting up | 16:18:10 |
| 9 | and going to work every day, right? | 16:18:13 |
| 10 | MS. McCONNELL:  Objection, | 16:18:14 |
| 11 | misstates prior testimony, vague and | 16:18:15 |
| 12 | ambiguous. | 16:18:23 |
| 13 | THE WITNESS:  Okay. | 16:18:25 |
| 14 | A.    Looking at it now, I would say | 16:18:26 |
| 15 | it looks like a fair and reasonable cost | 16:18:28 |
| 16 | to compensate someone.  I don't -- I'm not | 16:18:30 |
| 17 | aware of any salary offered to anybody | 16:18:34 |
| 18 | that's an out-of-pocket cost.  It's a | 16:18:36 |
| 19 | salary.  It's the way you get paid for the | 16:18:39 |
| 20 | hours you put in.  I'm assuming that | 16:18:42 |
| 21 | lawyers don't charge only for | 16:18:43 |
| 22 | out-of-pocket costs. | 16:18:45 |
| 23 | BY MR. THOMAS: | 16:18:45 |
| 24 | Q.    That's true.  Sometimes people | 16:18:48 |
| 25 | charge based on a percentage of some other | 16:18:50 |

Page 258

```
 1    analyze it.  But it does say that, you      16:55:54
 2    know the fund would be allowed to cover,    16:55:57
 3    you know, the costs of doing business.  It  16:56:00
 4    didn't say that we should be negotiating a  16:56:03
 5    value of something.  It talks about what    16:56:06
 6    the cost of something is.                   16:56:08
 7       Q.    In other situations where the      16:56:09
 8    fund incurred operational expenses, did     16:56:24
 9    you think it was necessary to examine the   16:56:30
10    underlying costs of providing those         16:56:31
11    services to the fund?                       16:56:34
12       A.    Can you ask about a specific --    16:56:40
13       Q.    For example, when you paid your    16:56:42
14    electric bill, did you just pay it if it    16:56:44
15    seemed like a reasonable electric bill or   16:56:47
16    did you go ask the power company to         16:56:49
17    justify how much it really cost to deliver  16:56:53
18    the power to the fund?                       16:56:54
19          MS. McCONNELL:  Objection,            16:56:56
20       incomplete hypothetical, vague and       16:56:57
21       ambiguous.                               16:56:59
22       A.    I think that that would be         16:57:00
23    rather difficult to do.  We know that we    16:57:02
24    get a charge from the utility company.  We  16:57:04
25    know that the charge from that utility      16:57:07
```

Page 281

| | | |
|---|---|---|
| 1 | company involves a certain profit margin | 16:57:08 |
| 2 | for -- for the shareholders.  It involves | 16:57:12 |
| 3 | the cost of equipment and salaries and all | 16:57:15 |
| 4 | those kind of things that are there.  So | 16:57:18 |
| 5 | that's the cost -- that's the cost of that | 16:57:21 |
| 6 | service.  It's not necessarily the value. | 16:57:23 |
| 7 | I may value having electricity, but I know | 16:57:27 |
| 8 | that it cost me an X amount of dollars. | 16:57:30 |
| 9 | BY MR. THOMAS: | 16:57:30 |
| 10 | Q.    Let's take another example then. | 16:57:33 |
| 11 | A.    Okay. | 16:57:36 |
| 12 | Q.    The fund sometimes obtains | 16:57:36 |
| 13 | public record information from databases | 16:57:38 |
| 14 | like Nexis Lexis [sic], right? | 16:57:40 |
| 15 | A.    Yes. | 16:57:42 |
| 16 | Q.    And the incremental cost for | 16:57:43 |
| 17 | LexisNexis to e-mail material to you is | 16:57:47 |
| 18 | probably a penny or something like that, | 16:57:49 |
| 19 | but that's not what they charge; is it? | 16:57:52 |
| 20 | A.    No. | 16:57:55 |
| 21 | MS. McCONNELL:  Objection, | 16:57:55 |
| 22 | incomplete hypothetical, vague and | 16:57:56 |
| 23 | ambiguous. | 16:57:58 |
| 24 | A.    You know, once again, you know, | 16:58:02 |
| 25 | LexisNexis is a service.  The fund can | 16:58:04 |

Page 282

```
 1   expand beyond that.                          17:34:38

 2            MS. McCONNELL:  He's giving you     17:34:41

 3        as full of an answer as he feels is     17:34:43

 4        appropriate, which is well within his   17:34:46

 5        rights so...                            17:34:48

 6        A.    You asked me if I had a date in   17:34:50

 7   mind, and I had not had a date.  I was       17:34:52

 8   hoping that we would have a replacement      17:34:54

 9   for myself.  The trustees have engaged the   17:34:55

10   employment firm of Korn Ferry to do a        17:35:00

11   search, and I was surprised that I never     17:35:03

12   heard from anybody at Korn Ferry to talk     17:35:04

13   to me about what the job description was      17:35:09

14   like, what I saw as the job or anything      17:35:10

15   like that.  I would have thought that        17:35:13

16   would be appropriate.                        17:35:14

17            And I did mention it to Duncan a    17:35:14

18   couple of times that, you know, I wondered   17:35:16

19   how the process was going, but I had not     17:35:18

20   set a date.  So I thought that was           17:35:21

21   responsive to your question, but perhaps I   17:35:22

22   didn't understand your question.             17:35:24

23        Q.    Well, okay.  When you did depart  17:35:27

24   from the fund in July of 2017, did the       17:35:32

25   board of trustees have a successor           17:35:38
```

Page 312

```
 1    executive director lined up?                    17:35:42

 2        A.    No.                                   17:35:44

 3        Q.    Jennifer La Blanca stepped into       17:35:45

 4    role briefly; did she not?                      17:35:49

 5        A.    I was not aware of that.  If she      17:35:51

 6    did, I didn't know that.                        17:35:53

 7        Q.    When did you become aware that        17:35:55

 8    the trustees had hired a forensic               17:35:57

 9    accountant to review irregularities in the      17:36:02

10    expense approval process at the fund?           17:36:06

11        A.    I don't remember the date, but        17:36:08

12    it was several -- several months before my      17:36:09

13    retirement, and we had had some                 17:36:13

14    discussions.  I had some discussions with       17:36:16

15    Duncan that I was unhappy with the CFO.         17:36:19

16    And he had known that I really had -- it        17:36:22

17    wasn't I was opposed to the CFO.  I was --      17:36:25

18    I had a different candidate in mind who I       17:36:27

19    thought would have done a much better job,      17:36:29

20    but they were set on Jennifer so we hired       17:36:31

21    Jennifer.                                       17:36:34

22            I was unhappy with her.  It was         17:36:35

23    not a good relationship.  And so at one         17:36:37

24    point when I was talking about some things      17:36:43

25    there, Duncan informed me that he thought       17:36:45
```

Page 313

```
 1    the best thing to do was to hire a          17:36:48
 2    forensic accountant to look into a number   17:36:50
 3    of matters.  They were going to bring an    17:36:52
 4    employment lawyer in, and at the same time  17:36:54
 5    the forensic accountant came in to look at  17:36:56
 6    a whole host of things.                     17:36:59
 7              I really didn't know the scope    17:37:00
 8    of it all.  I knew was that there would be  17:37:02
 9    a fairly broad based audit, and I was       17:37:05
10    asked to cooperate with the forensic        17:37:08
11    auditor which we did.  I -- I think the     17:37:11
12    auditor would say that we provided          17:37:14
13    excellent support.  We tried to meet all    17:37:16
14    of her requests, or their requests as       17:37:21
15    timely as possible.  I instructed           17:37:23
16    everybody in our staff to -- to be as       17:37:25
17    responsive as they possibly could with      17:37:28
18    them, to move this process along.           17:37:31
19       Q.    Ultimately the report was          17:37:39
20    critical of you; wasn't it?                 17:37:41
21       A.    No.                                17:37:45
22              MS. McCONNELL:  Objection, lacks  17:37:45
23       foundation.                              17:37:49
24       A.    No, that's not correct.            17:37:49
25    Ultimately by almost happenstance, the      17:37:54
```

Page 314

| | | |
|---|---|---|
| 1 | auditors found that my former assistant | 17:37:58 |
| 2 | who had been promoted to the office | 17:38:02 |
| 3 | manager status so was no longer my | 17:38:04 |
| 4 | assistant had been falsifying purchase | 17:38:08 |
| 5 | orders and embezzling small amounts of | 17:38:12 |
| 6 | money over a period of time.  And so | 17:38:15 |
| 7 | that's what was uncovered in the forensic | 17:38:21 |
| 8 | audit.  That was the only thing that was | 17:38:24 |
| 9 | stated. | 17:38:26 |
| 10 | The auditors themselves stated | 17:38:26 |
| 11 | to me that they -- would have been no way | 17:38:28 |
| 12 | for me to know this, that they didn't feel | 17:38:30 |
| 13 | I would be held responsible or at fault in | 17:38:33 |
| 14 | any way for this.  And when I found out | 17:38:36 |
| 15 | about that, I placed that person on | 17:38:38 |
| 16 | administrative leave, and as soon as I was | 17:38:40 |
| 17 | presented with what I considered | 17:38:44 |
| 18 | irrefutable evidence, I terminated her. | 17:38:47 |
| 19 | BY MR. THOMAS: | 17:38:53 |
| 20 | Q.    Isn't it -- go ahead.  Finish | 17:38:53 |
| 21 | your answer.  I'm sorry. | 17:38:54 |
| 22 | A.    That's -- I can pick up more | 17:38:55 |
| 23 | later. | 17:38:58 |
| 24 | Q.    Well, isn't it true that the -- | 17:38:59 |
| 25 | this is Bond Beebe, right, the forensic | 17:39:02 |

Page 315

| | | |
|---|---|---|
| 1 | accountant? | 17:39:07 |
| 2 | A.     Yes. | 17:39:07 |
| 3 | Q.     They had found that you failed | 17:39:07 |
| 4 | to supervise and essentially rubber | 17:39:09 |
| 5 | stamped expense reports from your | 17:39:12 |
| 6 | assistant who used falsified invoices to | 17:39:13 |
| 7 | embezzle about $20,000, right? | 17:39:15 |
| 8 | MS. McCONNELL:   Objection, lacks | 17:39:20 |
| 9 | foundation. | 17:39:21 |
| 10 | A.     I had never heard that statement | 17:39:25 |
| 11 | from Bond Beebe.  At best, specifically I | 17:39:27 |
| 12 | had been told that there was no fault of | 17:39:31 |
| 13 | mine.  I wouldn't say they were rubber | 17:39:32 |
| 14 | stamped.  These were purchase orders that | 17:39:35 |
| 15 | looked totally routine that had been | 17:39:38 |
| 16 | falsified.  I approved them.  It was | 17:39:40 |
| 17 | routine, and there was never mention to me | 17:39:44 |
| 18 | of any kind of poor management or failure | 17:39:49 |
| 19 | to manage properly and -- and I don't | 17:39:52 |
| 20 | believe -- I think that the settlement was | 17:39:59 |
| 21 | probably $20,000. | 17:40:01 |
| 22 | What I looked at were really | 17:40:03 |
| 23 | identifiable amounts of about $10,000 that | 17:40:06 |
| 24 | I feel she embezzled.  There were a lot of | 17:40:08 |
| 25 | amounts, things that were actually | 17:40:11 |

Page 316

| | | |
|---|---|---|
| 1 | legitimate expenses that they tacked on to | 17:40:13 |
| 2 | that, but she settled for an amount of, I | 17:40:16 |
| 3 | thought it was $20,000, it could have been | 17:40:18 |
| 4 | $25,000, which occurred over a period of | 17:40:20 |
| 5 | several years. | 17:40:24 |
| 6 | BY MR. THOMAS: | 17:40:24 |
| 7 | Q.    Your forensic accountant also | 17:40:27 |
| 8 | made findings that you circumvented the | 17:40:29 |
| 9 | funds expense reimbursement policies; | 17:40:35 |
| 10 | isn't that right? | 17:40:38 |
| 11 | A.    No, that's not correct. | 17:40:39 |
| 12 | Q.    Didn't they criticize you for | 17:40:41 |
| 13 | avoiding the process of having the | 17:40:45 |
| 14 | co-chairs review your travel expenses by | 17:40:49 |
| 15 | having Sheri Hoffman book your travel for | 17:40:51 |
| 16 | you so that it was a expense of hers that | 17:40:54 |
| 17 | then you could approve? | 17:40:56 |
| 18 | A.    That's not accurate.  That was | 17:40:57 |
| 19 | not in a report.  That was criticized by | 17:40:59 |
| 20 | Ray and Duncan and that was a total | 17:41:02 |
| 21 | mischaracterization of what happened.  It | 17:41:06 |
| 22 | was not to avoid anything.  We had an -- | 17:41:08 |
| 23 | we had a travel budget.  The travel budget | 17:41:11 |
| 24 | was approved.  Rather than each book our | 17:41:13 |
| 25 | travel individually, we booked myself, | 17:41:18 |

Page 317

| | | |
|---|---|---|
| 1 | Sheri Hoffman's travel and Lorraine Hurch | 17:41:21 |
| 2 | when the three of us had traveled | 17:41:24 |
| 3 | together, booked it all on one card. | 17:41:26 |
| 4 | Sheri had done the coordinating | 17:41:28 |
| 5 | in the travel and the hotel, and the -- | 17:41:30 |
| 6 | and the airfare.  It was done to | 17:41:33 |
| 7 | consolidate things actually to save money. | 17:41:36 |
| 8 | In no way was it meant to circumvent | 17:41:40 |
| 9 | anything.  I never in my wildest | 17:41:43 |
| 10 | imagination thought that a budget item | 17:41:45 |
| 11 | that was approved had to get approved a | 17:41:46 |
| 12 | second time. | 17:41:48 |
| 13 | Had they ever mentioned to me | 17:41:49 |
| 14 | that they would have approved it a second | 17:41:51 |
| 15 | time, we would have done it.  There was a | 17:41:52 |
| 16 | nothing to hide.  These were totally | 17:41:54 |
| 17 | customary charges, normal, actually | 17:41:56 |
| 18 | reasonable airfares, reasonable hotel | 17:41:58 |
| 19 | bills. | 17:42:00 |
| 20 | They just happened to all go on | 17:42:01 |
| 21 | one card to save money, put them on a | 17:42:02 |
| 22 | consolidated bill and was booked by one | 17:42:06 |
| 23 | person.  There was nothing being hidden. | 17:42:08 |
| 24 | It was well within the travel budget.  It | 17:42:11 |
| 25 | was preapproved by the trustees. | 17:42:13 |

Page 318

| | | |
|---|---|---|
| 1 | Q. Okay, Mr. Dreith, I don't want | 17:42:15 |
| 2 | to debate the -- the legitimacy of the | 17:42:17 |
| 3 | expenses with you. I'm just going to ask | 17:42:21 |
| 4 | what's your basis for saying that that | 17:42:23 |
| 5 | criticism was not in the forensic | 17:42:26 |
| 6 | accountant's report? | 17:42:29 |
| 7 | MS. McCONNELL: Objection, calls | 17:42:30 |
| 8 | for speculation, lacks foundation. | 17:42:31 |
| 9 | A. All I can tell you is I was | 17:42:35 |
| 10 | never presented with anything like that. | 17:42:37 |
| 11 | I've never seen the report. I never saw | 17:42:39 |
| 12 | that -- I did not see that -- what was | 17:42:41 |
| 13 | being said to me, I did not see that in a | 17:42:49 |
| 14 | report. | 17:42:52 |
| 15 | BY MR. THOMAS: | 17:42:52 |
| 16 | Q. But you haven't seen the Bond | 17:42:53 |
| 17 | Beebe report, have you? | 17:42:56 |
| 18 | A. I don't believe I ever received | 17:42:57 |
| 19 | it. | 17:42:58 |
| 20 | MR. KIESEL: Andrew, can we get | 17:43:04 |
| 21 | a time check to see how much time we | 17:43:05 |
| 22 | have? | 17:43:08 |
| 23 | MR. THOMAS: Yeah, actually I | 17:43:10 |
| 24 | was going to go off the record in a | 17:43:11 |
| 25 | minute. We could probably have them | 17:43:13 |

Page 319

| | | |
|---|---|---|
| 1 | disagree with the privilege | 18:06:01 |
| 2 | instruction because it's -- we're | 18:06:02 |
| 3 | talking about a period of time before | 18:06:05 |
| 4 | he was presumably ever entered into a | 18:06:06 |
| 5 | consulting agreement or -- or had any | 18:06:10 |
| 6 | attorney/client relationship with | 18:06:14 |
| 7 | either of your firms. | 18:06:15 |
| 8 | MS. McCONNELL:  And your | 18:06:16 |
| 9 | question is whether he consulted with | 18:06:17 |
| 10 | our firms about him suing the Fund? | 18:06:19 |
| 11 | MR. THOMAS:  Not about him | 18:06:22 |
| 12 | suing, but about the possibility of a | 18:06:23 |
| 13 | class action lawsuit being maintained | 18:06:26 |
| 14 | against the Fund. | 18:06:28 |
| 15 | MS. McCONNELL:  I don't see how | 18:06:34 |
| 16 | that couldn't be attorney/client | 18:06:35 |
| 17 | privileged if he's consulting with a | 18:06:38 |
| 18 | law firm to ask whether a class action | 18:06:39 |
| 19 | lawsuit could be maintained against | 18:06:42 |
| 20 | the Fund. | 18:06:43 |
| 21 | BY MR. THOMAS: | 18:06:43 |
| 22 | Q.    Let me ask it differently, | 18:06:47 |
| 23 | Mr. Dreith. | 18:06:49 |
| 24 | Did you have any role in | 18:06:50 |
| 25 | recruiting Kevin Risto to be the | 18:06:52 |

Page 328

| | | |
|---|---|---|
| 1 | representative plaintiff in this lawsuit? | 18:06:55 |
| 2 | MS. McCONNELL:  Just object, | 18:06:58 |
| 3 | it's vague and ambiguous, but I think | 18:06:59 |
| 4 | you can answer the question, Dennis. | 18:07:01 |
| 5 | A.    Sure.  Before I do, I lost | 18:07:03 |
| 6 | everybody on my screen.  I can only see | 18:07:06 |
| 7 | myself.  And I can see a document here, | 18:07:09 |
| 8 | but I can't see everybody else. | 18:07:12 |
| 9 | MR. KIESEL:  Can I ask you to | 18:07:15 |
| 10 | take the document down? | 18:07:17 |
| 11 | MR. THOMAS:  You can take the | 18:07:18 |
| 12 | document down. | 18:07:23 |
| 13 | (Whereupon, a brief discussion | 18:07:28 |
| 14 | is held off the record.) | 18:07:28 |
| 15 | A.    Mr. Thomas, can you repeat the | 18:07:51 |
| 16 | question, please? | 18:07:52 |
| 17 | MR. THOMAS:  Can you read it | 18:07:58 |
| 18 | back, please? | 18:07:59 |
| 19 | (Whereupon, the question is read | 18:08:10 |
| 20 | back by the reporter.) | 18:08:10 |
| 21 | A.    After a discussion in -- in my | 18:08:16 |
| 22 | office with Kevin, he had some questions | 18:08:18 |
| 23 | about the service fee and complained about | 18:08:24 |
| 24 | it and he asked what could be done about | 18:08:26 |
| 25 | it, I referred him to Neville Johnson. | 18:08:28 |

Page 329

| | | |
|---|---|---|
| 1 | MR. THOMAS:   Anna, can you | 18:08:44 |
| 2 | upload and mark tab 60, please? | 18:08:46 |
| 3 | (Exhibit 133, Document Bates | 18:08:50 |
| 4 | number Dreith 136, marked for | 18:08:50 |
| 5 | identification.) | 18:09:13 |
| 6 | MR. THOMAS:   Can we share that | 18:09:13 |
| 7 | document, please? | 18:09:14 |
| 8 | BY MR. THOMAS: | 18:09:33 |
| 9 | Q.   If we can scroll down this | 18:09:33 |
| 10 | document, which has Bates number Dreith | 18:09:35 |
| 11 | 136, there's an e-mail from Bruce Waynne | 18:09:39 |
| 12 | to Dirty Swift and to Dennis Dreith.  Do | 18:09:41 |
| 13 | you see that? | 18:09:44 |
| 14 | A.   Yes. | 18:09:45 |
| 15 | Q.   Bruce Waynne is your business | 18:09:46 |
| 16 | partner in Transparence, correct? | 18:09:50 |
| 17 | A.   No, Bruce is the vice president | 18:09:53 |
| 18 | of Transparence. | 18:09:53 |
| 19 | Q.   Oh, that's right, your business | 18:09:54 |
| 20 | partner is Sheri Hoffman, right? | 18:09:56 |
| 21 | A.   That's correct. | 18:09:59 |
| 22 | Q.   Dirty Swiftbut is the stage name | 18:10:00 |
| 23 | of Kevin Risto; is that right? | 18:10:02 |
| 24 | A.   That's correct. | 18:10:04 |
| 25 | Q.   And the e-mail says, "Hey | 18:10:04 |

Page 330

| | | |
|---|---|---|
| 1 | Dennis, per our conversation, I spoke to | 18:10:06 |
| 2 | Swift about your interest in him being a | 18:10:08 |
| 3 | plaintiff for the class action" -- I think | 18:10:11 |
| 4 | he means suit.  "He would like more | 18:10:14 |
| 5 | information." | 18:10:17 |
| 6 | Does this refresh your | 18:10:18 |
| 7 | recollection that you had previously had | 18:10:19 |
| 8 | conversations with a lawyer about setting | 18:10:22 |
| 9 | up a class action lawsuit and you wanted | 18:10:24 |
| 10 | to speak with Mr. Risto about the | 18:10:26 |
| 11 | possibility of being a plaintiff? | 18:10:29 |
| 12 | MS. McCONNELL:  Objection, | 18:10:31 |
| 13 | misstates prior testimony, lacks | 18:10:32 |
| 14 | foundation, and the same objections I | 18:10:34 |
| 15 | made before when you asked him | 18:10:37 |
| 16 | questions about class action lawsuit | 18:10:38 |
| 17 | about it being privileged and work | 18:10:41 |
| 18 | product.  I don't think he can answer | 18:10:43 |
| 19 | that question. | 18:10:48 |
| 20 | MR. THOMAS:  Are you instructing | 18:10:48 |
| 21 | him not to answer that question?  This | 18:10:49 |
| 22 | is an e-mail that was produced that | 18:10:50 |
| 23 | was testified about in the last | 18:10:52 |
| 24 | deposition. | 18:10:53 |
| 25 | MS. McCONNELL:  Well, you -- you | 18:10:55 |

Page 331

```
 1    compounded two things in your           18:10:57
 2    question, Mr. Thomas.  I think that's    18:10:58
 3    where the issue is.  He did just         18:11:00
 4    testify to you that he referred          18:11:04
 5    Mr. Risto to Mr. Johnson.                18:11:05
 6  BY MR. THOMAS:                             18:11:05
 7    Q.    And does this -- let me ask a      18:11:11
 8  different question then.                   18:11:13
 9        Does this document refresh your      18:11:14
10  recollection that you referred Mr. Risto  18:11:16
11  to Neville Johnson after this June 11,     18:11:19
12  2018 e-mail?                               18:11:23
13    A.    It probably was after that.  I     18:11:32
14  think Bruce's e-mail is a                  18:11:35
15  little hyperbole.  Bruce was present when  18:11:36
16  we had our discussion about service fees.  18:11:41
17  We have -- when we have a new client, and  18:11:46
18  then they ask us what are the fees of the  18:11:50
19  various CMOs.  What are -- how do they     18:11:53
20  work out -- so we will have a general,     18:12:01
21  sort of, onboarding discussion where we    18:12:04
22  will describe what are the fees with all   18:12:06
23  the different kind of clients and all the  18:12:07
24  different CMOs, what we charge, and, you   18:12:10
25  know, part of that was a discussion what   18:12:14
```

Page 332

```
 1          to be a plaintiff in a class action?        18:13:17
 2               MR. THOMAS:  No, for anyone else        18:13:19
 3          to be.                                       18:13:21
 4     BY MR. THOMAS:                                    18:13:21
 5          Q.    Did you speak with anyone else         18:13:21
 6     about that person being a plaintiff in a         18:13:22
 7     class action lawsuit against the Fund?           18:13:24
 8          A.    No.                                    18:13:28
 9          Q.    Okay.  Prior to this June 11,          18:13:33
10     2018 e-mail from Bruce Wayne to you, had         18:13:55
11     you had any conversation with Neville           18:14:00
12     Johnson about the possibility of a class        18:14:03
13     action lawsuit being maintained against         18:14:10
14     the Fund?                                        18:14:11
15               MS. McCONNELL:  Objection, vague        18:14:12
16          and ambiguous and also is                   18:14:14
17          attorney/client privileged and work         18:14:17
18          product.  So I'm going to instruct him      18:14:19
19          not to answer that question.                18:14:22
20     BY MR. THOMAS:                                    18:14:22
21          Q.    Mr. Dreith, when did you become        18:14:26
22     a client of the Johnson & Johnson law           18:14:27
23     firm?                                            18:14:31
24          A.    I don't have the date of that.        18:14:35
25          Q.    You are represented by the            18:14:36
```

