PAUL R. KIESEL (State Bar No. 119854)
    kiesel@kiesel.law
MARIANA A. MCCONNELL (State Bar No. 273225)
    mcconnell@kiesel.law
NICO L. BRANCOLINI (State Bar No. 318237)
    brancolini@kiesel.law
**KIESEL LAW LLP**
8648 Wilshire Boulevard
Beverly Hills, California 90211-2910
Telephone: (310) 854-4444
Facsimile: (310) 854-0812

NEVILLE L. JOHNSON (State Bar No. 66329)
    njohnson@jjllplaw.com
DANIEL B. LIFSCHITZ (State Bar No. 285068)
    dlifschitz@jjllplaw.com
**JOHNSON & JOHNSON LLP**
439 North Canon Drive, Suite 200
Beverly Hills, California 90210
Telephone: (310) 975-1080
Facsimile: (310) 975-1095

*Attorneys for Plaintiff and the Class*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| KEVIN RISTO, on behalf of himself and all others similarly situated,<br><br>        Plaintiff,<br><br>        v.<br><br>SCREEN ACTORS GUILD-AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS, a Delaware corporation; AMERICAN FEDERATION OF MUSICIANS OF THE UNITED STATES AND CANADA, a California nonprofit corporation; RAYMOND M. HAIR, JR, an individual, as Trustee of the AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund; TINO GAGLIARDI, an individual, as Trustee of the AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund; DUNCAN CRABTREE-IRELAND, an individual, as Trustee of the AFM and SAG-AFTRA Intellectual | **CASE NO.** 2:18-CV-07241-CAS-PLA<br><br>**CLASS ACTION**<br><br>**OPPOSITION TO DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT**<br><br>Hearing Date:    June 14, 2021<br>Hearing Time:   10:00 a.m.<br>Courtroom:      8D (Telephonic)<br><br>*[Plaintiff's Evidentiary Objections, Separate Statement of Genuine Disputes of Material Facts, Declaration of Mariana A. McConnell, Declaration of Barrie Kessler, Declaration of Kerry Adams, Declaration of Mark Bookman,* |

Property Rights Distribution Fund; STEFANIE TAUB, an individual, as Trustee of the AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund; JON JOYCE, an individual, as Trustee of the AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund; BRUCE BOUTON, an individual, as Trustee of the AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund; and DOE DEFENDANTS 1-10,

Defendants.

*and [Proposed] Order filed concurrently]*

1
2
# TABLE OF CONTENTS
3
I.    Introduction ............................................................................................. 1
4
5
II.   Statement of Facts .................................................................................. 2
6
III.  Legal Standard ........................................................................................ 8
7
IV.   Analysis of Disputed Claims .................................................................. 8
8
9
   A.   Breach of Fiduciary Duty .............................................................. 8
10
11
      1.   Legal Standard ..................................................................... 8
12
      2.   Defendants' Negotiation of the Services Agreement Was Defective ..... 10
13
14
      3.   The Data Provided to the Fund Does Not Support the Service Fee ........ 12
15
      4.   The Data's Value to Non-Union Members is Virtually Nonexistent ..... 13
16
17
      5.   The Service Fee Is Incompatible With The Unions' Legal Duties ......... 14
18
      6.   Defendants Are Bound By Federal Restrictions On Fund Costs ............ 15
19
20
      7.   The Trustees Were Mired In Uncured Conflicts of Interests ................. 17
21
   B.   Conversion ................................................................................... 19
22
23
   C.   Money Had and Received .............................................................. 22
24
   D.   Declaratory Relief ........................................................................ 23
25
26
   E.   Punitive Damages ......................................................................... 23
27
V.    Conclusion ............................................................................................ 25
28

OPPOSITION TO DEFENDANTS' NOTICE OF
MOTION AND MOTION FOR SUMMARY
JUDGMENT OR, IN THE ALTERNATIVE, FOR
PARTIAL SUMMARY JUDGMENT

# TABLE OF AUTHORITIES

**Cases**

*American Airlines, Inc. v. Sheppard, Mullin, Richter & Hampton,*
   96 Cal. App. 4th 1017 (2002)......................................................................23

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986) ..................................................................................... 8

*Armenian Assembly of Am., Inc. v. Cafesjian,*
   772 F. Supp. 2d 20 (D.D.C. 2011) .............................................................17

*Avocados Plus, Inc. v. Freska Produce Int'l LLC,*
   No. CV 06-896-RGK (JTLx),
   2007 U.S. Dist. LEXIS 96848 (C.D. Cal. Jan. 26, 2007) ............................. 9

*Baird v. BlackRock Institutional Tr. Co., N.A.,*
   No. 17-cv-01892-HSG,
   2021 U.S. Dist. LEXIS 35973 (N.D. Cal. Jan. 28, 2021) ............................ 1

*Barlow Respiratory Hosp. v. Cigna Health & Life Ins. Co.,*
   No. 2:15-CV-08411-RGK-PLA,
   2016 U.S. Dist. LEXIS 187305 (C.D. Cal. Sep. 30, 2016).........................22

*Baumgardner v. Town of Ruston,*
   712 F. Supp. 2d 1180 (W.D. Wash. 2010) ..................................................21

*Bd. of Regents v. Roth,*
   408 U.S. 564 (1972) ....................................................................................21

*Braun v. Crown Crafts Infant Prods.,*
   No. C12-5811 RBL,
   2014 U.S. Dist. LEXIS 11899 (W.D. Wash. Jan. 30, 2014).........................23

*C2 Educ. Sys. v. Lee,*
   No. 18-cv-02920-SI,
   2019 U.S. Dist. LEXIS 119272 (N.D. Cal. July 17, 2019)..........................25

*Capital Cities Commc'ns, Inc. v. FCC,*
   554 F.2d 1135 (D.C. Cir. 1976) .................................................................16

*Carter v. Amtrak,*
   No. CV 18-9652 PSG (JCx),
   2020 U.S. Dist. LEXIS 87323 (C.D. Cal. Jan. 24, 2020) ............................24

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986) ..................................................................................... 8

OPPOSITION TO DEFENDANTS' NOTICE OF
MOTION AND MOTION FOR SUMMARY
JUDGMENT OR, IN THE ALTERNATIVE, FOR
PARTIAL SUMMARY JUDGMENT

*Ching v. Mayorkas,*
    725 F.3d 1149 (9th Cir. 2013) .......................................................................... 21

*Citizens Allied for Integrity & Accountability, Inc. v. Schultz,*
    No. 1:17-cv-00264-BLW,
    2019 U.S. Dist. LEXIS 16777 (D. Idaho Feb. 1, 2019) ................................ 21

*Concialdi v. Jacobs Eng'g Grp.,*
    No. CV 17-1068 FMO (GJSx),
    2019 U.S. Dist. LEXIS 128041 (C.D. Cal. Apr. 29, 2019) ..................... 22, 23

*Ctc Glob. Corp. v. Huang,*
    No. SACV 17-02202 AG (KESx),
    2019 U.S. Dist. LEXIS 156886 (C.D. Cal. July 29, 2019) ............................. 9

*DCR Mktg. Inc. v. United States All. Grp., Inc.,*
    No. SACV 19-1897 JVS (DFMx),
    2021 U.S. Dist. LEXIS 35028 (C.D. Cal. Jan. 13, 2021) ............................. 19

*Dollar Tree Stores Inc. v. Toyama Partners LLC,*
    875 F. Supp. 2d 1058 (N.D. Cal. 2012) ........................................................... 9

*Egan v. Mutual Omaha Ins. Co.,*
    24 Cal.3d 809 (1979) ...................................................................................... 23

*Everest Inv'rs 8 v. McNeil Partners,*
    114 Cal. App. 4th 411 (2003) ........................................................................... 9

*Exec. Sec. Mgmt. v. Dahl,*
    830 F. Supp. 2d 883 (C.D. Cal. 2011) ........................................................... 19

*Farmers Ins. Exchange v. Zerin,*
    53 Cal. App. 4th 445 (1997) ........................................................................... 19

*FDIC v. Hawker,*
    No. CV F 12-0127 LJO DLB,
    2012 U.S. Dist. LEXIS 79320 (E.D. Cal. June 6, 2012) ............................... 11

*Fed. Deposit Ins. Co. v. Faigin,*
    No. CV 12-03448 DDP (CWx),
    2013 U.S. Dist. LEXIS 94899 (C.D. Cal. July 8, 2013) ............................... 11

*Ferretti v. Pfizer Inc.,*
    No. 11-CV-04486,
    2013 U.S. Dist. LEXIS 4730 (N.D. Cal. Jan. 10, 2013) ............................... 24

*Freyr Holdings, LLC v. Legacy Life Advisors, LLC,*
    No. CV 10-9446 GAF (Ex),
    2012 U.S. Dist. LEXIS 199813 (C.D. Cal. June 12, 2012) .......................... 22

OPPOSITION TO DEFENDANTS' NOTICE OF
MOTION AND MOTION FOR SUMMARY
JUDGMENT OR, IN THE ALTERNATIVE, FOR
PARTIAL SUMMARY JUDGMENT

*Harmelin v. Michigan,*
    501 U.S. 957 (1991) ...................................................................... 18

*Harvey v. The Landing Homeowners Ass'n,*
    162 Cal. App. 4th 809 (2008) ......................................................... 9

*Hesghiaian v. Bank of Am., N.A.,*
    No. CV 18-10458 PA (AFMx),
    2019 U.S. Dist. LEXIS 124508 (C.D. Cal. May 31, 2019) ............. 8

