PAUL R. KIESEL (State Bar No. 119854)
   kiesel@kiesel.law
MARIANA A. MCCONNELL (State Bar No. 273225)
   mcconnell@kiesel.law
NICO L. BRANCOLINI (State Bar No. 318237)
   brancolini@kiesel.law
**KIESEL LAW LLP**
8648 Wilshire Boulevard
Beverly Hills, California 90211-2910
Telephone: (310) 854-4444
Facsimile:  (310) 854-0812

NEVILLE L. JOHNSON (State Bar No. 66329)
   njohnson@jjllplaw.com
DANIEL B. LIFSCHITZ (State Bar No. 285068)
   dlifschitz@jjllplaw.com
**JOHNSON & JOHNSON LLP**
439 North Canon Drive, Suite 200
Beverly Hills, California 90210
Telephone: (310) 975-1080
Facsimile:  (310) 975-1095

*Attorneys for Plaintiff and the Class*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEVIN RISTO, on behalf of himself and all others similarly situated,<br><br>                              Plaintiff,<br><br>vs.<br><br>SCREEN ACTORS GUILD-AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS, a Delaware corporation, et al.<br><br>                              Defendants. | Case No. 2:18-CV-07241-CAS-PLA<br><br>**PLAINTIFF'S STATEMENT OF GENIUINE DISPUTES OF MATERIAL FACTS IN OPPOSITION TO DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing Date:     June 14, 2021<br>Hearing Time :    10:00 a.m.<br>Courtroom:         8D (Telephonic)<br><br>*[Plaintiff's Opposition to Defendants' Motion for Summary Judgment, Evidentiary Objections, Declaration of Mariana A. McConnell, Declaration of Barrie Kessler, Declaration of Kerry Adams, Declaration of Mark Bookman, and [Proposed] Order filed concurrently]* |

# I.   THE ESTABLISHMENT AND EARLY YEARS OF THE FUND

| Uncontroverted Fact | Supporting Evidence | Plaintiff's Response |
|---|---|---|
| 1.      The Intellectual Property Rights Distribution Fund ("Fund") was formed on September 16, 1998 with the execution of the Agreement and Declaration of Trust by the American Federation of Musicians ("AFM") and the American Federation of Television and Radio Artists ("AFTRA") and Fund Trustees. | Declaration of Andrew Sullivan ("Sullivan Decl."), Ex. 4 (Dreith Tr., Ex. 111); Ex. 13 (Risto Tr., Ex. 101) at ¶ 7. | Undisputed. |
| 2.      The "Fund" has operated as the "independent administrator" to receive royalties from SoundExchange and distribute to the non-featured performers their share of royalties generated under the | Sullivan Decl., Ex. 4 (Dreith, Tr., 58:9-58:16); Ex. 2 (Crabtree-Ireland, February 16, 2021, Tr., 220:5-220:20); Ex. 33 (DEFS_00042019) ("[A]s of September 16, 1998, the [Fund] has been jointly appointed by copyright owners and the | **Objection:** Misstates testimony as Ex. 4 does not support this "fact." <br><br> Disputed, to the extent this implies that the Fund has undertaken some voluntary duty to operate as the independent administrator. Instead, |

1

PLAINTIFF'S STATEMENT OF GENIUINE DISPUTES OF MATERIAL FACTS IN OPPOSITION TO DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

| | | |
|---|---|---|
| statutory license described in 17 U.S.C. § 114 ("Copyright Act"). | Unions as the independent administrator for receipt of sound recording performance royalties both for non-featured musicians and non-featured vocalists."); *see* 17 U.S.C. § 114(g)(2)(B), (C). | Congress instructed AFM and SAG-AFTRA to establish the Fund to be the independent administrator charged with distributing royalties generated under the statutory license. 17 U.S.C. § 114(g)(2)(B), (C). |
| 3.     The Copyright Act provides that—as the "independent administrator"—the Fund must distribute royalties to non-Union performers as well as performers who are Union members, but otherwise places no limits on the Fund's operations. | 17 U.S.C. § 114(g)(2)(B), (C). | **Objection:** Misstates evidence and compound.  Disputed as to "but otherwise places no limits on the Fund's operations." See statutory language in 17 U.S.C. § 114(g)(3); Court's Order Denying Motion to Dismiss [Dkt. 25] ("Additionally, while § 114 may permit Trustees to deduct 'reasonable costs' and expenses – including for the "administration of the |

| | | collection, distribution, and calculation of the royalties" – this only allows the deduction of 'reasonable,' rightful costs.") |
|---|---|---|
| 4. The Copyright Act provides that nonprofit entities that distribute royalties, like the Fund, are entitled to "deduct from any of its receipts, prior to the distribution of such receipts to any person or entity entitled thereto … [its] reasonable costs …." | 17 U.S.C. § 114(g)(3). | Undisputed. |
| 5. An amended and restated Trust Agreement was entered into by AFM and the Screen Actors Guild – American Federation of Television and Radio Artists ("SAG-AFTRA") (collectively, the "Unions") on July 26, | Sullivan Decl., Ex. 2 (Crabtree-Ireland, February 16, 2021, Tr., Ex. 1). | Undisputed. |

3

| | | |
|---|---|---|
| 2012. | | |
| 6.      The purpose of the Fund is to receive and distribute "royalties and remuneration" to eligible artists, including receiving and distributing funds collected by SoundExchange for the non-featured artists under the statutory license. | Sullivan Decl., Ex. 2 (Crabtree-Ireland, February 16, 2021, Tr., 22:2-22:14, 31:2-31:22 and Ex. 1 at Art. II, § 2). | **Objection:** Misstates the testimony and misstates evidence. Disputed to the extent the quoted testimony and evidence do not mention "eligible artists." The Fund is charged with distributing royalties which arise under the Copyright Act. See statutory language in 17 U.S.C. § 114(g)(2); Court's Order Denying Motion to Dismiss [Dkt. 25] ("Pursuant to the statute, the Fund's administrators are considerably restricted in how they distribute royalties: the Copyright Act specifically determines the percentages to which the various artists and copyright holders are |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS IN OPPOSITION TO
DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

| | | each entitled.") |
|---|---|---|
| 7.    The Fund is a tax-exempt 501(c)(6) organization for federal tax law purposes. | Sullivan Decl., Ex. 2 (Crabtree-Ireland, February 16, 2021, Tr., 31:23-31:25, and Ex. 1 at Art. II, § 2); *see* 26 U.S.C. § 501(c)(6). | Undisputed. |
| 8.    The Fund is not a federal government agency. | Taub Decl., ¶ 2. | Disputed to the extent that the Fund was established pursuant to statutory authority and charged with performing a quasi-governmental function. See statutory language in 17 U.S.C. § 114(g)(2); Court's Order Denying Motion to Dismiss [Dkt. 25] ("Pursuant to the statute, the Fund's administrators are considerably restricted in how they distribute royalties: the Copyright Act specifically determines the percentages to which the |

5

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS IN OPPOSITION TO DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

| | | various artists and copyright holders are each entitled.") |
|---|---|---|
| 9.    The Fund's employees are not government employees and are not paid by the federal government for their work at the Fund. | Taub Decl., ¶ 2. | Undisputed. |
| 10.    The Fund's officers and Trustees are not appointed by the federal government. | Taub Decl., ¶ 2. | Undisputed. |
| 11.    The Trust Agreement requires that three of the six Trustees be appointed by each of AFM and SAG-AFTRA. | Sullivan Decl., Ex. 8 (Hair, February 25, 2021, Tr., 76:14-77:8); Ex. 3 (Crabtree-Ireland, February 17, 2021, Tr., 65:10-65:23; Ex. 2 (Crabtree-Ireland, February 16, 2021, Tr., Ex. 1 at Art. III, § 1). | Undisputed. |
| 12.    Under the Trust Agreement, at least two Trustees—one appointed by AFM and one appointed by SAG- | Sullivan Decl., Ex. 3 (Crabtree-Ireland, February 17, 2021, Tr., 65:10-65:23); Ex. 10 (Joyce, Tr., 26:24-27:7); | **Objection:** Misstates evidence and misquotes testimony. Disputed. The Trust Agreement is silent on |

| | | |
|---|---|---|
| AFTRA—must be "rank-and-file" Union members, i.e., Union members who do not hold a management position in the national Union or in a local affiliate. | Ex. 2 (Crabtree-Ireland, February 16, 2021, Tr., Ex. 1 at Art. III, § 1). | the definition of "rank and file" Union members. None of Defendants' cited testimony defines "rank and file" in this manner. |
| 13.    The Fund's Trustees are not compensated for their duties. | Sullivan Decl., Ex. 2 (Crabtree-Ireland, February 16, 2021, Tr., Ex. 1 at Art. IV, § 4). | **Objection:** Relevance. Disputed, to the extent that several of the Fund's Trustees are compensated by the Unions and by virtue of their positions at the Unions hold their seat on the Fund's board. McConnell Decl., Ex. 2 (Crabtree-Ireland, February 16, 2021, Dep. Tr., 16:5-9; 24:19-24:23); Ex. 17 (Taub October 20, 2020, Dep. Tr., 79:19-80:23); Ex. 8 (Hair February 24, 2021, Dep. Tr., 33:23-34:8). |
| 14.    The Trust Agreement  provides that | Sullivan Decl., Ex. 2 (Crabtree-Ireland, | **Objection:** Relevance. Disputed to the extent |

| | | |
|---|---|---|
| "[t]he Trustees shall have power to construe the provisions of this Agreement and Declaration of Trust and the terms used herein, and any construction adopted by the Trustees in good faith shall be binding upon the AFM, SAG-AFTRA, and artists claiming benefits under the Fund." | February 16, 2021, Dep. Ex. 1 at Art. IV, § 2). | that Defendants assert that the Trust Agreement provides powers to the Fund or its board that are different or in excess of the Copyright Act.  The Trust Agreement was drafted by Patricia Polach who was in a conflicted position with the Unions and the Fund. McConnell Decl., Ex. 18 (Taub, January 20, 2021, Dep. Tr., 144: 3-6); Ex. 8 (Hair February 24, 2021 Dep. Tr., 104:18-105:3); Court's Order Denying Motion to Dismiss [Dkt. 25] ("To the extent that the language of the Trust Agreement, entered into by the Unions, may be contrary to Congress' statutory regime, § 114 prevails. *In re Dixon's Estate*, 143 Cal. 511, 514 |

8

| | | |
|---|---|---|
| | | (1904); Rest. 3d of Trusts § 29 (2003).") |
| 15.    The Trust Agreement states that Trustees are empowered "[t]o do all acts … which the Trustees may deem necessary to accomplish the general objective of distributing remuneration to eligible artists in the most efficient and economical manner." | Sullivan Decl., Ex. 2 (Crabtree-Ireland, February 16, 2021, Tr., Ex. 1 at Art. IV, § 3(N)). | **Objection:** Relevance. Disputed to the extent that Defendants assert that the Trust Agreement provides powers to the Fund or its board that are different or in excess of the Copyright Act.  The Trust Agreement was drafted by Patricia Polach who was in a conflicted position with the Unions and the Fund.<br><br>McConnell Decl., Ex. 18 (Taub, January 20, 2021, Dep. Tr., 144: 3-6); Ex. 8 (Hair February 24, 2021 Dep. Tr., 104:18-105:3); Court's Order Denying Motion to Dismiss [Dkt. 25] ("To the extent that the language of the Trust Agreement, entered into by the Unions, may be |

| | | |
|---|---|---|
| | | contrary to Congress' statutory regime, § 114 prevails. *In re Dixon's Estate*, 143 Cal. 511, 514 (1904); Rest. 3d of Trusts § 29 (2003).") |
| 16.     The Trust Agreement states that Trustees have "full authority to determine all questions of the nature and amount of payments to be provided to artists consistent with the relevant agreements for the receipt and distribution of remuneration." | Sullivan Decl., Ex. 2 (Crabtree-Ireland, February 16, 2021, Tr., Ex. 1 at Art. IV, § 1). | **Objection:** Relevance. Disputed to the extent that Defendants assert that the Trust Agreement provides powers to the Fund or its board that are different or in excess of the Copyright Act.  The Trust Agreement was drafted by Patricia Polach who was in a conflicted position with the Unions and the Fund.<br><br>McConnell Decl., Ex. 18 (Taub, January 20, 2021, Dep. Tr., 144: 3-6); Ex. 8 (Hair February 24, 2021 Dep. Tr., 104:18-105:3); Court's Order Denying Motion to Dismiss [Dkt. |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS IN OPPOSITION TO
DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

| | | 25] ("To the extent that the language of the Trust Agreement, entered into by the Unions, may be contrary to Congress' statutory regime, § 114 prevails. *In re Dixon's Estate*, 143 Cal. 511, 514 (1904); Rest. 3d of Trusts § 29 (2003).") |
|---|---|---|
| 17.   The Trust Agreement states that "[n]o artist or any person claiming by or through such artist ... shall have any right, title, or interest in or to the Fund or any property of the Fund or any part thereof except as may be specifically determined by the Trustees." | Sullivan Decl., Ex. 2 (Crabtree-Ireland, February 16, 2021, Tr., Ex. 1 at Art. XII, § 4). | **Objection:** Relevance. Disputed to the extent that Defendants assert that the Trust Agreement provides powers to the Fund or its board that are different or in excess of the Copyright Act.  The Trust Agreement was drafted by Patricia Polach who was in a conflicted position with the Unions and the Fund.

McConnell Decl., Ex. 18 (Taub, January 20, 2021, Dep. Tr., 144: 3-6); Ex. 8 |

| | | (Hair February 24, 2021 Dep. Tr., 104:18-105:3); Court's Order Denying Motion to Dismiss [Dkt. 25] ("To the extent that the language of the Trust Agreement, entered into by the Unions, may be contrary to Congress' statutory regime, § 114 prevails. *In re Dixon's Estate*, 143 Cal. 511, 514 (1904); Rest. 3d of Trusts § 29 (2003).") |
|---|---|---|
| 18.    The Trust Agreement states that Trustees are authorized "[t]o purchase or obtain from the AFM [and/or] SAG-AFTRA … any data helpful for the identification and location of artists eligible for remuneration or the identification of recorded or other performances covered by an agreement | Sullivan Decl., Ex. 4 (Dreith, Tr., 83:23-84:21, and Ex. 111 at § 3(O)); Ex. 2 (Crabtree-Ireland, February 16, 2021, Tr., Ex. 1 at Art. IV, § 3(O)). | **Objection:** Relevance. Disputed to the extent that Defendants assert that the Trust Agreement provides powers to the Fund or its board that are different or in excess of the Copyright Act.  The Trust Agreement was drafted by Patricia Polach who was in a conflicted position with the Unions and the Fund. |

12

| | | |
|---|---|---|
| for the receipt and distribution of remuneration." | | McConnell Decl., Ex. 18 (Taub, January 20, 2021, Dep. Tr., 144: 3-6); Ex. 8 (Hair February 24, 2021 Dep. Tr., 104:18-105:3); Court's Order Denying Motion to Dismiss [Dkt. 25] ("To the extent that the language of the Trust Agreement, entered into by the Unions, may be contrary to Congress' statutory regime, § 114 prevails. *In re Dixon's Estate*, 143 Cal. 511, 514 (1904); Rest. 3d of Trusts § 29 (2003).") |
| 19.     Each year the Fund receives from SoundExchange the royalties allocated to non-featured musicians under the Copyright Act and a report showing the royalties attributed to each track based on the | Declaration of Stefanie Taub ("Taub Decl."), at ¶ 3; Sullivan Decl., Ex. 39 (DEFS_00000086); Ex. 14 (Sandell, Tr., 36:3-36:22); Taub Decl., Ex. 16 (Taub, January 20, 2021, Tr., 181:15-182:7, 214:3-215:6); Ex. 4 | Undisputed. |

13

| | | |
|---|---|---|
| frequency of performance (the "Frequency Report"). | (Dreith, Tr., 61:5-61:10, 91:6-95:21); Ex. 21 (Amended Responses of Defendant Stefanie Taub to Plaintiff's First Set of Interrogatories, Resp. to ROG 2). | |
| 20.    The Fund determines how many of the tens of thousands of eligible recordings listed on the Frequency Report it will research and attempt to pay royalties on.  The goal of the Fund is to distribute royalties to as many non-featured performers as possible without issuing checks for de minimis amounts. | Taub Decl., ¶ 4; Sullivan Decl. Ex. 39 (DEFS_00000086); Ex. 16 (Taub, January 20, 2021, Tr. 183:16-184:12); Ex. 3 (Crabtree-Ireland, February 16, 2021, Tr., 83:8-83:17). | **Objection:** Compound. Relevance. Disputed, to the extent this fact implies that not all nonfeatured performers who have recordings on the Frequency Report are entitled to royalties. The Fund maintains a record of tracks who appear on the Frequency Reports and will issue a payment to the performers on those tracks once the royalty amount crosses the guideline's threshold. 17 U.S.C. § 114(g)(2); McConnell Decl., Ex. 11 (Joyce, August 27, 2019, |

| | | |
|---|---|---|
| | | *Blondell* Dep. Ex. 45 at DEFS_00042223); Ex. 12 (LeBlanc Dep. Tr., 145:16-147:16). |
| 21.    In the past few distribution cycles, the songs in connection with which the Fund has distributed royalties ("Covered Recordings") have numbered from around 14,000 to 16,000 individual songs per cycle. | Taub Decl., ¶ 5; Sullivan Decl. Ex. 39 (DEFS_00000086). | **Objection:** Relevance. Disputed, to the extent this fact implies that not all nonfeatured performers who have recordings on the Frequency Report are entitled to royalties. The Fund maintains record of tracks who appear on the Frequency Reports and will issue a payment once the royalty amount crosses the guideline's threshold. 17 U.S.C. § 114(g)(2); McConnell Decl., Ex. 11 (Joyce, August 27, 2019, *Blondell* Dep. Ex. 45 at DEFS_00042223); Ex. 12 (LeBlanc Dep. Tr., 145:16-147:16). |
| 22.    After the Fund | Taub Decl., ¶ 6; Sullivan | Undisputed. |

15

| | | |
|---|---|---|
| determines the scope of the Covered Recordings, the Fund compares the Covered Recordings to the Fund's own database of tracks researched in prior years.  Covered Recordings that "match" with tracks in the database will be paid out without additional research from the Fund. | Decl. Ex. 39 (DEFS_00000086). | |
| 23.    Based on staff, resources, and prior experience, the Fund determines how many tracks can be researched in the three-year distribution cycle. | Taub Decl., ¶ 7; Sullivan Decl. Ex. 39 (DEFS_00000086); Ex. 15 (Taub, October 20, 2020, Tr., 142:4-143:13); Ex. 16 (Taub, January 20, 2021, Tr. 212:10-212:15). | **Objection:** Relevance. Disputed, to the extent this fact implies that not all nonfeatured performers who have recordings on the Frequency Report are entitled to royalties. The Fund maintains record of tracks who appear on the Frequency Reports and will issue a payment once the royalty amount crosses the guideline's threshold. |

| | | 17 U.S.C. § 114(g)(2); McConnell Decl., Ex. 11 (Joyce, August 27, 2019, *Blondell* Dep. Ex. 45 at DEFS_00042223); Ex. 12 (LeBlanc Dep. Tr., 145:16-147:16). |
|---|---|---|
| 24.    The Fund's research department looks at multiple sources to identify and locate the correct non-featured performer(s) who performed on Covered Recordings, including the session reports and information provided by the Unions and online resources. | Taub Decl., ¶ 8; Sullivan Decl. Ex. 39 (DEFS_00000086); Ex. 15 (Taub, October 20, 2020, Tr., 118:13-119:12 and Ex. 1 at ¶ 5); Ex. 14 (Sandell Tr., 36:23-37:23). | Undisputed. |
| 25.    If the Fund is unable to locate a performer after research is conducted, the information about the performer that is known by the Fund is entered into an Unclaimed | Taub Decl., ¶ 9; Sullivan Decl. Ex. 39 (DEFS_00000086); Ex. 16 (Taub, January 20, 2021, Tr., 218:10-218:16); Ex. 21 (Amended Responses of Defendant Stefanie Taub | Undisputed. |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS IN OPPOSITION TO
DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

| | | |
|---|---|---|
| Royalties list that is published on the Fund's website. | to Plaintiff's First Set of Interrogatories, Resp. to ROG 9). | |
| 26.     Royalties associated with a Covered Recording are divided among all the non-featured performers who can be identified as having played on that recording. | Taub Decl., ¶ 10; Sullivan Decl. Ex. 39 (DEFS_00000086) | Undisputed. |
| 27.     If no non-featured performers performed on a Covered Recording, the royalties associated with that track are allocated among the remaining non-featured performers on Covered Recordings based on the frequency each track was played. | Taub Decl., ¶ 11; Sullivan Decl. Ex. 39 (DEFS_00000086); Ex. 16 (Taub, January 20, 2021, Tr., 183:16-184:6). | Undisputed. |
| 28.     It is not possible for the Fund to research and pay royalties on each track in the Frequency Report.  The Fund does not have enough staff or | Taub Decl., ¶ 12; Sullivan Decl. Ex. 39 (DEFS_00000086); Ex. 14 (Sandell Tr., 21:24-22:16). | **Objection:** Misstates the evidence; misstates testimony. Compound. Relevance.<br><br>Disputed. Utilizing the |

| | | |
|---|---|---|
| resources to research each of the hundreds of thousands of tracks. | | numbers of new tracks added each year set forth in Defendants' Rule 26 report, which Ms. Sandell said was not "a real number," because "we have no way of tracking the actual number of titles that are researched each year," the Fund researchers do have the time to research additional tracks. McConnell Decl., Ex. 16 (Sandell Dep. Tr., 19:1-19); Kessler Decl., Ex. 1. |
| 29.    For approximately the first 10 years of its existence, the Fund was staffed by one full-time employee and Dennis Dreith, its Administrator. | Sullivan Decl., Ex. 4 (Dreith, Tr., 52:18-54:19). | Undisputed. |
| 30.    For approximately the first 10 years of the Fund's existence, Mr. Dreith was not compensated by the Fund | Sullivan Decl., Ex. 4 (Dreith, Tr., 66:9-66:25). | **Objection:** Relevance. Disputed, to the extent that the Fund was reimbursing the Film Musicians Secondary |

| | | |
|---|---|---|
| for his services as the Administrator. | | Markets Fund for the Fund's overhead allocations, including Mr. Dreith's salary as the Administrator of the Fund. Mr. Dreith was being compensated for his services as administrator of the Fund. McConnell Decl., Ex. 5 (Dreith Dep. Tr., 119:14-122:15). |
| 31.    For approximately the first 10 years of its existence, the Fund shared office space and resources with the Film Musicians Secondary Markets Fund. | Sullivan Decl., Ex. 4 (Dreith, Tr., 52:18-54:25) ("[T]he fund started with a -- a hand-me-down fax machine, a computer we put together from used parts, and a borrowed desk in the corner of the Film Musicians Secondary Markets Fund."); Ex. 9 (Hoffman Tr., 50:8-51:4); Ex. 16 (Taub, January 20, 2021, Tr., 80:7-80:17); Ex. 7 | Undisputed. |

| | (Hair, February 24, 2021, Tr., 100:14-101:10). | |
|---|---|---|
| 32.    During the first five years of its existence, the Fund collected and distributed less than $5 million annually. | Taub Decl., ¶ 13. | **Objection:** Relevance. Undisputed. |
| 33.    During the first 10 years of its existence, the Fund collected and distributed less than $10 million annually. | Taub Decl., ¶ 14. | **Objection:** Relevance. Undisputed. |
| 34.    Beginning in approximately 2010, the use of digital streaming services such as Sirius XM Satellite Radio and Pandora became more widespread and the amount of statutory royalties received by the Fund from SoundExchange increased substantially. | Sullivan Decl., Ex. 7 (Hair, February 24, 2021, Tr., 120:12-121:6); Taub Decl., ¶ 15. | **Objection:** Compound. Relevance. Undisputed. |
| 35.    Dennis Dreith, former Executive | Sullivan Decl., Ex. 4 (Dreith, Tr., 254:14- | **Objection:** Relevance. Misstates testimony. |

21

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS IN OPPOSITION TO DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

| | | |
|---|---|---|
| Director of the Fund, requested increased compensation in 2013—even though he had "received no compensation whatsoever" up until 2013—based on the fact that "the duties of the AFM & SAG-AFTRA Fund have been escalating significantly between increased collections, [and] distribution responsibilities." | 258:22 and Ex. 123 at DEFS_0004179). | Disputed, to the extent the quoted testimony from Mr. Dreith does not support this fact and the language from Ex. 123 is misquoted. Mr. Dreith was receiving compensation from the Fund based on overhead allocation calculations between the Fund and the Film Musicians Secondary Markets Fund. Also disputed to the extent that Defendants insinuate that Mr. Dreith's compensation is relevant to the Union's ability to take 3% of the Fund's distributable amounts in perpetuity. McConnell Decl., Ex. 5 (Dreith Dep. Tr., 119:14-122:4; 256:6-13). |
| 36.     In his deposition, Mr. Dreith stated that, | Sullivan Decl., Ex. 4 (Dreith, Tr., 67:8-67:16). | **Objection:** Relevance. |

| | | |
|---|---|---|
| even though he initially agreed to work for the Fund without compensation, he never believed he was binding himself to work in that role for free indefinitely. | | Disputed, to the extent that Defendants believe this testimony is somehow related to the Union's receipt of a 3% royalty of the Fund's distributable amounts. Also, Mr. Dreith was receiving compensation. McConnell Decl., Ex. 5 (Dreith Dep. Tr., 119:14-122:15). |
| 37.     Between 2010 and 2013, the Fund hired dozens of additional staff and Mr. Dreith became its full-time, paid Executive Director. | Sullivan Decl., Ex. 4 (Dreith, Tr., 78:12-78:15, 62:14-62:21, 257:8-257:13). | **Objection:** Relevance. Misstates testimony. Compound.<br><br>Disputed to the extent that Mr. Dreith was being compensated before 2010. McConnell Decl., Ex. 5 (Dreith Dep. Tr., 257:8-257:13). |
| 38.     In 2012, the Fund moved out of the offices of the Film Musicians Secondary Markets Fund | Sullivan Decl., Ex. 4 (Dreith, Tr., 77:9-78:22); Ex. 9 (Hoffman, Tr., 50:8-51:4). | **Objection:** Relevance. Undisputed. |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS IN OPPOSITION TO
DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

| | | |
|---|---|---|
| and into its own leased office space. | | |
| 39.    In 2013, the Fund purchased its own office building. | Sullivan Decl., Ex. 4 (Dreith, Tr., 78:16-78:25). | **Objection:** Relevance. Undisputed. |
| 40.    Dennis Dreith resigned from the Fund in 2017, following an internal investigation into expense approval irregularities. | Sullivan Decl., Ex. 4 (Dreith, Tr., 312:23-319:19). | **Objection:** Relevance. Misstates testimony. Misstates evidence.  Disputed. Mr. Dreith first announced that he was going to retire from the Fund in 2015 and asked the Trustees to find his replacement. Also disputed because the internal investigation concluded that there was no wrongdoing on Mr. Dreith's part. Further, the Fund asked Mr. Dreith to stay on as a consultant after his retirement in 2017. McConnell Decl., Ex. 5 (Dreith Dep. Tr., 301:2-24; 314:19-315:18); Ex. |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS IN OPPOSITION TO
DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

| | | 23 (DREITH_0106-0109). |
|---|---|---|
| 41.    Mr. Dreith currently serves as a "litigation consultant" to counsel for Plaintiff and the class. | Sullivan Decl., Ex. 4 (Dreith, Tr., 334:25-338:15). | **Objection:** Relevance. Undisputed. |
| 42.    Mr. Dreith referred Plaintiff Kevin Risto to class counsel. | Sullivan Decl., Ex. 4 (Dreith, Tr., 328:22-333:19 and Ex. 133); Ex. 13 (Risto Tr., 146:4-147:1). | **Objection:** Relevance. Undisputed. |

## II.    THE SERVICES PROVIDED BY THE UNIONS

| Uncontroverted Fact | Supporting Evidence | Plaintiff's Response |
|---|---|---|
| 43.    Since the Fund's inception, the Unions have provided the Fund with information and other services necessary to identify and distribute royalties to non-featured performers. | Sullivan Decl., Ex. 4 (Dreith, Tr., 246:2-247:15 and Ex. 120 at DEFS_00040161-DEFS_00040162); Ex. 2 (Crabtree-Ireland, February 16, 2021, Tr., 92:13-92:23, 95:25-96:4). | **Objection:** Compound. |

/ / /

/ / /

/ / /

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Disputed in part. The
Unions have provided
information since the
Fund's inception.
However the Unions do
not provide all the
information necessary to
identify and distribute
royalties. Instead, the
Fund needs to perform
the majority of this work
themselves. The Fund's
designee testified that
SAG-AFTRA is only
able to return 26.67% of
Fund requests with
session reports, while
AFM is able to return
28.62%.

Mr. Dreith testified that
the information the
Unions provided to the
Fund is not largely
accurate and the Fund
has to consult various
sources of information to
identify non-featured

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS IN OPPOSITION TO
DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

| | | performers for payment. McConnell Decl., Ex. 17 (Taub, October 20, 2020, Dep. Tr., 116:7 – 119:12); Ex. 16 (Sandell Dep. Tr., 36:3 – 39:22); Ex. 5 (Dreith Dep. Tr., 109:14-119:8); Ex. 18 (Taub, January 20, 2021, Dep. Tr., 126:25-127:24). |
|---|---|---|

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS IN OPPOSITION TO
DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

| | | |
|---|---|---|
| 44.    For the first 15 years of the Fund's operation, the Unions provided this information and these services at no charge. | Sullivan Decl., Ex. 2 (Crabtree-Ireland, February 16, 2021, Tr., 92:13-93:18), Ex. 1 (Bouton Tr., 39:2-40:4); Ex. 4 (Dreith Tr., 246:2-246:7). | Disputed in part. The Unions did provide some information at no charge but it was not all the information necessary to identify and distribute royalties. Instead, the Fund needs to perform the majority of this work themselves. Mr. Dreith testified that the information the Unions provided to the Fund is not largely accurate and the Fund has to consult various sources of information to identify non-featured performers for payment.

McConnell Decl., Ex. 17 (Taub, October 20, 2020, Dep. Tr., 116:7 – 119:12); Ex. 16 (Sandell Dep. Tr., 36:3 – 39:22); Ex. 5 (Dreith Dep. Tr., 109:14-119:8); Ex. 18 |

| | | (Taub, January 20, 2021, Dep. Tr., 126:25-127:24). |
|---|---|---|
| 45.    Roughly half of the Fund's royalty participants are *not* members of AFM or SAG-AFTRA. | Sullivan Decl., Ex. 4 (Dreith, Tr., 117:7-118:19); Ex. 8 (Hair, February 25, 2021, Tr., 41:3-42:24). | **Objection:** Relevance. Undisputed. |
| 46.    Only a small fraction of SAG-AFTRA's roughly 160,000 members are background vocalists on sound recordings; most are film and TV actors. | Sullivan Decl., Ex. 3 (Crabtree-Ireland, February 17, 2021, Tr., 56:4-56:13); Crabtree-Ireland Decl., ¶ 2. | **Objection:** Relevance. Undisputed. |
| 47.    Only a small subset of AFM's members perform as session musicians on sound recordings.  The vast majority of AFM members are musicians who are engaged in the live entertainment industry for engagements that are performed in orchestral, theatrical, and | Sullivan Decl., Ex. 8 (Hair, February 25, 2021, Tr., 13:15-14:11); Declaration of Ray Hair ("Hair Decl."), ¶ 3. | **Objection:** Relevance. Undisputed. |

| | | |
|---|---|---|
| concert venues, restaurants, nightclubs, and bars, and for recording sessions in other media production, such as live television. | | |
| 48.      The performer and track information provided by the Unions is derived from records that have been collected, compiled, and maintained as part of a large-scale effort by the Unions over the course of decades, and such efforts continue on an ongoing basis. | Sullivan Decl., Ex. 6 (Gorbacsov Tr., 83:6-86:17); Ex. (Painting Tr., 57:5-57:19); Ex. 21 (Amended Responses of Defendant Stefanie Taub to Plaintiff's First Set of Interrogatories, Resp. to ROG 10). | Undisputed. |
| 49.      The information provided by the Unions to the Fund is derived from session reports (also called "B-forms" by the AFM) which contain information necessary to identify and locate some or all of the non-featured musicians and vocalists | Sullivan Decl., Ex. 6 (Gorbacsov Tr., 114:19-115:21); Ex. 12 (Painting Tr., 44:20-45:20); Decl., Ex. 8 (Hair, February 25, 2021 and Ex. 5 at DEFS_00000118); Ex. 21 (Amended Responses of Defendant Stefanie Taub to Plaintiff's First | **Objection:** Compound. Disputed. The session reports and B-forms are only prepared for Union session recordings. |

30

| | | |
|---|---|---|
| who performed on a given sound recording. | Set of Interrogatories, Resp. to ROG 10). | The session reports and B-forms that are provided do not include all of the information necessary to effectuate a payment and certainly do not include information on all of the tracks. The Fund's designee testified that SAG-AFTRA is only able to return 26.67% of Fund requests with session reports, while AFM is able to return 28.62%. Instead, the Fund needs to perform the majority of the research and outreach work themselves. Mr. Dreith testified that the information maintained by the Unions has to be verified and supplemented using various other sources of information because it was not entirely accurate. |

| | | McConnell Decl., Ex. 17 (Taub, October 20, 2020, Dep. Tr., 116:7 – 119:12); Ex. 16 (Sandell Dep. Tr., 36:3 – 39:22); Ex. 5 (Dreith Tr., 34:16-35:11); 109:14-119:8; Ex. 18 (Taub, January 20, 2021, Dep. Tr., 126:25-127:24). |
|---|---|---|
| 50.   These session reports and B-forms compile information related to both Union members and non-Union members who performed on a given sound recording. | Sullivan Decl., Ex. 6 (Gorbacsov Tr., 114:19-115:21); Ex. 13 (Risto Tr., 92:16-93:20); Ex. 8 (Hair, February 25, 2021 and Ex. 5 at DEFS_00000118); Ex. 21 (Amended Responses of Defendant Stefanie Taub to Plaintiff's First Set of Interrogatories, Resp. to ROG 10). | Disputed. The session reports and B-forms are only prepared for Union session recordings. Further, the Union session forms are sometimes incomplete and are not even reliably completed for all Union-session recordings. Mr. Dreith testified that the information maintained by the Unions has to be verified and supplemented using various other sources of information because it |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS IN OPPOSITION TO
DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

| | | |
|---|---|---|
| | | was not entirely accurate. McConnell Decl., Ex. 5 (Dreith Dep. Tr., 34:16-35:11; 109:14-119:8); Ex. 14 (Painting Dep. Tr., 81:24-85:24). |
| 51.    The Fund does not have access to another repository of information documenting the identities, work histories, and payment information associated with non-featured performers that is as exhaustive and accessible as the repositories maintained by the Unions. | Sullivan Decl., Ex. 15 (Taub, October 20, 2020, Tr., 149:10-150:9); Decl., Ex. 13 (Risto Tr., 128:13-128:17); Ex. 21 (Amended Responses of Defendant Stefanie Taub to Plaintiff's First Set of Interrogatories, Resp. to ROG 10). | Disputed, the Fund has access to online resources, the pension funds, records from the Country Music Hall of Fame, among other sources. Furthermore, the Union Trustees never performed any research to determine if another repository existed that could be accessed cheaper, instead choosing to pay the Unions a Service Fee per year.

McConnell Decl., Ex. 5 (Dreith Dep. Tr., 38:10-38:25; 85:4-86:13); Ex. 15 (Risto Dep. Tr., 129:5-129:14); Ex. 8 |

| | | (Hair, February 24, 2021, Dep. Tr., 196:19-198:17). |
|---|---|---|
| 52.    For some song titles, the relevant information about non-featured performers' identities and payment information is not collected in any other repositories. | Sullivan Decl., Ex. 15 (Taub, October 20, 2020, Tr., 149:10-150:12; 154:2-25). | **Objection:** Misstates evidence. Disputed. The Defendants' characterization of this testimony is inaccurate and the sections cited does not support this fact. The Fund has access and constantly utilizes numerous online resources, pension funds, record labels, etc. McConnell Decl., Ex. 5 (Dreith Dep. Tr., 38:10-38:25; 85:4-86:13); Ex. 8 (Hair, February 24, 2021 Dep. Tr., 196:19-198:17). |
| 53.    Without the data provided by the Unions, the Fund's ability to identify and locate the non-featured performers for whom royalty distributions are to be | Sullivan Decl., Ex. 15 (Taub, October 20, 2020, Tr., 149:15-151:15); Ex. 14 (Sandell Tr., 39:5-39:22); Ex. 21 (Amended Responses of Defendant Stefanie Taub to | Disputed, as Defendants' witnesses are not qualified to make this assertion. The Fund has access to online resources, the pension funds, records from the |

| paid would be hindered. | Plaintiff's First Set of Interrogatories, Resp. to ROG 10). | Country Music Hall of Fame, among other sources. Furthermore, the Union Trustees never performed any research to determine if another repository existed that could be accessed cheaper, instead choosing to pay the Unions a Service Fee per year.<br><br>McConnell Decl., Ex. 5 (Dreith Dep. Tr., 38:10-38:25; 85:4-86:13); Ex. 15 (Risto Dep. Tr., 129:5 – 129:14); Ex. 8 (Hair, February 24, 2021 Dep. Tr., 196:19-198:17). |
|---|---|---|
| 54.    Without the data provided by the Unions, the Fund would need to expend substantial efforts and incur substantial costs to compile independently the information provided by | Sullivan Decl., Ex. 15 (Taub, October 20, 2020, Tr., 149:15-151:15); Ex. 2 (Crabtree-Ireland, February 16, 2021, Tr., 130:13-131:9); Ex. 21 (Amended Responses of Defendant Stefanie Taub | Disputed. The record, including Mr. Dreith's testimony and even the Trust Agreement, mention possible alternative sources.<br><br>McConnell Decl., Ex. 5 |

| | | |
|---|---|---|
| the Unions. | to Plaintiff's First Set of Interrogatories, Resp. to ROG 10). | (Dreith Dep. Tr., 38:10-38:25; 85:4-86:13; Dep. Ex. 112 "Trust Agreement"); Ex. 8 (Hair, February 24, 2021 Dep. Tr., 196:19-198:17). |
| 55.    Union representatives expend between three to eight hours per week responding to the Fund's requests for session reports. | Sullivan Decl., Ex. 6 (Gorbacsov Tr., 88:4-89:15, 91:5-91:20, 116:10-121:15); Decl., Ex. 12 (Painting Tr., 95:6:95:22). | **Objection:** Misstates testimony. Disputed, to the extent that SAG-AFTRA only identified three employees who collectively spend six hours per week responding to Fund requests. Since the Fund has direct electronic access to the databases at the AFM locals in New York and Los Angeles, AFM could only identify (at most) 2-3 hours of work per week for the AFM local in Nashville to respond to Fund requests. |

| | | |
|---|---|---|
| | | McConnell Decl., Ex. 7 (Gorbacsov Dep. Tr., 88:4-89:15, 91:5-91:20, 116:10-121:15); Ex. 14 (Painting Dep. Tr., 95:6-95:22). |
| 56.    The Unions have fielded thousands of requests over the years for session and performer information from the Fund. | Sullivan Decl., Ex. 6 (Gorbacsov Tr., 126:11-127:23; Ex. 14 (Sandell Tr., 31:8-31:14). | Undisputed, but this fact does not state how much time the Union representatives spend nor does it state how many requests are answered with information. |
| 57.    Between 2014 and 2020, the Fund made 13,777 requests to SAG-AFTRA alone. | Sullivan Decl., Ex. 6 (Gorbacsov Tr., 126:6-127:23). | Undisputed, but this fact does not state how much time the Union representatives spend nor does it state how many requests are answered with information. |
| 58.    In response to Plaintiff's discovery requests, Defendants have produced in excess of 15,000 emails which reflect communications between the Fund and the | Sullivan Decl., ¶ 43. | **Objection:** Lacks foundation, misstates the evidence. See Plaintiff's Objections to Evidence.<br><br>Defendants have produced thousands of |

| | | |
|---|---|---|
| Unions pertaining to requests by the Fund for data regarding non-featured performers. | | pages of documents showing that the Unions do not have data on a multitude of requests. See, e.g., McConnell Decl., Ex. 19 (DEFS_00024887; DEFS_00015502; DEFS_00017045; DEFS_00018779; DEFS_00019595; DEFS_00019903; DEFS_00024966); Ex. 21 ("Kermit the Frog Documents"). |
| 59.　The session reports and B-forms maintained by the Unions are housed across the various local affiliates of each Union, for the most part based on where the relevant sound recording took place.  Much of the information exists in records that are maintained by the | Sullivan Decl., Ex. 6 (Gorbacsov Tr., 88:4-90:16, 121:16-121:21); Decl., Ex. 12 (Painting Tr., 46:24-47:12, 88:4-90:11); Ex. 14 (Sandell Tr., 63: 9-64:6). | **Objection:** Misstates testimony. Disputed. SAG-AFTRA does not have the same local structure as AFM. At SAG-AFTRA, all the requests are filtered through one SAG-AFTRA employee in Nashville, who will then make requests of the L.A. and N.Y. office as |

| | | |
|---|---|---|
| Unions' local affiliates only in hard copy form. | | needed. At AFM, the Fund has direct electronic access to the local AFM chapters in L.A. and N.Y., so the only major local that still maintains hard copies is Nashville. The minor locals might received three requests per month from teh Fund. McConnell Decl., Ex. 7 (Gorbacsov Dep. Tr., 88:4-89:15, 91:5-91:20, 116:10-121:15); Ex. 14 (Painting Dep. Tr., 95:6-95:22; 90:13-91:21). |
| 60.    Because the session reports and B-forms maintained by the Unions exist in decentralized repositories dispersed across the Unions' local affiliates, the Unions satisfy their obligations under the Agreement by making | Sullivan Decl., Ex. 12 (Painting Tr., 50:18-51:23, 95:23-97:18); Ex. 6 (Gorbacsov Tr., 88:4-91:20); Ex. 21 (Amended Responses of Defendant Stefanie Taub to Plaintiff's First Set of Interrogatories, Resp. to ROG 10). | **Objection:** Misstates testimony. Disputed. SAG-AFTRA does not have the same local structure as AFM. At SAG-AFTRA, all the requests are filtered through one SAG-AFTRA employee in Nashville, who will then |

| | | |
|---|---|---|
| numerous representatives available across these affiliates in order to field requests from the Fund. For example, SAG-AFTRA has representatives in New York City, Los Angeles, and Nashville fielding requests from the Fund. | | make requests of the L.A. and N.Y. office as needed. The Nashville employee spends five hours per week on Fund requests and the other two employees collectively spend 1 hour per week. |
| | | At AFM, the Fund has direct electronic access to the local AFM chapters in L.A. and N.Y., so the only major local that still maintains hard copies is Nashville. AFM's 30(b)(6) on this "data" topic estimated that the Nashville employee spends approximately 2 hours per week whereas the L.A. and N.Y. employee spends 15-20 hours per year. McConnell Decl., Ex. 7 (Gorbacsov Dep. Tr., 88:4-89:15, 91:5-91:20, |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS IN OPPOSITION TO
DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

| | | 116:10-121:15); Ex. 14 (Painting Dep. Tr., 95:6-95:22). |
|---|---|---|
| 61.    The Fund's research team—currently staffed with eleven full-time research associates and supervisors—works extensively with representatives in various local affiliates of the Unions on a year-round basis to obtain information regarding the non-featured performers associated with thousands of song titles. | Sullivan Decl., Ex. 2 (Crabtree-Ireland, February 16, 2021, Tr., 163:12:163:19); Ex. 21 (Amended Responses of Defendant Stefanie Taub to Plaintiff's First Set of Interrogatories, Resp. to ROG 10). | **Objection:** Misstates testimony. Disputed. The Fund's research does not work extensively with representatives at various local affiliates. At SAG-AFTRA, all the Fund's requests are filtered through one SAG-AFTRA employee in Nashville, who will then make requests of the L.A. and N.Y. office as needed. The Nashville employee spends five hours per week on Fund requests and the other two employees collectively spend 1 hour per week. At AFM, the Fund has direct electronic access to the major local AFM |

41

| | | chapters in L.A. and N.Y., so the only major local that still maintains hard copies, and needs to be interacted with, is Nashville. AFM's 30(b)(6) on this "data" topic estimated that the Nashville employee spends approximately 2 hours per week whereas the L.A. and N.Y. employee spends 15-20 hours per year. The minor AFM locals might receive three requests from the Fund per month. McConnell Decl., Ex. 7 (Gorbacsov Dep. Tr., 88:4-89:15, 91:5-91:20, 116:10-121:15); Ex. 14 (Painting Dep. Tr., 95:6-95:22, 90:13-91:21). |
|---|---|---|
| 62.   At Union local affiliates where session reports and B-forms exist in hard copy form, Union | Sullivan Decl., Ex. 12 (Painting Tr., 87:11-90:11); Ex. 6 (Gorbacsov Tr., 78:16-78:25); Ex. 7 | Undisputed. |

42

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS IN OPPOSITION TO DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

| | | |
|---|---|---|
| representatives must locate the requested document within their hard copy filing system before scanning and sending a digital copy of the record to the requestor at the Fund. | (Sandell Tr., Ex. 7 at pp. 1-2); Ex. 21 (Amended Responses of Defendant Stefanie Taub to Plaintiff's First Set of Interrogatories, Resp. to ROG 10); Ex. 19 (Amended Responses of Defendant Raymond Hair to Plaintiff's First Set of Interrogatories, Resp. to ROG 10). | |
| 63.     It is not uncommon for a Union representative at one local affiliate to field dozens of requests from the Fund over the course of a week. | Sullivan Decl., Ex. 6 (Gorbacsov Tr., 88:4-88:25); Ex. 19 (Amended Responses of Defendant Raymond Hair to Plaintiff's First Set of Interrogatories, Resp. to ROG 10). | **Objection:** Misstates testimony. Disputed to the extent that Ms. Gorbacsov's cited testimony does not support this "fact." At SAG-AFTRA, all the Fund's requests are filtered through one SAG-AFTRA employee in Nashville, who will then make requests of the L.A. and N.Y. office as needed. The Nashville employee spends five |

43

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

hours per week on Fund requests and the other two employees collectively spend 1 hour per week.

At AFM, the Fund has direct electronic access to the major local AFM chapters in L.A. and N.Y., so the only major local that still maintains hard copies, and needs to be interacted with, is Nashville. AFM's 30(b)(6) on this "data" topic estimated that the Nashville employee spends approximately 2 hours per week whereas the L.A. and N.Y. employee spends 15-20 hours per year. The minor AFM locals might receive three requests from the Fund per month. McConnell Decl., Ex. 7 (Gorbacsov Dep. Tr.,

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS IN OPPOSITION TO DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

| | | 88:4-89:15, 91:5-91:20, 116:10-121:15); Ex. 14 (Painting Dep. Tr., 95:6-95:22, 90:13-91:21). |
|---|---|---|
| 64.   Fulfilling each such request may take a Union representative anywhere from a few minutes to thirty minutes or longer. | Sullivan Decl., Ex. 14 (Sandell Tr., 47:19-48:20); Ex. 12 (Painting Tr., 102:9-23); Ex. 21(Amended Responses of Defendant Stefanie Taub to Plaintiff's First Set of Interrogatories). | Undisputed. |
| 65.   From 2013 to present, the number of requests for session report information from the Fund to the Unions has increased.  The corresponding amount of time and effort the Unions spend responding the Fund's requests has also increased. | Sullivan Decl., Ex. 15 (Taub, October 20, 2020, Tr., 67:4-68:12); Ex. 12 (Painting Tr., 32:1-33:2); Ex. 6 (Gorbacsov Tr., 48:9-50:15, 153:5-154:25). | **Objection:** Misstates Testimony. Disputed. Mr. Painting's cited testimony does not support this "fact." Ms. Gorbacsov testified that "over time [responding to the Fund] became a little bit more of a priority" and that she was "paying a little bit more attention to them," but she did not say that she was spending more time on requests because they were |

| | | increasing. While Ms. Taub testified that at one point SAG-AFTRA hired another person, responding to the Fund was not his full time job. Finally, Mr. Painting, AFM's 30(b)(6) on "data" could only offer assumptions about whether an increase in the service fee implies that there is an increase in the amount of work and research. McConnell Decl., Ex. 17 (Taub, October 20, 2020, Dep. Tr., 67:4-68:12); Ex. 7 (Gorbacscov Dep. Tr., 48:9-50:15); Ex. 14 (Painting Dep. Tr., 131:20-132:24). |
|---|---|---|
| 66.    Since 2013, the Unions have provided legislative advocacy and other advocacy services both domestically and | Sullivan Decl., Ex. 2 (Crabtree-Ireland, February 16, 2021, Tr., 17:1-17:23, 19:2-21:22); Ex. 3 (Crabtree-Ireland, | **Objection:** Relevance. Disputed, to the extent that the Unions have provided advocacy services that benefit |

Case 2:18-cv-07241-CAS-PLA   Document 111-1   Filed 05/14/21   Page 48 of 139   Page ID #:2451

| | | |
|---|---|---|
| internationally that benefit non-featured performers (both Union members and non-Union members). | February 17, 2021, Tr., 25:22-26:22); Ex. 15 (Taub, October 20, 2020, Tr., 133:12-134:16); Ex. 7 (Hair, February 24, 2021, Tr., 108:8-108:25, 158:16-160:11, 167:11-169:2); Ex. 21 (Amended Responses of Defendant Stefanie Taub to Plaintiff's First Set of Interrogatories, Resp. to ROG 10); Ex. 34 (DEFS_00041973); Ex. 37 (DEFS_00041992); Ex. 38 (DEFS_00041996); Ex. 26 (DEFS_00041718); Ex. 28 (DEFS_00041722); Ex. 29 (DEFS_00041728); Ex. 36 (DEFS_00041988); Ex. 31 (DEFS_00041736); Ex. 30 (DEFS_00041734); Ex. 32 (DEFS_00041740); | Union and non-Union members since the beginning of their non-profit organizations pursuant to their mission statements. McConnell Decl., Ex. 3 (Dep. Ex. 1 at "Objectives," SAG-AFTRA Constitution, art. III, § (A)-(I)); Ex. 9 (Dep. Ex. 2 at "Mission," AFM Bylaws, Art. 2, § 1); Bookman Decl., Ex. 1. |

47
PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS IN OPPOSITION TO
DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

| | Ex. 35<br>(DEFS_00041986). | |
|---|---|---|
| 67.    Since 2013, the Unions have met with and negotiated with domestic performing rights organizations (PROs), as well as engaged with international PROs to negotiate better terms for the collection and distribution of international royalties. | Sullivan Decl., Ex. 2 (Crabtree-Ireland, February 16, 2021, Tr., 20:4-20:7); Ex. 21 (Amended Responses of Defendant Stefanie Taub to Plaintiff's First Set of Interrogatories, Resp. to ROG 10); Ex. 38 (DEFS_00041996); Ex. 28 (DEFS_00041722); Ex. 40 (DEFS_00041983); Ex. 30 (DEFS_00041734). | **Objection:** Relevance. Disputed, to the extent that the Unions have provided advocacy services that benefit Union and non-Union members since the beginning of their non-profit organizations pursuant to their mission statements. McConnell Decl., Ex. 3 (Dep. Ex. 1 at "Objectives," SAG-AFTRA Constitution, art. III, § (A)-(I)); Ex. 9 (Dep. Ex. 2 at "Mission," AFM Bylaws, Art. 2, § 1); Bookman Decl., Ex. 1. |
| 68.    The Unions negotiate and interact with the World Intellectual Property Organization (WIPO), | Sullivan Decl., Ex. 2 (Crabtree-Ireland, February 16, 2021, Tr., 19:2-21:22); Ex. 3 (Crabtree-Ireland, | **Objection:** Relevance. Disputed, to the extent that the Unions have provided advocacy services that benefit |

| | | |
|---|---|---|
| the Societies' Council for the Collective Management of Performers' Rights (SCAPR), Phonographic Performance Limited (PPL), and the Musicians' Rights Organization Canada (MROC), among other international organizations. | February 17, 2021, Tr., 27:10-28:1); Ex. 7 (Hair, February 24, 2021, Tr., 159: 5-160:11); Ex. 21 (Amended Responses of Defendant Stefanie Taub to Plaintiff's First Set of Interrogatories, Resp. to ROG 10), Ex. 24 (DEFS_00041708); Ex. 25 (DEFS_00041713); Ex. 27 (DEFS_00041720); Ex. 28 (DEFS_00041722); Ex. 29 (DEFS_00041728); Ex. 36 (DEFS_00041988); Ex. 41 (DEFS_00041989). | Union and non-Union members since the beginning of their non-profit organizations pursuant to their mission statements. McConnell Decl., Ex. 3 (Dep. Ex. 1 at "Objectives," SAG-AFTRA Constitution, art. III, § (A)-(I)); Ex. 9 (Dep. Ex. 2 at "Mission," AFM Bylaws, Art. 2, § 1); Bookman Decl., Ex. 1. |
| 69.    This activity includes efforts to expand the performance right in sound recordings in the United States to apply to non-digital platforms (e.g., terrestrial radio), a cause which the Unions | Sullivan Decl., Ex. 21 (Amended Responses of Defendant Stefanie Taub to Plaintiff's First Set of Interrogatories, Resp. to ROG 14). | **Objection:** Relevance. Disputed, to the extent that the Unions have provided advocacy services that benefit Union and non-Union members since the beginning of their non- |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS IN OPPOSITION TO
DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

| | | |
|---|---|---|
| have furthered through their participation in the musicFIRST coalition. | | profit organizations pursuant to their mission statements. McConnell Decl., Ex. 3 (Dep. Ex. 1 at "Objectives," SAG-AFTRA Constitution, art. III, § (A)-(I)); Ex. 9 (Dep. Ex. 2 at "Mission," AFM Bylaws, Art. 2, § 1); Bookman Decl., Ex. 1. |
| 70.    The Unions also advocate with foreign governments for more stringent distribution requirements for collected royalties. | Sullivan Decl., Ex. 2 (Crabtree-Ireland, February 16, 2021, Tr., 19:2-21:22); Ex. 8 (Hair, February 25, 2021, Tr., 63:6-63:21); Ex. 21 (Amended Responses of Defendant Stefanie Taub to Plaintiff's First Set of Interrogatories, Resp. to ROG 14); Ex. 26 (DEFS_00041718); Ex. 31 (DEFS_00041736); Ex. 29 (DEFS_00041728). | **Objection:** Relevance. Disputed, to the extent that the Unions have provided advocacy services that benefit Union and non-Union members since the beginning of their non-profit organizations pursuant to their mission statements. McConnell Decl., Ex. 3 (Dep. Ex. 1 at "Objectives," SAG-AFTRA Constitution, art. |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS IN OPPOSITION TO
DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

| | | III, § (A)-(I)); Ex. 9 (Dep. Ex. 2 at "Mission," AFM Bylaws, Art. 2, § 1); Bookman Decl., Ex. 1. |
|---|---|---|
| 71.    The Unions' advocacy activities inure to the benefit of non-featured performers, regardless of Union affiliation, as they are aimed in part at increasing the scope and overall amount of the royalties paid for recordings on which non-featured musicians and vocalists have performed. | Sullivan Decl., Ex. 2 (Crabtree-Ireland, February 16, 2021, Tr., 19:2-20:3), Ex. 8 (Hair, February 25, 2021, Tr., 63:6-63:21). | **Objection:** Relevance. Disputed, to the extent that the Unions have provided advocacy services that benefit Union and non-Union members since the beginning of their non-profit organizations pursuant to their mission statements. McConnell Decl., Ex. 3 (Dep. Ex. 1 at "Objectives," SAG-AFTRA Constitution, art. III, § (A)-(I)); Ex. 9 (Dep. Ex. 2 at "Mission," AFM Bylaws, Art. 2, § 1); Bookman Decl., Ex. 1. |
| 72.    One example of Union advocacy work | Sullivan Decl., Ex. 2 (Crabtree-Ireland, | **Objection:** Relevance. Disputed, to the extent |

| | | |
|---|---|---|
| that benefitted non-featured performers is the inclusion of a provision in the Music Modernization Act that extends the Section 114 statutory license to pre-1972 sound recordings. | February 16, 2021, Tr., 212:3-216:8); Ex. 15 (Taub, October 20, 2020, Tr., 103:3-105:19; Hair Decl., ¶ 4; *see* 17 U.S.C. §. 1401(b). | that the Unions have provided advocacy services that benefit Union and non-Union members since the beginning of their non-profit organizations pursuant to their mission statements. McConnell Decl., Ex. 3 (Dep. Ex. 1 at "Objectives," SAG-AFTRA Constitution, art. III, § (A)-(I)); Ex. 9 (Dep. Ex. 2 at "Mission," AFM Bylaws, Art. 2, § 1); Bookman Decl., Ex. 1. |
| 73.    The Unions advocated in favor of the "escheat preemption" provision of the Music Modernization Act, which permits the Fund to distribute royalties from prior years to performers without | Sullivan Decl., Ex. 2 (Crabtree-Ireland, February 16, 2021, Tr., 219:12-219:23); Ex. 3 (Crabtree-Ireland, February 17, 2021, Tr., 28:2-28:24); *see* 17 U.S.C. §. 114(g)(7). | **Objection:** Relevance.<br><br>Disputed, to the extent that the Unions have provided advocacy services that benefit Union and non-Union members since the beginning of their non- |

52

| | | |
|---|---|---|
| regard to each state's escheat laws. | | profit organizations pursuant to their mission statements. |
| | | McConnell Decl., Ex. 3 (Dep. Ex. 1 at "Objectives," SAG-AFTRA Constitution, art. III, § (A)-(I)); Ex. 9 (Dep. Ex. 2 at "Mission," AFM Bylaws, Art. 2, § 1); Bookman Decl., Ex. 1. |
| 74.    In February 2021, the Fund analyzed a sample of 50 song titles for which session report data had been made available from the Unions.  The Fund directed its researchers to locate accurate song title information without using the data provided by the Unions.  The Fund found that when its researchers had access only to publicly available, non-Union sources of information, they were able to locate | Sandell Decl., ¶¶ 2, 7-9, 10. | **Objection.** Lacks foundation. Calls for expert opinion. See Plaintiff's Objections to Evidence. |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS IN OPPOSITION TO DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

| | | |
|---|---|---|
| the accurate credits information (*i.e.*, who performed on a given song title) for just 20 out of the 50 tracks in the sample (*i.e.*, 40%). | | |
| 75.     Dennis Dreith—the former Executive Director of the Fund confirmed to Fund Trustee Duncan Crabtree-Ireland that the information the Unions provide to the Fund is "valuable". | Sullivan Decl., Ex. 4 (Dreith, Tr., 117:8-119:8, Ex. 120 at DEFS_00040161-DEFS_00040162, and Ex. 126). | Disputed to the extent that the Copyright Act does not allow the Fund to deduct the value of information from the beneficiaries' royalty allocations. Further disputed to the extent Defendants mischaracterize Mr. Dreith's testimony. 17 U.S.C. § 114; McConnell Decl., Ex. 5 (Dreith Dep. Tr., 286:3 – 286:22). |

## III.    THE TRUSTEES' APPROVAL OF THE DATA PURCHASE AND SERVICE AGREEMENT

| Uncontroverted Fact | Supporting Evidence | Plaintiff's Response |
|---|---|---|
| 76.     On July 22, 2013, the Fund entered into a | Sullivan Decl., Ex. 8 (Hair, February 25, 2021, | Undisputed. |

54

| | | |
|---|---|---|
| Data Purchase and Services  Agreement (the "Data Agreement") with the Unions. | Dep. Ex. 5); Ex. 13 (Risto Tr., Ex. 101 at ¶ 11). | |
| 77.    Pursuant to the Data Agreement, the Unions are to provide the Fund with information from its member databases to enable the Fund to obtain contact information for Union members entitled to receive royalties, as well as access to session reports and other information necessary to identify and contact non-Union royalty recipients. | Sullivan Decl., Ex. 8 (Hair, February 25, 2021, Tr., Ex. 5 at DEFS_00000118). | Undisputed. |
| 78.    In exchange for information from the Union member databases and access to Union-maintained session reports and other services, the Data | Sullivan Decl., Ex. 8 (Hair, February 25, 2021, Tr., Ex. 5 at DEFS_00000120); Ex. 16 (Taub, January 20, 2021, Tr., 176:7-177:9 and Ex. 9 at MKA | Undisputed. |

| | | |
|---|---|---|
| Agreement provides that the Unions are each to receive compensation in the form of 1.5%, or 3% collectively, of the royalty receipts allocated for distribution by the Fund in each distribution cycle. | 000078). | |
| 79.    The concept of the Fund compensating the Unions for the data and services they provided to the Fund was discussed in 2012 by Raymond Hair, Duncan Crabtree-Ireland, Dennis Dreith, and the Fund's legal counsel, Patricia Polach. | Sullivan Decl., Ex. 2 (Crabtree-Ireland, February 16, 2021, Tr., at 150:4-152: 11); Ex. 4 (Dreith, Tr., 153:17-154:16); Ex. 7 (Hair, February 24, 2021, Tr., 156:6-158:13,163:24-165:16). | Disputed. Ms. Polach was representing both the Fund and the Unions in facilitating the Services Agreement. Further disputed to the extent that there was never a conversation between all of the individuals mentioned by Defendants in this "fact." Instead, from the time that he became President of AFM in 2011, Mr. Hair had repeatedly brought up to Mr. Dreith that he felt it was "unfair that the unions had invested a |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS IN OPPOSITION TO DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

| | | |
|---|---|---|
| 1 | | great deal of time and |
| 2 | | money and energy to |
| 3 | | help pass the copyright |
| 4 | | law and establish the |
| 5 | | fund, and that he felt that |
| 6 | | the fund had all these |
| 7 | | resources…but yet the |
| 8 | | AFM was going through |
| 9 | | a lot of financial |
| 10 | | difficulties and didn't |
| 11 | | have the money to pay |
| 12 | | for a lot of things that he |
| 13 | | wanted to do, and he felt |
| 14 | | that it was unfair that the |
| 15 | | fund had all this money, |
| 16 | | and he felt that he should |
| 17 | | have some of it." |
| 18 | | McConnell Decl., Ex. 5 |
| 19 | | (Dreith Dep. Tr., 196:3- |
| 20 | | 10; 153:17-154:10). |
| 21 | | In the months prior to the |
| 22 | | 6/3/13 meeting where the |
| 23 | | Services Agreement was |
| 24 | | voted on, Mr. Dreith |
| 25 | | "was not in favor of [the |
| 26 | | service fee]." |
| 27 | | McConnell Decl., Ex. 5 |
| 28 | | |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS IN OPPOSITION TO
DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(Dreith Dep. Tr., 155:11-18).

One or two months prior to the 6/3/13 trustee meeting, Mr. Dreith told Mr. Hair "what would really be fair and equitable is that if we could actually identify how much money the unions had spent in support of the fund…would really make sense to me to basically compensate them for what they had done and reimburse them for their expenses. And Ray didn't take favorably to that proposal, shall we say." McConnell Decl., Ex. 5 (Dreith Dep. Tr., 155:19-156:25).

Mr. Dreith told Mr. Hair that "if they could come up with a number that was a number we could

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS IN OPPOSITION TO DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

| | | |
|---|---|---|
| | | justify that if we ever had to do to Congress, we could actually say that here was a number that was the unions had invested in this and it was to reimburse them for their investment. I thought that would be a fair and equitable situation. And that- that was the last of that discussion, and the next time I heard about this was in a call from Trish Polach [telling him she was drafting an agreement]." McConnell Decl., Ex. 5 (Dreith Dep. Tr., 157: 1-13). |
| 80.     In 2012 and early 2013, prior to the Trustees' approval of the Data Agreement, the Fund's Executive Director, Dennis Dreith, | Hair Decl., ¶ 5; Crabtree-Ireland Decl, ¶ 3; Sullivan Decl., Ex. 9 (Hoffman Dep. Ex. 141) (stating that "I fully support the idea" of | **Objection:** Relevance. Disputed. Misstates evidence. In the months prior to the 6/3/13 meeting where the Services Agreement was |

| | | |
|---|---|---|
| supported the concept of compensating the Unions for the data and services they provided to the Fund. | reimbursing the Unions for the data and services they provided); Ex. 7 (Hair, February 24, 2021, Tr., 163:11-165:16); Ex. 4 (Dreith Tr, 248:6-20 and Ex. 120 (describing the Service Fee as "a completely justifiable expense"; and proposing to inform Fund participants that "While in the early days of the Fund's operation it was impossible to compensate the unions for their valuable service, the Fund has now grown to the point where such compensation is not only possible, but highly warranted."). | voted on, Mr. Dreith "was not in favor of [the service fee]." McConnell Decl., Ex. 5 (Dreith Dep. Tr., 155:11-18). Further, Mr. Dreith's emails supporting reimbursement of actual costs of the Unions are taken out of context. Ex. 120 is also taken out of context. Mr. Hair had a disagreement with Mr. Dreith about whether the Service Fee should be disclosed in a participant letter which accompanied the first distribution after the passage of the Services Agreement.  Mr. Dreith went behind Mr. Hair's back, and proposed several drafts of a letter to the Trustees which would disclose the Fee to participants. The Trustees voted to not |

| | | |
|---|---|---|
| | | directly inform the participants about the Fee. In the letter, Mr. Dreith was "doing [his] best to put the best spin on it" and trying to get the Trustees to approve a letter which would disclose the fee to beneficiaires. McConnell Decl., Ex. 5 (Dreith Dep. Tr., 244:11-251:5). |
| 81.    Prior to the Trustee's approval of the Data Agreement, Raymond Hair and Duncan Crabtree-Ireland considered whether the Fund should conduct a study of the time and effort expended by Union personnel in providing information to the Fund, but decided that such an analysis would be inappropriate, needlessly | Sullivan Decl., Ex. 2 (Crabtree-Ireland, February 16, 2021, Tr., 116:22-118:18); Ex. 3 (Crabtree-Ireland, February 17, 2021, Tr., 94:11-94:16). | Disputed. There are no documents to support Mr. Crabtree-Ireland's testimony. According to Mr. Dreith, the only concern about the amount of the fee was selecting a percentage to avoid detection from foreign societies. The Trustees failed to investigate whether foreign CMOs pay for data. The Trustees did |

| | | |
|---|---|---|
| cumbersome, and costly. | | not conduct a single inquiry to how other organizations operating under Section 114 incurred costs. If Mr. Crabtree-Ireland did consider whether a study should be performed, he never informed any of the other Trustees. None of the Fund employees were asked how much effort the Unions expend responding to their requests. The Trustees have not considered a study as the amount of the fee increased every year since 2013. McConnell Decl., Ex. 17 (Taub, October 20, 2020, Dep. Tr., 91:17-92:17; 96:8-99:13); Ex. 6 (Gagliardi Dep. Tr., 110:5-15); Ex. 1 (Bouton Dep. Tr., 41:16-43:21); |

| | | |
|---|---|---|
| | | Ex. 10 (Joyce Dep. Tr., 48:7-49:8); Ex. 12 (LeBlanc Dep. Tr., 66:5-68:19); Ex. 16 (Sandell Dep. Tr., 70:21-72:18); Ex. 14 (Painting Dep. Tr., 126:7-127:10); Ex. 7 (Gorbacsov Dep. Tr., 144:13-146:8); Ex. 5 (Dreith Dep. Tr., 164:2-168:7); Adams Decl., Ex. 1; Kessler Decl., Ex. 1. |
| 82.     On May 30, 2013, the Fund's Executive Director, Dennis Dreith, circulated an email to all of the Fund Trustees which included materials for the meeting and an agenda that listed "AFM & SAG-AFTRA Service fees" as an item to be considered. | Sullivan Decl., Ex. 4 (Dreith, Tr., 221:4-223-:1 and Ex. 118). | Undisputed. |
| 83.     The Data Agreement was proposed to the Trustees during the June 4, 2013 Board of | Sullivan Decl., Ex. 2 (Crabtree-Ireland, February 16, 2021, Tr., 151:17-151:25 and Ex. 3 | Disputed. There is no testimony about how much discussion there was on the services |

| | | |
|---|---|---|
| Trustees meeting. The Board discussed the proposed agreement and service fee for at least 20 minutes prior to the Board's unanimous decision to approve it. | at DEFS_00040631A-DEFS_000406312A); Ex. 7 (Hair, February 24, 2021, Tr., 189:23-190:9); Ex. 1 (Bouton Tr., 46:21-50:24); Taub Decl., ¶ 16. | agreement, as none of the Trustees remember what, if anything, was discussed. Mr. Hair stated there were no questions from any of the Trustees. There is also conflicting testimony about whether the vote was unanimous and whether there was unit voting or if each Trustee has his/her own vote. Finally, Mr. Crabtree-Ireland claims he abstained from voting but no other Trustee nor Mr. Dreith corroborate that testimony.

McConnell Decl., Ex. 5 (Dreith Dep. Tr., 240:24—241:1); Ex. 18 (Taub January 20, 2021, Dep. Tr., 74:17-75:7); Ex. 8 (Hair February 24, 2021 Dep. Tr., 117:15- |

| | | 19; 190:10-25, 192:18-193:8); Ex. 2 (Crabtree-Ireland February 16, 2021 Dep. Tr., 76:22-81:2). |
|---|---|---|
| 84.      During the June 4, 2013 Board of Trustees meeting where the Data Agreement was discussed and approved, the Trustees and Mr. Dreith considered whether the 3% fee would cause the Fund's overall expense ratio to increase to a level that was out of step with the overall administrative fees charged by some similar royalty distribution organizations, which in some cases charge fees in excess of 25%.  One concern raised was whether the 3% fee would impede the Fund's ability to reach bilateral | Sullivan Decl., Ex. 4 (Dreith, Tr. 164:2-168:7). | Undisputed. |

65

| | | |
|---|---|---|
| agreements with other performing rights organizations.  The Trustees and Mr. Dreith concluded that the 3% fee did not pose these risks. | | |
| 85.     Mr. Dreith had discussed the same issue with Mr. Crabtree-Ireland and Mr. Hair by email in January 25, 2013, where Mr. Dreith noted that the Fund's overall expense ratio was less than 10%, while the administrative expense ratio of the Netherlands collective management organization ("SENA") was 15%. | Sullivan Decl., Ex. 4 (Dreith, Tr., 213:10-217:17 and Ex. 117 at DEFS00040116). | Undisputed. |
| 86.     During the June 4, 2013 Board meeting where the Data Agreement was approved, no one, including the Fund's | Sullivan Decl., Ex. 4 (Dreith, Tr., 236:22-239:14) ; Ex. 7 (Hair, February 24, 2021, Tr., 189:23-190:12); Ex. 2 (Crabtree-Ireland, | Disputed. Prior to the June 4, 2013 board meeting, where the agreement was effectively already a foregone conclusion, Mr. |

| Executive Director Mr. Dreith, raised concerns about the legality, propriety, or reasonableness of implementing the Service Fee. | February 16, 2021, Tr., 151:17-151:25 and Ex. 3 at DEFS_00040631A-DEFS_00040632A). | Dreith had previously raised his concerns about the legality and reasonableness of the Service Fee to the Board's co-chair Mr. Hair and the Fund's attorney Ms. Polach. Mr. Bouton testified that while there are discussions on certain things, the Services Agreement "went through fairly quickly." Furthermore, Thomas F. Lee, a prior Fund Trustee and Mr. Hair's immediate predecessor as AFM President, was told that the Service Fee was not legal by the Fund's counsel years before it was implemented.

McConnell Decl., Ex. 5 (Dreith Dep. Tr., 158:16-162:4; 162:6-163:9; |

| | | 166:7 ; 164:2-166:18); Ex. 1 (Bouton Dep. Tr., 64:8-11); Bookman Decl., Ex. 1. |
|---|---|---|
| 87.    During the June 4, 2013 Board meeting where the Data Agreement was approved, no one, including the Fund's Executive Director Mr. Dreith, spoke against implementing the Service Fee. | Sullivan Decl., Ex. 4 (Dreith, Tr., 236:22-239:14);  Ex. 2 (Crabtree-Ireland, February 16, 2021, Tr., 151: 17-151:20 and Ex. 3 at DEFS_00040631A-DEFS_00040632A); Ex. 7 (Hair February 24, 2021, Tr., 190:10-190:12); Ex. 21 (Amended Responses of Defendant Stefanie Taub to Plaintiff's First Set of Interrogatories, Resp. to ROG 10). | **Objection:** Relevance.<br><br>Disputed to the extent that Mr. Dreith repeatedly raised concerns about the legality and reasonableness of the Service Fee.<br>From the time that he became President of AFM in 2011, Mr. Hair had repeatedly brought up to Mr. Dreith that he felt it was "unfair that the unions had invested a great deal of time and money and energy to help pass the copyright law and establish the fund, and that he felt that the fund had all these resources…but yet the |

| | | | |
|---|---|---|---|
| 1 | | | AFM was going through |
| 2 | | | a lot of financial |
| 3 | | | difficulties and didn't |
| 4 | | | have the money to pay |
| 5 | | | for a lot of things that he |
| 6 | | | wanted to do, and he felt |
| 7 | | | that it was unfair that the |
| 8 | | | fund had all this money, |
| 9 | | | and he felt that he should |
| 10 | | | have some of it." |
| 11 | | | McConnell Decl., Ex. 5 |
| 12 | | | (Dreith Dep. Tr., 153:17- |
| 13 | | | 155:10). |
| 14 | | | In the months prior to the |
| 15 | | | 6/3/13 meeting where the |
| 16 | | | Services Agreement was |
| 17 | | | voted on, Mr. Dreith |
| 18 | | | "was not in favor of [the |
| 19 | | | service fee]." |
| 20 | | | McConnell Decl., Ex. 5 |
| 21 | | | (Dreith Dep. Tr., 155:11- |
| 22 | | | 18). |
| 23 | | | One or two months prior |
| 24 | | | to the 6/3/13 trustee |
| 25 | | | meeting, Mr. Dreith told |
| 26 | | | Mr. Hair "what would |
| 27 | | | really be fair and |
| 28 | | | |

equitable is that if we could actually identify how much money the unions had spent in support of the fund…would really make sense to me to basically compensate them for what they had done and reimburse them for their expenses. And Ray didn't take favorably to that proposal, shall we say." McConnell Decl., Ex. 5 (Dreith Dep. Tr., 155:19-156:25).

Mr. Dreith told Mr. Hair that "if they could come up with a number that was a number we could justify that if we ever had to do to Congress, we could actually say that here was a number that was the unions had invested in this and it was to reimburse them for

| | | |
|---|---|---|
| 1 | | their investment. I |
| 2 | | thought that would be a |
| 3 | | fair and equitable |
| 4 | | situation. And that- that |
| 5 | | was the last of that |
| 6 | | discussion, and the next |
| 7 | | time I heard about this |
| 8 | | was in a call from Trish |
| 9 | | Polach [telling him she |
| 10 | | was drafting an |
| 11 | | agreement]." |
| 12 | | McConnell Decl., Ex. 5 |
| 13 | | (Dreith Dep. Tr., 157: 1- |
| 14 | | 13). |
| 15 | | |
| 16 | | On the day of the vote of |
| 17 | | the Services Agreement, |
| 18 | | Trustee Bouton testified |
| 19 | | that he "basically showed |
| 20 | | up at the meeting and the |
| 21 | | whole thing was |
| 22 | | presented and I had to |
| 23 | | approve or disapprove." |
| 24 | | Mr. Bouton admitted that |
| 25 | | he was not part of any |
| 26 | | discussion about the |
| 27 | | terms of the Services |
| 28 | | |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS IN OPPOSITION TO
DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

| | | |
|---|---|---|
| | | Agreement, and that "when the meeting happened, you know, this was the number that was presented and proposed" and that "this kind of went through really quickly." McConnell Decl., Ex. 1 (Bouton Dep. Tr., 40:22-41:22; 64:6-11; 94:4-13); Bookman Decl., Ex. 1. |
| 88.    During the June 4, 2013 Board meeting where the Data Agreement was approved, no one, including the Fund's Executive Director Mr. Dreith, suggested a time and materials study, or another analysis of the cost to the Unions to provide the relevant services, should be conducted prior to implementing the Service | Sullivan Decl., Ex. 4 (Dreith, Tr., 238:13-239:15), Ex. 2 (Crabtree-Ireland, February 16, 2021, Tr., 117:17-118:18 and Ex. 3 at DEFS_00040631A-DEFS_00040632A). | **Objection:** Relevance. Disputed to the extent that Mr. Dreith repeatedly raised concerns about the legality and reasonableness of the Service Fee. From the time that he became President of AFM in 2011, Mr. Hair had repeatedly brought up to Mr. Dreith that he felt it was "unfair that the |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS IN OPPOSITION TO
DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

| | | |
|---|---|---|
| Fee. | | unions had invested a great deal of time and money and energy to help pass the copyright law and establish the fund, and that he felt that the fund had all these resources…but yet the AFM was going through a lot of financial difficulties and didn't have the money to pay for a lot of things that he wanted to do, and he felt that it was unfair that the fund had all this money, and he felt that he should have some of it." McConnell Decl., Ex. 5 (Dreith Dep. Tr., 153:17-154:10). In the months prior to the 6/3/13 meeting where the Services Agreement was voted on, Mr. Dreith "was not in favor of [the service fee]." |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS IN OPPOSITION TO DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

McConnell Decl., Ex. 5
(Dreith Dep. Tr., 155:11-18).

One or two months prior to the 6/3/13 trustee meeting, Mr. Dreith told Mr. Hair "what would really be fair and equitable is that if we could actually identify how much money the unions had spent in support of the fund…would really make sense to me to basically compensate them for what they had done and reimburse them for their expenses. And Ray didn't take favorably to that proposal, shall we say."
McConnell Decl., Ex. 5
(Dreith Dep. Tr., 155:19-156:25).

Mr. Dreith told Mr. Hair that "if they could come up with a number that

| | | |
|---|---|---|
| | | was a number we could justify that if we ever had to do to Congress, we could actually say that here was a number that was the unions had invested in this and it was to reimburse them for their investment. I thought that would be a fair and equitable situation. And that- that was the last of that discussion, and the next time I heard about this was in a call from Trish Polach [telling him she was drafting an agreement]." McConnell Decl., Ex. 5 (Dreith Dep. Tr., 157: 1-13).<br><br>On the day of the vote of the Services Agreement, Trustee Bouton testified that he "basically showed |

| | | up at the meeting and the whole thing was presented and I had to approve or disapprove." Mr. Bouton admitted that he was not part of any discussion about the terms of the Services Agreement, and that "when the meeting happened, you know, this was the number that was presented and proposed" and that "this kind of went through really quickly." McConnell Decl., Ex. 1 (Bouton Dep. Tr., 40:22-41:22; 64:6-11; 94:4-13); Bookman Decl., Ex. 1. |
|---|---|---|
| 89.    Mr. Dreith testified that prior to the Trustees' approval of the Data Agreement, the Fund's outside counsel confirmed to the Trustees and Mr. Dreith that the | Sullivan Decl., Ex. 4 (Dreith, Tr., 234:22-235:13 and Ex. 115 at DEFS_00041341). | **Objection:** Relevance. Also, Plaintiff has alleged that the Fund's outside counsel had a conflict of interest in the transaction. Disputed. Mr. Dreith |

| | | |
|---|---|---|
| Data Agreement was authorized by the Declaration of Trust. | | testified that prior AFM president/former Trustee Tom Lee was told by Patricia Polach that any kind of fee paid out of the Fund to the Unions would not be legal. McConnell Decl., Ex. 5 (Dreith Dep. Tr., 162:6-15). |
| 90.    In September 2013, after the Service Fee was approved, Dennis Dreith proposed explaining to the Fund participants in a letter accompanying distributions that the Service Fee was "highly warranted" given the "valuable service" provided by the Unions. | Sullivan Decl., Ex. 4 (Dreith Tr., Ex. 120). | **Objection:** Relevance. Disputed. Mr. Dreith and Mr. Hair had a disagreement about whether the Service Fee should be disclosed in a participant letter which accompanied the first distribution after the passage of the Services Agreement.  Mr. Dreith went behind Mr. Hair's back, and proposed several drafts of a letter to the Trustees which would disclose the Fee to participants. The Trustees |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS IN OPPOSITION TO
DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

| | | voted to not directly inform the participants about the Fee. In the letter, Mr. Dreith was "doing [his] best to put the best spin on it." McConnell Decl., Ex. 5 (Dreith Dep. Tr., 244:11-251:5). |
|---|---|---|
| 91.      When the Service Fee was proposed and approved in 2013, the Trustees did not believe there was any meaningful conflict of interest because the interests of the Fund and the Unions were aligned—i.e., that it was in the best interests of the Fund and the Unions for the Fund to secure ongoing access to the session reports and other Union information the Fund used to identify and locate non-featured performers by paying a | Crabtree-Ireland Decl., ¶ 5; Hair Decl., ¶ 7; Sullivan Decl., Ex. 2 (Crabtree-Ireland, February 16, 2021, Tr., 156:19-160:18). | See Plaintiff's Evidentiary Objections.

Disputed. Mr. Crabtree-Ireland claims that he did not vote on the Services Agreement because he was concerned about a conflict of interest since he was signing the agreement on behalf of SAG-AFTRA. McConnell Decl., Ex. 2 (Crabtree-Ireland, February 16, 2021, Dep. Tr., 154:4-23); Ex. 4 (Crabtree-Ireland, August 29, 2019 *Blondell* Dep. |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS IN OPPOSITION TO
DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

| | | |
|---|---|---|
| reasonable fee to the Unions. | | Tr., 129:5-130:2 ("Q: Did you – did you regard that – that that would be a conflict of interest? A: You know, possibly.")) Mr. Joyce also admitted that he could see how there could be a conflict of interest with Mr. Hair and Mr. Crabtree-Ireland being high ranking officers at the Unions and also on the board of Trustees of a Fund that would be paying those Unions. McConnell Decl., Ex. 11 (Joyce, August 27, 2019, *Blondell* Dep. Tr., 144: 4-18); Bookman Decl., Ex. 1. |
| 92.     Stefanie Taub concluded that the payment of the Service Fee was justified when it was implemented because it compensated | Sullivan Decl., Ex. 15 (Taub, October 20, 2020, Tr., 103:3-105:19, 131:13-132:24, 146:18-147:19); Decl., Ex. 21 (Amended Responses of | **Objection:** Relevance. Disputed to the extent that reasonable value is not the appropriate metric for calculating the cost of the data. |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS IN OPPOSITION TO DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

| the Unions for the inherent value of the data provided that was integral to the distribution of the Fund. | Defendant Stefanie Taub to Plaintiff's First Set of Interrogatories, Resp. to ROG 10). | Prior to the 6/3/13 Trustee meeting, Ms. Taub was not part of any discussions regarding the amount of the Service Fee, did not see the agreement before the meeting, did not provide any input on the terms of the agreement, did not speak to any Fund employees about the agreement, did not consult with any attorneys about the agreement, did not make an evaluation of the reasonable cost of the services provided by the Unions to the Fund, did not ask anyone at SAG-AFTRA how many hours SAG-AFTRA employees were putting into responding to Fund inquiries, did not ask anyone about SAG- |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS IN OPPOSITION TO DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

| | | |
|---|---|---|
| | | AFTRA's overhead allocations for their efforts, did not consider a different methodology for the fee other than a percentage based fee, and had no expectation about how much money would actually be paid from the Fund to the Unions pursuant to the agreement. McConnell Decl., Ex. 17 (Taub, October 21, 2020, Dep. Tr., 92:4-98:21); Bookman Decl., Ex. 1; Kessler Decl., Ex. 1. |
| 93.     Ms. Taub believes that the increase in the amount of the Service Fee since it was implemented in 2013 is justified by the corresponding increase in the amount of work and value of the data provided by the Unions. | Sullivan Decl., Ex. 15 (Taub, October 20, 2020, Tr., 137:22-141:22). | Disputed. Ms. Taub does not know whether the number of participants increased as the amount of money distributed increased. If the number of participants did not increase, then the amount of work of the Unions did not increase. |

| | | |
|---|---|---|
| | | McConnell Decl., Ex. 17 (Taub, October 20, 2020, Dep. Tr., 146:18-147:19); Bookman Decl., Ex. 1; Kessler Decl., Ex. 1. |
| 94.    Duncan Crabtree-Ireland concluded that the Service Fee was justified when it was approved in 2013 because it compensated the Unions for the amount of work required to provide data resources to the Fund and engage in other activities on behalf of the Fund. | Sullivan Decl., Ex. 18 (Amended Responses of Defendant Duncan Crabtree-Ireland to Plaintiff's First Set of Interrogatories, Resp. to ROG 10); Ex. 2 (Crabtree-Ireland, February 16, 2021, Tr., 212:3-214:18); Ex. 3 (Crabtree-Ireland, February 17, 2021, Tr., 85:9-85:14). | Disputed. Mr. Crabtree-Ireland did not study how many hours the Unions spent providing data to the Fund.  Had, Mr. Crabtree-Ireland performed this investigation, or even a preliminary investigation, he would have learned that very minimal resources were being expended. McConnell Decl., Ex. 7 (Gorbacsov Dep. Tr., 88:4-89:15, 91:5-91:20, 97:10-16); Bookman Decl., Ex. 1; Kessler Decl., Ex. 1. |
| 95.    Mr. Crabtree-Ireland also concluded that the Service Fee was | Sullivan Decl., Ex. (Amended Responses of Defendant Duncan | Disputed. The Fund already had access to the session reports and B- |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS IN OPPOSITION TO DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

| | | |
|---|---|---|
| justified when it was approved in 2013 because it enabled the Fund to secure access to valuable information provided by the Unions. | Crabtree-Ireland to Plaintiff's First Set of Interrogatories, Resp. to ROG 10). | forms from the Unions prior to the Services Agreement and all of the information regarding researched performances was already saved on the Fund's databases. Instead, Mr. Crabtree-Ireland tried to justify the Fee by saying that the Unions did not want to continue providing the information unless they were handsomely compensated for it. McConnell Decl., Ex. 2 (Crabtree-Ireland, February 16, 2021, Dep. Tr., 93:10-18); Kessler Decl., Ex. 1. |
| 96.     Mr. Crabtree-Ireland concluded that the Service Fee was reasonable when it was approved in 2013 because he did not believe it was appropriate | Sullivan Decl., Ex. 3 (Crabtree-Ireland, February 17, 2021, Tr., 30:18-31:7, 85:9-85:25). | Disputed. The Fund already had access to the session reports and B-forms from the Unions prior to the Services Agreement and all of the information regarding |

| | | |
|---|---|---|
| for SAG-AFTRA to expend member dues to subsidize the activities of the Fund that benefitted performers who were not SAG-AFTRA members. | | researched performances was already saved on the Fund's databases. Instead, Mr. Crabtree-Ireland tried to justify the Fee by saying that the Unions did not want to continue providing the information unless they were handsomely compensated for it. Further, Mr. Crabtree-Ireland testified that if a nonmember performs on a Union session, he does pay fee to the Union "that are equivalent to the dues they would pay if they were a member," meaning that both union and non-union members who appear on union session reports have already paid the Unions for the maintenance of their information. McConnell Decl., Ex. 2 |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS IN OPPOSITION TO
DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

| | | |
|---|---|---|
| | | (Crabtree-Ireland, February 16, 2021, Dep. Tr., 93:10-18); Ex. 3 (Crabtree-Ireland, February 17, 2021, Dep. Tr., 12:23-13:11); Bookman Decl., Ex. 1. |
| 97.    Mr. Crabtree-Ireland concluded that the Service Fee was reasonable when it was approved in 2013 because he believed it was appropriate that such non-Union members and SAG-AFTRA members who benefitted from the activities of the Fund (i.e. the non-featured vocalists on sound recordings) should bear the Fund's administrative costs rather than SAG-AFTRA members (such as film and TV actors) who did not receive royalties from the Fund. | Sullivan Decl., Ex. 2 (Crabtree-Ireland, February 16, 2021, Tr., 100:21-102:16), Ex. 3 (Crabtree-Ireland, February 17, 2021, Tr., 85:9-85:25). | Disputed. The Fund already had access to the session reports and B-forms from the Unions prior to the Services Agreement and all of the information regarding researched performances was already saved on the Fund's databases. Instead, Mr. Crabtree-Ireland tried to justify the Fee by saying that the Unions did not want to continue providing the information unless they were handsomely compensated for it. Further, Mr. Crabtree-Ireland testified that if a |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS IN OPPOSITION TO DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

| | | |
|---|---|---|
| | | nonmember performs on a Union session, he does pay fee to the Union "that are equivalent to the dues they would pay if they were a member," meaning that both union and non-union members who appear on union session reports have already paid the Unions for the maintenance of their information. McConnell Decl., Ex. 2 (Crabtree-Ireland, February 16, 2021, Dep. Tr., 93:10-18); Ex. 3 (Crabtree-Ireland, February 17, 2021, Dep. Tr., 12:23-13:11); Bookman Decl., Ex. 1. |
| 98.    Mr. Crabtree-Island believed that the 3% Service Fee in 2013 actually "undervalue[d] the resources that were being provided to the | Sullivan Decl., Ex. 2 (Crabtree-Ireland, February 16, 2021, Tr., 209:1-209:22). | Disputed, to the extent that Mr. Crabtree-Ireland did not know how much resources were being provided by SAG-AFTRA to the Fund at |

| | | |
|---|---|---|
| Fund." | | the time he voted to approve the Services Agreement, nor does he know that information today. McConnell Decl., Ex. 2 (Crabtree-Ireland, February 16, 2021, Dep. Tr., 175:7-15); Bookman Decl., Ex. 1; Kessler Decl., Ex. 1. |
| 99.    Mr. Crabtree-Ireland believes that the current Service Fee paid to the Unions under the Data Agreement is still within "reasonable bounds." | Sullivan Decl., Ex. 2 (Crabtree-Ireland, February 16, 2021, Tr., 208:14-209:22). | Disputed, to the extent that Mr. Crabtree-Ireland has testified that the goal of the Services Fee was to recoup costs and not make a profit, and if the costs were recouped at the 2013 amount, then the 2020 amount provides pure profit. McConnell Decl., Ex. 2 (Crabtree-Ireland, February 16, 2021, Dep. Tr., 157:18-158:20); Ex. 4 (Crabtree-Ireland, August 29, 2019, |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS IN OPPOSITION TO
DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

| | | |
|---|---|---|
| | | *Blondell* Dep. Tr., 136:11-25); Bookman Decl., Ex. 1; Kessler Decl., Ex. 1. |
| 100.    Raymond Hair concluded that the Service Fee was justified when it was approved in 2013 because it accounted for the value of the data that the Unions provided and the Unions' efforts to expand the scope of the law. | Sullivan Decl., Ex. 7 (Hair, February 24, 2021, Tr.,158:16-161:16, 171:9-172:20, 180:7-181:12); Ex. 19 (Amended Responses of Defendant Raymond Hair to Plaintiff's First Set of Interrogatories, Resp. to ROG 10). | Disputed, to the extent that value of the data is not an appropriate metric for compensation. The Fund's 30(b)(6) witness testified that the AFM is only able to respond to 28.62% of the Fund's inquiries. This contradicts Defendants' value assertion. McConnell Decl., Ex. 22 (DEFS_00041810). Also disputed to the extent that the Unions are not entitled to be repaid for lobbying the Copyright Act. That is not an allowable item of costs under 17 U.S.C. § 114(g)(3). Mr. Hair did not provide any testimony regarding the |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

"value" of the B-Forms. Instead, his testimony constantly diverged into a discussion about the benefits of AFM and AFM's work "push[ing] for copyright laws and revisions to those laws to benefit our members…in the domestic and international advocacy, in all the other ways that we benefit this Fund, it's the value that we bring that is important here." Mr. Hair went on to say "I think the Fund would not be able to operate if it did not have the support and the services and everything the AFM is providing to it. And I think that the AFM deserves to and should and is receiving the value of what we provide." McConnell Decl., Ex. 8

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS IN OPPOSITION TO DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

| | | (Hair February 24, 2021, Dep. Tr., 172:22-175:16); Bookman Decl., Ex. 1; Kessler Decl. Ex. 1. |
|---|---|---|
| 101. Mr. Hair also concluded that the Service Fee was justified when it was approved in 2013 because it enabled the Fund to secure access to valuable information provided by the Unions. | Sullivan Decl., Ex. 7 (Hair, February 24, 2021, Tr., 175:5-176:13). | Disputed, to the extent that value of the data is not an appropriate metric for compensation. The Fund's 30(b)(6) witness testified that the AFM is only able to respond to 28.62% of the Fund's inquiries. This contradicts Defendants' value assertion. McConnell Decl., Ex 22. (DEFS_00041810); Bookman Decl., Ex. 1; Kessler Decl., Ex. 1. |
| 102. Mr. Hair concluded that the Service Fee was reasonable when it was approved in 2013 because he did not believe it was appropriate for AFM to expend | Sullivan Decl., Ex. 7 (Hair, February 24, 2021, Tr.,169:3-170:12) | Disputed, to the extent that the AFM only has B-forms for AFM sessions. If a track was not an AFM track, AFM would not maintain a B-form. Therefore, any B-form would have at least one |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS IN OPPOSITION TO DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

| | | |
|---|---|---|
| member dues to subsidize the activities of the Fund that benefitted performers who were not AFM members. | | AFM member on it. McConnell Decl., Ex. 14 (Painting Dep. Tr., 83:2-17); Bookman Decl., Ex. 1. |
| 103.   Mr. Hair concluded that the Service Fee was reasonable when it was approved in 2013 because he believed it was appropriate that participants who benefitted from the activities of the Fund (i.e. the non-featured musicians whose performances were embodied in sound recordings) should bear the Fund's administrative costs rather than AFM members who were engaged to perform in the live entertainment industry and in the production of other | Hair Decl., ¶ 6. | Disputed, to the extent that the AFM only has B-forms for AFM sessions. If a track was not an AFM track, AFM would not maintain a B-form. Therefore, any B-form would have at least one AFM member on it. McConnell Decl., Ex. 14 (Painting Dep. Tr., 83:2-17).<br><br>Further, Mr. Hair's testimony regarding the "value" of the B-Forms constantly diverged into a discussion about the benefits of AFM and AFM's work "push[ing] for copyright laws and revisions to those laws to |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS IN OPPOSITION TO
DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

| | | |
|---|---|---|
| media. | | benefit our members…in the domestic and international advocacy, in all the other ways that we benefit this Fund, it's the value that we bring that is important here." Mr. Hair went on to say "I think the Fund would not be able to operate if it did not have the support and the services and everything the AFM is providing to it. And I think that the AFM deserves to and should and is receiving the value of what we provide." This "justification" has nothing to do with the idea that AFM members who are not Fund beneficiaries should not subsidize the Fund's activities and further, is not an allowable cost under the Copyright Act. |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS IN OPPOSITION TO
DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

| | | McConnell Decl., Ex. 8 (Hair February 24, 2021, Dep. Tr., 172:22-175:16); Bookman Decl., Ex. 1. |
|---|---|---|
| 104.   Mr. Hair believes that the current Service Fee is reasonable because the data provided by AFM to the Fund is highly valuable and because "the value [the services provided by the AFM] continues to increase every year." | Sullivan Decl., Ex. 7 (Hair, February 24, 2021, Tr., 181:1-181:12); Ex. 19 (Amended Responses of Defendant Raymond Hair to Plaintiff's First Set of Interrogatories, Resp. to ROG 12). | Objection: Misstates the testimony and irrelevant. Mr. Hair, again, was testifying about the value of the advocacy services of the AFM, NOT the data's value. McConnell Decl., Ex. 8 (Hair, February 24, 2021, Dep. Tr., 181:1-181:12).

Disputed, to the extent that value is not an appropriate metric for compensation. Further, there is no evidence that the value increases every year. Bookman Decl., Ex. 1; Kessler Decl., Ex. 1. |
| 105.   As a session and recording musician, Bruce Bouton is familiar | Sullivan Decl., Ex. 1 (Bouton Tr., 18:15-19:2; 22:13-24:10). | Disputed, Mr. Bouton said he didnt know the details when asked what |

| | | |
|---|---|---|
| with the Unions' practice of providing session reports and B-forms to the Fund prior to the implementation of the Service Fee. | | a session report was. McConnell Decl., Ex. 1 (Bouton Dep. Tr., 22:15-21). |
| 106.   When the Data Agreement was approved, Mr. Bouton felt that the Service Fee was reasonable because the Unions provided ongoing research, lobbying power, and services during the establishment of the Fund. | Sullivan Decl., Ex. 17 (Amended Responses of Defendant Bruce Bouton to Plaintiff's First Set of Interrogatories, Resp. to ROG 10). | Disputed. Mr. Bouton believed that the Service Fee was intended to repay the Union for lobbying for the Copyright Act. Mr. Bouton also did not know whether the amount of work at the Unions corresponded with the increase in the fee. McConnell Decl., Ex. 1 (Bouton Dep. Tr., 34:6-35:13; 78:14-21); Bookman Decl., Ex. 1; Kessler Decl., Ex. 1. |
| 107.   Mr. Bouton continues to believe that the Service Fee is reasonable based on the importance of the | Sullivan Decl., Ex. 17 (Amended Responses of Defendant Bruce Bouton to Plaintiff's First Set of Interrogatories, Resp. to | Disputed. Mr. Bouton believes that the fee is too high. McConnell Decl., Ex. 1 (Bouton Dep. Tr., 79:7- |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS IN OPPOSITION TO
DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

| | | |
|---|---|---|
| information provided by the Unions to the Fund. | ROG 10). | 80:13); Bookman Decl., Ex. 1; Kessler Decl., Ex. 1. |
| 108.   Through his work as a vocalist, Jon Joyce is familiar with the value and purpose of the session reports and B-forms the Unions provided to the Fund. | Sullivan Decl., Ex. 10 (Joyce Tr., 17:11-14, 34:4-34:20). | **Objection:** Misstates testimony. Irrelevant. Defendants' cited "evidence" does not support this "fact." Disputed to the extent that value is not the appropriate metric. Bookman Decl., Ex. 1; Kessler Decl., Ex. 1. |
| 109.   When the Data Agreement was approved, Mr. Joyce felt that the Service Fee was reasonable because there was no other way for the Fund to obtain the data and information that the Union provided. | Sullivan Decl., Ex. 10 (Joyce Tr., 44:8-19); Ex. 20 (Amended Responses of Defendant Jon Joyce to Plaintiff's First Set of Interrogatories, Resp. to ROG 10). | Objection: Misstates testimony. Disputed. First, Mr. Joyce was out of the country when the Services Agrement was approved and did not learn about it until he returned. McConnell Decl., Ex. 10 (Joyce Dep. Tr., 38:22-40:25).  Mr. Joyce testified that |

| | | he believed the fee was justified because he "cant imagine finding another way to compensate the unions for the time." Mr. Joyce did not say anything about finding another way for the Fund to obtain the data. McConnell Decl., Ex. 10 (Joyce Dep. Tr., 44:8-19); Bookman Decl., Ex. 1; Kessler Decl., Ex. 1. |
|---|---|---|
| 110.   Mr. Joyce continues to believe that the current level of the Service Fee is reasonable, explaining that "I have felt, from the beginning, that -- that a service fee is -- is appropriate for the value of the information that we're getting." | Sulllivan Decl., Ex. 10 (Joyce Tr., 44:8-19, 77:11-77:22, 80:23:81-4, 83:2-83:11). | Disputed. Mr. Joyce testified that as the distributable royalties increased, he felt that the service fee should be revised and agreed that the trustees have an obligation to the Fund's benficiaries to calculate the cost of the data and services. McConnell Decl., Ex. 10 (Joyce Dep. Tr., 44:24-45:17; 81: 5-18; 98:13- |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS IN OPPOSITION TO
DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

| | | 18); Bookman Decl., Ex. 1; Kessler Decl., Ex. 1. |
|---|---|---|
| 111.   Tino Gagliardi, who became a Trustee in 2015, concluded that the Service Fee over the period of 2015 to the present is reasonable based on "the inherent value of the data" the Unions provide, in addition to the research and advocacy the Unions perform for the Fund. | Sullivan Decl., Ex. 5 (Gagliardi Tr., 109:11-110:4); Ex. 22 (Amended Responses of Defendant Tino Gagliardi to Plaintiff's First Set of Interrogatories, Resp. to ROG 10). | **Objection:** Irrelevant. Calls for speculation. Undisputed as to Mr. Gagliardi's conclusions, but disputed as to the relevance and appropriateness in light of the Copyright Act's limits on allowable costs, his fiduciary duties, and the standard operating procedures in non-profit governance. Bookman Decl., Ex. 1; Kessler Decl., Ex. 1. |
| 112.   The 2014 Annual Report includes a Note that states: "In June 2013, the Fund entered into service agreements with AFM and SAG-AFTRA whereby they will provide the Fund membership data and other support services | Sullivan Decl., Ex. 16 (Taub, January 20, 2021, Tr. Ex. 9 at MKA 000078). | Undisputed, but not referenced in Defendants' Motion and therefore irrelevant. |

| | | |
|---|---|---|
| that will help facilitate distributions to performers." | | |
| 113. The 2015 Annual Report includes a Note that states "On July 22, 2013, the Fund entered into a Data Purchase and Services Agreement with the AFM and SAG-AFTRA, pursuant to which each union agreed (a) to provide the Fund with access to member databases, session reports and other recording information including contact information regarding members and non-members for the purpose of aiding the distribution of royalties collected by the Fund […] Pursuant to the Data Purchase and Services Agreement, and in exchange for the data and | Sullivan Decl., Ex. 15 (Taub, January 20, 2021, Tr., Ex. 7 at MKA 000111). | Undisputed, but not referenced in Defendants' Motion and therefore irrelevant. |

| | | |
|---|---|---|
| services provided, the Fund agreed to pay each union 1-1/2% of the amount distributed in each distribution.  During the years ended March 31, 2015 and 2014, the Fund paid $272,845 and $193,814, respectively, to each union." | | |
| 114.   The 2016 Annual Report includes a Note that states "On July 22, 2013, the Fund entered into a Data Purchase and Services Agreement with the AFM and SAG-AFTRA, pursuant to which each union agreed (a) to provide the Fund with access to member databases, session reports and other recording information including contact information regarding members and non-members for the | Sullivan Decl., Ex. 11 (LeBlanc Tr., Ex. 2 at DEFS_00000082). | Undisputed, but not referenced in Defendants' Motion and therefore irrelevant. |

99

| | | |
|---|---|---|
| purpose of aiding the distribution of royalties collected by the Fund […] Pursuant to the Data Purchase and Services Agreement, and in exchange for the data and services provided, the Fund agreed to pay each union 1-1/2% of the amount distributed in each distribution.  During the years ended March 31, 2016 and 2015, the Fund paid $420,454 and $272,845 respectively, to each union." | | |
| 115.   The 2017-2018 Annual Report includes a Note that states "On July 22, 2013, the Fund entered into a Data Purchase and Services Agreement with the AFM and SAG-AFTRA, pursuant to which each union agreed (a) to | Sullivan Decl., Ex. 11 (LeBlanc Tr., Ex. 3 at DEFS_00000060). | Undisputed, but not referenced in Defendants' Motion and therefore irrelevant. |

100

| | | |
|---|---|---|
| provide the Fund with access to member databases, session reports and other recording information including contact information regarding members and non-members for the purpose of aiding the distribution of royalties collected by the Fund […] Pursuant to the Data Purchase and Services Agreement, and in exchange for the data and services provided, the Fund agreed to pay each union 1-1/2% of the amount distributed in each distribution.  During the years ended March 31, 2018 and 2017, the Fund paid $864,759 and $872,894 respectively, to each union." | | |

# IV.   PLAINTIFF'S ALLEGATIONS AGAINST THE FUND

| Uncontroverted Fact | Supporting Evidence | Plaintiff's Response |
|---|---|---|
| 116.   Plaintiff has taken the position that the Trustees breached their fiduciary duties in implementing the Service Fee because the amount of any fee paid to the Unions must not exceed the incremental costs incurred by the Unions in providing information to the Fund. | Sullivan Decl., Ex. 13 (Risto Tr., Ex. 101 at ¶¶ 16, 55-63); Ex. 23 (Plaintiff Kevin Risto's Responses to Defendants' Second Set of Interrogatories, Resp. to ROG 23-24). | **Objection:** Misstates the evidence. Disputed. Defendants have repeatedly and deliberately misrepresented Plaintiff's contentions, including here, where they point to Plaintiff's Complaint and discovery responses which appropriately elaborate on all of the ways Defendants violated their fiduciary duties and yet Defendants purposefully try to limit Plaintiff's arguments. The phrase "incremental costs" does not appear in either the Complaint nor the Plaintiff's discovery responses. Any cost deducted from the beneficiaries' royalties must comply |

| | | |
|---|---|---|
| | | with 17 U.S.C. § 114 and 31 U.S.C. § 9701 and any payment authorized by the Trustees to the Unions must not violate the fiduciary duties that the Trustee's owe to Plaintiff and the Class and the standards of non-profit governance. McConnell Decl., Ex. 24 (Plaintiff's Responses to Defs.' Second Set of Interrogatories, Resp. 23); Bookman Decl., Ex. 1. |
| 117.   Plaintiff has taken the position that the data the Unions provide to the Fund has "no value." | Sullivan Decl., Ex. 13 (Risto Tr., Ex. 103 at pp. 4-5); Ex. 4 (Dreith Tr., Ex. 126). | **Objection:** Misstates the evidence. Disputed. Ex. 4 (Dreith Tr., Ex. 126) is not a document that Plaintiff created, it is a document that the former administrator of the Fund created during his employment at Defendant Crabtree- |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS IN OPPOSITION TO DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Ireland's request because they were both concerned about the rising amount of the Service Fee. Further, Plaintiff has taken the position that "value" is not the proper metric pursuant to  17 U.S.C. § 114 and 31 U.S.C. § 9701 and that if there was a value to the Fund of having the information provided by the Unions it is de minimis since 1) Defendants' own witnesses have testified that the Unions are unable to respond to over 70% of the Fund's requests, 2) once the Fund researches a track it is not re-researched and therefore there is not a continuing value of data already received and 3) Dennis Dreith testified

104

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS IN OPPOSITION TO
DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

| | | that the information maintained by the Unions has to be verified and supplemented using various other sources of information because it was not entirely accurate. Defs.' Ex. 13, Risto Tr., Ex. 103 at pp. 4-5; Defs.' Ex. 23, Plaintiff's Responses to Defs.' Second Set of Interrogatories, Resp. 22, 23; McConnell Decl., 5 (Dreith Dep. Tr., 109:14-119:8); Bookman Decl., Ex. 1. |
|---|---|---|
| 118.   Plaintiff has asserted that the data and services provided by the Unions do not benefit non-Union members. | Sullivan Decl., Ex. 13 (Risto Tr., Ex. 101 at ¶¶ 18-58 and Ex. 103 at pp. 6-7); Ex. 23 (Plaintiff Kevin Risto's Responses to Defendants' Second Set of Interrogatories, Resp. to ROG 21-23). | **Objection:** Misstates the evidence. Disputed. With regard to Plaintiff, who is not a Union member, the Unions either did not have or did not provide Plaintiff's information to the Fund, and he retained a third party who reached |

105

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS IN OPPOSITION TO DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

| | | | out to the Fund to make claims for his royalties. Plaintiff received no benefit from the data and services purportedly provided by the Unions to the Fund. Defs.' Ex. 23 (Plaintiff Kevin Risto's Responses to Defendants' Second Set of Interrogatories, No. 21). Further, Defendants' own evidence shows that non-Union members have a far greater percentage of "uncashed" checks. (76% of the total distributions to non-union members are uncashed, as opposed to 33% of union members). "Uncashed" means that an amount is known to be payable to the participant, but no check is prepared because the Unions were |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS IN OPPOSITION TO
DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

| | | |
|---|---|---|
| | | not able to provide the Fund with any contact information. McConnell Decl., Ex. 22 (at DEFS_00041812); Bookman Decl., Ex. 1. |
| 119. Plaintiff has conceded that, if the information the Unions provided to the Fund is largely accurate, then it has value and the Unions should be compensated for providing information and services to the Fund. | Sullivan Decl., Ex. 13 (Risto Tr., 125:5-126:126:1, 161:10-163:18). | **Objection:** Irrelevant. Incomplete hypothetical. Disputed, to the extent that Mr. Dreith testified that the information the Unions provided to the Fund is not largely accurate and the Fund has to consult various sources of information to identify non-featured performers for payment. McConnell Decl., Ex. 5 (Dreith Dep. Tr., 109:14-119:8).<br><br>Further, Mr. Risto testified that the Unions should be paid an amount that "ties to the actual work done" and that "if |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS IN OPPOSITION TO DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

| | | somebody over there is doing some work, there should be come compensation for it". This is consistent with the strictures of 17 U.S.C. § 114 and 31 U.S.C. § 9701; McConnell Decl., Ex. 15 (Risto Dep. Tr., 162:9-163:18). |
|---|---|---|
| 120.   Prior to leaving the Fund in 2017, Mr. Dreith stated in a memorandum to Fund trustee Duncan Crabtree-Ireland that, "[f]or the sake of clarity, I am not suggesting that the items contained herein"—*i.e.*, the services the Unions provide to the Fund—"are of no value." | Sullivan Decl., Ex. 4 (Dreith Dep. Ex. 126). | **Objection:** Irrelevant and misstates the evidence. Disputed, to the extent that the memorandum's ultimate conclusion was that the value/actual cost of the data and services being provided was negligable at best and that the "investment made by the unions [to set up the Fund] has most certainly been paid back (possibly several times over) at this juncture." |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS IN OPPOSITION TO DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

| | | Defs.'s Ex. 4 (Dreith Dep. Ex. 126) |
|---|---|---|
| 121.   In discussing costs to the Fund during his deposition, Dennis Dreith acknowledged that operational costs other than the Service Fee, such as utilities, would not be provided at cost and would instead be charged at a markup for the provider. | Sullivan Decl., Ex. 4 (Dreith, Tr., 281:7-282:8). | **Objection:** Irrelevant. Misstates the testimony. Incomplete hypothetical.<br><br>Disputed, to the extent that Mr. Dreith actually testified that he believes that the charge from a utility company involves a profit margin for its shareholders and includes the cost of equipment and salaries. Further, Mr. Dreith stated that he may value having electricity, but he knows that it will cost him a certain amount of  money regardless of the value that he puts on it. The utility example has no relevance to the conflicted transaction entered into by the Trustees and their Unions. |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS IN OPPOSITION TO
DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

| | | McConnell Decl., Ex. 5 (Dreith Dep. Tr., 281:13-282:8). |
|---|---|---|
| 122.    In his deposition Mr. Dreith testified that his own salary when he was the Fund's Executive Director was a "fair and reasonable cost," even though it was not calculated by computing the incremental cost he incurred in performing the job. | Sullivan Decl., Ex. 4. (Dreith, Tr., 258:4-258:22) | **Objection:** Misstates the cited testimony. Relevance. Disputed, to the extent that Mr. Dreith testified that he is not aware of any salary offered to anybody that is an out of pocket cost and that his salary was to compensate him for time spent. McConnell Decl., Ex. 5 (Dreith Dep. Tr., 258:4-22). |
| 123.    Plaintiff's position is that, because the Unions' services under the Data Agreement also benefit Union members, the Unions had an independent obligation to provide that data without compensation. | Sullivan Decl., Ex. 23 (Plaintiff Kevin Risto's Responses to Defendants' Second Set of Interrogatories, Resp. to ROG 21-23). | Undisputed. See Bookman Decl., Ex. 1. |
| 124.    Plaintiff has | Sullivan Decl., Ex. 23 | **Objection:** Misstates |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS IN OPPOSITION TO
DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

N

| asserted that, because the Copyright Act requires the Fund to collect and distribute royalties to non-featured performers, those performers necessarily have a property interest in those royalties—and, by extension, the Service Fee. | (Plaintiff Kevin Risto's Responses to Defendants' Second Set of Interrogatories, Resp. to ROG 24-25). | evidence. Disputed, only to the extent that Defendants' "fact" misstates Section 114. Section 114 states that a nonfeatured performer "shall be entitled to receive payments from the copyright owner" and those receipts "shall be deposited in an escrow account." The Fund is also restricted in the types of costs that can be deducted from the nonfeatured performers' property. Further, the Fund's Sound Recording Guidelines also state that the royalties to unidentified nonfeatured performers will be held in an account until the performer is identified or the performer meets the threshold amount for |

| | | payment.<br>McConnell Decl., Ex. 11<br>(Joyce, August 27, 2019,<br>*Blondell* Dep. Ex. 45 at<br>DEFS_00042223); 17<br>U.S.C. § 114(g). |
|---|---|---|
| 125.   In discussing Fund distributions during his deposition, Dennis Dreith stated that there was a "group of recordings that the amount of money is too de minimis to really have a meaningful distribution," and he noted that the Fund implemented a "methodology whereby we could efficiently research enough sound recordings to make distributions that were meaningful to as many performers as possible." | Sullivan Decl., Ex. 4 (Dreith, Tr., 102:17-103:17). | **Objection:** Relevance. Disputed, to the extent this fact implies that not all nonfeatured performers who have recordings on the Frequency Report are entitled to royalties. The Fund maintains record of tracks who appear on the Frequency Reports and will issue a payment once the royalty amount crosses the guideline's threshold.<br>17 U.S.C. § 114(g)(2); McConnell Decl., Ex. 11 (Joyce, August 27, 2019, *Blondell* Dep. Ex. 45 at DEFS_00042223); Ex. 12 (LeBlanc Dep. Tr., |

| | | 145:16-147:16). |
|---|---|---|
| 126.   When asked whether he viewed this approach as consistent with the Copyright Act, he responded that the statute "just talks about nonfeatured performers as a group" and "didn't say to distribute to every nonfeatured performer." | Sullivan Decl., Ex. 4 (Dreith, Tr., 103-22:104:17). | **<u>Objection:</u>** Relevance. Disputed, to the extent this fact implies that not all nonfeatured performers who have recordings on the Frequency Report are entitled to royalties. The Fund maintains record of tracks who appear on the Frequency Reports and will issue a payment once the royalty amount crosses the guideline's threshold. 17 U.S.C. § 114(g)(2); McConnell Decl., Ex. 11 (Joyce, August 27, 2019, *Blondell* Dep. Ex. 45 at DEFS_00042223); Ex. 12 (LeBlanc Dep. Tr., 145:16-147:16). |
| 127.   Dreith explained that the Fund's goal was to "compensate as many nonfeatured . . . | Sullivan Decl., Ex. 4 (Dreith, Tr., 107:14-109:13). | **<u>Objection:</u>** Relevance. Disputed, to the extent this fact implies that not all nonfeatured |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS IN OPPOSITION TO DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

| | | |
|---|---|---|
| performers as ethically and fully as possible," but that the administrative costs of paying "micropennies" in royalties would be "astronomical" in relation to the benefit to the performer. | | performers who have recordings on the Frequency Report are entitled to royalties. The Fund maintains record of tracks who appear on the Frequency Reports and will issue a payment once the royalty amount crosses the guideline's threshold. 17 U.S.C. § 114(g)(2); McConnell Decl., Ex. 11 (Joyce, August 27, 2019, *Blondell* Dep. Ex. 45 at DEFS_00042223); Ex. 12 (LeBlanc Dep. Tr., 145:16-147:16). |

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

## V.   PLAINTIFF'S SEPARATE STATEMENTS OF UNDISPUTED FACTS

| No. | Fact | Supporting Evidence |
|---|---|---|
| 1. | The AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund (the "Fund") is an I.R.C. §501(c)(6) nonprofit organization created pursuant to 17 U.S.C. § 114 to receive and distribute royalties to non-featured performers on digitally transmitted sound recordings – specifically, 2.5% to nonfeatured musicians and 2.5%. to nonfeatured vocalists. | McConnell Decl., Ex. 18 (Taub, January 20, 2021, Dep. Ex. 5; Dep. Ex. 6 "Fund Trust Agreement" at art. II, pg. 3). |
| 2. | The American Federation of Musicians ("AFM") and Screen Actors Guild-American Federation of Television and Radio Artists ("SAG-AFTRA") are the nonprofit unions designated to establish and maintain the Fund, which they did pursuant to an Agreement and Declaration of Trust established in 1998 and updated in 2013 (the "Trust Agreement"). | McConnell Decl., Ex. 18 (Taub, January 20, 2021, Dep. Ex. 6 "Fund Trust Agreement" at art. II, pg. 3). |

| | | |
|---|---|---|
| 3. | Pursuant to the Trust Agreement, the Fund is managed by a board of six trustees (the "Trustees"), comprised of an apex officer, lower level officer, and rank-and-file member of each Union. | McConnell Decl., Ex. 8 (Hair, February 24, 2021, Dep. Tr., 66:16-67:6; 85:20-86:12); Ex. 1 (Bouton Dep. Tr., 25:4-25); Ex. 2 (Crabtree-Ireland, February 16, 2021, Dep. Tr., 32:5-11, 35:12-37:20). |
| 4. | Art. IV, § 3, N of the Trust Agreement requires the Trustees to "to accomplish the general objective of distributing remuneration to eligible artists *in the most efficient and economical manner*" (emphasis added). | McConnell Decl., Ex. 18 (Taub, January 20, 2021, Dep. Ex. 6 "Fund Trust Agreement" at art. IV, pg. 5). |
| 5. | The Fund's work consists of researching the identifies of nonfeatured performers to whom royalties are owed under Section 114. | McConnell Decl., Ex. 17 (Taub, October 20, 2020, Dep. Tr., 116:9 - 122:14). |
| 6. | The Fund maintains its own staff of researchers to accomplish this task, and said researchers consult a wide variety of informational sources to ascertain the proper royalty recipients on any given track. | McConnell Decl., Ex. 17 (Taub, October 20, 2020, Dep. Tr., 116:9-122:14); Ex. 18 (Taub, January 20, 2021, Dep. Tr., 199:16-204:9)(Fund spends approximately $3,415,000 annually on research and database maintenance). |

| 7. | As part of their work for their dues-paying members, each Union maintains two sources of data relevant to the Fund's work: session reports (or "B-forms") that reflect the identities of performers who contributed to a given Union-operated recording session, and databases containing contact information for the Unions' respective membership rolls. | McConnell Decl., Ex. 7 (Gorbacsov Dep. Tr., 74:16-17; 112:3-113:21, 116:6-9); Ex. 14 (Painting Dep. Tr., 54:23-56:25; 70:14-72:16; 74:16-76:23). |
| --- | --- | --- |
| 8. | The foregoing information is maintained in the ordinary course of the Unions' operations. | McConnell Decl., Ex. 7 (Gorbacsov Dep. Tr., 87:5-13; 112:3-113:21, 116:6-9); Ex. 14 (Painting Dep. Tr., 54:23-56:25; 70:14-72:16; 74:16-76:23). |
| 9. | SAG-AFTRA has identified three individuals responsible for handling all Fund requests, spending approximately 372 hours a year on such work for a total cost (based on their prorated salaries) of $13,650.92. | McConnell Decl., Ex. 7 (Gorbacsov Dep. Tr., 88:4-89:15, 91:5-91:20, 97:10-16). |

/ / /

/ / /

/ / /

117

| 10. | Three of four of the largest AFM locals have computerized databases that the Fund can access directly to pull session information. The only hands-on work for employees of those chapters would be approximately 15-20 hours per year. One employee at the Nashville local spends 2-3 hours of work per week on Fund requests. Based on their salaries, this is a cost of $560 to the local AFM chapters. | McConnell Decl., Ex. 14 (Painting Dep. Tr., 95:6-98:15). |
|---|---|---|
| 11. | For the first 15 years of the Fund's existence, the Unions provided session reports and membership information (the "Data") to the Fund *gratis* and have identified no operational detriments they incurred in doing so. | McConnell Decl., Ex. 1 (Bouton, 39:12-40:4); Ex. 17 (Taub, October 20, 2020 Dep. Tr., 97:8-98:1); Ex. 2 (Crabtree-Ireland, February 16, 2021 Dep. Tr., 92:13-93:18); Ex. 4 (Crabtree-Ireland, August 29, 2019 *Blondell* Dep. Tr., 136:3-6); Ex. 8 (Hair, February 24, 2021 Dep. Tr., 158:16-161:16). |

/ / /

/ / /

/ / /

/ / /

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS IN OPPOSITION TO
DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

| | | |
|---|---|---|
| 12. | The Unions' core mission is to assist their memberships in obtaining revenues owed from their work in the industry. | McConnell Decl., Ex. 3 (Dep. Ex. 1 at "Objectives," SAG-AFTRA Constitution, art. III, § (A)-(I)); Ex. 9 (Dep. Ex. 2 at "Mission," AFM Bylaws, Art. 2, § 1); Bookman Decl., Ex. 1. |
| 13. | Co-Chair Hair sought to secure a payment to the AFM from the Fund as reimbursement of the union's lobbying efforts which predate the Fund's very existence. | McConnell Decl., Ex. 8 (Hair, February 24, 2021, Dep. Tr., 158:22-160:11). |
| 14. | With the passage of time and the dawn of the current era of digital streaming, the corpus of the Fund began to swell by orders of magnitude, and the Unions could not identify a significant increase in the overall amount of work required of them to assist the Fund (e.g., they hired no new personnel to handle the increase and still require only a handful of hours per month from their employees to manage the existing workload). | McConnell Decl., Ex. 7 (Gorbacsov Dep. Tr., 158:14-20); Ex. 14 (Painting Dep. Tr., 133:13-134:2). |

| 15. | The Trustees settled on enacting a 3% "service fee" (the "Service Fee") in exchange for providing the Data, which they justified under 17 U.S.C. § 114(g)(3)'s allowance for the Fund to "deduct from any of its receipts … the reasonable costs of such collective incurred … in [] the administration of the collection, distribution, and calculation of the royalties." | McConnell Decl., Ex. 3 (Crabtree-Ireland, February 17, 2021, Dep. Ex. 2 "Services Agreement"). |
|---|---|---|
| 16. | The Unions and Fund entered into a Data Purchase and Services Agreement (the "Services Agreement") in 2013. | McConnell Decl., Ex. 3 (Crabtree-Ireland, February 17, 2021, Dep. Ex. 2 "Services Agreement"). |
| 17. | The Unions maintain session reports for all Union sessions to make sure their membership is paid appropriately for each session covered by their collecting bargaining agreements. The Unions receive the payments for the performers for covered recordings and then mail the checks to the appropriate performers listed on the session reports. | McConnell Dec., Ex. 17 (Taub, October 20, 2020, Dep. Tr., 41:18-44:14); Ex. 7 (Gorbacsov Dep. Tr., 115:3-116:9); Ex. 14 (Painting Dep. Tr., 74:16-76:23); Ex. 6 (Gagliardi Dep. Tr., 54:24-55:11). |

| 18. | The Unions then send a copy of the session report to the pension funds, for free. | McConnell Dec., Ex. 1 (Bouton Dep. Tr., 22:15-24:10); Ex. 17 (Taub, October 20, 2020, De. Tr., 41:18-44:14); Ex. 2 (Crabtree-Ireland, February 16, 2021, Dep. Tr., 226:10-227:2); Ex. 8 (Hair, February 24, 2021, Dep. Tr., 196:19-22). |
|---|---|---|
| 19. | The pension funds then make appropriate pension calculations on the performer's behalf. | McConnell Dec., Ex. 10 (Joyce Dep. Tr., 36:6-18); Ex. 17 (Taub, October 20, 2020, Dep. Tr., 41:18-44:14). |
| 20. | One copy of the session report also gets sent to the record label. | McConnell Decl., Ex. 1 (Bouton Dep. Tr., 22:15-24:10); Ex. 17 (Taub, October 20, 2020, Dep. Tr., 41:18-44:14). |
| 21. | Similar to any other organization, the Unions collect basic membership and marketing information for their members including their last known addresses. | McConnell Decl., Ex. 7 (Gorbacsov Dep. Tr., 87:5-13, 112:3-113:21; 116:6-9); Ex. 14 (Painting Dep. Tr., 54:23-56:25; 70:14-72:16; 74:16-76:23). |

/ / /

/ / /

/ / /

/ / /

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS IN OPPOSITION TO DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

| | | |
|---|---|---|
| 22. | AFM asked its longtime lawyer, Patricia Polach, to serve as outside counsel to the Fund. | McConnell Decl., Ex. 1 (Bouton Dep. Tr., 94:15-21 (Q: Who is Patricia Polach? A: She was the AFM's attorney from Bredhoff & Kaiser")); Ex. 2 (Crabtree-Ireland, February 16, 2021 Dep. Tr., 57:1-3 ("The Fund's primary counsel was Patricia Polach.")). |
| 23. | Ms. Polach drafted the Trust Agreement for the Fund and regularly attended the board of trustee meetings. | McConnell Decl., Ex. 17 (Taub, October 20, 2020, Dep. Tr., 86:14-19, 170:13-16); Ex. 2 (Crabtree-Ireland, February 16, 2021 Dep. Tr., 74:17-20, 135:2-12); Ex. 5 (Dreith Dep. Tr., 140:23-141:2). |
| 24. | Ms. Polach informed Mr. Lee that collecting a fee from the Fund's distributions would not be legal. | McConnell Decl., Ex. 5 (Dreith Dep. Tr., 162:6-163:9 ("Polach told [Mr. Lee] that that was – would not be legal...I was present when she told him that.")). |
| 25. | Once Defendant Hair became President of AFM, he began telling Fund administrator Dennis Dreith that he wanted to collect a fee from the Fund. | McConnell Decl., Ex. 5 (Dreith Dep. Tr., 154:17-155:10; 156:1-157:9; 158:8-162:4). |

| | | |
|---|---|---|
| 26. | On one occasion, Defendant Hair told Mr. Dreith that "it was unfair" that the Unions lobbied to help pass the copyright law and establish the Fund and weren't getting paid for it. In financial straits because of declining Union membership, Mr. Hair resented the fact that the Fund "had all these resources…yet the AFM was going through a lot of financial difficulties and didn't have the money." Ultimately, Mr. Hair believed that "the Fund had all this money, and he felt that he should have some of it." | McConnell Decl., Ex. 5 (Dreith Dep. Tr., 154:17-155:10). |
| 27. | Defendant Hair's 30(b)(6) testimony on behalf of AFM confirms that the Service Fee comprises the largest part of AFM's net revenue after membership dues. | McConnell Decl., Ex. 9 (Hair, February 25, 2021, Dep. Tr., 32:4-34:1). |
| 28. | Trustees used the Unions' lawyer, Patricia Polach, on both sides of the Services Agreement. | McConnell Decl., Ex. 2 (Crabtree-Ireland, February 16, 2021, Dep. Ex. 2); Ex. 5 (Dreith Dep. Tr., 188:14-191:18); Ex. 8 (Hair, February 24, 2021 Dep. Tr., 104:15-105:3, 149:18-150:24). |

| | | |
|---|---|---|
| 29. | In late 2012, Mr. Dreith received a call from conflicted lawyer Patricia Polach informing him that Defendant Hair and Defendant Crabtree-Ireland directed her to have an agreement drafted to provide for an annual fee to the Unions. | McConnell Decl., Ex. 5 (Dreith Dep. Tr., 154:3-16; 157:1-13). |
| 30. | The law firm of Jenner & Block drafted the Services Agreement, tying the recurring fee to the provision of data and services which the Unions were already providing the Fund for free. | McConnell Decl., Ex. 2 (Crabtree-Ireland, February 16, 2021 Dep. Ex. 2). |
| 31. | The initial proposal was for a 10% Service Fee. | McConnell Decl., Ex. 5 (Dreith Dep. Tr.,164:6-17). |
| 32. | Mr. Dreith then managed to get the fee to 3% by saying that a higher fee would raise issues with foreign collectives who would balk at a high administrative fee. | McConnell Decl., Ex. 5 (Dreith Dep. Tr., 164:6-168:6). |
| 33. | The only Trustees who were consulted or involved in the discussions about the fee were Defendant Hair and Defendant Crabtree-Ireland. | McConnell Decl., Ex. 17 (Taub, October 20, 2020, Dep. Tr., 98:22-100:20; 168:9-168:18). |

| 34. | The other Trustees received an Agenda on May 30, two business days ahead of the June 4, 2013 trustee meeting with an agenda item "AFM & SAG-AFTRA Services Fees" that lacked any explanatory detail, much less an actual draft to review. | McConnell Decl., Ex. 5 (Dreith Dep. Ex. 118 "Agenda for June 4, 2013 Meeting"). |
| 35. | The June 3, 2013 meeting included several other major items for discussion including the purchase of a $9.9 million purchase of an office building and parking lot, the Fund's 2014 budget, future distributions and collections, and a closed session discussion with the Fund administrator. The entire meeting lasted 2.5 hours, whereas typical meetings consumed a full workday. | McConnell Decl., Ex. 1 (Bouton Dep., Ex. 1 "June 4, 2013 Minutes"); Bookman Decl., Ex. 1. |

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS IN OPPOSITION TO
DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

| 36. | Defendant Taub testified that she was not asked for any input on the agreement, did not see the agreement before voting on it, and did not make an evaluation of the reasonable cost of the services being provided by the Unions to the Fund, even though she was employed as the national manager of the Sound Recordings division of SAG-AFTRA and arguably could have provided some information on the level of time and effort being expended by SAG-AFTRA employees. | McConnell Decl., Ex. 17 (Taub, October 20, 2020, Dep. Tr., 95:9 – 98:21). |
| 37. | Defendant Joyce was out of the country on tour and did not know about the Services Agreement until he returned. | McConnell Decl., Ex. 10 (Joyce Dep. Tr., 40:5-25). |
| 38. | Mr. Bouton testified that the Services Agreement "went through fairly quickly" and he "basically showed up at the meeting…and I had to approve or disapprove." | McConnell Decl., Ex. 1 (Bouton Dep. Tr., 46:7-24 ("Q. Do you recall what was presented at this meeting about the service fee? A. Yeah. Just that this what they wanted and we needed to approve it as a board"); 63:24-64:11; 94:4-13). |

| | | |
|---|---|---|
| 39. | The Trustees are all hand-selected by the Union President or designee and serve "at the pleasure of the president," and could be removed from their positions at any time. | McConnell Decl., Ex. 18 (Taub, January 20, 2021, Dep. Ex. 6, "Fund Trust Agreement" at pg. 3, art. III, section 2); Ex. 1 (Bouton Dep. Tr., 25:13-25, 81:18-23). |
| 40. | In fact, the two Union heads wield so much power in the Fund that they declared themselves Co-Chairs of the Board, requiring all information and data to flow through them, despite having no written authority to do so. | McConnell Decl., Ex. 2 (Crabtree-Ireland, February 16, 2021 Dep. Tr., 38:1-39:4); Ex. 8 (Hair, February 24, 2021, Dep. Tr., 72:17-74:18). |
| 41. | At the time of the vote on the Services Agreement, none of the Trustees disclosed the fact that several of them were employed by the Unions, held positions of power and influence at the Unions, and served on numerous Union boards. | McConnell Decl., Ex. 18 (Taub, January 20, 2021, Dep. Tr., 80:23-82:13; 84:6-15); Bookman Decl., Ex. 1. |
| 42. | Because none of these interests were disclosed, the Trustees did not consider whether these positions of influence would create a conflict when voting on the Services Agreement with the Unions. | McConnell Decl., Ex. 18 (Taub, January 20, 2021 Dep. Tr., 80:23-82:13, 84:6-15); Bookman Decl., Ex. 1. |

| | | |
|---|---|---|
| 43. | Defendant Crabtree-Ireland testified that he recused himself from voting on the Services Agreement because he was going to sign the agreement on behalf of SAG-AFTRA and wanted to avoid the appearance of a conflict of interest. | McConnell Decl., Ex. 2 (Crabtree-Ireland, February 16, 2021, Dep. Tr., 164:6-166:19). |
| 44. | No other Trustee remembers Defendant Crabtree-Ireland recusing himself. | McConnell Decl., Ex. 8 (Hair, February 24, 2021, Dep. Tr., 185:2-186:12; 191:9-193:8); Ex. 18 (Taub, January 20, 2021, Dep. Tr., 74:17-75:7). |
| 45. | The minutes of the June 3, 2013 board meeting do not reflect any recusals. | McConnell Decl., Ex. 1 (Bouton Dep. Ex. 1, "June 4, 2013 Meeting Minutes"). |

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

| 46. | The Trustees never considered whether the cost or value of the Unions' data and services was commensurate with the percentage selected for the fee, whether the services could be obtained in whole or part from other vendors at a lower cost, whether the propriety of the fee would diminish as distributions increased, or whether it would be prudent to consider a mechanism for periodically reevaluating the terms of the Services Agreement. | McConnell Decl., Ex. 1 (Bouton Dep. Tr., 50:2-13); Ex. 17 (Taub, October 20, 2020, Dep. Tr., 84:17-85:18; 97:8-99:16; 151:10-15); Ex. 18 (Taub, January 20, 2021, Dep. Tr., 120:14-121:16; 122:16-124:20; 150:2-18). |
| --- | --- | --- |
| 47. | Before approving the Services Agreement, the Trustees did not consider the time or cost of providing the data or services to the Fund. | McConnell Decl., Ex. 12 (LeBlanc, Dep. Tr., 67:12-23); Ex. 5 (Dreith Dep. Tr., 238:13-239:24); Ex. 18 (Taub, January 20, 2021 Dep. Tr., 122:16-25, 124:15-20); Ex. 10 (Joyce Dep. Tr., 38:22-40:13; 43:2-13). |

/ / /

/ / /

/ / /

/ / /

| | | |
|---|---|---|
| 48. | The Fund's former Harvard Business School-educated CFO, Jennifer LeBlanc, testified that the concept of a fee being calculated as a percent of the distribution is "not the way a businessperson would [do it]" and "there's no foundation for it." The former CFO further testified that "at a minimum, [the fee] should have been thought about from an analytical perspective, about what are the services provided, and how can you have a greater alignment between those services and the value of those services." | McConnell Decl., Ex. 12 (LeBlanc, Dep. Tr., 69:21-70:21). |
| 49. | When asked whether the amount of the service fee was justified, Ms. LeBlanc said "no." | McConnell Decl., Ex. 12 (LeBlanc, Dep. Tr., 156:5-156:23). |
| 50. | The annual cost of salaries for those SAG-AFTRA and local AFM employees who provide services to the Fund is less than $20,000. | McConnell Decl., Ex. 7 (Gorbacsov Dep. Tr., 88:4-89:15; 91:5-91:20, 97:10-16); Ex. 14 (Painting Dep. Tr., 95:6-98:15). |

/ / /

/ / /

/ / /

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS IN OPPOSITION TO DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

| | | |
|---|---|---|
| 51. | From 2014-2020, the Fund asked SAG-AFTRA about session reports for 10,973 songs and the Union was only able to provide session reports for 2,927 (26.67 percent) of those songs. | McConnell Decl., Ex. 7 (Gorbacsov Dep. Tr., 126:11-128:2); Ex. 18 (Taub, January 20, 2021 Dep. Tr., 126:25-127:24). |
| 52. | From 2014-2020 the AFM provided B-forms for 7,395 songs, which was 28.62 percent of the total number the Fund asked for. | McConnell Decl., Ex. 18 (Taub, January 20, 2021 Dep. Tr., 126:25-127:24). |
| 53. | Session reports are not reliably generated for all covered recording sessions. | McConnell Decl., Ex. 14 (Painting Dep. Tr., 81:24-85:24). |
| 54. | Defendants purposefully conflate the provision of session reports with the provision of membership data. | McConnell Decl., Ex. 20 (DEFS_00042028 "Union Data" column); Ex. 8 (Hair, February 24, 2021, Dep. Tr., 158:22-161:16). |
| 55. | The Fund has a relatively inexpensive subscription to Lexis Nexis ($433 per month) which is used to locate and contact performers. | McConnell Decl., Ex. 17 (Taub, October 20, 2020, Dep. Tr., 125:21-126:21); Ex. 16 (Sandell Dep. Tr., 53:15-25); Ex. 11 (Joyce, August 27, 2019, *Blondell* Dep., Ex. 33 at DEFS_00042333). |

/ / /

/ / /

| 56. | The Fund researchers utilize many online, public sources of information such as AllMusic and Discogs, they check liner notes, and they receive session information from the performers themselves. | McConnell Decl., Ex. 17 (Taub, October 20, 2020 Dep. Tr., 118:13-119:12); Ex. 5 (Dreith Dep. Tr., 110:10-19; 286:3-22); Ex. 16 (Sandell Dep. Tr., 33:19-35:17). |
|---|---|---|
| 57. | Class Representative Kevin Risto is just one example of a performer, who has performed on Grammy nominated sessions, who needed to reach out to the Fund himself in order to get paid his royalty allocations. | McConnell Decl., Ex. 24 (Plaintiff Kevin Risto's Responses to Defendants' Second Set of Interrogatories, No. 20). |
| 58. | The Film Musicians Secondary Markets Fund, a fund set up by the AFM, and the SAG-AFTRA & Industry Sound Recordings Distribution Fund, a fund set up by SAG-AFTRA, both receive session reports for free. | McConnell Decl., Ex. 17 (Taub, October 20, 2020, Dep. Tr.,77:10-13); Ex. 12 (LeBlanc Dep. Tr., 49:23-50:12, 59:3-9); Ex. 14 (Painting Dep. Tr., 118:17-120:3). |
| 59. | Testimony reveals that the pension funds have provided the Fund with session information at the cost of $7 per report. | McConnell Decl., Ex. 5 (Dreith Dep. Tr., 85:12-86:23). |

/ / /

/ / /

| 60. | Even if the Fund purchased a session report for every track currently in its database, that would cost the Fund $952,000, compared with the $10,229,756 paid to the Unions under the guise of the Services Agreement to date. | McConnell Decl., Ex. 25 (Defendant AFM's Amended Responses to Interrogatories No. 7, 8, 10 ("the Fund's database contains approximately 136,000 titles")). |
| --- | --- | --- |
| 61. | Mr. Dreith was powerless to stop the Trustees from implementing the Service Fee, as the Trustees exercised complete dominion over the operations of the Fund and could terminate Mr. Dreith at will. | McConnell Decl. 8 (Hair, February 24, 2021, Dep. Tr., 140:18-141:1); Ex. 18 (Taub, January 20, 2021, Dep. Tr., 121:8-122:8). |
| 62. | The Fund maintains records of those performers entitled to statutory royalties who do not meet the Fund's distribution guidelines. Once the track accumulates enough royalties to be paid pursuant to the guidelines, the Fund makes a distribution to them. | McConnell Decl., Ex. 11 (Joyce, August 27, 2019, *Blondell* Dep. Ex. 45 at DEFS_00042223); Ex 12 (LeBlanc Dep. Tr., 145:16-147:16). |

/ / /

/ / /

/ / /

/ / /

| | | |
|---|---|---|
| 63. | Defendants made efforts to conceal or obscure both the implementation of the Service Fee as well as the amounts taken thereunder. | McConnell Decl., Ex. 5 (Dreith Dep. Tr., 243:3-245:6; 262:15-264:21); Ex. 1 (Bouton Dep. Tr., 67:24-71:12 (when asked whether he thought the disclosure of the fee as part of the general operating expenses was clear, he stated, "my eyes have a really bad tendency to glaze over on [financial documents]")); Ex. 8 (Hair, February 24, 2020 Dep. Tr., 210:12-24 (Mr. Hair does not believe he has any duty to inform the beneficiaries about the Fee)). |
| 64. | Despite growing concern over the Service Fee's impact, none of the Trustees have done anything to reevaluate or raise it with the Board. | McConnell Decl., Ex. 4 (Crabtree-Ireland August 29, 2019, *Blondell* Dep. Tr., 150:14-151:20 (admitting that he had become concerned about the rising fee and admitting that the fee should be revisited because "having it as a percentage may not be the right way to go")); Ex. 10 (Joyce Dep. Tr., 44:24-45:17; 81: 5-18, 98:13-18); Ex.1 (Bouton Dep. Tr., 79:23-80:13; 83:25-84:19). |

| 65. | Had the Trustees conducted a preliminary evaluation concerning whether other CMOs purchase data, they would have recognized that no other CMO purchases data. | Adams Decl., Ex. 1. |
|---|---|---|
| 66. | Had the Trustees evaluated the industry, they would have determined that the only other organization operating under Section 114(g), SoundExchange, only deducts actual costs and would not consider giving away a percentage fee of the organization. | Kessler Decl., Ex. 1. |
| 67. | The median payment per recording in 2016 was $248.58. | McConnel Decl., Ex. 11 (Joyce, August 27, 2019, *Blondell* Dep. Ex. 45 at DEFS_00042432). |
| 68. | 76% of entitled non-Union members have not received their royalty distributions because the Unions have not provided the Fund with a valid address or taxpayer identification number. | McConnell Decl., Ex. 22 (DEFS_0041812). |
| 69. | SAG-AFTRA could impose work dues on those members who are Fund beneficiaries by proposing a resolution at the SAG-AFTRA convention, but to date, has not | McConnell Decl., Ex. 3 (Crabtree-Ireland, February 17, 2021, Dep. Tr., 61:8-62:19). |

| | | |
|---|---|---|
| | done so or considered it. | |
| 70. | In 2017, Mr. Crabtree-Ireland asked Mr. Dreith whether he felt the Service Fee had grown to excessive proportions. | McConnell Decl., Ex. 5 (Dreith Dep. Tr., 172:15-175:12). |
| 71. | Mr. Dreith prepared a memo for Mr. Crabtree-Ireland, confirming his concerns that the Service Fee was unjustified at its inception because it was not tied to a reasonable cost and had become so large as to attract negative attention. | McConnell Decl., Ex. 5 (Dreith Dep. Exs. 126 and 127). |
| 72. | Mr. Dreith again suggested that the fees be assessed as a cost and not a percentage of the Fund's distributions. | McConnell Decl., Ex. 5 (Dreith Dep. Exs. 126 and 127). |
| 73. | The concerns set forth in Mr. Dreith's memo went unaddressed by the board. | McConnell Decl., Ex. 5 (Dreith Dep. Tr., 172:15-175:12). |
| 74. | Defendants' expert, David Nolte, admitted that the 50-song study was not designed within the parameters necessary for him to "express conclusions using the science of inferential statistic[s]," relies on a small and seemingly arbitrary sample size,  its ordering and | McConnell Decl., Ex. 13 (Nolte Dep. Tr., 118:22-121:8; 123:1-132:19; 133:10-135:10; 137:4-140:22). |

136

| | | selection of tracks following no process likely to produce random, representative samples. | |
|---|---|---|---|
| | 75. | Defendants' own expert did not seem to understand how the songs were selected, as his explanation of how "largest" was used contradicted information on the very chart he claimed to be analyzing. | McConnell Decl., Ex. 13 (Nolte Dep. Tr., 138:10-140:6); Ex. 20 (DEFS_00042028). |
| | 76. | The Fund's database contains approximately 136,000 titles. | McConnell Decl., Ex. 25 (Defendant AFM's Amended Responses to Plaintiff's Interrogatories, No. 10). |
| | 77. | 47,650 tracks have been added since the Service Fee's inception. | McConnell Decl., Ex. 26 (DEFS_00042020). |
| | 78. | Of the 47,650 tracks added, AFM provided information on 7,395 tracks and SAG-AFTRA on 2,927 tracks. | McConnell Decl., Ex. 22 (DEFS_0041812). |
| | 79. | The Service Fee is administered on distributable amounts, not the amount actually distributed. | McConnell Decl., Ex. 12 (LeBlanc Dep. Tr., 78:9-80:25 (explaining that Ray Hair did not want to decrease amount of unclaimed distributions [i.e. distributions made to persons who have not been identified] on the Fund's balance sheet because |

| | | | it would reduce the Service Fee). |
|---|---|---|---|
| | 80. | The Unions have previously testified that the intent of the Service Fee was to recoup the costs, not to turn a profit. | McConnell Decl., Ex. 4 (Crabtree-Ireland, August 29, 2019 *Blondell* Dep. Tr., 136:3-25 ("So the intention was to come up with a way that would, you know, reasonably track the costs, not generate revenue for the union, but also not have the union subsidizing the operation of the fund"). |

DATED: May 14, 2021          KIESEL LAW LLP


By:   /s/ Mariana A. McConnell
      Paul R. Kiesel
      Mariana A. McConnell
      Nico L. Brancolini
      **KIESEL LAW LLP**

      Neville L. Johnson
      Daniel Lifschitz
      **JOHNSON & JOHNSON LLP**
      *Attorneys for Plaintiff and the Class*

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS IN OPPOSITION TO DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT