# EXHIBIT 1

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

\- - -

KEVIN RISTO, on behalf of himself and all others similarly situated,
Plaintiff,

vs.

SCREEN ACTORS GUILD-AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS, et al.,
Defendants.

CASE NO. 2:18-cv-07241-CAS-PLA

\- - -

Wednesday, October 21, 2020

\- - -

Remote videotaped stenographic deposition of BRUCE CARLYLE BOUTON, conducted at the location of the witness in Nashville, Tennessee, commencing at approximately 9:03 a.m., on the above date, before Rosemary Locklear, a Registered Professional Reporter, Certified Realtime Reporter.

\- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 971.591.5672 Fax
deps@golkow.com

APPEARANCES: (All appearances via remote technology)

KIESEL LAW, L.L.P.
BY: NICHOLAS BRANCOLINI, ESQUIRE
brancolini@kiesel.law
BY: MARIANA A. McCONNELL, ESQUIRE
mcconnell@kiesel.law
8648 Wilshire Boulevard
Beverly Hills, California 90211
(310) 854-4444

and

JOHNSON & JOHNSON, L.L.P.
BY: DANIEL B. LIFSCHITZ, ESQUIRE
dlifschitz@jjllplaw.com
439 North Canon Drive, Suite 200
Beverly Hills, California 90210
(310) 975-1080
Appearing on behalf of the Plaintiff

JENNER & BLOCK, L.L.P.
BY: ANDREW J. THOMAS, ESQUIRE
ajthomas@jenner.com
BY: ANNA LYONS, ESQUIRE
alyons@jenner.com
633 West 5th Street, Suite 3600
Los Angeles, California 90071
(213) 239-5100
Appearing on behalf of the Defendants

ALSO PRESENT:

STEVE ZAVATTERO, Video Operator

- - -

VIDEO OPERATOR: We are now on the record.

My name is Steve Zavattero. I'm the videographer for Golkow Litigation Services.

Today's date is October 21st, 2020, and the time is 9:03 a.m.

This remote video deposition is being held in the matter of Kevin Risto versus Screen Actors Guild-American Federation of Television and Radio Artists, et al., in the United States District Court, Central District of California, Case Number 2:18-cv-07241-CAS-PLA.

The deponent is Bruce Bouton.

All parties to this deposition are appearing remotely and --

THE WITNESS: Hey, you know what? Hold it. Hold it. Hold it. Hold it.

You know what? It's really irritating to hear all that noise in the back. There's a mic mute, which will -- which makes life easier. You don't have to hear all the -- whatever those gardening tools are.

MR. THOMAS: I --

VIDEO OPERATOR: I have to do my read-on.

MR. THOMAS: I think as soon as the court reporter finishes his little read-on here, then he can mute his -- I mean the videographer --

THE WITNESS: They just do -- they take care of business. They pay us, they collect money for us, they -- they follow up when somebody doesn't pay us. They do research if something gets out, you know, on TV or whatever, and they -- and nobody has been paid.

They -- you know, they run benefits if somebody gets sick. They -- you know, I mean, they speak to leadership officials to try to get, you know, parking for the union. I mean, it's the union. You know, you're looking out for the benefits for musicians.

MR. BRANCOLINI: Great.

BY MR. BRANCOLINI:

Q. And do the locals compile session reports?

A. Yes.

Q. And what are session reports?

A. When we do a recording session, we fill out a timecard, and they have to fill out, I guess it's a B-Form. I'm really not -- I don't know all the details, all that. I just know that we have -- we keep really great records in Nashville. We're very unique in that sense.

Q. I was -- I'm going to be honest. I was going to ask what the difference between a session report and a B-Form was because I was a little unclear myself, but it sounds --

A. You're talking the same. It's just paperwork.
Q. Do you know what information is contained on a session report?
A. Yes. The song that was recorded, the date of the session, the artist, and the musicians that played on the session.
Q. And do you know what personal information is collected by the musicians and artists on these -- on the session reports? Is there any?
A. Yeah. Social Security number.
Q. And so the primary purpose of session reports is to make sure artists get paid; is that correct?
A. Right. And to have the data for down the road.
Q. And so how does the -- how do you know what -- well, how does the local come into custody of the session reports?
A. As I just said, we sign timecards, and we turn it in to the local, and the local fills out the contract and they mail it to the record label or they mail it to the artist or they -- or they do whatever.
You know, I mean, not to the artist, but they mail it to the record label and the record label pays everybody.
Q. So the artist fills out the form and brings it to the --

A. No, the artist doesn't have anything to do with it. The musicians fill out the form.

We fill out a timecard on the recording session and we turn it in to the union, and then the union fills out the contract, they do the more detailed paperwork where they explain all the things, the components on it, and health and welfare, and they send it to the record label with the amount of money that they owe each musician, and then the record labels write a check to each individual musician.

Q. Got it. Okay.

So you did some work with the -- with Local 257, but you still are primarily a full-time musician; is that -- is that correct?

A. Yeah, that's what I do. I haven't -- I haven't been on the executive board for Local 257 for ten years, probably.

Q. Got it.

And when were you appointed to -- trustee of the Fund?

A. I think you probably know that, but I'm guessing, my estimate is 2011.

Q. And what was the selection process like to become a fund trustee?

A. I think people knew that I had a good knowledge

about records and they needed a rank-and-file trustee on the board, so I was appointed.

Q. That was actually my very next question.

Were you the rank-and-file member of the board?

A. Yes.

Q. There you go.

So had you expressed interest in becoming a fund trustee or was it just sort of you were knowledgeable and you were approached?

A. I was very knowledgeable about it. I've -- you know, I just -- I've spent a lot of time around performance rights.

Q. And in terms of the actual formalization of your appointment, did you have to apply?

A. No.

Q. Was there an interview process? What was that process?

A. We had a new regime, Ray Hair became president, the Fund was starting to develop, and they needed to put a board together, and they needed a rank-and-file person, and I was the obvious choice.

Q. So did -- does Mr. Hair directly appoint you or do you have to be approved by the new board?

A. In the AFM, we serve at the pleasure of the president.

A. I'm a little bit vague on the exact year. But I'm sure it was -- it was sometime between 2011 and '13 or -- did it happen in '13? See, I forget the exact date of when it happened.
Q. It did, in 2013.
Do you recall who first brought up the concept of a Services Agreement or service fee?
A. Yes.
Q. And who was that?
A. Ray Hair.
Q. And do you recall what that conversation was?
A. Not exactly. I think -- yeah. I don't -- I don't know exactly how the conversation went. I think we just felt they needed to be compensated for the time that they had put in and the research that they were doing.
Q. What did -- what do you mean by the time they put in?
A. Well, it's my understanding that the unions spent a lot of time before this thing went down. I mean, back -- they spent time lobbying Congress and supporting organizations that were working for performance rights, and they, you know -- I mean, I don't know all the details.
That's where -- that was a little bit before my

time, because it -- as you know, the performance rights thing started in '96, right, and, finally, started getting together towards '98 or '99, and I wasn't around, you know. I wasn't born then.

Q. So -- but it was your impression that Mr. Hair believed the Fund should partially pay for the lobbying efforts undertaken by the union?

A. I don't know if it was specifically the lobbying efforts. It was just everything that they did. I mean, they -- you know, they had a presence, they wrote letters, they supported -- supported stuff. They -- you know, they helped -- you know, helped get the Fund going.

Q. So a little earlier you said that Nashville was great at recordkeeping.

I'm curious sort of what experience you have on the local side of helping to identify musicians, if any.

A. The Fund works in many cases as a Wikipedia approach. It's -- the research people at the Fund are really incredible. They get better. I have watched them grow for ten years. It's a very easy process with the website.

If you're a musician, you can go on the Fund and you can find a song, and if it's a reported song, which gets reported from SoundExchange, and you look on that

BY MR. BRANCOLINI:

Q. You talked a little bit about the conversation with Ray Hair.

Can you elaborate on that, as best you can --

A. I just remember --

Q. -- that conversation --

A. I just remember having a conversation just saying that the union needed to be paid back or something for the money that they had put into this.

And that may have been -- yeah. Yeah. Yeah. That's -- I'm trying to think. Yeah.

Q. When you say "just saying that the union needed to be paid back," do you mean Mr. Hair -- that was Mr. Hair's position?

MR. THOMAS: Objection.

This whole line of -- this whole subject has been asked and answered before, but I'll allow you to continue.

So go ahead and answer.

THE WITNESS: You know, I -- as I've said, I think the union felt -- the union -- unions felt like they had put money into, you know, establishing this agreement between SoundExchange and the non-featured musicians.

And then when the Fund was started, you know,

and money started coming in, you know -- I mean, they did -- they did everything for, you know, all those years just, you know, gratis. So, I mean, they were never compensated. It came out of union dues.

BY MR. BRANCOLINI:

Q. Do you recall what form this conversation took? Was it in person, via email, over the phone?

A. I think it was just a casual conversation at one point, because I think everybody was just excited that this fund was starting to -- getting ready to start taking off.

Q. And in that conversation did you express your own opinion on the Service Agreement?

A. If I can even remember the conversation, which I can't really remember it exactly, as I said, it was -- it was very much in passing, I probably just acknowledged with a, "yeah, okay," or something. We didn't have a conversation.

Q. Did you help at all with the drafting of the Services Agreement?

A. No.

Q. Was there any negotiation about the terms of the Service Agreement?

MR. THOMAS: Objection. Vague. Lacks foundation. Overbroad.

BY MR. BRANCOLINI:

Q. You may answer.

A. You know the answer to that.

MR. THOMAS: You mean that -- you mean that Mr. Bouton participated in or -- I'm just not clear what the question is.

MR. BRANCOLINI: I mean generally.

THE WITNESS: Well, I mean, you've seen the documents, you know. You know, there was discussion about it, yeah. But, I mean, you know -- and then it was -- the agreement was made.

BY MR. BRANCOLINI:

Q. So just to sort of be clear on my end, there actually is a bit of ambiguity about the negotiations of the Service Agreement.

So may I ask again, was there a negotiation as to the terms of the Service Agreement that you're aware of?

A. Well --

MR. THOMAS: It's been asked and answered.

THE WITNESS: -- if there was -- if there was, I wasn't involved in any negotiation.

BY MR. BRANCOLINI:

Q. Do you know who would have been involved in any negotiation?

MR. THOMAS: Objection. That lacks foundation and calls for speculation.

THE WITNESS: Do I answer that?

MR. THOMAS: You can -- you can answer if you know.

THE WITNESS: Yeah. I mean, I'm just -- it wasn't me. I wasn't in the room.

BY MR. BRANCOLINI:

Q. Do you recall any conversation as to the amount of the service fee?

A. Yes.

Q. What was that conversation?

A. Well, you saw that it's the 3 percent service fee split between the two unions.

Q. Do you know if that was the only number contemplated?

MR. THOMAS: Same objections. Overbroad and lacks foundation.

BY MR. BRANCOLINI:

Q. You may still answer, Mr. Bouton.

A. There were numbers thrown about. I don't remember all of them exactly, but that's the number that was agreed upon.

Q. Do you remember what those other numbers were?

A. No.

Q. Do you recall the process for determining this number?

MR. THOMAS: Same objection. Overbroad. Calls for speculation.

THE WITNESS: I wasn't in the meeting where the number was determined.

BY MR. BRANCOLINI:

Q. Do you know if there was a specific meeting where the number was determined?

A. I don't know for sure, but when the trustee meeting happened, you know, this was the number that was presented and proposed.

Q. Do you know if any -- if any outside parties were consulted as to that number?

A. No.

Q. Just to clarify, would it be a correct summary of your testimony to say that there was some determination as to the amount of the service fee, it was then presented to the board of trustees, who approved the number at the 3 percent that exists today?

A. Yes. Yes.

MR. THOMAS: I would object that that is -- lacks foundation and doesn't quite accurately state the witness's testimony.

But you can answer, Mr. Bouton.

questions.
A. (Witness reviews document.) Yeah, I've read that.
Q. Okay. So you were present at this meeting; correct?
A. Yes, sir.
Q. And so, prior to this meeting, were you provided a draft of the Services Agreement?
A. I don't think so.
Q. It wasn't --
A. Not that I recall.
Q. You said that you received minutes prior to the meeting sometimes.
Was there anything included at all about the service fee?
A. Really, I don't recall. That was seven, eight years ago and, you know, I'm pretty bad about keeping all my records. They're probably in a box somewhere, but I think this is -- yeah.
Q. Completely fair.
Do you recall what was presented at this meeting about the service fee?
A. Yeah. Just that this is what they wanted and we needed to approve it as a board.
Q. Do you recall what was in that presentation?

reasonable way to do things.
Q. So, putting aside the concept of a service fee, if the service fee is reasonable, do you recall any specific conversation about the calculation of the amount that was decided on for the service fee?
Does that distinction make sense?
A. Yeah. But the amount was a percentage. The amount was a percentage of distributions, and at the time distributions weren't that high.
Q. Was there any conversation about why you should do it as a percentage, instead of some other method of assessing a fee?
A. I don't recall. I -- I -- you know.
Q. So -- and this was approved at that meeting; is that correct?
A. The trustees -- wait a minute. Well, let's see if we -- was it approved? Does it say in the meetings? Or did we come back and approve it later?
Q. It's sort of unclear from the meeting minutes, but it was approved -- it was ratified in July of that year.
A. And this meeting was when?
Q. June.
A. Yeah. Well, then it looks like it was approved.
Q. Would that approval have to have occurred at a

and they're union guys, and they are in a whole different thing. Dennis knows the recording business up and down.

And -- you know, and I would just -- you know, I -- it's just disagreements on why can't you get research this -- like this? And you've got to explain well, because, you know, people don't know this. Or why can't you get money out? Well, because we can't -- management companies are coming in. Or why isn't this license happening? You know, it's just stuff like that.

It's just -- it's just all -- it's just knowledge. So I think disagreements were probably -- you know, a lot of them were normal in -- you know, in the process of this fund developing.

Q. Do you recall if there were other disagreements about the service fee?

A. Well, we already talked about that.

Q. What do you mean?

A. Well, we already talked about the service fee. I mean, they basically -- you know, we got the service fee and a percentage was agreed on and the trustees voted and approved it.

Q. Apologies. I think I wasn't clear.

I meant, do you recall if there were any disagreements between Mr. Hair and Mr. Dreith about the

service fee?

A. I don't know. You would probably have to ask them, because I didn't -- you know, if they were in a room together, I wasn't -- necessarily wasn't there. It was off the record from the -- from the board meeting.

Q. But it wasn't necessarily something that came up in board meetings, then.

A. No. I mean, you know, board meetings are really interesting. Just things are presented and people vote. And there are discussions on certain things, but in this case, this kind of went through fairly quickly.

Q. So in terms of conversations at the board meetings, then, was it -- was there -- was conflict sort of resolved prior to the board meetings?

The board meetings weren't kind of an open forum, generally; is that correct?

MR. THOMAS: Objection. Vague. Overbroad as to time. Lacks foundation.

THE WITNESS: I think a lot of decisions were made just with Dennis and Duncan and Ray. I -- everything wasn't always presented to the board until we had the board meeting.

And, obviously, there would have been meetings between the chairs of the two unions -- the heads of the two unions or the representatives of the two unions and

able to, you know, exit the film fund.

You know, at one time, he was just working out of a room in the -- in the back of the film fund, you know?

Q. And following this conversation or this general -- this broader conversation about the disclosure letters, do you recall if you ever discussed disclosure again with Mr. Hair?

A. You know, there was no reason to.

Q. And do you recall -- so I guess same answer for Mr. Folio.

A. I never had any conversations with Sam. Sam kind of wasn't -- I don't know. I always liked Sam, but I didn't -- I -- you know, I didn't -- I'm not sure what he did.

Q. Fair enough.

Do you know when Mr. Folio stopped being a fund trustee, approximately?

A. No. You would know that, though.

Q. Do you recall why he -- do you know why he stopped being a fund trustee?

A. No. I just know that I think Tino ended up taking his place.

Q. And do you recall if disclosure was ever raised again at any of the trustee meetings?

A. I don't think it was.

MR. BRANCOLINI: So I actually have another exhibit that I would like to pull up.

(Exhibit Bouton-5 was marked for identification.)

BY MR. BRANCOLINI:

Q. So this is the May 2015 meeting of the trustees.

A. Okay.

Q. You are in attendance at this one.

I'm going to go down to this section just above "Appointment of Expense Committee," this paragraph, Mr. -- you asked whether payments made to the AFM and SAG-AFTRA pursuant to the administrative services agreement between the Fund and two unions were separately --

A. I'm reading the wrong thing.

Q. Sorry. Do you see right here (indicating)?

So I did not mean the last question as a -- as a gotcha. I was just curious if you had an independent recollection of it coming up again in this --

A. This is interesting. So, basically, they redacted this privileged section?

Q. Yeah.

A. Why would they do that?

MR. THOMAS: Well, just to explain how the

discovery process works, when documents are produced to the other side, privileged information is something that the -- that's not disclosed. And so, typically, if there's privileged information, it's redacted in order to protect the privilege.

So sometimes in a document you'll see the text of the document, but if there's, you know, conversations, you know, or input from a lawyer, for example, that will be -- that will be not visible. So that explains how this was produced.

THE WITNESS: Well, knowing me, yeah, I probably did ask that question.

MR. BRANCOLINI: Yeah.

BY MR. BRANCOLINI:

Q. So, to be clear, we didn't mark this privileged; this was your attorney, Mr. Thomas, or somebody from his office who did, so --

A. That's fine. That's fine. But I mean it says what it says. I asked whether the payments made, you know, and I'm -- I probably did, because, you know, it was a payment. It was like, you know --

Q. But this doesn't refresh your recollection at all about the specifics of that conversation?

A. I probably -- I would guess that it was dealt with -- I received a no. You know? And as he noted,

that any informational material distributed with royalty checks describes the Fund's receipts and operational expenditures, and I'm assuming that the service fee was built into the operation expenses.

Q. So this meeting, just back to the top, is May of 2015. So this is -- this is about a little more than a year and a half after the service fee went into effect, after a full year --

A. Okay.

Q. -- of distribution.

And I'm curious, do you recall why it would have come up in that window?

I ask sort of because the previous conversation took place in late 2013, and so do you recall if anything occurred in sort of early 2015 that would have made this question relevant again?

A. I probably just wanted to know, you know. I'm just -- you know, I stir the pot sometimes. I just -- you know, it's just -- I said, "Have you let anybody know?" You know, just to -- you know, just to ask.

Q. So going back down here, it says, "describes the Fund's receipts and operational expenditures in general terms."

Do you recall -- or scratch that.

The way that it was presented, that it was

disclosed as an operation expenditure in general terms, was it clear to you, looking at those documents, what that was, what the --

A. I don't like to -- I don't like to read financial documents. It's not -- it's not fun for me. But, basically, I think -- I think it says somewhere down there that, hey, this is a service fee. I think it's written in there as a service fee or something.

I'm not exactly sure what the term is on the document. Forgive me for that. But my eyes have a really bad tendency to glaze over on those kind of things.

Q. Okay. Did you ever speak to any other Fund beneficiaries about the service fee?

A. I'm sure I did. It became -- it became knowledge. You know, it started spreading around.

Q. Do you recall when that would have occurred, when the knowledge, to use your words, started spreading around?

A. Probably soon after the first couple distributions.

Q. Do you recall what that general conversation was among beneficiaries?

A. People just wanted to know, you know, about the service fees. And most people kind of just -- you know,

MS. McCONNELL: Nico, it's Mariana.

You might want to ask the question again. You mixed the Fund and the unions.

THE COURT REPORTER: And what was that objection? This is the court reporter.

MR. THOMAS: I think my objection was just that it was vague and lacked foundation. And, you know, I think then Mariana clarified something.

THE COURT REPORTER: Thank you.

THE WITNESS: So could you rephrase the question one more time so I give the right answer?

MR. BRANCOLINI: Yes.

BY MR. BRANCOLINI:

Q. So did this fee increase correspond to the amount of work performed by the unions to aid the Fund?

MR. THOMAS: Same objections.

THE WITNESS: You're not asking -- you're asking me a question that I can't -- I can't really -- the way you're asking the question, I can't really answer it. You know, I -- you know, I don't know what the union -- you know, I don't work at the union. So --

BY MR. BRANCOLINI:

Q. So you -- do you know at all if the amount of work increased?

MR. THOMAS: Same objections. Lacks foundation.

Overbroad.

BY MR. BRANCOLINI:

Q. If you understand, you can still answer.

A. You know, I under -- I just -- I can't tell you if their work increased or not. I'm not there. You know? Yeah. I mean --

Q. Were you surprised when you saw -- well, what was your impression when you saw the increase from year to year?

MR. THOMAS: Object to the form.

THE WITNESS: I thought that they were benefitting from the growth of the Fund. I thought that was -- they were very fortunate.

BY MR. BRANCOLINI:

Q. Did you ever make any inquiries as trustee as to any increase in work by the unions?

MR. THOMAS: Same objections. Vague and overbroad.

THE WITNESS: I probably kept my opinions to myself on certain issues. I mean, it is -- it was what it was. It was based on distributions.

BY MR. BRANCOLINI:

Q. What were your opinions on that increase?

A. Well, it's just my -- I -- they could have conceived -- they could have been perceived as being a

little bit high.

Q. By that do you mean you believed they were a little bit high?

A. I -- you know, my opinion, I -- as I said, I perceived them as a little bit high.

Q. You said earlier, quote, I thought they were benefitting from the growth of it.

Do you mean you thought that unions were benefitting from the growth of it?

MR. THOMAS: Objection. Vague.

THE WITNESS: The fee is based on a percentage. So as the Fund became more successful, the fees to the union increased.

BY MR. BRANCOLINI:

Q. So from your work as trustee -- and you had earlier described to us how you've witnessed the growth of the Fund and the researchers -- it was your impression that the Fund had become more successful at this?

A. Yes. The Fund had become incredibly successful, because you can just look and see how much money went out and what percentage the unions were getting. So it looks like it became, you know, close to five times as successful from 2014 to 2018.

Q. Yeah. It's about a 400 percent increase.

So you said as well that you kept your opinions to yourself. You mentioned earlier that you serve at the pleasure of the president of the AFM.
A. Yes, sir.
Q. Was there ever a fear that if you shared opinions that were different than the president of the AFM, that there was the potential for retaliation?
A. You know what? He can't do anything to me. I mean, I'm not afraid of anything. You know? There's not -- I don't get paid, dude. I don't -- you know, this is a volunteer job. I do it because I love musicians and I just --
Q. And I -- Sorry. I didn't mean to step on your words.
A. I just got -- and I did -- yeah. I'm sorry. I mean, I just -- I -- I'm really not scared of anything.
Q. Yeah.
So to be clear, I guess what I mean is, he could remove you, though, if he was unhappy with you as trustee; is that correct?
A. Yeah. Absolutely. But I don't think he could do it in the middle of a lawsuit, so -- but maybe he could. I don't know.
Q. I would presume that would look pretty bad.
A. Yeah, I would think so.

discussion amongst the trustees about modifying the fee going forward?

A. I think one of the attorneys maybe --

MR. THOMAS: Well, let's not talk about anything that involves conversations with attorneys. I think his questions --

THE WITNESS: Oh, that's right. Yeah. I mean, I think --

MR. THOMAS: -- are limited to --

THE WITNESS: Yeah.

MR. THOMAS: -- conversations you had, you know, maybe with board members that are not, you know, related in any way to a discussion of the lawsuit that lawyers were involved in.

THE WITNESS: Well, this was -- this was a while back. I think this was -- this might have been before the lawsuit. But, yeah, you're right. I understand what you're saying.

But, yeah, I don't think -- you know, I mean, I -- you know, just, you know, as I said, I've watched these fees go up and up and up and up. So, I mean, you know, I just think there may need to be another discussion at some point on modifying these fees.

BY MR. BRANCOLINI:

Q. So is it your opinion today that you think the

fee is maybe too high?

MR. THOMAS: Objection. Asked and answered.

THE WITNESS: We already talked about everything.

BY MR. BRANCOLINI:

Q. Can you just concisely give me your answer to that?

MR. THOMAS: Same objections.

THE WITNESS: I gave the answer about three different times, I think.

BY MR. BRANCOLINI:

Q. The answer is?

A. I just said, I thought the fees were starting to get pretty high and that we probably should have a discussion on -- in -- on maybe how to stabilize the fees because I would like to see this fund get huge.

And at some point, you know, it's just math. I mean, you know, just look at all this. We're not -- we're all -- you know.

Q. Perfect. Thank you.

And so what you -- you touched on earlier what the different ways that the Fund researchers locate fund beneficiaries.

Could you just sort of summarize, to the best of your knowledge, what those tools are?

So here you list as -- you are listed as having a direct and substantial role in the negotiation of the Data Purchase Agreement.

Do you believe you had a direct and substantial role in the negotiation of the Data Purchase and Services Agreement?

MR. THOMAS: Objection. Vague and ambiguous. Asked and answered.

BY MR. BRANCOLINI:

Q. You may answer.

A. No. I mean, I told you I wasn't -- you know, basically, I showed up at the meeting and the whole thing was presented and I had to approve or disapprove.

Q. Okay. Listed here as well is Patricia Polach. Who is Patricia Polach?

A. She was the attorney from Bredhoff & Kaiser that represented the union.

Q. When you say she represented the union, what union do you mean?

A. Yeah. She was the AFM's attorney from Bredhoff & Kaiser.

Q. Do you know if any of the people listed here served as an attorney for the Fund in the negotiation of the service --

A. You know, I don't know if Patricia was also --

I, ROSEMARY LOCKLEAR, a Certified Shorthand Reporter of the State of California, duly authorized to administer oaths pursuant to Section 2025 of the California Code of Civil Procedure, do hereby certify that

BRUCE CARLYLE BOUTON, the witness in the foregoing deposition, was by me duly remotely sworn to testify the truth, the whole truth and nothing but the truth in the within-entitled cause; that said testimony of said witness was stenographically reported by me, a disinterested person, and was thereafter transcribed under my direction into typewriting and is a true and correct transcription of said proceedings, to the best of my ability.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

Rosemary Locklear

ROSEMARY LOCKLEAR, RPR, CRR, CSR 13969

Dated:



EXHIBIT
Bouton-1
RL 10/21/2020
exhibitsticker.com

Approved as amended 12-12-13

**Minutes**
**Meeting of the Trustees**
**AFM & AFTRA Intellectual Property Rights**
**Distribution Fund**

June 4, 2013

AFM & AFTRA Intellectual Property Rights Distribution Fund
11846 Ventura Blvd., Suite 300, Studio City, CA 91604

**Trustees Present:** Bruce Bouton, AFM
Duncan Crabtree-Ireland, SAG-AFTRA (Via Telephone)
Sam Folio, AFM
Raymond M. Hair, Jr., AFM
~~Jon Joyce, SAG-AFTRA~~ Amendment 12-12-13
Stefanie Taub, SAG-AFTRA

**Present:** Dennis Dreith, Fund Administrator
Nancy Carney, Fund Controller
Shari Hoffman, Manager, Audio-Visual Division (Via Telephone)
Jo-Anne McGettrick, Manager, Sound Recording Division
Patricia Polach, Bredhoff & Kaiser, PLLC (Via Telephone)
Grant Miller, Miller, Kaplan & Arase
Doug Waite, Miller, Kaplan & Arase

The meeting convened at 4:05 p.m. (PDT) in person and via teleconference.

**Minutes**

The minutes of the July 26, 2012 meeting had been previously approved via e-mail poll.

**Discussion of Studio Plaza Building**

Following up on written material sent to the Trustees earlier, the Administrator presented information regarding the possible purchase of the Studio City Plaza building, a 38,000 square foot property located in Studio City. The building is available at a purchase price of $9.9 million. The purchase price includes an adjacent parking lot valued at $2.2 million, which is zoned to allow a 30,000 square foot building. There currently is a note of $3.6 million on the building and parking lot which the AFM & SAG-AFTRA Fund could assume, reducing the initial cash outlay for the proposed purchase to $6.3 million. The building itself is fully leased to 2016; thereafter, it would serve as the home of the Fund, which is currently out of rentable space and which will need expanded space in the near future.

The Administrator presented further information about the financial aspects of the possible purchase. The initial cash outlay for the purchase would come from the long-term investment account; i.e., the long-term investment fund would invest in the building. The Administrator projected that over the next three years, the rental receipts from the building

should exceed the costs of owning the building (the mortgage and operating expenses) by approximately $1.5 million per year. The Administrator anticipated that during or before 2016, the Fund would move in to the building (ultimately using one-third to one-half of the building) and pay a fair market value rent. The long-term investment account will be repaid from the net income derived from the building. The Administrator anticipated that the long-term investment account could be repaid within ten to twelve years, and that the Fund could be free of obligation after twelve to fourteen years (depending on the possibility of renegotiating the terms of the loan or loan buy-out with a reduced pre-payment penalty).

The Administrator reported that the purchase price is currently secured by a fully-refundable $300,000 deposit. He further advised the Trustees that no inspection has been performed on the building as of today, but that he was in the process of scheduling an inspection and appraisal. He asked for the views of the Trustees as to whether to move forward with the building purchase.

Various issues relating to ownership of the building were discussed. The accountants from Miller, Kaplan & Arase suggested that the Fund should establish a separate corporation to purchase the building in order to protect the Fund and the unions from any liabilities. A question was raised as to whether the title holding company would be tax exempt as well. Representatives of Miller, Kaplan & Arase advised that the title-holding corporation is tax-exempt, but not as to the mortgage. Because the debt on the building would be approximately 37% of the value of the building, 37% of the rental income and appreciation from the building would be taxable while the building is not being used for Fund purposes. However, if the Fund grew to occupy 85% usage of the building, no income tax would be owed.

Mr. Hair asked for clarification regarding repayment of the long-term investment account. The Administrator reiterated that the Fund would be paid back from the receipts of the current leases, and, after the Fund occupied the new building, from the revenue generated from the continuing leases and from the rent paid by the Fund. The Administrator said that he anticipated that continuing leases would provide sufficient income to fully pay the Fund back for all the costs of the building.

Mr. Duncan Crabtree-Ireland explored the benefits of an LLC structure for the new corporate entity to hold the title to the building. He further expressed his support for establishing a separate corporation for the purpose of purchasing the building.

**Privileged**

Mr. Crabtree-Ireland moved that the Trustees approve the purchase of building, contingent upon receiving an appraisal at or over the purchase price, and contingent upon a favorable inspection of the building. Motion carried unanimously.

**Budget:**

The Trustees continued the discussion from the last meeting regarding the Fund practice of preparing "expense only" budgets. Doug Waite of Miller, Kaplan & Arase explained that the Fund's practice is not unique, and that in organizations such as the Fund where collections cannot be fully predicted or routinized, expense-based budgets are appropriate. He further explained that expense-based budgets must be formulated based on actual expenses, track records of collections and expenditures, and sufficient oversight to assure that overall revenue is sufficient to meet expenses. He said that the Fund could add revenue projections to its proposed budgets, but that doing so was not a requirement for formulating an appropriate proposed budget. He suggested that further discussions of this topic could be taken up with Fund Auditor Jeff Goss if desired.

The Administrator presented the Fiscal Year 2014 Proposed Budget, which anticipates a complete separation from the Film Musicians' Secondary Markets Fund during the fiscal year. As a result, it included additional office space, new hires, and the establishment of FMSMF Administrative Assistant Johanna Medrano, IT Manager, Robert Rusek and Facilities Manager Tom Freas moving to the AFM & SAG-AFTRA Fund as full time employees. It also included the addition of a full-time paid Administrator, beginning mid-fiscal year. The Administrator noted that, consistent with past discussions of the Trustees, it is anticipated that he would move into that position at such point as an orderly transition can be made from his position at FMSMF.

Mr. Folio asked for additional detail on the proposed salaries for Fund staff. Mr. Crabtree-Ireland expressed the view that details as to staff salaries other than the Administrator's salary should be delegated to the Administrator for decision, but agreed that a detailed report should be provided. The Administrator agreed to provide that detailed report.

It was agreed that the Trustees would schedule a separate teleconference to review the proposed salary of the Administrator.

The Trustees approved the Fiscal Year 2014 Proposed Budget, contingent upon the resolution of the Administrator's salary in a subsequent meeting. It was agreed that Ms. Taub would arrange a meeting via teleconference for that purpose.

**Future Distributions and Future Collections:**

The Administrator informed the Trustees that he anticipated that the 2013 distributions would total about $14 million, which will include a partial distribution of sound recordings (mostly DPR) for years 2009-2010 and approximately $4 million in audiovisual royalties from AIE (the Spanish collective) from 2011 and 2012. He also reported that he projected collections in fiscal year 2014 of $32 million, the bulk of which will come from SoundExchange (including approximately $4 million from foreign royalties), other foreign agreements, and an additional $6 million from AIE for 2013 A-V royalties.

**Administrative Fee:**

A discussion ensued regarding the Fund entering into a service agreement with the American Federation of Musicians and SAG-AFTRA for ongoing support including membership

data and other information and services to assist in facilitating distributions. It was moved, seconded and carried that the Fund enter into a service agreement with the two unions, pursuant to which the unions would provide information and services important to the Fund, and the Fund would pay a service fee consisting of an amount equal to 3% of each distribution (after the deduction of administrative fees), with one-half payable to the AFM and one-half payable to SAG-AFTRA.

The staff and MKA guests were excused. A discussion ensued with the Administrator regarding his leaving his position at the FMSMF and devoting his full time to the AFM & SAG-AFTRA Fund.

The meeting adjourned at 6:30 p.m. PDT.

# EXHIBIT 2

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| KEVIN RISTO, on behalf of himself and all others similarly situated, Plaintiffs, | ) | |
| vs. | ) | Case No. 2:18-cv-07241-CAS-PLA |
| SCREEN ACTORS GUILD-AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS, a Delaware corporation; AMERICAN FEDERATION OF MUSICIANS OF THE UNITED STATES AND CANADA, a California nonprofit corporation; et al., Defendants. | ) | |

DEPOSITION OF DUNCAN CRABTREE-IRELAND
CONDUCTED VIRTUALLY
TUESDAY, FEBRUARY 16, 2021
9:05 a.m.

Job No. 269207
Pages: 248
Reported by: Lorie Rhyne, CSR, RPR, CRR
Appearing remotely from San Diego, California

R E M O T E A P P E A R A N C E S

On Behalf of the Plaintiff Kevin Risto:

PAUL KIESEL, ESQ.

NICHOLAS "NICO" BRANCOLINI, ESQ.

MARIANA A. McCONNELL, ESQ.

Kiesel Law LLP

8648 Wilshire Boulevard

Beverly Hills, California 90211

(310) 854-0812

Kiesel@kiesel.law

brancolini@kiesel.law

mcconnell@kiesel.law

Co-Counsel:

NEVILLE JOHNSON, ESQ.

DANIEL B. LIFSCHITZ, ESQ.

Johnson and Johnson

439 North Canon Drive, Suite 200

Beverly Hills, California 90210

(310) 975-1095

dlifschitz@jjllplaw.com

njohnson@jjllplaw.com

Duncan Crabtree-Ireland

On Behalf of the Defendants:

ANDREW J. THOMAS, ESQ.
ANDREW G. SULLIVAN, ESQ.
ANNA LYONS, ESQ.
Jenner & Block
633 West 5th Street, Suite 3600
Los Angeles, California 90071
(213) 239-5155
ajthomas@jenner.com
agsullivan@jenner.com
alyons@jenner.com

On Behalf of Defendant SAG-AFTRA:

SARAH LUPPEN FOWLER, ESQ.
SAG-AFTRA
5757 Wilshire Boulevard, 9th Floor
Los Angeles, California 90036
(323) 549-6836

Videographer: JENNIFER FRANKLIN

P R O C E E D I N G S

THE VIDEOGRAPHER: We are now on the record. My name is Jennifer Franklin. I'm a videographer for Golkow Litigation Services. Today's date is February 16th, 2021, and the time is 9:05 a.m. This remote video deposition is being held in the matter of Risto versus Screen Actors Guild-American Federation of Television and Radio Artists, et al., for the United States District Court, Central District of California. The deponent is Duncan Crabtree-Ireland.

All parties to this deposition are appearing remotely and have agreed to the witness being sworn in remotely. Due to the nature of remote reporting, please pause briefly before speaking to ensure all parties are heard completely.

Appearances by counsel will be reflected in the stenographic record.

The court reporter is Lorie Rhyne and will now swear in the witness.

\- - -

position did you move into?

A. Actually, I'm sorry. I need to correct my previous answer. I was giving the timeline a little bit wrong.

Immediately prior to the merger, my title at the Screen Actors Guild was deputy national executive director and general counsel, and immediately post the merger with SAG-AFTRA, my title changed to chief administrative officer and general counsel.

Q. And so how did those responsibilities vary -- I know, obviously, the title changed, but how did the responsibilities change, if at all?

A. Well, they changed a little bit. One of the ways that they changed was that in the months immediately after the merger, I took over responsibility for a number of things within our music area or sound recordings area. Basically, the assignment of certain departments shifted and certain responsibilities shifted as we were integrating the management teams of the two unions.

Q. And when the two unions were merged, did your work involve any advocacy for performance rights?

A. Sorry. You said when the unions merged. Does that mean at the moment of merger or after that or --

directors, the one from AFTRA and the one from SAG.

And shortly thereafter, within about a month or so of the merger, the former executive director of AFTRA departed. And so there were a number of responsibilities that that individual had -- had had, including serving on the board of trustees of the Fund. And so the remaining executive director -- my boss, David White -- and I had a conversation about how best to handle the various responsibilities that were needing to be assigned after her departure, after the departure of the former executive director of AFTRA.

And he decided that I should take over those duties that the former executive director of AFTRA had had on her plate as it related to the music area. And so as a result of that, I was appointed to fill the seat that she vacated on the trustees of the Fund as well as some other duties.

Q. Perfect. So basically, David White, who was your immediate report, your boss, in light of the departure of the executive director of AFTRA, suggested that you -- one of the things you could take on would be that -- assume her role as a trustee to the Fund?

A. Yes.

Q. Did you have any hesitancy in joining the board in that role?

Q. Then I'd like to take us to Article III, Section 1, and specifically have you just read for us what Nico is going to highlight for us, Section 1. And if you could read that to us, please?

A. Sure. Section 1. AFM and SAG-AFTRA trustees. The operation and administration of the Fund shall be the joint responsibility of six trustees, three appointed by the AFM, of which no fewer than one shall be a rank-and-file representative, and three appointed by SAG-AFTRA, of which no fewer than one shall be a rank-and-file representative.

Q. Thank you. Do you know if before 2012, there was a requirement that there be a rank-and-file representative?

A. I think so, but I would actually need to look back to be sure.

Q. Is it fair to say that Article III, the Trustees, that this would have been one of the sections that you would have been involved in amending because it now talks about the union of AFM and SAG-AFTRA themselves?

A. I'm sorry. I think that might be a mistake because you just said "the union of AFM and SAG-AFTRA." Did you mean SAG and AFTRA, or did you mean the union of AFM and SAG-AFTRA?

knowledge, where the trust fund trustees would only be rank-and-file members as opposed to something else?

MR. THOMAS: Objection. Vague. Lacks foundation.

THE WITNESS: I'm sorry. Just to be clear, are you asking me was there ever a consideration of making all the trustees required to be, quote/unquote, rank-and-file trustees; is that what you're asking?

BY MR. KIESEL:

Q. That's the question, yes.

A. I don't know.

Q. With regard to the appointment of trustees, referring specifically to the SAG-AFTRA trustees, other than a rank-and-file member, do you know who the other two trustees would be in terms of what position they would hold within either SAG-AFTRA or something else?

MR. THOMAS: Objection. Vague. Overbroad. Lacks foundation.

THE WITNESS: Traditionally, in AFTRA and now in SAG-AFTRA, one of the trustee seats is held by the national executive director or a designee of the national executive director. One of the trustee seats is held by a rank-and-file member by which, I believe, means a member that does not serve as, you know, a staff person of the union or as an officer of the

union. And the other seat may be held by a staff person or may be held by a member, depending on the appointment decisions made by the -- by -- made by SAG-AFTRA.

BY MR. KIESEL:

Q. So said another way, at least insofar as the 2012 trust agreement's concerned, one of the three members is going to be a rank-and-file member; correct?

A. Correct.

Q. One of the members is going to be selected by the national executive director to be a trustee; correct?

A. Correct.

Q. And in this case, that would have been you, at the request of David White, to serve in this capacity?

A. Correct.

Q. Is that protocol set forth anywhere in this agreement, or was it just by custom and practice that that was done?

A. As -- as to the -- the seat that was occupied by the national executive director, that is custom and practice. As to the seat that's held by the rank-and-file member representative, that's, as you can see, part of the trust agreement. So it's -- I guess

the answer to your question is both.

Q. And then how about the staff member? The -- the third seat, how was that decided? Who made the determination of who the third seat was going to be held by?

A. Typically, it would be -- I mean, the -- the decision would be made by our governing bodies. The recommendation as to who that would be would typically be made by the staff, such as myself, in combination with members -- member leadership who worked in that area.

Q. Is it fair to say that that process of selecting the third trustee is not set forth in the document itself, but it's just handled on a -- on a case-by-case basis?

A. Right. Yes. I mean, I think the unions have the appointment power, and so it's up to them. So long as they comply with the provision regarding the rank-and-file representative, it's up to the unions what their internal process is for appointing trustees.

Q. Thanks. To your knowledge, is there anything in the Copyright Act that sets forth any of the requirements for who would serve the trustee to the Fund?

A. Not that I can recall.

Q. Does the trust agreement say anything about the appointment of cochairs of the board?
A. Not to the best of my recollection, no.
Q. Do you recall a conversation about establishing cochairs to the Fund?
A. Not establishing them, no.
Q. Were there, in fact, cochairs to this fund?
A. There were and there are.
Q. Okay. But prior to your joining the Fund, had there been cochairs?
A. Yes, that's my understanding.
Q. And who was it your understanding was the cochair prior to your joining? Was it the executive director of AFTRA?
A. Yes.
Q. And was it then -- who was it for the AFM?
A. To the best of my knowledge, it was Ray Hair, the president of AFTRA -- of AFM, and his predecessors.
Q. And again, at least by way of your own experience, that decision of cochair was not something that was set forth in the Fund agreement itself but just done by custom and practice?
A. Right. I think there may have been a brief discussion about it with the trustees when -- when I

arrived to take over for my predecessor on that board of trustees. So I -- I think that the formal decision to have cochairs is one that's within the trustees' authority, and I think that's how that is decided.

Q. Thanks. What was the name of the prior executive director of AFTRA who left back in 2012?

A. Kim Roberts Hedgpeth.

Q. Is there a requirement that you have a hyphenated name to be on the --

A. It's not a requirement. It is highly preferred. But in -- in fairness, her name is not hyphenated. It is Roberts Hedgpeth, but without a hyphen.

Q. Fair enough. And for purposes of our court reporter, how do you spell, if you know, Hedgpeth?

A. H-e-d-g-p-e-t-h.

Q. Let's go to Section 2. Terms of Trustee. And have you please read that into the record for us.

A. Section 2. Term of Trustees. Each trustee shall continue to serve as such until his or her death, incapacity, resignation or removal by the appointing union. Each union may remove or replace its trustee at will.

Q. So am I correct that, essentially, once

Q. In 2012, who was the Fund's counsel?
A. The Fund's primary counsel was Patricia Polach.
Q. And is Patricia Polach currently, in 2021, the Fund's counsel?
A. No.
Q. When was she replaced, if you know?
A. Approximately 2018.
Q. Do you know why, in 2018, she was replaced as the Fund's counsel?
A. Yes. She retired.
Q. And what firm was she with?
A. She was with a firm called Bredhoff & Kaiser in Washington -- based in Washington, D.C.
Q. So upon Patricia Polach's retirement, did Bredhoff remain counsel or did you change firms, if you know?
A. Bredhoff remained counsel.
Q. And are they still counsel to the Fund?
A. Yes.
Q. When you joined the Fund, were you ever given any documents to review or explain what your legal duties were as a trustee to the Fund?
MR. THOMAS: Objection. Vague and overbroad.

than what had already been the case. You thought Kim was serving as cochair, so you were stepping into her position; therefore, you would serve as cochair of the Fund?

A. Right. And it would make sense to me in a fund structure like this one that there would be cochairs since, obviously, you have two organizations that are the settlors of the trust and that are appointing authorities for the trustees. There was a certain logic to the idea that there could be a desire to have cochairs.

Q. Who was it -- beginning when you became cochair in 2012 -- that would keep the minutes of the board meetings?

A. So far as I know, outside counsel always kept the minutes of the meetings.

Q. And was outside counsel typically present at every board meeting?

A. To the best of my recollection, yes.

Q. And would that have been Patricia Polach?

A. At that -- at the -- in 2012, yes.

Q. And so was Patricia Polach based here in Los Angeles or somewhere else?

A. She was based in Washington, D.C.

Q. So would she typically call in to the

MR. THOMAS: Objection. Vague.

BY MR. KIESEL:

Q. Would you expect the minutes to al- -- also reflect the individuals who voted for a particular motion?

MR. THOMAS: Same objection. Vague. Overbroad.

THE WITNESS: No. I mean, like, if -- if by that you mean would I expect that the minutes would show how each individual trustee voted? I would not expect that.

BY MR. KIESEL:

Q. You would expect it would be a numeric reference to what the -- the vote was? For example, if there were -- how many trustees were there in 2012 when you joined?

A. I believe there were six.

Q. Three for AFM and three for SAG-AFTRA?

A. Correct.

MR. THOMAS: Objection. Vague.

BY MR. KIESEL:

Q. And so if there was a vote, how -- I want to talk about this a second. With regard to, say, AFM and SAG-AFTRA, how was the vote tabulated with regard to each unions' position taken on a vote?

For example, if there's three members of AFM and two of the members of AFM voted for a particular motion and one voted against, would that 2:1 ratio typically be reflected in the minutes, or would it simply be AFM voted yes or no based upon the majority of those trustees, if you know?

A. So my expectation would be -- and I don't -- I don't know if this is exactly what was done by counsel in all cases -- but my expectation would be that simply the result of the vote would be recorded in the minutes, not -- unless it was, you know, a request for a roll call vote or for a recorded vote of some kind, I would not expect the minutes to contain a detailed listing of how each and every trustee voted.

I would also note that under the trust agreement, there is a unit voting system, which for those who aren't familiar with it is quite common in union trustee organizations. For example, our benefit plans have unit voting also. And so -- so if a vote came down to a formal vote of that nature, then the trustees appointed by AFM would collectively decide how to cast the one vote that AFM trustees hold, and the trustees appointed by SAG-AFTRA would, likewise, collectively decide how to cast that, which is intended to ensure that, you know, absences of any particular

meeting don't affect, you know, substantive decision-making.

Having said that, the custom and practice in the trustees is to operate by consensus, and almost all of the decisions that I can recall being made by the trustees over the years have been made by consensus.

Q. Thank you very much for that answer. So a unit vote would be one vote per union; right?

A. Correct. Well, one -- I mean, one vote per group of trustees appointed by a particular union. I don't want to imply that the union would get to cast the vote because it would not be the union casting the vote, it would be the trustees appointed by that union together deciding how to cast that one vote.

Q. Fair distinction, and thank you for that. So ultimately, the trustees that are appointed by AFM would have one vote, and the trustees appointed for SAG-AFTRA would have one vote?

A. Correct.

Q. And if there was a split 2:1 to vote for a particular motion, but the majority were the two, then the -- the motion would carry for that union reflecting just simply one vote as opposed to whatever split occurred within the -- the -- the trustees themselves; right?

MR. THOMAS: Objection. Vague.

THE WITNESS: Right. In theory, each of those groups of trustees would decide amongst themselves how to cast that one vote. And within their subgroup, they might cast their own votes, and a majority of their own votes would then carry the day within their group for the casting of their one vote.

BY MR. KIESEL:

Q. Right. Why don't we take a second and now look at page 7 of the trust agreement that specifically references what we're discussing here. So let me have Nico pull up for us -- this is the trust agreement, and we're going to go to page 7 -- page 7.

And we're going to look at Article VII, which is Meeting of the Trustees, and we're going to go down to Section 3. And Mr. Brancolini is going to highlight this. And if you could read for us Section 3, please?

A. Sure. Section 3. Agreement of the Trustees. All actions of the trustees shall be by agreement, with the AFM trustees casting one vote, and the SAG-AFTRA trustees casting one vote. In the event that any matter presented for decision cannot be decided because of a failure of agreement, the matter may be submitted for arbitration in accordance with

Article VIII.

Q. Thank you. To your knowledge, since 2012, did the trustees always follow this protocol?

A. Yes. I mean, maybe I should be clear. I don't feel the trustees deviated from this protocol. Again, as I said, most of the decisions are made by consensus, and so the first clause of the section states, "All actions of the trustees shall be by agreement."

So it is my view that if all the trustees are in agreement on a decision, there's not a need to then separate out into separate groups and go through that mechanical process. It's just adopted by consensus.

Q. So here's a question: Are you -- are you familiar with the -- what the idea of a quorum is?

A. Yes.

Q. If there are three board members from the AFM, would it require that there be a quorum of the AFM voting members to cast a vote? Let's just say, hypothetically, two of the three were either not available or conflicted out and couldn't vote. Could a single trustee for AFM carry the vote for the AFM, or does it need to be a quorum of the three, if you know?

A. A single vote could carry it. The quorum

applies to the meeting as a whole but not to the subgroups for voting purposes.

Q. Thank you. To your knowledge, has -- in your time with the board, has the board ever engaged in arbitration, in accordance with Article VIII down below, what references arbitration?

A. No.

Q. Does the board of trustees have any standing committees?

A. I believe we do. I'm not 100 percent sure which ones are currently in effect. But we have -- over the time since 2012, we have had committees, yes.

Q. Could you identify any one of those committees?

A. Sure. We have a -- we have had a committee that was charged with handling the hiring and the recommendations to the trustees regarding the hiring and compensation of the Fund's executive director.

Q. So like a search committee?

A. Right, like a search committee, plus a compensation committee kind of rolled into one.

Q. Anything other than a search committee/compensation committee that you recall?

A. I -- I would need to look back. I feel like we may have, at one time, had a committee of trustees

in exchange for those services and data.

Q. What would be a good way to describe the data coming from the unions as -- as we're going forward? Do you just simply call it data? Is that the best way to do it or something else?

(Stenographer clarification.)

BY MR. KIESEL:

Q. As regard to what the unions were providing?

A. Sure. I mean, as a general term, yes. I mean, there's obviously specific pieces of it that we could define more specifically. But generally, that's fine.

Q. Okay. When you had the conversation as you were onboarding to become a trustee, what was your understanding of the reason why they wanted to have a service fee in place for the unions?

MR. THOMAS: Objection. Vague. Calls for speculation.

THE WITNESS: I think the idea was that for a long time now the unions had been sort of informally and unofficially providing a lot of data and a lot of services to the Fund that the Fund was extremely reliant on and, in fact, was essential to the Fund.

And one of the things that was going on during this time period was what I would call a sort of

professionalization of the operations of the Fund. The Fund was going from being a small sort of mom-and-pop-type operation to a larger, more professional sort of type of environment. And I think there was a concern that having, essentially, such a significant dependence on data and services that come from the union without any kind of agreement in place to assure the continued provision of those services was not wise.

I think there was also a sentiment that the unions were starting to get to a place where they did not wish to continue to subsidize the operations of the Fund by providing services, et cetera, for free and that it would be best to define how that was going to work so that we didn't end up in some kind of a situation where the services or the data were withdrawn and leaving the Fund without access to that information.

BY MR. KIESEL:

Q. Did you have a conversation with either Ray Hair or Dennis Dreith or anyone else connected to the Fund before that service fee was voted on how the unions would be reimbursed for the costs associated with the data they were providing the Fund?

MR. THOMAS: Object to the form. Misstates

A. Yes.

Q. Without telling us what any attorney said, or any consultant, as to whether the union could charge the Fund a service fee under any governing law, to your knowledge?

A. Yes.

Q. Do you know whether it was Patricia Polach who was consulted?

A. Yes.

Q. Was Patricia Polach consulted prior to the vote approving the service fee?

A. Yes.

Q. Okay. Here's a question. I'm going to be going on to another exhibit. I'm more than happy to power through --

MR. KIESEL: Actually, Lorie, you're the most important person here as our -- let's go off the record.

THE VIDEOGRAPHER: We are now going off the record. The time is 12:26 p.m.

(A recess is taken.)

THE VIDEOGRAPHER: We are now going back on the record. The time is 12:43 p.m.

BY MR. KIESEL:

Q. Thank you. Mr. Crabtree-Ireland, when we

was going to be the one signing this agreement with the Fund on behalf of SAG-AFTRA, and I just felt it would be better if I didn't. So I didn't.

Q. Would you consider there might be a conflict of interest in your executing a document on behalf of the Fund, given your role with SAG-AFTRA as well?

MR. THOMAS: Objection. Misstates his testimony. Vague.

THE WITNESS: Well, I didn't really reach that -- that point. I mean, I can understand why you would ask me that, but from my perspective, it was more so about the perception than about an actual conflict of interest. You know, so to me, I was 100 percent, you know, in favor of -- of what we were doing, and I felt like it was completely appropriate, but I didn't feel like it would be great for me to participate in that and then sign the document on behalf of SAG-AFTRA.

So I just chose not to from a -- but I guess, from my perspective, I didn't really reach the conclusion that there would be -- that there was a formal conflict of interest or anything like that. I was more so concerned about just the perception of it and not wanting to create an unnecessary issue.

BY MR. KIESEL:

Q. Let's take the exhibit down for a second.

conflict between the Fund and the money it was to be paying to one of the unions and the hat you wear on behalf of the union -- not the Fund, but the union -- to recover money that the union was purportedly ex- -- expending for the benefit of the Fund?

MR. THOMAS: Object to the form. Vague. Calls for a legal conclusion.

THE WITNESS: You mean in the sense that the union would be trying to get more money out of the Fund and the Fund would be trying to get -- to pay less money to the union? Is that what you mean?

BY MR. KIESEL:

Q. Not necessarily. So the -- the Fund wants to make sure that it preserves as much of its money for distribution to the beneficiaries as it possibly can; right?

A. Yes.

Q. On the other hand, the union wants to make sure it's being reimbursed or given money back for whatever expenses it's incurring or value it's providing to the Fund to get back paid money to the union for the work it's doing; right?

MR. THOMAS: Object to the form.

THE WITNESS: I mean, yes, but I mean, I guess I would also just point out. I mean, as you --

as you noted earlier, these are two nonprofit organizations. So the union is not trying to make money. The union is not trying to get the most money it can get out of the Fund.

The Fund is not trying to somehow wheedle the union into giving it stuff for free that it should reasonably pay for, just like it doesn't go and try to, you know, get other service providers to -- to do that.

So I -- I -- I feel like there's a -- a conflict that's presumed in the nature of the question that doesn't really exist because both entities were -- had their targets set on the same result, which is a reasonable arrangement that provided for services to be provided that the Fund needed and that the union would be fairly compensated for those services.

So I -- I guess I don't buy into the presumption that there's a conflict the way there would be with two for-profit entities whose objective is to maximize the amount of money that they make and it's a zero-sum game.

BY MR. KIESEL:

Q. Would you agree that if money is taken from the Fund and provided to the union, that that is less money available to be distributed to the beneficiaries of the Fund?

administrative -- the overall administrative fee, yes.

Q. So you would agree that the -- the Fund itself has employees on staff who can do research to identify beneficiaries who get paid from the Fund?

A. Yes.

Q. Going back to my original question. In June 2013 when you did not vote, did you actually formally abstain from the vote?

A. I believe so.

Q. Do you know why the records don't reflect that there was an extension?

A. I don't. And I -- and I haven't had any way of finding out the answer to that other than just to say, you know, I do feel like I should have caught that at the December meeting and corrected it for the minutes. And I didn't, for whatever reason. But -- so no, I can't explain it.

Q. Thank you. Also -- and I asked you this earlier, but I'm not sure I got a clear answer. Do you believe that you had a conflict in wearing the hat that you did with SAG-AFTRA and your role as a trustee with the Fund approving a -- a fee to be paid to SAG-AFTRA?

MR. THOMAS: Objection. Vague. Asked and answered.

THE WITNESS: I think my answer was I never

reached a conclusion about having a conflict because I felt that it was better to not be in that position in the first place, which is why I chose not to vote. But it wasn't because I reached a formal legal conclusion that there was a conflict, nor did I have any analysis done that told me that. I just was concerned about the perception.

BY MR. KIESEL:

Q. So at least as you sit here today, you don't recall ever being advised by anybody that if you were to vote, that you would have a conflicting vote; true?

A. I'm unclear if -- when you say "advised by anybody," if that is meant to include the -- a communication with counsel, and if so, then I would like to know if I should be answering that or not.

Q. Well, obviously, I don't want to know about communications you've had necessarily with counsel. But on the other hand, if counsel advised you that you have a conflict of interest and you shouldn't have voted, then I think we'd be entitled to know that from a -- a board fiduciary duty obligation that you have as a trustee.

MR. THOMAS: Well, I'm going to object. It -- it sounds like you're still asking him for the content of a communication with counsel. And so for

now, at least, I think I have to instruct the witness not to answer.

Now, if we -- if we take a break, we might be able to clear it up. But I -- I -- I -- I don't know sort of -- right now, the way you phrased the question, I have to instruct the witness not to answer.

BY MR. KIESEL:

Q. Well, the answer is I don't think we need to have a debate about this because your testimony is you were advised by no one -- you -- you chose voluntarily not to vote here in -- in -- on June 4, 2013; right?

A. I don't believe I've testified what anybody else said to me. I believe I testified that I did not formulate a conclusion that there would have been a conflict of interest because I chose -- due to the perception -- to not vote regardless of whether or not I would have reached the ultimate conclusion there was a conflict of interest. That's what I believe I have testified to.

Q. Let me ask you this: Without telling me what the content was of -- of any response to -- did you consult with any counsel --

(Stenographer clarification.)

BY MR. KIESEL:

Q. Sure.

you mean by a breakdown of the reasonable costs. You mean from the union, has it -- has there ever been a calculation of what the actual costs are of pulling the session reports and -- is that what you're referring to?

BY MR. KIESEL:

Q. Yes, I want to know what the -- that's correct. Has there ever been an actual calculation of what the costs are for pulling the information that is provided to the Fund?

A. Not that I'm aware of.

Q. Has there ever been an outside, independent determination of what the value is of the services provided from the union to the Fund?

A. Not that I'm aware of.

Q. Has there ever been a quantification by SAG-AFTRA with regard to what the value is of the services it's providing to the Fund?

MR. THOMAS: Same objection. Vague.

THE WITNESS: Not that I'm aware of.

BY MR. KIESEL:

Q. Could you describe for us what you believe the Fund was receiving from the union in exchange for the fee? We talked about the data. What else is the Fund receiving from the union in exchange for the fee?

just say I don't know why.

Q. Perfect. So shifting gears back a second.

Does SAG-AFTRA provide part or all of its database to any other entities besides the Fund? For example, does it provide it to the AFM pension fund?

A. I'm assuming by that you mean the SAG-AFTRA -- the SAG-Producers Pension Plan, not the AFM pension fund. I mean, we wouldn't, obviously, have anything to do with the AFM pension fund.

Q. So that -- my next question is: Does it provide the data to the SAG-AFTRA pension and health fund?

A. Yes. Yeah, we -- we have a mutual exchange of information with the SAG-AFTRA Pension Plan, the AFTRA Retirement Fund and the SAG-AFTRA Health Plan in which we provide them access to certain information from our database, and in return, they provide us with earnings records that are used to calculate member dues bills.

Q. So that's the mutual exchange between the two groups?

A. Correct.

Q. There's no -- am I correct it's fair to say there's no compensation paid to either for the sharing of the data since it's a -- sort of a unilateral -- a

bilateral sharing agreement?
A. That's correct.
Q. Does -- does the Fund provide any information to the union, that the union benefits from that the Fund provides to it?
A. Not that I'm aware of.
Q. Does it provide the database to the Film Musicians Secondary Markets Fund?
A. When you say "it," do you mean does the Fund provide a database to the Fund Musicians Secondary Markets Fund [sic]?
Q. Does SAG-AFTRA provide all or part of its database to the Film Musicians Secondary Markets Fund?
A. No.
Q. Does it provide the data to the Sound Recording Special Payments Fund?
A. No.
Q. The charge to the pension and health funds, you said earlier, is a bilateral exchange of information, so there's no additional charges from either group for the sharing of the information; correct?
A. That's correct. And also I would just note that that's all automated. There is no manual intervention required to exchange that information.

CERTIFICATE OF COURT REPORTER

I, LORIE RHYNE, CSR No. 12905, RPR, CRR, a Certified Shorthand Reporter, for the County of San Diego, State of California, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; that reading and signing was not discussed; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

Dated this 25th day of February, 2021.

______________________________

LORIE RHYNE

CSR No. 12905

**From:** Ray Hair
**Sent:** Thursday, December 27, 2012 1:00 PM
**To:** Jennifer Garner
**Subject:** FW: Data Purchase and Service Agreement - AFM & SAG-AFTRA Fund
**Attachments:** union trust services agreement version 2 December 27 2012.doc

**Importance:** High

Ray Hair, International President
American Federation of Musicians
of the US and Canada
1501 Broadway, Suite 600
New York, NY 10036
212-869-1330, ext 1212
rhair@afm.org

-----Original Message-----
From: Patricia Polach [mailto:ppolach@bredhoff.com]
Sent: Thursday, December 27, 2012 2:07 PM
To: Ray Hair; Dennis Dreith
Cc: Jeff Freund
Subject: Data Purchase and Service Agreement - AFM & SAG-AFTRA Fund
Importance: High

Dear Ray and Dennis:

You each asked me earlier (Dennis on behalf of the AFM & SAG-AFTRA Fund, and Ray on behalf of AFM) to explore whether, and how, the AFM and SAG-AFTRA could enter into a service agreement with the Fund, pursuant to which the Fund would commence paying the Unions for the data and services that the Unions provide for the Fund's operations. Article IV, Section 3.O of the Agreement and Declaration of Trust explicitly allows the Fund to purchase data from the Unions, and by extension, the purchase of other services at a reasonable price from the Unions should fall within the general powers of the Trustees under the Fund's Agreement and Declaration of Trust.

As you both know, I obtained assistance from Jenner & Block. Among other things, they prepared a first draft of a "Data Purchase and Services Agreement," which I modified slightly. The draft Agreement expresses the contract fee as a percentage of Fund distributions -- but doesn't suggest what the percentage should be. It is attached for your review.

At some point, you will want to discuss with Duncan, but I have only sent it to the two of you.

Please let me know if you have any questions and how you would like to proceed.

Hope you are both having a good holiday season--

Trish

______________________________________________________________________
This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com ______________________________________________________________________

EXHIBIT
Crabtree-Ireland Ex. 2
exhibitsticker.com

DRAFT 2 – December 27, 2012

# DATA PURCHASE AND SERVICES AGREEMENT

This Data Purchase and Services Agreement ("Agreement"), dated as of ____________, 2013 (the "Effective Date"), is made by and between the American Federation of Musicians of the United States and Canada, AFL-CIO-CLC ("AFM"), the Screen Actors Guild - American Federation of Television and Radio Artists ("SAG-AFTRA") and the AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund (the "Fund"). AFM and SAG-AFTRA are sometimes referred to herein individually as a "Union" and collectively as the "Unions." AFM, SAG-AFTRA and the Fund are sometimes referred to herein individually as a "Party" and collectively as the "Parties."

WHEREAS, by an Agreement and Declaration of Trust dated September 16, 1998, as amended and restated on July 26, 2012, the Unions formed the Fund to collect and distribute certain artist royalties that are appropriate for collective administration;

WHEREAS, the Unions have in the past provided to the Fund certain data, as well as certain services of outside counsel and in-house staff to assist the Fund in its operation and administration and to represent the interests of the Fund in various external matters, without being reimbursed for their costs thereof;

WHEREAS, the Agreement and Declaration of Trust authorizes the Trustees of the Fund to purchase relevant data from the Unions (and others) and to employ assistants; and

WHEREAS, the Trustees of the Fund have determined that it is reasonable and appropriate at this time to memorialize arrangements for the provision by the Unions to the Fund of certain data and assistance in exchange for reasonable compensation to the Unions from the Fund;

NOW, THEREFORE, the Parties, intending to be legally bound, hereby agree as follows:

1. Provision of Data. From and after the Effective Date, each Union shall provide the Fund the following data, in a manner comparable to the way such data has been provided immediately prior to the Effective Date:

- Access to member databases to enable the Fund to obtain identifying and contact information for members.
- Access to session reports and "B-forms," or databases containing information derived therefrom, that in either case, identify the recordings made at recording sessions and provide identifying and contact information for performers (Union members and nonmembers) who performed at the session.

Each Union retains all its ownership rights in its data, and all such data shall be considered Confidential Information of the relevant Union subject to the provisions of Section 7. The Fund is authorized to, and shall, access, reproduce and use such data solely for purposes of distribution

of royalties collected by the Fund to the relevant persons. In its use of such data, the Fund further shall comply with the provisions of any applicable Union privacy policy of which such Union advises the Fund in writing from time to time.

2. Representation of Fund Interests. Each Union shall use commercially reasonable efforts to further the interests of the Fund and the Fund's beneficiaries through its participation in the following forums (or their successors):

- The board of SoundExchange, Inc.;
- The board of the Alliance of Artists and Record Companies;
- The musicFIRST Coalition;
- Activities under the auspices of the U.S. Copyright Office and other U.S. governmental entities; and
- Activities under the auspices of international entities such as the International Federation of Musicians, International Federation of Actors, World Intellectual Property Organization, Societies' Council for the Collective Management of Performers' Rights.

To the extent that the Fund may communicate to a Union particular interests, concerns or objectives relevant to the Unions' participation in the foregoing forums, each Union shall use commercially reasonable efforts promptly to address the Fund's requests in that regard, except to the extent the Union determines that such requests are contrary to the interests of its members.

3. Mandates. Each Union shall use commercially reasonable efforts to obtain from its members authorization to act as such members' representative for the purpose of collecting and distributing government-mandated or other compulsory royalties or remuneration payable to performers under U.S. or foreign law. Each Union shall use commercially reasonable efforts to extend to the Fund the benefit of such authorizations that the Union obtains. The Unions may fulfill the foregoing obligation by, for example, negotiating and signing together with the Fund, or authorizing the Fund to enter into, agreements with foreign collecting societies pursuant to which the Fund will be entitled to claim, and the foreign society will agree to pay to the Fund, foreign royalties owed to those U.S. performers for whom the Fund exercises a mandate on behalf of either or both Unions.

4. Other Services. From and after the Effective Date, it is not anticipated that either Union will provide the Fund material services in support of the Fund's operation and administration, except as specifically described above. However, the Unions shall not unreasonably refuse to provide the Fund incidental advice and assistance as the Fund may request from time to time.

5. Services in General. The foregoing data and services shall be provided in accordance with any schedule agreed upon between the Fund and a Union, or in the absence of such agreement, promptly upon the Fund's request. To the extent that a Union may provide the Fund any documents or other recorded information other than the data described in Section 1 (the

Fund's rights to which are also addressed in Section 1), and subject to Section 7, such Union hereby grants the Fund a nonexclusive, perpetual, worldwide license to reproduce, adapt, distribute, perform and display such item and authorize others to do the same for the Fund's purposes. At no time shall the Fund be deemed to be the employer of a Union's personnel providing services hereunder. Each Union, and not the Fund, shall be responsible for payment of compensation to its personnel, required payroll deductions, social security and Medicare contributions, and unemployment, disability and workers' compensation insurance, all as required under law from time to time.

6. Payment. In consideration of the foregoing, the Fund shall pay each Union, within 30 days after the conclusion of each of the Fund's distribution cycles, ___% of the amount distributed by the Fund in such distribution cycle. Each such payment shall be accompanied by a statement setting forth the computation of the payment amount. Such payment shall constitute complete compensation of the Unions and their personnel for providing the data and services contemplated by this Agreement. There shall be no additional charges or expense reimbursement associated with the Unions' provision of the data and services contemplated by this Agreement.

7. Confidentiality.

7.1. "Confidential Information" means any material or information that (i) a Party (the "Disclosing Party") treats as confidential; (ii) the Disclosing Party provides to another Party (the "Receiving Party") in connection with the performance of this Agreement; and (iii) the Receiving Party reasonably should recognize as being confidential material or information of the Disclosing Party. The Receiving Party shall not use the Disclosing Party's Confidential Information for any purpose other than the performance of this Agreement or enjoyment of benefits provided under this Agreement, and shall not disclose the Disclosing Party's Confidential Information to any person other than its directors, officers, employees and contractors who have a need to know such Confidential Information and are subject to a nondisclosure obligation comparable in scope to this Section 7.

7.2. Notwithstanding Paragraph 7.1, the Receiving Party may disclose any material or information that it can demonstrate is (i) or becomes publicly known through no fault of the Receiving Party; (ii) developed independently by the Receiving Party; (iii) known by the Receiving Party prior to its disclosure by the Disclosing Party; or (iv) rightfully obtained from a third party not obligated to preserve its confidentiality who did not receive the material or information directly or indirectly from the Receiving Party. The Receiving Party also may disclose materials or information to the extent required by a court or other governmental authority, provided that the Receiving Party (a) gives the Disclosing Party prompt notice of the disclosure, (b) uses reasonable efforts to resist disclosing the material or information, and (c) cooperates with the Disclosing Party on request to obtain a protective order or otherwise limit the disclosure.

7.3. The receiving Party acknowledges that its breach of this Section 7 would cause the Disclosing Party irreparable injury for which it would not have an adequate remedy at law. In the event of a breach, the Disclosing Party shall be entitled to injunctive relief in addition to any other remedies it may have at law or in equity.

8. Representations, Warranties and Covenants

8.1 Each Party represents and warrants that it has the right, power and authority to enter into and to perform this Agreement.

8.2 Each Union represents, warrants and covenants that the services it is to provide under this Agreement shall be provided (i) in a workmanlike manner; (ii) in accordance with the standards of care and diligence and the level of skill, knowledge and judgment normally practiced by organizations of a similar nature; and (iii) in compliance with all applicable laws and regulations.

8.3 Each Union represents, warrants and covenants that the data, and any other documents or other recorded information it may provide to the Fund in the performance of this Agreement, will not infringe or misappropriate any patent, copyright, trade secret, or other proprietary right of any third party or otherwise conflict with the rights of any third party.

9. Indemnity. Each Party shall defend, indemnify and hold harmless each other Party and its directors, officers and employees from and against any third party claims to the extent relating to or resulting from any breach of this Agreement by the indemnifying Party. The indemnifying Party shall have the right to exercise reasonable control over any litigation within the scope of this indemnity; provided, however, that the indemnified persons shall have the right to participate in any such litigation at their own expense insofar as it concerns claims against them. This indemnity shall be inapplicable to the extent that the indemnifying Party is not notified promptly of a claim and is prejudiced by the delay in notice. All indemnified persons shall cooperate to the extent necessary in the defense of any claim within the scope of this indemnity.

10. LIMITATION OF LIABILITY. EXCEPT FOR A CLAIM OF INDEMNIFICATION PURSUANT TO SECTION 9, OR FOR A BREACH OF SECTION 7, IN NO EVENT SHALL ANY PARTY BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL, OR CONSEQUENTIAL DAMAGES.

11. Term and Termination of this Agreement. The term of this Agreement shall commence as of the Effective Date and shall continue thereafter unless terminated in accordance with this Section 11. As between each Union and the Fund, this Agreement may be terminated (i) at will upon one year's written notice to the other Party, or (ii) if the other Party has materially breached this Agreement and failed to remedy that breach within 30 days after receiving written notice of that breach, upon further written notice by the non-breaching Party. Termination of this Agreement as between one Union and the Fund shall not, by itself, cause this Agreement to terminate as between the other Union and the Fund. Upon the effective date of termination, the relevant Union shall no longer be obligated to provide data or services as described in Sections 1-5. The Fund shall pay the relevant Union in accordance with Section 6 for data or services rendered through the effective date of termination on a prorated basis over the Fund's then current distribution cycle. The provisions of Sections 7-13 shall survive the termination of this Agreement.

12. Notices. All notices sent under this Agreement shall be in writing and hand delivered or delivered by prepaid overnight courier. Notices shall be sent to the Parties at the following addresses or such other addresses as the Parties subsequently may provide:

If to AFM: ____________________
____________________
____________________
Attention: ____________________
Telephone: ____________________

If to SAG-AFTRA: ____________________
____________________
____________________
Attention: ____________________
Telephone: ____________________

If to the Fund: ____________________
____________________
____________________
Attention: ____________________
Telephone: ____________________

13. Miscellaneous.

13.1. Governing Law. This Agreement shall be governed by and construed in accordance with the laws of ___________, without regard to its conflict of laws principles.

13.2. Severability. The provisions of this Agreement are severable, and the unenforceability of any provision of this Agreement shall not affect the enforceability of the remainder of this Agreement.

13.3. Cumulative Rights and Remedies. The rights and remedies provided in this Agreement and all other rights and remedies available to a Party at law or in equity are, to the extent permitted by law, cumulative and not exclusive of any other right or remedy now or hereafter available at law or in equity.

13.4. Assignment. No Party may assign any of its rights or delegate any of its duties under this Agreement to any third party without the prior written consent of the other Parties, which shall not be withheld unreasonably. This Agreement shall be binding upon and inure to the benefit of the Parties and their permitted assigns.

13.5. Relationship of the Parties. Nothing in this Agreement shall be construed as creating a partnership, joint venture or agency relationship between the Parties, or as authorizing any Party to act as agent for the other or to enter into contracts on behalf of any other Party.

13.6. Amendments. This Agreement may be modified or amended only by written agreement of the Parties.

13.7. Entire Agreement. This Agreement constitutes the entire agreement between the Parties concerning the subject matter of this Agreement, and supersedes all prior agreements between the Parties concerning the subject matter of this Agreement.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective duly authorized officers.

AMERICAN FEDERATION OF MUSICIANS OF
THE UNITED STATES AND CANADA, AFL-CIO-CLC

By: ________________________________

Name: ______________________________

Title: _______________________________

Date: _______________________________

SCREEN ACTORS GUILD - AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS

By: ________________________________

Name: ______________________________

Title: _______________________________

Date: _______________________________

AFM & SAG-AFTRA INTELLECTUAL PROPERTY RIGHTS DISTRIBUTION FUND

By: ________________________________

Name: ______________________________

Title: _______________________________

Date: _______________________________

# EXHIBIT 3

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

KEVIN RISTO, on behalf of himself and all others similarly situated,

Plaintiffs,

vs.

Case No. 2:18-cv-07241-CAS-PLA

SCREEN ACTORS GUILD-AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS, a Delaware corporation; AMERICAN FEDERATION OF MUSICIANS OF THE UNITED STATES AND CANADA, a California nonprofit corporation; et al.,

Defendants.

30(b)(6) DEPOSITION OF SAG-AFTRA
DUNCAN CRABTREE-IRELAND
CONDUCTED VIRTUALLY
WEDNESDAY, FEBRUARY 17, 2021
1:03 p.m.

Job No. 269209
Pages: 101
Reported by: Lorie Rhyne, CSR, RPR, CRR
Appearing remotely from San Diego, California

R E M O T E  A P P E A R A N C E S

On Behalf of the Plaintiff Kevin Risto:

PAUL KIESEL, ESQ.
NICHOLAS "NICO" BRANCOLINI, ESQ.
MARIANA A. McCONNELL, ESQ.
Kiesel Law LLP
8648 Wilshire Boulevard
Beverly Hills, California 90211
(310) 854-0812
Kiesel@kiesel.law
brancolini@kiesel.law
mcconnell@kiesel.law

Co-Counsel:

NEVILLE JOHNSON, ESQ.
DANIEL B. LIFSCHITZ, ESQ.
Johnson and Johnson
439 North Canon Drive, Suite 200
Beverly Hills, California 90210
(310) 975-1095
dlifschitz@jjllplaw.com
njohnson@jjllplaw.com

On Behalf of the Defendants:

ANDREW J. THOMAS, ESQ.
ANDREW G. SULLIVAN, ESQ.
ANNA LYONS, ESQ.
Jenner & Block
633 West 5th Street, Suite 3600
Los Angeles, California 90071
(213) 239-5155
ajthomas@jenner.com
agsullivan@jenner.com
alyons@jenner.com

Videographer: DASH ARNOTT

THE VIDEOGRAPHER: We are now on the record. My name is Dash Arnott. I'm a videographer for Golkow Litigation Services. Today's date is February 17th, 2021. And the time is 1:03 p.m. This remote video deposition is being held in the matter of Risto vs. Screen Actors Guild-American Federation of Television and Radio Artists for the United States District Court for the Central District of California.

The deponent is Duncan Crabtree-Ireland as 30(b)(6). All parties to this deposition are appearing remotely and have agreed to the witness being sworn in remotely.

Due to the nature of remote reporting, please pause briefly before speaking to ensure all parties are heard completely.

Will counsel please identify themselves.

MR. KIESEL: Paul Kiesel appearing on behalf of the plaintiffs. The other plaintiffs, we'll put in the chat for the court reporter who -- who's attending. They won't make an appearance on the video record.

MR. THOMAS: Good afternoon. AJ Thomas from Jenner & Block, also Andrew Sullivan and Anna Lyons from Jenner & Block, on behalf of the defendants.

MR. KIESEL: Want to swear the witness --

THE VIDEOGRAPHER: The court reporter is

A. Yes.
Q. Can you please explain SAG-AFTRA's work dues?
A. Sure. Members are charged a base amount of dues, which is currently approximately $215 a year, regardless of whether they work. That's just the sort of basic dues for being a member.
Then, in addition to that, members are charged 1.575 percent of any earnings that they have under SAG-AFTRA collective bargaining agreements up to a maximum of $500,000 of earnings in a given year.
Q. So the cap is 500,000?
A. In earnings, yes.
Q. Are there any other situations where SAG-AFTRA takes a percentage from the revenue source in lieu of including the income in work dues calculations?
A. Yes.
Q. What would be an example of that?
A. An example of that would be audiovisual royalties or foreign levy distributions in -- for which SAG-AFTRA deducts a 10 percent administrative fee in lieu of any kind of dues, charges.
Q. Now, nonunion members do not pay work dues to SAG-AFTRA; correct?
A. That's not correct.

Q. What do nonunion members pay?

A. If a nonunion -- nonmember is a -- for -- the term is financial core fee payer. They, despite being a nonmember, nonetheless, pay fees to the union that are equivalent to the dues that they would pay if they were a member, potentially minus a small deduction to account for lobbying and certain nonchargeable expenditures. And so nonmembers who are in that status would pay dues on exactly the same bas- -- or fees on exactly the same basis as a member would pay dues, except for that small deduction.

Q. Thank you. Am I correct that the SRDF is a result of a collective bargaining agreement?

A. Yes.

Q. Is one of the purposes of work dues on SRDF income to pay SAG-AFTRA for negotiating the bargaining agreement? You mentioned lobbying earlier, so --

A. Yes.

Q. That is different than our fund -- strike that.

Our fund came into existence through the Copyright Act; correct?

A. Correct.

Q. So no dues are taken out for the creation of the Copyright Act, but some money is spent on lobbying

MR. KIESEL: I'll move on from here.

MR. THOMAS: -- a while just as sort of background, but I think you're getting a little far afield here.

MR. KIESEL: I'm moving on. Thank you, AJ, got it.

BY MR. KIESEL:

Q. What is the process for changing SAG-AFTRA dues, if -- if SAG-AFTRA wanted to increase their dues, how would that work?

A. The base dues automatically increase every year based on a percentage increase, and the national board has the authority to decide not to impose the automatic increase in any year that it chooses not to. So that's the $215, where it is now. That would automatically increase by 2 percent every year unless the board stops the increase from happening.

The percentage dues doesn't automatically increase, other than by people's earnings going up; and for that to change, it would require a resolution adopted by the SAG-AFTRA convention to increase that.

Q. And assuming -- and that's the 1.575 number. Assuming you wanted to increase the 1.575 number, is that a vote that would have to happen among all of the membership of SAG-AFTRA members or could it -- could it

be done by the board?

A. It would -- it could -- it would have to be done by the convention. So it is not a vote of all of the members, but every two years, we have a convention with delegates that have been elected by the members. And so the convention would have to approve a resolution increasing the dues percentage.

Q. Okay. Thank you.

Are you aware of whether or not there's ever been a discussion at SAG-AFTRA about covering the costs associated with the Fund by applying dues to members who are also Fund beneficiaries?

A. Not to my knowledge, no.

Q. Has it ever been discussed or raised as a topic that you're aware of?

A. No.

Q. Do you know how many SAG-AFTRA members are Fund beneficiaries?

A. I don't.

MR. THOMAS: Objection. Lacks foundation. It's also beyond the scope of the 30(b)(6) topics.

BY MR. KIESEL:

Q. We're going to go to Topic Number 2, The appointment of union board members as board members of the Fund.

CERTIFICATE OF COURT REPORTER

I, LORIE RHYNE, CSR No. 12905, RPR, CRR, a Certified Shorthand Reporter, for the County of San Diego, State of California, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; that reading and signing was not discussed; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

Dated this 25th day of February, 2021.

[signature]

LORIE RHYNE

CSR No. 12905



# CONSTITUTION

October 2, 2015

EXHIBIT

SAG-AFTRA 30(b)(6) Ex. 1

exhibitsticker.com

# TABLE OF CONTENTS

**ARTICLE** **PAGE**

| Article | Title | Page |
|---|---|---|
| Article I. | General | 2 |
| Article II. | Objectives | 2 |
| Article III. | Membership | 3 |
| Article IV. | Dues, Initiation Fees, Assessments, Fines and Administrative Fees. | 5 |
| Article V. | National Board | 9 |
| Article VI. | National Officers | 19 |
| Article VII. | Convention | 25 |
| Article VIII. | Eligibility for National Officers, National Board Members, and Delegates | 28 |
| Article IX. | Committees | 30 |
| Article X. | Locals | 35 |
| Article XI. | Collective Bargaining | 37 |
| Article XII. | Rules and Regulations | 39 |
| Article XIII. | Non-Discrimination | 39 |
| Article XIV. | Discipline of Members | 39 |
| Article XV. | Indemnification and Expenses of Defense | 41 |
| Article XVI. | Non-liability for Unauthorized Acts | 42 |
| Article XVII. | Recall and Removal of National Officers and National Board Members | 42 |
| Article XVIII. | Amendments | 44 |
| Article XIX. | Referendum | 45 |
| Article XX. | Trusteeship | 46 |
| Article XXI. | Dissolution, Disaffiliation and Merger | 47 |
| Article XXII. | Miscellaneous Provisions | 47 |
| | APPENDIX 1: Membership Rules* | 48 |

**Note:* *The membership rules are included for convenient reference only and are not part of the Constitution.*

# Constitution

of the

Screen Actors Guild-American Federation of Television and Radio Artists (SAG-AFTRA)

## Preamble

The Screen Actors Guild-American Federation of Television and Radio Artists (SAG-AFTRA) brings together two great American labor unions: Screen Actors Guild and the American Federation of Television and Radio Artists. Both were formed in the turmoil of the 1930s, with histories of fighting for and securing the strongest protections for media artists. Our members united to form SAG-AFTRA in order to preserve those hard-won rights and to continue the struggle to extend and expand those protections into the 21st century and beyond.

We are actors, announcers, broadcast journalists, dancers, DJs, news writers, news editors, program hosts, puppeteers, recording artists, singers, stunt performers, voice over artists and other media professionals. Our work is seen and heard in theaters, on television and radio, sound recordings, the internet, games, mobile devices, home video: you see us and hear us on all media distribution platforms. We are the faces and the voices that entertain and inform America and the world.

SAG-AFTRA is committed to organizing all work done under our jurisdictions; negotiating the best wages, working conditions and health and pension benefits; preserving and expanding members' work opportunities; vigorously enforcing our contracts; and protecting members against unauthorized use of their work.

A proud member of the AFL-CIO, SAG-AFTRA partners with our fellow unions in the United States and internationally to seek the strongest protections for media artists throughout the world. We work with governments at the international, federal, state and local levels to expand protections for American media professionals both at home and abroad.

It is a core value of SAG-AFTRA that our strength is in our diversity. We are committed to the broadest employment and involvement of our members, regardless of race, national origin, ancestry, color, creed, religion, sex, marital status, sexual orientation, political affiliation, veteran status, gender identity or expression, age or disability. SAG-AFTRA strives to educate and engage members so that they may be full participants in the workings of their union. We are proud to be a model of inclusion, democratic organization and governance.

**Article I.    General**

    A.    This organization shall be known as Screen Actors Guild-American Federation of Television and Radio Artists or SAG-AFTRA (also referred to herein as the "Union").  This document shall be known as the SAG-AFTRA Constitution.

    B.    The Union shall have two national offices, one located in Los Angeles, California and the other in New York, New York, with its headquarters in Los Angeles.

    C.    SAG-AFTRA shall be affiliated with the AFL-CIO.

**Article II.    Objectives**

    A.    *Increasing* the power and leverage of our members in their bargaining relationships with the employers in our industries;

    B.    *Organizing* workers in the entertainment and media industries in order to maximize our bargaining strength;

    C.    *Increasing* our power in dealing with the various governmental bodies that address the significant public policy issues confronting our members;

    D.    *Protecting and securing* the rights of our members in their professional activities, including securing meaningful legislation and regulations on matters affecting their work and taking appropriate protective action in response to the unauthorized use of their work;

    E.    *Cooperating, coordinating and combining* with other organizations whose objectives include the advancement and improvement of members' compensation and working conditions whenever such action is in the best interests of our members;

    F.    *Establishing, conducting, sponsoring and maintaining* such educational, recreational, social and charitable enterprises as may assist our members and aid in their general welfare;

    G.    *Receiving, administering and expending* the Union's funds in the interests of our members;

    H.    *Collecting and distributing* government mandated or other compulsory royalties, levies or remuneration subject to worldwide collective administration;

I. Without limitation, *protecting* the rights of entertainment and media artists in all other respects consistent with the overall objectives of the Union and doing all other things necessary and proper to advance and promote their welfare and interests.

**Article III. Membership**

A. Qualifications for Membership

1. A person shall be eligible for membership in SAG-AFTRA if he or she:

a. Has worked, is working or is about to work in a position covered by a SAG-AFTRA (or AFTRA or SAG) collective bargaining agreement, provided that any person qualifying for work as a background actor must have completed three (3) days of work as a background actor under a SAG-AFTRA (or AFTRA or SAG) collective bargaining agreement; or

b. Is determined by the National Board to be engaged in work that advances the active organizing efforts or general goals of SAG-AFTRA.

2. The National Board has discretion to deny membership to any applicant if, in its judgment, his or her admission to membership would not be in the best interests of the Union.

B. Membership Application

1. All applications for membership shall be on a standard form provided for that purpose by the Secretary-Treasurer.

2. Each applicant, by becoming a member of the Union, agrees and subscribes, without reservation, to all the provisions and obligations in this Constitution, as well the Union's policies, procedures and rules, that currently are in effect or that may be added or amended from time to time.

3. The making of willful misstatements, the entering of misleading information or the withholding of essential information on an application for membership shall be cause for rejection, disciplinary action or expulsion.

4. Applications for membership shall be subject to approval in accordance with procedures established by the National Board.

C. Definition of Good Standing

A member in good standing, as defined in this Constitution, is an active member who is not in arrears in the payment of Union dues, assessments or, if any, fines. Only members in good standing are entitled to enjoy the rights, privileges and prerogatives of membership in the Union.

D. Membership Classifications

1. Active Member

An active member is a person who has met the qualifications of membership set forth in Paragraph A of this Article and who has been approved for membership in accordance with Paragraph B of this Article. A member shall remain active until:

a. He or she is transferred to another membership classification;

b. He or she resigns his or her membership or his or her membership is terminated under any provision of this Constitution;

2. Inactive Member

A person who has been a member in good standing for a period of at least eighteen (18) months and who is not employed or actively seeking employment in the Union's jurisdiction may become an inactive member as follows:

a. If the member is not delinquent in Union dues, assessments or, if any, fines, the member may be granted honorable withdrawal from active membership as set forth in Article IV(A)(2)(e) and in accordance with policies established by the National Board; or

b. If the member is indebted to SAG-AFTRA for no more than two (2) semi-annual dues periods, the member may be granted inactive status in accordance with policies and procedures adopted by the National Board.

3. Provisional Members

Executives and other persons who are self-employed or regularly employed by broadcasting companies, agencies, independent producers or sponsors for purposes other than performing on radio or television programs, or on sound recordings as artists, may be

eligible for Provisional Membership for the purpose of performing a part in a particular broadcast, program or recording, subject to such terms and conditions as may be determined by the National Board. Provisional members may not vote, hold office, attend meetings, become members of any committee, or have any property or other rights in the Union, except at the discretion of the National Board.

E. Rights and Obligations of Members

1. Rights

An active member in good standing shall be entitled to all of the rights and privileges of membership in the Union, including the right to vote for Union officers and hold elective office consistent with the eligibility requirements in Article VIII.

2. Obligations

All members of the Union agree, by virtue of such membership, to comply with the Union and Local Constitutions, rules, policies and procedures as they exist or are subsequently adopted or amended.

3. No rights upon Resignation or Termination of Membership

Upon the termination of membership as set forth below, an individual shall have no further rights and privileges in SAG-AFTRA, its property or in any of its Locals.

F. Termination of Membership

Membership shall be automatically terminated when: (1) a member has not been in good standing for a period of eighteen (18) months because of nonpayment of dues, assessments, fines or administrative fees as provided in Article IV, (2) he or she is expelled as provided in Article XIV, (3) he or she dies, or (4) he or she tenders a written resignation to the Secretary-Treasurer of the Union in accordance with polices established by the National Board.

**Article IV. Dues, Initiation Fees, Assessments, Fines and Administrative Fees.**

A. Dues, Initiation Fees and Assessments

1. General

a. The financial obligations of members and agency fee payers to the Union are due and payable by the due date as provided in this Article and in policies established by the National Board.

b. Except as provided below, any member failing to remit a billed obligation by the due date will be assessed a late payment fee in accordance with policies established by the National Board. An increase in the amount of the late payment fee must be approved by the National Board and affirmed by the Convention.

2. Dues

a. The Union shall derive its dues income from a combination of: (1) uniform minimum dues per member, and (2) percentage of earnings dues for earnings under SAG-AFTRA and Local collective bargaining agreements.

b. Dues shall be paid to the Union in accordance with policies and procedures established by the National Board.

c. Dues, including minimum dues and percentage of earnings dues, may be increased only by a secret ballot majority vote of Union members in good standing voting in a referendum or by a two-thirds (2/3) vote of the delegates voting at a Convention, provided, however, that the authority of a regular or special Convention to increase dues shall be limited to a dues increase that does not exceed five percent (5%) in any twelve (12) consecutive month period, and provided further that such increases may not be scheduled to take effect beyond the date of the next regularly-scheduled biennial Convention.

d. Dues Arrearage

i. Status upon Failure to Pay Dues

Any member who fails to pay his or her dues or other financial obligations to the Union by the due date, in accordance with policies and procedures established by the National Board, shall not be considered a member in good standing. A member who is not in good standing shall not be entitled to the rights, privileges and benefits of membership in the Union,

but shall continue to be bound by all obligations of membership.

ii.     Termination for Failure to Pay Dues

The membership of a member who is not in good standing for a period of eighteen (18) consecutive months shall be automatically terminated in accordance with policies and procedures established by the National Board.

iii.     Authority of National Board to Extend Payment Obligation

On application of a member and by special arrangement with the Secretary-Treasurer or his or her designee, in accordance with personal hardship guidelines established by the National Board, a delinquent member or former member with an accrued delinquent obligation may execute an agreement acknowledging the outstanding obligation and may arrange to repay the obligation over a period of time.

iv.     Reinstatement after Termination

a)     Any member who has paid his or her financial obligations to the Union, including any finance charges incurred, or who has made satisfactory arrangements in accordance with this Article and applicable policies and procedures established by the National Board, may apply to the Secretary-Treasurer to be restored to good standing status in accordance with procedures established by the National Board.  Such policies and procedures shall include payment of an application fee and may include a payment equal to the amount of the delinquent dues, any other financial obligation the member owes the Union and a reinstatement fee not to exceed the current initiation fee.

b)     Once restored to good standing status, a member shall be entitled to all of the rights,

privileges and benefits of membership in the Union.

e.      Honorable Withdrawal

At the discretion of the National Board, a member who has been an active member in good standing for at least eighteen (18) months who is not employed or actively seeking employment in the Union's jurisdiction and who is not indebted to the Union may become an inactive member on honorable withdrawal upon written application to the Union, in accordance with policies and procedures adopted by the National Board.

3.      Initiation Fees

a.      The Union shall charge an initiation fee to persons who become members of the Union.

b.      Initiation fees may be increased only by a secret ballot majority vote of Union members in good standing voting in a referendum or by two-thirds (2/3) of the votes of the delegates voting at Convention.

4.      Assessments

An assessment may be levied by:

a.      A majority vote of Union members in good standing voting in a secret referendum;

b.      Two-thirds (2/3) of the votes of the National Board members voting, which shall be effective until the next regular Convention; or

c.      Two-thirds (2/3) of the votes of the delegates voting at Convention.

B.      Administrative Fees

The Union may impose reasonable administrative fees for its expenses incurred in identifying persons, entities or estates entitled to payments, collecting the funds due, and thereafter distributing payments to them.

C. Remedies for Non-Payment

In addition to any other remedy prescribed herein or by law, the Union may enforce any liability of a member or former member of the Union for initiation fees, dues, assessments, fines, administrative fees or other obligation by an action at law or in equity. In such action, the Union shall have the right to recover its attorneys' fees and other costs incurred.

**Article V. National Board**

A. The general management, direction and control of the affairs, funds and properties of the Union, the determination of the relations and obligations of the members, the Union and the Locals, and the carrying out of the objectives of the Union, except as they are controlled or limited by this Constitution, shall be vested in the National Board.

B. Composition

1. Size and Composition

The National Board shall be comprised of the National Officers of the Union and members elected in accordance with Paragraph G of this Article.

The National Board shall consist of eighty (80) members, including the National Officers, or such smaller number as may be set by the National Board.

2. Proportionate Representation

The National Board shall establish rules and procedures to assure an equitable governance structure and the most appropriate representation of members. The National Board shall assign one or more Board seats to each Local or grouping of Locals.

3. Category Representation

a. To the extent practicable, the National Board shall be composed of members representing the significant work categories, as established by the National Board, from all sectors of the media and entertainment industries.

b. Each Local entitled to ten (10) or more seats on the National Board shall conduct its National Board elections so that all

significant work categories, as determined by the Local and subject to approval by the National Board, are represented.

4.      Computation by National Executive Director

The National Board shall direct the National Executive Director to conduct a membership census by no later than October 31 of each year preceding a regular Convention year and, based on the census, to make a report to the National Board certifying the number of paid up members and recommending a reapportionment of the National Board to reflect any changes to the membership.  The certified numbers shall be used for all Union and Local elections.

C.      General and Specific Authority

1.      The National Board shall have the following general powers:

a.      To interpret and enforce this Constitution;

b.      To be responsible for the general management, direction and control of the activities, funds and properties of the Union;

c.      To establish Union policy and adopt Union Bylaws and rules;

d.      To review any actions or decisions of a Local and to set aside any action or decision that is inconsistent with this Constitution or the policies and procedures of the Union;

e.      To determine the obligations of the members and Locals within the limits set by this Constitution; and

f.      To cause the Union to enter into mutual assistance and cooperation agreements with other organizations whose objectives and purposes are harmonious with the objectives of the Union.

2.      In addition to the powers conferred upon the National Board in this and any other Article of this Constitution, the National Board shall have the following specific powers:

a.      To adopt the Union's financial plan and budget;

b.      To adopt the budget for each Local, after taking into consideration each Local's recommended budget;

c.       To approve collective bargaining agreements, amendments thereto and waivers;

d.       To call a strike of the membership, subject to Article XI(E), Article X(B)(5) and Article X(C)(2);

e.       To order a membership referendum in accordance with the procedures set forth in Article XIX;

f.       To make all decisions regarding the employment of a National Executive Director ("NED") including hiring, discharging, establishing a procedure for evaluating and reviewing the NED's performance, and establishing the NED's basic compensation;

g.       To establish the Union's government relations and public policy agenda, and to coordinate such activities with other organizations;

h.       To establish the Union's public relations and public information policies;

i.       To establish, merge or terminate Locals, after consultation with the affected Local(s), and to resolve disputes between Locals;

j.       To recommend to Convention the Union's strategic plan and to oversee the implementation of the strategic plan by the Union and the Locals;

k.       To adopt and oversee the organizing strategy of the Union and the implementation of the strategy by the Union and the Locals;

l.       To provide executive, strategic and administrative support to the Union and the Locals;

m.       To exercise the Union's appointment and removal power with respect to representatives of all entities and organizations in which the Union participates including, but not limited to, appointing and removing the Union trustees on the AFTRA, SAG and Union benefit Funds;

n.       To propose Constitutional amendments for the Convention's consideration;

o. To approve dues and initiation fee waivers and to establish policies governing such waivers;

p. Consistent with other provisions in this Constitution, to establish committees and approve the appointment of committee members and chairs as recommended by the President;

q. To hear and determine appeals from charges against any member in accordance with the procedures set forth in Article XIV and policies adopted by the National Board;

r. To approve the Constitution and Bylaws of all Locals and all amendments thereto;

s. To recommend an increase in dues to the next regular or special Convention;

t. To adopt such policies and procedures as the National Board deems necessary or appropriate for the governance or operations of the Union; and

u. To delegate its authority in this Article or elsewhere in this Constitution, except that the following matters designated in this subparagraph V(C)(2) shall not be delegable: a. (financial plan), e. (referendum), f. (NED), r. (approve Local Constitutions), provided that the National Board may delegate the authority to approve amendments to Local Constitutions, and s. (dues increase recommendations).

D. Meetings

1. Frequency and Location

a. Regular meetings of the National Board shall be held four (4) times annually. At least one of these meetings each year shall be held in a single physical location.

b. The National Board shall determine the dates and location of National Board meetings, provided that the National Executive Director or the Executive Committee may change the date or location of a National Board meeting if circumstances warrant.

2. Written or electronic notice of all regular National Board meetings shall be sent to National Board members at least thirty (30) days in

advance of the meeting. Notice of any change in the date or location of a National Board meeting shall be provided to National Board members as soon as practicable.

3. Poll in Lieu of Meeting

a. The National Executive Director shall conduct an electronic poll of the entire National Board if he or she, or any one of the following, determines that a time-sensitive matter requires immediate attention:

i. The President,

ii. Three (3) National Officers plus members carrying one-third (1/3) of the votes of the National Board,

iii. The Executive Committee, including at least two (2) National Officers, or

iv. A majority of the National Officers.

b. Except as otherwise provided by this Constitution, a majority of the votes of the entire National Board is required to approve an action taken in a poll.

c. The National Board's decision in a poll shall be effective immediately.

4. Special Meetings

a. Special meetings of the National Board may be called at any time by:

i. The President,

ii. The National Executive Director,

iii. Three (3) National Officers plus members carrying one-third (1/3) of the votes of the National Board,

iv. The Executive Committee, including at least two (2) National Officers, or

v. A majority of the National Officers.

      b. Written or electronic notice of a special meeting shall be sent to each member of the National Board at least five (5) days in advance of the special meeting, or on twenty-four (24) hours' notice in emergency circumstances. Notice of the meeting shall include the time, location and topic(s) of such meeting.

E. Quorum and Voting

1. Quorum

One-third (1/3) of the votes and one-third (1/3) of the members of the National Board, including at least one (1) member from each of the two largest Locals, one (1) member from the Mid-sized Locals and one (1) member from the Small Locals, shall constitute a quorum for convening and transacting business at a National Board meeting.

2. Voting

a. Decisions on all matters brought before the National Board shall be determined by a majority vote, unless otherwise specified in the Constitution or policies of the Union.

b. No member of the National Board shall have less than one (1) vote.

c. If, in a vote on any matter, the votes cast by members of the largest Local (excluding the Vice President from the largest Local and all other National Officers) exceed a majority of the total votes cast, the action of the National Board must be approved by either:

i. A majority vote that is at least five percent (5%) more than the total votes cast by members of the largest Local, or

ii. A majority vote that includes at least one (1) member of each of the two (2) largest Locals, one (1) member of a mid-sized Local and one (1) member of a small Local.

d. Proxy voting

Proxy voting shall not be permitted.

e. Weighted voting

In order to fairly reflect the distribution of members throughout the Union, National Board members shall hold votes based on membership population as determined in the most recent census pursuant to subparagraph B(4) of this Article. The number of votes held by each National Board member shall be calculated as follows:

i. The National Board will establish five (5) weighting tiers based on member populations. The first tier will include only the largest Local, and the second tier will include only the second largest Local. The National Board shall assign the other Locals to the remaining three tiers based on member populations.

ii. The total number of votes to be cast by all members of the National Board combined (excluding National Officers) shall be determined by dividing the aggregate number of seats held by the Locals in the weighting tier with the smallest aggregate number of members by the percentage (rounded to the nearest thousandth of one percent) of the overall membership of the Union represented by those Locals. By way of example, if there are three (3) Locals in the smallest tier, and those Locals comprise two percent (2%) of the total Union membership, the total number of National Board votes is: 3÷.02=150.

iii. The number of votes cast by each National Board member in each weighting tier shall be determined by multiplying the total number of votes cast by all National Board members (calculated as specified in 2 above) by the percentage (to the nearest thousandth of one percent) of the membership represented by the Locals in that weighting tier, and then dividing the result by the number of National Board members in that weighting tier. By way of example, where the total number of National Board votes is 150, there are 15 Board seats assigned to that weighting tier and that tier comprises 20% of the membership, then each Board member's vote(s) shall be calculated as: 150 x .20÷15=2 votes.

          iv. National Officers shall each have one (1) vote, and shall be excluded from any of the calculations set forth in this subparagraph V(E)(2)(e).

3. Alternates

a. A member of the National Board unable to attend a National Board meeting may be represented by an alternate from his or her Local or group of Locals in accordance with procedures established by the National Board.

b. An alternate may attend, participate in and vote at a National Board meeting in the event of a National Board member's absence, provided that the alternate National Board member must have been elected as a Local Board member or, if none is available, a Convention delegate.

F. Local Board members and Convention delegates, by virtue of their election to those positions, are eligible to serve as alternate National Board members.

G. Nomination and Election Procedures

1. Nominations

a. In accordance with policies established by the National Board and the applicable provisions of the Local Constitution, candidates for National Board shall be nominated either by a petition containing the required number of signatures of members in good standing of that Local as set forth in the Local Constitution, by a Nominating Committee where so provided in the Local Constitution, or, where deemed appropriate by the National Board, at a membership meeting.

b. Each nominee shall sign a written statement affirming that he or she:

i. Accepts the nomination;

ii. Consents to serve as a National Board member if elected;

iii. Will not withdraw as a candidate after nomination; and

iv. Meets the eligibility requirements of Article VIII.

2.      Elections

    a.      Elections for National Board members shall take place every two (2) years in accordance with a schedule and policies established by the National Board.

    b.      Elections for National Board members shall take place at the same time as elections for the President and Secretary-Treasurer, Local Board and Convention delegates are held.

    c.      Elections shall be conducted by:

        i.      Mail ballot, with ballots mailed to the last-known home address of each active member in good standing not less than twenty-one (21) days prior to the due date for the receipt of ballots; or

        ii.      A telephonic/electronic voting system that ensures the secrecy of each vote cast; or

        iii.      If deemed appropriate by the National Board, at a membership meeting.

    d.      Each active member in good standing shall have one (1) vote.

    e.      In order to be eligible to vote, (1) a member must be an active member in good standing as of a date thirty (30) days prior to the date of the mailing of the ballots, the commencement of telephonic/electronic voting or a membership meeting at which the election will take place; or (2)  if ballots are mailed or voting in a telephonic/electronic or in-person election commences during the first ninety (90) days of a semi-annual dues period, members whose dues are paid up to and including the immediately preceding semi-annual dues period shall be eligible to vote.

    f.      An unopposed candidate shall be deemed elected. Write-in votes shall not be permitted.

    g.      The candidates from each Local who receive the highest number of votes cast shall be declared elected to the National Board.

    h.      In the event of a tie for any non-National Officer position, the winner shall be determined by a neutral, random selection,

except that in a Local or group of Locals that has only one
National Board seat a runoff election may be conducted.

i.    Post-election protest procedure:

    i.    Local Election Committee

        a)    Each Local shall establish an Election
Committee to (1) oversee the conduct of the
National Board, Local Board and delegate
elections; and (2) hear and determine election
protests in accordance with procedures adopted
by the National Board.

        b)    The Election Committee shall be made up of at
least three (3) members in good standing, who
may  not be candidates for National Officer,
National Board or Local Board in that election.

    ii.    Protest procedures

        a)    Within fourteen (14) days following a National
Board election, a member in good standing may
file with the Election Committee an election
protest concerning an alleged violation of the
election provisions of this Constitution, the
Union's election rules or applicable law.  Any
such protest shall set forth with reasonable
specificity the nature of the alleged violation,
the facts underlying it and how it may have
affected the outcome of the election.

        b)    The Election Committee shall consider all facts
it deems appropriate to resolve an election
protest and may, in its discretion, hold hearings
concerning any such protests.

        c)    The Election Committee shall render its written
decision on all election protests as promptly as
possible, but in no event more than forty-five
(45) days following the date of the election.

        d)    Election Committee decisions shall be final and
binding. Elections challenged by a member are

presumed valid unless and until the same or another candidate is elected in a rerun election.

H. Term of Office

Members of the National Board shall hold office for a term of four (4) years, and shall remain in office until the election of their successors.

I. Vacancies in Office

1. A permanent vacancy on the National Board shall occur upon the resignation, death or removal of a National Board member, when a National Board member is absent without excuse from three (3) consecutive meetings, or when a National Board member fails to maintain his or her good standing status and/or other eligibility requirements in accordance with Article VIII.

2. Such permanent vacancy shall be filled by the same Local or group of Locals whose representative's departure from the National Board created the vacancy, from among the Local Board members or the elected delegates of such Local or group of Locals. The member selected shall serve until the next regularly-scheduled National Board election, at which time a permanent replacement shall be elected to serve the balance of the unexpired term, if any.

**Article VI. National Officers**

A. National Officer Positions

1. The Officers of the Union shall be the President, Executive Vice President, Secretary-Treasurer, Vice President from the largest Local, Vice President from the second largest Local, Vice President from the Mid-sized Locals who shall be elected by the members of the Locals assigned to tier 3, as set forth in Article V(E)(2)(e)(i), Vice President from the Small Locals who shall be elected by the members of the Locals assigned to tiers 4 and 5, as set forth in the same Article, Actor/Performer Vice President, Broadcast Vice President, and Recording Artist/Singer Vice President.

2. The National Officers shall serve as members of the National Board and as members of the Executive Committee of the National Board.

B. Authority and Duties of the President

1.      The President shall be the chief elected officer of the Union and shall be charged with carrying out policies established by the National Board and Convention.

2.      The President shall preside at all meetings of the Convention, the National Board and the Executive Committee.

3.      The President shall be the chief spokesperson for the Union and shall represent the Union in affiliated and other organizations.

4.      The President shall have the authority to delegate duties and responsibilities to other elected officials of the Union in accordance with the Constitution and Union policies.

5.      Consistent with other provisions in this Constitution, the President, in consultation with the appropriate National Vice Presidents and/or Local Presidents, shall appoint the members of committees, subject to approval of the National Board.

6.      The President shall consult with and be assisted by the Executive Vice President, the Secretary-Treasurer and the Vice Presidents in furthering the objectives and policies of the Union.

7.      The President shall perform any other duties and responsibilities assigned to him or her by the National Board or set forth in the Constitution and policies of the Union.

C.      Authority and Duties of the Executive Vice President

1.      The Executive Vice President shall be the second highest elected officer in the Union and shall act in the place of the President at and between meetings of the Convention, National Board and Executive Committee if the President is absent or otherwise unavailable to perform his or her presidential duties.

2.      In consultation with and at the direction of the President, he or she shall assist the President in the governance of the Union.

3.      The Executive Vice President may perform such other duties as may be assigned to him or her by the President or the National Board.

D.      Authority and Duties of the Secretary-Treasurer

1.      The Secretary-Treasurer shall be the primary elected officer responsible for the general financial administration of the Union,

including overseeing the Union's funds, financial assets and fiscal records, and shall serve as chair of the Finance Committee.

2. The Secretary-Treasurer shall cause a quarterly financial report to be presented to the National Board.

3. The Secretary-Treasurer shall cause a budget to be prepared for the Union in line with modern budgetary and accounting principles for presentation to and approval of the National Board.

4. The Secretary-Treasurer shall be the chief elected officer responsible for the books and records of the Union, including the minutes of meetings of the Convention, National Board and Executive Committee.

5. The Secretary-Treasurer may perform such other duties as may be assigned to him or her by the President or the National Board.

E. Authority and Duties of the Vice Presidents

The Vice Presidents shall perform the duties and responsibilities assigned to them by the President or the National Board.

F. Concurrent Service as a National Board Member and National Officer

A National Board member who is elected to serve as a National Officer shall resign his or her position on the National Board and the National Board shall fill the vacancy in accordance with Article V(I)(2). While sitting as a National Officer, a member may not additionally seek or accept office as a member of the National Board for a term which would coincide with or overlap his or her term as National Officer. Notwithstanding the foregoing, a National Officer may run for a seat in regularly scheduled National Board elections immediately prior to the expiration of his or her current term as a National Officer.

G. Nomination and Election Procedures

1. Nomination Procedures

a. President and Secretary-Treasurer

Candidates for President and Secretary-Treasurer shall be nominated by petition as follows:

    i. For President, a written petition signed by not fewer than two hundred (200) members in good standing, including members from at least three (3) Locals.

ii. For Secretary-Treasurer, a written petition signed by not fewer than one hundred and fifty (150) members in good standing, including members from at least three (3) Locals.

b. Executive Vice President

Candidates for Executive Vice President shall be nominated at Convention by the delegate body.

c. Vice Presidents

i. The Vice Presidents other than the Executive Vice President shall be nominated by their respective delegate caucuses at Convention in accordance with policies established by the National Board.

ii. The delegate caucuses shall be: The caucus of the largest Local, the caucus of the second largest Local, the caucus of Mid-size Locals, the caucus of Small Locals (collectively the "Local caucuses"); the Actor/Performer caucus; the Broadcaster caucus; and the Recording Artist/Singer caucus.

2. Election Procedure

a. The President and Secretary-Treasurer shall be directly elected by a plurality vote of the membership every two (2) years. Votes shall be tallied within the forty-five (45) day period immediately prior to the Convention, in accordance with a schedule and policies established by the National Board.

b. The Executive Vice President of the Union shall be elected as soon as practicable after the opening of each regular Convention by a secret ballot vote of the Convention delegates in accordance with policies established by the National Board.

c. The Vice Presidents of the Union shall be elected as soon as practicable after the opening of each regular Convention by a secret ballot vote of the delegates in the delegate caucuses set

forth in subparagraph G(1)(c)(ii) above in accordance with policies established by the National Board.

d. In the event of a tie vote for any office, a run-off election shall be held.

e. The election for President and Secretary-Treasurer shall be conducted by mail or telephonic/electronic secret ballot in accordance with Article V(G)(2)(c) and policies established by the National Board.

f. An unopposed candidate shall be deemed elected. Write-in votes shall not be permitted.

g. National Officer Election Committee

i. The National Board shall appoint a National Officer Election Committee to oversee the conduct of all National Officer elections and to hear and determine election protests in accordance with the procedures and polices established by the National Board.

ii. The Election Committee shall be made up of at least three (3) members in good standing, who may not be candidates for National Officer, National Board or Local Board positions.

h. Post-election protest procedure

i. Within fourteen (14) days following a National Officer election, a member in good standing may file with the National Officer Election Committee an election protest concerning an alleged violation of the election provisions of this Constitution, the Union's election rules or applicable law. Any such protest shall set forth with reasonable specificity the nature of the alleged violation, the facts underlying it and how it may have affected the outcome of the election.

ii. The Committee shall consider all facts it deems appropriate to resolve an election protest and may, in its discretion, hold hearings concerning any such protests.

iii. The Committee shall render its written decision on all election protests as promptly as possible, but in no

event more than forty-five (45) days following the date of the election.

iv. Committee decisions shall be final and binding. Elections challenged by a member are presumed valid unless and until the same or another candidate is elected in a rerun election.

H. Terms of Office

1. The term of office for President and Secretary-Treasurer shall be two (2) years commencing immediately upon their election and continuing until their successors are elected.

2. The term of office for the Executive Vice President and all Vice Presidents shall be two (2) years commencing immediately upon their election and continuing until their successors are elected.

I. Vacancies in Office

1. In the event the office of President becomes vacant for any reason, the Executive Vice President shall assume the duties and responsibilities of the President set forth in this Constitution until the next meeting of the National Board, which shall elect from eligible members a President to serve the balance of the former President's unexpired term of office.

2. In the event the office of Executive Vice President becomes vacant for any reason, the Secretary-Treasurer shall assume the Executive Vice President's duties and responsibilities set forth in this Constitution until the next meeting of the National Board, which shall elect from among eligible members an Executive Vice President to serve the balance of the former Executive Vice President's unexpired term of office.

3. In the event the office of the Secretary-Treasurer becomes vacant for any reason, the Executive Vice President shall assume the Secretary-Treasurer's duties and responsibilities set forth in this Constitution until the next meeting of the National Board, which shall elect from among eligible members a Secretary-Treasurer to serve the balance of the former Secretary-Treasurer's unexpired term of office.

4. In the event the office of a Vice President, other than the Executive Vice President, becomes vacant for any reason, such vacancy shall be filled, at the discretion of the National Board, by an eligible member

who is either selected by the National Board members from the same Local, group of Locals or work category, or with an eligible member nominated and elected via telephonic/electronic poll of the relevant group of elected Convention delegates. The person selected to serve as acting Vice President shall assume the former Vice President's duties and responsibilities set forth in this Constitution and shall serve the balance of the former Vice President's unexpired term.

5. If a National Officer is elected to fill a vacancy, the National Board may fill the vacancy created thereby at the same meeting if the vacancy created thereby is the office of President, Secretary-Treasurer, or Executive Vice President.

J. Bonding

Any National Officer who may be entrusted with the Union's funds shall be bonded in the amount specified in the Labor Management Reporting and Disclosure Act of 1959, as amended, or as it may be amended in the future.

**Article VII. Convention**

A. Frequency, Time and Location of Convention

There shall be a biennial Convention at a time and place determined by the National Board, provided that the Convention shall be held within forty-five (45) days after the tally of ballots in the election of the President and Secretary-Treasurer.

B. Delegates

1. Number of Delegates and Delegate Votes

a. Each Local shall be entitled to the sum of the delegates calculated as follows:

i. One (1) delegate for every 100 members in good standing or portion thereof ("members") for up to the first 500 members, provided that each Local shall be entitled to at least one (1) delegate;

ii. One (1) delegate for every 250 members or portion thereof between 501 and 4,000 members; and

iii. One (1) delegate for every 400 members or portion thereof over 4,000 members.

b.    Each delegate will be entitled to have the number of votes equal to the number of members in his or her Local divided by the number of members of his or her delegation registered and attending the Convention.

c.    The Convention Credentials Committee shall establish procedures concerning the application of these rules.

2.    Category Representation

Each Local entitled to thirty (30) or more delegates to the Convention shall conduct its delegate elections so that all significant work categories, as determined by the Local and subject to approval by the National Board, are represented.

3.    Delegate Composition

Delegates to the Convention shall consist of:

a.    Members of the National Board, including National Officers,

b.    The Presidents of each Local, and

c.    Members elected in secret ballot elections.

4.    Nomination and Election Procedures

Delegates shall be nominated and elected in secret ballot elections in accordance with policies and procedures established by the National Board.

5.    Delegate Credentialing Procedures

The National Board shall adopt policies and procedures governing the credentialing of delegates.

6.    Term of Office for Delegates

The term of office for delegates shall be two (2) years, commencing upon their election and continuing until the election of delegates for the next biennial Convention.

C. Authority of Convention

The decisions of the Convention shall be binding on the National Board, the National Officers, the Locals, and the members of the Union. The Convention's authority shall include, but shall not be limited to:

1. The nomination and election of the Executive Vice President and all Vice Presidents;

2. The adoption of resolutions that have been submitted in writing to the National Board at least thirty (30) days prior to Convention or as otherwise provided in policies or procedures established by the National Board or Convention;

3. Increasing dues and initiation fees, and levying assessments in accordance with Article IV;

4. Upon at least thirty (30) days' notice to the delegates of proposed amendments to this Constitution, approving such amendments upon a two-thirds (2/3) vote of the delegates voting, in accordance with policies and procedures established by the National Board;

5. By a two-thirds (2/3) vote of the delegates voting, to order the reconsideration of any action taken by the National Board.

D. Quorum and Voting

A quorum at a Convention shall consist of delegates holding a majority of the votes.

E. Proxy and Assigned Voting

1. Proxy voting shall not be permitted.

2. Subject to approval by the Convention Credentials Committee, in the event a delegate who is the only member of a delegation attending convention must leave the Convention, or if the sole delegate in a Local is unable to attend Convention, he or she may assign his or her vote(s) to a delegate from another Local.

F. Procedural Issues

1. The National Board may establish rules and procedures concerning the submission of resolutions, the seating of delegates and alternates, and other procedures governing the conduct of the Convention.

2. The National Executive Director shall issue the call to the biennial Convention at least ninety (90) days prior to the commencement of the Convention.

3. Prior to the commencement of the Convention, the President, with the approval of a majority of the National Board voting, may appoint the necessary committees to conduct the Convention's activities including, but not limited to, a Credentials Committee, a Constitutional Amendments Committee and such other delegate committees as the President and National Board deem appropriate.

G. Special Convention

The National Executive Director shall issue a call for a Special Convention within sixty (60) days after receiving a written request to do so from two-thirds (2/3) of the Locals or upon seventy-five percent (75%) of the votes of the National Board members present and voting thereon.

**Article VIII. Eligibility for National Officers, National Board Members, and Delegates**

A. Good standing

To be eligible to serve as a National Officer, a member must have been in good standing in the Union throughout the two dues periods prior to, and the current dues period including the date of his or her nomination. To be eligible to serve as a member of the National Board or Local Board, a member must have been in good standing in the Union throughout the dues period prior to, and the current dues period including the date of his or her nomination.

B. Age

To be eligible to serve as a National Officer, a member of the National Board or Local Board, a member must be at least 18 years of age upon taking office.

C. Length of Membership

No member shall be eligible to serve as a National Officer or a member of the National Board unless he or she has been an active member for twenty-four (24) months prior to the date of his or her nomination.

D. Membership in Local

1. To be eligible to serve as a member of the National Board or National Officer from a Local or group of Locals, a member must have been a member of the Local or group of Locals for the twelve (12) months prior to the date of his or her nomination.

2. To be eligible to serve as a Convention delegate, a member must have been a member in good standing of his or her Local for the six (6) months prior to the date of his or her nomination.

E. Category Representative

To be eligible to serve as a category representative as set forth in Article VI(G)(1)(c)(i), a member must have been a declared member of that category for the twelve (12) months prior to the date of his or her nomination.

F. Maintenance of Eligibility

National Officers, members of the National Board, members of Local Boards and delegates must adhere to the good standing and eligibility requirements of this Article throughout their elected or appointed term of office in accordance with policies and procedures established by the National Board. Failure to maintain good standing shall disqualify the member from attending meetings or voting until he or she returns to good standing. Failure to maintain eligibility for any other reason shall create a permanent vacancy.

G. Management Employees

Except as set forth in this Paragraph, no member of the Union who is primarily employed as management or primarily performs the functions of management in the Union's jurisdiction shall be eligible to serve as a National Officer, a member of the National Board, Local Board, a Wages and Working Conditions Committee, a Negotiating Committee or as a delegate to the Convention. The term "management" shall be defined as anyone who acts primarily and continually in the interests of an employer or employers rather than in the interests of the members of the Union.

The following shall not cause a member to be considered "management" within the meaning of this provision:

1. A member elects to receive income through his or her own corporate entity, or offers his or her services through such corporate entity.

2. A member is a singer contractor, stunt coordinator, ADR coordinator, choreographer or assistant choreographer as defined in

the applicable AFTRA, SAG or Union collective bargaining agreement.

H. SAG-AFTRA Employees

No employee working for the Union shall be eligible to serve as a National Officer, a member of the National Board, Local Board, Wages and Working Conditions Committee, Negotiating Committee or delegate to the Convention provided, however, that the National Board may establish policies and procedures defining who shall be considered a Union employee for purposes of this provision.

**Article IX. Committees**

A. Executive Committee

1. Composition and Size

The National Board shall establish an Executive Committee consisting of the ten (10) National Officers and fourteen (14) members of the National Board selected in accordance with this Article.

2. Scope of Authority and Duties

a. The Executive Committee shall have authority to act on matters that require attention in intervals between meetings of the National Board, subject to Article V(C)(2)(u).

The Executive Committee's authority shall include, but shall not be limited to:

i. Approving Local, non-national (e.g. made in/played in) and single employer collective bargaining agreements, and waivers thereto,

ii. Approving budget amendments of not more than $50,000, and

iii. Making final decisions, when requested, on readmissions to the Union.

b. The Executive Committee shall not revoke or contravene any decision or resolution of the National Board, take any action with respect to matters within the exclusive authority of the Convention or National Board under this Constitution, take any action that violates this Constitution or any policy or procedure established by the Convention or National Board,

or take any action that establishes any new policy not previously approved by the Convention or National Board.

3. Election of non-National Officer Executive Committee Members

a. The non-National Officer members of the Executive Committee shall be elected at the first National Board meeting following the biennial convention in the manner set forth below.

b. The National Board members and National Officers meeting in their respective Locals or group of Locals shall elect from among themselves the number of non-National Officer Executive Committee members so that the Executive Committee approximately reflects the Union's Local membership distribution.

4. Meetings

a. The Executive Committee shall meet regularly at such time and place as the National Executive Director or President shall determine.

b. In the event that any of the following determines that a matter requires immediate attention, the Executive Committee may act by telephonic/electronic poll:

i. The President,
ii. The National Executive Director, or
iii. A majority of the Executive Committee that includes at least two (2) National Officers.

In order to adopt any action in a telephonic/electronic poll, a majority of the members of the Executive Committee must have voted. If an action is approved, it shall be effective immediately.

c. Special meetings of the Executive Committee may be called on no less than twenty-four (24) hours' telephonic/electronic notice by:

i. The President,
ii. The National Executive Director, or
iii. A majority of the Executive Committee that includes at least two (2) National Officers.

5. Quorum

A quorum of the Executive Committee shall consist of one-third (1/3) of Executive Committee members, including at least three (3) National Officers.

6. Term

Members of the Executive Committee shall serve until their successors are elected, except that a member shall no longer serve on the Executive Committee if he or she ceases to be a member of the National Board or a National Officer of the Union.

7. Voting

Each member of the Executive Committee shall have one (1) vote. Proxy voting shall not be permitted.

8. Permanent Vacancies

If a seat on the Executive Committee, other than one held by a National Officer, becomes vacant, the National Officers and National Board members from the Local caucus that elected the person holding that seat shall elect a replacement in accordance with subparagraph A(3)(b) above.

9. Alternates and Temporary Vacancies

a. A temporary vacancy on the Executive Committee shall occur whenever a non-National Officer member of the Executive Committee is unable to attend an Executive Committee meeting.

b. Such temporary vacancy, if filled, shall be filled from a pool of alternates equal to the number of non-National Officer Executive Committee members, in accordance with policies and procedures established by the National Board.

B. Finance Committee

1. Composition and Size

The National Board shall establish a Finance Committee consisting of the President, the Executive Vice President, the Secretary-Treasurer and such additional number of members as the National Board deems appropriate, whose appointment shall be

recommended by the President and approved by the National Board.
The Secretary-Treasurer shall serve as the chair of the Committee.

2.      Quorum

A majority of the Finance Committee shall constitute a quorum.

3.      Scope of Authority and Duties

The Committee shall function in accordance with the authority
delegated to it by the National Board and shall act in accordance
with policies established by the National Board.  The Committee
shall review and make recommendations to the National Board on
National and Local financial and budgetary issues, and shall
undertake additional duties as assigned by the National Board.  The
Committee may initiate and bring recommendations to the National
Board or Executive Committee for its consideration and approval.

4.      Term

Members of the Committee shall serve until their successors are
appointed by the President and approved by the National Board at
the first National Board meeting following the biennial Convention.

5.      Vacancies

If any non-National Officer seat on the Committee becomes vacant,
the President shall appoint a member to fill the vacancy, subject to
the approval of the National Board.

C.      National Broadcasters Steering Committee

1.      Composition and Size

There shall be a National Broadcasters Steering Committee.  Each
Local with broadcast contracts is entitled to at least one (1) member
on the Committee.  The composition of the Committee shall be
generally reflective of the number of broadcast contracts and
broadcast members in the respective Locals. Any National Officer
who works under a broadcast contract shall be a member of the
Committee. Appointments to the Committee will be made by the
President, based upon recommendations from the Locals, and
approved by the National Board.

2.      Scope of Authority and Duties

The Committee shall be responsible for identifying areas of concern to broadcasters and making recommendations to the National Executive Committee and National Board, including recommendations on standards for collective bargaining agreements, internal and external organizing efforts, public policy and other issues affecting members working in the broadcast sector.

3. Term

The non-National Officer members of the Committee shall serve until their successors are appointed.

4. Vacancies

Appointments to fill vacancies shall be made by the President, based on recommendations from the Locals, and approved by the National Board.

5. Meetings

The Committee shall hold no fewer than three (3) face-to-face meetings per year in addition to such teleconference or video-conference meetings of the Committee and its subcommittees as the Committee determines.

D. Committee of Locals

1. Composition and Size

There shall be a Committee of Locals. Each Mid-size and Small Local shall be entitled to at least one (1) member on the Committee. The following shall serve as members of the Committee: National Board members of the Mid-size and Small Locals or their designated alternates; the President of any Small Local that does not have its own National Board Member; National Officers who are members of a Mid-size or Small Local. The National Vice President elected by the Mid-size Locals and the National Vice President elected by the Small Locals shall serve as co-chairs of the Committee.

2. Scope of Authority and Duties

The Committee shall be a forum for identifying areas of common interest to Mid-size and Small Locals. The Committee may make recommendations to the National Board, the Executive Committee, and the Convention including, but not limited to, internal and

external organizing efforts, and public policy and other issues affecting members in the Mid-size and Small Locals.

3. Term

Members of the Committee shall serve concurrently with their term as a National Officer, National Board Member or Local President.

4. Vacancies

Each Local shall fill its respective vacancies on the Committee in accordance with its Local Constitution.

5. Meetings

The Committee shall hold no fewer than four (4) meetings per year, either in a face-to-face plenary or video-conference. Meetings may be held in conjunction with National Board Meetings and the Convention. Committee meetings may include all the Presidents of Mid-size and Small Locals.

E. The National Board may establish such other committees as it deems appropriate.

**Article X. Locals**

A. National Board Authority

1. The National Board may, in its discretion, authorize the establishment or admission of Locals, merge Locals and terminate Locals.

2. The National Board shall have the authority to assign members to Locals and to transfer members from one Local to another. The National Board shall adopt policies governing the assignment of members, objections to assignment and requests for change of assignment.

3. In the interest of unified action for the common good of the Union, and notwithstanding any other provision in the Union's governing documents or a Local's Constitution, policies or procedures, the National Board has the authority, in its sole discretion, to require a Local to take, or refrain from taking, a particular action.

B. Governance and Authority of Locals

1. Each Local shall adopt a Constitution, subject to approval by the National Board.

2. All amendments to Local Constitutions shall be subject to approval by the National Board or its designee.

3. The Constitution and Bylaws of each Local shall provide that the person elected as Local president, by virtue of being elected to that position, shall also be a Convention delegate.

4. Each Local has the authority to manage and govern its own affairs and to adopt its own policies and procedures, consistent with this Constitution, its own Constitution, and the policies and procedures established by the National Board.

5. Consistent with this Constitution, the Local Constitution and the policies and procedures of the Local and the National Board, each Local has authority to ratify and enter into local collective bargaining agreements and to call strikes with respect to such agreements, subject to approval by the National Board or its designee.

6. A Local may not adopt any policy or take any action which is injurious to any other Local or detrimental to the best interests of the Union, as determined by the National Board.

7. Absent the express written approval of the National Board, a Local shall not have any right or power to act as an agent or representative of this Union or bind it to any obligation.

8. Nominations and Elections

A Local shall conduct elections for Local Officers and Board members, and the National Board members and Convention delegates representing that Local, consistent with this Constitution, the Local's Constitution and the policies and procedures adopted by the National and Local Boards.

9. No Conflict

A Local's Constitution and rules may not conflict with this Constitution or policies and procedures adopted by the National Board. To the extent that any provision of a Local Constitution, Bylaw or rule conflicts with a provision of this Constitution, any

amendment thereto, or any rules, policies or procedures adopted by the National Board, the Local Constitution, Bylaw or rule shall be deemed to have been automatically amended to comply therewith. Each Local's Constitution shall contain a provision to this effect.

C. Right to Organize and Represent Members

1. Each Local shall have the right to organize members within the jurisdiction assigned to it by the National Board, subject to the authority of the National Board.

2. Each Local shall have the right to conduct collective bargaining, including the right to represent members, administer and enforce collective bargaining agreements and authorize strikes against an employer in accordance with the provisions of this Constitution and the Local Constitution. For the purpose of ensuring consistency, the National Board or its designee shall have authority to engage in and oversee such activities with respect to collective bargaining agreements that are national in scope or that affect more than one Local.

3. Any dispute as to jurisdiction among the Locals, or between a Local and the Union, or involving contract interpretation or dispute resolution, shall be determined by the National Board or its designee, whose decision shall be final and binding.

**Article XI. Collective Bargaining**

A. Conduct of Bargaining

1. With respect to multi-employer collective bargaining agreements that are national in scope, or any other agreements designated by the National Board, the National Board shall appoint a Wages and Working Conditions Committee to develop proposals, and a Negotiations Committee to conduct negotiations, under policies and procedures determined by the National Board.

2. The National Board shall approve all proposals developed by the Wages and Working Conditions Committee.

B. Approval of Collective Bargaining Agreements

1. All multi-employer collective bargaining agreements that are national in scope shall be approved by the National Board and submitted for ratification by the members affected thereby. Such

ratification may be made either (a) by majority vote of the members voting in a referendum conducted by mail or electronic means under policies and procedures established by the National Board, or (b) by majority vote of the members voting in meetings held in accordance with policies and procedures established by the National Board.

2. Membership ratification shall not be required for any collective bargaining agreement that the National Board determines is not to be used in widespread or industry-wide application affecting a substantial portion of the membership and interim contracts that are of short duration or that reflect the Union's last, best and final offer to an existing employer or employer group. Such agreements shall require approval by either sixty percent (60%) of the votes of the National Board present and voting or sixty percent (60%) of the votes of the Executive Committee present and voting. This provision shall not affect Local collective bargaining agreements that are subject to ratification by the affected members of the Local pursuant to the Local Constitution.

C. Waivers or amendments of a minor nature need not be submitted to membership ratification, but must be approved by the National Board or its designee acting in accordance with policies and procedures adopted by the National Board.

D. The Union shall not negotiate or seek to regulate the maximum compensation that may be earned by any member under any collective bargaining agreement.

E. With respect to any multi-employer or national agreement, the National Board may declare a strike against any employer upon a vote of seventy-five percent (75%) of the members affected thereby voting on the question. Such vote shall be conducted either by (a) a membership referendum conducted by mail or electronic means, under policies and procedures established by the National Board; or (b) in membership meetings, under policies and procedures established by the National Board. Where an employer is seeking to impose a final offer or to terminate an agreement, the National Board shall have emergency authority to authorize and declare a strike.

F. The Union may collect or receive on behalf of, and shall distribute to, persons any amounts payable or due to such persons under any SAG-AFTRA, SAG or AFTRA agreement providing for payment of residuals, rerun fees, royalties, foreign levies or royalties, or any other amounts payable to such persons, under policies and procedures adopted by the National Board. The Union may establish, maintain or participate in a fund

or trust for such purposes. Excepting residuals and rerun fees, other than those exempted by Article IV Section B of this Constitution, or those intended to ensure the fair contribution of non-members and non-agency fee payers, the Union may charge and deduct a reasonable fee to cover its expenses of collection, distribution and administration.

1. Unless otherwise specifically obligated under any agreement, the Union shall not be obligated to pay interest on any monies due any persons under this Article.

2. If the Union cannot locate a person or beneficiary owed any monies under this provision within three (3) years of the receipt of the monies due such person, or the person fails to make a claim within such time period, the Union may declare the monies forfeited and may use the monies for any allowable purposes. The person or beneficiary may relieve the forfeiture by making a written claim for the monies any time after the three (3) year time period.

**Article XII. Rules and Regulations**

The National Board has the authority to adopt rules and regulations governing members' rights, duties and obligations with respect to: (a) members; (b) the Union or any of its affiliated Locals, (c) persons or organizations engaged in employing or representing members in industries covered by SAG-AFTRA, or AFTRA or SAG, collective bargaining agreements, including without limitation, producers, agents, managers, and personal representatives, and (d) other persons or organizations involved in activities affecting industries covered by SAG-AFTRA, or AFTRA or SAG, collective bargaining agreements. The members of the Union shall be bound by all such rules and regulations.

**Article XIII. Non-Discrimination**

The Union, its affiliated Locals and any member, officer, representative or employee shall not discriminate or attempt to cause any employer to discriminate against any applicant for membership, member, representative or employee of the Union on the basis of race, national origin, ancestry, color, creed, religion, sex, marital status, sexual orientation, political affiliation, veteran status, gender identity or expression, age or disability for any purpose including, but not limited to, eligibility for membership, holding office or employment in the Union.

**Article XIV. Discipline of Members**

A. A member may be reprimanded, censured, fined, suspended or expelled from membership in the Union for any of the following offenses:

1.      Violation of any of the provisions of this Constitution, or the policies, rules or regulations adopted by the Union or any of its Locals.

2.      Engaging in actions antagonistic to the interests or integrity of the Union, any of its affiliated Locals or its membership, including providing services covered by the Union's jurisdiction for any employer declared unfair by the National Board.

B.      Procedure for Discipline

1.      Any member in good standing, any affiliated Local, the National Executive Director or his or her designee, may file with the Secretary-Treasurer, or his or her designee, written charges against any member alleging facts describing any of the offenses set forth in this Article.

2.      Charges must be filed within six (6) months of knowledge of the action or event that gave rise to the charges.  Charges must set forth with reasonable specificity the nature of the offense and the facts underlying it.

3.      The National Board, or its designee, shall review the charges and dismiss them if they have not been timely filed, if the act complained of does not constitute a violation subject to discipline under this Constitution or in the absence of sufficient evidence to establish probable cause for proceeding.

4.      Unless the charges are dismissed pursuant to subparagraph B(3) of this Article, the Secretary-Treasurer, or his or her designee, or the National Executive Director, or his or her designee, shall give written notice to the member or members charged, attaching a copy of the charges and setting a hearing date at least fourteen (14) days in advance.

5.      Prior to a hearing before the disciplinary committee, the National Board may designate a representative(s) to meet with a member who has been charged with any of the offenses set forth in this Article. The National Board's representative(s) may offer a resolution to the charges that, if the member accepts, would be final and binding.  If the member does not accept the offer, a disciplinary committee will be convened to hear and determine the charges, as described in this Article.

6. The National Board, or a disciplinary committee appointed pursuant to policies and procedures approved by the National Board, shall hear and decide the charges. At the hearing, a charged party shall have the opportunity to present evidence and testimony, and may have a representative assist him or her. The charged member shall be given written notice of the decision and penalty, if any. The National Board, or a disciplinary appeals committee designated by it, has authority to review the disciplinary committee's decision and penalty, if any, on its own motion or on the member's written appeal filed with the Secretary-Treasurer, or his or her designee, or the National Executive Director, or his or her designee, within twenty-one (21) calendar days of sending of notice of the disciplinary committee's decision. On any appeal, the charges may be upheld, dismissed, the decision modified, or the charges referred to the disciplinary committee for further proceedings.

7. A member may be expelled from membership only by two-thirds (2/3) of the votes of the National Board members voting on the issue.

8. The National Board may adopt rules governing the investigation of charges and the conduct of any hearings or appeals under this Article.

**Article XV. Indemnification and Expenses of Defense**

A. The Union is authorized to pay all reasonable expenses for defense, including attorney's fees, in any claim, charge, complaint or action in which the Union, any affiliated Local, or any Union or Local officer, delegate, representative, employee, agent or other person alleged to have acted on behalf of the Union or an affiliated Local, is alleged to have violated the law or any of the duties and responsibilities set forth in this Constitution or a Local Constitution, except to the extent prohibited by law.

B. The Union shall indemnify every officer, including National and Local Board members, delegates and employees of the Union, or any of its affiliated Locals, and may indemnify such other persons as it deems advisable, against all expenses and liabilities, including attorney's fees, reasonably incurred or imposed in connection with any proceeding to which he or she may be made a party, for acts within the scope of his or her authority, whether or not he or she is acting as such at the time such expenses are incurred, except in cases where such person is found to have engaged in willful malfeasance in the performance of his or her duties or to have breached his or her fiduciary duties, provided, however, that the

National Board may approve any settlement or reimbursement as being in the best interests of the Union.

C. The Union shall have the right, at its expense, to participate in or, at its election, assume the defense or prosecution of any proceeding against an officer, including any National or Local Board member, delegate, representative or employee of the Union or any of its affiliated Locals, and may employ counsel and fully participate therein.

**Article XVI. Non-liability for Unauthorized Acts**

The Union and any of its affiliated Locals shall not be liable for the acts or conduct of any of their officers, employees or representatives that are outside the scope of their authority, unless expressly authorized in writing by the National Board.

**Article XVII. Recall and Removal of National Officers and National Board Members**

A. Procedure for Recall of President, Executive Vice President and Secretary-Treasurer

1. A petition seeking removal of the President, Executive Vice President or Secretary-Treasurer signed by fifteen percent (15%) of the members in good standing may be filed with the National Executive Director. A statement of the reasons for the recall, not to exceed 500 words, shall accompany the petition.

2. The Union shall promptly determine whether the petition contains sufficient valid signatures of members in good standing. If so, the National Executive Director shall give written notice by certified mail to the officer in question, together with a copy of the petition. Upon receipt of the notice, the officer in question shall have ten (10) days to submit a statement of reasons, not to exceed 500 words, explaining why he or she should not be recalled.

3. After thirty-five (35) days from the filing of the petition or after receipt of the National Officer's statement, whichever is later, the Union shall hold a referendum vote by written mail or electronic ballot. The statements of reasons for and against recall shall be mailed together with the referendum ballot.

4. The National Officer in question shall be recalled upon two-thirds (2/3) vote of the members voting.

B. Procedure for Recall of Vice Presidents and National Board Members

1. A petition seeking removal of the Vice Presidents or a National Board member signed by fifteen percent (15%) of the relevant members in good standing may be filed with the National Executive Director. The petition shall be accompanied by a statement of the reasons for the recall, not to exceed 500 words.

2. The Union shall process the recall petition in the same manner as Paragraph A, subparagraphs 2-4 above, provided that a two-thirds (2/3) vote of the relevant membership voting is required for removal.

C. Procedure for Removal of National Officers and National Board Members for Serious Misconduct

1. Any member in good standing, any committee of the National Board established for such purpose or the National Executive Director, or his or her designee, may file charges of serious misconduct with the Secretary-Treasurer against any National Officer or National Board member. The charges shall be in writing and state all the facts and circumstances showing serious misconduct. A copy of the charges shall be mailed to the National Officer or National Board member in question.

2. The National Board, or a committee appointed by the National Board, shall investigate the charges and may dismiss them if they lack substantial merit or evidence in support. Otherwise, the National Board or committee shall set a hearing and give the National Officer or National Board member in question at least fifteen (15) days written notice of the date, time and place of the hearing. The hearing shall be before the National Board or a committee as determined by the National Board. The National Officer or National Board member in question shall have the right to have a representative at the hearing.

3. The National Board or committee appointed by the National Board shall issue a written decision following the hearing. A committee's decision to remove a National Officer or National Board member shall be considered a recommendation to the National Board or to an appeals committee designated by the National Board. A decision by the appeals committee to uphold the recommendation shall be automatically appealed to the National Board. A two-thirds (2/3) vote of the National Board members voting shall be required to remove the National Officer or National Board member in question. The decision of the National Board shall be final and binding.

D. In the event a National Board member or National Officer is recalled or removed, a successor shall be selected in the manner for filling a permanent vacancy in that office as set forth in Article V(I)(2) or Article VI(I) of this Constitution respectively.

E. The National Board has authority to adopt policies and procedures governing recall and removal of National Officers and National Board members under this Article.

**Article XVIII. Amendments**

A. This Constitution may be amended by any of the following methods:

1. With the exception of:

   a. Article I Section A (name),

   b. Article I Section C (afl/cio affiliation),

   c. Article V Section A (Establishment of National Board),

   d. Article V Section B Paragraph 3 (categories),

   e. Article V Section E (National Board quorum/voting),

   f. Article VII Section A (establishment of Convention),

   g. Article VII Section D (Convention quorum/voting),

   h. Article IX(C)(1) and (D)(1) (Broadcast Steering Committee and Committee of Locals)

   the Convention may delegate all or part of its authority to amend the Constitution to the National Board provided that no amendment may be adopted by the National Board pursuant to any delegated authority unless thirty (30) days' written or electronic notice of the substance of the proposed amendment has been provided to each Local. Any amendment by the National Board must be adopted by the same supermajority as would be required for the amendment to be adopted by the Convention. The National Board may not be delegated greater authority to amend the Constitution than the Convention has under this Article and may not adopt an amendment that previously has been voted on by the Convention. The foregoing authority will automatically cease on January 31, 2018 along with all delegations of authority thereunder.

2. The Constitution may be amended by a majority vote of the members voting in a referendum conducted pursuant to Article XIX. A proposal to amend the Constitution by membership referendum shall be acted upon if (a) it has been approved by a National Board

resolution; or (b) a petition of ten percent (10%) of the members in good standing has been presented to the National Executive Director. Upon receiving such resolution or petition, the National Board shall conduct a referendum pursuant to Article XIX, provided that sixty (60) days' written or electronic notice of the proposed amendment has been given to the members in accordance with procedures established by the National Board; or

3. The Constitution may be amended by a two-thirds (2/3) vote of the delegates voting at Convention, provided that thirty (30) days' written or electronic notice of the proposed amendment has been given to each Local. A proposal to amend the Constitution at Convention shall be acted upon if: (a) it has been approved by a National Board resolution; or (b) a petition signed by one-third (1/3) of the Locals has been submitted to the National Executive Director at least forty-five (45) days before Convention. Upon receiving such resolution or petition, the regular or special Convention shall consider the proposed Constitutional amendment.

B. Notwithstanding anything to the contrary contained in this Constitution, the Convention shall not have authority to amend the following provisions of this Constitution:

1. Article IV(A)(2)(c) (procedure for increasing dues);

2. Article XIX (referendum);

3. Articles V(C) and VII(C) (Authority of National Board and Convention), and

4. This Article XVIII(B) (limitation on amendments).

C. The following may only be amended by a seventy-five percent (75%) vote of the members voting in a referendum:

1. Article XI(E) (strike authorization);

2. Article XI(D) (prohibition on cap on members' earnings); and

3. Article XXI(A) (dissolution)

**Article XIX. Referendum**

The Union shall conduct a membership referendum by secret ballot at any time on any question or issue if (a) it has been approved by a National Board resolution; or (b) a petition of ten percent (10%) of the members in

good standing requesting such referendum has been presented to the National Executive Director. The referendum shall be conducted by mail ballot or by electronic means and under policies and procedures established by the National Board, and shall be determined by such majority of those members voting as is required by this Constitution.

**Article XX. Trusteeship**

A. Whenever there is reason to believe that, in order to protect the interests of the members, it is necessary for the purpose of correcting corruption or financial malpractice, assuring the performance of collective bargaining agreements or other duties of a bargaining representative, restoring democratic procedures, or otherwise carrying out the legitimate objectives of this Union, the President, with the approval of the National Board, may appoint a Trustee to take charge and control of the affairs of an affiliated Local.

B. The Trustee shall be authorized and empowered to take full charge of all of the affairs and activities of the Local, to take possession of all books, records, and property, to remove any of its officers, employees, agents or representatives and to take such other action as in his or her judgment is necessary for the preservation of the Local and for the protection of the interests of the membership.

C. The Trustee shall report on the affairs and activities of the Local to the National Board, or a committee designated by the National Board, at least every ninety (90) days. The Trustee's day-to-day activities shall be subject to the supervision and direction of the National Executive Director, subject to review by the National Board, the Executive Committee or a committee designated by the National Board.

D. Except as set forth in Paragraph E, below, prior to the appointment of a Trustee, the National Board shall appoint a trusteeship committee which shall issue a notice setting the time, date and place for a hearing, for the purpose of determining whether a Trustee should be appointed. The trusteeship committee shall issue a report and recommendation to the National Board within thirty (30) days of its appointment.

E. Should the President determine that an emergency situation exists within a Local requiring immediate appointment of a Trustee, he or she may appoint a Trustee prior to a hearing so long as the Executive Committee, acting in a teleconference, video conference or in-person meeting held within forty-eight (48) hours of the President's decision, approves the decision. If a trusteeship is imposed in such an emergency situation, a trusteeship

committee must conduct a hearing within thirty (30) days of the appointment of the Trustee and the National Board must approve the imposition of the trusteeship within sixty (60) days of the appointment of the Trustee.

F. Miscellaneous

1. Except for Paragraph E above, the President may extend any of the time limits contained in Article XX for good cause. The President's decision shall be final and binding.

2. The National Board has authority to adopt policies and procedures governing the appointment of a Trustee, the conduct of a trusteeship hearing and the imposition of a trusteeship as provided in this Article.

**Article XXI. Dissolution, Disaffiliation and Merger**

A. The Union may be dissolved by resolution adopted by a two-thirds (2/3) vote of the National Board and ratified by a seventy-five percent (75%) vote of the members voting in a membership referendum held in accordance with Article XIX.

B. Until dissolution, no member has any rights in or to the funds or property of the Union. Upon dissolution and winding up, the interests of members in the funds and property shall be distributed to the members on a pro rata basis as determined by the National Board.

C. No Local may dissolve or disaffiliate from the Union without the approval of the National Board.

D. The Union may merge with or become a part of any other organization by resolution of the National Board that is approved by either (1) sixty percent (60%) of the members in good standing voting in a mail or electronic ballot; or (2) sixty percent (60%) of the delegates voting at a Convention. A merger, affiliation or consolidation with another entity shall not be considered a dissolution under this Article.

**Article XXII. Miscellaneous Provisions**

A. Rules of Order

All meetings of SAG-AFTRA and its Locals, including the Convention, the National and Local Boards and all Committees, shall be conducted according to Robert's Rules of Order Newly Revised.

B.    Savings provision

If any provision of this Constitution shall be held to be invalid, the
remainder of this Constitution shall continue in full force and effect.

**APPENDIX 1:**

**MEMBERSHIP RULES***

**1.** No member shall render any services or make an agreement to perform services for any employer who has not executed a basic minimum agreement with the Union, which is in full force and effect, in any jurisdiction in which there is a SAG-AFTRA national collective bargaining agreement in place. This provision applies worldwide.

**(A.)** No member shall render any services, or make an agreement to perform services, for any employer against whom the Union is conducting a strike, nor shall any member otherwise violate any strike order of the Union.

**2.** It shall be the duty of every member to report to the Union any violation by a signatory of any of the Union's collective bargaining agreements, as the same now exist or may hereafter be amended.

**3.** It shall be the duty of every member when requested by the Union, to appear and testify at any arbitration hearing, any hearing of charges against a member, and at any other hearing conducted by the Union or by any committee or tribunal appointed by the National Board.

**4.** No member of the Union shall appear in, or assist in any manner, either directly or indirectly, any benefit within the jurisdiction of the Union which has not first been approved by the Union.

**5.** Every member of the Union who is now, or hereafter becomes a member of, or applies for membership in any trade union not a branch of the Associated Actors and Artistes of America ("4A's"), which purports to represent or seeks to represent employees in the jurisdiction of any branch of the 4A's, shall immediately report in writing the facts concerning the same to the -Union, and particularly shall report: (a) the name of the trade union; (b) how long he or she has been a member; (c) date of application; and (d) date he or she became a member. If the National Board of Directors, or its designee, shall be of the opinion that dual membership of any member in the Union and in any other such trade union is detrimental to the best interest of the Union, it may require such member to divest himself or herself of membership in such other trade union, and in default thereof, may suspend or expel such member. Failure of a member to give notice under this Section, or failure to comply with an order of the Board pursuant to this Section shall be considered an action antagonistic to the interests and integrity of the Union. The term "trade union" as used in this Section includes any association substantially similar to a trade union.

**Note: The membership rules are included for convenient reference only and are not part of the Constitution.*

**6.**     It shall be the duty of every member to carry his or her Union card when working, and to permit any representative of the Union to freely inspect the same.  No member shall allow any other person to have possession of his or her Union card.

**7.**     [Reserved for Future Use]

**8.**     No Union member shall drive any studio equipment to location.

**9.**     It shall be conduct considered an action antagonistic to the interests and integrity of the Union for a member of the Union to accept employment in the jurisdiction of any other branch of the Associated Actors and Artistes of America (4A's) for an employer whose employees are represented by the other branch, unless the member seeking such employment first inquires of the other branch to ascertain whether the employer is a signatory to a collective bargaining agreement with the other branch. It shall be conduct considered an action antagonistic to the interests and integrity of the Union if the member of the Union accepts employment with an employer in the jurisdiction of another branch after having been advised by the other branch that:

   **(A.)**     The employer has refused to bargain in good faith a collective bargaining agreement with the other branch and the other branch has declared the employer unfair or has otherwise directed its members not to work for the employer; or

   **(B.)**     If the employees of the employer are engaged in a primary strike ratified or approved by the other branch.

   **(C.)**     It shall be conduct considered an action antagonistic to the interests and integrity of the Union for a member of the Union to 1) work for any employer or other person who is on the Unfair List, or 2) accept an engagement to work on a live or recorded broadcast originating at any radio station that is unfair.

**10.**    The Presiding Officer at Board meetings and the chair of each committee shall be empowered to invoke a rule of confidentiality with regard to any subject to be discussed which is deemed to be of a confidential nature, on which outside discussion might be detrimental to the best interests of the members of the Union. This rule of confidentiality may be overruled by a super-majority comprised of two thirds of the Board or committee members present.

**11.**    Except with written permission of SAG-AFTRA, to be given in such manner as shall from time to time prescribed by the National Board, the making, solicitation or collection of group gifts or memorials of any character by members of the Union to or for an employer, or prospective employer, to any officer, agent, representative

or employee of such employer or prospective employer, to any of their officers, agents, representatives or employees, shall be considered an action antagonistic to the interests and integrity of the Union.

It shall likewise be deemed an action antagonistic to the interests and integrity of the Union for any member of the Union, directly or indirectly, to give or offer to give any money, gift, gratuity or other thing of value to an employer, or prospective employer, to any officer, agent, representative or employee of such employer or prospective employer, or to any employment or casting agency representing an employer, or prospective employer, or to any of their officers, agents, representatives or employees as an inducement to secure employment. This rule shall not apply to prohibit the payment of lawful commissions to motion picture agents holding franchises from the Union or its respective legacy entities.

**12.** When a complaint is presented by the Union for a member against a signatory, the member shall be deemed to have given the Union power and authority to dismiss, compromise, settle or otherwise resolve and/or dispose of the complaint.

If the Union, in its discretion, shall determine not to prosecute a given complaint, it may allow the member involved to prosecute such complaint at his or her own expense.

**13.** [Reserved for Future Use]

**14.** No member of the Union may perform services as both a performer and a casting director, nor as a performer and in a capacity within the jurisdiction of any theatrical teamster union, in any production without the consent of the Union.

**15.** [Reserved for Future Use]

**16.** [Reserved for Future Use]

**17.** Legislation in certain foreign countries provides that performers, collectively, have the right to share in a copyright royalty fund for certain exhibitions in those countries of motion pictures and television programs. Claims for such share may be made only by approved collecting societies in behalf of performers collectively.

Pursuant to the Union's objective to protect the rights and properties of performers, The Union is authorized to enter into agreements with foreign collecting societies to prosecute claims for royalties due performers under applicable foreign law ("foreign royalties"). The Union may retain an administrative fee in an amount set by the National Board from the sums, if any, received by the Union from such collecting societies to defray the cost of distribution of such funds.

Nothing in this rule shall prohibit the Union from modifying its practices related to pursuit of foreign royalties on behalf of its members.

**18.** No member shall perform services as a background or extra performer for any production without coverage of the applicable Union agreement in the specific zones, as to minimum pay, benefits and working conditions.

# DATA PURCHASE AND SERVICES AGREEMENT

This Data Purchase and Services Agreement ("Agreement"), dated as of July 22, 2013, 2013 (the "Effective Date"), is made by and between the American Federation of Musicians of the United States and Canada, AFL-CIO-CLC ("AFM"), the Screen Actors Guild - American Federation of Television and Radio Artists ("SAG-AFTRA") and the AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund (the "Fund"). AFM and SAG-AFTRA are sometimes referred to herein individually as a "Union" and collectively as the "Unions." AFM, SAG-AFTRA and the Fund are sometimes referred to herein individually as a "Party" and collectively as the "Parties."

WHEREAS, by an Agreement and Declaration of Trust dated September 16, 1998, as amended and restated on July 26, 2012, the Unions formed the Fund to collect and distribute certain artist royalties that are appropriate for collective administration;

WHEREAS, the Unions have in the past provided to the Fund certain data, as well as certain services of outside counsel and in-house staff to assist the Fund in its operation and administration and to represent the interests of the Fund in various external matters, without being reimbursed for their costs thereof;

WHEREAS, the Agreement and Declaration of Trust authorizes the Trustees of the Fund to purchase relevant data from the Unions (and others) and to employ assistants; and

WHEREAS, the Trustees of the Fund have determined that it is reasonable and appropriate at this time to memorialize arrangements for the provision by the Unions to the Fund of certain data and assistance in exchange for reasonable compensation to the Unions from the Fund;

NOW, THEREFORE, the Parties, intending to be legally bound, hereby agree as follows:

1. Provision of Data. From and after the Effective Date, each Union shall provide the Fund the following data, in a manner comparable to the way such data has been provided immediately prior to the Effective Date:

- Access to member databases to enable the Fund to obtain identifying and contact information for members.
- Access to session reports and "B-forms," or databases containing information derived therefrom, that in either case, identify the recordings made at recording sessions and provide identifying and contact information for performers (Union members and nonmembers) who performed at the session.

Each Union retains all its ownership rights in its data, and all such data shall be considered Confidential Information of the relevant Union subject to the provisions of Section 7. The Fund is authorized to, and shall, access, reproduce and use such data solely for purposes of distribution of royalties collected by the Fund to the relevant persons. In its use of such data, the Fund

EXHIBIT
SAG-AFTRA 30(b)(6) Ex. 2
exhibitsticker.com

further shall comply with the provisions of any applicable Union privacy policy of which such Union advises the Fund in writing from time to time.

2. Representation of Fund Interests. Each Union shall use commercially reasonable efforts to further the interests of the Fund and the Fund's beneficiaries through its participation in the following forums (or their successors):

- The board of SoundExchange, Inc.;
- The board of the Alliance of Artists and Record Companies;
- The musicFIRST Coalition;
- Activities under the auspices of the U.S. Copyright Office and other U.S. governmental entities; and
- Activities under the auspices of international entities such as the International Federation of Musicians, International Federation of Actors, World Intellectual Property Organization, Societies' Council for the Collective Management of Performers' Rights.

To the extent that the Fund may communicate to a Union particular interests, concerns or objectives relevant to the Unions' participation in the foregoing forums, each Union shall use commercially reasonable efforts promptly to address the Fund's requests in that regard, except to the extent the Union determines that such requests are contrary to the interests of its members.

3. Mandates. Each Union shall use commercially reasonable efforts to obtain from its members authorization to act as such members' representative for the purpose of collecting and distributing government-mandated or other compulsory royalties or remuneration payable to performers under U.S. or foreign law. Each Union shall use commercially reasonable efforts to extend to the Fund the benefit of such authorizations that the Union obtains. The Unions may fulfill the foregoing obligation by, for example, negotiating and signing together with the Fund, or authorizing the Fund to enter into, agreements with foreign collecting societies pursuant to which the Fund will be entitled to claim, and the foreign society will agree to pay to the Fund, foreign royalties owed to those U.S. performers for whom the Fund exercises a mandate on behalf of either or both Unions.

4. Other Services. From and after the Effective Date, it is not anticipated that either Union will provide the Fund material services in support of the Fund's operation and administration, except as specifically described above. However, the Unions shall not unreasonably refuse to provide the Fund incidental advice and assistance as the Fund may request from time to time.

5. Services in General. The foregoing data and services shall be provided in accordance with any schedule agreed upon between the Fund and a Union, or in the absence of such agreement, promptly upon the Fund's request. To the extent that a Union may provide the Fund any documents or other recorded information other than the data described in Section 1 (the Fund's rights to which are also addressed in Section 1), and subject to Section 7, such Union

hereby grants the Fund a nonexclusive, perpetual, worldwide license to reproduce, adapt, distribute, perform and display such item and authorize others to do the same for the Fund's purposes. At no time shall the Fund be deemed to be the employer of a Union's personnel providing services hereunder. Each Union, and not the Fund, shall be responsible for payment of compensation to its personnel, required payroll deductions, social security and Medicare contributions, and unemployment, disability and workers' compensation insurance, all as required under law from time to time.

6. Payment. In consideration of the foregoing, the Fund shall pay each Union, within 30 days after the conclusion of each of the Fund's distribution cycles, 3% of the amount distributed by the Fund in such distribution cycle. Each such payment shall be accompanied by a statement setting forth the computation of the payment amount. Such payment shall constitute complete compensation of the Unions and their personnel for providing the data and services contemplated by this Agreement. There shall be no additional charges or expense reimbursement associated with the Unions' provision of the data and services contemplated by this Agreement.

7. Confidentiality.

7.1. "Confidential Information" means any material or information that (i) a Party (the "Disclosing Party") treats as confidential; (ii) the Disclosing Party provides to another Party (the "Receiving Party") in connection with the performance of this Agreement; and (iii) the Receiving Party reasonably should recognize as being confidential material or information of the Disclosing Party. The Receiving Party shall not use the Disclosing Party's Confidential Information for any purpose other than the performance of this Agreement or enjoyment of benefits provided under this Agreement, and shall not disclose the Disclosing Party's Confidential Information to any person other than its directors, officers, employees and contractors who have a need to know such Confidential Information and are subject to a nondisclosure obligation comparable in scope to this Section 7.

7.2. Notwithstanding Paragraph 7.1, the Receiving Party may disclose any material or information that it can demonstrate is (i) or becomes publicly known through no fault of the Receiving Party; (ii) developed independently by the Receiving Party; (iii) known by the Receiving Party prior to its disclosure by the Disclosing Party; or (iv) rightfully obtained from a third party not obligated to preserve its confidentiality who did not receive the material or information directly or indirectly from the Receiving Party. The Receiving Party also may disclose materials or information to the extent required by a court or other governmental authority, provided that the Receiving Party (a) gives the Disclosing Party prompt notice of the disclosure, (b) uses reasonable efforts to resist disclosing the material or information, and (c) cooperates with the Disclosing Party on request to obtain a protective order or otherwise limit the disclosure.

7.3. The receiving Party acknowledges that its breach of this Section 7 would cause the Disclosing Party irreparable injury for which it would not have an adequate remedy at law. In the event of a breach, the Disclosing Party shall be entitled to injunctive relief in addition to any other remedies it may have at law or in equity.

8. Representations, Warranties and Covenants

8.1 Each Party represents and warrants that it has the right, power and authority to enter into and to perform this Agreement.

8.2 Each Union represents, warrants and covenants that the services it is to provide under this Agreement shall be provided (i) in a workmanlike manner; (ii) in accordance with the standards of care and diligence and the level of skill, knowledge and judgment normally practiced by organizations of a similar nature; and (iii) in compliance with all applicable laws and regulations.

8.3 Each Union represents, warrants and covenants that the data, and any other documents or other recorded information it may provide to the Fund in the performance of this Agreement, will not infringe or misappropriate any patent, copyright, trade secret, or other proprietary right of any third party or otherwise conflict with the rights of any third party.

9. Indemnity. Each Party shall defend, indemnify and hold harmless each other Party and its directors, officers and employees from and against any third party claims to the extent relating to or resulting from any breach of this Agreement by the indemnifying Party. The indemnifying Party shall have the right to exercise reasonable control over any litigation within the scope of this indemnity; provided, however, that the indemnified persons shall have the right to participate in any such litigation at their own expense insofar as it concerns claims against them. This indemnity shall be inapplicable to the extent that the indemnifying Party is not notified promptly of a claim and is prejudiced by the delay in notice. All indemnified persons shall cooperate to the extent necessary in the defense of any claim within the scope of this indemnity.

10. LIMITATION OF LIABILITY. EXCEPT FOR A CLAIM OF INDEMNIFICATION PURSUANT TO SECTION 9, OR FOR A BREACH OF SECTION 7, IN NO EVENT SHALL ANY PARTY BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL, OR CONSEQUENTIAL DAMAGES.

11. Term and Termination of this Agreement. The term of this Agreement shall commence as of the Effective Date and shall continue thereafter unless terminated in accordance with this Section 11. As between each Union and the Fund, this Agreement may be terminated (i) at will upon one year's written notice to the other Party, or (ii) if the other Party has materially breached this Agreement and failed to remedy that breach within 30 days after receiving written notice of that breach, upon further written notice by the non-breaching Party. Termination of this Agreement as between one Union and the Fund shall not, by itself, cause this Agreement to terminate as between the other Union and the Fund. Upon the effective date of termination, the relevant Union shall no longer be obligated to provide data or services as described in Sections 1-5. The Fund shall pay the relevant Union in accordance with Section 6 for data or services rendered through the effective date of termination on a prorated basis over the Fund's then current distribution cycle. The provisions of Sections 7-13 shall survive the termination of this Agreement.

12. Notices. All notices sent under this Agreement shall be in writing and hand delivered or delivered by prepaid overnight courier. Notices shall be sent to the Parties at the following addresses or such other addresses as the Parties subsequently may provide:

If to AFM: American Federation of Musicians of the United States & Canada
1501 Broadway, Suite 600
New York, NY 10036
Attention: President Raymond M. Hair, Jr.
Telephone: (212) 869-1330, ext. 212

If to SAG-AFTRA: SAG-AFTRA
5757 Wilshire Blvd., 7th Floor
Los Angeles, CA 90036
Attention: Chief Administrative Officer Duncan Crabtree-Ireland
Telephone: (323) 236-3259

If to the Fund: AFM & SAG-AFTRA Fund Distribution Fund
12001 Ventura Place, 5th Floor
Studio City, CA 91604
Attention: Administrator Dennis Dreith
Telephone: (818) 755-7777

13. Miscellaneous.

13.1. Governing Law. This Agreement shall be governed by and construed in accordance with the laws of New York, without regard to its conflict of laws principles.

13.2. Severability. The provisions of this Agreement are severable, and the unenforceability of any provision of this Agreement shall not affect the enforceability of the remainder of this Agreement.

13.3. Cumulative Rights and Remedies. The rights and remedies provided in this Agreement and all other rights and remedies available to a Party at law or in equity are, to the extent permitted by law, cumulative and not exclusive of any other right or remedy now or hereafter available at law or in equity.

13.4. Assignment. No Party may assign any of its rights or delegate any of its duties under this Agreement to any third party without the prior written consent of the other Parties, which shall not be withheld unreasonably. This Agreement shall be binding upon and inure to the benefit of the Parties and their permitted assigns.

13.5. Relationship of the Parties. Nothing in this Agreement shall be construed as creating a partnership, joint venture or agency relationship between the Parties, or as authorizing any Party to act as agent for the other or to enter into contracts on behalf of any other Party.

13.6. Amendments. This Agreement may be modified or amended only by written agreement of the Parties.

13.7. Entire Agreement. This Agreement constitutes the entire agreement between the Parties concerning the subject matter of this Agreement, and supersedes all prior agreements between the Parties concerning the subject matter of this Agreement.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective duly authorized officers.

AMERICAN FEDERATION OF MUSICIANS OF THE UNITED STATES AND CANADA, AFL-CIO-CLC

By: [signature]

Name: Raymond M. Hair, Jr.

Title: President

Date: 7/22/13

SCREEN ACTORS GUILD - AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS

By: [signature]

Name: Duncan Crabtree-Ireland

Title: Chief Admin Officer + General Counsel

Date: 7/22/13

AFM & SAG-AFTRA INTELLECTUAL PROPERTY RIGHTS DISTRIBUTION FUND

By: [signature]

Name: Dennis Dreith

Title: Administrator

Date: 7/24/13

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

BROOKLYN DIVISION

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

JON BLONDELL, PAUL HARRINGTON, TIMOTHY JOHNSON, STEPHANIE LOWE, F/K/A STEPHANIE MARIE, CHASTITY MARIE AND CLAYTON PRICHARD, INDIVIDUALLY AND ON BEHALF OF A CLASS OF SIMILARLY SITUATED PERSONS,

Plaintiffs,

vs.

BRUCE BOUTON, DUNCAN CRABTREE-IRELAND, AUGUSTINO GAGLIARDI, RAYMOND M. HAIR, JR., JON JOYCE AND STEFANIE TAUB,

Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

CASE NO.: 1:17-cv-00372-RRM -RML

CONFIDENTIAL VIDEOTAPED DEPOSITION OF
DUNCAN CRABTREE-IRELAND

AUGUST 29, 2019
8:31 A.M. TO 5:21 P.M.

633 WEST 5TH STREET, 36TH FLOOR
LOS ANGELES, CALIFORNIA 90071

Mimi Murray, CSR No. 13985

Job No. 165974

APPEARANCES OF COUNSEL

FOR THE PLAINTIFFS:

JEEVES MANDEL LAW GROUP
BY: ROGER MANDEL, ESQ.
12222 MERIT DRIVE
DALLAS, TEXAS 75251

QSLWM
BY: ERIC ZUKOSKI, ESQ.
2001 BRYAN STREET
DALLAS, TEXAS 75201

FOR THE DEFENDANTS:

JENNER & BLOCK
BY: DEVI RAO, ESQ.
1099 NEW YORK AVENUE NW
WASHINGTON, DC 20001

THE VIDEOGRAPHER:

CHRIS JORDAN

CONFIDENTIAL VIDEO DEPOSITION OF

DUNCAN CRABTREE-IRELAND

THURSDAY, AUGUST 29, 2019

THE VIDEOGRAPHER: This marks the beginning of the videotaped deposition of Duncan Crabtree-Ireland, being taken in the matter of Jon Blondell, et al. v. Bruce Bouton, et al., being held in the United States District Court, Eastern District of New York, Brooklyn Division.

Deposition is being taken on August 29th, 2019, at approximately 8:33 a.m.

My name is Chris Jordon, with TSG Reporting. The court reporter is Mimi Murray, with TSG Reporting.

Will counsel please state your name for the record.

MR. MANDEL: Roger Mandel for the plaintiffs.

MR. ZUKOSKI: Eric Zukoski for the plaintiffs.

MS. RAO: Devi Rao for the defendants.

THE VIDEOGRAPHER: Will the court reporter please swear in the witness.

DUNCAN CRABTREE-IRELAND,

having been duly administered an oath by the court reporter, was examined and testified as follows:

one signing the agreement on behalf of SAG-AFTRA with the Fund, and I felt like it would look bad to have me signing the agreement for one party and voting on the agreement for another party, so --

Q Did you -- did you regard that -- that that would be a conflict of interest?

A You know, possibly. I didn't really reach the conclusion about whether it was actually a conflict of interest because I felt like the perception wouldn't be positive, and so I decided I didn't want to do it regardless.

You know, I'm not trying to be cute about it. I just think that, you know, for anyone who sits on the kinds of boards and funds that I do, like, you know, take the benefit plans, for example, it's not at all uncommon for people who are appointed by an entity to have to make decisions that in some way relate to the that entity.

And so, you know, the question of whether a particular decision would or wouldn't be a conflict of interest, you know, I take it kind of seriously as to whether, from a legal perspective, it actually is a conflict of interest.

But in this case, I didn't really get to that level of analysis because I just felt the perception

would be -- would be bad, and so I didn't want that perception to exist, so --

Q As the president of -- of AFM, did you think that the perception would be the same for Ray Hair in terms of this -- this contract?

MS. RAO: Objection. Misstates facts.

THE WITNESS: Did I at the time or do I now?

BY MR. MANDEL:

Q Yes, at the time.

A I don't remember really thinking too much about it from the AFM perspective. I was more focused on our side. I'm not sure that I knew even who was going to sign the agreement for AFM, if it was going to be Ray or somebody else.

But, to be honest with you, I most likely didn't really give much thought to the AFM side of this. I was pretty much focused on making sure I was handling my own part of the issue, so --

Q Okay. If -- if -- as we sit here today, if Ray Hair signed the agreement as president of AFM and he voted on it, do you believe that would have constituted a conflict of interest?

A I don't know. I mean, to be perfectly honest with you, I feel it's a little bit unfair to ask me that question because I don't feel like I'm -- you

down that session report and then provide it to the Fund staff who are requesting it.

Q Okay. Up until this time in 2013, the SAG-AFTRA and AFM had been giving this information without charge; correct?

A Yes.

Q Okay. And at SAG-AFTRA at least, had you guys ever actually calculated the cost to you of -- of, you know, providing these session reports and B forms?

A Not specifically, no.

Q Okay. And was the intent for this to just recoup the union's costs, or for this to actually be a profitable -- you know, for the unions to make a profit on this?

A Oh, God, no. It was to recoup the union's costs, recognizing that those might fluctuate, you know, fairly significantly, depending upon the demand from the Fund for information and not wanting to spend a whole bunch of time and money on tracking that in a very granular way.

So the intention was to come up with a way that would, you know, reasonably track the costs, not generate revenue for the union, but also not have the union subsidizing the operation of the Fund through the services that we were providing to the Fund.

everyone that I am aware of thought that it was, you know, about right.

Q Now, was that, in part, based upon knowledge of what the distributions were then and what 3 percent represented at that time in 2013?

A Yeah. I mean, I think that it was in the context of the kind of level of revenue distributions that we had at the time.

Q Okay. So as -- as time went on, the -- the amount of distributions being -- that being the allocation of -- of royalties to specific persons, not necessarily paid, grew greatly and the 3 percent grew greatly.

Did there ever become a time when there was a discussion of whether the 3 percent had become too large?

A Yeah. I mean, we've had discussions over the last few years about whether that's the right structure for it, if it should continue to be structured as a percentage; if it is a percentage, is that the right percentage; should it be lower; should it -- I don't think anyone thinks it should be higher. And -- yes, so we've had -- we've had discussions about that.

Q Okay. And there is a feeling that for once, you know, when the fees are getting over -- were over a

million dollars that the Fund wasn't really incurring costs of over a million dollars?

A Well, I don't know about that. I mean, I think that the -- the amount of inquires is significant. The amount of time -- from what I understand, the amount of time that our staff spends responding to inquires from the Fund, particularly for session reports, is significant.

I do think that as the -- you know, as the royalty collections increase, it should be revisited because I think that there is definitely a point at which -- especially if the royalty increases are in -- are too dramatic that it may be the wrong structure, you know, having it as a percentage may not be the right way to go.

I do think that it served us well during the time period when it was originally adopted and in the succeeding years because as those royalty collections increased in those succeeding years, I do think that the burden of providing the services did increase as well.

So, you know, I'm -- I'm personally of the opinion that it should be reviewed regularly, and I'm personally of the opinion that it may be time to switch to a different structure now than we've had in the

I, Mimi Murray, a licensed Certified Shorthand reporter, before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to writing under my direction; that reading and signing was requested; and that I am neither counsel for, related to, nor employed by any of the parties in this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREEOF, I have subscribed my name this 12th day of September 2019.

Mimi Murray, CSR No. 13985

# EXHIBIT 5

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CASE NO. 2:18-cv-07241-CAS-PLA

KEVIN RISTO, on behalf of himself And all others similarly situated,

Plaintiffs,

vs.

SCREEN ACTORS GUILD - AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS, a Delaware corporation; AMERICAN FEDERATION OF MUSICIANS OF THE UNITED STATES AND CANADA, a California Nonprofit corporation; RAYMOND M. HAIR, JR., an individual, as Trustee of The AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund; TINO GAGLIARDI, an individual, as Trustee of the AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund; DUNCAN; CRABTREE-IRELAND, an individual, as Trustee of the AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund; STEFANIE TAUB, an individual, as Trustee of the AFM And SAG-AFTRA Intellectual Property Rights Distribution Fund; JON JOYCE, An individual, as Trustee of the AFM And SAG-AFTRA Intellectual Property Rights Distribution Fund; BRUCE BOUTON, an individual, as Trustee Of the AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund; and DOE RESPONDING PARTY 1-10,

Defendants.

****************************************

CORRECTED TRANSCRIPT OF
ZOOM VIDEOTAPED DEPOSITION OF DENNIS DREITH
February 11, 2021
9:00 a.m.

****************************************

REPORTED BY:
BELLE VIVIENNE, CRR,
JOB NO. 4420574

A P P E A R A N C E S

FOR THE PLAINTIFFS, KEVIN RISTO AND THE CLASS:

KIESEL LAW LLP
MARIANA A. MCCONNELL, ESQ.
PAUL R. KIESEL, ESQ.
NICHOLAS BRANCOLINI, ESQ.
8648 Wilshire Boulevard
Beverly Hills, California 90211-2910
310.854.4444
mcconnell@kiesel.law
kiesel@kiesel.law
brancolini@kiesel.law

JOHNSON & JOHNSON LLP
NEVILLE LAWRENCE JOHNSON, ESQ.
DANIEL B. LIFSCHITZ, ESQ.
439 North Canon Drive, Suite 200
Beverly Hills, California 90210
310.975.1080
njohnson@jjllplaw.com
dlifschitz@jjllplaw.com

FOR THE DEFENDANTS:

JENNER & BLOCK LLP
ANDREW J. THOMAS, ESQ.
ANDREW G. SULLIVAN, ESQ.
ANNA K. LYONS, ESQ.
633 West 5th Street, Suite 3600
Los Angeles, California 90071
213.239.5100
ajthomas@jenner.com
agsullivan@jenner.com
alyons@jenner.com

VIDEOGRAPHER:

Terry Weiss

THE VIDEOGRAPHER: Good morning. We're on the record at 9:16 a.m. on February 11, 2021. Audio and video recording will continue to take place unless all parties agree to go off the record. This is the video recorded deposition of Dennis Dreith in the matter of Kevin Risto versus Screen Actors Guild American Federation of Television and Radio Artists et al., filed in the United States District Court, Central District of California, Case No. 2:18-cv-07241-CAS-PLA. This deposition is being held via Zoom remote meeting. 09:16:18 09:16:18 09:16:23 09:16:28 09:16:29 09:16:31 09:16:34 09:16:38 09:16:42 09:16:44 09:16:47 09:16:49 09:16:51 09:16:59 09:17:02

My name is Terry Weiss from the firm Veritext Legal Solutions, and I am your videographer. Our court reporter today is Belle Vivienne from the firm Veritext Legal Solutions. I am not related to any party in this action nor am I financially interested in the outcome. Counsel and everyone attending remotely will now state their appearances and affiliations for 09:17:03 09:17:06 09:17:08 09:17:10 09:17:11 09:17:14 09:17:17 09:17:19 09:17:21 09:17:22

Recording Arts and Sciences. Obviously, ICSOM Symphony Orchestras were also interested because they were recording. The Producers Association was interested in obviously securing copyright, actually even though it didn't even affect them directly. Basically any other trade organization working in a recorded industry. Certainly the recording labels, the record companies, independent production companies, any rights holder, independent artists who were -- who might own their own masters would be rights holders and performers. 09:45:11 09:45:20 09:45:31 09:45:36 09:45:41 09:45:44 09:45:46 09:45:49 09:45:52 09:45:54 09:45:59 09:46:03 09:46:07 09:46:10

Q. Okay. Thank you. 09:46:12

Excuse me. Can you describe what a B form is or what is sometimes referred to as a session report? 09:46:24 09:46:25 09:46:29

A. Yes. For each recording agreement, there's a separate B form which are designated. B forms have, like, there's a B 7 for motion picture agreements, B 4 for phonograph agreements. But a B form, each individual contract has its separate B form, and the B form 09:46:32 09:46:36 09:46:40 09:46:43 09:46:45 09:46:48 09:46:51

basically lists the employer, the hours of employment, the recording studio where the recording took place, the name of the project. In the case of recordings, one or more songs that are recorded on that session and then a list of the musicians on that project and what their specific roles were. In other words, a contractor, a conductor, a leader, or just the other musicians along with their Social Security number, phone number and address. 09:46:54 09:46:59 09:47:03 09:47:05 09:47:11 09:47:13 09:47:16 09:47:19 09:47:22 09:47:26 09:47:29

Q. And generally speaking, in your experience, who -- who fills out the B forms and who maintains them? 09:47:36 09:47:38 09:47:41

A. Generally a contractor or in the record industry, oftentimes it's changed over the years, but a project coordinator at the label may do it. It might be done by the leader on the session. Depends on the size of the session. The larger sessions would almost always be a contractor or a contractor's assistant working with a payroll company maybe, and large record companies would be a production coordinator working with the AR 09:47:44 09:47:50 09:47:53 09:47:56 09:47:59 09:48:01 09:48:03 09:48:06 09:48:08 09:48:12 09:48:15

As you mentioned, the B form, it's a contract that documents who worked on a particular recording session and specifies what their entitled to get paid; isn't that right? 09:50:16 09:50:18 09:50:20 09:50:23 09:50:28

A. Well, yes. It lists their -- the scale earnings and then the case if there's overscale and oftentimes puts that on their contract as well. 09:50:29 09:50:31 09:50:34 09:50:36

Q. And is it true that the -- if it's a -- a union recording session that is with a label that's signatory to the collective bargaining agreement, the union would also maintain copies of the B forms? 09:50:40 09:50:44 09:50:49 09:50:52 09:50:55

A. The union would receive -- the federation would receive a copy of it, the pension fund would receive a copy of it, the local union would be a copy of it with the jurisdiction the recording took place. 09:50:59 09:51:04 09:51:06 09:51:08 09:51:12

Q. And the unions typically one of the things they would do with the forms would be use them to make sure the performers got paid properly, correct? 09:51:14 09:51:17 09:51:19 09:51:21

A. Generally speaking, it would be the local union that would do that. 09:51:23 09:51:26

MS. McCONNELL: Same objections. 11:25:39
A. Yes. 11:25:44
BY MR. THOMAS: 11:25:45
Q. Is there anything -- while you were administrator, did you ever believe there was anything about this grant of authority that was inconsistent with Section 114 of the Copyright Act? 11:25:45 11:25:52 11:25:55 11:25:57 11:26:00
MS. McCONNELL: Objection, calls for a legal conclusion, may call for an expert opinion. 11:26:02 11:26:03 11:26:04
A. To the extent that we purchased something for what would be an arm's length transaction, a fair market value, that was inconsistent. If we had to purchase something, we would have -- for example, with the pension fund, we would oftentimes purchase contracts from them. And it required, you know, someone from the pension fund to go to the warehouse and pull a contract, and there was basically an out-of-pocket expense for that. I believe at that time they were charging $6 or $7 per contract, and it was not uncommon that we would do that and it 11:26:10 11:26:12 11:26:16 11:26:18 11:26:21 11:26:24 11:26:28 11:26:31 11:26:33 11:26:34 11:26:36 11:26:39 11:26:40 11:26:44

seemed like that was anything that was -- that was disallowed in this and to me it was obtained. 11:26:47 11:26:49 11:26:53

So whatever -- to the best way to obtain the data, so to me it seemed like whatever most cost-effective way to obtain the data, and in some cases that meant just -- we would ask, you know, other organizations to share data. We were able to obtain data, contracts for no payment from the Country Music Hall of Fame who actually collected a large volume of contracts from Local 257. 11:26:55 11:26:56 11:26:59 11:27:02 11:27:04 11:27:08 11:27:11 11:27:15 11:27:20 11:27:22

At one point, the administration there decided that they were worthless and threw them out, and they were retrieved from the trash bins by the Country Music Hall of Fame who happened to have a large volume of contracts, and I was able to get copies of those from them. So in any way I could obtain them, as long as it was a cost that I could sort of ascertain and verify that was a reasonable cost. 11:27:25 11:27:27 11:27:30 11:27:32 11:27:35 11:27:37 11:27:40 11:27:43 11:27:47 11:27:50

BY MR. THOMAS: 11:27:51

Q. When you're talking about 11:27:51

every single micro-penny that was due 11:54:33
somebody would have been astronomical. 11:54:36
And so in my mind, that would not have -- 11:54:40
it certainly wouldn't have serviced the 11:54:44
community appropriately, and in many ways, 11:54:47
I don't believe that was the spirit of the 11:54:50
Copyright Act. 11:54:52
BY MR. THOMAS: 11:54:53
Q. What do you mean by that? 11:54:53
A. I meant that the spirit of it 11:54:55
was really to try to compensate as many 11:54:57
nonfeatured -- well, as many performers as 11:55:02
ethically and fully as possible. 11:55:07
Q. Okay. So just going back to the 11:55:10
research function that you described a few 11:55:22
minutes ago. What resources did the fund 11:55:24
consult to obtain information regarding 11:55:26
who performed on particular recordings? 11:55:30
MS. McCONNELL: One second. 11:55:35
Objection, vague and ambiguous. Just 11:55:37
at what particular time or just 11:55:38
generally? 11:55:40
MR. THOMAS: Let's talk about 11:55:41
the -- the time period from '99 up 11:55:42
until, say 2010. 11:55:49

A. So well, a lot changed between '99 and 2010. Certainly we tried -- and also we have to ask -- well, I'll come -- best way to phrase this for you, after 2000 -- well, I guess it would have been after 2010 -- if we're looking at a period before 2010, I guess we'd be looking at sound recordings only. After 2010, we began to include audio visual works. 11:55:53 11:55:56 11:56:03 11:56:08 11:56:12 11:56:16 11:56:24 11:56:27 11:56:30

So -- but up until -- so the initial research was actually more web-based. We looked -- that was when Discogs and Allmusic guide -- actually Allmusic was probably first of the websites. So the initial research was actually undertaken by doing web research. There's also a number of, like, fan sites, band sites, that we -- that would identify people. So we began the research by that. 11:56:34 11:56:39 11:56:43 11:56:47 11:56:49 11:56:51 11:56:52 11:56:58 11:57:01 11:57:03

We also -- and at that point in the early days before, say, between 1999 -- and really the research didn't really start until 2000, but between 2000 and, I would say 2000 -- maybe '8, the majority of the top recordings that were 11:57:07 11:57:10 11:57:13 11:57:16 11:57:19 11:57:27

researching were also union recordings. 11:57:30
So there was a great deal of work at that 11:57:32
time contacting the local unions, Local 11:57:34
47, Local 257, Local 802, and to a lesser 11:57:37
degree, the local in Miami because of the 11:57:42
Latin market and some in Chicago. But 11:57:46
most of the recordings were Local 47 in 11:57:49
Los Angeles, 802 New York, and 257 in 11:57:51
Nashville, contacting those locals to 11:57:54
obtain the B report form, either 11:57:58
information or copies of them. In the 11:58:03
early stages of it, Jo-Anne -- 11:58:04
BY MR. THOMAS: 11:58:08
Q. Why did you do that? Why was 11:58:08
that a component of the research process 11:58:12
contacting the locals and obtaining the B 11:58:15
reports? 11:58:17
A. Well, because obviously as you 11:58:20
showed earlier, there is a number of 11:58:22
session reports that include musicians on 11:58:24
them. The web -- we never wanted to look 11:58:26
up one source as the end-all and be-all. 11:58:29
So oftentimes, the -- there would be 11:58:32
either incomplete information or 11:58:35
information we weren't sure of on a 11:58:37

website, especially in the earlier days so we'd want to verify that. 11:58:40 11:58:42

Oftentimes initially, the web search -- research was sort of the starting point, and we wanted sort of at least a two-step verification process to have as much corroboration as possible that these are actually the right performers on a recording. 11:58:44 11:58:46 11:58:47 11:58:50 11:58:52 11:58:55 11:58:56

Q. I'm sorry. Go ahead. 11:58:59
A. If I can finish my answer. 11:59:00
Q. Please. I'm sorry. 11:59:01
A. Okay. So what we'd like to do is we'd like to one have at least a two-step and sometimes a three-step verification process because we -- we want to make sure that by doing as many verifications as possible, that we are actually identifying the correct performers. 11:59:03 11:59:04 11:59:08 11:59:10 11:59:24 11:59:27 11:59:29 11:59:31

So for example, just because someone is on a union contract doesn't mean that they are ultimately the performer on that sound recording. We have numerous situations where a producer 11:59:32 11:59:34 11:59:37 11:59:38 11:59:42

will maybe record a half a dozen, eight or ten guitar players looking for the ultimate guitar solo. They're going to hire all those people to play on a session. Those people are all going to be an session reports, but that doesn't mean that they're the person who played on the recording. 11:59:45 11:59:50 11:59:52 11:59:55 11:59:57 11:59:59 12:00:01 12:00:03

So we have to try to find out -- oftentimes the websites are actually the better source of who was the ultimate person who played on that. So sometimes we'll have the session report, we look at those, but we also have to go then back to websites, you know, or contact the producers directly to find out of these, you know, dozen or so guitar players who actually played the solo, who's solo is on this record, who are the people that we're hearing. The notion of -- of neighboring rights, equitable remuneration is always that we're compensating the performers that have made an audible contribution to a recording. 12:00:04 12:00:05 12:00:08 12:00:09 12:00:11 12:00:14 12:00:17 12:00:19 12:00:21 12:00:24 12:00:27 12:00:29 12:00:33 12:00:36 12:00:39 12:00:42

So oftentimes people play on 12:00:43

sessions, but those performances no longer -- they don't make the cut. Sometimes they're -- they're taken out of the mix. Somebody decides, you know what? We really didn't like the orange section, the orange are too much on this recording so we'd take them out. 12:00:45 12:00:48 12:00:49 12:00:51 12:00:54 12:00:56 12:00:59

So we want to try to find as many places. So we would need a copy of the session reports to verify that what we saw on the website was correct. Also, oftentimes the websites were -- would have information about the key players. You'd see the drummer and the base player and guitar player and the rhythm section noted, maybe a soloist but not necessarily the string section. So we'd want to try to find out who was on that or a website might say, National String Machine, but not list the players. So we would want to find out who was on that. 12:01:00 12:01:04 12:01:06 12:01:06 12:01:11 12:01:14 12:01:18 12:01:20 12:01:23 12:01:27 12:01:29 12:01:32 12:01:35 12:01:38

So in the early days, especially since there was a lot of session work from Los Angeles, Jo-Anne and ultimately other people we hired would actually go to the 12:01:41 12:01:42 12:01:45 12:01:47

local and make copies of the contracts which we did for quite some time. I don't remember the first year that we actually started to establish links with the locals, but as most locals began to digitize their contracts, create a database, the fund undertook a project which -- so where we would put a server, the funds own server would be at the local. We did this at 802 and 47, and we would actually then access their database. So we would pull their -- their information across, so we would access the local's information. But basically the idea was to get as much data from whatever source. 12:01:49 12:01:51 12:01:56 12:01:58 12:02:00 12:02:03 12:02:06 12:02:11 12:02:14 12:02:17 12:02:22 12:02:26 12:02:28 12:02:32 12:02:35 12:02:38

Q. Right. 12:02:39

A. And many instances we were actually able to -- and bear in mind some of these are older recordings so not necessarily new recordings. So some legacy recordings we would have to really try to find. And the local -- there had been at Local 47, there had been a flood and a fire so many contracts were lost. 12:02:40 12:02:42 12:02:45 12:02:48 12:02:50 12:02:52 12:03:06 12:03:09

In New York, for example, we had a lot of contracts that weren't in the system, but at the time, all through the '70s -- '70s and '80s, a very prominent contractor named Jesse Levy had kept every contract that he contracted. We were able to get copies of those. We actually had staff in New York box up Jesse's contracts and ship them home to us. 12:03:13 12:03:15 12:03:17 12:03:24 12:03:30 12:03:33 12:03:38 12:03:40 12:03:43

So we actually would try to find copies of contracts wherever we could. So locals were certainly a convenient source for more recent contracts, and oftentimes if they archived them, we had to go copy them. So it was basically a combination of cobbling together really the accurate information from as many sources as possible. No one source is really definitive. 12:03:45 12:03:47 12:03:50 12:03:53 12:03:59 12:04:03 12:04:05 12:04:08 12:04:10 12:04:12

Q. I understand that. So -- but it is true, is it not, that in some situations, the session reports will have more complete and more accurate information than you might find on, say, a website or the liner notes, right? 12:04:13 12:04:15 12:04:18 12:04:20 12:04:22 12:04:25

MS. McCONNELL: Objection, incomplete hypothetical, calls for speculation. 12:04:29 12:04:30 12:04:32

A. I would say in some cases that's true. 12:04:42 12:04:45

BY MR. THOMAS: 12:04:45

Q. And as I understand your testimony in some cases the converse is true, there may be more complete information somewhere else. But is it -- it is true, isn't it, that during this time period and thereafter, you considered the B forms and session reports to be at least a valuable source of information to aid the research function of the fund, right? 12:04:46 12:04:47 12:04:51 12:04:53 12:04:57 12:05:01 12:05:03 12:05:06 12:05:10 12:05:11

MS. McCONNELL: Objection, calls for speculation, vague and ambiguous. You can answer. 12:05:12 12:05:14 12:05:16

A. Certainly I would say, you know, a source of information, you know, and a convenient source of some information, but as I said, we really couldn't look at that as the only source. And we looked at -- I can say I looked at every source as 12:05:17 12:05:21 12:05:25 12:05:27 12:05:29 12:05:33

valuable. When we're looking at -- as the business has changed over the years, if you look at from 2008 to the present, we see the industry's changed tremendously. The advent of the urban market has basically set the industry up on its ears. 12:05:35 12:05:37 12:05:40 12:05:43 12:05:46 12:05:49

So what -- when I made the first distribution in say 2001, we had 90 -- 90 percent-plus union members, AFM and AFTRA members on that distribution. When I left in 2017 probably less than half were union members. So we saw the business change. So valuable -- I would say that every source of information is valuable to me. As we had to find more and more of the nonunion people, certainly the websites became only the source of information that was reliable that we could really count on to get every bit of information from. 12:05:52 12:05:55 12:06:00 12:06:07 12:06:08 12:06:14 12:06:15 12:06:16 12:06:19 12:06:22 12:06:26 12:06:28 12:06:30

And also we had to rely in -- more and more on the direct contact with producers, independent labels. So I don't want to say that one source is more valuable than the other. I want to say every piece of information we get is 12:06:33 12:06:35 12:06:37 12:06:42 12:06:45 12:06:48

valuable. 12:06:50

I can't stress enough the -- the Herculean task that the staff has to identify everybody who's on each of the recordings. It is a massive undertaking, and so one has to rely on every tool at your disposal to try to find the right people. 12:06:50 12:06:54 12:06:58 12:07:00 12:07:04 12:07:07 12:07:09

BY MR. THOMAS: 12:07:10

Q. Understood. 12:07:10

A. And as I said, you know, not -- not every source has -- has -- paints the whole picture. 12:07:11 12:07:14 12:07:17

Q. Okay. Just to turn briefly back to your testimony about the -- the operations of the fund in the early days when you were still at the Film Musicians Secondary Markets Fund offices, I believe you said that at some point the fund paid a fee to the Secondary Markets Fund for its allocated share for its operational costs; is that right? 12:07:18 12:07:23 12:07:28 12:07:30 12:07:32 12:07:36 12:07:43 12:07:47 12:07:50

A. We did. 12:07:51

Q. My question was when did the fund begin making those payments? 12:07:52 12:08:04

A. I don't have the exact date. Almost from the beginning. As soon as we had a distribution to make and as soon as we utilized some services, we would pay basically we'd allocate an actual cost. So if someone -- if we used one of the accounting staff to help us with a report and they spent two hours on it, we would allocate two hours of our time and that would be then charged back and the fund would pay -- pay the Film Musicians Secondary Markets Fund for whatever share that was. 12:08:13 12:08:14 12:08:17 12:08:19 12:08:24 12:08:28 12:08:31 12:08:34 12:08:36 12:08:39 12:08:41 12:08:44 12:08:46

Q. Okay. How was the -- how was that calculation made? 12:08:49 12:08:53

A. We would take the employees' hourly rate. 12:08:56 12:08:59

Q. And when you say "we," who was it you were doing -- I'm sorry -- who was the "we"? 12:09:02 12:09:04 12:09:07

A. Jo-Anne -- I was working with -- at that point we didn't have -- our chief controller -- our chief accountant for the Film Musicians Secondary Markets Fund. I would work with her on how to work out the 12:09:08 12:09:11 12:09:13 12:09:16 12:09:18

allocations. So we would also -- there's -- it's more complicated than that, though, because we would take not only the person's salary, generally, we would have some allocation of office space realizing there's other expenses so we would have any actual expense, any -- what would it be, you know, sort of an actual cost of that person's time. So let's say -- and it was very minimal in the beginning. We did everything, almost the first couple of years, Jo-Anne McGettrick and myself did almost everything there was to do without engaging anybody else. And as we began to engage other people, there was a fairly complicated formula that we began to devise about -- we'd take the percentage of that person's office space, how much office space they occupied as a factor of the overall office space of the building or of the -- of our suite of offices. 12:09:20 12:09:23 12:09:25 12:09:26 12:09:28 12:09:32 12:09:34 12:09:38 12:09:40 12:09:44 12:09:46 12:09:48 12:09:52 12:09:55 12:09:57 12:10:00 12:10:02 12:10:04 12:10:06 12:10:09 12:10:12

We would try to allocate a certain percentage of, you know, utility costs and all that. So the accountant helped me put together a formula for that, 12:10:16 12:10:18 12:10:20 12:10:23

and that's how we applied the allocation formulas. And at some point we just decided it would be easier to begin to hire employees. So as we began to hire more employees -- and then --

Q. During -- during the time that you paid the allocated share --

A. So I wanted to finish by saying that -- so as we began to hire more employees, obviously we allocated less staff time, and then basically the allocation became just a factor of how much office space we were using to form the Film Musicians Secondary Markets Fund. So it would be --

Q. Understood. During the time period that you were paying this allocated share of operational costs, did you believe that to be a reasonable expense for the fund to occur?

A. Yes.

Q. And do you believe that that was an expense that was permissible under Section 114?

MS. McCONNELL: Objection, may

12:10:26 12:10:30 12:10:33 12:10:35 12:10:38 12:10:40 12:10:46 12:10:48 12:10:50 12:10:52 12:10:55 12:10:57 12:11:01 12:11:01 12:11:05 12:11:05 12:11:06 12:11:08 12:11:12 12:11:14 12:11:16 12:11:17 12:11:19 12:11:22 12:11:24

Trustees changed very seldomly so. There did not seem to be a need for it. 13:13:35 13:13:43

Q. Okay. Let me ask you a little bit about Patricia Polach who you mentioned earlier in your testimony. She attended the board meetings; is that right? 13:13:45 13:13:47 13:13:50 13:13:54 13:13:58

A. Sometimes. Sometimes remotely by phone. 13:13:59 13:14:01

Q. I was going to say frequently by telephone, right? 13:14:01 13:14:03

A. Correct. 13:14:04

Q. Almost always by telephone, right? 13:14:04 13:14:06

A. Unless we had a meeting in New York or Washington. 13:14:08 13:14:09

Q. Okay. So I take it occasionally you might have a meeting in New York or Washington depending on people's availability, but ordinarily your meetings were in L.A.; is that right? 13:14:11 13:14:14 13:14:16 13:14:18 13:14:20

A. That's correct. 13:14:22

Q. Okay. And Ms. Polach attended board meetings during your entire tenure as administrator to the extent you had 13:14:23 13:14:28 13:14:31

them in the early days, right? 13:14:35
A. Yes. 13:14:38
Q. And what was her role? 13:14:38
A. Patricia Polach was outside counsel to the fund and she was counsel to AFM and counsel to SAG-AFTRA. 13:14:46 13:14:48 13:14:54
Q. In attending the board meetings of the fund, did you understand that she was acting as outside counsel for the fund? 13:14:57 13:14:59 13:15:01 13:15:04
MS. McCONNELL: Objection, calls for a legal conclusion, potentially expert opinion. You can answer. 13:15:04 13:15:06 13:15:07
A. My personal feeling was that at times those roles were blurred quite a bit. I wasn't sure who she was representing sometimes, whether it was, SAG-AFTRA, the AFM or the fund. 13:15:13 13:15:17 13:15:20 13:15:22 13:15:27
BY MR. THOMAS: 13:15:34
Q. Did you -- how long had you known Patricia Polach? 13:15:34 13:15:37
A. 25 years or so, I guess. 13:15:48
Q. And were you aware during that entire time that Bredhoff and Kaiser represented the AFM? 13:15:49 13:15:58 13:16:02

service fee idea to the board, are you talking about a particular board meeting? 13:29:27 13:29:30
A. I'm sorry. I missed part of it because you were turned away from -- 13:29:32 13:29:34
Q. I'm sorry. When you said that Ms. Polach and Ray Hair and Duncan Crabtree-Ireland presented the service fee idea to the board of trustees, are you referring to a particular board meeting? 13:29:34 13:29:35 13:29:38 13:29:42 13:29:44
A. Yes. It was at a particular board meeting. I don't have that date handy, but it was -- yeah. 13:29:47 13:29:50 13:29:51
Q. Is that the date when it was voted on? 13:29:53 13:29:55
A. I believe it was the date that it was voted on. 13:29:55 13:29:57
Q. And when -- was that the first time you heard about it? 13:30:02 13:30:05
A. No. 13:30:06
Q. You -- you knew that it was under consideration for some time before that, right? 13:30:07 13:30:10 13:30:11
A. Not by the board of directors. 13:30:15
Q. Well, you understood that it was a concept that eventually was going to be 13:30:17 13:30:22

presented to the board of directors, right? 13:30:24 13:30:26

A. It was -- yes, it was presented to me. I got a call from Trish Polach saying that Ray and Duncan were interested in a service fee and that she would be working on a document that they would be presenting to the board of directors. 13:30:29 13:30:31 13:30:34 13:30:38 13:30:40 13:30:42

Q. When do -- when was that phone call, if you recall? 13:30:46 13:30:47

A. That started -- could have been a month or two before the board meeting. I don't recall the date. There were ongoing discussions that we had about that. The whole issue of a fee or a service fee went back quite some time. 13:30:49 13:30:52 13:30:54 13:30:56 13:30:58 13:31:01

Almost from the time that Ray became a trustee, he brought up several times to me -- and I know others, but I know to me several times -- that he felt it was unfair that the unions had invested a great deal of time and money and energy to help pass the copyright law and establish the fund, and that he felt that the fund had all these resources and 13:31:05 13:31:09 13:31:12 13:31:16 13:31:18 13:31:20 13:31:23 13:31:26 13:31:28

could, you know, hire additional staff and have resources for computers and all the stuff that we needed to do the work, the funding it needed to do, but yet the AFM was going through a lot of financial difficulties and didn't have the money to pay for a lot of things that he wanted to do, and he felt that it was unfair that the fund had all this money, and he felt that he should have some of it. 13:31:30 13:31:35 13:31:37 13:31:39 13:31:43 13:31:44 13:31:46 13:31:48 13:31:50 13:31:51

Q. Okay. Let me -- and during the discussions leading up to the board meeting where the service fee was presented and voted on, were you in favor of it or not? 13:31:53 13:32:00 13:32:02 13:32:04 13:32:09

A. No. 13:32:11

Q. You were not in favor of it? 13:32:11

A. I was not in favor of it. 13:32:15

Q. Did you feel it was warranted and justified? 13:32:16 13:32:19

A. I felt what was justified was that there should be some kind of a structure to reimburse the unions for what they had put into it. I suggested as much to Ray earlier. 13:32:23 13:32:27 13:32:30 13:32:32 13:32:35

We had a dinner party with some RMA officers, Ray Hair and Jennifer Garner. The topic came up of the amount of money the fund had and how much money the federation had spent. And I suggested to Ray at that time what would really be fair and equitable is that if we could actually identify how much money the unions had spent in support of the fund now that the fund was doing so well, would really make a lot of sense to me to basically compensate them for what they had done and reimburse them for their expenses. And Ray didn't take favorably to that proposal, shall we say. 13:32:36 13:32:39 13:32:42 13:32:45 13:32:47 13:32:49 13:32:52 13:32:56 13:32:58 13:33:02 13:33:04 13:33:06 13:33:10 13:33:12 13:33:17

Q. Okay. What did he say? 13:33:20

A. Do you want me to leave in the expletives or should I -- you know -- I -- there -- there was a few -- a few -- minced words and it would be upshot of what it was, that he would be goddammed if he was going to come to me with hat in hand to ask for any money. And I tried to tell him that that wasn't exactly what I was suggesting. 13:33:21 13:33:27 13:33:32 13:33:36 13:33:39 13:33:40 13:33:42 13:33:44 13:33:46

I was saying that if they could come up with a number that was a number we could justify that if we ever had to go to Congress, we could actually say that here was a number that was the unions had invested in this, and it was reimburse -- and reimburse them for their investment. I thought that would be a fair and equitable situation. 13:33:47 13:33:51 13:33:54 13:33:57 13:33:59 13:34:01 13:34:04 13:34:06 13:34:08

And that -- that was the last of that discussion, and the next time I heard about this was in a call from Trish Polach. 13:34:09 13:34:11 13:34:14 13:34:16

Q. And this was the call that you think took place one or two months before the trustees meeting where the service fee was voted on? 13:34:18 13:34:23 13:34:26 13:34:30

A. To the best of my recollection. 13:34:31

Q. Okay. Well, I just want to go back to tie up something before we keep moving down the road. You talked about the conversations you had with other trustees where you raised the possibility -- or -- where you raised your view that Patricia Polach had a conflict 13:34:33 13:34:35 13:34:37 13:34:39 13:34:41 13:34:43 13:34:46

of interest. And in your conversations with Jon Joyce and Bruce Bouton, did you specifically mention the service fee agreement or were your conversation -- your discussions more general? 13:34:50 13:34:51 13:34:54 13:34:56 13:34:58

A. I'm pretty sure I mentioned the service fee. 13:35:03 13:35:06

Q. Okay. So when do you recall was the first time that you spoke with Ray Hair about the idea of compensating the unions for data and other services the unions had been providing for free since the creation of the fund? 13:35:07 13:35:45 13:35:49 13:35:54 13:35:58 13:36:00

MS. McCONNELL: Objection, lacks foundation. You can answer. 13:36:05 13:36:06

A. The first supplement -- we may have had a discussion about it before the dinner meeting that I mentioned previously, but the big discussion was clearly at that dinner meeting. I may have mentioned it to him once or twice before that. You know, because he brought it up several times that he was unhappy about how much money the fund was bringing in and that they didn't have the resources 13:36:11 13:36:24 13:36:26 13:36:28 13:36:32 13:36:34 13:36:36 13:36:39 13:36:41 13:36:43

that we did. And I'm sure I mentioned it a couple of times, but probably the dinner meeting was the first time I really sat down and said let's really try to work this out.

BY MR. THOMAS:

Q. Did he express to you that he felt that just because the unions had been providing data and other services for free didn't mean that they should always have to provide them for free or words to that effect?

A. No.

Q. Okay. When was the dinner meeting they're referring to?

A. I don't remember the date. Obviously before the service fee, but not too long after Ray became -- after he became the trustee when he won the election and became a trustee. It was -- I would think sometime in the first maybe -- a year after that time.

Q. So he became the -- a trustee in what year, in 2010?

A. I believe so. I would have to

13:36:46
13:36:49
13:36:51
13:36:54
13:36:56
13:36:56
13:36:56
13:36:58
13:37:02
13:37:08
13:37:10
13:37:13
13:37:14
13:37:15
13:37:17
13:37:22
13:37:24
13:37:27
13:37:30
13:37:34
13:37:37
13:37:39
13:37:43
13:37:49
13:37:53

look back. I don't remember the exact year now. Tom Lee had been the -- 13:37:56 13:37:58

Q. Tom Lee had been the -- 13:38:06

A. The president before him. Tom lost the election to Ray, and Ray became a trustee by virtue of his office. 13:38:08 13:38:10 13:38:14

Q. Right. What can you tell me about the dinner meeting? Where did it take place, do you remember? 13:38:16 13:38:24 13:38:26

A. Yes. At Mark Sazer's home. Mark was by that time RMA president. 13:38:27 13:38:32

Q. And who was in attendance at the dinner that you recall? 13:38:38 13:38:41

A. Ray Hair, Jennifer Garner, Mark Sazer, Pete Anthony who was actually president of the L.A. chapter of RMA at that point and a couple of other board members. I don't remember the board members who were there now, possibly Raphael Rishig who had been there -- 13:38:49 13:38:53 13:38:54 13:38:56 13:39:01 13:39:03 13:39:16

Q. Who is he? 13:39:21

A. I believe -- Raphael's a violinist and he was either there as a friend of Mark Sazer's or he was an active RMA member, or he may have been on the 13:39:23 13:39:28 13:39:30 13:39:33

board of directors at that time. 13:39:35

Possibly Jay Rosen might have been another board member there at the time, another violinist who has since become an employee of the AFM SAG-AFTRA fund in the research department. He may have been there. I'm not a hundred percent sure of Jay being there or not, but he was on the board at that same time. 13:39:39 13:39:42 13:39:45 13:39:48 13:39:55 13:39:56 13:39:58 13:40:08

Q. Do you recall any discussion of the -- this -- a service fee being paid from the fund to the unions that would take the form of a percentage during this dinner meeting? 13:40:21 13:40:26 13:40:30 13:40:31 13:40:34

A. I don't think we specifically got to a percentage. I don't believe Ray said anything about a percentage at that time. He just said he wasn't going to take a reimbursement -- wasn't going to take a one-time fee. He didn't think that was fair, but I don't believe -- 13:40:38 13:40:39 13:40:49 13:40:51 13:40:55 13:40:58 13:41:01

Q. Is that what you had proposed, which was a one-time reimbursement for services rendered? 13:41:03 13:41:05 13:41:09

A. I proposed that to Ray at that 13:41:10

time. 13:41:12

Q. Uh-huh. 13:41:13

A. That's not a proposal I ever made to the board of directors. 13:41:15 13:41:16

Q. Understood. All right. 13:41:17

A. You know, I should say there have been -- to be fair, Ray wasn't the first person to bring up the issue of a fee. When Tom Lee was president of the union, he himself had brought up the idea that he felt there should be some kind of -- of a work dues or a fee paid out of the fund. But at that point, Trish Polach told him that that was -- would not be legal in her opinion. 13:41:22 13:41:24 13:41:27 13:41:29 13:41:33 13:41:36 13:41:38 13:41:42 13:41:45 13:41:49

Q. How do you know that? 13:41:51

A. Because I was present when she told him that. 13:41:53 13:41:55

Q. Do you recall when this conversation took place? 13:41:56 13:41:57

A. I believe that was actually at a board meeting when Tom was on the board. I don't remember -- I don't have the day. I could look back over the records and come up with an idea of the date at some 13:42:00 13:42:02 13:42:06 13:42:08 13:42:09

point, but I don't know the exact date. 13:42:12
This would have probably been 2007, 13:42:14
someplace, 2007, 2008. 13:42:17
It was fairly early on in 13:42:20
Tom's -- when Tom was on the -- was the 13:42:21
trustee. So roughly. I'm sorry I can't 13:42:24
give you more specific dates. It was a 13:42:28
while ago, you know, we're kind of going 13:42:31
back in time here a bit. 13:42:34
Q. Prior to the meeting where the 13:42:37
service fee was voted on by the trustees, 13:43:25
did you have any conversations with Duncan 13:43:27
Crabtree-Ireland about the idea of a 13:43:30
service fee or compensation being paid to 13:43:34
the unions for data and other services? 13:43:36
A. I'm sorry, the last part of your 13:43:42
question trailed off. I couldn't hear 13:43:44
that. 13:43:45
Q. I'm sorry. Did -- prior to the 13:43:46
meeting where the service fee was 13:43:48
presented to the board of trustees, did 13:43:51
you have any conversations with Duncan 13:43:53
Crabtree-Ireland about the concept of a 13:43:55
service fee or compensation paid to the 13:43:58
unions for data and other services? 13:43:59

A. I don't recall any. 13:44:03

Q. Did you ever convey to either Ray Hair or Duncan Crabtree-Ireland that you thought it was unjustified to pay any form of ongoing service fee to the unions? 13:44:26 13:44:29 13:44:32 13:44:35

A. I raised a number of points to the board. Not to him directly. We had some discussion on the board meeting where the service fees were voted on. I will say that before that, there were numbers -- different percentages that had been proposed. At one point I believe Trish said something like 10 percent, and I reacted pretty strongly to that, saying that would be far in excess of anything that would be sort of acceptable under our bilateral agreements. 13:44:40 13:44:52 13:44:55 13:44:58 13:45:02 13:45:05 13:45:07 13:45:10 13:45:11 13:45:15 13:45:19 13:45:21

That was modified to 5 percent at the board of directors meeting, and while I didn't speak directly to the issue whether it was going to be ongoing, it seemed to me it wasn't -- I didn't have a vote. I didn't get anything to decide. At that point it wasn't a matter that I felt that it was appropriate or fair that 13:45:23 13:45:26 13:45:29 13:45:32 13:45:35 13:45:38 13:45:40 13:45:43

they were going to do this, but what I wanted to do at that point at least was sort of mitigate the cost as much as I could and I had to point out to them that even -- if they were looking at something, you know of a higher percentage, they were looking at 1.5 percent and -- and, you know, I did point out to them that the -- the -- at 5 percent, we would be higher than the amount that we agreed to under different bilateral agreements. 13:45:45 13:45:47 13:45:50 13:45:52 13:45:55 13:45:58 13:46:01 13:46:07 13:46:13 13:46:16 13:46:20

The norm of the foreign societies have requirements in their EU law how much we can charge in administrative expenses, and our bilateral agreements had to be matched to theirs for collection of foreign royalties so. I did point out that to have a higher administrative fee would put us above the allowable amount. 13:46:21 13:46:23 13:46:26 13:46:31 13:46:33 13:46:36 13:46:38 13:46:42 13:46:45

And there may have been some -- I do remember an e-mail I might have written to Trish Polach at this at one point. I don't remember the exact e-mail, but I'm pretty sure that at one point, 13:46:46 13:46:48 13:46:50 13:46:52 13:46:54

there was some correspondence between Trish and myself, and possibly between Trish, Duncan, and myself leading up to the board meeting just about the service fee that they were going to propose. And I do know at that time, I raised issues about the size of the fee.

13:46:57 13:46:59 13:47:02 13:47:05 13:47:07 13:47:10 13:47:14

Q. Do you ever propose a percentage of what the fee should be?

13:47:17 13:47:24

A. I did suggest that the 5 percent was too high and somebody asked me on the board, possibly Duncan, I think, asked me well, what would be a percentage that would keep us at or below the threshold to not trigger a problem with the foreign CMOs. And I had said at that point, I believe 3 percent would keep us at the threshold at or below that point.

13:47:29 13:47:33 13:47:36 13:47:41 13:47:43 13:47:47 13:47:50 13:47:54 13:47:56

Q. And what was the nature of the agreement -- the bilateral agreements with the foreign CMOs that you're referring to that would have limited the amount of the fee? Was it a provision that had to do with overall overhead expense?

13:48:00 13:48:04 13:48:06 13:48:10 13:48:12 13:48:14

A. Yes, generally speaking, each of

13:48:22

the bilateral agreements, whether -- 13:48:24
they'll have some provisions that are 13:48:27
different. Almost all of them have 13:48:29
certain basically standard form agreements 13:48:31
that conform with either EU policy or, in 13:48:33
some cases, actual statute. 13:48:38
Most of those have provisions, 13:48:40
for example, that says you can't charge a 13:48:42
foreign performer a higher administrative 13:48:45
fee than you charge your own performers. 13:48:52
And many will have a limit in terms of 13:48:54
what the overall administrator's fees can 13:48:57
be. So they'll set a ceiling -- 13:49:00
oftentimes they'll have a clause that says 13:49:02
you can charge a higher fee, but it has to 13:49:04
be justified. You have to come back to 13:49:07
the foreign CMO and explain why it's going 13:49:09
to be higher and demonstrate like a, you 13:49:13
know, what costs lead to that. And the 13:49:15
notion of the higher fee would be somehow 13:49:23
documented and somehow that you were 13:49:26
incurring some costs that you hadn't 13:49:30
anticipated just something in the 13:49:33
administration of the agreements. 13:49:34
Q. So was your concern then that if 13:49:36

the fund began paying a 5 percent service fee to the unions that it would cause the overall expense ratio of the fund to climb so high that the fund would be in violation of these bilateral agreements; is that the concern? 13:49:40 13:49:45 13:49:48 13:49:50 13:49:52 13:49:54

A. That was one of my concerns. 13:49:56

Q. Well, let me just ask about that then. Do you remember at this time 2012/2013 what the expense ratio of the fund was? 13:49:58 13:50:01 13:50:03 13:50:06

A. I believe it was around 7 percent at that time. 13:50:08 13:50:11

Q. And isn't it true that the foreign collecting societies often had expense ratios that were much higher than 7 percent? 13:50:12 13:50:24 13:50:26 13:50:30

A. Ask me one more time. 13:50:32

Q. Wasn't it -- was it true that at that time, the foreign collecting organizations had expense ratios that were much higher than 7 percent? 13:50:33 13:50:35 13:50:36 13:50:39

A. Some did, but that also precluded them to -- some of them did have a higher fee than that, but that also made 13:50:44 13:50:46 13:50:52

A. Yes. 14:29:37
Q. Now it says "Dear Ray and Dennis, you each asked me earlier (Dennis on behalf of the AFM and SAG-AFTRA fund and Ray on behalf of AFM) to explore whether and how the AFM and SAG-AFTRA could enter into a service agreement with the Fund, pursuant to which the Fund would commence paying the unions for the data and services that the unions provide for the Fund's operation." 14:29:38 14:29:47 14:29:52 14:29:55 14:29:59 14:30:05 14:30:08 14:30:15 14:30:18 14:30:20
Do you see that? 14:30:22
A. Yes, I do. 14:30:23
Q. Did you ask Ms. Polach to -- on behalf of the fund to look into whether and how the unions could enter into a service agreement with the fund? 14:30:24 14:30:28 14:30:31 14:30:34
A. No. 14:30:36
Q. You didn't ask her to do that? 14:30:36
A. No. 14:30:37
Q. Did you have any conversations with her about putting together an -- a draft agreement where the fund would pay the unions for data and services? 14:30:38 14:30:42 14:30:46 14:30:52
A. Yes. 14:30:55

Q. Did you understand that when she was preparing this agreement, she was acting as a lawyer for the fund? 14:30:55 14:31:06 14:31:08

A. I understand she was acting as a lawyer for the AFM, SAG-AFTRA and I guess the fund. 14:31:12 14:31:17 14:31:21

Q. Did you -- what was the basis of your understanding that she was acting as a lawyer for SAG-AFTRA in connection with preparing this agreement? 14:31:23 14:31:26 14:31:28 14:31:30

A. Because she was preparing agreement to have money paid to the unions from the fund. 14:31:32 14:31:34 14:31:38

I should say you asked me earlier, you know, I didn't quite get to finish the -- but no, I did not ask Trish to prepare this. She called me probably the day before I saw this e-mail and said that she really felt that they needed to basically -- I don't know how to put it -- she said we need to cover our ass. And we had these ongoing discussions, and I felt we should have had some sort of instruction to have -- to basically have those discussions and -- since there was 14:31:40 14:31:42 14:31:45 14:31:48 14:31:50 14:31:57 14:31:59 14:32:01 14:32:05 14:32:08 14:32:11 14:32:13

never an instruction to actually explore the activity, she wanted to put together this -- this e-mail basically to clean up the process. 14:32:20 14:32:22 14:32:24 14:32:29

Q. So were you surprised by the statement that you asked her and Ray asked her to look into whether and how the -- an agreement could be entered into? 14:32:35 14:32:37 14:32:41 14:32:45

A. No, because I had the discussion with her the night before or the day or two before where she said she was going to send me an e-mail. So I just frankly looked at it as shoddy workmanship, and she was going to clean up the mess after the fact and send me this e-mail to pretend to like we had this discussion or like I'd asked for something that I hadn't. 14:32:49 14:32:50 14:32:53 14:32:56 14:32:59 14:33:04 14:33:07 14:33:09 14:33:15 14:33:16

Q. Okay. Prior to receiving this -- your phone call with her the night before, did you know that a draft agreement was being worked on? 14:33:17 14:33:17 14:33:19 14:33:21

A. I knew there were discussions, and I believe I knew there was some activity on drafting an agreement. I'm 14:33:26 14:33:28 14:33:31

not a hundred percent sure of the timeline if there was already a draft of the agreement or if they were going to work on a draft. I'm not a hundred percent sure. 14:33:37 14:33:40 14:33:41 14:33:43

Q. At the time that you received this e-mail, did you have any understanding as to whether Ray Hair at AFM had asked Ms. Polach to look into the issue described in the e-mail? 14:34:15 14:34:16 14:34:17 14:34:21 14:34:23

A. Trish told me that he did. So, yes. And -- in reviewing the e-mail here I see that -- that Jenner & Block, your firm, had already prepared a first draft. So I don't believe I realized at that point that there actually had been a first draft until I saw this e-mail, but I knew there was a draft in the works just to be clear. 14:34:29 14:34:34 14:34:37 14:34:44 14:34:46 14:34:48 14:34:51 14:34:53 14:34:55

Q. And who did you understand was working on the draft? 14:34:55 14:34:57

A. Until I got this e-mail, I assumed it was Trish and possibly somebody from Bredhoff & Kaiser. I -- 14:34:58 14:34:59 14:35:04

Q. Did you -- 14:35:08

A. This was the first mention I had 14:35:08

concerned about this. 14:40:49

BY MR. THOMAS: 14:40:55

Q. And when you said you raised your concerns with counsel, who was that, was that Ms. Polach? 14:40:55 14:40:57 14:40:59

A. That was Ms. Polach. 14:41:00

Q. As counsel for the fund? 14:41:01

A. That was only counsel we had. She was counsel for the fund, counsel for the AFM, and counsel for SAG-AFTRA. 14:41:03 14:41:05 14:41:06

Q. Did you -- and what did you understand she was doing for SAG-AFTRA at this point? 14:41:11 14:41:12 14:41:15

A. I'm sorry. Can you repeat that? 14:41:15

Q. What did you understand she was doing for SAG-AFTRA at this point? 14:41:17 14:41:19

A. I know she had worked on the merger of SAG-AFTRA, and I didn't talk to her about her specific duties, but I know that she had mentioned to me several times that she was still counsel to SAG-AFTRA although she did say that -- that the most -- most -- she had been very -- 14:41:21 14:41:22 14:41:25 14:41:27 14:41:29 14:41:32 14:41:37

MR. THOMAS: I think he said most active, I believe. 14:41:51 14:41:52

thought the service fee was unjustified, right? 15:34:33 15:34:35

MS. McCONNELL: Objection, asked and answered, misstates prior testimony. 15:34:38 15:34:41 15:34:42

A. No, I did not tell them that. Some of the trustees already knew my feelings about it before. Others, probably the co-chairs in particular, it wouldn't have mattered what my opinion was. 15:34:48 15:34:50 15:34:53 15:34:54 15:34:58 15:35:00

BY MR. THOMAS: 15:35:01

Q. And at the meeting where the service fee was approved at this meeting, you didn't tell the trustees that -- that they should commission an outside consultant to study the actual incremental costs incurred by the unions to provide data to the fund? 15:35:01 15:35:10 15:35:12 15:35:15 15:35:20 15:35:22 15:35:25

A. I didn't. One would think that the unions should be able to tell me exactly what the real cost was. Why would they need an outside consultant to determine what their costs were? They know what -- how many hours per day 15:35:29 15:35:31 15:35:35 15:35:37 15:35:40 15:35:42

somebody would spend providing support to the fund. They would know what their hourly rates were. They would know what other expenses they incurred, so I don't know why an outside consultant would need to be engaged to do that. 15:35:45 15:35:47 15:35:50 15:35:53 15:35:55 15:35:57

Q. But you didn't tell the trustees that you thought the union should be required to provide that information in order to get paid a service fee? 15:35:58 15:36:00 15:36:01 15:36:03

MS. McCONNELL: Objection, misstates prior testimony, lacks foundation. 15:36:05 15:36:06 15:36:08

A. I did not tell them that. 15:36:10

BY MR. THOMAS: 15:36:11

Q. Do you recall any discussion prior to the June 2013 meeting with either Duncan or Ray in which there was a discussion that -- about whether it would be feasible or practical to try to measure the actual incremental costs incurred by the unions in providing data and services to the fund? 15:36:11 15:36:18 15:36:21 15:36:24 15:36:30 15:36:33 15:36:38 15:36:41

A. No. 15:36:42

MR. THOMAS: All right. Maybe 15:36:48

we should take, like, a five-minute comfort break. What do you think? 15:36:48 15:36:51

THE WITNESS: Sure. 15:36:54

MS. McCONNELL: Sounds good. 15:36:55

MR. THOMAS: Let's go off the record for maybe five minutes. 15:36:55 15:36:57

THE VIDEOGRAPHER: We're now going off the record. The time is 3:36. 15:36:58 15:36:59 15:37:01

(Whereupon, a brief recess is taken.) 15:48:43 15:48:49

THE VIDEOGRAPHER: We're now back on the record. The time is 3:50. 15:48:49 15:51:01

BY MR. THOMAS: 15:51:01

Q. Mr. Dreith, just returning briefly to the June 2013 board of trustees meeting, do you remember who voted on the issue of approving the service fee? 15:51:07 15:51:09 15:51:18 15:51:20

A. I didn't -- wasn't taking the minutes and I didn't keep track of the votes, but I believe either everybody voted in the affirmative or it might have been unanimous consent. 15:51:25 15:51:27 15:51:28 15:51:31 15:51:34

Q. Did anybody recuse themselves or abstain from the voting at the meeting? 15:51:36 15:51:39

A. No. 15:51:41

MR. THOMAS: Anna, if we could mark the next exhibit which would be tab 29. 15:51:45 15:51:49 15:51:51

(Exhibit 120, E-mail from Dennis Dreith to Board of Trustees, dated September 27, 2013, marked for identification.) 15:51:51 15:51:51 15:51:51 15:52:44

BY MR. THOMAS: 15:52:44

Q. Actually before we get to this, Mr. Dreith, do you remember that the Date of Purchase and Service Agreement was actually executed the following month in July of 2013? 15:52:37 15:52:39 15:52:45 15:52:47 15:52:50

A. I don't have a strong recollection of the date, but I will not dispute your -- what you're telling me. I believe that's -- if you say so, I'll accept it. 15:52:51 15:52:55 15:52:56 15:52:58 15:53:01

Q. And who signed on behalf of the fund? 15:53:01 15:53:04

A. On behalf of the fund you asked? 15:53:06

Q. Yes. 15:53:08

A. I'm sorry. Sometimes if you turn to the side, I -- I'm sorry, 15:53:09 15:53:10

information they provided about the fee. Is that basically right? 15:54:10 15:54:12

A. Basically. I'm not sure I'm a hundred percent correct on this one, but I believe this is the first audio-visual distribution. I do not believe it was the first distribution. I think there had been a regular sound recording distribution prior to this during which Ray and I had the argument about whether the fee should be disclosed. 15:54:15 15:54:19 15:54:22 15:54:23 15:54:25 15:54:26 15:54:29 15:54:30 15:54:32

Q. Oh, okay so you think there was a sound recording distribution in between July and September of -- of 2013? 15:54:36 15:54:38 15:54:40

A. Yeah, to the best of my recollection. It's a couple of years ago now so I'm trying to remember exactly, but I -- I assume -- my -- the best of my recollection is we had a service fee. We had a sound recording distribution during which Ray and I had certainly some disagreement over what should be included, and then there was the audio-visual distribution which was coming out. And I wrote this letter to the trustees, this 15:54:43 15:54:45 15:54:47 15:54:49 15:54:53 15:54:56 15:54:58 15:55:01 15:55:04 15:55:07 15:55:12

e-mail with the trustees. 15:55:14
Q. Okay. And you proposed three 15:55:16
different versions of the administrator's 15:55:22
letter for their consideration, right? 15:55:24
A. That is correct. 15:55:26
Q. And depending on how the 15:55:27
trustees voted, you were prepared to 15:55:31
accept any one of these versions to the 15:55:35
participants, right? 15:55:37
A. Correct. 15:55:38
Q. And versions 2 and 3 were the 15:55:38
ones that you favored; isn't that true? 15:55:49
A. Yeah, I think I -- it's safe to 15:56:13
say that I preferred two or three. You 15:56:15
know, I'm -- I mean, it should be obvious 15:56:19
from this. It's not -- I'm really trying 15:56:23
to -- to negotiate here. I'm trying to 15:56:26
find something that's acceptable to 15:56:28
everybody that would at least include a 15:56:30
mention of it. 15:56:33
It was -- you know, somewhat of 15:56:35
an aggressive action on my part I will say 15:56:38
because I had already been told not to do 15:56:40
it, but I was hoping that I could get 15:56:42
some -- something, you know, the trustee 15:56:45

to take some action. And we just, kind of, disclosed something to the participants. So I don't know that I would say that version 2 was preferable, you know, but was -- was really meant as a compromise. 15:56:48 15:56:52 15:56:53 15:56:55 15:57:00 15:57:03

Q. If you could turn to version 2, there, you just have to scroll down here. 15:57:04 15:57:15

MS. McCONNELL: Anna, is that the whole version 2 or is there more at the bottom? 15:57:33 15:57:35 15:57:37

MR. THOMAS: It should be two pages. 15:57:38 15:57:39

BY MR. THOMAS: 15:57:50

Q. So actually, let's -- let's go down to version 3. So in version 3 if you go to the very last page, in your unaudited financial summary, you break out the service fee, the $85,000 and show it separately from the other operating expenses of $317,600; is that correct? 15:57:50 15:57:58 15:58:08 15:58:22 15:58:24 15:58:30 15:58:32

A. Yes. 15:58:37

Q. And that's the service fee that would be applicable to this audio-visual distribution, right? 15:58:38 15:58:40 15:58:44

A. That is correct. 15:58:45
Q. And then on the preceding page 15:58:46
in the third full paragraph, about the 15:58:49
third sentence starts "In addition, it 15:59:03
bears mentioning" -- do you see that? 15:59:06
A. Yes. 15:59:10
Q. Can you please read that 15:59:13
sentence and the two that follow? 15:59:17
A. Okay. You're asking me to read 15:59:21
those? 15:59:23
Q. Yes, please. 15:59:23
A. In addition to bears mention -- 15:59:24
"In addition, it bears mentioning that 15:59:34
since the inception of the AFM and 15:59:37
SAG-AFTRA Fund, both the AFM and SAG-AFTRA 15:59:39
were responsible not only for the creation 15:59:42
of the Fund, but each union also invested 15:59:44
significant financial resources to bring 15:59:47
about the necessary changes in the U.S. 15:59:50
copyright legislation to make the fund a 15:59:52
reality. Throughout the entire time, the 15:59:55
unions free of charge have provided data 16:00:00
necessary to identify and pay entitled 16:00:03
performers." 16:00:05
Do you want me to continue or -- 16:00:06

Q. Just one more sentence. 16:00:07
A. Okay. "While in the early days of the fund's operation it was impossible to compensate the unions for their valuable service, the fund has now grown to the point where such compensation is not only possible, but highly warranted." 16:00:08 16:00:10 16:00:12 16:00:14 16:00:16 16:00:18
Q. Who wrote that language? 16:00:22
A. I believe I wrote that language, yes. 16:00:27 16:00:28
Q. Okay. And if the trustees had voted for this letter, that's the language that you would want to send out to the participants over your signature, right? 16:00:28 16:00:31 16:00:34 16:00:36
A. Yes. 16:00:38
Q. Now, if we take a look at version 2, look at the second page there, that one provides a number of operating -- a figure for the operating expenses of $402,700 approximately. So it -- it doesn't break out the service fee, but it includes it in the total amount of expenses; isn't that right? 16:00:38 16:00:45 16:00:54 16:00:58 16:01:00 16:01:08 16:01:10 16:01:12
A. That's correct. 16:01:14
Q. And, again, version 2, if you 16:01:14

look at the third paragraph on the first page, has the same language that you just read, right? 16:01:18 16:01:20 16:01:22

A. It looks to be the exact same language. 16:01:28 16:01:30

Q. And you were in favor of sending that version to the participants, right? 16:01:37 16:01:39

A. I was amenable to sending that version to the participants. 16:01:43 16:01:45

Q. Okay. And in your cover letter to the trustees -- excuse me, your cover e-mail to the trustees, you say "I am, however, concerned that the significant cost increase in expenses will raise some eyebrows from the membership or result in needless and unwarranted criticism about a completely justifiable expense." 16:01:47 16:02:01 16:02:03 16:02:11 16:02:14 16:02:19 16:02:22 16:02:25

The completely justifiable expense is the service fee, right? 16:02:34 16:02:35

A. Yes. 16:02:38

Q. And is it fair to say that your concern was not that the participants would never find out about the service fee, but that they would see the increase in cost and start asking questions and 16:02:40 16:02:48 16:02:54 16:02:57 16:02:59

maybe it would get criticized unfairly; isn't that right? 16:03:02 16:03:05

A. No, it's not correct. 16:03:05

Q. Did you assume at the time that this service fee would eventually be disclosed in the fund's financial statements and the participants would find out about it that way? 16:03:23 16:03:27 16:03:28 16:03:32 16:03:33

MS. McCONNELL: Objection, calls for speculation, vague and ambiguous. 16:03:36 16:03:37

A. I think it's more appropriate to say that my overarching concern was that people would look at a significant increase in the administrator expenses and wonder why we charged them so much more money and would think that somehow it was an expense that the fund was spending, basically we just increased -- they would wonder, you know, did salaries go up? Did we spend some money lavishly. I think people would look at the increase and say why was there such a substantial increase? That was my concern. 16:03:41 16:03:44 16:03:46 16:03:48 16:03:52 16:03:55 16:03:58 16:04:01 16:04:03 16:04:07 16:04:10 16:04:12 16:04:14

And I think it's also -- if you let me go on, yes, I wrote all of those 16:04:15 16:04:18

words. And I think that, you know, sometimes as administrator, you find the -- as I said, you pick which hills are ones to die on. If there's going to be an administrator fee, if it's going to go through, and I'm trying my very best to make peace especially with the AFM president, you know, but the co-chairs to some degree -- this caused a lot of bitter arguments with us. I really did not want a bad relationship for myself or the staff. I didn't want any staff members to be suffering for whatever arguments I might have.

And, you know, I was doing my best to put the best spin on it. Sometimes your job in these situations is to, you know, to -- to put the best spin on something we can, was my last phrase, and I was really just trying to do exactly that. You know, I'm not going to say that I -- and I also think at this point, by the way, the money hadn't escalated so far that we had -- we really had paid everybody back. So we could easily make

16:04:21 16:04:23 16:04:27 16:04:29 16:04:31 16:04:34 16:04:38 16:04:40 16:04:42 16:04:45 16:04:47 16:04:49 16:04:52 16:04:53 16:04:55 16:04:58 16:05:01 16:05:03 16:05:10 16:05:15 16:05:19 16:05:24 16:05:27 16:05:30 16:05:33

them -- make the statement that whatever the money we were paid at this point in time really had not reimbursed the unions for the cost of establishing a fund or lobbying activities up to this point. 16:05:35 16:05:37 16:05:40 16:05:44 16:05:49

BY MR. THOMAS: 16:05:49

Q. We talked about administrator letters this morning. I assume you're not -- your testimony is not that in this letter you decided to misinform or mislead or lie to the participants? 16:05:58 16:05:59 16:06:01 16:06:03 16:06:10

MS. McCONNELL: Objection, argumentative, vague and ambiguous. 16:06:14 16:06:14

A. I'm sorry. Was this a question? I didn't -- I didn't quite understand. 16:06:18 16:06:19

BY MR. THOMAS: 16:06:21

Q. Yes, that was a question. 16:06:21

A. Could you ask me again? Could you repeat the question? 16:06:23 16:06:28

Q. I assume it was not your intention in this letter to misinform or mislead or lie to the fund participants; isn't that right? 16:06:30 16:06:32 16:06:34 16:06:38

MS. McCONNELL: Objection, argumentative, vague and ambiguous. 16:06:39 16:06:40

MS. McCONNELL: Sorry, 16:14:29
Mr. Thomas -- 16:14:30
A. Let me read the whole thing. 16:14:32
It's a long e-mail. Sorry. Okay. Yeah 16:14:40
I'm done with it, yes. 16:14:48
Q. So just to make sure I have the 16:15:03
gist of this right, there was an issue 16:15:06
that arose because of your transition 16:15:08
moving from the Film Musicians Secondary 16:15:10
Market Fund to the fund that several 16:15:14
months went by without you getting paid; 16:15:17
is that correct? 16:15:20
A. That's correct. 16:15:21
Q. And you made a proposal that 16:15:21
you'd be paid until everything got sorted 16:15:28
out, $12,000 a month retroactive to the 16:15:32
point where you were removed? 16:15:36
A. Yes, I believe -- 16:15:39
(Crosstalk.) 16:15:39
Q. How did you come up with the 16:16:06
proposal of $12,000 a month? 16:16:07
A. I don't recall. 16:16:12
Q. You felt it was a reasonable 16:16:13
proposal? 16:16:30
A. I looked at the -- I don't know 16:16:31

what the numbers were from honestly. At the time, there must have been some rationale for the number. I just -- I wouldn't have proposed it if I didn't feel there was a rationale to the number and -- but looking at it right now, I'm sorry, I just don't recall. 16:16:32 16:16:33 16:16:35 16:16:39 16:16:41 16:16:44 16:16:47

Q. Well, during this time, you were essentially working more or less full-time at the Fund; is that right? 16:16:47 16:16:59 16:17:01

A. Yes I think it was safe to say I was actually holding down two full-time jobs at this point. 16:17:06 16:17:09 16:17:12

Q. And that's because the Secondary Markets Fund hadn't found a replacement for you yet; is that right? 16:17:14 16:17:17 16:17:19

A. That's correct. 16:17:20

Q. Okay. And the $12,000 figure that you came up with was not based on your actual out-of-pocket costs for providing services to the fund, right, like gas costs and commuting costs and mileage, right? 16:17:20 16:17:23 16:17:25 16:17:31 16:17:33 16:17:36

A. I wasn't aware that an administrator had an out-of-pocket cost. 16:17:37 16:17:39

I mean, a salary is not an out-of-pocket cost. So, no, this would be to compensate me for time spent. 16:17:41 16:17:45 16:17:48

Q. And you believe that that was a -- a fair value -- a fair compensation for the services you were provided to the fund, even though it wasn't based on the incremental cost for you to be getting up and going to work every day, right? 16:17:50 16:17:55 16:18:06 16:18:08 16:18:10 16:18:13

MS. McCONNELL: Objection, misstates prior testimony, vague and ambiguous. 16:18:14 16:18:15 16:18:23

THE WITNESS: Okay. 16:18:25

A. Looking at it now, I would say it looks like a fair and reasonable cost to compensate someone. I don't -- I'm not aware of any salary offered to anybody that's an out-of-pocket cost. It's a salary. It's the way you get paid for the hours you put in. I'm assuming that lawyers don't charge only for out-of-pocket costs. 16:18:26 16:18:28 16:18:30 16:18:34 16:18:36 16:18:39 16:18:42 16:18:43 16:18:45

BY MR. THOMAS: 16:18:45

Q. That's true. Sometimes people charge based on a percentage of some other 16:18:48 16:18:50

MR. THOMAS: And, Anna, if you could scroll down to page 12. 16:22:12 16:22:19

BY MR. THOMAS: 16:22:19

Q. And under note five related party transactions, the fourth paragraph that begins on July 22, 2013. Could you just read that to yourself, please, and let me know when you're done? 16:22:29 16:22:32 16:22:34 16:22:38 16:22:40

A. Okay: I don't think that it cuts off before -- 16:22:41 16:23:08

Q. You're going to need to scroll -- when you're ready, we can scroll to the next page. 16:23:08 16:23:10 16:23:13

A. Okay. Yes, I'm done. 16:23:14

Q. Do -- the description you just read, do you find that to be an accurate description of the services fee? 16:23:24 16:23:27 16:23:29

MS. McCONNELL: Objection, vague and ambiguous, calls for a legal conclusion and expert opinion. Go ahead. 16:23:31 16:23:33 16:23:34 16:23:37

A. It's -- attracts the language of the service fee agreement. 16:23:39 16:23:44

BY MR. THOMAS: 16:23:46

Q. Do you find -- do you -- is 16:23:46

there anything about it you think is misleading? 16:23:52 16:23:54

MS. McCONNELL: Objection, calls for a legal conclusion; vague and ambiguous. 16:23:56 16:23:58 16:24:01

A. Like I said, it restates what's in the service agreement. It inflates the -- you know, it puts it in the -- in the finest plate possible on the language. Let me put it that way. 16:24:10 16:24:13 16:24:16 16:24:18 16:24:25

BY MR. THOMAS: 16:24:27

Q. Did you have any role in the coming up with this language? 16:24:27 16:24:33

A. No. 16:24:34

Q. Okay. Is this -- do you know who did? 16:24:34 16:24:35

A. I would -- I believe the auditors basically took the language out of the service fee agreement. 16:24:36 16:24:37 16:24:42

Q. Did you ever -- and who are the auditors at this point? This is the 2015 annual report. That was Miller Kaplan, right? 16:24:44 16:24:46 16:24:50 16:24:51

A. Yes, I believe Jeff Goss would have taken that and -- 16:24:51 16:24:54

Q. Did you ever tell Miller Kaplan, Jeff Goss, or anyone else that you thought this description was inaccurate or misleading? 16:24:55 16:24:59 16:25:01 16:25:03

A. I know that Jeff Goss and I had some discussions about the service fee in general over -- over the time especially in terms of how it would be disclosed. I think we made note of the fact that this put the service fee in a -- in the best light that it could be put in. I think it was part of the goal here for the -- that he wanted to be able to do that, to please the trustees and not -- but not mislead anybody. 16:25:03 16:25:11 16:25:14 16:25:16 16:25:18 16:25:20 16:25:23 16:25:25 16:25:28 16:25:30 16:25:33

So I think it's -- I am only -- I'm speculating on why Jeff put these words in exactly. I'm thinking he took it out of the -- looked at the agreement and basically just copied those words across and put them in the agreement. 16:25:33 16:25:36 16:25:41 16:25:43 16:25:45 16:25:48

Q. Okay. My question was did you ever tell Mr. Goss or anyone at Miller Kaplan that you thought this description of the service fee was inaccurate or 16:25:49 16:25:50 16:25:54 16:25:56

analyze it. But it does say that, you know the fund would be allowed to cover, you know, the costs of doing business. It didn't say that we should be negotiating a value of something. It talks about what the cost of something is. 16:55:54 16:55:57 16:56:00 16:56:03 16:56:06 16:56:08

Q. In other situations where the fund incurred operational expenses, did you think it was necessary to examine the underlying costs of providing those services to the fund? 16:56:09 16:56:24 16:56:30 16:56:31 16:56:34

A. Can you ask about a specific -- 16:56:40

Q. For example, when you paid your electric bill, did you just pay it if it seemed like a reasonable electric bill or did you go ask the power company to justify how much it really cost to deliver the power to the fund? 16:56:42 16:56:44 16:56:47 16:56:49 16:56:53 16:56:54

MS. McCONNELL: Objection, incomplete hypothetical, vague and ambiguous. 16:56:56 16:56:57 16:56:59

A. I think that that would be rather difficult to do. We know that we get a charge from the utility company. We know that the charge from that utility 16:57:00 16:57:02 16:57:04 16:57:07

company involves a certain profit margin for -- for the shareholders. It involves the cost of equipment and salaries and all those kind of things that are there. So that's the cost -- that's the cost of that service. It's not necessarily the value. I may value having electricity, but I know that it cost me an X amount of dollars. 16:57:08 16:57:12 16:57:15 16:57:18 16:57:21 16:57:23 16:57:27 16:57:30

BY MR. THOMAS: 16:57:30

Q. Let's take another example then. 16:57:33

A. Okay. 16:57:36

Q. The fund sometimes obtains public record information from databases like Nexis Lexis [sic], right? 16:57:36 16:57:38 16:57:40

A. Yes. 16:57:42

Q. And the incremental cost for LexisNexis to e-mail material to you is probably a penny or something like that, but that's not what they charge; is it? 16:57:43 16:57:47 16:57:49 16:57:52

A. No. 16:57:55

MS. McCONNELL: Objection, incomplete hypothetical, vague and ambiguous. 16:57:55 16:57:56 16:57:58

A. You know, once again, you know, LexisNexis is a service. The fund can 16:58:02 16:58:04

items contained herein are of no value to the fund." 17:02:11 17:02:14

And you would agree, I assume, that just because something, the value of something is not readily quantifiable, that doesn't mean that it has no value, right? 17:02:17 17:02:19 17:02:23 17:02:26 17:02:29

MS. McCONNELL: Objection, vague and ambiguous. You can answer, Dennis. I don't think she heard you. 17:02:30 17:02:31 17:02:36

A. I would say it's because -- because you don't always ascertain a cost to something, it may still be of value. But as I said earlier, there's lots of things that are of value to the fund. It's valuable to the fund to access all the good fan websites, music fan websites, the -- all music dot -- AllMusic Guide, Discogs, all things that are there. All those things have value and convenience and some of them have a cost associated with it and some don't. 17:02:39 17:02:41 17:02:43 17:02:47 17:02:49 17:02:51 17:02:54 17:03:03 17:03:07 17:03:10 17:03:13 17:03:16

BY MR. THOMAS: 17:03:16

Q. Okay. Well, actually -- 17:03:19

MR. THOMAS: Anna, if you could 17:03:32

A. That's correct. 17:21:32

Q. When did you first announce that you were planning to retire or step down from the fund? 17:21:32 17:21:37 17:21:43

A. Sometime in -- around 2015. 17:21:45

Q. And what did you -- what did you tell people? What was the nature of your announcement? 17:21:48 17:21:56 17:21:58

A. First time I believe I mentioned it officially to Ray and Duncan. You know, I mentioned it casually in casual conversations. Around 2015, I began to mention to them that I thought it would be really good for the fund to start to think of a successor for me, that I was not getting any younger and my goals were to at some point spend more time sailing my boat, managing a winery and going back to playing jazz until the money ran out. 17:22:00 17:22:04 17:22:08 17:22:11 17:22:13 17:22:15 17:22:18 17:22:21 17:22:24 17:22:28 17:22:32

So I did feel and I mentioned to him on a number of occasions that it was really just time to think of a transition, and it was not a rush, but I wanted him to be -- start moving in that direction. 17:22:47 17:22:49 17:22:51 17:22:53 17:22:57

Q. Did you at some point make an 17:23:00

the best thing to do was to hire a forensic accountant to look into a number of matters. They were going to bring an employment lawyer in, and at the same time the forensic accountant came in to look at a whole host of things. 17:36:48 17:36:50 17:36:52 17:36:54 17:36:56 17:36:59

I really didn't know the scope of it all. I knew was that there would be a fairly broad based audit, and I was asked to cooperate with the forensic auditor which we did. I -- I think the auditor would say that we provided excellent support. We tried to meet all of her requests, or their requests as timely as possible. I instructed everybody in our staff to -- to be as responsive as they possibly could with them, to move this process along. 17:37:00 17:37:02 17:37:05 17:37:08 17:37:11 17:37:14 17:37:16 17:37:21 17:37:23 17:37:25 17:37:28 17:37:31

Q. Ultimately the report was critical of you; wasn't it? 17:37:39 17:37:41

A. No. 17:37:45

MS. McCONNELL: Objection, lacks foundation. 17:37:45 17:37:49

A. No, that's not correct. Ultimately by almost happenstance, the 17:37:49 17:37:54

auditors found that my former assistant who had been promoted to the office manager status so was no longer my assistant had been falsifying purchase orders and embezzling small amounts of money over a period of time. And so that's what was uncovered in the forensic audit. That was the only thing that was stated. 17:37:58 17:38:02 17:38:04 17:38:08 17:38:12 17:38:15 17:38:21 17:38:24 17:38:26

The auditors themselves stated to me that they -- would have been no way for me to know this, that they didn't feel I would be held responsible or at fault in any way for this. And when I found out about that, I placed that person on administrative leave, and as soon as I was presented with what I considered irrefutable evidence, I terminated her. 17:38:26 17:38:28 17:38:30 17:38:33 17:38:36 17:38:38 17:38:40 17:38:44 17:38:47

BY MR. THOMAS: 17:38:53

Q. Isn't it -- go ahead. Finish your answer. I'm sorry. 17:38:53 17:38:54

A. That's -- I can pick up more later. 17:38:55 17:38:58

Q. Well, isn't it true that the -- this is Bond Beebe, right, the forensic 17:38:59 17:39:02

CERTIFICATION

I, BELLE VIVIENNE, a Nationally Certified Realtime Reporter, do hereby certify:

That the witness whose testimony as herein set forth, was duly sworn by me; and that the within transcript is a true record of the testimony given by said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 18th day of February 2021.

Belle Vivienne

BELLE VIVIENNE, CRR, CCR, RPR

# AGREEMENT AND DECLARATION OF TRUST

**AFM and SAG-AFTRA**
**Intellectual Property Rights Distribution Fund**

**Established**
**September 16, 1998**

**Amended and Restated**
**July 26, 2012**

THIS AGREEMENT AND DECLARATION OF TRUST is made and entered into as of the 16th day of September, 1998, and is amended and restated as of July 26, 2012, in the City of New York, State of New York, by and between the American Federation of Musicians of the United States and Canada, AFL-CIO-CLC ("AFM") and the Screen Actors Guild - American Federation of Television and Radio Artists ("SAG-AFTRA"), hereinafter jointly known as the Unions.

**Preamble**

WHEREAS, this Agreement and Declaration of Trust was originally established as of the 16th day of September, 1998, in the City of New York, State of New York, by and between the AFM and the American Federation of Television and Radio Artists ("AFTRA"); and

WHEREAS AFTRA merged with the Screen Actors Guild ("SAG") effective March 2012, and the merged unions are now constituted as SAG-AFTRA; and

WHEREAS, the Trustees now desire to amend and restate the Agreement and Declaration of Trust to reflect the merger of AFTRA into the merged union SAG-AFTRA, as well as to incorporate other amendments that the Trustees have made from time to time; and

WHEREAS, the Unions or their designated entities obtain and distribute to artists royalties and remuneration that are created by U.S. or foreign law and that are appropriate for collective administration; and

WHEREAS, the Unions have entered into a Reciprocal Agreement and an Annex for the Distribution of Record Rental Royalties Collected in Japan, pursuant to which they will receive and distribute record rental remuneration payable to non-featured instrumentalists and vocalists under the law of Japan; and

WHEREAS, the Unions have entered into other such agreements for the receipt and distribution of royalties or remuneration for the benefit of their members and other performing artists in the United States and Canada, and will continue to enter into such agreements; and

WHEREAS, to accomplish this purpose the Unions established a trust fund known as the AFM and AFTRA Intellectual Property Rights Distribution Fund for receiving and

Exhibit
DEFS112
2/11/2021
Dreith

**EXHIBIT A**
**PLAINTIFFS' SECOND AMENDED COMPLAINT**

distributing royalties and remuneration; and

WHEREAS, the trust fund formerly known as the AFM and AFTRA Intellectual Property Rights Distribution Fund shall now be known as the AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund; and

WHEREAS, the Unions desire to restate the terms and conditions under which the said Fund is to be established and administered;

NOW, THEREFORE, in consideration of the premises, it is mutually understood and agreed as follows:

**Article I**
**Definitions**

*Section 1.* UNIONS. The term "Unions" as used herein shall mean the American Federation of the Musicians of the United States and Canada, AFL-CIO-CLC, and the Screen Actors' Guild – American Federation of Television and Radio Artists.

*Section 2.* AFM. The term "AFM" as used herein shall mean the American Federation of Musicians of the United States and Canada, AFL-CIO-CLC.

*Section 3.* SAG-AFTRA. The term "SAG-AFTRA" as used herein shall mean the Screen Actors Guild – American Federation of Television and Radio Artists, or, prior to March 2012, the American Federation of Television and Radio Artists.

*Section 4.* AGREEMENT AND DECLARATION OF TRUST. The term "Agreement and Declaration of Trust" as used herein shall mean this instrument including any amendments hereto and modifications hereof.

*Section 5.* FUND. The term "Fund" as used herein shall mean the AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund.

*Section 6.* AGREEMENT FOR THE RECEIPT AND DISTRIBUTION OF REMUNERATION. The term "agreement for the receipt and distribution of remuneration" as used herein shall mean any agreement entered into by the AFM, SAG-AFTRA or the Unions with a collecting society, rights organization or other appropriate entity to receive royalties or remuneration held by that entity and to distribute such royalties and remuneration to eligible artists.

*Section 7.* ARTISTS. The term "artists" as used herein shall mean instrumental musicians and vocalists.

**Article II**
**Creation of Fund**

*Section 1.* ESTABLISHMENT OF FUND. The AFM and AFTRA Intellectual Property Rights Distribution Fund, which was established on September 16, 1998. is hereby amended and restated as the AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund, to be used for the

purpose set forth in this Agreement and Declaration of Trust.

*Section 2.* GENERAL PURPOSE. The Fund shall be a trust fund and shall be used for the purpose of receiving and distributing royalties or remuneration to artists in accordance with such agreements for receipt and distribution of remuneration as are entered into by the Unions with the relevant collecting societies, rights organizations or other appropriate entities. The Fund shall further provide the means for financing the expenses of the Trustees and the operation and administration of the Fund, in accordance with this Agreement and Declaration of Trust. The Fund is intended to satisfy the requirements of section 501(c)(6) of the Internal Revenue Code and shall be construed in all respects consistently with section 501(c)(6).

**Article III**
**Trustees**

*Section 1.* AFM AND SAG-AFTRA TRUSTEES. The operation and administration of the Fund shall be the joint responsibility of six Trustees, three appointed by the AFM, of which no fewer than one shall be a rank-and-file representative, and three appointed by SAG-AFTRA, of which no fewer than one shall be a rank-and-file representative.

*Section 2.* TERM OF TRUSTEES. Each Trustee shall continue to serve as such until his or her death, incapacity, resignation, or removal by the appointing Union. Each Union may remove or replace its Trustee at will.

*Section 3.* SUCCESSOR TRUSTEES. Each Union shall appoint its successor Trustees.

*Section 4.* FORM OF NOTIFICATION. In case any Trustee shall be removed, replaced, or succeeded, a statement in writing by the relevant Union shall be sufficient evidence of its action, when forwarded to the Fund and to the remaining Trustees. Any resignation shall be evidenced in writing and forwarded by registered mail to the Fund and the remaining Trustees, and shall not be effective for two months following the date of mailing unless a successor Trustee has been appointed.

**Article IV**
**Powers, Duties and Obligations of Trustees**

*Section 1.* PROPERTY AND ASSISTANCE. The Trustees are authorized and empowered to lease or purchase such premises, materials, supplies and equipment, and to hire, employ and retain such legal counsel, investment advisor, administrative, accounting, actuarial, clerical and other assistants or employees as in their discretion they may find necessary or appropriate in the performance of their duties.

*Section 2.* CONSTRUCTION OF AGREEMENT. The Trustees shall have power to construe the provisions of this Agreement and Declaration of Trust and the terms used herein, and any construction adopted by the Trustees in good faith shall be binding upon the AFM, SAG-AFTRA, and artists claiming benefits under the Fund.

*Section 3.* GENERAL POWERS. The Trustees are hereby empowered, in addition to other such powers as are set forth herein or conferred by law:

A. To establish and administer the Fund on behalf of artists who may be entitled to payments pursuant to agreements for the receipt and distribution of remuneration entered into by the AFM, SAG-AFTRA or the Unions and determined by the Trustees to be appropriate for administration by the Fund.

B. As to each agreement for the receipt and distribution of remuneration recommended by the AFM, SAG-AFTRA or the Unions, to decide whether or not to administer the agreement through the Fund.

C. As to each agreement for the receipt and distribution of remuneration which is to be administered through the Fund, to establish governing rules and procedures for the distribution that are consistent with the relevant agreement.

D. As to each agreement for the receipt and distribution of remuneration which is to be administered through the Fund, to pay all expenses necessary to the establishment, administration and operation of the agreement out of the receipts generated by the agreement.

E. To enter into any and all contracts and agreements for carrying out the terms of this Agreement and Declaration of Trust and for the administration of the Fund and do all acts as they, in their discretion, may deem necessary and advisable.

F. To compromise, settle, arbitrate, and release claims or demands in favor of or against the Fund or the Trustees on such terms and conditions as the Trustees may deem advisable.

G. To establish and accumulate as part of the Fund a reserve or reserves, adequate, in the opinion of the Trustees, to carry out the purposes of the Fund.

H. To pay out of the Fund all real and personal property taxes, income taxes and other taxes of any and all kinds levied or assessed under existing or future laws upon or in respect to the Fund or any money, property, or securities forming a part thereof.

I. To make appropriate allocations of common administrative expenses and disbursements shared or to be shared with any other Plan or Fund, or among the various agreements for the receipt and distribution of remuneration.

J. To receive contributions, payments, distributions or transfers from any source whatsoever to the extent permitted by law.

K. To establish advisory committees composed of AFM and SAG-AFTRA representatives and/or other artists or artists' representatives, and to set forth the duties and functions of the members of such advisory committees.

L. To do all acts, whether or not expressly authorized herein, which the Trustees may deem necessary or proper for the protection of the property held hereunder.

M. To establish such bank account or accounts as the Trustees deem necessary in their discretion, including escrow accounts pending the adoption of distribution rules governing the administration of an agreement for the receipt and distribution of remuneration.

N. To do all acts, whether or not expressly authorized herein, which the Trustees may deem necessary to accomplish the general objective of distributing remuneration to eligible artists in the most efficient and economical manner.

O. To purchase or obtain from the AFM, SAG-AFTRA, the AFM and Employers' Pension Fund, the AFTRA Health and Retirement Funds, the Phonograph Manufacturers' Special Payments Fund, the Motion Picture Special Payments Fund or any commercial source any data helpful for the identification and location of artists eligible for remuneration or the identification of recorded or other performances covered by an agreement for the receipt and distribution of remuneration.

P. To invest the assets of the Fund with care, skill, prudence and diligence under circumstances then prevailing that a prudent person, acting in a like capacity and familiar with such matters, would use in the conduct of an enterprise of a like character and with such aims, without regard to state law restrictions on investments.

*Section 4.* COMPENSATION. The Trustees shall not receive compensation for the performance of their duties.

*Section 5.* PERSONAL LIABILITY. Neither the Trustees nor any individual or successor Trustee shall be personally answerable or personally liable for any liabilities or debts of the Fund contracted by them as Trustees, or for the non-fulfillment of contracts, but the same shall be paid out of the Fund and the Fund is hereby charged with a first lien in favor of such Trustee for indemnification for any amounts paid out by any such Trustee for any such liability and for indemnification against any liability of any kind which the Trustees or any of them may incur hereunder; provided, however, that nothing herein shall exempt any Trustee from liability arising out of his own willful misconduct, bad faith or gross negligence, or entitle such Trustee to indemnification for any amounts paid or incurred as a result thereof.

The Trustees and each individual Trustee shall not be liable for any error of judgment or for any loss arising out of any act or omission in the execution of their duties so long as they act in good faith and without gross negligence; nor shall any Trustee, in the absence of his own willful misconduct, bad faith or gross negligence, be personally liable for the acts or omissions (whether performed at the request of the Trustees or not) of any other Trustee, or of any agent or attorney elected or appointed by or acting for the Trustees.

The Trustees shall be fully protected in acting upon any instrument, certificate, or paper believed by them to be genuine and to be signed or presented by the proper person or persons, and shall be under no duty to make any investigation or inquiry as to any statement contained in any such writing, but may accept the same as conclusive evidence of the truth and accuracy of the statements contained therein.

Neither the AFM nor SAG-AFTRA shall in any way be liable in any respect for any of the acts, omissions or obligations of the Trustees, individually or collectively.

The Trustees may from time to time consult with legal counsel and shall be fully protected in acting upon such advice of counsel to the Fund as respects legal questions.

*Section 6.* BOOKS OF ACCOUNT. The Trustees shall keep true and accurate books of account and records of all their transactions, which shall be audited at least annually by a certified public accountant selected by the Trustees. Such audits shall be available at all times for inspection by the AFM and SAG-AFTRA.

*Section 7.* EXECUTION OF DOCUMENTS. The Trustees may authorize and designate an employee or agent of the Fund to execute any notice or other instrument in writing.

*Section 8.* DEPOSIT AND WITHDRAWAL OF FUNDS. All moneys received by the Trustees hereunder shall be deposited by them in such bank or banks as the Trustees may designate for that purpose, and all withdrawals of moneys from such account or accounts shall be made only by checks signed by the Trustees, except that the Trustees may, in their discretion, designate and authorize an employee or agent of the Fund to sign checks upon such separate and specific bank account or bank accounts as the Trustees may designate and establish for such purpose.

*Section 9.* SURETY BONDS. The Trustees and any employees of the Trustees who are empowered and authorized to sign checks as aforesaid shall each be bonded by a duly authorized surety company in such amounts as may be determined from time to time by the Trustees. Each such employee employed by the Trustees who may be engaged in handling moneys of the Trust Fund shall also be bonded by a duly authorized surety company in the same manner. The cost of the premium on such bonds shall be paid out of the Fund.

**Article V**
**Selection of Remuneration Systems to Be Administered by the Fund**

*Section 1.* ACCEPTANCE FOR ADMINISTRATION THROUGH THE FUND. As to each agreement for the receipt and distribution of remuneration entered into by the AFM, SAG-AFTRA, or the Unions jointly, and referred by one of them to the Trustees for their consideration, the Trustees, in their sole discretion, may decide whether or not the agreement is appropriate for administration through the Fund. An agreement will be accepted for administration through the Fund only if the Trustees, voting in accordance with Article VII, Section 3, agree to accept it. The refusal of the AFM or SAG-AFTRA to accept an agreement for administration by the Fund shall not be subject to arbitration. The acceptance of an agreement for administration by the Fund shall be in writing.

*Section 2.* HOLDING MONEY PENDING ACCEPTANCE FOR ADMINISTRATION. The Fund may hold moneys received pursuant to an agreement for the receipt and distribution of remuneration in an escrow account pending the Trustees' decision whether to accept the agreement for administration through the Fund. If the Trustees refuse acceptance, the moneys will be returned with any interest accumulated thereon and minus any administrative costs incurred to the AFM, SAG-AFTRA or the Unions jointly in accordance with the agreement for the receipt and distribution of remuneration.

*Section 3.* CONTINUATION OF ADMINISTRATION. Once an agreement for the receipt and distribution of remuneration has been accepted for administration through the Fund, it shall continue to be administered through the Fund until such time as the Trustees, voting in accordance with Article VII, Section 3, agree that such administration is no longer appropriate. If the Trustees, voting in accordance with Article VII, Section 3, disagree over whether continued administration is appropriate, they will attempt to resolve their difference on the matter. If they cannot resolve their difference on the matter, they agree to submit the dispute to mediation administered by the American Arbitration Association. If mediation fails to resolve the dispute, the agreement for the receipt and distribution of remuneration shall be discontinued for administration through the Fund upon the vote of the Trustees for one Union, voting in accordance with Article VII, Section 3.

**Article VI**
**Plan of Payments and Distributions**

*Section 1.* PAYMENTS. The Trustees shall have full authority to determine all questions of the nature and amount of payments to be provided to artists consistent with the relevant agreements for the receipt and distribution of remuneration.

*Section 2.* ELIGIBILITY FOR PAYMENTS. The Trustees shall have full authority to determine eligibility requirements for payments, consistent with the relevant agreements for the receipt and distribution of remuneration, and to adopt rules and regulations setting forth the same, which shall be binding on the artists.

*Section 3.* METHOD OF PROVIDING PAYMENTS. The payments shall be provided and maintained by such means as the Trustees in their sole discretion shall determine.

*Section 4.* WRITTEN PLAN OF PAYMENTS AND DISTRIBUTIONS. The detailed basis upon which payments are to be made pursuant to each agreement for the receipt and distribution of remuneration shall be specified in writing by appropriate action of the Trustees subject, however, to such changes or modifications by the Trustees from time to time as they in their discretion may determine. All such changes or modifications shall similarly be specified in writing by appropriate resolution of the Trustees.

*Section 5.* DETERMINING CLAIMS FOR PAYMENTS. The Trustees shall have full authority to determine all claims for payments, provided that they may delegate to the duly designated administrators of the Fund authority to determine such claims initially. The administrators' initial determination shall be submitted to the Trustees for final determination. An individual who believes that he or she has been adversely affected by the administrators' or Trustees' determinations regarding payment of benefits may submit a written appeal to the Trustees. The decision of the Trustees shall be final.

**Article VII**
**Meetings and Decision of Trustees**

*Section 1.* MEETING OF TRUSTEES. Meetings of the Trustees shall be held at such place or places as may be agreed upon by the Trustees.

*Section 2.* ACTION BY TRUSTEES WITHOUT MEETING. The Trustees may also take action in writing without a meeting.

*Section 3.* AGREEMENT OF THE TRUSTEES. All actions of the Trustees shall be by agreement, with the AFM Trustees casting one vote, and the SAG-AFTRA Trustees casting one vote. In the event that any matter presented for decision cannot be decided because of a failure of agreement, the matter may be submitted for arbitration in accordance with Article VIII.

*Section 4.* MINUTES OF MEETINGS. The Trustees shall keep minutes of all meetings but such minutes need not be verbatim.

**Article VIII**
**Arbitration**

*Section 1.* APPLICATION OF THIS ARTICLE. A Trustee may apply to the American Arbitration Association in the area where the Fund maintains its principal office for the designation of an arbitrator who will decide any disputes between the Trustees or any other matter submitted to arbitration in accordance with the provisions of Article VII, Section 3. The decision of the arbitrator shall be final and binding. Decisions to accept an agreement for the receipt and distribution of remuneration for administration through the Fund, pursuant to Article V, Section 1, shall not be subject to arbitration.

*Section 2.* EXPENSES OF ARBITRATION. The cost and expense incidental to any arbitration proceeding, including the fee, if any, of the impartial arbitrator, shall be a proper charge against the Fund and the Trustees are authorized and directed to pay such charges.

**Article IX**
**Execution of Trust Agreement**

*Section 1.* COUNTERPARTS. This Trust Agreement may be execute in counterparts.

**Article X**
**Amendment to Trust Agreement**

*Section 1.* AMENDMENT BY TRUSTEES. This Agreement and Declaration of Trust may be amended in any respect from time to time by the Trustees, provided that each amendment shall be duly executed in writing by the Trustees and annexed hereto. The Trustees shall have full discretion to fix the effective date of any amendment.

**Article XI**
**Termination of Trust**

*Section 1.* BY THE TRUSTEES. This Agreement and Declaration of Trust may be terminated by an instrument in writing executed by the Trustees when there is no longer in force and effect an agreement for the receipt and distribution of remuneration which is accepted for administration by the Fund.

*Section 2.* PROCEDURE ON TERMINATION. In the event of the termination of this Agreement and Declaration of Trust, the Trustees shall apply the Fund to pay or to provide for the payment

of any and all obligations of the Fund and shall distribute and apply any remaining surplus in such a manner as will in their opinion best effectuate the purpose of the Fund; provided, however, that no part of the corpus or income of said Fund shall be used for or diverted to purposes other than for the benefit of the artists eligible for benefits under the agreements for the receipt and distribution of remuneration administered by the Fund, or the administrative expenses of the Fund or other payments in accordance with the provisions of the Fund.

*Section* 3. NOTIFICATION OF TERMINATION. Upon termination of the Fund, the Trustees shall notify each necessary party, and the Trustees shall continue as Trustees for the purpose of winding up the affairs of the Trust.

**Article XII**
**Miscellaneous Provisions**

*Section 1.* GOVERNING LAW. This Agreement and Declaration of Trust shall be construed under the laws of the State of New York applicable to contracts made and to be performed within the County and State of New York (without regard to any conflict of laws provision), and venue for any dispute arising under this Agreement and Declaration of Trust shall be in New York.

*Section 2.* NOTIFICATION TO TRUSTEES. The address of each of the Trustees shall be that stated on the signature page of this Agreement and Declaration of Trust. Any change of address shall be effected by written notice to the Trustees.

*Section 3.* SEVERABILITY. Should any provision in this Trust Agreement or in the rules and regulations adopted thereunder be deemed or held to be unlawful or invalid for any reason, such fact shall not adversely affect the provisions contained therein unless such illegality shall make impossible or impractical the functioning of the Trust and the Plan, and in such case the appropriate parties shall immediately adopt a new provision to take the place of the illegal or invalid provision.

*Section 4.* VESTED RIGHTS. No artist or any person claiming by or through such artist, including the artist's family, dependents, beneficiary and/or legal representative, shall have any right, title or interest in or to the Fund or any property of the Fund or any part thereof except as may be specifically determined by the Trustees.

*Section 5.* ENCUMBRANCE OF PAYMENTS. No moneys, property or equity, of any nature whatsoever, in the Fund, or policies or benefits or moneys payable therefrom, shall be subject in any manner by any artist or person claiming through such artist to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, garnishment, mortgage, lien or charge, and any attempt to cause the same to be subject thereto shall be null and void.

*Section 6.* EXPENSES OF THE TRUSTEES. All expenses of the Trustees incurred in the performance of their duties may be chargeable to the Fund at the discretion of the Trustees. All other expenses incurred pursuant to Article IV hereof shall be paid by the Fund.

*Section* 7. NO EMPLOYER CONTRIBUTIONS PERMITTED. The Fund shall not accept contributions from any employer or association of employers who employ artists represented by the AFM or SAG-AFTRA, and shall not enter into agreements for the receipt and distribution of remuneration with

such employers or associations of employers.

IN WITNESS HEREOF, in accordance with Article X, the Trustees sign this Agreement and Declaration of Trust, which amends and restates the original agreement and declaration of trust. The Trustees, by affixing their signatures at the end of this Agreement and Declaration of Trust, agree to accept the trusteeship and act in their capacity strictly in accordance with the provisions of this Agreement and Declaration of Trust.

Raymond M. Hair, Jr., AFM Date
1501 Broadway, Suite 600
New York, NY 10036

Duncan Crabtree-Ireland, SAG-AFTRA Date
5757 Wilshire Boulevard, 7th Floor
Los Angeles, CA 90036

Sam Folio, AFM Date
1501 Broadway, Suite 600
New York, NY 10036

Stefanie Taub, SAG-AFTRA Date
5757 Wilshire Boulevard, 7th Floor
Los Angeles, CA 90036

Bruce Bouton, AFM Date
1501 Broadway, Suite 600
New York, NY 10036

Jon Joyce, SAG-AFTRA Date
5757 Wilshire Boulevard, 7th Floor
Los Angeles, CA 90036

such employers or associations of employers.

IN WITNESS HEREOF, in accordance with Article X, the Trustees sign this Agreement and Declaration of Trust, which amends and restates the original agreement and declaration of trust. The Trustees, by affixing their signatures at the end of this Agreement and Declaration of Trust, agree to accept the trusteeship and act in their capacity strictly in accordance with the provisions of this Agreement and Declaration of Trust.

Raymond M. Hair, Jr., AFM Date
1501 Broadway, Suite 600
New York, NY 10036

Duncan Crabtree-Ireland, SAG-AFTRA Date
5757 Wilshire Boulevard, 7th Floor
Los Angeles, CA 90036

Sam Folio, AFM Date
1501 Broadway, Suite 600
New York, NY 10036

11/13/12
Stefanie Taub, SAG-AFTRA Date
5757 Wilshire Boulevard, 7th Floor
Los Angeles, CA 90036

Bruce Bouton, AFM Date
1501 Broadway, Suite 600
New York, NY 10036

Jon Joyce, SAG-AFTRA Date
5757 Wilshire Boulevard, 7th Floor
Los Angeles, CA 90036

such employers or associations of employers.

IN WITNESS HEREOF, in accordance with Article X, the Trustees sign this Agreement and Declaration of Trust, which amends and restates the original agreement and declaration of trust. The Trustees, by affixing their signatures at the end of this Agreement and Declaration of Trust, agree to accept the trusteeship and act in their capacity strictly in accordance with the provisions of this Agreement and Declaration of Trust.

Raymond M. Hair, Jr., AFM — Date 11/15/12
1501 Broadway, Suite 600
New York, NY 10036

Duncan Crabtree-Ireland, SAG-AFTRA — Date 1/18/13
5757 Wilshire Boulevard, 7th Floor
Los Angeles, CA 90036

Sam Folio, AFM — Date
1501 Broadway, Suite 600
New York, NY 10036

Stefanie Taub, SAG-AFTRA — Date
5757 Wilshire Boulevard, 7th Floor
Los Angeles, CA 90036

Bruce Bouton, AFM — Date
1501 Broadway, Suite 600
New York, NY 10036

Jon Joyce, SAG-AFTRA — Date
5757 Wilshire Boulevard, 7th Floor
Los Angeles, CA 90036

Exhibit DEFS119
2/11/2021
Dreith

Approved as amended 12-12-13

**Minutes**
**Meeting of the Trustees**
**AFM & AFTRA Intellectual Property Rights**
**Distribution Fund**

June 4, 2013

AFM & AFTRA Intellectual Property Rights Distribution Fund
11846 Ventura Blvd., Suite 300, Studio City, CA 91604

**Trustees Present:** Bruce Bouton, AFM
Duncan Crabtree-Ireland, SAG-AFTRA (Via Telephone)
Sam Folio, AFM
Raymond M. Hair, Jr., AFM
~~Jon Joyce, SAG-AFTRA~~ Amendment 12-12-13
Stefanie Taub, SAG-AFTRA

**Present:** Dennis Dreith, Fund Administrator
Nancy Carney, Fund Controller
Shari Hoffman, Manager, Audio-Visual Division (Via Telephone)
Jo-Anne McGettrick, Manager, Sound Recording Division
Patricia Polach, Bredhoff & Kaiser, PLLC (Via Telephone)
Grant Miller, Miller, Kaplan & Arase
Doug Waite, Miller, Kaplan & Arase

The meeting convened at 4:05 p.m. (PDT) in person and via teleconference.

**Minutes**

The minutes of the July 26, 2012 meeting had been previously approved via e-mail poll.

**Discussion of Studio Plaza Building**

Following up on written material sent to the Trustees earlier, the Administrator presented information regarding the possible purchase of the Studio City Plaza building, a 38,000 square foot property located in Studio City. The building is available at a purchase price of $9.9 million. The purchase price includes an adjacent parking lot valued at $2.2 million, which is zoned to allow a 30,000 square foot building. There currently is a note of $3.6 million on the building and parking lot which the AFM & SAG-AFTRA Fund could assume, reducing the initial cash outlay for the proposed purchase to $6.3 million. The building itself is fully leased to 2016; thereafter, it would serve as the home of the Fund, which is currently out of rentable space and which will need expanded space in the near future.

The Administrator presented further information about the financial aspects of the possible purchase. The initial cash outlay for the purchase would come from the long-term investment account; i.e., the long-term investment fund would invest in the building. The Administrator projected that over the next three years, the rental receipts from the building

should exceed the costs of owning the building (the mortgage and operating expenses) by approximately $1.5 million per year. The Administrator anticipated that during or before 2016, the Fund would move in to the building (ultimately using one-third to one-half of the building) and pay a fair market value rent. The long-term investment account will be repaid from the net income derived from the building. The Administrator anticipated that the long-term investment account could be repaid within ten to twelve years, and that the Fund could be free of obligation after twelve to fourteen years (depending on the possibility of renegotiating the terms of the loan or loan buy-out with a reduced pre-payment penalty).

The Administrator reported that the purchase price is currently secured by a fully-refundable $300,000 deposit. He further advised the Trustees that no inspection has been performed on the building as of today, but that he was in the process of scheduling an inspection and appraisal. He asked for the views of the Trustees as to whether to move forward with the building purchase.

Various issues relating to ownership of the building were discussed. The accountants from Miller, Kaplan & Arase suggested that the Fund should establish a separate corporation to purchase the building in order to protect the Fund and the unions from any liabilities. A question was raised as to whether the title holding company would be tax exempt as well. Representatives of Miller, Kaplan & Arase advised that the title-holding corporation is tax-exempt, but not as to the mortgage. Because the debt on the building would be approximately 37% of the value of the building, 37% of the rental income and appreciation from the building would be taxable while the building is not being used for Fund purposes. However, if the Fund grew to occupy 85% usage of the building, no income tax would be owed.

Mr. Hair asked for clarification regarding repayment of the long-term investment account. The Administrator reiterated that the Fund would be paid back from the receipts of the current leases, and, after the Fund occupied the new building, from the revenue generated from the continuing leases and from the rent paid by the Fund. The Administrator said that he anticipated that continuing leases would provide sufficient income to fully pay the Fund back for all the costs of the building.

Mr. Duncan Crabtree-Ireland explored the benefits of an LLC structure for the new corporate entity to hold the title to the building. He further expressed his support for establishing a separate corporation for the purpose of purchasing the building.

**Privileged**

Mr. Crabtree-Ireland moved that the Trustees approve the purchase of building, contingent upon receiving an appraisal at or over the purchase price, and contingent upon a favorable inspection of the building. Motion carried unanimously.

**Budget:**

The Trustees continued the discussion from the last meeting regarding the Fund practice of preparing "expense only" budgets. Doug Waite of Miller, Kaplan & Arase explained that the Fund's practice is not unique, and that in organizations such as the Fund where collections cannot be fully predicted or routinized, expense-based budgets are appropriate. He further explained that expense-based budgets must be formulated based on actual expenses, track records of collections and expenditures, and sufficient oversight to assure that overall revenue is sufficient to meet expenses. He said that the Fund could add revenue projections to its proposed budgets, but that doing so was not a requirement for formulating an appropriate proposed budget. He suggested that further discussions of this topic could be taken up with Fund Auditor Jeff Goss if desired.

The Administrator presented the Fiscal Year 2014 Proposed Budget, which anticipates a complete separation from the Film Musicians' Secondary Markets Fund during the fiscal year. As a result, it included additional office space, new hires, and the establishment of FMSMF Administrative Assistant Johanna Medrano, IT Manager, Robert Rusek and Facilities Manager Tom Freas moving to the AFM & SAG-AFTRA Fund as full time employees. It also included the addition of a full-time paid Administrator, beginning mid-fiscal year. The Administrator noted that, consistent with past discussions of the Trustees, it is anticipated that he would move into that position at such point as an orderly transition can be made from his position at FMSMF.

Mr. Folio asked for additional detail on the proposed salaries for Fund staff. Mr. Crabtree-Ireland expressed the view that details as to staff salaries other than the Administrator's salary should be delegated to the Administrator for decision, but agreed that a detailed report should be provided. The Administrator agreed to provide that detailed report.

It was agreed that the Trustees would schedule a separate teleconference to review the proposed salary of the Administrator.

The Trustees approved the Fiscal Year 2014 Proposed Budget, contingent upon the resolution of the Administrator's salary in a subsequent meeting. It was agreed that Ms. Taub would arrange a meeting via teleconference for that purpose.

**Future Distributions and Future Collections:**

The Administrator informed the Trustees that he anticipated that the 2013 distributions would total about $14 million, which will include a partial distribution of sound recordings (mostly DPR) for years 2009-2010 and approximately $4 million in audiovisual royalties from AIE (the Spanish collective) from 2011 and 2012. He also reported that he projected collections in fiscal year 2014 of $32 million, the bulk of which will come from SoundExchange (including approximately $4 million from foreign royalties), other foreign agreements, and an additional $6 million from AIE for 2013 A-V royalties.

**Administrative Fee:**

A discussion ensued regarding the Fund entering into a service agreement with the American Federation of Musicians and SAG-AFTRA for ongoing support including membership

data and other information and services to assist in facilitating distributions. It was moved, seconded and carried that the Fund enter into a service agreement with the two unions, pursuant to which the unions would provide information and services important to the Fund, and the Fund would pay a service fee consisting of an amount equal to 3% of each distribution (after the deduction of administrative fees), with one-half payable to the AFM and one-half payable to SAG-AFTRA.

The staff and MKA guests were excused. A discussion ensued with the Administrator regarding his leaving his position at the FMSMF and devoting his full time to the AFM & SAG-AFTRA Fund.

The meeting adjourned at 6:30 p.m. PDT.

# EXHIBIT 6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

---oOo---

KEVIN RISTO, on behalf of himself and all others similarly situated,

Plaintiffs,

vs.

No. 2:18-cv-07241-CAS-PLA

SCREEN ACTORS GUILD-AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS, a Delaware corporation; AMERICAN FEDERATION OF MUSICIANS OF THE UNITED STATES AND CANADA, a California nonprofit corporation, et al.,

Defendants.

_______________________________/

VIDEOTAPED AND VIDEOCONFERENCED DEPOSITION OF

TINO GAGLIARDI

Friday, October 9, 2020

Stenographically Reported by:

GINA V. CARBONE, CSR, RPR, RMR, CRR, CCRR

California State Lic. No. 8249

REMOTE APPEARANCES OF COUNSEL

For the Plaintiff KEVIN RISTO:

KIESEL LAW, LLP
By: NICHOLAS BRANCOLINI, ESQ.
MARIANA A. McCONNELL, ESQ.
PAUL KIESEL, ESQ.
8648 Wilshire Boulevard
Beverly Hills, California 90211
(310) 854-0812
brancolini@kiesel.law
mcconnell@kiesel.law
kiesel@kiesel.law

CO-COUNSEL:

JOHNSON & JOHNSON, LLP
By: DANIEL B. LIFSCHITZ, ESQ.
439 N. Canon Drive, Suite 200
Beverly Hills, California 90210
(310) 975-1095
dlifschitz@jjllplaw.com

APPEARANCES (continued)

For the Defendants:

JENNER & BLOCK
By: ANDREW J. THOMAS, ESQ.
ANDREW G. SULLIVAN, ESQ.
633 W. 5th Street, Suite 3600
Los Angeles, California 90071
(213) 239-5155
ajthomas@jenner.com
agsullivan@jenner.com

ALSO PRESENT: JOSEPH MOURGOS, videographer

--oOo--

THE VIDEOGRAPHER: We are now on the record. My name is Joseph Mourgos. I am a videographer for Golkow Litigation Services. Today's date is October 9th, 2020, and the time on the video monitor is 9:09 a.m. Pacific Time.

This remote video deposition is being held in the matter of Risto versus Screen Actors Guild-American Federation of Television and Radio Artists, for the United States District Court, Central District of California.

The deponent is Augustino Gagliardi. All parties to this deposition are appearing remotely and have agreed to the witness being sworn in remotely. Due to the nature of remote reporting, please pause briefly before speaking to ensure all parties are heard completely.

Would counsel please identify yourselves for the record. Let's begin with Mr. Brancolini.

MR. BRANCOLINI: Good morning, this is Nico Brancolini from Kiesel Law for the plaintiffs and the class.

THE VIDEOGRAPHER: Mr. Kiesel.

MR. KIESEL: Good morning. Paul Kiesel, also plaintiffs and the class.

THE VIDEOGRAPHER: Ms. McConnell.

my distractions at the time was business that I had to conduct with the local.

After that, it was the health funds and the pension funds. I guess you could say that those two took equal amounts of my time.

Regarding the AFM SAG-AFTRA Fund, this was well on its way, it was running well at the time. My attention was not so much with the AFM SAG-AFTRA Fund at the time.

I don't mean to underestimate or diminish my obligations to that Fund, though. Let's be perfectly clear about that.

Q. I understand. Thank you.

So can you tell me what a session report is?

A. So we have these different categories of what we call B forms, the B stands for "broadcast." These are broadcast forms in which -- in which the names and contact information, as well as the wages and benefits that are paid for -- it's a session report form. It contains the names and information for all the musicians that participate in the session.

Q. And why do the local chapters compile these reports?

A. To make sure everyone gets paid. We have to track this. I'm -- maybe you're not aware. But our recording agreements have a back-end structure to them where there's repeated payments that come into the musicians if -- I mean, once you get music in a can, once you get it recorded, it can be exploited in any number of ways.

In order for us to make sure that the musicians get paid for future payments that may be owed, we have to have a record of those musicians that were performing in the session.

Is that clear?

Q. Yes. Thank you.

A. You're welcome.

Q. And so it's the local union's responsibility to compile the B forms; is that correct?

A. So the B forms are compiled in the jurisdiction of where the recording takes place. That's -- so yes. Short answer is yes.

Q. So is there a local chapter -- or scratch that. Let me rephrase.

You said in the local jurisdiction.

A. Geographical jurisdiction.

Q. Geographical jurisdiction. How -- is that

not hesitate to let me know if he does not know or if you -- you know, if you don't know, please just say so.

I'm just trying to sort of get a clear picture of what this database is, and he is somebody who presumably has knowledge in his capacity either as a trustee or an AFM executive officer. So I'm just tying to clarify that.

THE WITNESS: I understand, and I think you'll be better served by talking to the actual peoples that are directly involved with that, because they certainly will have more expertise in that area than I will.

BY MR. BRANCOLINI:

Q. But it's not your understanding that this -- this database is maintained to the union's benefit; is that accurate?

MR. THOMAS: Objection. Vague.

THE WITNESS: What do you mean by "the union"?

BY MR. BRANCOLINI:

Q. This database --

A. How do you define "to the union"?

Q. The AFM union, the national --

A. Okay. So I'm a unionist. It's not what a

union is.

Q. What's not what a union is?

A. The union is made up of a collective of performers, right? They get together. The building is not the union. The institution is not the union. It's the musicians, the participants that do the work that are the union.

Q. So this database is maintained for the union --

A. To service the participants. Yes.

Q. That's exactly what I'm asking. This database is maintained -- is this database maintained to the benefit of the union membership, which is what I mean when I say "union"?

A. But you keep saying "union membership." And in this particular case, whether it's this case or even pension contributions, it's not only members that we have to track. You know that, right? I mean, it's a matter of law.

I'm sorry if I overstated that. I'm not a lawyer, to be clear.

Q. So the union is its membership, but the union is also itself an entity. Is it a legal entity?

A. Uh-huh.

you can peg that 400 percent increase to, but you don't find it -- would it be accurate to say you don't find it unreasonable?
A. I do not find it unreasonable.
Q. Have any of the other trustees ever expressed any concern to you about the amount of the service fee?
A. No.
Q. And since you joined the board of trustees of the Fund in 2016, have you ever asked for an audit of the services provided by the unions to the Fund?
A. No.
Q. Do you know if any audit has taken place?
A. Not to my knowledge.
Q. Let's turn to Interrogatory Response No. 10, which is on pages 12 to 15, if you'd like to take a moment to read through that.
A. I'm sorry, which one is it again?
Q. It is Interrogatory Response No. 10 --
A. No. 10.
Q. -- on page 12 and goes through page 15.
A. Okay.
Q. So --
A. Hold on, hold on, I'm not done reading.

I, GINA V. CARBONE, CSR No. 8249, RPR, RMR, CRR, CCRR, certify: that the foregoing proceedings were taken before me at the time and place herein set forth; at which time the witness was duly sworn; and that the transcript is a true record of the testimony given to the best of my ability via remote teleconferencing.

Witness review, correction and signature was

( ) by code. (X) requested.

( ) waived. ( ) not requested.

( ) not handled by the deposition officer due to party stipulation.

The dismantling or unbinding of the original transcript will render the reporter's certificate null and void.

I further certify that I am not financially interested in the action, and I am not a relative or employee of any attorney of the parties, nor of any of the parties.

Dated this 15th day of October, 2020.

GINA V. CARBONE

CSR #8249, STATE OF CALIFORNIA

# EXHIBIT 7

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

- - -

KEVIN RISTO, on behalf of himself and all others similarly situated, Plaintiff,

vs.

SCREEN ACTORS GUILD-AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS, et al., Defendants.

CASE NO. 2:18-cv-07241-CAS-PLA

- - -

PORTIONS CONFIDENTIAL

Friday, October 23, 2020

- - -

Remote videotaped stenographic deposition of KRISTINA GORBACSOV, conducted at the location of the witness in Los Angeles, California, commencing at approximately 9:03 a.m., on the above date, before Rosemary Locklear, a Registered Professional Reporter, Certified Realtime Reporter and California CSR (#13969).

- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 971.591.5672 Fax
deps@golkow.com

APPEARANCES: (All appearances via remote technology)

KIESEL LAW, L.L.P.
BY: NICHOLAS BRANCOLINI, ESQUIRE
brancolini@kiesel.law
BY: MARIANA A. McCONNELL, ESQUIRE
mcconnell@kiesel.law
8648 Wilshire Boulevard
Beverly Hills, California 90211
(310) 854-4444
and
JOHNSON & JOHNSON, L.L.P.
BY: DANIEL B. LIFSCHITZ, ESQUIRE
dlifschitz@jjllplaw.com
439 North Canon Drive, Suite 200
Beverly Hills, California 90210
(310) 975-1080
Appearing on behalf of the Plaintiff

JENNER & BLOCK, L.L.P.
BY: ANDREW J. THOMAS, ESQUIRE
ajthomas@jenner.com
BY: ANDREW G. SULLIVAN, ESQUIRE
agsullivan@jenner.com
633 West 5th Street, Suite 3600
Los Angeles, California 90071
(213) 239-5100
Appearing on behalf of the Defendants

ALSO PRESENT:

STEVE ZAVATTERO, Video Operator

SARAH L. FOWLER, Deputy General Counsel of SAG-AFTRA

- - -

VIDEO OPERATOR: We are now on the record.

My name is Steve Zavattero. I'm a videographer for Golkow Litigation Services.

Today's date is October 23rd, 2020. Time is 9:03 a.m.

This remote video deposition is being held in the matter of Kevin Risto versus Screen Actors Guild-American Federation of Television and Radio Artists, et al., for the United States District Court, Central District of California, Case Number 2:18-cv-07241-CAS-PLA.

The deponent is Kristina Gorbacsov, the person most knowledgeable of SAG-AFTRA.

All parties to this deposition are appearing remotely and have agreed to the witness being sworn in remotely.

Due to the nature of remote reporting, please pause briefly before speaking to ensure all parties are heard completely.

Will counsel please identify themselves.

MR. LIFSCHITZ: Good morning. This is Daniel Lifschitz for Johnson & Johnson on behalf of plaintiff and the class.

MS. McCONNELL: Good morning. Mariana McConnell from Kiesel Law for plaintiff and the class.

putting context into any of it, to be honest, because I was just trying to get through the volume at that time as quickly as I could.

Q. Understood.

So it's fair to say you didn't have any role in the negotiation or execution of the Services Agreement, then?

A. I did not, no.

Q. Did you notice a change in the work that you were performing before and after the Services Agreement was entered into?

A. I would say that there was always a steady increase. I believe when I started, it was pretty quick when I started to get these requests from the Fund. I didn't quite understand why or where they were coming from. I didn't really understand exactly how much information we were able to provide. I was a little bit conservative.

There was a period of time when I was, you know, unsure if we could even supply all the information. So I -- again, I was sort of reacting to what I was directed.

And then I started -- you know, I was instructed that it was safer to do so, those requests definitely increased over time, I would say, and it became -- I

think, at first, it was more, you know, get to them when you get to them, and then there was a little bit more of an emphasis where I was responding to them. Over time it became a little bit more of a priority, if you will. So there was a shift in paying a little bit more attention to them.

Q. So, if I'm understanding you correctly, the priority of work changed and perhaps the volume of work changed, but did the essential nature of the work you were performing for the Fund change?

MR. SULLIVAN: Objection. Mischaracterizes testimony.

BY MR. LIFSCHITZ:

Q. Do you believe that I've mischaracterized anything that you just said?

A. I'm sorry. Can you repeat that?

Q. Sure.

I asked that it sounded like the volume of requests you were handling changed and perhaps the priority of meeting them, but it didn't sound like the essential nature of your work for the Fund changed before and after the Services Agreement.

Is that a mischaracterization?

A. I would clarify that. As far as the nature goes, I'm not sure on the timing exactly. There was a

shift for when I would respond to these requests and I would literally send them a screenshot of basic information, and then it progressed into a place where I would have to physically scan the actual session reports, which would take up more time.

So the nature of it actually did change and got a little bit more involved as time went on, but it was still similar information.

So when I started, it was almost, okay, just -- I was learning so many other things. So it was like, okay, and then when you have time, get to these requests, and then that increased, the volume. But the way I would respond to them changed and became a little bit more involved. There was a little more time spent on them, for sure.

Q. Got it.

So, actually, why don't we back up for a second.

Can you generally describe the work you were doing for the Fund in terms of what they were asking for you and what specifically you were providing in this role?

A. Sure. I would get what I would call session/song queries, I would call them that. Basically, the Fund would send me multiple requests for specific song titles and they would be looking to know

A. Able to use the data that we provide them.
Q. Great.
Let's go down to Paragraph 1, "Provision of Data."
Could you read out loud the first sentence of that paragraph, including the first bullet point that follows?
A. "Provision of Data. From and after the Effective Date, each union shall provide the Fund the following data," in a manner -- "in a manner comparable to the way such data has been provided immediately prior to the Effective Date: Access to member databases to enable the Fund to obtain identifying and contact information for members."
Q. Thank you.
So what member databases is SAG-AFTRA providing the Fund under this section?
A. Well, I wouldn't call them databases. We have information that we provide the Fund and we have several sources of that information that we have to source and go through and research.
As far as a member database goes, that is something that we have as a union that would include information about all of our members, not just members that would be impacted by what the Fund does.

THE WITNESS: Okay. Can you repeat it again? Sorry. I just got --

BY MR. LIFSCHITZ:

Q. I was asking if you can separate out or estimate the amount of time spent gathering information for SAG-AFTRA generally versus the time spent gathering information solely for the Fund's purposes.

A. Sure. So information gathering for the Fund purposes would be -- it depends on the specific person who is performing the function. At this point, we've tried to streamline the process because we were trying to figure out a more time-effective way because it is time-consuming.

So we streamlined it to have the requests initially go to Josh Reese in Nashville, and from there, he filters them on to whoever is needed. So his time is spent, at least five hours a week, on the requests that come in to us from the Fund. And that compared to what he's doing with the information for other purposes is -- he's not spending -- he doesn't do conversion claims in general, but he does do some research.

So, you know, he does do a few hours of research to help our business rep who files conversion claims. But at least five hours of his week is devoted to these requests because he gets maybe 45 to 60 requests a week.

So his time is much more than, perhaps, you know, our rep in L.A., her name is Alyssa Clayton. Josh has done the bulk of trying to filter out to see if we have these reports. So Alyssa spends probably an hour per week trying to retrieve the actual physical files and -- after he's done the legwork.

So it depends on who -- I would say Alyssa, and Kimberlee in New York, who's -- again, who filters for there too, so their time is -- I mean, Kimberlee probably even less so, because there's not as many sessions in New York, so hers is, you know, maybe like five hours a month.

But Alyssa, you know, an hour, 30 minutes to an hour, perhaps, per week, trying to retrieve those for Josh. But Josh is putting more time into it.

Q. So we've identified, then, six hours a week, five from Josh, one from Alyssa, that is spent on fielding requests by the Fund.

Is the information being collected in the work being done during these six hours a week only of use to the Fund?

A. For this part, yes, because they're not researching for conversions. Because, you know, with conversions, we don't know which songs -- like, this is dependent on the reports that we get from the record

A. If we did not have to provide this information, then we would be able to use those hours on something else. So, yeah, we would not have to spend six hours a week.
Q. So, aside from the two people you just identified, Josh and Alyssa, are there any other employees at SAG-AFTRA who are undertaking this work on behalf of the Fund?
A. Yes. In addition to Alyssa and Josh, it's Kimberlee Archie in New York.
Q. And how many hours a week would you estimate that she spends purely on Fund business?
A. Kimberlee is less frequent than Josh and Alyssa, so I would say she's spending only two to three hours a month, probably. There's just not as many sessions in New York.
Q. Got it.
So, other than these three people, is there anyone else who is fielding the Fund's requests?
A. Not at this time, no.
Q. And, historically, has that been the case, as a general -- you've been at SAG-AFTRA that these three --
A. In my -- my understanding is that these requests started early 2000s and they went to Josh and Kimberlee in Nashville and New York, respectively, and I am not

Q. Great.

MR. LIFSCHITZ: Why don't we take another quick five- to ten-minute break.

VIDEO OPERATOR: Going off the record.

The time is 11:16 a.m.

(Recess, 11:16-11:29 a.m.)

VIDEO OPERATOR: Coming back on the record.

The time is 11:29 a.m.

BY MR. LIFSCHITZ:

Q. So as we were discussing the work being done on behalf of the Fund, I wanted to know if you could provide the salaries for the three positions you identified as providing that work.

A. Sure. For Josh Reese, his salary is 65,000 yearly, Alyssa Clayton is 64,000 yearly, and Kimberlee Archie is about 77,000 yearly.

Q. 7,000 or 77,000?

A. 77,000.

Q. 70.

A. Approximately. 77, approximately.

Q. Oh, 77. Sorry. Thank you.

MR. SULLIVAN: I'm going to designate that salary info as confidential on the record. Assume that the parties agreed upon the Confidentiality Order.

A. The database does include not only members, but non-members as well, yes.

Q. What does SAG-AFTRA do with that information beyond providing it to the Fund?

A. Well, that information is -- I guess organization-wide that's used in many different ways for, in general, claims purposes and trying to -- you know, for claims purposes when we -- when we obviously file a claim, we would have to list their personal information.

That's what we -- we'd use it for in Music or, what I referenced before, for conversion purposes. Organization-wide this is how we keep track of the members. We can see their earnings that are reported, and there's -- for us, again, in Music with our roster artists, that information is used differently.

So this is how we keep track of everyone. So when artists call in to figure out if they've joined or just eligibility questions and insurance questions, there's just so many different parts of it. But Music specifically, claims conversions and when artists have questions about their insurance and their eligibility.

Q. Do you know if SAG-AFTRA ever solicits non-members to become members or otherwise participate in organizational activities?

MR. SULLIVAN: Objection. Outside the scope of the designated topics.

BY MR. LIFSCHITZ:

Q. If you know.

A. I guess I wonder what you mean by "soliciting." If you mean trying to get people to join, is that what you're asking?

Q. Yeah, that's one component of it, whether you ever sent or SAG-AFTRA ever sends emails or letters to non-union members, if they happen to have contact information for, suggesting they become members or notifying them about events that they could participate in, things of that nature.

A. Well, these type of things would be -- these would be handled by our membership department. So my understanding is, there is a letter that is sent to individuals when they have become eligible to alert them to the fact that they are now eligible to join.

I don't know that letter offhand to tell you the details of it, but that is all handled by our membership department.

Q. Understood. Okay.

Why don't we move on to the second bullet point under Paragraph 1.

I know it's hard to remember we were talking

information for performers (Union members and nonmembers) who performed at the session."

Q. So to begin, can you generally describe what session reports and B-Forms are and if there's any distinction meaningful between them?

A. Sure. So for me -- I mean, for Sound Recordings, it's session reports. I think B-Forms is really AFM, what AFM calls their reports. So I'm just going to call them session reports because I think that's most accurate.

And session reports are forms that contain -- I can list the information for you. It would include information such as the record label, the producer, the song title, possibly the album title, the length of the track, the list of performers, singers, who are members and non-members, the featured artist.

The performer information would include the Social Security number, as well as the address, and it would include the number of overdubs or multi-tracks that the performer performed during the session. It would include the start time and the end time.

And, basically, it would -- it's a bit of a snapshot of the work that was done during that session, and it would be used to have the -- you know, make sure that we have the correct performers identified on that

session. And that's what we use in order to get them paid for claims purposes and that is what we supply to the Fund.

Q. And, as you just indicated, these are used by SAG-AFTRA for claim purposes.

So is it fair to say SAG-AFTRA has multiple uses and needs for this information?

A. It is fair to say that we have multiple uses for this information, yes.

Q. Can you separate out or estimate the time spent gathering this information for SAG-AFTRA's general purposes versus the time spent gathering and providing it specifically to the Fund?

MR. SULLIVAN: Objection. Vague and ambiguous. Calls for speculation.

THE WITNESS: I would be really speculating, because, again, it's sort of -- it's a little bit hard to guess only because the -- again, the people involved do different pieces of this time-wise.

So Josh, for example, as I mentioned, he's spending about, you know, at least five hours a week, let's say, on just supplying the session reports to the Fund, which is different than him helping -- you know, him filing claims for initial compensation.

So then I would say that, just for Josh

specifically, we're saying five hours a week on the Fund requests and, perhaps -- I mean, again, I'm really speculating -- possibly -- I'm just thinking it through from when I was filing claims -- could spend six hours on filing claims using the session reports or that could be helping people fill it out. It varies, too, week to week.

I mean, it's pretty consistent that we're going to be spending -- he's going to be spending five hours a week on AFM/SAG-AFTRA Fund requests, but it kind of waxes and wanes when we're talking about using the session report for our purposes, because sometimes there's a lot of sessions happening and sometimes there's really not.

So it really fluctuates and there's not a whole lot of consistency, but -- so I guess my point is that it could be three to eight hours a week on claims for sessions.

MR. LIFSCHITZ: Sure.

BY MR. LIFSCHITZ:

Q. So to suss that out a little bit, can a distinction be made between the work and time involved collecting the session reports, in the first instance, versus then providing information from the reports requested by the Fund?

A. It could. Again, I'd be speculating. I think that when it comes to time spent on -- with the session reports for initial compensation, that also involves sometimes educating the members on how to complete it, and also communications with record labels on trying to follow up on those claims that are filed and actually filing the claims.

So I guess, if I tried to do it percentage-wise, maybe, you know, he's spending 50 percent of his time on claims, the -- that have to do with, you know, our SAG-AFTRA claims for initial comp, 40 -- you know, maybe 40, 50 percent. And then if I said five hours a week, that's like a 20 percent for the Fund requests.

And the rest of the time he's dealing with other SAG-AFTRA work that he's doing, which is -- could be research for other things. So, I mean, again, I'm really speculating. I haven't -- I don't have an exact number.

Q. Got it.

But -- so your estimation is that out of the five hours a week that he is working on providing session report information, about one hour a week estimated to be for the Fund and the remainder on other SAG-AFTRA activities like claims?

A. No. The five hours a week is just time he's

spending on responding to --

MR. SULLIVAN: Objection. Misstates --

THE WITNESS: Sorry.

MR. SULLIVAN: Objection. Misstates the witness's testimony.

BY MR. LIFSCHITZ:

Q. So please correct me.

A. So the correction is that the five hours a week for Josh is just really on responding to the AFM/SAG-AFTRA requests exclusively and the research done on those.

The rest of the time he's dividing his time between claims for initial compensation for the sessions, researching for us for other claims purposes, which would be those conversions. So that would be the majority of his time, for sure.

I'm not sure what the percentage would be because we do have other things that we do with a limited number of people, so -- but I'm pretty clear that that's still -- it's about five hours a week, and it's just on requests at this point.

Q. Okay. So the process and work that Josh is doing, then, when he is spending these five hours a week, is that accessing existing session reports maintained by SAG-AFTRA and then providing responsive

information to the Fund or are there instances where the Fund requests information from Josh that SAG-AFTRA doesn't currently possess, a session report it hasn't yet acquired, and Josh has to then undertake that work of acquiring the report in the first instance?

A. The work that he's doing is mostly supplying information that we have. So he's not going to do extensive -- he's not doing research for them outside of what we have at the union.

Though, I do want to just say that sometimes there's a little bit of follow-up where they might have access -- they have might have possession of a form that we might have supplied in the past, and then maybe they have to contact us as a follow-up to clarify like Social Security numbers or to get something because the scan that they received isn't quite clear.

So there is some follow-up work sometimes, but, for the most part, he is still -- he's looking for the information that we have collectively at the union. It's not where he's doing outside research to come up with it. It's something that, hopefully, we are possessing and that we are able to provide them.

Q. Could you provide an estimate for the amount of time that Josh spends on a weekly basis doing that follow-up to the extent it's broken out from the five

hours a week or is that part of the five hours a week?

A. Oh, I would -- I mean, I think the requests he gets are -- it's like 45 to 60 a week. So that time that's spent -- that five hours is for those.

Anything additional probably is extra time. I don't think those -- those don't come super-often. So this is not on a daily basis. It's just maybe, you know, once a -- every couple weeks, maybe, there will be a follow-up on specific things because the scans weren't that hard -- they were hard to read or maybe they're looking at something quite, like I said, older, so they might ask him, but they're more one-off situations.

I don't know -- I don't think it's a whole lot of extra time, but that would be additional time in addition to those five hours I'm talking about.

Q. Okay. And who is generally responsible for collecting these documents at the national level?

A. Initially, these documents are sent to -- it depends where the work is happening really. So, primarily, the session work is happening in New York, Los Angeles, and Nashville.

So the sessions are being completed -- we have different ways we receive this information, but the reports are sent to us by the performers themselves directly after they've completed the session report.

MR. LIFSCHITZ: Yeah.

BY MR. LIFSCHITZ:

Q. So the Fund has a certain number of recordings it needs to identify the performers to pay on.

A. Uh-huh.

Q. And it seeks that information from SAG-AFTRA. SAG-AFTRA has multiple sources of information that it can turn to, between the session reports, membership information, and good, old-fashioned sleuthing, as you've indicated.

Do you have any sense of how many requests for information SAG-AFTRA fields where there are responsive session reports versus recordings that no session report was ever either generated for or ever remitted to SAG-AFTRA for?

A. Okay. I think to answer that, I best reference a conversation that I had with Julie Sandell and Lisa Finnie at the Fund specifically in my research in preparation for this.

So one thing -- things that I learned from them, because we've never -- you know, like SAG-AFTRA, we didn't have a -- we did not have a way we were actually tracking this information. So they actually have their own internal tracking system, but I learned that there's also some flaws with that. So this is, again, going to

be an estimate to get to the answer.

And what they did is try to -- they only looked at the years between 2014 and 2020, so they were able to tell me the number of requests they made during that period of time.

And I should say that this only is for the New York, Nashville, Los Angeles, and Miami office. So this only reflects those offices, which are probably the four largest, and it's only for that time period.

And the number is also -- you know, it's not going to be exact. It's probably underreported, because it's really reliant on the researchers doing this accurately. And the way she explained the system, they had to, you know, check certain boxes, just -- it allows for some human error, so this isn't going to be super-accurate.

But the number they gave me was that they -- they sent us 13,777 requests, and that is during that time span. And my -- again, I want to emphasize -- put emphasis on the fact that that this is underreported. This is just the floor. So this is at least that much, and we have returned 27 percent of those requests with actual session reports.

So out of the 13,000 that I'm mentioning, we responded to 27 percent of those and actually had the

session reports. So that's really the best way I can answer that question for you.

Q. Does anyone besides SAG-AFTRA have access to these session reports?

A. No.

Q. It's not possible for the Fund to contact any particular individual or entity other than SAG-AFTRA to maintain these reports?

A. No, there's no one else who would be able to provide these reports and we don't provide these reports to anyone else.

Q. And just going back to the language in the second bullet point, you know, the language is disjunctive, in that it says SAG-AFTRA can provide either the session reports directly or it can provide a database where that information is aggregated.

Is it correct that you were providing the session reports themselves to the Fund or are you simply providing requested information pulled from the session reports?

A. We are providing the session reports themselves via scans. I would say that, to be clear, when I started doing them in 2011, I think I mentioned that I was only really giving them a screenshot of that old Q&A system that we use. So it was kind of more bare bones.

let her respond.

Is there something else to talk about?

MR. SULLIVAN: I think we've made it clear that -- I mean, you're attempting to ask a witness essentially in her -- a 30(b)(6) designee essentially in her personal capacity to surmise on what are ultimately legal issues.

Having voiced all those -- all those objections, I can -- I can instruct our witness to respond.

MS. McCONNELL: Dan, you might want to ask the question again.

BY MR. LIFSCHITZ:

Q. How does the 1.5 percent fee correlate to the actual costs we've previously discussed?

MR. SULLIVAN: Same objections.

THE WITNESS: Can I answer?

MR. LIFSCHITZ: Yes.

THE WITNESS: Okay.

Well, given my limited knowledge here, I would only be answering for -- in regard to what I know as far as the work and the effort that we have done in collecting and providing this data. So, from my perspective, you know, I think -- I think it's fair. I think that we do a considerable amount of effort.

There has not been a formal valuation, but the

information that we provide is fairly priceless. We do -- there's nowhere else they can get this information. There is no other organization that they could go to. So it's exclusive to SAG-AFTRA.

And the only opinion I can offer is that, that this is priceless information that they cannot receive from any other organization, so -- and we make a huge effort in providing them accurate information with an abundance of requests that do eat up a lot of our staff time and resources on the daily -- on a daily basis.

So that's really the best way I can answer without having any other outside knowledge.

BY MR. LIFSCHITZ:

Q. Has SAG-AFTRA ever undertaken a process to determine the dollar value of its membership list?

A. There has not been a formal process that I'm aware of, no.

Q. Has there been an informal process?

A. No, there has not been that I'm aware of.

Q. And same question for the session reports. How did SAG-AFTRA go about determining the dollar value of its repository of session reports?

A. There is -- I cannot conceive of a formal or informal way to do a valuation of the session reports.

Again, I would just restate that this is

information that you can only find at SAG-AFTRA and without this information the Fund would not -- they would not be able to get it anywhere else.

So, beyond that, there's not -- again, there's not a way to put a price on it, besides saying that it's -- enables them to make their distributions. And, again, we use our resources in order to facilitate that to them.

Q. You mentioned earlier that your attorneys gave you information regarding Topic 7, the reasonable costs of the services provided.

Do you know if that information has been produced to us in this action?

MR. SULLIVAN: Objection. Mischaracterizes the witness's testimony.

THE WITNESS: Can you repeat that?

BY MR. LIFSCHITZ:

Q. Did the information your attorneys provided you regarding Topic 7, which I believe you testified at the very top of the deposition regarding the reasonable costs of the services provided, do you know if that information has been produced in this action?

A. I --

MR. SULLIVAN: Objection. Mischaracterizes the witness's testimony.

databases.

So, you know, we could talk about the time that -- you know, just entering them into Oracle from the beginning. If we didn't even do that, we wouldn't have the session information available. So I don't know how to answer this question with a percentage.

I can only relay that there are so many components that go into it, so it's not just pulling reports from one database. It's a more of a collective effort. So it's increased. I can't tell you what percentage. I don't know if it's 40 or not.

MR. LIFSCHITZ: Okay.

BY MR. LIFSCHITZ:

Q. Did SAG-AFTRA have to hire any additional workers or acquire additional resources in order to meet the demands of the increased number of requests?

MR. SULLIVAN: Objection. Asked and answered.

THE WITNESS: We did not hire additional people. We have used our own staff resources in the Music Department.

MR. LIFSCHITZ: Okay.

BY MR. LIFSCHITZ:

Q. The next increase, from 2015 to 2016, was by more than 50 percent to $420,454.

Does SAG-AFTRA contend this reflects the

STATE OF CALIFORNIA )
COUNTY OF LOS ANGELES )

I, ROSEMARY LOCKLEAR, a Certified Shorthand Reporter of the State of California, duly authorized to administer oaths pursuant to Section 2025 of the California Code of Civil Procedure, do hereby certify that

KRISTINA GORBACSOV, the witness in the foregoing deposition, was by me duly remotely sworn to testify the truth, the whole truth and nothing but the truth in the within-entitled cause; that said testimony of said witness was stenographically reported by me, a disinterested person, and was thereafter transcribed under my direction into typewriting and is a true and correct transcription of said proceedings, to the best of my ability.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

ROSEMARY LOCKLEAR, RPR, CRR, CSR 13969

Dated:

# EXHIBIT 8

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

KEVIN RISTO, on behalf of himself and all others similarly situated,

Plaintiff(s),

vs.

SCREEN ACTORS GUILD-AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS, a Delaware corporation; AMERICAN FEDERATION OF MUSICIANS OF THE UNITED STATES AND CANADA, a California nonprofit corporation; et al.,

Defendants.

Case No.: 2:18-cv-07241-CAS-PLA

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
VIDEOTAPED DEPOSITION OF
RAYMOND HAIR
Appearing Remotely From
Denton, Texas
Wednesday, February 24, 2021

Stenographically reported by:
EMILY SAMELSON, CSR No. 14043
Golkow Job No.: 269544

A P P E A R A N C E S:

(All appearances appearing remotely)

For Plaintiff(s):

KIESEL LAW LLP
BY: PAUL R. KIESEL, ESQ.
MARIANA A. MCCONNELL, ESQ.
NICHOLAS BRANCOLINI, ESQ.
8648 Wilshire Boulevard
Beverly Hills, California 90211
310.854.4444
kiesel@kiesel.law
mcconnell@kiesel.law
brancolini@kiesel.law

JOHNSON AND JOHNSON, LLP
BY: NEVILLE L. JOHNSON, ESQ.
DANIEL B. LIFSCHITZ, ESQ.
439 North Canon Drive
Beverly Hills, California 90210
310.975.1080
njohnson@jjllplaw.com
dlifschitz@jjllplaw.com

For Defendants:

JENNER & BLOCK LLP
BY: ANDREW THOMAS, ESQ.
ANDREW G. SULLIVAN, ESQ.
ANNA K. LYONS, ESQ.
633 West 5th Street, Suite 3600
Los Angeles, California 90071
213.239.5155
ajthomas@jenner.com
agsullivan@jenner.com
alyons@jenner.com

Also Present: Jennifer Garner, Esq., and Russell Naymark, Esq., In-house Counsel for American Federation of Musicians

Videographer: David Kim

Denton, Texas

Wednesday, February 24, 2021; 9:13 a.m.

--oOo--

THE VIDEOGRAPHER: We are now on the record. My name is David Kim. I'm a videographer for Golkow Litigation Services.

Today's date is February 24th, 2021, and the time is 9:13 a.m. Pacific time.

This remote video deposition is being held in the matter of Risto v Screen Actors Guild - American Federation of Television and Radio Artists, for the U.S. District Court for the Central District of California. The deponent is Ray Hair.

All parties to this deposition are appearing remotely and have agreed to the witness being sworn in remotely.

Due to the nature of remote reporting, please pause briefly before speaking to ensure all parties are heard completely.

Will counsel please identify themselves.

MR. KIESEL: For the plaintiffs, good morning. We've got Paul Kiesel, Mariana McConnell, and Nico Brancolini for plaintiffs.

MR. THOMAS: Good morning. A.J. Thomas from Jenner & Block for all defendants. Also Andrew

A Yes.
Q Got it.
And how long did you remain president of Local 72-147?
A I remained president of Local 72-147 through May of 2011.
Q That's a wonderful run.
So from essentially '83 to 2011, you were with either Local 72 initially and then the merged Local 72-147 up through May of 2011; is that correct?
A Yes. 28 years.
Q Great.
What happened in May of 2011 that changed your role?
A I resigned my position.
Q And what was the reason why you reviewed the position in May of 2011?
A I had been elected president -- I'm sorry -- international president of the American Federation of Musicians.
Q Thank you.
So you were elected president of the international AFM in 2011?
A No.

Q What year was that?
A I was elected international president of the American Federation of Musicians 10 years, 6 months, 24 hours -- I'm sorry -- and 11 minutes ago, I think. Let me see.
It was 10 years, 6 months, 24 days, 11 hours, and 49 minutes ago that I was elected president of the American Federation of Musicians.
Q And when the deposition is over, it's going to be 10 hours -- okay.
A I'll make it easier for you, Mr. Kiesel. I took office as AFM president on August the 1st, 2010.
Q Thank you.
A I was actually elected a few weeks before that, but I did not take office until August 1st, 2010.
Q So you resigned with Local 72-147 in May of 2011 to become the president of the AFM, which you did August 1, 2010?
MR. THOMAS: Objection to form.
THE WITNESS: Not exactly. I did both jobs from August the 1st, 2010 --
BY MR. KIESEL:
Q All right --

A When I say "2'10," you know I mean 2010.
Q I do know that.
So ultimately, when you became the new president of the international AFM, you took over the trustee seat that Tommy Lee had held before?
A Yes.
Q And how did you become aware of the fact that this was a position that was open to you and/or a position that you would take over when you became the international president of the AFM?
MR. THOMAS: Object to the form.
THE WITNESS: Could you repeat that question?
BY MR. KIESEL:
Q Sure.
In other words, you become the president of the international AFM. And when you became president in August of 2010, did you realize that, when you became the president of the international AFM, it also meant that you were going to have some responsibility for the Fund as well? Or is that something you learned once you became president of the AFM?
A I would answer that question by saying that, as I became international president of the

American Federation of Musicians of the United States and Canada, I knew that I would inherit the same schedule of duties and responsibilities that were my predecessor's. And serving on the board of trustees -- I'm sorry -- serving as a trustee of the Fund was one of those duties.

Q So, for example, one of those other duties would have been the AFM Employers Pension Fund; right?

A That was another duty or --

Q So --

A -- action, responsibility -- whatever.

Q Right. So you understood when you became the president of the international American Federation of Musicians of the United States and Canada that one of the hats that you would wear would potentially be also on the board of the AFM Employers Pension Fund as well as the Fund itself that we're here to talk about today; correct?

A I wouldn't say that it was a hat to wear or that any of those were hats. I don't see duties as hats. I don't see those kinds of responsibilities as hats.

But I did understand that I would become co-chair of the AFM and Employers Pension Fund as a

was not specifically a co-chair identified with the Fund when you became the international president of the AFM?

A I'm sorry. Could you repeat that?

MR. THOMAS: Object to the form.

BY MR. KIESEL:

Q Sure.

THE WITNESS: So I'm sorry, Andrew. Maybe I'm not -- I'm not stopping long enough.

MR. THOMAS: If you could just pause for a moment, I may or may not have an objection. On this one I just objected to the form, and I think Paul is going to rephrase.

THE WITNESS: Okay.

BY MR. KIESEL:

Q I'll read this back to you.

I said: Did you have an understanding that there was not specifically a co-chair identified with the Fund when you became the international president of the AFM?

A I think that's right.

Q What happened, if you recall, that created the position of the co-chair of the Fund?

A Do you mean when did the terminology co-chair -- quote, "co-chair," unquote -- become

part of the picture?

Q Yes, please.

A Okay. I asked -- did I -- I asked a good question, didn't I?

Q That's a good question. It's a non-objectionable question. Answer.

A In the beginning, Dennis Dreith ran the meetings.

Q By the way, when I start playing the drums, then we can really have a day.

A I'm going to tell you, my time is expensive. If you're going to take from me, I'm going to charge good.

Q Amen, brother.

A Seeing as how rich you look back there.

Q It's actually a virtual background. So let's -- so I cut you off.

You started to say, in the beginning, Dennis Dreith ran the meetings.

A That's right.

Q And --

A And I think he ran the meetings for a couple of years, where he would come in and bring the agenda. You know, we would get the product before the meeting, and we would all come in and we

would -- he would call the questions and call the votes. And, you know, he was -- he was like the chair of the meetings.

And then as -- I think it was after SAG-AFTRA -- I'm sorry. I think it was after SAG and AFTRA merged, because they merged sometime during that time period of 2012. I'm trying to recall the dates. I'm having a little bit of trouble trying to nail the exact dates down.

But then Duncan replaced Kim Roberts on the board. And at that time, I think I had a discussion with Duncan about the -- to upgrade the professionalism. That's -- maybe that's a bad word but to just upgrade the circumstances that he and I would co-chair the meetings.

And then he would co-chair a meeting, and then the next meeting I would be the co-chair. So we would alternate.

Q When you joined, what did you understand Dennis Dreith's position was with the Fund?

A Well, he was the -- he was the administrator.

Q And Mr. Dreith was not a trustee to the Fund; right?

A No.

showed up. That's my -- that's the best of my recollection. I could be mistaken about that, but that's what I think.

Q Understood.

A I haven't -- I haven't looked to -- I haven't researched that, but that's what I -- that's what I -- that's what I believe.

Q Is it your belief that the AFM trustee -- that one of the trustees is always the president of the international AFM to the Fund?

A Do I --

MR. THOMAS: Object to the form.

THE WITNESS: Sorry, A.J.

(Reporter clarification.)

MR. THOMAS: Object to the form.

THE WITNESS: Could you repeat the question, Mr. Kiesel?

BY MR. KIESEL:

Q Of course. I just need to --

Is it your belief that the AFM trustee -- that one of the trustees is always the president of the international AFM to the Fund?

A My belief is that it is custom and practice.

Q To your knowledge, is there a formal

written policy at the AFM that identifies the appointment process for the other two Fund trustees from the AFM?

A None other than our AFM bylaws, I would think, where under the -- you know, under some of the bylaws, it empowers the president of the union to appoint all committees and representatives and so forth.

Q So to the best of your recollection, the president of the AFM would have the discretion of appointing the trustees to the Fund?

A Yes.

Q And am I also correct that the president of the AFM would have the right to discharge a trustee of the Fund as the president wishes?

MR. THOMAS: Objection. Vague.

You can answer.

THE WITNESS: I do want to -- I do want to say something about that question. I've never removed anybody; so I've never thought about it. And so I really don't know that there's any specific thing other than custom and practice about the question that you asked.

BY MR. KIESEL:

Q So let's put it this way.

you know, on respective issues.

BY MR. KIESEL:

Q So let me get more specific, then.

Did the Fund, in 2012, have its own counsel?

A Are you talking about the AFM and SAG-AFTRA Fund?

Q Correct.

A Okay. I must have -- I must have misinterpreted your question there.

Q Not a problem. Just let me restate it.

I just want to know, in 2012, did the Fund have counsel?

A Yes.

Q And who was the counsel to the Fund in 2012?

A Trish Polach.

Q I understand. And Trish Polach is a principal at Bredhoff & Kaiser, and Bredhoff & Kaiser were the attorneys to the AFM in 2012; correct?

A Yes. Yeah, I don't know the ins and outs of how attorneys refer to themselves, whether they represent them as a single attorney or if they represent clients as the firm, you know. But

Trish Polach was representing the Fund and was also an attorney from B&K -- I'm shortening Bredhoff & Kaiser to B&K -- and served the AFM as well.

Q Perfect. Thank you for that.

MR. KIESEL: So here's the deal. It's about noon Pacific time. It's 2:00 in your neck of the woods. I'm happy to take either the break at the top of the hour and we'll take ten minutes and keep pushing on, because I rarely eat.

Or really, Emily, I'm going to look to you. Let's go off the record.

THE VIDEOGRAPHER: We are now going off the record, and the time is 11:54 a.m.

(Break taken.)

THE VIDEOGRAPHER: We are now going back on the record, and the time is 12:11 p.m.

BY MR. KIESEL:

Q So, Mr. Hair, when Dan Navarro -- he's a recent trustee to the Fund?

A Uh-huh.

Q "Yes"?

A Yes.

Q When Mr. Navarro joined the Fund, do you know whether he received any training, either discussions or formal classes or anything, to

how that one vote should be cast?

A We generally did not discuss, you know, how unit voting would be working. I mean, generally, all of our decisions were by consensus among everyone.

Q Can you recall a time, for example, where the AFM felt it should be a vote, say, that was a "yes" vote and the SAG-AFTRA felt -- and which all three members felt it should be a "no" vote and, therefore, it didn't pass? Or did you almost always come to a uniform collective agreement on an issue?

A There -- to my recollection, I don't recall there ever being a unit voting disagreement. All of our decisions were done by consensus.

Q And when you say "done by consensus," what do you mean by that?

A It was just generally understood and generally agreed upon all the -- all of the trustees when a decision was made.

Q Okay. From 2012 to the present, has the Fund ever had any standing committees?

MR. THOMAS: Object to the form.

THE WITNESS: I believe we have. Yes.

BY MR. KIESEL:

Q Can you recall the name of any standing

trustees of the Fund?

A I believe so.

Q Did he serve at the specific direction of the co-chairs of the Fund, you and Mr. Crabtree-Ireland?

MR. THOMAS: Objection. Vague. Lacks foundation.

THE WITNESS: Would you repeat that question?

BY MR. KIESEL:

Q Sure.

Were you and Mr. Crabtree-Ireland in a position to direct Mr. Dreith what to do?

MR. THOMAS: Same objections.

THE WITNESS: We did not exercise any day-to-day supervision of Dennis Dreith.

BY MR. KIESEL:

Q Did Mr. Dreith serve as an at-will employee of the Fund subject to either you/Mr. Crabtree-Ireland saying, "You're fired"?

MR. THOMAS: Objection. Calls for a legal conclusion. Vague.

THE WITNESS: I -- my answer to that is I believe he was an at-will employee because he did not have a contract with the Fund, that I can

recall.

BY MR. KIESEL:

Q Just as the trustees we looked at with Exhibit Number 1 are subject to an at-will appointment to the board of trustees, subject to the president of the AFM or the president of SAG-AFTRA's decision to remove a trustee from their respective -- I hate the question. Strike it. Let me start again.

Is it fair to say that you or Mr. Crabtree-Ireland would talk to each other before any decisions were made about whether or not to discharge someone such as Mr. Dreith from the Fund?

MR. THOMAS: Objection. Overbroad, vague, and lacks foundation.

MR. KIESEL: Withdraw the question. Don't even answer it. Ignore it.

BY MR. KIESEL:

Q Prior to Mr. Dreith's departure from the Fund -- and he departed from the Fund; correct?

A Yes.

Q Do you recall what year he departed from the Fund?

A I'm sorry. Say that again.

Q Do you recall what year he departed from

the individuals it was sent to; correct?

A Yes.

Q And a courtesy copy to Jeff Freund, who I think you said was general counsel?

A Yes.

Q And who was Jeff Freund general counsel to?

A The American Federation of Musicians.

Q Okay. So he was AFM's general counsel?

A Yes.

Q And the subject line is "Data Purchase and Service Agreement AFM SAG-AFTRA Fund."

Do you see that?

A Yes.

Q And at least Ms. Polach put this importance as high, as it's reflected in the email.

All that is correct; right?

A Yes.

Q So could I ask you to read the sentence that's currently highlighted for us? Start with "Dear Ray and Dennis."

A (As read:) "You asked me earlier, Dennis on behalf of the AFM SAG-AFTRA Fund and Ray on behalf of AFM, to explore whether, and how, the AFM and SAG-AFTRA could enter into a service agreement with the Fund" --

Q And why don't you just keep reading the rest of the paragraph.

A You want me to read the rest of it?

Q Yeah, please.

A -- "pursuant to which the Fund would commence paying the unions for the data and services that the unions provide for the Fund's operations. Article IV, Section 3-O of the agreement and declaration of trust explicitly allows the Fund to purchase data from the unions, and by extension, the purchase of other services at a reasonable price from the unions should fall within the general powers of the trustees under the Fund's agreement and declaration of trust."

You want me to continue to read?

Q Please.

A (As read:) "As you both know, I obtained assistance from Jenner & Block. Among other things, they prepared a first draft of a Data and Services Agreement, which I modified slightly. The draft agreement expresses the contract fee as a percentage of Fund distributions but doesn't suggest what the Fund" -- "what the percentage should be. It is attached for your review."

Q So let me stop you right there. A couple

THE WITNESS: All right. So the AFM had been doing many, many things from 1994, you know, up to the date of those discussions, the general discussions that may have been had. But it would have taken the form of the fact that the AFM is subsidizing the Fund, you know, with the provision of services and the -- the provision of information that -- and the Fund was dependent on that. And, you know -- you know, how can we figure a way to -- to be -- to be reimbursed or to be -- to receive the value of what we provide.

So, I mean, that's just a general discussion, I suppose.

BY MR. KIESEL:

Q I understand.

So the idea was, look, the AFM is subsidizing the Fund. We're providing information to the Fund that they're using, and there ought to be some reimbursement to the AFM for what we're providing to the Fund.

Is that the general idea?

A I think -- I think there's more to it than that. Because the AFM was engaging in services that supported the Fund and the creation of it all the way up through the lobbying efforts that we were

taking, you know, to 2010. And there was a lot of -- there was quite a bit of resources being used from AFM to have the Fund carry on and move forward. So --

Q So when you say there were quite a bit of services provided to the Fund, one would be the lobbying efforts that were happening that -- was that -- those the lobbying efforts that created the Fund?

A Not only created the Fund but that were attempting to broaden the copyright laws that established the digital remuneration that was paid to the Fund.

You know, I mean, since -- particularly in 2010, there was a performance rights bill on deck that was sponsored by -- oh, from Detroit, John Conyers. And the AFM was heavily involved in the lobbying efforts for that.

Matter of fact, John Conyers came to the convention in 2010, AFM convention where I was elected, to talk to the convention about the efforts to broaden the copyright law to include a terrestrial right.

And then my -- in my education from counsel and others about those laws, it was determined that

if the -- if the terrestrial rights in the U.S. were adopted, then that would unlock many millions of dollars in Europe, you know, on a reciprocal basis to flow through Sound Exchange and AFM SAG-AFTRA Fund to then be able to distribute more -- collect more royalties and distribute them.

So there was a lot of stuff going on and there was a lot of, you know, sweat equity. There was a lot of -- a lot of attention and a lot of activity being -- being used or being expended, you know, by the AFM to the benefit of the Fund.

Q So you felt that the lobbying activities that AFM was involved in that ultimately led to unlocking funds that were then deposited with the Fund to be distributed to beneficiaries, that the AFM should be reimbursed for the costs associated with their activities?

A See, you're trying to -- you're trying to make it seem like I want to be reimbursed for the costs. But, you know, it's really the value of what we provide, and the value of what we provide comes in a lot of different ways. It comes in the data. It comes in the maintenance of that data. It comes in the maintenance of the performers' addresses and personal information.

By the way, I want to go back to 1956. I want to go back to Elvis Presley. The people who are still alive today who performed on the Elvis Presley song we were talking about, "Hound Dog," they don't live in the same place that they lived in in 1956. They've been -- they probably have lived several different places.

And so the union maintains not only the addresses and the contact information for the union members and also the nonunion participants, but we engage in a lot of activity that, besides the negotiating with the record companies to formulate the B-forms that are then transmitted to the Fund, but we also go all out, all out, to expand the scope of the laws that exist that create the money, that cause the money to be paid over in the first place.

Q So, Mr. Hair -- and I appreciate you recognize that I'm talking "cost."

And you're talking "value," what's the value to the Fund for the work that the AFM in particular is doing; correct?

A I'm talking about the value.

Q Right.

Was there an attempt that you're aware of to quantify the value of the services provided by

Because every time data is provided and services are provided, that work continues to -- the work and the data and the ongoing provision of data continues to serve the Fund every day forward. So, you know, it's a value provided that continues to be served because the consumption of the music and the content that is created continues to drive the -- continues to drive the payment of royalties.

It's not just -- it's not just a one-shot deal, you know, where a B-form goes into a file and then, you know, that's it. You know, it's not like, you know, we're a can of soup at the grocery store that gets consumed and that's it.

It's not like, you know -- you know, you call a plumbing and the plumber fixes the toilet, you know, and, you know, you don't have to pay the plumber every time you flush the toilet. You know, this is about the provision of services and also data that continues to provide value to the Fund every day forward.

BY MR. KIESEL:

Q So when you say "value to the Fund," my question to you, Mr. Dreith, is -- "Mr. Dreith" -- Mr. Hair, who sets what the value is to the unions?

Who sets that figure, what the value is to

the unions?

MR. THOMAS: Object to the form. Vague.

THE WITNESS: I'm sorry, but I don't see where your question is going here. I think we -- the union is an organization that does whatever it has to do to establish agreements with employers and organize and bargain those agreements to benefit its members and anyone else who is covered by that employment.

And so to the extent that this union has, since 1908, pushed for copyright laws and revisions to those laws to benefit our members, you know, that's a very, very good thing. And, you know, that value, you know, from 2013 forward, is going to inure to the benefit of the Fund.

So, you know, I don't think anybody's sitting around with a slide rule trying to figure out what the value is of the work that the union does to the union, you know. I think that what we do is, to the extent that we are making people's lives better in the -- in the advocation -- I'm sorry -- in the domestic and international advocacy, in all the other ways that we benefit this Fund, it's the value that we bring that is important here.

///

BY MR. KIESEL:

Q Follow me, if you will.

I appreciate the fact that, as the president of the AFM, you believe that you provide a value to the Fund and its beneficiaries for which the Fund should reimburse the AFM for the value of the service it's providing to the Fund.

Do I have that right so far?

MR. THOMAS: Objection. I think that misstates his testimony, and it also is argumentative.

BY MR. KIESEL:

Q You can answer it.

A Could you repeat it, please?

Q I'm going to read it back to you.

I appreciate the fact that, as president of the AFM, you believe that you provide a value to the Fund and its beneficiaries from which the Fund should reimburse the AFM for the value of the services it's providing to the Fund; correct?

MR. THOMAS: Same objections.

THE WITNESS: You know, I think -- I think what I'm hearing here is you trying to tie me to the reimbursement piece so that it becomes a finite thing, you know, from one day to the next. And I

really think that that may have been the wrong word for me to use, because I think the AFM should be entitled to receive the value of what it provides.

BY MR. KIESEL:

Q So if I just use your words, "the value of what it provides" -- let's take that phrase, "the value of what it provides" -- it's your view that the Fund should give back to the union the value of what the union is providing to the Fund; right?

MR. THOMAS: Object to the form. Vague. Argumentative.

THE WITNESS: I think the Fund would not be able to operate if it did not have the support and the service and everything the AFM is providing to it. And I think that the AFM deserves to and should and is receiving the value of what we provide.

BY MR. KIESEL:

Q You said the Fund would not be able to operate if it did not get provided the value of what the AFM provides to it; correct?

A I'm going to say this again. The Fund is dependent upon the AFM for a lot of things. It's dependent upon the AFM to -- for the -- obviously, for the data. And the data consists of two things.

It's the session reports. And it's not

Q So when you say "our data and our services" are being used, you are clearly wearing your hat as the president of the international AFM; correct?

MR. THOMAS: Objection. Argumentative.

THE WITNESS: I'm not wearing hats. I'm describing the AFM's role in doing what it does to bargain with the record labels to create not only the data provided but also the services that we provide AFM and SAG-AFTRA Fund with regard to domestic and international advocacy and in every other way that we do. All of that, the value continues to increase every year.

BY MR. KIESEL:

Q I'm going to restate the question.

When you say "our data and our services" are being used, you're referring to the AFM when you use the word "our"; correct?

MR. THOMAS: Objection. Asked and answered.

THE WITNESS: Yes.

BY MR. KIESEL:

Q Would you agree with the idea that, as the co-chair of the Fund, you have a responsibility, a fiduciary obligation to return as much money to the beneficiaries of the Fund as possible?

A I believe that it would have been. Yes.

Q Do you recall at the June 4, 2013, meeting, specifically with respect to the service fee, that Duncan Crabtree-Ireland did not vote on that particular motion?

A I don't recall that.

Q Okay. So if I were to say to you, "Do you know one way or the other whether Mr. Crabtree-Ireland actually voted on the service fee motion?" you wouldn't recall one way or the other?

A I wouldn't recall.

Q Okay. If I told you that Duncan abstained or didn't vote because he felt he had a conflict of interest in voting on this, would that refresh your recollection about what he may have done?

MR. THOMAS: Objection. That misstates Mr. Crabtree-Ireland's testimony quite egregiously. Lacks foundation.

MR. KIESEL: Object to form. I got that. Enough.

THE WITNESS: Are you looking for an answer?

BY MR. KIESEL:

Q Yes.

THE WITNESS: A.J.?

MR. THOMAS: You can answer the question.

THE WITNESS: I'm sorry. Would you read the question back?

BY MR. KIESEL:

Q Sure.

The question was, if I told you Duncan abstained or didn't vote because he felt he had a conflict in interest in voting on this, would that refresh your recollection about what he may have done?

A No.

Q Thank you.

Before this meeting on June 4, 2013, did you speak with any other trustees about the proposed service agreement?

MR. THOMAS: Object to the form.

THE WITNESS: I'm sure that I did. I don't recall what specifically was said.

BY MR. KIESEL:

Q Do you recall whether you had an opportunity before June 4, 2013, and the vote -- whether you spoke to each of the trustees? one of the trustees? Just a sense of who you may have communicated with?

that ensued regarding a service fee at the meeting?

A The best of my recollection is that, you know, everyone there commented about it. There were no unfavorable comments. There wasn't a whole lot of discussion, but what discussion there was was not adversarial. There was consensus. My best rel- -- I'm sorry -- my best recollection is that there was consensus among everyone that this was the right thing to do.

Q Do you recall any of the trustees speaking against the proposal?

A I do not.

Q Do you recall what sorts of questions may have been asked by other trustees regarding the proposal?

A I don't recall questions from the trustees.

Q Do you recall that there were, in fact, no questions from the trustees, or you just -- you know there were questions but "I can't recall what those questions were"? Which might that be?

A I don't recall any questions from the trustees. I think there was some discussion, but the discussions were not in the form of questions. I think the discussions were that there was a consensus among the group to adopt the motion.

Q Okay. Thank you.

Am I correct that only the trustees had the ability to vote on the service agreement?

A Paul, say that again, because you broke up, one more time. I'm sorry.

Q Only the trustees had the ability to vote on the service agreement?

A Yes.

Q And I take it that you voted in favor of the service agreement?

A Yes. I would have. Yes.

Q And you can't -- is it fair to say that you don't believe that Duncan abstained from the vote?

I'm going to give you a choice: "I don't believe he abstained," "I can't recall what he voted," or "He voted yes."

A I don't recall that Duncan abstained. I don't think there was a discussion. I don't recall any, you know, discussion about anyone abstaining from a vote.

Q And is it fair to say, based upon that you and Duncan were co-chairs of the board of trustees, that, had Duncan abstained from the vote, you would remember he abstained from the vote?

MR. THOMAS: Objection. Argumentative.

THE WITNESS: I don't know whether I would have remembered that or not.

Excuse me. I don't see it in the minutes of the meeting that anyone abstained.

BY MR. KIESEL:

Q And that's just what I was looking down at my notes. Because I see nothing in the minutes that reflect that Duncan Crabtree-Ireland abstained from the vote, and that would normally have been there -- am I correct -- well, we're looking at them right now.

If we look at the vote, it doesn't specifically say how the vote broke down in terms of the unanimity or lack thereof, but it does not say that Duncan abstained from the vote.

Let me just strike the question and start again.

In looking at the minutes, do you see anything in the minutes that Duncan Crabtree-Ireland abstained from the vote?

A Not from the pages of the minutes that I've been shown here today.

Q And if I represent to you that there's nothing in the minutes that reflect in the minutes of this meeting that Duncan Crabtree-Ireland

abstained from the vote, would that at least be consistent with your memory that he did not abstain from the vote?

MR. THOMAS: Object to the form. Mischaracterizes testimony.

THE WITNESS: I don't know whether he -- you know, I can't remember there being anything about anyone at the meeting abstaining from voting.

BY MR. KIESEL:

Q Would it have raised a level of concern --

You can take this down.

Would it have raised a level of concern for you, Mr. Hair, if Duncan abstained because of his position with SAG-AFTRA, with regard to your position with the AFM, if Duncan chose not to vote?

MR. THOMAS: Object to the form. Lacks foundation and calls for speculation.

THE WITNESS: I would have to transport myself back in time to the situation. And, you know, it's -- I didn't know at the time and I don't know whether I would have been concerned about it or not.

BY MR. KIESEL:

Q Is it fair to conclude, from everything that you knew about your role as the president of

THE WITNESS: No.

BY MR. KIESEL:

Q Did anyone from SAG-AFTRA, Mr. Hair, express to you that SAG-AFTRA did not believe there was a need for a service fee?

A No.

Q After the implementation of the service fee, has there ever been a breakdown of the costs of providing the data?

MR. THOMAS: Object to the form. Lacks foundation.

THE WITNESS: No.

BY MR. KIESEL:

Q Does the AFM provide part or all of the data it shares with the Fund with any other entities?

A Could you repeat that?

Q Sure.

Does AFM provide all the data it shares with the Fund with any other entity? For example, the AFM Pension Fund?

A Yes.

Q Other than the AFM Pension Fund, does it provide the data to anyone else other than the Fund?

MR. THOMAS: Object to the form. Lacks

foundation.

THE WITNESS: Are you talking about the specific data that we send to the Fund?

BY MR. KIESEL:

Q Yes.

A I don't think we provide the same information to other entities that we provide to the Fund. It's not -- I don't recall that. I mean, other information is provided but not in that form.

Q So when you say other information is provided to other organizations, one of them would be the AFM Pension Fund; right?

A Right. Yes.

Q Other than the AFM Pension Fund, is there another group within AFM that it shares data with?

MR. THOMAS: Object to the form. Lacks foundation.

THE WITNESS: So the AFM's agreements with various media companies, in those collective bargaining agreements, there are provisions that we provide information, certain information to the royalty funds that are connected -- I'm sorry -- residual funds -- strike that word "royalty" -- residual funds that are attached to those agreements.

BY MR. KIESEL:

Q What information does the AFM provide to the AFM Pension Fund?

A The AFM provides data on the employees that are covered by agreements that are negotiated by AFM, that are, you know, also covered by employment with the AFM and its locals and any other agreement that -- any other participation agreement in the Pension Fund. We provide all the data to them about that. Those are covered employees.

Q Does the Pension Fund -- does the Pension Fund provide any service fee back to the AFM for the information the AFM is providing to the Pension Fund?

MR. THOMAS: Objection. Vague. Lacks foundation.

THE WITNESS: No.

BY MR. KIESEL:

Q You are on the board of the Pension Fund; correct?

A Yes.

Q Are you the chair of the Pension Fund?

A I'm the co-chair.

Q And who is the other co-chair?

A Chris Brockmeyer.

BY MR. KIESEL:

Q Right. And that this is your opportunity to speak for yourself.

So in looking at that word that says "not to put words in your mouth," which he was doing, I'm asking you do you recall as you sit here today that specifically the beneficiaries were told about the 3 percent service fee?

MR. THOMAS: Objection. Vague. Overbroad.

THE WITNESS: I don't recall.

BY MR. KIESEL:

Q Do you believe as the co-chair of the Fund that you had any duty to the beneficiaries of the Fund to advise them of the adoption of the service fee that was going to be paid to the unions?

MR. THOMAS: Objection. Overbroad. Lacks foundation.

THE WITNESS: I don't.

BY MR. KIESEL:

Q Did you believe as co-chair of the Fund that there was any duty to explain the purpose of the service fee to the Fund beneficiaries?

MR. THOMAS: Same objections.

THE WITNESS: No.

///

I, the undersigned, a Certified Shorthand Reporter of the State of California do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is an accurate transcription thereof.

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ ] was [X] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or any of the parties.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: 9th of March, 2021

EMILY SAMELSON,

CSR No. 14043

# EXHIBIT 9

Confidential Pursuant to Protective Order

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

KEVIN RISTO, on behalf of himself and all others similarly situated,

Plaintiff(s),

vs.

SCREEN ACTORS GUILD-AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS; a Delaware corporation; AMERICAN FEDERATION OF MUSICIANS OF THE UNITED STATES AND CANADA, a California nonprofit corporation; et al.,

Defendants.

Case No.: 2:18-cv-07241-CAS-PLA

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
VIDEOTAPED DEPOSITION OF
RULE 30(b)(6) WITNESS FOR THE AMERICAN FEDERATION OF MUSICIANS, BY: RAYMOND HAIR
Appearing Remotely From
Denton, Texas
Thursday, February 25, 2021

Stenographically reported by:
EMILY SAMELSON, CSR No. 14043
Golkow Job No.: 269545

A P P E A R A N C E S:

(All appearances appearing remotely)

For Plaintiff(s):

KIESEL LAW LLP
BY: PAUL R. KIESEL, ESQ.
MARIANA A. MCCONNELL, ESQ.
NICHOLAS BRANCOLINI, ESQ.
8648 Wilshire Boulevard
Beverly Hills, California 90211
310.854.4444
kiesel@kiesel.law
mcconnell@kiesel.law
brancolini@kiesel.law

JOHNSON AND JOHNSON, LLP
BY: NEVILLE L. JOHNSON, ESQ.
DANIEL B. LIFSCHITZ, ESQ.
439 North Canon Drive
Beverly Hills, California 90210
310.975.1080
njohnson@jjllplaw.com
dlifschitz@jjllplaw.com

For Defendants:

JENNER & BLOCK LLP
BY: ANDREW THOMAS, ESQ.
ANDREW G. SULLIVAN, ESQ.
ANNA K. LYONS, ESQ.
633 West 5th Street, Suite 3600
Los Angeles, California 90071
213.239.5155
ajthomas@jenner.com
agsullivan@jenner.com
alyons@jenner.com

Also Present: Jennifer Garner, Esq., and Russell Naymark, Esq., In-house Counsel for American Federation of Musicians

Videographer: Larry Maher

Denton, Texas

Thursday, February 25, 2021; 9:12 a.m.

--oOo--

THE VIDEOGRAPHER: We are now on the record. My name is Larry Maher. I am a videographer for Golkow Litigation Services.

Today's date is Thursday, February 25th, 2021, and the time is 9:13 a.m. Pacific Standard Time.

This remote video deposition is being held in the matter of Risto v Screen Actors Guild - American Federation of Television and Radio Artists for the United States District Court for the Central District of California.

The deponent is Ray Hair. He is the 30(b)(6) witness for the AFM.

All parties to this deposition are appearing remotely and have agreed to the witness being sworn in remotely.

Due to the nature of remote reporting, please pause briefly before speaking to ensure all parties are heard completely.

Will counsel please identify themselves.

MR. KIESEL: Paul Kiesel for plaintiffs.

You already have the appearances of Nico

just tell us the year and the amount.

A 2013 to 2019?

Q Yes.

A So in 2013 our income was $11,000,893 -- I'm sorry. Let me go back. I misread it.

In the year 2013, income was $11,893,180.

Q And by the way, you almost said, "Strike that," which is my line.

A Well, I learned it from you.

Q Well done.

A But I'm assuming that's free. I don't have to pay you a residual for that; is that true?

Q Yes. I'm drumming.

MR. THOMAS: And the little-known secret is nothing actually gets stricken, but anyway.

MR. KIESEL: Exactly.

THE WITNESS: The expenses that year were $11,530,740. And the surplus was $561,579.

In 2014, income was $12,333,861. Expenses were $11,429,698. Surplus was 904,000,000 -- I'm sorry -- 904,163.

2015, our income was $12,656,671. Expenses were $11,394,057. Surplus was $1,262,614.

2016, the income was $13,916,124. Expenses were $13,152,710. The surplus for 2016 was 763,414.

2017, the income, AFM, was $13,046,192. Our expenses were $11,001,887. Surplus that year was $2,044,305.

2018, income was $13,906,400. Expenses were $11,303,369. Surplus was $2,603,031.

2019, 14,000,000 -- income was $14,508,125. Expenses were $13,472,091. That gave us a surplus of $1,036,034.

BY MR. KIESEL:

Q Thank you very much for that information.

Of the income received by the AFM, would you say 90, 95 percent -- what percent would you say is dues-based income?

A At least 90 percent.

Q If 90 percent were the dues-based income, what would reflect the other 10 percent?

A The other 10 percent would be other income. It could be investment income. It could be just other general income, settlement income. You know, we began a very rigid enforcement regimen when our team was elected, and that resulted in some additional income as well.

Q Would --

A And, of course, I think part of that -- part of that other percentage would be the service

fees that we --

Q Exactly. I was just about to go there. I was pulling my notes from yesterday.

And if we look at 2017 -- let's look at 2018. 2018, which the net income after expenses was 2.6 million, the AFM received $864,000 of money from the service fee. The year before that, it received $872,000.

So if we look at that year, about 40-some-odd percent, maybe 45 percent of the net revenue for the AFM was from the service fee paid from the Fund to the AFM that year?

MR. THOMAS: Object to the form.

BY MR. KIESEL:

Q Just ballpark --

MR. THOMAS: Misstates his testimony.

BY MR. KIESEL:

Q If the AFM, in 2017, did receive $872,894, that was paid from the Fund to the AFM and the AFM's net was $2,044,000, it's going to be north of 40 percent of the net revenue came from the service fee paid from the Fund; true?

MR. THOMAS: Object to the form.

THE WITNESS: I would object --

MR. THOMAS: Misstates his testimony.

I, the undersigned, a Certified Shorthand Reporter of the State of California do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is an accurate transcription thereof.

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ ] was [X] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or any of the parties.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: 11th of March, 2021

EMILY SAMELSON,

CSR No. 14043

# BYLAWS

## of the

## AMERICAN FEDERATION OF MUSICIANS

## OF THE

## UNITED STATES AND CANADA

Revised September 15, 2019

EXHIBIT
30(b)(6) for AFM, R. Hair
2
2/25/21 E.S.

# BYLAWS

## of the

## AMERICAN FEDERATION OF MUSICIANS

## OF THE

## UNITED STATES AND CANADA

**Revised September 15, 2019**

# INTERNATIONAL OFFICERS
# of the
# AMERICAN FEDERATION OF MUSICIANS

---

## TITLED OFFICERS

**RAYMOND M. HAIR, JR., President**
1501 Broadway, Ninth Floor; New York, NY 10036

**BRUCE FIFE, International Vice President**
325 NE 20th Avenue; Portland, OR 97232

**ALAN WILLAERT, Vice President from Canada**
150 Ferrand Drive, Suite 202; Toronto, Ontario, Canada M3C 3E5

**JAY BLUMENTHAL, International Secretary-Treasurer**
1501 Broadway, Ninth Floor; New York, NY 10036

---

## EXECUTIVE COMMITTEE

**DAVE POMEROY**
11 Music Circle North; Nashville, TN 37203

**TINA MORRISON**
Spokane Regional Labor Council; 510 S. Elm St.; Spokane, WA 99201

**JOHN ACOSTA**
3220 Winona Avenue; Burbank, CA 91504

**EDGARDO MALAGA**
4400 MacArthur Blvd; Washington, DC 20007

**TERRYL JARES**
656 West Randolph, Ste. 2W; Chicago, IL 60661

---

NEW YORK HEADQUARTERS
1501 Broadway, Ninth Floor; New York, NY 10036-5501
212-869-1330 • Fax: 212-768-7452

WEST COAST OFFICE
3220 Winona Avenue; Burbank, CA 91504
818-565-3400 • Fax: 818-565-3455

CANADIAN OFFICE
150 Ferrand Drive, Suite 202; Toronto, Ontario, Canada M3C 3E5
416-391-5161 • Fax: 416-391-5165

www.afm.org

TABLE OF CONTENTS

ARTICLE 1 - NAME & PARLIAMENTARY AUTHORITY ........ 1
ARTICLE 2—MISSION ........ 2
ARTICLE 3—OFFICERS ........ 3
International President ........ 3
International Vice President ........ 6
Vice President from Canada ........ 6
International Secretary-Treasurer ........ 7
*International Musician* ........ 9
International Executive Board ........ 9
Emeritus/Emerita Officers ........ 13
Trials of Officers ........ 13
ARTICLE 4 — LOCAL CHARTERS ........ 15
Charter Applications ........ 15
Charter Revocation ........ 17
Charges Against a Local ........ 17
Geographic Jurisdiction Changes ........ 18
ARTICLE 5—LOCALS' RIGHTS & DUTIES ........ 19
Minimum Operational Requirements ........ 19
Local Elections ........ 22
Collective Bargaining ........ 23
Contract Ratification ........ 24
Conflicts of Interest ........ 29
Officers as Fiduciaries ........ 30
Fees, AFM Affiliation ........ 31
Local Dues & Fees Authorities ........ 33
General ........ 34
Trusteeship ........ 35
ARTICLE 6—FUNDS ........ 37
Symphony-Opera Orchestra Strike Fund ........ 37
Regional Orchestra Emergency Relief Fund ........ 39
Theater Defense Fund ........ 40
ARTICLE 7—GRIEVANCES & CLAIMS ........ 43
ARTICLE 8—UNFAIR LIST ........ 45
ARTICLE 9—MEMBERSHIP; ELIGIBILITY, APPLICATION, FEES & DUES ........ 46
Membership Categories Summary ........ 46
Joining ........ 47
Members of Other Locals ........ 48
Reinstating Membership ........ 49
Resignation, Suspension, Expulsion ........ 50
Work Dues ........ 52
Work Dues—Traveling ........ 54
ARTICLE 10—MEMBERS' RIGHTS & DUTIES ........ 56
ARTICLE 11—CHARGES & TRIALS ........ 60

ARTICLE 12—APPEALS ........ 64
ARTICLE 13—TRAVELING ENGAGEMENTS ........ 67
General Rules ........ 67
Traveling Engagement Compensation ........ 68
Traveling Contracts ........ 69
Theatrical Engagements ........ 70
ARTICLE 14—SYMPHONIC ORCHESTRAS ........ 71
ARTICLE 15—RECORDING ........ 74
ARTICLE 16—BOOKING AGENTS ........ 76
ARTICLE 17—CONVENTIONS ........ 79
ARTICLE 18—CONVENTION PROCEDURES ........ 83
Procedure for Submitting Resolutions ........ 83
ARTICLE 19—ELECTIONS ........ 87
ARTICLE 20—POLICY ........ 90
ARTICLE 21—COLLECTION AND DISTRIBUTION ON BEHALF OF MEMBERS ........ 944
ARTICLE 22—MISCELLANEOUS ........ 955
Conferences ........ 966
GLOSSARY OF TERMS AND ACRONYMS ........ 988
INDEX ........ 102
OFFICERS EMERITI ........ 12121

# BYLAWS

## ARTICLE 1 - NAME & PARLIAMENTARY AUTHORITY

**SECTION 1.** This organization shall be known as the American Federation of Musicians of the United States and Canada. In an effort to recognize/acknowledge that the activities of the organization are subject to the laws of each country referenced, for all its activities within the United States and its Territories, this organization shall be known as the "American Federation of Musicians" (AFM), and for all its activities within Canada and its Territories, this organization shall be known as the "Canadian Federation of Musicians/Fédération canadienne des musicienes). The American Federation of Musicians of the United States and Canada shall consist of Locals chartered in accordance with these Bylaws, the individuals who form these Locals, and other organizations active in the field of music that may be granted a charter of affiliation with the American Federation of Musicians of the United States and Canada.

**SECTION 2(a)**. The rules contained in the most recent edition of Robert's Rules of Order Newly Revised shall govern the AFM in all cases to which they are applicable and in which they are not inconsistent with these Bylaws.

**SECTION 2(b).** Unless a Local's Constitution and/or Bylaws specifies some other source of parliamentary authority, the most recent edition of Robert's Rules of Order Newly Revised shall be the parliamentary authority for the Local in all matters to which they are applicable and in which they are not inconsistent with these Bylaws and/or the Local's Constitution and/or Bylaws.

# ARTICLE 2—MISSION

**SECTION 1.** We are the American Federation of Musicians of the United States and Canada, professional musicians united through our Locals so that:

- We can live and work in dignity;
- Our work will be fulfilling and compensated fairly;
- We will have a meaningful voice in decisions that affect us;
- We will have the opportunity to develop our talents and skills;
- Our collective voice and power will be realized in a democratic and progressive union;
- We can oppose the forces of exploitation through our union solidarity.

To achieve these objectives, we must commit to:

- Treating each other with respect and dignity without regard to ethnicity, creed, sex, age, disability, citizenship, sexual orientation, marital status, family status, or national origin;
- Honoring the standards and expectations we collectively set for ourselves in pursuit of that vision, supporting and following the Bylaws that we adopt for ourselves;
- Actively participating in the democratic institutions of our union.

With that unity and resolve, we must engage in direct action that demonstrates our power and determination to:

- Organize unorganized musicians, extending to them the gains of unionism while securing control over our industry sectors and labor markets;
- Bargain contracts and otherwise exercise collective power to improve wages and working conditions, expand the role of musicians in work place decision-making, and build a stronger union;
- Build political power to ensure that musicians' voices are heard at every level of government to create economic opportunity and foster social justice;
- Provide meaningful paths for member involvement and participation in strong, democratic unions;
- Develop highly trained and motivated leaders at every level of the union who reflect the membership in all its diversity;
- Build coalitions and act in solidarity with other organizations that share our concern for social and economic justice.

# ARTICLE 3—OFFICERS

**SECTION 1**. The AFM's Officers shall consist of an International President, two Vice Presidents (one of whom shall be "the International Vice President" and the other "the Vice President from Canada"), an International Secretary-Treasurer, and an Executive Committee of five members elected at large. The Vice President from Canada shall be a resident of Canada and shall be elected solely by the Delegates representing the Canadian Locals. Collectively these Officers shall constitute the International Executive Board (IEB).

**SECTION 2.** Any AFM member who has been in good standing for at least two continuous years immediately preceding the date of his/her nomination for election to an AFM office shall be eligible to be an AFM Officer, except that in the case of the Vice President from Canada, he/she must, in addition to the foregoing, be a citizen or permanent resident of Canada. No member may hold more than one Office.

**SECTION 3.** All AFM Officers shall be considered members at large during their term of office, and if the Local in which they hold membership should disaffiliate, be suspended from the AFM, or become defunct, their membership shall not be affected.

**SECTION 4(a)**. It is the duty of each AFM Officer to hold the AFM's money and property solely for the benefit of the AFM and its members and to manage, invest, and expend the same in accordance with these Bylaws and the rules and policies as adopted by the IEB, to refrain from dealing with the AFM as an adverse party or on behalf of an adverse party in any matter connected with his or her duties and from holding or acquiring any pecuniary or personal interest which conflicts with the interests of such AFM, and to account to the AFM for any profit received by such AFM Officer in whatever capacity in connection with transactions conducted by him or her on behalf of the AFM.

**SECTION 4(b)**. In addition to the obligation to provide an accounting, an AFM Officer shall pay to the AFM an amount equivalent to the personal profit gained by him or her as a result of any transaction involving the AFM unless, prior to engaging in the transaction, a majority of the disinterested IEB members voted to approve the transaction after the material facts and the Officer's interest were fully disclosed, and the transaction was fair and reasonable to the AFM when approved.

**SECTION 4(c)**. For purposes of this Section, any personal pecuniary interest taken by an AFM Officer for engaging in the duties and obligations of the Office above and beyond the salary or honorarium provided by these bylaws shall be presumed unreasonable.

## International President

**SECTION 5(a).** It shall be the duty of the International President to: preside at all AFM Federation and IEB meetings; sign all official AFM documents; sign all warrants; appoint all committees unless otherwise ordered; supervise the AFM's affairs; and make decisions in cases where, in his or her opinion, an emergency exists. To put these decisions into effect the International President shall issue executive orders, which shall be final and binding upon all members and Locals. Any order may enforce the Bylaws or other laws, resolutions, or rules of the AFM.

**SECTION 5(b)**. The International President shall call special IEB sessions when necessary; call strikes; draw funds to pay all expenses incurred by the exercise of his or her duties; and perform other duties as may be provided for elsewhere in these Bylaws.

**SECTION 5(c)**. At IEB meetings the International President shall vote only in the case of a tie vote.

**SECTION 5(d).** The International President and IEB are given full power to draw on the AFM treasury when deemed necessary to further the AFM's interests.

**SECTION 5(e).** The International President shall report his or her actions to the AFM Convention.

**SECTION 5(f).** The International President shall represent the AFM at the American Federation of Labor and Congress of Industrial Organizations ("AFL- CIO") Convention as one of its Delegates.

**SECTION 5(g)**

i. The International President shall receive a basic monthly salary of $8,787.00 adjusted on each August 1 for the cost of living change from July 2000 to July of that year as shown by the Consumer Price Index-All Urban Consumers: U.S. All items, 1982=100 (rounded to the nearest dollar).

ii. The adjusted monthly salary as of August 1 in the year of publication of these Bylaws shall be $13,046.81.

iii. The adjusted monthly salary as of August 1 in all other years shall be set forth in the Annual Report.

iv. The International President shall also receive all hotel and traveling expenses when traveling on AFM business outside the metropolitan area where the AFM maintains its principal office, which expenses shall be reviewed by the Executive Committee each quarter.

**SECTION 5(h).** The International President shall appoint an "Executive Assistant to the President," and, after consulting with the Secretary-Treasurer, Vice President from Canada, and Executive Assistant, appoint International Representatives as follows, all subject to approval by the IEB, which shall also set the compensation for these positions. There shall be an Executive Assistant to the President, answerable to the President, who shall serve as his/her representative with regard to implementation of AFM policy and supervision of field/resource departments. The Executive Assistant shall direct and sort inquiries that may come into the AFM offices. There shall be up to ten full and/or part-time International Representatives appointed who shall report to the Executive Assistant. One of the IRs shall be designated as the Canadian International Representative who shall have Canadian citizenship or Permanent Resident status and who must reside in Canada.

**SECTION 5(i)**. The International President may appoint "Assistants to the President," subject to approval by the IEB, which shall also set the compensation of these Assistants.

i. There shall be at least one Assistant to the President assigned to service Locals and members located in the western part of the United States. There

shall be at least one Assistant to the President assigned to administer the AFM's organizing and education programs. There shall be at least one Assistant to the President assigned to administer the AFM's programs to assist freelance musicians not engaged under CBAs. There shall be at least one Assistant to the President assigned as Public Relations/Marketing Resource Coordinator.

ii. No Assistant to the President may be a member of the IEB, but all Assistants to the President must be AFM members.

iii. The duties of all Assistants to the President shall be to assist in the discharge of all lawful business in the manner that the International President directs. The Assistant shall receive information from both sides of a controversial issue before making decisions or orders affecting Locals.

**SECTION 5(j).** The International President is authorized to appoint, with IEB consent, a national representative for each U.S. State and Canadian Province. Each national representative shall be a resident of the State or Province, and shall perform such services as the International President may require. These representatives, or any other members who are not AFM employees but who are called upon to assist the International President, shall receive all hotel and other expenses incurred incidental to their travel for services performed outside the jurisdiction of the Locals where they reside.

**SECTION 5(k).** The International President shall employ supervisory and clerical assistance as, in his/her discretion is necessary.

**SECTION 5(l).** The International President shall employ an auditor, who must be a Certified Public Accountant (CPA), properly bonded according to the custom of that profession, to audit the AFM's books annually. The audited annual combined financial statements and other financial information report shall be referred to the Finance Committee at the Convention. The International President shall make a read-only copy of that information available on the members area of the AFM website.

**SECTION 5(m).**

i. The International President may suspend or remove from office any Local Officer for: neglect of duty; or for interference with or violation of any of the Bylaws or any Convention, Presidential, or IEB orders or directions or the purposes, objects, or affairs of the AFM.

ii. The International Secretary-Treasurer's office shall be notified and shall, without unnecessary delay, forward a copy of the charge(s) and specifications by registered mail to the accused Officer for reply. Upon receipt, the accused Officer shall submit a reply within 15 days. Should an accused Officer fail to answer the charge(s) within 15 days after receipt of the registered letter, the action of the International President shall stand.

iii. If a reply is received from the accused Officer within the time limit, the International Secretary-Treasurer shall then forward copies of the charge(s) and specifications and the accused Officer's reply to the IEB. If the accused Officer replies with a request for a hearing, the International President shall appoint one or more hearing Officers from the IEB to conduct the hearing and provide the International Secretary-Treasurer with a tran-

script of the proceedings, which shall be incorporated into the record. The International President, having filed the charge(s), may participate in the presentation of any evidence but may not participate in or be present during deliberations. The IEB shall consider the entire record and render a decision as soon as practicable. The IEB's decision shall be final and binding.

iv. Upon the removal of any Local Officer, the vacancy created shall be filled in accordance with the Bylaws, Rules, and Regulations governing the Local.

## International Vice President

**SECTION 6.** It shall be the International Vice President's duty to act in the absence or disability of the President, or, when requested by the International President, the IEB shall direct him or her to so act. The International Vice President shall receive a monthly salary of $1,750.00. If called upon to act as Assistant to the International President, the International Vice President shall be paid, in addition, a rate to be determined by the IEB plus all hotel and traveling expenses when traveling on AFM business outside the metropolitan area where the International Vice President resides. If called upon to act in the absence or disability of the International President or to attend IEB meetings or to fulfill other duties assigned by the President or the IEB, the International Vice President shall also receive all hotel and traveling expenses.

## Vice President from Canada

**SECTION 7(a).** The Vice President from Canada shall maintain a full-time AFM office in Canada, and shall employ supervisory and clerical help as necessary, both subject to the International President's approval.

**SECTION 7(b).** The Vice President from Canada shall be responsible for the administration of AFM affairs throughout Canada, including an international contracts department, all of which shall be under the International President's direct supervision, and under the general supervision of the International Executive Board. When unable to contact the International President, the Vice President from Canada shall have the authority to make decisions in cases where, in his/her opinion, an emergency exists in matters affecting solely Canadian members, Canadian Locals, and/or Canadian matters. To give effect to these decisions, the Vice President from Canada is authorized to promulgate and issue executive orders to Canadian Locals and Canadian members.

**SECTION 7(c).** The Vice President from Canada shall have the authority to appoint committees made up of Canadian members to advise him/her when, in his or her opinion, the appointment of these committees is necessary to effectively carry out his or her duties.

**SECTION 7(d).** The International Secretary-Treasurer shall have the authority to maintain an impest fund in a Canadian bank upon which the Vice President from Canada may draw checks to pay petty cash expenses of the AFM office in Canada.

**SECTION 7(e)**

i. The Vice President from Canada shall also perform other duties from time to time as directed by the International President and/or the IEB. The Vice President from Canada shall receive a basic monthly salary of $7,398.00

(US dollars in its Canadian equivalent) adjusted on each August 1 for the cost of living change from July 2000 to July of that year as shown by the Consumer Price Index-All Urban Consumers: U.S. All items, 1982=100 (rounded to the nearest dollar).

ii. The adjusted monthly salary as of August 1 in the year of publication of these Bylaws shall be $10,948.45.

iii. The adjusted monthly salary as of August 1 in all other years shall be set forth in the Annual Report.

iv. When traveling on AFM business, the Vice President from Canada shall be paid transportation, hotel, and other traveling expenses, which expenses shall be reviewed by the Executive Committee each quarter.

**SECTION 7(f).** The Vice President from Canada shall sit on the board of Musicians' Rights Organization Canada (MROC).

## International Secretary-Treasurer

**SECTION 8(a).** The International Secretary-Treasurer shall keep a faithful record of the proceedings of all meetings; answer all communications pertaining to the AFM; issue all charters in accordance with AFM Bylaws; inform all Locals of all additions to the AFM; compile a list of Locals' Work Dues to be distributed to all Locals and booking agents; attest all bills; provide on the AFM .org website the most complete current Federation census of unique members; that is, excluding multiple memberships, and divided by membership category (regular, life, etc.); notify the Delegates of all Convention-related meetings; publish in the *International Musician*'s May issue all Recommendations to be proposed by the IEB at the Convention as are then formulated and all Resolutions submitted in accordance with these Bylaws; publish the Convention proceedings (the actual four days' Minutes) in a separate booklet, along with the official Roll Call, and send a copy to each Delegate as soon after the Convention as possible; publish in the *International Musician* as soon as possible all laws that have been in any way changed; forward to each Local a number of copies of the AFM Bylaws representing 5% of the Local membership, plus additional copies of the Bylaws as requested; and if any Convention Resolutions are referred to the International President or the IEB for action or change, publish the results of the action in the *International Musician*.

**SECTION 8(b).** The International Secretary-Treasurer shall collect all dues, fees, assessments, and fines levied upon Locals and AFM members in accordance with the Bylaws; take charge of all AFM monies, securities and other property; and keep true and complete accounts of them.

**SECTION 8(c).** The International Secretary-Treasurer shall deposit all monies belonging to the AFM in two or more banks in his/her name as the AFM's International Secretary-Treasurer. Before any monies are withdrawn, each check shall be signed by the International Secretary-Treasurer or by the Assistant Treasurer.

**SECTION 8(d)**

i. The International Secretary-Treasurer shall pay all regularly drawn warrants, which shall be signed by the International President and International Secretary-Treasurer.

ii. The International President and International Secretary-Treasurer shall be

authorized to permit an assistant to sign warrants in their names, provided that the International President and International Secretary-Treasurer shall at all times be responsible for every warrant drawn, either signed by them personally or on their behalf by their respective assistants.

**SECTION 8(e).** The International Secretary-Treasurer shall be the AFM bookkeeper and shall submit to the Convention a complete statement of all assets, liabilities, income and expenses during his or her term of office, and shall allow the Finance Committee to examine all books and papers. The International Secretary-Treasurer shall make available on the members area of the AFM website copies of current AFM Bylaws, IEB policies, copies of official publications, an annual IRS form 990, DOL form LM-2 and other annual financial reports required to be filed with the government.

**SECTION 8(f).** The International Secretary-Treasurer shall be given an indemnity bond in the sum of at least $1,000,000, together with a forgery insurance bond in the sum of $1,000,000, the cost of which shall be borne by the AFM.

**SECTION 8(g).** Once each calendar year the International Secretary-Treasurer shall send to all Locals a “List of Locals” containing the name, number, address, jurisdiction, telephone number(s), e-mail address(es), web site address(es) and FAX number(s) of each Local, as well as the names and telephone numbers of its principal Officers. The International Secretary-Treasurer shall maintain a digital file containing the e-mail address(s) of the principal Officer(s) of each Local as published in the AFM List of Locals (as updated from time to time), which shall be available by download to the principal Officer(s) of any Local.

**SECTION 8(h).** If a change of Officers occurs in any Local, the International Secretary-Treasurer shall inform other Locals of this change as soon as possible through notice in an official AFM publication.

**SECTION 8(i).** The International Secretary-Treasurer shall procure and preserve the necessary books, papers, and other documents pertaining to that office. These shall be transmitted, together with all AFM monies and securities under the International Secretary-Treasurer’s control, to his or her successor when that person is properly qualified to receive them, clear of all encumbrances.

**SECTION 8(j)**

i. The International Secretary-Treasurer shall receive a basic monthly salary of $7,398.00 adjusted on each August 1 for the cost of living difference from July 2000 to July of that year as shown by the Consumer Price Index-All Urban Consumers: U.S. All items, 1982=100 (rounded to the nearest dollar).

ii. The adjusted monthly salary as of August 1 in the year of publication of these Bylaws shall be $10,948.45.

iii. The adjusted monthly salary as of August 1 in all other years shall be set forth in the Annual Report.

iv. The International Secretary-Treasurer shall also receive all hotel and traveling expenses when traveling on AFM business outside the metropolitan area where the AFM maintains its principal office, which expenses shall be reviewed by the Executive Committee each quarter.

**SECTION 8(k).** The International Secretary-Treasurer may appoint and determine the duties of an Assistant Secretary, whose compensation shall be determined by the IEB. The Assistant Secretary must be an AFM member.

**SECTION 8(l).** The International Secretary-Treasurer may appoint and determine the duties of an Assistant Treasurer, whose compensation shall be determined by the IEB and who shall be given an indemnity bond in the sum of $2,000,000, the cost of which shall be borne by the AFM.

**SECTION 8(m).** The International Secretary-Treasurer may employ supervisory and clerical assistance for the conduct of his or her office as the interests and developments in that office may require.

**SECTION 8(n).** The International Secretary-Treasurer shall represent the AFM at the AFL-CIO Convention as one of its Delegates.

**SECTION 8(o).** The International Secretary-Treasurer is authorized to purchase a "consolidated form, labor organization bond" covering the AFM and all its Locals, the cost of this premium to be paid by the AFM. However, the International Secretary-Treasurer shall be authorized to collect the premium costs from the Locals if at any time in the future the IEB deems this action necessary.

## *International Musician*

**SECTION 8(p).** The AFM's Official Journal (i.e., *International Musician*) shall be issued monthly by the International Secretary-Treasurer, under the IEB's supervision. The Official Journal shall be furnished to each AFM member at the rate of $2 per member per year.

i. The IEB shall make all regulations regarding advertising rates and all other matters pertaining to publishing the Official Journal. The International Secretary-Treasurer shall make a separate report to the Convention as to all matters pertaining to publishing and issuing the Official Journal.

ii. The *International Musician*'s accounts shall be in the charge of the International Secretary-Treasurer, who shall be authorized to carry a bank account and to sign checks necessary for the Official Journal's business. The International Secretary-Treasurer and the Assistant Treasurer shall be bonded in sufficient sums to safeguard all funds carried under the official title of the *International Musician*, the amount of the bonds to be determined by the IEB.

iii. Locals are authorized to purchase gift subscriptions to the *International Musician* to be sent to selected people, such as newspaper editors, and to organizations and educational institutions of their choice, at one-half of the regular subscription rate.

iv. The AFM shall, upon written request, make available to all Locals on a first-come, first-served basis, a limited number of copies of the *International Musician* for organizing and/or recruitment purposes. The cost of shipping and handling shall be paid by the requesting Local.

## International Executive Board

**SECTION 9(a).** The IEB shall consist of the International President, two Vice

Presidents, the International Secretary-Treasurer and the members of the Executive Committee.

**SECTION 9(b).** Matters not covered by the Bylaws shall be in the IEB's discretion. The IEB shall have the power to adopt rules supplementing the Bylaws or covering any matter not contained here, as it may deem proper, in addition to determining and announcing AFM policies. These rules, matters and policies shall have equal force and effect with the Bylaws.

**SECTION 9(c).** The IEB may, from time to time, repeal, change, or amend any of these rules, policies, or directions.

**SECTION 9(d)** IEB shall have general supervision of all AFM matters. The IEB shall have complete jurisdiction and power of disposition of all matters and questions relating to the AFM, any of its members, or any Local, as well as complete jurisdiction and power of disposition of all matters and questions in which the AFM or any of its Locals or members may be interested or which may affect any of them.

**SECTION 9(e).**

i. Except as provided for in Article 5, Section 26, the IEB shall negotiate all traveling and national scales subject to AFM jurisdiction. However, a Convention may make recommendations to the IEB for adjustments in these scales.

ii. The IEB shall have the authority to negotiate agreements or promulgate scales and conditions for the benefit of the local and traveling members engaged by an employer for a series of related or substantially similar live productions presented in more than one Local jurisdiction whenever the IEB determines, in consultation with the affected Locals, that the establishment of national or international employment standards for such series is necessary to secure the employment of Local members and to prevent the erosion of Local standards. Such agreements or scales shall provide that they are not applicable to employment in locations in which employment is subject to a Local CBA that provide for higher wages and conditions. This Section shall have no force and affect after the close of the 102nd Convention unless renewed by the Delegates to the 102nd Convention.

**SECTION 9(f).** All decisions, determinations, and orders made by the IEB regarding matters that must be determined before the next Convention shall have the same force as though made by an AFM Convention.

**SECTION 9(g).** The IEB may refer any of these questions or matters to a subcommittee, in which event the decision or determination of the subcommittee with respect to that matter shall have the same force and effect as though made by an AFM Convention.

**SECTION 9(h)**

i. The IEB, or an IEB subcommittee, shall be eligible to hear and determine all matters concerning or affecting the AFM, its members or Locals, as well as all matters and questions of interest to the AFM, its members or Locals.

ii. Any IEB decision shall include a written statement containing the basis for that decision. Any IEB member may be excused from either participating

or voting; any objection to the eligibility of an IEB or subcommittee member must be presented in writing before any action is taken on the matter in question. The determination of the IEB or subcommittee regarding any objection or question of the eligibility of any of its members shall be final and binding.

**SECTION 9(i).** The IEB or an IEB subcommittee shall have complete power to make any rules or orders that, in its judgment, may be necessary or desirable regarding any matters concerning the AFM, its Locals or members. This includes (after due notice to the Local and an opportunity for a hearing) the power to order any changes to the Constitution or Bylaws of any Local deemed necessary by the IEB as in the best interests of the AFM, the Local, or its members. Any provision in the Constitution or Bylaws of a Local that is illegal or in conflict with AFM Bylaws shall be null and void.

**SECTION 9(j).** The IEB shall decide all appeals in accordance with AFM Bylaws. In ruling on any appeal, the IEB shall include a written statement containing the basis for its decision.

**SECTION 9(k).** The IEB may decide appeals, complaints, charges, and all other matters before it or submitted to it without formal meeting or session. In its discretion, the IEB may dispense with the personal appearance of parties or witnesses and receive and consider as evidence affidavits and/or signed statements submitted by the parties or witnesses, giving these the weight the IEB deems proper. The IEB may prescribe and change the method and procedure for any trial or hearing. The concurrence of a majority of the IEB members in the disposition of an appeal or other matters filed with the Secretary-Treasurer shall be deemed the IEB's decision as if the decision were made in a formal or regular IEB session.

**SECTION 9(l).** IEB members shall not act upon or decide any matter or question before them by secret ballot. The approved minutes of every meeting, including a record of all votes cast by each member, shall be posted on the AFM's Web site, and shall be available in written form to any member in good standing upon request.

**SECTION 9(m).** When requested by the International President, IEB members shall conduct investigations and exercise such authority as may be conferred upon them by the International President.

**SECTION 9(n).** All documents emanating from the IEB in the transaction of its business must bear the signature of the International President or the International Secretary-Treasurer or their respective designees.

**SECTION 9(o)**

i. The IEB shall hold regular meetings at least four times annually at a time and place determined by the International President. The International President shall call special meetings, designating the time and place. The IEB meetings shall continue in session for the period that the International President deems necessary. Special meetings may also be called by the petition of any five IEB members.

ii. The International Secretary-Treasurer shall post a summarized agenda of all IEB meetings on the AFM's web site in advance of each meeting. Such agenda shall include all scheduled items with the exception of those dealing with charges and trials, claims or appeals. Further, it shall not include

items or requests of members and/or Locals that are deemed to be of a personal nature or that of a strictly AFM-Local relationship.

**SECTION 9(p).** It shall be the duty of IEB members to attend Conventions unless prevented by illness or other unavoidable cause.

**SECTION 9(q).** IEB members shall receive their transportation, hotel, and other incidental expenses while traveling to, attending and going from a Convention or an IEB meeting and when on an assignment from the International President or the IEB.

**SECTION 9(r).** Each Executive Committee member shall receive a monthly salary of $1,417.00 plus the actual expenses associated with the fulfillment of the member's duties between Conventions, except as otherwise provided.

**SECTION 9(s).** Should any IEB Office become vacant between Conventions, the IEB shall fill that vacancy, provided that should the Office of Vice President from Canada become vacant between Conventions, the IEB shall consult with the Canadian Conference Executive Board prior to filling the vacancy. Should any IEB Officer request and be granted a leave of absence, all compensation for that office shall cease for the length of the leave.

**SECTION 9(t).** A subcommittee of the Executive Committee members shall, in advance of each quarterly IEB meeting, inspect and verify the expense reports and credit card statements for the President, Vice President from Canada and Secretary-Treasurer. The subcommittee shall have the authority to receive whatever information or documentation it requires in this connection. The subcommittee shall be chosen annually by the Executive Committee members at the IEB's second quarter meeting and shall report its findings to the full IEB.

**SECTION 9(u).**

i. An annual comprehensive proposed budget and projected cash flow shall be presented to the IEB prior to the third quarter IEB meeting in the year preceding the year to which the budget relates. At the same time, a three-year financial forecast (commencing with the budgeted-for year) shall be presented to the IEB. At that third quarter meeting, the IEB shall adopt a budget in which the projected operational expenses shall not exceed the projected annual income for that year.

ii. The AFM's auditor shall serve as an advisor to the IEB, shall receive copies of all the budgetary materials referred to above, shall be present at the third quarter IEB meeting, and shall provide advice on budget matters on an ongoing basis as appropriate.

iii The IEB shall review and compare the actual expenditures with the projected cash flow throughout the year at least quarterly. No expenditure of funds in excess of those budgeted for the year shall be allowed without explicit prior IEB approval after consultation with the auditor.

iv. Prior to every convention, the IEB shall formulate and present to the Convention a Recommendation for the amount of Per Capita dues, Federation Work Dues and any other assessments on Locals or members for the period between the upcoming Convention and the following Convention. This Recommendation shall be titled "Recommendation No. 1" and listed first in the relevant issue of the *International Musician* and the listing of Recommenda-

tions and Resolutions printed in pamphlet form and mailed to all Local Presidents, Secretaries, and Delegates then known in each Convention year.

**SECTION 9(v).** The IEB shall formulate a three-year plan. The plan shall be based on available data and shall be representative of each AFM department. The plan should include goals and objectives, as well as a program to implement the plan. The plan will include a formative and summative evaluation that assesses program input and outcomes. The plan and evaluations, both summative and formative, shall be mailed to the Locals and made available to individual members upon request.

**SECTION 9(w)**

i. The IEB shall establish the terms, conditions, and marketing strategy for membership drives when such drives are deemed to be in the best interest of the AFM and its Locals.

ii. The IEB shall notify all Locals of the terms and conditions governing the membership drive at least three months in advance of the date of implementation. Within 30 days of such notification, a Local opting to participate in the membership drive shall notify the International Secretary-Treasurer in writing of its decision to participate. Such written notification shall be in a form that the International Secretary-Treasurer shall prescribe. Local participation shall be optional.

iii. The terms and conditions applicable to the membership drive shall take precedence over all Local Bylaws, and must be adhered to by all participating Locals as a condition of participation.

## Emeritus/Emerita Officers

**SECTION 10(a).** Emeritus/emerita status for former AFM Officers or employees must be submitted to a Convention by the IEB or by a Delegate. This shall be done in written Resolution form setting forth the merits and reasons for that status. This status shall be subject to and may be reviewed at a subsequent Convention.

**SECTION 10(b).** A former AFM Officer or employee who has been awarded emeritus/emerita status by a Convention shall be entitled to attend all AFM Conventions and shall receive hotel and per diem equal to Convention Delegates. Provided, however, that if the former Officer or employee serves as a delegate to the Convention, the former Officer or employee shall not receive more than one reimbursement payment from the AFM.

## Trials of Officers

**SECTION 11.** AFM Officers may be removed from Office for conduct unbecoming their position or for inattention to the duties of their station between Conventions after a fair trial and conviction by a two-thirds vote of all the IEB on charges preferred by a Local or any IEB member. The charge(s), with specifications, shall be formulated through the International Secretary-Treasurer who shall, without unnecessary delay, forward a copy of the charge(s) and specifications by registered mail to the accused Officer for an answer, and on receipt of answer shall, as soon as possible, forward a copy of the charge(s), with specifications and the accused's answer to all IEB members. Should the accused

Officer fail to answer the charge(s) within 30 days after receipt of the registered letter, the case shall be at once submitted to the IEB and its decision shall be binding until the following Convention. Should charges be preferred against the International Secretary-Treasurer, they shall be formulated through the International President under the same conditions.

# ARTICLE 4 — LOCAL CHARTERS

## Charter Applications

**SECTION 1(a).** The IEB may grant a charter for a Local to 50 professional musicians who are not AFM members in any territory that is not included in the jurisdiction of a Local already organized or within a currently organized jurisdiction with the consent of the Local(s) involved. When the membership of any Local becomes less than 50 members in good standing (15 in the case of a Local chartered prior to May 1, 1948), the charter of that Local shall automatically lapse. The members in good standing of the lapsed Local shall have the right to join the Local to which the jurisdiction has been reallocated upon payment of the difference between the lapsed Local's Initiation Fee (if lower) and that of the Local with which they seek affiliation, provided that application for membership is made within 60 days. The IEB may grant a charter to a Local consisting of fewer than 50 members when the IEB finds it in the AFM's best interest.

**SECTION 1(b).** Notwithstanding anything to the contrary in Section 1(a), above, the IEB shall have the authority to charter a new Local by changing the jurisdiction of an existing Local or Locals when it deems it to be in the best interest of the AFM and the Local(s) involved. Prior to taking this action, a hearing shall be held with the affected Local(s).

**SECTION 2.** All musicians signing an application for charter must be bonafide residents of the jurisdiction granted in the issuing of that charter.

**SECTION 3.** The jurisdiction of a Local shall include the services of its members as instrumental performers as well as that of copyists, arrangers of music, or as orchestral librarians.

**SECTION 4.** The Local's charter fee shall be $100 plus a payment of six months Federation Per Capita Dues for each member; provided, however, that if application for a charter shall be made in the months of April, May, June, October, November or December, the Federation Per Capita dues payable shall be one-half of the above amount.

**SECTION 5.** The acceptance of a charter for a Local shall constitute that Local's agreement to comply with, observe, and conform to all the provisions of the AFM Bylaws, Standing Orders, Standing or Special Resolutions, and directions of any Convention or any order or direction of the IEB or an IEB subcommittee or any duly authorized AFM Officer then in force or later made or enacted. A violation of any provisions of the Bylaws, Standing Orders, Standing or Special Resolutions, or directions shall subject the Local to expulsion at the discretion of the IEB or its subcommittee. The IEB may also, on granting a charter, impose additional conditions and require additional agreements on the part of that Local, as the IEB may deem necessary or desirable.

**SECTION 6.** No Local shall be chartered if it is wholly or in part composed of suspended or expelled members of any existing Local in good standing in the AFM.

**SECTION 7.** Before the charter is granted, the International Secretary- Treasurer shall communicate with the nearest Local, and, if objections are made by it against the granting of the charter, the matter shall be referred to the IEB for decision.

**SECTION 8.** All applications for Local charters must be made to the IEB and all

charters shall require the International Secretary-Treasurer's signature and the counter-signatures of the International President and the International Vice President.

**SECTION 9.** A charter granted to a Local must be kept open at least 30 days after date of issue, and during the time the charter is open all eligible musicians within the jurisdiction granted shall be invited through the press or otherwise to become members and shall be enrolled upon payment of the Local Initiation Fee.

**SECTION 10.** In addition to charters issued under the above provisions, the IEB may grant a non-geographic charter to 50 musicians who are not AFM members and who perform primarily as traveling musicians, if, in its opinion, these musicians have a special common interest warranting the formation of a Local and the issuance of a charter will be in the best interest of the AFM, its Locals, and its members. The members of such a Local shall be considered traveling musicians on all their engagements (other than those within a geographic Local in which they also are required to hold membership) and shall be subject to all the rules and regulations governing traveling musicians wherever they may perform, except that when members of a non-geographic Local perform in the jurisdiction of other Locals, they shall pay Work Dues only to the non- geographic Local. [*See Article 9, Section 37*]

**SECTION 11(a).** Other organizations may affiliate with the AFM, as provided in Section 11(b), below. They shall have their own autonomy as separate organizations and maintain their own Constitution and Bylaws, which shall not contradict AFM principles or objectives. They shall receive AFM support in all matters not contrary to AFM interests. (Affiliate status shall not apply to organizations made up of instrumental musicians, arrangers, orchestrators, copyists or librarians, by virtue of their eligibility for full membership in the AFM.)

**SECTION 11(b).** The affiliation fee for organizations as described in Section 11(a), above, shall be $50 and the AFM dues of these organizations shall be in an amount to be determined by the IEB.

**SECTION 12(a).** In addition to charters issued under other Sections of this Article, the IEB may grant a geographic or non-geographic charter to 50 or more individuals if, in its opinion, the individuals have a special common interest warranting the formation of such a Local and the issuance of a charter will be in the best interest of the AFM, its Locals, and its members.

**SECTION 12(b).** The granting of a charter under this provision shall be subject to the following restrictions:

(1) A charter shall not be granted unless the group of individuals applying for the charter is currently employed under one or more CBAs or is attempting to establish a CBA with an employer; and

(2) A charter shall not be granted under this Section to groups made up of instrumental musicians, arrangers, orchestrators, copyists or librarians if they are otherwise eligible for membership in an existing Local. The members of a Local created under this provision shall be subject to all the rules and regulations governing other AFM Locals. Members of a Local created under this Section who are also instrumental musicians, arrangers, orchestrators, copyists, or librarians shall not be relieved of their responsibility to join the appropriate AFM Local that represents instrumental musicians, arrangers, orchestrators, copyists, or librarians for work performed in any of those capacities.

## Charter Revocation

**SECTION 13.** If a Local is found guilty of violating or failing to comply with any provision of the AFM Bylaws, Standing Orders, Standing or Special Resolutions, or directions of any Convention or any order, direction, or verdict of the IEB, an IEB subcommittee, or any duly authorized AFM Officer, then the Local shall be subject to expulsion from the AFM at the discretion of the IEB or an IEB subcommittee. The International President shall carry out and execute the decision of the IEB or IEB subcommittee.

**SECTION 14(a).** No Local can dissolve, secede or disaffiliate from the AFM, or otherwise cease to exist without IEB approval.

**SECTION 14(b).** If a Local dissolves, secedes or disaffiliates, has its charter revoked or canceled, or it otherwise ceases to exist, its Officers are required to turn over all records, funds, assets, and properties to the International President or his/her representative.

**SECTION 14(c).** Under these circumstances, the IEB shall determine which Local(s) shall be assigned the jurisdiction. The IEB shall determine the distribution of all records, funds, assets, or properties to that Local(s) to assist in the maintenance of the expanded jurisdiction(s). Under no circumstances shall any Local distribute or dissipate any part of its funds, assets, or properties among its members or otherwise, in anticipation of, or preparation for, dissolution, secession, disaffiliation, or cessation.

**SECTION 15(a).** Any Local that obstructs the AFM or its Officers in enforcing AFM laws or carrying out the instructions of a Convention may, after being tried and found guilty by the IEB, have its charter revoked by the AFM authorities.

**SECTION 15(b).** The action of the IEB or its subcommittee in revocation of a Local's charter is not appealable.

**SECTION 15(c).** The IEB shall notify the members in good standing of a Local whose charter is to be revoked, surrendered, or cancelled or which seeks to dissolve, secede, or disaffiliate from the AFM at least 30 days before it approves of that action. Those members of the Local may request and shall be entitled to a hearing within 30 days of such notice in order that they may present their views to the AFM concerning the allocation of territory from their former Local. The AFM shall advise the members of their rights in this regard.

## Charges Against a Local

**SECTION 16(a).** Charges against a Local may be filed with the International President or International Secretary-Treasurer. At the discretion of the President or the IEB, the trial of these charges may be held before the IEB or a subcommittee thereof. The trial shall include, at the discretion of the trial body, either (1) the production of witnesses and the taking of testimony before it, or (2) the submission to the trial body of affidavits or other written proof or documents in support and in defense of the charges.

**SECTION 16(b).** A copy of the charges together with notice fixing the time and manner of the trial (either by the taking of oral testimony or the submission of the respective parties' written proof) shall be served upon the ac-

cused Local. This service shall be made by mailing a copy to the Local, at the address appearing in the International Secretary-Treasurer's records, or delivering a copy to one of the Local Officers in person. Each member of the trial body shall be deemed eligible to participate and decide all matters presented, and they may all participate but need not all vote on the disposition of the charges.

**SECTION 16(c).** Any one or more of the trial body may be excused from either participating or voting. Any objection to the qualifications or eligibility of any trial members must be presented in writing before any hearing or submission. The trial body's determination with respect to the eligibility or qualifications of any of its members shall be conclusive and final.

**SECTION 16(d).** In the event that the accused Local fails to appear or answer, the trial body shall proceed to determine the charges upon the written or oral proof submitted to it.

**SECTION 17.** The provision of this Article referring to the trial of charges against a Local shall not apply to a Local failing to pay its Federation Per Capita Dues to the AFM. For non-payment the Local is subject to the suspension or revocation of its charter without trial.

## Geographic Jurisdiction Changes

**SECTION 18(a).** The IEB shall have the authority to merge Locals when it deems it to be in the best interest of the AFM and the Locals involved, provided that a hearing is held in advance of the merger decision being made, at which hearing interested parties and people may appear.

**SECTION 18(b).** In addition, two or more Locals desiring to merge may jointly petition the IEB for a merger and the IEB may grant the petition under such conditions as it finds necessary if it deems a merger to be in the AFM's best interest. The IEB shall not consider joint merger petitions from Locals unless the memberships of all affected Locals have approved the merger proposal in advance of the petition.

**SECTION 18(c).** The International Secretary-Treasurer shall immediately announce all mergers through a posting on the AFM website and through notice in the next regularly scheduled *International Musician* and *Officer's edge* following the merger.

**SECTION 19.** The IEB shall have the authority to change the jurisdictional boundaries of Locals when it deems it to be in the best interest of the AFM and the Locals involved.

**SECTION 20.** Two or more Locals desiring a change in their jurisdictional boundaries may jointly petition the IEB for the change provided that the affected Locals are afforded a hearing in advance of changes being made in the jurisdictional boundaries.

# ARTICLE 5—LOCALS' RIGHTS & DUTIES

## Minimum Operational Requirements

**SECTION 1(a).** Locals shall be required to adopt as part of their Local Constitution and Bylaws a provision to the effect that the Local Constitution and Bylaws shall be subject and subordinate to the AFM Bylaws and amendments and providing further that wherever conflict or discrepancy appears between the Local Constitution and Bylaws and the AFM Bylaws and amendments, the latter shall prevail.

**SECTION 1(b).** The Bylaws of each Local must contain provisions permitting amendments to the Local's Constitution and/or Bylaws to be made at least annually in accordance with guidelines promulgated by the IEB. A two-thirds majority of the members voting shall be the maximum vote that can be required to amend a Local's Constitution and/or Bylaws. Any Local Bylaw inconsistent with this Section shall be null and void.

**SECTION 2.** Locals are encouraged to provide an information folder to traveling and new members giving data regarding engagement opportunities, lodging and restaurant facilities, instrument repair, and related items of interest.

**SECTION 3.** A Local may adopt regulations governing the use by its members of electronic and mechanical devices that duplicate the sounds of traditional musical instruments. In order to enforce these regulations against traveling members performing in its jurisdiction, the Local must comply with the following:

(1) The regulations must be non-discriminatory and consistently enforced.

(2) The regulations must be approved by the International President's office.

**SECTION 4.** Any Local that has the headquarters of a local chapter of any Player Conference with official AFM status within its jurisdiction shall, at no additional expense to the members involved other than their regularly imposed Initiation Fees, periodic dues, and Work Dues pay the reasonable and necessary expenses of sending one Delegate from each such local chapter to the annual meeting of the national or international conference with which the chapter is affiliated.

**SECTION 5.** The Local Secretary or any person authorized by the Local to handle its funds (either Local or AFM funds), including escrow and other funds, shall be bonded under a "consolidated form, labor organization bond" purchased by the AFM subject to Article 3, Section 8(p), Duties of Officers.

**SECTION 6.** The Local Secretary shall provide monthly to the International Secretary-Treasurer, in a manner and form approved by the IEB, an update of the Local's membership roster and a roster of U.S. nonmember agency fee payers (i.e. nonmembers who, by law or agreement, pay agency fees in lieu of membership dues), which shall include: the name and a/k/a, address, Local affiliation, social security/social insurance number, e-mail address(s), date of birth, date of admission (if admitted) to the Local, date of suspension (if suspended) from the Local, and the home, business and cell phone numbers of each of the Local's members and U.S. nonmember agency fee payers, as such information may exist.

**SECTION 7.** The Secretary of a new Local shall furnish an alphabetical list of members, arranged by the towns in which they live, within 30 days after the charter is closed, and then shall comply with the provisions of this Article.

**SECTION 8.** The Local Secretary shall transmit the following information to the International President's office within 30 days after adoption or completion:

(1) Changes in the Local's Constitution and Bylaws;

(2) Changes in the Local's wage scales;

(3) Reports on the results of the Local's elections;

(4) Changes in information included in the "List of Locals" including the street address of the Local;

(5) Copies of the Local's U.S. Department of Labor Report (LM-2 or LM-3), where applicable;

(6) Copies of the Local's official publications.

**SECTION 9.** In any calendar year a Local must call at least three membership meetings and hold at least four Executive Board meetings. A Local charter shall be subject to cancellation by the IEB if the Local fails to meet either of these minimum meeting requirements.

**SECTION 10.** Each Local shall have the responsibility and obligation to collect Work Dues as provided for in Article 9, Section 32, and Article 5, Sections 54, 55, and 56, from all members performing services subject to these Work Dues within its jurisdiction. Failure to make a reasonable effort to collect all Work Dues from its members shall subject the Local to action by the AFM.

**SECTION 11(a).** Each Local shall maintain visibility sufficient to be easily identified and located by all musicians in its jurisdiction and the general public. The AFM shall assess each Local's compliance based on the jurisdiction's music industry activity, available Local resources, location, and any other criteria the AFM deems relevant. Effective January 1, 2006, all correspondence and/or publicity circulated by a Local shall bear the AFM seal, the acronym "AFM," or the words "American Federation of Musicians of the United States and Canada" along with Local identification.

**SECTION 11(b).** Each Local shall develop and implement a plan, which shall be consistent with the mission of the AFM as set forth in Article 2, to (1) expand its representation of the active music industry in its jurisdiction, (2) increase its membership base, and (3) advance the general welfare of professional musicians within its jurisdiction. The AFM shall develop and maintain support resources to assist Locals in pursuing this objective.

**SECTION 12.** Each Local shall conduct an orientation program for new members. In support of the Locals, the AFM shall develop, maintain, and regularly update supplementary material to assist each Local in this regard.

**SECTION 13.** Each Local shall have at least one representative whose duties shall include communicating with musicians who perform in that Local's jurisdiction for the purpose of securing such musicians' support of and participation in the attainment of the membership's collective goals as set forth in Article 2.

**SECTION 14.** Each Local shall maintain a permanent business office with regular hours of operation to assure musicians and the general public of

the viability and professionalism of such Local. The Local's office must be located in the jurisdiction of the Local.

**SECTION 15.** Each Local shall actively participate in an employment referral or booking program.

**SECTION 16.** Each Local shall disclose pertinent information to its members in the following manner and form:

(1) An annual financial statement compiled from an appropriate financial bookkeeping system, which shall be printed and made available to all Local members and mailed to the International President's office.

(2) A Local newsletter, published and mailed or e-mailed to all Local members and the International President's office at least three times annually.

(3) Amended Bylaws, published and distributed at least once every five years to all Local members and to the International President's office. Between publications, all Bylaws changes shall be published in the Local's newsletter.

(4) A Roster of Members and Local Scales (Tariff of Fees), which shall be reviewed, revised, published and made available to all Local members at least once every three years. Copies of the revised publication(s) shall be forwarded to the International President's office and to all Locals within a radius of 100 miles (160 km). Between publications, all changes shall be published in the Local's newsletter.

**SECTION 17.** Each Local shall pay a wage or honorarium to its chief executive Officer and chief administrative Officer.

**SECTION 17(a).** In the event any claim is asserted (other than a claim by the Local) against any current or former Local Officer based on the Officer's actions authorized by the board, or the governing documents of such Local, the Local shall defend and indemnify such Officer to the extent permitted by law.

**SECTION 18.** Each Local shall be actively affiliated with at least one AFM Regional Conference. Active Conference affiliation includes paying annual dues to the Conference and having a representative from the Local selected in accordance with the Local's Bylaws attending at least one meeting of the Conference annually. If the Local has no provision for designating a representative or if the Local's designated representative is unavailable to attend, the Local Executive Board shall appoint a representative.

**SECTION 19.** Each Local shall have at least one duly elected delegate attend the International Convention. (*See Article 17, Section 4(a).*)

**SECTION 20.** All AFM Locals shall have computer access, including Internet and e-mail capability, and a Local Officer registered on the AFM websites with a valid e-mail address as a means of communicating with the AFM.

**SECTION 21.** Any Local that fails to institute the minimum procedures and services mandated by Article 5, Sections 11 through 20 shall be given written notice by the International President's office. Upon receipt of such notice, the Local shall, within 30 days, offer proof of compliance or request assistance, where needed, of its International Representative.

(1) With the recommendation of its International Representative, a Local may be provided with an additional 60 days from receipt of written notice to institute the minimum procedures and services mandated by Article 5, Sections 11 through 20.

(2) Failure to institute the minimum procedures and services shall result in the institution of proceedings as set forth in Article 3, Section 5(m) for removal of Officer(s).

(3) The IEB may grant exceptions or variations from the minimum procedures and services in special cases of extreme and unreasonable hardship.

## Local Elections

**SECTION 22.** All Local Officers must be nominated and elected in conformity with Local and AFM Bylaws and, except for Canadian Locals, in conformity with the *Labor-Management Reporting and Disclosure Act of 1959, as amended*. All Local Union Delegates and alternate Delegates to AFM Conventions must be nominated and elected in conformity with Local and AFM laws and in conformity with the *Labor-Management Reporting and Disclosure Act of 1959, as amended*. In elections of Local Officers, Convention Delegates, and alternate Delegates, no vote shall be counted for a person who has not been duly nominated. A quorum is not required for such nominations/elections to take place. All Player Conference Delegates and alternate Delegates to AFM Conventions must be selected in conformity with the bylaws of their conference.

**SECTION 23(a).** A member of any Local who is entitled to vote at a Local election may challenge any matter relating to the nomination and election of Local Officers and/or Convention Delegates and alternate Delegates after the election by filing a challenge with the Local Secretary or other person or body designated by the Local Bylaws within 10 days after the election. The challenge shall be in writing, setting forth the exact nature and specifications of the challenge and how the election was affected. The Local Executive Board or other person or body designated by the Local Bylaws shall, within 15 days of receipt of a challenge, meet and decide the challenge and determine the appropriate remedial action if the challenge should be ruled valid. The Local decision shall be appealable to the International President, in writing, within 10 days of the appellant being advised of the decision.

**SECTION 23(b).** The International President, or his/her designee, shall have the authority to decide the appeal and to order and direct appropriate remedial action should the appeal be sustained. The actions of the International President's Office in these matters shall constitute the exhaustion of union remedies. The procedure specified above shall be the exclusive procedure to be utilized for challenges involving the nomination and election of Local Officers and/or Convention Delegates and alternate Delegates. Any of the above specified time limits may be extended for good cause by the International President, or his/her designee.

**SECTION 24.** Any Local Constitution or Bylaws provision containing restrictions upon the length of service or the number of terms in office of elected Local Officers, or unlawful restrictions as to the eligibility for nomination to hold office, shall be null and void.

**SECTION 25(a).** If a Local's Bylaws do not provide for the filling of vacancies in

office between elections of Officers, the vacancies shall be filled by appointment by the Local Executive Board. If the Local's Executive Board is unable to attain a quorum in order to make such appointment, the International Executive Board is authorized to determine an appropriate mechanism to permit the Local to fill the vacancy. In all cases, however, a member may assume the position of Convention delegate only by secret ballot vote of the membership in conformity with the requirements of the *Labor-Management Reporting and Disclosure Act of 1959, as amended.*

**SECTION 25(b).** All Local Officers shall subscribe to an Oath of Office.

**Oath of Obligation for Officers**

I, (name), do hereby solemnly pledge on my most sacred word of honor that I will faithfully discharge the duties of my office as (officer) of this Local during the term for which I have been elected, or until my successor is duly elected and installed; that I will support the Constitution and Bylaws and rules and regulations of the Local, as may be applicable, and the Bylaws of the American Federation of Musicians of the United States and Canada, and will enforce the laws thereof to the best of my ability, without prejudice or partiality.

*(Administering Officer)*: I now declare you duly elected and installed.

## Collective Bargaining

**SECTION 26(a).** All AFM members, by virtue of their membership, authorize the AFM and its Locals to act as their exclusive bargaining representative with full and exclusive power to execute agreements with employers governing terms and conditions of employment. The AFM, by entering into CBAs, does so for the benefit of all AFM members, and each member is bound by the CBA's terms.

**SECTION 26(b).** A Local enters into CBAs for its members and for AFM members who perform within the Local jurisdiction. Each Local member and each AFM member who performs within its jurisdiction is bound by the Local CBA's terms. Similarly, the AFM licenses and enters into agreements with booking agents for the benefit of all AFM members and each member is bound by the terms of these agreements.

**SECTION 27.** A Local may represent or seek to represent musicians for collective bargaining purposes only for employment based primarily in that Local's jurisdiction except as provided by Section 28, below. A Local desiring to initiate an organizing campaign among a unit of musicians for employment based primarily in another Local's jurisdiction must first obtain the other Local's permission to commence that organizing campaign, and ultimately must obtain the IEB's approval pursuant to Section 28, below. A Local found guilty of failing to obtain the permissions referred to above shall pay actual damages, if any, and be subject to a fine of not less than $50 nor more than $10,000.

**SECTION 28(a).** The IEB may authorize a Local to negotiate and enter into an agreement with an employer based in the Local's jurisdiction covering employment outside the Local's jurisdiction. Upon the Local's request, the International President shall provide assistance to the Local in conducting these negotiations. The Local shall notify the AFM of the contract expiration date 90

days in advance. Authorization may be rescinded prior to the extension of the agreement or the negotiation of a successor agreement, if in the IEB's opinion, rescission would be in the best interest of the musicians who perform or who would perform services under the agreement.

**SECTION 28(b).** The IEB may authorize a Non-geographic Local (as defined in Article 4, Section 10) to negotiate and enter into an agreement with an employer who is based in a geographical Local's jurisdiction when, in the determination of the IEB, such authorization is in the best interest of the Federation and the employer employs solely musicians who hold in common the special interest for which the Non-geographical Local was chartered. The affected Local shall be notified in writing by the Non-geographic Local not less than 7 days in advance of any such request.

**SECTION 29.** Notwithstanding any other provision of these Bylaws and upon good cause shown, the IEB shall have the authority to assign collective bargaining rights from one Local to another. Such assignment shall be done in accordance with applicable labor law and with a procedure established by the IEB. Such procedure shall include:

(1) Consultation with the current signatory Local;

(2) Approval of the Local to which the collective bargaining responsibilities are being assigned;

(3) Approval of the affected bargaining unit by secret ballot majority vote;

(4) Agreement of the signatory employer if required by law or contract.

**SECTION 30(a).** In keeping with Article 22, Section 12, the International President may give assistance to a Local attempting to organize musicians within its jurisdiction in order to bargain collectively with the musicians' employer(s), when requested to do so by the Local.

**SECTION 30(b).** When, following investigation, the IEB determines that a Local is either unwilling or unable to organize musicians within a geographic area of the Local, the International President shall have the authority (with the IEB's approval) to administer temporarily that geographic area for a one-year period in order to organize musicians employed within the area for the purpose of bargaining collectively with the musicians' employer(s). During that one-year period, all Work Dues, membership dues, fees and other assessments otherwise owed to the Local by musicians performing in the area shall be collected and retained by the AFM and all such members shall be considered members of the AFM at large. At the end of the one-year period, the membership of all affected musicians shall revert to the Local. Upon the International President's recommendation, the IEB may extend the temporary administration of the area in one-year increments.

## Contract Ratification

**SECTION 31(a). Federation Agreements Other Than Canadian National Agreements**

i. Any CBA negotiated or renegotiated by the AFM (other than Canadian National Agreements; including but not limited to the TVO/TFO, the Canadian Broadcasting Corporation, the National Film Board, the Canadian

Commercial Announcement Agreements) or any negotiated extension of an existing agreement for a period of more than six months beyond its expiration date shall be subject to a secret ballot ratification by the eligible members in good standing who have worked under the previous agreement. A majority of those eligible members who cast ballots shall be sufficient to ratify the agreement.

ii. If there is a dissenting opinion emanating from members of the negotiating committee, the dissenter(s) shall have the right to prepare a minority report at their own expense and have it included as part of the ratification materials presented to those members eligible to vote on the agreement.

iii. The eligibility requirements and ratification voting procedure shall in each case be determined by the IEB. The AFM shall keep accurate and up-to-date lists of all musicians who are eligible to ratify the agreements. In the event that a list of eligible members cannot be reasonably established, this requirement shall not apply, and the IEB shall be empowered to ratify the agreement.

iv. The IEB shall also be empowered to ratify amendments that are of the nature of technical corrections, incidental improvements, or experimental formulas provided the period of time during which the amendment is to be in force does not exceed 15 months.

**SECTION 31(b)**. **Federation Agreements – Canadian National Agreements**

i. Canadian National Agreements (including but not limited to the TVO/TFO, the Canadian Broadcasting Corporation, the National Film Board, the Canadian Commercial Announcement Agreements) or any negotiated extension of such agreements for a period of more than six months beyond its expiration date shall be subject to a secret ballot ratification by the eligible members in good standing who have worked under the previous agreement. A majority of those eligible members who cast ballots shall be sufficient to ratify the agreement.

ii. If there is a dissenting opinion emanating from members of the negotiating committee, the dissenter(s) shall have the right to prepare a minority report at their own expense and have it included as part of the ratification materials presented to those members eligible to vote on the agreement.

iii. The eligibility requirements and ratification voting procedure shall in each case be determined by the Vice President from Canada in consultation with the Canadian Conference Executive Board or with a committee pursuant to Article 3, Section 7(c) shall make the eligibility determination. The Canadian Office shall keep accurate and up-to-date lists of all musicians who are eligible to ratify the agreements. In the event that a list of eligible members cannot be reasonably established, this requirement shall not apply, and the Vice President from Canada in consultation with the Canadian Conference Executive Board (or with a committee thereof pursuant to Article 3, Section 7(c)) shall be empowered to ratify the agreement.

iv. The Vice President from Canada in consultation with the Canadian Conference Executive Board (or with a committee pursuant to Article 3, Section 7(c)) shall also be empowered to ratify amendments that are of the nature of technical corrections, incidental improvements, or experimental formulas provided the period of time during which the amendment is to be

in force does not exceed 15 months.

**SECTION 31(c)**. **Local Agreements**

i. Any CBA negotiated or renegotiated by a Local Union or any negotiated extension of an existing agreement for a period of more than six months beyond its expiration date shall be subject to a secret ballot ratification by the eligible members in good standing who have worked under the previous agreement. In the event of a ratification held by meeting and secret ballot, there shall be no proxy or absentee ballots. If it is necessary to hold a ratification by mail, then all voting shall be by mail ballot. A majority of those eligible members who cast ballots shall be sufficient to ratify the agreement.

ii. If there is a dissenting opinion emanating from members of the negotiating committee, the dissenter(s) shall have the right to prepare a minority report at their own expense and have it included as part of the ratification materials presented to those members eligible to vote on the agreement.

iii. The eligibility requirements and ratification voting procedure shall in each case be determined by the Local Union executive board. The Local Union shall keep accurate and up-to-date lists of all musicians who are eligible to ratify the agreements. In the event the Local Union is unable to identify a bargaining unit for purposes of ratification, the International President or the Vice President from Canada, as is appropriate, may empower the Local Union Executive Board to ratify the agreement.

**SECTION 31(d)**. **Ratification by Electronic Balloting**

i. If it is necessary to hold a ratification by an electronic balloting method (e.g. online, telephone), then all voting shall be done by electronic balloting, provided that ratification by electronic balloting has been authorized by the Local's bylaws or action of the Local's Executive Board, and provided that the Local selects an independent organization approved by the International President's Office to conduct the voting. In all cases, the method of voting must (1) ensure that the member casting the vote is eligible to do so, (2) ensure that the member casting the vote cannot be identified with the vote cast, and (3) afford sufficient safeguards to protect the integrity and security of the voting system. Further, in the case of electronic balloting, an appropriate accommodation must be made for a voter who lacks the technology or equipment necessary to cast his or her vote.

ii. Ratification by electronic voting for a CBA negotiated by the AFM may be permitted at the discretion of the IEB or, in the case of Canadian National Agreements, at the discretion of the Vice President from Canada in consultation with the Canadian Conference Executive Board or with a committee thereof pursuant to Article 3, Section 7(c). Where electronic balloting is utilized pursuant to this subsection, all voting shall be done by electronic balloting. Such electronic balloting shall be conducted by an independent organization approved by the International President's office to conduct the voting. In all cases, the method of voting must (1) ensure that the member casting the vote is eligible to do so, (2) ensure that the member casting the vote cannot be identified with the vote cast, and (3) afford sufficient safeguards to protect the integrity and security of the voting system. Further, in the case of electronic balloting, an appropriate accommodation

must be made for a voter who lacks the technology or equipment necessary to cast his or her vote.

iii. The International President's Office shall maintain a list of one or more vendors whose electronic balloting services meet the requirements set forth in this Section.

**SECTION 32.** Prior to a Local becoming involved in a strike, the Local shall receive strike authorization from the bargaining unit by a majority of those casting valid ballots in a secret ballot vote and shall notify the International President's office of the contemplated action, setting forth the action contemplated and the nature of the difficulty.

**SECTION 33.** The AFM and any Local may enter into a collective or trade agreement relating to the rendition of musical services for a period exceeding five years only with IEB authorization and approval.

**SECTION 34.** A Local may negotiate a minimum number of musicians for engagements under a Local collective bargaining agreement.

**SECTION 35(a).** All Locals are urged, either through collective bargaining, participation agreement or single engagement pension form, to negotiate employer contributions to the American Federation of Musicians and Employers' Pension Fund (U.S.) or the Musicians' Pension Fund of Canada/caisse de retraite des musiciens du Canada on all engagements, where practicable and feasible.

**SECTION 35(b).** In the event than an employer requests a withdrawal liability estimate or engages in discussion of bankruptcy and/or withdrawal from the American Federation of Musicians and Employers Pension Fund or the Musicians' Pension Fund of Canada/caisse de retraite des musiciens du Canada, or a proposal is made that would result in a reduction of the effective percentage contribution rate, the Local and negotiating committee shall promptly notify the International President's Office or the Vice President from Canada's Office, as appropriate. The Local Union and negotiating committee will engage in educational session(s) with the International President's Office or the Vice President from Canada's Office, as appropriate, in order to supply the Local Union and negotiating committee with pertinent information regarding the AFM-EP Fund (U.S.) or AFM-EPW (Canada). Thereafter, the parties shall agree to appropriate steps, which may include, but are not limited to,

(1) Federation and Pension Fund representatives meeting with the negotiating committee;

(2) Federation and Pension Fund representatives meeting with the orchestra;

(3) Federation and Pension Fund representatives attending bargaining sessions designated for discussion of pension withdrawal or bankruptcy proposals.

This Section 36(b) shall not be applied to deprive, or otherwise interfere with, Locals' rights and responsibilities with respect to the negotiation and ratification of any CBA.

**SECTION 36(a).** In representing members of symphonic orchestras (as defined in Article 14) for purposes of collective bargaining with their employers, Locals shall provide, at no additional expense to the members involved other than their regularly imposed Initiation Fees, periodic dues, and Work Dues, at least the following services:

(1) competent representation in negotiations as the situation requires and the orchestra members may reasonably request;

(2) continuing contract administration, including the handling of grievances and arbitration;

(3) all reasonable and necessary out-of-pocket expenses (e.g., photocopy and telephone) incurred by the orchestra committee in assisting the Local in negotiations and contract administration;

(4) the reasonable and necessary expenses of sending one Delegate to the appropriate annual Conference of ICSOM, OCSM/OMOSC, or ROPA, if applicable. The Symphonic Services Division in the International President's office and the Canadian Office shall supervise the Locals' responsibilities in this regard, including making determinations concerning the adequacy and suitability of representation furnished for negotiations, and shall render whatever assistance it deems necessary.

**SECTION 36(b).** In the event that a Local does not or cannot provide the services set forth above in a satisfactory manner, or upon the request of the Local or the members of an orchestra for reasonable cause, the International President (after consultation with the Local and the members involved) shall have the authority to take either of the following actions:

(1) Appoint a representative who shall act as a mediator and shall work to resolve any differences that may exist between the Local and its bargaining unit (the Orchestra Members); such representative, acting as mediator, shall so act at the direction of the International President, who shall consult with the International Executive Board, and the Local Officers on these issues. Any costs shall be paid by the Federation out of the Symphonic Work Dues paid to the Federation by the Local.

(2) Place the orchestra in an Orchestra Service Program ("OSP") established and maintained under IEB supervision. The OSP shall provide those services and such other assistance as the IEB may deem necessary in the situation at a cost to the Local of 2% of the scale wages received by the orchestra members under their CBA. If the Local Work Dues payable by the members of an orchestra placed in OSP are less than 2%, the Local Work Dues rate payable by the members working under that orchestra's CBA shall be automatically increased to 2%.

**SECTION 37.** All Locals having symphonic orchestras as defined in Article 14, Section 1, shall recognize orchestra committees, elected by the orchestra, to serve as liaison between the orchestra players and the Local.

**SECTION 38.** A copy of all contracts and trade agreements between a Local and a Symphonic society shall be filed by the Local with the International President's office.

**SECTION 39.** Members of a Local who are contractors, personnel managers, or who perform other supervisory duties for an employer with whom the Local has a CBA shall not be eligible to serve on the negotiation and/or grievance- arbitration committee. In addition, they shall not be permitted to participate in any membership meeting or portion of a meeting in which collective bargaining negotiations or contract administration issues are discussed notwithstanding the

fact that they may also perform musical services for the employer and may be a member of the affected bargaining unit. However, the members shall be permitted to participate in any contract ratification vote, as long as they are otherwise eligible.

## Conflicts of Interest

**SECTION 40(a).** No Officer, business agent, employee, or committee member of a Local who is involved in booking, contracting, or engaging AFM members to perform musical services shall:

(1) use that position, or any information received in an official capacity, including referrals, contracts, or engagement reports received by or filed with the Local, to solicit or obtain business for the performance of musical services from which that individual would personally benefit; or

(2) participate in the establishment of wage or price scales, or minimums, established by the Local for Local members engaged in the same music industry field as the one in which that individual books, contracts, or engages musicians; or

(3) set or promulgate any wage scale or other term or condition of employment not previously established in accordance with the Local's Bylaws for musical services in the same music industry field as the one in which that individual books, contracts, or engages musicians; or

(4) participate in the negotiation, ratification, or administration of CBAs with employers of Local members engaged in same music industry field as that individual; or

(5) participate in the hearing of, or deliberation upon, any claims filed against any member, or purchaser of the services of any member, engaged in the same music industry field as that individual; or

(6) participate in the hearing of, or deliberation upon, any charge against any member that arises from an engagement in which that individual was involved in any way; or

(7) retaliate against any AFM member who brings a good faith charge under Article 5, Section 40 or takes an action to enforce Article 5, Sections 39 or 40.

**SECTION 40(b).** All elected Officers, elected business agents, appointed employees, and committee members shall comply with all AFM and Local Bylaws, rules, and regulations pertaining to the duties and responsibilities of people who book, contract, or engage AFM members to perform musical services.

**SECTION 40(c).** A charge of alleged violation of any provision of this rule and regulation shall be filed with the International Secretary-Treasurer and shall be tried by the IEB, an IEB subcommittee appointed by the International President, or a referee appointed by the International President.

**SECTION 40(d).** A member found guilty of a violation of any provision of this rule and regulation may be punished by a fine of not less than $10 nor more than $1,000; by expulsion; or by removal from office or position and/or disqualification from serving as an Officer or in a position with a Local in the future, all in the IEB's sole discretion.

**SECTION 40(e).** An elected Local Officer who is also a member of a bargaining unit represented by the Local shall not be disqualified from deliberating or voting upon any issue that affects that bargaining unit.

**SECTION 40(f).** It is not the intent of this policy to deprive elected Officers, elected business agents, appointed employees, or committee members who are predominantly engaged in the music industry as sidemusicians and who only sporadically or minimally engage, book, or contract for Local members of the opportunity to perform the functions outlined in the policy or to deprive the Local of their services in performing the functions outlined in this policy. In interpreting this policy, the IEB shall be guided by the declaration in the foregoing paragraph.

**SECTION 40(g)**. No AFM member employed in any management or supervisory capacity by an organization which is party to a collective bargaining agreement with an AFM Local shall serve as a Local Officer, Executive Board Director, Delegate or Alternate Delegate in any AFM Local.

**SECTION 41.** No Local Officer shall serve in the position of Personnel Manager for an employer/engager of musicians in the Local's jurisdiction. No Local Officer shall serve in the position of a contractor of musicians in the musical theatre field.

**SECTION 42.** A Local shall exclude an AFM member from participating in the creation, amendment, negotiation, or enforcement of Local CBAs or Local scales if the member is an employer who is affected by the Local CBA or scales under consideration or is employed as a supervisor by an employer who is affected by the Local CBA or Local scales under consideration. The AFM shall have the responsibility of enforcing this provision as it relates to the creation, amendment, negotiation, or enforcement of AFM CBAs or AFM scales. The IEB shall develop and maintain policies and guidelines to implement this provision.

## Officers as Fiduciaries

**SECTION 43(a)**. It is the duty of each Local Officer to hold the Local's money and property solely for the benefit of the Local and its members and to manage, invest, and expend the same in accordance with its Bylaws and the rules and policies as adopted by the IEB, to refrain from dealing with the Local as an adverse party or on behalf of an adverse party in any matter connected with his or her duties and from holding or acquiring any pecuniary or personal interest which conflicts with the interests of such Local, and to account to the organization for any profit received by such Local Officer in whatever capacity in connection with transactions conducted by him or her on behalf of the Local.

**SECTION 43(b)**. In addition to the obligation to provide an accounting, a Local Officer shall pay to the Local an amount equivalent to the personal profit gained by him or her as a result of any transaction involving the Local unless, prior to engaging in the transaction, a majority of the disinterested Local executive board members voted to approve the transaction after the material facts and the Officer's interest were fully disclosed, and the transaction was fair and reasonable to the Local when approved.

**SECTION 43(c)** . For purposes of this Section, any personal pecuniary interest taken by a Local Officer for engaging in the duties and obliga-

tions of the Office above and beyond the salary or honorarium provided by the Local's bylaws shall be presumed unreasonable.

**SECTION 43(d)**. The International President shall have the authority to take all acts and issue all orders necessary to enforce the obligations of this Section.

### Fees, AFM Affiliation

**SECTION 44.** Each Local and each AFM member shall pay to the AFM the dues, fees, assessments, and fines that are provided for in these Bylaws.

**SECTION 45.** In the event the AFM initiates a lawsuit to collect any financial obligation owed to the AFM by a Local and the court rules in favor of the AFM, the delinquent Local shall reimburse the AFM for any reasonable attorney's fees and all costs, fees, and expenses incurred by the AFM in connection with the lawsuit. In the event the AFM uses the services of a collection agency to enforce a financial obligation owed to the AFM by a Local, the delinquent Local shall, in addition to paying off its indebtedness, with or without a judgment entered by a court, also reimburse the AFM for any and all costs and expenses incurred and reasonable attorney's fees, where applicable.

**SECTION 46(a).** Each Local shall pay to the AFM Per Capita Dues at the rate of $66 per annum for each Regular, Student and Youth member and $50 per annum for each Life member in good standing with the Local. Federation Per Capita Dues shall include the subscription fee of $2 for the Official Journal, a contribution of 10 cents to the Lester Petrillo Memorial Fund as required to maintain the Fund at a balance of no less than $500,000, and a contribution of 10 cents to the AFM Emergency Relief Fund as required to maintain the Fund balance of $100,000.

**SECTION 46(b).** A Local may, at its option and subject to IEB approval, establish a special classification of Inactive Life Members who shall pay dues to the Local at a reduced rate that the Local may determine. Those Life Members who opt for this Inactive status shall have all the rights annumberd privileges of active members except that they shall not be allowed to vote or hold office. In addition, they may be limited in the amount of professional musical activities in which they may participate in such a way and to such an extent as the Local may determine appropriate. The Local shall pay to the AFM Per Capita Dues at the reduced rate of $44 per annum for each Inactive Life Member in good standing with the Local.

**SECTION 46(c).** Each Local shall report Federation Per Capita Dues quarterly based on the membership in good standing of each Local as of March 31, June 30, September 30 and December 31 of each year. Payments of Federation Per Capita Dues for such respective periods shall be due and made by check, draft or postal or express money order payable to the AFM not later than April 30, July 31, October 31 and January 31 of each year. Absent a showing of extraordinary circumstances, payments postmarked after April 30, July 31, October 31 and January 31 shall be subject to a penalty in the amount of 2% per month or fraction of a month computed from April 30, July 31, October 31 and January 31.

**SECTION 46(d).** If a Local requests forgiveness of delinquent Federation Per Capita dues and/or accrued penalties thereon, or prior to delin-

quency it requests a waiver of Per Capita dues and presents financial evidence of its inability to make such payments, the IEB may, after examination of the Local's evidence, and such other investigation as it deems necessary, at its discretion waive or defer such payments in whole or in part.

**SECTION 46(e).** A Local in arrears one quarterly payment of Federation Per Capita Dues or in arrears three months in reporting and/or forwarding Federation Work Dues and/or Federation Initiation Fees (FIF) collected to the International Secretary-Treasurer shall not be allowed representation at the Convention. A Local in arrears two quarterly payments of Federation Per Capita Dues and/or six months of Federation Initiation Fees (FIF) to the International Secretary-Treasurer may have its charter revoked by the IEB if it fails to pay the delinquent Federation Per Capita Dues within 60 days of written final notice of its delinquency from the IEB. Upon revocation of the charter, the IEB shall be authorized to assign the jurisdiction to an adjacent Local or Locals.

**SECTION 46(f).** A Local in arrears six months in reporting or forwarding Federation Work Dues or Federation Initiation Fees shall be given a final notice by the International Secretary-Treasurer. If the Local fails to forward Federation Work Dues or Federation Initiations Fees within 60 days after such final notice, the matter shall be referred to the International President, who shall be empowered to suspend or remove the Local Officer(s) responsible for such failure, in accordance with the provisions of Article 3, Section 5(m).

**SECTION 47.** The FIF shall be paid by each member subject to it, collected by the Local the member joins at the time of affiliation, and forwarded to the Federation each month, whether or not the member pays the LIF in installments. The Local shall make a monthly report of the FIF collected to the International Secretary-Treasurer (in a form that the Secretary-Treasurer shall prescribe) not later than the 15th day of the month immediately following the member's affiliation. The form shall include the member's name, address, U.S. Social Security or Canadian Social Insurance number, and prior AFM affiliations. Absent a showing of extraordinary circumstances, Locals remitting FIF payments after a grace period of 15 days shall be subject to a penalty in the amount of 2% per month or fraction of a month computed from the end of the grace period.

**SECTION 48(a).** In circumstances where a Local is engaging in a membership drive or attempting to organize musicians for the purposes of (1) representing them in collective bargaining with their employer(s), or (2) conducting an organizing drive within an existing bargaining unit represented by the Local, the IEB shall have the authority to waive the FIF for applicants for membership as required by Article 9, Section 2, provided that the Local must first seek and obtain IEB permission to waive its LIF.

**SECTION 48(b).** The Local, if it wishes, may also seek permission from the IEB to waive its Local periodic dues for a specified period of time in connection with a membership or organizing drive, in accordance with Article 5, Section 52.

**SECTION 49.** Any money paid by Locals to the AFM shall be transmitted by check, draft, postal money order or express money order made payable to the American Federation of Musicians.

## Local Dues & Fees Authorities

**SECTION 50.** Each Local may impose the dues (whether regular, periodic, or based upon earnings), fees, and assessments that shall be lawfully adopted by the Local, subject to the following conditions and limitations:

**SECTION 51.** All Local Bylaws and Resolutions that provide for increases or decreases of dues, assessments, and Initiation Fees shall be enacted only by majority vote of the members in good standing voting by secret ballot at a general or special membership meeting after reasonable notice of the intention to vote upon the question or by majority vote of the members in good standing voting in a membership referendum conducted by secret ballot.

**SECTION 52.** No Local shall decrease the rate of its LIF, its Local periodic dues, or its Local Work Dues without prior IEB consent. No Local shall impose an LIF in excess of $200.

**SECTION 53(a).** Regardless of Local Constitutions, Bylaws, Rules, or Regulations that provide otherwise, each Life Member of a Local shall be required to pay to the Local regular periodic dues in an amount at least equal to the Federation Per Capita Dues as set forth in Section 47(a) of this Article, plus not less than 25% of the amount of the Local's regular periodic dues and all assessments in excess of the Federation Per Capita Dues required to be paid by non-Life Members.

**SECTION 53(b).** Based upon a properly constituted vote of its membership, a Local may establish a Life Membership category. The minimum requirements for Life Membership in any Local shall be 65 years of age and 35 accumulated years of AFM membership, however, a Local may establish higher thresholds for attaining Life Membership status, (i.e., age greater than 65 years; more than 35 years of accumulated AFM membership, or the requirement that the requisite years of AFM membership be attained within the specific Local).

**SECTION 54(a).** In addition to any Work Dues required pursuant to Article 9, Section 32, Locals may impose additional Work Dues on scale wages earned.

**SECTION 54(b).** The maximum amount of Work Dues payable by traveling members (as defined by the IEB in connection with the establishment and maintenance of the minimum scales for traveling members) for performing services on a Traveling Engagement in a motel, hotel, cocktail lounge, restaurant, tavern, nightclub, or similar type of establishment within the jurisdiction of a Local of which they are not members and where there is no existing CBA to which the Local is a signatory covering the engagement, shall not be more than 3% of the scale wages earned.

**SECTION 54(c).** The maximum amount of Work Dues payable by traveling members for all types of engagements shall not be more than 4% of the scale wages earned.

**SECTION 54(d).** The maximum amount of Work Dues payable by any Local members for performing services within the jurisdiction of a Local of which they are members shall not be more than the following:

i. 4% of the scale wages earned for employment under AFM-negotiated

Agreements covering services rendered for electronic media (recordings, broadcasts, films, video, etc.) plus the Federation Work Dues percentage amounts set forth in the chart in Article 9, Section 32(b);

ii. 5¼% of the scale wages earned for employment under a Local-negotiated Agreement covering theatrical employment where the members in the bargaining unit have voted to participate in the Theater Defense Fund as provided in Section 57 below;

iii. 5% of the scale wages earned for all other work.

**SECTION 54(e).** No greater rate of Work Dues shall be imposed upon traveling members for services performed within the jurisdiction of a Local of which they are not members than the rate imposed upon a Local member for the same classification of services.

**SECTION 55.** A Local may, at its option and subject to membership approval, establish a Referral Program with a special classification in the Local Scales (Tariff of Fees). All engagements obtained through the Local Referral Program, for Local or traveling members, may then be subject to Work Dues at a rate no higher than 10% of scale wages earned.

**SECTION 56.** For employment under a Local-negotiated Agreement covering theatrical employment where the members in the bargaining unit have voted to participate in the Theater Defense Fund, the Local shall collect Work Dues in the amount of ¼% to be remitted to the AFM for payment to the Theater Defense Fund.

**SECTION 57.** The Local where the services were performed (unless provided otherwise in these Bylaws) shall collect the Federation Work Dues along with its Local Work Dues and make a monthly report of Federation Work Dues collected to the International Secretary-Treasurer in a form that the Secretary-Treasurer shall prescribe. The Local shall forward to the International Secretary-Treasurer all Federation Work Dues collected during each month on or before the 15th day of the following month. Absent a showing of extraordinary circumstances, payments forwarded after a grace period of one month shall be subject to a penalty in the amount of 2% per month or fraction of a month computed from the end of the grace period.

## General

**SECTION 58.** The IEB shall exercise supervision over the price lists of all Locals, and upon finding that the price list and working conditions in force in any Local are detrimental to other Locals, the IEB shall be empowered to adjust the objectionable sections.

**SECTION 59.** All Locals must enforce all verdicts rendered against the Local's members for violating the AFM Bylaws or rules and regulations. Locals failing to comply with this provision shall be held responsible for all fines assessed against the Local's members.

**SECTION 60.** A Local shall have the right to investigate all engagements played in its jurisdiction by its own members or by members of any other Local.

**SECTION 61.** Locals must require members who use professional names to regis-

ter the names with the Local. Locals must also require all U.S. members to register their Social Security number and all Canadian members to register their Social Insurance number.

**SECTION 62.** All Locals are urged to assist members in obtaining a medical benefit plan.

**SECTION 63.** It is the duty of Locals to protest competition from bands or orchestras organized by public, private, or fraternal institutions. However, if bands accompany their own organization or institution, it does not constitute competition.

**SECTION 64.** A Local shall not abridge the rights of a member to render exclusive services to an employer.

**SECTION 65.** Each Local shall regulate the form of notice of termination of engagement between its own members. Exempt from this provision are Traveling Engagements under AFM jurisdiction.

**SECTION 66.** If a Local sends a check to the AFM in payment of an amount due the AFM and the check is unpaid or protested, then the offending Local shall be subject to a $35 fine, and payment of all charges incurred.

**SECTION 67.** Prior to proposing or taking any position relative to any state, provincial, or federal legislation that may affect the music industry, the AFM, or any of its Locals, a Local must advise the International President's office of its intent to take action.

## Trusteeship

**SECTION 68.** Whenever the IEB has substantial reason to believe that a Local, or the Local's Officers or members, are

(1) acting in violation of the AFM Bylaws,

(2) disobeying a lawful order of the Convention, the IEB, or the International President,

(3) mismanaging the Local's financial affairs or otherwise conducting the affairs in a fiscally unsound manner, or

(4) engaging in any activity or course of conduct detrimental to the welfare or interests of the AFM or the Local, the IEB may place the Local in Trusteeship.

**SECTION 69.** Trustees shall be appointed by the International President. They shall take immediate charge of the Local's affairs and shall take possession of all the Local's funds, books, papers, and other property and shall tender a receipt for them. They shall institute any necessary action to recover money or other Local properties. They shall hold the Local's funds and property in trust for the Local's exclusive benefit and shall expend them only to the extent necessary for the proper and efficient conduct of the Local's affairs during the Trusteeship period. Trustees shall give bond to safeguard the Local's funds and assets. For the faithful discharge of their duties they shall be paid from AFM funds a fee to be fixed by the IEB.

**SECTION 70.** Upon the appointment of a Trustee, the functions of all the Local's elected officials shall terminate and shall pass to the Trustee. Trus-

tees may reappoint former officials and employees or appoint new temporary officials and employees. Trustees shall take other actions, consistent with the Local's Bylaws, as they deem necessary for the preservation of the rights and interests of the Local's members and the AFM. They shall submit periodic and complete reports of their actions and the Local's affairs to the IEB and to the Local's membership.

**SECTION 71.** Immediately upon the appointment of a Trustee, the International Secretary-Treasurer shall notify the Local's Officers that a hearing shall be held at which interested parties may be heard on the subject of retaining the Trusteeship. The hearing may be conducted by the IEB, an IEB subcommittee appointed by the International President, or a referee appointed by the International President. It shall take place as soon as practicable and as conditions permit but in no event later than 25 days after the Trustee's appointment. If, upon the hearing, the IEB decides that the Local should continue under the Trusteeship, the Local shall have an appeal to the Convention in accordance with the provisions of Article 12. If, upon this hearing, it is decided that the Local does not require a Trusteeship, the Local and its Officers shall revert to their former status and continue without Trusteeship.

**SECTION 72.** The Trusteeship shall not extend beyond one year unless, after further formal hearing, the IEB orders a further extension. The IEB shall terminate the Trusteeship as soon as, in its judgment, Local conditions warrant termination.

**SECTION 73.** Prior to the termination of a Trusteeship, the Trustee shall conduct an election of Local Officers, who shall be installed on the final day of the Trusteeship. The Trustee shall convey all funds, books, property and assets to the Local's newly elected Officers and shall make a final accounting of the Trusteeship and submit this to the IEB and to the newly elected Local Officers.

**SECTION 74.** No Local financial obligation or liability that may exist at the time that the Trusteeship is instituted or that may have been incurred before that time shall be assumed by or become an obligation of the AFM.

# ARTICLE 6—FUNDS

**SECTION 1.** The AFM funds shall be generated and derived from the dues, fees, assessments, and fines that shall be levied upon the Locals and AFM members in accordance with the Bylaws; from all sums received as interest, dividends, or other returns from investments; from donations; and from such other means as may be authorized and determined by the IEB.

**SECTION 2.** All funds shall be utilized as determined by the IEB for any purpose consistent with AFM interests. The funds shall not, however, be utilized in lawsuits or unfair labor practice charges where a Local may become involved, unless the suit or charge is instigated or defended by order of or under the instructions of the AFM's Officers.

**SECTION 3.** An operating budget of $100,000 annually shall be allocated to a program whose sole purpose is to assist Locals in developing and maintaining programs and services beneficial to freelance and club-date musicians not employed under CBAs. This project shall be under the direction of the Assistant to the President assigned to administer the AFM's programs to assist freelance musicians and shall be subject to periodic review by the IEB.

**SECTION 4**. The AFM's Symphony-Opera Orchestra Strike Fund shall be administered in accordance with the following terms and conditions:

**SECTION 4(a)**. Participation in the Fund shall be on a voluntary basis by those eligible groups whose players, by a two-thirds vote of the beneficiary musicians determined by the Trustees as described in 4(b), determine to join the Fund. The vote shall be taken by secret ballot. Once a group has in this manner become a participant in the Fund, it must remain in the Fund.

**SECTION 4(b)**. Eligibility for participation in the Fund shall be limited to Symphonic Orchestras that operate under the terms of a CBA between the symphonic organization and a Local providing for a minimum weekly section player salary of at least $300 and a season of at least 15 weeks of employment.

i. The number of beneficiary musicians from an orchestra applying to join the Fund shall be determined by the Trustees, who shall consult with the orchestra committee and the Local prior to the vote described in 4(a).

ii. The Trustees are authorized to waive the requirements set forth in Section 4(b) and/or increase the minimum salary requirement if, in their judgment, conditions warrant the change.

**SECTION 4(c)**

i. Each beneficiary musician in a participating orchestra shall be obligated to contribute annually to the Fund according to the following contribution schedule to cover a span between September 1 and August 31, which amount must be paid not later than April 1 of that span.

| Weekly section player salary | Annual contribution per beneficiary musician |
|---|---|
| $300 to 599 | $37.50 |
| $600 to 749 | $50.00 |
| $750 to 899 | $62.50 |
| $900 and higher | $75.00 |

ii. If the Fund's net assets drop below $1,000,000, each beneficiary musician in a participating orchestra shall be obligated to contribute an additional 50% of his or her contribution as set forth in (c)i., above. The annual contribution amount shall thereafter be fixed at 150% of the contribution rate set forth in (c)i., above, and this Section shall be automatically adjusted in the succeeding edition of these Bylaws to reflect that increase. In addition, the AFM, upon the establishment of the Fund, shall make available to the Fund monies up to $250,000 on a non-interest bearing loan basis. This loan shall be repaid at such times and at such amounts as the Trustees determine is consistent with the Fund's fiscal soundness. The Trustees may also, in their discretion, modify the contribution structure if, in their judgment, conditions warrant the change.

**SECTION 4(d).** Strike benefits shall be payable from the Fund only after a strike has been ordered or approved by:

(1) the players of a participating orchestra, acting by at least a majority vote or in accordance with some other established written policy requiring more than a majority vote,

(2) the Local Executive Board, and

(3) the International President or Vice President from Canada, as is appropriate. Strike benefits shall also be payable from the Fund in the event of a lockout.

**SECTION 4(e)**. Benefits shall be paid for a maximum period of 15 weeks to the beneficiary musician on strike in accordance with the following benefit schedule, commencing with the second week of a strike or lockout. However, the Trustees in their discretion may determine that lesser payments or a lesser duration are appropriate or necessary in order to preserve the Fund's fiscal soundness. The Trustees may also, in their discretion, increase the payments or duration, or both.

| Weekly section player salary | Weekly benefit 2nd-4th week | Weekly benefit 5th-10th week | Weekly benefit 11th-16th week |
|---|---|---|---|
| $300 to 599 | $ 75 | $150 | $225 |
| $600 to 749 | $100 | $200 | $300 |
| $750 to 899 | $125 | $250 | $375 |
| $900 and higher | $150 | $300 | $450 |

**SECTION 4(f)**. When an orchestra not previously participating in the Fund votes to become a participant in the Fund, the participation must be effected no later than December 15. Strike benefits shall become available to that orchestra on September 1 of the second calendar year following the year in which participation is effected.

**SECTION 4(g)**. Any request to the Trustees under this Subsection must come with a two-thirds secret ballot vote of the orchestra members in support of such request.

i. An orchestra making application to participate in the Fund may propose to participate at a higher contribution and benefit level than that for which it would otherwise be qualified, but once its participation level has been established at the higher level, it may not reduce its level of participation.

ii. An orchestra already participating in the Fund may propose to participate

at a higher contribution and benefit level than that at which it is currently participating. Benefits at the higher level shall become available on September 1 of the second calendar year following the year in which the higher level of contribution is effected.

iii. An orchestra participating in the Fund prior to September 15, 1999, shall continue its participation at the highest contribution and benefit level. If such an orchestra would otherwise qualify for participation at a lower contribution and benefit level, upon request by the musicians of the orchestra, the Trustees may permit such orchestra to contribute and benefit at the lower level, provided, however, that such permission to reduce its contribution and benefit level may be given to that orchestra one time only.

**SECTION 4(h)**. The Fund shall be maintained and administered by six trustees. Three shall be named by the IEB and three shall be active players in participating orchestras, two of whom shall be selected by ICSOM in accordance with the procedures established by ICSOM. The third player Trustee shall be selected by ROPA and OCSM/OMOSC jointly in accordance with procedures established by them. The alternate Trustee shall be selected from the remaining Symphonic Player Conference, and shall be a participant in all of the Trustees' deliberations. Any tie votes of the Trustees may be broken by the International President.

The Trustees shall have full power to establish and promulgate rules and regulations for the Fund's administration consistent with this Section. They shall collect, invest, and hold all contributions to the Fund and shall pay and distribute all benefits and payments from that Fund. The Trustees are empowered to take all steps appropriate or necessary to effectuate this Section and to see that the Fund is administered fairly and in accordance with any applicable laws.

**SECTION 5**. The AFM's Regional Orchestra Emergency Relief Fund shall be administered in accordance with the following terms and conditions:

**SECTION 5(a)**. Participation in the Fund shall be in accordance with ROPA Bylaws by ROPA Full Member Orchestras. Associate Member Orchestras may not participate in the Fund unless otherwise determined by the Trustees of the Fund.

**SECTION 5(b)**. Each participating orchestra shall be obligated to contribute $100 annually to the Fund to cover the fiscal period from January 1 to December 31, the amount to be paid not later than April 1 of each fiscal period. The Trustees, in their discretion, may recommend to the participating orchestras that a lesser or greater contribution amount should be made to the Fund. The participating orchestras shall have the right to ratify a recommendation, in accordance with the Bylaws of ROPA, and the recommendation must be passed by majority vote of the qualifying orchestras. In addition, the AFM shall make available to the fund monies up to the amount of $50,000 on a non-interest bearing loan basis, to be repaid at such times and at such amounts as the Trustees determine is consistent with the Fund's fiscal soundness.

**SECTION 5(c)**. Emergency relief loans of up to 20% of the funds available as of April 1 of the current year shall be available to members of participating orchestras that are current in their payments to the Fund. Loans shall be payable from the Fund only after a strike has been ordered or approved by: (1) the players of a participating orchestra acting by at least a majority vote or in accord-

ance with some other established written policy requiring more than a majority vote, (2) the Local Executive Board, and (3) the International President's Office. Emergency relief loans shall be payable from the Fund in the event of a lockout or other serious confrontation with management that, in the Trustees' opinion, should be considered for emergency relief.

**SECTION 5(d)**. All monies in the Fund shall be held separate from all other AFM monies and, whenever possible, placed in limited access, high interest bearing financial instruments. The International Secretary-Treasurer shall cause the Fund to be audited on an annual basis for the fiscal period January 1 to December 31 immediately on the conclusion of each fiscal period and shall furnish a copy of that audit to each Trustee as soon as possible. In addition, the International Secretary-Treasurer shall advise each Trustee not later than April 15 of each year of the Fund balance and the participants eligible for emergency relief as of April 1 of that year.

**SECTION 5(e)**. Loans shall be repaid without interest in 12 equal monthly installments commencing on the first day of the month following resolution of the confrontation. At the end of the 12-month period, any outstanding unpaid balance will be charged interest calculated at the Wall Street Journal (WSJ) prime rate in effect on the first day following the 12-months period until said balance is paid in full. In the event of hardship, a feasible payment schedule shall be determined by the Trustees. A member failing to make repayment after due notice from the International Secretary-Treasurer will be subject to disciplinary charges in accordance with Article 11, Section 2(a)ii, of these Bylaws. A member found guilty of failing to make repayment will be subject to a fine, suspension and/or expulsion in addition to a judgement in the amount of the unpaid balance, accrued interest, legal fees and collection costs.

**SECTION 5(f)**. The Fund shall be maintained and administered by five Trustees, consisting of the International Secretary-Treasurer, the President of ROPA, the Treasurer of ROPA, and two additional Trustees named by the IEB. The Trustees shall have full power to establish and promulgate rules and regulations for the Fund administration consistent with this Section, shall collect, invest, and hold all contributions to the Fund, and shall pay and distribute all payments and loans from the Fund. The Trustees shall be empowered to take all steps appropriate or necessary to effectuate this Section and to see that the Fund is administered fairly and in accordance with any applicable laws. The Trustees shall be further empowered to dissolve the Fund and to roll any balance over into a new or existing Fund if, in their judgment, conditions warrant the change.

**SECTION 6**. The AFM's Theater Defense Fund shall be administered in accordance with the following terms and conditions:

**SECTION 6(a)**. The Fund shall be established and maintained with Work Dues assessed at a rate of ¼% of minimum scale earned by members in participating bargaining units employed under local theater or touring CBAs.

**SECTION 6(b)**. Participation in the Fund shall be limited to members who meet the following criteria:

i. Participation shall be automatic for members employed (or engaged to be employed) under Pamphlet B Touring Theatrical Musicals.

ii. Participation shall be available to members employed (or engaged to be

employed) under (1) a AFM-negotiated Agreement covering touring employment, (2) a Local-negotiated Agreement covering theatrical employment or (3) a Local-negotiated Agreement with a symphony orchestra or other bargaining unit that is not eligible to participate in the AFM's Symphony-Opera Strike Fund. Participation shall be voluntary on a bargaining unit by bargaining unit basis. Members in a bargaining unit may initiate participation in the Fund by majority vote of those members voting by secret ballot. Once a bargaining unit has in this manner become a participant in the Fund, it must remain in the Fund. Members in a bargaining unit that elects to participate in the Fund in this manner shall be eligible for benefits one year from the date that their contributions begin. Work Dues for participating bargaining units shall be increased by ¼%. In the case of bargaining units under AFM-negotiated Agreements covering touring employment, the Work Dues shall be payable to the AFM. In the case of bargaining units under Local-negotiated agreements, the Work Dues shall be collected by the Local and remitted to the Fund.

iii. The net assets of the fund shall be limited to $1,000,000. This limit may be amended by IEB order. Should the assets of the Fund exceed the limit, the ¼ % Work Dues shall be suspended until such time as the net assets of the Fund fall below the limit.

**SECTION 6(c)**. Strike Benefits shall be payable from the Fund only after a strike has been ordered and approved by (1) the eligible members, acting by a majority vote or in accordance with some other established written policy requiring more than a majority vote, (2) the Local Executive Board, and (3) the IEB. Strike benefits shall also be payable from the Fund in the event of a lockout.

**SECTION 6(d)**. Benefits in the amount of one-half of applicable Local and/or AFM negotiated wages shall be payable for a period of up to two months (eight work weeks). Per diem set forth in the applicable AFM-negotiated touring agreement (e.g., Pamphlet B-Touring Theatrical Musicals) shall be paid to touring musicians who remain in the city in which the dispute originates. Benefits shall commence with the first week of a strike or lockout, provided that the IEB in its discretion may determine that lesser payments of a lesser duration are appropriate in order to preserve the Fund's fiscal soundness. The IEB may also, in its discretion, increase payments and/or duration.

**SECTION 6(e)**. The Fund shall be maintained and administered by the IEB. The IEB shall have full power to establish and promulgate rules and regulations for the Fund's administration consistent with this Section, shall collect, invest, and hold all contributions to the Fund, and shall pay and distribute all benefits and payments from that Fund. The IEB is empowered to take all steps necessary to effectuate this Section and to see that the Fund is administered fairly and in accordance with applicable laws.

**SECTION 6(f)** The IEB is further empowered to amend payment and benefit levels and/or to create a separate defense fund for members employed (or engaged to be employed) under a Local-negotiated Agreement with a symphony orchestra.

**SECTION 7**. The fiscal year shall close December 31 of each year.

**SECTION 8**. Commencing January 1, 2007, $150,000 annually will be placed in

a dedicated account and used solely for the purpose of litigating claims as necessary against electronic media employers, organizing electronic media employers, and enforcing electronic media agreements. These activities shall be in addition to the customary activities of the EMSD determined using 2004 and 2005 as baselines. The use of these funds shall be under the joint control of the IEB and the four AFM members who currently compose the EMSD Oversight Committee as described in the Roehl Report (or their replacements selected in accordance with current practice). All application and transfer of funds shall require concurrence of both the IEB and the EMSD Oversight Committee. When the IEB defines the bargaining units for the AFM's electronic media contracts, the representatives of those bargaining units will replace the EMSD Oversight Committee for purposes of this Section 8.

**SECTION 9(a)**. The IEB shall have the express authority to establish an annual fee payable by all musicians who earned scale wages of $2,500 or more, in the aggregate, in the prior calendar year for work under Federation recording agreements (other than symphonic recording agreements) provided that such fee i) is approved by the four AFM members who currently compose the EMSD Oversight Committee as described in the Roehl Report (or their replacements selected in accordance with current practice); and ii) is ratified by the affected musicians by mail ballot referendum. Such fee ("EMSD Fee") shall be collected by the appropriate Local and shall be remitted by the Local to the Federation.

**SECTION 9(b)**. If the EMSD Fee is calculated as a percentage of scale wages earned, the fee shall be due and payable to the Local where the services were performed and shall be due and payable no later than the 15th day of the month following the month during which the member was paid. Any member violating the provision of this Section shall be subject to a fine of not less than $10 nor more than $100, suspension and/or expulsion from the AFM. The Local where the services were performed shall collect the EMSD Fee along with its Local Work Dues.

**SECTION 9(c)**. The Local shall forward to the International Secretary-Treasurer all EMSD Fees collected during each month on or before the 15th day of the following month, together with a report in a form that the Secretary-Treasurer shall prescribe. Absent a showing of extraordinary circumstances, payments forwarded after a grace period of one month shall be subject to a penalty in the amount of 2% per month or fraction of a month computed from the end of the grace period.

# ARTICLE 7—GRIEVANCES & CLAIMS

**SECTION 1**. Grievance and arbitration provisions contained in a CBA or engagement contract shall be the exclusive method of resolving disputes arising under those agreements between the parties to those agreements.

**SECTION 2**. In the absence of the grievance and arbitration language referred to in Section 1 above, any member or Officer of any Local or the AFM may make a claim through a Local or the AFM, as the case may be, against any member(s) or purchaser(s) for any amount of money that is alleged to be due to any musician(s) as a result of a violation of a provision of applicable Local or AFM Bylaws, price list, engagement contract, or violation of any agreement between members relating to a musical engagement. The member(s) against whom the claim is filed shall submit to the jurisdiction of the Local or AFM, as the case may be, for a determination of the claim.

**SECTION 3**. All claims and charges for alleged violation of Local or AFM Bylaws must be filed within one year from the date of the event(s) that gave rise to the claim or alleged violation or within one year from the date on which the relevant facts became known or reasonably could have become known, whichever is later.

**SECTION 4**. Any claim of a member against a member that relates to a Traveling Engagement, audio or visual recording activities, or any other matter within the AFM's sole competence shall be adjudicated by the AFM. Any claims of members against purchasers of their services on Traveling Engagements shall be governed by the AFM's U.S. or Canadian Traveling Claims Procedure, as applicable.

**SECTION 5**. When claims are filed by out-of-town musicians against establishments in which they have played, the International Secretary-Treasurer shall immediately notify the Local where the establishment is located.

**SECTION 6**. Any claim of a member against any booking agent signatory to a Booking Agent Agreement with the AFM with respect to a violation of the agreement, or any claim of a booking agent signatory to a Booking Agent Agreement with the AFM against any member shall be adjudicated through the AFM's processes.

**SECTION 7**. All claims, as described in Section 2 above, must be filed within one year from the date of the event(s) that gave rise to the claim or within one year from the date on which the relevant facts became known or reasonably could have become known, whichever is later.

**SECTION 8**. All claims, including appeals from decisions and/or determinations of a Local that are submitted to the IEB in accordance with this Article shall be processed, heard, and determined in accordance with the IEB's Rules of Practice and Procedure, which the IEB may amend from time to time as it deems necessary. The Rules of Practice and Procedure shall be obtained from the International Secretary-Treasurer's Office at the time that claims are filed.

**SECTION 9**. Any claim of a member against another member affiliated with the same Local shall be adjudicated by the Local under procedures as established by the Local's Bylaws, Rules, or Practice. Decisions of Locals in these matters are subject to appeal to the IEB.

**SECTION 10**. In the event that a claim for wages is filed against a leader and the

IEB finds that the leader has improperly withheld wages, the IEB may, in addition to rendering an award for the amount of the wages withheld, include in the award to the individual whose wages were withheld an additional sum not exceeding the amount of the withheld wages as liquidated damages.

**SECTION 11**. Any member failing to comply with an IEB arbitration award is subject to charges for that failure. The charges shall be tried by the IEB or an IEB subcommittee appointed by the International President.

**SECTION 12**. Any party (including a member) involved in any Local award and/or decision on a claim may appeal to the IEB.

**SECTION 13**. Local decisions and determinations when not appealed and/or AFM decisions and determinations on claim(s) shall be final and binding on the members.

**SECTION 14**. Parties to decided claims may exercise their right of reconsideration in accordance with the IEB's Rules of Practice and Procedure referred to above.

# ARTICLE 8—UNFAIR LIST

**SECTION 1**. If the AFM determines that it has a primary labor dispute with an employer, the employer may be placed on the International Unfair List after notification to the Local where the dispute is occurring.

**SECTION 2**. If a Local determines that it has a primary labor dispute with an employer, the Local may request the AFM to place the employer on the International Unfair List. Following the AFM's listing of an employer as unfair, a Local may place the employer on its Unfair List.

**SECTION 3**. Members shall not render musical services for organizations, establishments, or people who are listed on the International Unfair List or for any other organization, establishment, or person who the member knew or reasonably should have known is owned or effectively controlled by an organization, establishment, or person listed on the International Unfair List. Any member who violates this Section shall be subject to penalties in accordance with Article 11, Section 13 [See Article 13, Section 4].

# ARTICLE 9—MEMBERSHIP; ELIGIBILITY, APPLICATION, FEES & DUES

## Membership Categories Summary

| CATEGORY | PERIODIC DUES | LIF REQUIRED? | FIF REQUIRED? | ANNUAL PER CAPITA | CONDITIONS APPLICABLE |
|---|---|---|---|---|---|
| **REGULAR MEMBER** | Set by Local<br>*Art. 5, §51* | Yes<br>set by Local<br>*Art. 9, §2<br>5, §51* | Yes<br>$65.00<br>*Art. 9, §2* | $66.00<br>($16.50/qtr)<br>*Art. 5, §47(a)* | • Instrumentalists, vocalists, dancers, support crew and any other individuals who render musical services are eligible.<br>*Art. 9, § 1(a)* |
| **LIFE MEMBER**<br>*Local option to establish*<br>*Art. 5, § 54(b)* | Set by Local subject to <u>minimum</u> rate formula:<br>*(Reg dues)*<br>*– (Reg per cap)*<br>*÷ 4*<br>*+ (Life per cap)*<br>*Art. 5, §54(a)* | n/a\\ | n/a | $50.00<br>($12.50/qtr)<br>*Art. 5, § 47(a)* | • Set by Local.<br>• Minimum age 65 and at least 35 cumulative years of AFM member-ship.<br>• Local may set higher and/or narrower threshold.<br>*Art. 5, § 54(b)* |
| **INACTIVE LIFE MBR**<br>*Local option to establish w/IEB approval*<br>*Art. 5, § 47(b)* | Set by Local<br>*Art. 5,§ 47(b)* | n/a | n/a | $44.00<br>($11.00/qtr)<br>*Art. 5, § 47(b)* | • May not vote or hold of-fice; Local may set additional limitations on professional music activity.<br>*Art. 5, § 47(b)* |
| **STUDENT MEMBER**<br>*Local option to establish*<br>*Art. 9, § 4* | Same as Regular member<br>*Art. 9, § 4(b)* | No<br>*Art. 9, § 4(b)* | No<br>*Art. 9, § 4(b)* | $66.00<br>($16.50/qtr)<br>*Art. 5, § 47(a)* | • Must be registered in an accredited school, college or university. When no longer a student, s/he con-verts to Regular member without additional fees.<br>• Has same rights and ob-ligations as Regular members, subject to all AFM and Local rules, regulations and Bylaws.<br>*Art. 9, §§ 4 and 4(a)* |
| **YOUTH MEMBER**<br>*Local option to establish*<br>*Art. 9, § 3* | Set by Local<br>*Art. 9, § 3(b)* | No<br>*Art. 9, § 3(b)* | No<br>*Art. 9, § 3(b)* | $66.00<br>($16.50/qtr)<br>*Art. 5, § 47(a)* | • Applicants must be age 20 years or younger.<br>• Has same rights and ob-ligations as Regular members, subject to all AFM and Local rules, regulations and Bylaws.<br>*Art. 9, § 3(a)* |

## Joining

**SECTION 1(a)**. All performers on musical instruments of any kind and vocalists, dancers, and support crew or other individuals who render musical services of any kind shall be eligible for membership, subject to AFM laws and jurisdiction. All individuals who are eligible to become members of a Local created under the provisions of Article 4 are eligible for membership in the AFM.

**SECTION 1(b)**. Once individuals become members, they shall have the right to retain their membership even though they are no longer engaged in the activities that initially made them eligible for membership.

**SECTION 2(a)**. All members, in addition to paying a Local Initiation Fee ("LIF") to the Local that they join, shall also pay a Federation Initiation Fee ("FIF") of $65 (except as provided in Article 9, Section 11, and except as provided for Youth Members in Article 9, Section 3(b) and Student Members in Article 9, Section 4(b).

**SECTION 2(b)**. Pursuant to a properly constituted vote of its Executive Board, a Local may waive LIF and FIF when all non-AFM members of a self-contained band or musical unit (consisting of two or more musicians) make application together to join a Local.

**SECTION 3**. Pursuant to a properly constituted vote of its membership, a Local may establish a Youth Membership classification, which shall enable people 20 years or younger to join the Local as Youth Members and remain in that classification until their 21st birthday.

**SECTION 3(a)**. Youth Members shall have all of the rights and obligations that Regular Members have, and they shall be subject to all AFM and Local rules, regulations and Bylaws.

**SECTION 3(b)**. A Youth Member shall be subject to AFM Per Capita at the same rate as Regular Members. A Youth Member shall pay periodic dues at a rate set by the Local, and Work Dues where applicable, but shall not pay LIF or FIF.

**SECTION 4**. Pursuant to a properly constituted vote of its membership, a Local may establish a Student Membership classification, which shall enable a musician who is registered as a student in an accredited school, college, or university to join the Local as a Student Member and remain in that classification until s/he is no longer a student at which time s/he will become a regular member with no additional cost.

**SECTION 4(a)**. Student Members shall have all of the rights and obligations that Regular Members have, and they shall be subject to all AFM and Local rules, regulations and Bylaws.

**SECTION 4(b)**. A Student Member shall pay periodic dues at the same rate as Regular Members as set by the Local and Work Dues where applicable, but shall not pay LIF or FIF.

**SECTION 5(a)**. Application for membership in any Local must be made in the jurisdiction in which the applicant resides; however, non-members who are part of a self-contained traveling group or unit may apply for membership in any Local in which they are performing an engagement.

**SECTION 5(b)**. No Local shall consider an application unless it is made on the official application blanks prescribed or approved by the AFM, which shall contain an Authorization for Checkoff of Work Dues in a form that shall be prescribed by the IEB. Failure to comply shall render the Local liable to a penalty, at the IEB's discretion. No Local shall accept an application for membership from an alien if the immigration laws prohibit the applicant from accepting employment.

**SECTION 5(c)**. Members found guilty of furnishing false information on their membership applications shall forfeit their membership and all monies paid for that purpose.

**SECTION 6**. A student or faculty member of a college, music school, university, or similar institution who is residing in the jurisdiction in which the institution is located, but who is not an AFM member, may, if otherwise eligible, obtain full membership in the Local where the institution is located.

**SECTION 7**. Locals may appoint or elect an Examination Board to pass upon the eligibility of applicants for membership. This does not apply to anyone who is already a member of another Local.

**SECTION 8**. In any case where Local law or procedure is the cause of delay in enrolling applicants to membership and the delay exceeds eight days, then the Local where the applications are pending shall issue the applicants written temporary permits, conferring temporary performing rights upon them, pending the consideration of their application. Engagements contracted during this temporary period does not exceed the duration of the temporary permit. The foregoing shall not apply to applications forwarded to the IEB.

**SECTION 9**. It shall be the duty of a Local to administer an oral or written oath to abide by the AFM Bylaws to all applicants for membership prior to the time full membership rights are granted.

**SECTION 10**. No Local may issue a full membership card to any partially paid member, but shall issue a Local receipt showing the unpaid balance until the partially paid member has submitted full membership fees to that Local.

## Members of Other Locals

**SECTION 11**. No FIF shall be imposed upon or collected from any Regular or Life member in good standing of any Local at the time of his/her induction into any other Local.

**SECTION 12**. Members who obtained membership in the Local in which they reside shall retain membership in that Local so long as they reside in that Local's jurisdiction and are engaged in performing musical services in that jurisdiction. Members who have resigned from such a Local shall reinstate their membership in that Local if they have maintained or reestablished residence in that jurisdiction and again engage in performing musical services in that jurisdiction.

**SECTION 13**. Any member taking up permanent residency in the jurisdiction of

another Local who solicits and/or performs musical engagements in that jurisdiction shall join the Local of residency. Any member who violates the provisions of this Section shall be subject to a fine of not more than $500 and/or expulsion.

**SECTION 14**. Any member may retain membership in more than one Local, provided all dues, assessments, and other legal demands are paid and all the provisions of this Article are complied with.

**SECTION 15**. A Local may confer full membership on members of another Local even though they reside in the other Local's jurisdiction.

**SECTION 16**. A member may petition the Secretary-Treasurer for a rebate equal to the Per Capita dues received by the AFM by virtue of that member's membership throughout the entire prior year in each AFM Local in excess of two. After the International Secretary-Treasurer has confirmed that the member had been a member of more than two Locals throughout that year, the AFM shall pay the rebate to the member.

**SECTION 17**. No Local, after written notification from the International Secretary-Treasurer's office, shall retain upon its rolls people who have been expelled by other Locals. No Local shall accept as members people who have been suspended or expelled by another Local unless those applicants present a properly signed receipt or confirmation from the other Local showing that they have either placed themselves in good standing or cleared their account of all outstanding dues, assessments, fines, or claims due that Local.

## Reinstating Membership

**SECTION 18**. No FIF shall be imposed upon or collected from any former member who has resigned in good standing.

**SECTION 19(a)**. If former AFM members file an application for reaffiliation with the Local with which they were last affiliated and during their lapse of membership committed any act contrary to the AFM Bylaws or orders, the Local may, at its sole discretion, refer the application to the IEB for action.

**SECTION 19(b)**. When a former AFM member who has been expelled by a Local or otherwise by the AFM as disciplinary action, files an application for reinstatement, the Local in which the application has been filed, may, at its sole discretion, refer the application to the IEB for action.

**SECTION 20**. When a former member submits a membership application, the Local in which the application has been filed must consult with the applicant's previous Local(s) with respect to any specific offensive act(s) of the applicant while a member or during the lapse of membership. If the former Local reports any offensive acts, the Local to which the applicant is applying shall refer the application to the International Secretary-Treasurer for appropriate action.

**SECTION 21**. No Local shall assess a reinstatement fee that exceeds its LIF.

**SECTION 22**. Any current or former AFM member expelled from a Local or Locals for failure to pay periodic annual dues shall be permitted to join any Local as a new member four years after the date of the expulsion, without payment of any outstanding annual dues or related fines.

**SECTION 23(a)**. In cases where applications for membership have been referred to the IEB, before the applicants shall be admitted to membership in the Local, they shall be required to pay any claims, dues, or fines standing against them in addition to paying to the Local the usual initiation or reinstatement fee.

**SECTION 23(b)**. Where a Local membership application is referred to the IEB for action, the IEB may grant to the applicant in lieu of membership, or pending the disposition of the membership application, written authority or permit to play with or for members for a period of time that the IEB may deem fit. This written authority or playing permit shall be subject to the limitation and conditions that may be imposed by the IEB and may also be subject to revocation at any time by the IEB without previous notice.

**SECTION 23(c)**. The IEB's determination with respect to any application for membership referred to it and with respect to all matters referred to in this Article shall be binding and conclusive.

## Resignation, Suspension, Expulsion

**SECTION 24**. The definitions of the terms "suspended" and "expelled" relating to membership status in these Bylaws and those of all Locals shall be:

**SECTION 24(a)**. A suspended member is a member whose regular periodic dues are unpaid for a period of time as specified in a Local's Bylaws to declare a member automatically suspended for non-payment (subject to the requirement of Article 9, Section 25, that a member may not be suspended until at least 30 days after the first day of the period for which the dues would be paid). However, in no case can this period of time exceed six months, at which time a member shall be automatically expelled for non-payment, as specified in Article 9, Section 26. A member having been suspended as provided here shall have all the obligations of membership but none of the rights and is not in good standing.

**SECTION 24(b)**. The following terms are some that are synonymous with "expelled": Erased, removed, dropped, terminated, canceled, annulled, nullified, and eradicated. An expelled person is (1) a former member who has been automatically expelled for failure to pay regular periodic dues to a Local for six months from the expiration date of the period for which the person's dues were previously paid to the Local, or for a shorter period than six months if the Local's Bylaws so provide (subject to the requirement in Article 9, Section 25, that a member may not be expelled until at least 30 days after the first day of the period for which the dues would be paid); or (2) a person who has been expelled by a Local as disciplinary action for violation of the Local's or AFM's Bylaws, after a full and fair hearing; or (3) a person who has been expelled by AFM order. A person having been expelled as provided here shall have neither the rights nor obligations of membership to the Local.

**SECTION 25**. No Local may remove a member from good standing, either by suspension or expulsion, for failure to remit periodic membership dues until at least 30 days after the first day of the period for which the dues would have been paid.

**SECTION 26**. A member is automatically expelled from a Local if the member's periodic dues to the Local remain unpaid for six months from the expiration date of the period for which the member's dues were paid. A Local may,

if its Bylaws so provide, expel a member whose dues have remained unpaid for a shorter period than six months. The Local must remove from its roster the name of any member expelled as provided here.

**SECTION 27**. Members who have been suspended from a Local for non-payment of dues, late fees or fines on dues, or assessments may be reinstated by paying the Local's prescribed reinstatement fee, if any, and the back standing dues, late fees or fines, and assessments owing at the time of suspension. Dues, late fees or fines on dues or assessments cannot be charged covering a period longer than six months.

**SECTION 28(a)**. Individuals who have been expelled from a Local for non-payment of dues, late fees or fines on dues, or assessments can be reinstated by paying the Local's prescribed reinstatement fee, if any, and the back standing dues, late fees or fines, and assessments owing at the time of suspension or expulsion. Dues, late fees or fines on dues, or assessments cannot be charged covering a period longer than six months. [*see Article 9, Section 22 re: amnesty*.]

**SECTION 28(b)**. Individuals who have been expelled and who currently reside in a jurisdiction other than their former Local's jurisdiction may be accepted into the new Local upon payment of back standing dues, late fees or fines on dues, or assessments owed to the former Local at the time of expulsion. In addition, the new Local shall charge its LIF plus the FIF in accordance with Article 9, Section 2.

**SECTION 28(c)**. A former AFM member expelled for reasons other than the non-payment of dues, late fees or fines on dues, or assessments is not entitled to the benefit of this Section, but must comply with AFM or Local bylaws, or both, governing their reinstatement, as the case may be.

**SECTION 29(a)**. Members who wish to place themselves in good standing for the purpose of resigning from a Local after being suspended for the non-payment of assessments, dues, late fees or fines on dues, cannot be required to pay more than the amount owed at the date of their suspension. The amount due for these obligations shall not cover a period longer than six months, when a member is automatically expelled for failure to pay a Local's regular periodic dues in accordance with AFM Bylaws. The addition of a reinstatement fee is prohibited.

**SECTION 29(b)**. Former members who wish to place themselves in good standing for the purpose of resigning from a Local after being expelled for the non-payment of assessments, dues, late fees or fines on dues, cannot be required to pay more than the amount owed at the date of their expulsion. The amount due for these obligations shall not cover a period longer than six months, when a member is automatically expelled for failure to pay a Local's regular periodic dues in accordance with AFM Bylaws. The addition of a reinstatement fee is prohibited.

**SECTION 30**. Members must tender their resignation in writing to the Secretary of the Local from which they wish to resign.

**SECTION 31**. If a member sends a check to any AFM Officer in payment of an amount due the AFM and the check is unpaid or protested, then the offending member shall be subject to a $5 fine, together with all protest charges incurred. If a traveling member delivers a check to any Local in payment of an amount due the Local and the check is unpaid or protested and the member fails to make the check good within five days after notification as provided in Article 11, Section 3,

then the offending member shall be subject to a $5 fine, together with all protest charges incurred. The fine shall become the Local's property. The International Secretary- Treasurer must be notified of all Local fines levied under this Section.

## Work Dues

**SECTION 32**. All AFM members, as a condition of membership, shall be required to pay dues based on scale earnings (Work Dues) for all musical services performed under AFM-negotiated Agreements, AFM touring Pamphlets, and employment with any Symphonic Orchestra. For the purposes of this Bylaw, a Symphonic Orchestra shall be defined as an orchestra organized as a philanthropic community project and maintained in substantial part by public subscriptions and contributions, and (1) with not less than 60 musicians and a scheduled annual season of not less than 15 performances of the character performed by Symphonic Orchestras (termed Symphonic employment), or (2) that engages musicians for 100 or more orchestral services per season (excluding chamber music, defined as music performed by no more than 16 musicians).

These Work Dues shall be due and payable as follows:

**SECTION 32(a)**. For Symphonic employment Work Dues shall be no less than 1.05% of scale wages and shall be payable to the Local in which the engagement takes place, except as otherwise provided by these Bylaws. Of this amount, .55% of scale wages shall be due and payable by the Local to the AFM as Federation Work Dues.

**SECTION 32(b)**. For employment under AFM-negotiated Agreements covering services rendered for electronic media (recordings, broadcasts, films, video, etc.), Work Dues shall be no less than the Minimum Work Dues set forth in the chart below and shall be payable to the Local in which the engagement takes place, except as otherwise provided by these Bylaws. Of this amount, the portion set forth in the chart below shall be due and payable by the Local to the AFM as Federation Work Dues. In cases where a sound recording is being produced by an artist who is a member of a non-geographic local as defined in Article 4, Section 10, and where the contract for the recording is administered by the non-geographic local, the work dues shall be payable to the non-geographic local administering the contract.

*Rates Effective January 1, 2014*

| Type of Work | Minimum Work Dues as a % of scale wages | Federation Work Dues as a % of scale wages |
|---|---|---|
| Employment in the U.S. under the Theatrical Motion Picture Agreement | 2.60% | 2.35% |
| Employment in the U.S. under the T.V. Videotape Agreement | 2.25% | 2.00% |

| | | |
|---|---|---|
| Earnings under Commercial Announcements Agreement except for earnings for original sessions | 2.25% | 2.00% |
| Earnings under the Sound Recordings Labor Agreement | 1.75% | 1.50% |
| All other employment under Federation-negotiated Electronic Media Agreements (other than Symphony, Opera or Ballet Electronic Media Agreements) | 2.00% | l.75% |
| Federation-negotiated Symphony, Opera or Ballet Electronic Media Agreements | 1.50% | l.25% |

**SECTION 32(c)**

i. For employment under Pamphlet B—Touring Theatrical Musicals, or for employment under any other AFM-negotiated Agreement(s) or "Pamphlets" covering touring employment in which the members have voted to participate in the Theater Defense Fund in accordance with Article 6, Section 6(b)(ii), Work Dues shall be 3¾% of scale wages and shall be payable to the AFM. Of this amount, ¼% shall be paid into the Theater Defense Fund.

ii. For employment under AFM agreements negotiated pursuant to Article 3, Section 9(e)(ii) of these Bylaws, work dues shall be 3.25%, allocated 2% to the Local(s) in which the work is performed and 1.25% to the Federation.

iii. For any other employment under AFM-negotiated Agreements and "Pamphlets" covering touring employment, Work Dues shall be 3¼% of scale wages and shall be payable to the AFM.

**SECTION 32(d)**. With the exception of (1) motion picture and television sound track albums, (2) Industrial Promotional Agreement Use of Broadway Cast Album tracks (3) new uses covered by the Federation's Symphony, Opera, Ballet Audio-Visual Agreement (4) new uses covered by the Federation's Radio and Television Commercial Announcements Agreement for product originally recorded under that Agreement, Work Dues for earnings received from the use of a music product for a purpose in electronic media other than that for which it was originally produced (commonly known as "new use," "clip use," etc.), shall be 15% of the monies received by the musician and shall be payable to the Federation. From this amount, 2% of the monies received by the musician shall be due and payable by the Federation to the Local where the original services were rendered.

**SECTION 32(e)**. For earnings resulting from employment that is in whole or in part funded pursuant to the terms of trust agreements negotiated by the AFM as an adjunct to agreements covering electronic media work, Work Dues shall be 5% of scale wages. Half of this shall be payable to the AFM and the other half shall be payable to the Local where the scale wages are earned.

**SECTION 32(f)**. The amount of Work Dues retained by or remitted to Locals as provided here, as well as any additional Work Dues permitted, shall be due and payable to the Local where the services were performed (unless provided otherwise in these Bylaws) and shall be known as Local Work Dues.

**SECTION 33**. All Work Dues, both AFM and Local, specified in Sections 32(a) through 32(e), above, shall be payable on all scale earnings with no Local restrictions as to the total amount payable within any specified time period.

**SECTION 34**. For the purpose of this Article, the Work Dues paid on the scale wages of traveling musicians, other than those covered by a scale established by the AFM or a Local other than the Local in which an engagement takes place, shall be based upon the minimum Local wages of the Local where the engagement takes place.

**SECTION 35**. All Work Dues shall be due and payable no later than the 15th day of the month following the month during which the member was paid. Any member violating the provision of this Section shall be subject to a fine of not less than $10 nor more than $100, suspension and/or expulsion from the AFM.

## Work Dues—Traveling

**SECTION 36(a)**. In connection with any Traveling Engagement within the United States (except those covered by a AFM CBA) each member, at or prior to the time of payment for the Traveling Engagement, shall either (1) execute and deliver a written authorization to the leader on the engagement to deduct from the member's wages the amount of all monies (including Federation and Local Work Dues) owed or to be owed by the member to any Local by reason of and in connection with the engagement and to deliver the monies to the Local in behalf of the member; or (2) make all payments directly to the Local. Leaders shall immediately transmit to the Local where the Traveling Engagement was performed all authorizations received by them (or a certification that they have received the authorizations) and all monies authorized to be deducted. Leaders shall immediately report to the Local the names, addresses, and Local numbers of any members who have failed to sign and deliver the authorization.

**SECTION 36(b)**. In connection with any Traveling Engagement performed in Canada (except those covered by a AFM CBA) the leader who is a member shall deduct or collect from the wages of each member who has performed on the engagement the amount of all monies (including Federation and Local Work Dues) owed or to be owed by the member to any Local in Canada by reason of and in connection with the engagement and shall deliver the monies to the Local in behalf of the member.

**SECTION 36(c)**. Any member who shall fail to comply with the requirements set forth in Sections (a) and (b) above shall be subject to a fine of not less than $10 nor more than $100 for each offense and/or to expulsion from the AFM.

**SECTION 36(d)**. The International Secretary-Treasurer, from time to time, may adopt and promulgate such other and further procedural requirements as shall be necessary and proper to effect the intent and purpose of this Bylaw, including the forms of authorization and certification referred to in Section (a) above.

**SECTION 37**. A non-geographical Local, as defined in Article 4, Section 10, may impose Work Dues upon its members while performing services on Traveling Engagements with groups or singles composed solely of its members, provided that the maximum amount of Work Dues does not exceed 4% of scale wages. In these cases Work Dues on the engagements shall not be payable to any other Local.

**SECTION 38**. Except as provided by Article 14, Section 3, members performing

Symphonic services outside the orchestra's home Local, including services performed with a ballet or opera company, provided that those members customarily perform with the ballet or opera company in their home Local, and provided that the ballet or opera company is based in the jurisdiction of the home Local, when the services are rendered under a Master Agreement between the home Local and the orchestra management, shall not be considered traveling members for the purposes of this Article and shall be required to pay Federation Work Dues only to the home Local.

**SECTION 39**. Members performing services other than for a Symphonic Orchestra outside of the jurisdiction of the home Local where their employer is based, when the services are rendered under a CBA between the home Local and the employer, pursuant to Article 5, Section 28, shall not be considered traveling members for the purposes of this Article and shall be required to pay any required Local and/or Federation Work Dues pertaining to the services only to the home Local. The home Local shall, within 30 days of receipt of the Work Dues, remit to the Local where the services are rendered an amount equal to one-half of the Local Work Dues received or an amount equal to one-half of the Work Dues payable on the wage scale and Work Dues rate of the Local where the services are rendered, whichever is less.

# ARTICLE 10—MEMBERS' RIGHTS & DUTIES

**SECTION 1**. Every member in good standing shall have the following rights:

(1) Equal Right to:
- (a) nominate candidates;
- (b) vote in elections or referendums;
- (c) attend membership meetings;
- (d) participate in deliberations;
- (e) participate in votes at membership meetings (all subject to reasonable Rules and Regulations contained in the Bylaws).

(2) Freedom of Speech as expressed by the right to:
- (a) meet and assemble;
- (b) express any views;
- (c) speak out at meetings (all subject to established and reasonable rules pertaining to conduct at meetings)

(3) Due Process in all cases of discipline, which must include:
- (a) notice in writing of the specific charge(s);
- (b) reasonable time to reply to said charge(s);
- (c) a full and fair hearing by an impartial tribunal with the opportunity to tell his/her own side of the story.

(4) The Right to examine a copy of any collective bargaining agreement covering their work place and the right of fair representation by the union in all matters relating to the collective bargaining agreement.

(5) To Participate in Elections:
- (a) as a Candidate:
  - to run and hold office subject to reasonable qualifications, which must be stated in the Bylaws;
  - to have an observer at the poll;
  - to distribute or have distributed candidate literature at the candidate's expense in accordance with procedures established by the Local or the AFM.
- (b) as a Voter:
  - entitled to one vote;
  - the right to a secret ballot.

(6) To file any claim, charge, or appeal in accordance with Local or AFM Bylaws.

**SECTION 2**. No member shall violate any AFM law, order, direction, resolution, or rule. A member found guilty of a violation under this Section shall be fined by the IEB a sum of not less than $10 nor more than $10,000 or shall be expelled from the AFM.

**SECTION 3**. No AFM member shall be permitted to hold membership in any union of musicians not affiliated with the AFM or in any other organization or association of musicians that has as a goal or engages in a pattern of conduct undermining or weakening the legitimate interests of the AFM or any affiliated Local. Any member violating the provision of this Section shall be subject to expulsion.

**SECTION 4**. An employee AFM member cannot perform with employees of the same employer who are not members in good standing of the AFM or any of its Locals on competitive engagements except with the AFM's consent or

in cases where AFM laws provide otherwise. In Canada, an AFM member cannot perform with or in conjunction with suspended or expelled members or with non-members in the jurisdiction of a Local on competitive engagements except with the AFM's or Local's consent or in cases where AFM laws provide otherwise. Engagements are considered competitive if musicians receive pay for their services or if the employer, in the absence of free services of musicians, would be obliged to pay for them. Any member who violates the provisions of this Section shall be subject to a fine of not more than $500 and/or expulsion.

**SECTION 5**. No member shall work as an employee or perform or agree to perform musical services for or with any person or organization where such employment or service is clearly intended to assist an employer in preparation for, defense against or in breaking a lawful primary strike.

**SECTION 6**. No member shall work as an employee for an employer against whom the AFM or a Local is engaging in a lawful primary strike. No member shall cross through or work behind a lawful primary picket line established by the AFM or a Local. Any member who violates this Section shall be subject to penalties in accordance with Article 11, Section 13.

**SECTION 7**. All contracts or agreements covering live performances by AFM members must contain the following provision: "No performance or rehearsal shall be recorded, reproduced, or transmitted from the place of performance, in any manner or by any means whatsoever, in the absence of a specific written agreement with or approved in writing by the AFM relating to and permitting such recording, reproduction, or transmission. This prohibition shall not be subject to any procedure of arbitration and the AFM may enforce this prohibition in any court of competent jurisdiction."

**SECTION 8**. Every cooperative group, band, or orchestra shall designate one member who is an AFM member to act as leader for the purpose of complying with Local and AFM regulations governing bands and orchestras. If the group members fail to comply with this requirement, each group member shall be individually responsible for fulfilling all Local and AFM regulations applicable to a leader.

**SECTION 9**. No member shall perform or agree to perform an engagement for less than the applicable minimum compensation established for the engagement by the Local or AFM, as the case may be. Any member who violates the provisions of this Section shall be subject to a fine of not more than $1,000 and/or expulsion.

**SECTION 10(a)**. Local leaders or Local individual members performing alone, prior to the time a local engagement is performed, must submit the contract for the engagements to the Local if the Local has a law requiring filing of a contract prior to each engagement.

**SECTION 10(b)**. When the Local does not have such a law, the Local leaders or Local individual members performing alone shall either file their contract with the Local prior to the engagement or file a written statement with the Local prior to the engagement that will reflect their home address, the date, place, and hours of the engagement, the number of musicians who will perform, and their names if known at the time the statement is prepared. If the musicians' names are unknown at the time the statement is prepared, the Local leader

must file a supplementary statement with the Local within five days after the engagement is performed naming the musicians who performed.

**SECTION 11**. A Local cannot interfere in the cancellation of contracts between members made by mutual consent of the parties to the contract.

**SECTION 12**. If any AFM members at any time or under any circumstances whatsoever deny that they are AFM members in any case that involves the interests of the AFM or their obligation as members, they shall be subject to expulsion.

**SECTION 13**. AFM members who change their names in any way whatsoever or use Social Security/Insurance Numbers other than the ones assigned to them with intent to defeat the efforts of any AFM or Local Officers in establishing their identity, shall be subject to expulsion.

**SECTION 14**. Any AFM member who is found guilty of giving, lending, or borrowing a membership card for the purpose of evading, or assisting anyone to evade the laws and regulations of the AFM or any Local shall be subject to a fine of not more than $500.

**SECTION 15**. In the event that a band or orchestra composed of AFM members incorporates, the AFM and its Locals shall have the right to continue to look to the individual members to perform their AFM obligations. Any member of a corporation who violates any AFM or Local rule shall be subject to the same actions as if the corporation did not exist.

**SECTION 16**. Share plan engagements will be permitted only by Local consent when they are proven absolutely non-competitive. The decision of a Local under this Section is subject to IEB control.

**SECTION 17**. An engagement becomes a share plan engagement if members among themselves or with a second party agree to accept as pay for their services all or a portion of the receipts or profits of the function where the engagement is played.

**SECTION 18**. AFM members may assume a business risk and arrange a non-competitive share plan engagement with non-members provided that they pay to the other members playing the engagement the full union price.

**SECTION 19**. Leaders who assume the responsibility for the payment of a member's services shall be bound by their action and cannot escape their obligation by claiming the protection of any Local or AFM law.

**SECTION 20**. Members of a Local who demand, request, induce, or try to induce other members not to play with or for any other leaders or members shall be subject to a fine of not more than $100 or to suspension or expulsion.

**SECTION 21**. No member, without the approval of the IEB or its duly authorized agent, shall enter into any contract for the rendition of musical services for a period (including options) longer than one year from the contract date, and no such contract shall become effective without approval.

The IEB may approve contracts for a period (including options) not exceeding five years from the contract date.

**SECTION 22**. AFM members and leaders are prohibited from assuming any responsibility for the payment of license fees for any composition they play and from assuming or attempting to assume any liability whatsoever for royalties, fees, damage suits, or any other claims arising out of the playing of copyright compositions.

**SECTION 23**. Any member(s) of a Local found guilty by the IEB of charges of misrepresenting the conditions existing in the Local jurisdiction for the purpose of deterring AFM members from accepting or fulfilling engagements, as provided in Article 13, Section 4, shall be fined not more than $250 and, in case of failure to pay the fine within 30 days, shall be expelled. Where any Local official misrepresents conditions as specified above by the Local's instruction, the Local shall be subject to a fine of not more than $500 and, if not paid within 30 days, the Local shall be suspended until the fine is paid.

**SECTION 24**. AFM members may not enter into an agreement, either personally or through their Agent(s), with an employer that gives the employer an interest in their future earnings, commissions, or any substitute of these at any time. AFM members, either personally or through their Agent(s), may not offer an employer rebates, gifts, or any substitute for these in consideration for securing an engagement. No AFM member is permitted to render services on any engagement under such conditions.

**SECTION 25**. All Local laws denying minors who have acquired full membership the right to vote are null and void.

**SECTION 26**. No member shall bring any action in any court or other tribunal against any other member, any Local or the Federation, or any Local or Federation officer asserting any claim that could have been asserted under the member's Local's Bylaws or the Federation's Bylaws without first having exhausted all remedies and appeals provided by such Bylaws.

# ARTICLE 11—CHARGES & TRIALS

**SECTION 1(a)**. In any and all trials, before they can be held and before a penalty can be imposed, members must be notified in writing of the specific charges against them, must be afforded a reasonable time to prepare a defense, must be summoned to appear at a time and place for trial or to otherwise present their defense before the appropriate Local Board, the IEB, an IEB subcommittee or a referee hearing the charges, as the case may be, and must be given an opportunity to defend themselves. The notification and charges shall be prepared in duplicate, one to be sent to the defendant, the other filed with the case records.

**SECTION 1(b)**. Defendants may request a reasonable extension of time for submission of evidence or a delay in the trial date, approval of which will not be unreasonably withheld.

**SECTION 1(c)**. If defendants fail to appear or otherwise present their defense when summoned or in any way obstruct the holding of a trial, hearing, or investigation, they shall be judged in default and the case shall proceed to a decision without further delay.

**SECTION 1(d)**. Charges against members must be filed within one year from the date of the event(s) that gave rise to the alleged violation or within one year from the date on which the relevant facts became known or reasonably could have become known, whichever is later.

**SECTION 2(a)**

i. A charge may be filed by a Local or a member of a Local.

ii. If a Local or an AFM Bylaw is allegedly violated by a member of the Local having jurisdiction where the alleged violation occurred, the Local where the alleged violation occurred shall try the charges against the member. However, any alleged violations of Article 6, Section 5; Article 15 (Recordings), Sections 1, 2, 3, 4, 5, 6(b); or to Article 5, Section 40; shall be tried by the IEB or an IEB subcommittee or a referee appointed by the International President.

iii. A charge against a member for failure to remit Work Dues in accordance with Article 9, Section 36, of AFM Bylaws, or in accordance with a Local Bylaw requiring Work Dues, shall be tried by the Local where the alleged violation occurred.

iv. In the event that a Local trial body arguably cannot function impartially, a request may be made of the International President, by the charging party or the accused party, that the IEB conduct the trial. The International President shall have the sole authority to grant or deny such a request.

**SECTION 2(b)**. Any alleged violation of Article 8 (Unfair List) or of Article 10 (Rights and Duties of Members) with regard to an engagement on which any musician performed who is not a member of the Local in which the alleged violation occurred, shall be tried by the IEB, an IEB subcommittee, or a referee appointed by the International President.

**SECTION 2(c)**. Except as provided above, the IEB or an IEB subcommittee or a referee appointed by the International President shall hear all other charges against a person who is a member of a Local other than the one in which the alleged violation occurred.

**SECTION 2(d)**. When the trial is conducted by the charging Local, any fine imposed shall be paid into that Local's treasury. Otherwise, fines shall be paid into the AFM treasury.

**SECTION 2(e)**. The Vice President from Canada shall have exclusive jurisdiction over any matters that are in the jurisdiction of the AFM with respect to this Article 11, and that involve only Canadian parties and issues. In exercising such jurisdiction, s/he shall follow the procedures outlined in the Canadian Office Rules of Practice and Procedure (CORPP), as may be amended from time to time.

**SECTION 3**. If members have left the jurisdiction where they are charged with having committed a violation, they must be given an opportunity to forward their testimony in writing. Summons to send their testimony, forwarded to the members' address as appearing on the books of the Local to which they belong, shall be considered legal notice.

**SECTION 4**. If members fail to answer within 30 days from the date the notice was forwarded, they shall be judged to be in default and the Local may proceed to make its decision without further delay.

**SECTION 5**. If the trial is conducted by an IEB subcommittee or referee, it may be held in the Local where the violation is alleged to have been committed or in some other jurisdiction or place, as the convenience of the situation may reasonably require.

**SECTION 6**. If the trial is held before a referee appointed by the International President, then the referee shall hear the evidence in the case and submit the entire record including transcript, if any, exhibits received in evidence, and the referee's report and recommendation to the IEB. The IEB shall decide the case as if it had heard the evidence.

**SECTION 7**. If the trial is held before the IEB, then the charges specifying the violation must be made in writing and submitted to the International Secretary-Treasurer, who shall follow the procedure as outlined below:

(1) The charge(s) shall be sent to the defendant for reply within 30 days.

(2) The defendant's reply shall be sent to the opposing party for rebuttal within 30 days.

(3) The opposing party's rebuttal shall be sent to the defendant for surrebuttal within 30 days.

(4) The defendant's surrebuttal shall be sent to the opposing party for the party's records only and shall complete the assembly of the entire record; however, in the event of any amendment of the charge(s) during this process (1-4), the provisions of Subsections (5) and (6) below shall be implemented in assembling the entire record.

(5) The opposing party shall be afforded the opportunity to comment on the defendant's surrebuttal within 30 days.

(6) The opposing party's comment on the defendant's surrebuttal shall be sent to the defendant for final comment within 30 days.

(7) At the conclusion of this process, the International Secretary-Treasurer shall submit the entire record in the case to the IEB for its decision.

**SECTION 8**. If defendants are found guilty by a Local Board, they may be fined not less than $10 nor more than $5,000 and/or they may be suspended or expelled.

**SECTION 9**. If defendants are found guilty by the IEB or its subcommittee, they may be fined not less than $10 nor more than $50,000 and/or they may be expelled.

**SECTION 10**. Any Local investigating or prosecuting an alleged or known violation of AFM or Local laws shall have the right to demand that another Local summon and secure the testimony or evidence of witnesses or people with knowledge of the subject matter who are within the jurisdiction of that Local. The Local so concerned shall comply in good faith, under such penalty for failure to do so as may be imposed by the IEB.

**SECTION 11**. A Local requested to secure evidence as set forth here shall have the power to impose a fine of not more than $50 for failure to appear and testify after summons, and the requesting Local shall have similar jurisdiction over all members not affiliated locally who may be within its jurisdiction.

**SECTION 12**. The expenses of securing testimony under this Section shall be paid by the Local requesting the testimony.

**SECTION 13**. If a fine is not provided for violation of any provision of the AFM Bylaws or Standing Resolutions, then the IEB may, at its discretion, impose a fine of not less than $10 nor more than $50,000 upon the offending members or expel them.

**SECTION 14**. A fine imposed upon a member by a Local and sustained by the IEB cannot be rescinded by a Local without IEB consent. The same rule applies if a member is fined by the IEB.

**SECTION 15**. All penalties imposed under AFM laws must be immediately reported to the International Secretary-Treasurer, who shall notify the member or members. Members who within 30 days fail to pay the penalties allowed against them or fail to appeal to the IEB or to the Convention in cases where the AFM Bylaws provide for that appeal shall be expelled from all Locals to which they belong upon written notice from the International Secretary-Treasurer to the Locals.

**SECTION 16**. Any member who attempts to influence a decision of the IEB, or an IEB member, in any manner other than by submitting a proposition, evidence, or argument in regular form through the office of the International President or Secretary-Treasurer shall be disciplined by the IEB.

**SECTION 17**. A member may request a personal hearing. A member who requests that the AFM conduct a hearing and fails without justification to appear at that hearing shall be subject to disciplinary action including but not limited to the penalty of paying all expenses incurred by the AFM in connection with the hearing.

**SECTION 18**. Charges preferred by a member of a Local against an Officer of that Local shall be adjudicated by that Local in accordance with its

Bylaws. If the Local's adjudicating body is unable to conduct the trial for whatever reason (e.g., the number of defendants or other conflicts of interest serve to deprive the body of its quorum or the body believes that it cannot, for whatever reason, conduct a trial, etc.), the Local or the charging party shall refer the charges to the International President. The President, or his or her designee, shall then review the charges and either (i) refer them back to the Local for adjudication, (ii) dismiss them or (iii) refer them to the International Secretary-Treasurer for adjudication by the IEB. The decision made under this section, by the President, or his/her designee, shall be final and not subject to appeal.

**SECTION 19**. If a defendant is found guilty of a violation of a Local or AFM Bylaw and it is determined that the violation has resulted in depriving any musician(s) of compensation that would have otherwise been due from a musical engagement, then, in addition to any other fine(s) that may be imposed on the member, the Local Board or the IEB, as the case may be, shall collect from the defendant and distribute to the musician(s) the full amount of unpaid compensation, plus accrued interest and any amounts that should have been contributed for statutory and union-negotiated employee benefits.

**SECTION 20**. When under instruction from the International President or International Secretary-Treasurer, a Local that incurs expenses from procuring evidence or prosecuting charges for violation of any AFM law against members other than those who belong to that Local, shall be reimbursed out of AFM funds upon presentation of an itemized bill duly approved by either the International President or the International Secretary-Treasurer.

# ARTICLE 12—APPEALS

*NOTE: The following sections of this article apply to all appeals from Local and/or IEB decisions except those from decisions or awards that are governed by provisions of Article 5, Sections 22, 23, 24, and 25 relating to election challenges; Article 6—Funds, passim; Article 11, Section 18, relating to dismissal of charges preferred against Local Officers; and those specific Sections of Article 7, relating to grievances and arbitration.*

**SECTION 1**. Members are required to exhaust all remedies and appeals provided by their Locals and/or the AFM before proceeding in court or any other tribunal against any member, Local, or the AFM.

**SECTION 2(a)**. An appeal can be made to the IEB from any decision of a Local or any other subordinate authority. A further appeal can be made to a Convention in any case involving an ultimate fine of $1000 or more or expulsion from AFM membership, regardless of whether the original decision was made by a Local or by the IEB.

**SECTION 2(b)**. Any decision of the Vice President from Canada in any case involving only Canadian parties and issues in which a verdict of guilty results in a fine or expulsion from AFM membership may be appealed by the member(s) affected to the annual meeting of the Canadian Conference of Musicians. Any appeal shall be submitted to the Secretary-Treasurer of the Canadian Conference of Musicians within 30 days of receipt of the final decision of the Vice President from Canada. The Secretary-Treasurer shall within ten business days, acknowledge receipt of the appeal and invoke the Canadian Office Rules of Practice and Procedure (CORPP), as may be necessary, to complete the procedures for submissions by the respondent parties which are to be considered by the Canadian Conference. A decision by the Canadian Conference on appeal by the Canadian member(s) under this Section shall be final and binding and the decision cannot be appealed to the AFM Convention.

**SECTION 3**. A Local Officer or Officers may appeal to the IEB from a Local decision if, in the Officers' opinion, the decision or the process by which the decision was reached violated the AFM's principles. If the IEB sustains the appeal, then it shall correct the situation, and its decision shall be binding upon the Local.

**SECTION 4**. An appeal to the IEB from the decision of a Local shall be decided only upon the evidence used in the hearing of that matter before the Local, which shall be reduced to writing at the hearing and certified by the Secretary under Local seal.

**SECTION 5(a)**. In the event of an appeal to the IEB or to a Convention, the appellant may request a stay of judgment from the International President, who shall decide whether or not the appellant is entitled to it.

**SECTION 5(b)**. If the request for stay of judgment is denied, then the appellant must deposit the amount of any fine, or in lieu of that a satisfactory bond, placed with the Local if the appeal is concerning a violation of a Local law by a Local member, or with the International Secretary-Treasurer if the appeal is concerning a violation of, or is governed by, AFM laws. If the appeal is upheld, then the deposit shall be returned to the appellant.

**SECTION 6**. An appeal to either the IEB or to a Convention must be filed with

the International Secretary-Treasurer within 30 days of the time that the appellant was advised of the Local or IEB decision, as the case may be.

**SECTION 7**. The International President or the IEB may extend the time for filing appeals for a period or periods longer than 30 days.

**SECTION 8(a)**. All transcripts of records, arguments, citations, exhibits, and other documentary evidence shall accompany any appeals and they shall be in typewritten form. The International Secretary-Treasurer shall have the authority to return the papers of either party for correction in case of non-compliance with the provisions specified here.

**SECTION 8(b)**. Local Secretaries, upon request, must furnish an appellant with full Local records of the case.

**SECTION 9**. The International Secretary-Treasurer shall forward a copy of the appeal to the Local Secretary, or defendant, as the case may be, who shall within 30 days respond to the appeal. For good cause, the International Secretary-Treasurer may extend the time limit.

**SECTION 10**. The Local Secretary is required to notify the parties who appeared before the Local authorities of the taking and pendency of the appeal. They shall have not more than 30 days to answer, unless an extension of time is granted in which to answer. For good cause, the International Secretary- Treasurer may extend the time limit.

**SECTION 11**. After the answer is received, the International Secretary- Treasurer shall forward it to the appellant, who shall make a rebuttal within 30 days. The International Secretary-Treasurer shall then submit the appellant's rebuttal to the defendant for surrebuttal to be made within 30 days. The International Secretary-Treasurer shall forward a copy of the surrebuttal to the appellant for his or her records and shall submit the case to the IEB for its decision. For good cause, the International Secretary-Treasurer may extend the time limit.

**SECTION 12**. In the event that either the appellant or defendant fails to proceed or make defense in the case in accordance with the stipulation contained here, the IEB may proceed to decide the case by default.

**SECTION 13**. An aggrieved party may request the reopening of a case decided by the IEB upon the grounds of prejudicial error or may submit new evidence that was not available at the prior proceeding. An application for a reopening must be submitted in writing to the International Secretary-Treasurer not later than 30 days after receipt of the IEB's initial decision, and shall explicitly set forth the alleged prejudicial error and/or the new evidence relied upon. The International Secretary-Treasurer, in his or her discretion, may grant or deny the application after reviewing the evidence submitted. If the International Secretary-Treasurer denies the request, the member may file an appeal of that denial with the IEB by filing a notice of appeal with the International Secretary-Treasurer not later than 30 days after receiving the denial of the request.

**SECTION 14**. In all cases that may be appealed to a Convention, notice of appeal must be given within 30 days from the date that the decision that is to be appealed is made. All appeal cases to the Convention shall be heard not later than the third business day of the Convention and the hearing of these cases, when the time is set, shall take precedence over all other matters except by majority vote

of the Convention.

**SECTION 14(a)**. An appeal to the Convention shall be heard only upon the evidence submitted to the IEB, which shall be in writing.

**SECTION 14(b)**. When an appeal is taken to the Convention from an IEB decision it shall be heard by the Appeals Committee, which shall render a report to the Convention. The motion presented to the Convention will be the adoption of the Committee's report. The usual rules governing debates on the motion will apply, except that the parties to the appeal may speak on the motion even if they are not Delegates.

**SECTION 14(c)**. Appeals Committee members may not sit on any case in which they have any interest or which arose in a Local of which they are members. The International President may substitute members to the Appeals Committee for those disqualified.

**SECTION 14(d)**. The International President may direct the Appeals Committee to come to the Convention city for the purpose of hearing appeals before the Convention officially begins.

# ARTICLE 13—TRAVELING ENGAGEMENTS

*NOTE: The rules contained in this article apply to all Traveling Engagements played by bands, orchestras, or individual members. Further rules are contained in Article 9, Section 36.*

## General Rules

**SECTION 1**. For the purpose of these Bylaws, a "Traveling Engagement" means an engagement in which any member performs outside the jurisdiction of that member's home Local.

**SECTION 2**. No member shall accept employment in any of the following types of work unless the individual, partnership, or corporation engaging musicians for the work has signed an appropriate contract approved by the International President's office: Traveling theatrical orchestras, concert orchestras, concert bands, foreign engagements, seagoing passenger and cruise ships, fairs, circuses, rodeos, and carnivals.

**SECTION 3**. The IEB is given full power and authority to promulgate, adopt, revise, and/or adjust all scales for traveling musicians and to promulgate, adopt, revise, change, suspend, and/or repeal any rules, laws, and/or Bylaws pertaining to traveling musicians, including those relating to the filing of contracts or written statements for Traveling Engagements and/or the procedure for collecting Work Dues (dues based on earnings) from traveling members for performing services within the jurisdiction of a Local of which they are not members. The IEB may exercise its powers and authorities under this Section in such a manner and to such an extent as in the IEB's sole judgment may be in the best interest of the AFM and its members.

**SECTION 4**. Before accepting any Traveling Engagement, members shall be responsible to ascertain that the organization, establishment, or person for whom they propose to render musical services has not been placed on the International Unfair List.

**SECTION 5**. As proof of good standing, members must produce membership cards or receipts showing payment to the Local in which they hold membership. Failure to do so shall subject them to a $5 fine.

**SECTION 6**. Members shall not be called upon to appear for duty an unreasonable length of time before their services are required. If this rule is complied with by the employer, then the time shall be computed from the time members begin service. Nothing in the above shall be construed to interfere with Local regulations governing Local engagements.

**SECTION 7**. Leaders or their agents are prohibited from furnishing singers, dancers, or other entertainers as an integral part of a group unless the entertainers receive at least the minimum AFM or Local scale, whichever is applicable.

**SECTION 8**. Members of traveling orchestras (including leaders) cannot be used by the manager of a company with which they travel or by the local employer to displace the Local orchestra or any orchestra member, if the displacing interferes with the contract under which the Local orchestra is employed.

**SECTION 9**. Leaders or their agents must immediately notify the Local Secretary where an engagement is to be or is being performed if the engagement is postponed, canceled, extended beyond the original term, or terminated

before the end of the original term. Like notice must be given as to the termination of an engagement under a contract where a specified number of weeks or other definite period is not named. (See Sections 19 & 20.)

## Traveling Engagement Compensation

**SECTION 10**. Except for services that are covered by a CBA with a home Local or the AFM that provides for wages and other conditions of employment and that is approved for the purposes of this Article by the AFM, or services that are covered by another provision of these Bylaws or by AFM rules or regulations promulgated under these Bylaws, the minimum wage to be charged and received by any member (including arrangers, orchestrators and copyists) for services rendered on a Traveling Engagement shall be no less than either the Local wage scale where the services are rendered or the Local wage scale where the musical unit has its base of operations, whichever is greater.

**SECTION 11**. Services rendered by a member whose home Local has jurisdiction over the place of any Traveling Engagement, as part of an orchestra, group or unit including members from other Locals, shall be governed by the provisions of this Article.

**SECTION 12**. When employers fail to use all the time they are entitled to for an engagement, members cannot permit them to add the time they have failed to use to any future engagement.

**SECTION 13**. The salary of one week cannot be applied to that of another week, even though it may be in excess of a Local or AFM price. The same principle shall apply in single engagements.

**SECTION 14**. For all Traveling Engagements the employer is required to at all times make payment for services in the currency of the country where the engagement emanates, unless an amount in excess of the stipulated salary sufficient to cover the rate of exchange is paid.

**SECTION 15**. The leader of a traveling orchestra shall be required to furnish transportation for the orchestra members. If orchestra members, at the leader's request, are required to drive their vehicles, they shall be reimbursed for all toll road expense and shall be compensated at the current mileage/kilometer rate recognized by the U.S. or Canada, as appropriate, for a maximum of four musicians per vehicle. Each additional passenger shall require compensation at the rate of one-fourth (1/4) of the U.S. or Canadian mileage/kilometer rate, as appropriate, per passenger.

**SECTION 16**. The transportation furnished or compensated for in accordance with the above shall be round-trip between the place from which the musicians were engaged and the place where the engagement occurs. If the musicians continue or tour to other engagements, however, only one-way transportation between engagements shall be provided until the end of the tour or the season's close, at which time transportation shall be furnished or compensated for back to the place from which the musicians were originally engaged. However, if musicians of their own volition terminate their engagement before the close of the tour or season they are not entitled to this return transportation.

## Traveling Contracts

**SECTION 17**. If any contract requires or contemplates the recording, transmission, or reproduction of any music by any mechanical means, there shall be included in the contract a provision that "this contract shall not become effective unless and until it shall be approved by the IEB of the AFM."

**SECTION 18(a)**. Prior to the time when a Traveling Engagement is performed, leaders or individual members performing alone shall submit the contract for the engagement to the Local where the engagement is to take place when the Local has a Local law requiring its own members to file a written contract with the Local prior to each engagement. When the Local does not have such a law, the leaders or individual members performing alone shall either file their contract with the Local prior to the engagement or file a written statement with the Local prior to the engagement.

Either of these shall reflect their home address and must fully explain the conditions of the engagement, the compensation to be received for the engagement (which must include transportation costs, as defined in Section 15), the engagement hours, the names of the members who will play, the Locals to which they belong and their respective Social Security or Social Insurance numbers.

**SECTION 18(b)**. Members of a non-geographic Local (as defined in Article 4, Section 10) who perform a Traveling Engagement shall submit the contract for the engagement to the non-geographical Local prior to each engagement. The non-geographical Local shall then forward a copy of each contract to the Local where the engagement was played, unless the Local elects to be notified electronically of the engagement, in which case such notification shall be required of the non-geographic Local.

**SECTION 18(c)**. In the event that the members performing the Traveling Engagement are a co-op group (as defined in Article 22, Section 6), partnership or other form of a group in which there is no leader, each group member shall be responsible for complying with the provisions of this Section. Any member who violates the provisions of this Section shall be subject to a fine of not more than $50 for each offense.

**SECTION 18(d)**. However, imposition of a penalty for a violation of this Section does not exempt the leader, individual member performing alone, co-op group, partnership, or other form of group in which there is no leader, from the responsibility of filing with the Local Secretary in whose jurisdiction work was performed, a contract copy or written statement showing terms, conditions agreed to prior to playing the engagement, and all required contractual information.

**SECTION 19**. All contracts between leaders and members of traveling orchestras and bands where a specified number of weeks is not named can be canceled by either party giving two weeks written notice to the other. However, when the contract is for an engagement that lasts for a year or more, the engagement can be canceled by either party giving four weeks written notice to the other.

**SECTION 20**. All contracts between employers and members performing alone or as leaders of orchestras and bands where a specified number of weeks is not named, can be canceled by either party giving two weeks written notice to the other, after the engagement commences. However, when the contract is for an engagement that lasts for a year or more, the engagement can be canceled

by either party giving four weeks written notice to the other.

**SECTION 21**. The failure by any member to fully perform an engagement according to its terms and conditions shall subject the member to a fine of not less than $10 nor more than $450 and/or expulsion.

**SECTION 22**. The price named in all contracts must be at least that of the Local or the AFM, as the case may be, regardless of any provision in the contract that if the price named is less than the Local scale or less than the AFM scale, that then the Local or the AFM scale shall govern the contract.

## Theatrical Engagements

**SECTION 23**. Without the Local's consent, members shall not solicit or accept Theatrical Engagements in the jurisdiction of a Local of which they are not members, if that Local or the AFM has a written agreement with the employer for the engagement in question that restricts employment to musicians residing in the Local's geographic jurisdiction. Members who are engaged to play a local Theater Engagement for a traveling musical show in the jurisdiction of the Local in which they hold membership shall not accompany the traveling musical show to the next succeeding Local jurisdiction unless engaged to play in the traveling theatrical orchestra for the full remaining tour of the traveling musical show. Any member violating this Section shall be subject to a fine of not less than $100 nor more than $500. This law shall not be construed so as to conflict with engagements of traveling orchestras that accompany opera and ballet companies when the services are rendered under an existing Master Agreement negotiated by the orchestra's home Local.

**SECTION 24**. A Local may place in its Constitution or Bylaws a clause specifying the minimum number of musicians who shall be allowed to play in theaters within the Local's jurisdiction. The local house leader shall be included in the minimum number.

# ARTICLE 14—SYMPHONIC ORCHESTRAS

**SECTION 1**. The term "Symphonic Orchestra" shall mean a non-profit symphony, opera, ballet, or chamber orchestra performing a varied repertoire during recurring annual seasons under a Local CBA with musicians who have personal service contracts or are otherwise engaged on a consistent and continuing basis.

**SECTION 2**. The term "Symphonic Player" as used in this Article means and includes (1) all people who are now members of Symphonic Orchestras as defined above; (2) all conductors or instrumental artists who perform with Symphonic Orchestras on a substantial number of occasions each season, and (3) all people who after an examination given by a Symphonic Orchestra are found by it to be qualified.

**SECTION 3**.(a) A Symphonic Orchestra may travel freely for the purpose of giving concerts of a Symphonic type and without payment by it or its members of any Work Dues or other fee for the concert to the Local where the concerts are given, and without interference from, or imposition of burdens or restrictions by that Local, and without submitting its contract or the details of its engagement to that Local; but it shall remain subject to the jurisdiction of its home Local. In cases where a Symphonic Orchestra travels as a back-up unit to an artist or in a commercial venture that is not self-produced (i.e., "fee engagements"), where the symphonic employer is not the primary presenter, (is a co-presenter), or the orchestra is not the main attraction, except for services performed with a ballet or opera company, provided that those members customarily perform with that ballet or opera company in their home Local as provided in Article 9, Section 38, (and provided that the ballet or opera company is based in the jurisdiction of the home Local), the wage scale of the home Local or the Local having jurisdiction over the place of the engagement, whichever is higher, shall be payable to the musicians, and the Work Dues shall be remitted to the Local having jurisdiction over the place of the engagement.

**SECTION 3(b)**. In order to prevent unfair competition, the IEB shall have the authority to establish policies and regulations affecting an orchestra "in residence" outside the home jurisdiction of that orchestra or to restrict an orchestra from performing "in residence" in the home jurisdiction of another orchestra. Members of Symphonic Orchestras "in residence" in another Local's jurisdiction shall not be permitted to perform other musical engagements in that jurisdiction without the prior consent of that Local. All engagements for Symphonic Orchestras may be arranged without the intervention of a licensed agent or other intermediary and at such terms and prices as the management and the person making the engagement may mutually agree upon, it being understood that at no time shall the players receive less than the minimum rates provided for the particular type of engagement in their contracts.

**SECTION 4(a)**. The home Local shall be the exclusive bargaining representative of the members of a Symphonic Orchestra.

**SECTION 4(b)**. A Local Symphonic CBA (including, but not limited to, an interim agreement and/or a side letter of agreement) may contain provisions for the orchestra to provide electronic services (radio, television, tape, film, phonograph, etc.), provided that the International President's office or, in Canada, the Vice President from Canada, has approved those provisions in advance of the agreement's submission for contract ratification. For Local Symphonic CBAs based in the USA, the International President's office shall consult with the IEB

when time constraints and circumstances permit.

**SECTION 4(c)**. Symphonic Players shall be free to make individual personal service contracts with the management of Symphonic Orchestras. These contracts need not be in any particular form or contain any particular provisions, but to the extent any provision is inconsistent with the CBA negotiated by the Local or with any AFM law, Bylaw, or policy in effect on the date the contract is executed, that provision shall be void. No Symphonic Player may enter into a contract with the management of an orchestra for a term exceeding five years. An individual contract may provide for the exclusive services of the player and need not be for a higher price than would otherwise prevail if the contract were not exclusive. CBAs shall be for such period of time as the parties agree and may provide that any particular terms shall be incorporated in the subsequent contract or contracts, notwithstanding the expiration of the contract period initially containing the terms.

**SECTION 4(d)**. An individual member of a Local who performs an engagement or engagements with a Symphonic Orchestra whose bargaining representative under Section 4(a) of this Article is another Local, shall be free to accept the wages, terms, and conditions prevailing in the bargaining representative Local.

**SECTION 4(e)**. However, in no case shall any Local agree to a collective bargaining provision that shall operate to permit an employer to displace live musicians by the use of taped or otherwise recorded music.

This section shall not be interpreted to prohibit or restrict the use of taped or recorded music when all musicians who have a personal service contract under a CBA are employed or when all musicians who are engaged on a consistent and continuous basis are employed, and the tape or recorded music is used only to provide music of indigenous or otherwise unavailable special purpose pieces or sound effects.

**SECTION 4(f)**. Meetings convened or continued for contract administration matters, contract negotiation matters, or other union matters may be attended only by AFM members, and only AFM members shall be eligible to participate in related voting. Further, only AFM members shall be eligible to serve on any Orchestra Committee, Negotiating Committee, or any other committee that is authorized to advise on, implement, or in any other way address union policy. [*Also see Article 5, Sections 39 & 40*]

**SECTION 5**. Symphonic Players shall not be required to strike or to refrain from playing or performing with a Symphonic Orchestra in sympathy with or in support of a labor dispute that does not involve the orchestra of which they are members or the place, radio station, or network where they propose to perform, if that dispute is not a direct controversy between AFM members and some other person or party.

**SECTION 6**. Locals cannot compel the management of a Symphonic Orchestra to employ a local conductor to the exclusion of other conductors who are AFM members.

**SECTION 7**. The foregoing provisions applicable to Symphonic Players are not intended to abridge their rights, privileges, and obligations in other respects as members of the AFM or of its Locals. In other respects they shall be entitled to all rights and privileges and be subject to all obligations generally applicable to members of the AFM or Local, as the case may be.

**SECTION 8**. Members of a Local who have entered into a personal service contract with a Symphonic Orchestra in the jurisdiction of another Local may apply for and become full members of the Local in which the orchestra is located without any waiting period.

**SECTION 9**. AFM members who sign a contract that does not contain a cancellation clause with a Symphonic Orchestra association may cancel the contract only by written mutual consent. Members who sign a contract with a Symphonic Orchestra association must hold all lawful provisions in the contract inviolate. Members who violate this Section may have charges preferred against them in the Local where the orchestra is maintained and shall be fined a sum of not more than $1,000 for each offense and any other penalties that may be imposed by the IEB. Nothing in this Section shall be construed as setting aside or interfering with other lawful provisions contained in the contract.

**SECTION 10**. The wage scales for Traveling Symphonic Orchestras that do not fall within the minimum guidelines established in Section 1 above, shall be those set forth in the appropriate AFM agreement.

**SECTION 11**. Established Symphonic Orchestras on tour are governed by the wage scales and conditions promulgated by their own Local and are not affected by the traveling Symphonic Orchestra scale.

# ARTICLE 15—RECORDING

**(All forms of recorded music—audio and/or visual)**

**SECTION 1(a)**. No AFM member shall take engagements or employment or become engaged or employed in the rendering of musical services of any kind (e.g., the making of sound tracks, "sidelining," etc.) for any type of recorded product (audio and/or visual) unless the person, firm, or corporation providing the engagement or employment shall have previously entered into an appropriate written agreement with, or approved in writing by, the AFM.

**SECTION 1(b)**. Self-produced recordings by a solo performer, band or ensemble are exempt from SRLA signatory requirements provided that the musician(s) are protected by an AFM-approved joint venture agreement which shall be developed by the IEB and EMSD no later than September 30, 2008 and shall be reported back to the Locals under separate communication. This provision shall allow for sales of product outside the member's home Local. An exemption to Local and Federation recording scales, pension, and reporting bylaws shall be granted for recording projects when the following criteria are met:

(1) AFM members on the date are self-producing or collaborating in self production, not providing a service for hire, and are in creative control over material and the recording process;

(2) there is no employer;

(3) the purpose of the recording is to produce a demo to obtain work for live performing and/or the purpose of the recording is to produce a product for sale and the proceeds from sales exclusively benefit band members.

**SECTION 2**. Members performing alone, leaders and contractors are required to report engagement(s) or employment that will result in the production of recordings (audio and/or visual) to the Local where the engagement or employment is scheduled to take place.

**SECTION 3(a)**. No AFM member may perform services (whether as composer, arranger, copyist, proofreader, instrumentalist, leader, contractor, cutter, editor, or in any other capacity): (1) where the product of the services is intended to result in, or be embodied in, recorded music made outside of the United States and Canada and the possessions of either; or (2) for the purpose of producing, editing, or dubbing recorded music except where expressly authorized and covered by a contract with the AFM or when expressly authorized by the AFM.

**SECTION 3(b)**. Any member violating Section 3(a) shall be subject to a fine not exceeding $50,000 and/or expulsion.

**SECTION 4**. No AFM member may perform any musical services where the product is intended to result in recorded music to be used by, for, or with any performer (variety or musical) as background for, accompaniment of, or in connection with the performer's live performance except with explicit prior IEB approval.

**SECTION 5**. Employment for audio and/or visual recordings under agreements negotiated by the IEB shall not be restricted to members of the Local where the work is performed, unless otherwise provided.

**SECTION 6(a)**. All geographically located Locals shall have the right to establish scale wages for local commercial radio, public radio, public tele-

vision, basic cable television, and videotape/live television, provided the emanating broadcast is confined to that Local's jurisdiction.

**SECTION 6(b)**. Locals may not enter into any contract or agreement with any person, firm, or corporation providing for any type of electronic media production without prior written approval from the International President's office.

**SECTION 7**. Locals shall submit copies of all Electronic Media report forms to the Federation.

# ARTICLE 16—BOOKING AGENTS

**SECTION 1**. It is the AFM's policy to assist AFM members in securing the services of fair, honest, and scrupulous Booking Agents and to protect AFM members against unfair dealing by people serving in that capacity in order to maintain and enhance the employment opportunities and wage scales of AFM members. To further this policy, a plan of regulation of relationships between members and people serving as Booking Agents has been adopted by the IEB and amended from time to time in accordance with empowering Resolutions of the 40th Annual Convention. The plans, any amendments, and any and all related rules, orders, and regulations adopted by the IEB shall have the force and effect of Bylaws and shall supersede any other Bylaws that are inconsistent with them. Changes in Booking Agents' commission percentages shall be ratified by the Convention before becoming effective.

**SECTION 2**. For the purpose of these Bylaws, "Booking Agent" shall mean any person, firm, or corporation who for a fee procures, offers, promises, or attempts to procure employment or engagements for musicians whether or not, in addition to these activities, they perform additional services for musicians as artists' managers, personal managers, or otherwise.

"Fee" shall mean anything of value, including any money or other valuable consideration that, directly or indirectly, is charged, collected, received, paid, or promised for any service or act rendered or to be rendered by a Booking Agent.

**SECTION 3**. Any member who shall violate the provisions of this Article shall be subject to a fine not exceeding $500 and/or to expulsion from the AFM and to any other direction that the IEB may find proper in the circumstances.

**SECTION 4**. The AFM shall maintain a Booking Agent Agreement stipulating the terms and conditions pursuant to which a Booking Agent shall perform services for AFM members and the procedures for the determination of disputes between Booking Agents and members, employers, and other Booking Agents. All parties to the agreement must be given a copy of the agreement as well as copies of amendments, modifications, or releases.

**SECTION 5**. Without becoming party to the agreement with the AFM contemplated by Section 4 above, members may act as Booking Agents: (1) for engagements to be performed within the jurisdiction of the Local in which they hold membership and reside or (2) if the activity is incidental and not a continuing practice, for engagements to be performed outside the jurisdiction of that Local, provided that the rate of commission and the other terms and conditions relating to the rendering of booking agency services by members shall be the same as are proscribed by the IEB with respect to non-member Booking Agents.

**SECTION 6(a)**. No member, directly or indirectly, shall pay or agree to pay to any Booking Agent compensation exceeding the following:

(1) Commissions equal to the percentages set forth below of the gross monies or other consideration (as defined below) received directly or indirectly by the member for each engagement:

(a) 15% on all engagements that have a duration of two or more consecutive days per week.

(b) 20% on single miscellaneous engagements (one-nighters each for a different employer in a different location).

(c) Signatory Booking Agents who have negotiated a Personal Management Agreement with members, having it filed with and approved by the President's office, shall be allowed an additional commission of 5% for each engagement performed.

(2) In no event, however, shall the payment of any commissions result in the retention by a member for any engagement of net monies or other considerations in an amount less than the applicable minimum scale of the AFM or of any Local having jurisdiction over the engagement.

**SECTION 6(b)**. Commissions shall become due and payable to Booking Agents immediately following receipt of the full contract price for the stipulated engagement pay period by the members or their representative.

**SECTION 6(c)**. No commissions shall be payable on any engagement if the member is not paid for the engagement, unless the non-payment was the member's fault. In such instances, the Booking Agent may file a claim with the IEB for damages not exceeding the amount of commission that would have been payable if the member had been paid for the engagement.

**SECTION 7**. All agreements providing for the exclusive employment or retainer of a Booking Agent by a member shall contain the following provisions relating to term, termination, and cancellation of engagements:

(1) No agreement shall have an original term exceeding five years.

(2) If an agreement providing for an original term of five years is in effect, at the expiration of the original five-year term the agreement shall be automatically extended for a further term of two years from the date of the expiration, unless:

(a) The member shall not obtain employment for at least 40 cumulative weeks during the last 52 weeks of the original term; or

(b) The total of gross earnings earned by the member from engagements to be performed during the last 52 weeks of the original term shall not equal or exceed four times the total minimum scales of the AFM or of any Local having jurisdiction over the engagements.

(3) The agreement may be terminated by either party by notice as provided below, if the member:

(a) Is unemployed for four consecutive weeks at any time during the original term or any extension of the term; or

(b) Does not obtain employment for at least 20 cumulative weeks of engagements to be performed during each of the first and second six-month periods during the agreement term; or

(c) Does not obtain employment for at least 40 cumulative weeks of engagements to be performed during the subsequent year of the agreement term or any extension of the term; or

(d) Does not obtain employment that results in total gross earnings exceeding, in aggregate, by at least 25%, the minimum scales of the AFM or of any Local having jurisdiction applicable to the engage-

ments to be performed during the third 12-month period and during each subsequent 12-month period during the term of the agreement or any extension of the agreement; and

(e) Notice of termination shall be given by certified mail addressed to the addressee's last known address and a copy shall be sent to the AFM. Termination shall be effective as of the notice mailing date. The notice shall be mailed no later than two weeks following the occurrence of any event described in Subsections (a), and/or (d) above; two weeks following a period in excess of 13 of the cumulative weeks of unemployment specified in Subsection (b) above; and two weeks following a period in excess of 26 of the cumulative weeks of unemployment specified in Subsection (c) above. Failure so to do shall constitute a waiver of the right to terminate based upon the happening of the prior events.

(4) A member's disability resulting in failure to perform engagements and a member's unreasonable refusal to accept and perform engagements shall not by themselves either deprive a Booking Agent of the right to automatic extension of the term of this agreement (as provided in Section 7(2) above) or give the member the right to terminate (as provided in Section 7(3) above).

(5) As used above, a "week" shall commence on Sunday and terminate on Saturday. A "week of engagements" shall mean any one of the following:

(a) A week during which a member is to perform on at least four days; or

(b) A week during which a member's gross earnings equal or exceed the lowest gross earnings obtained by the member for performances rendered during any one of the immediately preceding six weeks; or

(c) A week during which a member is to perform engagements on commercial television or radio or in concert for compensation equal to at least three times the minimum scale of the AFM or of any Local having jurisdiction over the engagements.

**SECTION 8**. Booking Agents shall be prohibited from making any agreements that would obligate an AFM member to assume responsibility for the payment of license fees or royalties for the performance of copyrighted compositions.

# ARTICLE 17—CONVENTIONS

**SECTION 1**.  Effective August 1, 2007 the AFM shall hold a Convention triennially at a place that the IEB may determine. The Convention shall take place as close as possible to the fourth week in June except in years that conflict with Canada Day in the first week of July; in those years the Convention shall take place during the third week of June.

**SECTION 1(a)**.  If governmental, Presidential, or other lawful or military decree or orders, inadequacy of transportation, or other causes make it impossible to hold a Convention, then the IEB may determine that the Convention shall not be held and shall immediately notify all Locals of the facts and reasons.

**SECTION 1(b)**.  During the time that no Conventions are held because of the above-mentioned reasons, the IEB is vested with all the authority and power of a Convention, in addition to its regular authority—subject to the provisions of Article 3, Section 5. In lieu of a Convention, the International President shall call a special IEB meeting at a convenient time and place.

**SECTION 1(c)**.  The incumbent Officers shall continue in office until their successors assume their offices on the first day of August following the election at the next Convention.

**SECTION 1(d)**.  All of the above additional powers vested in the IEB shall remain in force only during the time that this emergency exists, it being clearly understood that Conventions shall be resumed immediately after transportation facilities permit and other restrictions are removed.

**SECTION 2**.  In the event that the International President and/or IEB deem it necessary, they shall have the power to call a Special Convention.

**SECTION 3**.  In the event that suitable arrangements cannot be made for a Convention in the city where it is to be held, then the International President and the International Secretary-Treasurer are empowered to select some other city for this purpose. However, the selection must be made not less than 90 days prior to the Convention and the Locals must be advised of the selection through the International Secretary-Treasurer's office.

**SECTION 4(a)**.  All Locals of 200 members or less shall be entitled to one Delegate. All Locals of not less than 201 members and not more than 400 members shall be entitled to two Delegates. All Locals of not less than 401 members and not more than 1,500 members shall be entitled to three Delegates. All Locals of not less than 1,501 members and not more than 3,000 members shall be entitled to four Delegates. All Locals of not less than 3,001 members and not more than 5,000 members shall be entitled to five Delegates. All Locals of not less than 5,001 members and not more than 8,500 members shall be entitled to six Delegates. All Locals in excess of 8,501 members shall be entitled to seven Delegates.

**SECTION 4(b)**.  A merged Local, the merger of which was the result of compliance with the AFM Civil Rights policy, shall be entitled to one additional Delegate. This Delegate shall be elected from the general membership and be identified as the "Diversity Delegate" on all election notices and ballots.

**SECTION 4(c)**.  Each Delegate shall be entitled to one vote on all matters determined by voice vote, including a division of the house to ascertain or verify the result of the voice vote. For election of Officers and Delegates to the AFL- CIO Convention, each Local shall be entitled to one vote for

each 100 members or major fraction thereof, but no Local shall be entitled to cast more than 50 votes. No Local shall have less than one vote.

**SECTION 4(d)**. The number of members of each Local shall be based on the last report made by that Local as of the December 31 immediately preceding the Convention, according to the International Secretary-Treasurer's books.

**SECTION 4(e)**. On questions affecting a change in the Bylaws, each Local may, upon Roll Call, cast as many votes as it has members, according to the International Secretary-Treasurer's books. Roll Call shall be held under this Article on demand of 30 Delegates or 15 Locals.

**SECTION 5**. Local Union Delegates to the Convention (and alternates for those Delegates who may be unable to attend the sessions) shall be elected by the Locals either at annual, regular, or special meetings or at regular or special elections, but in any event by secret ballot. In the event there is no opposition for the Delegate position(s), the unopposed Delegate candidate(s) shall be declared elected by acclamation. At least 15 days prior to the election of Delegates, notice of the election shall be mailed by the Local to the last known home address of each member in good standing. Elections in violation of this law are null and void.

**SECTION 6**. All Local Union Delegates and alternate Delegates to AFM Conventions must be nominated and elected in conformity with Local and AFM laws and in conformity with the Labor-Management Reporting and Disclosure Act of 1959, as amended. In elections of Local Officers, Convention Delegates, and alternate Delegates no vote shall be counted for a person who has not been duly nominated. A quorum is not required for such nominations and/or elections to take place. All Player Conference Delegates and alternate Delegates to AFM Conventions must be selected in conformity with the bylaws of their conference.

**SECTION 7**. No member shall be permitted to represent more than one Local, nor shall members be permitted to act as Delegates for a Local unless they are full members in good standing in the Local.

**SECTION 8**. In the event of protests being filed against the seating of Delegates, the protests must be accompanied by a certified copy of the minutes of the meeting at which the election of Delegates took place or the official returns of the election at which the Delegates were elected (or a certified copy), together with the ballots cast if necessary to prove the facts, under seal, which shall be furnished by the Local Secretary. All other documentary evidence must be duly sworn to before a notary public. Contestants must notify the accredited Delegate at least 48 hours before the Convention opening of their intention to contest, and either party may submit evidence in person or by proxy.

**SECTION 9**. It shall be the duty of Local Secretaries to notify the International Secretary-Treasurer of the names of the Delegates and their alternates immediately after the election.

**SECTION 10(a)**. If any Local secures credentials for any member as a Delegate to an AFM Convention in excess of the number of Delegates to which the Local is entitled and the excess Delegate appears at a Convention, is seated and serves there, solicits and/or accepts and receives per diems, hotel, and other expenses, then the Local, the person appearing as the excess Delegate, and any other AFM members who directly or indirectly aided or had any part in procuring the credentials, may all be made defendants in charges for the commission of these acts.

**SECTION 10(b)**. The IEB shall have exclusive jurisdiction to try the charges and, after trial, if defendants are found guilty, the IEB may in its judgment compel the defendants to repay to the AFM all sums so received by the excess Delegate and may further discipline the defendants by fine, suspension, and/or expulsion, as may be determined. The IEB may also, in its judgment, declare any excess Delegate or any other member found guilty to be ineligible to act as a Delegate to an AFM Convention for a period not to exceed five years.

**SECTION 11**. The title of Honorary Delegate may be conferred by majority vote of the Convention Delegates assembled, but the compliment shall not entitle the Honorary Delegate to any privileges vested in the Locals' Delegates, and only the hotel expenses shall be borne by the AFM.

**SECTION 12**. Conferences shall be permitted to submit Resolutions to the AFM Convention. In addition, each Player Conference shall be allowed to send three nonvoting Delegates to the Convention who shall be duly elected by their Conferences and shall be entitled to all the rights and privileges of other Delegates except the right to nominate candidates for office, to participate in any floor debate on nominations, and to vote in elections of Officers or on any matter presented to the Convention. Player Conference Delegates shall also be eligible to serve on Committees of the Federation as provided in Article 18, Section 11.

**SECTION 13**. The International President shall not be eligible for election as a Delegate from any Local, but shall exercise all the prerogatives of a presiding Officer and shall, in addition, have the right to speak on the Convention floor on all questions.

**SECTION 14**. IEB members are not eligible to serve as Delegates to an AFM Convention.

**SECTION 15**. The AFM shall pay per diem at the applicable IRS rate to each of the following in attendance for each full or fraction of a day during which the Convention is in official session plus one day of travel to the Convention city:

(1) One Delegate from each Local as defined in Article 17, Section 4;

(2) One Delegate from each Player Conference as defined in Article 22, Section 15;

(3) Each "Diversity Delegate" from merged Locals as defined in Article 17, Section 4(b).

In addition, the AFM shall pay per diem at the applicable IRS rate to each committee member required to be present in the Convention city prior to the first day on which the Convention is in official session.

Hotel accommodations shall be paid by the AFM for each individual mentioned above in this Section for each day per diem is required (including the one additional day), provided the individuals stay at the designated hotel(s) pursuant to an agreement between the AFM and the designated hotel(s).

**SECTION 16**. Delegates who leave their home Locals directly for the Convention or who arrive at the Convention site and who, due to death, accident, illness, or other unfortunate or unforeseen event, either do not arrive at the Convention site or, having arrived, are unable to attend the Convention proceedings, may be voted full Delegate payments after submission of the facts to the Convention.

**SECTION 17**. No Convention may raise or lower the rate of compensation for Delegates for the current year.

**SECTION 18**. AFM members in good standing, upon presentation of proper identification, may attend Convention sessions as spectators except when the Convention itself goes into executive session, when all but Delegates are excluded.

# ARTICLE 18—CONVENTION PROCEDURES

**SECTION 1**. The order of business at Conventions shall be:

FIRST DAY
Call to Order Opening Ceremonies
International President's Report Introductions
Appointment of Committees
Report of the Credentials Committee
Convention Business
Communications and Announcements

SECOND DAY
Memorial Service
Discussion About, and Voting On, Recommendation No. 1 and All Other Recommendations or Resolutions Dealing with the Amount of Per Capita Dues, AFM Work Dues, and Any Other Fee or Assessment Charged to Locals or Members
Convention Business
Nominations of Officers and AFL-CIO Convention Delegates

THIRD DAY
Convention Business
Election of Officers and AFL-CIO Convention Delegates

FOURTH DAY
Report of the Election Committee
Business of the Convention
Administration of Oath of Office to Elected Officers
Adjournment

**SECTION 2**. The most recent edition of Robert's Rules of Order Newly Revised shall be the parliamentary authority for the AFM Convention, which rules shall govern the Convention in all cases to which they are applicable and in which they are not inconsistent with these Bylaws and any Special Standing Rules adopted for each Convention. The manner of voting shall be viva voce, unless otherwise ordered. All voting shall be in accordance with Article 17, Section 4.

**SECTION 3**. The Recommendations made in the official report of the International President or International Secretary-Treasurer relative to any new law or to any advisable changes in existing laws shall be immediately referred to the Law Committee and shall not then be considered in connection with the Officer's report.

## Procedure for Submitting Resolutions

**SECTION 4(a)**. Delegates, Locals, or Conferences desiring to introduce a Resolution for consideration by the Convention must forward it in writing to the International Secretary-Treasurer, postmarked or electronically transmitted not later than March 1 of the Convention year. All electronically transmitted Resolutions must also be submitted by mail, postmarked no later than the next business day after March 1. Resolutions must bear the signatures of all sponsoring Delegates, or the signatures of authorized officers of sponsoring Locals or Conferences.

**SECTION 4(b)**. Any Resolution or measure to amend the provisions of the AFM Bylaws shall be cast in the following form for presentation to

the Convention:

(1) Language and punctuation to be deleted from an existing provision shall be set forth in full and enclosed by square brackets and the deleted material shall be struck through, as [—]. This requirement shall not apply to a proposal to repeal an entire section, which may be done simply by specific reference. A Resolution prepared on a typewriter on which square brackets are not available may use double parentheses as a substitute for the square brackets.

(2) New words added to an existing provision shall be underlined.

(3) The deletions shall precede the new matter; e.g., "...in the sum of [~~$50~~] $100."

(4) Entirely new sections need not have all words underlined but shall be preceded by the designation NEW SECTION. in upper case followed by a period and the designation underlined, including the period.

**SECTION 4(c)**. Resolutions forwarded to the International Secretary-Treasurer must be drafted and submitted in the form as detailed in Section 4(b) above by the Delegate(s), Local(s), or Conference forwarding the Resolution(s) to the International Secretary-Treasurer, and any Resolution not in proper form shall not be accepted by the International Secretary-Treasurer and must be returned to the proponent(s).

**SECTION 4(d)**. All Resolutions thus submitted shall be printed in the International Musician prior to the Convention.

**SECTION 5**. All Recommendations to be proposed to the Convention by AFM Officers or by the IEB, as are then formulated, shall be printed in the May issue of the International Musician. However, in the event of an emergency, a Recommendation may be introduced to the Delegates of any Convention by a two-thirds vote of the IEB.

**SECTION 6(a)**. All Resolutions or measures shall be numbered consecutively and laid out and formatted in compact pamphlet form.

**SECTION 6(b)**. All Resolutions and/or Recommendations shall also be published as an electronic document in Portable Document File format and e-mailed by the International Secretary-Treasurer not later than June 1 of the Convention year to all Local Presidents, Secretaries, and Delegates then known. Said electronic document is also to be made available through the AFM Convention website.

**SECTION 6(c)**. All Resolutions and/or Recommendations shall also be printed and mailed by the International Secretary-Treasurer not later than June 1 of the Convention year to any Local Presidents, Secretaries and Delegates then known who request them, such request to be made in writing to the International Secretary-Treasurer, postmarked or electronically submitted not later than March 30 of the Convention year.

**SECTION 7**. In the event of an emergency, a Resolution may be introduced to the Convention by a vote of two-thirds of the Delegates present.

**SECTION 8**. No Resolution having for its object the expenditure or allocation of AFM funds shall be acted upon by the Convention until 24 hours after the resolution has been properly submitted to the Delegates for their consideration. No Resolution or Recommendation having for its object the increasing or

decreasing of Per Capita Dues, Federation Work Dues, or any other fee or assessment charged to Locals or members shall be considered by the Convention until Recommendation No. 1 has been voted on by the delegates.

**SECTION 9**. No alterations or amendments to the Bylaws (except as is otherwise provided in the Bylaws or ordered by a Convention) shall be made unless proposed in writing, and the alterations or amendments must receive a majority vote of the Delegates present to become a law, unless otherwise provided.

**SECTION 10**. All amendments and additions to the laws passed by the AFM shall go into effect the 15th day of September succeeding the Convention that enacts them except when the Convention has designated a date other than September 15.

**SECTION 11**. At the Convention the International President shall appoint the following Committees of the Convention: Credentials, Law, Finance, Measures and Benefits, Good and Welfare, and Organization and Legislation, which shall meet at the Convention and report to the Convention on matters assigned to each by the International President. The International President shall also appoint the following Committees of the Federation, which shall each meet and make their reports to the Convention: International Musician, Public Relations, TEMPO-PCC, Small Locals, Diversity, and Organizing. The International President shall also appoint such other Committees as the Convention may direct. As soon as practicable after receiving the list of Delegates, the International President shall appoint from that list the Credentials Committee and the Law Committee, and from the Law Committee members a subcommittee of five to be known as the Appeals Committee. The Law Committee and Finance Committee shall be comprised of no fewer than 15 Delegates. The number of Delegates appointed to all other Committees shall be determined by the International President but shall be no fewer than ten.

**SECTION 12**. The President may direct any Committee to come to the Convention city prior to the Convention for the purpose of considering and making recommendations on Resolutions or for other Convention business.

**SECTION 13**. The Credentials Committee shall examine and report on the credentials of Delegates. The Committee chairperson shall take charge of all documents appertaining to the Committee's duties, and investigate and report upon the Delegates' credentials immediately after appointment. The Committee report shall be disposed of before any other business is transacted.

**SECTION 14**. The Finance Committee shall inspect and investigate the AFM's financial affairs and the International Secretary-Treasurer's accounts, as well as the books and accounts of all who may be entrusted with the receipt or expenditure of AFM funds, and shall make a full report in writing of its findings to the AFM Convention at which it was appointed.

**SECTION 15**. All other Committees created by the Convention shall perform the duties indicated by their title, and all Resolutions introduced shall be referred by the International President to the Committee he or she deems appropriate to receive and act upon the Resolutions.

**SECTION 16**. On or before May 1 of a year in which a Convention is held, if possible (and on or before March 30 of a year in which no Convention is held, if possible) electronic copies of the Annual Report booklet containing

the reports of the International President, International Secretary-Treasurer (which shall include beginning and year-end Federation census, excluding multiple membership), Auditor's financial statement, and International Musician shall be e-mailed to the accredited Delegates to the AFM Convention. A printed copy of the Annual Report booklet will be mailed only upon request to any Local or accredited Delegate to the AFM and only in a year in which a Convention is held, on or before May 1, if possible. Requests for printed copies are to be made in writing to the International Secretary-Treasurer, postmarked or electronically transmitted not later than March 30 of the Convention year.

**SECTION 17**. Members of Locals cannot act as lobbyists to influence Delegates in any matter that has not been properly presented and discussed by the Convention Delegates in meeting assembled. Locals are not permitted to send lobbyists either at their own expense or at the expense of members; neither can Locals or members designate non-members to act as lobbyists. Only delegates and Federation officials shall have access to the convention floor. Individuals not having proper badges will be removed from the tables reserved for Delegates.

**SECTION 18**. A Memorial Service shall be conducted at each Convention by a Committee of three, appointed by the International President, and held at a time designated by the International President. Suitable music shall be provided and the musicians and soloists shall be paid from AFM funds.

**SECTION 19**. Locals acting as AFM Convention hosts are directed to provide a band and/or orchestra during the Convention. The IEB shall set the time and place for the services and the number of members to perform.

**SECTION 20**. The hours of registration of Convention Delegates shall be from 3:00 p.m. to 6:00 p.m. on the day preceding the opening of the Convention and from 8:00 a.m. to 11:00 a.m. on the Convention opening day. Registration shall be at the headquarters hotel, and notice of the time and place of registration shall be printed in boldface type on the Certification of Credentials issued to each Delegate.

**SECTION 21**. The host Local shall furnish to the International Secretary-Treasurer within a reasonable time prior to the Convention a list of names and addresses of establishments in the Convention city using live union music and indicating the type of music. These lists shall be furnished to the Delegates for their information.

# ARTICLE 19—ELECTIONS

**SECTION 1**. The election of Officers shall take place at each Convention and shall be as prescribed in the following Sections.

**SECTION 2**. Candidates seeking election to any International Office may forward to the International Secretary-Treasurer, postmarked or electronically transmitted not later than April 1 of the Convention year, a statement certifying their intention of seeking election for the particular Office and a campaign statement that shall not exceed 100 words. All electronically transmitted statements must also be submitted by mail, postmarked no later than the next business day after April 1. The International Secretary-Treasurer shall publish the names and campaign statements received from candidates in the International Musician prior to the Convention.

**SECTION 3**. Candidates seeking election to any Federation Office may only be nominated by a Convention delegate at the Convention. Only members who have been in good standing for at least two continuous years immediately preceding the date of his/her nomination may be nominated except that in the case of the Vice-President from Canada, he/she must, in addition to the foregoing, be a citizen or permanent resident of Canada. No member may be nominated for more than one Office. The time of nominations and election of Officers shall be designated by the Convention not later than the first day it is in session. A correct copy of the names of all nominees shall be furnished to each Delegate and the election shall be conducted in accordance with the Australian ballot system. Nominating speeches by Delegates shall be limited to two minutes each.

**SECTION 4**. Nominees for AFM Office may choose to appear on the election ballot as part of a group of candidates associated with one another. Nominees desiring to be listed on the ballot as members of such a group shall present a written notification to the Election Committee within one hour after the end of the Convention session during which nominations are held, which notification must be signed by all the candidates in the proposed group. Any such group of candidates may choose a name of reasonable length for their group, which name shall appear on the ballot after each candidate's name. Notwithstanding such designation, voting for Officers and AFL-CIO delegates shall be on an individual candidate basis.

**SECTION 5**. For the Offices of International President, International Vice President, Vice President from Canada, and International Secretary-Treasurer, a majority of votes cast is necessary to elect. In case of nominees not receiving a majority of votes for their respective Offices, all but those two nominees for the Office receiving the highest vote shall be dropped and a second ballot shall then be taken for the Officers, and the candidate receiving the majority of votes cast shall be declared elected.

**SECTION 6**. If there is no opposition for an AFM Office or position, the unopposed candidate(s) shall be declared elected by acclamation.

**SECTION 7**. The five candidates receiving the highest number of votes for the Executive Committee shall be declared elected.

**SECTION 8(a)**. The number of candidates to be elected as AFL-CIO Convention Delegates receiving the highest number of votes shall be declared elected. If an elected AFL-CIO Convention Delegate is unable to attend the AFL-CIO Convention, the candidate receiving the next highest number of votes who is able to attend shall be the alternate. If there are no remaining candidates

able to attend, the International President shall have the authority to appoint an alternate. If the elected AFM Delegates to the AFL-CIO Convention do not meet the AFL-CIO diversity standards, the President has the authority to appoint an additional Delegate who complies with these standards. AFM Delegates to the AFL-CIO Convention shall be allowed their hotel and traveling expenses for attending the AFL-CIO Convention.

**SECTION 8(b)**. Unless given specific direction by the AFM Convention or, in the absence of Convention direction, the IEB, AFM Delegates to a convention or conference of a non-AFM organization (e.g., the AFL-CIO) shall be free to exercise their representative duties in the manner they see best fit, provided that this exercise of representative duties is not inconsistent with the AFM's mission as set forth in these Bylaws.

**SECTION 9**. In the event that more than one ballot is necessary by reason of a tie vote, only the names of those candidates who have received an equal number of votes shall be voted upon, and the candidate(s) receiving the greatest number of votes shall be declared elected.

**SECTION 10**. Votes for members not nominated in accordance with Section 3 of this Article (i.e. write-in votes) shall not be counted. In those places on the ballot calling for more than one candidate to be elected, that part of the ballot shall not be counted if more than the full number to be elected is voted for.

**SECTION 11**. On the ballot, after the name of each candidate for the Office, there shall be printed the number of the Local that the candidate represents and the name of the city and state or province in which the Local is located.

**SECTION 12**. The International President shall appoint an Election Committee of sufficient members whose duties shall be as follows:

(1) Following the nomination of all candidates there shall be a drawing of lots for position on the ballot. The drawing shall be supervised by the Election Committee.

(2) As soon as the balloting is declared in order, the judge shall take charge of the Convention and the Delegates shall form in line irrespective of the number of their Locals. Delegates on passing the ballot box shall call the name and number of their Locals.

(3) The clerk shall check these on a checklist, naming the number of votes the Local is entitled to.

(4) The tellers shall see that the correct number of votes are cast and, after balloting is declared closed, count them and report the results to the Convention.

**SECTION 13**. Each candidate for Office at the International Convention, or a representative designated in writing, shall be permitted to witness the counting and tallying of votes while it is being done by the Election Committee.

**SECTION 14**. A Convention may, by a two-thirds vote, elect anyone who has been an IEB member for at least 15 years to "Life Membership at

Large" in the AFM.

**SECTION 15**. All Officers elected at a Convention shall assume Office on the first day of August following the Convention. All Federation Officers shall subscribe to the following Oath of Office:

### Oath of Obligation for Federation Officers:

I, (NAME) , do hereby solemnly pledge on my most sacred word of honor that I will faithfully discharge the duties of my office as (OFFICER) of this Federation during the term for which I have been elected, or until my successor is duly elected and installed; that I will support the Bylaws of the American Federation of Musicians of the United States and Canada, and will enforce the laws thereof to the best of my ability, without prejudice or partiality.

(*Administering Officer*): I now declare you duly elected and installed.

# ARTICLE 20—POLICY

**SECTION 1**. As a matter of policy, the AFM shall, whenever possible, purchase only union made supplies and services and shall patronize establishments using only union musicians. The AFM strongly urges all members, Locals, and Conferences to adhere to this same policy.

**SECTION 2**. The AFM urges Locals to assist AFM members in distress.

**SECTION 3**. The AFM endorses the political policy of the AFL-CIO, to wit: "Stand faithfully by your friends and elect them. Oppose your enemies and defeat them."

**SECTION 4**. The AFM recognizes the week beginning on the first Sunday in May as National Music Week, commends the activities of those agencies that brought about its establishment and observance, and urges all AFM Locals to give moral and active support in all communities where the observance of the week has been already established and to give support or take the initiative bringing about observance in all localities where it has not yet been done.

**SECTION 5**. The AFM approves and adopts as expressive of its fundamental policy the Code of Ethical Practices adopted by the AFL-CIO Second Constitutional Convention.

**SECTION 6**. Compulsory retirement because of age is contrary to AFM policy.

**SECTION 7**. The AFM approves and adopts as expressive of its fundamental policy the principles embodied in Article II, Section 4, of the AFL-CIO Constitution.

**SECTION 8**. The AFM is unalterably opposed to all Right-to-Work laws and requests all Local Officers to inform their respective state legislators of our position. The AFM, in conjunction with the AFL-CIO, shall do all in its power to have laws proposed in the United States Congress banning all so-called Right-to-Work laws.

**SECTION 9**. AFM members who are directors or members of fraternal bands, school bands, drum corps, or marching units are urged to encourage members' purchases of band uniforms only from those firms that sell a union-made garment carrying a union label.

**SECTION 10**. The AFM shall endeavor to have included in all CBAs covering the services of members in the production of records, tapes, and other products containing recorded music the provision that the product shall bear the AFM seal in a conspicuous place.

**SECTION 11**. The AFM shall dedicate itself to the vital task of recruiting and organizing, pursuing this mission both on the AFM level and through Local cooperation and active participation.

**SECTION 12**. As a matter of policy, each Local shall be affiliated with its local Central Labor Body and/or its State or Provincial Central Labor Body.

**SECTION 13**. As a matter of policy, musicians who work for full-time orchestra employers under collective bargaining agreements and their Locals are urged to negotiate and/or maintain parity in wages and benefits for substitute and extra musicians performing with those orchestras.

Further, in accordance with fundamental principles of union democracy and the Mission of the AFM, musicians who work for full-time orchestra employers under collective bargaining agreements and their Locals are encouraged to explore ways that substitute and extra musicians may participate in the bargaining process.

## Code of Conduct

**SECTION 14(a).** The AFM is committed to insuring, to the maximum extent possible, that official meetings and events under the authority of the AFM be conducted in a respectful environment free of discrimination and harassment, regardless of an individual's race, ethnicity, religion, color, sex, age, national origin, sexual orientation, disability, gender identity or expression, ancestry, pregnancy, or any other characteristic protected by law ("protected characteristics"). The AFM expects all AFM members in attendance at such meetings to respect other individuals and groups and their views and to recognize and value individual differences. The AFM is an entity that values open and vigorous discussion on issues. Accordingly, this Code of Conduct is not intended to restrict free and open debate, but to prevent unacceptable behavior that infringes upon the rights, views, and differences of other individuals or groups.

This Code is not intended to cover any employment relationship or issues between employers and employees that may be covered by an anti-harassment/anti-discrimination policy and various laws nor is it intended to cover Local Union or Conference events; rather it is intended to cover conduct by AFM persons in attendance at AFM organized events. Local Unions and Conferences are encouraged to adopt their own Codes of Conduct.

**SECTION 14(b): Definitions**

A. Discrimination

It is discrimination to make any harmful decision or judgment based on another person's race, ethnicity, religion, color, sex, age, national origin, sexual orientation, disability, gender identity or expression, ancestry, pregnancy, or any other characteristic protected by law.

B. Harassment

Harassment consists of unwelcome verbal, visual, or physical conduct that is based on another person's race, ethnicity, religion, color, sex, age, national origin, sexual orientation, disability, gender identity or expression, ancestry, pregnancy, or any other characteristic protected by law. It may include, but is not limited to, actions such as use of epithets, slurs, negative stereotyping, jokes or threatening, intimidating or hostile acts that relate to sex, race, age, disability, or other protected categories. Harassment may also include written or graphic material that denigrates or shows hostility toward an individual or group based on protected characteristics, whether that material is sent by email, placed on walls, bulletin boards, computer screens or other devices, or elsewhere on the premises of the activity, event, or meeting.

C. Sexual Harassment

Sexual harassment is harassment that can involve unwelcome sexual advances, requests for sexual favors, and other verbal, visual, or physical conduct of a sexual nature. It can involve conduct by a person of any gender toward a person of any gender.

D. Disrespectful Behavior

Disrespectful behavior consists of verbal or physical conduct, unrelated to an individual's protected characteristics, which demeans, belittles, disparages or

degrades another person.

E. Unacceptable Behavior

Unacceptable behavior includes, but is not limited to, the following behavior, whether in a group or individual setting:

• Discrimination

• Harassment

• Sexual Harassment

• Disrespectful behavior

• Discriminatory or harassing speech or actions by any participant in an AFM event

• Harmful or offensive verbal or written comments or visual images related to race, ethnicity, religion, color, sex, age, national origin, sexual orientation, disability, gender identity or expression, ancestry, pregnancy, or any other characteristic protected by law

• Inappropriate use of nudity and/or sexual images

• Intimidating, bullying, or stalking behavior

• Harassing photography or recording

• Sustained disruption of the activity, event, or meeting

• Unwelcome sexual attention or contact

• Physical assault (including unwelcome touching or groping)

• Real or implied threat of physical harm

• Retaliation or retribution against a member for making a complaint under this Code of Conduct.

F. AFM Event

An AFM Event is any meeting held under the authority of the AFM and includes, but is not limited to the following:

• The AFM Convention

• PCC/LCC meetings

• Negotiations for national agreements and related caucuses

**SECTION 14(c): Implementation**

At all AFM Events, there shall be a person to whom complaints may be directed ("the Designated Person"). The Designated Person for AFM Conventions and for PCC/LCC meetings shall be the AFM Secretary-Treasurer (or, if the International Secretary-Treasurer is the subject of the complaint, the highest ranking IEB member in attendance who is not the Secretary-Treasurer) who, if not present at the Event, may be reached by telephone at the Federation offices. Any member attending an AFM Event who is subjected to what he/she believes in good faith to be Unacceptable Behavior under this Code of Conduct may report the complaint to the Designated Person. If that Designated Person is not available, the complaining member may inform any other AFM officer present at the Event, who will work with the Designated Person to respond to the complaint. The AFM takes these complaints seriously. The Designated Person will investigate the complaint, includ-

ing talking with the subject(s) of the complaint. Following the investigation, the AFM, in its discretion, may take any action deemed appropriate.

Possible responses may include a warning to the alleged offender, expulsion of the alleged offender from the AFM Event, or discipline consistent with the procedures set forth in Articles 10, 11 and 12 of the AFM Bylaws if the alleged offender is an AFM member. If needed or requested, the Designated Person will help complainants contact security or local law enforcement, provide escorts, or otherwise assist complainants experiencing unacceptable behavior to feel safe for the duration of the AFM Event. Any complaint brought will be treated confidentially to the extent possible to properly assess the situation. The AFM will take all appropriate steps to ensure that the complainant is no longer subject to the unacceptable behavior. The AFM will not tolerate retaliation against any individual who complains of unacceptable behavior under this Code of Conduct. It will take every step necessary to ensure that retaliation does not occur, and if it believes that retaliation has occurred, the AFM will take any action deemed appropriate to stop the retaliation. While preserving the confidentiality of complainants, the Designated Person will periodically report to the AFM International Executive Board on the number and nature of complaints made under this Code of Conduct and the outcome.

# ARTICLE 21—COLLECTION AND DISTRIBUTION ON BEHALF OF MEMBERS

**SECTION 1**. The AFM is authorized to act as the representative of musicians for the purpose of collecting and distributing government mandated or other compulsory royalties or remuneration payable to musicians under the laws of the United States, Canada, or other countries included but not limited to the United Kingdom, Spain, the Netherlands, Italy, Japan and France. The AFM is authorized to offset from any royalties and remunerations collected the reasonable expenses of collecting, administering, and distributing those royalties and remunerations.

**SECTION 2(a)**. With respect to any residual payments received by the AFM pursuant to a AFM negotiated agreement for a New Use of a musical product, the AFM shall deposit those monies into a separate interest-bearing account and then attempt to identify and locate the musicians to whom the payments are due and to distribute those payments to them. Similarly, when the AFM receives any government mandated or other compulsory royalties or remuneration, the AFM shall deposit those monies into a separate interest-bearing account and attempt to identify and locate the musicians to whom the payments are due and to distribute those payments to them.

**SECTION 2(b)**. In the event that musicians cannot be identified and located, and they do not file a claim for payment with the AFM within three years after the AFM has received the payment, the AFM shall then be authorized to transfer the monies due to those musicians to the general treasury to be used to defray the costs of administering and operating the AFM; provided, however that at any subsequent point the musicians may file a written claim with the AFM and, upon doing so, they shall receive the residual payment to which they are entitled without interest and offset by any applicable AFM Work Dues. If the State or Province is holding the residual payment due to the musicians, the musicians may apply to the State or Province for their payment. This section shall apply retroactively to all residual payments received by the AFM.

# ARTICLE 22—MISCELLANEOUS

**SECTION 1**. Three flags (one Canadian, one American, and the official AFM flag) shall be used and displayed at all AFM parades and meetings.

**SECTION 2**. The provisions of the AFM Bylaws and of the Constitution and/or Bylaws of any Local shall not be enforced in any manner in conflict with public law.

**SECTION 3**. If any Article, Section, Subsection, or portion of these Bylaws or of any Resolution or Recommendation adopted by any Convention should be held to be illegal, invalid, or null and void by a court of competent jurisdiction, each and every other provision of these Bylaws or of the Resolution or Recommendation shall remain in full force and effect.

**SECTION 4**. Non-gender reference shall be used when referring to musicians and members in all AFM and Local Constitutions and Bylaws, wage scale sheets (price lists), contracts, CBAs, correspondence, and office memos.

The International Secretary-Treasurer shall make the appropriate changes in new AFM publications and shall direct all Local Secretaries to do the same in all Local publications.

**SECTION 5.** Canada has two official languages, French and English. In the Province of Quebec, French is the official language. New Brunswick is Canada's only bilingual province. The Federation shall accommodate the requirements of that reality, in the context of the applicable legislation, to the extent it is practicably able to do so.

**SECTION 6**. The definition of a cooperative (co-op) or partnership group shall be: A musical unit consisting of two or more permanent members in which the permanent members share all income and expenses of the group and participate in making decisions including, but not limited to, the engagements to be performed, the amounts to be charged, and distribution of all income.

**SECTION 7(a)** As a matter of policy, at least three rank-and-file musicians, selected in consultation with the Player Conferences Council and the Freelance Musicians representative(s), shall be included among the Trustees appointed by the President to the Board of the American Federation of Musicians and Employers' Pension Fund (U.S.).

**SECTION 7(b)**. To give effect to and fulfill the requirements of this Section, the President, upon learning of a Trustee vacancy or Trustee resignation among the three rank and file musician Trustees shall, at Federation expense, convene as soon as practicable a conference call with the principal officer (or his/her designee) of each Player Conference and Freelance Musicians to initiate the above consultation and selection process. This consultation process shall be repeated for each succeeding vacancy until the number of rank-and-file board members required in subsection (i), above, is satisfied.

**SECTION 7(c)**. For purposes of this Section only, rank-and-file musicians are defined as individuals who, at the time of their respective appointments, (1) are vested in the American Federation of Musicians and Employers' Pension fund (U.S.); (2) received AFM-EP-covered wages for the rendering of musical services in each of the three years immediately preceding in an amount at least equal to that required by the Fund to accrue one year's vesting credit for each of the three years; and (3) are neither Federation officers nor hold major elected or

appointed union office in an AFM Local (i.e., President, Secretary, Treasurer, Executive Assistant).

**SECTION 8**. The AFM shall advocate the rights of musicians in their live and recorded performances in the United States, Canada, and other countries, and, where the AFM deems it appropriate, collect and distribute government mandated or other compulsory royalties or remuneration that are subject to collective administration.

**SECTION 9**. Any agreement to merge the AFM with another International union may be considered at a regular triennial Convention of the AFM, at a special Convention called for that purpose, or by a mail ballot referendum. At a regular or special Convention, a merger agreement shall require for ratification a two-thirds vote of the Delegates present, or, upon request for a Roll Call vote presented in the manner described in Article 17, Section 4(e), a two-thirds vote of the membership represented at the Convention. A mail ballot referendum shall require a two-thirds vote of the valid ballots returned by the members in good standing in order to ratify the merger agreement.

**SECTION 10**. The A FM shall provide ongoing support and service in connection with computer software systems provided by the AFM to its Locals, including the provision of periodic software updates which shall conform software previously provided to agree with any subsequent adoption of or amendment and modification to AFM Bylaws, Rules, and Regulations, as the case may be. For the further benefit of its Locals in this regard, the AFM shall provide written instructions for installing and utilizing all such software systems.

**SECTION 11**. All Locals are encouraged to computerize at the earliest opportunity.

**SECTION 12**. All air travel by AFM Officers, staff, or representatives, when done at the AFM's expense, shall be only at "coach," or "economy," or similarly classed fares.

**SECTION 13**. The AFM shall develop and maintain an ongoing program to educate Local and AFM Officers, staff, and members in a manner and form to be determined by the IEB. The AFM shall report annually on the education program's progress and effectiveness.

**SECTION 14**. Except as required in contracts entered into prior to August 1, 2001, it shall be the policy of the Federation and its Locals thereof to maintain the privacy of all membership information, including e-mail addresses, telephone numbers, fax numbers and social security/social insurance numbers. This information shall not be disclosed to any person or firm that has as an objective the solicitation of business from AFM members.

## Conferences

**SECTION 15**. Conferences composed of representatives from the Locals in one or more states or provinces ("Locals' Conferences"), and conferences composed of representatives from Symphonic Orchestras or of member-musicians in other specialized fields ("Player Conferences"), may be organized and granted official status in the AFM by the IEB.

**SECTION 15(a)**.Each Conference shall provide the International President's office with copies of its current Constitution and Bylaws, copies

of official publications, and (1) an annual IRS Form 990 or other annual financial report required to be filed with the government or, if none exists, (2) an annual financial statement consisting of assets, liabilities, and cash receipts and disbursements.

**SECTION 15(b)**. All official meetings of Conferences shall be under the supervision of an IEB member, designated by the International President. In the event that the International President is of the opinion that, because of unusual circumstances, it is impractical to assign an IEB member, s/he may assign an Executive Officer Emeritus, a Presidential Assistant, or a State or Provincial representative.

**SECTION 15(c)**. A player conference shall select its own representative(s) to all Federation committees that are created by these Bylaws, the Convention, the IEB or International President on which such player conference participation is specified.

**SECTION 16(a)**. A Council shall be formed consisting of one elected representative from each of the then current Locals' Conferences, which shall be known as the Locals' Conferences Council ("LCC"). A Council shall be formed consisting of one elected representative from each of the then current Player Conferences, which shall be known as the Player Conferences Council ("PCC"). The purpose of these Councils is to exchange information and ideas on appropriate subjects regarding the good and welfare of the AFM, its Locals, and its members.

**SECTION 16(b)**. The LCC and the PCC shall meet for two days in non-convention years at the discretion of the International President. The first day shall be an exclusive meeting of the LCC. The first order of business shall be the election of an LCC Chairperson and Secretary. The Chairperson shall appoint the Sergeant-at-Arms. On the second day, the LCC and the PCC may meet jointly or separately with the IEB.

**SECTION 16(c)**. Each LCC and PCC Delegate shall be compensated as provided for AFM Convention Delegates and shall receive per diem at the applicable IRS rate and hotel allowance for the two days the meeting is in session and the Delegate attends plus one travel day.

# GLOSSARY OF TERMS AND ACRONYMS

**AFM**—American Federation of Musicians of the United States and Canada: the organization governed by these Bylaws.

**AFL-CIO**—American Federation of Labor and Congress of Industrial Organizations: a federation of national labor organizations in the United States, with which the AFM is affiliated.

**Bargaining representative**—Phrase referring to the union entity, i.e., Local or Federation, authorized by musicians to negotiate and administer a collective bargaining agreement on their behalf with a specific employer.

**Bargaining unit**—Phrase referring to the group of musicians employed by an employer, who are represented by the union for collective bargaining.

**CBA**—Collective Bargaining Agreement: a negotiated contract between a union and one or more employers covering terms of employment, such as wages, working conditions and dispute resolution.

**CFM/FCM**—Canadian Federation of Musicians/Fédération canadienne des musiciens: moniker by which the AFM is referred to for its activities in Canada.

**CLC**—Canadian Labour Congress: a federation of national labor organizations in Canada, with which the AFM is affiliated.

**Collective bargaining**—The process by which employees, through their union, negotiate wages and working conditions with their employer.

**Electronic Media**—General phrase for any employment activity that transmits or preserves music electronically, e.g., broadcasting, sound recording, film scoring, videotaping, and recording commercial announcements.

**EMSD**—Electronic Media Services Division: the department of the AFM that administers employment-related recording matters.

**Executive Committee**—The five untitled International executive officers who, together with the titled officers, form the International Executive Board.

**Federation**—Within the AFM, term used in bylaws and communications to differentiate between the International Union and its Locals.

**FIF**—Federation Initiation Fee: the one-time fee that new members pay to the Federation when they join the AFM.

**FMSMF**—Film Musicians Secondary Markets Fund: a service that tracks, collects and distributes residual payments from the AFM-signatory motion picture and television film producers to musicians who worked on their films.

**ICSOM**—International Conference of Symphony and Opera Musicians: a player conference of symphonic musicians employed by major member-orchestras in the United States.

**IEB**—International Executive Board: the governing body of the AFM between conventions consisting of the President, the Vice President, the Vice President from Canada, the Secretary-Treasurer, and the five members of the Executive Committee.

***International Musician***—The AFM's official journal, commonly referred to as the ***IM***, a monthly publication sent to all AFM members in good standing.

**LCC**—Locals' Conferences Council: a council composed of one representative from each regional conference of locals.

**LIF**—Local Initiation Fee: a one-time fee that new members pay to a local when they join that local.

**Locals' Conference**—Regional conference of locals, attended by delegates of the locals comprising the region, serving the interests of those locals.

**MPTF**—Music Performance Trust Fund: a non-profit organization co-sponsoring free performances by professional musicians for the public good, funded primarily by AFM-signatory record labels and by other sponsors.

**MROC**—Musicians' Rights Organization Canada: performers' royalty rights subcollective in Canada.

**OCSM/OMOSC**—Organization of Canadian Symphony Musicians/L'Organisation des Musiciens d'Orchestres Symphoniques du Canada: a player conference of symphonic musicians employed by member-orchestras in Canada.

**OSP**—Orchestra Service Program: a special intervention program authorizing the AFM to substitute as a symphonic orchestra's bargaining representative when the local cannot or does not provide basic services needed to properly represent them.

**Pamphlet B**—An AFM CBA covering musicians working with touring theatrical musicals.

**Per Capita Dues**—Dues that a Local pays quarterly to the AFM, based on the its membership count as of specified dates. Per capita dues are embedded in the local's member dues structure.

**PCC**—Player Conferences Council, a body composed of one representative from each of the official player conferences.

**Player Conference**—A conference composed of representatives of member-musicians in specialized fields of employment, e.g., recording, symphonic, theatrical.

**Price List**—A list of Federation or local minimum wage scales, also called as a Scale Book or Tariff of Fees.

**Referral Program**—A program by which a local refers members to potential purchasers of their services.

**Regional Conference**—Regional conference of locals, attended by delegates of the locals comprising the region, serving the interests of those locals.

**RMA**—Recording Musicians Association, a player conference of electronic media musicians.

**Roehl Report**—Policy adopted by the IEB in 1990 for restructuring Federation departments arising out of trade division discussion:

1. *The title of the Symphony Department shall be changed to the Symphonic Services.*
2. *The administrator of the Symphony Department and operating head of the Orchestra Service Program shall serve as Director of the Symphonic Services, to be appointed to that position by the AFM President and to be designated by the President*

*as Assistant to the President.*

3. *A Symphonic Steering Committee, consisting of the principal officer of ICSOM, OCSM and ROPA, shall be established. This committee shall serve as the advisory committee to the Symphonic Services.*
4. *The title of the Recording Department shall be renamed the Electronic Media Services.*
5. *The administrator of the Recording Department shall serve as Director of the Electronic Media Services, to be appointed to that position by the AFM President and to be designated by the President as Assistant to the President.*
6. *An Electronic Media Steering Committee shall be established, consisting of three RMA representatives to be determined in consultation with that conference, plus one electronic media representative from the symphonic conferences. This committee shall serve as the advisory committee to the Electronic Media Services.*
7. *The name of the Summit Committee shall be changed to the Player Conference Council, maintaining the present composition of the principal officer of ICSOM, OCSM, ROPA and RMA.*
8. *The Player Conference Council shall meet with the International Executive Board at a time and place mutually agreed upon. The purpose of the meetings shall be to exchange information and ideas on appropriate subjects regarding the good and welfare of the American Federation of Musicians.*
9. *The existing AFM Structure Committee shall continue its research into structural and operational improvements within the AFM, possibly including the submission of a detailed plan for a trade division.*
10. *The AFM President shall serve as an ex officio member of all the committees referenced above, and any meetings of these committees involving expenditure of Federation funds shall take place only with the prior approval of the Office of the AFM President.*

**ROPA**—Regional Orchestra Players' Association, a player conference of symphonic musicians employed by regional orchestras in the United States.

**Scale**—The applicable minimum that AFM members may accept for an engagement, as designated in a CBA covering the engagement or in the wage scale sheet, price list, Tariff of Fees, or the executive order of a local or of the AFM.

**Scale Book**—A list of Federation or Local minimum wage scales, also called as a Price List or Tariff of Fees.

**SRSPF**—Sound Recording Special Payments Fund, a service that distributes payments from recording companies' product sales to musicians based on the amount of each musician's scale earnings from sound recording sessions.

**SSD**—Symphonic Services Division, the division of the AFM assisting locals and local musicians in connection with symphonic employment.

**Symphonic Orchestra**—A regularly organized nonprofit symphony, opera, ballet, or chamber orchestra having a local CBA.

**Tariff of Fees**—A term used, particularly in Canada, for a list of AFM or local scales, also called a Price List or a Scale Book.

**TEMPO-PCC**—Taskforce for the Employment of Musicians Promotional Organization-Political Contribution Committee: the AFM's PAC used for political and legislative activities in the United States.

**TMA**—Theater Musicians Association: international player conference of theatrical musicians.

**Traveling Engagement**—Any engagement that includes a member working outside of the jurisdiction of that member's home local.

**Work Dues**—Dues to a local and/or to the AFM based on a percentage of the scale wages earned.

# INDEX

(¶ = Article; § = Section; *et seq.*= and the following; *passim* = throughout)

## A

Affiliate Organizations ¶4, §11(a)
 Fee ¶4, §11(b)
AFL-CIO ¶20, §8
 Code of Ethical Practices ¶20, §5
 Delegates ¶19, §8(a-b); ¶19, §8(a)
 Election ¶19, §8(a)
  President ¶3, §5(f)
  Secretary-Treasurer ¶3, §8(n)
 Political Policy ¶20, §3
AFM Oath of Obligation ¶9, §9
AFM Delegates ¶17, *passim*
 AFM Officers Ineligible ¶17, §13, 14
 Compensation ¶17, §15
  Increase or Decrease ¶17, §17
  Unable to Attend ¶17, §16
 Election ¶5, §22; ¶17, §6
  Protest ¶17, §8
 Excess Credentials ¶17, §10(a-b)
 Honorary ¶17, §11
 Local Membership ¶17, §7
 Notification ¶17, §9
 Number ¶17, §4(a)
 Player conference ¶5, §22; ¶17, §6
AFM-EP Fund ¶5, §35
 Rank-and-File Trustees ¶22, §7
Air Travel ¶22, §12
Amnesty after Four Years ¶9, §22
Annual Report ¶18, §16
Appeals ¶12, *passim*
 Canadian Conference ¶12, §2(b)
 Charter Revocation ¶4, §15(b)
 Convention ¶12, §2(a), 14 *et seq.*
 Based on Original Evidence only ¶12, §4, 14(a)
 Default Decision ¶12, §12
 Deposit of Fine ¶12, §5(b)
 Evidence ¶12, §8(a)
 Formal Meeting ¶3, §9(k)
 IEB ¶3, §9(k); ¶12, §2(a), 3-7
 Local Decisions ¶12, §2(a); ¶12, §3
 Notifications ¶12, §9, 10
 Rebuttals and Surrebuttals ¶12, §11
 Reopening of Case ¶12, §13
 Right to Full Local Records ¶12, §8(b)
 Stay of Judgment ¶12, §5(b)
 Time Limits ¶12, §6, 10, 11
  Extensions ¶12, §7
Arbitration ¶7, §1
Assistant Secretary ¶3, §8(k)
Assistant Treasurer ¶3, §8(l)

**Index**

Check-Signing Authority ........ ¶3, §8(c)
Assistants to President ........ ¶3, §5(i) *et seq.*
Auditor ........ ¶3, §5(l), 9(u)ii

B

Bond ........ ¶3, §8(o)
Booking Agents ........ ¶16, *passim*
Agreement ........ ¶16, §4
Claims ........ ¶7, §6
Commissions ........ ¶16, §6(a-c)
Definition ........ ¶16, §2
Exclusive Agreements ........ ¶16, §7
Inducements and Kickbacks ........ ¶10, §24
Members Acting As ........ ¶16, §5
Payment of Copyright Fees ........ ¶16, §8
Penalties for Violation of Article ........ ¶16, §3
Policy ........ ¶16, §1
Booking/Referral Program ........ ¶5, §15
Bounced Check ........ ¶9, §31
Budget ........ ¶3, §9(u)i-iv
Three-Year Plans ........ ¶3, §9(v)
Business Representative ........ ¶5, §13
Business Office ........ ¶5, §14
Business Risk Engagement ........ ¶10, §18
Bylaws, Adoption and Amendment ........ ¶5, §1
AFM ........ ¶3, §8(a)
Effective Date ........ ¶18, §10
Enactment ........ ¶18, §10
Local ........ ¶5, §1
AFM Notification ........ ¶5, §8, 16
Distribution ........ ¶5, §16
Conflict with AFM Bylaws ........ ¶3, §9(i); ¶5, §1(a)
Conflict with Public Law ........ ¶22, §2-3

C

Canadian Office ........ ¶3, §7(a); ¶5, §37(a)
Charges and Claims ........ ¶11, §2(e)
Operating Expenses Imprest Account ........ ¶3, §7(d)
Candidate Statements ........ ¶19, §2
Charges ........ ¶4, §16(a-d); ¶11, *passim*
AFM Hearings ........ ¶11, §17
Against Local ........ ¶4, §16(a-d)
Against Members ........ ¶11, §1(a-d)
Against Local Officer ........ ¶11, §18
Default Judgment ........ ¶11, §4
Fines ........ ¶11, §8-9, 13
IEB ........ ¶11, §5-7; 9
Impartiality ........ ¶11, §2(a)iv
Improper Influence ........ ¶11, §16
Jurisdiction ........ ¶11, §2(a-e)
Formal Meeting Waiver ........ ¶3, §9(k)

Notification ¶11, §1(a)
Procuring Evidence ¶11, §10-12
Referees ¶11, §6
Removing Local Officer ¶3, §5(m)i-iv
Time Limits ¶7, §3; ¶11, §1(d), 7
Written Testimony ¶11, §3
Charters ¶4, *passim*
Applicants Residence ¶4, §2
Applicants Suspended/Expelled ¶4, §6
IEB's Authority ¶4, §1(a-b), §8
Local's Acceptance ¶4, §5
Local's Jurisdiction ¶4, §3
Changing Boundaries ¶4, §1(a-b), 19
Non-Geographic Local ¶4, §10
Mergers ¶4, §18(a-c)
Musicians Ineligibility ¶4, §12(b)
Objections ¶4, §7
Open Period ¶4, §9
Revocation ¶4, §5, 13; ¶5, §46(e)
AFM Bylaws ¶4, §13
Membership Meetings ¶5, §9
Obstruction of AFM ¶4, §15(a)
Non-Appealable ¶4, §15(b)
Claims ¶7, §2-14
Appeals to IEB ¶7, §9, 12
Booking Agents ¶7, §6
Jurisdiction ¶7, §2, 9
Final and Binding ¶7, §13
IEB Rules of Practice and Procedure ¶7, §8
Liquidated Damages ¶7, §10
Local ¶7, §9
Notice to Local ¶7, §5
Right to File ¶7, §2
Time Limit ¶7, §3; ¶11, §1(d)
Traveling ¶7, §4
Clip Use ¶9, §32(d)
Code of Conduct ¶20, §14(a-c)
Collective Bargaining ¶5, §26(a)-30(b); ¶20, §13
Ratification ¶5, §31(a-d); ¶14, §4
Union's Authorization ¶5, §26(a-b)
Commissions for Booking ¶16, §6(a-c)
Compensation ¶10, §9
Computer Software Support ¶22, §10
Conductors ¶14, §2, 6
Conferences ¶20, §14(a-c); ¶22, §15-15(c)
Convention Delegates ¶17, §12; ¶20, §14(a-c)
Convention Resolutions ¶17, §12
Local Affiliation ¶5, §18
Meeting Costs ¶5, §4
Obligations to AFM ¶22, §14(a-b)
Contractors ¶5, §39-42
Contracts ¶10, §10(a-b)
Cancellation ¶10, §11; ¶14, §9

Duration Limitations ........ ¶5, §33; ¶10, §21
Filing Requirement ........ ¶10, §10(a-b); ¶13, §18(d)
Ratification ........ ¶5, §31(a-d)
Recording Prohibition ........ ¶10, §7
Conventions ........ ¶17-19, *passim*; ¶20, §14(a-c)
IEB delegate ineligibility ........ ¶17, §14
IEB Attendance ........ ¶3, §9(p)
Formulating Recommendation No. 1 ........ ¶3, §9(u)iv
Annual Report ........ ¶18, §16
Arrearages ........ ¶5, §46(e)
Bylaws Amendments ........ ¶18, §4(a-d), 5; 9
Effective Date ........ ¶18, §10
Committees ........ ¶18, §11-15
Appeals ........ ¶18, §11
Credentials ........ ¶18, §13
Duties ........ ¶18, §15
Election ........ ¶19, §12
Finance ........ ¶18, §14
Law ........ ¶18, §11
Pre-Convention Call ........ ¶12, §14(d); ¶18, §12
Dates ........ ¶17, §1
Delegates, see *AFM Delegates*
Elections ........ ¶19, §1-15
Financial Report ........ ¶3, §8(e)
Grouping of Nominees ........ ¶19, §4
Guests ........ ¶17, §18
Host Local ........ ¶18, §19, 21
Impossibility ........ ¶17, §1(a-d)
Live Music List ........ ¶18, §21
Lobbyists ........ ¶18, §17
Local Orchestra ........ ¶18, §19
Memorial Service ........ ¶18, §1, 18
Order of Business ........ ¶18, §1
Parliamentary Authority ........ ¶18, §2
Player Conference Delegates ........ ¶5, §22; ¶17, §6, 12
President's Report ........ ¶3, §5(e)
President's Right to Voice ........ ¶17, §13
Recommendations ........ ¶3, §8(a); ¶18, §5, 6(b), 8; ¶22, §3
Conflict ........ ¶22, §3
Emergency ........ ¶18, §7
Format ........ ¶18, §6(a-c)
No. 1 ........ ¶3, §9(u)iv; ¶18, §1, 8
Officers ........ ¶3, §8(a); ¶19, §3, 5
Publication ........ ¶3, §7(a); ¶18, §5
Registration ........ ¶18, §20
Resolutions ........ ¶3, 8(a); ¶5, §51; ¶17, §12; ¶18, §4(a-d)
Emergency ........ ¶18, §7
Expenditure ........ ¶18, §8
Filing ........ ¶18, §4(a-c)
Format ........ ¶18, §6(a-c)
Numbering ........ ¶18, §6(a)
Printing ........ ¶18, §4(d), 6(a)
Roll Call ........ ¶17, §4(e); ¶22, §9

# Index

Scheduling .......... ¶17, §1
Spectators .......... ¶17, §18
Site Selection .......... ¶17, §3
Special Convention .......... ¶17, §2
Voting .......... ¶17, §4(c)
Cooperative Groups .......... ¶22, §6
Acting Leader .......... ¶10, §8
Contract Filing .......... ¶13, §18(c)
Copyrighted Compositions (License Fees) .......... ¶10, §22; ¶16, §8

D

Dancers .......... ¶9, §1(a)
Digital File of e-mail addresses .......... ¶3, §7(h)
Distressed Members .......... ¶20, §2
Diversity Delegate .......... ¶17, §4(b); ¶17, §15(3)
Dues .......... ¶5, §44-57
AFM .......... ¶5, §44-49, 57
EMSD fee .......... ¶6, §9
Per Capita Dues .......... ¶5, §46(a-e)
Arrearage .......... ¶5, §46(e-f)
Changing .......... ¶3, §8(u)iv; ¶18, §1, 8
Multi-Local Rebate .......... ¶9, §16
Waiver .......... ¶5, §46(d)
Work Dues .......... ¶5, §54(a)-57; ¶9, §32-39
Arrearage .......... ¶5, §46(f)
Clip Use .......... ¶9, §32(d)
Collection .......... ¶5, §57
Due Date .......... ¶9, §35
Electronic Media work .......... ¶9, §32(b)
Film Funds .......... ¶9, §32(e)
Maximum .......... ¶5, §54(b-e)
Members' Obligation .......... ¶9, §32
Music Performance Fund .......... ¶9, §32(e)
New Use .......... ¶9, §32(d)
Non-Geographic Local .......... ¶9, §32(b); ¶9, §37
Scale Wages .......... ¶9, §33-34
Penalties .......... ¶5, §46(c), 58
Referral Program .......... ¶5, §55
Reporting and Remitting .......... ¶9, §36(a-b)
Supplemental Trusts .......... ¶9, §32(e)
Symphonic Orchestras .......... ¶9, §32, 32(a), 38-39; ¶14, §3
Theater Defense Fund .......... ¶5, §57
Traveling Engagements .......... ¶5, §54(b-e); ¶9, §32(c)i-ii, 38-39
Traveling Members .......... ¶5, §54(b-c, e)
Local .......... ¶5, §50-57
Decreasing .......... ¶5, §52
Expulsion Requirement .......... ¶9, §25-26
Majority Secret Ballot Vote .......... ¶5, §51

E

Education Program .......... ¶22, §13

**Index**

Elections ........ ¶5, §22-25
AFM ........ ¶19, *passim*
Acclamation ........ ¶19, §6
Assumption of Office ........ ¶19, §15
Ballots ........ ¶19, §9-13
Handling ........ ¶19, §12
Local Designation ........ ¶19, §11
Over-voting ........ ¶19, §10
Slate/Candidate Grouping ........ ¶19, §4
Witnesses ........ ¶19, §13
Candidate Requirements ........ ¶19, §3
Candidate Statements ........ ¶19, §2
Delegates to AFL-CIO ........ ¶19, §4, 8(a-b)
Election Committee ........ ¶19, §12
Nominating Speeches ........ ¶19, §3
Runoff ........ ¶19, §5
Unopposed Candidates ........ ¶19, §6
Votes ........ ¶19, §5-10
AFL-CIO Delegates ........ ¶19, §8(a-b)
Executive Committee ........ ¶19, §7
Ties ........ ¶19, §9
Titled Officers ........ ¶19, §5
Local ........ ¶5, §22-25; ¶17, §6
Challenges ........ ¶5, §23(a-b)
Convention Delegates ........ ¶17, §5-6
Protests ........ ¶17, §8
Electronic Devices ........ ¶5, §3
Electronic Media Reports ........ ¶15, §7
EMSD fee ........ ¶6, §9
EMSD Oversight Committee ........ ¶6, §8
Emeritus/Emerita Officers ........ ¶3, §10(a-b)
Employers ........ ¶5, §42
Exclusive Agreements ........ ¶16, §7
Exclusive Services to Employer ........ ¶5, §64
Expenses
Canadian Office ........ ¶3, §7(d)
IEB Members ........ ¶3, §9(q)
National Representatives ........ ¶3, §5(j)
President ........ ¶3, §5(g)
Secretary-Treasurer ........ ¶3, §8(j)
Vice President ........ ¶3, §6 *passim*
Vice President from Canada ........ ¶3, §7(e)iv
Expulsion ........ ¶9, §24(b)
Automatic ........ ¶9, §26
Fines ........ ¶11, §13-14
Grace Period ........ ¶9, §25
Penalties ........ ¶11, §8, 9, 13-15
Reinstatement ........ ¶9, §28(a), (c)
Resignation ........ ¶9, §29(b)
Extras/subs, orchestral, bargaining for ........ ¶20, §13

## F

Fees
- Affiliate Organizations ........ ¶4, §11(a-b)
- Charter ........ ¶4, §4
- Initiation
  - Federation (FIF) ........ ¶5, §47; ¶9, §2(a-b), 3(b), 4(b), 11, 28
  - Local (LIF) ........ ¶9, §21, 28
- Waiver ........ ¶5, §48(a)
- Payment to AFM by Check from Local ........ ¶5, §49
- Penalties, Failure to Remit Initiation Fees ........ ¶5, §46(f), 47
- Failure to Remit EMSD Fees ........ ¶6, §9(b-c)
- Failure to Remit Per Capita Dues ........ ¶5, §46(e)
- Failure to Remit Work Dues ........ ¶5, §46(f)
- Source of AFM Funding ........ ¶6, §1
- Student Membership ........ ¶9, §4 *et seq.*
- Youth Membership ........ ¶9, §3 *et seq.*

Fiduciary responsibility
- AFM officers ........ ¶3, §4(a-c)
- Local officers ........ ¶5, §43(a-c)

Film Funds, Work Dues ........ ¶9, §32(e)

Financial Statement of Local ........ ¶5, §16

Fines ........ ¶11, §8, 9, 11, 13-14
- Failure to pay ........ ¶11, §15
- Local Rescission ........ ¶11, §14
- Minimum/Maximum ........ ¶11, §9
- Misrepresenting Conditions ........ ¶10, §23
- Report ........ ¶11, §15
- Recipient ........ ¶11, §2(d)

Fiscal Year ........ ¶6, §7

Flag Display ........ ¶22, §1

Freelance Musicians ........ ¶3, §5(i)

Freelance Funding ........ ¶6, §3

French language, Quebec, New Brunswick ........ ¶22, §5

Funds ........ ¶6, *passim*
- AFM ........ ¶6, §1-2, ¶18, §8
- Electronic Media ........ ¶6, §8
- Lester Petrillo Memorial Fund ........ ¶5, §46(a)
- Music Performance Trust Fund (MPTF) ........ ¶9, §32(e)
- Pension Fund (AFM-EP(W)) ........ ¶5, §35; ¶22, §7
- Regional Orchestra Emergency Relief Fund ........ ¶6, §5 *et seq.*
- Symphony Opera Strike Fund ........ ¶6, §4 *et seq.*
- Theater Defense Fund ........ ¶5, §56; ¶6, §6 *et seq.*; ¶9, §32(c)i

## G

Gender Usage ........ ¶22, §4

Grievance ........ ¶5, §39; ¶7, §1

Grievance-Arbitration Committee ........ ¶5, §39

## H

Hearing Attendance ........ ¶11, §17

I

Inactive Life Membership ¶5, §46(b)
Incorporated Units ¶10, §15
Indemnity Bonds ¶3, §8(f, l)
Initiation Fees ¶9, §2 (a-b)
Collection and Reporting ¶5, §47
Exemption ¶9, §3(b), 4(b), 11, 18
Maximum ¶5, §52
Membership Drives ¶5, §48(a)
Organizing Drives ¶5, §48(a)
Penalty ¶5, §47
Reduction ¶5, §52
Waiver ¶5, §48(a)
International Executive Board ¶3, §9(a-w)
AFM Membership ¶3, §3
Agenda ¶3, §9(o)ii
Appeals ¶3, §9(j)
Appointments Approval ¶3, §5(i)
Authority ¶3, §9(a-k)
Conventions ¶3, §8(a), 9(f)
Attendance ¶3, §9(p)
Not Delegates ¶17, §14
Recommendation No. 1 ¶3, §9(u)iv
Decision Basis Recording ¶3, §9(h)ii
Deputization ¶3, §7(e), 9(m)
Election ¶19, §5-7
Expenses ¶3, §9(q)
Expense-Statements Review ¶3, §9(t)
Fiduciary responsibility ¶3 §4(a-c)
Life Membership At Large ¶19, §14
Local Officers Removal ¶3, §5(m)i-iv
Local Price Lists ¶5, §58
Offices ¶3, §1, 9(a)
Meetings ¶3, §9(o)i-ii
National Scales ¶3, §9(e)
Policies ¶3, §9(b-c)
Salary ¶3, §9(r)
Salaries Approval ¶3, §5(h-i), 8(l-m)
Secret Ballot ¶3, §9(l)
Session-less Decisions ¶3, §9(k)
Signatures ¶3, §9(n)
Special Sessions ¶3, §5(b)
Subcommittees ¶3, §9(g)
Traveling Scales ¶3, §9(e-f)
Vacancy ¶3, §9(s)
Vice President from Canada, May Direct ¶3, §7(e)
Votes Record ¶3, §9(l)
*International Musician* ¶3, §8(p)
Copies for Recruiting ¶3, §8(p)iv
Gift Subscriptions ¶3, §8(p)iii
Subscriptions ¶3, §8(p)

# Index

Supervision ..... ¶3, §8(p)
International Representatives ..... ¶3, §5(h); ¶5, §21

J

Jurisdiction Changes ..... ¶4, §19, 20
Mergers ..... ¶4, §18(a-c)

K

Kickbacks ..... ¶10, §24

L

Language, official, Quebec, New Brunswick ..... ¶22, §5
Legislation ..... ¶5, §67
License Fees for Compositions ..... ¶10, §22
Life Members ..... ¶5, §53(a-b)
List of Locals ..... ¶3, §8(g)
Local Secretaries ..... ¶5, §5-8
Bond ..... ¶5, §5
Membership Updates ..... ¶5, §6-7
Required Reports ..... ¶5, §8; ¶17, §9
Locals ..... ¶5, *passim*
Conventions Attendance ..... ¶5, §19
Bond ..... ¶3, §8(o)
Booking/Referral ..... ¶5, §15
Business Office ..... ¶5, §14
Business Representative ..... ¶5, §13
Bylaws ..... ¶3, §9(i); ¶5, §1(a-b), 16, 24, 25(a), 53; ¶13, §28
Amendment ..... ¶5, §1(b), 51
Conflict with AFM ..... ¶5, §1(b), ¶3, §9(i)
Membership Drives ..... ¶3, §9(w)iii
Subordination ..... ¶5, §1(a)
Violation of AFM Bylaws ..... ¶4, §13
Vote Maximum Limitation ..... ¶5, §1(b), 51
Cancellation of Contracts Between Members ..... ¶10, §11
Charges
Against Local ..... ¶4, §16(a)-17
Time Limit ..... ¶7, §3
Procuring Evidence ..... ¶11, §20
Charters ..... ¶4, *passim*
Granting ..... ¶4, §1(a-b)
Lapse ..... ¶4, §1(a), 13-15(c)
Revocation ..... ¶4, §15
Dissolution/Secession/Disaffiliation ..... ¶4, §14(a-c)
Collective Bargaining ..... ¶5, §26(a)-39
Authorization ..... ¶5, §26(a)
Competition from Non-professional Groups ..... ¶5, §63
Computer Access ..... ¶5, §20
Computerization ..... ¶22, §11
Distressed Member Assistance ..... ¶20, §2
Dues Reduction ..... ¶5, §52

**Index**

Referral/Booking Programs ..... ¶5, §15
Elections ..... ¶5, §22-25
Electronic Devices ..... ¶5, §3
Investigation of Engagements ..... ¶5, §60
Exclusive Services ..... ¶5, §64
Financial Statement ..... ¶5, §16
Identification on Correspondence ..... ¶5, §11(a)
Information for Members ..... ¶5, §16
Initiation Fee Reduction ..... ¶5, §52
Labor Council Affiliation ..... ¶20, §12
Legislation Involvement ..... ¶5, §67
Mechanical Devices ..... ¶5, §3
Membership Roster ..... ¶5, §16
    Distribution of ..... ¶5, §16
Minimum Requirements ..... ¶5, §1-20
Mission Plan ..... ¶5, §11(b)
Newsletter Publication ..... ¶5, §16
NSF Check ..... ¶5, §66
Officers ..... ¶5, §40(a); ¶17, §6
    Conflict of Interest ..... ¶5, §40(a)
    Defense & Indemnification ..... ¶5, §17(a)
    Elections ..... ¶5, §22, 73
        Challenges ..... ¶5, §23(a-b)
        Length of Service ..... ¶5, §24
    Fiduciary responsibility ..... ¶5, §43(a-c)
    Removal for Cause ..... ¶3, §5(m)i-iv
    Vacancies ..... ¶5, §25
    Wage/Honorarium ..... ¶5, §17
Orchestra Service Program ..... ¶5, §36(a-b)
Organizing Ultra-Jurisdictionally ..... ¶5, §27-29
Orientation Program ..... ¶5, §12
Ratification ..... ¶5, §31(a-d)
Price List ..... ¶5, §16 (iv)
    IEB Supervision ..... ¶5, §58
Pension Contributions ..... ¶5, §35
Regional Conferences ..... ¶5, §18
Strikes ..... ¶5, §32
Symphonic Orchestras ..... ¶5, §36(a-b); ¶14, §6-8
Tariff of Fees ..... ¶5, §16
Termination Notice ..... ¶5, §65
Trusteeship ..... ¶5, §68-74
    Grounds ..... ¶5, §68
    Hearing ..... ¶5, §71
    Length of ..... ¶5, §72
    Liability Assumption ..... ¶5, §74
    Termination of ..... ¶5, §73
    Trustees ..... ¶5, §69-71
Visibility of ..... ¶5, §11
Work Dues Obligation ..... ¶5, §10

M

MROC Board ..... ¶3, §7(f)

**Index**

Mechanical Devices ..... ¶5, §3
Medical Benefits Urged ..... ¶5, §62
Meetings
  IEB ..... ¶3, §9(o)i-ii, 9(q)
  Local ..... ¶5, §9
Members
  Bargaining Representative, Union Authorized As ..... ¶5, §26(a-b)
  Business Risk ..... ¶10, §18
  Claims ..... ¶7, §2-14
    IEB Award Non-Compliance ..... ¶7, §11
    Liquidated Damages ..... ¶7, §10
  Clearing Indebtedness to Resign ..... ¶9, §29(a-b)
  Compensation Minimum ..... ¶10, §9
  Contract Duration ..... ¶10, §21
  Contract Filing ..... ¶10, §10(a-b)
  Contract Provision Prohibiting Recording ..... ¶10, §7
  Copyrighted Compositions ..... ¶10, §22; ¶16, §8
  Denial of Membership ..... ¶10, §12
  Employers ..... ¶5, §42
  Expulsion for Nonpayment ..... ¶9, §24-26
  Expulsion for Reasons Other Than Nonpayment ..... ¶9, §28(c)
  Incorporation ..... ¶10, §15
  Inducing not to Play ..... ¶10, §20
  Internal Remedies ..... ¶10, §26; ¶12, §1
  License Fees for Composition ..... ¶10, §22
  Local Membership Retention ..... ¶9, §12
  Membership Card Misuse ..... ¶10, §14
  Multi-Local Membership ..... ¶9, §14
  Name/Number Change to Defraud ..... ¶10, §13
  New Member Information ..... ¶5, §2, 12
  Non-Affiliated Organization ..... ¶10, §3
  Notification of Charter Revocation ..... ¶4, §15(c)
  Performing with Nonmembers ..... ¶10, §4
  Permanent Residency ..... ¶9, §13
  Picket Line Crossing ..... ¶10, §6
  Professional Names ..... ¶5, §61
  Per Capita Dues Rebate ..... ¶9, §16
  Reinstatement ..... ¶9, §27-28(a)
  Residing in Another Local ..... ¶9, §13
  Resignation ..... ¶9, §29(a)-30
    Expelled ..... ¶9, §29(b)
    Suspended ..... ¶9, §29(a)
    Written ..... ¶9, §30
  Rights ..... ¶10, §1
  Scale Requirement ..... ¶10, §9
  Service Jurisdiction ..... ¶4, §3
  Share Plan Engagements ..... ¶10, §18
  Social Security/Insurance Numbers ..... ¶5, §61
  Struck Employer ..... ¶10, §6
  Supervisors ..... ¶5, §42
  Suspended/Expelled by Another Local ..... ¶9, §17
  Symphonic Musicians ..... ¶5, §36(a-b); ¶14, §7
  Unfair List ..... ¶8, *passim*

Violations of AFM Bylaws .......... ¶5, §59; ¶10, §2
Membership Card Misuse .......... ¶10, §14
Membership Roster .......... ¶5, §6-7
Membership .......... ¶9, *passim*, ¶10, *passim*
Application .......... ¶9, §5(a)-9
Approved form .......... ¶9, §5(b)
College Faculty Member .......... ¶9, §6
Delay in Approval .......... ¶9, §8
Eligibility .......... ¶9, §1(a-b)
Examination Board .......... ¶9, §7
Expelled from Another Local .......... ¶9, §28(b)
Expulsion for Nonpayment .......... ¶9, §26
False Information .......... ¶9, §5(c)
Former Member .......... ¶9, §12
Jurisdictional Residence .......... ¶9, §5(a)
Members of Other Locals .......... ¶9, §15
Oath of Obligation .......... ¶9, §9
Traveling Musicians .......... ¶9, §5(a)
Inactive Life Membership .......... ¶5, §46(b)
Minors .......... ¶10, §25
Multiple Local .......... ¶9, §14
Non-Affiliated Musicians' Union .......... ¶10, §3
Organizing .......... ¶20, §11
Partially Paid .......... ¶9, §10
Reaffiliation .......... ¶9, §19(a)(b),§20, §28(a)
Initiation Fee .......... ¶9, §18, §23(a)
Referral to IEB .......... ¶9, §19(a)&(b), 23(a-b)
Reinstatement Fee .......... ¶9, §21, 23(a)
Recruitment .......... ¶20, §11
Retention of Membership .......... ¶9, §1(b), 12
Student Membership .......... ¶9, §4-4(b)
Students .......... ¶9, §6
Suspended/Expelled from Another Local .......... ¶9, §17
Symphonic Players .......... ¶14, §7
Youth Membership .......... ¶9, §3-3(b)
Mergers .......... ¶4, §18(a-c)
Minors .......... ¶10, §25
Mission .......... ¶2, §1
Music Performance Fund .......... ¶9, §32(e)
Multiple Local Membership .......... ¶9, §14
Per Capita Rebate .......... ¶9, §16

N

Name Change to Defraud .......... ¶10, §13
Name of Organization .......... ¶1, §1
National Music Week .......... ¶20, §4
National Representatives .......... ¶3, §5(j)
Newsletters .......... ¶5, §16
New Brunswick, bi-lingual .......... ¶22, §5
New Use .......... ¶9, §32(d)
Non-Geographic Local .......... ¶4, §10
Contracts, Submission and Remittance of .......... ¶13, §18(b)

Jurisdiction ........ ¶4, §10
Negotiate with Geographic Local Employer ........ ¶5, §28(b)
Work Dues ........ ¶4, §10; ¶9, §32(b); ¶9, §37
Notice of Termination ........ ¶5, §65
NSF Checks ........ ¶9, §31

O

Officers: AFM ........ ¶3, §1
Beginning of Term ........ ¶19, §15
Eligibility ........ ¶3, §2
Emeritus ........ ¶3, §10(a-b)
Fiduciary responsibility ........ ¶3, §4(a-c)
Oath of Office ........ ¶18, §1
Extension of Term When No Convention ........ ¶17, §1(c)
Trials of ........ ¶3, §11
Local
Engaging Members to Perform Musical Services ........ ¶5, §40(a)
Fiduciary responsibility ........ ¶5, §43(a-c)
Length of Service ........ ¶5, §24
Presidential Removal ........ ¶3, §5(m)i-iv
Oath of Office (Local) ........ ¶5, §25(b)
Oath of Office (Federation Officers) ........ ¶19, §15
Orchestra Service Program ........ ¶5, §36(a-b)
Organizing ........ ¶20, §11
Assistant to the President ........ ¶3, §5(i)
Local Organizing jurisdiction ........ ¶5, §27
President Administrating Area for Organizing ........ ¶5, §30(b)
Waiver of Initiation Fees/Periodic Dues ........ ¶5, §48(a)
Orientation ........ ¶5, §12

P

Penalties ........ ¶5, 46(c), 47, 57
Pension Contributions ........ ¶5, §35(a)
Pension Withdrawal ........ ¶5 §35(b)
Pension Fund Trustees ........ ¶22, §7
Per Capita Dues ........ ¶5, §46 (a-c)
Delinquencies ........ ¶5, §46(d-e)
Locals Arrearages ........ ¶5, §46(e)
Rates ........ ¶5, §46(a-b)
Rebate to Multiple Card Members ........ ¶9, §16
Reporting and Paying ........ ¶5, §46(c)
Per Diem ........ ¶17, §15
Personnel Managers ........ ¶5, §39, 41
Petrillo Fund ........ ¶5 §46(a)
Picket Lines ........ ¶10, §6
Player Conferences ........ ¶5, §4; ¶22, §15-16(c)
Representation at Conventions ........ ¶17, §12
Representation to Federation Committees ........ ¶22, §15(c)
Player Conferences Council ........ ¶22, §16(a)
Policy ........ ¶20, *passim*
AFL-CIO Code of Ethical Practices ........ ¶20, §5

AFL-CIO Constitution ..... ¶20, §7
AFL-CIO Political Policy ..... ¶20, §3
Air Travel ..... ¶22, §11
Assisting Distressed Members ..... ¶20, §2
Band Uniforms ..... ¶20, §9
Compulsory Retirement ..... ¶20, §6
Labor Council Affiliation ..... ¶20, §13
Local Officers Who Hire Musicians ..... ¶5, §40(a-f)
Medical Benefit Plan ..... ¶5, §62
National Music Week ..... ¶20, §4
Information Folders ..... ¶5, §2
Orchestra Committees ..... ¶5, §37
Pension Contributions, Locals Urged to Negotiate for ..... ¶5, §35
Privacy of Member Information ..... ¶22, §14
Recorded Music to Bear AFM Seal ..... ¶20, §10
Retirement, Compulsory ..... ¶20, §6
Right-to-Work Laws ..... ¶20, §8
Symphonic Orchestra Committees ..... ¶5, §37
Union-Made Products ..... ¶20, §1
President ..... ¶3, §5(a-g)
AFL-CIO Delegate ..... ¶3, §5(f)
AFM Delegate Ineligibility ..... ¶17, §13
Appointees ..... ¶3, §5(a, h-l)
Assistants ..... ¶3, §5(i)
Auditor ..... ¶3, §5(l)
Clerical Employees ..... ¶3, §5(k)
Committees ..... ¶3, §5(a)
Convention Voice ..... ¶17, §13
Deputizing Board Members ..... ¶3, §9(m)
Drawing Upon Funds ..... ¶3, §5(b), 5(d)
Duty to Preside ..... ¶3, §5(a)
Executive ..... ¶3, §5(h)
Executive Duties ..... ¶3, §5(a)
Expenses ..... ¶3, §5(g)
IEB Documents ..... ¶3, §9(n)
IEB Meetings ..... ¶3, §5(b)
International Representatives ..... ¶3, §5(h)
National Representatives ..... ¶3, §5(j)
Report to Convention ..... ¶3, §5(e)
Salary ..... ¶3, §5(g)
Strikes ..... ¶3, §5(b)
Supervision of Vice President from Canada ..... ¶3, §7(b)
Suspending/Removing Local Officer ..... ¶3, §5(m)i-iv
Voting ..... ¶3, §5(c)
Warrants ..... ¶3, §8(d)
Professional Names ..... ¶5, §61
Protested Checks ..... ¶5, §67; ¶9, §31
Public Law in Conflict with AFM or Local Union Laws ..... ¶22, §2-3
Public Relations/Marketing Resource Coordinator ..... ¶3, §5(i)i

Q

Quebec, official language ..... ¶22, §5

**Index**

R

Ratification ... ¶5, §31(a-d)
Absentees ... ¶5, §31(c)i
CBAs ... ¶5, §31 *passim*
Eligibility ... ¶5, §31 *passim*
Electronic ... ¶5, §31(d)
Vendors ... ¶5, §31(d)iii
Lists ... ¶5, §31 *passim*
Unestablishable, International ... ¶5, §31(a)iii
Canadian ... ¶5, §31(b)iii
Local ... ¶5, §31(c)iii
Meeting/Mail Balloting ... ¶5, §31(c)iii
Majority Vote, International ... ¶5, §31(a)ii
Canadian ... ¶5, §31(b)ii
Local ... ¶5, §31(c)ii
Minority Report, International ... ¶5, §31(a)ii
Canadian ... ¶5, §31(b)ii
Local ... ¶5, §31(c)ii
Personnel Managers ... ¶5, §39
Proxies ... ¶5, §31(c)i
Technical/Incidental/Experimental Amendments, International ... ¶5, §31(a)iv
Canadian ... ¶5, §31(b)iv
Recommendations ... ¶3, §8(a); ¶18, §5
No. 1 ... ¶3, 9(u)iv; ¶18 §1, 8
Recording ... ¶15, *passim*
AFM Agreement Requirement ... ¶15, §1, 3(a)
Background/Accompaniment for Live Performance ... ¶15, §4
Contract Clauses Requiring IEB Approval ... ¶13, §21
EMSD Oversight Committee ... ¶6, §8
Electronic Media Reports ... ¶15, §7
Foreign Product ... ¶15, §3(a)
Live Engagement Contracts Must Prohibit ... ¶10, §7
Local Media Scales ... ¶15, §6(a)
Local Membership not Required ... ¶15, §5
Penalties ... ¶15, §3(b)
Prohibition in Absence of Agreement with AFM ... ¶15, §1, 3(a)
Prohibition When Made Outside of U.S. or Canada ... ¶15, §3(a)
Reporting ... ¶15, §2
Scale, Locals Rights to Establishing ... ¶15, §6(a)
Self-Produced ... ¶15, §1(b)
Work Dues ... ¶9, §32(b, d)
Recruiting ... ¶20, §11
Referral Program ... ¶5, §15
Work Dues for ... ¶5, §55
Regional Orchestra Emergency Relief Fund ... ¶6, §5 *et seq.*
Reinstatement ... ¶9, §18-23(c)
Amnesty ... ¶9, §22
Back Standing Indebtedness ... ¶9, §27-28(b)
Consultation with Former Local ... ¶9, §20
Reinstatement Fee Limitation ... ¶9, §21
FIF ... ¶9, §18
Referral to IEB ... ¶9, §19, 23(a-c)

Removal of Officers ........ ¶3, §5(m)i-iv
Reopening of Case ........ ¶12, §13
Representation of Symphonic Members ........ ¶5, §36(a-b)
Residual Payments ........ ¶21, §2(a)
Resignation in Writing ........ ¶9, §30
In Good Standing When Expelled ........ ¶9, §29(b)
In Good Standing When Suspended ........ ¶9, §29(a)
Resolutions ........ ¶18, §4(a)-8
Deadline ........ ¶18, §4(a)-8
Emergency ........ ¶18, §7
Form ........ ¶18, §4(b-c)
Printing/Circulating of ........ ¶18, §6(a-b)
Retirement, Compulsory ........ ¶20, §6
Right-to-Work Laws ........ ¶20, §8
Roadies ........ ¶9, §1(a-b)
Roll Call ........ ¶17, §4(e)
Roster of Members ........ ¶5, §16(4)
Royalties ........ ¶21, §1

S

Salaries ........ ¶3, *passim*
Assistant Secretary ........ ¶3, §8(k)
Assistant Treasurer ........ ¶3, §8(l)
Assistants to President ........ ¶3, §5(i)
Executive Committee ........ ¶3, §9(r)
President ........ ¶3, §5(g)
International Representative ........ ¶3, §5(h)
Secretary-Treasurer ........ ¶3, §8(j)
Vice President ........ ¶3, §6
Vice President from Canada ........ ¶3, §7(e)
Scales ........ ¶3, §9(e); ¶5, §16, 40(a), 42; ¶13, §3, 10, 22; ¶14, 10-11
Contractors ........ ¶5, §40(a)(2-3)
Employers ........ ¶5, §40(a)(2-3), 42
Local ........ ¶5, §16
Electronic Media ........ ¶15, §6(a)
Minimums ........ ¶10, §9
National ........ ¶3, §9(e); ¶5, 40(a)(2-3)
Supervisors ........ ¶5, §42
Traveling ........ ¶3, §9(e); ¶13, §3, 10, 22
Traveling Symphonic Orchestras ........ ¶14, §10-11
Secretary-Treasurer ........ ¶3, §8
AFL-CIO Delegate ........ ¶3, §8(n)
Appointees ........ ¶3, §8(k-l)
Assistant Secretary ........ ¶3, §8(k)
Assistant Treasurer ........ ¶3, §8(l)
AFM Bookkeeper ........ ¶3, §8(e)
Books/Papers/Documents ........ ¶3, §8(i)
Bylaws ........ ¶3, §8(a)
Canadian Office Imprest Fund ........ ¶3, §7(d)
Change of Local Officers ........ ¶3, §8(h)
Check Signatures ........ ¶3, §8(c)
Clerical Assistance ........ ¶3, §8(m)

# Index

Collections ..... ¶3, §8(b)
Communications ..... ¶3, §8(a)
Convention Proceedings ..... ¶3, §8(a)
Delegates Notification ..... ¶3, §8(a)
IEB Documents ..... ¶3, §8(m)
Indemnity Bond ..... ¶3, §8(f)
List of Locals ..... ¶3, §8(g)
Local Membership Rosters ..... ¶5, §6
Local Officer Change ..... ¶3, §8(h)
Local Work Dues List ..... ¶3, §8(a)
Money Deposits ..... ¶3, §8(c)
Recommendations ..... ¶3, §8(a)
Records ..... ¶3, §8(a), (b), (i)
Removal of Local Officer ..... ¶3, §5(m)i-iv
Resolutions Referred to IEB ..... ¶3, §8(a)
Salary ..... ¶3, §8(j)
Traveling Claims Notification ..... ¶7, §5
Traveling Engagement Work Dues ..... ¶9, §36(d)
Warrants ..... ¶3, §8(d)
Sexual Harassment ..... ¶20, §14(a-c)
Share Plan Engagements ..... ¶10, §16-18
Singers ..... ¶9, §1(a-b); ¶13, §7
Social Security/Insurance Numbers ..... ¶5, §61
Strike Authorization ..... ¶5, §32
Struck Employer ..... ¶10, §6
Subscriptions, *International Musician* ..... ¶3, §8(p)
Supervisors ..... ¶5, §39, 42
Support Crew ..... ¶9 §1(a-b)
Suspended Members ..... ¶9, §24(a)
Time Limitation ..... ¶9, §25
Reinstatement Requirements ..... ¶9, §27
Resignation in Good Standing ..... ¶9, §29(a)
Symphonic Orchestras ..... ¶14, *passim*
Bargaining Representative ..... ¶14, §4(a)
Definition ..... ¶9, §32; ¶14, §1
Extras/subs, bargaining for ..... ¶20, §13
Emergency Relief Fund ..... ¶6, §5 *et seq.*
Filing Agreement with AFM ..... ¶5, §38
Individual Contracts ..... ¶14, §4(c)
In Residence ..... ¶14,§3(a)(b)
Local Conductor Employment ..... ¶14, §6
Member of Another Local ..... ¶14, §4(d)
Orchestra Committees Required ..... ¶5, §37
Orchestra Service Program ..... ¶5, §36(b)
Personal Service Contracts ..... ¶14, §4(c)
Personnel Managers ..... ¶5, §39
Regional Orchestra Emergency Relief Fund ..... ¶6, §5
Strike Fund ..... ¶6, §4
Trustees ..... ¶6, §4(h)
Sympathy Strikes ..... ¶14, §5
Symphonic Player ..... ¶14, §2
Taped Music ..... ¶14, §4(e)
Traveling ..... ¶14, §3, 11

Outside of Definition ¶14, §10-11
Work Dues ¶9, §32 *et seq.*, 38; ¶14, §3
Symphonic Players ¶14, §2
Contract Cancellation ¶14, §9
Extras/subs, bargaining for ¶20, §13
Local Membership ¶14, §8
Rights As Local Members ¶14, §7
Symphony Opera Strike Fund ¶6, §4 *et seq.*
Trustees ¶6, §4(h)

T

Taped Music in Symphonic CBAs ¶14, §4(e)
Tariff of Fees ¶5, §16
Term of Office ¶5, §24
Theater Defense Fund ¶6, §6 *et seq.*
Work Dues ¶5, §56; ¶9, §32(c)i.
Three-Year Plan ¶3, §9(v)
Traveling Engagements ¶13, *passim*
Cancellation ¶13, §19-20
Contract Filing Requirement ¶13, §2, 18(a)
Definition ¶13, §1
Displacing of Local Members ¶13, §8
Early Appearance ¶13, §6
Failure to Utilize Time ¶13, §12
IEB Authority to Set/Reassign Scales ¶3, §9(e)
Minimum Wage ¶13, §10
Membership Applications ¶9, §5(a-c)
Minimum Scale ¶13, §22
Notification of Contract Change ¶13, §9
Payment Currency ¶13, §14
Performance Failure ¶13, §21
Proof of Good Standing ¶13, §5
Recording Limitations ¶13, §17
Recordings ¶15, §6(b)
Salary of One Week Applied to Another ¶13, §13
Singers Payment ¶13, §7
Symphonic Orchestras ¶14, §3
Theatrical Minimums ¶13, §24
Transportation ¶13, §15
Return Trip ¶13, §16
Unfair List ¶13, §4
Symphonic Orchestras ¶14, §10-11
Work Restrictions ¶13, §23
Trials of AFM Officers ¶3, §11
Trustees to Symphony Opera Strike Fund ¶6, §4(h)
Trusteeship ¶5, §68-74
Grounds ¶5, §68
Hearing ¶5, §71
Length of ¶5, §72
Liability/Financial Obligation of AFM ¶5, §74
Termination of ¶5, §73
Trustees ¶5, §69-70

**Index**

U

Unfair List ........ ¶8, *passim*
Placement ........ ¶8, §1-2
Traveling Engagements ........ ¶13, §4
Musical Service Prohibition ........ ¶8, §3
Unpaid Checks ........ ¶9, §31

V

Vacancies in AFM Office ........ ¶3, §9(s)
Vacancies in Local Office ........ ¶5, §25
Vice President ........ ¶3, §6
Vice President from Canada ........ ¶3, §7(a-e)
Administration of Canadian Affairs ........ ¶3, §7(b)
Appointment of Committees ........ ¶3, §7(c)
Emergency Decisions ........ ¶3, §7(b)
Executive Orders ........ ¶3, §7(b)
International Contracts Department ........ ¶3, §7(b)
Nationality Requirement ........ ¶3, §2
Office Location ........ ¶3, §7(a)
Operating Expenses ........ ¶3, §7(d)
Salary/Expenses ........ ¶3, §7(e)
Vocalists ........ ¶9, §1(a-b)
Voting at Convention ........ ¶17, §4(c)

W

Wage Scales ........ ¶3, §9(e); ¶13, §3, 10, 22; ¶14, §10-11; ¶15, §6(a)
Contractors ........ ¶5, §40(a)(2-3)
Employers ........ ¶5, §40(a)(2-3), 42
Local ........ ¶5, §16
Electronic Media ........ ¶15, §6(a)
National ........ ¶3, §9(e); ¶5, 40(a)(2-3)
Supervisors ........ ¶5, §42
Traveling ........ ¶3, §9(e); ¶13, §3, 10, 22
Traveling Symphonic Orchestras ........ ¶14, §10-11

Y

Youth Membership ........ ¶9, §3 *et seq.*
Initiation Fees ........ ¶9, §3(b)
Per Capita Payments ........ ¶5, §46(a)
Rights and Responsibilities ........ ¶9, §3(a)

# OFFICERS EMERITI

### PRESIDENTS EMERITI

Victor W. Fuentealba
Mark Tully Massagli
Thomas F. Lee

### VICE PRESIDENT FROM CANADA EMERITUS

David J. Jandrisch

### SECRETARY-TREASURERS EMERITI

Florence Nelson
Sam Folio

### EXECUTIVE OFFICERS EMERITI

Ed Ward
Kenneth B. Shirk
Vince Trombetta
Joe Parente

### INTERNATIONAL REPRESENTATIVES EMERITI

James A. Kitchings

### GENERAL COUNSELS EMERITI

George Cohen
Jeffrey Freund

# EXHIBIT 10

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

KEVIN RISTO, Plaintiffs,

vs.

SCREEN ACTORS GUILD-AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS, et al., Defendants.

No. 2:18-cv-07241-CAS-PLA

VIDEOTAPED DEPOSITION OF JON JOYCE

Volume I

APPEARING REMOTELY FROM

BRATTLEBORO, VERMONT

TUESDAY, SEPTEMBER 22ND, 2020

REPORTED BY:
MONICA LEPE-GEORG
CSR No. 11976
APPEARING REMOTELY FROM CLOVERDALE, CALIFORNIA

Job No. 255738

PAGES 1 - 107

REMOTE APPEARANCES

FOR PLAINTIFF:

KIESEL LAW LLP
BY: MARIANA A. MCCONNELL, ESQ.
NICHOLAS BRANCOLINI, ESQ.
8648 Wilshire Boulevard
Beverly Hills, California 90211-2910
Telephone: 310.854.4444
Fax: 310.854.0812
E-mail: mcconnell@kiesel.law
brancolini@kiesel.law

CO-COUNSEL:

JOHNSON & JOHNSON LLP
BY: DANIEL B. LIFSCHITZ, ESQ.
NEVILLE L. JOHNSON, ESQ.
439 N. Canon Drive
Suite 200
Beverly Hills, California 90210
Telephone: 310.975.1080
Fax: 310.975.1095
E-mail: dlifschitz@jjllplaw.com
njohnson@jjllplaw.com

REMOTE APPEARANCES (Continued):

FOR DEFENDANTS:

JENNER & BLOCK, LLP
BY: ANDREW J. THOMAS, ESQ.
ANNA LYONS, ESQ.
633 W. 5th Street
Suite 3600
Los Angeles, California 90071
Telephone: 213.239.5155
Fax: 213.239.5165
E-mail: ajthomas@jenner.com
alyons@jenner.com

Also Present:

Joseph Mourgos, Videographer

REPORTED REMOTELY FROM CLOVERDALE, CALIFORNIA

TUESDAY, SEPTEMBER 22ND, 2020

9:04 A.M. - 12:07 P.M.

---oOo---

THE VIDEOGRAPHER: We are now on the record. My name is Joseph Mourgos. I am a videographer for Golkow Litigation Services. Today's date is September 22nd, 2020, and the time on the video monitor is 9:04 Pacific Time.

This remote video deposition is being held in the matter of Risto versus Screen Actors Guild-American Federation of Television and Radio Artists for the United States District Court, Central District of California. The deponent is Jon Joyce. All parties to this deposition are appearing remotely and have agreed to the witness being sworn in remotely. Due to the nature of remote reporting, please pause briefly before speaking to ensure all parties are heard completely.

Will counsel please identify yourselves for the record.

MS. MCCONNELL: Mariana McConnell from Kiesel Law for the plaintiffs and the class.

MR. BRANCOLINI: Nico Brancolini from Kiesel Law for the plaintiffs and the class.

MR. LIFSCHITZ: Daniel Lifschitz from

Johnson and Johnson for plaintiffs and the class.

MR. THOMAS: Andrew Thomas from Jenner & Block on behalf of the defendants, including Mr. Joyce.

MS. LYONS: Anna Lyons from Jenner & Block on behalf of the defendants, including Mr. Joyce.

THE VIDEOGRAPHER: The court reporter today is Monica Lepe-Georg and she will now administer the oath.

THE REPORTER: Would you please raise your right hand, Mr. Joyce.

(Witness sworn.)

THE VIDEOGRAPHER: Please begin.

---oOo---

JON JOYCE,

having been administered an oath, was examined and testified as follows:

EXAMINATION

BY MS. MCCONNELL:

Q. Okay. Good morning, Mr. Joyce.

A. Good morning.

Q. Can you please state and spell your full name for the record?

A. Jon Joyce, J-o-n, J-o-y-c-e.

Q. Have you ever had your deposition taken before?

A. Yes.

called a contingent scale payment, and if recordings achieve a certain level of sales, labels were obligated to pay a -- a small fee, as a reward for the background singers on that, but it never meant much money and -- yeah.

Q. What about health benefits?

MR. THOMAS: Objection. Lacks foundation.

But go ahead. You can answer.

THE WITNESS: Okay. Health benefits, pursuant to the earnings requirements at any given time, were -- and pension as well, would have accrued, and this was an important way to keep track of it.

BY MS. MCCONNELL:

Q. So the unions would look at the session reports to track how many hours or days or tracks a nonfeatured or performer was spending on work that qualified for the pension?

A. Yes. Yeah.

Q. Okay. Do the local unions maintain these session reports or does the national union?

MR. THOMAS: Objection to the form. Lacks foundation.

But you can answer.

THE WITNESS: Okay. The locals generally, yes. Local by local kept track of -- of recordings

A. May not be a singer thing. It could be a musician thing.

Q. True, that's true.

A. Yeah.

Q. Do you want to take maybe a few minutes, take a break? Would you --

A. Sure. Yeah.

Q. Okay. We'll just take a quick five.

A. Five, great. Thank you.

Q. Okay. Thank you.

THE VIDEOGRAPHER: Okay. Without objection, we are off the record.

The time is 9:53 a.m. Pacific Time.

(Short recess was taken from 9:53 a.m. until 10:02 a.m.)

THE VIDEOGRAPHER: We are back on the record.

The time is 10:02 a.m. Pacific.

BY MS. MCCONNELL:

Q. Okay. Mr. Joyce, we're back on the record. Do you understand you're still under oath?

A. Yes.

Q. When did you first learn that the unions were considering charging the fund a service fee?

THE REPORTER: I'm sorry, a what fee?

MS. MCCONNELL: Service fee -- a service fee.

THE WITNESS: I'm not really sure. I -- I think I was on the road during that time. I was doing a rock and roll show with Roger Waters, and I think that it just came up in minutes and it was established and I had some questions about it and -- yeah.

BY MS. MCCONNELL:

Q. As far as you recall, you don't think that there was a conversation between yourself and any of the other SAG-AFTRA fund trustees before it came up in the fund minutes?

A. I -- I can't -- I -- I know that -- I know that Bruce Bouton and I talked about it, but that was after it was -- I believe after it was approved. I'm not sure of the timeline.

Q. Okay. Was it the practice, back in 2013, for the secretary of the board or some other position to send out information prior to board meetings, or no?

A. I believe so. I -- I believe that we were given an archive of documents and an agenda. Certainly an agenda was sent out.

Q. Okay. Do you recall an agenda before the June 2013 meeting, which I understand you weren't present for, but do you recall an agenda being sent out before that meeting?

A. I don't recall seeing one.

Q. Is it your testimony that you didn't see the text of the services agreement before it was approved by the board?

A. I believe so, yes.

Q. Before the services agreement was approved by the board, did you have any conversations with any fund employees about the concept of a service fee?

A. I don't remember clearly. I -- I assume I discussed it with Dennis at the time because he was my go-to guy, but I can't remember.

Q. Do you think that that conversation happened after June 2013?

A. I believe so.

Q. Okay.

A. Like I said, I was out of the country a lot during that time.

Q. Do you remember when you came back to the country?

A. I believe that year was -- I came back in September --

Q. Okay.

A. -- of that year.

Q. How long were you gone?

A. I think from June through September, the entire summer.

A. I don't know.
Q. At any time, did you ever find out how many hours SAG-AFTRA employees spend responding to fund inquiries?
A. No.
Q. And do you know if the director of sound -- director of the sound recordings department of the local Los Angeles SAG-AFTRA chapter responds to the fund inquiries?
A. I believe so.
Q. Do you know what other positions that the local L.A. chapter responds to the fund inquiries?
A. I -- I don't. I don't know who else.
Q. Who -- do you know who the current director of the current sound recordings department of the L.A. chapter is?
A. I think her name is Christine, but I don't -- I don't --
Q. Okay. Do you know how long Christine has had that job?
A. I'm thinking less than two years. Because Stefanie Taub was doing that before.
Q. Okay. Do you happen to know how much the salary is for the director of the sound recordings department?

A. No.

Q. At any time, have you considered whether a percentage fee is appropriate for the services agreement or whether the service fee should be tied to the reasonable cost of services that the union is providing?

A. Restate the question, please.

Q. Sure. At any point in time, have you considered whether a percentage fee is appropriate for the services agreement or whether a service fee should be tied to the reasonable cost of services that the union is providing?

A. In that case -- in that sense, no.

Q. Why not?

A. I have felt, from the beginning, that -- that a service fee is -- is appropriate for the value of the information that we're getting and -- and I -- and I don't -- I -- I can't imagine finding another way to compensate the unions for the time.

Q. Well, what about compensating them for the time using an hourly rate?

A. That's -- it -- that really is not my -- not my expertise -- area of expertise.

Q. You seem to have a lot of expertise with collective bargaining agreements. In your opinion,

should the services agreement have a shorter life, meaning wouldn't it be more appropriate if it was renegotiated every few years?

A. I -- I -- I don't see any value into renegotiating the service fee. I will offer that more recently, in the last couple of years, I have been thinking that some discussion might take place at the board about the service fee. As -- as the receipts have mounted up, I have felt that there was room for discussion added.

Q. Have you had any of these discussions amongst the board since 2013?

A. Not -- not officially. It's -- I -- I -- I support the idea of the fee and -- and -- but as the -- as distributions went over $50 million in a year, I felt that some discussion on the local board -- on the trustees board would be warranted.

Q. Have you had any discussion amongst the SAG-AFTRA trustees about revising the service fee?

A. Not yet. Not -- no. Not --

Q. Have you had any informal discussions with Duncan Crabtree-Ireland about revising the service fee?

A. No.

Q. Have you had any discussion with Ray Hair about revising the service fee?

A. I -- the determination of how many recordings to be covered has been increasing every year. That's all I know.

Q. Okay. But we don't know how much it's increasing?

A. No.

Q. Have you asked anyone at SAG-AFTRA who specifically responds to the fund's inquiries?

A. No.

Q. Is it your opinion that both unions are providing roughly equal work in helping to identify the fund beneficiaries?

A. Yes.

Q. Have you spoken to anyone at AFM about the services it provides the fund?

A. No.

Q. So do you know how many inquiries AFM gets compared to how many inquiries SAG-AFTRA gets?

A. I don't, no.

Q. Do you know who proposed the 3 percent fee?

A. No, I'm not sure.

Q. Do you know how that number came to be?

A. No.

Q. Do you know if the board consulted any outside consultant?

A. I don't know.
Q. Back in 2013, did you speak to Patricia Polach about the services agreement?
A. Would you restate the question?
Q. Sure. In 2013, when the services -- services agreement was passed, did you have any conversations with Patricia Polach about it?
A. I don't believe so.
MR. THOMAS: (Inaudible.)
THE WITNESS: I don't remember.
Sorry?
MR. THOMAS: I was just going to say you can answer yes or no, but you shouldn't --
THE WITNESS: Your -- your audio is--
THE REPORTER: Mr. Thomas, your audio is very low. Cannot hear you.
MS. MCCONNELL: I think he's working on it.
THE WITNESS: It's a wonky mic.
MR. THOMAS: Okay. Is this better?
THE WITNESS: Yeah.
MS. MCCONNELL: Much better.
THE REPORTER: Yes.
MR. THOMAS: Okay. Well, we'll go with the headset, then.
THE WITNESS: Okay.

A. I -- the only thing that I can say is that, in my experience, the only source of data and information was the unions for the fund. And it was incalculable, the -- the value of that, to the fund.

Q. So, no matter what the amount of money is that the fund pays the unions, in your mind, that would be reasonable?

MR. THOMAS: Objection. Misstates his testimony. Overbroad.

THE WITNESS: Let me just clarify that, and I'm -- I'm sure Andrew will hate me for this, but I --

MR. THOMAS: Do whatever you want.

THE WITNESS: I -- I, in the last few years, have -- and I think I mentioned this earlier in my testimony, that some review of the -- the service agreement, the actual amount of money being paid to the union should be taken up and -- and that's my -- that's my position.

BY MS. MCCONNELL:

Q. Is there a number in your mind where you think that's too much money?

A. No.

MR. THOMAS: Objection. Vague.

THE WITNESS: And -- no, just as -- just as I -- I try not to assess a value to CEOs of major

Q. Just because streaming has increased and access to different tracks has become easier, does that mean that the value of the -- of the database has increased in your mind?

MR. THOMAS: Objection. Incomplete hypothetical and argumentative.

THE WITNESS: I believe so. The -- the historical work that -- the -- the value of the -- the information from the unions is, like I said, incalculable. There is no other source of information like that from unions for the fund.

BY MS. MCCONNELL:

Q. Do you think that the trustees have an obligation to the fund's beneficiaries to calculate the cost of what you're saying is incalculable?

A. Yes. Yes. And -- and in the spirit of ongoing discussions and -- and evaluation, I believe that is the process that we're engaged in.

Q. Okay.

A. Yeah.

Q. So you think that you are engaged now in a process of figuring out how much the service fee should be?

A. I believe that there is --

MR. THOMAS: Objection. I think that

STATE OF CALIFORNIA )
)
COUNTY OF SONOMA )

I, Monica Lepe-Georg, a Certified Shorthand Reporter of the State of California, do hereby certify:

That prior to being examined, the witness in the foregoing proceedings was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That said proceedings were taken remotely before me at the time and places therein set forth and were taken down by me in shorthand and thereafter transcribed into typewriting under my direction and supervision;

I further certify that I am neither counsel for, nor related to, any party to said proceedings, not in anywise interested in the outcome thereof.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: October 5th, 2020

______________________________
MONICA LEPE-GEORG, No. 11976

# EXHIBIT 11

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
BROOKLYN DIVISION

------------------------------x

JON BLONDELL, PAUL HARRINGTON, TIMOTHY JOHNSON, STEPHANIE LOWE, F/K/A STEPHANIE MARIE, CHASTITY MARIE, AND CLAYTON PRITCHARD, INDIVIDUALLY AND ON BEHALF OF A CLASS OF SIMILARLY SITUATED PERSONS,

Plaintiffs,

vs.

BRUCE BOUTON, DUNCAN CRABTREE-IRELAND, AUGUSTINO GAGLIARDI, RAYMOND M. HAIR, JR., JON JOYCE, AND STEPHANIE TAUB,

Defendants.

------------------------------x

Civil Action No. 1:17-CV-00372

C O N F I D E N T I A L

VIDEOTAPED DEPOSITION OF JON JOYCE
LOS ANGELES, CALIFORNIA
TUESDAY, AUGUST 27, 2019
1:06 P.M.

Job No.: 166375
Pages: 1 - 351
Reported by: Leslie A. Todd

A P P E A R A N C E S

ON BEHALF OF PLAINTIFFS:

ROGER MANDEL, ESQUIRE
Jeeves Mandel Law Group
3102 Oak Lawn Avenue
Dallas, Texas 75219

ERIC ZUKOSKI, ESQUIRE
QUILLING SELANDER LOWNDS
WINSLETT MOSER
2001 Bryan Street
Dallas, Texas 75210

ON BEHALF OF DEFENDANTS:

DEVI RAO, ESQUIRE
JENNER & BLOCK
1099 New York Avenue N.W.
Washington, D.C. 20001

ALSO PRESENT:

ROB CHANG (Videographer)

THE VIDEOGRAPHER: Will the court reporter please swear in the witness.

JON JOYCE,

and having been first duly sworn,

was examined and testified as follows:

MR. MANDEL: Before we begin, I think counsel have a -- a couple of stipulations that we can put on the record.

The first is that -- stipulate that all of the documents that were produced by defendants in this case will be considered authentic for purposes of the rules -- Federal Rules of Evidence.

MS. RAO: That's right.

MR. MANDEL: Okay. And in addition, all of the documents that were produced by defendants and created by the Fund, but not specifically for the purposes of this litigation, will fall within the business records exception to the hearsay rule under the Federal Rules of Evidence with the right on behalf of defendants to later specify that certain documents were created for the purposes of litigation if it's not done at the time the document is discussed during the deposition.

MS. RAO: That's right. I'll try to --

agreement that would pay -- have the fund paying money to the two unions, correct?

A Yes.

Q Okay. Do you see that it was -- that -- that Ray Hair and Duncan Crabtree-Ireland, being president and chief administrative officer and general counsel of the union that would be getting money and as -- also as trustees of the Fund that would be paying the money to the union, would have a conflict of interest in voting on this agreement for the fund?

A I can't really comment on that. I -- not the way I know them.

Q Well --

A But I -- I can see what -- yes, I can see --

Q You could --

A -- that it could be perceived that way.

Q Okay. Well, I mean, you say it could be perceived that way. Wouldn't -- this was going to pay money to their -- to the organizations which they're high ranking officers of. Wouldn't that give them an interest to do that even if potentially it was not in the best interest of the Fund?

CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

The undersigned Certified Shorthand Reporter does hereby certify:

That the foregoing proceeding was taken before me at the time and place therein set forth, at which time the witness was duly sworn; That the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed, said transcript being a true and correct copy of my shorthand notes thereof; That the dismantling of the original transcript will void the reporter's certificate.

In witness thereof, I have subscribed my name this date: September 10, 2019.

________________________

LESLIE A. TODD, CSR, RPR

Certificate No. 5129

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

**From:** Shari Hoffman [shoffman@raroyalties.org]
**Sent:** 9/26/2013 8:24:11 PM
**To:** 'Mark Ciapka' [mciapka@ads-llc.com]
**CC:** Dennis Dreith [ddreith@fmsmf.org]
**Subject:** FW: SR (DPR) DIst Guidelines
**Attachments:** FAQs SR Division.docx; SR combined Dist Guidelines.docx

Hi Mark,

Attached are the FAQ's which replace the current FAQ's for Sound Recording.

Also attached are the Distribution Guidelines which are mentioned throughout the section in parentheticals. Please take the attached Word document and make a "Distribution Guidelines clickable link to a pop up page providing the information. This is only applicable to Sound Recording. My feedback sent earlier removes the reference to Distribution Guidelines for AV.

Thanks,
Shari

**Sound Recording Distribution Guidelines:**

**1.** The American Federation of Musicians ("AFM") and the Screen Actors Guild-American Federation of Television and Radio Artists ("SAG-AFTRA") have designated the AFM & SAG-AFTRA Intellectual Property Rights Distribution Fund ("Fund") as their agent for the distribution of remuneration resulting from the DPRA (Digital Performance Rights Amendment), DMCA (Digital Millennium Copyright Act), and the Audio Home Recording Act of 1992 (AHRA).

**2.** In accordance with the DPRA, the DMCA, and the AHRA funds are collected on behalf of non-featured musicians (including music preparation personnel) and non-featured vocalists. These separately collected funds shall be referred to as the Musicians' Subfund and the Vocalists' Subfund, respectively. A non-featured performer for purposes of distributions under these guidelines shall be a musician or vocalist who is not one of the performers most prominently identified in print or otherwise with respect to the specific sound recording for which distributions from the Fund are made, and/or a performer who has not directly received a distribution from SoundExchange or from AARC (Alliance of Artists and Record Companies) respectively for that recording.

**3.** Funds are segregated (*i.e.* not co-mingled with funds from other years, or between the Musicians' Subfund and the Vocalists' Subfund), and are allocated on an annual basis.

**4.** The Fund shall maintain a website to provide distribution information and participant access for inquiries and related matters.

**5.** The Fund shall publish a notice in various trade publications no less than twice each calendar year directing non-featured performers to the website and informing them of the possible payments from the Fund. At least one such notice must be placed no less than 60 days prior to a disbursement.

**6.** There will be two lists posted on the website—one for musicians and one for vocalists—containing the covered sound recordings as defined in Paragraph 9 herein for non-featured musicians and non-featured vocalists. Each record list posted on the Fund website shall identify all the non-featured musicians and non-featured vocalists, respectively, known to have participated on each covered sound recording. It shall also identify the sound recordings for which it believes all non-featured musicians and/or non-featured vocalists have been identified. The website shall provide a method for non-featured performers to claim that they performed on a record and/or to provide personal or contact information. A non-featured performer may also make a claim in writing to the AFM and AFTRA Intellectual Property Rights Distribution Fund at 11846 Ventura Blvd, Suite 300, Studio City, CA 91604. A non-featured performer

who has been omitted from the Fund's list of performers for a record shall have forty-five days from the publication on the Fund's website of the titles ready for distribution to make a claim to the Fund. The Fund, in its sole discretion, may process claims received after forty-five days but prior to disbursement.

**7.** In preparing for distributions, the Fund may rely on information available to it (e.g. session reports and website responses) and information available to the public (e.g. liner notes, on-line services), in its discretion, unless it is demonstrated that the information is not accurate.

**8.** Prior to each distribution, the Fund shall withhold a sum, the amount of which shall be determined by the Fund, for the purposes (1) of resolving disputes, and (2) correcting errors and/or omissions from any prior regular or supplemental distribution of the remuneration for that calendar year. Such withheld sums shall be known as the Omissions Fund.

**9.** The Fund shall deduct administrative expenses from the funds to be distributed prior to distribution. Administrative expenses may include, but shall not be limited to, costs of staff, consultants, research, administration, services, equipment, distribution costs or other fees at the discretion of the Trustees.

**10.** It is the goal of the Fund to distribute the DPR funds received for each year to as many non-featured musicians and non-featured vocalists as possible without issuing checks for de minimus amounts. Due to the fact that the non-featured performers' share of DPR royalties has been quite low in the past and is expected to remain quite low for the foreseeable future, the Fund only is able to make distributions on a limited number of sound recordings that were digitally transmitted each year. The following system will be used to determine, for each year, the identity of the recordings upon which distributions shall be made and the amount to be distributed upon each recording:

- Sound recordings upon which distribution shall be made will be determined separately for the non-featured musicians and the non-featured vocalists.
- A proportionate pro-rata share of administrative expenses proportionate to amount received by the Musicians' Subfund and the Vocalists' Subfund respectively shall be deducted from each such Subfund for each year (*e.g.* if the funds collected for each Subfund are equal, then administrative expenses will be split on a 50-50 basis irrespective of the number of particular sound recordings and non-featured performers subject to a distribution for a particular year). The amount remaining after the deduction of administrative expenses shall be defined as the Distributable Amount for each year.
- Sound recordings subject to distribution shall be identified based on a frequency of transmission/activity report (Frequency Report) ranking provided by SoundExchange (for DPR Distributions) or based on SoundScan sales ranking (for AHRA Distributions) as applicable for each year of distribution.
- The number of sound recordings for each year upon which distributions shall be made from the Musicians' Subfund shall be determined in the following manner. For each year, the Fund shall review the top 100 Frequency Report

ranked recordings, or the album listing of the top 100 SoundScan ranked recordings as applicable and determine the number of non-featured musicians appearing on a recording. The largest number of non-featured musicians appearing on a recording shall be ***M***. The number of sound recordings upon which distributions shall be made for each year shall be the Distributable Amount for that year divided by 2***M***. The resulting number shall be the number of sound recordings upon which distribution shall be made for that year, starting from the Frequency Report top-ranked sound recording on the sound recording list. For example, if Distributable Amount/2***M*** = 12, distributions will be made to the top 12 ranked sound recordings on the Frequency Report recording list for that year.

- The number of sound recordings for each year upon which distributions shall be made from the Vocalists' Subfund shall be determined in the same manner. For each year, the Fund shall review the top 100 Frequency Report ranked recordings and determine the number of non-featured vocalists appearing on a recording. The largest number of non-featured vocalists appearing on a recording shall be ***V***. The number of sound recordings upon which distributions shall be made for each year shall be the Distributable Amount for that year divided by 2***V***. The resulting number shall be the number of sound recordings upon which distribution shall be made for that year from the Vocalists' Subfund, starting from the Frequency Report top-ranked sound recording on the album list. For example, if Distributable Amount/2***V*** = 12, distributions will be made to the top 12 ranked sound recordings on the Frequency Report recording list for that year.
- In the event that the foregoing formulas leave a remaining consecutive sound recording(s) with individual non-featured musicians' shares or individual vocalists' share (as determined below) equal to or greater than $10.00, then additional sound recordings shall be added to the list of sound recordings subject to a distribution until such time as the minimum individual pro-rata amount is at or near the $10.00 threshold.
- Within the Musicians' Subfund, once the sound recordings have been identified upon which distribution shall be made for a particular year, each sound recording's pro-rata share of that year's Distributable Amount shall be determined by dividing that sound recording's Frequency Report percentage market share by the Frequency Report cumulative percentage market share for the sound recordings upon which distribution shall be made for that year, as follows: *Sound Recording % market share / Cumulative % market share = Sound Recording Pro-rata Share of Distributable Amount*. Similarly, for the Vocalists' Subfund, once the sound recordings have been identified upon which distribution shall be made for a particular year, each sound recording's pro-rata share of that year's Distributable Amount shall be determined by dividing that sound recording's Frequency Report percentage market share by the Frequency Report cumulative percentage market share for the sound recordings upon which distribution shall be made for that year, as follows: *Sound Recording % market share / Cumulative % market share = Sound Recording Pro-rata Share of Distributable Amount.* Sound recording weighted activity as determined by SoundExchange data shall be used to determine sound recording activity percentage. The Fund, however, shall continue to

investigate other methods to make this determination, and at such time as there are additional or other proven industry-wide accepted methods for making these determinations, then the Fund shall incorporate said methods in its procedures.

- If a recording has no non-featured performers, its share will be distributed to the remaining recordings on a pro-rata basis. The amount to be distributed to each non-featured performer on a sound recording shall be determined by dividing the amount distributable for that sound recording by the number of non-featured performers identified on the recording. Distributions shall be made to non-featured performers without regard to union membership.
- Any monies unclaimed after six months (e.g. stale-dated checks, payments for which the Fund has no good address, Omissions Fund balance, etc.) shall revert to the Fund.
- In order to achieve an efficient scale of operation, the Fund will not generate a check or a royalty statement to an individual who is not entitled to receive $10.00 or more ("deminimus threshold"). The Fund will establish a carry-over procedure and will issue a check and royalty statement to that individual when the $10.00 threshold has been cumulatively satisfied. In determining whether such cumulative deminimus threshold has been met, the Fund will aggregate any sums held as deminimus from other revenue streams subject to a distribution from the Fund (*e.g.* a non-featured performer who is entitled $4.00 from Japanese record rentals, $5.00 from private home taping monies, and $2.00 from a DPR distribution would be issued a check and a royalty statement even though none of the specific revenue sources satisfied the deminimus threshold).

**11.** In the event a non-featured performer feels aggrieved by the actual or proposed distribution of royalties, but not by the distribution formula, s/he may seek an adjustment by writing to the Administrator within 90 days of the distribution and setting forth the grounds for the complaint. The Administrator shall review the complaint and provide a written decision within thirty days. If the non-featured performer does not accept the decision of the Administrator, s/he may appeal the decision to the Trustees of the AFM & SAG-AFTRA Intellectual Property Rights Distribution Fund. The appeal must be sent to the Trustees at AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund at 11846 Ventura Blvd, Suite 300, Studio City, CA 91604 within sixty days of the Administrator's decision, and must set forth the grounds for the appeal in writing. The Trustees shall review the appeal and reach a decision no later than sixty days from the date of the appeal. The Trustees shall advise the Administrator and the non-featured performer of their decision, which shall be final.

**12.** In reaching their determinations, the Administrator and the Trustees shall follow the distribution methodology set forth in these Guidelines, supplemented by the principles of law and equity. The Administrator and the Trustees shall not consider the complainant's union status.

**13.** If at some future date, in the sole determination of the Trustees, the annual amount collected for distribution from either the Musicians' Subfund or the Vocalists'

Subfund become too small to effect an economically feasible distribution, then the monies collected for that year shall be held until such distributions are feasible in a subsequent year. In no circumstance, however, shall monies held for distribution is co-mingled with monies collected for a different year.

**14.** The Fund shall not make a distribution to any Participant, except as provided herein, who does not possess a valid Tax Identification Number (TIN), which may be any of the following:

- Social Security Number "[ HYPERLINK "http://www.irs.gov/businesses/small/international/article/0,,id=96696,00.html" \l "ssn" ]"
- Employer Identification Number "[ HYPERLINK "http://www.irs.gov/businesses/small/international/article/0,,id=96696,00.html" \l "ein" ]"
- Individual Taxpayer Identification Number "[ HYPERLINK "http://www.irs.gov/businesses/small/international/article/0,,id=96696,00.html" \l "itin" ]"
- Taxpayer Identification Number for Pending U.S. Adoptions "[ HYPERLINK "http://www.irs.gov/businesses/small/international/article/0,,id=96696,00.html" \l "atin" ]"

When a foreign withholding tax obligation exists with respect to a distribution to a foreign resident who does not possess a SSN, but does possess a valid TIN, the Fund shall withhold the default statutory amount unless the Participant provides the Fund with a fully completed IRS Form 8233, in which case the Fund shall apply provisions in accordance with the applicable treaty.
Alternatively, participants in foreign territories who either are unable to, or elect not to acquire a valid TIN, may complete and submit a TIN Waiver Form provided by the Fund, in which case the Fund will remit the applicable payment to the participant after deducting the default statutory amount (currently 30%). When a foreign withholding tax obligation exists with respect to a distribution to a foreign resident who does not possess a SSN, but does possess a valid TIN, the Fund withholds the default statutory amount (currently 30%) unless the Participant provides the Fund with a fully completed IRS Form 8233, in which case the Fund applies the provisions in accordance with the applicable treaty of the country in which the participant resides. Foreign residents should consult their tax professional with any questions or to receive advice with respect to these payments.
For Non-Resident Alien Participants If you wish to inquire about ITIN, Exemption from withholding Form 8233, and/or the reporting of your payment on form 1042, you may refer to this website for assistance: [ HYPERLINK "http://www.artistsfromabroad.org/taxes/appendix.html" ]

**15.** For each participant for whom the AFTRA or SAG-AFM pension fund has information, we will use the beneficiary or beneficiaries they have designated with respect to their respective pension fund as follows:

- For participants for whom neither fund has information, then a beneficiary or beneficiaries named in a will shall apply. In the event a participant dies without a will, then (A) The widow or widower shall be the sole beneficiary unless there are any surviving children, in which case the widow or widower is entitled to

one-half of participant's interest; (B) The participant's surviving children shall receive the participant's entire interest unless there is a widow or widower, in which case the ownership of one-half of the participant's interest is divided among the children; (C) The participant's children's one-half interest shall be divided among them on a pro rata basis according to the number of children.

- We will allow multiple beneficiaries, but not allow a beneficiary or beneficiaries to name subsequent beneficiaries (e.g. benes of benes will not be allowed);
- The Fund's website shall list those deceased participants for whom we have a payment but no beneficiary to enable potential beneficiaries to contact us;
- The Fund will not maintain or solicit separate beneficiary declarations, but shall rather utilize those specified above in order to minimize the administrative burden.

Amended as of 09/26/13

## Where does the money come from?

We get royalties from both domestic and foreign sources. Revenue to the Sound Recording Division includes Private Copy royalties generated from the U.S. Audio Home Recording Act (AHRA); and reciprocal Private Copy agreements with numerous foreign collectives in countries that also have legislation providing these royalties such as: Japan, the Netherlands, Hungary, Spain, Portugal, Greece, Germany, Latvia, and Estonia, just to name a few. The Fund also collects record rental remuneration from Japan, and the Netherlands where sound recordings are rented in much the same manner as DVDs are rented in the U.S. The largest share of royalties, however, is generated from the Digital Performance Royalty Act (DPRA) and the Digital Millennium Copyright Act (DMCA) which the Fund collects from Sound Exchange on behalf of non-featured performers. These include royalties collected from digital subscription services, webcasting, and other digital services.

## When did the Fund begin?

The Fund became operational in 2000 when the AFM and AFTRA (now SAG-AFTRA) determined that neither union had the staffing and resources to distribute statutory royalties to non-featured performers pursuant to U.S. Copyright legislation and foreign equitable remuneration ("foreign royalties") due their members.

## Are royalties for musicians and vocalists treated the same?

No, there are actually two discreet pools of money; one for musicians and another for vocalists. Therefore, while the distribution formula is the same, there are some circumstances where vocalists could receive a royalty for a sound recording that musicians don't and vice e versa (see Distribution Guidelines for more information).

## What determines which sound recordings are selected for a royalty distribution?

Due to the complex nature of the distributions and the vast number of sound recordings and performers involved, the Fund does NOT pay on each and every sound recording performed or released. Rather, payments are based on a census or a survey. For Private Copy royalties in the U.S., the Fund uses sales data from SoundScan to determine each sound recording's ranking and pro-rata

share of the royalty pool, and data from the respective foreign collectives for such determinations. For Digital Performance Royalties the Fund relies on performance data (such as play lists, and similar material) supplied by Sound Exchange to make these determinations (See Distribution Guidelines for a complete explanation).

## How are the individual royalty payments calculated?

There are discreet Funds. Each individual non-featured performer eligible for a distribution from the applicable Fund (instrumental musicians, music preparation personnel and vocalists alike) receives a single credit in that Fund for each sound recording they perform on regardless of the number of cuts or parts performed on a particular sound recording. Then, the amount received for each sound recording (less administrative expenses) is divided by the number of non-featured performers to establish each individual's pro-rata share of the royalties.

## Does the Fund then make payments only as a result of union sessions?

Not necessarily. Union and non-union projects will be treated equally for Domestic royalties (i.e. those generated in the U.S.), but a number of the foreign collectives we have agreements with do require that payments made to the Fund generated in their territories be made only to members of the AFM and/or SAG-AFTRA.

## How is participation on a particular sound recording determined?

The Fund staff conducts extensive research examining union contracts, and other documentation available such as Web sites, CD jackets, and direct contact with record companies to determine the identity of the participating non-featured performers.

## If I find my name on one recording, how can I find out what other recordings I have been included on?

Double click your name and all the other recordings we have found you for will appear.

### What if I was on a recording, but have been left out of a royalty disbursal for a particular sound recording?

Simply contact the Fund via the online inquiry form, and request additional research on your behalf. It is important to include all pertinent information such as song(s) you worked on, session dates, studio location, etc. Supporting documentation such as pay stubs, session contracts, or even affidavits from other non-featured performers and others such as record producers and engineers who were also involved in the recording in question will be most helpful. The Fund will then promptly investigate your claim. If your participation can be verified, then an appropriate pro-rata payment will be made to you from the reserves held back for omissions (see Distribution Guidelines for more information).

### What if I received a check but didn't perform on the sound recording?

If for one reason or another (i.e. you have the same or similar name to someone who did actually perform on the album) you received a check but did not perform on any album/single listed, please notify the Fund.

### What if my name is listed on the credits on the Web Site, but I didn't receive a check?

There could be a variety of reasons that despite your performance on a particular sound recording you still did not receive a payment. The most likely cause would be that we might not have your address or social security number. If you move or want to be sure we have the most current information for you, you can email a change of address form.

Lexis Advance® Subscription Agreement
for Corporate Legal
(New Subscriber - Trial to Automatic Renewal Version)

| "Subscriber" Name: AFM & SAG-AFTRA Intellectual Property Rights Distribution Fund |
|---|
| Account Number: TBD |
| "LN": LexisNexis, a division of Reed Elsevier Inc. |

**1. Subscription Agreement**
LexisNexis, a division of Reed Elsevier Inc. ("LN") grants Subscriber a non-exclusive, non-transferable limited license to access and use Lexis Advance® and the materials available therein ("Materials") pursuant to terms set forth in the LexisNexis General Terms and Conditions ("General Terms") and the pricing set forth in the Price Schedule ("Price Schedule") (the General Terms together with the Price Schedule is collectively referred to as the "Subscription Agreement"), both of which are incorporated herein by reference. Subscriber may view and print the Subscription Agreement at: http://www.lexisnexis.com/terms/LACommercial/.

**2. Lexis Advance Product and Charges**
2.1 This Section 2 amends the Subscription Agreement with respect to the Lexis Advance product offering described below. The term of Subscriber's commitment for the Lexis Advance product offering will begin upon the date Subscriber's billing account ("Account Number") is activated ("Activation") and will continue for the last period set forth in Section 2.2 below (the "Committed Term"). **UPON THE EXPIRATION OF THE COMMITTED TERM, THIS AGREEMENT WILL AUTOMATICALLY RENEW EACH YEAR FOR ADDITIONAL 1 YEAR PERIODS (EACH A "RENEWAL TERM") AT THE THEN-CURRENT MONTHLY COMMITMENT RATE PLUS 6%.** The Committed Term and any Renewal Terms will collectively be the "Term." The Subscription Agreement and the Monthly Commitment may be terminated by Subscriber during the balance of the first month of the trial period (as described below) (the "Trial Period") on 7 days prior written notice to LN. Thereafter, Subscriber may avoid entering into a Renewal Term by providing LN with at least 90 days prior written notice before the expiration of the Committed Term or the beginning of any subsequent Renewal Term. Subscriber may not terminate this Agreement under Section 5.2 of the General Terms during the Committed Term or any Renewal Term, except as set forth above during the Trial Period. Notwithstanding the foregoing, Subscriber may terminate this Agreement for a material breach by LN that remains uncured for more than 30 days after LN receives written notice from Subscriber identifying a specific breach. If Subscriber terminates this Agreement pursuant to this Section, then Subscriber must pay all Monthly Commitments and other charges incurred up to the date of termination.

| Lexis Advance Content & Features | | |
|---|---|---|
| Product | SKU Number | Number of Users |
| Core Public Records with Smartlinx Person, Business and Location Reports | 1004801 | Up to 2 |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

2.2 In exchange for access to the Lexis Advance Content, Feature and/or Service set forth above in Section 2.1, Subscriber will pay to LN the following amount (the "Monthly Commitment") during the periods set forth below.

| Committed Term | Trial Period Monthly Commitment |
|---|---|
| Trial Period begins 3/2/2015 for balance of the first month | $0 |


© 2013 LexisNexis. All rights reserved.

| Committed Term | Monthly Commitment |
|---|---|
| 4/1/2015-3/31/2016 | $433.20 |
| | |
| | |
| | |
| | |
| | |
| | |

2.3 Subscriber may elect to add additional users of the Lexis Advance Content & Features by notifying LN by the 20th day of a calendar month in order to be effective on the first day of the next calendar month. Subscriber will pay the following additional per user per month rate, in addition to the Monthly Commitment, for such added users.

| Lexis Advance Content & Features | | |
|---|---|---|
| Product | SKU Number | Per User Per Month Rate |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

2.4 During the Term, LN will make content and features available to Subscriber that are not included in the Lexis Advance Content described above and which will be offered to Subscriber at an additional charge ("Alternate Materials"). Subscriber will be under no obligation to access and use the Alternate Materials, or to incur additional fees beyond the Monthly Commitment. Subscriber's Authorized Users (defined in the General Terms) will be notified that additional charges will apply before the Alternate Material is displayed. If Subscriber's Authorized Users proceed to access the Alternate Content, Subscriber will pay the then current transactional charge(s) for the Alternate Materials that is displayed at the time of access. If Subscriber elects not to have access to the Alternate Content, Subscriber may initial below, and Subscriber will not have access to Alternate Content and will not incur additional fees beyond the Monthly Commitment.

______ **Subscriber elects not to have access to the Alternate Materials**
(Initial)

2.5 Use of Lexis Advance under this Agreement is available to Subscriber and its Authorized Users.

2.6 If any charge not the subject of a legitimate dispute should remain unpaid for more than 75 days after becoming due LN reserves the right to require each remaining unpaid Monthly Commitment for the Committed Term to be immediately paid in full to LN. LN may temporarily suspend access to Lexis Advance until all unpaid amounts are paid in full. No claims directly or indirectly related to this Agreement with respect to amounts billed or payments made under this Agreement may be initiated by Subscriber more than 6 months after such amounts were first billed to Subscriber.

**3. Closed Offer**
The prices and other terms are subject to change if Subscriber has not submitted a signed original or copy on or before 2/24/2015.

© 2013 LexisNexis. All rights reserved.

**4. Confidential Information**

This Agreement contains confidential pricing information of LN. Subscriber understands that disclosure of the pricing information contained herein could cause competitive harm to LN, and will receive and maintain this Agreement in trust and confidence and take reasonable precautions against such disclosure to any third person. This Section 4 will survive the termination or expiration of this Agreement.

**5. Miscellaneous**

This Agreement does not bind either party until it has been accepted by both parties. Subscriber may accept this Agreement by signing below. LN will accept this Agreement by providing Subscriber with access to Lexis Advance.

***LEXISNEXIS WILL NOT ACCEPT ANY CHANGES, CORRECTIONS OR ADDITIONS TO THIS AGREEMENT UNLESS SUCH CHANGES ARE EXPRESSLY ACCEPTED BY LN IN WRITING. SUCH CHANGES WILL HAVE NO LEGAL EFFECT.***

**AGREED TO AND ACCEPTED BY:**

| **Subscriber:** | **AFM & SAG-AFTRA Intellectual Property Rights Distribution Fund** |
|---|---|
| | [MUST BE COMPLETED BY SUBSCRIBER] |
| **Authorized Subscriber Signature:** | [signature] |
| **Printed Name:** | Dennis Dreith |
| **Job Title:** | Executive Director |
| **Date:** | 02/25/2015 |

© 2013 LexisNexis. All rights reserved.

| CUSTOMER INFORMATION (Please type or print): | | |
|---|---|---|
| Organization Name: (Full Legal Name) | AFM & SAG-AFTRA Intellectual Property Rights Distribution Fund | |
| | Physical Address | Invoice Address |
| Street Address: | 4705 Laurel Canyon Blvd., Ste. 400 | SAME |
| City: | Valley Village, CA 91607 | SAME |
| State: | CA | SAME |
| Zip: | 91607 | SAME |
| County: | Los Angeles | SAME |
| Telephone: | (818) 255-7980 x4806 | SAME |
| Fax: | (818) 853-0113 | SAME |
| Email Address: | ktucker@afmsagaftrafund.org | SAME |
| Parent Company: *(If applicable)* | n/a | |

**Type of Organization:**

☐ Law Firm ☐ Publicly Traded ☐ Private Corp ☐ Partnership/LLC ☐ Sole Proprietor

No. of Attorneys: ______ Practicing Area of Law: ______

Ticker Symbol: ______ Exchange: ______

No. of Employees: ______ No. of years in business: 17

Bar/Business/Prof. Lic No: ______ Employer Identification Number: 95-4815790

Date Issued/Expiration Date: ______ Issuing State: ______

Dun & Bradstreet Number/ Martindale-Hubbell Rating: ______ Organization Web Address: www.afmsagaftrafund.org

**Contacts:**

| | Name | Telephone | Email |
|---|---|---|---|
| Installation: | Karen Tucker | 818-255-7980 X4806 | ktucker@afmsagaftrafund.org |
| Billing: | Deena Navarro | 818-255-7980 x4897 | dnavarro@afmsagaftrafund.org |
| Policy/Legal Notification: | Karen Tucker | 818-255-7980 x4806 | ktucker@afmsagaftrafund.org |
| Scheduling/Training: | | 818-255-7980 x4806 | ktucker@afmsagaftrafund.org |

| | Name | Telephone |
|---|---|---|
| Super Admin: | Karen Tucker | (818) 255-7980 x4806 |
| | **Email** | **IP Address** |
| | ktucker@afmsagaftrafund.org | 173.196.199.106 |

© 2013 LexisNexis. All rights reserved.

| CUSTOMER ID INFORMATION (Please type or print) | | | |
|---|---|---|---|
| ID HOLDERS' NAMES (additional sheet attached ☐) | ID HOLDERS' TITLES/POSITIONS | ID HOLDERS' EMAIL ADDRESSES | LOCATION/ADDRESS |
| Karen Tucker | Human Resources Director | ktucker@afmsagaftrafund.org | 4705 Laurel Canyon Blvd., Ste 400, Valley Village, CA 91607 |
| Shari Hoffman | Operations Director | shoffman@afmsagaftrafund.org | 4705 Laurel Canyon Blvd., Ste 400, Valley Village, CA 91607 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

© 2013 LexisNexis. All rights reserved.



2016

Dennis Dreith

AFM
&
SAG·AFTRA

Intellectual Property Rights Distribution Fund

# ROYALTY DISTRIBUTION COMPARISONS

Top to bottom study of royalty distributions, and impact of expanding the research floor

EXHIBIT 45
Deponent Joyce
Date 8/27/19 Rptr. LL
WWW.DEPOBOOKPRODUCTS.COM

CONFIDENTIAL - ATTORNEYS' EYES ONLY DEF00000909

Confidential DEFS_00042430

# Royalty Ranking Comparisons

## Royalties Distributed in 2016:

In preparation for a revision of the Distribution Guidelines, and a general review of the process the Trustees requested a study of average payments to performers on the bottom 10 recordings, middle 10 recordings and top 10 recordings during the most recent sound recording distribution. The following summarizes those findings for sound recording royalties distributed in 2016[1]:

**Bottom 10 Domestic Source/Collections Sound Recordings (ranked 11,955–11,964)**

- 10 recordings earned a total of $86.58
- There were a total of 64 (5 musicians/59 vocalists) performers on those recordings
- The average payment per recording was $1.35
- Vocalists were on 10 of the 10 recordings
- Musicians were on 1 of the 10 recordings
- The largest payment per recording was $9.43 for a vocalist (for a recording having 2 performers on it)
- The smallest payment per recording was $0.07 for a vocalist (for a recording containing 23 performers)
- A musician on the 1 bottom 10 recordings containing musicians received $0.12
- If the same vocalist was on every one of the bottom 10 recordings containing vocalists (i.e. all 10 tracks) they would have received $38.81
- Source year 2009, except last ranked recording with a source year of 2011

**Bottom 10 Foreign Source/Collections Sound Recordings[2] (ranked 953—962)**

- 10 recordings earned a total of $496.83
- There were a total of 104 performers on those recordings
- The average payment per recording was $4.78
- The largest payment per recording was $33.97 (for a recording with 1 performer)
- The smallest payment per recording was $1.42 (for a recording with 6 performers)
- If a performer[3] was on every one of the bottom 10 recordings they would have received $180.54

---

[1] The 2016 Distribution included sound recordings from multiple source years. While titles are researched as far down a particular year, the actual ranking for distributions may be a different ranking than the source year. Consequently, a recording ranked for example at 17,500 in 2014, may be on the 2016 distribution at 11,960.

[2] These categories may be under reported due to anomalies, discrepancies and omissions in the Sound Exchange reports that co-mingle foreign royalties with symphonic Featured Artist royalties. Consequently Foreign recordings in all categories are royalties primarily reported and paid directly by the foreign collectives.

[3] No distinction is made between a vocalist and a musician in foreign collections and distributions, with foreign collectives treating musicians and vocalists the same (e.g. a single distribution without segregating musician and vocalist payments into separate sub-funds).

CONFIDENTIAL - ATTORNEYS' EYES ONLY 

Confidential

**Middle 10 Domestic Source/Collections Sound Recordings (ranked 5,978—5,987)**

- 10 recordings earned a total of $12,428.87
- There were a total of 54 performers (46 musicians/8 vocalists) on those recordings
- Vocalists were on 5 of the 10 recordings
- Musicians were on 8 of the 10 recordings
- The average payment per recording was $248.58
- The largest payment per recording was $1,241.47 for vocalists (for a recording with 1 performer)
- The smallest payment per recording was $73.24 for a musician (for a recording with 17 performers)
- If the same vocalist was on every one of the middle 10 recordings containing a vocalist (i.e. 5 of the 10 tracks) they would have received $3670.96
- If the same musician was on every one of the middle 10 recordings containing a musician (i.e. 8 of the 10 tracks) they would have received $ 1,246.57
- Source years 2009 – 2015, with 2012 – 2015 as the primary source years

**Middle 10 Foreign Source/Collections Sound Recordings (ranked 477—486)**

- 10 recordings earned a total of $5,068.59
- There were a total of 157 performers on those recordings
- The average payment per recording was $41.83
- The largest payment per recording was $168.79 (for a recording with 3 performers)
- The smallest payment per recording was $10.51 (for a recording with 47 performers)
- If the same performer was on every one of the middle 10 recordings they would have received $666.17

**Top 10 Domestic Source/Collections Sound Recordings**

- 10 recordings earned a total of $1,406,070.25
- There were a total of 60 performers (32 musicians/28 vocalists)on those recordings
- Vocalists were on 10 of the top 10 recordings
- Musicians were on 10 of the top 10 recordings
- The average payment per recording was $21,631.85
- The largest payment per recording was $89,332.35 for a musician (for a recording with 2 vocalists and 1 musician)
- The smallest payment per recording was $7,553.47 for a musician (for a recording with 4 vocalists and 5 musicians)
- If the same musician was on every one of the top 10 recordings they would have received $262,098.37
- If the same vocalist was on every one of the top 10 recordings they would have received $379,758.13
- Primary source years are 2014 & 2015 with some titles also including royalties from source years 2012 & 2013

**Top 10 Foreign Source/Collections Sound Recordings**

- 10 recordings earned a total of $895,117.56
- There were a total of 808 performers on those recordings
- The average payment per recording was $1,107.82
- The largest payment per recording was $64,506.97 (for a recording with 6 performer)
- The smallest payment per recording was $73.20 (for a recording with 494 performers)
- If a performer was on every one of the top 10 recordings they would have received $259,778.45

## Sound Exchange Royalties Collected in 2015

While we are just now in the process of distributing the 2015 titles, looking solely at the 2015 royalties received from Sound Exchange does provide quite a different picture than looking at the 2016 Distribution which includes titles from multiple source years.

Looking at 2015 SX royalties you should first note the following:

| | |
|---|---|
| Total 2015 contributions: | 40,802,407 |
| Total 2015 titles reporting airplay: | 72,777,795 |
| 2015 likely titles reporting airplay after combining exact matches: | 6,004,769 |

Putting it simply, approximately $41M in collections represents nearly 72 million lines of data for 6 million discreet sound recordings.

Based on past experience we also can extrapolate that approximately 42% of the sound recordings in the top 20,000 recordings are either all featured artists or no credits can be found. Extrapolations beyond 20,000 sound recordings are based on the same assumptions.

The following table depicts the amounts generated for sound recordings at different plateaus[4]:

| Rank | Contributions at rank ($) | Cumulative contributions ($) |
|---|---|---|
| 1 | 46034 | $46,034 |
| 500 | 5489 | $4,873,382 |
| 1,000 | 3690 | $7,109,073 |
| 5,000 | 1189 | $14,877,460 |
| 10,000 | 659 | $19,240,018 |
| 15,000 | 456 | $21,965,999 |
| 20,000 | 345 | $23,946,491 |
| 25,000 | 276 | $25,489,625 |
| 30,000 | 229 | $26,746,987 |
| 35,000 | 194 | $27,800,690 |
| 40,000 | 166 | $28,697,981 |
| 6,000,000 | 0.01 | $40,802,407 |

[4] The amounts in this table are allocated among all sound recordings irrespective of whether the sound recordings contain non-featured performers, as well as combines vocalist and musician payments.

The following graph[5] depicts the same information as the table, and illustrates how rapidly the royalties decline from the number 1 ranked recording to the number 500 ranked recording. Additional steep declines continue from the 500 ranked recording to the 10,000 ranked recording and flatten with a gradual decline thereafter.

**Total Royalties vs. Ranking**

(*X* axis = total royalties (combined musician and vocalist) per recording; *Y* axis = sound recording ranking)

Based on the assumption that 42% of the recordings are Featured Artists only or no credits found[6] (i.e. do not contain a performance of any non-featured performers), researching all 6 million sound recordings would yield a total of 3,600,000 sound recordings containing non-featured performers. Reallocating the royalties on 6 million recordings to the 3.6 million sound recordings with non-featured performers would result in the following distribution (noted on the blue line in the comparison chart below).

[5] All amounts have musician and vocalist royalties combined.

[6] Based on statistical information gathered by the research staff comparing the number of sound recordings with non-featured performers occurring over the past several distributions (see Appendix A).

**Total Royalties vs. Ranking adjusted for Non-featured performers only**

(*X* axis = total royalties (combined musician and vocalist) per recording; *Y* axis = sound recording ranking)

While the goal of the Fund has always been to research as many sound recordings for each distribution as possible, making a determination on 6 million sound recordings as to which recordings contain non-featured performances, much less the identity of each such performer is, given the resources of the Fund just not feasible at this time. Nor would it be prudent to expend Fund resources to research vast numbers of sound recordings that would yield deminimus payments (in some cases down to a fraction of a penny).

In the early days of the Fund a simple formula was employed to determine how many sound recordings to make a distribution to while avoiding deminimus payments.[7] While this formula worked well for

---

[7] The number of sound recordings for each year upon which distributions shall be made from the Musicians' Subfund shall be determined in the following manner. For each year, the Fund shall review the top 100 Frequency Report ranked recordings, or the album listing of the top 100 SoundScan ranked recordings as applicable and determine the number of non-featured performers (musicians and vocalists combined) appearing on a recording. The largest number of non-featured performers appearing on a recording shall be M. The number of sound

CONFIDENTIAL - ATTORNEYS' EYES ONLY 

Confidential

many years, as collections increased significantly, the denominator was from 2 to 4, to 8, and above not so much to avoid deminimus payments but to keep the volume of research on prospective sound recordings to a manageable number. As the Fund's database has expanded, the number of previously researched recordings that are also included in a new distribution has increased (generally 10-15%) enabling research of additional titles. For the 2016 royalties, it is anticipated that the staff will be able to research the top 20,000 recordings. Assuming that 42%[8] of the recordings researched will not contain non-featured performances, researching 20,000 recordings will yield a distribution on approximately 12,000 discrete recordings. The following chart depicts the reallocation of royalties with research terminating at 20,000 recordings.

**Results of research on the top 20,000 sound recordings**

recordings upon which distributions shall be made for each year shall be the Distributable Amount for that year divided by 2M (or a higher multiplier if necessary to avoid an inordinate number of recordings allocated minimus amounts). The resulting number shall be the number of sound recordings upon which a distribution shall be made for that year, starting from the Frequency Report top-ranked sound recording on the sound recording list. For example, if Distributable Amount equals $1million and M=50 then the number of sound recordings subject to a distribution would be 1,000,000/ 100 (2M) = 10,000. In other words, the distribution will be made to the top 10,000 ranked sound recordings on the Frequency Report recording list for that year.

[8] Average of past distributions

Increasing the distribution floor beyond the current floor of 20,000 titles is both a short and long term goal of the Fund. Without doubt, this is an achievable goal at a future date assuming collections and resources (both staff and infrastructure) continue to increase along with the growth and increased sophistication of the Fund's database and computer system. The following graph depicts a comparison between a research floor of 20k and one of 40k (which would yield a projected distribution to approximately 24,000 discrete sound recordings.

**Comparison of 20k to 40k Research Floor**

The following bar graph depicts the same information but with a different view. Note that royalties for the top recordings (most dramatically the top 500) are increased substantially but that from 12,000 to 24,000 the royalty payments flatten considerably (especially when considering that the amounts listed are vocalists and musician royalties combined). At the 24,000 unit level musician payments would be $153 for the sound recording (less administrative fees) leaving approximately $130 available for distribution for the recording. While this may still seem significant, this may be divided among a large number of musicians.

**Comparison of 20k to 40k Research Floor**

Perhaps the more interesting comparison is to look at a distribution based on a 40k floor, but with broader categories. It is interesting to note that (prior to any adjustments) the top 10,000 recordings account for more than two thirds (67%) of the distribution, and that the top 500 recordings (22.4%) are more than 10,000 recordings between 10k and 20k, and more than the 20,000 recordings between 20k and 40k.

**Research to 40k (not adjusted for titles below 40k research floor)**

**Research to 40k (adjusted for titles below 40k research floor)**

## Getting to 40,000

Currently, researching 20,000 sound recordings for each distribution year is becoming the norm. However, this is not an activity accomplished without expenditure of considerable resources of staff and infrastructure, and one that takes 2 to 3 years to complete. To maximize the amounts distributed, the Fund's annual distribution includes several distribution years at one time. Previously, the Fund would concentrate on a single year before moving on to the next year. However, as the distributable amounts increased, so did the time it would take to complete the research and distributions, and over time a back-log of royalties began to pile up. To alleviate this, the Fund began to make distributions on multiple royalty years, matching titles and adding research, accounting, IS and IT staff. Consequently, the back-log was significantly reduced, and research increased the size of the database to facilitate additional matches going forward.

With each year, the Fund has increased the number of recordings researched, and certainly has a goal to continue along this path, and will eventually reach 40,000 recordings and beyond. However, before embarking on the path to accelerate this endeavor, there are several factors to consider.

1. The Fund could extend the time to research each distribution year. However, this would no doubt result in a back-log of royalties as current years would pile up while the research staff worked its way down the list to reach 40,000 (or even a lesser number) for each distribution year;
2. The Fund could hire additional staff. However, considering that it takes the entire staff to reach the current floor of 20k recordings, the additional staff required would require another 8 to 10 researchers, one more accounting staff, and at least one IS staff, plus additional office space, computers and furniture. The additional cost of this could reach $1million or more annually. Plus the training time for the additional staff would require considerable time, slowing the research process the first year of additional staffing;
3. Considering, that the amount of royalties to distribute will be roughly $5.7 after the deduction admin expenses[9], is a significant increase in the budget of an additional $1million justifiable to distribute those royalties which would otherwise be distributed among the top 20,000 titles?
4. How many performers will be added to the distributions by going to 40,000, opposed to how many performers in the top 20,000 will be included in the recordings between 20,000 and 40,000? If a significant number of performers are the same, then we will make distributions on a greater number of sound recordings, but actually reduce the amount of payments to a potentially large body of performers. Of course, there is no way to know this number until the research is completed on the bottom 40,000 sound recordings.

In light of the foregoing, the Trustees will need to consider the options presented here to determine if it is the most prudent course of action for the Fund to continue on its current path to gradually increase the number of sound recordings researched on each distribution utilizing the current resources, and gradually adding resources to expand the distributions in an orderly measured manner, or to take more drastic measures along the lines detailed above, or recommend other alternatives.

[9] $6,74,116 minus approximately 13% admin fees

## Acknowledgements

Report compiled, drafted, and edited by Dennis Dreith, Executive Director

Additional data and supporting materials for this Report prepared and supplied by:

Andrea D'Sylva, Senior Programmer Analyst
Lorena Hirsch, Director, Applications Software Development
Shari Hoffman, COO
Hank Van Sickle, Repertoire Manager

Respectfully submitted, December 27, 2016
Dennis Dreith
Executive Director

Page | 12

CONFIDENTIAL - ATTORNEYS' EYES ONLY DEF00000921

Confidential DEFS_00042442

# Appendix A

Prepared by Hank Van Sickle

2015 DPR data from SX; Effect of researching deeper into the data on distribution multipliers

Total 2015 contributions: 40,802,407

Total 2015 titles reporting airplay: 72,777,795

2015 likely titles reporting airplay after combining exact matches: 6,004,769

| Rank | Contributions at rank ($) | Cumulative contributions ($) | % of total contributions | Additional % contributions | # times these titles reported | % of total titles researched | avg # times title reported | $ left below stopping point | A & C $ in research group (42%) | total rolled in $ | # titles distributed to (60%NFA's) | rolled in $/Cumul. $ | top paying title | bottom paying title | Multiplier |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 46,034 | 46,034 | 0.1 | | 21 | 0.0 | 21.0 | 40,756,373 | 0 | 40,756,373 | 0 | 885.35 | 40,802,407 | 40,802,407 | 886.35 |
| 500 | 5,489 | 4,873,382 | 11.9 | 11.8 | 7,240 | 0.0 | 14.5 | 35,929,025 | 2,046,820 | 37,975,846 | 300 | 7.79 | 404,754 | 48,262 | 8.79 |
| 1,000 | 3,690 | 7,109,073 | 17.4 | 5.5 | 14,142 | 0.0 | 14.1 | 33,693,334 | 2,985,811 | 36,679,145 | 600 | 5.16 | 283,546 | 22,728 | 6.16 |
| 5,000 | 1,189 | 14,877,460 | 36.5 | 19.0 | 69,715 | 0.1 | 13.9 | 25,924,947 | 6,248,533 | 32,173,480 | 3,000 | 2.16 | 145,586 | 3,760 | 3.16 |
| 10,000 | 659 | 19,240,018 | 47.2 | 10.7 | 135,517 | 0.2 | 13.6 | 21,562,389 | 8,080,808 | 29,643,197 | 6,000 | 1.54 | 116,959 | 1,674 | 2.54 |
| 15,000 | 456 | 21,965,999 | 53.8 | 6.7 | 199,971 | 0.3 | 13.3 | 18,836,408 | 9,225,720 | 28,062,128 | 9,000 | 1.28 | 104,844 | 1,039 | 2.28 |
| 20,000 | 345 | 23,946,491 | 58.7 | 4.9 | 262,122 | 0.4 | 13.1 | 16,855,916 | 10,057,526 | 26,913,442 | 12,000 | 1.12 | 97,772 | 733 | 2.12 |
| 25,000 | 276 | 25,489,625 | 62.5 | 3.8 | 321,718 | 0.4 | 12.9 | 15,312,782 | 10,705,643 | 26,018,425 | 15,000 | 1.02 | 93,023 | 558 | 2.02 |
| 30,000 | 229 | 26,746,987 | 65.6 | 3.1 | 381,537 | 0.5 | 12.7 | 14,055,420 | 11,233,735 | 25,289,155 | 18,000 | 0.95 | 89,559 | 446 | 1.95 |
| 35,000 | 194 | 27,800,690 | 68.1 | 2.6 | 440,771 | 0.6 | 12.6 | 13,001,717 | 11,676,290 | 24,678,007 | 21,000 | 0.89 | 86,897 | 366 | 1.89 |
| 40,000 | 166 | 28,697,981 | 70.3 | 2.2 | 499,675 | 0.7 | 12.5 | 12,104,426 | 12,053,152 | 24,157,578 | 24,000 | 0.84 | 84,785 | 306 | 1.84 |
| 6,000,000 | 0.01 | 40,802,407 | 100.0 | 29.7 | 72,777,795 | 100.0 | 12.1 | 0 | 17,137,011 | 17,137,011 | 3,600,000 | 0.42 | 65,368 | 0 | 1.42 |
| | | | | | | | | | | | | | | | |
| | AS400: | no of titles | % of SR singles | | | | | | | | | | 97,771.58 | $13,609.42 | 13.92% |
| | total SR titles | 77,285 | | | | | | | | | | | 86,897.28 | | |
| | total SR singles | 49,357 | 100.0 | | | | | | | | | | | | |
| | "C" SR singles | 7,621 | 15.4 | | | | | | | | | | | | |
| | "A" SR singles | 12,999 | 26.3 | 42% C's and A's | | | | | | | | | | | |
| | "F" SR singles | 24,476 | 49.6 | | | | | | | | | | | | |
| | "H" SR singles | 1,417 | 2.9 | | | | | | | | | | | | |
| | "R", "P", "N", " " | 2,705 | 5.5 | | | | | | | | | | | | |

# EXHIBIT 12

UNITED STATES DISTRICT COURT
FOR THE
CENTRAL DISTRICT OF CALIFORNIA

--------------------------x

| | |
|---|---|
| KEVIN RISTO, Plaintiff, v. SCREEN ACTORS GUILD-AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS, et al., Defendants. | Civil Action No. 2:18-cv-07241-CAS-PLA |

--------------------------x

REMOTE VIDEOTAPED DEPOSITION OF JENNIFER LeBLANC

THURSDAY, JULY 23, 2020

10:05 A.M. PACIFIC TIME

Job No.: 249294

Pages: 1 - 164

Reported by: Leslie A. Todd, CSR No. 5129 and RPR

A P P E A R A N C E S

ON BEHALF OF PLAINTIFF:

MARIANA McCONNELL, ESQUIRE
NICHOLAS BRANCOLINI, ESQUIRE
KIESEL LAW, LLP
8648 Wilshire Boulevard
Beverly Hills, California 90211
(310) 854-4444

DANIEL B. LIFSCHITZ, ESQUIRE
JOHNSON & JOHNSON, LLP
439 North Canon Drive
Beverly Hills, California 90210
(310) 975-1080

ON BEHALF OF DEFENDANTS AND THE WITNESS:

ANDREW J. THOMAS, ESQUIRE
CAMILA A. CONNOLLY, ESQUIRE
JENNER & BLOCK
633 West 5th Street
Suite 3600
Los Angeles, California 90071-2054
(213) 239-5100

ALSO PRESENT:

LARRY MAHER, Videographer

Johnson and Johnson, for the plaintiff.

MR. THOMAS: Andrew Thomas from Jenner & Block, for the witness and the defendants.

MS. CONNOLLY: Camila Connolly from Jenner & Block, for the witness and the defendants.

THE VIDEOGRAPHER: The court reporter is Leslie Todd, and she will now swear in the witness.

Whereupon,

JENNIFER LeBLANC,

having been first duly sworn, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MS. McCONNELL:

Q Good morning, Ms. LeBlanc. Can you please state and spell your full name for the record?

A Jennifer LeBlanc, J-E-N-N-I-F-E-R, L-E-B-L-A-N-C.

Q Have you used any other names over the last 20 or so years?

A No.

Q Have you had your deposition taken before?

with the performance evaluation?

A He didn't.

Q Did he review that performance evaluation after you brought it to his attention?

A I gave it to him. I don't know if he read it.

Q Did he take any action after you gave him that performance review?

A I can't say what he did, beyond what he told me to do.

Q Okay. What did he tell you to do?

A He told me to take the evaluation and put it on the corner of my desk.

Q What does that mean?

A It means don't worry about it.

Q Okay. Got it.

You were explaining to us earlier that one of the cost-cutting measures that you implemented at the Fund was related to the service agreement with SCDF.

Do you remember telling us about that?

A SRDF.

Q SRDF. Can you tell us a little bit more about what that service agreement was?

A The -- so SRDF is a fund that -- where

-- it's for vocalists only, so it doesn't involve AFM. It's entirely SAG-AFTRA. And the main fund, the employees of this fund we've been talking about today, provided all the same services to that fund, in terms of collecting the distributions, reporting on them, doing the research, and then ultimately processing the distributions to those vocalists.

So it was basically a shared service. So there was an agreement set up that gave the Fund employees and its management the authority to do that work.

Q I think I understand. So the Fund employees were doing their day-to-day tasks, and those tasks were being performed equally for the Fund's business and also for SRDF's business; is that correct?

A Equally in terms of --

MR. THOMAS: Objection. I think that slightly misstates the testimony, and lacks foundation, but the witness can explain.

THE WITNESS: The services provided were the same, and the scale was less because the Fund itself is -- was smaller at the time.

BY MS. McCONNELL:

that the actual tax associated with running the Fund should -- should be the same.

Q Right. Does the SRDF have a union tax?

A It does not.

MR. THOMAS: Objection, vague.

BY MS. McCONNELL:

Q Did you understand what I meant by the question, Ms. LeBlanc?

A Yes.

Q Okay. Let's turn, then, to what we call the services agreement, and the 3 percent service fee.

When you first started at the Fund, how did you learn about the 3 percent service fee?

A Through conversations with my staff, with my controller.

Q Who was your controller at the time?

A Nancy Carney.

Q Do you remember what, if anything, Nancy Carney told you about the service fee?

A She -- we were walking through the distribution, all the steps in creating the distribution, the math behind it. And it came up in a discussion about the process.

Q Okay. Were you surprised to hear about

worked for the Fund, did you gain an understanding of what benefits the Fund was receiving from the unions in return for the 3 percent service fee?

A Can you repeat that?

Q Yeah, at any time while you were at the Fund, did you get an understanding of what benefits the Fund was receiving in exchange for the 3 percent service fee?

A The general understanding is the Fund -- the unions were helping provide information that would help us identify performers.

Q Did you look into that any more? Did you do any sort of analysis on what the information was that was being provided from the unions to the Fund?

A I did not.

Q Did you ask anyone at the Fund to do any investigations into that?

A I did not.

Q Did you ask anyone at the Fund whether any sort of allocation methodology was performed at the unions, to see how much the value of services were that were being provided from the unions to the Fund?

MR. THOMAS: Objection, vague, and lacks

foundation.

THE WITNESS: Can you repeat that question?

BY MS. McCONNELL:

Q Yeah. Did you ask anyone at the unions or the Fund whether there was an allocation methodology performed at the union to figure out what the value of the services were?

MR. THOMAS: Same objections.

THE WITNESS: I did not.

BY MS. McCONNELL:

Q Did you ask if a time and materials study was performed at the unions, to see whether the services that they were performing was being done for the benefit of their own membership?

A I did not ask that question.

Q Do you know whether it was performed? Let me try strike -- let me try again. Sorry. Let me cut you off a little.

Do you know whether a time and materials study was performed at the unions?

A I am not aware of a time and materials study.

Q Do you know how many employees at the unions are working on compiling the database that

you referred to?

A I do not.

Q Did you ever look into what the fair market value of the database was that was purportedly being provided by the unions to the Fund?

MR. THOMAS: I'm going to object that it's vague and lacks foundation, and misstates the facts on the record, but the witness can answer.

THE WITNESS: I did not.

BY MS. McCONNELL:

Q And I think I asked you if you did it. Did you ever ask anyone else to look into the fair market value of what was being provided?

A I did not.

Q At any time while you were working for the Fund, did you think that the service fee should be reduced?

A Yes.

Q When did you gain that understanding?

A When did I gain that opinion?

MR. THOMAS: Objection, vague.

BY MS. McCONNELL:

Q Yeah. When did you -- yeah, so I asked you, at any time while you were working for the

Fund, did you think that the service fee should be reduced, and you said, yes. And when did you think that?

A When this lawsuit got on my radar.

Q When was that? You said last year?

A Yes.

Q At any time before that, did you think that the service fee should be reduced?

A It wasn't at the forefront of my mind, no.

Q Right. After you saw our lawsuit, you developed the understanding that the service fee should be reduced. Is that your testimony?

MR. THOMAS: Objection. I think that misstates her testimony slightly, but it's also vague and ambiguous.

MS. McCONNELL: Okay.

BY MS. McCONNELL:

Q Please tell us, Ms. LeBlanc.

A Do you mind restating the question?

Q I think so. I think you told us that after seeing our lawsuit, you developed the understanding that the service fee should be reduced; is that correct?

MR. THOMAS: Same objections.

THE WITNESS: I thought it might be -- it might be worth looking into.

BY MS. McCONNELL:

Q Why is that?

A Because the -- the main thing of the service fee is the percent of -- the whole notion of it being calculated as a percent of the distribution is not the way a businessperson would approach that. There's just no foundation for it. So at minimum, it should have been thought about from an analytical perspective, about what are the services provided, and how can they -- how can you have a greater alignment between those services and the value of the services.

Q While you were at the Fund, did you tell anyone what you thought about the services fee?

A Yes. Yes.

Q Who did you tell?

A My boss.

Q Who was that?

A Stefanie Taub.

Q She -- I'll just ask it as an open-ended question. Did she become the executive director for the Fund at a certain point in time?

A Her title was repurposed to CEO.

came up as a tangential subject.

Q Do you recall which trustees it came up as a tangential subject with?

A Ray Hair.

Q Do you recall when that conversation happened?

A It happened after Dennis left, and before Stefanie started.

Q What do you recall about that conversation?

A I -- I told Ray I was concerned about the distributions payable balance growing, and I was concerned about the Fund's process of distributing royalties to placeholder performers, meaning people where we didn't have enough information to actually send them a check. And I -- I was really advocating to stop that process, because it -- it really isn't helpful for many reasons. And he -- his pushback to me was that by doing that, it would increase the gross dollar amount of the union fee.

Q So this -- and I think I have an exhibit later on that we could get to, but this is the difference between -- let me find it -- undistributed royalties and unclaimed royalties;

is that correct?

A Unclaimed royalties is what I'm talking about, is when a distribution was made, but to a person that isn't really an identified person.

Q Correct. So the Fund receives that money as a royalty, but you have no idea -- the Fund has no idea who to distribute that to; is that correct?

MR. THOMAS: Objection, lacks foundation and vague.

BY MS. McCONNELL:

Q Did I characterize that correctly?

A Well, every time the Fund receives a royalty, we don't know who it goes to. That's what the research process is. But once money goes through a research process and the researchers still say they don't know who it's for, where they have some of the information, but not all, so for example, they know who the performer is, but they don't have a Social Security number, then it can't be distributed to that person.

There's a certain minimum amount of information that's required to actually get that payment into the performer's hands. And if there is one of those elements that's not in place, then

the money simply sits on the Fund's balance sheet.

Q And in that conversation with Ray Hair, you were expressing -- I suppose I'll let you answer it. What were you telling Ray Hair in that conversation about the unclaimed royalty amounts?

A I was telling him that the optics of having such a large amount on the balance sheet for unclaimed distributions was really problematic. Problematic for the unions as well as the Fund, because it's the biggest number on the balance sheet, and we should really be thinking about how to get that number down, not up.

And so the way to decrease the number would be to stop that process of quote/unquote distributing money that really doesn't go anywhere.

Q And what was Ray Hair's response to you?

A He said, well, if we do that, then it reduces the union fee.

Q And that's something that he didn't want to do, I assume?

A Correct.

Q Were you surprised by his response?

A Actually, I was.

A Okay.
Q Do you recall having this conversation with the trustees?
A Let me review.
Q Yeah.
A I don't remember the conversation, specifically, but I -- I understand the gist of the meeting minutes.
Q On the annual reports -- and you're welcome to go back and let me know -- do the reports show the amounts for the undistributed and unclaimed royalties?
A The financial statements?
Q Yes.
A The financial statements show unclaimed.
Q For unclaimed royalty amounts, how does the Fund maintain that amount?
A It's in the accounting records.
Q Is it -- are those funds placed in a separate account, or is it just in the general fund of the Fund?
MR. THOMAS: Objection, vague.
THE WITNESS: There's no separate bank account.
BY MS. McCONNELL:

Q Okay. What about the undistributed royalty amounts, where are those maintained?
A It's the same bank account.
Q What about the distributable amounts, meaning the -- well, strike that.
What about the amounts payable to performers who you have contact information for and you're intending to make a payment to, where are those funds maintained?
A It's -- the same bank account.
Q Okay. At the end of every financial year, what, if anything, does the Fund do with the amounts attributed to undistributed or unclaimed royalties?
A There is no movement of cash.
Q It stays in the same account?
A Yes.
Q And the liabilities of the Fund -- by that, I just mean all the administrative costs -- are those taken from that same account as well?
A Yes.
Q Is there any care taken by the Fund to maintain an adequate cash reserve in that account in case unclaimed performers come forward to claim their royalty payments?

MR. THOMAS: Objection, vague, but you can answer.

THE WITNESS: Can you repeat the question, please?

BY MS. McCONNELL:

Q Yeah. Are there any steps -- well, I don't like that word.

Does the Fund ensure that they maintain adequate balances in that account for performers who may come forward at a later date to claim their royalty payments?

MR. THOMAS: Same objections, lacks foundation.

THE WITNESS: The Fund has a very, very high balance of unclaimed royalties, so there's no -- there's no need to set any money aside.

BY MS. McCONNELL:

Q Okay. Because they maintain adequate -- I don't want to use the word cash reserves, and I don't mean that in a term of art, but they maintain adequate cash reserves, such that if someone came forward, they would have enough money to pay them?

MR. THOMAS: Same objections.

THE WITNESS: Yes, the Fund is -- the

foundation, calls for speculation.

THE WITNESS: Can you repeat the question?

BY MS. McCONNELL:

Q Is it your opinion that the service fee is the way that the AFM funds their union?

MR. THOMAS: Same objection, lacks foundation, calls for speculation.

THE WITNESS: The service fee is a source of revenue for AFM.

BY MS. McCONNELL:

Q Do you think that the service fee is justified?

MR. THOMAS: Same objections, lacks foundation.

THE WITNESS: The service fee as a concept is justified.

BY MS. McCONNELL:

Q Do you think that the amount of the service fee is justified?

MR. THOMAS: Same objections.

THE WITNESS: Based on the services provided, no.

MS. McCONNELL: Okay. Let's just take a quick break, and maybe we can go to our breakout

CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

The undersigned Certified Shorthand Reporter does hereby certify:

That the foregoing proceeding was taken before me remotely via Zoom videoconferencing at the time therein set forth, at which time the witness was duly sworn; That the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed, said transcript being a true and correct copy of my shorthand notes thereof; That the dismantling of the original transcript will void the reporter's certificate.

In witness thereof, I have subscribed my name this date: August 3, 2020.

Leslie A Todd

LESLIE A. TODD, CSR, RPR

Certificate No. 5129

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

# EXHIBIT 13

Confidential Pursuant to Protective Order

IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| KEVIN RISTO, on behalf of himself and all others similarly situated, | ) | |
| Plaintiffs, | ) | CASE NO. |
| vs. | ) | 2:18-cv-07241-CAS-PLA |
| SCREEN ACTORS GUILD-AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS; a Delaware corporation; AMERICAN FEDERATION OF MUSICIANS OF THE UNITED STATES AND CANADA, a California nonprofit corporation; et al., | ) | |
| Defendants. | ) | |

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Tuesday, April 27, 2021

Remote videotaped deposition of DAVID NOLTE, conducted at the location of the witness in Los Angeles, California, commencing at 9:08 a.m. and ending at 4:03 p.m., on the above date, before SHARI BOLTON, CSR 9291.

REMOTE APPEARANCES:

For Plaintiffs:

KIESEL LAW LLP
BY: MARIANA McCONNELL, ESQ.
NICHOLAS BRANCOLINI, ESQ.
8648 Wilshire Boulevard
Beverly Hills, California 90211
(310) 854-4444
mcconnell@kiesel.law
brancolini@kiesel.law
JOHNSON AND JOHNSON, LLP
BY: DANIEL B. LIFSCHITZ, ESQ.
439 North Canon Drive
Beverly Hills, California 90210
(310) 975-1080

For Defendants:

JENNER & BLOCK
BY: ANDREW THOMAS, ESQ.
ANDREW G. SULLIVAN, ESQ.
633 West 5th Street, Suite 3600
Los Angeles, California 90071
(213) 239-5155
ajthomas@jenner.com
agsullivan@jenner.com

Videographer:

DAVID KIM

LOS ANGELES, CALIFORNIA

TUESDAY, APRIL 27, 2021, 9:08 A.M.

THE VIDEOGRAPHER: We are now on the record. My name is David Kim. I'm a videographer for Golkow Litigation Services.

Today's date is April 27, 2021, and the time is 9:08 a.m.

This remote video deposition is being held in the matter of Risto v. Screen Actors Guild-American Federation of Television and Radio Artists for the Superior Court -- no -- for the U.S. District Court for the Central District of California.

The deponent is David Nolte.

All parties to this deposition are appearing remotely and have agreed to the witness being sworn in remotely.

Due to the nature of remote reporting, please pause briefly before speaking to ensure all parties are heard completely.

Will counsel please identify themselves.

MS. McCONNELL: Mariana McConnell from Kiesel Law for plaintiff and the class.

MR. BRANCOLINI: Nico Brancolini from Kiesel Law on behalf of plaintiff and the class.

Q We can start there.

A I did not set the sample size of 50.

Q Okay. Did you provide any input on any other starting points for the study, including what -- what general group of titles to pull the 50 songs from?

A No.

Q Okay.

A Well, and the no -- well, hold on a minute. Your -- your question was compound. So the part that I was answering was the last half of your question, not the first half. So I -- let me say the same thing a different way.

I was not involved with the sample selection. That would be a more precise way of answering what I was intending just a second ago.

Q How -- generally speaking, how would you design a statistical study?

A How would I?

Q Yes.

MR. THOMAS: Objection; overbroad, vague, outside the scope.

THE WITNESS: If -- and -- and the sentence starts with "if," so you may not need to do this, but if one decided that they needed to follow the rules of inferential statistics, then one would need to have a

random sample and the sample size of that random sample would be a function of the confidence level, the precision intervals, and the variance within the population. And that would mathematically tell you what the sample size needed to be so that you could express conclusions using the science of inferential statistics.

BY MS. McCONNELL:

Q Is it correct that when you first set out to do a statistical study you need to identify a hypothesis?

A Okay. I mean, yeah, you need to know what you're testing, otherwise -- you're right, I mean, I'm -- I'm presuming that that's understood.

Q Okay. Do you collect data and identify a sample subset?

A You do use a sample which I think you're calling a sample subset. So sure, a sample is a subset of the entire population.

Q What are the principles of sample selection?

A Perhaps I haven't -- well, I probably don't understand your question. But I -- but I would refer you to the earlier answer I gave you in terms of how one would go about designing a -- a test if you wanted to follow inferential statistic requirements.

Q Okay. What are the consequences of having a poor sample selection?

A Well, I don't know what "poor" is so I -- so I'm afraid I can't answer the question without knowing what "poor" is. I could substitute my own definition of "poor," but I don't know what you have in mind.

Q What are the consequences of having a not statistically significant sample selection?

A Then you cannot draw statistical inferences expressed in terms of precisions and confidence levels.

Q What are the consequences of having a sample that is not representative of the whole?

A Well, then -- then you would have what's commonly called a sample error and so the conclusions -- which, by the way, can happen even if you got a statistically valid sample. In other words, you follow the rules you -- you could have a sample error, and the -- the effect of having a sample error is that your conclusions expressed in terms of inferential statistics are incorrect.

Q In your opinion, is it important for a sample to be representative of the larger dataset from which it's drawn?

A Yes.

Q And is it important, in your opinion, to obtain a random sample?

A A random sample is a requirement of -- of -- of any -- following any of the requirements of inferential statistics. So if you're going to express your conclusions in a manner consistent with inferential statistics the sample must be randomly selected.

Q Is it possible to have a sample that is representative if it is not random?

A Yes.

Q How? How is it possible?

A How?

Q Uh-huh.

A Okay. Well, I'm -- I'm looking at my screen and in my screen I got four people and then a whole bunch of people that aren't shown. But you're shown. Mr. Thomas is shown. The reporter is shown. And I'm shown. There's nothing random about those four observations.

And by the way, it's also a pretty small sample size. It's only four. Nevertheless, there are two women and two men. And so if we were to look at this sample of -- nonrandom sample of four people and say, hey, what do you think the population of men

Q You're talking specifically about the 50-song sample again, I'm assuming. But if you're saying that you didn't use inferential statistics to come to your conclusions how are you confident that the 50-song sample is representative?

A I've not -- I've not reached any conclusion regarding it being representative. The Fund made the sample. The Fund indicated that in their mind it was random and in their mind it was sufficiently large to accomplish its purpose. And so I did my work with the results of that sample.

Q Are you able to extrapolate results on the larger track list based on the 50-song sample?

A One can extrapolate it. You will lose the opportunity to do so with the precision and confidence parameter. So I've -- I've not expressed anything with the precision and confidence level because of what you just mentioned. But, yeah, you certainly can extrapolate it, yes. You -- you don't need -- you don't need to use inferential statistics to do an extrapolation.

Q Why not?

A It's definitionally you don't. I mean, look, look, look, look. Let me give you an example.

Let's say we go back -- and this is not luck.

I -- you know, we were quarreling about, you know, my luck example with the four people that are on my screen. But let's say instead I say let's do a test.

We want to figure out how many fingers each human has. And so I say, okay, everyone put up their fingers and we'll count them and I haven't seen your fingers yet so I don't know what the answers are, but I can tell you I have ten fingers and I'm willing to wager that the other three people I was describing have ten fingers. So then I've got four observations of ten fingers. And I would say, well, based on that, I will extrapolate that humans have ten fingers.

Now, there's nothing following inferential statistics, but I don't think anybody is going to doubt the conclusion that humans have ten fingers. And that's an example of what -- how you could do that without using inferential statistics.

Q Who devised the 50-song study?

A You said who devised it?

Q I did.

A That assumes that there was a single person that devised it so I -- I -- the Fund was certainly involved in coming up with that, and I'm sure they would say I had some input.

Q What input did you have?

A I had a conversation with Jenner & Block and Fund representatives about what information the Fund had regarding what happens when they don't use the union data. And they -- this is my characterization. I'm not trying to put words in anyone's mouth.

But the impression I got back was, golly, that's an awful stupid question, why would we ever waste our time trying to figure out the impact of data that we know to be valuable and that we use every day of the week.

I said, well, because -- and I answered and said, well, that's because that's what the plaintiff thinks you should be doing. They think either the union should be giving away the data for free or you should not be using it. And those are the two options that I think the -- the plaintiff is proposing.

And my question is, have you ever really contemplated that, that as a possibility, and they said, no, we just told you that was a stupid question. I said, well, okay, but that's the stupid question that the plaintiffs are asking so maybe we should try to answer their question.

And so they went off and did the 50-sample test and it was -- I suspect I was the cause of it initially, although they are the ones that -- that

initially did the sample and -- and did the work because that's of course what they do for a living. And then they gave it back to me and I did the work that's reported in my report.

So when you say who devised it, I did some of the calculations at the end. And -- and I think I was probably the guy who caused the thing to come up to begin with and they were the ones that implemented the research because they of course have the researchers on staff and I don't research this and couldn't do it near as fast as they can.

Q You are aware that there's several instances where the unions don't have session reports for tracks and the Fund needs to do all the research by themselves, right?

A I think what you're asking me is, is it true that the 100 percent of the nonfeatured performers are not covered by session reports and -- I think that's what you're asking me. And I think everybody's acknowledged that that's the case.

Q Okay. I don't need to know that it's true. I don't need you to answer whether it's true or not because I know that it's true.

So my question to you is, were you aware of the fact that the unions don't have session reports

for all the nonfeatured performers that the Fund needs to pay?

A I'm sure it's in my report somewhere if -- if -- that -- that's a basic starting point for much of this dispute. So I -- I'm sure I could find something in the report that says just that. But, yes, I'm -- I was aware of that.

Q Were you consulted at all in the methodology of the study?

A Well, I was not consulted on how to research. The folks at the Fund are very confident they know how to research, and they did not ask me any questions about how to research.

Q If you were going to create an ideal inferential statistic study of these songs, how would you go about doing that?

MR. THOMAS: Object to the form.

THE WITNESS: Well, you said "ideal." The whole point of inferential statistics is to not do something ideal. That's the -- so when you say ideal inferential statistics, it's kind of like, well --

BY MS. McCONNELL:

Q Okay. Let me try it again.

A We're not communicating.

Q Thank you.

If you were going to create an inferential statistics study of these songs, how would you go about doing that?

A I would do the things that I described in response to the very first question on this line of questioning where I described inferential statistics and how one goes about it.

Q Would you look to a single year or multiple years?

A I have to give that some thought. What -- you probably -- there's more than one acceptable way of doing that. You could, for example, look at payments in a -- in a particular year and then for purposes of reporting errors, go back and look at life-to-death information. And there'd be nothing improper about that.

You -- you could also look at a database that has everything from the beginning of time and use that as your starting point. So I'm not sure it's an either/or situation. The question is whether whatever group you're using from which you select your samples, is that representative of the problem you're trying to solve.

Q Would it be more accurate to look at a sampling of songs over multiple years?

A Not necessarily. It depends what you were trying to solve. So let's say, for example, that what you were saying, as -- as the plaintiff has said, that, well, on a going-forward basis this -- this past information is not as important as it used to be, so we -- we think that it's more important to look at it on a going-forward basis. And plaintiff has certainly said that. Then if that were the case, then there'd be reason to look at more recent data in making your sample.

Q Can you think of any advantages to using only one year of data?

A I just gave you an advantage.

Q You talked about --

A So I guess the answer's, yes, I just answered that question.

Q Weren't you answering the question based on recent years. I said how about one year.

A Okay. You can substitute one year for recent years.

Q Okay. Footnote 12 on page 11 of your report, you write, "The Fund's selection process started with a list of 5,992 titles that had distributions in 2020 and had Union session reports. Starting approximately halfway through this list, the largest fifty of the

next one hundred sequential titles were selected."

So to start from, the Fund started with a list of tracks that all had session reports from the unions, right?

A That's what it says.

Q Do you know what the total amount of tracks in the pool was that was whittled down to the 5,992?

A I -- I'm -- I don't understand your question. If you're saying that if you went to the beginning of time would you get a larger collection, the answer is most certainly.

Q Thank you.

Do you know what that number is?

A No.

Q Okay.

A Although you could probably infer it. But the answer is, no, I don't know.

Q Okay. Is it the 136,000 number that was in that interrogatory response that we looked at earlier?

A It could be. That -- I mean, those -- those -- those are titles and, similarly, the titles in footnote 12 are -- they're both expressed in terms of titles.

Q Why didn't the Fund use the entire pool of titles to determine which tracks were researched using

union data as opposed to other sources?

A I'm sorry, someone's going to need to reread that question. Or let me give you a better answer. I can give you an answer.

You're asking me some -- about someone else's state of mind, as I understand this question, so upon reflection, even though I do not understand your question and would need to have it reread, the answer to the question, what is the Fund's state of mind, is, I don't know because I'm not the Fund.

Q Well, you were consulted to do the sample, weren't you?

A Yes, as I described before.

Q Right. Okay. So I'm asking you why didn't you use the entire pool of songs distributed in 2020 as opposed to whittling it down to 5,992 before then doing another sample of just 50?

A Well, first of all, I don't think your question summarizes accurately what was done, but -- but the answer, ultimately, to your question is, you said why didn't you, and "you" I think refers to David Nolte. So why didn't David Nolte do -- and then fill in whatever your question.

And the answer is, David Nolte didn't do that so you're asking the wrong fellow.

Q Okay. So what was done, then, by the Fund?

A The Fund did what this footnote 12 says.

Q Okay. How was the list of 5,992 songs ordered?

A My understanding, and it's not written here so I -- my recollection could be wrong, but my understanding is that it was ordered by size so that the biggest item was first and the smallest item was second and so from the vantage point of the person that was doing this, they wanted songs that were kind of typical. And typical meant halfway in the middle. And so that's how whoever decided to do this did that.

Q So what do you mean when you say "size"? Size, the number of performers?

A In other words, the -- the titles with the largest -- they were ordered -- the titles were ordered by dollar amounts of -- of -- hold on, I'm sorry, there's something happening here that -- I'm sorry, excuse me.

THE WITNESS: I -- I apologize but there's a problem that just arose. Can we take even just a minute?

MS. McCONNELL: Sure. We'll just wait here.

THE WITNESS: Yeah, I -- my apologies. This is not --

THE VIDEOGRAPHER: Should we go off the record, Counsel?

MS. McCONNELL: Sure.

THE VIDEOGRAPHER: We are now going off the record, and the time is 1:06 p.m.

(Recess.)

THE VIDEOGRAPHER: We are now going back on the record, and the time is 1:08 p.m.

BY MS. McCONNELL:

Q Okay. Before we took our break, I asked you what did you mean when you said size, and then I don't think you had finished your answer.

A Okay. My understanding is that the Fund obtained a -- a printout by title that was ordered by royalties to be distributed to nonfeatured performers. So that the largest title obtaining -- was listed first. I say largest, the largest in terms of the dollars to be distributed was first, and the smallest to be distributed was last.

I -- I don't actually have that report, but that was my understanding of what was being described. And so the folks who made the sample wanted something that was typical and so they went roughly to the middle of the list.

Q Was it your suggestion to order the list

based on size?

A I made no such suggestion.

Q Okay. And I think I might have asked you this. Forgive me.

Do you know what fraction of the whole 5,992 songs represent?

MR. THOMAS: Objection to the form.

THE WITNESS: Well, my understanding is that the whole is the 5,992, so, in other words, they -- for whatever parameters that were identified they said give us all of these. And that's what the starting point of the list was. So perhaps I don't understand your question.

BY MS. McCONNELL:

Q Yeah. Isn't the whole the total number of tracks that were distributed on in 2020?

A I -- I understood this to be a recent year. It was probably 2020, but I -- I couldn't even tell you that.

Q Okay. Isn't the whole the total number of tracks that were distributed on in the year that they were using?

A Where they had unions reports, yes. They -- they were -- see, the -- the whole idea was to figure out what would happen with and without union session

reports. So given that definition of the problem, you had to further limit it to -- to titles with -- with session reports.

Q Are you able to assume that the 5,992 songs were representative of the total songs distributed in that year?

A Are you asking me am I able to make that assumption?

Q Yes.

A I make no assumptions.

Q To determine what would happen with or without union session reports, would it matter if the 5,992 is out of 10,000 tracks versus 30,000 tracks?

MR. THOMAS: Objection; vague.

THE WITNESS: I -- I maybe don't understand your question. But here -- here's what I think you're asking me.

The Fund reports roughly 6,000. It's 8 shy of 6,000. So there's 6,000 titles. And you're saying, no, they're liars, it really wasn't 6,000, it should have been some other number but I don't -- you gave two numbers in your question.

If the Fund folks who were doing this are lying, well, then, I would not condone lying, and then I would -- I'd want to know more about it. But I've

not accused anybody of lying and so when they said that the -- they took everything that met their -- their sample parameters, I did not require that I -- I -- I start from scratch.

BY MS. McCONNELL:

Q Honestly, I don't know what you're even referring to about lying because I said nothing about lying and I'm -- and now you're saying, "I did not require that I start from scratch." So are you saying now that you did a different sample than the Fund? What do you mean when you're saying, "I did not require that I start from scratch"?

A I'm sorry if I misunderstood your question. But I understood your question to say there's 6,000 that they -- the Fund used but the real number's not 6,000, the real number is whatever -- and then I said, well, okay, I don't know where these new numbers come from, but if someone's lying and there really wasn't 6,000, then under your hypothetical question that the real number is more than twice what the Fund representatives told me, then they must be lying.

Q No.

A I didn't -- you're right, I didn't make that assumption. I didn't test it and -- and I didn't catch them in a lie, if that's what you're accusing

them of.

Q Yeah, we're obviously talking past each other. That's okay.

Is the utility of this sample data to determine what would happen with or without session reports?

A That is what's being tested, yes.

Q Okay. So in order -- and was it the point to extrapolate from this sample how it would work for the entire track list of songs in a given year?

A Yes, there's an extrapolation being done.

Q Okay. So isn't it important, then, to know how many songs were distributed in that given year?

A No, because it's being expressed as a percentage. So if it's being expressed as a percentage you could apply, or extrapolate, to use the word you were using, the percentage to a larger group and it's still -- the percentage doesn't change.

Q Okay. So what percentage of the total group is 5,992?

A 100 percent of whatever they were selecting from.

Q Okay. But how does that answer my question? What percentage of the total group of songs distributed in that year is 5,992?

A I don't have the number. Effectively what you're asking me is, is what -- well, how many nonunion -- or -- or how many tracks do not have union session reports, and the answer is, I don't know. I could --
Q Okay --
A I could -- I could ask based on the other information that's in here, but I don't -- I don't have that precise figure that I think you're seeking.
Q What was the significance of starting, quote, approximately halfway down that list?
A That was the explanation that was provided to me. I gave you at least on two prior answers the rationale that was expressed that I understood it to be. But I wasn't the one who did that.
Q Then the footnote, same footnote 12, says that they used, quote, "The largest 50 of the next 100." And does largest mean dollar value, dollar amount of distributions?
A Correct. So my -- look, and I apologize if it wasn't well expressed. But my understanding was that this starting point was some current period of distribution and the report had a year-to-date or a life-to-date amount on it. And -- and that -- that may have been a function of -- of available data in

the database.

I mean, frequently -- you know, we want to work in an ideal world where everything is available to us and it simply isn't. So using -- oftentimes using current periods gets you a -- a more desirable or a more accurate answer simply because of the constraints of the data.

But in any event, my understanding is that the report that was run included life-to-death amounts, and so they were able to pick the larger of those within the -- the sample, if you wish, the -- the first sample.

Q Okay. So if the -- if the 5,992 was originally ordered in terms of largest to smallest, as you described, and then you go halfway down and then you pick the next 50, why does the note again say picking the largest 50 of the next 100? Wouldn't it necessarily be numbers 51 to 100 because the list was ordered by largest to smallest to begin with?

A Well, first of all, you really are asking the wrong person. I -- I was not doing this, and I've told you that in response to probably every single question. But I can give you my understanding.

My understanding is that there were the data reported in this document or file, whatever it was,

included a current period, which was the -- the basis for initially looking at this, and then they had a life-to-death or origin-to-current period, or what -- however they labeled it, field. And within the 100 they selected another field that had the largest life to death. And that was their selection process.

Now, again, I wasn't doing this, and I wasn't directing it either. I was -- I was told about it after it was done.

Q Okay. And you don't know why the year was limited to only 2020, right?

A You used the word "know" and so the answer is, I -- I do not know that because I wasn't the one doing it.

Q Right. You were told about it after it was done?

A I'm sorry?

Q You said you were told about it after it was done, right?

A Correct. The -- the sample was created and the research was done and then I was told about the results.

Q Okay. Do you happen to know approximately how many songs in that 50-song sample were by country artists?

shorthanded that to a reasonable cost of what the Fund is paying. And -- and if that was confusing to you, you have my apologies.

MS. McCONNELL: Okay. Let's take a break. Ten minutes.

MR. THOMAS: Okay.

THE VIDEOGRAPHER: We are now going off the record, and the time is 3:43 p.m.

(Recess.)

THE VIDEOGRAPHER: We are now going back on the record, and the time is 3:55 p.m.

BY MS. McCONNELL:

Q Have you performed evaluation of the services purportedly provided by the unions to the Fund?

A Ms. McConnell, I want to answer that question, and I promise you I will, but I -- I didn't want to -- there was something I wanted to alert you to and I'm worried that I'm going to forget a second time.

There was an answer that I gave that accurately and honestly reflected my state of mind, but Mr. Sullivan said that it was not factually accurate and -- so because it's not factually accurate, even if it was my state of mind, I want to make certain that it is fixed.

It involves the footnote 12 involving how the samples were actually selected. And I gave you my understanding and I -- this footnote comes from Ms. Sandell's description of it. But I'm told that this may not have been artfully expressed, maybe by me, maybe by Ms. Sandell.

But in any event, the -- what Ms. Sandell really did was take the first 50 transactions from what she considered a random starting point. So my answers involving the existence of the highest 50 transactions from a group of 100 is actually not what Ms. Sandell did. At least that's what Mr. Sullivan told me. And so I wanted to correct that because I want you to have accurate information.

Q Okay. And again, you were not directing the step-by-step process for conducting this 50-song sample, right?

A Correct.

Q Okay. And now you're saying that Ms. Sandell -- strike that.

How were the 5,992 titles ordered?

A By dollar amount. There was no change in that.

Q Okay.

A The only change is that instead of saying

CERTIFICATE

I, SHARI BOLTON, Certified Shorthand Reporter, No. 9291, do hereby certify that prior to the commencement of the examination, the Deponent was duly remotely sworn by me to testify to the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a verbatim transcript of the testimony as taken stenographically by me at the time, place and on the date hereinbefore set forth, to the best of my ability.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

______________________________________

SHARI BOLTON

Certified Shorthand Reporter, No. 9291

Dated:________________________________

# EXHIBIT 14

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

KEVIN RISTO, on behalf of himself and all others similarly situated,

Plaintiff's,

vs.

CASE NO. 2:18-cv-07241-CAS-PLA

SCREEN ACTORS GUILD-AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS; a Delaware corporation; AMERICAN FEDERATION OF MUSICIANS OF THE UNITED STATES AND CANADA, a California nonprofit corporation, et al.,

Defendants.

\- - -

OCTOBER 29, 2020

\- - -

Remote videotaped deposition of JOHN PAINTING, conducted at the location of the witness in New York City, New York, commencing at 9:11 A.M., on the above date before Pamela Cotten, CSR, RDR, Certified Realtime Reporter, California Certificate No. 4497; New York Notary No. 01C06309443.

\- - -

GOLKOW LITIGATION SERVICES, INC.
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

A P P E A R A N C E S:

(All parties appearing remotely)

For the Plaintiffs:

KIESEL LAW LLP
BY: NICHOLAS BRANCOLINI, ESQUIRE
MARIANA A. McCONNELL, ESQUIRE
8648 Wilshire Boulevard
Beverly Hills, California 90211
310.854.4444
brancolini@kiesel.law
mcconnell@kiesel.law

JOHNSON & JOHNSON, LLP
BY: DANIEL B. LIFSCHITZ, ESQUIRE
NEVILLE L. JOHNSON, ESQUIRE
439 N. Canon Drive, Suite 200
Beverly Hills, California 90210
310.975.1080
dlifschitz@jjllplaw.com
njohnson@jjllplaw.com

For the Defendants:

JENNER & BLOCK
BY: ANDREW J. THOMAS, ESQUIRE
ANDREW G. SULLIVAN, ESQUIRE
ANNA LYONS, ESQUIRE
633 W. 5th Street, Suite 3600
Los Angeles, California 90071
213.239.5100
ajthomas@jenner.com
agsullivan@jenner.com
alyons@jenner.com

ALSO PRESENT:

RUSSELL NAYMARK, ESQUIRE
American Federation of Musicians
JOSEPH MOURGOS, Videographer

Pamela Cotten, and she will now administer the oath.

JOHN PAINTING,

called as a witness, and having been first duly sworn in remotely by the Certified Shorthand Reporter, was examined and testified as follows:

MR. LIFSCHITZ: Just to confirm, can everyone hear me right now?

MR. SULLIVAN: Yes.

MR. LIFSCHITZ: Fantastic. Good morning, everyone.

EXAMINATION

BY MR. LIFSCHITZ:

Q Could the deponent please state and spell his full name for the record.

A My name is John Painting. J-o-h-n. Painting is P-a-i-n-t-i-n-g.

Q Thank you very much.

So some housekeeping to begin. Have you ever had your deposition taken before?

A I have not.

Q Then we will discuss some basic admonitions to get you acquainted with the format.

THE WITNESS: The locals do share resources. For example, if a track that was recorded in Los Angeles is used on a television show in New York, then the Los Angeles local may have to provide a copy of the report form in order to get the musicians paid for the work in New York, but that wasn't what I was speaking to. I was speaking in terms of their dealings with the Fund, in which case there would be no situation where one local went through a second local in dealing with the AFM and SAG-AFTRA.

BY MR. LIFSCHITZ:

Q Understood.

So my understanding is that the L.A. and New York locals have their own electronic databases that they provide some of this information to the Fund through; is that correct?

A That is correct.

Q But no other locals have access to that database or those platforms?

A That is correct.

Q Got it.

So what does the AFM use the collective membership information of its members for, generally speaking?

A So, I mean, this includes addresses and email address contact information. Let's say, for example, a ratification vote comes up. We have just concluded bargaining the contract with some industry and, you know, we now have to look at wage data to see who is eligible to vote yea or nay on the new contract terms. The Federation needs to utilize its membership database to determine who is an active member who can vote on the contract, what their mailing address is and what their email address is, so that we are able to run a ratification vote in a timely manner.

The Federation maintains a monthly newsletter that goes out to all active members that is mailed to their home address.

Our finance department may utilize that information in case that a check needs to be cut to those musicians.

We do run what is called "new use" through the Federation. Just a brief primer on that topic, if a sound recording is used in a commercial announcement, for example, the musicians on that sound recording must be paid as if they did a commercial announcement session. So that is administered through the Federation. Our

department, our new use department, which is through electronic media, does the billing to the advertising agency for that, and occasionally our finance department will run the payroll to make sure the musicians get paid that money they are owed.

So all of those are the major reasons why the Federation is going to need direct and immediate access to who is a member and where they live.

Q And is any of that membership information collected solely for use by the Fund or is it generalist information that the AFM has overall use for?

A I mean, we are talking about home addresses here. So the AFM has general need for it. The Fund's need is to be able to find where people are. The Federation is the best place to have that for those who are its members. There is no other better source of up-to-date information as to where musicians live than the information those musicians provide to the locals and therefore the Federation.

Q Sure.

So is this information placed into an actual centralized database?

A The membership database is centralized, yes.

How frequently is the AFM's membership information updated? I think you may have touched on this previously, but --

MR. SULLIVAN: Objection. Asked and answered.

THE WITNESS: Again, each local keeps their own database. Some locals provide that information to the Federation on a daily basis; some do not. But they are all required to provide it at least monthly.

BY MR. LIFSCHITZ:

Q And then the updates to the Fund flow directly through the national AFM?

A Yes.

Q Do the locals collect information on performers who have never been AFM members?

A Only when they perform work in the jurisdiction.

Q What does the AFM do with that information?

A The Federation does not get it as a portion of their member database. The CSV file that I mentioned before is only those who are members or were members. But if you are talking about a nonmember who appears on a contract once who has never been a member of the AFM, has not joined, has not lapsed, et cetera, a local may retain that

information because they need it to know where he lived at the time to receive his check for that work that was done, but that information is not part of the updating of the member database that the Federation gets.

Q Got it.

So then the nonunion members do not get delivered to the Fund?

MR. SULLIVAN: Objection. Mischaracterizes testimony.

THE WITNESS: Not as a part of the CSV file that is updated as being the member database.

BY MR. LIFSCHITZ:

Q But that is, to be clear, the only provision of the membership data done by the national AFM?

A Yes. It's the only -- you know, the member database is a database of members both those who were members and are not any longer or those who remain active members, but it does not contain nonunion musicians.

Q And the local AFM chapters have multiple uses for this nonunion performer's information?

A Yes. If a nonunion musician performs work in a local's jurisdiction, the local does need to be

in touch with that musician who make sure that they are paid correctly, that they have gotten their check, that they pay their agency fee on the work that was done. You know, that they have all of their questions answered. The local, and the Federation as well, have a responsibility to that musician to make sure that the terms of the collective bargaining agreement are met.

Q Do you know if the locals ever solicit those nonmembers to become members?

MR. SULLIVAN: Objection. Outside the scope of the designated testimony.

THE WITNESS: As a matter of organizing, of course, that happens -- I can't speak to how frequently. It depends on what the local's organizing department looks like.

BY MR. LIFSCHITZ:

Q Okay. Let's discuss the session reports and B-forms next.

Up top, is it correct that the proper AFM nomenclature here is B-forms, not session reports, or is that terminology used interchangeably?

A You could say it is interchangeable, but the Federation prefers the term B-forms because there's a variety of different B-forms which are

projects.

BY MR. LIFSCHITZ:

Q Is there a substantial difference between the types of information collected on the B4 B-form as opposed to the B9 B-form?

A No. The difference is with regards to scope of the projects. Form -- projects that are filed on a B9 form are not expected to sell past the threshold beyond on which residual payments are required to be made to the musicians by matter of contract. It is sort of a cheaper type of contract that allows for what are termed somewhat vanity projects or, you know, smaller things that are not going to sell beyond the threshold where residual payment is due.

Q So is it fair to say that the distinction between the B-form types is more for internal categorization rather than soliciting substantially different information from the performers?

A That's correct. They are all basically an invoice of payment to say what a musician did, what wages they are earning, what their benefits are, as a way for the local and the Federation to ensure that that information is correct, but, yes, the difference between the B-forms themselves depend on

the work -- the information that must be tracked based on the type of work that it was.

Q So, generally speaking, what information is contained in your usual B-form?

A So on any B-form, it must be enough information for the local and the Federation to be sure that the terms of the collective bargaining agreement are met. So let's use, for example, the B4 report form which is for standard, you know, major label and independent sound recordings.

Basically any term that might alter how the payment is made to a musician for their sound-recording work is going to have to be tracked. So you're going to have to have the date and time of the session. If a session was longer than the minimum call, then a musician would be owed overtime.

So you must have the length of the session listed. It is going to need to include the record label, who is the signatory record label on the project. Who is the artist. What tracks were recorded. How long are they because in a standard session you can only get 15 minutes of final product.

If you go into a studio, and even if it is

three hours' worth of work, which is the minimal call lane, but produce 20 minutes' worth of final product, the musician is also then therefore owed overtime because more work was done than is standard. So track lanes are important as well.

Then there is the payment grid which basically tells you everything that the musician needs to have put down in order to get paid promptly and on time and accurately, which includes, you know, their address, their instrumentation, the wages that they earned under the contract, the pension contribution that goes with it.

Health and welfare, which might either go to a health and welfare fund, if they are a member of a local that has one, or it is an additional non-pensionable wage.

It lists deductions as well because it is an invoice for payment that would go along with payroll paperwork to a payroll company so that the musician can get paid on time.

Basically any detail that might somehow affect what a musician is owed for their work on that session goes down on the B-form.

Q Extremely thorough and helpful. Thank you.

MR. LIFSCHITZ: Nico, can we pull up the B-form

not 100 percent sure. Sometimes it is 10; sometimes it is 12. I believe sound recording is 12. It says that if that many musicians are required, then that's too many for the leader to be the responsible party for the paperwork. At that point a contractor needs to be hired. The contractor, who is part of the AFM bargaining unit, is essentially a paperwork point person who would fill out the B-form themselves and collect all of that payroll information and then submit that to the record label.

If a musician is uncertain of how to do that, they can go to the local and have the local help them fill out the B-form. And then the local can submit the document to the record label for payment.

So according to the agreement, it doesn't matter who sends the B-form to the label. It just matters that someone sends a report to the label for payment because it is essentially an invoice for the record-label services -- services to the record label.

Q Got it.

You mentioned that, generally speaking, when you receive a session report, the information

fields are reliably filled out. I'm curious, are the reports themselves reliably generated across all relevant recording sessions?

MR. SULLIVAN: Objection. Overbroad.

THE WITNESS: I would say no. If you think that there's a strong feeling that every recording session gets a B-form just as a matter of course, then that is mistaken.

Just for the major record labels, our pension fund estimated during the course of our last round of contract bargaining in 2015 that 37 percent of covered work went unfiled. And so as a result, the union has to do an enormous amount of legwork to figure out what is being unfiled, you know, who are these musicians who are not being represented on B-forms. It is not being done automatically by the record labels. They don't -- they are not in the business of paying everyone correctly automatically. So the union has to inquire when things come out that don't match their records. An album comes out, it says it was recorded in Nashville but the local doesn't have the list of these facts, now the local has to go to the record label and say where are the B-forms.

///

BY MR. LIFSCHITZ:

Q And are B-forms ever generated for non-AFM recording sessions?

A Inasmuch as the B-form is an invoice for payment under the terms of the AFM collective bargaining agreement with the major record labels, I would say no. The B-form is not going to be generated for work that is not covered.

Q And to the extent the B-form could be characterized as an invoice having this information, the AFM has no practice of collecting that information for nonunion recording sessions?

MR. SULLIVAN: Objection. Mischaracterizes testimony.

THE WITNESS: The Federation, its locals, would not be privy to, you know, the detailed information of nonunion recording sessions.

BY MR. LIFSCHITZ:

Q Do you have any sense of how many recording sessions relevant to the Fund are union sessions versus nonunion sessions?

MR. SULLIVAN: Objection. Outside the scope of the designated testimony. Vague. Vague.

THE WITNESS: Yeah, I can't make an estimate of that kind. It changes wildly over time. I mean,

nowadays you in your basement can provide a track. So what I'm just getting at there is that changes drastically from year to year from jurisdiction to jurisdiction. There's no way I could put an estimate together on that.

BY MR. LIFSCHITZ:

Q Okay. We can circle back around to it. I have a couple different ways to approach the topic.

So if I recall correctly, you said that the B-forms are provided directly to the Fund by the locals rather than funneled through national AFM; is that correct?

A That is correct.

Q How many people are involved in that process, to your knowledge?

MR. SULLIVAN: Objection. Vague as to "involved in that process."

THE WITNESS: You know, on what side are we talking about here, on the local side? On the Fund side?

BY MR. LIFSCHITZ:

Q On the local side.

A So it depends on the local. There are in excess of 150 locals around the country. Most don't do recording work necessarily. So there's still

probably at least 50 to 75 locals that the Fund has reached out to in an attempt to find copies of B-forms over the course of not just current work but work that -- legacy work, as we would say, such as, you know, a Willy Nelson B4 from 1989. So, I mean, if we're talking about an estimate of how many people are involved in responding to Fund inquiries across, you know, upwards of 75 major -- potentially minor and major recording locals, I mean, there's at least a hundred individuals in totality across the United States. I'm not sure they have to inquire on Canadian B-forms, but then there's -- you know, there's at least 15 locals in Canada, three of which are major recording locals as well.

Q Did you determine who those contacts reached out to by the Fund at each of the relevant locals would be in preparing for this deposition?

A What we did do is we did speak with those locals that have dedicated recording departments. If they are not a local that we spoke to explicitly on this, then the contact person that the Fund would go to looking for a B4 report form would likely be a titled officer of that local.

Q So how many of the locals did you speak to as a proportion of the relevant locals who may have

internal database of logging when contracts come in and where they are filed. So if a request comes in from the Fund manually to find a copy of a B4 report form, they have a spreadsheet that tells them what box the file is in so they can pull it out and scan a copy to the Fund.

That is sort of what is common for locals that do not have sophisticated data management systems with regards to report forms. So there is a lot of manually digging through boxes to find copies of reports.

BY MR. LIFSCHITZ:

Q Do you have a sense of how many requests from the Fund are made to the locals in any given week?

MR. SULLIVAN: Vague. Objection. Vague as to number of requests. Vague as to what a request is.

MR. LIFSCHITZ: Request for B-form information.

THE WITNESS: What I do know is that from the four major sound-recording locals, since 2016 or so, there are, according to their best efforts of tracking what they consider a request, they have been making no fewer than 7,000 annual searches for individual songs to those four locals.

The question as to how often they are going

to go to a local that is smaller than that in an attempt to find either legacy information or just something even more recent as a local like, let's say, Memphis or Chicago or Houston, that is going to be extremely sporadic. So coming up with something week to week is going to fluctuate very wildly. One week it could be one request, another week there might be none at all. My conversations with Dean in Chicago would suggest he probably receives three requests in a month, but that is not indicative of what Memphis might get where that's much more legacy content. But their stuff is not digitized either, and we did not have the time to speak with that specific local. That's just one that I'm picking off the top of my head in mind because of a connection with Elvis.

So there's no great way to quantify that because, at that level, it becomes essentially -- I don't want to say random, but it kind of feels that way. It just depends on what they are looking for at the time.

BY MR. LIFSCHITZ:

Q Let's step back to week to week, then. I know you mentioned there were about 7,000 annual requests amongst the biggest four locals. So for a

daily basis looking for copies of contracts.

BY MR. LIFSCHITZ:

Q So let's break it down, then, along the lines we were previously discussing, the major four chapters of the AFM.

Can you estimate how many hours in a given week, month, or year are spent between workers at those four chapters fielding these requests?

A At a local where the Fund has access to the database, again, Los Angeles and New York, then the only time they are going to have direct dealing with a Fund is if a copy of the contract that the Fund is looking for is not in that database.

And so they are dealing with the Funds on an annual basis significantly less. I would have to say it's, you know, a handful of times a month. So in a given year we are talking about, you know, maybe, in totality, 15 to 20 hours of work in a given year whereas in Nashville where you are doing several hours of Fund-related work in a given week, then multiply that by 52 and you are talking about, you know, upwards of 125 to maybe 150 hours.

Q Do you have knowledge of who in each of these chapters is specifically responsible for responding to the requests of the Fund?

A It does change over time. But I have reasonable information with regards to that, yes.

Q Can you provide as many of those names and titles as you can?

A With the caveat that during the pandemic, many of these people either have been furloughed or let go entirely and may no longer be at these locals.

At Local 802 requests for paperwork would often go through what they call business representatives. So, for example, a request might go to Robert Pawlo -- last name P-a-w-l-o -- to find paperwork that is not in that computer system. However, he is no longer there as he has been furloughed. Staff that was there in that department when I worked there are no longer there anymore.

At Local 47 there are three -- there were three specific data clerks. I do not know how many are still on staff at this point in time. I know numerous requests went to a man by the first name of Kenwood. He deals with their sort of archives that I mentioned are pretty substantial and go back to 1920. I do not recall his last name.

His and Taguhi I will have to, again, go back and find because they both handled some of

these requests whenever they come in to sort of pull out hard copies if they need to.

At Local 257, those requests are going to Christina Mitchell who is sort of a data entry clerical assistant to that department.

But other than that and other than, let's say, at Chicago, requests would then be going through Dean Rolando, who is the head of their recording department. Again, at every other local it is pretty much going to a titled officer whether that is Jeff Apana in Miami, George Troia in Detroit, you know. Essentially anyone else who is getting these requests around the country is not a member of a recording department because no other local has a recording department. So they are going to either the president or the secretary-treasurer of those locals, which may change over time given union administration and elections.

Q Do you know the typical salary range for the individuals who are responsible for fielding these requests?

A It depends on the jurisdiction as well.

So at Local 802, for example, those requests were going to business reps who had salaries, depending on seniority, in the 65- to

80,000 range. Again, these are New York-based salaries, so they are probably the highest in the country. Whereas at Local 47, those are going to clerks who have worked there for the better part of decades and so have probably received longstanding increases on their original base salaries but are probably more in the 50- to 60,000-dollar range.

And Local 257, again, Nashville, not quite the same salary level as those other two locals. So Christina's salary is more in the 35,000 range.

Dean Rolando's salary in Chicago is about 50,000.

And anyone else who is getting these questions, again, is a local officer and so those salaries are a matter of their union bylaws.

Q Do you have a sense of how often -- when the Fund reaches out to the locals for assistance with locating B-forms that they cannot find, how successful the locals typically are in responding to those requests by providing the requested B-form?

A That's going to depend entirely on how well the local has maintained their documentation over the course of decades, which very much changes from local to local. Some locals have been hit by floods, and so B-forms from the '70s might be gone

knowledge of the system is that it is essentially a log-in sort of system where the Fund is able to log in and see these report forms as well as the information that is contained therein that is relevant to them. But those I spoke to who might just have been at a different level of this than the sort of tech side of things, that never came up as a complaint or a problem or a specific instance.

I'm sure there are conversations between Fund staff and IT staff at a given local if some sort of problem arises, if there's an issue with a login, if there's an issue with the server, of that nature, but that did not come up as a course of the conversations that I had with specific personnel that generally deal with these requests.

Q Understood.

Are you aware of any third-parties beyond the Fund who have log-in access to these databases?

MR. SULLIVAN: Objection. Outside the scope of designated testimony.

THE WITNESS: So some other funds do have access to the systems, but these are all funds that are set up as a manner of collective bargaining in terms of an individual contract. So, for example, Local 802 and Local 47 both have health and welfare funds.

They need direct access to these systems in order to -- you know, health contributions are allocated to a musician for work they do, and so the Fund needs access to that information to know whether or not that musician is able to make a plan act. Those are funds that are set up as a matter of bargaining these contracts.

There are also residual funds that are set up as a matter specifically of collective bargaining, like the film musicians' secondary markets fund is explicitly set up to pay out residuals to musicians who did film work. That is a -- that is outlined in the collective bargaining agreement, and it is outlined in the CBA that the Federation negotiates with the film industry; that the Fund receive reports directly from certain major locals such as New York and Los Angeles; and to achieve that, the Fund has access to that database as well, whereas smaller locals it is actually outlined in that agreement that they get those copies of report forms directly from the employer.

But, again, any Fund -- any other Fund that has access to these databases is strictly a Fund that has been set up through the course of bargaining with the specific industry rather than

the Fund in the respect of this deposition, the AFM and SAG-AFTRA fund, which was set up as a matter of the copyright fund.

Q Does the AFM generally track how much time is spent maintaining and updating these databases?

A I mean, those who are clerical staff in these departments, those who are recording staff in these departments, those who are at these locals, those who are membership staff at these locals if it has that, the entirety of their jobs involves maintaining, updating, and utilizing these databases. So while it is not really tracked at an institutional level, there are people, you know, whose entire 9:00 to 5:00 involve entering, updating, changing, dealing with these databases.

Q Were you aware of any specific costs that the AFM incurs at either the local or national level providing access to the database to the Fund?

MR. SULLIVAN: Objection. Vague as to "database."

BY MR. LIFSCHITZ:

Q Databases.

A Costs specifically to providing access to the database?

Q Yes.

Q And, similarly, does it not have any particular methodology for determining the dollar value of the B-forms?

A No, because there would be no way to -- that would be pure speculation based on future value of that information.

Q Has the AFM ever attempted to quantify the out-of-pocket costs of preparing the services to the service agreement to the Fund?

A I do not believe so.

Q Has it ever quantified the reasonable cost for the membership list creation?

A I do not think so.

Q Has it ever quantified the reasonable cost for the membership list maintenance?

A Going back to when I spoke about that maintenance before, because of the fact that that work is -- inherently fluctuates from time to time, there would be no way to put such a value on it.

Q Has it ever quantified the reasonable cost of providing the membership information to the Fund?

A Not to my knowledge.

Q Has it ever quantified the cost of compiling its session reports?

MR. SULLIVAN: Objection.

MR. LIFSCHITZ: B-forms rather.
MR. SULLIVAN: Objection. Vague.
THE WITNESS: No, I do not believe so.
BY MR. LIFSCHITZ:
Q And has it ever quantified the reasonable cost of providing the B-forms to the Fund?
MR. SULLIVAN: Objection. Vague.
THE WITNESS: I don't think -- and this would be individual locals going through that process. I don't believe that has taken place.
BY MR. LIFSCHITZ:
Q You mentioned previously that certain third-parties, other funds in particular, have access to the information being provided to the Fund under the services agreement. Does the AFM charge any of those other third-parties for access?
MR. SULLIVAN: Objection. Outside the scope of designated testimony. Vague.
THE WITNESS: In as much as those funds are set up as a course of collective bargaining to provide, let's say, residual payments or benefits to the musicians on those contracts that were explicitly bargained with the industry in those specific instances, I do not believe there is a charge for that information, but that is outside the scope of

to know the answer, that's a perfectly appropriate response.

For the following year the fee increased by roughly 40 percent to $272,845.

Do you see this amount?

A Yes.

Q Can you explain how that number relates to the reasonable cost of the services performed by the AFM, or is it still not something that you have sufficient information to provide a response for?

MR. SULLIVAN: Objection. Vague and ambiguous as to "reasonable cost." Outside the scope of designated testimony. Call for a legal opinion. Asked and answered. Call for expert testimony.

THE WITNESS: Again, to my previous point, it all goes into -- you know, obviously there's a different -- my answer would be no different than it was previously.

BY MR. LIFSCHITZ:

Q Between 2014 and 2015, did the amount of work being done by the AFM under the service agreement increase by roughly 40 percent, to your knowledge?

MR. SULLIVAN: Objection. Outside the scope of designated testimony. Calls for -- vague and

 ambiguous. Asked and answered.

THE WITNESS: So an increase in the service fee implies that there's an increase in the amount of money that the Fund paid out, which generally would imply that, you know, there are -- is more work -- it could be assumed that there is more work that goes into producing a payout of that size, which probably means that more songs are being paid out, which probably means that more research must be done in order to find the musicians on those songs, which probably means that there are more requests from the funds to individual locals to find that information.

So, you know, an increase in the service fee doesn't have a direct correlation necessarily just because of where the service fee comes from, but it does, to me, imply that there must be more research, there must be more work. There must be more songs. Therefore, there is an implication that there is some level of, you know, additional work being involved in that process. I mean, these numbers don't entirely exist in a vacuum, but they are not directly correlated because, again, there is more to the service fee than just the information that is provided below this.

///

BY MR. LIFSCHITZ:

Q Sure. But are you aware of specifically requests from the Fund to the unions under the services agreement increased by roughly 40 percent --

A Between 2014 and 2015, there was an increase in requests from the Fund. Whether that -- I believe that would have been -- between 2014 and 2015, I believe from those four major locals, the total requests between those two years jumped by about 300 percent, maybe 350 percent.

Q Got it.

Did the AFM have to hire additional workers or acquire additional resources, to your knowledge, in order to field this increase in requests?

A To my knowledge, they did not have to in order to do so. That does not necessarily mean that they could not have or -- my knowledge is that they did not. That doesn't mean that, you know -- that doesn't mean to imply that the increase in requests is part of a standard workload. The Federation might have been better -- you know, the locals might have been better off hiring additional clerical staff in order to handle requests. They did not do that. I cannot speak to the process of the locals

at that given time with regards to that specific reasoning.

Q Then you said that the number of requests increased by roughly 300 percent. Was that reflecting your earlier testimony regarding the average number of hours that were being expended by the union personnel to --

A So what I was speaking to before --

MR. SULLIVAN: Objection. Vague.

THE WITNESS: What -- I think I brought up that those numbers that were in between the 7,000 and 9,000 range were between 2015 and the third quarter of 2020. There was a jump between 2014 and 2015, but we were speaking sort of more specifically about how requests come in at the time. So I did not go back to the lower numbers in the earlier years because I was really trying to provide a snapshot of sort of what's going on now and recently when answering those prior questions.

BY MR. LIFSCHITZ:

Q Sure.

So the next increase was from 2015 to 2016, and that was to $420,454, which is a roughly 50 percent increase from the prior figure.

Should I assume there is still no way to

CERTIFICATE OF REPORTER

I, Pamela Cotten, a duly licensed Certified Shorthand Reporter of the State of California and New York Notary, No. 01C06309443, hereby certify that the witness in the foregoing deposition was by me duly sworn in remotely;

That said testimony was taken down in stenographic shorthand by me, a disinterested person, remotely at the time herein stated and was thereafter reduced to typewriting, and that the testimony as transcribed is a true record of the testimony given by the witness:

That before completion of the deposition, review of the transcript was requested. The original transcript was sent to Jenner & Block for the review procedures and/or future safekeeping.

I further certify that I am not of counsel or attorney for any of the parties to the said deposition nor in any way interested in the outcome of this cause.

Dated_____________________.

________________________________

Pamela Cotten, CSR, RDR, CRR
California Certificate No. 4497
New York Notary No. 01C06309443

# EXHIBIT 15

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

KEVIN RISTO, on behalf of )
himself and all others ) Case No.
similarly situated, ) 2:18-cv-07241-CAS-PLA
Plaintiff, )
vs. )
SCREEN ACTORS GUILD- )
AMERICAN FEDERATION OF )
TELEVISION AND RADIO )
ARTISTS, a Delaware )
corporation, et al., )
Defendants. ) (Pages 1-168)
---------------------------)

VIRTUAL VIDEOCONFERENCE

VIDEOTAPED DEPOSITION OF

KEVIN RISTO

FRIDAY, JANUARY 29, 2021

10:04 A.M.

REPORTED BY:

SUSAN NELSON

C.S.R. No. 3202

JOB NO. 4420543

Virtual videoconference videotaped deposition of KEVIN RISTO, the witness, taken on behalf of Defendants, commencing at 10:04 A.M., on FRIDAY, JANUARY 29, 2021, at Las Vegas, Nevada, before SUSAN NELSON, C.S.R. No. 3202.

APPEARANCES OF COUNSEL (VIA VIDEOCONFERENCE):

FOR PLAINTIFF KEVIN RISTO AND THE CLASS:

KIESEL LAW LLP
BY: MARIANA A. MCCONNELL, ESQ.
NICHOLAS BRANCOLINI, ESQ.
8648 Wilshire Boulevard
Beverly Hills, California 90211-2910
(310) 854-4444
mcconnell@kiesel.law
brancolini@kiesel.law

-- and --

JOHNSON & JOHNSON LLP
BY: DANIEL B. LIFSCHITZ, ESQ.
439 North Canon Drive, Suite 200
Beverly Hills, California 90210
(310) 975-1080
dlifschitz@jjllplaw.com

APPEARANCE OF COUNSEL (CONTINUED):

FOR DEFENDANTS:

JENNER & BLOCK LLP
BY: ANDREW G. SULLIVAN, ESQ.
ANDREW J. THOMAS, ESQ.
ANNA K. LYONS, ESQ.
633 West 5th Street, Suite 3600
Los Angeles, California 90071
(213) 239-5100
ajthomas@jenner.com
agsullivan@jenner.com
alyons@jenner.com

ALSO APPEARING (VIA VIDEOCONFERENCE):
DAVE HALVORSON, VIDEOGRAPHER

on behalf of Defendants. 10:05:56

MS. MCCONNELL: Mariana McConnell, Kiesel Law, for Plaintiff and the Class. 10:05:59 10:05:59

MR. BRANCOLINI: Nico Brancolini for Kiesel Law, also for Plaintiff and the Class. 10:06:06 10:06:09

MR. LIFSCHITZ: Daniel Lifschitz from Johnson & Johnson, on behalf of Plaintiff and the Class. 10:06:09 10:06:10

MR. SULLIVAN: All right. Mr. Risto --

THE REPORTER: Let me swear in the witness.

MR. SULLIVAN: Yes, yes, please.

THE REPORTER: If you'll raise your right hand, Kevin, I'll swear you in.

KEVIN RISTO,

having been first duly sworn, was

examined and testified as follows:

THE REPORTER: Thank you. Please proceed.

EXAMINATION

BY MR. SULLIVAN:

Q. Mr. Risto, can you please state and spell your name for the record. 10:06:41 10:06:41

MR. SULLIVAN: Susan, could you repeat the question. 14:34:00 14:34:00

THE REPORTER: One moment, please. 14:34:00

(Record read as follows: 14:34:00

"QUESTION: So do you have any basis to contradict or doubt Ms. Taub's assertion that the information provided by the unions cannot be obtained from any other source?") 14:33:15 14:33:17 14:33:20 14:33:23 14:33:26 14:33:30

MR. LIFSCHITZ: Same objections. And calls for speculation. 14:34:18 14:34:23

THE WITNESS: Yeah, I don't know. I don't know if there's another source or not. 14:34:33 14:34:35

BY MR. SULLIVAN: 14:34:36

Q. If it's true that the fund -- scratch that. 14:34:44

If it's true that the unions provide information to the fund that is largely accurate related to which performers performed on which titles and are therefore entitled to distributions and there's no other way for the fund to obtain that data, wouldn't you say -- would you agree that the union providing this information provides a valuable service to the fund? 14:34:48 14:34:52 14:35:00 14:35:06 14:35:09 14:35:16 14:35:21 14:35:27

MR. LIFSCHITZ: Incomplete hypothetical. 14:35:28

STATE OF CALIFORNIA )
COUNTY OF LOS ANGELES ) ss.

I, SUSAN NELSON, C.S.R. 3202, in and for the State of California, do hereby certify:

That, prior to being examined, the witness named in the foregoing deposition was by me duly sworn to testify the truth, the whole truth and nothing but the truth; that said virtual videoconference videotaped deposition was taken down by me stenographically at the time and place therein named, and thereafter transcribed via computer-aided transcription under my direction, and the same is a true, correct and complete transcript of said proceedings;

Before completion of the deposition, review of the transcript [X] was [ ] was not requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

I further certify that I am not interested in the event of the action.

Witness my hand this 19th day of February, 2021.

Susan Nelson, C.S.R. No. 3202
Certified Shorthand Reporter
State of California

# EXHIBIT 16

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

---oOo---

KEVIN RISTO, on behalf of himself and all others similarly situated,

Plaintiffs,

vs. No. 2:18-cv-07241-CAS-PLA

SCREEN ACTORS GUILD-AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS, a Delaware corporation; AMERICAN FEDERATION OF MUSICIANS OF THE UNITED STATES AND CANADA, a California nonprofit corporation, et al.,

Defendants.

_______________________________/

Wednesday, December 9, 2020

- - -

Remote videotaped deposition of JULIE SANDELL, conducted with the witness located in Studio City, California, commencing at 9:07 a.m., before me, Gina V. Carbone, a Registered Merit Reporter, California Certified Realtime Reporter, California Certified Shorthand Reporter No. 8249.

- - -

GOLKOW TECHNOLOGIES, INC.

877.370.3377 ph | 971.591.5672 fax

deps@golkow.com

REMOTE APPEARANCES OF COUNSEL

For the Plaintiff KEVIN RISTO:

KIESEL LAW LLP
By: NICHOLAS BRANCOLINI, ESQ.
MARIANA A. McCONNELL, ESQ.
8648 Wilshire Boulevard
Beverly Hills, California 90211
(310) 854-0812
brancolini@kiesel.law
mcconnell@kiesel.law

CO-COUNSEL:

JOHNSON & JOHNSON
By: DANIEL B. LIFSCHITZ, ESQ.
439 N. Canon Drive, Suite 200
Beverly Hills, California 90210
(310) 975-1095
dlifschitz@jjllplaw.com

//

REMOTE APPEARANCES (continued)

For the Defendants:

JENNER & BLOCK
By: ANDREW J. THOMAS, ESQ.
ANDREW G. SULLIVAN, ESQ.
ANNA LYONS, ESQ.
633 W. 5th Street, Suite 3600
Los Angeles, California 90071
(213) 239-5155
ajthomas@jenner.com
agsullivan@jenner.com
alyons@jenner.com

ALSO PRESENT: ALEX KLYUSNER, videographer

--oOo--

MR. SULLIVAN: Andrew Sullivan from Jenner & Block on behalf of all defendants and the witness.

THE VIDEOGRAPHER: Okay. The court reporter is Gina Carbone and will now please swear in the witness.

THE REPORTER: I'm sorry. Ms. Lyons was, I think, introducing herself but we couldn't hear her.

And Mr. Sullivan, you're on mute as well.

MR. SULLIVAN: Apologies.

If Anna is having difficulty joining, I'll identify her and say that Anna Lyons from Jenner & Block on behalf of all defendants and the witness is also present.

JULIE SANDELL,

called as a witness, having been duly sworn,

testified as follows:

EXAMINATION BY MS. McCONNELL

BY MS. McCONNELL:

Q. Good morning, Ms. Sandell.

A. Good morning.

Q. Could you please state and spell your full name for the record.

A. Julie Sandell, J-U-L-I-E, S-A-N-D-E-L-L.

Q. Okay. Thank you. So before we get started with the substance of questions, I want to go over

What analysis and research did you do to figure out the number of titles that are researched each year?

A. Well, it's a -- it's a number that -- frankly, we don't have a real number. The tracking systems are imperfect because the database that we use, it tracks the date that a title is created to be researched, but our current database doesn't track when somebody goes in and researches a title that's already in the database or that may have been partially researched for a different project and that is going to be researched for sound recording.

So we have no way of tracking the actual number of titles that are researched each year. It's an imperfect system. So I was brainstorming and trying to come up with a true answer, which proved very difficult. The best we could do, that was objective and valid, was the number of titles that we created each year, so....

Q. Does the Fund have a database that would show how many tracks are actually paid on each year?

A. Yes. Well, it's not --

MR. THOMAS: Object to the form that it's vague.

But you can answer the question.

to the performers who had not been located yet.

(Reporter clarification.)

THE WITNESS: Unclaimed list. Which means the participants who had been allocated checks, but that we didn't have their address or tax ID information.

BY MS. McCONNELL:

Q. When you started in September of 2009, how much research associates were there at the Fund?

A. One. I was the second.

Q. Okay. When you first started, do you recall how many tracks you were responsible for researching in a given year?

A. That wasn't a metric that we used. All of them, basically.

Q. Yeah. Do you know how many tracks the Fund paid on the first year that you were at the Fund?

A. I don't have that number.

Q. Okay. How would you go about your duties of researching titles when you started in September of 2009?

A. May I answer this question and then use the bathroom, please?

Q. Of course you may.

A. Okay. We're going to go back to September

of 2009. We'd have a list of tracks on a Excel spreadsheet. At the time the two researchers, I did evens and she did odds.

So the track would come up, let's say it's the Carpenters. And the first thing you do is find out where it's recorded, what year, check with the unions. Then you go on the Internet, you go to AllMusic -- at the time -- this is back then. AllMusic, Discogs, Grace Notes, anywhere -- you're like a detective. You're just searching for credits.

You compile those. At the time our PDFs were actually hard copies that we printed out and then we marked them up. We'd say emailed LA AFTRA equals a wait. Checked Local 47 pre-2005 equals found, not found.

And once you've compiled all of your information, then you had to make a determination of who was featured and who was nonfeatured, if they had an eligible role, because there are some nonmusic roles that are eligible, such as copyist, contractor. Then you get your list of names and you highlight them, and then you have to make sure you enter them. Sometimes there could be contracts with hundreds of, you know, orchestra players. And then

at that point it became a data entry job into, at the time it was Access database, so you had the component of the research and the detective work, and then you had the data entry part. And then you had decisions along the way.

If you didn't have a union contract with a social, and it was John Williams or Mike Campbell and we had six Mike Campbells in our database, then you had to do some detective work to make sure you have either by instrument, birth date, or their discography of others' titles to make sure that you were crediting the correct performer.

And if they weren't in the database, then you had to create a whole new performer title -- you know, account with a fake social -- with an unknown social, and that took time to create the account and then add the credit.

Q. Okay. I have follow-up questions, but how about we take a restroom break and then we'll continue.

A. Okay.

THE VIDEOGRAPHER: Time is 9:59 a.m. We're off the video record.

(Recess taken.)

THE VIDEOGRAPHER: Time is 10:11 a.m.

We're back on the video record.

BY MS. McCONNELL:

Q. Okay. Ms. Sandell, before we took a break you were telling us about your process for researching titles when you started at the Fund in September of 2009.

You started by telling us that you'd get a list of tracks on an Excel spreadsheet. Where did that Excel spreadsheet come from?

A. The -- it came from SoundExchange, but it had -- but our technical person -- there were only a couple of us at the time, there was no IS department -- he would create -- take the data that came from SoundExchange and turn it into a spreadsheet for us.

Q. What data was on that spreadsheet?

A. Well, at the time we researched albums, not tracks, so it was -- and he preloaded the tracks into Access, so we didn't create -- so it had a title ID, had the album name, the artist, maybe the year, and the dollar amount. It was ranked by dollar amount.

Q. When you were telling us about your process you said that the next step after getting the Excel sheet was reaching out to the unions; what

information were you asking the unions to provide?

A. Session reports.

Q. And is that so that you could determine who the performers were on certain tracks or albums?

A. Yes.

Q. You weren't asking the unions for the year that an album was recorded or where it was recorded, right?

A. No. We would usually provide that information to them in our request.

Q. Right. We're still talking about 2009; did Discogs or Grace Notes have performer information for albums and tracks?

A. AllMusic, yes, had some.

Q. Are you able to give an approximate percentage of albums and tracks where you would be able to get that information from Discogs, Grace Notes, or AllMusic?

A. No. It depends on the -- on the genre and the artist. Most of the website credits and liner notes that the credits are taken from don't include the session musicians and background vocalists, unfortunately, or the orchestras.

Q. Other than -- strike that.

How is the Excel sheet different today,

other than the fact that you're researching tracks and not albums? Are there any other differences?

MR. THOMAS: Object to the form. Vague.

THE WITNESS: We converted from Excel spreadsheet to a playlist that's in AS400, so we no longer use Excel.

BY MS. McCONNELL:

Q. Okay. So IS receives the information from SoundExchange and then inputs it into AS400?

A. Correct. The difference is they don't create the title IDs, we create them when we start the research.

Q. Okay. You talked about figuring out who the featured performers were and who the nonfeatured performers were on a given album or track. How would you go about doing that?

A. Sometimes it can be difficult and it's not clear. We also don't have the information -- SoundExchange doesn't provide the information of who they pay as featured, so we kind of have to guess, or -- we don't guess, we use critical thinking.

But one important advantage of having a session report is if the featured artist, say if it's a Tom Petty and the Heartbreakers session report, next to the featured artist names it will

say contracted artist, which means they have the record deal. So we can tell who was contracted and who was -- worked for hire off the session report, which is very helpful.

Q. Okay. If the union wasn't able to provide a session report for a given album or track back in 2009, what would you do next?

A. You have to make a choice of using the credits that you found on the Internet. Sometimes I would get books from the library, or my own library, my own albums trying to track down the liner notes from the album. But that still didn't help because there's a lot of cases where the session musicians were not listed on the liner notes.

So we had another option where we could put no credits found and hope that musicians would make a claim and provide the session reports; maybe they kept a copy.

We could -- in the early days, we could access the pension fund through the union, and the pension fund might provide us with information about the credits.

Q. Does the Fund no longer access the pension fund of the union?

A. We don't -- when we were young, and in

it depends on if the session was in 1968 or if the session was in 2018.

But if we have that address and we don't have the performer already registered and receiving checks, we -- the researcher puts that on a performer information request spreadsheet that we log. And there's one person in participant services who every Monday sends out letters to those participants informing them that they may have royalties and providing their registration form to update their information.

Q. Okay. If the session report has a social security number or a tax ID, how does the Fund use that information to locate a performer?

A. We use it to match the correct performer in our database. If the performer is not in our database, there are several people at the Fund that have access to LexisNexis.

And we also -- several of us have access to the Social Security Administration where we can take that social and verify against their name. It doesn't necessarily give us an address, but we can find out if they're deceased, and we can find out if their name matches. You know, if it's a verified social.

process. And I don't know if that was before or after the service fee.

Q. Do you remember having a conversation with Ms. Taub or Mr. Bouton about how frequently the unions were able to provide useful information to the Fund?

A. (Indiscernible.)

(Reporter clarification.)

THE WITNESS: No. Not specifically.

BY MS. McCONNELL:

Q. In the Access system did it have those radio buttons that the AS400 had?

A. No, but we typed it out in the notes the type, the date, emailed Nashville 257 equals a wait. Emailed Nashville SAG-AFTRA equals received. I --

Q. Do you --

A. -- the idea, the radio buttons would save us all that typing.

Q. Do you know if prior to the implementation -- or strike that.

Do you know if prior to the approval of the services agreement anyone went through the Access system to see how many requests were made of the unions and how many requests were responded to?

A. There was no access -- oh, you mean the

comments? The notes? No.

Q. Yes -- no, you don't know or, no, they didn't?

A. I don't believe anybody did.

Q. I think I asked this in a different way, but just one more time.

Did anyone ask you, when you were supervisor in the sound recordings division, what percentage of nonfeatured performers could be identified by the unions as opposed to those that were identified by the Fund researchers?

MR. THOMAS: Objection. Vague and overbroad.

But you can answer.

THE WITNESS: No.

BY MS. McCONNELL:

Q. Did anyone ask you prior to 2013 how many inquiries the Fund made to the union?

A. No.

Q. Did you have any conversations with Joanne McGettrick about the services agreement?

A. Probably.

Q. Do you recall anything about those conversations?

A. No.

Q. Do you know who Patricia Polach is?

A. Yes.

Q. Who is she?

A. She was the Fund's attorney who helped Dennis set up the Fund.

Q. Did you have any conversations with Patricia Polach about the services agreement?

A. No.

Q. Did you have any conversations with Patricia Polach about the services that the unions were providing the Fund?

A. No.

Q. Did Patricia Polach ever reach out to you to discuss the services agreement?

A. No.

Q. Were you asked to review the services agreement before the trustees voted on it?

A. No.

Q. At any point in time up until today, were you asked to collect any data showing the number of times a nonfeatured performer was located due to the union's effort as opposed to the Fund's effort?

MR. THOMAS: Objection. Vague. Overbroad.

THE WITNESS: Can you repeat that?

CERTIFICATE

I, GINA V. CARBONE, CSR No. 8249, RPR, RMR, CRR, CCRR, certify: that the foregoing proceedings were taken before me via videoconference; at which time the witness was remotely sworn; and that the transcript is a true record of the testimony so given to the best of my ability noting some technical audio distortions.

Witness review, correction and signature was

( ) by code. (X) requested.

( ) waived. ( ) not requested.

( ) not handled by the deposition officer due to party stipulation.

The dismantling or unbinding of the original transcript will render the reporter's certificate null and void.

I further certify that I am not financially interested in the action, and I am not a relative or employee of any attorney of the parties, nor of any of the parties.

Dated this 21st day of December, 2020.

GINA V. CARBONE

CSR #8249, STATE OF CALIFORNIA

# EXHIBIT 17

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

KEVIN RISTO, Plaintiff,

v.

SCREEN ACTORS GUILD-AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS, et al., Defendants.

No. 2:18-cv-07241-CAS-PLA

TUESDAY, OCTOBER 20, 2020

- - -

Remote videotaped deposition of Stefanie Taub, held at the location of the witness in Los Angeles, California, commencing at 9:05 a.m. Pacific Time, on the above date, before Carrie A. Campbell, Registered Diplomate Reporter, Certified Realtime Reporter, Illinois, California & Texas Certified Shorthand Reporter, Missouri & Kansas Certified Court Reporter.

- - -

GOLKOW LITIGATION SERVICES
877.370.DEPS
deps@golkow.com

R E M O T E   A P P E A R A N C E S :

KIESEL LAW, LLP
BY: MARIANA A. MCCONNELL
mcconnell@kiesel.law
NICHOLAS BRANCOLINI
brancolini@kiesel.law
8648 Wilshire Boulevard
Beverly Hills, California 90211
(310) 854-4444
and
JOHNSON & JOHNSON, LLP
BY: DANIEL B. LIFSCHITZ
dlifschitz@jjllplaw.com
NEVILLE JOHNSON
njohnson@jjllplaw.com
439 North Canon Drive, Suite 200
Beverly Hills, California 90210
(310) 975-1080
Counsel for Plaintiff

JENNER & BLOCK, LLP
BY: ANDREW J. THOMAS
ajthomas@jenner.com
ANNA LYONS
alyons@jenner.com
633 West 5th Street, Suite 3600
Los Angeles, California 90071
(213) 239-5100
Counsel for Defendants

BREDHOFF & KAISER, PLLC
BY: ABIGAIL V. CARTER
acarter@bredhoff.com
805 Fifteenth Street N.W.
Washington, DC 20005-2207
(202) 842-2600
Counsel for The Fund

V I D E O G R A P H E R :

STEVE ZAVATTERO,
Golkow Litigation Services

- - -

STEFANIE TAUB,

of lawful age, having been first duly sworn to tell the truth, the whole truth and nothing but the truth, deposes and says on behalf of the Plaintiff, as follows:

VIDEOGRAPHER: Please begin.

DIRECT EXAMINATION

QUESTIONS BY MS. MCCONNELL:

Q. Good morning.

Can you please state and spell your name for the record?

A. Stefanie Taub, S-t-e-f-a-n-i-e, T-a-u-b.

Q. Okay. Ms. Taub, have you ever had your deposition taken before?

A. No, I have not.

Q. Okay. Although the setting is a little bit informal, and especially so now that we're on Zoom and you can see inside everyone's house, you're still under oath.

Do you understand that?

A. Yes.

Q. At certain points today I may ask a bad question or your attorney may think

QUESTIONS BY MS. MCCONNELL:
Q. Okay. And we're talking about the -- what time frame are you talking about?
A. Probably like -- I'm thinking the first few years of The Fund, like the early 2000s maybe.
Q. Okay. You had -- your department had paper files in the local LA chapter office that you would consult?
A. Yes.
Q. Okay. How were those organized?
A. Let's see. At that time they were filed by -- chronologically by date, so we had -- it was, what, by the year that the work took place and then -- and then by label, I think.
Q. If you know, how did the LA local get in the custody of these session reports? How are they transmitted to the LA local?
A. When a session takes place, the -- that form is required to be filled out and submitted by the producer or the record company and sent in to the local office with

the payment for the performers.

Q. I suppose I didn't understand that before. But the actual payment for the performers was going through your division, and then would you turn around and pay the performer?

A. Well, we -- the union did not pay them directly. We would just take that check that was sent in from the employer and then mail it out to the performer.

Q. Okay. Why was it done that way, if you know?

A. To verify that they actually got paid.

Q. Okay. When the producer would fill out the session report and send it in to the sound recording division, what information were they required to input on a session report?

A. So the employer, which was normally the record company, contact information for that company, the date of the session, the featured artist, the recording studio, the address of the recording studio, the song titles, the performer's name, Social

Security number, which songs they performed on, how many hours they were in the studio and the times, address, if they had it. That wasn't always filled out. The amount they were getting paid. The amount of the health and retirement contribution that went along with that. Contact information for the producer. I think that's it.

Q. Okay.

A. That I can remember off the top of my head.

Q. Okay. The producer would be required to include the amount of the health and retirement contribution on the form; is that right?

A. Yes.

Q. How would they know how much that would be?

A. It's a percentage that's set in the CBA, so they would just multiply the total gross compensation by that percentage.

Q. Okay. And in the sound recordings division, were you double-checking that the correct amount of health and retirement contribution was being allocated

to each performer?

A. No, that was done by -- allocated to each performer was done by -- directly by the health and retirement fund, which was a separate entity.

Q. Okay. Did the health and retirement fund also request these session reports to look at?

A. Well, they would -- they were in -- at the same time that the producer sends it into SAG -- into AFTRA at the time, they would also send a copy with the health and retirement contribution to the health and retirement fund. It was a dual form.

Q. Got it.

Would the producer include information for nonunion performers on a session report?

A. Yes.

Q. And would the sound recordings division pay nonunion performers?

MR. THOMAS: Objection to form.

THE WITNESS: Well, the employer pays everyone on the session. If the employer is a signatory to the

A. I mean -- I mean, we didn't -- to say that we didn't address the increase is not accurate.

Q. No, I'm wondering what changes you made in the department in order to respond to the inquiries as well as take care of SAG-AFTRA day-to-day business.

A. There -- there was a point where we did add a person to the staff. I don't remember exactly when, but one of the reasons for that was to -- was to address the fact that we were getting increased inquiries from The Fund.

Q. Do you remember who it was that you added?

A. Well, like it wasn't a specific -- it was just adding another resource so that we could spread it more. Like they weren't -- they weren't -- that wasn't their job.

Q. Right. They weren't hired just to devote their time --

A. Right.

Q. -- to The Fund inquiries?

A. Right.

Q. But if you know who that person was, then we could maybe find a point in time when this increase happened.

A. Let me think. I mean, I would have to reconstruct that, go back and reconstruct it. I just -- off the top -- there were a lot of changes in the last, I don't know, five years over there, so I -- I don't remember exactly.

Q. Okay.

A. But I do know we at some point got an extra person added to the staff.

Q. Do you recall at any point in time going to Ray Rodriguez or Brad Keenan, I think you said, to inform them that a lot of your staff time in your department was going toward responding to Fund inquiries?

A. I think we added the person before Brad was there, so it might have -- it must have been Ray that I talked to, I think.

Q. Okay.

A. Brad was there for a short -- maybe a year or two.

But that -- I mean, that doesn't mean that that was the only point in

Was there -- is there a health and pension provision in the SRDF CBA?

A. Yes.

Q. Okay. So health and pension division of SAG-AFTRA could have been performing some role?

A. Well, the health and pension fund is completely separate from SAG-AFTRA.

Q. You're right. Correct.

If you know, is there a provision in the SRDF to pay any money to SAG-AFTRA for its assistance?

A. There is not.

Q. We talked about the sources of information that the sound recordings division has, which include the hardcopy session reports and the membership directory.

Are there any other sources of information that the sound recordings division has for the SRDF specifically?

MR. THOMAS: Objection. Vague. Overbroad.

THE WITNESS: I -- no, I don't think there's anything different.

A. At the time, it was the national -- I think the national executive director, which was Kim Roberts.

Q. And did she ask you if you were interested in becoming a Fund trustee and you said yes, or was it a different conversation?

A. I mean, I don't know if I specifically remember, but I assume I said yes.

Q. Do you remember what the appointment process was before you became a Fund trustee?

A. At -- at AFTRA or at The Fund?

Q. Was there a process at SAG -- at SAG -- well, was it AFTRA or SAG-AFTRA? Was there --

A. It was still AFTRA.

Q. It was still AFTRA.

Was there a process at AFTRA for you to be appointed as a Fund trustee?

A. I do know that the national board had to approve the appointment.

Q. Okay. And then after they approved the appointment, was there a separate process at The Fund to get you

appointed?

A. I believe just the -- the union would then notify The Fund at some -- you know, a new trustee was appointed.

Q. Okay.

A. Or if there was a change or whatever.

Q. Were you replacing an outgoing trustee, if you know?

A. No. There was a -- I think there was an added -- they added a seat.

Q. Was it -- was the seat added because of the merger?

A. I don't know because I wasn't on the board, so I don't know why they did that.

Q. Okay. Got it.

After you were appointed to the -- let's just strike that.

So in approximately 2012, you were national manager West Coast at AFTRA; is that right?

A. Yes.

Q. Okay. Do you recall in 2012 what the time commitment was for The Fund

MR. THOMAS: Same objections.

THE WITNESS: I really didn't know what her connection was. I had heard in passing that she had done some work for them, but I don't really know what it involved.

QUESTIONS BY MS. MCCONNELL:

Q. Okay. At the time that you became a Fund trustee, did you review the relevant portions of the Copyright Act that directed the unions to establish the fund?

A. I don't know if I could see I did it right then, but at some point I did.

Q. Okay. At some point before today, you reviewed the Copyright Act?

A. Yeah.

Q. Okay. Did you personally ever form an opinion as to what cost the Copyright Act allowed the unions to deduct?

MR. THOMAS: Object to the form.

THE WITNESS: I guess -- I mean, I didn't connect those two things in that way.

QUESTIONS BY MS. MCCONNELL:

Q. Okay. Meaning you didn't look to the Copyright Act to see what types of costs could be deducted from The Fund?

MR. THOMAS: Objection. Vague. Misstates her testimony.

THE WITNESS: I mean, I knew generally that the Copyright Act had language in it that allowed The Fund to pay for certain types of information and things that -- to help to administer The Fund.

QUESTIONS BY MS. MCCONNELL:

Q. Okay. Did you at any point in time ask anybody for a legal opinion on what types of costs could be deducted under the Copyright Act?

A. No.

Q. Were you involved in the negotiation of the trust agreement?

A. Which trust agreement?

Q. Well, either of them.

A. The original one, no. The one that was -- there was one that was updated once I became a trustee, I believe, to

reflect the change from AFTRA to SAG-AFTRA. So I --

Q. Yeah, I --

A. It depends on what you mean by "involved." I didn't draft it.

Q. Right.

Did you review it after it was drafted?

A. Yes.

Q. Did you suggest any changes to it?

A. I don't recall that I did.

Q. Do you know who drafted it?

A. I mean, I -- my understanding is I believe it was Trish Polach.

Q. Do you know who, if anybody, Trish Polach worked with to draft the amended and restated trust agreement?

A. No.

Q. Did you ever make any suggestions to Trish Polach or anybody else about any of the terms of that amended and restated trust agreement?

A. No.

Q. Were you ever involved in any

conversation was internal to SAG-AFTRA members?

A. What do you mean "internal to SAG-AFTRA members"?

Q. Well, you said that you remember that there was a conversation somewhere that you knew it was going to be discussed at the meeting, and I'm wondering if that conversation was between the trustees who were SAG-AFTRA members as opposed to the board as a whole.

A. So you're not using "members" in the term of members of the union. Okay. Got it. I just wanted to clarify that.

I believe so. I think it was something -- it was internal at SAG-AFTRA.

Q. Do you remember anything about the conversation?

A. Just in general that there had been discussions about having this servicing fee implemented. And, you know, I knew that SAG-AFTRA did provide a lot of information and time to The Fund, so it -- you know, that -- I was going, okay, I'll wait to hear the details at the meeting.

But it didn't seem -- it wasn't a long conversation or anything. It was just, hey, a heads-up kind of...

Q. At the pre-June 2013 SAG-AFTRA conversation, do you recall discussing what the amount of the service fee was going to be?

A. I don't recall a specific amount at that time. I think it was still -- there were still conversations happening about where -- what that would be.

Q. Do you know who those conversations were between?

A. I believe it was Ray Hair and Duncan Crabtree-Ireland, but I'm not a hundred percent sure if anybody else was involved.

Q. Okay. Before the June 2013 trustee meeting, did you have any conversations with Ray Hair about the proposal?

A. No.

Q. Before the June 2013 trustee meeting, did you speak to any other SAG-AFTRA employee about the services agreement outside

of this conversation we were just talking about?

A. I don't believe so, but I don't recall.

Q. Okay. After this first initial conversation with SAG-AFTRA employees, were you asked to provide any input on the proposed services agreement?

MR. THOMAS: Object to the form. I think it misstates her testimony.

THE WITNESS: Separate from at the board meeting?

QUESTIONS BY MS. MCCONNELL:

Q. Yes.

A. I don't believe so.

Q. I'm under the impression that at the board meeting the services agreement had already been drafted and the trustees were voting on the services agreement as drafted; is that correct?

A. I don't recall if that was actually drafted. I mean, I know the terms were presented of what we were voting on. I don't remember if it was -- if the actual

agreement was drafted prior to or after it was voted on and then they, you know, put together the actual term, you know, the actual agreement.

Q. If you recall, when was the first time you saw the actual services agreement?

A. I don't remember.

Q. Okay. You're not sure if it was before June 2013 or after?

A. No, I don't remember.

Q. Okay. You mentioned that -- I'm looking at your testimony -- that the terms were presented of what the trustees were voting on at the June 2013 meeting.

Were you asked to provide any opinion or input on those terms prior to the June 2013 meeting?

A. No.

Q. Did anybody ask you as -- since you were the national director of the sound recordings division, about your opinion on the services agreement prior to June 2013?

A. That was not my position then.

Q. You're right. Your position

then was national manager West Coast?

A. Right.

Q. Okay. So let me do math really fast.

At that point in time in 2013, you had approximately 19 years of experience in the sound recordings division, right?

A. Yes.

Q. So prior to the June 2013 board meeting, did anybody ask you your opinion or input on the terms of the services agreement prior to when it was voted on?

MR. THOMAS: Objection. Vague. Lacks foundation. Overbroad.

THE WITNESS: I mean, I don't recall that, no, but I was not the head of the department then, so I don't...

QUESTIONS BY MS. MCCONNELL:

Q. So you're saying maybe someone asked the head of the department their input, but you don't know?

A. I don't know. I was just making the point that I was not the national director at that time.

Q. Right.
You were national manager?
A. Uh-huh, yes.
Q. Did you have any conversations with Randall Himes about the proposed services agreement before it was voted on?
A. I don't recall.
Q. Before the June 2013 trustee meeting, did you speak to any Fund employees about the proposed services agreement?
A. Not that I remember, no.
Q. Before the June 2013 trustee meeting, did you consult with any attorneys about the proposed services agreement?
A. No.
Q. At any point in time before the services agreement was signed, did you help with the drafting of the services agreement?
A. No.
Q. Were you asked by anyone to negotiate the terms of the services agreement?
A. No.
Q. Yes or no question: Did you meet with any attorneys at Jenner & Block

before signing the services agreement?

A. No.

Q. And again, yes or no question: Did you meet with any attorneys at Bredhoff & Kaiser before approving the services agreement?

A. No.

Q. Before voting to approve the services agreement, did you make an evaluation of the reasonable cost of the services provided by the unions to The Fund?

MR. THOMAS: Objection. Vague. Ambiguous.

THE WITNESS: No.

QUESTIONS BY MS. MCCONNELL:

Q. Before voting on the services agreement, did you ask anyone at SAG-AFTRA how many hours SAG-AFTRA employees were putting into responding to The Fund's inquiries?

A. No.

Q. Before voting on the services agreement, did you ask anyone at SAG-AFTRA what the overhead allocation was for employees responding to Fund inquiries?

A. No.

Q. Before voting on the services agreement, did you consider whether a percentage fee was appropriate for the service fee?

MR. THOMAS: Objection. Vague. Overbroad.

THE WITNESS: Well, yes, since I voted for it.

QUESTIONS BY MS. MCCONNELL:

Q. So did you consider whether a different methodology for calculating the services fee would be superior to a percentage fee?

A. No.

Q. Okay. Did you -- before you voted on the services agreement, did you have an expectation of how much money would actually be paid from The Fund to the unions under the services agreement?

A. No.

Q. At any point in time before the services agreement was signed, were you aware of a difference of opinion between any trustees about what the percentage of the fee

should be?

A. I mean, I don't know if I would use the words "difference of opinion." I know there were other -- there was discussions before the 3 percent was decided to be the number proposed to the trustees.

Q. What do you remember about those discussions?

A. I just -- like general that -- that I think it was originally discussed as being a higher percentage, and that was not agreed to as what ended up in the final proposal.

Q. Was it SAG-AFTRA that didn't agree to that higher percentage?

A. I think so, yeah.

Q. Do you know what the higher percentage was that AFM was seeking?

MR. THOMAS: Objection to form.

THE WITNESS: Yeah, I didn't actually say that AFM was specifically seeking that, but I don't -- I don't know the number. I just know it was -- it was higher than the 3 percent.

QUESTIONS BY MS. MCCONNELL:

Q. You didn't say that AFM was seeking it, but if it was SAG-AFTRA that didn't agree to the higher percentage, who was it that was seeking a higher percentage?

A. Well, I said there were discussions between them. So, you know, seeking is a very strong word to say. I don't really know -- I was not part of those discussions. I just know as part of those discussions, a higher percentage was talked about.

So I don't really know the dynamic, other than I do know that from the SAG-AFTRA side, it was -- they weren't interested in agreeing to something higher than the 3 percent.

Q. Okay. These were discussions between Ray Hair and Duncan Crabtree-Ireland?

A. That's my understanding.

Q. Okay.

A. But again, I wasn't there.

Q. Were you aware of any discussion in 2013 about different ways to calculate the fee to the unions? For

THE WITNESS: I mean, in what capacity? When I was at SAG-AFTRA? When -- now?

QUESTIONS BY MS. MCCONNELL:

Q. Now.

A. No.

Q. Okay. How many Fund employees -- well, let's back up.

Is there a name of the department at The Fund that conducts this research into performer identities and contact information?

A. There is -- there's a research department that does the bulk of that, but there are some other divisions and departments that also do it; not as much, but do touch on that as well.

Q. Okay. How many employees does The Fund have in the research department?

A. I believe it's currently ten.

Q. Okay.

A. Though, again, there's other -- you know, there's other departments that do similar work that just aren't under that research heading.

Q. Who are those other employees?

A. There is -- there's a department that does audio/visual distributions, and there's four people in that department. I'm not sure, I think two of them work in a research -- two or three of them work in a research capacity on audio/visual works, so that would be a similar -- it's just they -- they ask for different types of information about film and TV work instead of sound recordings.

And then we have a participant services department that also -- that does not as much identifying the performers on a recording, but they deal with all the participant issues. So there's times when they use the membership information and data that comes in, but not -- not as much as the research department. They're the main...

Q. How many people in the participant services department utilize the membership data?

A. It -- I mean, I think all of them do at some point. It's combined -- it's -- participant services also includes

the beneficiary department. So, you know, whatever -- if they're missing information on any individuals or beneficiaries, any of them can reach out. It's just not as large of a part of their job as it is the research department.

Q. How many -- how many people are in the participant services department?

A. I'm thinking including beneficiaries, it might be up to 10 or 12. I don't remember off the top of my head, but it's a large department.

Q. Okay. Can you tell us a bit more about what the researchers in the research department do to identify performers?

A. You mean to -- to identify who was on a track?

Q. Yes.

A. Well, they -- they start with an inquiry to the unions, unless it's very clear that it's not a union recording, which they learn over time sort of which ones are and which ones aren't.

And if they don't receive --

well, actually, even if they receive session reports from the union, they will also look in other sources just to have a backup. We try to match multiple sources if we can.

They'll check online databases that are publicly available, such as Discogs, and use other -- other online sources, some more dependable than others. But it's sort of a combination of all of those things that puts -- that really, like, paints a picture of a recording, and they put all of that information together.

Q. Have some researchers learned so much about recordings that they're able to just listen to a track and identify how many different performers are on tracks?

A. That's not a -- that's not an accepted way of us doing research, no.

I don't know if they do that, but that's not part of our process.

Q. Okay. The process would be session reports, online databases --

A. And --

Q. -- prior payments?

A. Sometimes, you know, the

performer will come forward and have some other documentation that they can provide.

Q. And if you look at your declaration on paragraph 9, it starts with, "When a performer who appears on a covered recording is located, The Fund's research department contacts the individual to confirm his or her participation on the given recording."

Do you see that? Is that the next step?

A. Yeah, I mean, generally the next step is to, once we have a name, to confirm that that is the right person and that the -- you know, if it's John Smith, that we have the right John Smith.

Q. This paragraph goes on to talk about a participant information form.

Is that something unique to The Fund?

A. Yes.

Q. Okay. And is that how the fund maintains contact information for beneficiaries?

MR. THOMAS: Objection.

Overbroad. Lacks foundation.

THE WITNESS: I mean, it's one of the sources.

QUESTIONS BY MS. MCCONNELL:

Q. Okay. Just walk me through how that works.

You said "one of the sources." So is there a compilation of participant information forms at The Fund?

A. No, no, I just mean like, you know, that -- that's the one that's filled out by the participant themselves. We -- there's -- we have to find -- we have to actually locate the person before we can send that out to them. So either -- either we have an address or some other contact information from one of the unions' databases or from another source that we were able to connect with the person.

It just -- we have to get that information initially, first, to even know where to send the participant information form to get all of the other details filled out and to confirm their identity.

Q. What about phone numbers? I

don't think we've talked about phone numbers yet.

Do session reports have phone numbers of performers?

A. Generally not.

Q. Okay. So it's not typical that The Fund's research department would have contact information like a phone number of a performer who they could call and say, "Hey, what's your address? I want to mail you the participant information form"?

A. Not unless they got it from another source. It wouldn't be from the session report, no.

Q. Okay. In paragraph 9 of your declaration, is there any involvement in any of those activities by union employees?

MR. THOMAS: Objection. Vague and overbroad.

THE WITNESS: Yeah, I'm not really sure what you're asking on that. I mean, they -- yeah, I don't --

QUESTIONS BY MS. MCCONNELL:

Q. Yeah, we can walk through it.

of our other sources. Do you have, you know, a connection to this person, or do you know another musician who might have a connection to this person. And, you know, we've done that as well. Just whatever we possibly can do, yes.

Q. And when you're saying "whatever we can possibly do," you're talking about The Fund?

A. Yes.

Q. Okay. Okay. The next sentence, "Another department within The Fund, participant services, then reviews and processes the performer's submitted information, verifies its accuracy, and ensures that a check is issued or that a direct deposit is made."

That, again, is describing work of The Fund, right?

A. Yes.

Q. Okay. If you'll look at paragraph 10, I think you've told us about this step in the process, which is, "Session reports for covered recordings will list the full name of the nonfeatured performer on the

track but will lack additional identifying information, e.g., address, contact information, necessary to locate the performer."

And then if I skip a sentence, "When The Fund is able to obtain partial identifying information for nonfeatured performers on covered recordings, The Fund's researchers will use resources such as LexisNexis, as well as social media, e.g., Facebook, Twitter, LinkedIn, SoundCloud, the online White Pages and the Internet more generally to locate nonfeatured performers."

This is what you described to us a little bit earlier, right?

A. Yes.

Q. And this piece of the process is performed by the approximately ten employees in the research department of The Fund, right?

A. Yes.

Q. Okay. And the last sentence I don't mean to omit: "Researchers also may consult the networks of Fund employees who have extensive contacts within the music

if the amount of songs that The Fund paid on was the same or similar in 2020 as it was in 2019?

A. Same answer, that we endeavor to increase it every year.

The only caveat I will add to that is we get our distribution at the end of April of 2020, when we were working from home and just adjusting to that, so I'm not sure if that affected our ability to do as much work as we normally would have.

Q. Meaning the distributable amount could have been lower just by virtue of everything that was going on?

A. Yeah. I mean, the amount of recordings that we would have been able to research to include in that distribution.

Q. When you saw the amount of money in the 2020 distribution that was going to be allocated to the service fee, did you think that that number was justified?

A. Yes.

Q. Okay. And how did you justify that dollar amount?

A. The same way we've been talking

about. As the amount of money distributed increased, the amount of work increased, the amount of data we used -- that The Fund uses from the unions increases.

Because not only did the number of recordings increase, but I -- I would hope that the number of participants increased as well that we were able to distribute to.

Again, I don't have these numbers in my pocket, but, you know, that's -- that's the whole -- you know, that's one of the reasons why a percentage makes sense, is as the work increases, then the payment for that information, as it grows, and the more information that's needed would justify a higher amount.

I mean, the money into The Fund over that period of time increased quite a bit.

Q. You can't tell us today, though, how many songs have been distributed on year over year from 2014 until 2020, right?

A. No.

Q. Okay. And we don't know how

Fund to do its work that we're, you know, entrusted to do by the participants, to get that money out to them.

So that -- you know, that's a huge value. Again, I can't say it's -- nothing's -- well, incalculable is not the word.

QUESTIONS BY MS. MCCONNELL:

Q. Okay. As CEO of The Fund, have you looked into how The Fund could replicate the membership data at a lower cost?

A. As far as I know, there's not another source that we could obtain that from.

Q. At this point, haven't you obtained all of the information -- strike that.

You told us earlier that every quarter the membership data is sent over from SAG-AFTRA to The Fund, right?

A. Yes.

Q. And I think you told us earlier that there's -- there's something that we called The Fund's system where The Fund

top of my head. I think one of the -- I don't remember if the chair or the co -- or one of the cochairs signed it.

QUESTIONS BY MS. MCCONNELL:

Q. Do you remember signing it?

A. It's possible. I don't remember.

Q. I think you told us earlier you were not involved in the discussions, which you said you thought involved Ray Hair and Duncan Crabtree-Ireland, about the specifics of the services agreement, right?

A. Correct.

Q. Okay. And did you negotiate with anyone regarding the specifics of the services agreement?

A. No.

MR. THOMAS: Objection. Vague. Sorry.

QUESTIONS BY MS. MCCONNELL:

Q. Who is David White?

A. He's the -- I forget what title he is. I don't know if he's CEO at SAG-AFTRA. He -- I think national executive

QUESTIONS BY MS. MCCONNELL:

Q. Okay. Ms. Taub, we are back on the record and you're still under oath.

Do you understand that?

A. Yes.

Q. Great.

In the 2013 time period, how often did The Fund have board meetings?

A. Either three or four times a year.

Q. Is that still the case today?

A. Yes.

Q. In the 2013 time period, who would take the minutes of the board meetings, if you remember?

A. I believe it was Trish Polach.

Q. Was she physically present at the majority of board meetings, if you recall, or was she on the phone?

A. I think she was on the phone.

Q. Okay. Does Trish Polach take the minutes of board meetings today?

A. No.

Q. Okay. Who does that today?

A. Abigail Carter.

CERTIFICATE

I, CARRIE A. CAMPBELL, Registered Diplomate Reporter, Certified Realtime Reporter and Certified Shorthand Reporter, do hereby certify that prior to the commencement of the examination, Stefanie Taub, was duly sworn by me to testify to the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a verbatim transcript of the testimony as taken stenographically by and before me at the time, place and on the date hereinbefore set forth, to the best of my ability.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

____________________________

CARRIE A. CAMPBELL,
NCRA Registered Diplomate Reporter
Certified Realtime Reporter
California Certified Shorthand Reporter #13921
Missouri Certified Court Reporter #859
Illinois Certified Shorthand Reporter #084-004229
Texas Certified Shorthand Reporter #9328
Kansas Certified Court Reporter #1715
Notary Public
Dated: November 2, 2020

# EXHIBIT 18

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

KEVIN RISTO, )
)
Plaintiff, )
)
vs. ) No. 2:18-cv-07241-CAS-PLA
)
SCREEN ACTORS GUILD-AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS, et al., )
)
Defendants. )
_______________________________)

DEPOSITION OF PMK - STEFANIE TAUB
Volume I
APPEARING REMOTELY FROM
GRANADA HILLS, CALIFORNIA
WEDNESDAY, JANUARY 20TH, 2021

REPORTED BY:
MONICA LEPE-GEORG
CSR No. 11976
APPEARING REMOTELY FROM CLOVERDALE, CALIFORNIA

Job No. 264541

REMOTE DEPOSITION OF PMK - STEFANIE TAUB, VOLUME NO. I, taken on behalf of Plaintiff, at Granada Hills, California, beginning at 9:05 a.m. and ending at 4:00 p.m., on Wednesday, January 20th, 2021, before Monica Lepe-Georg, Certified Shorthand Reporter No. 11976.

REMOTE APPEARANCES

FOR PLAINTIFF:

KIESEL LAW LLP
BY: MARIANA A. MCCONNELL, ESQUIRE
PAUL R. KIESEL, ESQUIRE
NICHOLAS BRANCOLINI, ESQUIRE
8648 Wilshire Boulevard
Beverly Hills, California 90211-2910
Telephone: 310.854.4444
Fax: 310.854.0812
E-mail: mcconnell@kiesel.law
kiesel@kiesel.law
brancolini@kiesel.law

CO-COUNSEL:

JOHNSON & JOHNSON LLP
BY: DANIEL B. LIFSCHITZ, ESQUIRE
439 N. Canon Drive
Suite 200
Beverly Hills, California 90210
Telephone: 310.975.1080
Fax: 310.975.1095
E-mail: dlifschitz@jjllp.com

REMOTE APPEARANCES (Continued):

FOR DEFENDANTS:

JENNER & BLOCK, LLP
BY: ANDREW J. THOMAS, ESQUIRE
ANNA LYONS. ESQUIRE
ANDREW G. SULLIVAN, ESQUIRE
633 W. 5th Street
Suite 3600
Los Angeles, California 90071
Telephone: 213.239.5155
Fax: 213.239.5165
E-mail: ajthomas@jenner.com
alyons@jenner.com
agsullivan@jenner.com

FOR THE FUND:

BREDHOFF & KAISER PLLC
BY: ABIGAIL V. CARTER, ESQUIRE
805 15th Street N.W.
Suite 1000
Washington, D.C. 20005-2207
Telephone: 202.842.2600
Fax: 202.842.1888
E-mail: acarter@bredhoff.com

conflict of interest that the board has reviewed this policy with.

I mean, that means there hasn't been a conflict of interest that came up. I mean, if there was --

MS. MCCONNELL: Yeah, I --

THE WITNESS: -- they would have applied this policy.

BY MS. MCCONNELL:

Q. I couldn't figure out why you didn't just answer my questions as a yes or no. I thought maybe you were trying to split the difference somewhere, so that's why I asked you --

A. No.

Q. -- the follow-up question.

A. No.

Q. Okay. Mr. Crabtree-Ireland didn't recuse himself from voting on the services agreement, did he?

A. I -- I think -- I think he did.

Q. Okay. How do you know that?

A. I -- I -- you know, I don't -- I -- I -- I will -- I'm going to be honest, I really don't remember.

Q. Okay.

A. He -- he -- if -- I don't want to say he did if he didn't. I -- I don't remember.

Q. Did he tell you recently that he did?

A. No. I -- I -- I thought I had heard that in the past, but I -- I don't -- I didn't -- I don't have anything to base that on, so I don't want to say it, that I don't -- that I don't know for sure.

Q. Okay. Does any training take place for the board of trustees that explains or reviews the duties the trustees have to the fund?

MR. THOMAS: Objection. Vague. Overbroad.

THE WITNESS: No. Not that I'm aware of.

BY MS. MCCONNELL:

Q. Okay. Is there any sort of education or onboarding that the fund provides for new members of the board of trustees?

A. No.

MR. THOMAS: Same objections. Lacks foundation.

THE WITNESS: Nothing formal. No.

BY MS. MCCONNELL:

Q. You're going to hate me for asking this question, but what's the informal?

A. I -- I --

MR. THOMAS: Same objections. Lacks

Q. Does the fund consider outside counsel for the fund to be a third-party administrator hired by the trustees to manage the fund --
A. No.
Q. -- under No. 3?
A. No.
Q. Okay. What -- what would be a third-party administrator?
A. That -- my understanding of that is -- is, for example -- like, at the beginning of -- well, let me use a different example.
The current situation that the fund is a third-party administrator for the SRDF, the smaller SRDF fund. In the same way, this fund had -- Dennis was acting a third-party administrator originally when he was employed by the Film Musicians Secondary Markets Fund.
THE STENOGRAPHER: Employed by the --
THE WITNESS: That's -- that's how I understand what a third-party administrator is.
MS. MCCONNELL: Got it.
BY MS. MCCONNELL:
Q. And just to kind of close out this conflict of interest piece. Were any disclosures of potential conflicts of interest made by any of the

parties involved in the negotiation of the services agreement?

MR. THOMAS: Objection. Overbroad and vague.

THE WITNESS: Well, I mean, again, like disclosure, peep -- you know, everybody was aware of -- of the positions that people held, but there was no separate disclosure.

BY MS. MCCONNELL:

Q. Were any disclosures of potential conflicts of interest made by any of the parties involved in the drafting of the services agreement?

MR. THOMAS: Same objections. Lacks foundation.

THE WITNESS: Again, not -- not apart from what I've already said, yes.

BY MS. MCCONNELL:

Q. Not apart from --

A. I mean, not from -- apart from the fact that people already -- everybody already knew, you know, the positions that people held, so, you know, to disclose something that people already know.

Q. Didn't seem necessary?

A. I -- I -- it doesn't -- it doesn't seem so, to me. I mean, the whole point of disclosure is to

disclose things that people don't already know.

Q. Were any disclosures of potential conflicts of interest made by any of the parties involved in the voting on the services agreement?

MR. THOMAS: Same objections.

THE WITNESS: Same answer.

BY MS. MCCONNELL:

Q. Other than what we talked about with Duncan Crabtree-Ireland, did any members of the board of trustees recuse themselves from voting on the services agreement?

MR. THOMAS: Objection. Vague.

THE WITNESS: I don't believe so, no.

MS. MCCONNELL: Okay. Nico, can you please send the -- Mr. Hair's disclosures?

And if you can share it as well, that would be great, please.

(Exhibit 3 was marked for identification.)

BY MS. MCCONNELL:

Q. Okay. The earliest conflict-of-interest-policy disclosure statement that we have from Mr. Hair is this one, which we will attach as Exhibit 3, I believe.

And it's dated April 20th, 2016, and bears Defendants' Bates-stamp 41544.

Which leads me to believe that there was a previous disclosure of interest, but your testimony is that we can't find it -- the fund can't find it, right?

A. Yeah -- yes.

Q. Okay. Do you happen to know if Mr. Ray Hair disclosed his position with AFM to the fund?

MR. THOMAS: Objection. Overbroad and vague.

THE WITNESS: I -- I don't know for a fact either way, but, I mean, again, that's -- you know, to dis- -- to disclose something that was already common knowledge by all the trustees, really, it's not necessary to disclose that. I mean, everybody knew he was president of AFM.

BY MS. MCCONNELL:

Q. So, the top of this page says:

"We are required to annually -- we are required annually to file Form 990 with the Internal Revenue Service, and the form we file is available to the public. To complete Form 990 fully and accurately, we need each trustee to disclose the information requested in this Part II."

Do you see that?

BY MS. MCCONNELL:

Q. Okay. Who -- who do you believe was involved in the discussion of the key points of the services agreement?

MR. THOMAS: Objection. Lacks foundation.

THE WITNESS: Dennis Dreith, Ray Hair, and Duncan Crabtree-Ireland.

BY MS. MCCONNELL:

Q. At the time the services agreement was being considered, what, if anything, did the fund do to evaluate the proposed amount of the service fee?

A. What do you mean, what did it -- what did the fund do? I...

Q. Did the fund do anything to quantify the reasonable cost of the services it was going to be provided for the unions?

MR. THOMAS: Objection. Vague. Lacks foundation.

THE WITNESS: Other than -- I mean, I don't know what -- I don't know what Dennis -- what -- I don't know of --

I -- I don't know what Dennis did, particularly. I mean, I know he -- he had the discussions and was the -- was having those discussions as the fund -- I forget, administrator,

at the time, and so I don't know, in his mind, what analysis he did. I assume, since he agreed to it, that there was some sort of assessment that -- that was something that made sense to him. I -- but I don't know beyond that, that any particular analysis was done.

BY MS. MCCONNELL:

Q. In terms of fund governance, did the fund administrator vote on the -- vote on approving the services agreement?

A. In -- in the -- at the board level?

Q. Yes.

A. Oh, he's not a member of the board.

Q. So he didn't have the authority to vote yes or no on approving the services agreement?

A. Correct.

Q. Okay. Did the fund administrator have the authority to tell the trustees that no fund (sic) was warranted?

MR. THOMAS: Objection. Vague.

THE WITNESS: No -- no fee was warranted?

MS. MCCONNELL: Yeah, sorry.

THE WITNESS: I mean, as the administrator, he would have, you know, his view of being the -- the one tasked with -- with leading the fund that --

you know, I mean, he didn't have voting authority, but he's -- he had the role in expressing whether some -- whether that type of arrangement made sense for the fund to enter into.

BY MS. MCCONNELL:

Q. And that ultimate decision would have been the board of trustees'?

A. Yes.

Q. Okay. As the fee amount increased, has the fund evaluated the services it was receiving from the unions?

MR. THOMAS: Objection. Vague. Overbroad.

THE WITNESS: Yeah, I mean, in -- in what sense?

BY MS. MCCONNELL:

Q. Has the fund, prior to when this lawsuit was filed, calculated how many requests were being made to the unions and how many were being responded to?

A. I mean, I don't -- I don't -- there wasn't, like, an official tally that was -- that was particularly looked at. It's -- you know, that's -- that is something that, to some extent, the fund does track, but that was not put into any particular review.

Q. For purposes of this lawsuit, the fund has undertaken efforts to count, for lack of a better word, how many requests are made and how many are responded to, right?

MR. THOMAS: Objection. Misstates facts. Vague.

THE WITNESS: Well, no, we didn't undertake that -- the fund didn't undertake that for the purposes of this lawsuit. I believe the question had been asked if we had data regarding that information and we -- we pulled whatever data we could locate in response to that question. That doesn't mean that we -- we didn't start any new, like, process or procedure based on that.

BY MS. MCCONNELL:

Q. Prior to the lawsuit, had you pulled that data before?

MR. THOMAS: Objection. Vague.

THE WITNESS: Like I said, like, not in a -- you know, oh, we're going to go look at this to -- to -- as a whole. It -- it may -- there may have been an informal tracking, just to kind of look at it in passing, but not -- not any kind of "We're going to really sit down and take a look at this information."

BY MS. MCCONNELL:

Q. Okay.

A. We -- we track -- the fund tracks that more so to -- not to -- not to do a count, but to just look back if we -- if we're trying to figure out, like, where we got the information on a track, in case somebody is, you know, questioning its accuracy or we want to look to see where the information came from. That's -- that's the reason that, in general, the fund tracks the requests to the union and, you know, if we got it back or not. It wasn't to do a particular count at any time.

Q. Correct. I think we're saying the same thing.

So the fund didn't look at that data in order to specifically analyze the service fee and whether it was getting adequate responses from the unions. It was tracking that data, but for more of a verification-type purpose?

A. Yes.

Q. Is that right? Okay.

A. Yes.

Q. And we have testimony that the fund database, it's called the AS400; is that correct?

A. Yes.

the unions and the number of times the unions were able to respond to the requests?

MR. THOMAS: Objection. Vague. Overbroad.

THE WITNESS: I -- you know, we -- it would probably increase the numbers. I'm not sure that it would be, you know, the only -- or the accurate way to do that. I mean, there's a lot of other factors that go into that.

BY MS. MCCONNELL:

Q. Sitting here today, we don't know how many times the buttons were used, we don't know whether the unions responded to certain ones, and the buttons weren't pressed or not, right? It's speculative.

MR. THOMAS: Objection. Misstates the testimony.

THE WITNESS: The -- yeah, again, you can't -- there's no way for our system to be able to know whether it was used or -- or -- that -- in a situation that it was not used and it should have been.

BY MS. MCCONNELL:

Q. It's speculative?

A. Yes.

Q. Do you know what percentage of fund

requests the unions are able to answer?

A. Hold on.

Q. Okay.

A. I have that somewhere.

We're able to answer -- I mean, there's a lot that -- that the fund gets an answer, but the answer is we don't have the report.

Q. Okay.

A. So, is that --

Q. That's what I'm asking you.

A. I'm not -- I'm not sure I pulled those numbers. I -- I have the one -- like how many -- how many times that we did receive information back, the percentage.

Q. Okay. So you received information back from the unions, but that information could have been we don't have any information?

A. No, no, no, no, I'm saying I have the percentage of ones that we got actual information --

Q. Okay. Then what's that number?

A. -- back, not -- not just we don't have -- have anything.

I have -- for SAG-AFTRA, it's 26.67 percent. And for AFM, 28.62 percent.

THE STENOGRAPHER: There's background

trustees, right?
A. Yes.
Q. Do you know who drafted this trust agreement?
A. My understanding -- I believe it was Trish Polach.
Q. Okay. Did the board of trustees ask Trish Polach to draft this agreement?
A. This 2000 -- specifically the 2012 one?
Q. Yes.
A. I believe so, yes. I mean, it wasn't -- it was to update the -- the previous one with some added -- some added things.
Q. Right. One of the things was that AFTRA became SAG-AFTRA, right?
A. Yes.
Q. Okay. Do you remember what else was added?
A. I don't specifically remember. That's always what I think of, is with the 2012, it was to change the name. There may have been a couple other things changed. I don't remember, off the top of my head.
Q. Okay. In this document, the trustees are tasked with establishing and administering the fund, right?

Copyright Act.

Q. Did you ask any other trustees about whether they believed that the Copyright Act authorized those powers -- or the deduction of costs, specifically?

A. No.

Q. While you were on the board of trustees, did you have any conversations amongst the trustees about whether the deduction of costs were authorized by the Copyright Act?

A. I -- I don't -- I don't recall, like, a specific conversation along those lines. I mean, there were -- there had been discussions just about costs and -- and, I mean, I knew it was the trust agreement. I don't recall if anybody ever particularly pointed out Section 114, but it may have -- may have come out in -- in conversation. I don't remember.

Q. The trust agreement was voted on and approved by the board of trustees at the time, right?

A. The -- the 2012 one?

Q. Yeah.

A. Yes.

Q. Okay. Do you agree that the 2012 trust

this stuff about this subject.

Q. We -- on Topic 15, it's the costs, including overhead allocations and labor costs incurred by the fund in maintaining and updating the database.

A. Yeah, but this project doesn't relate to that. I mean --

Q. It doesn't relate to updating the database?

A. They haven't done any work to update the database.

Q. Okay. Isn't that their purpose or not?

A. Well, updating is -- is -- in -- I understood that to mean adding information and keeping the information in it current. They -- they don't do anything related to that.

Q. Okay. Did you calculate any costs, incurred by the fund, in making the updates to the database that you just described?

A. Yes.

Q. Okay. What did you do in that regard?

A. So, I'll -- I'll explain how -- how I went about putting these numbers together.

So, it was asked the -- the hours and the costs associated with both maintaining and updating the fund's database. So, like, there's kind of the

two pieces to that. We have staff who actually are tasked with the technical side of maintaining the database, and then we have the other staff who are putting the information in and updating the information that's in the database.

So then I went -- base -- based on that, excuse me, I have five departments that sort of touch on those things. One is under operations. It's -- it's -- includes what we traditionally call the research or sound recording department, but also audiovisual. That's a separate department, it's not titled research, but that's what they do. And a hundred percent of their work is -- is spent, you know, updating the fund's database.

Participant services, they deal, as it says, on the participant side of taking in participant information when -- when people fill out the PIF forms. And they spend maybe about 80 percent of their time updating the database, 'cause they're updating participant information all the time.

We have international accounts. They exchange data with our international partners, so they're -- they do some updating of the -- the information in the database. If we get new

information from other international CMOs, and I put that about 20 percent of what they do.

Information systems, that's Lorena Lewbel's department, who does all of the programming and maintenance and everything on the AS400. So I put they're -- they're at 100 percent of their work is to maintain and keep that AS400 going.

And then our -- we have a separate IT staff that, you know, does the general IT work, like help desk and desktop computers and those kind of things and keeps all of our servers running, and so I -- they're about 20 percent. And I only actually counted half of that department, so there's 20 percent of two people instead of 20 percent of the full four-person department.

So that's kind of how I assessed what -- what portion of people's work is dedicated to those two things.

Q. Maintaining and updating the database?

A. Right.

Q. Okay.

A. Then I took -- you know, from there, I put the number of staff from each one of those departments. If you want me to read that off, I can. If I -- I can go down the list, if you'd like.

Q. Yeah, that would be great.
A. The research AV is 17 people; participant services is 13; international is four; in- -- information systems is five; and IT, as I said, I only counted two people.
Q. Okay.
A. Then I figured out, based on the percentage of their work and a 35-hour workweek, what the number of hours -- annual hours that that comes out to. I can read those numbers down.
Q. Yeah.
A. Research, 30,000 hours.
Participant services is 19,000.
International is 6,000.
IS is 9,000.
And IT is 700, for a grand total of 64,700.
Then I pulled salary information for those people. I will say I did do some rounding, but very minimal rounding, just to make some even numbers.
So -- and I adjusted the salary based on the percentage, so I took the total salary and then I would multiply it down, like, to 80 percent.
Q. Right.
A. So research AV is a million dollars.
Participant services is 600,000.

International is 50,000.

IS, 600,000.

And IT is 50,000, for a total of 2.3 million.

And then I added -- I did -- this was a little bit more of an estimate. So we took -- tried to apportion some of the overhead --

Q. Right.

A. -- in addition to salary, and the things that I counted in this number is -- we have a 401(k) Safe Harbor that we pay -- that the fund pays. Pension contribution, employer taxes, payroll taxes, medical, and rent, and I did that as a -- kind of an average across the board of 33,000 per person. Some are more and some are less 'cause a couple of those things are salary based.

Q. Right.

A. But it -- this just kind of came out as a number in the middle.

And those numbers, again, based on the percentage of work, for operations, it's 561,000.

Participant services, 343,000.

International, 33,000.

IS, 165,000.

IT, 13,000. And that totals out to

1,115,000.

So, adding together the 2.3 million salary, along with that number, comes out to a grand total of 3,415,000. And that's an annual number. And I'll just add that those specific things is all I counted for overhead. There's a lot of other overhead we had that I didn't just parse out individual things. Those seem to be the most, you know, just general, that applies to everyone.

Q. Okay. Thank you. And these annual numbers are using figures from 2020, or at what point in time?

A. Yes, I meant -- I meant to say that. That was for 2020.

Q. Okay.

MR. SULLIVAN: Just an update that I -- I dropped the trustee expense spreadsheet Bates-stamped in the chat.

MS. MCCONNELL: Okay. Thank you.

MR. SULLIVAN: And there's a -- there's a -- not to put words in Stefanie's mouth --

THE STENOGRAPHER: I'm sorry. There's a what?

MR. SULLIVAN: -- but we noticed one year that has duplicate expenses.

STATE OF CALIFORNIA )
)
COUNTY OF SONOMA )

I, Monica Lepe-Georg, a Certified Shorthand Reporter of the State of California, do hereby certify:

That prior to being examined, the witness in the foregoing proceedings was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That said proceedings were taken remotely before me at the time and places therein set forth and were taken down by me in shorthand and thereafter transcribed into typewriting under my direction and supervision;

I further certify that I am neither counsel for, nor related to, any party to said proceedings, not in anywise interested in the outcome thereof.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: February 3rd, 2021

____________________________

MONICA LEPE-GEORG, No. 11976

1/20/2021
Stefanie Taub
Exhibit 5
MLG CSR 11976

efile GRAPHIC print - DO NOT PROCESS | As Filed Data - | DLN: 93493030007475

OMB No 1545-0047

Form 990

# Return of Organization Exempt From Income Tax

Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except private foundations)

▶ Do not enter Social Security numbers on this form as it may be made public By law, the IRS generally cannot redact the information on the form

▶ Information about Form 990 and its instructions is at www.IRS.gov/form990

Department of the Treasury
Internal Revenue Service

2013

Open to Public Inspection

A For the 2013 calendar year, or tax year beginning 04-01-2013 , 2013, and ending 03-31-2014

B Check if applicable
☑ Address change
☐ Name change
☐ Initial return
☐ Terminated
☐ Amended return
☐ Application pending

C Name of organization
AFM & SAG-AFTRA INTELLECTUAL PROPERTY rights DISTRIBUTION FUND

Doing Business As

Number and street (or P O box if mail is not delivered to street address) Room/suite
4705 laurel canyon blvd
Suite 400

City or town, state or province, country, and ZIP or foreign postal code
valley village, CA 91607

D Employer identification number
95-4815790

E Telephone number
(818) 755-7777

G Gross receipts $ 62,179,422

F Name and address of principal officer
DENNIS DREITH
4705 LAUREL CYN BLVD 400
valley village, CA 91607

H(a) Is this a group return for subordinates? ☐ Yes ☑ No

H(b) Are all subordinates included? ☐ Yes ☐ No
If "No," attach a list (see instructions)

H(c) Group exemption number ▶

I Tax-exempt status ☐ 501(c)(3) ☑ 501(c) ( 6 ) ◀ (insert no ) ☐ 4947(a)(1) or ☐ 527

J Website: ▶ www raroyalties org

K Form of organization ☐ Corporation ☑ Trust ☐ Association ☐ Other ▶

L Year of formation 1998

M State of legal domicile CA

## Part I Summary

**Activities & Governance**

1 Briefly describe the organization's mission or most significant activities
THE FUND COLLECTS AND DISTRIBUTES ROYALTIES ON BEHALF OF BACKGROUND INSTRUMENTAL MUSICIANS AND VOCALISTS

2 Check this box ▶☐ if the organization discontinued its operations or disposed of more than 25% of its net assets

| | | | |
|---|---|---|---|
| 3 | Number of voting members of the governing body (Part VI, line 1a) | 3 | 6 |
| 4 | Number of independent voting members of the governing body (Part VI, line 1b) | 4 | 6 |
| 5 | Total number of individuals employed in calendar year 2013 (Part V, line 2a) | 5 | 28 |
| 6 | Total number of volunteers (estimate if necessary) | 6 | 0 |
| 7a | Total unrelated business revenue from Part VIII, column (C), line 12 | 7a | 0 |
| b | Net unrelated business taxable income from Form 990-T, line 34 | 7b | 0 |

| | | | Prior Year | Current Year |
|---|---|---|---|---|
| **Revenue** | 8 | Contributions and grants (Part VIII, line 1h) | 0 | 0 |
| | 9 | Program service revenue (Part VIII, line 2g) | 27,561,164 | 41,699,519 |
| | 10 | Investment income (Part VIII, column (A), lines 3, 4, and 7d ) | 179,771 | 155,405 |
| | 11 | Other revenue (Part VIII, column (A), lines 5, 6d, 8c, 9c, 10c, and 11e) | 0 | 0 |
| | 12 | Total revenue—add lines 8 through 11 (must equal Part VIII, column (A), line 12) | 27,740,935 | 41,854,924 |
| **Expenses** | 13 | Grants and similar amounts paid (Part IX, column (A), lines 1–3 ) | 0 | 0 |
| | 14 | Benefits paid to or for members (Part IX, column (A), line 4) | 11,356,319 | 13,013,664 |
| | 15 | Salaries, other compensation, employee benefits (Part IX, column (A), lines 5–10) | 2,086,824 | 2,651,919 |
| | 16a | Professional fundraising fees (Part IX, column (A), line 11e) | 0 | 0 |
| | b | Total fundraising expenses (Part IX, column (D), line 25) ▶0 | | |
| | 17 | Other expenses (Part IX, column (A), lines 11a–11d, 11f–24e) | 827,681 | 975,635 |
| | 18 | Total expenses Add lines 13–17 (must equal Part IX, column (A), line 25) | 14,270,824 | 16,641,218 |
| | 19 | Revenue less expenses Subtract line 18 from line 12 | 13,470,111 | 25,213,706 |
| | | | **Beginning of Current Year** | **End of Year** |
| **Net Assets or Fund Balances** | 20 | Total assets (Part X, line 16) | 73,938,175 | 103,015,101 |
| | 21 | Total liabilities (Part X, line 26) | 13,718,039 | 17,624,115 |
| | 22 | Net assets or fund balances Subtract line 21 from line 20 | 60,220,136 | 85,390,986 |

## Part II Signature Block

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete Declaration of preparer (other than officer) is based on all information of which preparer has any knowledge

**Sign Here**

****** 2015-01-26
Signature of officer Date

dennis dreith executive director
Type or print name and title

**Paid Preparer Use Only**

Print/Type preparer's name: MILLER KAPLAN ARASE LLP | Preparer's signature | Date | Check ☐ if self-employed | PTIN P00349311

Firm's name ▶ MILLER KAPLAN ARASE LLP | Firm's EIN ▶

Firm's address ▶ 4123 LANKERSHIM BLVD NORTH HOLLYWOOD, CA 916022828 | Phone no (818) 255-7980

May the IRS discuss this return with the preparer shown above? (see instructions) ☑ Yes ☐ No

For Paperwork Reduction Act Notice, see the separate instructions. Cat No 11282Y Form **990** (2013)

Case 2:18-cv-07241-CAS-PLA Document 111-4 Filed 05/14/21 Page 693 of 893 Page ID #:3248

**Part III Statement of Program Service Accomplishments**

Check if Schedule O contains a response or note to any line in this Part III . . . . . . . . . . ☐

1 Briefly describe the organization's mission

THE FUND COLLECTS AND DISTRIBUTES ROYALTIES ON BEHALF OF BACKGROUND INSTRUMENTAL MUSICIANS AND VOCALISTS

2 Did the organization undertake any significant program services during the year which were not listed on the prior Form 990 or 990-EZ? . . . . . . . . . . ☐ Yes ☑ No

If "Yes," describe these new services on Schedule O

3 Did the organization cease conducting, or make significant changes in how it conducts, any program services? . . . . . . . . . . ☐ Yes ☑ No

If "Yes," describe these changes on Schedule O

4 Describe the organization's program service accomplishments for each of its three largest program services, as measured by expenses Section 501(c)(3) and 501(c)(4) organizations are required to report the amount of grants and allocations to others, the total expenses, and revenue, if any, for each program service reported

4a (Code ) (Expenses $ including grants of $ ) (Revenue $ )

THE FUND COLLECTS AND DISTRIBUTES ROYALTIES ON BEHALF OF BACKGROUND INSTRUMENTAL MUSICIANS AND VOCALISTS

4b (Code ) (Expenses $ including grants of $ ) (Revenue $ )

4c (Code ) (Expenses $ including grants of $ ) (Revenue $ )

4d Other program services (Describe in Schedule O )

(Expenses $ including grants of $ ) (Revenue $ )

4e **Total program service expenses ▶**

Case 2:18-cv-07241-CAS-PLA Document 111-4 Filed 05/14/21 Page 694 of 893 Page ID #:3249

**Part IV** **Checklist of Required Schedules**

| | | | Yes | No |
|---|---|---|---|---|
| 1 | Is the organization described in section 501(c)(3) or 4947(a)(1) (other than a private foundation)? *If "Yes," complete Schedule A* | 1 | | No |
| 2 | Is the organization required to complete *Schedule B, Schedule of Contributors* (see instructions)? | 2 | | No |
| 3 | Did the organization engage in direct or indirect political campaign activities on behalf of or in opposition to candidates for public office? *If "Yes," complete Schedule C, Part I* | 3 | | No |
| 4 | **Section 501(c)(3) organizations.** Did the organization engage in lobbying activities, or have a section 501(h) election in effect during the tax year? *If "Yes," complete Schedule C, Part II* | 4 | | |
| 5 | Is the organization a section 501(c)(4), 501(c)(5), or 501(c)(6) organization that receives membership dues, assessments, or similar amounts as defined in Revenue Procedure 98-19? *If "Yes," complete Schedule C, Part III* | 5 | | No |
| 6 | Did the organization maintain any donor advised funds or any similar funds or accounts for which donors have the right to provide advice on the distribution or investment of amounts in such funds or accounts? *If "Yes," complete Schedule D, Part I* | 6 | | No |
| 7 | Did the organization receive or hold a conservation easement, including easements to preserve open space, the environment, historic land areas, or historic structures? *If "Yes," complete Schedule D, Part II* | 7 | | No |
| 8 | Did the organization maintain collections of works of art, historical treasures, or other similar assets? *If "Yes," complete Schedule D, Part III* | 8 | | No |
| 9 | Did the organization report an amount in Part X, line 21 for escrow or custodial account liability, serve as a custodian for amounts not listed in Part X, or provide credit counseling, debt management, credit repair, or debt negotiation services? *If "Yes," complete Schedule D, Part IV* | 9 | | No |
| 10 | Did the organization, directly or through a related organization, hold assets in temporarily restricted endowments, permanent endowments, or quasi-endowments? *If "Yes," complete Schedule D, Part V* | 10 | | No |
| 11 | If the organization's answer to any of the following questions is "Yes," then complete Schedule D, Parts VI, VII, VIII, IX, or X as applicable | | | |
| a | Did the organization report an amount for land, buildings, and equipment in Part X, line 10? *If "Yes," complete Schedule D, Part VI.* | 11a | Yes | |
| b | Did the organization report an amount for investments—other securities in Part X, line 12 that is 5% or more of its total assets reported in Part X, line 16? *If "Yes," complete Schedule D, Part VII* | 11b | | No |
| c | Did the organization report an amount for investments—program related in Part X, line 13 that is 5% or more of its total assets reported in Part X, line 16? *If "Yes," complete Schedule D, Part VIII* | 11c | | No |
| d | Did the organization report an amount for other assets in Part X, line 15 that is 5% or more of its total assets reported in Part X, line 16? *If "Yes," complete Schedule D, Part IX* | 11d | | No |
| e | Did the organization report an amount for other liabilities in Part X, line 25? *If "Yes," complete Schedule D, Part X* | 11e | Yes | |
| f | Did the organization's separate or consolidated financial statements for the tax year include a footnote that addresses the organization's liability for uncertain tax positions under FIN 48 (ASC 740)? *If "Yes," complete Schedule D, Part X* | 11f | Yes | |
| 12a | Did the organization obtain separate, independent audited financial statements for the tax year? *If "Yes," complete Schedule D, Parts XI and XII* | 12a | Yes | |
| b | Was the organization included in consolidated, independent audited financial statements for the tax year? *If "Yes," and if the organization answered "No" to line 12a, then completing Schedule D, Parts XI and XII is optional* | 12b | | No |
| 13 | Is the organization a school described in section 170(b)(1)(A)(ii)? *If "Yes," complete Schedule E* | 13 | | No |
| 14a | Did the organization maintain an office, employees, or agents outside of the United States? | 14a | | No |
| b | Did the organization have aggregate revenues or expenses of more than $10,000 from grantmaking, fundraising, business, investment, and program service activities outside the United States, or aggregate foreign investments valued at $100,000 or more? *If "Yes," complete Schedule F, Parts I and IV* | 14b | | No |
| 15 | Did the organization report on Part IX, column (A), line 3, more than $5,000 of grants or other assistance to or for any foreign organization? *If "Yes," complete Schedule F, Parts II and IV* | 15 | | No |
| 16 | Did the organization report on Part IX, column (A), line 3, more than $5,000 of aggregate grants or other assistance to or for foreign individuals? *If "Yes," complete Schedule F, Parts III and IV* | 16 | | No |
| 17 | Did the organization report a total of more than $15,000 of expenses for professional fundraising services on Part IX, column (A), lines 6 and 11e? *If "Yes," complete Schedule G, Part I (see instructions)* | 17 | | No |
| 18 | Did the organization report more than $15,000 total of fundraising event gross income and contributions on Part VIII, lines 1c and 8a? *If "Yes," complete Schedule G, Part II* | 18 | | No |
| 19 | Did the organization report more than $15,000 of gross income from gaming activities on Part VIII, line 9a? *If "Yes," complete Schedule G, Part III* | 19 | | No |
| 20a | Did the organization operate one or more hospital facilities? *If "Yes," complete Schedule H* | 20a | | No |
| b | If "Yes" to line 20a, did the organization attach a copy of its audited financial statements to this return? | 20b | | |

Case 2:18-cv-07241-CAS-PLA Document 111-4 Filed 05/14/21 Page 695 of 893 Page ID #:3250

**Part IV** **Checklist of Required Schedules** *(continued)*

| | | Line | Yes | No |
|---|---|---|---|---|
| 21 | Did the organization report more than $5,000 of grants or other assistance to any domestic organization or government on Part IX, column (A), line 1? *If "Yes," complete Schedule I, Parts I and II* | 21 | | No |
| 22 | Did the organization report more than $5,000 of grants or other assistance to individuals in the United States on Part IX, column (A), line 2? *If "Yes," complete Schedule I, Parts I and III* | 22 | | No |
| 23 | Did the organization answer "Yes" to Part VII, Section A, line 3, 4, or 5 about compensation of the organization's current and former officers, directors, trustees, key employees, and highest compensated employees? *If "Yes," complete Schedule J* | 23 | Yes | |
| 24a | Did the organization have a tax-exempt bond issue with an outstanding principal amount of more than $100,000 as of the last day of the year, that was issued after December 31, 2002? *If "Yes," answer lines 24b through 24d and complete Schedule K. If "No," go to line 25a* | 24a | | No |
| b | Did the organization invest any proceeds of tax-exempt bonds beyond a temporary period exception? | 24b | | |
| c | Did the organization maintain an escrow account other than a refunding escrow at any time during the year to defease any tax-exempt bonds? | 24c | | |
| d | Did the organization act as an "on behalf of" issuer for bonds outstanding at any time during the year? | 24d | | |
| 25a | **Section 501(c)(3) and 501(c)(4) organizations.** Did the organization engage in an excess benefit transaction with a disqualified person during the year? *If "Yes," complete Schedule L, Part I* | 25a | | |
| b | Is the organization aware that it engaged in an excess benefit transaction with a disqualified person in a prior year, and that the transaction has not been reported on any of the organization's prior Forms 990 or 990-EZ? *If "Yes," complete Schedule L, Part I* | 25b | | |
| 26 | Did the organization report any amount on Part X, line 5, 6, or 22 for receivables from or payables to any current or former officers, directors, trustees, key employees, highest compensated employees, or disqualified persons? *If so, complete Schedule L, Part II* | 26 | | No |
| 27 | Did the organization provide a grant or other assistance to an officer, director, trustee, key employee, substantial contributor or employee thereof, a grant selection committee member, or to a 35% controlled entity or family member of any of these persons? *If "Yes," complete Schedule L, Part III* | 27 | | No |
| 28 | Was the organization a party to a business transaction with one of the following parties (see Schedule L, Part IV instructions for applicable filing thresholds, conditions, and exceptions) | | | |
| a | A current or former officer, director, trustee, or key employee? *If "Yes," complete Schedule L, Part IV* | 28a | | No |
| b | A family member of a current or former officer, director, trustee, or key employee? *If "Yes," complete Schedule L, Part IV* | 28b | | No |
| c | An entity of which a current or former officer, director, trustee, or key employee (or a family member thereof) was an officer, director, trustee, or direct or indirect owner? *If "Yes," complete Schedule L, Part IV* | 28c | | No |
| 29 | Did the organization receive more than $25,000 in non-cash contributions? *If "Yes," complete Schedule M* | 29 | | No |
| 30 | Did the organization receive contributions of art, historical treasures, or other similar assets, or qualified conservation contributions? *If "Yes," complete Schedule M* | 30 | | No |
| 31 | Did the organization liquidate, terminate, or dissolve and cease operations? *If "Yes," complete Schedule N, Part I* | 31 | | No |
| 32 | Did the organization sell, exchange, dispose of, or transfer more than 25% of its net assets? *If "Yes," complete Schedule N, Part II* | 32 | | No |
| 33 | Did the organization own 100% of an entity disregarded as separate from the organization under Regulations sections 301 7701-2 and 301 7701-3? *If "Yes," complete Schedule R, Part I* | 33 | | No |
| 34 | Was the organization related to any tax-exempt or taxable entity? *If "Yes," complete Schedule R, Part II, III, or IV, and Part V, line 1* | 34 | Yes | |
| 35a | Did the organization have a controlled entity within the meaning of section 512(b)(13)? | 35a | | No |
| b | If 'Yes' to line 35a, did the organization receive any payment from or engage in any transaction with a controlled entity within the meaning of section 512(b)(13)? *If "Yes," complete Schedule R, Part V, line 2* | 35b | | |
| 36 | **Section 501(c)(3) organizations.** Did the organization make any transfers to an exempt non-charitable related organization? *If "Yes," complete Schedule R, Part V, line 2* | 36 | | |
| 37 | Did the organization conduct more than 5% of its activities through an entity that is not a related organization and that is treated as a partnership for federal income tax purposes? *If "Yes," complete Schedule R, Part VI* | 37 | | No |
| 38 | Did the organization complete Schedule O and provide explanations in Schedule O for Part VI, lines 11b and 19? **Note.** All Form 990 filers are required to complete Schedule O | 38 | Yes | |

Confidential DEFS_00040244

Case 2:18-cv-07241-CAS-PLA Document 111-4 Filed 05/14/21 Page 696 of 893 Page ID #:3251

**Part V** **Statements Regarding Other IRS Filings and Tax Compliance**

Check if Schedule O contains a response or note to any line in this Part V

| | | | | Yes | No |
|---|---|---|---|---|---|
| 1a | Enter the number reported in Box 3 of Form 1096 Enter -0- if not applicable | 1a | 11,722 | | |
| b | Enter the number of Forms W-2G included in line 1a Enter -0- if not applicable | 1b | 0 | | |
| c | Did the organization comply with backup withholding rules for reportable payments to vendors and reportable gaming (gambling) winnings to prize winners? | | | 1c Yes | |
| 2a | Enter the number of employees reported on Form W-3, Transmittal of Wage and Tax Statements, filed for the calendar year ending with or within the year covered by this return | 2a | 28 | | |
| b | If at least one is reported on line 2a, did the organization file all required federal employment tax returns? **Note.** If the sum of lines 1a and 2a is greater than 250, you may be required to e-file (see instructions) | | | 2b Yes | |
| 3a | Did the organization have unrelated business gross income of $1,000 or more during the year? | | | 3a | No |
| b | If "Yes," has it filed a Form 990-T for this year? *If "No" to line 3b, provide an explanation in Schedule O* | | | 3b | |
| 4a | At any time during the calendar year, did the organization have an interest in, or a signature or other authority over, a financial account in a foreign country (such as a bank account, securities account, or other financial account)? | | | 4a | No |
| b | If "Yes," enter the name of the foreign country ▶ See instructions for filing requirements for Form TD F 90-22 1, Report of Foreign Bank and Financial Accounts | | | | |
| 5a | Was the organization a party to a prohibited tax shelter transaction at any time during the tax year? | | | 5a | No |
| b | Did any taxable party notify the organization that it was or is a party to a prohibited tax shelter transaction? | | | 5b | No |
| c | If "Yes," to line 5a or 5b, did the organization file Form 8886-T? | | | 5c | |
| 6a | Does the organization have annual gross receipts that are normally greater than $100,000, and did the organization solicit any contributions that were not tax deductible as charitable contributions? | | | 6a | No |
| b | If "Yes," did the organization include with every solicitation an express statement that such contributions or gifts were not tax deductible? | | | 6b | |
| 7 | **Organizations that may receive deductible contributions under section 170(c).** | | | | |
| a | Did the organization receive a payment in excess of $75 made partly as a contribution and partly for goods and services provided to the payor? | | | 7a | |
| b | If "Yes," did the organization notify the donor of the value of the goods or services provided? | | | 7b | |
| c | Did the organization sell, exchange, or otherwise dispose of tangible personal property for which it was required to file Form 8282? | | | 7c | |
| d | If "Yes," indicate the number of Forms 8282 filed during the year | 7d | | | |
| e | Did the organization receive any funds, directly or indirectly, to pay premiums on a personal benefit contract? | | | 7e | |
| f | Did the organization, during the year, pay premiums, directly or indirectly, on a personal benefit contract? | | | 7f | |
| g | If the organization received a contribution of qualified intellectual property, did the organization file Form 8899 as required? | | | 7g | |
| h | If the organization received a contribution of cars, boats, airplanes, or other vehicles, did the organization file a Form 1098-C? | | | 7h | |
| 8 | **Sponsoring organizations maintaining donor advised funds and section 509(a)(3) supporting organizations.** Did the supporting organization, or a donor advised fund maintained by a sponsoring organization, have excess business holdings at any time during the year? | | | 8 | |
| 9 | **Sponsoring organizations maintaining donor advised funds.** | | | | |
| a | Did the organization make any taxable distributions under section 4966? | | | 9a | |
| b | Did the organization make a distribution to a donor, donor advisor, or related person? | | | 9b | |
| 10 | **Section 501(c)(7) organizations.** Enter | | | | |
| a | Initiation fees and capital contributions included on Part VIII, line 12 | 10a | | | |
| b | Gross receipts, included on Form 990, Part VIII, line 12, for public use of club facilities | 10b | | | |
| 11 | **Section 501(c)(12) organizations.** Enter | | | | |
| a | Gross income from members or shareholders | 11a | | | |
| b | Gross income from other sources (Do not net amounts due or paid to other sources against amounts due or received from them ) | 11b | | | |
| 12a | **Section 4947(a)(1) non-exempt charitable trusts.** Is the organization filing Form 990 in lieu of Form 1041? | | | 12a | |
| b | If "Yes," enter the amount of tax-exempt interest received or accrued during the year | 12b | | | |
| 13 | **Section 501(c)(29) qualified nonprofit health insurance issuers.** | | | | |
| a | Is the organization licensed to issue qualified health plans in more than one state? **Note.** See the instructions for additional information the organization must report on Schedule O | | | 13a | |
| b | Enter the amount of reserves the organization is required to maintain by the states in which the organization is licensed to issue qualified health plans | 13b | | | |
| c | Enter the amount of reserves on hand | 13c | | | |
| 14a | Did the organization receive any payments for indoor tanning services during the tax year? | | | 14a | No |
| b | If "Yes," has it filed a Form 720 to report these payments? *If "No," provide an explanation in Schedule O* | | | 14b | |

**Part VI** **Governance, Management, and Disclosure** *For each "Yes" response to lines 2 through 7b below, and for a "No" response to lines 8a, 8b, or 10b below, describe the circumstances, processes, or changes in Schedule O. See instructions.*

Check if Schedule O contains a response or note to any line in this Part VI . . . ☑

**Section A. Governing Body and Management**

| | | | | Yes | No |
|---|---|---|---|---|---|
| 1a | Enter the number of voting members of the governing body at the end of the tax year . . . If there are material differences in voting rights among members of the governing body, or if the governing body delegated broad authority to an executive committee or similar committee, explain in Schedule O | 1a 6 | | | |
| b | Enter the number of voting members included in line 1a, above, who are independent . . . | 1b 6 | | | |
| 2 | Did any officer, director, trustee, or key employee have a family relationship or a business relationship with any other officer, director, trustee, or key employee? . . . | | 2 | | No |
| 3 | Did the organization delegate control over management duties customarily performed by or under the direct supervision of officers, directors or trustees, or key employees to a management company or other person? . | | 3 | | No |
| 4 | Did the organization make any significant changes to its governing documents since the prior Form 990 was filed? . . . | | 4 | | No |
| 5 | Did the organization become aware during the year of a significant diversion of the organization's assets? . | | 5 | | No |
| 6 | Did the organization have members or stockholders? . . . | | 6 | | No |
| 7a | Did the organization have members, stockholders, or other persons who had the power to elect or appoint one or more members of the governing body? . . . | | 7a | | No |
| b | Are any governance decisions of the organization reserved to (or subject to approval by) members, stockholders, or persons other than the governing body? . . . | | 7b | | No |
| 8 | Did the organization contemporaneously document the meetings held or written actions undertaken during the year by the following | | | | |
| a | The governing body? . . . | | 8a | Yes | |
| b | Each committee with authority to act on behalf of the governing body? . . . | | 8b | | No |
| 9 | Is there any officer, director, trustee, or key employee listed in Part VII, Section A, who cannot be reached at the organization's mailing address? *If "Yes," provide the names and addresses in Schedule O* . . . | | 9 | | No |

**Section B. Policies** *(This Section B requests information about policies not required by the Internal Revenue Code.)*

| | | | Yes | No |
|---|---|---|---|---|
| 10a | Did the organization have local chapters, branches, or affiliates? . . . | 10a | | No |
| b | If "Yes," did the organization have written policies and procedures governing the activities of such chapters, affiliates, and branches to ensure their operations are consistent with the organization's exempt purposes? | 10b | | |
| 11a | Has the organization provided a complete copy of this Form 990 to all members of its governing body before filing the form? . . . | 11a | Yes | |
| b | Describe in Schedule O the process, if any, used by the organization to review this Form 990 . . . | | | |
| 12a | Did the organization have a written conflict of interest policy? *If "No," go to line 13* . . . | 12a | Yes | |
| b | Were officers, directors, or trustees, and key employees required to disclose annually interests that could give rise to conflicts? . . . | 12b | Yes | |
| c | Did the organization regularly and consistently monitor and enforce compliance with the policy? *If "Yes," describe in Schedule O how this was done* . . . | 12c | Yes | |
| 13 | Did the organization have a written whistleblower policy? . . . | 13 | Yes | |
| 14 | Did the organization have a written document retention and destruction policy? . . . | 14 | Yes | |
| 15 | Did the process for determining compensation of the following persons include a review and approval by independent persons, comparability data, and contemporaneous substantiation of the deliberation and decision? | | | |
| a | The organization's CEO, Executive Director, or top management official . . . | 15a | Yes | |
| b | Other officers or key employees of the organization . . . | 15b | Yes | |
| | If "Yes" to line 15a or 15b, describe the process in Schedule O (see instructions) | | | |
| 16a | Did the organization invest in, contribute assets to, or participate in a joint venture or similar arrangement with a taxable entity during the year? . . . | 16a | | No |
| b | If "Yes," did the organization follow a written policy or procedure requiring the organization to evaluate its participation in joint venture arrangements under applicable federal tax law, and take steps to safeguard the organization's exempt status with respect to such arrangements? . . . | 16b | | |

**Section C. Disclosure**

17 List the States with which a copy of this Form 990 is required to be filed▶

18 Section 6104 requires an organization to make its Form 1023 (or 1024 if applicable), 990, and 990-T (501(c)(3)s only) available for public inspection Indicate how you made these available Check all that apply

☐ Own website ☐ Another's website ☑ Upon request ☐ Other (explain in Schedule O)

19 Describe in Schedule O whether (and if so, how) the organization made its governing documents, conflict of interest policy, and financial statements available to the public during the tax year

20 State the name, physical address, and telephone number of the person who possesses the books and records of the organization ▶DENNIS DREITH 4705 LAUREL CANYON BLVD STE 400
valley village, CA 91607 (818) 255-7980

**Part VII Compensation of Officers, Directors, Trustees, Key Employees, Highest Compensated Employees, and Independent Contractors**

Check if Schedule O contains a response or note to any line in this Part VII

**Section A. Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees**

**1a** Complete this table for all persons required to be listed Report compensation for the calendar year ending with or within the organization's tax year

- List all of the organization's **current** officers, directors, trustees (whether individuals or organizations), regardless of amount of compensation Enter -0- in columns (D), (E), and (F) if no compensation was paid
- List all of the organization's **current** key employees, if any See instructions for definition of "key employee "
- List the organization's five **current** highest compensated employees (other than an officer, director, trustee or key employee) who received reportable compensation (Box 5 of Form W-2 and/or Box 7 of Form 1099-MISC) of more than $100,000 from the organization and any related organizations
- List all of the organization's **former** officers, key employees, or highest compensated employees who received more than $100,000 of reportable compensation from the organization and any related organizations
- List all of the organization's **former directors or trustees** that received, in the capacity as a former director or trustee of the organization, more than $10,000 of reportable compensation from the organization and any related organizations

List persons in the following order individual trustees or directors, institutional trustees, officers, key employees, highest compensated employees, and former such persons

Check this box if neither the organization nor any related organization compensated any current officer, director, or trustee

| (A) Name and Title | (B) Average hours per week (list any hours for related organizations below dotted line) | (C) Position: Individual trustee or director | Institutional Trustee | Officer | Key employee | Highest compensated employee | Former | (D) Reportable compensation from the organization (W- 2/1099-MISC) | (E) Reportable compensation from related organizations (W- 2/1099-MISC) | (F) Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| (1) DUNCAN CRABTREE-IRELAND<br>TRUSTEE | 1 0 | X | | | | | | 0 | 0 | 0 |
| (2) STEPHANIE TAUB<br>TRUSTEE | 1 0 | X | | | | | | 0 | 0 | 0 |
| (3) BRUCE BOUTON<br>TRUSTEE | 1 0 | X | | | | | | 0 | 0 | 0 |
| (4) JON JOYCE<br>TRUSTEE | 1 0 | X | | | | | | 0 | 0 | 0 |
| (5) SAM FOLIO<br>TRUSTEE | 1 0 | X | | | | | | 0 | 0 | 0 |
| (6) RAYMOND M HAIR<br>TRUSTEE | 1 0 | X | | | | | | 0 | 0 | 0 |
| (7) DENNIS DREITH<br>FUND ADMINISTRATOR | 40 0 | | | | X | | | 96,000 | 326,392 | 63,658 |
| (8) BARBARA DE LUCIA<br>DIRECTOR OF OPERATIONS | 40 0 | | | | | X | | 0 | 146,915 | 26,752 |
| (9) JENNIFER GRASMICK<br>CONTROLLER | 40 0 | | | | | X | | 0 | 140,514 | 32,139 |
| (10) ROBERT RUSEK<br>IT MANAGER | 40 0 | | | | | X | | 0 | 135,348 | 36,935 |
| (11) KAREN TUCKER<br>HR & PARALEGAL | 40 0 | | | | | X | | 31,731 | 113,717 | 21,649 |
| (12) EDWARD WILKINSON<br>MGR APP SYS DEV | 40 0 | | | | | X | | 0 | 124,668 | 23,907 |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

**Part VII** Section A. Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees *(continued)*

| (A) Name and Title | (B) Average hours per week (list any hours for related organizations below dotted line) | (C) Position (do not check more than one box, unless person is both an officer and a director/trustee): Individual trustee or director | Institutional Trustee | Officer | Key employee | Highest compensated employee | Former | (D) Reportable compensation from the organization (W-2/1099-MISC) | (E) Reportable compensation from related organizations (W-2/1099-MISC) | (F) Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

| | | (D) | (E) | (F) |
|---|---|---|---|---|
| 1b | **Sub-Total** ▶ | | | |
| c | **Total from continuation sheets to Part VII, Section A** ▶ | | | |
| d | **Total (add lines 1b and 1c)** ▶ | 127,731 | 987,574 | 205,240 |

2 Total number of individuals (including but not limited to those listed above) who received more than $100,000 of reportable compensation from the organization ▶0

| | | | Yes | No |
|---|---|---|---|---|
| 3 | Did the organization list any **former** officer, director or trustee, key employee, or highest compensated employee on line 1a? *If "Yes," complete Schedule J for such individual* | 3 | | No |
| 4 | For any individual listed on line 1a, is the sum of reportable compensation and other compensation from the organization and related organizations greater than $150,000? *If "Yes," complete Schedule J for such individual* | 4 | Yes | |
| 5 | Did any person listed on line 1a receive or accrue compensation from any unrelated organization or individual for services rendered to the organization? *If "Yes," complete Schedule J for such person* | 5 | | No |

## Section B. Independent Contractors

1 Complete this table for your five highest compensated independent contractors that received more than $100,000 of compensation from the organization Report compensation for the calendar year ending with or within the organization's tax year

| (A) Name and business address | (B) Description of services | (C) Compensation |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |

2 Total number of independent contractors (including but not limited to those listed above) who received more than $100,000 of compensation from the organization ▶0

Case 2:18-cv-07241-CAS-PLA Document 111-4 Filed 05/14/21 Page 700 of 893 Page ID #:3255

**Part VIII Statement of Revenue**

Check if Schedule O contains a response or note to any line in this Part VIII

| | | | (A) Total revenue | (B) Related or exempt function revenue | (C) Unrelated business revenue | (D) Revenue excluded from tax under sections 512-514 |
|---|---|---|---|---|---|---|
| **Contributions, Gifts, Grants and Other Similar Amounts** | 1a Federated campaigns | 1a | | | | |
| | b Membership dues | 1b | | | | |
| | c Fundraising events | 1c | | | | |
| | d Related organizations | 1d | | | | |
| | e Government grants (contributions) | 1e | | | | |
| | f All other contributions, gifts, grants, and similar amounts not included above | 1f | | | | |
| | g Noncash contributions included in lines 1a-1f $ | | | | | |
| | h **Total.** Add lines 1a-1f | | 0 | | | |
| **Program Service Revenue** | | Business Code | | | | |
| | 2a ROYALTY RECEIPTS | 900099 | 41,699,519 | 41,699,519 | | |
| | b | | | | | |
| | c | | | | | |
| | d | | | | | |
| | e | | | | | |
| | f All other program service revenue | | | | | |
| | g **Total.** Add lines 2a-2f | | 41,699,519 | | | |
| **Other Revenue** | 3 Investment income (including dividends, interest, and other similar amounts) | | 155,697 | | | 155,697 |
| | 4 Income from investment of tax-exempt bond proceeds | | 0 | | | |
| | 5 Royalties | | 0 | | | |

| | (i) Real | (ii) Personal |
|---|---|---|
| 6a Gross rents | | |
| b Less rental expenses | | |
| c Rental income or (loss) | 0 | 0 |

| | (A) | (B) | (C) | (D) |
|---|---|---|---|---|
| d Net rental income or (loss) | 0 | | | |

| | (i) Securities | (ii) Other |
|---|---|---|
| 7a Gross amount from sales of assets other than inventory | 20,324,835 | 171 |
| b Less cost or other basis and sales expenses | 20,324,835 | 463 |
| c Gain or (loss) | | -292 |

| | | (A) | (B) | (C) | (D) |
|---|---|---|---|---|---|
| d Net gain or (loss) | | -292 | | | -292 |
| 8a Gross income from fundraising events (not including $ of contributions reported on line 1c) See Part IV, line 18 | a | | | | |
| b Less direct expenses | b | | | | |
| c Net income or (loss) from fundraising events | | 0 | | | |
| 9a Gross income from gaming activities See Part IV, line 19 | a | | | | |
| b Less direct expenses | b | | | | |
| c Net income or (loss) from gaming activities | | 0 | | | |
| 10a Gross sales of inventory, less returns and allowances | a | | | | |
| b Less cost of goods sold | b | | | | |
| c Net income or (loss) from sales of inventory | | 0 | | | |
| Miscellaneous Revenue | Business Code | | | | |
| 11a | | | | | |
| b | | | | | |
| c | | | | | |
| d All other revenue | | | | | |
| e **Total.** Add lines 11a-11d | | 0 | | | |
| 12 **Total revenue.** See Instructions | | 41,854,924 | 41,699,519 | | 155,405 |

Case 2:18-cv-07241-CAS-PLA Document 111-4 Filed 05/14/21 Page 701 of 893 Page ID #:3256

**Part IX Statement of Functional Expenses**

Section 501(c)(3) and 501(c)(4) organizations must complete all columns All other organizations must complete column (A)

Check if Schedule O contains a response or note to any line in this Part IX . . . . . . . . . . . . . . ☐

| Do not include amounts reported on lines 6b, 7b, 8b, 9b, and 10b of Part VIII. | (A) Total expenses | (B) Program service expenses | (C) Management and general expenses | (D) Fundraising expenses |
|---|---|---|---|---|
| 1 Grants and other assistance to governments and organizations in the United States See Part IV, line 21 | 0 | | | |
| 2 Grants and other assistance to individuals in the United States See Part IV, line 22 | 0 | | | |
| 3 Grants and other assistance to governments, organizations, and individuals outside the United States See Part IV, lines 15 and 16 | 0 | | | |
| 4 Benefits paid to or for members | 13,013,664 | | | |
| 5 Compensation of current officers, directors, trustees, and key employees . . . . . | 144,000 | | | |
| 6 Compensation not included above, to disqualified persons (as defined under section 4958(f)(1)) and persons described in section 4958(c)(3)(B) . . . . . | 0 | | | |
| 7 Other salaries and wages | 1,781,488 | | | |
| 8 Pension plan accruals and contributions (include section 401(k) and 403(b) employer contributions) . . . . . | 201,514 | | | |
| 9 Other employee benefits . . . . . . . . . | 379,748 | | | |
| 10 Payroll taxes . . . . . . . . . . . . . . | 145,169 | | | |
| 11 Fees for services (non-employees) | | | | |
| a Management . . . . . . . | 0 | | | |
| b Legal . . . . . . . . . . . | 45,397 | | | |
| c Accounting . . . . . . . . . . . . . . | 11,515 | | | |
| d Lobbying . . . . . . . . . . . . . . | 0 | | | |
| e Professional fundraising services See Part IV, line 17 | 0 | | | |
| f Investment management fees . . . . . . . . | 0 | | | |
| g Other (If line 11g amount exceeds 10% of line 25, column (A) amount, list line 11g expenses on Schedule O ) . . . . . . . . . . . | 32,200 | | | |
| 12 Advertising and promotion . . . . . | 26,154 | | | |
| 13 Office expenses . . . . . . . . . | 87,958 | | | |
| 14 Information technology . . . . . . . | 0 | | | |
| 15 Royalties . . | 0 | | | |
| 16 Occupancy . . . . . . . . . . . . . . | 255,335 | | | |
| 17 Travel . . . . . . . . . . . . . . . . | 0 | | | |
| 18 Payments of travel or entertainment expenses for any federal, state, or local public officials . . . . . . . | 0 | | | |
| 19 Conferences, conventions, and meetings . . . . . | 116,474 | | | |
| 20 Interest . . . . . . . . . . . . . . . | 0 | | | |
| 21 Payments to affiliates . . . . . . . . . | 0 | | | |
| 22 Depreciation, depletion, and amortization . . . . . . | 32,137 | | | |
| 23 Insurance . . . . . . . . . . . . . . . . . . | 14,385 | | | |
| 24 Other expenses Itemize expenses not covered above (List miscellaneous expenses in line 24e If line 24e amount exceeds 10% of line 25, column (A) amount, list line 24e expenses on Schedule O ) | | | | |
| a RESEARCH | 181,498 | | | |
| b BANK AND INVESTMENT MGR FEES | 17,524 | | | |
| c TEMPORARY HELP | 17,444 | | | |
| d PRINTING | 75,472 | | | |
| e All other expenses | 62,142 | | | |
| 25 **Total functional expenses.** Add lines 1 through 24e | 16,641,218 | | | |
| 26 **Joint costs.** Complete this line only if the organization reported in column (B) joint costs from a combined educational campaign and fundraising solicitation Check here ▶ ☐ if following SOP 98-2 (ASC 958-720) | | | | |

**Part X** **Balance Sheet**

Check if Schedule O contains a response or note to any line in this Part X

| Section | Line | Description | | | (A) Beginning of year | | (B) End of year |
|---|---|---|---|---|---|---|---|
| Assets | 1 | Cash—non-interest-bearing | | | 0 | 1 | 0 |
| | 2 | Savings and temporary cash investments | | | 50,462,024 | 2 | 72,321,436 |
| | 3 | Pledges and grants receivable, net | | | 0 | 3 | 0 |
| | 4 | Accounts receivable, net | | | 5,868 | 4 | 14 |
| | 5 | Loans and other receivables from current and former officers, directors, trustees, key employees, and highest compensated employees Complete Part II of Schedule L | | | 0 | 5 | 0 |
| | 6 | Loans and other receivables from other disqualified persons (as defined under section 4958(f)(1)), persons described in section 4958(c)(3)(B), and contributing employers and sponsoring organizations of section 501(c)(9) voluntary employees' beneficiary organizations (see instructions) Complete Part II of Schedule L | | | 0 | 6 | 0 |
| | 7 | Notes and loans receivable, net | | | 0 | 7 | 7,000,000 |
| | 8 | Inventories for sale or use | | | 0 | 8 | 0 |
| | 9 | Prepaid expenses and deferred charges | | | 6,091 | 9 | 73,308 |
| | 10a | Land, buildings, and equipment cost or other basis Complete Part VI of Schedule D | 10a | 276,069 | | | |
| | b | Less accumulated depreciation | 10b | 71,794 | 138,426 | 10c | 204,275 |
| | 11 | Investments—publicly traded securities | | | 23,325,746 | 11 | 23,416,068 |
| | 12 | Investments—other securities See Part IV, line 11 | | | 0 | 12 | 0 |
| | 13 | Investments—program-related See Part IV, line 11 | | | 0 | 13 | 0 |
| | 14 | Intangible assets | | | 0 | 14 | 0 |
| | 15 | Other assets See Part IV, line 11 | | | 0 | 15 | 0 |
| | 16 | **Total assets.** Add lines 1 through 15 (must equal line 34) | | | 73,938,175 | 16 | 103,015,101 |
| Liabilities | 17 | Accounts payable and accrued expenses | | | 0 | 17 | 0 |
| | 18 | Grants payable | | | 0 | 18 | 0 |
| | 19 | Deferred revenue | | | 0 | 19 | 0 |
| | 20 | Tax-exempt bond liabilities | | | 0 | 20 | 0 |
| | 21 | Escrow or custodial account liability Complete Part IV of Schedule D | | | 0 | 21 | 0 |
| | 22 | Loans and other payables to current and former officers, directors, trustees, key employees, highest compensated employees, and disqualified persons Complete Part II of Schedule L | | | 0 | 22 | 0 |
| | 23 | Secured mortgages and notes payable to unrelated third parties | | | 0 | 23 | 0 |
| | 24 | Unsecured notes and loans payable to unrelated third parties | | | 0 | 24 | 0 |
| | 25 | Other liabilities (including federal income tax, payables to related third parties, and other liabilities not included on lines 17-24) Complete Part X of Schedule D | | | 13,718,039 | 25 | 17,624,115 |
| | 26 | **Total liabilities.** Add lines 17 through 25 | | | 13,718,039 | 26 | 17,624,115 |
| Net Assets or Fund Balances | | **Organizations that follow SFAS 117 (ASC 958), check here ▶ ☐ and complete lines 27 through 29, and lines 33 and 34.** | | | | | |
| | 27 | Unrestricted net assets | | | | 27 | |
| | 28 | Temporarily restricted net assets | | | | 28 | |
| | 29 | Permanently restricted net assets | | | | 29 | |
| | | **Organizations that do not follow SFAS 117 (ASC 958), check here ▶ ☑ and complete lines 30 through 34.** | | | | | |
| | 30 | Capital stock or trust principal, or current funds | | | 0 | 30 | 0 |
| | 31 | Paid-in or capital surplus, or land, building or equipment fund | | | 0 | 31 | 0 |
| | 32 | Retained earnings, endowment, accumulated income, or other funds | | | 60,220,136 | 32 | 85,390,986 |
| | 33 | Total net assets or fund balances | | | 60,220,136 | 33 | 85,390,986 |
| | 34 | Total liabilities and net assets/fund balances | | | 73,938,175 | 34 | 103,015,101 |

Case 2:18-cv-07241-CAS-PLA Document 111-4 Filed 05/14/21 Page 703 of 893 Page ID #:3258

**Part XI Reconciliation of Net Assets**

Check if Schedule O contains a response or note to any line in this Part XI . . . . . . . . . . . . . ☐

| | | | |
|---|---|---|---|
| 1 | Total revenue (must equal Part VIII, column (A), line 12) | 1 | 41,854,924 |
| 2 | Total expenses (must equal Part IX, column (A), line 25) | 2 | 16,641,218 |
| 3 | Revenue less expenses Subtract line 2 from line 1 | 3 | 25,213,706 |
| 4 | Net assets or fund balances at beginning of year (must equal Part X, line 33, column (A)) | 4 | 60,220,136 |
| 5 | Net unrealized gains (losses) on investments | 5 | -42,856 |
| 6 | Donated services and use of facilities | 6 | |
| 7 | Investment expenses | 7 | |
| 8 | Prior period adjustments | 8 | |
| 9 | Other changes in net assets or fund balances (explain in Schedule O) | 9 | |
| 10 | Net assets or fund balances at end of year Combine lines 3 through 9 (must equal Part X, line 33, column (B)) | 10 | 85,390,986 |

**Part XII Financial Statements and Reporting**

Check if Schedule O contains a response or note to any line in this Part XII . . . . . . . . . . . . . ☑

| | | | Yes | No |
|---|---|---|---|---|
| 1 | Accounting method used to prepare the Form 990 ☐ Cash ☐ Accrual ☑ Other ____________<br>If the organization changed its method of accounting from a prior year or checked "Other," explain in Schedule O | | | |
| 2a | Were the organization's financial statements compiled or reviewed by an independent accountant? | 2a | | No |
| | If 'Yes,' check a box below to indicate whether the financial statements for the year were compiled or reviewed on a separate basis, consolidated basis, or both<br>☐ Separate basis ☐ Consolidated basis ☐ Both consolidated and separate basis | | | |
| b | Were the organization's financial statements audited by an independent accountant? | 2b | Yes | |
| | If 'Yes,' check a box below to indicate whether the financial statements for the year were audited on a separate basis, consolidated basis, or both<br>☑ Separate basis ☐ Consolidated basis ☐ Both consolidated and separate basis | | | |
| c | If "Yes," to line 2a or 2b, does the organization have a committee that assumes responsibility for oversight of the audit, review, or compilation of its financial statements and selection of an independent accountant? | 2c | Yes | |
| | If the organization changed either its oversight process or selection process during the tax year, explain in Schedule O | | | |
| 3a | As a result of a federal award, was the organization required to undergo an audit or audits as set forth in the Single Audit Act and OMB Circular A-133? | 3a | | |
| b | If "Yes," did the organization undergo the required audit or audits? If the organization did not undergo the required audit or audits, explain why in Schedule O and describe any steps taken to undergo such audits | 3b | | |

Confidential DEFS_00040252

**SCHEDULE D** (Form 990)

Department of the Treasury
Internal Revenue Service

# Supplemental Financial Statements

▶ Complete if the organization answered "Yes," to Form 990, Part IV, line 6, 7, 8, 9, 10, 11a, 11b, 11c, 11d, 11e, 11f, 12a, or 12b
▶ Attach to Form 990. ▶ See separate instructions. ▶ Information about Schedule D (Form 990) and its instructions is at www.irs.gov/form990.

OMB No 1545-0047

**2013**

**Open to Public Inspection**

**Name of the organization**
AFM & SAG-AFTRA INTELLECTUAL PROPERTY rights DISTRIBUTION FUND

**Employer identification number**
95-4815790

**Part I Organizations Maintaining Donor Advised Funds or Other Similar Funds or Accounts.** Complete if the organization answered "Yes" to Form 990, Part IV, line 6.

| | | (a) Donor advised funds | (b) Funds and other accounts |
|---|---|---|---|
| 1 | Total number at end of year | | |
| 2 | Aggregate contributions to (during year) | | |
| 3 | Aggregate grants from (during year) | | |
| 4 | Aggregate value at end of year | | |

5 Did the organization inform all donors and donor advisors in writing that the assets held in donor advised funds are the organization's property, subject to the organization's exclusive legal control? ☐ Yes ☐ No

6 Did the organization inform all grantees, donors, and donor advisors in writing that grant funds can be used only for charitable purposes and not for the benefit of the donor or donor advisor, or for any other purpose conferring impermissible private benefit? ☐ Yes ☐ No

**Part II Conservation Easements.** Complete if the organization answered "Yes" to Form 990, Part IV, line 7.

1 Purpose(s) of conservation easements held by the organization (check all that apply)
☐ Preservation of land for public use (e g , recreation or education) ☐ Preservation of an historically important land area
☐ Protection of natural habitat ☐ Preservation of a certified historic structure
☐ Preservation of open space

2 Complete lines 2a through 2d if the organization held a qualified conservation contribution in the form of a conservation easement on the last day of the tax year

| | | | Held at the End of the Year |
|---|---|---|---|
| a | Total number of conservation easements | 2a | |
| b | Total acreage restricted by conservation easements | 2b | |
| c | Number of conservation easements on a certified historic structure included in (a) | 2c | |
| d | Number of conservation easements included in (c) acquired after 8/17/06, and not on a historic structure listed in the National Register | 2d | |

3 Number of conservation easements modified, transferred, released, extinguished, or terminated by the organization during the tax year ▶______________

4 Number of states where property subject to conservation easement is located ▶______________

5 Does the organization have a written policy regarding the periodic monitoring, inspection, handling of violations, and enforcement of the conservation easements it holds? ☐ Yes ☐ No

6 Staff and volunteer hours devoted to monitoring, inspecting, and enforcing conservation easements during the year ▶______________

7 Amount of expenses incurred in monitoring, inspecting, and enforcing conservation easements during the year ▶ $ ______________

8 Does each conservation easement reported on line 2(d) above satisfy the requirements of section 170(h)(4)(B)(i) and section 170(h)(4)(B)(ii)? ☐ Yes ☐ No

9 In Part XIII, describe how the organization reports conservation easements in its revenue and expense statement, and balance sheet, and include, if applicable, the text of the footnote to the organization's financial statements that describes the organization's accounting for conservation easements

**Part III Organizations Maintaining Collections of Art, Historical Treasures, or Other Similar Assets.** Complete if the organization answered "Yes" to Form 990, Part IV, line 8.

1a If the organization elected, as permitted under SFAS 116 (ASC 958), not to report in its revenue statement and balance sheet works of art, historical treasures, or other similar assets held for public exhibition, education, or research in furtherance of public service, provide, in Part XIII, the text of the footnote to its financial statements that describes these items

b If the organization elected, as permitted under SFAS 116 (ASC 958), to report in its revenue statement and balance sheet works of art, historical treasures, or other similar assets held for public exhibition, education, or research in furtherance of public service, provide the following amounts relating to these items

(i) Revenues included in Form 990, Part VIII, line 1 ▶ $ ______________

(ii) Assets included in Form 990, Part X ▶ $ ______________

2 If the organization received or held works of art, historical treasures, or other similar assets for financial gain, provide the following amounts required to be reported under SFAS 116 (ASC 958) relating to these items

a Revenues included in Form 990, Part VIII, line 1 ▶ $ ______________

b Assets included in Form 990, Part X ▶ $ ______________

**Part III Organizations Maintaining Collections of Art, Historical Treasures, or Other Similar Assets** *(continued)*

3 Using the organization's acquisition, accession, and other records, check any of the following that are a significant use of its collection items (check all that apply)

- a ☐ Public exhibition
- b ☐ Scholarly research
- c ☐ Preservation for future generations
- d ☐ Loan or exchange programs
- e ☐ Other

4 Provide a description of the organization's collections and explain how they further the organization's exempt purpose in Part XIII

5 During the year, did the organization solicit or receive donations of art, historical treasures or other similar assets to be sold to raise funds rather than to be maintained as part of the organization's collection? ☐ Yes ☐ No

**Part IV Escrow and Custodial Arrangements.** Complete if the organization answered "Yes" to Form 990, Part IV, line 9, or reported an amount on Form 990, Part X, line 21.

1a Is the organization an agent, trustee, custodian or other intermediary for contributions or other assets not included on Form 990, Part X? ☐ Yes ☐ No

b If "Yes," explain the arrangement in Part XIII and complete the following table

| | | | Amount |
|---|---|---|---|
| c | Beginning balance | 1c | |
| d | Additions during the year | 1d | |
| e | Distributions during the year | 1e | |
| f | Ending balance | 1f | |

2a Did the organization include an amount on Form 990, Part X, line 21? ☐ Yes ☐ No

b If "Yes," explain the arrangement in Part XIII Check here if the explanation has been provided in Part XIII . . . . . . . . ☐

**Part V Endowment Funds.** Complete if the organization answered "Yes" to Form 990, Part IV, line 10.

| | | (a) Current year | (b) Prior year | (c) Two years back | (d) Three years back | (e) Four years back |
|---|---|---|---|---|---|---|
| 1a | Beginning of year balance | | | | | |
| b | Contributions | | | | | |
| c | Net investment earnings, gains, and losses | | | | | |
| d | Grants or scholarships | | | | | |
| e | Other expenditures for facilities and programs | | | | | |
| f | Administrative expenses | | | | | |
| g | End of year balance | | | | | |

2 Provide the estimated percentage of the current year end balance (line 1g, column (a)) held as

a Board designated or quasi-endowment ▶

b Permanent endowment ▶

c Temporarily restricted endowment ▶

The percentages in lines 2a, 2b, and 2c should equal 100%

3a Are there endowment funds not in the possession of the organization that are held and administered for the organization by

| | | | Yes | No |
|---|---|---|---|---|
| | (i) unrelated organizations | 3a(i) | | |
| | (ii) related organizations | 3a(ii) | | |
| b | If "Yes" to 3a(ii), are the related organizations listed as required on Schedule R? | 3b | | |

4 Describe in Part XIII the intended uses of the organization's endowment funds

**Part VI Land, Buildings, and Equipment.** Complete if the organization answered 'Yes' to Form 990, Part IV, line 11a. See Form 990, Part X, line 10.

| Description of property | (a) Cost or other basis (investment) | (b) Cost or other basis (other) | (c) Accumulated depreciation | (d) Book value |
|---|---|---|---|---|
| 1a Land | | | | |
| b Buildings | | | | |
| c Leasehold improvements | | 58,416 | 16,083 | 42,333 |
| d Equipment | | 127,240 | 45,372 | 81,868 |
| e Other | | 90,413 | 10,339 | 80,074 |
| **Total.** Add lines 1a through 1e *(Column (d) must equal Form 990, Part X, column (B), line 10(c).)* ▶ | | | | 204,275 |

**Part VII Investments—Other Securities.** Complete if the organization answered 'Yes' to Form 990, Part IV, line 11b. See Form 990, Part X, line 12.

| (a) Description of security or category (including name of security) | (b) Book value | (c) Method of valuation Cost or end-of-year market value |
|---|---|---|
| (1) Financial derivatives | | |
| (2) Closely-held equity interests | | |
| Other | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| **Total.** *(Column (b) must equal Form 990, Part X, col (B) line 12 )* ▶ | | |

**Part VIII Investments—Program Related.** Complete if the organization answered 'Yes' to Form 990, Part IV, line 11c. See Form 990, Part X, line 13.

| (a) Description of investment | (b) Book value | (c) Method of valuation Cost or end-of-year market value |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| **Total.** *(Column (b) must equal Form 990, Part X, col (B) line 13 )* ▶ | | |

**Part IX Other Assets.** Complete if the organization answered 'Yes' to Form 990, Part IV, line 11d See Form 990, Part X, line 15

| (a) Description | (b) Book value |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| **Total.** *(Column (b) must equal Form 990, Part X, col.(B) line 15.)* ▶ | |

**Part X Other Liabilities.** Complete if the organization answered 'Yes' to Form 990, Part IV, line 11e or 11f. See Form 990, Part X, line 25.

| 1 (a) Description of liability | (b) Book value |
|---|---|
| Federal income taxes | 0 |
| DISTRIBUTIONS PAYABLE | 17,624,115 |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

**Part XI** **Reconciliation of Revenue per Audited Financial Statements With Revenue per Return** Complete if the organization answered 'Yes' to Form 990, Part IV, line 12a.

| | | | | | |
|---|---|---|---|---|---|
| 1 | Total revenue, gains, and other support per audited financial statements | | | 1 | |
| 2 | Amounts included on line 1 but not on Form 990, Part VIII, line 12 | | | | |
| a | Net unrealized gains on investments | 2a | | | |
| b | Donated services and use of facilities | 2b | | | |
| c | Recoveries of prior year grants | 2c | | | |
| d | Other (Describe in Part XIII ) | 2d | | | |
| e | Add lines **2a** through **2d** | | | 2e | |
| 3 | Subtract line **2e** from line **1** | | | 3 | |
| 4 | Amounts included on Form 990, Part VIII, line 12, but not on line **1** | | | | |
| a | Investment expenses not included on Form 990, Part VIII, line 7b | 4a | | | |
| b | Other (Describe in Part XIII ) | 4b | | | |
| c | Add lines **4a** and **4b** | | | 4c | |
| 5 | Total revenue Add lines **3** and **4c.** (This must equal Form 990, Part I, line 12 ) | | | 5 | |

**Part XII** **Reconciliation of Expenses per Audited Financial Statements With Expenses per Return.** Complete if the organization answered 'Yes' to Form 990, Part IV, line 12a.

| | | | | | |
|---|---|---|---|---|---|
| 1 | Total expenses and losses per audited financial statements | | | 1 | |
| 2 | Amounts included on line 1 but not on Form 990, Part IX, line 25 | | | | |
| a | Donated services and use of facilities | 2a | | | |
| b | Prior year adjustments | 2b | | | |
| c | Other losses | 2c | | | |
| d | Other (Describe in Part XIII ) | 2d | | | |
| e | Add lines **2a** through **2d** | | | 2e | |
| 3 | Subtract line **2e** from line **1** | | | 3 | |
| 4 | Amounts included on Form 990, Part IX, line 25, but not on line **1:** | | | | |
| a | Investment expenses not included on Form 990, Part VIII, line 7b | 4a | | | |
| b | Other (Describe in Part XIII ) | 4b | | | |
| c | Add lines **4a** and **4b** | | | 4c | |
| 5 | Total expenses Add lines **3** and **4c.** (This must equal Form 990, Part I, line 18 ) | | | 5 | |

**Part XIII** **Supplemental Information**

Provide the descriptions required for Part II, lines 3, 5, and 9, Part III, lines 1a and 4, Part IV, lines 1b and 2b, Part V, line 4, Part X, line 2, Part XI, lines 2d and 4b, and Part XII, lines 2d and 4b Also complete this part to provide any additional information

| Return Reference | Explanation |
|---|---|
| PART X, LINE 2 | The Fund has adopted guidance on accounting for uncertainty in income taxes issued by the Financial Accounting Standards Board Management believes that the Fund has taken no uncertain tax positions that require adjustment to the financial statements to comply with the provisions of this guidance as of march 31, 2014, information returns subsequent to 2010 are subject to examination by authorities |
| | |
| | |
| | |
| | |
| | |
| | |

Schedule D (Form 990) 2013 Case 2:18-cv-07241-CAS-PLA Document 111-4 Filed 05/14/21 Page 708 of 893 Page ID #:3263 Page 5

**Part XIII Supplemental Information** *(continued)*

| Return Reference | Explanation |
| --- | --- |
| | |

Schedule D (Form 990) 2013

Confidential DEFS_00040257

**Schedule J** (Form 990)

Department of the Treasury Internal Revenue Service

# Compensation Information

**For certain Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees**

▶ **Complete if the organization answered "Yes" to Form 990, Part IV, line 23.**
▶ **Attach to Form 990.** ▶ **See separate instructions.**
▶ **Information about Schedule J (Form 990) and its instructions is at** ***www.irs.gov/form990.***

OMB No 1545-0047

**2013**

**Open to Public Inspection**

Name of the organization
AFM & SAG-AFTRA INTELLECTUAL PROPERTY rights DISTRIBUTION FUND

**Employer identification number**
95-4815790

**Part I Questions Regarding Compensation**

| | | | Yes | No |
|---|---|---|---|---|
| **1a** | Check the appropriate box(es) if the organization provided any of the following to or for a person listed in Form 990, Part VII, Section A, line 1a Complete Part III to provide any relevant information regarding these items<br>☐ First-class or charter travel ☐ Housing allowance or residence for personal use<br>☐ Travel for companions ☐ Payments for business use of personal residence<br>☐ Tax idemnification and gross-up payments ☐ Health or social club dues or initiation fees<br>☐ Discretionary spending account ☐ Personal services (e g , maid, chauffeur, chef) | | | |
| **b** | If any of the boxes in line 1a are checked, did the organization follow a written policy regarding payment or reimbursement or provision of all of the expenses described above? If "No," complete Part III to explain | **1b** | | |
| **2** | Did the organization require substantiation prior to reimbursing or allowing expenses incurred by all directors, trustees, officers, including the CEO/Executive Director, regarding the items checked in line 1a? | **2** | | |
| **3** | Indicate which, if any, of the following the filing organization used to establish the compensation of the organization's CEO/Executive Director Check all that apply Do not check any boxes for methods used by a related organization to establish compensation of the CEO/Executive Director, but explain in Part III<br>☐ Compensation committee ☐ Written employment contract<br>☐ Independent compensation consultant ☐ Compensation survey or study<br>☐ Form 990 of other organizations ☑ Approval by the board or compensation committee | | | |
| **4** | During the year, did any person listed in Form 990, Part VII, Section A, line 1a with respect to the filing organization or a related organization | | | |
| **a** | Receive a severance payment or change-of-control payment? | **4a** | | No |
| **b** | Participate in, or receive payment from, a supplemental nonqualified retirement plan? | **4b** | | No |
| **c** | Participate in, or receive payment from, an equity-based compensation arrangement?<br>If "Yes" to any of lines 4a-c, list the persons and provide the applicable amounts for each item in Part III | **4c** | | No |
| | **Only 501(c)(3) and 501(c)(4) organizations only must complete lines 5-9.** | | | |
| **5** | For persons listed in Form 990, Part VII, Section A, line 1a, did the organization pay or accrue any compensation contingent on the revenues of | | | |
| **a** | The organization? | **5a** | | |
| **b** | Any related organization?<br>If "Yes," to line 5a or 5b, describe in Part III | **5b** | | |
| **6** | For persons listed in Form 990, Part VII, Section A, line 1a, did the organization pay or accrue any compensation contingent on the net earnings of | | | |
| **a** | The organization? | **6a** | | |
| **b** | Any related organization?<br>If "Yes," to line 6a or 6b, describe in Part III | **6b** | | |
| **7** | For persons listed in Form 990, Part VII, Section A, line 1a, did the organization provide any non-fixed payments not described in lines 5 and 6? If "Yes," describe in Part III | **7** | | |
| **8** | Were any amounts reported in Form 990, Part VII, paid or accured pursuant to a contract that was subject to the initial contract exception described in Regulations section 53 4958-4(a)(3)? If "Yes," describe in Part III | **8** | | |
| **9** | If "Yes" to line 8, did the organization also follow the rebuttable presumption procedure described in Regulations section 53 4958-6(c)? | **9** | | |

**Part II Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees.** Use duplicate copies if additional space is needed.

For each individual whose compensation must be reported in Schedule J, report compensation from the organization on row (i) and from related organizations, described in the instructions, on row (ii) Do not list any individuals that are not listed on Form 990, Part VII

**Note.** The sum of columns (B)(i)-(iii) for each listed individual must equal the total amount of Form 990, Part VII, Section A, line 1a, applicable column (D) and (E) amounts for that individual

| (A) Name and Title | | (B) Breakdown of W-2 and/or 1099-MISC compensation | | | (C) Retirement and other deferred compensation | (D) Nontaxable benefits | (E) Total of columns (B)(i)-(D) | (F) Compensation reported as deferred in prior Form 990 |
|---|---|---|---|---|---|---|---|---|
| | | (i) Base compensation | (ii) Bonus & incentive compensation | (iii) Other reportable compensation | | | | |
| (1)DENNIS DREITH FUND ADMINISTRATOR | (i) | 96,000 | | | | | 96,000 | |
| | (ii) | 326,392 | | | 33,984 | 29,874 | 390,250 | |
| (2)BARBARA DE LUCIA DIRECTOR OF OPERATIONS | (i) | 0 | | | | | 0 | |
| | (ii) | 146,915 | | | 16,086 | 10,666 | 173,667 | |
| (3)JENNIFER GRASMICK CONTROLLER | (i) | 0 | | | | | 0 | |
| | (ii) | 140,514 | | | 15,268 | 16,871 | 172,653 | |
| (4)ROBERT RUSEK IT MANAGER | (i) | 0 | | | | | 0 | |
| | (ii) | 135,348 | | | 15,359 | 21,576 | 172,283 | |
| (5)KAREN TUCKER HR & PARALEGAL | (i) | 31,731 | | | | | 31,731 | |
| | (ii) | 113,717 | | | 12,956 | 8,693 | 135,366 | |

**Part III Supplemental Information**

Provide the information, explanation, or descriptions required for Part I, lines 1a, 1b, 3, 4a, 4b, 4c, 5a, 5b, 6a, 6b, 7, and 8, and for Part II
Also complete this part for any additional information

| Return Reference | Explanation |
|---|---|

efile GRAPHIC print - DO NOT PROCESS | As Filed Data - | DLN: 93493030007475

**SCHEDULE O** (Form 990 or 990-EZ)

Department of the Treasury
Internal Revenue Service

# Supplemental Information to Form 990 or 990-EZ

Complete to provide information for responses to specific questions on Form 990 or to provide any additional information.
▶ Attach to Form 990 or 990-EZ.
▶ Information about Schedule O (Form 990 or 990-EZ) and its instructions is at www.irs.gov/form990.

OMB No 1545-0047

**2013**

**Open to Public Inspection**

Name of the organization
AFM & SAG-AFTRA INTELLECTUAL PROPERTY rights DISTRIBUTION FUND

**Employer identification number**
95-4815790

**990 Schedule O, Supplemental Information**

| Return Reference | Explanation |
|---|---|
| PART VI, SECTION a, LINE 8B | |

efile GRAPHIC print - DO NOT PROCESS | As Filed Data - | DLN: 93493030007475

Case 2:18-cv-07241-CAS-PLA Document 111-4 Filed 05/14/21 Page 712 of 893 Page ID #:3267

**SCHEDULE R (Form 990)**

Department of the Treasury
Internal Revenue Service

# Related Organizations and Unrelated Partnerships

▶ Complete if the organization answered "Yes" on Form 990, Part IV, line 33, 34, 35b, 36, or 37.
▶ Attach to Form 990. ▶ See separate instructions.
▶ Information about Schedule R (Form 990) and its instructions is at www.irs.gov/form990.

OMB No 1545-0047

**2013**

**Open to Public Inspection**

Name of the organization
AFM & SAG-AFTRA INTELLECTUAL PROPERTY rights DISTRIBUTION FUND

Employer identification number
95-4815790

**Part I** **Identification of Disregarded Entities** Complete if the organization answered "Yes" on Form 990, Part IV, line 33.

| (a) Name, address, and EIN (if applicable) of disregarded entity | (b) Primary activity | (c) Legal domicile (state or foreign country) | (d) Total income | (e) End-of-year assets | (f) Direct controlling entity |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**Part II** **Identification of Related Tax-Exempt Organizations** Complete if the organization answered "Yes" on Form 990, Part IV, line 34 because it had one or more related tax-exempt organizations during the tax year.

| (a) Name, address, and EIN of related organization | (b) Primary activity | (c) Legal domicile (state or foreign country) | (d) Exempt Code section | (e) Public charity status (if section 501(c)(3)) | (f) Direct controlling entity | (g) Section 512(b)(13) controlled entity? Yes | No |
|---|---|---|---|---|---|---|---|
| (1) FILM MUSICIANS SECONDARY MARKETS FUND<br>12001 VENTURA PL 5TH FL<br>STUDIO CITY, CA 91604<br>13-6695765 | ROYALTY DIST | CA | 501(C)(6) | N/A | NA | | No |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

For Paperwork Reduction Act Notice, see the Instructions for Form 990. Cat No 50135Y Schedule R (Form 990) 2013

Confidential DEFS_00040261

Case 2:18-cv-07241-CAS-PLA Document 111-4 Filed 05/14/21 Page 713 of 893 Page ID #:3268

**Part III Identification of Related Organizations Taxable as a Partnership** Complete if the organization answered "Yes" on Form 990, Part IV, line 34 because it had one or more related organizations treated as a partnership during the tax year.

| (a) Name, address, and EIN of related organization | (b) Primary activity | (c) Legal domicile (state or foreign country) | (d) Direct controlling entity | (e) Predominant income(related, unrelated, excluded from tax under sections 512-514) | (f) Share of total income | (g) Share of end-of-year assets | (h) Disproportionate allocations? Yes | (h) No | (i) Code V-UBI amount in box 20 of Schedule K-1 (Form 1065) | (j) General or managing partner? Yes | (j) No | (k) Percentage ownership |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | |

**Part IV Identification of Related Organizations Taxable as a Corporation or Trust** Complete if the organization answered "Yes" on Form 990, Part IV, line 34 because it had one or more related organizations treated as a corporation or trust during the tax year.

| (a) Name, address, and EIN of related organization | (b) Primary activity | (c) Legal domicile (state or foreign country) | (d) Direct controlling entity | (e) Type of entity (C corp, S corp, or trust) | (f) Share of total income | (g) Share of end-of-year assets | (h) Percentage ownership | (i) Section 512 (b)(13) controlled entity? Yes | (i) No |
|---|---|---|---|---|---|---|---|---|---|
| (1) live tv videotape supplemental mkts fd<br><br>12001 VENTURA PL 5TH FL<br>STUDIO CITY, CA 91604<br>95-4815792 | DISTR INC/ROY | CA | NA | TRUST | | | | | No |

Confidential DEFS_00040262

Case 2:18-cv-07241-CAS-PLA Document 111-4 Filed 05/14/21 Page 714 of 893 Page ID #:3269

**Part V** **Transactions With Related Organizations** Complete if the organization answered "Yes" on Form 990, Part IV, line 34, 35b, or 36.

**Note.** Complete line 1 if any entity is listed in Parts II, III, or IV of this schedule

| | | | Yes | No |
|---|---|---|---|---|
| **1** | During the tax year, did the organization engage in any of the following transactions with one or more related organizations listed in Parts II-IV? | | | |
| **a** | Receipt of **(i)** interest **(ii)** annuities **(iii)** royalties or **(iv)** rent from a controlled entity | 1a | | No |
| **b** | Gift, grant, or capital contribution to related organization(s) | 1b | | No |
| **c** | Gift, grant, or capital contribution from related organization(s) | 1c | | No |
| **d** | Loans or loan guarantees to or for related organization(s) | 1d | | No |
| **e** | Loans or loan guarantees by related organization(s) | 1e | | No |
| **f** | Dividends from related organization(s) | 1f | | No |
| **g** | Sale of assets to related organization(s) | 1g | | No |
| **h** | Purchase of assets from related organization(s) | 1h | | No |
| **i** | Exchange of assets with related organization(s) | 1i | | No |
| **j** | Lease of facilities, equipment, or other assets to related organization(s) | 1j | Yes | |
| **k** | Lease of facilities, equipment, or other assets from related organization(s) | 1k | Yes | |
| **l** | Performance of services or membership or fundraising solicitations for related organization(s) | 1l | | No |
| **m** | Performance of services or membership or fundraising solicitations by related organization(s) | 1m | | No |
| **n** | Sharing of facilities, equipment, mailing lists, or other assets with related organization(s) | 1n | Yes | |
| **o** | Sharing of paid employees with related organization(s) | 1o | Yes | |
| **p** | Reimbursement paid to related organization(s) for expenses | 1p | Yes | |
| **q** | Reimbursement paid by related organization(s) for expenses | 1q | Yes | |
| **r** | Other transfer of cash or property to related organization(s) | 1r | | No |
| **s** | Other transfer of cash or property from related organization(s) | 1s | | No |

**2** If the answer to any of the above is "Yes," see the instructions for information on who must complete this line, including covered relationships and transaction thresholds

| (a) Name of related organization | (b) Transaction type (a-s) | (c) Amount involved | (d) Method of determining amount involved |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**Part VI Unrelated Organizations Taxable as a Partnership** Complete if the organization answered "Yes" on Form 990, Part IV, line 37.

Provide the following information for each entity taxed as a partnership through which the organization conducted more than five percent of its activities (measured by total assets or gross revenue) that was not a related organization See instructions regarding exclusion for certain investment partnerships

| (a) Name, address, and EIN of entity | (b) Primary activity | (c) Legal domicile (state or foreign country) | (d) Predominant income (related, unrelated, excluded from tax under sections 512-514) | (e) Are all partners section 501(c)(3) organizations? | | (f) Share of total income | (g) Share of end-of-year assets | (h) Disproportionate allocations? | | (i) Code V-UBI amount in box 20 of Schedule K-1 (Form 1065) | (j) General or managing partner? | | (k) Percentage ownership |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Yes | No | | | Yes | No | | Yes | No | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |

Case 2:18-cv-07241-CAS-PLA Document 111-4 Filed 05/14/21 Page 716 of 893 Page ID #:3271

**Part VII Supplemental Information**

Provide additional information for responses to questions on Schedule R (see instructions)

| Return Reference | Explanation |
| --- | --- |



1/20/2021
Stefanie Taub
Exhibit 6
MLG CSR 11976

# AGREEMENT AND DECLARATION OF TRUST

**AFM and SAG-AFTRA**
**Intellectual Property Rights Distribution Fund**

**Established**
**September 16, 1998**

---

**Amended and Restated**
**July 26, 2012**

THIS AGREEMENT AND DECLARATION OF TRUST is made and entered into as of the 16th day of September, 1998, and is amended and restated as of July 26, 2012, in the City of New York, State of New York, by and between the American Federation of Musicians of the United States and Canada, AFL-CIO-CLC ("AFM") and the Screen Actors Guild - American Federation of Television and Radio Artists ("SAG-AFTRA"), hereinafter jointly known as the Unions.

## Preamble

WHEREAS, this Agreement and Declaration of Trust was originally established as of the 16th day of September, 1998, in the City of New York, State of New York, by and between the AFM and the American Federation of Television and Radio Artists ("AFTRA"); and

WHEREAS AFTRA merged with the Screen Actors Guild ("SAG") effective March 2012, and the merged unions are now constituted as SAG-AFTRA; and

WHEREAS, the Trustees now desire to amend and restate the Agreement and Declaration of Trust to reflect the merger of AFTRA into the merged union SAG-AFTRA, as well as to incorporate other amendments that the Trustees have made from time to time; and

WHEREAS, the Unions or their designated entities obtain and distribute to artists royalties and remuneration that are created by U.S. or foreign law and that are appropriate for collective administration; and

WHEREAS, the Unions have entered into a Reciprocal Agreement and an Annex for the Distribution of Record Rental Royalties Collected in Japan, pursuant to which they will receive and distribute record rental remuneration payable to non-featured instrumentalists and vocalists under the law of Japan; and

WHEREAS, the Unions have entered into other such agreements for the receipt and distribution of royalties or remuneration for the benefit of their members and other performing artists in the United States and Canada, and will continue to enter into such agreements; and

WHEREAS, to accomplish this purpose the Unions established a trust fund known as the AFM and AFTRA Intellectual Property Rights Distribution Fund for receiving and

distributing royalties and remuneration; and

WHEREAS, the trust fund formerly known as the AFM and AFTRA Intellectual Property Rights Distribution Fund shall now be known as the AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund; and

WHEREAS, the Unions desire to restate the terms and conditions under which the said Fund is to be established and administered;

NOW, THEREFORE, in consideration of the premises, it is mutually understood and agreed as follows:

**Article I**
**Definitions**

*Section 1.* UNIONS. The term "Unions" as used herein shall mean the American Federation of the Musicians of the United States and Canada, AFL-CIO-CLC, and the Screen Actors' Guild – American Federation of Television and Radio Artists.

*Section 2.* AFM. The term "AFM" as used herein shall mean the American Federation of Musicians of the United States and Canada, AFL-CIO-CLC.

*Section 3.* SAG-AFTRA. The term "SAG-AFTRA" as used herein shall mean the Screen Actors Guild – American Federation of Television and Radio Artists, or, prior to March 2012, the American Federation of Television and Radio Artists.

*Section 4.* AGREEMENT AND DECLARATION OF TRUST. The term "Agreement and Declaration of Trust" as used herein shall mean this instrument including any amendments hereto and modifications hereof.

*Section 5.* FUND. The term "Fund" as used herein shall mean the AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund.

*Section 6.* AGREEMENT FOR THE RECEIPT AND DISTRIBUTION OF REMUNERATION. The term "agreement for the receipt and distribution of remuneration" as used herein shall mean any agreement entered into by the AFM, SAG-AFTRA or the Unions with a collecting society, rights organization or other appropriate entity to receive royalties or remuneration held by that entity and to distribute such royalties and remuneration to eligible artists.

*Section 7.* ARTISTS. The term "artists" as used herein shall mean instrumental musicians and vocalists.

**Article II**
**Creation of Fund**

*Section 1.* ESTABLISHMENT OF FUND. The AFM and AFTRA Intellectual Property Rights Distribution Fund, which was established on September 16, 1998. is hereby amended and restated as the AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund, to be used for the

purpose set forth in this Agreement and Declaration of Trust.

*Section 2.* GENERAL PURPOSE. The Fund shall be a trust fund and shall be used for the purpose of receiving and distributing royalties or remuneration to artists in accordance with such agreements for receipt and distribution of remuneration as are entered into by the Unions with the relevant collecting societies, rights organizations or other appropriate entities. The Fund shall further provide the means for financing the expenses of the Trustees and the operation and administration of the Fund, in accordance with this Agreement and Declaration of Trust. The Fund is intended to satisfy the requirements of section 501(c)(6) of the Internal Revenue Code and shall be construed in all respects consistently with section 501(c)(6).

**Article III**
**Trustees**

*Section 1.* AFM AND SAG-AFTRA TRUSTEES. The operation and administration of the Fund shall be the joint responsibility of six Trustees, three appointed by the AFM, of which no fewer than one shall be a rank-and-file representative, and three appointed by SAG-AFTRA, of which no fewer than one shall be a rank-and-file representative.

*Section 2.* TERM OF TRUSTEES. Each Trustee shall continue to serve as such until his or her death, incapacity, resignation, or removal by the appointing Union. Each Union may remove or replace its Trustee at will.

*Section 3.* SUCCESSOR TRUSTEES. Each Union shall appoint its successor Trustees.

*Section 4.* FORM OF NOTIFICATION. In case any Trustee shall be removed, replaced, or succeeded, a statement in writing by the relevant Union shall be sufficient evidence of its action, when forwarded to the Fund and to the remaining Trustees. Any resignation shall be evidenced in writing and forwarded by registered mail to the Fund and the remaining Trustees, and shall not be effective for two months following the date of mailing unless a successor Trustee has been appointed.

**Article IV**
**Powers, Duties and Obligations of Trustees**

*Section 1.* PROPERTY AND ASSISTANCE. The Trustees are authorized and empowered to lease or purchase such premises, materials, supplies and equipment, and to hire, employ and retain such legal counsel, investment advisor, administrative, accounting, actuarial, clerical and other assistants or employees as in their discretion they may find necessary or appropriate in the performance of their duties.

*Section 2.* CONSTRUCTION OF AGREEMENT. The Trustees shall have power to construe the provisions of this Agreement and Declaration of Trust and the terms used herein, and any construction adopted by the Trustees in good faith shall be binding upon the AFM, SAG-AFTRA, and artists claiming benefits under the Fund.

*Section 3.* GENERAL POWERS. The Trustees are hereby empowered, in addition to other such powers as are set forth herein or conferred by law:

A. To establish and administer the Fund on behalf of artists who may be entitled to payments pursuant to agreements for the receipt and distribution of remuneration entered into by the AFM, SAG-AFTRA or the Unions and determined by the Trustees to be appropriate for administration by the Fund.

B. As to each agreement for the receipt and distribution of remuneration recommended by the AFM, SAG-AFTRA or the Unions, to decide whether or not to administer the agreement through the Fund.

C. As to each agreement for the receipt and distribution of remuneration which is to be administered through the Fund, to establish governing rules and procedures for the distribution that are consistent with the relevant agreement.

D. As to each agreement for the receipt and distribution of remuneration which is to be administered through the Fund, to pay all expenses necessary to the establishment, administration and operation of the agreement out of the receipts generated by the agreement.

E. To enter into any and all contracts and agreements for carrying out the terms of this Agreement and Declaration of Trust and for the administration of the Fund and do all acts as they, in their discretion, may deem necessary and advisable.

F. To compromise, settle, arbitrate, and release claims or demands in favor of or against the Fund or the Trustees on such terms and conditions as the Trustees may deem advisable.

G. To establish and accumulate as part of the Fund a reserve or reserves, adequate, in the opinion of the Trustees, to carry out the purposes of the Fund.

H. To pay out of the Fund all real and personal property taxes, income taxes and other taxes of any and all kinds levied or assessed under existing or future laws upon or in respect to the Fund or any money, property, or securities forming a part thereof.

I. To make appropriate allocations of common administrative expenses and disbursements shared or to be shared with any other Plan or Fund, or among the various agreements for the receipt and distribution of remuneration.

J. To receive contributions, payments, distributions or transfers from any source whatsoever to the extent permitted by law.

K. To establish advisory committees composed of AFM and SAG-AFTRA representatives and/or other artists or artists' representatives, and to set forth the duties and functions of the members of such advisory committees.

L. To do all acts, whether or not expressly authorized herein, which the Trustees may deem necessary or proper for the protection of the property held hereunder.

M. To establish such bank account or accounts as the Trustees deem necessary in their discretion, including escrow accounts pending the adoption of distribution rules governing the administration of an agreement for the receipt and distribution of remuneration.

N. To do all acts, whether or not expressly authorized herein, which the Trustees may deem necessary to accomplish the general objective of distributing remuneration to eligible artists in the most efficient and economical manner.

O. To purchase or obtain from the AFM, SAG-AFTRA, the AFM and Employers' Pension Fund, the AFTRA Health and Retirement Funds, the Phonograph Manufacturers' Special Payments Fund, the Motion Picture Special Payments Fund or any commercial source any data helpful for the identification and location of artists eligible for remuneration or the identification of recorded or other performances covered by an agreement for the receipt and distribution of remuneration.

P. To invest the assets of the Fund with care, skill, prudence and diligence under circumstances then prevailing that a prudent person, acting in a like capacity and familiar with such matters, would use in the conduct of an enterprise of a like character and with such aims, without regard to state law restrictions on investments.

*Section 4.* COMPENSATION. The Trustees shall not receive compensation for the performance of their duties.

*Section 5.* PERSONAL LIABILITY. Neither the Trustees nor any individual or successor Trustee shall be personally answerable or personally liable for any liabilities or debts of the Fund contracted by them as Trustees, or for the non-fulfillment of contracts, but the same shall be paid out of the Fund and the Fund is hereby charged with a first lien in favor of such Trustee for indemnification for any amounts paid out by any such Trustee for any such liability and for indemnification against any liability of any kind which the Trustees or any of them may incur hereunder; provided, however, that nothing herein shall exempt any Trustee from liability arising out of his own willful misconduct, bad faith or gross negligence, or entitle such Trustee to indemnification for any amounts paid or incurred as a result thereof.

The Trustees and each individual Trustee shall not be liable for any error of judgment or for any loss arising out of any act or omission in the execution of their duties so long as they act in good faith and without gross negligence; nor shall any Trustee, in the absence of his own willful misconduct, bad faith or gross negligence, be personally liable for the acts or omissions (whether performed at the request of the Trustees or not) of any other Trustee, or of any agent or attorney elected or appointed by or acting for the Trustees.

The Trustees shall be fully protected in acting upon any instrument, certificate, or paper believed by them to be genuine and to be signed or presented by the proper person or persons, and shall be under no duty to make any investigation or inquiry as to any statement contained in any such writing, but may accept the same as conclusive evidence of the truth and accuracy of the statements contained therein.

Neither the AFM nor SAG-AFTRA shall in any way be liable in any respect for any of the acts, omissions or obligations of the Trustees, individually or collectively.

The Trustees may from time to time consult with legal counsel and shall be fully protected in acting upon such advice of counsel to the Fund as respects legal questions.

*Section 6.* BOOKS OF ACCOUNT. The Trustees shall keep true and accurate books of account and records of all their transactions, which shall be audited at least annually by a certified public accountant selected by the Trustees. Such audits shall be available at all times for inspection by the AFM and SAG-AFTRA.

*Section 7.* EXECUTION OF DOCUMENTS. The Trustees may authorize and designate an employee or agent of the Fund to execute any notice or other instrument in writing.

*Section 8.* DEPOSIT AND WITHDRAWAL OF FUNDS. All moneys received by the Trustees hereunder shall be deposited by them in such bank or banks as the Trustees may designate for that purpose, and all withdrawals of moneys from such account or accounts shall be made only by checks signed by the Trustees, except that the Trustees may, in their discretion, designate and authorize an employee or agent of the Fund to sign checks upon such separate and specific bank account or bank accounts as the Trustees may designate and establish for such purpose.

*Section 9.* SURETY BONDS. The Trustees and any employees of the Trustees who are empowered and authorized to sign checks as aforesaid shall each be bonded by a duly authorized surety company in such amounts as may be determined from time to time by the Trustees. Each such employee employed by the Trustees who may be engaged in handling moneys of the Trust Fund shall also be bonded by a duly authorized surety company in the same manner. The cost of the premium on such bonds shall be paid out of the Fund.

**Article V**
**Selection of Remuneration Systems to Be Administered by the Fund**

*Section 1.* ACCEPTANCE FOR ADMINISTRATION THROUGH THE FUND. As to each agreement for the receipt and distribution of remuneration entered into by the AFM, SAG-AFTRA, or the Unions jointly, and referred by one of them to the Trustees for their consideration, the Trustees, in their sole discretion, may decide whether or not the agreement is appropriate for administration through the Fund. An agreement will be accepted for administration through the Fund only if the Trustees, voting in accordance with Article VII, Section 3, agree to accept it. The refusal of the AFM or SAG-AFTRA to accept an agreement for administration by the Fund shall not be subject to arbitration. The acceptance of an agreement for administration by the Fund shall be in writing.

*Section 2.* HOLDING MONEY PENDING ACCEPTANCE FOR ADMINISTRATION. The Fund may hold moneys received pursuant to an agreement for the receipt and distribution of remuneration in an escrow account pending the Trustees' decision whether to accept the agreement for administration through the Fund. If the Trustees refuse acceptance, the moneys will be returned with any interest accumulated thereon and minus any administrative costs incurred to the AFM, SAG-AFTRA or the Unions jointly in accordance with the agreement for the receipt and distribution of remuneration.

*Section 3.* CONTINUATION OF ADMINISTRATION. Once an agreement for the receipt and distribution of remuneration has been accepted for administration through the Fund, it shall continue to be administered through the Fund until such time as the Trustees, voting in accordance with Article VII, Section 3, agree that such administration is no longer appropriate. If the Trustees, voting in accordance with Article VII, Section 3, disagree over whether continued administration is appropriate, they will attempt to resolve their difference on the matter. If they cannot resolve their difference on the matter, they agree to submit the dispute to mediation administered by the American Arbitration Association. If mediation fails to resolve the dispute, the agreement for the receipt and distribution of remuneration shall be discontinued for administration through the Fund upon the vote of the Trustees for one Union, voting in accordance with Article VII, Section 3.

**Article VI**
**Plan of Payments and Distributions**

*Section 1.* PAYMENTS. The Trustees shall have full authority to determine all questions of the nature and amount of payments to be provided to artists consistent with the relevant agreements for the receipt and distribution of remuneration.

*Section 2.* ELIGIBILITY FOR PAYMENTS. The Trustees shall have full authority to determine eligibility requirements for payments, consistent with the relevant agreements for the receipt and distribution of remuneration, and to adopt rules and regulations setting forth the same, which shall be binding on the artists.

*Section 3.* METHOD OF PROVIDING PAYMENTS. The payments shall be provided and maintained by such means as the Trustees in their sole discretion shall determine.

*Section 4.* WRITTEN PLAN OF PAYMENTS AND DISTRIBUTIONS. The detailed basis upon which payments are to be made pursuant to each agreement for the receipt and distribution of remuneration shall be specified in writing by appropriate action of the Trustees subject, however, to such changes or modifications by the Trustees from time to time as they in their discretion may determine. All such changes or modifications shall similarly be specified in writing by appropriate resolution of the Trustees.

*Section 5.* DETERMINING CLAIMS FOR PAYMENTS. The Trustees shall have full authority to determine all claims for payments, provided that they may delegate to the duly designated administrators of the Fund authority to determine such claims initially. The administrators' initial determination shall be submitted to the Trustees for final determination. An individual who believes that he or she has been adversely affected by the administrators' or Trustees' determinations regarding payment of benefits may submit a written appeal to the Trustees. The decision of the Trustees shall be final.

**Article VII**
**Meetings and Decision of Trustees**

*Section 1.* MEETING OF TRUSTEES. Meetings of the Trustees shall be held at such place or places as may be agreed upon by the Trustees.

*Section 2.* ACTION BY TRUSTEES WITHOUT MEETING. The Trustees may also take action in writing without a meeting.

*Section 3.* AGREEMENT OF THE TRUSTEES. All actions of the Trustees shall be by agreement, with the AFM Trustees casting one vote, and the SAG-AFTRA Trustees casting one vote. In the event that any matter presented for decision cannot be decided because of a failure of agreement, the matter may be submitted for arbitration in accordance with Article VIII.

*Section 4.* MINUTES OF MEETINGS. The Trustees shall keep minutes of all meetings but such minutes need not be verbatim.

**Article VIII**
**Arbitration**

*Section I.* APPLICATION OF THIS ARTICLE. A Trustee may apply to the American Arbitration Association in the area where the Fund maintains its principal office for the designation of an arbitrator who will decide any disputes between the Trustees or any other matter submitted to arbitration in accordance with the provisions of Article VII, Section 3. The decision of the arbitrator shall be final and binding. Decisions to accept an agreement for the receipt and distribution of remuneration for administration through the Fund, pursuant to Article V, Section 1, shall not be subject to arbitration.

*Section 2.* EXPENSES OF ARBITRATION. The cost and expense incidental to any arbitration proceeding, including the fee, if any, of the impartial arbitrator, shall be a proper charge against the Fund and the Trustees are authorized and directed to pay such charges.

**Article IX**
**Execution of Trust Agreement**

*Section 1.* COUNTERPARTS. This Trust Agreement may be execute in counterparts.

**Article X**
**Amendment to Trust Agreement**

*Section 1.* AMENDMENT BY TRUSTEES. This Agreement and Declaration of Trust may be amended in any respect from time to time by the Trustees, provided that each amendment shall be duly executed in writing by the Trustees and annexed hereto. The Trustees shall have full discretion to fix the effective date of any amendment.

**Article XI**
**Termination of Trust**

*Section 1.* BY THE TRUSTEES. This Agreement and Declaration of Trust may be terminated by an instrument in writing executed by the Trustees when there is no longer in force and effect an agreement for the receipt and distribution of remuneration which is accepted for administration by the Fund.

*Section 2.* PROCEDURE ON TERMINATION. In the event of the termination of this Agreement and Declaration of Trust, the Trustees shall apply the Fund to pay or to provide for the payment

of any and all obligations of the Fund and shall distribute and apply any remaining surplus in such a manner as will in their opinion best effectuate the purpose of the Fund; provided, however, that no part of the corpus or income of said Fund shall be used for or diverted to purposes other than for the benefit of the artists eligible for benefits under the agreements for the receipt and distribution of remuneration administered by the Fund, or the administrative expenses of the Fund or other payments in accordance with the provisions of the Fund.

*Section* 3. NOTIFICATION OF TERMINATION. Upon termination of the Fund, the Trustees shall notify each necessary party, and the Trustees shall continue as Trustees for the purpose of winding up the affairs of the Trust.

## Article XII
## Miscellaneous Provisions

*Section 1.* GOVERNING LAW. This Agreement and Declaration of Trust shall be construed under the laws of the State of New York applicable to contracts made and to be performed within the County and State of New York (without regard to any conflict of laws provision), and venue for any dispute arising under this Agreement and Declaration of Trust shall be in New York.

*Section 2.* NOTIFICATION TO TRUSTEES. The address of each of the Trustees shall be that stated on the signature page of this Agreement and Declaration of Trust. Any change of address shall be effected by written notice to the Trustees.

*Section 3.* SEVERABILITY. Should any provision in this Trust Agreement or in the rules and regulations adopted thereunder be deemed or held to be unlawful or invalid for any reason, such fact shall not adversely affect the provisions contained therein unless such illegality shall make impossible or impractical the functioning of the Trust and the Plan, and in such case the appropriate parties shall immediately adopt a new provision to take the place of the illegal or invalid provision.

*Section 4.* VESTED RIGHTS. No artist or any person claiming by or through such artist, including the artist's family, dependents, beneficiary and/or legal representative, shall have any right, title or interest in or to the Fund or any property of the Fund or any part thereof except as may be specifically determined by the Trustees.

*Section 5.* ENCUMBRANCE OF PAYMENTS. No moneys, property or equity, of any nature whatsoever, in the Fund, or policies or benefits or moneys payable therefrom, shall be subject in any manner by any artist or person claiming through such artist to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, garnishment, mortgage, lien or charge, and any attempt to cause the same to be subject thereto shall be null and void.

*Section 6.* EXPENSES OF THE TRUSTEES. All expenses of the Trustees incurred in the performance of their duties may be chargeable to the Fund at the discretion of the Trustees. All other expenses incurred pursuant to Article IV hereof shall be paid by the Fund.

*Section* 7. NO EMPLOYER CONTRIBUTIONS PERMITTED. The Fund shall not accept contributions from any employer or association of employers who employ artists represented by the AFM or SAG-AFTRA, and shall not enter into agreements for the receipt and distribution of remuneration with

such employers or associations of employers.

IN WITNESS HEREOF, in accordance with Article X, the Trustees sign this Agreement and Declaration of Trust, which amends and restates the original agreement and declaration of trust. The Trustees, by affixing their signatures at the end of this Agreement and Declaration of Trust, agree to accept the trusteeship and act in their capacity strictly in accordance with the provisions of this Agreement and Declaration of Trust.

Raymond M. Hair, Jr., AFM — Date
1501 Broadway, Suite 600
New York, NY 10036

Duncan Crabtree-Ireland, SAG-AFTRA — Date
5757 Wilshire Boulevard, 7th Floor
Los Angeles, CA 90036

Sam Folio, AFM — Date
1501 Broadway, Suite 600
New York, NY 10036

Stefanie Taub, SAG-AFTRA — Date
5757 Wilshire Boulevard, 7th Floor
Los Angeles, CA 90036

Bruce Bouton, AFM — Date
1501 Broadway, Suite 600
New York, NY 10036

Jon Joyce, SAG-AFTRA — Date
5757 Wilshire Boulevard, 7th Floor
Los Angeles, CA 90036

such employers or associations of employers.

IN WITNESS HEREOF, in accordance with Article X, the Trustees sign this Agreement and Declaration of Trust, which amends and restates the original agreement and declaration of trust. The Trustees, by affixing their signatures at the end of this Agreement and Declaration of Trust, agree to accept the trusteeship and act in their capacity strictly in accordance with the provisions of this Agreement and Declaration of Trust.

Raymond M. Hair, Jr., AFM — Date
1501 Broadway, Suite 600
New York, NY 10036

Duncan Crabtree-Ireland, SAG-AFTRA — Date
5757 Wilshire Boulevard, 7th Floor
Los Angeles, CA 90036

Sam Folio, AFM — Date
1501 Broadway, Suite 600
New York, NY 10036

Stefanie Taub, SAG-AFTRA — 11/13/12 Date
5757 Wilshire Boulevard, 7th Floor
Los Angeles, CA 90036

Bruce Bouton, AFM — Date
1501 Broadway, Suite 600
New York, NY 10036

Jon Joyce, SAG-AFTRA — Date
5757 Wilshire Boulevard, 7th Floor
Los Angeles, CA 90036

such employers or associations of employers.

IN WITNESS HEREOF, in accordance with Article X, the Trustees sign this Agreement and Declaration of Trust, which amends and restates the original agreement and declaration of trust. The Trustees, by affixing their signatures at the end of this Agreement and Declaration of Trust, agree to accept the trusteeship and act in their capacity strictly in accordance with the provisions of this Agreement and Declaration of Trust.

Raymond M. Hair, Jr., AFM — Date 11/15/12
1501 Broadway, Suite 600
New York, NY 10036

Duncan Crabtree-Ireland, SAG-AFTRA — Date 1/18/13
5757 Wilshire Boulevard, 7th Floor
Los Angeles, CA 90036

Sam Folio, AFM — Date
1501 Broadway, Suite 600
New York, NY 10036

Stefanie Taub, SAG-AFTRA — Date
5757 Wilshire Boulevard, 7th Floor
Los Angeles, CA 90036

Bruce Bouton, AFM — Date
1501 Broadway, Suite 600
New York, NY 10036

Jon Joyce, SAG-AFTRA — Date
5757 Wilshire Boulevard, 7th Floor
Los Angeles, CA 90036

**RESOLUTION TO AMEND AGREEMENT AND DECLARATION OF TRUST TO PROVIDE FOR ALTERNATE TRUSTEES**

WHEREAS, the Agreement and Declaration of Trust of the AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund, as Amended and Restated on July 26, 2012, ("Agreement and Declaration of Trust") does not provide for Alternate Trustees; and

WHEREAS, an expansion of the Board of Trustees to include the option to appoint Alternate Trustees will be beneficial for the efficient operation of the Board of Trustees; and

WHEREAS, Article X, Section 1 authorizes the Trustees to amend the Agreement and Declaration of Trust and to fix the effective date of the amendment;

NOW BE IT THEREFORE RESOLVED that, effective July 27, 2015, Article III of the Agreement and Declaration of Trust shall be amended to read as follows:

**Article III**
**Trustees**

*Section 1.* AFM AND SAG-AFTRA TRUSTEES. The operation and administration of the Fund shall be the joint responsibility of six Trustees, three appointed by the AFM, of which no fewer than one shall be a rank-and-file representative, and three appointed by SAG-AFTRA, of which no fewer than one shall be a rank-and-file representative.

*Section 2.* AFM AND SAG-AFTRA ALTERNATE TRUSTEES. The AFM and SAG-AFTRA shall each have the option of appointing up to two Alternate Trustees. Alternate Trustees shall not be empowered to vote on any matter except in the event that one or more Trustees (i) abstain from voting on any matter before the Board of Trustees due to a conflict of interest or (ii) are absent from a meeting. In such a case, the Alternate Trustee shall be entitled to the vote otherwise exercised by the abstaining or absent Trustee(s) and shall be entitled to take any other discretionary action on the matter without the involvement of the conflicted or absent Trustee(s). When acting in the place of a Trustee, the powers, duties, responsibilities and protections of a Trustee described in this Agreement and Declaration of Trust shall apply to the Alternate Trustee. An Alternate Trustee's expenses may be chargeable to the Fund in accordance with Article XII, Section 6 only when the Alternate Trustee attends a meeting or otherwise acts in the place of a Trustee.

*Section 2.* TERM OF TRUSTEES. Each Trustee or Alternate Trustee shall continue to serve as such until his or her death, incapacity, resignation, or removal by the appointing Union. Each Union may remove or replace its Trustee or Alternate Trustee at will.

*Section 3.* SUCCESSOR TRUSTEES. Each Union shall appoint its successor Trustees or Alternate Trustees.

*Section 4.* FORM OF NOTIFICATION. In case any Trustee or Alternate Trustee shall be removed, replaced, or succeeded, a statement in writing by the relevant Union shall be sufficient evidence of its action, when forwarded to the Fund and to the remaining Trustees and Alternate

DRAFT

Trustees. Any resignation shall be evidenced in writing and forwarded by registered mail to the Fund and the remaining Trustees and Alternate Trustees, and in the case of a Trustee, shall not be effective for two months following the date of mailing unless a successor Trustee has been appointed.

Approved and executed this 27th day of July 2015.

7/27/15
Raymond M. Hair, Jr., AFM Date
1501 Broadway, Suite 600
New York, NY 10036

7/27/15
Duncan Crabtree-Ireland, SAG-AFTRA Date
5757 Wilshire Boulevard, 7th Floor
Los Angeles, CA 90036

7/25/15
Sam Folio, AFM Date
1501 Broadway, Suite 600
New York, NY 10036

7/27/15
Stefanie Taub, SAG-AFTRA Date
5757 Wilshire Boulevard, 7th Floor
Los Angeles, CA 90036

7-27-15
Bruce Bouton, AFM Date
1501 Broadway, Suite 600
New York, NY 10036

7/27/15
Jon Joyce, SAG-AFTRA Date
5757 Wilshire Boulevard, 7th Floor
Los Angeles, CA 90036

# EXHIBIT 19

**From:** Veniece Vicente
**Sent:** Thursday, July 21, 2011 1:57 PM
**To:** Julie Sandell
**Subject:** RE: Session Request - Lil Wayne - Tha Carter III - Cash Money Records - 2008

No Sessions found.

---

**From:** Julie Sandell [mailto:jsandell@fmsmf.org]
**Sent:** Thursday, July 21, 2011 3:48 PM
**To:** Veniece Vicente; Sarah Hardy
**Subject:** Session Request - Lil Wayne - Tha Carter III - Cash Money Records - 2008

Hello,
Please accept this email as a request for any session reports for the following title. Thank you!
Lil Wayne – Tha Carter III – Cash Money Records - 2008

| | |
|---|---|
| 1 | 3 Peat<br>Producer – Vaushaun "Maestro" Brooks* |
| 2 | Mr. Carter<br>Rap [Featuring] – Jay-Z<br>Producer – Andrews "Drew" Correa*, Infamous |
| 3 | A Milli<br>Producer – Shondrae "Mr. Bangladesh" Crawford* |
| 4 | Got Money<br>Producer – Play & Skillz*, T-Pain<br>Vocals [Featuring] – T-Pain |
| 5 | Comfortable<br>Producer – Kanye West<br>Vocals [Featuring] – Babyface |
| 6 | Dr. Carter<br>Producer – Swizz Beatz |
| 7 | Phone Home<br>Producer – Cool & Dre |
| 8 | Tie My Hands<br>Producer – Robin Thicke<br>Vocals [Featuring] – Robin Thicke |
| 9 | Mrs. Officer (Bonus)<br>Featuring – Bobby Valentino (2)<br>Producer – Darius "Deezle" Harrison* |
| 10 | Let The Beat Build (Bonus)<br>Producer – Kanye West |
| 11 | Shoot Me Down<br>Featuring – D. Smith<br>Producer – D. Smith |
| 12 | Lollipop<br>Featuring – Static Major<br>Producer – Jim Jonsin<br>Co-producer – Darius "Deezle" Harrison* |
| 13 | La La<br>Rap [Featuring] – Brisco, Busta Rhymes<br>Producer – David Banner |
| 14 | Playing With Fire (Bonus)<br>Producer – Streetrunner<br>Vocals [Featuring] – Betty Wright |
| 15 | You Ain´t Got Nuthin<br>Rap [Featuring] – Fabolous, Juelz Santana<br>Producer – Alchemist |
| 16 | Dontgetit<br>Producer – Rodnae |

Best Regards,
Julie Sandell
Data Analyst/Research Specialist
AFM & AFTRA Intellectual Property Rights Distribution Fund
11846 Ventura Blvd., Suite 300
Studio City, CA 91604
818-755-7777 x859
FAX (818) 755-7779
jsandell@raroyalties.org
www.raroyalties.org

**From:** Judy Marie Ellis
**Sent:** Tuesday, August 22, 2017 7:09 AM
**To:** Andy Creighton
**Subject:** RE: SAG-AFTRA session request - Jack White – Lazaretto

Good Morning Andy,
Sorry to report I have no session reports for Jack White.
Thanks,
JM

Judy Marie Ellis
Office Manager, Nashville
SAG-AFTRA
1108 17th Ave. S
Nashville, TN 37212
615.327.2944
judy.ellis@sagaftra.org / SAGAFTRA.org

**From:** Andy Creighton [mailto:ACreighton@afmsagaftrafund.org]
**Sent:** Monday, August 21, 2017 4:30 PM
**To:** Judy Marie Ellis
**Subject:** SAG-AFTRA session request - Jack White – Lazaretto

Hi, Judy Marie.
Happy eclipse day!
Please accept this email as a request for the following session report(s):
Jack White – Lazaretto
Third Man Records – 2014

1. Three Women
2. Lazaretto
3. Temporary Ground
4. Would You Fight for My Love?
5. High Ball Stepper
6. Just One Drink
7. Alone in My Home
8. That Black Bat Licorice
9. Entitlement
10. I Think I Found the Culprit
11. Want and Able

Recording information:
Third Man Studio, Nashville, TN
Kind regards,
*Andy Creighton*

Researcher, Sound Recording Research Division
AFM & SAG-AFTRA Intellectual Property Rights Distribution Fund
4705 Laurel Canyon Blvd., Suite 400
Valley Village, CA 91607
ph: 818-255-7980 x4835
fax: 818-255-7985
acreighton@afmsagaftrafund.org
www.afmsagaftrafund.org

**From:** sec@atlantamusicians.com
**Sent:** Thursday, December 21, 2017 7:24 AM
**To:** Ariana Murray
**Subject:** RE: AFM session info request: Gucci Mane, Everybody Looking

Hi Ariana,
We have no session reports on this album. Sorry we can't be of more help!
Best,

**Christina Ottaviano**, Secretary
**Atlanta Federation of Musicians**
**AFM Local 148-462**
551 Dutch Valley Road NE Atlanta, GA 30324
404-873-2033

---

**From:** Ariana Murray [mailto:AMurray@afmsagaftrafund.org]
**Sent:** Wednesday, December 20, 2017 3:33 PM
**To:** sec@atlantamusicians.com
**Subject:** AFM session info request: Gucci Mane, Everybody Looking

Hi Christina,
Please accept this email as a request for the following session report (s):
Gucci Mane
Everybody Looking
Atlantic, 2016

Track Listing
No Sleep (Intro) 3:34
Out Do Ya 2:56
Back On Road 2:29
Waybach 3:33
Pussy Print 3:35
Pop Music 3:19
Guwop Home 3:42
Gucci Please 3:22
Robbed 3:24
Richest Nigga In The Room 4:03
1st Day Out Tha Feds 3:04
At Least A M 3:50
All My Children 3:43
Pick Up The Pieces (Outro) 3:53
Bonus
Multi Millionaire Laflare

Thank you!

*Ariana Murray*

Research Associate
AFM & SAG-AFTRA IPRD FUND
4705 Laurel Canyon Blvd., Suite 400
Valley Village, CA 91607
amurray@afmsagaftrafund.org
(818) 255-7980 Ext 4840
FAX: 818-255-7985
http://afmsagaftrafund.org

**From:** Judy Marie Ellis
**Sent:** Thursday, November 16, 2017 7:27 AM
**To:** Debbie Brayboy
**Subject:** RE: SAG-AFTRA session request - Third Day – Come Together

Good Morning Debbie,
Sorry to report I have no session reports for 2001 on Third Day.
Thanks,
JM

Judy Marie Ellis
Office Manager, Nashville
SAG-AFTRA
1108 17th Ave. S
Nashville, TN 37212
615.327.2944
judy.ellis@sagaftra.org / SAGAFTRA.org

**From:** Debbie Brayboy [mailto:DBrayboy@afmsagaftrafund.org]
**Sent:** Thursday, November 09, 2017 4:38 PM
**To:** Judy Marie Ellis
**Subject:** SAG-AFTRA session request - Third Day – Come Together

Hi Judy Marie,
Please accept this email as a request for the following session report(s):
Third Day – Come Together
Essential Records - 2001

1. "Come Together" – 4:01
2. "40 Days" – 3:11
3. "Show Me Your Glory" – 3:19
4. "Get On" – 2:57
5. "My Heart" – 3:40
6. "It's Alright" – 5:08
7. "Still Listening" – 4:08
8. "I Got You" – 4:19
9. "I Don't Know" – 4:53
10. "When The Rain Comes" – 2:55
11. "Sing Praises" – 3:19
12. "Nothing Compares" – 3:49

Kind regards,

Debbie Brayboy
Supervisor, Sound Recording Research Division
AFM & SAG-AFTRA Intellectual Property Rights Distribution Fund
4705 Laurel Canyon Blvd., Suite 400
Valley Village, CA 91607
ph: 818-255-7980 x4864
fax: 818-255-7985
dbrayboy@afmsagaftrafund.org
www.afmsagaftrafund.org

**From:** Kristina Tunzi
**Sent:** Tuesday, August 19, 2014 4:09 PM
**To:** Debbie Brayboy
**Subject:** RE: SAG-AFTRA session request - Bright Eyes – Cassadaga

No session reports for this one.

---

**From:** Debbie Brayboy [mailto:DBrayboy@afmsagaftrafund.org]
**Sent:** Tuesday, August 19, 2014 3:47 PM
**To:** Kristina Tunzi
**Subject:** SAG-AFTRA session request - Bright Eyes – Cassadaga
Hi Kristina,

Please accept this email as a request for the following session report(s):
Bright Eyes – Cassadaga
Saddle Creek - 2007
Track Listing
1. Clairaudients (Kill or Be Killed)
2. Four Winds
3. If the Brakeman Turns My Way
4. Hot Knives
5. Make a Plan to Love Me
6. Soul Singer in a Session Band
7. Classic Cars
8. Middleman
9. Cleanse Song
10. No One Would Riot for Less
11. Coat Check Dream Song
12. I Must Belong Somewhere
13. Lime Tree
Kind regards,
Debbie Brayboy
Sr. Data Analyst/Research Specialist
AFM & AFTRA Intellectual Property Rights Distribution Fund
11846 Ventura Blvd., Suite 300
Studio City, CA 91604
Tel: 818-255-7980 x4864
Fax: 818-255-7985
www.raroyalties.org
dbrayboy@raroyalties.org

**From:** Kimberlee Archie
**Sent:** Thursday, March 13, 2014 12:08 PM
**To:** Judy Marie Ellis; Debbie Brayboy
**Subject:** RE: SAG/AFTRA session request - Beyonce - I Am... Sasha Fierce

No session reported here.

---

**From:** Judy Marie Ellis
**Sent:** Thursday, March 13, 2014 1:39 PM
**To:** Debbie Brayboy
**Cc:** Kimberlee Archie
**Subject:** RE: SAG/AFTRA session request - Beyonce - I Am... Sasha Fierce

Hi Debbie,
I'm sorry but I don't have any report on Beyonce.
Thanks,
JM

---

**From:** Debbie Brayboy [mailto:dbrayboy@raroyalties.org]
**Sent:** Thursday, March 13, 2014 12:35 PM
**To:** Judy Marie Ellis
**Subject:** SAG/AFTRA session request - Beyonce - I Am... Sasha Fierce

Hi Judy Marie,
Please accept this email as a request for the following (NY sessions):
Beyonce – I Am… Sasha Fierce
Columbia – Nov 14, 2008
Tracklist

| I Am... | |
|---|---|
| If I Were A Boy | 4:10 |
| Halo | 4:22 |
| Disappear | 4:29 |
| Broken-Hearted Girl | 4:39 |
| Ave Maria | 3:42 |
| Satellites | 3:07 |
| Sasha Fierce | |
| Single Ladies (Put A Ring On It) | 3:13 |
| Radio | 3:39 |
| Diva | 3:21 |
| Sweet Dreams | 3:28 |
| Video Phone | 3:35 |

Kind regards,
Debbie Brayboy
Sr. Data Analyst/Research Specialist
AFM & AFTRA Intellectual Property Rights Distribution Fund
11846 Ventura Blvd., Suite 300
Studio City, CA 91604
Tel: 818-755-7777 x864
Fax: 818-755-7779
dbrayboy@fmsmf.org
www.raroyalties.org

**From:** Sarah Hardy
**Sent:** Tuesday, January 18, 2011 3:32 PM
**To:** Julie Sandell
**Subject:** RE: Session Request - 3T - Brotherhood - Sony Music - 1995

We have nothing on record for this album.

---

**From:** Julie Sandell [mailto:jsandell@raroyalties.org]
**Sent:** Wednesday, January 12, 2011 3:16 PM
**To:** Sarah Hardy
**Subject:** Session Request - 3T - Brotherhood - Sony Music - 1995

Hi Sarah,

Please send session reports if you have them for the following title. Thank you!

3T - Brotherhood
Sony Music - 1995

**Track Listing**

1. Anything
2. 24/7
3. Why
4. Gotta Be You
5. With You
6. Sexual Attention
7. Memories
8. I Need You
9. Give Me All Your Lovin'
10. Tease Me
11. Words Without Meaning
12. Brotherhood

Best Regards,

Julie Sandell
Data Analyst/Research Specialist
AFM & AFTRA Intellectual Property Rights Distribution Fund
12001 Ventura Pl., 5th Floor
Studio City, CA 91604
818-755-7777 x859
FAX (818) 755-7779
www.raroyalties.org

# EXHIBIT 20

| Distribution Year | Title ID | Primary Market | RecType | Track | Artist | Country of Recording | Participant count | Union Data | Year Contribution | Total Contribution |
|---|---|---|---|---|---|---|---|---|---|---|
| 2015 | 004871 | SR | S | FLASHDANCE (WHAT A FEELING) | CARA IRENE | US | 9 | | 1,326.58 | 480,675.18 |
| 2015 | 059885 | SR | S | YEAH! | USHER FT LIL JON & LUDACRIS | US | 4 | Y | 22,861.64 | 340,765.10 |
| 2015 | 019321 | SR | S | SWEET HOME ALABAMA | LYNYRD SKYNYRD | US | 6 | Y | 13,112.78 | 246,204.74 |
| 2015 | 016852 | SR | S | BEFORE HE CHEATS | UNDERWOOD CARRIE | US | 11 | Y | 19,642.86 | 245,485.52 |
| 2015 | 018733 | SR | S | BROWN EYED GIRL | MORRISON VAN | US | 22 | | 17,196.33 | 236,759.11 |
| 2015 | 018757 | SR | S | YOUR LOVE | OUTFIELD THE | UK | 3 | | 13,429.43 | 230,150.75 |
| 2015 | 040448 | SR | S | IF I DIE YOUNG | BAND PERRY | US | 9 | Y | 35,161.80 | 226,649.07 |
| 2015 | 004797 | SR | S | BRING ME TO LIFE | EVANESCENCE | US | 28 | | 15,289.06 | 223,615.48 |
| 2015 | 047480 | SR | S | SECRETS | ONEREPUBLIC | US | 1 | | 26,004.46 | 220,663.51 |
| 2015 | 018462 | SR | S | LOVE IS A BATTLEFIELD | BENATAR PAT | US | 3 | | 3,080.94 | 218,741.61 |
| 2015 | 016432 | SR | S | BREAKAWAY | CLARKSON KELLY | US | 2 | Y | 4,388.82 | 217,479.81 |
| 2015 | 017036 | SR | S | CHICKEN FRIED | ZAC BROWN BAND | US | 10 | Y | 17,919.96 | 205,307.76 |
| 2015 | 017037 | SR | S | YOU BELONG WITH ME | SWIFT TAYLOR | US | 6 | Y | 31,497.00 | 205,272.52 |
| 2015 | 016851 | SR | S | ALL SUMMER LONG | KID ROCK | US | 6 | | 15,191.71 | 204,629.49 |
| 2015 | 019700 | SR | S | JESSIE'S GIRL | SPRINGFIELD RICK | US | 2 | Y | 14,212.36 | 203,728.30 |
| 2015 | 018312 | SR | S | FRIENDS IN LOW PLACES | BROOKS GARTH | US | 35 | Y | 11,271.29 | 198,767.93 |
| 2015 | 016842 | SR | S | LOVE STORY | SWIFT TAYLOR | US | 7 | Y | 19,710.58 | 185,394.69 |
| 2015 | 016932 | SR | S | ONE HEADLIGHT | WALLFLOWERS THE | US | 8 | Y | 12,090.77 | 182,964.23 |
| 2015 | 017522 | SR | S | GOLD DIGGER | WEST KANYE FT JAMIE FOXX | US | 9 | Y | 9,337.73 | 179,625.52 |
| 2015 | 072849 | SR | S | I'M YOURS | MRAZ JASON | US | 9 | Y | 2,795.59 | 177,416.25 |
| 2015 | 022019 | SR | S | I WON'T BACK DOWN | PETTY TOM | US | 3 | Y | 7,748.06 | 172,015.53 |
| 2015 | 016880 | SR | S | UNDER THE BRIDGE | RED HOT CHILI PEPPERS | US | 8 | | 8,780.80 | 171,412.79 |
| 2015 | 017796 | SR | S | COLLIDE | DAY HOWIE | UK | 14 | Y | 13,326.47 | 170,566.19 |
| 2015 | 026246 | SR | S | SISTER GOLDEN HAIR | AMERICA | US | 5 | Y | 8,176.01 | 168,106.34 |
| 2015 | 020085 | SR | S | YOU'RE GONNA GO FAR, KID | OFFSPRING THE | US | 2 | | 9,655.43 | 166,793.79 |
| 2015 | 017030 | SR | S | KEEP ON LOVING YOU | REO SPEEDWAGON | US | 3 | Y | 11,181.56 | 166,079.97 |
| 2015 | 017548 | SR | S | HEY YA! | OUTKAST | US | 3 | | 9,624.03 | 166,061.70 |
| 2015 | 017111 | SR | S | GOOD DIRECTIONS | CURRINGTON BILLY | US | 8 | Y | 10,721.30 | 165,969.97 |
| 2015 | 020257 | SR | S | STAND BY ME | KING BEN E. | US | 25 | Y | 6,816.98 | 165,862.50 |
| 2015 | 074820 | SR | S | GIVES YOU HELL | ALL-AMERICAN REJECTS | US | 13 | | 14,052.16 | 163,575.94 |
| 2015 | 016984 | SR | S | PROMISCUOUS | FURTADO NELLY FT TIMBALAND | US | 3 | Y | 10,412.32 | 161,792.42 |
| 2015 | 017322 | SR | S | IF I AIN'T GOT YOU | KEYS ALICIA | US | 11 | Y | 9,560.93 | 160,320.17 |
| 2015 | 017868 | SR | S | SHE'S COUNTRY | ALDEAN JASON | US | 11 | Y | 10,876.10 | 159,625.60 |
| 2015 | 017346 | SR | S | ROCKET MAN | JOHN ELTON | FR | 5 | | 5,178.64 | 159,606.19 |
| 2015 | 017972 | SR | S | PIANO MAN | JOEL BILLY | US | 10 | Y | 10,948.22 | 157,844.91 |
| 2015 | 017012 | SR | S | SUNDAY MORNING | MAROON 5 | US | 4 | Y | 10,428.52 | 157,651.26 |
| 2015 | 028590 | SR | S | SOMETHING LIKE THAT | MCGRAW TIM | US | 11 | Y | 7,963.06 | 157,196.16 |
| 2015 | 020794 | SR | S | AFRICA | TOTO | US | 4 | Y | 7,579.75 | 156,021.17 |
| 2015 | 019035 | SR | S | LIVE LIKE YOU WERE DYING | MCGRAW TIM | US | 24 | Y | 11,920.16 | 153,969.82 |
| 2015 | 018760 | SR | S | WHAT WAS I THINKIN' | BENTLEY DIERKS | US | 9 | Y | 11,031.87 | 152,571.00 |
| 2015 | 017271 | SR | S | SHE'S EVERYTHING | PAISLEY BRAD | US | 9 | Y | 9,292.88 | 151,605.41 |
| 2015 | 046035 | SR | S | LOVE LIKE CRAZY | BRICE LEE | US | 13 | Y | 16,251.13 | 151,397.01 |
| 2015 | 004749 | SR | S | CAN'T FIGHT THE MOONLIGHT | RIMES LEANN | US | 52 | Y | 1,732.48 | 151,136.06 |
| 2015 | 017551 | SR | S | PEOPLE ARE CRAZY | CURRINGTON BILLY | US | 9 | Y | 13,390.75 | 150,122.67 |
| 2015 | 000030 | SR | S | ROLLING IN THE DEEP | ADELE | UK | 5 | | 26,408.18 | 149,603.34 |
| 2015 | 019379 | SR | S | BIG GREEN TRACTOR | ALDEAN JASON | US | 9 | Y | 14,033.27 | 149,002.78 |
| 2015 | 039740 | SR | S | NOT AFRAID | EMINEM | US | 13 | | 25,176.04 | 148,579.48 |

# EXHIBIT 21



Confidential

DEFS_00013640



Confidential DEFS_00013641



Confidential DEFS_00013642



Confidential DEFS_00013643



Confidential

DEFS_00013644



Confidential DEFS_00013645



Confidential DEFS_00013646



Confidential DEFS_00013647



Confidential

DEFS_00013648



Confidential

DEFS_00013649



Confidential

DEFS_00013650



Confidential

DEFS_00013651



Confidential DEFS_00013652



Confidential

DEFS_00013653



Confidential

DEFS_00013654



Confidential DEFS_00013656



Confidential DEFS_00013657



Confidential DEFS_00013658



Confidential

DEFS_00013659



Confidential DEFS_00013660



Confidential

DEFS_00013661



Confidential DEFS_00013662



Confidential DEFS_00013663



Confidential

DEFS_00013664



Confidential DEFS_00013665



Confidential

DEFS_00013666



Confidential DEFS_00013667



Confidential DEFS_00013668



Confidential

DEFS_00013669



Confidential

DEFS_00013670



Confidential DEFS_00013672



Confidential

DEFS_00013673



Confidential DEFS_00013674



Confidential

DEFS_00013675



Confidential DEFS_00013676



Confidential DEFS_00013677



Confidential DEFS_00013678



Confidential DEFS_00013679



Confidential DEFS_00013680



Confidential

DEFS_00013681



Confidential

DEFS_00013682



Confidential DEFS_00013683



Confidential DEFS_00013684



Confidential

DEFS_00013685



Confidential

DEFS_00013686



Confidential DEFS_00013688



Confidential DEFS_00013689



Confidential DEFS_00013690



Confidential

DEFS_00013691



Confidential DEFS_00013692



Confidential DEFS_00013693



Confidential

DEFS_00013694



Confidential DEFS_00013695



Confidential DEFS_00013696



Confidential DEFS_00013697



Confidential

DEFS_00013698



Confidential DEFS_00013699



Confidential DEFS_00013700



Confidential

DEFS_00013701



Confidential DEFS_00013702



Confidential DEFS_00026304



Confidential

DEFS_00026305



Confidential DEFS_00026306



Confidential DEFS_00026307



Confidential

DEFS_00026308



Confidential DEFS_00026309



Confidential DEFS_00026310



Confidential DEFS_00026311



Confidential DEFS_00026312



Confidential DEFS_00026313





Confidential DEFS_00026315



Confidential DEFS_00026316



Confidential

DEFS_00026317



Confidential

DEFS_00026318



Confidential DEFS_00026321



Confidential DEFS_00026322



Confidential DEFS_00026323



Confidential DEFS_00026324



Confidential DEFS_00026325



Confidential

DEFS_00026326



Confidential DEFS_00026327



Confidential DEFS_00026328



Confidential

DEFS_00026329



Confidential

DEFS_00026330



Confidential DEFS_00026331



Confidential DEFS_00026332



Confidential

DEFS_00026333



Confidential

DEFS_00026334



Confidential

DEFS_00026335

# EXHIBIT 22

| *Total Songs RCD* | *2927* |
|---|---|
| *Total Songs Queried* | *10973* |

**26.67%**

SAG - AFTRA

| Song Titles Researched | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | |
|---|---|---|---|---|---|---|---|---|
| Miami 7.06% | 107 | 113 | 237 | 144 | 130 | 87 | 154 | **972** |
| Nashville 37.76% | 275 | 485 | 726 | 941 | 817 | 1059 | 899 | **5202** |
| Los Angeles 37.27% | 262 | 324 | 1030 | 1230 | 809 | 723 | 757 | **5135** |
| New York 17.91% | 161 | 182 | 547 | 475 | 424 | 340 | 339 | **2468** |
| **Grand Total** | **805** | **1104** | **2540** | **2790** | **2180** | **2209** | **2149** | **13777** |

| *Total Songs RCD* | *7395* |
|---|---|
| *Total Songs Queried* | *25839* |

**28.62%**

AFM

| Song Titles Researched | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | |
|---|---|---|---|---|---|---|---|---|
| Miami 14.94% | 156 | 340 | 1362 | 1383 | 1244 | 1153 | 882 | **6520** |
| Nashville 11.93% | 314 | 509 | 763 | 823 | 795 | 1083 | 917 | **5204** |
| Los Angeles 43.02% | 750 | 1198 | 3172 | 4043 | 3251 | 3350 | 3007 | **18771** |
| New York 30.12% | 404 | 629 | 2090 | 3107 | 2371 | 2348 | 2192 | **13141** |
| **Grand Total** | **1624** | **2676** | **7387** | **9356** | **7661** | **7934** | **6998** | **43636** |

## Individual allocations by year 2013 – present:

| 2013 | 2014* | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|
| 7836 | 54175 | 15530 | 28227 | 27514 | 37616 | 47236 | 47717 |

## Union v. Non-union beneficiaries 2013 – present:

| YEAR | MEMBER CASHED | MEMBER UNCASHED | MEMBER TOTAL | NON-MEMBER CASHED | NON-MEMBER UNCHASHED | NON-MEMBER TOTAL |
|---|---|---|---|---|---|---|
| 2013 | 6673 | 495 | 7168 | 649 | 19 | 668 |
| 2014 | 9952 | 9933 | 19885 | 1872 | 32418 | 34290 |
| 2015 | 7807 | 2360 | 10167 | 1037 | 4326 | 5363 |
| 2016 | 12114 | 4321 | 16435 | 3930 | 7862 | 11792 |
| 2017 | 12105 | 4414 | 16519 | 4130 | 6865 | 10995 |
| 2018 | 16114 | 6640 | 22754 | 4002 | 10860 | 14862 |
| 2019 | 17868 | 9318 | 27186 | 5347 | 14703 | 20050 |
| 2020 | 16244 | 10434 | 26678 | 7436 | 13603 | 21039 |

| YEAR | MEMBER CASHED | NON-MEMBER CASHED | TOTAL CASHED | MEMBER UNCASHED | NON-MEMBER UNCHASHED | TOTAL UNCASHED |
|---|---|---|---|---|---|---|
| 2013 | 6673 | 649 | 7322 | 495 | 19 | 514 |
| 2014 | 9952 | 1872 | 11824 | 9933 | 32418 | 42351 |
| 2015 | 7807 | 1037 | 8844 | 2360 | 4326 | 6686 |
| 2016 | 12114 | 3930 | 16044 | 4321 | 7862 | 12183 |
| 2017 | 12105 | 4130 | 16235 | 4414 | 6865 | 11279 |
| 2018 | 16114 | 4002 | 20116 | 6640 | 10860 | 17500 |
| 2019 | 17868 | 5347 | 23215 | 9318 | 14703 | 24021 |
| 2020 | 16244 | 7436 | 23680 | 10434 | 13603 | 24037 |

*2014 – Converted from ACCESS to AS400. Brought in all the allocations that were greater than $10 and made them into sequence number checks that could now be reissued if we found them (could not do reissues in ACCESS)

**Only includes allocations over $10

# EXHIBIT 23

**From:** Dennis Dreith
**To:** "Patricia Polach"
**Subject:** RE: Congratulations ...
**Attachments:** RE DD expenses.msg
DD Expenses.msg

Thanks Trish,

I have taken a cursory look at the document and did spot some mistakes and have a few questions, none of which when resolved will change my inclinations against entering into such an agreement, but I will keep an open mind. The one item that does pop out is Appendix B, listing some 11 items totaling $932.67. all of which I have just confirmed with the Accounting Department were all paid, and were done so quite some time prior to my retirement (see attached). Would you like to deal with this item, or would you prefer that I do so directly?

Dennis

**From:** Patricia Polach [mailto:ppolach@bredhoff.com]
**Sent:** Friday, July 21, 2017 12:06 PM
**To:** Dennis Dreith <dennis.dreith@yahoo.com>
**Subject:** Re: Congratulations ...

Great, thanks. I understand your concerns and – for what it is worth – I have not heard anything that suggests that Rob wouldn't find value in speaking to you about the Fund, or for that matter, that the co-chairmen don't think that transition is important. Please do take a look at the agreement and let me know if there are other concerns with it that we need to address.

**From:** Dennis Dreith <dennis.dreith@yahoo.com>
**Sent:** Thursday, July 20, 2017 5:22 PM
**To:** Patricia Polach
**Subject:** RE: Congratulations ...

Hi Trish,

Thanks. I will take a look at it. Regardless, unless I can be convinced that *everyone* (and not just me) has the best interest of the Fund at heart, I don't see a way forward. While all second hand (but even enough hearsay evidence leads to conclusions), I have heard from numerous sources that Rob has told them quite directly that "Dennis is the past and I have no interest in going there" when informed that I might have the information he had asked about. If you want chapter and verse about Ray's [reported] comments I'll gladly have that conversation with you. Needless to say, reports of the comments made by Ray leads me to conclude that Ray would never be able to adhere to an agreement that would bar the parties from making negative comments about each other, which I assume this agreement would contain as that is a pretty customary provision.

Dennis

**From:** Patricia Polach [mailto:ppolach@bredhoff.com]
**Sent:** Thursday, July 20, 2017 2:04 PM
**To:** dennis.dreith@yahoo.com
**Subject:** FW: Congratulations ...

Aagh.

See attached and below for the draft agreement and the original e-mail about it. Here I thought I was giving you enough time to process it after your return before I nagged you; I didn't realize that you didn't have it any more.

The Fund *is* interested in reaching a consulting agreement with you; Rob would however be constrained from reaching out until the agreement is entered into. I assume you are saying you haven't heard from him - but I don't think you can read anything into that.

I'm not sure what happened with the e-mail & auto-reply, but the auto-reply is fixed now. I understood that you'd keep a Fund e-mail address as part of the consulting agreement. If you are (as I hope) entering into a consulting agreement with the Fund, that should be reinstated if it was cut off.

I know you have the best interests of the Fund at heart, & hope you'll review the draft and that you and the Fund will reach an agreement that is good for all.

Trish

**From:** Patricia Polach
**Sent:** Wednesday, July 05, 2017 5:30 PM
**To:** Dennis Dreith
**Subject:** Congratulations ...

Hi, Dennis,

I just tried you by phone. I didn't get through (even to VM) at the office, but did leave you a message on your cell. First things first – congratulations on your retirement. (Being the person on the phone at the last meeting, I didn't get to opine or offer my two cents.) I hope to not be too far behind you (as you know), and so this is a stage of life I've been thinking about a lot. I hope it is a great one for you. It certainly seems like you are starting it out in the best possible way – I hope Cuba is *great* (and I bet you're wise to get this trip in before the current administration makes it much harder or closes the doors altogether). While you're there (and ever after) you can think with deep satisfaction of the birth and incredible growth of "the little Fund that could" and all you did to make that happen.

I understand that you've spoken with Duncan about a consulting arrangement in your new life, and that Ray mentioned that they'd asked me to put together an agreement to cover exit issues as well

as the consulting. To that end, attached for your review is an Agreement and General Release, which includes (as Appendix C) a Consulting Agreement. The Consulting Agreement includes the rate of $175/hour as an independent contractor, which you discussed with Duncan, and it improves on that discussion by guaranteeing you sixty hours of consulting work over the next twelve months.

The rest of the Agreement and General Release consists largely of provisions that are fairly standard in executive exit agreements. Appendix A consists of the list of equipment (and prices) per your e-mail (assuming you still want to purchase the items on the list). Appendix B consists of a short list of unreimbursed personal expenditures (that presumably fell through the cracks); because they turned up in the Bond Beebe audit, they are included as an item to clear up.

Let me know if you have any questions or want to discuss –

Trish

Patricia Polach
Bredhoff & Kaiser P.L.L.C.
805 15th Street N.W.
Suite 1000
Washington D.C. 20005
PH (202) 842-2600
FAX (202) 842-1888

---------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------

This Electronic Transmission Is Intended Only For The Addressee Shown Above. It May Contain Information That Is Privileged, Confidential Or Otherwise Protected From Disclosure. Any Review, Dissemination Or Use Of This Transmission Or Its Contents By Persons Other Than The Addressee Is Strictly Prohibited. If You Have Received This Electronic Transmission In Error, Please Delete the E-Mail And Notify Us Immediately By Telephone Or By Reply E-Mail.
To Ensure Compliance With The Requirements Imposed By The Internal Revenue Service In IRS Circular 230, Please Be Informed That Any Tax Advice Contained In This Communication (Including Any Attachments) Is Not Intended Or Written To Be Used, And Cannot Be Used, For The Purpose Of (i) Avoiding Tax-Related Penalties Under The Internal Revenue Code Or (ii) Promoting, Marketing Or Recommending To Another Party Any Tax-Related Matter Addressed Herein.

______________________________________________________________________

This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com

______________________________________________________________________

Virus-free. www.avast.com

______________________________________________________________________

This email has been scanned by the Symantec Email Security.cloud service.

# EXHIBIT 24

PAUL R. KIESEL (State Bar No. 119854)
*kiesel@kiesel.law*
MARIANA A. MCCONNELL (State Bar No. 273225)
*mcconnell@kiesel.law*
NICO L. BRANCOLINI (State Bar No. 318237)
*brancolini@kiesel.law*
**KIESEL LAW LLP**
8648 Wilshire Boulevard
Beverly Hills, California 90211-2910
Telephone: (310) 854-4444
Facsimile: (310) 854-0812

NEVILLE L. JOHNSON (State Bar No. 66329)
*njohnson@jjllplaw.com*
DANIEL B. LIFSCHITZ (State Bar No. 285068)
*dlifschitz@jjllplaw.com*
**JOHNSON & JOHNSON LLP**
439 North Canon Drive, Suite 200
Beverly Hills, California 90210
Telephone: (310) 975-1080
Facsimile: (310) 975-1095

*Attorneys for Plaintiff and the Class*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

KEVIN RISTO, on behalf of himself and all others similarly situated,

Plaintiff,

v.

SCREEN ACTORS GUILD-AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS, a Delaware corporation; AMERICAN FEDERATION OF MUSICIANS OF THE UNITED STATES AND CANADA, a California nonprofit corporation; RAYMOND M. HAIR, JR, an individual, as Trustee of the AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund; TINO GAGLIARDI, an individual, as Trustee of the AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund; DUNCAN CRABTREE-IRELAND, an individual, as Trustee of the AFM and SAG-AFTRA Intellectual

**CASE NO.** 2:18-CV-07241-CAS-PLA

**CLASS ACTION**

**PLAINTIFF KEVIN RISTO'S RESPONSES TO DEFENDANTS' SECOND SET OF INTERROGATORIES**

Property Rights Distribution Fund; STEFANIE TAUB, an individual, as Trustee of the AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund; JON JOYCE, an individual, as Trustee of the AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund; BRUCE BOUTON, an individual, as Trustee of the AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund; and DOE DEFENDANTS 1-10,

Defendants.

PROPOUNDING PARTY: Defendants Screen Actors Guild-American Federation of Television and Radio Artists ("SAG-AFTRA"), American Federation of Musicians of the United States and Canada ("AFM"), Raymond M. Hair, Jr., Tino Gagliardi, Duncan Crabtree-Ireland, Stefanie Taub, Jon Joyce, and Bruce Bouton (collectively, "Defendants").

RESPONDING PARTY: Plaintiff Kevin Risto

SET NO.: Two

**PRELIMINARY STATEMENT**

These responses are made solely for the purpose of this action. These responses are made subject to all objections as to competence, relevance, materiality, propriety and admissibility, and any and all other objection and grounds that would require the exclusion of any statement made herein if any such statement were made by, or if any interrogatory were asked of, a witness present and testifying in court, all of which objections are expressly reserved and may be interposed up to and including the time of trial.

The following responses are based upon information presently available to Responding Party and except for explicit facts admitted herein, no incidental or implied admissions are intended hereby. The fact that either Responding Party has answered or objected to an interrogatory or part thereof should not be taken as an admission that either Responding Party accepts or admits the existence of any fact or facts set forth or assumed by such interrogatory, or that such answer or objection constitutes admissible evidence. The fact that either Responding Party has answered part or all of any interrogatory is not intended and shall not be construed to be, a waiver by either Responding Party of all or any part of any objection to any interrogatory made by such Responding Party.

To the extent that any or all of the interrogatories call for information which

constitutes information or material prepared in anticipation of litigation or for trial, or information or material covered by the work-product doctrine or which constitutes information which is privileged by virtue of the attorney-client privilege, Responding Party objects to each and every interrogatory and, thus, will not supply or render any information or material protected from discovery by virtue of the attorney-client privilege or the work-product doctrine.

It should be noted that Responding Party has not fully completed their investigation of the facts related to this case and has not fully completed preparation for the trial in this matter. All of the responses contained herein are based only on such information and documents which are presently available to and specifically known to each responding party and disclose only those contentions which presently are known to such responding party. It is anticipated that further discovery, independent investigation, legal research and analysis will supply additional facts, add meaning to the known facts, as well as establish entirely new factual conclusions and legal contentions, all of which may lead to substantial additions to, changes in, and variations from the contentions herein set forth.

The following responses are given without prejudice to each responding party's right to produce evidence of any subsequently discovered fact or facts which each responding party may later recall. Each responding party accordingly reserves the right to change any and all answers herein as additional facts are ascertained, analysis is made, legal research is completed, and contentions are made. The responses contained herein are made in a good-faith effort to supply as much factual information and as much specification of legal contentions as is presently known but should in no way be to the prejudice of each responding party in relation to further discovery, research or analysis.

The following responses are based on information and documents presently in the possession of or readily available to each responding party, and are made without prejudice to the responding party's right to utilize subsequently discovered

documents. This preliminary statement is incorporated in each of the responses set forth below:

**RESPONSES TO INTERROGATORIES**

**INTERROGATORY NO. 11:**

State all facts that support YOUR claim, as asserted in Paragraph 42 of the First Amended Complaint and elsewhere, that the TRUSTEES breached their fiduciary duties in approving the payment of the annual 3% SERVICE FEE to the UNIONS.

**RESPONSE TO INTERROGATORY NO. 11:**

**OBJECTION:** Responding Party objects to this Interrogatory to the extent it calls for a legal conclusion from the Responding Party.

**OBJECTION:** Responding Party objects to this this Interrogatory to the extent it calls for an expert opinion from the Responding Party in violation of the Federal Rules and the scheduling order in this case.

**OBJECTION:** Responding Party objects to this Interrogatory as calling for conjecture on the part of Responding Party as the phrase "and elsewhere" is not defined.

Without waiving and subject to the foregoing objections, Responding Party responds as follows:

17 U.S.C. § ("Section") 114(g)(1)(B) entitles non-featured performers to up to 5% of royalties generated under the Copyright Act. Section 114(g)(2)(B) and (C) state that the royalties are to be placed in an "escrow account managed by an independent administrator." The Fund was set up to be that independent administrator, responsible for distributing receipts from the licensing of transmissions to the owners of those royalties. Section 114(g)(3) limits the Fund to the deduction of its reasonable costs in three scenarios: (A) the administration of the collection, distribution, and calculation of the royalties; (B) the settlement of disputes relating to the collection and calculation of the royalties; and (C) the licensing and enforcement of rights with respect to the making of certain ephemeral recordings and performances. The measure of these costs

is further constrained by 31 U.S.C. § 9701, as the Fund is tasked with performing a statutory duty by the Copyright Royalty Judges (a federal agency) and may only charge for the actual cost of providing services, not the intrinsic value thereof.

The Fund's Agreement and Declaration of Trust dated September 16th, 1998 was drafted by Patricia Polach, longtime attorney of AFM. AFM enlisted their outside counsel, Patricia Polach, formerly with the law firm of Bredhoff & Kaiser, to perform legal services for the Fund. Patricia Polach was performing legal services for the Fund simultaneously with legal services for AFM and AFTRA/SAG-AFTRA. The Trust Agreement, signed by the Trustees, states that AFM and AFTRA shall each appoint two trustees. The first trustees appointed by the Unions were the International President and Vice President of AFM and the National Executive Director and President of AFTRA. Those four Union executives signed the original Trust Agreement. Accordingly, not a single individual responsible for the creation or administration of the Fund was truly "independent" of the Unions.

The Trust Agreement was amended and restated on July 26, 2012. The 2012 Trust Agreement expanded the number of Trustees to six, three from AFM and three from SAG-AFTRA, and requires that one trustee from each union be a rank and file member. The 2012 Trust Agreement was drafted by Patricia Polach, longtime attorney of AFM, and signed by the Union Trustees. The Unions chose Union-affiliated members, including members on local boards and committee chairs, to be the "rank and file" Trustees. The process for the selection and appointment of Trustees to the Fund's board does not meet the standard of care for non-profit governance.

The 2012 Trust Agreement requires the Fund Trustees to "do all acts… necessary or proper for the protection of the property held hereunder;" "to do all acts…necessary to accomplish the general objective of distributing remuneration to eligible artists in the most efficient and economical manner;" "to invest the assets of the Fund with care, skill, prudence and diligence…" All the Trustees agreed in deposition that they owe fiduciary duties to the Fund beneficiaries which require them

to be cost conscious with the beneficiaries' funds, to put the Fund beneficiaries' interests above all others, and act impartially.

Since the Fund's inception, the Unions (by and through their personnel, including the Fund Trustees) expressed an interest in receiving compensation from the Fund. Former AFM President/Fund Trustee asked Patricia Polach if AFM could take a fee from the Fund but was told that a fee would be "unlawful." After Ray Hair became President of AFM and placed himself as a Trustee of the Fund board, he reiterated AFM's interest in obtaining an interest in the Fund's distribution. In December 2012, Ray Hair, "on behalf of AFM," asked Patricia Polach "whether and how the AFM and SAG-AFTRA could enter into a service agreement with the Fund…" Instead of invoicing the Fund for expenses actually incurred, the Unions insisted on converting a percentage of the Fund's revenues in perpetuity.

Ms. Polach had a conflict of interest with the Fund in dealings with the Unions due to the several decades she spent as outside counsel for AFM as well as SAG-AFTRA. Despite this conflict, she held herself out as counsel for the Fund in connection with the drafting and negotiation of the Services Agreement while simultaneously servicing the Unions. The Fund never had adequate, independent legal advice. None of the Trustees did anything to investigate, remedy, or cure Ms. Polach's conflict of interest, because, as Union executives and leaders, they were benefitting from the conflict. The Trustees did not inquire about her scope of services for AFM or SAG-AFTRA, nor did any party seek or obtain a conflict waiver.

Fund Trustees Stefanie Taub, Jon Joyce and Bruce Bouton testified that they did not review the Services Agreement before the board voted to approve the Services Agreement. All three Trustees said that the upcoming vote on the Services Agreement was mentioned, but they were never part of any discussion to implement the Service Fee thereby. They each testified that these discussions occurred between Ray Hair and Duncan Crabtree-Ireland, apex Union employees, to which they were not privy.

The Services Agreement came up for vote at the June 4, 2013 Fund Trustee

board meeting. The minutes of that meeting do not reflect the vote, nor do the minutes reflect any recusals. It is noted that the motion to approve the Services Agreement was moved, seconded and carried by the Fund Trustees.

The Fund's own Conflict of Interest policy and the standard of care of non-profit governance require that conflicts of interest be identified and remedied. The Fund Trustees did not take any steps to remedy or alleviate possible or actual conflicts of interest. The Fund's IRS 990 for the year 2013 indicate that the Fund had a conflict of interest policy in effect that year. Neither the Fund nor the Trustees have been able to produce a 2013 Conflict of Interest Policy. The current Fund CEO, Stefanie Taub, who was a Trustee in 2013, stated that conflicts did not need to be disclosed, because everyone on the board knew about the interests which existed at the time. Ray Hair, who was concurrently AFM's President, had a conflict of interest in the Services Agreement transaction. Duncan Crabtree-Ireland, who was concurrently SAG-AFTRA's COO and General Counsel, had a conflict of interest in the Services Agreement transaction. Stefanie Taub, who was concurrently the National Manager, West Coast for SAG-AFTRA, had a conflict of interest in the Services Agreement transaction. Bruce Bouton was on the board of a Local AFM chapter, but his possible conflict of interest was not considered by the board. Jon Joyce was not present at the June 2013 board meeting. If (at least) three of the six trustees were ineligible to vote on the transaction due to their conflict of interest, the Services Agreement would not have been able to be approved as there was no majority to carry the motion. The Fund Trustees failed to properly recuse themselves and undertake a non-conflicted vote on the Services Agreement.

Paragraphs 1 through 5 of the Services Agreement specify the various services being provided by the Unions to the Fund in exchange for the Service Fee. Of these services, only one – "Provision of Data" – arguably falls within a permissible category of costs under Section 114(g)(3). The remaining services do not concern the administration of the collection, distribution, and calculation of the royalties, the

settlement of disputes relating to the collection and calculation of the royalties, or the licensing and enforcement of rights with respect to the making of certain ephemeral recordings and performances. Paragraph 6 of the Services Agreement specifies that the Service Fee is made in consideration of "the foregoing" – *i.e.*, all services specified in Paragraphs 1 through 5. Accordingly, the Trustees approved payment to the Unions in exchange for services not properly compensable from the Fund's corpus.

None of the Trustees who have been deposed to date made an evaluation of the reasonable cost of the services purportedly being provided by the Unions to the Fund before the vote on the Services Agreement. None of the Trustees who have been deposed to date asked how many hours the Unions were spending on Fund requests. None of the Trustees who have been deposed to date spoke to Fund employees to ask how many inquiries were being fulfilled. None of the Trustees who have been deposed to date asked what the overhead allocation was for Union employees responding to Fund inquiries. None of the Trustees who have been deposed to date considered or evaluated whether a percentage fee was appropriate for the Service Fee. The Fund Trustees did not perform a time and materials study or a time tracking study to evaluate the Services Agreement.  The Fund Trustees did not undertake any acts to evaluate the reasonable cost of the services to be provided to the Fund under the Services Agreement. This failure to undertake a basic analysis before voting to give up 3% of the distributable amounts of the Fund violates applicable trust law, the Fund Trustees' fiduciary duties, as well as Section 114(g)(3), 31 U.S.C. § 9701, and the Trust Agreement.

The membership data and session reports/B-Forms which are sometimes provided by the Unions to the Fund are compiled and maintained by the Unions for a plethora of Union-related purposes. The Unions use the session report/B-Forms to make pension and health benefit calculations, to ensure that performers on Union tracks are paid, and to compile their own membership databases for Union-related marketing and membership drives. These activities are not Fund-related. The

membership data is simply copied to the Fund, without regard to whether the Fund actually needs the information. The data is also duplicated from prior years, leaving the Fund to sort through the data dump to pick out the information that it requires for the distribution before verifying it for accuracy. The Fund has been accumulating its own, up to date, verified data since its creation. The data for prior years' tracks and identified performers have already been accumulated. The delta between the information already known by the Fund and new information sought is small, if not non-existent. Unlike music production of days past, the likelihood of a Union session is rare. If the track was not a Union session, the Unions would have no chance of obtaining any relevant information that would assist the Fund.

The Trustees of the Fund also have fiduciary duties to their own Union memberships, and they are required to assist their membership in obtaining available royalties. Every session report/B-Form provided to the Fund implicates at least one Union member's interests, as they would not otherwise maintain the document in question, and so there is no instance where the Unions are providing services to the Fund that is not for the benefit of their members. The notion that the AFM President or SAG-AFTRA COO could withhold identifying information from the Fund unless provided a handsome fee ignores their duties to their own membership.

The "representation of Fund interests" outlined in Part II of the Services Agreement are all activities which the Unions do on behalf of Union membership. There is no additional cost or effort in this representation, nor has the Fund asked the Unions to represent its interests at any time.

Despite the millions of dollars the Unions have taken from the Fund to date, the Unions' 30(b)(6) witnesses and the Fund's designee have all confirmed that over 70% of the Fund's data requests are not fulfilled, requests that themselves only relate to a fraction of the Fund's overall catalog of compensable recordings (much of which are not covered by the Unions). The number of hours and overhead allocations for the Union employees who respond to Fund requests is *de minimis*.

Trustees Jon Joyce and Bruce Bouton noticed that the Service Fee was growing and expressed misgivings in deposition about the ever-increasing amount that has and still is being converted from the Fund's beneficiaries. Despite these concerns, none of the Trustees have raised the Services Agreement as an item to be reconsidered by the Fund. The Trustees continue to convert Fund beneficiaries' assets on a semi-annual basis.

Fiduciary duties require the Fund Trustees to constantly evaluate the Service Fee. Instead of bringing the Services Agreement back up for discussions, the Trustees continue to ignore their duties, some quietly expressing doubt and concern about the increasing fee but not wanting to betray their Union allegiances. Although all the Trustees deposed to date are under the mistaken impression that the number of beneficiaries has increased at the same rate as the amount of the Service Fee, a comparison of the numbers provided by the Defendants belies that conclusion.

Instead of performing any type of study or evaluation, the Trustees arbitrarily decided on a 3% fee. Testimony from former Fund administrator Dennis Dreith, former CFO Jennifer LeBlanc and Fund CEO/former Trustee Stefanie Taub confirms that the AFM President Ray Hair was interested in securing a larger fee from the Fund but was tempered by SAG-AFTRA COO/GC/Trustee Duncan Crabtree-Ireland and former Fund administrator Dennis Dreith. The 3% amount was a compromise number. While Defendants seek to pin Dennis Dreith with the decision to fix the fee at 3%, rules of governance and the testimony of the Fund's CEO confirms that as an administrator, Mr. Dreith did not have the authority to vote or make decisions on behalf of the Fund. The implementation of a variable 3% Service Fee does not comply with Section 114, 31 U.S.C. § 9701, the Trustees' obligations under the Trust Agreement and applicable trust law.

After approving the Services Agreement, the Fund did not expressly disclose the fee to the Fund's beneficiaries, choosing instead to hide the fee in administrative expenses instead of identifying the fee for what it was – an arbitrary taking of the

Fund beneficiaries' royalties by the Unions. The Annual Report for 2014, the first year that the fee was administered, did not get posted on the Fund's website until late 2016. The Fund's former CEO testified that the way the service was disclosed in the consolidated schedule of the Annual Reports was not clear to understand. Since the Annual Reports were unclear to a Harvard educated MBA CFO, it is likely that the Annual Reports were unclear to the Fund's beneficiaries.

The activities set forth herein, in addition to the facts which have been developed in discovery to date, show that Defendants violated the Internal Revenue Service Code, the common law, trust code and corporate code of the applicable states, non-profit law and related public policy.

Discovery is ongoing, and Responding Party reserves the right to supplement this Interrogatory as information becomes available.

**INTERROGATORY NO. 12:**

State all facts that support YOUR claim, as asserted in Paragraph 42 of the First Amended Complaint and elsewhere, that the TRUSTEES converted funds rightfully due to Plaintiff and the Class by diverting the funds to the UNIONS.

**RESPONSE TO INTERROGATORY NO. 12:**

**OBJECTION:** Responding Party objects to this Interrogatory to the extent it calls for a legal conclusion from the Responding Party.

Without waiving and subject to the foregoing objections, Responding Party responds as follows:

See Responding Party's response to Special Interrogatory No. 11.

**INTERROGATORY NO. 13:**

State all facts that support the statement in YOUR recent Joint Stipulation re Motion to Compel (Dkt. No. 85) that the information provided by the UNIONS to the FUND pursuant to the SERVICES AGREEMENT "costs the Unions nothing to provide" to the FUND.

/ / /

**RESPONSE TO INTERROGATORY NO. 13:**

See Responding Party's response to Special Interrogatory No. 11.

**INTERROGATORY NO. 14:**

If YOU deny all or any part of DEFENDANTS' Request for Admission No. 1, IDENTIFY all facts, witnesses, COMMUNICATIONS, and DOCUMENTS that support YOUR denial.

**RESPONSE TO INTERROGATORY NO. 14:**

**OBJECTION:** Responding Party objects to this Interrogatory and the companion Request for Admission to the extent it calls for a legal conclusion from the Responding Party.

**OBJECTION:** Responding Party objects to this Interrogatory and the companion Request for Admission to the extent it calls for an expert opinion from the Responding Party in violation of the Federal Rules and the scheduling order in this case.

**OBJECTION:** Responding Party objects to this Interrogatory as calling for a legal conclusion from a lay witness.

Without waiving and subject to the foregoing objections, Responding Party responds as follows:

**Facts:**

Section 114(g) states that non-featured performers are entitled to up to 5% of the receipts to be deposited "in an escrow account managed by an independent administrator." The Fund was set up to be that "independent administrator," obligated to distribute receipts from the licensing of transmissions through an escrow account pursuant to Section 114(g)(2)(B) and (C).

Section § 114 restricts the Fund to the deduction of only "reasonable costs… incurred after November 1, 1995, in—(A) the administration of the collection, distribution, and calculation of the royalties; (B) the settlement of disputes relating to the collection and calculation of the royalties; and (C) the licensing and enforcement

of rights with respect to the making of ephemeral recordings and performances subject to licensing under section 112 and this section, including those incurred in participating in negotiations or arbitration proceedings under section 112 and this section, except that all costs incurred relating to the section 112 ephemeral recordings right may only be deducted from the royalties received pursuant to section 112." 17 U.S.C. § 114(g)(3)(A)-(C). Pursuant to the Independent Offices Appropriation Act, any fees charged to the Fund's beneficiaries cannot be based on the "intrinsic value" of the services being provided, but the actual cost of providing the services.

The Fund already deducts its own costs pursuant to 17 U.S.C. § 114(g)(3)(A)-(C). On average, those costs amount to 10-15% of the Fund's annual distribution. The Service Fee is an extra tax on the Fund's distribution that is unjustified, unearned, and unaccounted for by the Unions.

The Service Fee represents an arbitrary percentage fee (1) not tethered to the reasonable cost of the administration of the collection, distribution and calculation of the royalties, (2) not associated with the settlement of disputes relating the collection and calculation of the royalties, and (3) not associated to the licensing and enforcement of rights with respect to the making of ephemeral records or performances subject to licensing under section 112. Therefore, the Service Fee violates the express provisions of Section 114 and 31 U.S.C. § 9701.

Section 114 confers fiduciary responsibilities on the Fund's Trustees as the property holders of the beneficiaries' royalties in charge of a statutorily directed escrow account. Because of their fiduciary obligations, the Trustees had obligations for, among other things: ensuring that the Fund had adequate, conflict-free legal representation in the negotiation of the Services Agreement, evaluating whether the implementation of the Service Fee was permitted by law, evaluating the reasonable cost of the services purportedly purchased by the Fund, monitoring the rising Service Fee, and undertaking all acts to protect the corpus of the Fund, including but not limited to, terminating the Services Agreement and/or revising the amount of the

Service Fee so that it reflected the actual cost of services performed by the Unions.

The activities set forth herein, in addition to the facts which have been developed in discovery to date, show that Defendants violated the Internal Revenue Service Code, the common law, trust code and corporate code of the applicable states, non-profit law and related public policy.

**Witnesses:**

Ray Hair, Duncan Crabtree-Ireland, Jennifer LeBlanc, Nancy Carney, Bruce Bouton, Jon Joyce, Stefanie Taub, Tino Gagliardi, Julie Sandel, Sidney White, Kristina Gorbascov, John Painting, Thomas Lee, Patricia Polach, Dennis Dreith.

**Documents:**

17 U.S.C. § 114; 31 U.S.C. § 9701; 1998 Trust Agreement; 2012 Amended and Restated Declaration of Trust; 2014 Conflict of Interest Policy; 2017 Conflict of Interest Policy; Data Purchase and Services Agreement ("Services Agreement"); Trustee Meeting Minutes; Defendants' Responses to Interrogatories; Deposition Transcripts of the witnesses listed above.

Discovery is ongoing and Responding Party reserves the right to supplement this interrogatory as information becomes available.

**INTERROGATORY NO. 15:**

If YOU deny all or any part of DEFENDANTS' Request for Admission No. 2, IDENTIFY all facts, witnesses, COMMUNICATIONS, and DOCUMENTS that support YOUR denial.

**RESPONSE TO INTERROGATORY NO. 15:**

**OBJECTION:** Responding Party objects to this Interrogatory and the companion Request for Admission to the extent it calls for a legal conclusion from the Responding Party.

/ / /

/ / /

/ / /

**OBJECTION:** Responding Party objects to this Interrogatory and the companion Request for Admission to the extent it calls for an expert opinion from the Responding Party in violation of the Federal Rules and the scheduling order in this case.

**OBJECTION:** Responding Party objects to this Interrogatory as calling for a legal conclusion from a lay witness.

Without waiving and subject to the foregoing objections, Responding Party responds as follows:

**Facts:**

The 2012 Amended and Restated Declaration of Trust was approved and signed by the same Trustees who had a conflict of interest in the Fund's transactions with the Unions. The 2012 Amended and Restated Declaration of Trust was drafted by an attorney whose conflicts prohibited her from representing the Fund. Putting aside the blatant conflicts, the 2012 Amended and Restated Declaration of Trust did not, and could not, alleviate the Trustees from complying with 17 U.S.C. § 114.

The 2012 Amended and Restated Declaration of Trust itself requires the Trustees to only perform acts which are "necessary to accomplish the general objective of distributing remuneration to eligible artists in the most efficient and economical manner." The Service Fee is neither efficient nor economical. The 2012 Amended and Restated Declaration of Trust also requires that the Trustees "invest the assets of the Fund with care, skill, prudence and diligence under circumstances then prevailing that a prudent person, acting in a like capacity and familiar with such matters, would use in the conduct of an enterprise of a like character and with such aims, without regard to state law restrictions on investments." The Trustees failed to act with care, skill, prudence and diligence, in that the percentage-based Service Fee siphons millions of dollars from the Fund to the Unions in exchange for data that has little, or no, value to the Fund and costs the Unions nothing to provide, in violation of 17 U.S.C. § 114 and 31 U.S.C. § 9701. In addition, at every distribution cycle, the

Fund Trustees had an obligation to reevaluate and reconsider the fee.

In addition to violating 17 U.S.C. § 114, 31 U.S.C. § 9701, and the 2012 Trust Agreement, the decision to implement the Service Fee violated the Trustees' fiduciary duties including but not limited to: the duty of loyalty, the duty of impartiality, and the duties of prudence, diligence and good faith.

The activities set forth herein, in addition to the facts which have been developed in discovery to date, show that Defendants violated the Internal Revenue Service Code, the common law, trust code and corporate code of the applicable states, non-profit law and related public policy.

**Witnesses:**

Ray Hair, Duncan Crabtree-Ireland, Jennifer LeBlanc, Nancy Carney, Bruce Bouton, Jon Joyce, Stefanie Taub, Tino Gagliardi, Julie Sandel, Sidney White, Kristina Gorbascov, John Painting, Thomas Lee, Patricia Polach, Dennis Dreith.

**Documents:**

17 U.S.C. § 114; 31 U.S.C. § 9701; 1998 Trust Agreement; 2012 Amended and Restated Declaration of Trust; 2014 Conflict of Interest Policy; 2017 Conflict of Interest Policy; Data Purchase and Services Agreement ("Services Agreement"); Trustee Meeting Minutes; Defendants' responses to Interrogatories; Deposition Transcripts of the witnesses listed above.

Discovery is ongoing and Responding Party reserves the right to supplement this interrogatory as information becomes available.

**INTERROGATORY NO. 16:**

If YOU deny all or any part of DEFENDANTS' Request for Admission No. 3, IDENTIFY all facts, witnesses, COMMUNICATIONS, and DOCUMENTS that support YOUR denial.

/ / /

/ / /

/ / /

**RESPONSE TO INTERROGATORY NO. 16:**

      **OBJECTION:** Responding Party objects to this Interrogatory and the companion Request for Admission to the extent it calls for a legal conclusion from the Responding Party.

      **OBJECTION:** Responding Party objects to this Interrogatory and the companion Request for Admission to the extent it calls for an expert opinion from the Responding Party in violation of the Federal Rules and the scheduling order in this case.

      **OBJECTION:** Responding Party objects to this Interrogatory as calling for a legal conclusion from a lay witness.

      Without waiving and subject to the foregoing objections, Responding Party responds as follows:

      See Responding Party's Response to Interrogatory Nos. 14 and 15.

**INTERROGATORY NO. 17:**

      If YOU deny all or any part of DEFENDANTS' Request for Admission No. 4, IDENTIFY all facts, witnesses, COMMUNICATIONS, and DOCUMENTS that support YOUR denial.

**RESPONSE TO INTERROGATORY NO. 17:**

      **OBJECTION:** Responding Party objects to this Interrogatory and the companion Request for Admission to the extent it calls for a legal conclusion from the Responding Party.

      **OBJECTION:** Responding Party objects to this Interrogatory and the companion Request for Admission to the extent it calls for an expert opinion from the Responding Party in violation of the Federal Rules and the scheduling order in this case.

      **OBJECTION:** Responding Party objects to this Interrogatory as calling for a legal conclusion from a lay witness.

      Without waiving and subject to the foregoing objections, Responding Party

responds as follows:

See Responding Party's Response to Interrogatory Nos. 14, 15, and 16.

**INTERROGATORY NO. 18:**

If YOU deny all or any part of DEFENDANTS' Request for Admission No. 5, IDENTIFY all facts, witnesses, COMMUNICATIONS, and DOCUMENTS that support YOUR denial.

**RESPONSE TO INTERROGATORY NO. 18:**

**Objection:** Responding Party objects to this Interrogatory and the companion Request for Admission on the ground that it is vague and ambiguous with respect to the phrase "has value." The word "value" does not appear in 17 U.S.C. § 114, which restricts the Fund to deduct only the reasonable costs actually incurred in certain limited situations. 17 U.S.C. § 114 (g)(3)(A)-(C).

Without waiving and subject to the foregoing objections, Responding Party responds as follows:

**Facts:**

According to numerous witnesses testifying on behalf of the Unions and the Fund, the Unions are unable to provide information for over 70% of the Fund's requests, which themselves only represent a fraction of the recordings tracked by the Fund. The time and cost to the Unions in providing this information to the Fund is *de minimis*. In addition, since the Fund has been compiling the information provided by the Unions at its own expense and effort, the Fund no longer has any use for the Unions' limited information for the vast majority of Fund beneficiaries.

The Fund also expends time and effort conducting its own research through several sources, validating and cross-checking information received by the Unions (if any). The Fund's administrative costs are charged to the Fund, and on average represent, 10-20% of the distributable amount. This administrative cost is in addition to the Service Fee, which amounts to approximately $9M in the last seven years. Finally, because the manner in which sessions are recorded has changed over the last

several years, the Unions no longer have or maintain information with regard to non-featured performers on current tracks.

**Witnesses:**

Ray Hair, Duncan Crabtree-Ireland, Jennifer LeBlanc, Nancy Carney, Bruce Bouton, Jon Joyce, Stefanie Taub, Tino Gagliardi, Julie Sandel, Sidney White, Kristina Gorbascov, John Painting, Patricia Polach, Dennis Dreith.

**Documents:**

17 U.S.C. § 114; 1998 Trust Agreement; 2012 Amended and Restated Declaration of Trust; 2014 Conflict of Interest Policy; 2017 Conflict of Interest Policy; Data Purchase and Services Agreement ("Services Agreement"); Trustee Meeting Minutes; Defendants' responses to Interrogatories; Deposition Transcripts of the witnesses listed above; Emails produced by Defendants showing a failure of the Unions to respond to Fund requests.

Discovery is ongoing and Responding Party reserves the right to supplement this interrogatory as information becomes available.

**INTERROGATORY NO. 19:**

If YOU deny all or any part of DEFENDANTS' Request for Admission No. 6, IDENTIFY all facts, witnesses, COMMUNICATIONS, and DOCUMENTS that support YOUR denial.

**RESPONSE TO INTERROGATORY NO. 19:**

**Objection:** Responding Party objects to this Interrogatory and the companion Request for Admission on the ground that it is vague and ambiguous with respect to the phrase "has value." The word "value" does not appear in 17 U.S.C. § 114, which restricts the Fund to deduct only the reasonable costs actually incurred in certain limited situations. 17 U.S.C. § 114 (g)(3)(A)-(C).

Without waiving and subject to the foregoing objections, Responding Party responds as follows:

See Responding Party's Response to Interrogatory No. 18.

**INTERROGATORY NO. 20:**

If YOU deny all or any part of DEFENDANTS' Request for Admission No. 7, IDENTIFY all facts, witnesses, COMMUNICATIONS, and DOCUMENTS that support YOUR denial.

**RESPONSE TO INTERROGATORY NO. 20:**

**Objection:** Responding Party objects to this Interrogatory and the companion Request for Admission on the ground that it is vague and ambiguous with respect to the phrase "have maintained."

**Objection:** Responding Party objects to this Interrogatory and the companion Request for Admission as it calls for information within the custody and control of Defendants.

**Objection:** Responding Party objects to this Interrogatory and the companion Request for Admission as overbroad as to time.

Without waiving and subject to the foregoing objections, Responding Party responds as follows:

**Facts:**

Responding Party is unable to admit or deny this Request with regard to the universe of non-Union, non-featured performers from 2013 to the present as he has no personal knowledge of the amount of non-Union, non-featured performers whose information was allegedly provided. Nor does he know whether this information is accurate.

With regard to Responding Party, the Unions either did not have or did not provide Responding Party's information to the Fund, and he was forced to retain a third party who reached out to the Fund, provide his identifying information, provide verification of his track history with documentation from the copyright owners.

**Witnesses:**

Kevin Risto, Dennis Dreith.

/ / /

**Documents:**

PLTF001-129.

Discovery is ongoing and Responding Party reserves the right to supplement this interrogatory as information becomes available.

**INTERROGATORY NO. 21:**

If YOU deny all or any part of DEFENDANTS' Request for Admission No. 8, IDENTIFY all facts, witnesses, COMMUNICATIONS, and DOCUMENTS that support YOUR denial.

**RESPONSE TO INTERROGATORY NO. 21:**

**Objection:** Responding Party objects to this Interrogatory and the companion Request for Admission on the ground that it is vague and ambiguous with respect to the phrase "have maintained."

**Objection:** Responding Party objects to this Interrogatory and the companion Request for Admission as it calls for information within the custody and control of Defendants.

**Objection:** Responding Party objects to this Interrogatory and the companion Request for Admission as overbroad as to time.

Without waiving and subject to the foregoing objections, Responding Party responds as follows:

**Facts:**

Responding Party is unable to admit or deny this Request with regard to the universe of non-Union, non-featured performers from 2013 to the present as he has no personal knowledge of the amount of non-Union, non-featured performers whose information was allegedly provided. Nor does he know whether this information is accurate.

With regard to Responding Party, the Unions either did not have or did not provide Responding Party's information to the Fund, and he was forced to retain a third party who reached out to the Fund, provide his identifying information, provide

verification of his track history with documentation from the copyright owners.

**Witnesses:**

Kevin Risto, Dennis Dreith.

**Documents:**

PLTF001-129.

Discovery is ongoing and Responding Party reserves the right to supplement this interrogatory as information becomes available.

**INTERROGATORY NO. 22:**

If YOU deny all or any part of DEFENDANTS' Request for Admission No. 9, IDENTIFY all facts, witnesses, COMMUNICATIONS, and DOCUMENTS that support YOUR denial.

**RESPONSE TO INTERROGATORY NO. 22:**

**Objection:** Responding Party objects to this Interrogatory and the companion Request for Admission on the ground that it is vague and ambiguous with respect to the phrase "provide benefits, directly or indirectly."

**Objection:** Responding Party objects to this Interrogatory and the companion Request for Admission to the extent it assumes that words on a page can provide benefits.

Without waiving and subject to the foregoing objections, Responding Party responds as follows:

**Facts:**

The activities listed in Part I and Part II of the Services Agreement, by themselves, do not provide any benefits to non-featured performers who are not Union members. With regard to the activities listed in Part I, non-featured performers who have not performed on Union sessions and are not Union members are not listed in the Unions' member databases. Non-featured performers who are not Union members are unlikely to be identified in session reports and B-forms. Defendants' witnesses in this case have testified that the Unions are unable to respond to over 70% of the Fund's

research requests. For the percentage of requests to which the Unions are able to provide information, Responding Party is not able to surmise the extent that non-featured performers who are not Union members are on session reports or B-forms that are maintained by the Unions or the accuracy of the information the Unions are able to locate. Without knowing this information, Responding Party is unable to state whether the universe of non-featured performers have actually derived a benefit from the Unions.

In addition, the Fund's research team independently searches recording session information through publicly available and paid-for resources to identify non-featured performers (whether Union or non-Union). Responding Party is unable to determine, and Defendants would not be able to state, whether the Fund would have discovered the identity of a non-featured performer through its own research or whether the Unions provided a unique, non-replicable benefit.

With regard to Part II, the "representation of Fund interests," the Unions have a fiduciary duty to their own beneficiaries to further the interests of their membership through participation in SoundExchange, Inc., the Alliance of Artists and Record Companies, the musicFIRST Coalition, the U.S. Copyright Office and other U.S. Governmental entities, and international entities such as International Federation of Musicians, International Federation of Actors, World Intellectual Property Organization, and Societies' Council for the Collective Management of Performers' Rights. These interests necessarily overlap with the interests of the Fund beneficiaries, whether Union or non-Union. Union members already pay dues to the Unions to further their interests through participation in these organizations. The imposition of a Service Fee on Union members' statutorily entitled royalties amounts to a double charge to Union members. Non-Union members, by virtue of not joining the Unions and refusing to pay dues to the Unions, have made a decision not to support the Unions' efforts in this regard. The imposition of a Service Fee on non-Union members' statutorily entitled royalties circumvents their decisions not to be

represented by, and therefore not pay dues to, the Unions.

**Witnesses:**

Ray Hair, Duncan Crabtree-Ireland, Jennifer LeBlanc, Nancy Carney, Bruce Bouton, Jon Joyce, Stefanie Taub, Tino Gagliardi, Julie Sandel, Sidney White, Kristina Gorbascov, John Painting, Patricia Polach, Dennis Dreith.

**Documents:**

17 U.S.C. § 114; 1998 Trust Agreement; 2012 Amended and Restated Declaration of Trust; 2014 Conflict of Interest Policy; 2017 Conflict of Interest Policy; Data Purchase and Services Agreement ("Services Agreement"); Trustee Meeting Minutes; Defendants' responses to Interrogatories; Deposition Transcripts; Emails produced by Defendants showing a failure of the Unions to respond to Fund requests.

Discovery is ongoing and Responding Party reserves the right to supplement this interrogatory as information becomes available.

**INTERROGATORY NO. 23:**

If YOU deny all or any part of DEFENDANTS' Request for Admission No. 10, IDENTIFY all facts, witnesses, COMMUNICATIONS, and DOCUMENTS that support YOUR denial.

**RESPONSE TO INTERROGATORY NO. 23:**

**OBJECTION:** Responding Party objects to this Interrogatory and the companion Request for Admission to the extent it calls for an expert opinion from the Responding Party in violation of the Federal Rules and the scheduling order in this case.

**OBJECTION:** Responding Party objects to this Interrogatory and the companion Request for Admission to the extent it calls for a legal conclusion from the Responding Party.

Without waiving and subject to the foregoing objections, Responding Party responds as follows:

**Facts:**

See Responding Party's Responses to Interrogatory Nos. 14 and 15.

The Trustees of the Fund are limited by 17 U.S.C. § 114 and 31 U.S.C. § 9701 to only deduct reasonable costs necessarily incurred, which cannot be based on a service's "intrinsic value." In addition, the Trustees of the Fund are further constrained by their fiduciary duties to only pay for services provided, and to evaluate the cost of those services annually pursuant to a prudent person standard.

**Witnesses:**

Ray Hair, Duncan Crabtree-Ireland, Jennifer LeBlanc, Nancy Carney, Bruce Bouton, Jon Joyce, Stefanie Taub, Tino Gagliardi, Julie Sandel, Sidney White, Kristina Gorbascov, John Painting, Thomas Lee, Patricia Polach, Dennis Dreith.

**Documents:**

17 U.S.C. § 114; 31 U.S.C. § 9701; 1998 Trust Agreement; 2012 Amended and Restated Declaration of Trust; 2014 Conflict of Interest Policy; 2017 Conflict of Interest Policy; Data Purchase and Services Agreement ("Services Agreement"); Trustee Meeting Minutes; Defendants' responses to Interrogatories; Deposition Transcripts of the witnesses listed above; Emails produced by Defendants showing a failure of the Unions to respond to Fund requests.

Discovery is ongoing and Responding Party reserves the right to supplement this interrogatory as information becomes available.

**INTERROGATORY NO. 24:**

If YOU deny all or any part of DEFENDANTS' Request for Admission No. 11, IDENTIFY all facts, witnesses, COMMUNICATIONS, and DOCUMENTS that support YOUR denial.

**RESPONSE TO INTERROGATORY NO. 24:**

**OBJECTION:** Responding Party objects to this Interrogatory and the companion Request for Admission to the extent it calls for a legal conclusion from the Responding Party.

Without waiving and subject to the foregoing objections, Responding Party responds as follows:

**Facts:**

Section 114 states that a nonfeatured recording artist who performs on a sound recording that has been licensed for transmission "shall be entitled to receive payments from the copyright owner." The receipts "shall be deposited in an escrow account managed by an independent administrator." Pursuant to the statute, the Fund's administrators are considerably restricted in how to distribute these royalties: the Copyright Act specifically determines the percentages to which the various artists and copyright holders are entitled and restricts the type and amount of costs that may be deducted from the nonfeatured performers' property. Neither the Fund's Sound Recording Guidelines, the Fund's Trust Agreement, nor the Services Agreement (all approved and drafted by conflicted parties), have the authority to contradict Congress' statutory regime.

**Witnesses:**

Ray Hair, Duncan Crabtree-Ireland, Jennifer LeBlanc, Bruce Bouton, Jon Joyce, Stefanie Taub, Tino Gagliardi, Dennis Dreith.

**Documents:**

17 U.S.C. § 114; 1998 Trust Agreement; 2012 Amended and Restated Declaration of Trust; 2014 Conflict of Interest Policy; 2017 Conflict of Interest Policy; Data Purchase and Services Agreement ("Services Agreement"); Trustee Meeting Minutes; Defendants' responses to Interrogatories; Deposition Transcripts of the witnesses listed above.

/ / /

/ / /

/ / /

/ / /

/ / /

Discovery is ongoing and Responding Party reserves the right to supplement this interrogatory as information becomes available.

Mariana A. McConnell

26 PLAINTIFF KEVIN RISTO'S RESPONSES TO DEFENDANTS' SECOND SET OF INTERROGATORIES

# VERIFICATION

I, Kevin Risto, declare:

I have read the foregoing **PLAINTIFF KEVIN RISTO'S RESPONSES TO DEFENDANTS' SECOND SET OF INTERROGATORIES** and hereby declare that the responses are true to and correct to the best of my personal knowledge, information, and belief, with the exception of those matters upon which I have relied on the investigation of counsel, and as to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. I reserve my right to supplement or revise this statement based upon any subsequently discovered documents or information.

Executed at Las Vegas, Nevada on February 12, 2021.

Kevin Risto

Kevin Risto

# PROOF OF SERVICE

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and **not a party to this action**. I am employed in the County of Los Angeles, State of California. My business address is 8648 Wilshire Boulevard, Beverly Hills, CA 90211-2910.

On February 12, 2021, I served true copies of the following document(s) described as **PLAINTIFF KEVIN RISTO'S RESPONSES TO DEFENDANTS' SECOND SET OF INTERROGATORIES** on the interested parties in this action as follows:

**SEE ATTACHED SERVICE LIST**

**BY E-MAIL OR ELECTRONIC TRANSMISSION:** I caused a copy of the document(s) to be sent from e-mail address mcruz@kiesel.law to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on February 12, 2021, at Beverly Hills, California.

Melanie Cruz

**SERVICE LIST**

***Kevin Risto, et. al. v. Screen Actors Guild-American Federation Of Television And Radio Artists, et. al.*; Case No. 2:18-cv-07241-CAS-PLA**

Andrew J. Thomas
Andrew G. Sullivan
Anna K. Lyons
**JENNER & BLOCK LLP**
633 West 5th Street, Suite 3600
Los Angeles, CA 90071
Telephone: (213) 239-5100
Facsimile: (213) 239-5199
Emails: ajthomas@jenner.com
agsullivan@jenner.com
alyons@jenner.com

*Attorneys for All Defendants*

Neville L. Johnson
Daniel B. Lifschitz
**JOHNSON & JOHNSON LLP**
439 North Canon Drive, Suite 200
Beverly Hills, California 90210
Telephone: 310-975-1080
Facsimile: 310-975-1095
Emails: njohnson@jjllplaw.com
dlifschitz@jjllplaw.com

*Attorneys for Plaintiff and the Class*

# EXHIBIT 25

JENNER & BLOCK LLP
Andrew J. Thomas (Cal. Bar No. 159533)
ajthomas@jenner.com
Andrew G. Sullivan (Cal. Bar No. 301122)
agsullivan@jenner.com
Anna K. Lyons (Cal. Bar No. 324090)
633 West 5th Street, Suite 3600
Los Angeles, CA 90071
Telephone: (213) 239-5100
Facsimile: (213) 239-5199

*Attorneys for All Defendants*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

KEVIN RISTO, on behalf of himself and all others similarly situated,

Plaintiff,

vs.

SCREEN ACTORS GUILD-AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS, a Delaware corporation; AMERICAN FEDERATION OF MUSICIANS OF THE UNITED STATES AND CANADA, a California nonprofit corporation; RAYMOND M. HAIR, JR., an individual, as Trustee of the AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund; TINO GAGLIARDI, an individual, as Trustee of the AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund; DUNCAN CRABTREE-IRELAND, an individual, as Trustee of the AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund; STEFANIE TAUB,

Case No. 2:18-cv-07241-CAS-PLA

Class Action

**AMENDED RESPONSES OF DEFENDANT AMERICAN FEDERATION OF MUSICIANS OF THE UNITED STATES AND CANADA TO PLAINTIFF'S FIRST SET OF INTERROGATORIES**

an individual, as Trustee of the AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund; JON JOYCE, an individual, as Trustee of the AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund; BRUCE BOUTON, an individual, as Trustee of the AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund; and DOE RESPONDING PARTY 1-10,

Responding Party.

PROPOUNDING PARTIES: PLAINTIFF KEVIN RISTO

RESPONDING PARTIES: AMERICAN FEDERATION OF MUSICIANS OF THE UNITED STATES AND CANADA

SET NUMBER: ONE

**DEFENDANT'S AMENDED RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES NOS. 4-8, 10, 16, 21-28, 30**

Defendant American Federation of Musicians of the United States and Canada ("AFM," or the "Responding Party"), by and through its undersigned counsel, hereby responds and objects to Plaintiff's First Set of Interrogatories.

## GENERAL OBJECTIONS

Responding Party's general objections to the interrogatories are set forth below. To avoid the necessity of restating in full each objection, the general objections are incorporated within each response as if fully set forth in such response. The assertion of additional specific objections to certain individual interrogatories shall not be construed as waiving any general objection.

Neither the general objections to the interrogatories nor the assertion of additional specific objections to certain individual interrogatories shall waive Responding Party's right to challenge the relevance, materiality, and admissibility of the information provided or to object to the use of such information in any subsequent proceeding or hearing in this action. Responding Party makes no implied admissions in these responses and objections. No response or objection set forth herein should be taken to mean that Responding Party admits the existence of any facts stated in or assumed by an interrogatory beyond those expressly admitted by Responding Party.

1. Responding Party objects to the interrogatories to the extent they purport to impose requirements on Responding Party beyond or inconsistent with the Federal Rules of Civil Procedure, the Local Rules of the Central District of

California or any applicable rules, statutes, or common law.  Responding Party is responding to the interrogatories based on information maintained in the ordinary course of business and to the extent required by the Federal Rules of Civil Procedure, the Local Rules of the Central District of California, and any other applicable rules, statutes, or common law.

2.      Responding Party objects to the interrogatories to the extent they seek material protected by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege, doctrine, or immunity.  The inadvertent production of any privileged information shall not be deemed to be a waiver of any applicable privilege with respect to such information or any other information, or the subject matter thereof.

3.      Responding Party objects to the interrogatories to the extent they seek material that is neither relevant to the subject matter of this action nor reasonably calculated to lead to the discovery of admissible evidence of this action.  By producing information or materials in response to these interrogatories, Responding Party does not concede that any such information or materials are admissible in evidence or relevant to issues in this action.  Responding Party reserves any and all objections to the use or admission of any information, materials or documents contained, identified or produced in response to these interrogatories.

4.      Responding Party does not, by responding to the interrogatories, accept or agree with any descriptions or assumptions contained therein.

5.      Responding Party objects to the interrogatories to the extent they seek information that is already in Plaintiff's possession, custody or control, or that is obtainable from another source that is more convenient or less burdensome or expensive.

6.      Responding Party objects to the interrogatories to the extent they seek information or documents that are not within Responding Party's possession, custody, or control.

7. Responding Party objects to the interrogatories to the extent they are ambiguous, vague, cumulative or duplicative of other interrogatories or requests.

8. Responding Party has not completed their investigation, discovery, or preparation for trial. Accordingly, all answers below are based only on such information and documents as are currently available and known to Responding Party. Responding Party reserves the right to supplement, correct, or amend its responses.

**RESPONSES AND OBJECTIONS**

**INTERROGATORY NO. 4:**

On an annual basis, separately state the total **ROYALTIES** collected or received by the **FUND** since 2013.

**AMENDED RESPONSE TO INTERROGATORY NO. 4:**

Responding Party refers Plaintiff to the responsive information contained in the Fund's Annual Reports for years 2013, 2014, 2015, 2016, 2017, 2018, and 2019. These reports are accessible on the Fund's website and have been produced in response to Plaintiff's Requests for Production Nos. 2 and 3. According to the Annual Reports, as well as data recently compiled by the Fund in connection with FY2020 and FY2021, the total amount of Royalties received by the Fund each year since 2013 are as follows:

| | |
|---|---|
| FY2013: | $27,561,164 |
| FY2014: | $41,699,519 |
| FY2015: | $49,322,129 |
| FY2016: | $46,051,587 |
| FY2017: | $52,001,911 |
| FY2018: | $65,339,258 |
| FY2019: | $61,369,239 |
| FY2020: | $71,723,181 |
| FY2021: | $44,099,024 |

Note that the figures listed above refer to collections that occurred in the financial years ending March 31 in the year listed (i.e., FY2020 refers to the period from April 1, 2019 through March 31, 2020). The figure reported for FY2021 refers to the collections that have occurred in FY2021 to date.

**INTERROGATORY NO. 5:**

On an annual basis, separately state the total **ROYALTIES** paid to members of the **CLASS** from the FUND since 2013.

**RESPONSE TO INTERROGATORY NO. 5:**

Responding Party refers Plaintiff to the responsive information contained in the Fund's Annual Reports for years 2013, 2014, 2015, 2016, 2017, 2018, and 2019. These reports are accessible on the Fund's website and have been produced in response to Plaintiff's Requests for Production Nos. 2 and 3. According to the Annual Reports, as well as data recently compiled by the Fund in connection with FY2020 and FY2021, the total amount of Royalties paid to non-featured performers each year since 2013 is as follows:

FY2013: $11,356,319

FY2014: $13,013,664

FY2015: $24,670,071

FY2016: $28,260,096

FY2017: $56,169,632

FY2018: $55,847,132

FY2019: $52,345,932

FY2020: $54,713,484

FY2021: $58,658,747

Note that the figures listed above refer to collections that occurred in the financial years ending March 31 in the year listed (i.e., FY2020 refers to the period from April 1, 2019 through March 31, 2020). The figure reported for FY2021 refers to the payments that have occurred in FY2021 to date.

**INTERROGATORY NO. 6:**

On an annual basis, separately state the total **ROYALTIES** received by the **FUND** and not paid to members of the **CLASS** since 2013.

**AMENDED RESPONSE TO INTERROGATORY NO. 6:**

Responding Party objects that Plaintiff's request is misleading to the extent it implies that the Royalties received by the Fund during the period from 2013 to present encompass the same corpus of funds from which distributions were made by the Fund during the same period. This suggestion is misleading because a lag exists between the Fund's receipt of Royalties and its distribution of those Royalty receipts, during which time the Fund identifies, locates, and coordinates distributions to non-featured performers that the Fund determines are to receive such distributions. Accordingly, the Fund's distributions in 2013 encompassed Royalties collected prior to 2013, and Royalties received by the Fund in 2020 remain to be distributed.

Responding Party also objects to this interrogatory as misleading to the extent it implies that all funds received by the Fund from SoundExchange during the period from 2013 to present should have been paid to non-featured performers. This ignores the Fund's ability to deduct from Royalty receipts prior to distribution the reasonable costs of the Fund's administration. Additionally, it fails to account for the fact that the Fund maintains funds for payment to non-featured performers to whom Royalty payments have been allocated, but who remain to be identified and/or located by the Fund.

Without waiving and subject to these objections, Responding Party refers Plaintiff to information contained in the Fund's Annual Reports for years 2013, 2014, 2015, 2016, 2017, 2018, and 2019. These reports are accessible on the Fund's website and have been produced in response to Plaintiff's Requests for Production Nos. 2 and 3. According to the Annual Reports, as well as data recently compiled by the Fund in connection with FY2020 and FY2021, the total amount of administrative expenses incurred by the Fund each year since 2013 is as follows:

FY2013: $2,820,342

FY2014: $3,538,442

FY2015: $5,816,099

FY2016: $6,411,158

FY2017: $11,887,748

FY2018: $12,936,211

FY2019: $11,301,441

FY2020: $11,948,304

FY2021: $6,919,382

Note that the figures listed above refer to collections that occurred in the financial years ending March 31 in the year listed (i.e., FY2020 refers to the period from April 1, 2019 through March 31, 2020). The figure reported for FY2021 refers to the administrative expenses that have been incurred in FY2021 to date.

**INTERROGATORY NO. 7:**

On an annual basis, separately state the amounts paid from the **FUND** to SAG-AFTRA since 2013.

**AMENDED RESPONSE TO INTERROGATORY NO. 7:**

Responding Party refers Plaintiff to the responsive information contained in the Fund's Annual Reports for years 2013, 2014, 2015, 2016, 2017, 2018, and 2019. These reports are accessible on the Fund's website and have been produced in response to Plaintiff's Requests for Production Nos. 2 and 3. According to the Annual Reports, as well as data recently compiled by the Fund in connection with FY2020 and FY2021, the amounts of the Service Fee paid by the Fund to SAG-AFTRA each year since 2013 are as follows:

FY2013: $0 (No Service Fee payments were made to the Unions during the 2013 fiscal year because the Data Purchase and Services Agreement was not yet in effect.)

FY2014: $193,814

| | |
|---|---|
| FY2015: | $272,845 |
| FY2016: | $420,454 |
| FY2017: | $872,894 |
| FY2018: | $864,759 |
| FY2019: | $782,462 |
| FY2020: | $825,404 |
| FY2021: | $882,246 |

Note that the figures listed above refer to payments that occurred in the financial years ending March 31 in the year listed (i.e., FY2020 refers to the period from April 1, 2019 through March 31, 2020). The figure reported for FY2021 refers to the payments that have occurred in FY2021 to date.

Responding Party has also produced documents related to Fund payments to SAG-AFTRA for advertising or attendance at SAG-AFTRA conventions. Responding Party refers Plaintiff to DEFS00041588 which summarizes such payments.

**INTERROGATORY NO. 8:**

On an annual basis, separately state the amounts paid from the **FUND** to AFM since 2013.

**AMENDED RESPONSE TO INTERROGATORY NO. 8:**

Responding Party refers Plaintiff to the responsive information contained in the Fund's Annual Reports for years 2013, 2014, 2015, 2016, 2017, 2018, and 2019. These reports are accessible on the Fund's website and have been produced in response to Plaintiff's Requests for Production Nos. 2 and 3. According to the Annual Reports, as well as data recently compiled by the Fund in connection with FY2020 and FY2021, the amounts of the Service Fee paid by the Fund to AFM each year since 2013 are as follows:

| | |
|---|---|
| FY2013: | $0 (No Service Fee payments were made to the Unions during the 2013 fiscal year because the Data Purchase and Services Agreement was not yet in effect.) |
| FY2014: | $193,814 |
| FY2015: | $272,845 |
| FY2016: | $420,454 |
| FY2017: | $872,894 |
| FY2018: | $864,759 |
| FY2019: | $782,462 |
| FY2020: | $825,404 |
| FY2021: | $882,246 |

Note that the figures listed above refer to payments that occurred in the financial years ending March 31 in the year listed (i.e., FY2020 refers to the period from April 1, 2019 through March 31, 2020). The figure reported for FY2021 refers to the payments that have occurred in FY2021 to date.

Responding Party has also produced documents related to Fund payments to AFM for advertising or attendance at AFM conventions. Responding Party refers Plaintiff to DEFS00041588 which summarizes such payments.

**INTERROGATORY NO. 10:**

If **YOU** contend that the **SERVICE FEE** is a reasonable charge for the services provided by the **UNIONS,** state **ALL** facts that support that contention.

**AMENDED RESPONSE TO INTERROGATORY NO. 10:**

Responding Party objects to this interrogatory to the extent it calls for Responding Party to make a legal conclusion.

Without waiving and subject to the foregoing objections, Responding Party responds as follows: Pursuant to the Data Purchase and Services Agreement, the Unions are required to provide the Fund with information in their possession that is necessary to enable the Fund to identify and pay the non-featured performers (both

Union members and nonmembers) to whom Royalty payments have been allocated in a given distribution cycle. This valuable data is derived from records developed and maintained by the Unions at considerable expense, including forms obtained by the Unions from producers and/or other individuals or entities involved in the creation of a given sound recording. Specifically, the information provided by the Unions to the Fund is derived from session reports and "B-forms" which contain information necessary to identify and locate some or all of the non-featured musicians and vocalists who performed on a given sound recording. These session reports and B-forms compile information related to both Union members and nonmembers who served as non-featured performers on a given sound recording. These records maintained by the Unions are housed across various local affiliates of each Union, for the most part based on where the relevant sound recording took place. Much of this information exists in records that are maintained locally by the Unions only in hard copy form.

Pursuant to the Data Purchase and Services Agreement, the Unions must coordinate with the Fund to provide the information necessary for the Fund to identify and pay non-featured performers. The information provided by the Unions pursuant to the Data Purchase and Services Agreement is essential to the Fund's administration. This information has been collected, compiled, and maintained as part of a large-scale effort by the Unions over the course of decades, and such efforts continue on an ongoing basis. There is no other repository of information documenting the identities, work histories, and payment information associated with non-featured performers that is nearly as exhaustive as the repositories maintained by the Unions. Without this data, the Fund would be significantly constrained in its ability to perform the fundamental task of identifying and locating the non-featured performer(s) for whom Royalty distributions are to be paid, and/or would be required to expend significant additional resources in order to perform this essential function, or in the alternative would have to expend substantial efforts and incur substantial

costs to compile independently the information provided by the Unions. Accordingly, the data has substantial intrinsic value and is highly valuable to the Fund in the performance of its work.

In addition, Union representatives expend considerable effort supplying the data the Unions are obligated to provide under the Data Purchase and Services Agreement. Researchers at the Fund have worked extensively with Union representatives in an effort to build and grow a database compiling the identities of the non-featured performers who performed on a given sound recording, as well as the information necessary to locate and pay such individuals. This database serves as the Fund's central resource used to identify, locate, and pay Royalties to non-featured performers. As this database has grown, the Fund has been able more efficiently to identify and locate the non-featured performers who performed on eligible sound recordings. Currently, this database compiles information related to the non-featured performers associated with approximately 136,000 song titles.

Because the records maintained by the Unions exist in decentralized repositories dispersed across the Unions' local affiliates, the Unions satisfy their obligations under the Agreement by making numerous representatives available in these locations in order to field requests from the Fund. The Fund's research team—currently staffed with ten full-time research associates and supervisors—works extensively with representatives located in various local affiliates of the Unions on a year-round basis to obtain information regarding the non-featured performers associated with thousands of song titles. Except with respect to two local affiliates of the AFM (located in New York and Los Angeles) that maintain electronic records on a platform that Fund researchers may directly log into, in all other cases Union representatives handle individual requests from Fund researchers to locate and provide information related to specific song titles and/or to verify the recent contact information for non-featured performers associated with such song title. In locations where such records exist in hard copy form, Union representatives must locate the

requested document within their hard copy filing system before scanning and sending a digital copy of the record to the requestor at the Fund. The quantity of the requests made to the Unions by the Fund vary across the respective Unions' locations and fluctuate on a day-to-day and week-to-week basis. It is not uncommon for a Union representative at one location to field dozens of requests from the Fund over the course of a week. Fulfilling each such request may take a Union representative anywhere from a few minutes to thirty minutes or longer.

In addition to providing the information necessary to locate and pay non-featured performers, the Unions also provide advocacy services both domestically and internationally that benefit non-featured performers (both Union members and nonmembers). These activities include meeting with members of Congress, negotiating with domestic performing rights organizations (PROs), as well as engaging with international PROs to negotiate better terms for the collection and distribution of international royalties. In addition to advocating with the federal government for more expansive rights that would benefit all non-featured performers, the Unions have negotiated and interacted with the World Intellectual Property Organization (WIPO), the Societies' Council for the Collective Management of Performers' Rights (SCAPR), Phonographic Performance Limited (PPL), and the Musicians' Rights Organization Canada (MROC), among other international organizations. This includes efforts to expand the performance right in the United States to apply to non-digital platforms (e.g., terrestrial radio), a cause which the Unions have furthered through their participation in the musicFIRST coalition. The Unions also engage in advocacy efforts with foreign governments for more stringent distribution requirements for collected royalties. These activities all inure to the benefit of non-featured performers, regardless of union affiliation, as they are aimed in part at increasing the scope and overall amount of the royalties paid for recordings on which non-featured musicians and vocalists have performed.

In consideration of the inherent value of the data the Unions provide to the Fund, as well as the services provided by the Unions as described above, the Trustees of the Fund agreed in 2013 that each Union should be paid a fee in the amount of 1.5% of the receipts distributed by the Fund in a given distribution cycle. This was an entirely reasonable exercise of the Trustees' broad discretion in determining the value of the information and services provided by the Unions.

**INTERROGATORY NO. 16:**

**IDENTIFY ALL** individuals responsible in the negotiation of the **SERVICES AGREEMENT.**

**AMENDED RESPONSE TO INTERROGATORY NO. 16:**

Responding Party objects to this interrogatory on the grounds that it is vague and ambiguous as to the phrase "responsible in the negotiation of." Plaintiff's request is also unduly burdensome to the extent it requests contact information for individuals with no current affiliation to the Responding Party. Plaintiff's interrogatory is improper to the extent it requests confidential information belonging to a third party, and also to the extent it seeks the contact information of Defendants in this litigation who are represented by counsel and may only be contacted in regard to this litigation through such counsel. Responding Party also objects to this interrogatory to the extent it requests information protected by the attorney-client privilege.

Without waiving and subject to the foregoing objections, Responding Party identifies the following individuals, whom Responding Party is informed and believes had a role in the negotiation of the Data Purchase and Services Agreement: Duncan Crabtree-Ireland, Raymond M. Hair, Sam Folio, Stefanie Taub, Bruce Bouton, Patricia Polach, Dennis Dreith, and David White.

**INTERROGATORY NO. 21:**

State **ALL** facts supporting **YOUR** contention that the **CLASS** is not sufficiently numerous to treat this case as a class action.

**AMENDED RESPONSE TO INTERROGATORY NO. 21:**

Responding Party objects to this interrogatory on the ground that any substantive response to this request provided by Responding Party would consist of a legal conclusion.

Notwithstanding the foregoing objection, Defendants refer to and incorporate by reference Defendants' Opposition to Plaintiff's Motion for Class Certification, and accompanying declarations.  *See* ECF 68.

**INTERROGATORY NO. 22:**

State **ALL** facts supporting **YOUR** contention that the **CLASS** is not ascertainable.

**AMENDED RESPONSE TO INTERROGATORY NO. 22:**

Responding Party objects to this interrogatory on the ground that any substantive response to this request provided by Responding Party would consist of a legal conclusion.

Notwithstanding the foregoing objection, Defendants refer to and incorporate by reference Defendants' Opposition to Plaintiff's Motion for Class Certification, and accompanying declarations.  *See* ECF 68.

**INTERROGATORY NO. 23:**

State **ALL** facts supporting **YOUR** contention that common questions of law or fact do not predominate over any individual questions in this case.

**AMENDED RESPONSE TO INTERROGATORY NO. 23:**

Responding Party objects to this interrogatory on the ground that any substantive response to this request provided by Responding Party would consist of a legal conclusion.

Notwithstanding the foregoing objection, Defendants refer to and incorporate by reference Defendants' Opposition to Plaintiff's Motion for Class Certification, and accompanying declarations.  *See* ECF 68.

**INTERROGATORY NO. 24:**

State **ALL** facts supporting **YOUR** contention that **PLAINTIFF'S** claims are not typical of the claims of the **CLASS**.

**AMENDED RESPONSE TO INTERROGATORY NO. 24:**

Responding Party objects to this interrogatory on the ground that any substantive response to this request provided by Responding Party would consist of a legal conclusion.

Notwithstanding the foregoing objection, Defendants refer to and incorporate by reference Defendants' Opposition to Plaintiff's Motion for Class Certification, and accompanying declarations. *See* ECF 68.

**INTERROGATORY NO. 25:**

State **ALL** facts supporting **YOUR** contention that P**LAINTIFF** will not adequately represent the **CLASS**.

**AMENDED RESPONSE TO INTERROGATORY NO. 25:**

Responding Party objects to this interrogatory on the ground that any substantive response to this request provided by Responding Party would consist of a legal conclusion.

Notwithstanding the foregoing objection, Defendants refer to and incorporate by reference Defendants' Opposition to Plaintiff's Motion for Class Certification, and accompanying declarations. *See* ECF 68.

**INTERROGATORY NO. 26:**

State **ALL** facts supporting **YOUR** contention that **PLAINTIFF'S** counsel will not adequately represent the **CLASS**.

**AMENDED RESPONSE TO INTERROGATORY NO. 26:**

Responding Party objects to this interrogatory on the ground that any substantive response to this request provided by Responding Party would consist of a legal conclusion.

Notwithstanding the foregoing objection, Defendants refer to and incorporate by reference Defendants' Opposition to Plaintiff's Motion for Class Certification, and accompanying declarations. *See* ECF 68.

**INTERROGATORY NO. 27:**

State **ALL** facts supporting **YOUR** contention that a class action is not the superior method of adjudicating this case.

**AMENDED RESPONSE TO INTERROGATORY NO. 27:**

Responding Party objects to this interrogatory on the ground that any substantive response to this request provided by Responding Party would consist of a legal conclusion. Notwithstanding the foregoing objection, Defendants refer to and incorporate by reference Defendants' Opposition to Plaintiff's Motion for Class Certification, and accompanying declarations. *See* ECF 68.

**INTERROGATORY NO. 28:**

State **ALL** facts supporting **YOUR** contention that **CLASS MEMBERS** have or had knowledge of the S**ERVICE FEE**.

**AMENDED RESPONSE TO INTERROGATORY NO. 28:**

Responding Party objects to this interrogatory on the ground that it asks Responding Party to make conclusions about the knowledge third parties. This information is not within the possession, custody, or control of the Responding Party.

Without waiving and subject to the foregoing objections, Responding Party responds as follows: Following its execution of the Data Purchase and Services Agreement in 2013, the Fund has taken measures to ensure transparency regarding the fees paid to the Unions pursuant to the Agreement. The Fund publishes on its website Annual Reports which explain in detail all disbursements from the Fund pursuant to the Agreement. The Annual Report for the period ending March 31, 2014—which covers the first financial year in which the Fund paid fees to the Unions—included a note describing the Data Purchase and Services Agreement, the

3% combined fee paid to the Unions under the Agreement, and the precise amount paid to each Union pursuant to the Agreement in the previous financial year. All subsequent Annual Reports published by the Fund have included similar information. In addition, the Fund has properly disclosed the payment of the Service Fee where applicable in all public tax documents filed since the implementation of the Service Fee.

Responding Party refers Plaintiff to the disclosures regarding the Services Fee contained in the Fund's Annual Reports for years 2013, 2014, 2015, 2016, 2017, 2018, and 2019. These reports are accessible on the Fund's website and have been produced by the Responding Party in response to Plaintiff's Requests for Production Nos. 2 and 3.

**INTERROGATORY NO. 30:**

**IDENTIFY ALL** individuals who decided to implement the **SERVICE FEE**.

**AMENDED RESPONSE TO INTERROGATORY NO. 30:**

Responding Party objects to this interrogatory on the ground that it is vague and ambiguous as to the term "decided to implement." Plaintiff's request is unduly burdensome to the extent it requests detailed contact information for individuals with no current affiliation to the Responding Party. Plaintiff's interrogatory is improper to the extent it requests confidential information belonging to a third party, and also to the extent it seeks the contact information of Defendants in this litigation who are represented by counsel and may only be contacted in regard to this litigation through such counsel.

Without waiving and subject to the foregoing objections, Responding Party refers Plaintiff to the Trustee Defendants' production in response to Plaintiff's Request for Production No. 12, pursuant to which the Trustee Defendants will produce the minutes of the duly-constituted meeting of the Fund's Trustees which occurred on June 4, 2013 and which records the attending Trustees' vote approving the Data Purchase and Services Agreement. The meeting minutes reflect that

Trustees Bruce Bouton, Duncan Crabtree-Ireland, Sam Folio, Ray Hair, and Stefanie Taub were present at the June 4, 2013 meeting.

Dated: March 1, 2021

JENNER & BLOCK LLP

/s/ Andrew J. Thomas
Andrew J. Thomas
Andrew G. Sullivan
Anna K. Lyons
*Attorneys for All Responding Party*

**VERIFICATION**

I, Raymond M. Hair, am a representative of the American Federation of Musicians of the United States and Canada ("AFM"). No one person at AFM knows all of the information requested by Plaintiff's First Set of Interrogatories. The foregoing amended response to Plaintiff's First Set of Interrogatories has been prepared from information known to me, from information assembled by others, including counsel, and information gleaned from documents and records. I have reviewed the foregoing Amended Responses and Objections, and I declare under penalty of perjury under the laws of the United States that the foregoing Amended Responses and Objections are true and correct to the best of my knowledge and belief.

Executed this 1st day of March, 2021, at Denton, Texas.

Ray Hair

# EXHIBIT 26

The table below represents the number of **new titles created** and researched in AS400 by year as of 11/10/2020.

| Year | Title Create Count |
|---|---|
| 2020 | 8034 |
| 2019 | 8656 |
| 2018 | 7730 |
| 2017 | 8971 |
| 2016 | 7243 |
| 2015 | 4867 |
| 2014 | 2149 |
| 2013 | 3255 |