1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

JENNER & BLOCK LLP
Andrew J. Thomas (Cal. Bar No. 159533)
ajthomas@jenner.com
Alexander M. Smith (Cal. Bar No. 295187)
asmith@jenner.com
Andrew G. Sullivan (Cal. Bar No. 301122)
agsullivan@jenner.com
Anna K. Lyons (Cal. Bar No. 324090)
alyons@jenner.com
633 West 5th Street, Suite 3600
Los Angeles, CA  90071-2054
Telephone: (213) 239-5100
Facsimile: (213) 239-5199

*Attorneys for all Defendants*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

KEVIN RISTO, on behalf of himself
and all others similarly situated,

                                    Plaintiff,

vs.

SCREEN ACTORS GUILD-
AMERICAN FEDERATION OF
TELEVISION AND RADIO ARTISTS,
a Delaware corporation, et al.

                                    Defendants.

Case No. 2:18-CV-07241-CAS-PLA

Class Action

**REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT**

Hearing Date:     June 14, 2021
Hearing Time:     10:00 a.m.
Courtroom:        8D (Telephonic)

[Defendants' Evidentiary Objections, Response to Plaintiff's Evidentiary Objections and Motion to Strike, Response to Plaintiff's Separate Statement of Undisputed Material Facts, and Declaration of Anna K. Lyons with Exhibits 1-20, filed concurrently.]

# <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION ............................................................................... 1

II.    ARGUMENT ...................................................................................... 3

    A.    Undisputed Evidence Shows That The Fund Trustees Had A Reasonable Basis For Approving The Service Fee. ........................... 3

    B.    Plaintiff's Secondary Claims Also Fail As A Matter of Law ............. 9

        1.    Money Had and Received .......................................................... 9

        2.    Declaratory Relief ................................................................... 10

        3.    Conversion. ............................................................................. 10

            a.    The Copyright Act does not give individual performers a cognizable property interest in the statutory royalties. . 11

            b.    By giving the Fund discretion to deduct "reasonable costs," the Copyright Act forecloses any property interest in the Service Fee. ............................................. 15

    C.    Plaintiff's Request For Punitive Damages Should Be Stricken. ....... 16

III.   CONCLUSION ................................................................................ 18

i

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT

3036010

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Allen v. City of Beverly Hills*,
   911 F.2d 367 (9th Cir. 1990).................................................................. 11

*American Airlines, Inc. v. Sheppard, Mullin, Richter & Hampton*,
   96 Cal. App. 4th 1017 (2002)................................................................ 17

*Andrews v. Sirius XM Radio*,
   932 F.3d 1253 (9th Cir. 2019)............................................................... 12

*Avidor v. Sutter's Place*,
   212 Cal. App. 4th 1439 (2013)................................................................ 9

*Baumgardner v. Town of Ruston*,
   712 F. Supp. 2d 1180 (W.D. Wash. 2010)........................................... 16

*Bourget v. Allstate Insurance Co.*,
   2007 WL 9705900 (C.D. Cal. Jan. 4, 2007).......................................... 16

*Capital Cities Communications, Inc. v. F.C.C.*,
   554 F.2d 1135 (D.C. Cir. 1976) .............................................................. 8

*Citizens Allied for Integrity & Accountability, Inc. v. Schultz*,
   2019 WL 418406 (D. Idaho Feb. 1, 2019) ........................................... 15

*Evanston Insurance Co. v. OEA, Inc.*,
   566 F.3d 915 (9th Cir. 2009) .................................................................. 4

*FDIC v. Hawker*,
   2012 U.S. Dist. LEXIS 79320 (E.D. Cal. June 7, 2012)........................ 3

*Ferretti v. Pfizer Inc.*,
   2013 WL 140088 (N.D. Cal. Jan. 10, 2013) ........................................ 16

*In re First Alliance Mortgage Co.*,
   471 F.3d 977 (9th Cir. 2006)................................................................. 17

*Grieves v. Superior Court*,
   157 Cal. App. 3d 159 (1984)................................................................. 17

*Hajianpour v. Synova, Inc.*,
  2012 WL 5468834 (C.D. Cal. Nov. 5, 2012) ........................................ 18

*Haley v. Cohen & Steers Capital Management, Inc.*,
  871 F. Supp. 2d 944 (N.D. Cal. 2012) .................................................. 17

*Hobbs v. Bateman Eichler, Hill Richards, Inc.*,
  164 Cal. App. 3d 174 (1985) ................................................................ 18

*Jacobson v. Hannifin*,
  627 F.2d 177 (9th Cir. 1980) ................................................................ 15

*King v. Bumble Trading, Inc.*,
  393 F. Supp. 3d 856 (N.D. Cal. 2019) .................................................... 9

*Lackner v. North*,
  135 Cal. App. 4th 1188 (2006) ............................................................. 17

*Larkin v. Home Depot, Inc.*,
  2015 WL 1049716 (N.D. Cal. Mar. 9, 2015) ....................................... 18

*Lyles v. City of Huntington Park*,
  2016 WL 7479365 (C.D. Cal. July 7, 2016) ......................................... 15

*Mains v. City Title Insurance Co.*,
  34 Cal. 2d 580 (1949) ............................................................................. 9

*Nuwintore v. Management & Training Corp.*,
  2018 WL 3491676 (E.D. Cal. July 19, 2018) ...................................... 18

*Peralta v. Dillard*,
  744 F.3d 1076 (9th Cir. 2014) .............................................................. 11

*In re Plyam*,
  530 B.R. 456 (B.A.P. 9th Cir. 2015) .................................................... 17

*Seafarers International Union of North America v. U.S. Coast Guard*,
  81 F.3d 179 (D.C. Cir. 1996) ................................................................. 8

*Shaterian v. Wells Fargo Bank, N.A.*,
  829 F. Supp. 2d 873 (N.D. Cal. 2011) .................................................. 10

*In re Software Toolworks Inc.*,
  50 F.3d 615 (9th Cir. 1994) .................................................................... 4

*SoundExchange, Inc. v. Librarian of Congress*,
   571 F.3d 1220 (D.C. Cir. 2009) ........................................................ 8

*Steele v. United States*,
   159 F. Supp. 3d 73 (D.D.C. 2016) .................................................... 8

*Surf & Sand, LLC v. City of Capitola*,
   2008 WL 2225684 (N.D. Cal. May 28, 2008) ................................. 10

*Taylor v. Superior Court*,
   24 Cal. 3d 890 (1979) ...................................................................... 17

*Thomas v. Network Solutions, Inc.*,
   176 F.3d 500 (D.C. Cir. 1999) .......................................................... 8

*Town of Castle Rock v. Gonzales*,
   545 U.S. 748 (2005) ......................................................................... 15

*Trans v. World Savings Bank, FSB*,
   2012 WL 12894838 (C.D. Cal. Oct. 29, 2012) ................................. 9

*United States v. Sacramento Municipal Utility District*,
   652 F.2d 1341 (9th Cir. 1981) ......................................................... 15

*Van de Kamp v. Bank of America*,
   204 Cal. App. 3d 819 (1988) ............................................................. 3

*Wedges/Ledges of California v. City of Phoenix*,
   24 F.3d 56 (9th Cir. 1994) ............................................................... 15

**Statutes**

17 U.S.C. § 114(g)(2)(B) ...................................................................... 11

17 U.S.C. § 114(g)(2)(C) ...................................................................... 11

17 U.S.C. § 114(g)(3) ........................................................................... 15

31 U.S.C. § 9701 .................................................................................... 8

I.R.C. § 501(c)(6) ................................................................................... 8

California Civil Code § 3294(a) ........................................................... 16

California Corporations Code § 309 ................................................... 3, 6

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT
3036010

New York Business Corporation Law § 717(a) ........................................................ 6

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT

3036010

# I. INTRODUCTION

If the Court concludes that the Fund Trustees acted prudently and reasonably when they approved the Data Agreement and the Service Fee in 2013, then Defendants should prevail on every claim in the case. Plainly, they had the authority under the Trust Agreement and the Copyright Act to incur reasonable costs in operating the Fund and, specifically, they had the authority to purchase from the Unions data necessary to help locate and pay royalties to non-featured performers. To the extent the Court concludes there is a reasonable basis for the Service Fee, then the Plaintiff's ancillary claims for money had and received and for conversion likewise fail as a matter of law, as does the Plaintiff's duplicative and superfluous claim for declaratory relief.

The question is not whether the Service Fee is the precise amount, or is calculated in precisely the manner, that Plaintiff or his counsel may have preferred—or, for that matter, that the Court might have chosen in the first instance. The question is merely whether the Trustees acted reasonably—based on their own experience and knowledge, as well as other information available to them, including the recommendation of the Fund's knowledgeable and experienced Executive Director, who designed the Fund's research and distribution procedures in a manner that prioritized the use of session reports and database information supplied by the Unions.

Perhaps recognizing that the Court might be reluctant to substitute its own judgment for the considered business judgment of Trustees who collectively had decades of experience in the music and entertainment industry, Plaintiff has sought throughout the case to oversimplify the inquiry—first, arguing without any support that the Union data "has no value" or that it does not provide any assistance in identifying non-featured performers who are not Union members. Undisputed evidence has now thoroughly debunked these bogus claims. Plaintiff next embraced

contrived and unsupported legal theories that oversimplified the question in different ways—such as their argument that the only way to determine whether the Service Fee was a "reasonable cost" incurred by the Fund is to measure the incremental, marginal costs incurred by the *Unions* in terms of time spent responding to requests from Fund researchers.   This is obviously not how one would analyze the reasonableness of any other cost incurred by the Fund—such as costs incurred for personnel, office space, computer equipment, furniture, office supplies, utilities, and so forth—where the question would simply be whether the Fund got its money's worth for inputs that helped it fulfill its mission.

In their Opposition to the Defendants' Motion for Summary Judgment, Plaintiff takes this approach a step further and now simply fabricates supposed facts and factual disputes.   These include statements that the session reports have identified non-featured performers on just 8 percent of tracks in the Fund's database—which is a completely made-up figure, never explained in their papers—and their fabricated assertion that the Fund could purchase session reports from the Union pension funds for $7 apiece.  This approach also includes their assertion, flatly contradicted by the deposition testimony of their own witness and litigation consultant, that the Fund's lawyer Patricia Polach advised the former AFM President that any payment of any kind from the Fund to the Unions would be illegal.  *See* Dkt. 111, Opposition to Defendants' Notice of Motion and Motion for Summary Judgment ("MSJ Opp.") at 1, 3, 13.

Beyond that, Plaintiff's counsel indulges in the familiar tactic of throwing every conceivable evidentiary quibble against the wall in the hope that something sticks in the Court's mind.  Thus, Plaintiff makes a big show of demonstrating that session reports are not available for all sound recordings (never disputed), or that the Fund consults other resources in addition to Union data in going about its business

(also never in question).[1]   Finally, Plaintiff attempts to rely on a series of expert reports—ignoring this Court's caution against doing so on summary judgment—which consist of either inadmissible legal conclusions or irrelevant factual observations that do nothing to create a genuine issue of material fact.  These should be disregarded for the reasons set forth in Defendants' evidentiary objections, and the Court should enter judgment in favor of Defendants as a matter of law.

## II.   ARGUMENT

**A.   Undisputed Evidence Shows That The Fund Trustees Had A Reasonable Basis For Approving The Service Fee.**

At the outset, Plaintiff misstates the burden of proof applicable to his claim for breach of fiduciary duty.  Unless the plaintiff establishes a breach of duty in the first instance, there is no shifting of the burden of proof to the defendants to justify their actions.  *See*, *e.g.*, *Van de Kamp v. Bank of America*, 204 Cal. App. 3d 819, 853 (1988).[2]   Here, Plaintiff as a matter of law has failed to satisfy his initial burden of showing a breach of fiduciary duty by the Fund Trustees.

The question before the Court is thus whether the Trustees, in approving the Data Agreement and the Service Fee in 2013, acted prudently and reasonably.  It is well established that this is a question the Court may decide as a matter of law on a

---

[1] In responding to Defendants' Statement of Undisputed Facts, Plaintiff fails to dispute with admissible evidence the factual content of any of the Defendants' propositions.  Instead, Plaintiff fills up its chart by taking issue with imagined implications of Defendants' factual statements.  This accounts for the prolix responses to at least two-thirds of the entries in Defendants' SUF.  *See* Dkt. 111-1, Plaintiff's Response to Defendants' Statement of Undisputed Facts ("Pl. SUF") Nos. 2, 3, 6, 12-18, 30, 35-37, 40, 43-44, 49-61, 63, 65-73, 75, 79-81, 83, 86-115.  (For instance, SUF Nos. 12-18 simply consist of direct quotations from the Trust Agreement, yet Plaintiff pettifogs for pages in response.)

[2] Plaintiff also fundamentally misreads the decision in *FDIC v. Hawker*, 2012 U.S. Dist. LEXIS 79320 (E.D. Cal. June 7, 2012).  That decision merely held that Cal. Corp. Code § 309 only permits directors, and not officers, to rely on the opinions of other staff in their decision-making.  It does not suggest that the Fund *Trustees* could not reasonably rely on the expertise and recommendations of Mr. Dreith, the Fund's Executive Director, in connection with their decision to approve the Service Fee.

3036010

motion for summary judgment. *See, e.g.*, *Evanston Ins. Co. v. OEA, Inc.*, 566 F.3d 915, 920 (9th Cir. 2009) (holding courts may properly determine reasonableness as a question of law at summary judgment); *see also In re Software Toolworks Inc.*, 50 F.3d 615, 621-22 (9th Cir. 1994).

In assessing the decision by the Fund Trustees to approve the Data Agreement and the Service Fee, the following facts are undisputed and determinative:

- o   The Trustees had decades of experience in the music and entertainment industries and were well aware of the value of the Unions' session report and database information to the Fund's mission. *See* Dkt. 104, Defendants' Statement of Uncontroverted Facts ("Def. SUF") Nos. 92-110.

- o   By 2013, the Fund had matured to the point that it was capable of paying its own expenses, which included compensating its Executive Director, paying for its own real estate costs, hiring additional staff, and paying the Unions for the value of the data and services they previously had provided for free. *See* Def. SUF Nos. 37-39.

- o   All of the Trustees believed that the Service Fee was reasonable and justified, based on the value of the information that the Unions provided to the Fund, and the fact that the information was not available from any other reliable source. *See* Def. SUF Nos. 92-110; *see also* Dkt. 117, Declaration of Anna K. Lyons ("Lyons Decl."), Ex. 15 (Taub, Oct. 20, 2020, Tr. 149:10-150:12).[3]

---

[3] Contrary to Plaintiff's unsupported assertion (MSJ Opp. at 12), everyone in a position to know—including all of the Trustees and all of the Fund managers who have been deposed—has confirmed that the session report data is critically important to the Fund's ability to fulfill its mission, even though session report data is not available for every song that is researched. *See* Def. SUF 75, 80, 92-111; Dkt. 109, Declaration of Andrew G. Sullivan ("Sullivan Decl."), Ex. 15 (Taub, October 20, 2020, Tr., 149:15-151:15), Ex. 14 (Sandell Tr., 39:5-39:22).

3036010

- o   The Co-Chairs of the Board of Trustees engaged in discussions with the Fund's Executive Director, Dennis Dreith, for several months before the Trustees' vote regarding the appropriate way to compensate the Unions for the data and other services they provided.  *See* Def. SUF Nos. 79-81.

- o   The Trustees and Mr. Dreith carefully considered whether the payment of the Service Fee would cause the overall expense ratio of the Fund to grow to a level that was out of step with other royalty distribution organizations around the world, and concluded that it would not.  *See* Def. SUF Nos. 84-85.[4]

- o   Per Mr. Dreith, the outside counsel for the Fund, Patricia Polach, advised the Trustees that the implementation of the Service Fee was lawful and consistent with the Fund's Declaration of Trust.  *See* Def. SUF No. 89.

- o   Some of the Trustees also considered whether it would be sensible and prudent to engage in a time and materials study of the effort expended by the Unions to respond to Fund research requests, and concluded that such an exercise would be unduly cumbersome and costly.  *See* Def. SUF Nos. 81, 88.

- o   The Trustees were well aware of the Union affiliations of the other Trustees but did not consider there to be any meaningful conflict of interest in agreeing to pay a reasonable price to the Unions for the data and services that the Unions provided to the Fund, since the data was essential to the Fund's mission of compensating non-featured performers.  *See* Def. SUF No. 91.[5]

---

[4] Plaintiff does not even attempt to dispute this critical fact.  *See* Pl. SUF No. 84.

[5] Plaintiff's argument that the Trustees should have gone through a pedantic exercise of "informing" each other of their respective Union affiliations borders on

3036010

o  The Trustees were justified in relying on the judgment and express recommendations of the Fund' Executive Director, who expressly and repeatedly voiced his support for the payment of the Service Fee to the Unions in 2012 and 2013.  *See* Def. SUF Nos. 75, 80, 90; and

o  The Trustees were justified in approving the Service Fee when it was presented for a vote at the June 2013 board meeting, when no one—including Mr. Dreith or any other executive or Trustee—expressed any concerns regarding the size, structure, or legality of the Service Fee. *See* Def. SUF Nos. 86-87.

Plaintiff's feeble attempts to rebut these undisputed facts betray the emptiness of his arguments.   First, Plaintiff argues that Mr. Dreith's undisputed and uncontradicted support for the 3% Service Fee somehow doesn't count because he was a Fund executive who could be fired by the Board of Trustees and was therefore "coerced."  MSJ Opp. at 10-11.  Logically, this argument proves far too much, as it would mean that Trustees could never rely on the considered judgment and recommendations of their experienced and expert staff, since administrative staff always could potentially be terminated by the board.  The law is to the contrary, holding that trustees are fully justified in relying on the expertise and recommendations of knowledgeable and experienced professional staff.  *See*, *e.g.*, N.Y. Bus. Corp. Law § 717(a)(1)-(3) ("[A] director shall be entitled to rely on information, opinions, reports or statements […] prepared or presented by: […] one or more officers or employees of the corporation[.]"); Cal. Corp. Code § 309 ("[A] director shall be entitled to rely on information, opinions, reports or statements, including financial statements and other financial data, in each case prepared or presented by any of the following: […] One or more officers or employees of the

the absurd.  The Trustees' testimony makes plain that they all knew each other, and it is undisputed that just a year before the Trustees signed a restated Trust Agreement that expressly noted the Union affiliation of each Trustee.  Sullivan Decl., Ex. 2 (Crabtree-Ireland Dep. Tr. Ex. 1).

6

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT

3036010

corporation[.]").  This is true regardless of the fact that a Board of Trustees, by definition, always has the power to hire and fire executives of the organization.  The argument also is belied by other facts that Plaintiff touts, including the fact that Mr. Dreith later had a change of heart and, in 2017, wrote a memo to Mr. Crabtree-Ireland in which he was highly critical of the Service Fee.  *See*, *e.g.*, Dkt. 111-1, Plaintiff's Separate Statement of Undisputed Facts ("PUMF") Nos. 70-71.  Plainly, Mr. Dreith was no shrinking violet, afraid to speak his mind on matters that he thought were important regarding the Fund that he managed.

In a desperate effort to manufacture a factual issue, Plaintiff claims that there is evidence in the record that the Fund could obtain session reports from a Union pension fund for $7 per report.  This is pure fictionalization.  In fact, Mr. Dreith testified that the pension fund provided certain "contracts" to the Fund for a $7 fee, which, from the context of his testimony, clearly referred to collective bargaining agreements.  *See* Dkt. 115, Defendants' Response to Plaintiff's Separate Statement of Undisputed Facts ("Def. Resp. to PUMF") No. 59.  Plaintiff's distortion of Mr. Dreith's testimony defies logic.  If it were in fact the case that the Fund could acquire session reports upon request for $7, why didn't Mr. Dreith mention that "fact" in any of his emails with the Fund staff or Trustees leading up to the June 2013 vote on the Data Agreement and Service Fee?  Why didn't he mention it at the June 2013 board meeting?  If this affordable alternate source of session reports actually existed, why didn't Mr. Dreith mention it in his memorandum to Duncan Crabtree-Ireland in early 2017, in which Mr. Dreith, after his working relationship with the Trustees had begun to deteriorate, went out of his way to lob unsubstantiated criticisms at the Service Fee?  Sullivan Decl., Ex. 4 (Dreith Dep. Ex. 126).  Clearly, he would have made the point that session reports readily could be acquired for a small fee, if that were in fact true—all of which makes clear that Plaintiff's characterization of Mr. Dreith's testimony is simply false.  *See* PUMF No. 59; Lyons Decl., Ex. 15 (Taub,

Oct. 20, 2020, Tr. 149:10-150:12). The pension funds never offered to sell the Fund session reports for $7 apiece.

Similarly, Plaintiff's arguments about the legal advice provided by Fund counsel Patricia Polach are blatantly and demonstrably false. Plaintiff relies on hearsay testimony by Dennis Dreith to the effect that Ms. Polach, in her capacity as legal counsel for the Fund, advised the former Fund trustee and AFM President Thomas Lee that "any payment" by the Fund to the Unions would be "unlawful." MSJ Opp. at 4-5. Mr. Dreith's own testimony confirms that Ms. Polach's alleged comment did not relate to a proposed purchase of data and other services by the Fund, but instead related to another form of payment not relevant here. *See* Def. Resp. to PUMF 24.[6] To the contrary, Mr. Dreith confirmed in his deposition testimony that Ms. Polach advised the Trustees that the Data Agreement and Service Fee were fully authorized and lawful under the Trust Agreement and the Copyright Act. *See* Def. SUF No. 89.

Finally, Plaintiff seeks solace in a completely unrelated statute, 31 U.S.C. §9701. MSJ Opp. at 15-16. Plaintiff fails to cite any authority that would even suggest that this statute, which governs federal agencies, would apply to the Fund, which is a private trust eligible for federal tax-exempt status under I.R.C. § 501(c)(6). *See* Def. Resp. to PUMF No. 1.[7] Indeed, the only case cited by Plaintiff,

---

[6] He also could not recall whether Ms. Polach said that the hypothetical payment discussed with Mr. Lee was not lawful or whether she said it was "not possible" for some other reason. Lyons Decl., Ex. 5, (Dreith Tr. 185:3-187:9).

[7] Plaintiff does not cite a single case that holds that the IOAA applies to a private trust like the Fund—or for that matter, to any private royalty distribution organization, including SoundExchange. Instead, Plaintiff cites cases that do not address the IOAA or that find the IOAA inapplicable. *See Steele v. United States*, 159 F. Supp. 3d 73 (D.D.C. 2016) (containing no reference to the IOAA); *Thomas v. Network Sols., Inc.*, 176 F.3d 500, 510 (D.C. Cir. 1999) (holding the IOAA does not apply to a private company). Further, the two cases Plaintiff cites that do apply the IOAA involve the regulation of clearly-recognized government agencies, such as the Coast Guard and the Federal Trade Commission, as distinct from a private organization such as the Fund. *See Seafarers Int'l Union of N. Am. v. U.S. Coast Guard*, 81 F.3d 179 (D.C. Cir. 1996); *Cap. Cities Commc'ns, Inc. v. F.C.C.*, 554 F.2d 1135 (D.C. Cir. 1976).

3036010

*SoundExchange, Inc. v. Librarian of Congress*, 571 F.3d 1220 (D.C. Cir. 2009), tellingly does *not* concern the IOAA at all and does *not* treat the private corporation SoundExchange as a governmental entity or agency, nor does it say anything about the status of the Fund.

In sum, all of Plaintiff's transparently contrived and manufactured efforts to gainsay the Trustees' prudent, informed and reasonable decision to approve the Service Fee fall short of the mark, and the Court should enter judgment in favor of the Defendants.

**B.**   **Plaintiff's Secondary Claims Also Fail As A Matter of Law.**

**1.**   **Money Had and Received.**

Despite his insistence to the contrary, Plaintiff's claim for money had and received requires him to establish that "equity and good conscience" mandates the return of the money supposedly obtained by Defendants.  *Mains v. City Title Ins. Co.*, 34 Cal. 2d 580, 586 (1949); *accord Avidor v. Sutter's Place*, 212 Cal. App. 4th 1439, 1454 (2013) (affirming grant of summary judgment on claim for money had and received).  Defendants' argument is not simply that the value of the services provided by the Unions exceeds the fair value of the Service Fee.  Instead, it is that the decision to approve payment of the Service Fee was fundamentally reasonable, such that equity and good conscience do not require its return.  Plaintiff suggests that Defendants "waived" this argument by reducing it to a single sentence.  MSJ Opp. at 19.  But the brevity of this argument reflects nothing more than the fact that "a common count for money had and received rises and falls with the underlying … claims."  *King v. Bumble Trading, Inc.*, 393 F. Supp. 3d 856, 870 (N.D. Cal. 2019). Plaintiff does not dispute that his claim for money had and received rises and falls with his conversion and fiduciary duty claims.

### 2.   **Declaratory Relief.**

Courts have made clear that "[d]eclaratory relief is intended to afford a new form of relief where needed and not to furnish a litigant with a second cause of action for the determination of identical issues." *Trans v. World Savings Bank, FSB*, 2012 WL 12894838, at *4 (C.D. Cal. Oct. 29, 2012) (citation and internal quotation marks omitted).  For that reason, Plaintiff is "not entitled to [declaratory] relief absent a viable underlying claim." *Shaterian v. Wells Fargo Bank, N.A.*, 829 F. Supp. 2d 873, 888 (N.D. Cal. 2011); *see also Surf & Sand, LLC v. City of Capitola*, 2008 WL 2225684, at *2 n.5 (N.D. Cal. May 28, 2008) (noting that a plaintiff's claim for declaratory relief "rises or falls with its other claims").

Plaintiff argues that his claim for declaratory relief is not duplicative of his remaining claims because it is possible that the Court could resolve those claims "without ascertaining the proper measure of the Service Fee."  MSJ Opp. at 23.  But if Plaintiff cannot establish that the Trustee Defendants breached their fiduciary duties in agreeing to pay the Service Fee or that he and the class are entitled to its return, there would be no reason for this Court to determine how large the Service Fee should be, which means that Plaintiff would not be entitled to declaratory relief in any event.

### 3.   **Conversion.**

Plaintiff does not dispute that, to prevail on his claim for conversion, he must establish not only that Defendants' imposition of the Service Fee amounted to a "wrongful act or disposition of property rights," but also that he had a property interest in the funds Defendants allegedly converted.  Plaintiff is accordingly misguided in arguing that "the same issues of disputed fact … that warrant denial of [Defendants'] summary judgment motion as to breach of fiduciary duty equally warrant denial as to conversion."  MSJ Opp. at 19; *see also id.* ("The factual dispute as to whether the Service Fee is 'reasonable' under the Copyright Act therefore

precludes summary judgment on the matter.").  Even if Plaintiff were correct that the alleged *wrongfulness* of Defendants' conduct implicates disputed issues of fact (which he is not), his conversion claim fails for a separate and antecedent reason: he has not established that he has a cognizable property interest in the funds at issue.

Plaintiff appears to agree that the existence of a property interest depends on the extent to which the Copyright Act—which Plaintiff identifies as the source of his purported property interest—restricts Defendants' discretion.  *See generally Allen v. City of Beverly Hills*, 911 F.2d 367, 370 (9th Cir. 1990) ("Whether an expectation of entitlement is sufficient to create a property interest will depend largely upon the extent to which the statute contains mandatory language that restricts the discretion of the decisionmaker.") (citation and internal quotation marks omitted).  Plaintiff incorrectly asserts the Court has "already found that Plaintiff adequately established a possessory interest in the monies collected by the Fund." MSJ Opp. at 19.  That ruling—which took place at the motion to dismiss stage— does not preclude the Court from concluding, with the benefit of a more developed factual record, that the Copyright Act does not vest individual performers with a property interest in their royalties, much less in the Service Fee deducted from them.[8]

### a. The Copyright Act does not give individual performers a cognizable property interest in the statutory royalties.

Despite Plaintiff's insistence to the contrary, the Copyright Act does not grant Plaintiff, or any individual performer, a cognizable property interest in his individual royalty payments under the Section 114 statutory license.  Instead, it dictates only

---

[8] To the extent Plaintiff suggests that the Court's motion to dismiss ruling precludes Defendants from arguing at the summary stage that Plaintiff lacks a protected property interest in the funds at issue, that is plainly wrong.  *See generally Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) (*en banc*) ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case.").  Plaintiff does not cite a single case holding, or even suggesting, that the Court's motion to dismiss ruling conclusively determined whether Plaintiff has a cognizable property interest in the funds Defendants allegedly "converted."

that the Fund must collect and distribute 5% of the royalties generated by the Section 114 statutory license (*i.e.*, those that are not due to copyright owners or featured performers) and distribute them to "nonfeatured vocalists" and "nonfeatured musicians." 17 U.S.C. § 114(g)(2)(B)-(C).  It is irrelevant that the statute defines the *aggregate* amount of royalties the Fund must collect and distribute with "particularized precision."  MSJ Opp. at 19.  That does not mean that the statute defines with similar precision the amount of royalties any *individual performer* is due—as would be required for that performer to have a protected property interest in his or her share of the royalties.  Indeed, even Mr. Dreith—the former Executive Director of the Fund, who designed the Fund's distribution guidelines and processes, and the Plaintiff's current litigation consultant—admitted that the Copyright Act "just talks about non-featured performers as a group" and "didn't say to distribute to every nonfeatured performer."  Sullivan Decl., Ex. 4 (Dreith Tr., 107:14-109:13).

Moreover, Plaintiff does not dispute that, under his interpretation of the Copyright Act, any given performer would have a cognizable property interest in his or her pro rata share of the statutory royalties *regardless* of how small that share might be.  In those cases where royalties amounted to only a few pennies, or even a few dollars, the costs associated with identifying that performer and distributing his or her share of the royalties would greatly exceed the royalties themselves.  This, in turn, would require the Fund to incur enormous administrative costs, all of which necessarily would come out of the royalty pool.  There can be no dispute that this is an absurd reading of the Copyright Act.[9]  Indeed, even Mr. Dreith admitted that there were a number of recordings where "the amount of money is too *de minimis* to have a meaningful distribution," and he agreed that it was more important to "compensate

---

[9] Although Plaintiff disagrees that his reading of the Copyright Act leads to absurd results, he does not—and could not reasonably—dispute the proposition that this Court should not interpret a statute in a way that would "lead to an absurd result" or "thwart the purpose of the overall statutory scheme."  *Andrews v. Sirius XM Radio*, 932 F.3d 1253, 1260 (9th Cir. 2019) (citations and internal quotation marks omitted).

12

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT

3036010

as many non-featured … performers as ethically and fully as possible," even if some performers might lose "micropennies" in royalties as a result.  Sullivan Decl., Ex. 4 (Dreith Tr., 107:14-109:13).

Plaintiff characterizes this argument as a "strawman concerning the *timing* of the distributions" as opposed to the "the *allocation* of such royalties."  MSJ Opp. at 19-20 (emphasis in original).  Plaintiff misses the point.[10]  Whether or not the Service Fee is assessed at the time of allocation (indeed, whether or not it is assessed at all), the logical consequence of Plaintiff's argument is that a performer whose pro rata share of the statutory royalties amounts to mere pennies has a legally enforceable right to those funds.  That, in turn, would impose a legal duty on the Fund to identify each recipient and distribute funds to him or her—whether or not it was economically sensible or administratively feasible to do so.  That is precisely the sort of absurd reading this Court should avoid.[11]

Indeed, the evidence relied upon by Plaintiff in his Opposition aptly and thoroughly establishes the Defendants' point.  In Exhibit 45 to Mr. Joyce's deposition in the *Blondell* case, for example, *see* Lyons Decl., Ex. 19 ("Royalty

---

[10] Plaintiffs' assertion appears to be based on a fundamental misunderstanding of their own evidence.  *See* PUMF No. 62.  While the Fund's distribution guidelines for sound recordings do provide that, *for covered recordings*, the Fund will not issue checks to individual performers for amounts less than $10, but will accumulate such de minimis royalty payments until such time as they exceed $10 and then issue a check, that is an entirely different issue.  It is true only for royalty amounts determined to be due to individual performers on *covered* recordings – *i.e.*, the 40,000 or so recordings,  out of a total of 6 million listed on the SoundExchange Frequency Report each year,  that the Fund makes a discretionary decision to research and pay royalties on.  *See* Def. Resp. to PUMF No. 62; Def. SUF No. 20.

[11] Plaintiff asserts, in a throwaway footnote, that Defendants' interpretation of the statute is absurd because it would "allow[] the Fund to destroy beneficiaries' property interests in their royalties by simply setting the Fund's distribution threshold above whatever amount it misappropriates."  MSJ Opp. at 20 n.17.  But this simply *assumes* the premise that individual performers have a property interest in their royalties—which they do not.  Moreover, this argument implicitly concedes that the Fund has some degree of discretion to set a distribution threshold—which means that performers below that threshold would not have a legal entitlement to their (minuscule) pro rata share of royalties.

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT
3036010

Distribution Comparisons"), Mr. Dreith submitted a report to the Trustees in 2016 that delineates in detail the numerous discretionary choices that Fund staffers make in deciding how many sound recordings to "cover"—*i.e.*, to research regarding non-featured performers—in a given year.   Mr. Dreith notes that SoundExchange annually provides the Fund with a "Frequency Report" that includes approximately 6 *million* song titles that generated statutory royalties in the prior year.   *See id.* at 4. The Fund opts to research only a fraction of those titles—about 20,000 in 2016, although Mr. Dreith expresses hope that the number can rise to 40,000 in the future (which in fact has happened)—due to the Fund's limited staff resources and the need to avoid unduly and irrationally expending time and effort on researching recordings that would yield only pennies in royalties to any particular performer.  *See id.* at 8.[12]

Furthermore, if the Copyright Act did not make this point clear enough, the Trust Agreement also provides that "[n]o artist or person claiming by or through such artist … shall have any right, title or interest in or to the Fund or any property of the Fund or any part thereof except as may be specifically determined by the Trustees." Def. SUF 17.  That language makes clear that no individual performer—including Plaintiff—has a cognizable property interest in the royalties.  Plaintiff once again claims that this language is ineffectual because it conflicts with the Copyright Act.  MSJ Opp. at 20.  But there is no such conflict: even if the Copyright Act requires the Fund to allocate and distribute a specified amount of royalties in the aggregate, it is silent as to whether *each performer* has a property interest in his or her share of the royalties.  This interpretation accords not only with the text of the

[12] As Mr. Dreith explained in this 2016 Report, cited and relied on by Plaintiff: "While the goal of the Fund has always been to research as many sound recordings for each distribution as possible, making a determination on 6 million sound recordings as to which recordings contain non-featured performances, much less the identity of each such performer is, given the resources of the fund[,] just not feasible at this time.  Nor would it be prudent to expend Fund resources to research vast numbers of sound recordings that would yield de [minimis] payments (in some cases down to a fraction of a penny)."  Lyons Decl. Ex. 19 (Royalty Distribution Comparisons).

3036010

Copyright Act and the Trust Agreement, but also with the principle that "contracts should not be interpreted to render them illegal if a legal construction is plausible." *United States v. Sacramento Mun. Util. Dist.*, 652 F.2d 1341, 1346 (9th Cir. 1981). Read in this way, the Trust Agreement squarely forecloses any purported property interest in the royalties.

> **b.    By giving the Fund discretion to deduct "reasonable costs," the Copyright Act forecloses any property interest in the Service Fee.**

Even if this Court were to conclude that the Copyright Act gives non-featured performers a property interest in their royalties, Plaintiff's conversion claim nonetheless fails because the Copyright Act gives the Fund discretion to deduct "reasonable costs," including those associated with the "collection, distribution and administration of the royalties." 17 U.S.C. § 114(g)(3). The use of the phrase "reasonable costs" gives the Fund considerable discretion to set the *amount* of the Service Fee, which negates any purported property interest in the Service Fee (*i.e.*, the "property" that Defendants allegedly "converted").

For that reason, courts across the country have held that the use of the term "reasonable" in a statute or regulation entails a degree of discretion inconsistent with the existence of an enforceable property right.[13] *See, e.g.*, *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 763-64 (2005); *Jacobson v. Hannifin*, 627 F.2d 177, 180 (9th Cir. 1980). Indeed, one court has applied this exact reasoning in rejecting a

---

[13] Plaintiffs' cited cases do not assist them. *See* MSJ Opp. at 21. In *Lyles v. City of Huntington Park*, 2016 WL 7479365 (C.D. Cal. July 7, 2016), the plaintiff did not allege that the defendant deprived him of property, and the court did not address whether plaintiff had a protected property interest. In *Wedges/Ledges of Cal. v. City of Phoenix*, 24 F.3d 56 (9th Cir. 1994), the statute at issue did not use the term "reasonable." Indeed, the Ninth Circuit specifically distinguished the statute at issue in *Wedges/Ledges* from the one at issue in *Jacobson*, which granted "wide discretion" and negated the existence of a protected property right. *Id.* at 63-64. And *Citizens Allied for Integrity & Accountability, Inc. v. Schultz*, 2019 WL 418406 (D. Idaho Feb. 1, 2019) held only that a statute requiring the state to provide "just and reasonable" compensation to landowners did not permit the state to provide *zero* compensation—which is not the case here. *See id.* *2-3.

3036010

claim that a local government charged excessive permitting fees, as the statute at issue—which permitted the collection of "reasonable fees"—did "not contain language that is sufficiently 'mandatory' to create a protected due process interest." *Baumgardner v. Town of Ruston*, 712 F. Supp. 2d 1180, 1203 (W.D. Wash. 2010) (noting that "[t]he phrase 'reasonable fees' gives cities a great deal of discretion in the amount of fees they choose to charge, if they choose to do so at all").

Here too, the Copyright Act's use of the phrase "reasonable costs" does not meaningfully restrict the Fund's discretion as to the *amount* of the Service Fee.  It is irrelevant that the Copyright Act specifies that the Fund "shall" distribute a specified percentage of royalties in the aggregate.  *See* MSJ Opp. at 21 n.20. Leaving aside the fact that this language does not give any *individual* performer a property interest in those royalties, the statute does not use similarly "mandatory language" to define the "costs" Defendants supposedly converted.  Instead, it requires only that those costs be "reasonable."  That language does not restrict the Fund's discretion as to the *amount* of the Service Fee, which negates the existence of a property interest in the Service Fee and defeats Plaintiff's claim for conversion.

## C.   Plaintiff's Request For Punitive Damages Should Be Stricken.

Plaintiff does not dispute that, under California law, "punitive damages are only available 'where it is proven *by clear and convincing evidence* that the defendant has been guilty of oppression, fraud, or malice.'"  *Bourget v. Allstate Ins. Co.*, 2007 WL 9705900, at *6 (C.D. Cal. Jan. 4, 2007) (citing Cal. Civ. Code § 3294(a)) (emphasis added).  Nor does Plaintiff dispute that "[t]he 'clear and convincing' standard is applicable even on a motion for summary judgment."[14]  *Id.*

---

[14] Relying on *Ferretti v. Pfizer Inc.*, 2013 WL 140088 (N.D. Cal. Jan. 10, 2013), Plaintiff argues that this Court "should not impose on [Plaintiff] the obligation to prove [his] case." MSJ Opp. at 24 (citing *Ferretti*, 2013 WL 140088 at *23) (internal quotation marks omitted).  But the issue is not that Plaintiff has failed to carry his burden of proof.  Rather, it is that Plaintiff has failed to carry his burden of producing evidence sufficient to show that he *could* establish, by clear and convincing evidence, that Defendants' conduct is so "despicable" as to merit punitive damages.

3036010

at *6; *see also Haley v. Cohen & Steers Cap. Mgmt., Inc.*, 871 F. Supp. 2d 944, 962 (N.D. Cal. 2012) ("[E]vidence of fraud, malice, or oppression … must be supported by clear and convincing evidence, even at the summary judgment stage.").  And under California law, the fact that the defendant's conduct was illegal or wrongful is not sufficient to obtain punitive damages.  Instead, the defendant must have "acted with intent or engaged in 'despicable conduct'"—*i.e.*, "conduct that is so vile, base, contemptible, miserable, wretched or loathsome that it would be looked down upon and despised by ordinary decent people." *In re First Alliance Mortg. Co.*, 471 F.3d 977, 998 (9th Cir. 2006) (citation omitted). [15]

As explained above and in Defendants' opening brief, Defendants' implementation of the Service Fee—and the amount of that fee—reflected a good-faith and reasonable exercise of business judgment by Trustees with deep knowledge about and decades of experience working in the music and entertainment industries.  Even if Plaintiff were somehow correct that Defendants labored under a conflict of interest when they decided to implement the Service Fee (which is false), that alone would not warrant an award of punitive damages.  *See Am. Airlines, Inc. v. Sheppard, Mullin, Richter & Hampton*, 96 Cal. App. 4th 1017, 1020 (2002) (holding that, while an attorney's conflict presented a potential for a conflict of interest, it was not so despicable as to warrant an award of punitive damages).

Whether or not Plaintiff's evidence is sufficient to create a triable issue of fact at all as to liability (it is not), it certainly does not establish that Plaintiff could prove, by clear and convincing evidence, that Defendants' conduct was so

---

[15] Relying on *In re Plyam*, 530 B.R. 456 (B.A.P. 9th Cir. 2015), Plaintiff suggests that punitive damages require a lower standard of proof, such that even mere recklessness may suffice.  *See* MSJ Opp. at 23.  But California law makes clear that "recklessness alone is insufficient to sustain an award of punitive damages." *Lackner v. North*, 135 Cal. App. 4th 1188, 1211 (2006) (citing *Taylor v. Superior Ct.*, 24 Cal. 3d 890 (1979)).  Indeed, even if "an intentional tort was committed," that alone "is not sufficient to warrant an award of punitive damages." *Grieves v. Superior Ct.*, 157 Cal. App. 3d 159, 166 (1984).

1  "despicable" as to justify an award of punitive damages.  Despite Plaintiff's claim

2  to the contrary, the "denial of summary judgment as to a given claim" does not

3  necessarily "extend[] to any related punitive damages requests."  MSJ Opp. at 24.

4  To the contrary, courts—including this Court—routinely grant summary judgment

5  on claims for punitive damages, even if disputed issues of fact preclude summary

6  judgment on the underlying substantive claim.[16]  *See, e.g.*, *Hajianpour v. Synova,*

7  *Inc.*, 2012 WL 5468834, at *9 (C.D. Cal. Nov. 5, 2012) (Snyder, J.) (denying

8  defendant's motion for summary judgment as to liability in employment

9  discrimination case, but granting it as to punitive damages).  Because Plaintiff has

10  not shown that he can establish, by clear and convincing evidence, that Defendants'

11  conduct was "despicable," this Court should grant summary judgment on Plaintiff's

12  claim for punitive damages.

### III.    CONCLUSION

For all of the reasons set forth in Defendants' moving and reply papers, the Court should grant the motion and enter judgment as a matter of law in favor of all Defendants.

---

[16] *See also, e.g.*, *Nuwintore v. Management & Training Corp.*, 2018 WL 3491676, at *9 (E.D. Cal. July 19, 2018) (granting summary judgment on the prayer for punitive damages, while denying it as to liability, because "[w]ithout 'clear and convincing' evidence demonstrating malice on the part of [defendant], the Court cannot say that reasonable jurors could conclude punitive damages are warranted"); *Larkin v. Home Depot, Inc.*, 2015 WL 1049716, at *3 (N.D. Cal. Mar. 9, 2015) ("[A]lthough he has presented viable claims for basic liability, the plaintiff has not adduced 'clear and convincing' proof that Home Depot maliciously discriminated against him.").  Plaintiff's reliance on *Hobbs v. Bateman Eichler, Hill Richards, Inc.*, 164 Cal. App. 3d 174 (1985), is misplaced, as the plaintiff in that case established that the defendant engaged in despicable conduct such as falsifying client information and knowingly making unauthorized purchases and sales.  *See id.* at 194-95.

Dated:  May 28, 2021

JENNER & BLOCK LLP


/s/ Andrew J. Thomas

Andrew J. Thomas
Alexander M. Smith
Andrew G. Sullivan
Anna K. Lyons

*Attorneys for All Defendants*

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT

3036010