Page 334

| | | |
|---|---|---|
| 1 | Johnson & Johnson firm in connection with | 18:14:39 |
| 2 | this deposition, right? | 18:14:41 |
| 3 | A.    I'm a consultant to Keisel firm | 18:14:42 |
| 4 | and Johnson & Johnson. | 18:14:46 |
| 5 | Q.    Okay, but are they your lawyers | 18:14:47 |
| 6 | or are you a consultant in connection with | 18:14:49 |
| 7 | this litigation? | 18:14:51 |
| 8 | MS. McCONNELL:  Objection, calls | 18:14:52 |
| 9 | for a legal conclusion.  We did | 18:14:55 |
| 10 | represent him for the purposes of his | 18:14:57 |
| 11 | deposition. | 18:14:58 |
| 12 | BY MR. THOMAS: | 18:14:58 |
| 13 | Q.    Mr. Dreith, you didn't hire | 18:15:06 |
| 14 | Johnson & Johnson two years ago to | 18:15:07 |
| 15 | represent you in connection with this | 18:15:08 |
| 16 | deposition; did you? | 18:15:10 |
| 17 | MS. McCONNELL:  Objection, lacks | 18:15:13 |
| 18 | foundation, vague and ambiguous. | 18:15:15 |
| 19 | A.    I would say no because certainly | 18:15:19 |
| 20 | I didn't know about this deposition two | 18:15:21 |
| 21 | years ago so, no, I did not hire them two | 18:15:23 |
| 22 | years ago. | 18:15:26 |
| 23 | BY MR. THOMAS: | 18:15:26 |
| 24 | Q.    You mentioned that you're a | 18:15:26 |
| 25 | litigation consultant to both firms.  Do | 18:15:28 |

Page 335

```
 1    you have a written agreement with the        18:15:30
 2    Johnson & Johnson law firm that addresses    18:15:32
 3    your role as a consultant?                   18:15:36
 4        A.    I have a verbal agreement.         18:15:42
 5        Q.    Do you have any written            18:15:44
 6    agreement with the Johnson & Johnson law     18:15:45
 7    firm or the Keisel law firm prior to the     18:15:48
 8    year 2020 in which you hired them to be      18:15:57
 9    your lawyers?                                18:16:03
10        A.    I don't believe so.               18:16:09
11        Q.    So in 2018, the Johnson &          18:16:12
12    Johnson firm was not your legal counsel;     18:16:15
13    were they?                                   18:16:19
14            MS. McCONNELL:  Objection,           18:16:20
15        calls -- lacks -- sorry, lacks           18:16:21
16        foundation, calls for a legal            18:16:24
17        conclusion, privileged is attached by    18:16:26
18        virtue of a written agreement,           18:16:29
19        Mr. Thomas.                              18:16:31
20    BY MR. THOMAS:                               18:16:32
21        Q.    In the year 2018, did you have     18:16:32
22    any verbal agreement that the Johnson &      18:16:34
23    Johnson law firm was going to act as your    18:16:36
24    lawyer?                                      18:16:38
25        A.    I don't believe in 2018, I don't   18:16:45
```

Page 336

| | | |
|---|---|---|
| 1 | believe it's -- I think the answer is no. | 18:16:48 |
| 2 | Q.    When was the first time that you | 18:16:50 |
| 3 | talked with anyone at the Johnson & | 18:16:51 |
| 4 | Johnson law firm about them representing | 18:16:53 |
| 5 | you as your lawyers?  Was it -- | 18:16:55 |
| 6 | A.    I don't recall. | 18:17:01 |
| 7 | Q.    -- in the past year? | 18:17:01 |
| 8 | A.    I don't recall the date. | 18:17:03 |
| 9 | Q.    When you first had any | 18:17:12 |
| 10 | conversation with the Johnson -- somebody | 18:17:13 |
| 11 | at the Johnson & Johnson law firm about | 18:17:15 |
| 12 | them representing you as your lawyer, was | 18:17:18 |
| 13 | it because this deposition was coming up? | 18:17:20 |
| 14 | MS. McCONNELL:   Objection, lacks | 18:17:27 |
| 15 | foundation, calls for a legal | 18:17:28 |
| 16 | conclusion. | 18:17:31 |
| 17 | A.    I've had a number of | 18:17:46 |
| 18 | conversations with Neville Johnson over | 18:17:47 |
| 19 | the years.  I've known Neville for many | 18:17:49 |
| 20 | years.  Our paths have crossed oftentimes | 18:17:52 |
| 21 | so I don't remember exactly when we had | 18:17:55 |
| 22 | any discussions. | 18:17:58 |
| 23 | BY MR. THOMAS: | 18:18:02 |
| 24 | Q.    In connection with your being | 18:18:02 |
| 25 | represented by Neville -- excuse me, by | 18:18:04 |

Page 337

| | | |
|---|---|---|
| 1 | Johnson & Johnson and by the Keisel firm | 18:18:06 |
| 2 | in connection with this deposition, do you | 18:18:08 |
| 3 | have any written agreement? | 18:18:11 |
| 4 |     A.    No. | 18:18:15 |
| 5 |     Q.    Okay.  You said your agreement | 18:18:15 |
| 6 | with the -- you had an oral agreement with | 18:18:24 |
| 7 | the Johnson & Johnson firm to act as a | 18:18:27 |
| 8 | consultant in connection with this | 18:18:30 |
| 9 | lawsuit, right? | 18:18:32 |
| 10 |     A.    Correct. | 18:18:33 |
| 11 |     Q.    You also had an oral agreement | 18:18:34 |
| 12 | with the Keisel law firm to act as a | 18:18:36 |
| 13 | consultant in connection with this | 18:18:38 |
| 14 | lawsuit? | 18:18:40 |
| 15 |     A.    Yes. | 18:18:40 |
| 16 |     Q.    How are you -- let me back up. | 18:18:40 |
| 17 |     Are you being compensated for | 18:18:45 |
| 18 | your services as a consultant? | 18:18:46 |
| 19 |     A.    No. | 18:18:48 |
| 20 |     Q.    Do you have any expectation of | 18:18:49 |
| 21 | being compensated for your services as a | 18:18:54 |
| 22 | consultant? | 18:18:57 |
| 23 |     A.    No. | 18:19:01 |
| 24 |     Q.    If the plaintiffs are successful | 18:19:01 |
| 25 | in this lawsuit, do you have any | 18:19:03 |

Page 338

## AFM and AFTRA
## Intellectual Property Rights Distribution Fund

THIS AGREEMENT AND DECLARATION OF TRUST is made and entered into as of the 16th day of September, 1998, in the City of New York, State of New York, by and between the American Federation of Musicians of the United States and Canada, AFL-CIO-CLC ("AFM") and the American Federation of Television and Radio Artists ("AFTRA"), hereinafter jointly known as the Unions.

### Preamble

WHEREAS, the Unions or their designated entities obtain and distribute to artists royalties and remuneration that are created by U.S. or foreign law and that are appropriate for collective administration, and

WHEREAS, the Unions have entered into a Reciprocal Agreement and an Annex for the Distribution of Record Rental Royalties Collected in Japan, pursuant to which they will receive and distribute record rental remuneration payable to non-featured instrumentalists and vocalists under the law of Japan, and

WHEREAS, the Unions may enter into other such agreements for the receipt and distribution of royalties or remuneration for the benefit of their members and other performing artists in the United States and Canada, and

WHEREAS, to accomplish this purpose the Unions desire to establish a trust fund for receiving and distributing royalties and remuneration, and

WHEREAS, the trust fund shall be known as the AFM and AFTRA Intellectual Property Rights Distribution Fund, and

WHEREAS, the Unions desire to set forth the terms and conditions under which the said Fund is to be established and administered,

NOW, THEREFORE, in consideration of the premises, it is mutually understood and agreed as follows:

### Article I
### Definitions

*Section 1.* UNIONS. The term "Unions" as used herein shall mean the American Federation of the Musicians of the United States and Canada, AFL-CIO-CLC and the American Federation of Radio and Television Artists.

*Section 2.* AFM. The term "AFM" as used herein shall mean the American Federation of Musicians of the United States and Canada, AFL-CIO-CLC.

**Exhibit DEFS111**
2/11/2021
Dreith

*Section 3.* AFTRA. The term "**AFTRA**" as used herein shall mean the American Federation of Television and Radio Artists.

*Section 4.* AGREEMENT AND DECLARATION OF TRUST. The term "Agreement and Declaration of Trust" as used herein shall mean this instrument including any amendments hereto and modifications hereof.

*Section 5.* FUND. The term "Fund" as used herein shall mean the AFM and AFTRA Intellectual Property Rights Distribution Fund.

*Section 6.* AGREEMENT FOR THE RECEIPT AND DISTRIBUTION OF REMUNERATION. The term "agreement for the receipt and distribution of remuneration" as used herein shall mean any agreement entered into by the AFM, AFTRA or the Unions with a collecting society, rights organization or other appropriate entity to receive royalties or remuneration held by that entity and to distribute such royalties and remuneration to eligible artists.

*Section 7.* ARTISTS. The term "artists" as used herein shall mean instrumental musicians and vocalists.

### Article II
### Creation of Fund

*Section 1.* ESTABLISHMENT OF FUND. There is hereby established the AFM and AFTRA Intellectual Property Rights Distribution Fund, to be used for the purpose set forth in this Agreement and Declaration of Trust.

*Section 2.* GENERAL PURPOSE. The Fund shall be a trust fund and shall be used for the purpose of receiving and distributing royalties or remuneration to artists in accordance with such agreements for receipt and distribution of remuneration as are entered into by the Unions with the relevant collecting societies, rights organizations or other appropriate entities. The Fund shall further provide the means for financing the expenses of the Trustees and the operation and administration of the Fund, in accordance with this Agreement and Declaration of Trust. The Fund is intended to satisfy the requirements of section 501(c)(5) of the Internal Revenue Code and shall be construed in all respects consistently with section 501(c)(5).

### Article III
### Trustees

*Section 1.* AFM AND AFTRA TRUSTEES. The operation and administration of the Fund shall be the joint responsibility of four Trustees, two appointed by the AFM and two appointed by AFTRA.

*Section 2.* INITIAL TRUSTEES. The initial Trustees shall be:

Steve Young
International President
AFM

Bruce A. York
National Executive Director
AFTRA

Thomas F. Lee
Vice President
AFM

Shelby Scott
President
AFTRA

*Section 3.* ACCEPTANCE OF TRUSTEESHIP. The Trustees shall immediately confer and sign this Agreement and Declaration of Trust, which establishes the Fund. The Trustees, by affixing their signatures at the end of this Agreement and Declaration of Trust, agree to accept the trusteeship and act in their capacity strictly in accordance with the provisions of this Agreement and Declaration of Trust.

*Section 4.* TERM OF TRUSTEES. Each Trustee shall continue to serve as such until his or her death, incapacity, resignation, or removal by the appointing Union. Each Union may remove or replace its Trustee at will.

*Section 5.* SUCCESSOR TRUSTEES. Each Union shall appoint its successor Trustees.

*Section 6.* FORM OF NOTIFICATION. In case any Trustee shall be removed, replaced, or succeeded, a statement in writing by the relevant Union shall be sufficient evidence of its action, when forwarded to the Fund and to the remaining Trustee. Any resignation shall be evidenced in writing and forwarded by registered mail to the Fund and the remaining Trustee, and shall not be effective for two months following the date of mailing unless a successor Trustee has been appointed.

### Article IV
### Powers, Duties and Obligations of Trustees

*Section 1.* PROPERTY AND ASSISTANCE. The Trustees are authorized and empowered to lease or purchase such premises, materials, supplies and equipment, and to hire, employ and retain such legal counsel, investment advisor, administrative, accounting, actuarial, clerical and other assistants or employees as in their discretion they may find necessary or appropriate in the performance of their duties.

*Section 2.* CONSTRUCTION OF AGREEMENT. The Trustees shall have power to construe the provisions of this Agreement and Declaration of Trust and the terms used herein, and any construction adopted by the Trustees in good faith shall be binding upon the AFM, AFTRA, and artists claiming benefits under the Fund.

*Section 3.* GENERAL POWERS. The Trustees are hereby empowered, in addition to other such powers as are set forth herein or conferred by law:

A.      To establish and administer the Fund on behalf of artists who may be entitled

to payments pursuant to agreements for the receipt and distribution of remuneration entered into by the AFM, AFTRA or the Unions and determined by the Trustees to be appropriate for administration by the Fund.

B. As to each agreement for the receipt and distribution of remuneration recommended by the AFM, AFTRA or the Unions, to decide whether or not to administer the agreement through the Fund.

C. As to each agreement for the receipt and distribution of remuneration which is to be administered through the Fund, to establish governing rules and procedures for the distribution that are consistent with the relevant agreement.

D. As to each agreement for the receipt and distribution of remuneration which is to be administered through the Fund, to pay all expenses necessary to the establishment, administration and operation of the agreement out of the receipts generated by the agreement.

E. To enter into any and all contracts and agreements for carrying out the terms of this Agreement and Declaration of Trust and for the administration of the Fund and do all acts as they, in their discretion, may deem necessary and advisable.

F. To compromise, settle, arbitrate, and release claims or demands in favor of or against the Fund or the Trustees on such terms and conditions as the Trustees may deem advisable.

G. To establish and accumulate as part of the Fund a reserve or reserves, adequate, in the opinion of the Trustees, to carry out the purposes of the Fund.

H. To pay out of the Fund all real and personal property taxes, income taxes and other taxes of any and all kinds levied or assessed under existing or future laws upon or in respect to the Fund or any money, property, or securities forming a part thereof.

I. To make appropriate allocations of common administrative expenses and disbursements shared or to be shared with any other Plan or Fund, or among the various agreements for the receipt and distribution of remuneration.

J. To receive contributions, payments, distributions or transfers from any source whatsoever to the extent permitted by law.

K. To establish advisory committees composed of AFM and AFTRA representatives and/or other artists or artists' representatives, and to set forth the duties and functions of the members of such advisory committees.

L. To do all acts, whether or not expressly authorized herein, which the Trustees may deem necessary or proper for the protection of the property held hereunder.

M. To establish such bank account or accounts as the Trustees deem necessary in their discretion, including escrow accounts pending the adoption of distribution rules governing the administration of an agreement for the receipt and distribution of remuneration.

N. To do all acts, whether or not expressly authorized herein, which the Trustees may deem necessary to accomplish the general objective of distributing remuneration to eligible artists in the most efficient and economical manner.

5

O.   To purchase or obtain from the AFM, AFTRA, the AFM and Employers'
     Pension Fund, the AFTRA Health and Retirement Funds, the Phonograph
     Manufacturers' Special Payments Fund, the Motion Picture Special
     Payments Fund or any commercial source any data helpful for the
     identification and location of artists eligible for remuneration or the
     identification of recorded or other performances covered by an agreement
     for the receipt and distribution of remuneration.

P.   To invest the assets of the Fund with care, skill, prudence and diligence under
     circumstances then prevailing that a prudent person, acting in a like capacity
     and familiar with such matters, would use in the conduct of an enterprise of
     a like character and with such aims, without regard to state law restrictions
     on investments.

*Section 4.*  COMPENSATION.  The Trustees shall not receive compensation for the
performance of their duties.

*Section 5.*  PERSONAL LIABILITY.  Neither the Trustees nor any individual or
successor Trustee shall be personally answerable or personally liable for any liabilities
or debts of the Fund contracted by them as Trustees, or for the non-fulfillment of
contracts, but the same shall be paid out of the Fund and the Fund is hereby charged
with a first lien in favor of such Trustee for indemnification for any amounts paid out by
any such Trustee for any such liability and for indemnification against any liability of
any kind which the Trustees or any of them may incur hereunder; provided, however,
that nothing herein shall exempt any Trustee from liability arising out of his own willful
misconduct, bad faith or gross negligence, or entitle such Trustee to indemnification for
any amounts paid or incurred as a result thereof.

         The Trustees and each individual Trustee shall not be liable for any error of
judgment or for any loss arising out of any act or omission in the execution of their
duties so long as they act in good faith and without gross negligence; nor shall any
Trustee, in the absence of his own willful misconduct, bad faith or gross negligence, be
personally liable for the acts or omissions (whether performed at the request of the
Trustees or not) of any other Trustee, or of any agent or attorney elected or appointed
by or acting for the Trustees.

         The Trustees shall be fully protected in acting upon any instrument, certificate,
or paper believed by them to be genuine and to be signed or presented by the proper
person or persons, and shall be under no duty to make any investigation or inquiry as to
any statement contained in any such writing, but may accept the same as conclusive
evidence of the truth and accuracy of the statements contained therein.

         Neither the AFM nor AFTRA shall in any way be liable in any respect for any
of the acts, omissions or obligations of the Trustees, individually or collectively.

         The Trustees may from time to time consult with legal counsel and shall be fully
protected in acting upon such advice of counsel to the Fund as respects legal questions.

*Section 6.*  BOOKS OF ACCOUNT. The Trustees shall keep true and accurate books
of account and records of all their transactions, which shall be audited at least annually

DEFS_00000099

6

by a certified public accountant selected by the Trustees. Such audits shall be available at all times for inspection by the AFM and AFTRA.

*Section 7.* EXECUTION OF DOCUMENTS. The Trustees may authorize and designate an employee or agent of the Fund to execute any notice or other instrument in writing.

*Section 8.* DEPOSIT AND WITHDRAWAL OF FUNDS. All moneys received by the Trustees hereunder shall be deposited by them in such bank or banks as the Trustees may designate for that purpose, and all withdrawals of moneys from such account or accounts shall be made only by checks signed by the Trustees, except that the Trustees may, in their discretion, designate and authorize an employee or agent of the Fund to sign checks upon such separate and specific bank account or bank accounts as the Trustees may designate and establish for such purpose.

*Section 9.* SURETY BONDS. The Trustees and any employees of the Trustees who are empowered and authorized to sign checks as aforesaid shall each be bonded by a duly authorized surety company in such amounts as may be determined from time to time by the Trustees. Each such employee employed by the Trustees who may be engaged in handling moneys of the Trust Fund shall also be bonded by a duly authorized surety company in the same manner. The cost of the premium on such bonds shall be paid out of the Fund.

**Article V**
**Selection of Remuneration Systems to Be Administered by the Fund**

*Section 1.* ACCEPTANCE FOR ADMINISTRATION THROUGH THE FUND. As to each agreement for the receipt and distribution of remuneration entered into by the AFM, AFTRA, or the Unions jointly, and referred by one of them to the Trustees for their consideration, the Trustees, in their sole discretion, may decide whether or not the agreement is appropriate for administration through the Fund. An agreement will be accepted for administration through the Fund only if the Trustees, voting in accordance with Article VII, Section 3, agree to accept it. The refusal of the AFM or AFTRA to accept an agreement for administration by the Fund shall not be subject to arbitration. The acceptance of an agreement for administration by the Fund shall be in writing.

*Section 2.* HOLDING MONEY PENDING ACCEPTANCE FOR ADMINISTRATION. The Fund may hold moneys received pursuant to an agreement for the receipt and distribution of remuneration in an escrow account pending the Trustees' decision whether to accept the agreement for administration through the Fund. If the Trustees refuse acceptance, the moneys will be returned with any interest accumulated thereon and minus any administrative costs incurred to the AFM, AFTRA or the Unions jointly in accordance with the agreement for the receipt and distribution of remuneration.

Section 3. CONTINUATION OF ADMINISTRATION. Once an agreement for the receipt and distribution of remuneration has been accepted for administration through the Fund, it shall continue to be administered through the Fund until such time as the Trustees, voting in accordance with Article VII, Section 3, agree that such administration is no longer appropriate. If the Trustees, voting in accordance with Article VII, Section 3, disagree over whether continued administration is appropriate, they will attempt to resolve their difference on the matter. If they cannot resolve their difference on the matter, they agree to submit the dispute to mediation administered by the American Arbitration Association. If mediation fails to resolve the dispute, the agreement for the receipt and distribution of remuneration shall be discontinued for administration through the Fund upon the vote of the Trustees for one Union, voting in accordance with Article VII, Section 3.

## Article VI
### Plan of Payments and Distributions

Section 1. PAYMENTS. The Trustees shall have full authority to determine all questions of the nature and amount of payments to be provided to artists consistent with the relevant agreements for the receipt and distribution of remuneration.

Section 2. ELIGIBILITY FOR PAYMENTS. The Trustees shall have full authority to determine eligibility requirements for payments, consistent with the relevant agreements for the receipt and distribution of remuneration, and to adopt rules and regulations setting forth the same, which shall be binding on the artists.

Section 3. METHOD OF PROVIDING PAYMENTS. The payments shall be provided and maintained by such means as the Trustees in their sole discretion shall determine.

Section 4. WRITTEN PLAN OF PAYMENTS AND DISTRIBUTIONS. The detailed basis upon which payments are to be made pursuant to each agreement for the receipt and distribution of remuneration shall be specified in writing by appropriate action of the Trustees subject, however, to such changes or modifications by the Trustees from time to time as they in their discretion may determine. All such changes or modifications shall similarly be specified in writing by appropriate resolution of the Trustees.

Section 5. DETERMINING CLAIMS FOR PAYMENTS. The Trustees shall have full authority to determine all claims for payments, provided that they may delegate to the duly designated administrators of the Fund authority to determine such claims initially. The administrators' initial determination shall be submitted to the Trustees for final determination. An individual who believes that he or she has been adversely affected by the administrators' or Trustees' determinations regarding payment of benefits may submit a written appeal to the Trustees. The decision of the Trustees shall be final.

## Article VII
### Meetings and Decision of Trustees

8

*Section 1.* MEETING OF TRUSTEES. Meetings of the Trustees shall be held at such place or places as may be agreed upon by the Trustees.

*Section 2.* ACTION BY TRUSTEES WITHOUT MEETING. The Trustees may also take action in writing without a meeting.

*Section 3.* AGREEMENT OF THE TRUSTEES. All actions of the Trustees shall be by agreement, with the AFM Trustees casting one vote, and the AFTRA Trustees casting one vote. In the event that any matter presented for decision cannot be decided because of a failure of agreement, the matter may be submitted for arbitration in accordance with Article VIII.

*Section 4.* MINUTES OF MEETINGS. The Trustees shall keep minutes of all meetings but such minutes need not be verbatim.

### Article VIII
### Arbitration

*Section 1.* APPLICATION OF THIS ARTICLE. A Trustee may apply to the American Arbitration Association in the area where the Fund maintains its principal office for the designation of an arbitrator who will decide any disputes between the Trustees or any other matter submitted to arbitration in accordance with the provisions of Article VII, Section 3. The decision of the arbitrator shall be final and binding. Decisions to accept an agreement for the receipt and distribution of remuneration for administration through the Fund, pursuant to Article V, Section 1, shall not be subject to arbitration.

*Section 2.* EXPENSES OF ARBITRATION. The cost and expense incidental to any arbitration proceeding, including the fee, if any, of the impartial arbitrator, shall be a proper charge against the Fund and the Trustees are authorized and directed to pay such charges.

### Article IX
### Execution of Trust Agreement

*Section 1.* COUNTERPARTS. This Trust Agreement may be executed in counterparts.

### Article X
### Amendment to Trust Agreement

*Section 1.* AMENDMENT BY TRUSTEES. This Agreement and Declaration of Trust may be amended in any respect from time to time by the Trustees, provided that each amendment shall be duly executed in writing by the Trustees and annexed hereto. The Trustees shall have full discretion to fix the effective date of any amendment.

## Article XI
## Termination of Trust

*Section 1.* BY THE TRUSTEES. This Agreement and Declaration of Trust may be
terminated by an instrument in writing executed by the Trustees when there is no longer
in force and effect an agreement for the receipt and distribution of remuneration which
is accepted for administration by the Fund.

*Section 2.* PROCEDURE ON TERMINATION. In the event of the termination of this
Agreement and Declaration of Trust, the Trustees shall apply the Fund to pay or to
provide for the payment of any and all obligations of the Fund and shall distribute and
apply any remaining surplus in such a manner as will in their opinion best effectuate the
purpose of the Fund; provided, however, that no part of the corpus or income of said
Fund shall be used for or diverted to purposes other than for the benefit of the artists
eligible for benefits under the agreements for the receipt and distribution of
remuneration administered by the Fund, or the administrative expenses of the Fund or
other payments in accordance with the provisions of the Fund.

*Section 3.* NOTIFICATION OF TERMINATION. Upon termination of the Fund, the
Trustees shall notify each necessary party, and the Trustees shall continue as Trustees
for the purpose of winding up the affairs of the Trust.

## Article XII
## Miscellaneous Provisions

*Section 1.* GOVERNING LAW. This Agreement and Declaration of Trust shall be
construed under the laws of the State of New York applicable to contracts made and to
be performed within the County and State of New York (without regard to any conflict
of laws provision), and venue for any dispute arising under this Agreement and
Declaration of Trust shall be in New York.

*Section 2.* NOTIFICATION TO TRUSTEES. The address of each of the Trustees shall
be that stated on the signature page of this Agreement and Declaration of Trust. Any
change of address shall be effected by written notice to the Trustees.

*Section 3.* SEVERABILITY. Should any provision in this Trust Agreement or in the
rules and regulations adopted thereunder be deemed or held to be unlawful or invalid
for any reason, such fact shall not adversely affect the provisions contained therein
unless such illegality shall make impossible or impractical the functioning of the Trust
and the Plan, and in such case the appropriate parties shall immediately adopt a new
provision to take the place of the illegal or invalid provision.

*Section 4.* VESTED RIGHTS. No artist or any person claiming by or through such
artist, including the artist's family, dependents, beneficiary and/or legal representative,
shall have any right, title or interest in or to the Fund or any property of the Fund or any
part thereof except as may be specifically determined by the Trustees.

10

*Section 5.* ENCUMBRANCE OF PAYMENTS. No moneys, property or equity, of any nature whatsoever, in the Fund, or policies or benefits or moneys payable therefrom, shall be subject in any manner by any artist or person claiming through such artist to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, garnishment, mortgage, lien or charge, and any attempt to cause the same to be subject thereto shall be null and void.

*Section 6.* EXPENSES OF THE TRUSTEES. All expenses of the Trustees incurred in the performance of their duties may be chargeable to the Fund at the discretion of the Trustees. All other expenses incurred pursuant to Article IV hereof shall be paid by the Fund.

11

*Section 7.* NO EMPLOYER CONTRIBUTIONS PERMITTED. The Fund shall not accept contributions from any employer or association of employers who employ artists represented by the AFM or AFTRA, and shall not enter into agreements for the receipt and distribution of remuneration with such employers or associations of employers.


_____          _____
Steve Young                                Bruce A. York
Trustee                                    Trustee


_____          _____
Thomas F. Lee                              Shelby Scott
Trustee                                    Trustee

**From:** Ray Hair
**Sent:** Thursday, December 27, 2012 1:00 PM
**To:** Jennifer Garner
**Subject:** FW: Data Purchase and Service Agreement - AFM & SAG-AFTRA Fund
**Attachments:** union trust services agreement version 2 December 27 2012.doc

**Importance:** High

Ray Hair, International President
American Federation of Musicians
of the US and Canada
1501 Broadway, Suite 600
New York, NY 10036
212-869-1330, ext 1212
rhair@afm.org

-----Original Message-----
From: Patricia Polach [mailto:ppolach@bredhoff.com]
Sent: Thursday, December 27, 2012 2:07 PM
To: Ray Hair; Dennis Dreith
Cc: Jeff Freund
Subject: Data Purchase and Service Agreement - AFM & SAG-AFTRA Fund
Importance: High

Dear Ray and Dennis:

You each asked me earlier (Dennis on behalf of the AFM & SAG-AFTRA Fund, and Ray on behalf of AFM) to explore whether, and how, the AFM and SAG-AFTRA could enter into a service agreement with the Fund, pursuant to which the Fund would commence paying the Unions for the data and services that the Unions provide for the Fund's operations. Article IV, Section 3.O of the Agreement and Declaration of Trust explicitly allows the Fund to purchase data from the Unions, and by extension, the purchase of other services at a reasonable price from the Unions should fall within the general powers of the Trustees under the Fund's Agreement and Declaration of Trust.

As you both know, I obtained assistance from Jenner & Block. Among other things, they prepared a first draft of a "Data Purchase and Services Agreement," which I modified slightly. The draft Agreement expresses the contract fee as a percentage of Fund distributions -- but doesn't suggest what the percentage should be. It is attached for your review.

At some point, you will want to discuss with Duncan, but I have only sent it to the two of you.

Please let me know if you have any questions and how you would like to proceed.

Hope you are both having a good holiday season--

Trish

_____
This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com _____

**Exhibit
DEFS115**
2/11/2021
Dreith

DRAFT 2 – December 27, 2012

## DATA PURCHASE AND SERVICES AGREEMENT

This Data Purchase and Services Agreement ("Agreement"), dated as of _____, 2013 (the "Effective Date"), is made by and between the American Federation of Musicians of the United States and Canada, AFL-CIO-CLC ("AFM"), the Screen Actors Guild - American Federation of Television and Radio Artists ("SAG-AFTRA") and the AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund (the "Fund"). AFM and SAG-AFTRA are sometimes referred to herein individually as a "Union" and collectively as the "Unions." AFM, SAG-AFTRA and the Fund are sometimes referred to herein individually as a "Party" and collectively as the "Parties."

WHEREAS, by an Agreement and Declaration of Trust dated September 16, 1998, as amended and restated on July 26, 2012, the Unions formed the Fund to collect and distribute certain artist royalties that are appropriate for collective administration;

WHEREAS, the Unions have in the past provided to the Fund certain data, as well as certain services of outside counsel and in-house staff to assist the Fund in its operation and administration and to represent the interests of the Fund in various external matters, without being reimbursed for their costs thereof;

WHEREAS, the Agreement and Declaration of Trust authorizes the Trustees of the Fund to purchase relevant data from the Unions (and others) and to employ assistants; and

WHEREAS, the Trustees of the Fund have determined that it is reasonable and appropriate at this time to memorialize arrangements for the provision by the Unions to the Fund of certain data and assistance in exchange for reasonable compensation to the Unions from the Fund;

NOW, THEREFORE, the Parties, intending to be legally bound, hereby agree as follows:

1.      Provision of Data. From and after the Effective Date, each Union shall provide the Fund the following data, in a manner comparable to the way such data has been provided immediately prior to the Effective Date:

- Access to member databases to enable the Fund to obtain identifying and contact information for members.

- Access to session reports and "B-forms," or databases containing information derived therefrom, that in either case, identify the recordings made at recording sessions and provide identifying and contact information for performers (Union members and nonmembers) who performed at the session.

Each Union retains all its ownership rights in its data, and all such data shall be considered Confidential Information of the relevant Union subject to the provisions of Section 7. The Fund is authorized to, and shall, access, reproduce and use such data solely for purposes of distribution

70441.1 version 2

of royalties collected by the Fund to the relevant persons. In its use of such data, the Fund further shall comply with the provisions of any applicable Union privacy policy of which such Union advises the Fund in writing from time to time.

2.      Representation of Fund Interests. Each Union shall use commercially reasonable efforts to further the interests of the Fund and the Fund's beneficiaries through its participation in the following forums (or their successors):

- The board of SoundExchange, Inc.;

- The board of the Alliance of Artists and Record Companies;

- The musicFIRST Coalition;

- Activities under the auspices of the U.S. Copyright Office and other U.S. governmental entities; and

- Activities under the auspices of international entities such as the International Federation of Musicians, International Federation of Actors, World Intellectual Property Organization, Societies' Council for the Collective Management of Performers' Rights.

To the extent that the Fund may communicate to a Union particular interests, concerns or objectives relevant to the Unions' participation in the foregoing forums, each Union shall use commercially reasonable efforts promptly to address the Fund's requests in that regard, except to the extent the Union determines that such requests are contrary to the interests of its members.

3.      Mandates. Each Union shall use commercially reasonable efforts to obtain from its members authorization to act as such members' representative for the purpose of collecting and distributing government-mandated or other compulsory royalties or remuneration payable to performers under U.S. or foreign law. Each Union shall use commercially reasonable efforts to extend to the Fund the benefit of such authorizations that the Union obtains. The Unions may fulfill the foregoing obligation by, for example, negotiating and signing together with the Fund, or authorizing the Fund to enter into, agreements with foreign collecting societies pursuant to which the Fund will be entitled to claim, and the foreign society will agree to pay to the Fund, foreign royalties owed to those U.S. performers for whom the Fund exercises a mandate on behalf of either or both Unions.

4.      Other Services. From and after the Effective Date, it is not anticipated that either Union will provide the Fund material services in support of the Fund's operation and administration, except as specifically described above. However, the Unions shall not unreasonably refuse to provide the Fund incidental advice and assistance as the Fund may request from time to time.

5.      Services in General. The foregoing data and services shall be provided in accordance with any schedule agreed upon between the Fund and a Union, or in the absence of such agreement, promptly upon the Fund's request. To the extent that a Union may provide the Fund any documents or other recorded information other than the data described in Section 1 (the

70441.1 version 2

Fund's rights to which are also addressed in Section 1), and subject to Section 7, such Union hereby grants the Fund a nonexclusive, perpetual, worldwide license to reproduce, adapt, distribute, perform and display such item and authorize others to do the same for the Fund's purposes. At no time shall the Fund be deemed to be the employer of a Union's personnel providing services hereunder. Each Union, and not the Fund, shall be responsible for payment of compensation to its personnel, required payroll deductions, social security and Medicare contributions, and unemployment, disability and workers' compensation insurance, all as required under law from time to time.

6.      Payment. In consideration of the foregoing, the Fund shall pay each Union, within 30 days after the conclusion of each of the Fund's distribution cycles, ___% of the amount distributed by the Fund in such distribution cycle. Each such payment shall be accompanied by a statement setting forth the computation of the payment amount. Such payment shall constitute complete compensation of the Unions and their personnel for providing the data and services contemplated by this Agreement. There shall be no additional charges or expense reimbursement associated with the Unions' provision of the data and services contemplated by this Agreement.

7.      Confidentiality.

        7.1.    "Confidential Information" means any material or information that (i) a Party (the "Disclosing Party") treats as confidential; (ii) the Disclosing Party provides to another Party (the "Receiving Party") in connection with the performance of this Agreement; and (iii) the Receiving Party reasonably should recognize as being confidential material or information of the Disclosing Party. The Receiving Party shall not use the Disclosing Party's Confidential Information for any purpose other than the performance of this Agreement or enjoyment of benefits provided under this Agreement, and shall not disclose the Disclosing Party's Confidential Information to any person other than its directors, officers, employees and contractors who have a need to know such Confidential Information and are subject to a nondisclosure obligation comparable in scope to this Section 7.

        7.2.    Notwithstanding Paragraph 7.1, the Receiving Party may disclose any material or information that it can demonstrate is (i) or becomes publicly known through no fault of the Receiving Party; (ii) developed independently by the Receiving Party; (iii) known by the Receiving Party prior to its disclosure by the Disclosing Party; or (iv) rightfully obtained from a third party not obligated to preserve its confidentiality who did not receive the material or information directly or indirectly from the Receiving Party. The Receiving Party also may disclose materials or information to the extent required by a court or other governmental authority, provided that the Receiving Party (a) gives the Disclosing Party prompt notice of the disclosure, (b) uses reasonable efforts to resist disclosing the material or information, and (c) cooperates with the Disclosing Party on request to obtain a protective order or otherwise limit the disclosure.

        7.3.    The receiving Party acknowledges that its breach of this Section 7 would cause the Disclosing Party irreparable injury for which it would not have an adequate remedy at law. In the event of a breach, the Disclosing Party shall be entitled to injunctive relief in addition to any other remedies it may have at law or in equity.

Confidential                                                                                    DEFS_00041344

8.      Representations, Warranties and Covenants

        8.1      Each Party represents and warrants that it has the right, power and authority to enter into and to perform this Agreement.

        8.2      Each Union represents, warrants and covenants that the services it is to provide under this Agreement shall be provided (i) in a workmanlike manner; (ii) in accordance with the standards of care and diligence and the level of skill, knowledge and judgment normally practiced by organizations of a similar nature; and (iii) in compliance with all applicable laws and regulations.

        8.3      Each Union represents, warrants and covenants that the data, and any other documents or other recorded information it may provide to the Fund in the performance of this Agreement, will not infringe or misappropriate any patent, copyright, trade secret, or other proprietary right of any third party or otherwise conflict with the rights of any third party.

9.      Indemnity.  Each Party shall defend, indemnify and hold harmless each other Party and its directors, officers and employees from and against any third party claims to the extent relating to or resulting from any breach of this Agreement by the indemnifying Party.  The indemnifying Party shall have the right to exercise reasonable control over any litigation within the scope of this indemnity; provided, however, that the indemnified persons shall have the right to participate in any such litigation at their own expense insofar as it concerns claims against them.  This indemnity shall be inapplicable to the extent that the indemnifying Party is not notified promptly of a claim and is prejudiced by the delay in notice.  All indemnified persons shall cooperate to the extent necessary in the defense of any claim within the scope of this indemnity.

10.     LIMITATION OF LIABILITY.  EXCEPT FOR A CLAIM OF INDEMNIFICATION PURSUANT TO SECTION 9, OR FOR A BREACH OF SECTION 7, IN NO EVENT SHALL ANY PARTY BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL, OR CONSEQUENTIAL DAMAGES.

11.     Term and Termination of this Agreement.  The term of this Agreement shall commence as of the Effective Date and shall continue thereafter unless terminated in accordance with this Section 11.  As between each Union and the Fund, this Agreement may be terminated (i) at will upon one year's written notice to the other Party, or (ii) if the other Party has materially breached this Agreement and failed to remedy that breach within 30 days after receiving written notice of that breach, upon further written notice by the non-breaching Party.  Termination of this Agreement as between one Union and the Fund shall not, by itself, cause this Agreement to terminate as between the other Union and the Fund.  Upon the effective date of termination, the relevant Union shall no longer be obligated to provide data or services as described in Sections 1-5.  The Fund shall pay the relevant Union in accordance with Section 6 for data or services rendered through the effective date of termination on a prorated basis over the Fund's then current distribution cycle.  The provisions of Sections 7-13 shall survive the termination of this Agreement.

12.     Notices.  All notices sent under this Agreement shall be in writing and hand delivered or delivered by prepaid overnight courier.  Notices shall be sent to the Parties at the following addresses or such other addresses as the Parties subsequently may provide:

70441.1 version 2

                                                          DEFS_00041345

If to AFM:                   _____
                             _____
                             _____
Attention:                   _____
Telephone:                   _____

If to SAG-AFTRA:             _____
                             _____
                             _____
Attention:                   _____
Telephone:                   _____

If to the Fund:              _____
                             _____
                             _____
Attention:                   _____
Telephone:                   _____

13.    Miscellaneous.

       13.1.   Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of _____, without regard to its conflict of laws principles.

       13.2.   Severability.  The provisions of this Agreement are severable, and the unenforceability of any provision of this Agreement shall not affect the enforceability of the remainder of this Agreement.

       13.3.   Cumulative Rights and Remedies.  The rights and remedies provided in this Agreement and all other rights and remedies available to a Party at law or in equity are, to the extent permitted by law, cumulative and not exclusive of any other right or remedy now or hereafter available at law or in equity.

       13.4.   Assignment.  No Party may assign any of its rights or delegate any of its duties under this Agreement to any third party without the prior written consent of the other Parties, which shall not be withheld unreasonably.  This Agreement shall be binding upon and inure to the benefit of the Parties and their permitted assigns.

       13.5.   Relationship of the Parties.  Nothing in this Agreement shall be construed as creating a partnership, joint venture or agency relationship between the Parties, or as authorizing any Party to act as agent for the other or to enter into contracts on behalf of any other Party.

       13.6.   Amendments.  This Agreement may be modified or amended only by written agreement of the Parties.

       13.7.   Entire Agreement.  This Agreement constitutes the entire agreement between the Parties concerning the subject matter of this Agreement, and supersedes all prior agreements between the Parties concerning the subject matter of this Agreement.

70441.1 version 2

DEFS_00041346

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective duly authorized officers.

AMERICAN FEDERATION OF MUSICIANS OF
THE UNITED STATES AND CANADA, AFL-CIO-CLC

By: _____

Name: _____

Title: _____

Date: _____


SCREEN ACTORS GUILD - AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS

By: _____

Name: _____

Title: _____

Date: _____


AFM & SAG-AFTRA INTELLECTUAL PROPERTY RIGHTS DISTRIBUTION FUND

By: _____

Name: _____

Title: _____

Date: _____

70441.1 version 2

DEFS_00041347



Exhibit
DEFS117
2/11/2021
Dreith

Hilversum, 25th January 2013

Re: Statement Sena remuneration and administrative cost percentage

Dear Dennis,

Please find enclosed the SENA statement of your article 12 rights. The net amount, as mentioned on the statement, has already been transferred to your bank account at the end of December 2012.

By this letter, we would like to inform you that the administrative cost percentage charged by Sena has been increased with retro-active effect from 2006 onwards to 16%.
The percentage of administrative costs regarding the years 2006-2009 used to be 11%, respectively 15% in 2010.

**Why?**

As you might be aware of, Sena has gone through a reorganization during the years 2010 and 2011.
A detailed analysis of the difference between the distribution obligation of the Dutch cash income (the sum of the amounts to be paid out in the future, at the end of 2011) and the distribution debt (the reserve created so that this obligation can be fulfilled) has in the meantime revealed that a deficit arose in previous years.
The withholding percentages used at the time were insufficient to cover the costs incurred during those years. During that period account was taken of a continuing significant increase in the collections as a result of which the deficit would be compensated, as well as with more slowly declining interest income.

The adapted collections policy in combination with worsening economic circumstances means one has to assume a more conservative estimate of the collections growth. With a view to compensating the deficit - that was largely caused by the one-off special expenditure in 2010 - within a foreseeable period, a decision was taken to increase the withholding percentage for both the open (period 2006-2011) and future years to 16 percent. For the open years this concerns both the payments already carried out and those still to be carried out. In addition the unclaimed remunerations over closed years will, until further notice, be added to the distribution debt. These changes will mean that the deficit on the distribution debt will have been cleared within a period of between 5 and 7 years. This additional measure has no effect on the results for 2011.

**How does this affect your right holders in practice?**

Sena has decided to correct this increase of administrative costs in multiple phases. We have started  in 2012 with the corrections of the percentage of the administrative costs, on the remuneration transferred in  the period 2006 and 2009 only.
In 2013, 2007 and 2010 shall be recalculated.  Finally in 2014, 2008 shall be corrected.

DEFS_00040117

Due to the fact that our period of limitation has been reduced from 5 to 3 years as of 2009 onward, 2009 and 2010 will be recalculated earlier than 2008.

I trust I informed you sufficiently. Should you have any further questions, please do not hesitate to contact me.

Best regards

Natalie Loop
Manager Distribution

Confidential                                                                                                DEFS_00040118

**From:** Dennis Dreith
**Sent:** Friday, January 25, 2013 4:07 PM
**To:** Ray Hair (rhair@afm.org), Duncan Crabtree-Ireland (dci@sagaftra.org)
**Subject:** AFM & SAG-AFTRA Fund expense ratios
**Attachments:** Sena letter.docx

Hi Ray and Duncan,

First, thank you both for a very productive meeting last Friday. As a follow-up to that meeting, , as promised, I had our controller generate a more exact expense ratio than I was able to do off the top of my head. As you may recall, I reported that we had been traditionally holding that rate to around 7%, but that based on our budget and income I estimated that our rate for FY 2012/13 could climb to as high as 12%. Please understand that making this determination is not quite as easy as simply dividing our budget by the income (which is roughly the way I made the estimate, less a little guess work about reasonably deductions). This is due to the fact that the Fund operates under a Modified Cash basis of accounting so that we can amortize capital expenditures (i.e. any single item purchased or improvement exceeding $1,500) over several years, but still budget for necessary purchases. What this means is that our budget will always be larger than our expense base for purposes of calculating an expense ratio (which is one of the reasons that I am reluctant to change the manner in which budgeting and expenses are determined). I am still not saying that there may not be a different way to do our accounting, it's just that I am unaware of a better way to accomplish what we need to do Regardless, when we looked at the **2012 expense ratio** in detail, I am happy to report that it is currently just under **9.8%** (although we do anticipate that it will still climb yet slightly higher by the end of this fiscal year , but less than the 12% I projected).

I understand that this may make it more difficult to deduct a fixed service fee for the unions and still maintain an expense ratio of 10%, but I do think there will still be a way to accomplish this while still providing the Fund with all the resources necessary to effectively service our participants...it may just take a little creative thinking on all our parts. To that end, I will gladly schedule a meeting with our controller and our auditor (Jeff Goss of Miller, Kaplan & Arase) at your earliest convenience to explore these issues further.

To put matters in a bit of perspective about reasonable expense ratios, I have attached a letter I received today from Natalie Loop, Manager Distributions from SENA (Netherlands) regarding a change in their expense rate.

Best regards,

Dennis
*Dennis Dreith*
Administrator, FMSMF
12001 Ventura Place 5th Floor
Studio City, CA 91604
v. 818-755-7777 ext.810
F. 818-755-6786
www.fmsmf.org

Confidential                                                                                              DEFS_00040116

**From:** Dennis Dreith
**Sent:** Thursday, May 30, 2013 6:29 PM
**To:** 'Duncan Crabtree-Ireland (dci@sagaftra.org)'; 'Jon Joyce'; 'Stefanie Taub (Stefanie.Taub@sagaftra.org)'; 'Ray Hair (rhair@afm.org)'; 'Sam Folio'; 'Bruce Bouton'
**CC:** 'Patricia Polach (ppolach@bredhoff.com)'; Shari Hoffman; Jo-Anne McGettrick; Nancy Carney
**Subject:** Updated budget
**Attachments:** Fiscal Year 2014 w_FY13 Actuals_1S.xlsx; Agenda Trustees Meeting 060413.docx

Hi Trustees, and related folks!

In preparation for our meeting on June 4, I have attached the proposed 2013-2014 budget and comparison of last year's budget and actual expenses. IN addition, I have included a proposed agenda. As usual, please let me know should you wish to add to or delete any items to the agenda.

I know you will experience quite a bit of "sticker shock" when you look at the proposed numbers for this year. However, please bear in mind that this includes some additional office space, a number of new hires, and the addition of me as the full-time administrator (along with the salary and benefits that come with that). Also, bear in mind that this is heading in exactly the direction many of you have asked us to do. Namely, a separation from the FMSMF, and the ability to process more royalty payments in a quicker manner. While not a complete separation from the FMSMF, this budget does reflect a tremendous shit in that direction.

As always, please feel free to contact with any questions or requests for additional information. IN addition, please let me know if you desire any6 one else to be invited to attend the meeting (the Fund's Auditor Jeff Goss??).

I am looking forward to seeing you and/or talking to you on the 4th. As usual, I will be circulating the Fund's conference Call information is a couple of days.

Best regards,
Dennis

**Exhibit DEFS118**
2/11/2021
Dreith

**AFM & SAG-AFTRA Intellectual Property Rights Distribution Fund**
**Budget and Analysis for Fiscal Years 2013**
**Proposed Budget for Fiscal Year 2014**

| Acct ID | Account Name |
|---|---|
| 1410 | Computers |
| 1430 | Equipment |
| 1450 | Furniture & Fixtures |
| 1470 | Leasehold Improvements |
| 1490 | Systems |
| 1510 | Website |
| 1620 | Prepaid Insurance |
| 6020 | Bank Fees |
| 6040 | Printing (Distribution) |
| 6050 | Research |
| 6110 | Administrative |
| 6120 | Advertisement |
| 6130 | Dues & Subscriptions |
| 6170 | Delivery & Postage |
| 6190 | Maintenance/Repairs |
| 6195 | Loss on Asset Disposal |
| 6230 | Rent-Office Space |
| 6240 | Insurance-Business/Prop Etc |
| 6245 | Insurance/Other |
| 6250 | Business/Office Expense - Licenses |
| 6270 | Supplies-computer hardware |
| 6275 | Supplies-computer software |
| 6280 | Supplies-Add'l/Office/supplies |
| 6285 | Supplies-Guest/Mtlserv/Equip |
| 6290 | Utilities ( A/C, Elec, Tel) |
| 6310 | Accounting |
| 6311 | Audit Fees |
| 6350 | Book Management |
| 6370 | Consultant |
| 6375 | Consultant-Research |
| 6380 | Equipment Lease |
| 6390 | Legal |
| 6510 | Staff Salaries |
| 6530 | Contribution-Pension |
| 6540 | Contribution-Retirement |
| 6560 | Fringe-Health Reimbursement Acct |
| 6565 | Insurance Life |
| 6570 | Payroll Taxes-Work Comp |
| 6620 | Payroll Taxes-Social Security |
| 6650 | Payroll Taxes-Medicare |
| 6660 | Payroll Taxes-Futa |
| 6670 | Payroll Taxes-SUI |
| 6690 | Payroll Processing |
| 6710 | Seminar/Training |
| 6720 | Temporary Help |
| 6810 | Meals |
| 6830 | Parking |
| 6850 | Travel |
|  | Total |

Budget 2014 columns: Total Budget, ADM, GEN, SRD, AVD, SYM, Leased FROM

Budget 2013 columns: Total Budget, AFM & AFTRA General, SRD, AVD, SYM, Leased

Expenses 2013 columns: AFM & AFTRA General, SRD, AVD, SYM, Leased, Total Expenses, Under/(Over)

# AFM & AFTRA Fund Trustees Meeting

June 4, 2013 4:00 p.m.
11846 Ventura Boulevard Suite 300
Studio City, CA 91604

# Agenda

1. Minutes of July 2012 meeting were previously approved via email poll (no action requited)

2. Building Purchase

3. Review and Approval of Proposed FY2014 Budget
   a. Comparison of 2013 Actual expenses to Proposed 2014 Budget
   b. staff breakdown & description
   c. allocation of staff and resources

4. Full-Time Administrator position/separation from FMSMF

5. AFM & SAG-AFTRA Service fees

6. AFM & SAG-AFTRA Fund branding
   a. RAR (Recording Artist Royalties)
   b. New website

7. Review of Collections and Distributions

DEFS_00040124

**From:** Dennis Dreith on behalf of Dennis Dreith <ddreith@fmsmf.org>
**Sent:** Saturday, September 7, 2013 4:16 PM
**To:** 'Ray Hair (rhair@afm.org)';'Sam Folio';'Bruce Bouton';'Duncan Crabtree-Ireland (dci@sagaftra.org)';'Stefanie Taub';'Jon Joyce'
**CC:** 'Patricia Polach (ppolach@bredhoff.com)'
**Subject:** Admin Letter/Service Fee
**Attachments:** AV Participcant_Sept2013_Administrator_Letter_ver1.doc; AV Participcant_Sept2013_Administrator_Letter_ver2.doc; AV Participcant_Sept2013_Administrator_Letter_ver3.doc

Dear Trustees,

Inasmuch as the upcoming Audiovisual Distribution will be the first time that we will be deducting the service fee agreed to at the last Trustee's Meeting, I thought it would be wise to confirm what is most desirable. At Duncan's suggestion I have put together 3 different versions of the Administrator's Letter. Not to put words in anyone's mouth or assume too much, I know that Ray and Duncan prefer to make no mention of the fee and simply include it in the Operating Expenses in the Unaudited Financial Statement, which is what I have done in Version 1. I am, however, concerned that the significant cost increase in expenses will raise some eyebrows from the membership or result in needless and unwarranted criticism about a completely justifiable expense. I will gladly present this (or not) in any manner that you, the Trustees desire, and am only providing these as options to consider.

Consequently, following are the 3 versions of the Admin Letter.

- Ver.1 makes no mention of the Service Fee, , and includes the Service Fee in the Operating Expenses without any explanation or mention.
- Ver.2 includes a complimentary explanation and justification of the Service Fee (giving the unions credit for establishing the Fund, providing data, etc.) , but only includes the Service Fee in the Operating Expenses without identifying it separately in the Financial Statement.
- Ver.3 includes the same language explaining the Service Fee, and includes the Service Fee as a separate line item in the Financial Statement.

A 4th option could be to identify the Service Fee as a separate item in the Financial Statement, but make no mention of it in the body of the letter itself. I think that would be a mistake and could raise more unnecessary questions.

If I do NOT hear from any of you, I will assume that version 1 is preferred, and that is what we will send to the printer to be mailed with the Distribution Packets.

Regards,
Dennis
**Dennis Dreith**
**AFM & SAG-AFTRA Intellectual Property Rights Distribution Fund**
11846 Ventura Blvd. , Suite 500
Studio City, CA. 91604

Phone: (818) 755-7777 ext.810
FAX: (818) 755-6786

This communication is confidential and may contain privileged information. It is intended only for the person(s) to whom it is addressed. If you have received this message in error, please notify the sender immediately and delete this message without reading, copying or forwarding it to anyone.

Exhibit
**DEFS120**
2/11/2021
Dreith

DEFS_00040158

September 30, 2013

Dear Participant,

I am very happy to report that you are receiving the enclosed payment as a result of ongoing revenues from our audiovisual agreement with AIE (the Spanish rights collective). As reported previously, these payments are a unique form of royalties covering featured and non-featured performance rights, for both licensed sound recordings and underscore. The payment you are receiving means that you performed in one or more of the categories (which are identified on the enclosed statement) on a motion picture or television film broadcast on Spanish television.

This payment is being made by the Audiovisual Division of the AFM & SAG-AFTRA Intellectual Property Rights Distribution Fund. ***This distribution is in addition to any payments that you may receive from the Sound Recording Division of the AFM & SAG-AFTRA Fund.*** Please note that there has been a change in the formula for featured underscore performers to make the ratio of distributions between featured and non-featured underscore performers more equitable. This change is the result of ongoing discussions with AIE and modifications to the Audiovisual Distribution Guidelines (see enclosed distribution flow chart for more details).

While this represents ongoing distributions from Spain *only* at this time, we are hopeful that there will be collectives in other countries providing such rights prospectively. In order to deal with the complexities of making this distribution and in anticipation of similar payments being made from other collectives, we have continued to increase staff and services to facilitate the distribution of these rights.

Questions about this distribution should be directed to Shari Hoffman, Manager of the Audiovisual Division of the AFM & SAG-AFTRA Fund at 818-255-7980, ext.1;  or via fax at 818-255-7981. You can also access the Audiovisual Division by going to the AFM & SAG-AFTRA Fund website at www.raroyalties.org and following the Audiovisual Division link located on the Home Page.

**Enclosures (**Included with this mailing):

1) A check covering your share of royalties detailed above;
2) A statement detailing your personal information, which also identifies each motion picture or television film and/or recording licensed for use into such films. It also identifies (when applicable) whether the payment is for your performance as a non-featured or featured performance;
3) A flowchart describing the Audiovisual Royalty collections and distributions;

Confidential                                                                           DEFS_00040159

4) A Beneficiary Designation Form (and instructions)  **only for Performers who have not previously returned  a Designation Form to the Fund;**

5) An Inquiry Form (with pre-addressed return envelope). You can use the Inquiry Form to change your address, provide additional information to the Fund, or to claim that you are entitled to payment for a recording on the Master List for which you have not been credited.

6) Direct Deposit/Go Paperless Enrollment Forms ;

7) An Online Access Agreement;

8) A reply envelope to be used for Items 4, 5, & 6 above.

## Un-audited Financial Summary

|  | 2013 | 2012 |
|---|---|---|
| Total Contributions Available for Distribution | $3,156,592.90 | $ 3,665,038.05 |
| Interest Earned | 170.86 | 132.13 |
| Less Operating Expenses | -402,773.61 | -316,440.27 |
| Less Omission Reserve | -170.86 | -132.13 |
| Net of Expenses & Reserve | $2,753,819.29 | $ 3,348,597.78 |

This distribution represents a sizable investment of Fund resources in terms of computer programming, research and general administrative activities. This distribution is enormously complex given that the identity and location of thousands of featured and non-featured musicians and vocalists must be researched by the Fund. In addition, the Fund must identify what portion of each film broadcast on Spanish television contains any performance of a U.S. musician or vocalist. As this is a relatively new Fund, we are continuing to make additional refinements to our process and services, such as the introduction of the Direct Deposit and Paperless Option, *which we strongly encourage to save time and money for both you and the Fund!*

Wishing you continued success,

Dennis Dreith
Fund Administrator

September 30, 2013

Dear Participant,

I am very happy to report that you are receiving the enclosed payment as a result of ongoing revenues from our audiovisual agreement with AIE (the Spanish rights collective). As reported previously, these payments are a unique form of royalties covering featured and non-featured performance rights, for both licensed sound recordings and underscore. The payment you are receiving means that you performed in one or more of the categories (which are identified on the enclosed statement) on a motion picture or television film broadcast on Spanish television.

This payment is being made by the Audiovisual Division of the AFM & SAG-AFTRA Intellectual Property Rights Distribution Fund. *This distribution is in addition to any payments that you may receive from the Sound Recording Division of the AFM & SAG-AFTRA Fund.* Please note that there has been a change in the formula for featured underscore performers to make the ratio of distributions between featured and non-featured underscore performers more equitable. This change is the result of ongoing discussions with AIE and modifications to the Audiovisual Distribution Guidelines (see enclosed distribution flow chart for more details).

While this represents ongoing distributions from Spain *only* at this time, we are hopeful that there will be collectives in other countries providing such rights prospectively. In order to deal with the complexities of making this distribution and in anticipation of similar payments being made from other collectives, we have continued to increase staff and services to facilitate the distribution of these rights. In addition, it bears mentioning that since the inception of the AFM & SAG-AFTRA Fund, both the AFM and SAG-AFTRA were responsible not only for the creation of the Fund, but each union also invested significant financial resources to bring about the necessary changes in the U.S. Copyright legislation to make the Fund a reality. Throughout this entire time, the unions – free of charge – have provided data necessary to identify and pay the entitled performers. While in the early days of the Fund's operation it was impossible to compensate the unions for their valuable service, the Fund has now grown to the point where such compensation is not only possible, but highly warranted. Consequently, beginning with this distribution, the Operating Expenses also include a service fee paid to the unions to cover the costs of their support of the Fund.

Questions about this distribution should be directed to Shari Hoffman, Manager of the Audiovisual Division of the AFM & SAG-AFTRA Fund at 818-255-7980, ext.1; or via fax at 818-255-7981. You can also access the Audiovisual Division by going to the AFM & SAG-AFTRA Fund website at www.raroyalties.org and following the Audiovisual Division link located on the Home Page.

**Enclosures** (Included with this mailing):

1) A check covering your share of royalties detailed above;
2) A statement detailing your personal information, which also identifies each motion picture or television film and/or recording licensed for use into such films. It also identifies (when applicable) whether the payment is for your performance as a non-featured or featured performance;
3) A flowchart describing the Audiovisual Royalty collections and distributions;
4) A Beneficiary Designation Form (and instructions) **only for Performers who have not previously returned a Designation Form to the Fund;**
5) An Inquiry Form (with pre-addressed return envelope). You can use the Inquiry Form to change your address, provide additional information to the Fund, or to claim that you are entitled to payment for a recording on the Master List for which you have not been credited.
6) Direct Deposit/Go Paperless Enrollment Forms;
7) An Online Access Agreement;
8) A reply envelope to be used for Items 4, 5, & 6 above.

### Un-audited Financial Summary

|  | 2013 | 2012 |
|---|---|---|
| Total Contributions Available for Distribution | $3,156,592.90 | $ 3,665,038.05 |
| Interest Earned | 170.86 | 132.13 |
| Less Operating Expenses | -402,773.61 | -316,440.27 |
| Less Omission Reserve | -170.86 | -132.13 |
| Net of Expenses & Reserve | $2,753,819.29 | $ 3,348,597.78 |

This distribution represents a sizable investment of Fund resources in terms of computer programming, research and general administrative activities. This distribution is enormously complex given that the identity and location of thousands of featured and non-featured musicians and vocalists must be researched by the Fund. In addition, the Fund must identify what portion of each film broadcast on Spanish television contains any performance of a U.S. musician or vocalist. As this is a relatively new Fund, we are continuing to make additional refinements to our process and services, such as the introduction of the Direct Deposit and Paperless Option, *which we strongly encourage to save time and money for both you and the Fund!*

Wishing you continued success,

Dennis Dreith
Fund Administrator

DEFS_00040162

September 30, 2013

Dear Participant,

I am very happy to report that you are receiving the enclosed payment as a result of ongoing revenues from our audiovisual agreement with AIE (the Spanish rights collective). As reported previously, these payments are a unique form of royalties covering featured and non-featured performance rights, for both licensed sound recordings and underscore. The payment you are receiving means that you performed in one or more of the categories (which are identified on the enclosed statement) on a motion picture or television film broadcast on Spanish television.

This payment is being made by the Audiovisual Division of the AFM & SAG-AFTRA Intellectual Property Rights Distribution Fund. ***This distribution is in addition to any payments that you may receive from the Sound Recording Division of the AFM & SAG-AFTRA Fund.*** Please note that there has been a change in the formula for featured underscore performers to make the ratio of distributions between featured and non-featured underscore performers more equitable. This change is the result of ongoing discussions with AIE and modifications to the Audiovisual Distribution Guidelines (see enclosed distribution flow chart for more details).

While this represents ongoing distributions from Spain *only* at this time, we are hopeful that there will be collectives in other countries providing such rights prospectively. In order to deal with the complexities of making this distribution and in anticipation of similar payments being made from other collectives, we have continued to increase staff and services to facilitate the distribution of these rights. In addition, it bears mentioning that since the inception of the AFM & SAG-AFTRA Fund, both the AFM and SAG-AFTRA were responsible not only for the creation of the Fund, but each union also invested significant financial resources to bring about the necessary changes in the U.S. Copyright legislation to make the Fund a reality. Throughout this entire time, the unions – free of charge – have provided data necessary to identify and pay the entitled performers. While in the early days of the Fund's operation it was impossible to compensate the unions for their valuable service, the Fund has now grown to the point where such compensation is not only possible, but highly warranted. Consequently, beginning with this distribution, the Operating Expenses also include a service fee paid to the unions to cover the costs of their support of the Fund.

Questions about this distribution should be directed to Shari Hoffman, Manager of the Audiovisual Division of the AFM & SAG-AFTRA Fund at 818-255-7980, ext.1; or via fax at 818-255-7981. You can also access the Audiovisual Division by going to the AFM & SAG-AFTRA Fund website at www.raroyalties.org and following the Audiovisual Division link located on the Home Page.

**Enclosures** (Included with this mailing):

1) A check covering your share of royalties detailed above;
2) A statement detailing your personal information, which also identifies each motion picture or television film and/or recording licensed for use into such films. It also identifies (when applicable) whether the payment is for your performance as a non-featured or featured performance;
3) A flowchart describing the Audiovisual Royalty collections and distributions;
4) A Beneficiary Designation Form (and instructions) **only for Performers who have not previously returned a Designation Form to the Fund;**
5) An Inquiry Form (with pre-addressed return envelope). You can use the Inquiry Form to change your address, provide additional information to the Fund, or to claim that you are entitled to payment for a recording on the Master List for which you have not been credited.
6) Direct Deposit/Go Paperless Enrollment Forms;
7) An Online Access Agreement;
8) A reply envelope to be used for Items 4, 5, & 6 above.

## Un-audited Financial Summary

|  | 2013 | 2012 |
|---|---|---|
| Total Contributions Available for Distribution | $3,156,592.90 | $ 3,665,038.05 |
| Interest Earned | 170.86 | 132.13 |
| Less Operating Expenses | -317,603.94 | -316,440.27 |
| Less Service Fee | -85,169.67 | - |
| Less Omission Reserve | -170.86 | -132.13 |
| Net of Expenses & Reserve | $2,753,819.29 | $3,348,597.78 |

This distribution represents a sizable investment of Fund resources in terms of computer programming, research and general administrative activities. This distribution is enormously complex given that the identity and location of thousands of featured and non-featured musicians and vocalists must be researched by the Fund. In addition, the Fund must identify what portion of each film broadcast on Spanish television contains any performance of a U.S. musician or vocalist. As this is a relatively new Fund, we are continuing to make additional refinements to our process and services, such as the introduction of the Direct Deposit and Paperless Option, *which we strongly encourage to save time and money for both you and the Fund!*

Wishing you continued success,

Dennis Dreith
Fund Administrator

**From:** Dennis Dreith
**Sent:** Monday, September 9, 2013 12:31 AM
**To:** 'Ray Hair (rhair@afm.org)'; 'Sam Folio'; 'Bruce Bouton'; 'Duncan Crabtree-Ireland (dci@sagaftra.org)'; 'Jon Joyce'; 'Stefanie Taub'
**Subject:** Administrator Compensation

**Importance:** High

Dear Trustees,

As you know, by now we had planned that my transition to full-time Administrator for the AFM & SAG-AFTRA Fund would have been complete and I would have left my position as Administrator for the FMSMF. However, as the AFM negotiations with the AMPTP have continued longer than expected, this has not been possible just yet. To resign my position with the FMSMF prior to the conclusion of the negotiation would undoubtedly put the AFM at a bargaining disadvantage since the issues of greater control over the governance of the FMSMF and the appointment of my successor have been topics of bargaining. Therefore, I have continued to fill both positions, in essence maintaining two full-time positions. In addition, the duties of the AFM & SAG-AFTRA Fund have been escalating significantly between increased collections, distribution responsibilities, and of course the substantial activities surrounding the purchase of the new building. To ensure that I maintain the highest level of service to both organizations, my work days have become longer and longer, and I have consistently worked weekends and holidays.

What you may not be aware of is that for this entire fiscal year (nearly 6 months now) I have received no compensation whatsoever. Since we had not made the transition from the FMSMF I did not feel it appropriate to begin collecting a salary from the AFM & SAG-AFTRA Fund, nor have I asked for anything previously. However, the responsibilities and commitment are such, that I feel we do need to address this at this time. I am not asking that I be provided my full salary until I am settled in full-time at the Fund, but I am proposing that retroactive to April 1 (the start of our fiscal year) I receive $12,000 per month until we can affect my resignation from the FMSMF and transition to full-time at the AFM & SAG-AFTRA Fund. I want to point out that this is well below half of the salary that was approved by the Trustees, and it does not include any benefits or employer taxes. Consequently, a monthly payment of this amount will put this well below what we budgeted for or we would have spent, had I begun in mid-July or August as originally expected.

I know that all of you are also working a tremendous number of hours and making substantial personal sacrifices. However, it does not seem reasonable to provide the hours, commitment and expertise that I am absent any compensation.

I am eager to discuss any and all aspects of this with any of you personally or with a group should that be desired. I also do not want intimate that my proposal is cast in concrete, nor should it be taken as ultimatum in any manner whatsoever. I am rather merely bringing a matter to your attention that you may not be aware of in the hope that you will be able to address it. Of course, should you want more details about the activities I have been engaged and the hours spent doing so, I will be happy to provide that. However, this email is already lengthy, and in view of the volume of lengthy emails you have been receiving from me of late, I did not want to wear out my welcome.

Regardless, I want you to know that I am very eager to meet the challenges that lie ahead, and am looking forward to some incredibly exciting times in the knowledge that we can do great things together.

Inasmuch as the AMPTP is (to best of our knowledge) is unaware of my plans, this email should be kept in confidence. I would ask that you not share it with anyone or discuss this outside of our group.

Thank you in advance for your kind consideration of this matter.

Best regards,

Dennis
**Dennis Dreith**
**AFM & SAG-AFTRA Intellectual Property Rights Distribution Fund**
11846 Ventura Blvd. , Suite 300
Studio City, CA. 91604

Phone: (818) 755-7777 ext.810
FAX: (818) 755-0786
This communication is confidential and may contain privileged information. It is intended only for the person(s) to whom it is addressed.  If you have received this message in error, please notify the sender immediately and delete this message without reading, copying or forwarding it to anyone.

**Exhibit DEFS123**
2/12/2021
Dreith



Exhibit
**DEFS126**
2/12/2021
Dreith

# Review and Discussion of Union Service Fees

In July of 2013, SAG-AFTRA, the AFM ("unions") and the AFM & SAG-AFTRA Intellectual Property Rights Distribution Fund ("Fund") entered into an agreement for the unions to provided data and services to the Fund in exchange for a fee equal to 3% of the distributable amount of distributions. Since inception of the agreement, the Fund has paid $3,517,931 to the unions as follows:

2013 - $  387,628
2014 - $  562,554
2015 - $  824,037
2016 - $1,743,712


The Serves listed in the agreement are:

- Access to member databases to enable the Fund to obtain identifying and contact information for members.

- Access to session reports and "B-forms," or databases containing information derived therefrom, that in either case, identify the recordings made at recording sessions and provide identifying and contact information for performers (Union, members and nonmembers) who performed at the session.

- Representation of Fund Interests through participation in the following forums:

  o The board of SoundExchange, Inc.;
  o The board of the Alliance of Artists and Record Companies;
  o The musicFIRST Coalition;
  o Activities under the auspices of the U.S. Copyright Office and other U.S. governmental entities; and
  o Activities under the auspices of international entities such as the International Federation of Musicians, International Federation of Actors, World Intellectual Property Organization, Societies' Council for the Collective Management of Performers' Rights.

- Use of mandates

I don't believe the Fund can accurately place a value on each item, but we can at least examine the extent of each service in the hope that the unions can place such a value on them.

### *Access to member databases to enable the Fund to obtain identifying and contact information for members:*

What is provided by the AFM is essentially the exact same info that any AFM member has without additional charge. The AFM does provide a bulk data dump once or twice per year that

DEFS_00040589

over and above what a regular AFM member would have access too, but this is just what is already in the AFM system.

SAG-AFTRA does not provide access to an online database, but does provide a data dump containing members names, addresses and the first 5 digits of members Social Security numbers. This is a secondary source of information to the Fund to help verify the accuracy of the information in the Fund's database

**Value/actual cost to the unions**: ?? Possibly a few hundred dollars to each union

### *Access to session reports and "B-forms," or databases containing information derived therefrom:*

The AFM does not provide these directly. Rather, they are gathered from the various AFM Locals at no cost or effort on the part of the Federation (AFM). Similarly, SAG-AFTRA Does not provide these to the Fund. It does, however, allow Fund staff (at Fund expense) access to examine the session reports on site. Many of the SAG-AFTRA session reports are provided directly by the vocal contractors.

**Value/actual cost to the unions**: It's difficult to place a dollar value on this, but the cost (if any) to the unions would seem negligible

### *Representation of the SounExchange Board*

Inasmuch as the overwhelming majority of the revenue to the Fund passes through SoundExchange, representation of that Board is significant. However, it would seem that at least half of the activity of such representation is on behalf of the unions Featured performers. Nonetheless, it would seem that the cost of attending meetings of the SX Board could be quantified and what portion of such costs can be attributable to Fund representation.

**Value/actual cost to the unions**: TBD by unions

### *The board of the Alliance of Artists and Record Companies (AARC)*

No revenue passes through AARC to the Fund, nor is AARC involved in the claims, collections or distributions to and/or from the Fund. AARC and the Fund do have a large number of bi-lateral agreements that have been negotiated jointly, but which are administered independently. However, the unions have little involvement in those activities, nor have the unions incurred any costs on behalf of the Fund with respect to representation of the AARC Board. I assume that the union's representation of the AARC Board has more to do with representation of Featured Artist members of the unions than with representation of non-Featured performers.

**Value/actual cost to the unions**: negligible if any

***Activities under the auspices of the U.S. Copyright Office and other U.S. governmental entities***

All claims to the U.S. Copyright Office are made by the Fund. I am unaware of any activities conducted by the unions with respect to the claims or other action regarding this agency. I do know that the AFM President and I assume that a representative of SAG-AFTRA also make an annual appearance before the CRB regarding rate settings. I have no way of quantifying the cost of these activities or there monetary value to the Fund, but assume that the unions can quantify this amount.

**Value/actual cost to the unions**: TBD by unions

***The musicFIRST Coalition***

No doubt participation in musicFIRST is important to the long-term growth of the Fund. This is also an area in which I feel the Fund itself should be more deeply involved.   While I'm certain union involvement has significantly benefitted the Fund, it is impossible for us to quantify the value or place a dollar value on the cost to the unions for this since we have never received any reports of what the unions' activities have been with respect to this. It also seems that  a portion of the activity of the unions in this regard is in relation to their representation of their Featured Artist members, and any allocation of costs should be made with this in mind.

**Value/actual cost to the unions**: TBD by unions

***Activities under the auspices of international entities such as the International Federation of Musicians, International Federation of Actors***

I believe these are activities the unions undertake independent of the Fund, and would be involved in regardless of the Fund's existence. If there are any activities or benefits to the Fund, I believe these are purely incidental. If this is incorrect, perhaps the unions could quantify the activities undertaken and the attendant costs associated with such activities.

**Value/actual cost to the unions**: negligible if any

***World Intellectual Property Organization***

I know that the unions participated in the Beijing Conference regarding the Audiovisual Treaty. However, what if any of those activities had to do with the Fund is unknown to us. The Fund is actively involved in audiovisual agreements and ongoing negotiations, but those outside of any WIPO activities, at least to date.   Regardless, it would be helpful for the unions to quantify any participation and/or WIPO activities undertaken on the Fund's behalf.

**Value/actual cost to the unions**: TBD by unions

***Societies' Council for the Collective Management of Performers' Rights (SCAPR)***

While the Fund has been quite active in SCAPR, and has borne the costs for such participation, I believe the involvement of the unions has been tangential at most. If anything, it is the Fund's membership in SCAPR that has facilitated the unions attendance at various SCAPR forums.

**Value/actual cost to the unions**: negligible if any

***Use of mandates***

Clearly, the use of the union's mandates is of tremendous significance and value. Also, resolving mandate conflicts does require union intervention, and expenditure of resources. On the other hand, if it were not possible for the Fund to rely on the mandates of the unions, it would be necessary to either set up a system similar to SX where performers register, or for the unions to process the claims and pay the royalties directly to non-featured performers (both union members and non-members).

**Value/actual cost to the unions**: TBD by unions

For the sake of clarity, I am not suggesting that the items contained herein are of no value to the Fund, or that there is not a cost to the unions for providing them, but rather that these are not facts that can be determined by the Fund (at least with respect to the cost to the unions). With respect to their value, that in most cases is subjective rather than objective. There is one exception that is not specifically included in the Service Agreement that the Fund has derived a direct benefit from. Namely, Bob Hadl has been assisting the Fund with various AV matters and was instrumental in the GVL/GWFF AV agreement. Clearly, the time Bob has spent working on these matters is quantifiable, and up to this point all of these services have been paid for by SAG-AFTRA.

Initially, the unions expended considerable capitol to help create the legislation making royalties to performers a possibility and in establishing the Fund to process those royalties. However, the investment made by the unions has most certainly been paid back (possibly several times over) at this juncture. As the distributions continue to increase significantly, so do the service fees. So much so that at some point I am concerned as to the perception of these fees and the attention they may generate. To lessen any negativity about these fees, perhaps an assessment of the cost and potential value of the services provided (rather than a simple percentage) would be a more prudent procedure going forward.

DEFS_00040592

**From:** TheDirtyswift
**To:** Dennis Dreith
**Subject:** Re: Plaintive Request
**Date:** Tuesday, June 12, 2018 10:21:34 AM

Kevin Risto

████████████

On Jun 12, 2018, at 10:03 AM, Dennis Dreith <ddreith@teg-intl.com> wrote:

Hey Swift….I can call you if you send me a phone number…or you can call me at ████████
████████

**From:** TheDirtyswift <thedirtyswift@gmail.com>
**Sent:** Monday, June 11, 2018 7:47 PM
**To:** Dennis Dreith <ddreith@teg-intl.com>
**Subject:** Re: Plaintive Request

Sure thing, does 10AM work for you?

- Swift

On Jun 11, 2018, at 7:39 PM, Dennis Dreith <ddreith@teg-intl.com> wrote:

Great….and Swift, perhaps a phone call will be the best way to proceed. I am available tomorrow morning if that works for you. Feel free to call my cell phone ████████████ or send me your number if you prefer.

Dennis

**From:** Bruce Waynne <bw@brucewaynne.com>
**Sent:** Monday, June 11, 2018 12:54 PM
**To:** Dirty Swift <thedirtyswift@gmail.com>; Dennis Dreith <ddreith@teg-intl.com>
**Cc:** Shari Hoffman <shoffman@teg-intl.com>
**Subject:** Plaintive Request

Hey Dennis,

Per our conversation; I spoke to Swift about your interest in him being a plaintive for the Class Action Suite. He would like more information and is



open to talk about this with you in detail.

Take it from here gentleman!!

"Be Your Own Hero"

**Bruce Waynne**
**CEO | Founder**
Bruce Waynne LLC.
Intellectual Property Consultant Firm
LinkedIn | Facebook | Instagram | Twitter

<image001.png>

CONFIDENTIALITY NOTICE: This e-mail message contains confidential information belonging to the sender. This information is intended only for use by the addressee. this message is not to be forwarded, redirected, or copied to anyone except senior staff of Bruce Waynne LLC. or as expressly authorized by the sender. If you are not the intended recipient, you are hereby notified that any review, disclosure, copying, distribution, or the taking of any action in reliance on the   contents of this e-mail message is strictly prohibited.

DREITH_0137

# Exhibit 5

```
 1              UNITED STATES DISTRICT COURT

 2             CENTRAL DISTRICT OF CALIFORNIA

 3                     ---oOo---

 4

 5   KEVIN RISTO, on behalf of

     himself and all others

 6   similarly situated,

 7                    Plaintiffs,

 8      vs.                       No.

                                  2:18-cv-07241-CAS-PLA

 9

     SCREEN ACTORS GUILD-AMERICAN

10   FEDERATION OF TELEVISION AND

     RADIO ARTISTS, a Delaware

11   corporation; AMERICAN

     FEDERATION OF MUSICIANS OF THE

12   UNITED STATES AND CANADA, a

     California nonprofit

13   corporation, et al.,

14                    Defendants.

15   _____/

16

17     VIDEOTAPED AND VIDEOCONFERENCED DEPOSITION OF

18                   TINO GAGLIARDI

19              Friday, October 9, 2020

20

21

22

23   Stenographically Reported by:

24   GINA V. CARBONE, CSR, RPR, RMR, CRR, CCRR

25   California State Lic. No. 8249
```

Tino Gagliardi

```
 1   Marquis Theatre.

 2          MS. McCONNELL:  I was in elementary school.

 3          THE WITNESS:  There you go.

 4          MR. THOMAS:  Not to brag.

 5          MS. McCONNELL:  Thought I'd throw it out

 6   there.

 7   BY MR. BRANCOLINI:

 8      Q.  So you -- we can put a button on this.  So

 9   you don't believe that -- sorry.  Let's back up for

10   a second.

11          Looking at the inception of the service

12   fees, still looking at Interrogatory Response No. 8,

13   from the inception of the service fee and the first

14   payment of 193,814 per union, to 2018, the most

15   recent year that we have available audits for,

16   there's essentially a 400 percent increase paid as a

17   service fee to the Fund -- sorry, to the unions by

18   the Fund.

19          You -- having worked on the union side

20   during that 2014-2018 period, you -- could -- you

21   don't have any -- sorry.  I want to make sure that I

22   don't misstate your previous testimony.

23      A.  Thank you.

24      Q.  You don't have -- on the union side, you

25   don't have anything necessarily specifically that
```

Tino Gagliardi

1    you can peg that 400 percent increase to, but you

2    don't find it -- would it be accurate to say you

3    don't find it unreasonable?

4          A.   I do not find it unreasonable.

5          Q.   Have any of the other trustees ever

6    expressed any concern to you about the amount of the

7    service fee?

8          A.   No.

9          Q.   And since you joined the board of trustees

10   of the Fund in 2016, have you ever asked for an

11   audit of the services provided by the unions to the

12   Fund?

13         A.   No.

14         Q.   Do you know if any audit has taken place?

15         A.   Not to my knowledge.

16         Q.   Let's turn to Interrogatory Response

17   No. 10, which is on pages 12 to 15, if you'd like to

18   take a moment to read through that.

19         A.   I'm sorry, which one is it again?

20         Q.   It is Interrogatory Response No. 10 --

21         A.   No. 10.

22         Q.   -- on page 12 and goes through page 15.

23         A.   Okay.

24         Q.   So --

25         A.   Hold on, hold on, I'm not done reading.

# Exhibit 6

Kristina Gorbacsov

1                    UNITED STATES DISTRICT COURT
                    CENTRAL DISTRICT OF CALIFORNIA

2

3                              - - -

4

      KEVIN RISTO, on behalf of    :   CASE NO. 2:18-cv-
5     himself and all others       :   07241-CAS-PLA
      similarly situated,          :

6                      Plaintiff,  :
                                   :
7            vs.                   :
                                   :
8     SCREEN ACTORS GUILD-AMERICAN :
      FEDERATION OF TELEVISION AND :
9     RADIO ARTISTS, et al.,
                      Defendants.

10

11                             - - -

                    PORTIONS CONFIDENTIAL
12                  Friday, October 23, 2020

13                             - - -

14

15           Remote videotaped stenographic deposition of

16     KRISTINA GORBACSOV, conducted at the location of the

17     witness in Los Angeles, California, commencing at

18     approximately 9:03 a.m., on the above date, before

19     Rosemary Locklear, a Registered Professional Reporter,

20     Certified Realtime Reporter and California CSR (#13969).

21

22                             - - -

23

24                  GOLKOW LITIGATION SERVICES
              877.370.3377 ph | 971.591.5672 Fax
25                    deps@golkow.com

Krisztian Gorbacsov

```
1   program, the Oracle system, we had to figure out a way
2   that we could enter our session report information into
3   Oracle, which we did.  And now we use that, which we
4   can't really search through Oracle.  It's very -- it's
5   kind of complicated.
6          I'm sorry for this level of detail.  But there's
7   a program that is more of an application that's called
8   ClickView, and ClickView is a representation of
9   everything that's in the Oracle system.
10         So we can use ClickView, which looks -- I guess,
11  when you use ClickView, the best way I can explain it is
12  it looks like an Excel sheet and you're able to search
13  for the titles.  But in ClickView, it doesn't link you
14  to specific session reports, so you have to go to the
15  physical files.
16         So the process of getting to this -- you know,
17  to call it a database, it's not a database, because we
18  have to, first of all, enter the information from the
19  session report into this Oracle system.  Then it
20  migrates, you know, it updates every so often into
21  what's called a ClickView, which is just a visual way we
22  can capture the information, and we search it, but then
23  we have to physically go to the files, pull them and
24  scan them.  And that's just how it's done in Los
25  Angeles.
```

 1   A.      No.  It's okay.

 2   Q.      I'm not asking so much about the requests --

 3   A.      Okay.

 4   Q.      -- as the information that the requests are

 5   seeking.

 6           So the session reports and B-Forms, the

 7   membership data maintained by IT, do you know when

 8   SAG-AFTRA began collecting that information, generally

 9   speaking?

10   A.      Sure.  Well, the member -- I mean, I would say

11   that collections started with just physical files,

12   firstly, and that would be the beginning of, you know,

13   whenever our offices really opened, whenever Sound

14   Recordings started, because we would collect the session

15   reports and would have filed them physically firstly.

16           So that's just from whenever, you know, the

17   actual offices sprang up.  So, I mean, our contract

18   dates back to 1951, so we would have physically kept

19   session reports just as physical files.

20           As far as when the ACE program or, you know, our

21   other programs, that would be much later, probably, you

22   know, I think maybe ACE was in the -- I don't know

23   exactly about that one specifically.

24           I do know that the system that I referenced, the

25   ClickView and the entering of Oracle, we did have this

 1   Q&A system which started in '93, and it became after --

 2   in 2015 we lost Q&A and had -- that's when we figured

 3   out a way to enter them in the Oracle system.  So --

 4   Q.     It sounds like this information was being

 5   collected prior to the creation of the Fund in the mid

 6   to late '90s, then; is that correct?

 7   A.     The information has been -- with the exception

 8   of other offices outside of those main three, L.A.,

 9   Nashville, and New York, we have maintained our physical

10   records since these offices have really opened.

11         I say "with the exception" because other

12   locations didn't really keep files for various reasons,

13   perhaps storage or a lack of office or offices closing,

14   or whatnot, so they sometimes destroyed them.  So we

15   might have lost some if a session was elsewhere, but

16   those three offices would have kept as much as we could

17   of physical files.

18         Keeping in mind that some have been destroyed

19   only because of maybe climate or how they were stored.

20   We used to have sessions on carbon copy, and that

21   doesn't really last too well over time.

22         So with the exception of those sessions that we

23   don't have physically anymore because they've been --

24   they've deteriorated, then we would have kept our

25   sessions just to have as a bit of a, you know, library

 1    just because we would keep them for claims, you know, we

 2    just would maintain them.  So, yes, they did exist

 3    before the Fund, to answer in short.

 4    Q.      And then in terms of processing this

 5    information, is the -- is SAG-AFTRA undertaking tasks

 6    with respect to processing, digitizing the data that it

 7    would not have done if not for the Services Agreement?

 8            MR. SULLIVAN:  Objection.  Speculation.

 9    Incomplete hypothetical.

10    BY MR. LIFSCHITZ:

11    Q.      You can answer if you're able to.

12    A.      I would say that -- well, we certainly

13    wouldn't -- I mean, the research part of it that we do

14    for the Fund is something that we wouldn't really do

15    otherwise.

16            As far as maintaining the records, I would say

17    that, you know, we have an increased consciousness of

18    the need to be accurate because this is now something

19    that is relied on by another organization.

20            So not that we didn't care in the past, but

21    there certainly is more pressure to be accurate and be

22    more careful in our recordkeeping.  So I don't want to

23    say necessarily we would do everything the same way even

24    if we didn't have to supply that information because

25    there are so many other things that we need to do as a

Krisj.Gja Gorbacsov

```
 1   department.
 2           So we would have to keep our -- we would keep
 3   our records, we would physically keep them, but we did
 4   make a conscious effort when we realized, hey, we're
 5   losing Q&A and we're losing ACE system, but we need a
 6   way -- we also, you know, need to figure out how we can
 7   keep this information as a more trackable way because we
 8   get so many requests from the Fund.
 9           So the thinking, I think, was there was more
10   pressure on us to figure out a way to maintain it in a
11   user-friendly way than if we didn't have to supply this
12   information.  Yes, we have a need for the information,
13   but when we have so many requests coming from us so
14   frequently, then there's more urgency.
15           So -- and now we're responsible for not just us,
16   but another organization so the focus was, you know,
17   more intense on making sure that we have these records.
18   Q.      So the improvements that SAG-AFTRA has made to
19   its document filing system, do they have any benefit to
20   SAG-AFTRA beyond assisting the Fund?
21           Are there other uses of this information by
22   SAG-AFTRA?
23   A.      Besides providing the information to the Fund,
24   we do use this information for claims purposes and for
25   what's called conversions.
```

 1          THE WITNESS:  Okay.  Can you repeat it again?

 2     Sorry.  I just got --

 3     BY MR. LIFSCHITZ:

 4     Q.        I was asking if you can separate out or estimate

 5     the amount of time spent gathering information for

 6     SAG-AFTRA generally versus the time spent gathering

 7     information solely for the Fund's purposes.

 8     A.        Sure.  So information gathering for the Fund

 9     purposes would be -- it depends on the specific person

10     who is performing the function.  At this point, we've

11     tried to streamline the process because we were trying

12     to figure out a more time-effective way because it is

13     time-consuming.

14          So we streamlined it to have the requests

15     initially go to Josh Reese in Nashville, and from there,

16     he filters them on to whoever is needed.  So his time is

17     spent, at least five hours a week, on the requests that

18     come in to us from the Fund.  And that compared to what

19     he's doing with the information for other purposes is --

20     he's not spending -- he doesn't do conversion claims in

21     general, but he does do some research.

22          So, you know, he does do a few hours of research

23     to help our business rep who files conversion claims.

24     But at least five hours of his week is devoted to these

25     requests because he gets maybe 45 to 60 requests a week.

Krisztina Gorbacsov

1    So his time is much more than, perhaps, you

2    know, our rep in L.A., her name is Alyssa Clayton.   Josh

3    has done the bulk of trying to filter out to see if we

4    have these reports.   So Alyssa spends probably an hour

5    per week trying to retrieve the actual physical files

6    and -- after he's done the legwork.

7            So it depends on who -- I would say Alyssa, and

8    Kimberlee in New York, who's -- again, who filters for

9    there too, so their time is -- I mean, Kimberlee

10   probably even less so, because there's not as many

11   sessions in New York, so hers is, you know, maybe like

12   five hours a month.

13           But Alyssa, you know, an hour, 30 minutes to an

14   hour, perhaps, per week, trying to retrieve those for

15   Josh.   But Josh is putting more time into it.

16   Q.      So we've identified, then, six hours a week,

17   five from Josh, one from Alyssa, that is spent on

18   fielding requests by the Fund.

19           Is the information being collected in the work

20   being done during these six hours a week only of use to

21   the Fund?

22   A.      For this part, yes, because they're not

23   researching for conversions.   Because, you know, with

24   conversions, we don't know which songs -- like, this is

25   dependent on the reports that we get from the record

Krisztina Gorbacsov

1  labels.  So these are not the same songs that we're

2  researching for the Fund versus what we're researching

3  for conversions.  So that's a different thing.

4          It would be lovely to have them use the same

5  songs, then we could do both at once, but that's just

6  not how it works.  So we may have, you know -- you know,

7  like I said, 45 to 60 report -- requests from the Fund,

8  but those are not titles that we are going to be able to

9  use for conversion purposes.

10         So it's not like we can, you know, multitask on

11 that.  We have to do those separately.  And conversions

12 are handled -- those are different songs and they're

13 researched potentially differently, so -- based on

14 Internet and other things that we use to handle those.

15 So it's not the same.  Like, they don't overlap with the

16 time.  They're different.

17 Q.      Got it.

18         So if the Services Agreement did not exist and

19 SAG-AFTRA had no obligation to provide information to

20 the Fund, these six hours a week of work would not

21 occur?

22         MR. SULLIVAN:  Objection.  Incomplete

23 hypothetical.  Calls for speculation.

24 BY MR. LIFSCHITZ:

25 Q.      You can answer, if you can.

Krisliga Gorbacsov

1   A.      If we did not have to provide this information,

2   then we would be able to use those hours on something

3   else.  So, yeah, we would not have to spend six hours a

4   week.

5   Q.      So, aside from the two people you just

6   identified, Josh and Alyssa, are there any other

7   employees at SAG-AFTRA who are undertaking this work on

8   behalf of the Fund?

9   A.      Yes.  In addition to Alyssa and Josh, it's

10  Kimberlee Archie in New York.

11  Q.      And how many hours a week would you estimate

12  that she spends purely on Fund business?

13  A.      Kimberlee is less frequent than Josh and Alyssa,

14  so I would say she's spending only two to three hours a

15  month, probably.  There's just not as many sessions in

16  New York.

17  Q.      Got it.

18          So, other than these three people, is there

19  anyone else who is fielding the Fund's requests?

20  A.      Not at this time, no.

21  Q.      And, historically, has that been the case, as a

22  general -- you've been at SAG-AFTRA that these three --

23  A.      In my -- my understanding is that these requests

24  started early 2000s and they went to Josh and Kimberlee

25  in Nashville and New York, respectively, and I am not

Kristina Gorbacsov

```
 1   about the Services Agreement this whole time.  And we've
 2   already touched on what's contemplated by the second
 3   bullet point, but can you read it out loud for the
 4   record?
 5          MR. SULLIVAN:  Dan, before we go on, for both
 6   Numbers 2 and 3, Kristina has been prepared to provide
 7   30(b)(6) testimony about the provision of data.  With
 8   respect to advocacy, and also Point 3, the mandates, she
 9   hasn't been prepared to provide 30(b)(6) testimony on
10   these topics.
11          Apologies to the extent there was any confusion
12   there, but our 30(b)(6) -- SAG-AFTRA's 30(b)(6)
13   designee, Duncan Crabtree-Ireland, can offer -- can
14   offer responses with respect to Topic Number 7 for
15   Bullets 2 and 3 here, and Kristina can respond to your
16   questions to the extent she has personal knowledge.
17          MR. LIFSCHITZ:  Understood.
18   BY MR. LIFSCHITZ:
19   Q.      So, again, can you read the second bullet point
20   out loud for the record.
21   A.      Yes, I can.
22          "Access to session reports and 'B-forms,' or
23   databases containing information derived therefrom, that
24   in either case, identify the recordings made at
25   recording sessions and provide identifying and contact
```

1    information for performers (Union members and

2    nonmembers) who performed at the session."

3    Q.      So to begin, can you generally describe what

4    session reports and B-Forms are and if there's any

5    distinction meaningful between them?

6    A.      Sure.  So for me -- I mean, for Sound

7    Recordings, it's session reports.  I think B-Forms is

8    really AFM, what AFM calls their reports.  So I'm just

9    going to call them session reports because I think

10   that's most accurate.

11          And session reports are forms that contain -- I

12   can list the information for you.  It would include

13   information such as the record label, the producer, the

14   song title, possibly the album title, the length of the

15   track, the list of performers, singers, who are members

16   and non-members, the featured artist.

17          The performer information would include the

18   Social Security number, as well as the address, and it

19   would include the number of overdubs or multi-tracks

20   that the performer performed during the session.  It

21   would include the start time and the end time.

22          And, basically, it would -- it's a bit of a

23   snapshot of the work that was done during that session,

24   and it would be used to have the -- you know, make sure

25   that we have the correct performers identified on that

Krisztina Gorbacsov

```
 1    session.  And that's what we use in order to get them

 2    paid for claims purposes and that is what we supply to

 3    the Fund.

 4    Q.      And, as you just indicated, these are used by

 5    SAG-AFTRA for claim purposes.

 6            So is it fair to say SAG-AFTRA has multiple uses

 7    and needs for this information?

 8    A.      It is fair to say that we have multiple uses for

 9    this information, yes.

10    Q.      Can you separate out or estimate the time spent

11    gathering this information for SAG-AFTRA's general

12    purposes versus the time spent gathering and providing

13    it specifically to the Fund?

14            MR. SULLIVAN:  Objection.  Vague and ambiguous.

15    Calls for speculation.

16            THE WITNESS:  I would be really speculating,

17    because, again, it's sort of -- it's a little bit hard

18    to guess only because the -- again, the people involved

19    do different pieces of this time-wise.

20            So Josh, for example, as I mentioned, he's

21    spending about, you know, at least five hours a week,

22    let's say, on just supplying the session reports to the

23    Fund, which is different than him helping -- you know,

24    him filing claims for initial compensation.

25            So then I would say that, just for Josh
```

Krisztina Gorbacsov

1   specifically, we're saying five hours a week on the Fund

2   requests and, perhaps -- I mean, again, I'm really

3   speculating -- possibly -- I'm just thinking it through

4   from when I was filing claims -- could spend six hours

5   on filing claims using the session reports or that could

6   be helping people fill it out.  It varies, too, week to

7   week.

8          I mean, it's pretty consistent that we're going

9   to be spending -- he's going to be spending five hours a

10  week on AFM/SAG-AFTRA Fund requests, but it kind of

11  waxes and wanes when we're talking about using the

12  session report for our purposes, because sometimes

13  there's a lot of sessions happening and sometimes

14  there's really not.

15         So it really fluctuates and there's not a whole

16  lot of consistency, but -- so I guess my point is that

17  it could be three to eight hours a week on claims for

18  sessions.

19         MR. LIFSCHITZ:  Sure.

20  BY MR. LIFSCHITZ:

21  Q.      So to suss that out a little bit, can a

22  distinction be made between the work and time involved

23  collecting the session reports, in the first instance,

24  versus then providing information from the reports

25  requested by the Fund?

Krisztina Gorbacsov

```
 1   A.        It could.  Again, I'd be speculating.  I think
 2   that when it comes to time spent on -- with the session
 3   reports for initial compensation, that also involves
 4   sometimes educating the members on how to complete it,
 5   and also communications with record labels on trying to
 6   follow up on those claims that are filed and actually
 7   filing the claims.
 8           So I guess, if I tried to do it percentage-wise,
 9   maybe, you know, he's spending 50 percent of his time on
10   claims, the -- that have to do with, you know, our
11   SAG-AFTRA claims for initial comp, 40 -- you know, maybe
12   40, 50 percent.  And then if I said five hours a week,
13   that's like a 20 percent for the Fund requests.
14           And the rest of the time he's dealing with other
15   SAG-AFTRA work that he's doing, which is -- could be
16   research for other things.  So, I mean, again, I'm
17   really speculating.  I haven't -- I don't have an exact
18   number.
19   Q.        Got it.
20           But -- so your estimation is that out of the
21   five hours a week that he is working on providing
22   session report information, about one hour a week
23   estimated to be for the Fund and the remainder on other
24   SAG-AFTRA activities like claims?
25   A.        No.  The five hours a week is just time he's
```

Krisztian Gorbacsov

 1    spending on responding to --

 2            MR. SULLIVAN:   Objection.   Misstates --

 3            THE WITNESS:   Sorry.

 4            MR. SULLIVAN:   Objection.   Misstates the

 5    witness's testimony.

 6    BY MR. LIFSCHITZ:

 7    Q.      So please correct me.

 8    A.      So the correction is that the five hours a week

 9    for Josh is just really on responding to the

10    AFM/SAG-AFTRA requests exclusively and the research done

11    on those.

12            The rest of the time he's dividing his time

13    between claims for initial compensation for the

14    sessions, researching for us for other claims purposes,

15    which would be those conversions.   So that would be the

16    majority of his time, for sure.

17            I'm not sure what the percentage would be

18    because we do have other things that we do with a

19    limited number of people, so -- but I'm pretty clear

20    that that's still -- it's about five hours a week, and

21    it's just on requests at this point.

22    Q.      Okay.   So the process and work that Josh is

23    doing, then, when he is spending these five hours a

24    week, is that accessing existing session reports

25    maintained by SAG-AFTRA and then providing responsive

Kristin Gorbacsov

1  information to the Fund or are there instances where the

2  Fund requests information from Josh that SAG-AFTRA

3  doesn't currently possess, a session report it hasn't

4  yet acquired, and Josh has to then undertake that work

5  of acquiring the report in the first instance?

6  A.      The work that he's doing is mostly supplying

7  information that we have.  So he's not going to do

8  extensive -- he's not doing research for them outside of

9  what we have at the union.

10          Though, I do want to just say that sometimes

11  there's a little bit of follow-up where they might have

12  access -- they have might have possession of a form that

13  we might have supplied in the past, and then maybe they

14  have to contact us as a follow-up to clarify like Social

15  Security numbers or to get something because the scan

16  that they received isn't quite clear.

17          So there is some follow-up work sometimes, but,

18  for the most part, he is still -- he's looking for the

19  information that we have collectively at the union.

20  It's not where he's doing outside research to come up

21  with it.  It's something that, hopefully, we are

22  possessing and that we are able to provide them.

23  Q.      Could you provide an estimate for the amount of

24  time that Josh spends on a weekly basis doing that

25  follow-up to the extent it's broken out from the five

Krisztian Gorbacsov

1  hours a week or is that part of the five hours a week?

2  A.      Oh, I would -- I mean, I think the requests he

3  gets are -- it's like 45 to 60 a week.  So that time

4  that's spent -- that five hours is for those.

5          Anything additional probably is extra time.  I

6  don't think those -- those don't come super-often.  So

7  this is not on a daily basis.  It's just maybe, you

8  know, once a -- every couple weeks, maybe, there will be

9  a follow-up on specific things because the scans weren't

10 that hard -- they were hard to read or maybe they're

11 looking at something quite, like I said, older, so they

12 might ask him, but they're more one-off situations.

13         I don't know -- I don't think it's a whole lot

14 of extra time, but that would be additional time in

15 addition to those five hours I'm talking about.

16 Q.      Okay.  And who is generally responsible for

17 collecting these documents at the national level?

18 A.      Initially, these documents are sent to -- it

19 depends where the work is happening really.  So,

20 primarily, the session work is happening in New York,

21 Los Angeles, and Nashville.

22         So the sessions are being completed -- we have

23 different ways we receive this information, but the

24 reports are sent to us by the performers themselves

25 directly after they've completed the session report.

Kristina Gorbacsov

```
 1          MR. LIFSCHITZ:  Yeah.

 2   BY MR. LIFSCHITZ:

 3   Q.       So the Fund has a certain number of recordings

 4   it needs to identify the performers to pay on.

 5   A.       Uh-huh.

 6   Q.       And it seeks that information from SAG-AFTRA.

 7   SAG-AFTRA has multiple sources of information that it

 8   can turn to, between the session reports, membership

 9   information, and good, old-fashioned sleuthing, as

10   you've indicated.

11          Do you have any sense of how many requests for

12   information SAG-AFTRA fields where there are responsive

13   session reports versus recordings that no session report

14   was ever either generated for or ever remitted to

15   SAG-AFTRA for?

16   A.       Okay.  I think to answer that, I best reference

17   a conversation that I had with Julie Sandell and Lisa

18   Finnie at the Fund specifically in my research in

19   preparation for this.

20          So one thing -- things that I learned from them,

21   because we've never -- you know, like SAG-AFTRA, we

22   didn't have a -- we did not have a way we were actually

23   tracking this information.  So they actually have their

24   own internal tracking system, but I learned that there's

25   also some flaws with that.  So this is, again, going to
```

Kristiga Gorbacsov

1    be an estimate to get to the answer.

2         And what they did is try to -- they only looked

3    at the years between 2014 and 2020, so they were able to

4    tell me the number of requests they made during that

5    period of time.

6         And I should say that this only is for the New

7    York, Nashville, Los Angeles, and Miami office.  So this

8    only reflects those offices, which are probably the four

9    largest, and it's only for that time period.

10        And the number is also -- you know, it's not

11   going to be exact.  It's probably underreported, because

12   it's really reliant on the researchers doing this

13   accurately.  And the way she explained the system, they

14   had to, you know, check certain boxes, just -- it allows

15   for some human error, so this isn't going to be

16   super-accurate.

17        But the number they gave me was that they --

18   they sent us 13,777 requests, and that is during that

19   time span.  And my -- again, I want to emphasize -- put

20   emphasis on the fact that that this is underreported.

21   This is just the floor.  So this is at least that much,

22   and we have returned 27 percent of those requests with

23   actual session reports.

24        So out of the 13,000 that I'm mentioning, we

25   responded to 27 percent of those and actually had the

# Exhibit 7

```
 1              UNITED STATES DISTRICT COURT

 2            CENTRAL DISTRICT OF CALIFORNIA

 3   KEVIN RISTO, on behalf of      )
     himself and all others        )
 4   similarly situated,           )
                                   )
 5           Plaintiff(s),         )
                                   )
 6     vs.                         ) Case No.:
                                   ) 2:18-cv-07241-CAS-PLA
 7   SCREEN ACTORS GUILD-AMERICAN  )
     FEDERATION OF TELEVISION AND  )
 8   RADIO ARTISTS, a Delaware     )
     corporation; AMERICAN         )
 9   FEDERATION OF MUSICIANS OF THE )
     UNITED STATES AND CANADA, a   )
10   California nonprofit          )
     corporation; et al.,          )
11                                 )
             Defendants.           )
12   _____ )

13

14

15      CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

16            VIDEOTAPED DEPOSITION OF

17                  RAYMOND HAIR

18            Appearing Remotely From

19                 Denton, Texas

20         Wednesday, February 24, 2021

21

22

23

24   Stenographically reported by:
     EMILY SAMELSON, CSR No. 14043

25   Golkow Job No.: 269544
```

Confidential Pursuant to Protective Order

```
 1   management and other documents that would be

 2   presented to the board of trustees for review and

 3   approval.

 4       Q    Okay.  When you were appointed to the Fund,

 5   I asked you if you were given any training with

 6   regard to what your roles were as a Fund trustee.

 7   And I'm going to change that a little bit to say you

 8   talked about lots of discussions, and I don't mean

 9   to have it like a formal training.

10           So did you have discussions with what it

11   meant to be a trustee of the Fund?  That's a

12   yes-or-no question.

13       A    In part.

14       Q    Okay.  And my next question is going to be

15   with whom did you have discussions with about your

16   role as a trustee to the Fund?

17       A    Well, I had lots of in-depth discussions

18   with AFM attorneys who were involved in the -- the

19   entire process starting in 1994 in the lobbying and

20   the agreements with the RAA and eventually the

21   passage of the Digital Audio Recording Act, which

22   led to the creation of 114(g) or the -- it led to

23   the actual laws.

24           And then I also had discussions with our

25   attorneys about what was going on with the AFM
```

1    SAG-AFTRA Fund.  I also had discussions with Dennis

2    Dreith about the Fund.

3            Actually, when I first -- my first visit to

4    the Film Secondary Markets Fund in -- it must have

5    been in later 2010.  I don't know exactly when that

6    would been, but that's when Dennis -- I took a tour

7    of the Film Secondary Markets Fund offices and found

8    the AFM SAG-AFTRA Fund residing in the break room of

9    the Film Secondary Markets Fund.  So we had

10   discussions about that.

11           And I also had some discussions with Kim

12   Roberts Hedgpeth, who was the executive director.  I

13   believe it's -- I believe it's called the National

14   Executive Director of AFTRA about the Fund.

15      Q    And without you telling me the substance of

16   any communication, what AFM attorneys did you meet

17   with to discuss the Fund?

18           MR. THOMAS:  Objection.  Vague.

19           THE WITNESS:  Without -- without comment on

20   the substance of the discussions I had with our

21   attorneys, the attorneys were Jeff Freund and

22   Patricia Polach.

23   BY MR. KIESEL:

24      Q    And could you spell Jeff's last name?

25      A    F-R-E-U-N-D.

Confidential Pursuant to Protective Order

```
 1   belief is as to what those duties are, and that's

 2   what you've described to us already; correct?

 3        A    I just have to stand on what I've said.

 4        Q    Fine.

 5             And you used the word "maximize

 6   collections"; correct?

 7        A    Yes.

 8        Q    And you would stand by the duty of care as

 9   is to maximize collections for Fund participants;

10   correct?

11        A    We want --

12             MR. THOMAS:  Object to the form.  Vague.

13             THE WITNESS:  I'm sorry.  Andrew, did I --

14   I stepped on you there.

15             MR. THOMAS:  I said, "objection to form.

16   Vague."

17             But you can answer the question.

18             THE WITNESS:  We want to -- we want to push

19   the principle, as our union has in every way, the

20   principle of no collection without distribution.

21   And I refer to that as a principle that we have

22   continually used in our -- in our international

23   advocacy to get the foreign collectives to pay what

24   they owe.  So that's an example of trying to

25   maximize the royalties.
```

Confidential Pursuant to Protective Order

```
 1      Q    If I were to ask you to sort of describe

 2    the day-to-day work of the Fund, has the day-to-day

 3    work of the Fund changed today versus how it was

 4    when you first started with the Fund in 2012?

 5              MR. THOMAS:  Objection.  Lacks foundation.

 6              You can answer.

 7              THE WITNESS:  Well, I first started with

 8    the Fund in 2010.

 9    BY MR. KIESEL:

10      Q    I apologize.  2010.  I was thinking when

11    they -- so let's go back.

12              2010, when you started with the Fund, have

13    the day-to-day activities of the Fund changed over

14    the last 11 years?

15      A    I think I would answer that question this

16    way.  I think the Fund functions have been pretty

17    much the same.  I think it's broadened out with the

18    audiovisual portions and then also the symphonic

19    side of it.  There's a lot more to do because

20    there's a lot more consumption worldwide in

21    streaming.

22              But I think the basic functions -- I mean,

23    if you were -- if you were going to just look at

24    what the Fund is supposed to do when you've got --

25    you know, you've got -- you've got royalties coming
```

1    in from Pandora and Sirius XM and other sources,

2    foreign sources, and, you know, you've got AV

3    royalties coming in and you've got, you know, all of

4    the sources, you know, the functions of what has to

5    be done, I believe, are pretty much the same.

6    There's just -- there's just a lot more of it to do.

7        Q    Understood.

8             So the number of sources of revenue have

9    expanded coming into the Fund, but the basic

10   operation of the Fund has not changed itself?

11            MR. THOMAS:  Object to the form.  Misstates

12   his testimony.

13            THE WITNESS:  I don't want to say the

14   operations of the Fund because I think the

15   operations of the Fund, they have varied.  But I

16   think the basic, fundamental, you know, goal of the

17   Fund, to collect the royalties and distribute them,

18   I think that's the same.

19            You know, if you mean which -- which part

20   of that operation is allocated to this person or

21   that person or this department or that department

22   or, you know, a symphonic department or an AV

23   department or another department, you know, I'm

24   sure that -- I'm sure those things have changed.

25   ///

Confidential Pursuant to Protective Order

```
 1   the idea?

 2        A    It could have been.

 3        Q    Okay.

 4        A    It's possible.

 5        Q    Understood.

 6             Do you recall any discussions that occurred

 7   within the AFM before December 27, 2012, the date of

 8   Exhibit Number 2, with regard to a service fee

 9   agreement with the Fund to AFM?

10        A    I do not recall specific discussions.

11        Q    Do you have any generalized sense of

12   discussions you may have had, if not specific

13   discussions just a general discussion you may have

14   had, before the request was made to Patricia Polach

15   to prepare an agreement?

16             MR. THOMAS:  Object to the form and vague.

17             THE WITNESS:  So you're saying general

18   discussions.  I think there were general discussions

19   between the -- me and the officers of the union with

20   counsel about the idea of a service fee.

21   BY MR. KIESEL:

22        Q    And when you say you and officers of the

23   union, are you referring to officers of the AFM

24   union or SAG-AFTRA or both?

25        A    It would be AFM.
```

Confidential Pursuant to Protective Order

1      Q      Got it.

2             And with regard to the officers that you

3      may have discussed with them and counsel about a

4      service fee, who would those officers have been?

5      A      One would have been Sam Folio.

6      Q      And is there another one?

7      A      Specifically, Sam Folio might have been

8      more likely to have had conversations with me and

9      with counsel about it.

10     Q      And when you say "counsel," who are you

11     referring to when you say "counsel"?

12     A      Well that would have been Jeff Freund and

13     Trish Polach.

14     Q      And when you say that there were general

15     discussions between you, Sam Folio, Jeff Freund, and

16     Patricia Polach about the idea of a service fee,

17     what did those general discussions consist of?

18     A      Generally --

19            MR. THOMAS:  To the extent -- I would

20     like the caution the witness, to the extent -- he

21     could -- he can probably answer the question about

22     general discussions, but I would caution him not to

23     reveal the substance of any legal advice that he may

24     have obtained in the course of those discussions

25     from any counsel.

Confidential Pursuant to Protective Order

1                THE WITNESS:  All right.  So the AFM had

2    been doing many, many things from 1994, you know,

3    up to the date of those discussions, the general

4    discussions that may have been had.  But it would

5    have taken the form of the fact that the AFM is

6    subsidizing the Fund, you know, with the provision

7    of services and the -- the provision of information

8    that -- and the Fund was dependent on that.  And,

9    you know -- you know, how can we figure a way to --

10   to be -- to be reimbursed or to be -- to receive the

11   value of what we provide.

12            So, I mean, that's just a general

13   discussion, I suppose.

14   BY MR. KIESEL:

15       Q    I understand.

16            So the idea was, look, the AFM is

17   subsidizing the Fund.  We're providing information

18   to the Fund that they're using, and there ought to

19   be some reimbursement to the AFM for what we're

20   providing to the Fund.

21            Is that the general idea?

22       A    I think -- I think there's more to it than

23   that.  Because the AFM was engaging in services that

24   supported the Fund and the creation of it all the

25   way up through the lobbying efforts that we were

Confidential Pursuant to Protective Order

1  taking, you know, to 2010.  And there was a lot

2  of -- there was quite a bit of resources being used

3  from AFM to have the Fund carry on and move forward.

4  So --

5      Q     So when you say there were quite a bit of

6  services provided to the Fund, one would be the

7  lobbying efforts that were happening that -- was

8  that -- those the lobbying efforts that created the

9  Fund?

10     A     Not only created the Fund but that were

11  attempting to broaden the copyright laws that

12  established the digital remuneration that was

13  paid to the Fund.

14            You know, I mean, since -- particularly in

15  2010, there was a performance rights bill on deck

16  that was sponsored by -- oh, from Detroit, John

17  Conyers.  And the AFM was heavily involved in the

18  lobbying efforts for that.

19            Matter of fact, John Conyers came to the

20  convention in 2010, AFM convention where I was

21  elected, to talk to the convention about the efforts

22  to broaden the copyright law to include a

23  terrestrial right.

24            And then my -- in my education from counsel

25  and others about those laws, it was determined that

Confidential Pursuant to Protective Order

```
 1    if the -- if the terrestrial rights in the U.S. were

 2    adopted, then that would unlock many millions of

 3    dollars in Europe, you know, on a reciprocal basis

 4    to flow through Sound Exchange and AFM SAG-AFTRA

 5    Fund to then be able to distribute more -- collect

 6    more royalties and distribute them.

 7            So there was a lot of stuff going on and

 8    there was a lot of, you know, sweat equity.  There

 9    was a lot of -- a lot of attention and a lot of

10    activity being -- being used or being expended,

11    you know, by the AFM to the benefit of the Fund.

12        Q    So you felt that the lobbying activities

13    that AFM was involved in that ultimately led to

14    unlocking funds that were then deposited with the

15    Fund to be distributed to beneficiaries, that the

16    AFM should be reimbursed for the costs associated

17    with their activities?

18        A    See, you're trying to -- you're trying to

19    make it seem like I want to be reimbursed for the

20    costs.  But, you know, it's really the value of what

21    we provide, and the value of what we provide comes

22    in a lot of different ways.  It comes in the data.

23    It comes in the maintenance of that data.  It comes

24    in the maintenance of the performers' addresses and

25    personal information.
```

Confidential Pursuant to Protective Order

```
 1              By the way, I want to go back to 1956.  I
 2   want to go back to Elvis Presley.  The people who
 3   are still alive today who performed on the Elvis
 4   Presley song we were talking about, "Hound Dog,"
 5   they don't live in the same place that they lived
 6   in in 1956.  They've been -- they probably have
 7   lived several different places.
 8              And so the union maintains not only the
 9   addresses and the contact information for the union
10   members and also the nonunion participants, but we
11   engage in a lot of activity that, besides the
12   negotiating with the record companies to formulate
13   the B-forms that are then transmitted to the Fund,
14   but we also go all out, all out, to expand the scope
15   of the laws that exist that create the money, that
16   cause the money to be paid over in the first place.
17   Q    So, Mr. Hair -- and I appreciate you
18   recognize that I'm talking "cost."
19              And you're talking "value," what's the
20   value to the Fund for the work that the AFM in
21   particular is doing; correct?
22   A    I'm talking about the value.
23   Q    Right.
24              Was there an attempt that you're aware of
25   to quantify the value of the services provided by
```

Confidential Pursuant to Protective Order

```
 1    appropriate for the Fund to pay a fee to the unions

 2    for the data and services it was providing to the

 3    Fund?

 4         A    Not specifically that I can recall.

 5         Q    Do you recall whether Dennis ever made that

 6    inquiry of Ms. Polach when you were present?

 7         A    I don't know what Dennis did.

 8         Q    When you were present, I was saying.

 9    Obviously, I'm not asking you to state what Dennis

10    did.

11              But when you were -- when you were present

12    with Ms. Polach, do you ever recall a conversation

13    that someone, whether it was you or Dennis or

14    someone else, asked Ms. Polach whether such a fee

15    was appropriate?

16              MR. THOMAS:   Object to the form.  Vague.

17              But you can answer it.

18              THE WITNESS:  I don't recall.

19    BY MR. KIESEL:

20         Q    Did you ever make a request of Ms. Polach

21    whether it was appropriate for AFM to make the

22    request to the union?

23         A    I can't recall.

24         Q    Do you know, Mr. Hair, how it was the

25    3 percent number was arrived at?  There's been
```

Confidential Pursuant to Protective Order

1    testimony sort of across the board of highs and

2    lows, and I'm wondering if you can shed some light

3    on that for us.

4         A    I think --

5              MR. THOMAS:  Object to the form.

6              But you can answer.

7              THE WITNESS:  Here's the best I can do with

8    that, because I've been trying to think about it and

9    try to remember.

10             But back in 2012, you know, when we were --

11   we were beginning to discuss the idea of a service

12   fee arrangement, I remember Dennis Dreith and I

13   having a conversation where we thought that

14   a 2 percent number for each union would be

15   appropriate.

16             As a matter of fact, we -- you know, it was

17   just an informal conversation in his office at the

18   Fund.  And we thought that 2 percent per union was a

19   reasonable place to be with that.

20   BY MR. KIESEL:

21        Q    Do you recall how it was the 2 percent

22   number was arrived at?

23        A    I can't recall exactly why that number,

24   you know, emerged, but it seemed like a reasonable

25   number.  And, you know, so that would have been

Confidential Pursuant to Protective Order

1   under the scenario that we're -- that we have now,

2   that would have been 4 percent.

3       Q    Right.  I was going to say, that would have

4   been a 4 percent number based upon --

5       A    Right.

6       Q    -- now it's 1 1/2 to 1 1/2.  It would have

7   been 2 and 2 to 4?

8       A    Yes.  But, you know, we just -- we just

9   sort of kept talking about it together.  And like I

10  said, I can't remember any specific conversation

11  about it with the group, but it was sort of a group

12  thing where we sort of talked it to 3 percent.

13          But, you know, there was a time when

14  Dennis and I were in his office and we thought that

15  2 percent to AFM and 2 percent to SAG-AFTRA was the

16  right -- the right place to be.

17      Q    And is it fair to say that when these

18  discussions were happening in 2012, the amount of

19  funds recovered by the Fund in 2012 were

20  substantially less than they were, by example,

21  in 2018?

22          MR. THOMAS:  Object to the form.  Vague.

23          But you can answer.

24          THE WITNESS:  There was less -- there was

25  less money being collected and distributed in 2012

Confidential Pursuant to Protective Order

```
 1   BY MR. KIESEL:

 2       Q    To your knowledge, up until the present

 3   time, has there ever been a time that there's been a

 4   discussion of doing audits to actually place a value

 5   on the services provided by the union to the Fund?

 6       A    No.

 7            MR. THOMAS:  Object to the form.  Vague as

 8   to "audit."

 9            THE WITNESS:  The answer is no.

10   BY MR. KIESEL:

11       Q    You said a brief while ago that the service

12   fee was in part to reimburse the AFM because the AFM

13   was subsidizing the Fund.

14            Do you recall that?

15       A    Yes.

16       Q    And by "subsidizing the Fund" -- and I then

17   said what do you mean by "subsidizing"?

18            You talked about the lobbying activities

19   that were being done by the union.  You talked about

20   the data that was being provided to the Fund from

21   the union.

22            Anything else other than the lobbying

23   activities and the data that was being provided

24   would make up the AFM subsidizing the Fund?

25            MR. THOMAS:  Object to the form.  Overbroad
```

Confidential Pursuant to Protective Order

```
 1   and vague.
 2            THE WITNESS:  There were lots and lots
 3   and lots of services provided in domestic and
 4   international advocacy.  The AFM also negotiates the
 5   deals with the record labels.  And, you know, to the
 6   extent that the AFM continues to bargain with the
 7   record companies and continues to improve its
 8   agreements with the record companies that also
 9   include the maintenance of data and establishment of
10   the forms, plus the data itself, you know, there's a
11   lot of things that go into all that.
12   BY MR. KIESEL:
13       Q    In 2012, how many members of the AFM were
14   there?
15       A    2012.  75-, 80,000.
16       Q    And these union members are dues-paying
17   members?  Should be dues-paying members?
18       A    Yes.  Yes.  Union members pay dues.
19       Q    And is it fair to say that the dues that
20   the union members pay, in part, covers the cost of
21   domestic and international advocacy that the union
22   is performing on their behalf?
23       A    The dues that union members pay go to the
24   union to fund the totality of what the union does.
25       Q    Which includes domestic and international
```

Confidential Pursuant to Protective Order

```
 1    advocacy?

 2         A    It includes that.

 3         Q    It includes the creation of databases that

 4    identify union members, so when the time comes for

 5    the union members to get paid, you know who are

 6    members that are subject to being paid funds that

 7    are due them?

 8         A    Union members and also nonunion musicians.

 9         Q    In fact, the nonunion musicians aren't

10    paying in at all to the work being done by the union

11    in distributing funds to them; right?

12              MR. THOMAS:  Object to the form.  Vague.

13    Lacks foundation.

14              THE WITNESS:  Yes.  They're not paying.

15    And that's another reason that we thought the AFM

16    ought to receive the value of what we provide to the

17    AFM and SAG-AFTRA Fund.

18    BY MR. KIESEL:

19         Q    It's a way to basically have the nonunion

20    musicians pay for some of the costs associated with

21    getting them the money they're taking from the Fund;

22    right?

23              MR. THOMAS:  Objection.  Misstates the

24    testimony.  Vague.

25              THE WITNESS:  I don't know.  I think
```

Confidential Pursuant to Protective Order

1    you're -- I think you're confusing me, what you

2    just said.

3    BY MR. KIESEL:

4        Q    Sorry.  Don't me mean to confuse you.

5             What I thought I heard you say is the

6    nonunion members are doing nothing to subsidize the

7    AFM for providing data that assists the Fund in

8    getting them paid their royalties?

9             MR. THOMAS:  Object to the form.  Vague.

10            THE WITNESS:  The data is one part, but

11   services are another.  It's all -- it's all wadded

12   up.

13   BY MR. KIESEL:

14       Q    I'm going to have you flip your blinds up

15   just a wee bit, because the sun is facing west now

16   and it's blinding.

17       A    Okay.

18       Q    Maybe turn the blinds the other direction,

19   and that way the --

20       A    Let me make sure I know which one you're

21   talking about.

22       Q    It's in the upper right-hand corner, upper

23   left-hand corner.  It's the one behind you.

24       A    It's getting in your eye.

25       Q    It is getting in my eye.

Confidential Pursuant to Protective Order

```
 1     A     How is that?

 2     Q     That's better.

 3     A     Is that better?

 4           MR. KIESEL:  Camera?  How is it for the

 5    camera?

 6           THE VIDEOGRAPHER:  It looks fine.

 7           MR. KIESEL:  Okay.  Perfect.  Thank you.

 8    BY MR. KIESEL:

 9     Q     If I were to ask you what was the AFM

10    trying to recover, in part, with regard to the

11    1.5 percent service fee that it was collecting from

12    the Fund, you've talked about the data.  You talked

13    about the domestic and international advocacy.  You

14    talked about negotiating the deals with the labels.

15           Anything else you can think of that is

16    intended to reimburse the union for what it's

17    providing to the Fund?

18           MR. THOMAS:  Object to the form.  Overbroad

19    and vague.

20           THE WITNESS:  You know, the "reimbursed"

21    word, I think, is better turned into a word that

22    says the AFM should receive the value that it

23    provides to the AFM and SAG-AFTRA Fund, not only

24    today, not only the day that it became effective,

25    service fee agreement, but every day in the future.
```

Confidential Pursuant to Protective Order

1    Because every time data is provided and

2    services are provided, that work continues to -- the

3    work and the data and the ongoing provision of data

4    continues to serve the Fund every day forward.  So,

5    you know, it's a value provided that continues to be

6    served because the consumption of the music and the

7    content that is created continues to drive the --

8    continues to drive the payment of royalties.

9           It's not just -- it's not just a one-shot

10   deal, you know, where a B-form goes into a file and

11   then, you know, that's it.  You know, it's not like,

12   you know, we're a can of soup at the grocery store

13   that gets consumed and that's it.

14          It's not like, you know -- you know, you

15   call a plumbing and the plumber fixes the toilet,

16   you know, and, you know, you don't have to pay the

17   plumber every time you flush the toilet.  You know,

18   this is about the provision of services and also

19   data that continues to provide value to the Fund

20   every day forward.

21   BY MR. KIESEL:

22       Q    So when you say "value to the Fund," my

23   question to you, Mr. Dreith, is -- "Mr. Dreith" --

24   Mr. Hair, who sets what the value is to the unions?

25          Who sets that figure, what the value is to

Confidential Pursuant to Protective Order

1    really think that that may have been the wrong word

2    for me to use, because I think the AFM should be

3    entitled to receive the value of what it provides.

4    BY MR. KIESEL:

5        Q    So if I just use your words, "the value of

6    what it provides" -- let's take that phrase, "the

7    value of what it provides" -- it's your view that

8    the Fund should give back to the union the value of

9    what the union is providing to the Fund; right?

10            MR. THOMAS:  Object to the form.  Vague.

11    Argumentative.

12            THE WITNESS:  I think the Fund would not be

13    able to operate if it did not have the support and

14    the service and everything the AFM is providing to

15    it.  And I think that the AFM deserves to and should

16    and is receiving the value of what we provide.

17    BY MR. KIESEL:

18        Q    You said the Fund would not be able to

19    operate if it did not get provided the value of what

20    the AFM provides to it; correct?

21        A    I'm going to say this again.  The Fund is

22    dependent upon the AFM for a lot of things.  It's

23    dependent upon the AFM to -- for the -- obviously,

24    for the data.  And the data consists of two things.

25            It's the session reports.  And it's not

Confidential Pursuant to Protective Order

 1    just the session reports, but it's also the paper

 2    trail on what happened at a session that's

 3    memorialized sometimes in writing by a company or by

 4    a producer, you know, in a different form than just

 5    a B-form.

 6            And then it also -- you know, the Fund is

 7    also dependent upon the unions for the provision of

 8    data in the form of contact information for those

 9    who perform, who performed on -- you know,

10    originally.

11            Without -- without the union's provision

12    of that, the Fund would not be able to operate the

13    way -- to its -- up to its potential.

14            You know, on the advocacy efforts, domestic

15    and internationally, the Fund would not be here

16    without the AFM and AFTRA in the beginning pushing

17    this, negotiating with the record labels.  It's our

18    relationships with the record labels that got us

19    here to begin with.

20            And, you know, and I'm not saying that, you

21    know, what we receive now is indicative of -- did I

22    use that word right, "indicative"?

23            It's not indicative of, you know, every --

24    you know, every effort that we've provided from 1908

25    until 2013.  But I do -- I do think that the Fund

Confidential Pursuant to Protective Order

```
 1          MS. MCCONNELL:  '13.

 2          MR. KIESEL:  Oh, thank you.

 3   BY MR. KIESEL:

 4     Q    To the extent you made a --

 5          MR. KIESEL:  Thank you, Mariana.

 6   BY MR. KIESEL:

 7     Q    -- that you made a decision in 2013 to

 8   have the service fee be 3 percent of what the Fund

 9   received in 2013, that was a whole lot less than

10   what 3 percent was of the money paid in 2018 because

11   of the increased royalties paid into the Fund over

12   those five years; correct?

13          MR. THOMAS:  Objection.  Lacks foundation.

14   Misstates facts in the record.

15          You can answer.

16          THE WITNESS:  Mr. Kiesel, you are doing

17   arithmetic.  And I would say you're doing a good job

18   at arithmetic, but you're not doing a very good job

19   at value.  And the value of what we do continues to

20   grow every year.  As --

21   BY MR. KIESEL:

22     Q    Stop right there.

23     A    As worldwide consumption increases, our

24   data and our services continue to be used, you

25   know -- you know, all along the way.
```

Confidential Pursuant to Protective Order

```
 1      Q    So when you say "our data and our services"

 2  are being used, you are clearly wearing your hat as

 3  the president of the international AFM; correct?

 4           MR. THOMAS:  Objection.  Argumentative.

 5           THE WITNESS:  I'm not wearing hats.  I'm

 6  describing the AFM's role in doing what it does to

 7  bargain with the record labels to create not only

 8  the data provided but also the services that we

 9  provide AFM and SAG-AFTRA Fund with regard to

10  domestic and international advocacy and in every

11  other way that we do.  All of that, the value

12  continues to increase every year.

13  BY MR. KIESEL:

14      Q    I'm going to restate the question.

15           When you say "our data and our services"

16  are being used, you're referring to the AFM when you

17  use the word "our"; correct?

18           MR. THOMAS:  Objection.  Asked and

19  answered.

20           THE WITNESS:  Yes.

21  BY MR. KIESEL:

22      Q    Would you agree with the idea that, as the

23  co-chair of the Fund, you have a responsibility, a

24  fiduciary obligation to return as much money to the

25  beneficiaries of the Fund as possible?
```

Confidential Pursuant to Protective Order

```
 1    the trustees on June 2013 where the service fee came

 2    up for a vote.

 3              (Exhibit 3 was marked for identification.)

 4    BY MR. KIESEL:

 5        Q    And have you -- I want to give you a second

 6    to read through.  These are the minutes of the

 7    meeting from June 4, 2013, approved on December --

 8    December 12, 2013.  So take a second, and let me

 9    know when you need to scroll up.

10              Are you ready for it to lift up on the

11    screen?

12        A    I'm looking at it.

13        Q    Great.  No, no.  I can scroll up.  I just

14    want you to see more of the document.

15        A    Oh, yeah.  Go ahead.  Yeah, go ahead.

16              MR. KIESEL:  Pull it up.

17    BY MR. KIESEL:

18        Q    This is the line that I'm going to get to,

19    which is the administrative fee issue.  And let me

20    know when you've had a chance to review it.

21        A    Okay.

22        Q    All right.  Let's go back to the top of

23    this.

24              Okay.  So does this appear to be, to you,

25    a copy of the minutes of the June 4, 2013, board
```

Confidential Pursuant to Protective Order

1   meeting that was held?

2        A    It appears so.

3        Q    Okay.  And it would indicate that the

4   trustees that were present there physically was

5   Bruce Bouton; Duncan Crabtree-Ireland on the

6   telephone; Sam Folio; yourself, and you're

7   highlighted; Jon Joyce, who has been crossed

8   out there; and then Stefanie Taub.

9             Do you recall that you chaired this

10  meeting, or did Mr. Crabtree-Ireland chair this

11  meeting?

12       A    No.  I probably would have chaired it.

13       Q    Probably, because Mr. Crabtree-Ireland was

14  on the telephone, you would have chaired it in

15  person there?

16       A    Yes.

17       Q    Did you know ahead of time before June 4,

18  2013, that the service agreement was going to be

19  discussed at this meeting?

20       A    I don't recall specifically that it was

21  going to be discussed, but I'm sure I -- I'm sure I

22  saw it on the agenda when I got it.

23       Q    Was the proposed service agreement sent out

24  in advance of the meeting so the board of trustee

25  members could review the service agreement?

Confidential Pursuant to Protective Order

```
 1        A     I believe that it would have been.  Yes.

 2        Q     Do you recall at the June 4, 2013, meeting,

 3   specifically with respect to the service fee, that

 4   Duncan Crabtree-Ireland did not vote on that

 5   particular motion?

 6        A     I don't recall that.

 7        Q     Okay.  So if I were to say to you,

 8   "Do you know one way or the other whether

 9   Mr. Crabtree-Ireland actually voted on the service

10   fee motion?" you wouldn't recall one way or the

11   other?

12        A     I wouldn't recall.

13        Q     Okay.  If I told you that Duncan abstained

14   or didn't vote because he felt he had a conflict of

15   interest in voting on this, would that refresh your

16   recollection about what he may have done?

17             MR. THOMAS:  Objection.  That misstates

18   Mr. Crabtree-Ireland's testimony quite egregiously.

19   Lacks foundation.

20             MR. KIESEL:  Object to form.  I got that.

21   Enough.

22             THE WITNESS:  Are you looking for an

23   answer?

24   BY MR. KIESEL:

25        Q     Yes.
```

Confidential Pursuant to Protective Order

```
 1              THE WITNESS:  A.J.?

 2              MR. THOMAS:  You can answer the question.

 3              THE WITNESS:  I'm sorry.  Would you read

 4  the question back?

 5  BY MR. KIESEL:

 6      Q    Sure.

 7              The question was, if I told you Duncan

 8  abstained or didn't vote because he felt he had a

 9  conflict in interest in voting on this, would that

10  refresh your recollection about what he may have

11  done?

12      A    No.

13      Q    Thank you.

14              Before this meeting on June 4, 2013, did

15  you speak with any other trustees about the proposed

16  service agreement?

17              MR. THOMAS:  Object to the form.

18              THE WITNESS:  I'm sure that I did.  I don't

19  recall what specifically was said.

20  BY MR. KIESEL:

21      Q    Do you recall whether you had an

22  opportunity before June 4, 2013, and the vote --

23  whether you spoke to each of the trustees? one of

24  the trustees?  Just a sense of who you may have

25  communicated with?
```

Confidential Pursuant to Protective Order

1    A    I was -- I was around Sam Folio a lot, as

2    two officers would be of the union.  But I would

3    have had discussions with him and also with Bruce

4    Bouton at some point.

5    Q    If I were to say --

6    A    I don't recall specific discussions.

7    Q    Could you give us a sense of what those

8    discussions may have consisted of with Mr. Bouton

9    and Mr. Folio?

10   A    As I said, I don't recall specifically what

11   was said.

12   Q    Would the gist of it be that you felt that

13   the AFM was subsidizing the Fund and, therefore,

14   should be compensated for the value of the services

15   it provided to the Fund?

16   A    I don't think that I would agree that there

17   were conversations specifically as you have just

18   tried to lead me to agree to.  But I will say that

19   we had discussions about a service fee and what the

20   percentage would be and that it was -- there was

21   certainly no objection to any of that at all.

22   Q    Did Mr. Bouton or Mr. Folio express any

23   concern to you in being asked to vote on a

24   resolution that would take money from the Fund and,

25   therefore, reduce the amount available for payment

Confidential Pursuant to Protective Order

```
 1   Federation of Musicians and SAG-AFTRA for ongoing

 2   support, including membership data and other

 3   information and services to assist in facilitating

 4   distributions.  It was moved, seconded, and carried

 5   that the Fund enter into a service agreement with

 6   the two unions, pursuant to which the unions would

 7   provide information and services important to the

 8   Fund, and the Fund would pay a service fee

 9   consisting of an amount equal to 3 percent of each

10   distribution, after the deduction of administrative

11   fees, with one-half payable to the AFM and one-half

12   payable to SAG-AFTRA."

13        Q    When it says "A discussion ensued regarding

14   the Fund," do you recall --

15             (Connectivity disruption.)

16             THE WITNESS:  I'm sorry.  You're breaking

17   up, Paul.  You're breaking up a little bit.

18   BY MR. KIESEL:

19        Q    Yeah.  Not a problem.

20        A    Would you start over?

21        Q    Of course.  Sorry.  I heard sort of an echo

22   at the same time.  I appreciate that.

23             So it says "A discussion ensued regarding

24   the Fund entering into a service agreement with" the

25   unions, and I'm asking you what was the discussion
```

Confidential Pursuant to Protective Order

1    that ensued regarding a service fee at the meeting?

2        A    The best of my recollection is that, you

3    know, everyone there commented about it.  There were

4    no unfavorable comments.  There wasn't a whole lot

5    of discussion, but what discussion there was was not

6    adversarial.  There was consensus.  My best rel- --

7    I'm sorry -- my best recollection is that there was

8    consensus among everyone that this was the right

9    thing to do.

10       Q    Do you recall any of the trustees speaking

11   against the proposal?

12       A    I do not.

13       Q    Do you recall what sorts of questions may

14   have been asked by other trustees regarding the

15   proposal?

16       A    I don't recall questions from the trustees.

17       Q    Do you recall that there were, in fact, no

18   questions from the trustees, or you just -- you know

19   there were questions but "I can't recall what those

20   questions were"?  Which might that be?

21       A    I don't recall any questions from the

22   trustees.  I think there was some discussion, but

23   the discussions were not in the form of questions.

24   I think the discussions were that there was a

25   consensus among the group to adopt the motion.

# Exhibit 8

Confidential Pursuant to Protective Order

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3   KEVIN RISTO, on behalf of      )
     himself and all others        )
 4   similarly situated,           )
                                   )
 5         Plaintiff(s),           )
                                   )
 6     vs.                         ) Case No.:
                                   ) 2:18-cv-07241-CAS-PLA
 7   SCREEN ACTORS GUILD-AMERICAN  )
     FEDERATION OF TELEVISION AND  )
 8   RADIO ARTISTS; a Delaware     )
     corporation; AMERICAN         )
 9   FEDERATION OF MUSICIANS OF THE )
     UNITED STATES AND CANADA, a   )
10   California nonprofit          )
     corporation; et al.,          )
11                                 )
             Defendants.           )
12   _____ )

13

14

15       CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

16             VIDEOTAPED DEPOSITION OF

17   RULE 30(b)(6) WITNESS FOR THE AMERICAN FEDERATION OF

18             MUSICIANS, BY:  RAYMOND HAIR

19              Appearing Remotely From

20                  Denton, Texas

21           Thursday, February 25, 2021

22

23

24   Stenographically reported by:
     EMILY SAMELSON, CSR No. 14043

25   Golkow Job No.: 269545
```

Confidential Pursuant to Protective Order

1    membership dues, because these are dues based on the

2    earnings that are received by the members under

3    those agreements.

4            And then -- and then beyond that, there

5    are different kinds of dues based on earnings in

6    freelance employment.

7        Q    Okay.  And how is freelance employment

8    defined?

9        A    Freelance employment would be employment

10   either under a freelance engagement contract or

11   just general freelance work that may be done under a

12   collective bargaining agreement but is not regular

13   in nature.

14       Q    Got it.

15            What currently is the AFM's total

16   membership by way of numbers, approximately?

17       A    Are you saying today?

18       Q    Yes, today.

19       A    I don't know exactly what it is today.  We

20   have been -- we've been monitoring it as a result

21   of COVID, because the live -- the live entertainment

22   sector is completely shut down right now.

23            We do have employment currently in various

24   media sectors.  For example, live television, film

25   scoring, and other electronic media sectors, those

Confidential Pursuant to Protective Order

```
 1    are -- those are still operating.  But I believe the
 2    last -- the last estimate that I saw or heard of or
 3    heard from our secretary-treasurer was in the
 4    neighborhood of 68,000 members.
 5         Q    And if we were to go back to pre-pandemic
 6    times and say January of 2020, what would the number
 7    have been approximately just before the pandemic
 8    hit?
 9         A    It may have been around 70- -- early --
10    70,000-plus.  And I'm just -- I'm trying to recall.
11    I don't have any numbers in front of me here.  So --
12         Q    Understood.  Well --
13         A    And that fluctuates, by the way.
14         Q    I was going to ask you about fluctuation.
15              Is it fair to say that -- what would be
16    the fluctuation annually?  Maybe 5 percent?
17    1 percent?
18              Do you have a sense of what the annual
19    fluctuation tends to be?
20         A    Well, it's based on quarterly --
21    quarterly -- it's based on quarterly estimations.
22    And that could go anywhere from -- for example, it
23    could be anywhere from 62,000 to 72,000, or 60,000
24    to 70,000.  So it just -- it fluctuates.
25         Q    If we were to talk about 2010, August 1,
```

Confidential Pursuant to Protective Order

1    that there are other sources of income that you

2    receive.

3             Do you know, say, in 2017 how many AFM

4    members are Fund beneficiaries?

5       A    I don't know.

6       Q    Would it be --

7       A    I have an idea.

8       Q    Yeah.  Yeah.  Yeah.  You're testifying as

9    the person most qualified from the AFM on this

10   particular subject.  So I want -- your idea needs to

11   be based upon some research or knowledge and not

12   sort of an arbitrary number.

13            But what would be your best estimate as

14   to the number of AFM members that are Fund

15   beneficiaries?

16            MR. THOMAS:  Well, first of all, I have to

17   object.  Because I don't think there is a 30(b)(6)

18   topic on the number of AFM members who are also Fund

19   participants.  So I think it's perfectly appropriate

20   for the witness to testify to the best of his

21   knowledge or recollection without having done any

22   homework, because I don't think that was one of the

23   topics he was supposed to do homework on.

24   BY MR. KIESEL:

25       Q    Okay.  We can -- I'll take your best

Confidential Pursuant to Protective Order

```
 1    estimate.
 2         A    Well, and you said "AFM."  You didn't say
 3    "unions."
 4         Q    Well, when you say "unions," are you
 5    referring to the locals, or are you referring to
 6    SAG-AFTRA?
 7         A    Yeah, I'm referring to SAG-AFTRA and AFM as
 8    "unions."
 9         Q    Yeah.  No, right.  So let me just -- I want
10    to know specifically AFM as opposed to SAG-AFTRA.  I
11    asked that question of Duncan Crabtree-Ireland to
12    testify for the SAG-AFTRA.  So I'm asking you the
13    question now on behalf of AFM.
14         A    Well, I want to, first of all, say that
15    there are members who are in good standing, there
16    are members who have been suspended, or there
17    members who have resigned.  There are members who
18    have retired.  And so -- but my best estimate, I
19    really would say it like this.
20              Of the Fund beneficiaries, I would say
21    50 percent of those Fund beneficiaries or more are
22    members of our unions.  I wouldn't separate it out
23    to AFM and SAG-AFTRA, but I would say there are more
24    musicians than vocalists who are being paid.
25              And of the musicians who are being paid,
```

Confidential Pursuant to Protective Order

```
1   and overbroad.

2           THE WITNESS:  I think I would look at it in

3   reverse.  I think that the AFM advances the Fund's

4   mission.

5   BY MR. KIESEL:

6       Q    But you would admit that the Fund advances

7   the interests of the AFM and its members to ensure

8   that they get paid for the work they do in a timely

9   manner?

10          MR. THOMAS:  Objection to the form.  Vague

11  and overbroad.

12          Which members are you talking about?

13          THE WITNESS:  The Fund collects royalties

14  due nonfeatured performers on performances and

15  distributes them to those who are entitled to

16  receive them.  And the AFM, you know, plays a proud

17  part in that.  I personally have negotiated

18  agreements with foreign collectives.  So -- and I --

19  and I have a really good feeling when I'm able to

20  get foreign collectives to pay more money into the

21  Fund.

22  BY MR. KIESEL:

23      Q    Okay.  Let's go to page 30 of this Exhibit

24  Number 2, the AFM bylaws.  And I think this might be

25  highlighted for us as well.  There we go.
```

Confidential Pursuant to Protective Order

```
 1   BY MR. KIESEL:

 2        Q    You're consistent with Mr. Duncan

 3   Crabtree-Ireland on that.

 4        A    I have a lot of respect for Duncan.

 5        Q    Me too.

 6             All right.  We're going to go on to

 7   Topic Number 2, and this is the appointment of union

 8   board members as board members of the Fund.  And

 9   we're going to take a look at, I think -- is it

10   Exhibit Number 3?  And this is the Trust Fund

11   Agreement.

12             (Exhibit 3 was marked for identification.)

13   BY MR. KIESEL:

14        Q    And the Trust Fund Agreement we're looking

15   at now is the 2012 Trust Fund Agreement, July 26,

16   2012.

17             And I believe we looked at this section

18   already, Article III, Trustees.  But now in your

19   capacity as the 30(b)(6) witness for AFM, we're just

20   going to revisit this briefly.

21             Could I ask you to read into the record

22   "Article III, Trustees"?

23        A    You want me to read the highlighted

24   portion?

25        Q    Please.
```

Confidential Pursuant to Protective Order

1        A    (As read):  "Section 1.  AFM and SAG-AFTRA

2    Trustees.  The operation and administration of the

3    Fund shall be jointly the responsibility of six

4    trustees, three appointed by the AFM, of which no

5    fewer than one shall be a rank-and-file

6    representative, and three appointed by SAG-AFTRA, of

7    which no fewer than one shall be a rank-and-file

8    representative."

9        Q    Am I correct?  There's no written policy

10   for this process at the AFM?

11       A    Yes.

12       Q    And the process for appointing

13   rank-and-file or regular trustees is the same on

14   the AFM side; correct?

15            MR. THOMAS:  Object to the form.

16            THE WITNESS:  Would you say that again,

17   please?

18   BY MR. KIESEL:

19       Q    Sure.

20            The process for appointing someone who is

21   the rank-and-file member or just a regular trustee

22   is the same process at the AFM.  It's not called out

23   specifically?

24            MR. THOMAS:  Same objection.

25            THE WITNESS:  Yes.

## DATA PURCHASE AND SERVICES AGREEMENT

This Data Purchase and Services Agreement ("Agreement"), dated as of July 22, 2013, 2013 (the "Effective Date"), is made by and between the American Federation of Musicians of the United States and Canada, AFL-CIO-CLC ("AFM"), the Screen Actors Guild - American Federation of Television and Radio Artists ("SAG-AFTRA") and the AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund (the "Fund"). AFM and SAG-AFTRA are sometimes referred to herein individually as a "Union" and collectively as the "Unions." AFM, SAG-AFTRA and the Fund are sometimes referred to herein individually as a "Party" and collectively as the "Parties."

WHEREAS, by an Agreement and Declaration of Trust dated September 16, 1998, as amended and restated on July 26, 2012, the Unions formed the Fund to collect and distribute certain artist royalties that are appropriate for collective administration;

WHEREAS, the Unions have in the past provided to the Fund certain data, as well as certain services of outside counsel and in-house staff to assist the Fund in its operation and administration and to represent the interests of the Fund in various external matters, without being reimbursed for their costs thereof;

WHEREAS, the Agreement and Declaration of Trust authorizes the Trustees of the Fund to purchase relevant data from the Unions (and others) and to employ assistants; and

WHEREAS, the Trustees of the Fund have determined that it is reasonable and appropriate at this time to memorialize arrangements for the provision by the Unions to the Fund of certain data and assistance in exchange for reasonable compensation to the Unions from the Fund;

NOW, THEREFORE, the Parties, intending to be legally bound, hereby agree as follows:

1.   Provision of Data.   From and after the Effective Date, each Union shall provide the Fund the following data, in a manner comparable to the way such data has been provided immediately prior to the Effective Date:

- Access to member databases to enable the Fund to obtain identifying and contact information for members.

- Access to session reports and "B-forms," or databases containing information derived therefrom, that in either case, identify the recordings made at recording sessions and provide identifying and contact information for performers (Union members and nonmembers) who performed at the session.

Each Union retains all its ownership rights in its data, and all such data shall be considered Confidential Information of the relevant Union subject to the provisions of Section 7. The Fund is authorized to, and shall, access, reproduce and use such data solely for purposes of distribution of royalties collected by the Fund to the relevant persons. In its use of such data, the Fund

70441.1 version 2

**EXHIBIT**
30(b)(6) for AFM, R. Hair
5
2/24/21     E.S.

DEFS_00000118

further shall comply with the provisions of any applicable Union privacy policy of which such Union advises the Fund in writing from time to time.

2.      Representation of Fund Interests.  Each Union shall use commercially reasonable efforts to further the interests of the Fund and the Fund's beneficiaries through its participation in the following forums (or their successors):

- The board of SoundExchange, Inc.;

- The board of the Alliance of Artists and Record Companies;

- The musicFIRST Coalition;

- Activities under the auspices of the U.S. Copyright Office and other U.S. governmental entities; and

- Activities under the auspices of international entities such as the International Federation of Musicians, International Federation of Actors, World Intellectual Property Organization, Societies' Council for the Collective Management of Performers' Rights.

To the extent that the Fund may communicate to a Union particular interests, concerns or objectives relevant to the Unions' participation in the foregoing forums, each Union shall use commercially reasonable efforts promptly to address the Fund's requests in that regard, except to the extent the Union determines that such requests are contrary to the interests of its members.

3.      Mandates.  Each Union shall use commercially reasonable efforts to obtain from its members authorization to act as such members' representative for the purpose of collecting and distributing government-mandated or other compulsory royalties or remuneration payable to performers under U.S. or foreign law.  Each Union shall use commercially reasonable efforts to extend to the Fund the benefit of such authorizations that the Union obtains.  The Unions may fulfill the foregoing obligation by, for example, negotiating and signing together with the Fund, or authorizing the Fund to enter into, agreements with foreign collecting societies pursuant to which the Fund will be entitled to claim, and the foreign society will agree to pay to the Fund, foreign royalties owed to those U.S. performers for whom the Fund exercises a mandate on behalf of either or both Unions.

4.      Other Services.  From and after the Effective Date, it is not anticipated that either Union will provide the Fund material services in support of the Fund's operation and administration, except as specifically described above.  However, the Unions shall not unreasonably refuse to provide the Fund incidental advice and assistance as the Fund may request from time to time.

5.      Services in General.  The foregoing data and services shall be provided in accordance with any schedule agreed upon between the Fund and a Union, or in the absence of such agreement, promptly upon the Fund's request.  To the extent that a Union may provide the Fund any documents or other recorded information other than the data described in Section 1 (the Fund's rights to which are also addressed in Section 1), and subject to Section 7, such Union

70441.1 version 2

hereby grants the Fund a nonexclusive, perpetual, worldwide license to reproduce, adapt, distribute, perform and display such item and authorize others to do the same for the Fund's purposes. At no time shall the Fund be deemed to be the employer of a Union's personnel providing services hereunder. Each Union, and not the Fund, shall be responsible for payment of compensation to its personnel, required payroll deductions, social security and Medicare contributions, and unemployment, disability and workers' compensation insurance, all as required under law from time to time.

6.      Payment. In consideration of the foregoing, the Fund shall pay each Union, within 30 days after the conclusion of each of the Fund's distribution cycles, 3% of the amount distributed by the Fund in such distribution cycle. Each such payment shall be accompanied by a statement setting forth the computation of the payment amount. Such payment shall constitute complete compensation of the Unions and their personnel for providing the data and services contemplated by this Agreement. There shall be no additional charges or expense reimbursement associated with the Unions' provision of the data and services contemplated by this Agreement.

7.      Confidentiality.

        7.1.    "Confidential Information" means any material or information that (i) a Party (the "Disclosing Party") treats as confidential; (ii) the Disclosing Party provides to another Party (the "Receiving Party") in connection with the performance of this Agreement; and (iii) the Receiving Party reasonably should recognize as being confidential material or information of the Disclosing Party. The Receiving Party shall not use the Disclosing Party's Confidential Information for any purpose other than the performance of this Agreement or enjoyment of benefits provided under this Agreement, and shall not disclose the Disclosing Party's Confidential Information to any person other than its directors, officers, employees and contractors who have a need to know such Confidential Information and are subject to a nondisclosure obligation comparable in scope to this Section 7.

        7.2.    Notwithstanding Paragraph 7.1, the Receiving Party may disclose any material or information that it can demonstrate is (i) or becomes publicly known through no fault of the Receiving Party; (ii) developed independently by the Receiving Party; (iii) known by the Receiving Party prior to its disclosure by the Disclosing Party; or (iv) rightfully obtained from a third party not obligated to preserve its confidentiality who did not receive the material or information directly or indirectly from the Receiving Party. The Receiving Party also may disclose materials or information to the extent required by a court or other governmental authority, provided that the Receiving Party (a) gives the Disclosing Party prompt notice of the disclosure, (b) uses reasonable efforts to resist disclosing the material or information, and (c) cooperates with the Disclosing Party on request to obtain a protective order or otherwise limit the disclosure.

        7.3.    The receiving Party acknowledges that its breach of this Section 7 would cause the Disclosing Party irreparable injury for which it would not have an adequate remedy at law. In the event of a breach, the Disclosing Party shall be entitled to injunctive relief in addition to any other remedies it may have at law or in equity.

70441.1 version 2

8.      Representations, Warranties and Covenants

        8.1     Each Party represents and warrants that it has the right, power and authority to
enter into and to perform this Agreement.

        8.2     Each Union represents, warrants and covenants that the services it is to provide
under this Agreement shall be provided (i) in a workmanlike manner; (ii) in accordance with the
standards of care and diligence and the level of skill, knowledge and judgment normally
practiced by organizations of a similar nature; and (iii) in compliance with all applicable laws
and regulations.

        8.3     Each Union represents, warrants and covenants that the data, and any other
documents or other recorded information it may provide to the Fund in the performance of this
Agreement, will not infringe or misappropriate any patent, copyright, trade secret, or other
proprietary right of any third party or otherwise conflict with the rights of any third party.

9.      Indemnity.  Each Party shall defend, indemnify and hold harmless each other Party and
its directors, officers and employees from and against any third party claims to the extent relating
to or resulting from any breach of this Agreement by the indemnifying Party.  The indemnifying
Party shall have the right to exercise reasonable control over any litigation within the scope of
this indemnity; provided, however, that the indemnified persons shall have the right to
participate in any such litigation at their own expense insofar as it concerns claims against them.
This indemnity shall be inapplicable to the extent that the indemnifying Party is not notified
promptly of a claim and is prejudiced by the delay in notice.  All indemnified persons shall
cooperate to the extent necessary in the defense of any claim within the scope of this indemnity.

10.     LIMITATION OF LIABILITY.  EXCEPT FOR A CLAIM OF INDEMNIFICATION
PURSUANT TO SECTION 9, OR FOR A BREACH OF SECTION 7, IN NO EVENT SHALL
ANY PARTY BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL, OR
CONSEQUENTIAL DAMAGES.

11.     Term and Termination of this Agreement.  The term of this Agreement shall commence
as of the Effective Date and shall continue thereafter unless terminated in accordance with this
Section 11.  As between each Union and the Fund, this Agreement may be terminated (i) at will
upon one year's written notice to the other Party, or (ii) if the other Party has materially breached
this Agreement and failed to remedy that breach within 30 days after receiving written notice of
that breach, upon further written notice by the non-breaching Party.  Termination of this
Agreement as between one Union and the Fund shall not, by itself, cause this Agreement to
terminate as between the other Union and the Fund.  Upon the effective date of termination, the
relevant Union shall no longer be obligated to provide data or services as described in Sections
1-5.  The Fund shall pay the relevant Union in accordance with Section 6 for data or services
rendered through the effective date of termination on a prorated basis over the Fund's then
current distribution cycle.  The provisions of Sections 7-13 shall survive the termination of this
Agreement.

12.     Notices.  All notices sent under this Agreement shall be in writing and hand delivered or
delivered by prepaid overnight courier.  Notices shall be sent to the Parties at the following
addresses or such other addresses as the Parties subsequently may provide:

70441.1 version 2

DEFS_00000121

| If to AFM: | American Federation of Musicians of the United States & Canada |
| | 1501 Broadway, Suite 600 |
| | New York, NY 10036 |
| Attention: | President Raymond M. Hair, Jr. |
| Telephone: | (212) 869-1330, ext. 212 |
| | |
| If to SAG-AFTRA: | SAG-AFTRA |
| | 5757 Wilshire Blvd., 7th Floor |
| | Los Angeles, CA 90036 |
| Attention: | Chief Administrative Officer Duncan Crabtree-Ireland |
| Telephone: | (323) 236-3259 |
| | |
| If to the Fund: | AFM & SAG-AFTRA Fund Distribution Fund |
| | 12001 Ventura Place, 5th Floor |
| | Studio City, CA 91604 |
| Attention: | Administrator Dennis Dreith |
| Telephone: | (818) 755-7777 |

13.   <u>Miscellaneous</u>.

13.1.   <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of New York, without regard to its conflict of laws principles.

13.2.   <u>Severability</u>.  The provisions of this Agreement are severable, and the unenforceability of any provision of this Agreement shall not affect the enforceability of the remainder of this Agreement.

13.3.   <u>Cumulative Rights and Remedies</u>.  The rights and remedies provided in this Agreement and all other rights and remedies available to a Party at law or in equity are, to the extent permitted by law, cumulative and not exclusive of any other right or remedy now or hereafter available at law or in equity.

13.4.   <u>Assignment</u>.  No Party may assign any of its rights or delegate any of its duties under this Agreement to any third party without the prior written consent of the other Parties, which shall not be withheld unreasonably.  This Agreement shall be binding upon and inure to the benefit of the Parties and their permitted assigns.

13.5.   <u>Relationship of the Parties</u>.  Nothing in this Agreement shall be construed as creating a partnership, joint venture or agency relationship between the Parties, or as authorizing any Party to act as agent for the other or to enter into contracts on behalf of any other Party.

13.6.   <u>Amendments</u>.  This Agreement may be modified or amended only by written agreement of the Parties.

13.7.   <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement between the Parties concerning the subject matter of this Agreement, and supersedes all prior agreements between the Parties concerning the subject matter of this Agreement.

DEFS_00000122

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective duly authorized officers.

AMERICAN FEDERATION OF MUSICIANS OF
THE UNITED STATES AND CANADA, AFL-CIO-CLC

By: _____

Name: Raymond M Hair Jr

Title: President

Date: 7/22/13

SCREEN ACTORS GUILD - AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS

By: _____

Name: Duncan Crabtree-Ireland

Title: Chief Admin Officer + General Counsel

Date: 7/22/13

AFM & SAG-AFTRA INTELLECTUAL PROPERTY RIGHTS DISTRIBUTION FUND

By: _____

Name: Dennis Dreith

Title: Administrator

Date: 7/24/13

70441.1 version 2

DEFS_00000123

# Exhibit 9

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3

4    _____

5    KEVIN RISTO, on behalf of      )
     himself and all others         )
6    similarly situated,            )
7              Plaintiffs,          )
                                    )Case No.
8        vs.                        )2:18-cv-07241-CAS-PLA
                                    )
9    SCREEN ACTORS GUILD -          )
     AMERICAN FEDERATION OF         )
10   TELEVISION AND RADIO ARTISTS,  )
     a Delaware corporation,        )
11   et al.,                        )
12              Defendants.         )
     _____)

13

14

15      VIDEOCONFERENCE DEPOSITION OF SHARI HOFFMAN

16            Friday, February 19, 2021

17                    Volume I

18

19

20   Reported by:

21   KATHLEEN E. BARNEY

22   CSR No. 5698

23   Job No. 4420582

24

25   PAGES 1 - 164

                                          Page 1

1   it was done in Los Angeles.

2       Q   In doing your piece of the project, were

3   there other resources that you consulted other than

4   the B forms?

5       A   Local officers, likely.  Other than that, I        10:04:51

6   don't recall the protocols.  That's so long ago.

7       Q   Right.

8           So turning back to when you were working at

9   the -- at the fund from 2010 to 2014, when you first

10  started working there, where was the -- where was        10:05:12

11  the fund located?

12      A   When I first started -- I don't know when

13  they moved over to 11138 Ventura Boulevard, but I

14  worked -- I know when I was in Live Television, I

15  was housed at the Film Musicians Secondary Markets        10:05:31

16  Fund.  So there was an overlap where I -- what is

17  their address?  The big Citi National Bank building

18  on the corner of Ventura and Laurel Canyon.

19          Then we moved into small offices on -- at

20  11138 Ventura Boulevard just a block and a half        10:05:49

21  away.

22      Q   Okay.  So when you first started working at

23  the fund, the fund essentially was housed at the

24  offices of the Film Musicians Secondary Markets

25  Fund, right?        10:06:05

Page 50

1      A    I can't confirm that because of the overlap.

2      Q    Okay.  But at some point in time, the fund

3    moved to the offices you just described --

4      A    Yeah.

5      Q    -- a block and a half away?                    10:06:14

6           Do you remember when that was?

7      A    No.

8      Q    Okay.

9           MS. MCCONNELL:  Mr. Thomas, we've been going

10   about an hour.  Whenever you would --              10:06:22

11          MR. THOMAS:  Yeah, why don't we take like

12   a -- you want to take like a five-minute, ten-minute

13   break?

14          Let's take a ten-minute break so we can all

15   stretch our legs a bit.  Let's go off the record.   10:06:32

16          THE VIDEOGRAPHER:  We're now going off the

17   record.  The time is 10:06.

18          (Recess.)

19          THE VIDEOGRAPHER:  We're now back on the

20   record.  The time is 10:16.                        10:17:03

21   BY MR. THOMAS:

22     Q    Ms. Hoffman, just going back briefly to your

23   testimony about being a consultant to the fund in

24   about 2006, 2007.  You said you consulted session

25   reports and B form reports.  Where were you getting  10:17:21

Page 51

**From:** Shari Hoffman
**Sent:** Wednesday, October 24, 2012 12:25 PM
**To:** Dennis Dreith
**CC:** Jo-Anne McGettrick
**Subject:** RE: Services and Assets that the Unions Provide to the AFM/SAG-AFTRA Fund
**Attachments:** ASSETS AND SERVICES PROVIDED TO THE FUND.docx

I made one small correction to the attached.

For Audiovisual and Symphonic royalties (there is no mention of the Featured Artist royalties that we collect from Sound Exchange given that they are not equipped to do so), we have extended much of research to other sources such as websites (Baseline, IMDB, Netflix), vocal contractors, composers, orchestra players, orchestra managers, the Pension Fund and ASCAP. Unlike Live TV, we do not rely much on Local 47 or Local 802's databases since most of our contracts have been previously carried over from FMSMF. However, we do cross reference bad addresses with the AFM International website as needed.

*Shari Hoffman*
*Manager Audiovisual & Symphonic Recordings*
*AFM & SAG-AFTRA Intellectual Property Rights Distribution Fund*
*11846 Ventura Blvd. Suite 208*
*Studio City, CA 91604*
*(818) 255-7980 Ext 868*
*(818) 255-7981 Fax*
*shoffman@raroyalties.org*

---

**From:** Dennis Dreith
**Sent:** Wednesday, October 24, 2012 12:00 PM
**To:** Jo-Anne McGettrick; Shari Hoffman
**Subject:** FW: Services and Assets that the Unions Provide to the AFM/SAG-AFTRA Fund

This is what Trish is using for a basis to try and reimburse the AFM for services proved to us. While I fully support the concept, I do want to make sure she is painting an accurate picture. I know that our research goes far beyond just looking at AFM session reports, but wanted your take on this.

DD

# Privileged

**Exhibit DEFS141**
2/19/2021
Hoffman

   DEFS_00041251

# Exhibit 10

```
 1                 UNITED STATES DISTRICT COURT

 2                 CENTRAL DISTRICT OF CALIFORNIA

 3    KEVIN RISTO,                    )

                                      )

 4                 Plaintiffs,        )

                                      )

 5    vs.                             )  No.

                                      )  2:18-cv-07241-CAS-

 6    SCREEN ACTORS                   )  PLA

      GUILD-AMERICAN FEDERATION       )

 7    OF TELEVISION AND RADIO         )

      ARTISTS, et al.,                )

 8                                    )

                   Defendants.        )

 9    _____)

10

11

12            VIDEOTAPED DEPOSITION OF JON JOYCE

13                       Volume I

14              APPEARING REMOTELY FROM

15               BRATTLEBORO, VERMONT

16           TUESDAY, SEPTEMBER 22ND, 2020

17

18

19

20

21    REPORTED BY:

      MONICA LEPE-GEORG

22    CSR No. 11976

      APPEARING REMOTELY FROM CLOVERDALE, CALIFORNIA

23

      Job No. 255738

24

25    PAGES 1 - 107
```

```
1       A.  No.  I have -- I don't have anything other

2  open.

3       Q.  Okay.  Do you have any documents in front of

4  you today, other than the music notes behind you?

5       A.  No.

6       Q.  I generally like to take a five- to ten-minute

7  break about every hour, but if you need to take a break

8  sooner than that, just let me know and we'll go off the

9  record and pick it up in five, ten minutes, okay?

10      A.  Thank you.

11      Q.  I want to talk a little bit about your

12  background.  It's my understanding that you're a

13  professional singer; is that correct?

14      A.  Yes.

15      Q.  And I read online that your parents are

16  vocalists as well; is that correct?

17      A.  Were, yes.

18      Q.  So you group up in a musical family; is that

19  true?

20      A.  Yes.

21      Q.  Can you walk me through any formal training or

22  education that you had?

23      A.  Well, I studied cello and piano at a young

24  age.  There was a -- a singers' workshop that my father

25  ran when I was 12 and so I learned sight-singing and
```

Joyce

```
1    labels; is that correct?

2       A.  Right.

3       Q.  Did the record labels have any legal

4    representation in that negotiation?

5       A.  Yes.

6       Q.  Do you remember who they were?

7       A.  Well, I remember Norman Samnick, who was a --

8    a perennial force.  Yeah, I think he put -- I believe

9    he was an attorney for Warner Brothers Records and was

10   the chair of the -- of the alliance of recording

11   artists of -- of labels.  I don't know what they call

12   themselves, but...

13      Q.  Do you know why that CBA expires every three

14   years?

15      A.  So we could improve the contract in

16   negotiation.

17      Q.  Okay.  When did you become a fund trustee?

18      A.  I believe in 1998.

19      Q.  Is this a position you applied for or were you

20   asked?

21      A.  I was asked and -- and appointed, I believe,

22   by the -- the president of AFTRA at the time and -- and

23   the -- and the executive director.

24      Q.  If you know, are you considered the

25   rank-and-file trustee of the fund?
```

Joyce

1          A.   I don't know.   I'm -- I'm -- I'm one of two

2    rank-and-file trustees of the fund currently.   The

3    other is Dan -- Dan Navarro.

4          Q.   When you started, were you one of two

5    rank-and-file trustees?

6          A.   No.   I was the only one from -- from the

7    union.

8          Q.   Got it.

9               Do you know how the other trustees were

10   selected for their appointment at the fund?

11              MR. THOMAS:   Objection.   Vague as to timing.

12              THE WITNESS:   I don't know.

13   BY MS. MCCONNELL:

14         Q.   Okay.   Do you know how you were appointed as

15   the trustee in 1998?

16         A.   My memory tells me that I was nominated and

17   elected by the board, or appointed and approved by the

18   board.   Appointed by the president and approved by the

19   board.

20         Q.   Okay.

21         A.   That's how I remember it.

22         Q.   In your own words, what do you understand the

23   duties of a fund trustee to be?

24         A.   To see that the fund is -- is operating

25   efficiently, making as broad of distributions to

Joyce

```
 1   that we're currently involved in.  I'm thinking it was

 2   about ten years ago, but...

 3       Q.  Okay.  Sounds right.

 4           What are session reports?

 5       A.  Oh, boy.  Session reports are the -- the --

 6   the legal record of what we background singers -- and

 7   that's what I was mostly involved with, filled out to

 8   get paid and to keep the union aware of who was

 9   recording what and where and for whom, for what label,

10   what -- and what artist, tune titles, and over the --

11   over the years, became an essential part of fund data.

12       Q.  Why -- why is it important for the unions to

13   know what background singers are performing on a track

14   and where the recording is happening?

15       A.  Well, before the fund was -- existed, the

16   union received payment at the offices and checked to

17   make sure that they were compliant with the contractual

18   obligations and -- and then forwarded the money on to

19   performers, also to make sure that if they were a union

20   member, that they were paid up in good standing.

21       Q.  Okay.  I'm trying to understand the last part

22   of it.

23           Is -- is there any requirement that a featured

24   musician use nonfeatured musicians that are union

25   members?
```

John Joyce

```
1         A.  No.

2         Q.  At any time, have you considered whether a

3    percentage fee is appropriate for the services

4    agreement or whether the service fee should be tied to

5    the reasonable cost of services that the union is

6    providing?

7         A.  Restate the question, please.

8         Q.  Sure.  At any point in time, have you

9    considered whether a percentage fee is appropriate for

10   the services agreement or whether a service fee should

11   be tied to the reasonable cost of services that the

12   union is providing?

13        A.  In that case -- in that sense, no.

14        Q.  Why not?

15        A.  I have felt, from the beginning, that -- that

16   a service fee is -- is appropriate for the value of the

17   information that we're getting and -- and I -- and I

18   don't -- I -- I can't imagine finding another way to

19   compensate the unions for the time.

20        Q.  Well, what about compensating them for the

21   time using an hourly rate?

22        A.  That's -- it -- that really is not my -- not

23   my expertise -- area of expertise.

24        Q.  You seem to have a lot of expertise with

25   collective bargaining agreements.  In your opinion,
```

```
 1              MR. THOMAS:  Objection.  Vague.

 2              MS. MCCONNELL:  Okay.

 3      BY MS. MCCONNELL:

 4         Q.  Did Mr. Crabtree-Ireland express to you that

 5      he thought SAG-AFTRA could do more in terms of locating

 6      the fund's members?

 7         A.  No.

 8              MR. THOMAS:  Objection.  Vague.  Lacks

 9      foundation.

10      BY MS. MCCONNELL:

11         Q.  In 2015 --

12         A.  Uh-hm.

13         Q.  -- when you found out that the fund paid

14      $545,690 to the unions, did you think that that amount

15      represented the reasonable costs of the services

16      provided by the unions to the fund?

17         A.  Yes.

18         Q.  Were you able to justify, in your mind, the

19      increase of the amount of the service fee from 2014 to

20      2015?

21              MR. THOMAS:  Objection.  Vague.

22              THE WITNESS:  Yes.

23      BY MS. MCCONNELL:

24         Q.  Did anyone tell you that there was an increase

25      in the amount of work the unions did to benefit the
```

Joyce

```
 1      A.  No.

 2      Q.  So when I asked you whether $840,000 -- well,

 3   $840,908 was the reasonable cost of the services

 4   provided by the unions to the fund, what did you mean

 5   when you said yes?

 6      A.  I -- I have not -- I didn't -- didn't really

 7   relate to the reasonable cost as a concept.

 8      Q.  Okay.

 9      A.  I'm -- that -- that's my assumption, is that

10   it did reflect the reasonable costs.

11         MR. THOMAS:  I also objected to the question

12   as vague and ambiguous because the previous time you

13   said "reasonable value," Mariana.

14         MS. MCCONNELL:  Okay.  Well, I'm glad I asked

15   him to clarify, then.

16   BY MS. MCCONNELL:

17      Q.  Did you ever see, from any source, a

18   breakdown -- a financial breakdown of the services

19   provided by the unions to the fund?

20         MR. THOMAS:  Objection.  Vague.  Overbroad.

21         THE WITNESS:  No.

22   BY MS. MCCONNELL:

23      Q.  How are you able to evaluate whether $840,908,

24   in 2016, is a reasonable amount of money for the fund

25   to pay the unions?
```

Joyce

1      A.   I -- the only thing that I can say is that, in

2  my experience, the only source of data and information

3  was the unions for the fund.   And it was incalculable,

4  the -- the value of that, to the fund.

5      Q.   So, no matter what the amount of money is that

6  the fund pays the unions, in your mind, that would be

7  reasonable?

8           MR. THOMAS:  Objection.  Misstates his

9  testimony.  Overbroad.

10          THE WITNESS:  Let me just clarify that, and

11  I'm -- I'm sure Andrew will hate me for this, but I --

12          MR. THOMAS:  Do whatever you want.

13          THE WITNESS:  I -- I, in the last few years,

14  have -- and I think I mentioned this earlier in my

15  testimony, that some review of the -- the service

16  agreement, the actual amount of money being paid to the

17  union should be taken up and -- and that's my -- that's

18  my position.

19  BY MS. MCCONNELL:

20      Q.   Is there a number in your mind where you think

21  that's too much money?

22      A.   No.

23          MR. THOMAS:  Objection.  Vague.

24          THE WITNESS:  And -- no, just as -- just as

25  I -- I try not to assess a value to CEOs of major

Joyce

```
 1    BY MS. MCCONNELL:

 2         Q.  In your mind, can you justify almost

 3    $2 million for the fund to pay the unions in 2020?

 4         A.  Yes.

 5         Q.  Okay.  How can you do that?

 6         A.  Based upon the relationship that the union has

 7    been to the fund, the -- the relationship that the

 8    union has been to the industry, to all participants,

 9    that it's an invaluable asset to the fund in its

10    ability to -- to get money out and to -- and to get

11    money to participants.

12         And as I said, I also feel that, at some

13    point, the red- -- the trustees of the fund need to

14    have a conversation about limits to payouts to the

15    unions.

16         Q.  When you are talking about the invaluable

17    asset, are you referring to the information contained

18    in the session reports?

19         A.  Among other things.  Also, the -- the lobbying

20    presence and the value of contracts to not only

21    members, but to nonunion members who use that as a --

22    as a -- a threshold of employment and -- yeah.

23         Q.  Would you agree with me that the unions have

24    other uses, that we've talked about today, for

25    compiling the information in the session reports?
```