*Hobbs v. Bateman Eichler, Hill Richards,*
    164 Cal. App. 3d 174 (1985) ......................................................... 23

*Huff v. L.A. Cty. Sheriffs Dep't,*
    No. CV 16-01733-AB (AGRx),
    2017 U.S. Dist. LEXIS 224577 (C.D. Cal. Dec. 8, 2017) ............. 25

*In re Dixon's Estate,*
    143 Cal. 511 (1904) ....................................................................... 20

*In re Marriage of Prentis-Margulis & Margulis,*
    198 Cal. App. 4th 1252 (2011) ....................................................... 9

*In re Walt Disney Co. Derivative Litig.,*
    907 A.2d 693 (Del. Ch. 2005) ....................................................... 18

*Interstate Restoration, LLC v. Seaman,*
    No. SACV 13-00706 DOC(RNBx),
    2014 U.S. Dist. LEXIS 199667 (C.D. Cal. July 9, 2014) .............. 24

*Invisible Dot, Inc. v. Dedecker,*
    No. CV 18-08168-RGK (RAOx),
    2019 U.S. Dist. LEXIS 222446 (C.D. Cal. Oct. 11, 2019) .............. 9

*Jackson v. Calone,*
    No. 2:16-cv-00891-TLN-KJN,
    2019 U.S. Dist. LEXIS 169388 (E.D. Cal. Sep. 30, 2019) ........... 18

*Jacobson v. Hannifin,*
    627 F.2d 177 (9th Cir. 1980) ......................................................... 21

*Johnson v. HSBC Bank USA,*
    No. 3:11-cv-2091-JM-WVG,
    2012 U.S. Dist. LEXIS 36798 (S.D. Cal. Mar. 19, 2012) ............. 23

*Johnson v. Poway Unified School Dist.,*
    658 F.3d 954 (9th Cir. 2011) ........................................................... 8

*Lincoln Nat'l Life Ins. Co. v. McClendon,*
    230 F. Supp. 3d 1180 (C.D. Cal. 2017) ......................................... 22

iv

*Lowe v. SEC*
        472 U.S. 181 (1985) ........................................................................15

*Lyles v. City of Huntington Park,*
        No. CV 16-3223-GW (KSx),
        2016 U.S. Dist. LEXIS 187694 (C.D. Cal. July 7, 2016) ...........................21

*Mack v. Universal Truckload, LLC,*
        No. 5:19-cv-02363-RGK-SP,
        2020 U.S. Dist. LEXIS 248159 (C.D. Cal. Dec. 18, 2020) ......................24

*Madrigal v. Allstate Indem. Co.,*
        No. CV 14-4242 SS,
        2015 U.S. Dist. LEXIS 193784 (C.D. Cal. Sep. 30, 2015)..........................24

*Mains v. City Title Ins. Co.,*
        34 Cal. 2d 580 (1949)........................................................................22

*Mihara v. Dean Witter & Co.,*
        619 F.2d 814 (9th Cir. 1980)..............................................................25

*Monterey Bay Military Hous., LLC v. Pinnacle Monterey LLC,*
        116 F. Supp. 3d 1010 (N.D. Cal. 2015) ..........................................18

*Nissan Fire & Marine Ins. Co. v. Fritz Cos.,*
        210 F.3d 1099 (9th Cir. 2000) ............................................................8

*O'Neal v. Stanislaus Cty. Emps.' Ret. Ass'n,*
        8 Cal. App. 5th 1184 (2017)................................................9, 10, 17

*Oates v. City of Lincoln,*
        93 Cal. App. 4th 25 (2001)...................................................................9

*Palm Springs Villas II Homeowners Ass'n, Inc. v. Parth,*
        248 Cal. App. 4th 268 (2016).............................................................10

*Parmeter v. Am. Fed'n of Musicians of the United States & Canada,*
        No. CV 07-07225 MMM (SSx),
        2009 U.S. Dist. LEXIS 138835 (C.D. Cal. May 21, 2009) ......................14

*PCO, Inc. v. Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP,*
        150 Cal. App. 4th 384 (2007)..............................................................19

*Pegues v. Raytheon Space & Airborne Sys.,*
        No. 2:17-cv-05420 DSF (GJSx),
        2018 U.S. Dist. LEXIS 225463 (C.D. Cal. Dec. 3, 2018) ......................22

*Plyam v. Precision Dev., LLC (In re Plyam),*
        530 B.R. 456 (B.A.P. 9th Cir. 2015)...................................................23

OPPOSITION TO DEFENDANTS' NOTICE OF
MOTION AND MOTION FOR SUMMARY
JUDGMENT OR, IN THE ALTERNATIVE, FOR
PARTIAL SUMMARY JUDGMENT

*Receivables Exch., LLC v. TR Music Grp.,*
    No. CV 14-9219 DSF (FFMx),
    2016 U.S. Dist. LEXIS 183835 (C.D. Cal. Mar. 16, 2016) ..........................23

*San Luis & Delta-Mendota Water Auth. v. United States DOI,*
    No. 1:11-cv-00952 LJO GSA,
    2015 U.S. Dist. LEXIS 24970 (E.D. Cal. Mar. 2, 2015) ..............................20

*Sanchez v. Barr,*
    919 F.3d 1193 (9th Cir. 2019) ......................................................................18

*Seafarers Int'l Union v. United States Coast Guard,*
    84, 81 F.3d 179 (D.C. Cir. 1996) .................................................................16

*Shaterian v. Wells Fargo Bank, N.A.,*
    829 F. Supp. 2d 873 (N.D. Cal. 2011) .........................................................23

*Solon v. Lichtenstein,*
    39 Cal. 2d 75 (1952)........................................................................................9

*SoundExchange, Inc. v. Librarian of Cong.,*
    571 F.3d 1220 (2009) ....................................................................................16

*Stanley v. Richmond,*
    35 Cal. App. 4th 1070 (1995)..........................................................................9

*Steele v. United States,*
    159 F. Supp. 3d 73 (D.D.C. 2016) ...............................................................16

*Stephens v. National Distillers & Chem. Corp.,*
    91 Civ. 2901 (JSM), 91 Civ. 2902 (JSM),
    1996 U.S. Dist. LEXIS 6915 (S.D.N.Y. May 20, 1996)...............................11

*T.W. Elec. Serv. V. Pacific Elec. Contractors Ass'n,*
    809 F.2d 626 (9th Cir. 1987)...........................................................................8

*Thomas v. Network Sols.,*
    176 F.3d 500 (1999) ......................................................................................16

*Town of Castle Rock v. Gonzales,*
    545 U.S. 748 (2005) ......................................................................................21

*Tribeca Companies, LLC v. First Am. Title Ins. Co.,*
    239 Cal. App. 4th 1088 (2015)........................................................................9

*Tufenkian v. Tirakian,*
    2020 NY Slip Op 30697(U), ¶ 19 (2020).....................................................11

*United States v. Jensen,*
    705 F.3d 976 (9th Cir. 2013)........................................................................20

vi                OPPOSITION TO DEFENDANTS' NOTICE OF
                  MOTION AND MOTION FOR SUMMARY
                  JUDGMENT OR, IN THE ALTERNATIVE, FOR
                  PARTIAL SUMMARY JUDGMENT

*Van de Kamp v. Bank of America,*
      204 Cal. App. 3d 819 (1988)............................................................9

*Wedges/Ledges of Cal. v. City of Phx.,*
      24 F.3d 56 (9th Cir. 1994).............................................................21

*Wilkinson v. Torres,*
      610 F.3d 546 (9th Cir. 2010)...........................................................1

**Statutes**

17 U.S.C. § 114(g)(2)(B)-(C) .................................................................16

17 U.S.C. § 114(g)(3) ....................................................................10, 19

31 U.S.C. § 9701.............................................................................16

Cal. Corp. Code § 309 .......................................................................11

Cal. Prob. Code § 859 .......................................................................18

Cal. Prob. Code § 16002(a) .................................................................18

Cal. Prob. Code § 16004(a) .................................................................18

Cal. Prob. Code § 16040 (a) ................................................................18

Cal. Prob. Code § 16400.....................................................................18

**Rules**

Fed. R. Civ. Proc. 56(a) .....................................................................8

**Secondary Sources**

Rest. 3d of Trusts § 29......................................................................20

Rest. 3d of Trusts § 78 cmt. c(2) ...........................................................17

SBA's Imposition of Oversight Review Fees,,
      2004 U.S. Comp. Gen. LEXIS 13 (2004) ...............................................16

OPPOSITION TO DEFENDANTS' NOTICE OF
MOTION AND MOTION FOR SUMMARY
JUDGMENT OR, IN THE ALTERNATIVE, FOR
PARTIAL SUMMARY JUDGMENT

## I.   __INTRODUCTION__

"[A] sanitized version of the incident cannot control on summary judgment when the record as a whole does not support that version." *Wilkinson v. Torres*, 610 F.3d 546, 551 (9th Cir. 2010). Virtually every "uncontested fact" relied upon in Defendants' Motion for Summary Judgment (ECF No. 103) ("MSJ") is not only contested by Plaintiff, but flatly contradicted by the evidentiary record in this case. Furthermore, Defendants have recycled numerous legal arguments already rejected by the Court in disposing Defendants' Motion to Dismiss (ECF No. 18) ("MTD"), while doing nothing to breathe any new life into them. *See Baird v. BlackRock Institutional Tr. Co., N.A.*, No. 17-cv-01892-HSG, 2021 U.S. Dist. LEXIS 35973, at *4 (N.D. Cal. Jan. 28, 2021) (rejecting argument in motion for summary judgment "already addressed by the Court in its order on Defendant's motion to dismiss").

What the undisputed evidence in this case actually demonstrates is that the Services Agreement at the heart of this case between the Unions (AFM and SAG-AFTRA) and the Fund is a pure contrivance. It has no purpose beyond conferring an unearned, unwarranted, and unlawful windfall upon the Unions at the expense of the Fund's beneficiaries (whose royalties are perpetually garnished 3%) in exchange for information of, at best, specious significance to the Fund's operations. Indeed, the Fund has paid the Unions more than $10 million to date for their "mission critical" documents that, by Defendants' own admission, have been utilized to successfully identify a beneficiary on fewer than 8% of tracks in the Fund's catalog. Defendants' reverential descriptions of the Unions' information are performative and merely intended to insinuate that no price would be too high to pay for access to it.

Defendants, however, have never been arms-length negotiators for purposes of assessing the value of the Unions' information. They are tax-exempt nonprofits with fiduciary duties to act in the best interests of their beneficiaries. The Unions had no justification for withholding their information (which would harm their members) simply because a non-member may occasionally benefit from it, and the Trustees had

OPPOSITION TO DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT

no justification for simply giving away *millions* in Fund beneficiaries' royalties for information the Unions could not justifiably withhold. The "negotiation" between the Unions and the Trustees for the Services Agreement was, in fact, simply an intra-Union conspiracy, as every last Trustee was a Union figurehead, the Unions' attorney papered both sides of the deal, and the fee chosen had no relationship whatsoever to the "reasonable cost" – the metric mandated by federal statute in this case – to obtain the information being provided. The Service Fee is facially unreasonable and admitted to lack any evidence base. It was, and still is, simply being used as a slush fund to prop up the AFM's precarious financials. Defendants are not entitled to so conscript the beneficiaries' royalties, nor to secure summary judgment via whitewashing. This matter is rife with genuine factual disputes as to every last argument presented by Defendants, and the law requires that Plaintiff's facts be accepted at this time.

## II.   **STATEMENT OF FACTS**

The AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund (the "Fund") is an I.R.C. §501(c)(6) nonprofit organization created pursuant to 17 U.S.C. § 114 to receive and distribute royalties to non-featured performers on digitally transmitted sound recordings –, 2.5% each to nonfeatured musicians and vocalists. (Plaintiff's Statement of Undisputed Facts ["PUMF"] ¶ 1). The American Federation of Musicians ("AFM") and Screen Actors Guild-American Federation of Television and Radio Artists ("SAG-AFTRA") are the nonprofit Unions designated to establish and maintain the Fund, which they did pursuant to an Agreement and Declaration of Trust established in 1998 and updated in 2013 (the "Trust Agreement"). (PUMF ¶ 2). Pursuant to the Trust Agreement, the Fund is managed by a board of six Trustees, comprised of an apex officer, lower level officer, and rank-and-file member of each Union. (PUMF ¶ 3). During the time period relevant to this case, this included:

- Ray Hair, AFM President;
- Duncan Crabtree-Ireland, SAG-AFTRA General Counsel and COO;
- Tino Gagliardi, AFM International Executive Board member;

OPPOSITION TO DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT

- Stefanie Taub, former SAG-AFTRA director and currently Fund CEO;
- Bruce Bouton, former AFM Local 257 executive; and
- Jon Joyce, former SAG-AFTRA National Board member.

Art. IV, § 3, N, of the Trust Agreement requires the Trustees to "to accomplish the general objective of distributing remuneration to eligible artists *in the most efficient and economical manner*" (emphasis added) (PUMF ¶ 4), as they are bound by the strictures of general nonprofit law, which holds them to the standard of fiduciaries.[1]

The Fund's work consists of researching the identities of nonfeatured performers to whom royalties are owed under Section 114. (PUMF ¶ 5). The Fund maintains its own staff of researchers to accomplish this task, and said researchers consult a wide variety of informational sources to ascertain the proper royalty recipients on any given track. (PUMF ¶ 6). As part of their work for their dues-paying members, however, each Union maintains two sources of data relevant to the Fund's operations: session reports (or "B-forms") that reflect identities of performers present at a given Union-ran recording session, which are collected and maintained to ensure their members are paid for such session work,[2] and databases containing contact and marketing information for the Unions' respective membership rolls, including last known addresses. (PUMF ¶ 7). As the foregoing information is maintained in the ordinary course of the Unions' operations (PUMF ¶¶ 8,21), they incur no incremental costs to collect it for the Fund and (at most) *de minimis* costs in providing it to the Fund.[3] Indeed, the Unions send copies of the exact same reports at no charge to their

---

[1] The Trustees owe the beneficiaries of the Fund a duty of loyalty, a duty of impartiality and duties of prudence diligence and good faith. (ECF No. 18.)

[2] The Unions receive payments for the covered recordings and cut checks to the appropriate performers listed on the corresponding session reports. (PUMF ¶ 17).

[3] SAG-AFTRA has identified three individuals responsible for handling all Fund requests, spending approximately 372 hours a year on such work for a total cost (based on their prorated salaries) of $13,650.92. (PUMF ¶ 9). Three of four of the largest (footnote continued)

3

1   pension funds (PUMF ¶¶ 18-19), as well as to record labels. (PUMF ¶ 20).

2          For the first 15 years of the Fund's existence, the Unions provided the foregoing

3   session reports and membership information (the "Data") to the Fund *gratis* and have

4   identified no operational detriments they incurred in doing so. (PUMF ¶ 11). Indeed,

5   given that the Unions' core mission is to assist their memberships in obtaining

6   revenues owed (PUMF ¶ 12), it is inconceivable that the Unions would ever hold this

7   information hostage without violating fundamental duties to their memberships.

8          Nevertheless, with the passage of time and the dawn of the current era of digital

9   streaming, the corpus of the Fund began to swell by orders of magnitude, and although

10  the Unions could not identify a significant increase in the overall amount of work

11  required of them to assist the Fund (e.g., they hired no new personnel to handle the

12  increase and still require only a handful of hours per month from their employees to

13  respond to requests), Mr. Hair became intent on rerouting this revenue back to the

14  Unions. (PUMF ¶ 14). This was ultimately accomplished via a 3% "Service Fee" for

15  the Data, which Defendants justified under Section 114(g)(3)'s allowance for the

16  Fund to "deduct from any of its receipts … the reasonable costs of such collective

17  incurred … in [] the administration of the collection, distribution, and calculation of

18  the royalties" and implemented by the 2013 Data Purchase and Services Agreement

19  (the "Services Agreement") between the Unions and Fund. (PUMF ¶¶ 15-16).

20         The Services Agreement implicates at least three major liabilities:

21         ***First,*** the process by which the Services Agreement was enacted is rife with

22  conflicts of interest. In or around 2007, Mr. Hair's predecessor at both AFM and the

23  Fund, Thomas Lee, asked AFM's longtime lawyer, Patricia Polach (who had been

24  tasked to serve as outside counsel to the Fund), if the AFM could justify collecting a

25  _____

26  AFM locals employ computerized databases that the Fund can access directly to pull

27  this information, the only hands-on work requiring 15-20 hours per year, while the

    Nashville local spends 2-3 hours of work per week on Fund requests. Based on their

28  salaries, this is a cost of $560 per year to the local AFM chapters. (PUMF ¶ 10).

OPPOSITION TO DEFENDANTS' NOTICE OF
MOTION AND MOTION FOR SUMMARY
JUDGMENT OR, IN THE ALTERNATIVE, FOR
PARTIAL SUMMARY JUDGMENT

percentage fee from the Fund's distributions. (PUMF ¶¶ 22, 24). Ms. Polach, who had drafted the Trust Agreement and regularly attended the Trustee meetings (PUMF ¶ 23), informed Mr. Lee that such would not be legal. (PUMF ¶ 24). Once Mr. Hair assumed Mr. Lee's role as President of AFM, however, he informed Fund CEO Dennis Dreith that "it was unfair" the Unions were not compensated for having lobbied to establish the Fund. (PUMF ¶¶ 13, 25-26). Mr. Hair resented the fact that the Fund "had all these resources… yet the AFM was going through a lot of financial difficulties and didn't have the money," and given the fact that "the Fund had all this money, [Mr. Hair] felt that he should have some of it." (PUMF ¶ 26). So, abusing his power as a Trustee, Mr. Hair simply took the money that he felt was his.[4]

Shortly after an explosive conversation between Mr. Dreith and Mr. Hair on the matter, Mr. Dreith received a call from Ms. Polach informing him that Mssrs. Hair and Crabtree-Ireland had unilaterally directed her to implement the Service Fee over his concerns. (PUMF ¶¶ 28-29). Jenner & Block was then enlisted to draft the Services Agreement, tying the Service Fee to deliverables the Unions were already providing the Fund for free. (PUMF ¶ 30). As Mr. Dreith recognized that protesting the Service Fee further would simply lead to his termination, he instead focused on minimizing its impact to the Fund's beneficiaries, chiefly by convincing Mssrs. Hair and Crabtree-Ireland to reduce the initial proposal of a 10% fee to 3%. (PUMF ¶¶ 31-32).

No Trustees but Mssrs. Hair and Crabtree-Ireland had any input on the Services Agreement. (PUMF ¶ 33). Indeed, the other Trustees only learned of its existence two business days before having to vote on it, when they were provided with a nondescript agenda item, "AFM & SAG-AFTRA Services Fees," that lacked any explanatory detail, much less an actual draft to review. (PUMF ¶ 34). The meeting itself lasted only 2.5 hours instead of the typical full workday despite including several other

---

[4] Defendant Hair's 30(b)(6) testimony confirmed that the Service Fee comprises the largest part of AFM's net revenue after membership dues. (PUMF ¶ 27).

OPPOSITION TO DEFENDANTS' NOTICE OF
MOTION AND MOTION FOR SUMMARY
JUDGMENT OR, IN THE ALTERNATIVE, FOR
PARTIAL SUMMARY JUDGMENT

major items for discussion, such as the purchase of a $9.9 million office building and parking lot, the Fund's 2014 budget, future distributions and collections, and a closed session discussion with the Fund's administrator. (PUMF ¶ 35). Trustees Taub, Joyce, and Bouton testified that they were not involved in fixing the measure of the Service Fee at 3%. (PUMF ¶¶ 36-38). None of the Trustees reviewed the Services Agreement prior to approving it.[5] As Mr. Bouton put it, they "basically showed up at the meeting" and "had to approve or disapprove" of the proposal on the spot. (PUMF ¶ 38).[6]

The foregoing is readily explained by the lack of true independence on the part of non-apex Trustees, all of whom are hand-selected by top Union leadership and serve "at the pleasure of the president," meaning they may be removed at any time. (PUMF ¶ 39). In fact, the two Union heads wield so much power in the Fund that they have declared themselves Co-Chairs of the Board, requiring all information and data to flow through them despite having no written authority to do so. (PUMF ¶ 40). No disclosures were ever made regarding the Trustees' conflicting loyalties borne of their (often extremely powerful) Union positions (PUMF ¶ 41), suppressing consideration of same during the vote on the Services Agreement. (PUMF ¶ 42). Mr. Crabtree-Ireland is the only party who claims to have recognized the conflict and recused himself from the vote accordingly (PUMF ¶ 43), though no other Trustee recalls this alleged recusal (PUMF ¶ 44) and none is reflected in the minutes (PUMF ¶ 45).

---

[5] Nor did Ms. Taub attempt to evaluate of the reasonable cost of the services being provided thereunder despite her position as the national manager of SAG-AFTRA's Sound Recordings division granting her unique insight into the level of time and effort that was expended by SAG-AFTRA employees on such services. (PUMF ¶ 36).

[6] To the extent any Trustee was aware of the basis for a 3% fee, they knew it was (1) a compromise figure lower than what Mr. Hair had initially proposed, and (b) only capped by the specter of foreign CMO scrutiny raised by Mr. Dreith. It had no basis in the very modest augmented costs put forth by the Unions, as the Data is maintained primarily for Union business and the overhead calculation for employees who respond to Fund requests is less than $20,000. (PUMF ¶ 50). In other words, the only evidence in the record paints the Service Fee's structure and amount as a contrivance.

OPPOSITION TO DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT

***Second,*** the record contains no evidence the Trustees ever considered if the cost or value of the Services Agreement was commensurate with the Service Fee, if the Unions' deliverables could be obtained in whole or part from other vendors at a lower cost, if the propriety of the Service Fee would diminish as distributions increased, or if it would be prudent to consider a mechanism to periodically reevaluate the terms of the Services Agreement. (PUMF ¶ 46). No cost or time and materials study was ever considered to determine the fee's propriety, nor the time or cost of providing the Data to the Fund. (PUMF ¶ 47). This is despite Mr. Crabtree-Ireland testifying that the intent of the Service Fee was to recoup the costs of servicing the Fund, not to turn a profit. (PUMF ¶ 80). The Fund's former Harvard Business School-educated CFO, Jennifer LeBlanc, who has no long-standing allegiances to the Unions, testified that the Service Fee's structure is "not the way a businessperson would [do it]," has "no foundation," and "at a minimum … should have been thought about from an analytical perspective, about what are the services provided, and how can you have a greater alignment between those services and the value of those services." (PUMF ¶ 48). Asked whether the 3% fee was justified, Ms. LeBlanc said "no." (PUMF ¶ 49)

***Third,*** the Unions misrepresent the uniqueness of the Data by conflating the session reports and membership rolls. (PUMF ¶ 54). Beneficiary contact information is shored up through the Fund's inexpensive subscription to LexisNexis (PUMF ¶ 55), while session information is available via many public sources, including AllMusic, Discogs, liner notes, and self-claiming by beneficiaries (which is the only reason the Fund knew to pay Plaintiff Risto). (PUMF ¶¶ 56-57). Indeed, <u>even the Unions' crown jewel, their session reports, are available from other entities</u>, including the record labels, pension funds, Film Musicians Secondary Markets Fund, and SAG-AFTRA & Industry Sound Recordings Distribution Fund, all of which receive them <u>for free</u>, and none of which were investigated by the Trustees prior to approving the Services Agreement. (PUMF ¶¶ 18, 20, 58). Given that the pension funds have previously sold the Fund session information at the negligible cost of $7 per report (PUMF ¶ 59),

OPPOSITION TO DEFENDANTS' NOTICE OF
MOTION AND MOTION FOR SUMMARY
JUDGMENT OR, IN THE ALTERNATIVE, FOR
PARTIAL SUMMARY JUDGMENT

crosschecking the Fund's *entire database* would cost the Fund only $952,000, or less than 10% of the $10,229,756 paid out to the Unions to date. (PUMF ¶ 60).

## III.  LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to *any* material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(a) (emphasis added). Defendants bear the initial burden of demonstrating that no facts exist to support one or more essential elements as to each of Plaintiff's claims, even viewed in the light most favorable to Plaintiff and with all justifiable inferences drawn in his favor. *Hesghiaian v. Bank of Am*., N.A., No. CV 18-10458 PA (AFMx), 2019 U.S. Dist. LEXIS 124508, at *3 (C.D. Cal. May 31, 2019) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)); *Johnson v. Poway Unified School Dist*., 658 F.3d 954, 960 (9th Cir. 2011). "If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos*., 210 F.3d 1099, 1102-03 (9th Cir. 2000).

Plaintiff may defeat Defendants' showing by identifying any facts that create a genuine dispute for trial on the challenged claims. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986). Plaintiff need not establish that he will prevail on these disputes, as the Court does not make credibility determinations or weigh conflicting evidence. *T.W. Elec. Serv. V. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987). Rather, Plaintiff must simply show that the matters "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Id.* at 630.

## IV.  ANALYSIS OF DISPUTED CLAIMS

### A. Breach of Fiduciaty Duty

#### 1. Legal Standard

Under California law, the elements for breach of fiduciary duty are: "(1) existence of a fiduciary duty; (2) breach of the fiduciary duty; and (3) damage proximately caused by the breach." *Stanley v. Richmond*, 35 Cal. App. 4th 1070, 1086

(1995). The claim can be based upon either negligence or fraud. *Tribeca Companies, LLC v. First Am. Title Ins. Co*., 239 Cal. App. 4th 1088, 1114 (2015). "Whether a breach of fiduciary duty or duty of loyalty occurs under a specific set of facts is 'mainly for the trier of facts.'" *Ctc Glob. Corp. v. Huang*, No. SACV 17-02202 AG (KESx), 2019 U.S. Dist. LEXIS 156886, at *22 (C.D. Cal. July 29, 2019) (quoting *O'Neal v. Stanislaus Cty. Emps.' Ret. Ass'n*, 8 Cal. App. 5th 1184, 1215 (2017)).

As fiduciaries, Defendants bear the burden of establishing the propriety of their challenged conduct and affirmatively disproving any breach of their duties. *See, e.g., Solon v. Lichtenstein*, 39 Cal. 2d 75, 81 (1952); *Everest Inv'rs 8 v. McNeil Partners*, 114 Cal. App. 4th 411, 424 (2003); *Oates v. City of Lincoln*, 93 Cal. App. 4th 25, 35 (2001); *Van de Kamp v. Bank of America,* 204 Cal. App. 3d 819, 853 (1988). This is particularly so where they have the best access to the data relevant to the dispute. *See In re Marriage of Prentis-Margulis & Margulis*, 198 Cal. App. 4th 1252, 1267-68 (2011). Thus, Defendants' motion may only be granted if the circumstances do not permit *any* reasonable doubt as to whether Defendants' conduct violates the degree of care exacted of them. *Invisible Dot, Inc. v. Dedecker*, No. CV 18-08168-RGK (RAOx), 2019 U.S. Dist. LEXIS 222446, at *22 (C.D. Cal. Oct. 11, 2019) (citing *Harvey v. The Landing Homeowners Ass'n*, 162 Cal. App. 4th 809, 822 (2008)).

Summary judgment regarding a breach of fiduciary duty claim is particularly inappropriate where Defendants dispute the breach on a primarily factual basis. *See, e.g., Avocados Plus, Inc. v. Freska Produce Int'l LLC*, No. CV 06-896-RGK (JTLx), 2007 U.S. Dist. LEXIS 96848, at *17-18 (C.D. Cal. Jan. 26, 2007) ("Defendants contend that, as a matter of law, Clevenger did not breach any duty. However, Defendants' arguments are based entirely on the factual dispute at the core of this action. […] All of these facts may well be true, but since FDI has provided evidence raising disputes over these issues, they must be established by a jury."); *Dollar Tree Stores Inc. v. Toyama Partners LLC*, 875 F. Supp. 2d 1058, 1084 n.11 (N.D. Cal. 2012) (fiduciary's factual argument that his conduct was "entirely proper," despite

OPPOSITION TO DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT

1  having has "some force," did not permit summary judgment on the issue).[7]

2        2.  <u>Defendants' Negotiation of the Services Agreement Was Defective</u>

3        Defendants have argued that the propriety of the Service Agreement is

4  supported by both the Copyright Act and Trust Agreement. MSJ at 9:3-16. However,

5  Plaintiff has never disputed that the Copyright Act and – to the extent it comports with

6  the Copyright Act and general fiduciary law – the Trust Agreement permit the Fund

7  to deduct costs from the royalties it collects, only that such costs must be *reasonable.*

8  17 U.S.C. § 114(g)(3). Defendants' one-sided recounting of the Service Agreement's

9  genesis (MSJ at 9:17-10:13) completely fails to explain how the Service Fee was

10  found to reflect the "reasonable cost" of the Services Agreement rather than simply

11  the most that could be skimmed without arousing immediate suspicion. In truth, the

12  Service Fee was negotiated solely by Mssrs. Hair and Crabtree-Ireland working

13  backwards from the desire to obtain an equity stake in the Fund's distributions, Mr.

14  Dreith only being approached in a *post hoc* attempt to justify the scheme. The 3% fee

15  was not based on the cost or value of the services (*i.e.*, whether said amount was

16  reasonable), but rather on an extracted representation from Mr. Dreith that any greater

17  amount would cause financial problems for the Fund. (PUMF ¶ 32). All parties knew

18  that Mr. Dreith was powerless to stop the Trustees from implementing the Service

19  Fee, as the Trustees exercised complete dominion over the operations of the Fund and

20  could terminate Mr. Dreith at will. (PUMF ¶ 61). His involvement, much like that of

21  Ms. Polach, was window dressing for an arrangement contrived first and foremost to

22  benefit the Unions. There was no attempt by other Trustees to question or investigate

23

24  _____

25  [7] *See also O'Neal*, 8 Cal. App. 5th at 1221-22 ("Although many facts detailing the disputed conduct are not in dispute, there remain material issues of fact whether the

26  resulting conduct violated the constitutionally mandated fiduciary duty of loyalty the board owed…."); *Palm Springs Villas II Homeowners Ass'n, Inc. v. Parth*, 248 Cal.

27  App. 4th 268, 283 (2016) (reversing grant of summary judgment where "material issues of fact exist as to whether [a fiduciary] exercised reasonable diligence").

28

OPPOSITION TO DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT

1   the parameters of the Services Agreement. (PUMF ¶¶ 36- 38). Defendants' suggestion

2   that this lack of inquiry somehow *supports* their case is frankly inexplicable.

3        Additionally, Defendants' entitlement to rely on Mr. Dreith's opinions requires

4   that they have done so "in good faith, after reasonable inquiry when the need therefor

5   is indicated by the circumstances and without knowledge that would cause such

6   reliance to be unwarranted." *Fed. Deposit Ins. Co. v. Faigin*, No. CV 12-03448 DDP

7   (CWx), 2013 U.S. Dist. LEXIS 94899, at *26 (C.D. Cal. July 8, 2013) (quoting Cal.

8   Corp. Code § 309); *accord Stephens v. National Distillers & Chem. Corp.,* 91 Civ.

9   2901 (JSM), 91 Civ. 2902 (JSM) 1996 U.S. Dist. LEXIS 6915, at *19 (S.D.N.Y. May

10  20, 1996); *see also Tufenkian v. Tirakian*, 2020 NY Slip Op 30697(U), ¶ 19 (2020)

11  (denying summary judgment on breach of fiduciary duty where "there are issues of

12  fact concerning the degree to which Ms. Tirakian relied, if at all, on the information,

13  opinion, reports, or statements of Mr. Anastasi in performing her duties...").[8]

14       Defendants' coercion of Mr. Dreith's support negates any notion of good faith,

15  reliance. *Id.* Indeed, basic inquiry would have revealed that not a single collective

16  management organization (the Service Fee's supposed benchmark) pay for data

17  (PUMF ¶ 65)[9] – not even SoundExchange, the upstream provider of the royalties

18  distributed by the Fund, and who were surely only a phone call or e-mail away to the

19  Trustees. (PUMF ¶ 66).[10] Defendants did not learn this information because they did

20  not want to confirm that the Service Fee simply had no evidentiary support.[11]

21  _____

22  [8] Additionally, California law requires Mr. Dreith to have been a director rather than
23  an officer to take advantage of this protection. *FDIC v. Hawker,* No. CV F 12-0127
    LJO DLB, 2012 U.S. Dist. LEXIS 79320, at *17-19 (E.D. Cal. June 6, 2012).
24  [9] *See* [Adams Declaration, Ex. 1]
25  [10] *See* [Kessler Declaration, Ex. 1]
26  [11] For example, when Mr. Crabtree-Ireland asked Mr. Dreith in 2017 whether he felt
    the Service Fee had become excessive (PUMF ¶ 70), Mr. Dreith provided a memo
27  confirming that the Service Fee was unjustified from inception for lack of any ties to
    an evidence base, its hypertrophic growth now attracting negative attention (PUMF ¶
28  (footnote continued)

OPPOSITION TO DEFENDANTS' NOTICE OF
                                                MOTION AND MOTION FOR SUMMARY
                                                JUDGMENT OR, IN THE ALTERNATIVE, FOR
                                                PARTIAL SUMMARY JUDGMENT

3.   <u>The Data Provided to the Fund Does Not Support the Service Fee</u>

Unable to meaningfully support the process by which the Services Agreement was reached, Defendants switch to a "no harm, no foul" argument (MSJ at 11:14-21) and spend a majority of their time attempting to prove the Data has "value" (MSJ at 11:22-12:18). This provides no metric by which to evaluate *whether the Service Fee constitutes a "reasonable cost" in exchange for that Data*. The claim that the Data is "essential" to the Fund is an *ipse dixit* supported exclusively by a statistically insignificant and fundamentally flawed "50 song" study, laundered through a Fund employee, that Defendants' own expert admitted was not designed within parameters necessary to "express conclusions using the science of inferential statistic[s]." (PUMF ¶ 74). It relies on a small and seemingly arbitrary sample size, its ordering and selection of tracks following no process likely to produce random, representative samples. *Id*. Defendants' own expert did not seem to understand how the songs were selected, as his explanation of how "largest" was used contradicted information on the very chart he claimed to be analyzing. (PUMF ¶ 75). This renders the study's methodology and conclusions easily manipulated and inherently unreliable.

Because of this, Defendants avoid claiming the songs reviewed are statistically representative and merely suggest they speak to the reasonableness of the fee – but that is a far cry from establishing there to be *no genuine dispute* as to the Service Fee's reasonableness, particularly when comparing amounts paid to results achieved.[12] To wit, is it reasonable that each Union receives the exact same payment despite SAG-AFTRA identifying 60% fewer tracks than AFM? *Id.* Is it reasonable that the Fund

_____

71), and again suggested a move towards incremental costs rather than a percentage stake. (PUMF ¶ 72). The memo was buried and never addressed. (PUMF ¶ 73).

[12] The Fund's database contains approximately 136,000 song titles. (PUMF ¶ 76). 47,650 have been added since the Service Fee's inception. (PUMF ¶ 77). Of those, AFM provided information on 7,395 tracks, SAG-AFTRA on 2,927. (PUMF ¶ 78). Assuming no overlap, the Unions only corroborated 22% of new Fund beneficiaries.

OPPOSITION TO DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT

has paid the Unions $991 per track identified ($10,229,756 for 10,322 tracks), nearly 400% the median amount paid out to artists by the Fund ($248.58), 14,158% more than the $72,254 it would have cost to purchase those same documents from the Unions' health and pension funds at $7 apiece, and 1,072% more than the $952,000 it would have cost them to doublecheck all 136,000 tracks in the Fund's database? (PUMF ¶¶ 50-52, 59-60, 67, 76-78). Even read in the light most favorable to *Defendants* rather than Plaintiff, this study does virtually nothing to support the reasonableness of the Service Fee, let alone place it outside genuine dispute.

Beyond this, Defendants have nothing to support the reasonableness of the Service Fee. The time and effort expended by the Unions in compiling the Data is fully financed by existing membership dues, and Defendants' reliance on it to justify the Service Fee (MSJ at 11:25-28) tacitly admits that the Unions are utilizing the Service Fee to recoup sunk costs not incurred at the Fund's behest. The unproductive labor of the Unions (MSJ at 11:28-12:2) and assertedly unique and essential "value" of the Data (MSJ at 12:2-7)[13] provides no correlative explanation for the amount paid under the Services Agreement and, if the Unions' argument were to be believed, would support a Service Fee of *any* amount being reasonable. The law governing fiduciaries requires so much more than Defendants' manufactured rationalizations.

4. The Data's Value to Non-Union Members is Virtually Nonexistent

Defendants' sole argument for the value of the Data to non-Union members is that, on occasion, a non-Union member *might* participate in a Union recording session and piggyback their way onto a Union session report. (MSJ at 12:19-13:3) Defendants provide no evidence for how often this occurs or how many non-Union beneficiaries are ultimately located thereby, and therefore nothing to substantiate that the benefits conferred are anything more than isolated at best. Indeed, the only data available

---

[13] Data, including session reports which their own 30(b)(6) witness admits are not reliably generated for all covered recording sessions. (PUMF ¶ 53),

OPPOSITION TO DEFENDANTS' NOTICE OF
MOTION AND MOTION FOR SUMMARY
JUDGMENT OR, IN THE ALTERNATIVE, FOR
PARTIAL SUMMARY JUDGMENT

1   demonstrates that 76% of non-Union beneficiaries are *never* located, yet their

2   royalties continued to be garnished for Data worthless to them. (PUMF ¶ 68). As such,

3   the percentage of non-Union beneficiaries (MSJ at 13:4-12) provides no indication

4   for the percentage of such beneficiaries who benefit *from the Data* – yet the Services

5   Agreement requires every last one of them to pay for help most never receive.[14]

6          5.   The Service Fee Is Incompatible With The Unions' Legal Duties

7          Defendants contend that because only a "small fraction" or "small subset" of

8   the Unions' respective membership are Fund beneficiaries, "[t]he Service Fee ensures

9   that the Union members who actually benefit from the Fund's activities are the ones

10  who bear the reasonable costs of the Fund's operations." (MSJ at 13:12-21) Three

11  observations are thus warranted: *First,* Defendants have effectively conceded that the

12  vast majority of the Unions' membership data is worthless to the Fund. *Second,* if it

13  would be unfair to charge the Unions' full membership for benefits only conferred on

14  a small subset thereof, it must be equally unfair to charge the Fund's full beneficiary

15  pool for Data that only benefits a small subset thereof. *Third,* Defendants' argument

16  ignores that the Fund could simply charge relevant Union beneficiaries *directly*

17  through work dues. (PUMF ¶ 69); *Parmeter v. Am. Fed'n of Musicians of the United*

18  *States & Canada,* No. CV 07-07225 MMM (SSx), 2009 U.S. Dist. LEXIS 138835, at

19  *8 (C.D. Cal. May 21, 2009) (explaining concept of work dues). However, this would

20  deny the Unions access to roughly half the Fund's corpus and require membership

21  approval, whereas the Service Fee bypasses informed beneficiary consent entirely.

22         The truth of the matter is that the core mission of the Unions is to assist their

23  members in receiving monies owed, and to claim that simply sending their members'

24  information to the Fund is outside the scope of their representation betrays everything

---

26  [14] Defendants make reference to a generalized benefit conferred by the Unions'
27  "advocacy efforts" (*i.e.*, lobbying) as justifying the Service Fee. (MSJ at 13 n.9,
    PUMF ¶ 13). Nowhere in Section 114(g)(3) is lobbying listed as a reasonable cost
28  that may be deducted from the royalties collected, and Defendants cite to none.

OPPOSITION TO DEFENDANTS' NOTICE OF
     MOTION AND MOTION FOR SUMMARY
     JUDGMENT OR, IN THE ALTERNATIVE, FOR
     PARTIAL SUMMARY JUDGMENT

their respective bylaws proclaim. (PUMF ¶ 12). The Unions have put forth no evidence to substantiate that any increases in their respective workloads assisting the Fund have been anything more than middling (MSJ at 14:7-8; *see* SUF ¶ 65; PUMF ¶ 14), and it is not a defense to observe that Defendants refrained from gouging the Fund until its revenue stream eventually became worth gouging (MSJ at 13:22-14:11). Thus, a genuine dispute remains as to the fundamental propriety of the Service Fee.

6.   Defendants Are Bound By Federal Restrictions On Fund Costs

Defendants wisely do not argue that the costs incurred by the Fund need not be reasonable, as this would render the "*reasonable* costs" restriction of 17 U.S.C. § 114(g)(3) mere surplusage. *See Lowe v. SEC*, 472 U.S. 181, 236 n.53 (1985) ("we must give effect to every word that Congress used in [a] statute"). Instead, they erect a strawman argument, claiming that Plaintiff believes this requires *all* Fund vendors to provide their services at cost. (MSJ at 14:14-26) Defendants' argument is intended to gloss over the unique position the Unions occupy in relation to the Fund – nonprofits appointed by Congress to oversee its operation, with fiduciary obligations to assist its membership and no colorable legal justification for withholding its membership's own Data from the Fund unless a ransom is paid. (PUMF ¶ 11). Yet the Unions solely analogize themselves to for-profit businesses such retailers, utilities, and data brokers (MSJ at 14:27-15:18), ignoring that even data brokers such as LexisNexis – the closest commercial analog to what is offered under the Services Agreement – do not structure their fees on a percentage-of-revenue basis. (PUMF ¶ 55). As explained by the COO of SoundExchange, which also labors under Section 114(g)(3), Defendants' argument "is infected by [their] failure to recognize how the strictures of a non-profit venture fundamentally realign the considerations animating any vendor contract negotiation." (Kessler Decl., Ex. 1) The Unions cannot have it both ways – either they are in the business of data brokerage and no longer nonprofits, or the Services Agreement is substantially related to their exempt purpose and activity they would be expected to incur regardless of compensation from the Fund. Simply

15

put, the Fund had leverage, but the Trustees purposefully refused to use it because their ultimate loyalties lay with the Unions rather than Plaintiff and the Class.

Defendants also attempt to extricate the Fund from the strictures of the Independent Offices Appropriation Act ("IOAA"), 31 U.S.C. § 9701, by emphasizing that it is not a federal agency (MSJ at 15:19-16), yet they admit that the IOAA binds non-governmental entities tasked with performing a federal agency's statutory duty. (MSJ at 16 n.12) The Copyright Royalty Judges are just such an agency, tasked by the Librarian of Congress to administer copyright royalties. *SoundExchange, Inc. v. Librarian of Cong.,* 571 F.3d 1220, 1222 (2009). The Fund, in turn, is tasked with facilitating this royalty distribution as to non-featured performers. 17 U.S.C. § 114(g)(2)(B)-(C). It cannot escape the IOAA by hiring the Unions to perform those duties. *Thomas v. Network Sols*., 176 F.3d 500, 510 (1999). The Service Fee, as a charge imposed against the Fund's beneficiaries, must therefore "bear a reasonable relationship to the cost of the services rendered…" *Capital Cities Commc'ns, Inc. v. FCC*, 554 F.2d 1135, 1138 (D.C. Cir. 1976). Critically, it cannot be based on the "intrinsic value" of the services, as Defendants have done. *See Seafarers Int'l Union v. United States Coast Guard*, 84, 81 F.3d 179, 185 (D.C. Cir. 1996) ("the measure of fees is the cost … of providing the service, not the intrinsic value of the service to the recipient"); a*ccord Steele v. United States*, 159 F. Supp. 3d 73, 82-83 (D.D.C. 2016).[15] This is yet another reason why the Service Fee fails to comport with the law.

7. <u>The Trustees Were Mired In Uncured Conflicts of Interests</u>

Defendants' final defense of the Services Agreement's propriety is to entirely whitewash the myriad conflicts and improprieties that were overlooked to implement

---

[15] Defendants' argument that the IOAA only applies to "money 'bound for the federal treasury'" (MSJ at 16:9) ignores that 31 U.S.C. § 3302 (the source of this purported requirement) only applies *where there is no statutory authorization to retain and use said fees*. SBA's Imposition of Oversight Review Fees, 2004 U.S. Comp. Gen. LEXIS 13, *8-9 (2004). 17 U.S.C. § 114(g)(3) provides just such authorization here.

OPPOSITION TO DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT

1    it. (MSJ at 16:12-19:21) They once again trot out the Trust Agreement as though they

2    may contractually negate their legal obligations (MSJ at 16:20-17:13), ignoring that

3    their own cited authority holds "no matter how broad the provisions of a trust may be

4    in conferring power to engage in self-dealing or other transactions involving a conflict

5    of fiduciary and personal interests, a trustee violates the duty of loyalty to the

6    beneficiaries by acting in bad faith or unfairly." Rest. 3d of Trusts § 78 cmt. c(2). The

7    fact that it may have been in the Fund's interest to *receive* the Data (MSJ at 17:14-24)

8    does *not* by any means establish that it was in its interest to pay upwards of $10 million

9    to date for the Data under an agreement "negotiated and implemented solely by Union

10   members, employees, and potentially even a shared attorney." ECF No. 25 at 11.

11          Nor may the Trustees place an artificial divide between themselves and their

12   respective Unions for conflict purposes (MSJ at 17:25-18:6) when the Court has

13   already rejected this identical argument as "understat[ing] the scope of the duty of

14   loyalty," which protects against "against improper influence generally," including

15   actions taken to benefit third parties or advance their objectives. ECF No. 25 at 10

16   (quoting, *inter alia, O'Neal*, 8 Cal. App. 5th at 1209). Plaintiff has marshalled

17   significant evidence that the Service Fee dramatically outstrips any reliable metric of

18   reasonable cost or value, therefore favoring the Unions over the Fund's beneficiaries,

19   which Defendants cannot handwave away on summary judgment. (PUMF ¶¶ 1-80).

20          Lastly, Defendants argue that adhering to fiduciary duties does not necessarily

21   require adhering to best practices for nonprofit governance. (MSJ at 18:7-19:3) This

22   once again misapprehends Plaintiff's actual argument, which is that violations of best

23   practices were carried out <u>to ensure the Services Agreement improperly benefited the</u>

24   <u>Unions to the detriment of the Fund's beneficiaries</u>. (Bookman Decl., Ex. 1.) In

25   *Armenian Assembly of Am., Inc. v. Cafesjian*, 772 F. Supp. 2d 20, 107 (D.D.C. 2011),

26   the evidence showed that typical protocol was disregarded in good faith to save the

27   organization money by prioritizing "relatively inexpensive" services. And, unlike in

28   *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 697 (Del. Ch. 2005), the "best

17          OPPOSITION TO DEFENDANTS' NOTICE OF
            MOTION AND MOTION FOR SUMMARY
            JUDGMENT OR, IN THE ALTERNATIVE, FOR
            PARTIAL SUMMARY JUDGMENT

1   practices" eschewed by the Trustees here were not a 'moving target,' but keyed

2   directly to basic fiduciary duties the court admitted do not change with time.

3           This is not a case of the Trustees merely discarding formalism, but undermining

4   every routine safeguard that would have threatened to cast doubt on the Service Fee's

5   propriety, with reams of evidence impugning Defendants' failure to act in the best

6   interests of Fund beneficiaries (Cal. Prob. Code § 16002(a)), use of the Fund for their

7   own benefit (*id.* § 16004(a)), failure to administer the Fund with care (*id.* § 16040

8   (a)), and wrongful taking of property belonging to the beneficiaries of the Fund (*id.* §

9   859), thereby committing a breach of trust (*id.* § 16400). This raises genuine issues of

10  material fact as to whether Defendants' conduct met the minimum levels of care,

11  loyalty, and obedience required by California law and precludes summary judgment.

12  *See, e.g., Jackson v. Calone*, No. 2:16-cv-00891-TLN-KJN, 2019 U.S. Dist. LEXIS

13  169388, at *34-35 (E.D. Cal. Sep. 30, 2019); *Monterey Bay Military Hous., LLC v.*

14  *Pinnacle Monterey LLC*, 116 F. Supp. 3d 1010, 1037-38 (N.D. Cal. 2015).[16]

15  **B. Conversion**

16          Under California law, the elements for conversion are (1) the plaintiff's

17  ownership or right to possession of the property at the time of the conversion; (2) the

18

19  [16] Defendants close their argument with the baffling assertion that holding Trustees

20  accountable for purchasing Data at an unreasonable cost means they may also be held

21  accountable for *not* purchasing Data at a *reasonable* cost, (MSJ at 19:4-21.)

    Defendants point to no law requiring the Fund to affirmatively acquire the Data (in

22  contrast to the numerous state and federal authorities cited herein that require charges

    voluntarily incurred to be reasonable), nor do they explain how a class member would

23  even know, much less prove, that Trustees' election not to purchase certain Data

24  causally deprived them of Fund royalties. In other words, Defendants have merely

    offered a "parade of horribles that are unsubstantiated at best, hypothetical."

25  *Sanchez v. Barr*, 919 F.3d 1193, 1196 (9th Cir. 2019) (Paez, J., concurring); *see also*

26  *Harmelin v. Michigan*, 501 U.S. 957, 1029 n.11 (1991) (Scalia, J., concurring) ("[a

    parade of horrible's] strength is in direct proportion to (1) the certitude that the

27  provision in question was meant to exclude the very evil represented by the imagined

    parade, and (2) the probability that the parade will in fact materialize.").

28

OPPOSITION TO DEFENDANTS' NOTICE OF
                        MOTION AND MOTION FOR SUMMARY
                        JUDGMENT OR, IN THE ALTERNATIVE, FOR
                        PARTIAL SUMMARY JUDGMENT

defendant's conversion by a wrongful act or disposition of property rights; and (3) damages. *Farmers Ins. Exchange v. Zerin*, 53 Cal. App. 4th 445, 451 (1997). The Court has already found that Plaintiff adequately established a possessory interest in the monies collected by the Fund under the language of 17 U.S.C. § 114. *See* ECF No. 25 at 15. Thus, the same issues of disputed fact regarding Defendants' wrongful conduct that warrant denial of their summary judgment motion as to breach of fiduciary duty equally warrant denial as to conversion. *See Exec. Sec. Mgmt. v. Dahl*, 830 F. Supp. 2d 883, 892 (C.D. Cal. 2011) (citing *PCO, Inc. v. Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP*, 150 Cal. App. 4th 384, 396 (2007)).

Defendants make four primary arguments in seeking summary judgment on Plaintiff's conversion claim. ***First,*** Defendants claim that the Copyright Act does not grant a cognizable property interest in the monies collected by the Fund due to the Fund's "discretion to distribute and allocate royalties" and "to incur 'reasonable costs' associated with doing so." MSJ at 20:28-21:1. The Court rejected this exact argument at the motion to dismiss stage, noting that the Copyright Act states the property interest at issue "with particularized precision" and so "considerably restrict[s]" the Fund's activities, including by allowing it to deduct only "'reasonable,' rightful costs." ECF No. 25 at 15 (quoting 17 U.S.C. § 114(g)(3)). The factual dispute as to whether the Service Fee is "reasonable" under the Copyright Act therefore precludes summary judgment on the matter. *See DCR Mktg. Inc. v. United States All. Grp., Inc.*, No. SACV 19-1897 JVS (DFMx), 2021 U.S. Dist. LEXIS 35028, at *12-13 (C.D. Cal. Jan. 13, 2021) (denying summary judgment on conversion claim where the facts concerning the plaintiff's entitlement to certain property and alleged damages were "inextricably bound up with the fundamental dispute between the parties").

***Second,*** Defendants' dispute that the entitlements under 17 U.S.C. § 114(g)(2) extend to each qualifying performer individually rather than the Class as a whole by claiming that such a reading would create an "absurd" obligation to distribute *de minimis* royalty payments. MSJ at 21:4-22:13. This is a strawman concerning the

19

*timing* of the distributions, which has nothing to do with the *allocation* of royalties pending such distribution. (PUMF ¶ 62). The Service Fee is assessed as soon as the Fund allocates royalties to a particular recording and set of beneficiaries, even if the amounts do not meet the threshold for distribution and even if the beneficiary is never identified. (PUMF ¶ 62, 79). Disallowing this assessment would not require the Fund to immediately disburse the affected royalties, and Defendants cite nothing to the contrary. *See San Luis & Delta-Mendota Water Auth. v. United States DOI,* No. 1:11-cv-00952 LJO GSA, 2015 U.S. Dist. LEXIS 24970, at *78 (E.D. Cal. Mar. 2, 2015) (rejecting claim of absurd result from statutory interpretation where "[t]he record simply does not reflect that the result hypothesized … is likely to occur"). "In other words, the literal interpretation of the statute leads to results that are neither absurd nor odd." *United States v. Jensen*, 705 F.3d 976, 979-80 (9th Cir. 2013).[17]

**Third,** Defendants once again rely upon language in the Trust Agreement disclaiming any intent to grant the Fund's beneficiaries "any right, title, or interest in or to the Fund or any property of the Fund or any part thereof except as may be specifically determined by the Trustees." MSJ at 22:14-19. This language affords Defendants no independent protection, as the Court has already ruled that "[t]o the extent that the language of the Trust Agreement, entered into by the Unions, may be contrary to Congress' statutory regime, § 114 prevails." ECF No. 25 at 15 (citing *In re Dixon's Estate*, 143 Cal. 511, 514 (1904) and Rest. 3d of Trusts § 29).

**Fourth,** Defendants offer a permutation of their first argument by claiming that the Fund's ability to deduct "reasonable costs" is, by itself, incompatible with a claimed property right. MSJ at 22:20-24:5. However, Defendants rely entirely on

---

[17] Indeed, it is *Defendants'* interpretation that results in patent absurdity, allowing the Fund to destroy beneficiaries' property interests in their royalties by simply setting the Fund's distribution threshold above whatever amounts it misappropriates.

OPPOSITION TO DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT

cases with exceptional subject matter,[18] statutory authority to *completely withhold* the property in question,[19] or where the "reasonable fees" at issue were *themselves* alleged to be the property interest at issue.[20] Section 114 does not merely entitle performers to "reasonable royalties," such that the measure is left entirely to the Fund, but to defined royalties of specified percentages, with Defendants' discretion cabined to only certain deductible costs (which must still be reasonable). The Court found this to be not a "vague" entitlement, but one spelled out "with particularized precision" that leaves the Fund "considerably restricted in how they distribute royalties[.]" ECF No. 25 at 15. Defendants' inability to identify even one remotely factually similar case to support their argument confirms the Court was correct in its initial assessment, and that the Class maintains property interests sufficient to support conversion.

## C. <u>Money Had and Received</u>

Under California law, the elements for money had and received are that (1) defendant received money; (2) the money defendant received was for plaintiff's use;

---

[18] *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 761 (2005) held that police had historical discretion in deciding whether to make an arrest regardless of seemingly mandatory language. *Lyles v. City of Huntington Park*, No. CV 16-3223-GW (KSx), 2016 U.S. Dist. LEXIS 187694, at *17 (C.D. Cal. July 7, 2016). The comparatively uncontroversial royalty rights at issue in this case warrant no similar heightened scrutiny. *Citizens Allied for Integrity & Accountability, Inc. v. Schultz*, No. 1:17-cv-00264-BLW, 2019 U.S. Dist. LEXIS 16777, at *8 (D. Idaho Feb. 1, 2019).

[19] *Jacobson v. Hannifin*, 627 F.2d 177, 180 (9th Cir. 1980) found no property interest to casino licenses where the agency had "full and absolute power and authority to deny any application for any cause deemed reasonable by [it]."). Section 114 confers no similar discretion on the Fund to deny royalty payments to beneficiaries. *See Wedges/Ledges of Cal. v. City of Phx.*, 24 F.3d 56, 63 (9th Cir. 1994).

[20] *Baumgardner v. Town of Ruston*, 712 F. Supp. 2d 1180 (W.D. Wash. 2010) found a state statute mandating "reasonable fees" for review of land use applications too vague to support a property interest in the measure of those fees. Here, the stated property interest is to defined royalties under Section 114, which uses mandatory language ("shall") and defined percentages (2.5%). *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972); *Ching v. Mayorkas*, 725 F.3d 1149, 1155-56 (9th Cir. 2013).

and (3) defendant is indebted to plaintiff. *Lincoln Nat'l Life Ins. Co. v. McClendon*, 230 F. Supp. 3d 1180, 1190 (C.D. Cal. 2017). "A plaintiff may prevail on this claim by demonstrating the existence of an express, implied, or quasi-contract entitling it to the sum, but that the defendant used the money for its own benefit." *Freyr Holdings, LLC v. Legacy Life Advisors, LLC*, No. CV 10-9446 GAF (Ex), 2012 U.S. Dist. LEXIS 199813, at *29-30 (C.D. Cal. June 12, 2012). Here, Plaintiff has pled and produced evidence on all required elements of this claim: (1) Defendants received money from SoundExchange; (2) the money received was intended for Plaintiff and the Class under 17 U.S.C. § 114; and (3) Defendants are thus indebted to Plaintiff and the Class. (SUF ¶ 19; PUMF ¶¶ 62, 79). A rational factfinder could therefore conclude that the monies paid to the Unions were intended for Plaintiff and the Class and should be returned to them. *See Pegues v. Raytheon Space & Airborne Sys*., No. 2:17-cv-05420 DSF (GJSx), 2018 U.S. Dist. LEXIS 225463, at *7 (C.D. Cal. Dec. 3, 2018).

Defendants' challenge to Plaintiff's claim for money had and received is limited to a single sentence claiming that "equity and good conscience" do not require return of the Service Fee, which is not a distinct element of the claim. MSJ at 19:28-20:2 (citing *Mains v. City Title Ins. Co*., 34 Cal. 2d 580, 586 (1949). Defendants fail to meaningfully develop this argument in any way, which constitutes waiver thereof. *Concialdi v. Jacobs Eng'g Grp*., No. CV 17-1068 FMO (GJSx), 2019 U.S. Dist. LEXIS 128041, at *36 n.9 (C.D. Cal. Apr. 29, 2019) (one-sentence argument deemed insufficiently developed for court to consider on summary judgment). To the extent Defendants are claiming "equity and good conscience" do not require the Service Fee to be refunded because it does not exceed the fair value of the Services Agreement, Plaintiff has presented myriad genuine issues of material fact precluding summary judgment on the issue. *Barlow Respiratory Hosp. v. Cigna Health & Life Ins. Co*., No. 2:15-CV-08411-RGK-PLA, 2016 U.S. Dist. LEXIS 187305, at *13 (C.D. Cal. Sep. 30, 2016); *Receivables Exch., LLC v. TR Music Grp*., No. CV 14-9219 DSF (FFMx), 2016 U.S. Dist. LEXIS 183835, at *7 (C.D. Cal. Mar. 16, 2016).

OPPOSITION TO DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT

## D. **Declaratory Relief**

Defendants make no argument for summary judgment as to Plaintiff's claim for declaratory relief other than to gesture at his alleged lack of a viable underlying claim. MSJ at 20:2-5 (citing *Shaterian v. Wells Fargo Bank, N.A.*, 829 F. Supp. 2d 873, 888 (N.D. Cal. 2011)). Defendants' failure to address this issue or otherwise develop their argument beyond a single sentence is once again a waiver of the matter. *Concialdi*, 2019 U.S. Dist. LEXIS 128041, at *36 n.9. However, as already explained at the motion to dismiss stage, Plaintiff's underlying claims may be resolved without ascertaining the proper measure of the Service Fee (such as by finding it simply unreasonable in its current form). See *Johnson v. HSBC Bank USA*, No. 3:11-cv-2091-JM-WVG, 2012 U.S. Dist. LEXIS 36798, at *11 (S.D. Cal. Mar. 19, 2012) ("[I]t remains possible that some or all of Plaintiff's other claims will not survive to trial—if that occurs, declaratory judgment could serve to clarify the parties' interests.").

## E. **Punitive Damages**

California law provides for the recovery of punitive damages "where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice." *American Airlines, Inc. v. Sheppard, Mullin, Richter & Hampton*, 96 Cal. App. 4th 1017, 1022 (2002). Under this standard, "a defendant must act with the intent to vex, injure, or annoy, or with a conscious disregard of the plaintiff's rights," which "may be proven directly or by implication." *Hobbs v. Bateman Eichler, Hill Richards*, 164 Cal. App. 3d 174, 194 (1985) (internal quotes and citations omitted); *see also Plyam v. Precision Dev., LLC (In re Plyam)*, 530 B.R. 456, 465-69 (B.A.P. 9th Cir. 2015) (recklessness satisfies conscious disregard).

"The decision to award punitive damages is usually left to the jury." *Braun v. Crown Crafts Infant Prods.*, No. C12-5811 RBL, 2014 U.S. Dist. LEXIS 11899, at *15-16 (W.D. Wash. Jan. 30, 2014) (citing *Egan v. Mutual Omaha Ins. Co.*, 24 Cal.3d 809, 821 (1979)). Thus, "[s]ummary judgment on the issue of punitive damages is proper only when no reasonable jury could find the plaintiff's evidence to be clear and

OPPOSITION TO DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT

convincing proof of malice, fraud or oppression." *Madrigal v. Allstate Indem. Co.*, No. CV 14-4242 SS, 2015 U.S. Dist. LEXIS 193784, at *58 (C.D. Cal. Sep. 30, 2015) (internal quotes and citation omitted). "In adjudicating the issue of punitive damages at the summary judgment stage, courts should not impose on a plaintiff the obligation to 'prove' its case." *Ferretti v. Pfizer Inc.*, No. 11-CV-04486, 2013 U.S. Dist. LEXIS 4730, at *72-73 (N.D. Cal. Jan. 10, 2013). Indeed, courts frequently hold that the denial of summary judgment as to a given claim extends to any related punitive damages requests. *See Mack v. Universal Truckload, LLC*, No. 5:19-cv-02363-RGK-SP, 2020 U.S. Dist. LEXIS 248159, at *20 (C.D. Cal. Dec. 18, 2020); *Carter v. Amtrak*, No. CV 18-9652 PSG (JCx), 2020 U.S. Dist. LEXIS 87323, at *26 (C.D. Cal. Jan. 24, 2020); *Interstate Restoration, LLC v. Seaman*, No. SACV 13-00706 DOC(RNBx), 2014 U.S. Dist. LEXIS 199667, at *57 (C.D. Cal. July 9, 2014).

Here, the record is rife with clear and convincing evidence that the Trustees knowingly and purposefully violated their fiduciary duties to the Class, all in service of third parties to whom they pledged greater fealty as their principal employers. Mr. Hair knew that a percentage fee was unlawful; indeed, his lawyer told his predecessor precisely that. (PUMF ¶ 24). However, Mr. Hair pushed forward with the Service Fee anyway, having his lawyer tie it to the sale of Data without ever ascertaining the reasonable cost of same, violating the Copyright Act, the IOAA, and his fiduciary duties to the beneficiaries. (PUMF ¶¶ 28-29, 46-47). Defendants further made efforts to conceal or obscure both the implementation of the Service Fee as well as the amounts taken thereunder. (PUMF ¶ 63). Despite growing concern over the Service Fee's impact, none of the Trustees have done anything to reevaluate or raise it with the Board. (PUMF ¶ 64). The Unions continue to happily convert the rightful property of the Class. Indeed, AFM has grown quite dependent on the Service Fee, as it makes up the majority of their net profits exclusive of membership fees. (PUMF ¶ 27). The Trustees' use of the Unions' own lawyer on both sides of the transaction is further evidence of the malicious breach of their fiduciary duties. (PUMF ¶¶ 22, 28-29).

OPPOSITION TO DEFENDANTS' NOTICE OF
MOTION AND MOTION FOR SUMMARY
JUDGMENT OR, IN THE ALTERNATIVE, FOR
PARTIAL SUMMARY JUDGMENT

Defendants' entire argument on the matter is that "there is no evidence—let alone clear and convincing evidence---that the Fund or its Trustees engaged in 'despicable' conduct." MSJ at 24:25-26. "As the above discussion should make clear, the parties hold widely different views of the facts in this case, which is why … summary judgment is inappropriate." *C2 Educ. Sys. v. Lee*, No. 18-cv-02920-SI, 2019 U.S. Dist. LEXIS 119272, at \*16 (N.D. Cal. July 17, 2019); *see also Huff v. L.A. Cty. Sheriffs Dep't*, No. CV 16-01733-AB (AGRx), 2017 U.S. Dist. LEXIS 224577, at \*27-28 (C.D. Cal. Dec. 8, 2017). Defendants' decision to downplay this dispute as merely a "quibble[] with the amount of the Service Fee or the process whereby it was implemented" (MSJ at 25:2-3) is a self-serving attempt to paper over the process by which Defendants sought a windfall from the Fund and trampled over myriad conflicts of interest and a total lack of economic justification to obtain it. Whether this conduct and knowledge is sufficient to carry a punitive damages award is a question for trial. *See Mihara v. Dean Witter & Co*., 619 F.2d 814, 825 (9th Cir. 1980).

## V.    CONCLUSION

For all the foregoing reasons, Defendants' Motion should be denied in full.


DATED: May 14, 2021                    KIESEL LAW LLP


                                       By:   /s/ Mariana A. McConnell
                                       Paul R. Kiesel
                                       Mariana A. McConnell
                                       Nico L. Brancolini
                                       **KIESEL LAW LLP**

                                       Neville L. Johnson
                                       Daniel Lifschitz
                                       **JOHNSON & JOHNSON LLP**
                                       *Attorneys for Plaintiff and the Class*

OPPOSITION TO DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT