PAUL R. KIESEL (State Bar No. 119854)
  kiesel@kiesel.law
MARIANA A. MCCONNELL (State Bar No. 273225)
  mcconnell@kiesel.law
NICO L. BRANCOLINI (State Bar No. 318237)
  brancolini@kiesel.law
**KIESEL LAW LLP**
8648 Wilshire Boulevard
Beverly Hills, California 90211-2910
Telephone: (310) 854-4444
Facsimile: (310) 854-0812

NEVILLE L. JOHNSON (State Bar No. 66329)
  njohnson@jjllplaw.com
DANIEL B. LIFSCHITZ (State Bar No. 285068)
  dlifschitz@jjllplaw.com
**JOHNSON & JOHNSON LLP**
439 North Canon Drive, Suite 200
Beverly Hills, California 90210
Telephone: (310) 975-1080
Facsimile: (310) 975-1095

*Attorneys for Plaintiff and the Class*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| KEVIN RISTO, on behalf of himself and all others similarly situated,<br><br>        Plaintiff,<br><br>        v.<br><br>SCREEN ACTORS GUILD-AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS, a Delaware corporation; AMERICAN FEDERATION OF MUSICIANS OF THE UNITED STATES AND CANADA, a California nonprofit corporation; RAYMOND M. HAIR, JR, an individual, as Trustee of the AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund; TINO GAGLIARDI, an individual, as Trustee of the AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund; DUNCAN CRABTREE-IRELAND, an individual, as Trustee of the AFM and SAG-AFTRA Intellectual | **CASE NO.** 2:18-CV-07241-CAS-PLA<br><br>**CLASS ACTION**<br><br>**PLAINTIFF'S NOTICE OF MOTION AND MOTION IN LIMINE NO. 2 TO EXCLUDE ANY MENTION, REFERENCE, OR EVIDENCE RELATED TO DEFENDANTS' 50 SONG STUDY; DECLARATION OF NICO L. BRANCOLINI IN SUPPORT THEREOF**<br><br>Judge:  Hon. Christina A. Snyder<br>Crtrm.: 8D – 8th Floor<br><br>Date: July 19, 2021<br>Time: 11:00 a.m.<br><br>Trial Date: August 17, 2021 |

1  Property Rights Distribution Fund;
   STEFANIE TAUB, an individual, as
2  Trustee of the AFM and SAG-AFTRA
   Intellectual Property Rights Distribution
3  Fund; JON JOYCE, an individual, as
   Trustee of the AFM and SAG-AFTRA
4  Intellectual Property Rights Distribution
   Fund; BRUCE BOUTON, an individual,
5  as Trustee of the AFM and SAG-
   AFTRA Intellectual Property Rights
6  Distribution Fund; and DOE
   DEFENDANTS 1-10,
7
            Defendants.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TO THE COURT AND TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on July 19, 2021, at 11:00 a.m., or as soon thereafter as the matter can be heard in Courtroom 8D of this Court, located at First Street Courthouse, 350 W. First Street, 8th Floor, Los Angeles, California 90012, Plaintiff Kevin Risto will and hereby moves the Court for an order to preclude Defendants from referencing, mentioning, or seeking to introduce evidence related to the 50 Song Study referenced in David Nolte's expert report, the April 23, 2021 Sandell Declaration and produced as bates stamped document DEFS_00042027.

Plaintiff further moves the Court to instruct the parties and their counsel of the following:

1. Not to reference, mention, or seek to introduce evidence related to the 50 Song Study and DEFS_00042027.

2. Not to make any reference to the fact that this Motion *in Limine* has been filed and/or granted; and

3. To warn and caution each and every witness to strictly adhere to the same instructions.

This Motion is made following a conference of counsel pursuant to L.R. 7-3 and L.R. 16-2, which took place on June 9, 2021.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

1

1         This Motion is based on this Notice of Motion and Motion, the attached

2    Memorandum of Points and Authorities, the Declaration of Nico L. Brancolini and any

3    supporting exhibits filed concurrently therewith, all pleadings and other papers on file

4    with the Court in this matter, and any additional evidence and oral argument that may

5    be presented at the hearing on this Motion.

6

7    DATED: June 21, 2021           KIESEL LAW LLP

8

9                       By:   /s/ Nico L. Brancolini

10                        Paul R. Kiesel

11                        Mariana A. McConnell

12                        Nico L. Brancolini
                          **KIESEL LAW LLP**

13

14                        Neville L. Johnson

15                        Daniel Lifschitz
                          **JOHNSON & JOHNSON LLP**
                          *Attorneys for Plaintiff and the Class*

16

17

18

19

20

21

22

23

24

25

26

27

28

2

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Included in Mr. Nolte's Rule 26(a)(2)(B) expert report was a discussion of a study conducted by Fund personnel to identify the role that Union data played in ensuring the accuracy of performer royalty allocations. *See* Declaration of Nico L. Brancolini ("Brancolini Decl.") Ex. 1, Mr. Nolte's Expert Report, p.11. For this study 50 songs were researched by Fund personnel who compared Union performer data on those tracks with performer data from other publicly available sources. This research, catalogued in a spreadsheet by the Fund and produced as bates stamp DEFS_00042027, was then cited by Mr. Nolte to conclude that the Unions' data was more accurate than publicly available sources. Brancolini Decl., Ex. 2, DEFS_00042027. He further used the study and findings as a significant factor in his conclusion that absent the Service Agreement, "the Fund would not be able to make payments to participants that are as accurate and complete as what is now occurring." But these sweeping pronouncements and grand conclusions are totally incongruous with the 50 Song Study's accuracy or relevancy. Mr. Nolte's report is a Trojan Horse for a fatally flawed and highly prejudicial study – which is in reality nothing more than a piece of agitprop created by a lay witness lacking the requisite expertise and ability to create a representative sample – smuggled in under the edifice of Nolte's expert designation.

Fund manager Julie Sandell is not qualified to testify to the foundation of the 50 Song Study. Despite having no background in statistics, Ms. Sandell appears to have developed the 50 Song Study for its specialized technical purpose. ECF No. 108, ¶¶ 7,8. Unsurprisingly, given her lack of qualifications or designation, the genesis and methodology of the study has no basis in sound statistical principles – and in fact – the selection process appears to have been contrary to accepted practices.

Mr. Nolte theoretically may have been qualified to work with Ms. Sandell and develop a statistically useful study, but as Mr. Nolte repeatedly made clear he was not involved in the process. Brancolini Decl., Ex. 3, Nolte Dep., 117:16-118:15, 130:2-

131:25. "Reliance on incomplete facts and data will make an expert's opinion unreliable because an expert must know "of facts which enable him to express a reasonably accurate conclusion." *Powell v. Anheuser-Busch Inc.*, No. CV 09-729-JFW (VBKx) 2012 U.S. Dist. LEXIS 200311, at *18 (C.D. Cal. Sep. 24, 2012) (internal citation omitted).

The Study's core analysis is broadly unrelated to the main issues of this case. This deeply flawed, inscrutable, and irrelevant study does nothing to assist the trier of fact and is likely to cause confusion and delay if included at trial. For all the reasons set forth herein, any mention or reference to the 50 Song Study should be excluded.

## II.  **FACTUAL BACKGROUND**

In February of 2019, Plaintiff propounded an interrogatory asking Defendants "If YOU contend that the SERVICE FEE is a reasonable charge for the services provided by the UNIONS, state ALL facts that support that contention." Brancolini Decl., Ex. 4, Interrogatory No. 10, p. 8. Throughout the fall and winter of 2020 Plaintiff took depositions of a number of fact witness, including Ms. Sandell, who when asked questions about the sources of information utilized by Fund researchers were told identifying individual sources was not possible. Brancolini Decl. Ex. 5, Sandell Dep.[1] At no point during discovery did Defendants disclose or produce the 50 Song Study.

Plaintiff first learned of the 50 Song Study when Defendants served their expert report of David Nolte on March 8, 2021. In his report Mr. Nolte wrote that the study was supposed to demonstrate what would occur if the Fund did not have access to the Unions' data and instead tried to locate performer data from non-Union sources. Ex. 2,

---

[1] *See e.g.* Brancolini Decl., Ex. 5 73:11-24:
"Q. You told us about the different sources that the Fund can look at to identify nonfeatured performers on tracks, and I'm wondering has anyone ever asked you to segregate whether the Fund has identified a performer due to something that the union has provided the Fund, as opposed to an online resource like Discogs or ALLMusic?
A. Well, that would be too time consuming. It wouldn't be worth it.
Q. Why wouldn't it be worth it?
A. Because our objective is to research the title correctly to the best of our ability and get it as right as right can be with all of our sources. We don't really think about it that way."

p. 8. The "Fund selected 50 titles in a manner that the Fund described as random" and were selected from a list of songs that all shared two attributes: "(i) had distributions in 2020 and (ii) had Union session reports." *Id*. at FN 12, p. 11. Fund researchers then consulted various alternative sources of performer data and compared the accuracy of the publicly available data with the Unions' data.

From this process, Mr. Nolte concluded that the Unions' data was more accurate than the free publicly available data Fund researchers consulted. As stated more fully in Plaintiff's Motion in Limine #1, after taking the deposition of Mr. Nolte, it became apparent that Ms. Sandell was the primary architect of the Study.

Defendants relied upon the 50 Song Study in their Motion for Summary Judgment which included a declaration from Ms. Sandell confirming her role in developing and managing the study. ECF Nos. 103, 104, 108. Ms. Sandell does not have any background in statistics or accounting. Ex. 5, 31:24-32:15. Ms. Sandell explained that she directed and completed this project over January and February of 2021[2]. ECF No. 108 ¶¶ 2, 7. Therefore, this project appears to have begun after Ms. Sandell testified that this sort of project would not be consistent with the actual research process used by Fund researchers. Ex. 5, 73:11-24.

On June 14, 2021 this Court granted leave to re-open Ms. Sandell's deposition on the topic of the 50 Song Study. ECF No. 119, FN 1, p. 2-3. That same morning Plaintiff's counsel reached out to Defendants' counsel to schedule Ms. Sandell's testimony ahead of the motion in limine deadline. Brancolini Decl., Ex. 7. Instead, defense counsel offered a date after the motion deadline, refusing to extend the deadline for filing this motion and summarily declaring that this motion was moot. Plaintiff has no choice but to file this motion and supplement the record once the deposition of Ms. Sandell is complete. Brancolini Decl., Ex. 8.

/ / /

---

[2] Mr. Nolte's invoices going back to early January also reference the 50 song study and revisions to it. Brancolini Decl., Ex. 6 Fulcrum Invoices.

3

## III.   **LEGAL STANDARD**

"Irrelevant evidence is not admissible." Fed. R. Evid. 402. Evidence is only relevant "if it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Fed. R. Evid. 401. Even if proffered evidence is relevant, the Court may nevertheless exclude it "if its probative value is substantially outweighed by the danger of … confusion of issues or misleading the jury." *U.S. v. Moreno*, 201 F.3d 994, 998 n.3 (9th Cir. 1996) (citing Fed. R. Evid. 403) ("The court may exclude relevant evidence if its probative value is substantially outweighed by danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.").

Unless offering expert testimony under Rule 703, a witness can only testify to matters for which he or she has personal knowledge. Fed. R. Evid. 602, 703. Lay opinion testimony **must** be: "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issues; and (c) **not based** on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701 (emphasis added).

One of the principle tasks of Rule 702 of the Federal Rules of Evidence is "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579, 597 (1993). The purpose of the prohibition of lay testimony requiring scientific, technical, or specialized knowledge is "to prevent litigants from skirting the *Daubert* standard or the expert disclosure guidelines by introducing expert opinion testimony as lay opinion testimony." *Hynix Semiconductor Inc. v. Rambus Inc.*, No. C-05-00334 RMW, 2008 U.S. Dist. LEXIS 16716, at *30 (N.D. Cal. Feb. 19, 2008) (*citing* FRE 701, adv. committee note (2000)).

/ / /

/ / /

## IV.   ARGUMENT

**A. The 50 Song Study Is Unreliable and Testimony on it From Either Ms. Sandell or Mr. Nolte is Barred Under the Federal Rules of Evidence**

**i.   There is no evidence that the 50 song study utilizes a reliable sample size**

As an initial matter it is not at all clear that the sample size of 50 songs was large enough to be useful or reliable for any of the conclusions for which it is presented. "In order to draw reliable conclusions about a population based on a statistical sample, the sample size must be large enough to support those conclusions." *In re Countrywide Fin. Corp. Mortgage-Backed Secs. Litig. v. Countrywide Fin. Corp.*, 984 F. Supp. 2d 1021, 1033 (C.D. Cal. 2013). "Statistical evidence derived from an extremely small universe…has little predictive value and must be disregarded." *Morita v. Southern Cal. Permanente Med. Group*, 541 F.2d 217, 220 (9th Cir. 1976) (quoting *Harper v. Trans World Airlines, Inc.*, 525 F.2d 409, 412 (8th Cir. 1975)).

Neither Ms. Sandell nor Mr. Nolte provided any evidence that they determined 50 titles was a large enough sample size to be reliable or predictive. When asked, Mr. Nolte did not appear to have a clear idea of what the overall population was that the 50 songs were selected from. The songs were apparently selected from a list of 5,992 tracks for which the Fund had Union data and were distributed on in 2020. However, Mr. Nolte had no idea how this universe of songs connected to the broader universe of tracks distributed in 2020, could not say if the 5,992 songs represented all the songs that met those two criteria, nor how many songs met one or both of the mentioned criteria, or how the year 2020 was selected over any other. Ex. 3, 137:4-142:22. Since Nolte did not know these things when he drafted his report, he had no way of knowing if the study was representative. Therefore none of his conclusions related to the 50 song study can credibly be called reliable.

**ii.   The 50 song study requires a degree of specialized knowledge not possessed by Ms. Sandell**

Under   Rule   702,   expert   "reports   describing   the statistical sampling

1   methodologies must be authored by a qualified expert witness, reliably apply scientific
2   methods to sufficient data, and be helpful to the trier of fact." *In re Countrywide Fin.*
3   *Corp. Mortgage-Backed Secs. Litig. v. Countrywide Fin. Corp.*, 984 F.Supp.2d 1021,
4   1027 (C.D. Cal. 2013).

5       Here, the person who prepared the statistical model for the 50 song study, Ms.
6   Sandell, is neither offered nor qualified as an expert in statistical analysis. Testimony
7   from Defendants' actual designated expert confirms the degree to which specialized
8   knowledge would be needed. Mr. Nolte explained as a general principle the necessity
9   of random and representative samples in statistical modeling. Ex. 3, 118:22-121:8. He
10  expounded at great length on the role of both in drawing statistical inferences in terms
11  of precision and confidence levels.

12      As described both in Mr. Nolte's report and Ms. Sandell's declaration, nothing
13  indicates that the selection process was devised to be representative or random. The
14  sampling process was described as "generating a list of 5,992 covered recordings that
15  (i) were subject to royalty distributions in 2020; and (ii) had Union session reports"
16  and then Ms. Sandell started "approximately halfway down the list, and then selected
17  the largest 50 of the next 100 sequential titles." ECF No. 108, ¶ 8. This raises various
18  questions, the answers to which will necessarily impact how random or representative
19  (and therefore reliable) the results of this selection process were.

20      For example: was 5,992 the total number of songs that met the two criteria? If
21  not, how many songs did? And how then were the 5,992 selected from that full list?
22  How were the 5,992 songs ordered? What does approximately halfway down mean?
23  Were the songs selected representative of the genre/style/year release of the overall
24  songs within the total sample group? How does 2020 compare to other distribution
25  years? What does "largest" mean? More troubling, things like the decision to select the
26  "largest 50 of the next 100" is a decision that can is likely to make the sample *less*
27  random and representative of the overall set.
28  / / /

### iii.  **Mr. Nolte cannot give testimony on a study he had no role in devising**

The court, as the gatekeeper, "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. LTD. v. Carmichael et al*. 526 US 137, 152 (1999).

Since Ms. Sandell could not and did not create a reliable data set, Mr. Nolte cannot express any reasonably accurate conclusions based off of it. When specifically discussing the 50 song study, Mr. Nolte attempted to both limit the scope of his conclusions and insist that the Fund "indicated that in their mind it was random [sample selection] and… sufficiently large to accomplish its purpose." Ex. 3, 123:1-11. Mr. Nolte claimed that you can still "extrapolate" some results he just has "not expressed anything with the precision and confidence level." *Id*. at 123:12-21. In effect, Mr. Nolte is saying that he was able to draw some conclusions he just won't say whether they are accurate or useful conclusions.

Despite Mr. Nolte's efforts to obscure the issue it is obvious that Defendants are attempting to use the imprimatur of their expert's credentials to launder in a methodologically flawed study. This becomes particularly clear in the context of the conclusions and calculations Mr. Nolte makes as to allocation error rate based on the 50 song study. While Mr. Nolte may be qualified to calculate a simple error rate, Mr. Nolte is not qualified or permitted to draw conclusions from an inadmissible sample he did not participate in, direct, and has no knowledge of. *Snyder v. Bank of Am., N.A.*, 2020 U.S. Dist. LEXIS 206437 at *19 (N.D. Cal. Nov. 3, 2020). Despite insisting in his deposition that he's "not reached any conclusion regarding the [study] being representative" he still attempts to use the study to support the claim that the Unions prevent $34.5-$115 million worth of misallocations. Ex. 1, p. 18.

Ms. Sandell is not qualified to create this sort of study and all available evidence was that she did not make a study that is of any statistical value. Lacking this foundation, Mr. Nolte's calculations based on that study are not reliable. Plaintiff

therefore urges this Court to exclude the resultant unreliable and prejudicial testimony and conclusions.

**B. The 50 Song Study Is Not Admissible Under Federal Rules 401 – 403**

   **i.   <u>The study is irrelevant to the process by which the Service Fee was adopted and if that process constituted a breach of the Trustees' fiduciary duties</u>**

Plaintiff alleges that the process under which the Services Agreement was approved improperly favored the Unions. The Study continues Defendants' habit of focusing on the supposed intrinsic value of the data rather than the reasonableness of the fee itself. Plaintiff has never disputed that the data has some value – rather, he believes the process surrounding the adoption of the Service Fee was a cash grab by Fund Trustee Co-Chairs focused on extracting money from for the Unions, not meaningfully connected to the actual work the Unions were doing to support the Fund, and contrary to Copyright Act Section 114.

A study conducted in late 2020 or early 2021 that uses Union data as a baseline to "prove" that Union data is valuable does nothing to elucidate the evaluation or negotiation process that preceded the adoption of Services Agreement back in 2013. Even if the data was not available from any other source, a Services Agreement whose terms were overly favorable to the Unions would be improper and could constitute of breach of fiduciary duty. The Trustees still had an obligation, as this Court has noted, to administer the trust with "completed loyalty to the interests of the beneficiary and must exclude… all consideration of the interests of third persons." *In re Northrop Grumman Corp. Erisa Litig.*, No. CV 06-06213 MMM (JCx), 2015 WL 10433713, at *26 (C.D. Cal. Nov. 24, 2015).

   **ii.   <u>The study is irrelevant as to either availability of comparable alternative data sources or the reasonableness of the Service Fee amount</u>**

As described by Mr. Nolte the "purpose of the exercise was to ascertain what outcome would result if the Fund did not have the Unions' data available." Ex. 1, p. 11. His report goes onto to explain that the exercise demonstrates the inferiority of

"Internet resources" and "publicly available, non-Union sources of information." *Id*.

In other words, this study did not actually look at the availability of this data from alternative sources, it just looked at *free publicly available* alternative sources. However it does not make sense in the context of Plaintiff's claims to only look at free, publicly available information. Putting aside the questions of accuracy, Defendants are essentially asking to use this study to state "since this information cannot be located free of charge, it must not exist anywhere else and it is therefore reasonable to pay the Unions whatever they want in exchange for this information."

But the reality is this study did not look at the availability and accuracy of this information – let alone cost – from the other sources. Indeed, Defendants frequently evoke a section of the Trust Agreement which appears to authorize the Fund to "purchase or obtain from the AFM, SAG-AFTRA, the AFM and Employers' Pension Fund, the AFTRA Health and Retirement Funds, the Phonograph Manufacturers' Special Payments Fund, the Motion Picture Special Payments Fund, or any [other] commercial source any data." Brancolini Decl., Ex. 9, Trust Agreement p.5. This study did not look to any of these other sources, commercial or otherwise, to try and determine if the information was available. Notably absent from the resources consulted as part of the 50 song study was LexisNexis even though: (i) the Fund already has a paid subscription and (ii) it contains a database of contact information comparable to the one available through the Unions. A study purporting to demonstrate the availability and value of Union data should be looking at all these possible sources.

### iii. Further considerations of the Study's circumstances and content would make its inclusion prejudicial to Plaintiff

**First**, the Study was not disclosed in a timely manner. Defendants should not be allowed to rely on evidence or testimony related to that evidence which was not timely and properly disclosed pursuant to Rule 26 of the Federal Rules of Civil Procedure, this Court's scheduling order, or through timely served discovery requests. *See* Fed. R. Civ. P. 37(c)(1) ("the party is not allowed to use that information or witness to supply

9

evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless").

Far from being harmless, Plaintiff first learned of the study from Mr. Nolte's expert report after the close of fact discovery. However, by all indications the study was completed weeks before with both Ms. Sandell's declaration and Mr. Nolte's invoices indicating that the Study was completed by mid-February. Applying Occam's Razor, this failure to disclose the Study during discovery, before Mr. Nolte's report was produced, leaves Defendants' conduct somewhere between improperly careless and outright malicious. To allow Defendants to offer or elicit testimony about an improperly disclosed study would be irreversibly prejudicial to Plaintiff and therefore should be excluded pursuant to Fed. R. Evid. 403. Such testimony would confuse the issues and mislead the Court into deciding the case based upon improper evidence. *Id*.

**Second,** Defendants' testimony regarding the 50 Song Study is inadmissible because it would be confusing and unduly consume time, outweighing any probative value it may offer. Allowing Defendants to testify about the Study itself would require further testimony on numerous conjectural matters to resolve the issues of its accuracy and utility as presented. The minimal probative value of the Defendants' testimony on the Study is substantially outweighed by the undue consumption of time, along with the danger that their speculative testimony will confuse the issues central to this case. Thus, the testimony should be excluded under Rule 403. As further outlined above, the accuracy and reliability of the study's methodology is also in dispute, an issue compounded by having a non-expert witness develop a study that an expert later relies upon for analysis.

## V.   **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court grant his Motion in Limine to Exclude Any Reference or Mention of the 50 Song Study and to preclude Mr. Nolte, Ms. Sandell, or anyone else from offering any opinions or testimony related to the study at trial.

PLAINTIFF'S MOTION IN LIMINE NO. 2 TO EXCLUDE ANY MENTION, REFERENCE, OR EVIDENCE RELATED TO DEFENDANTS' 50 SONG STUDY

DATED: June 21, 2021              KIESEL LAW LLP


                                 By:   /s/ Nico L. Brancolini
                                       Paul R. Kiesel
                                       Mariana A. McConnell
                                       Nico L. Brancolini
                                       **KIESEL LAW LLP**

                                       Neville L. Johnson
                                       Daniel Lifschitz
                                       **JOHNSON & JOHNSON LLP**
                                       *Attorneys for Plaintiff and the Class*

PLAINTIFF'S MOTION IN LIMINE NO. 2 TO EXCLUDE ANY MENTION, REFERENCE, OR EVIDENCE RELATED TO DEFENDANTS' 50 SONG STUDY

## DECLARATION OF NICO L. BRANCOLINI

I, Nico L. Brancolini, hereby declare as follows:

1.      I am an attorney at law, duly licensed to practice before all Courts in the State of California and the United States District Court for the Northern, Central and Southern Districts of California. I am an associate at Kiesel Law LLP, counsel for Plaintiff Kevin Risto and designated Class Counsel in the above-captioned action.

2.      This Declaration is offered in support of Plaintiff's Motion in Limine No. 2 to exclude any reference, opinions, and testimony on Defendants' 50 Song Study. If called upon as a witness I could and would competently testify to the following based on personal knowledge.

3.      The parties met and conferred as to the subject matter of this Motion pursuant to Local Rule 7-3 and Local Rule 16-2. The parties were unable to reach agreement, thereby necessitating this Motion.

4.      Attached hereto as Exhibit "1" is a true and correct copy of David Nolte's March 8, 2021 expert report.

5.      Attached hereto as Exhibit "2" is a true and correct copy of the excel sheet documenting the 50 song study which was produced as bates stamped document DEFS_00042027 and provided with their expert report on March 8, 2021.

6.      Attached hereto as Exhibit "3" is a true and correct copy of the deposition of David Nolte taken on April 27, 2021.

7.      Attached hereto as Exhibit "4" is a true and correct copy of Plaintiff's First Set of Interrogatories to Defendants.

8.      Attached hereto as Exhibit "5" are true and correct excerpts of the deposition of Julie Sandell taken on December 9, 2020.

9.      Attached hereto as Exhibit "6" is a true and correct copy of Fulcrum's Invoices produced as bates stamped documents Defendants NOLTE00000001-4.

10.     Attached hereto as Exhibit "7" is a true and correct copy of the email sent by Mariana A. McConnell to Defense counsel on June 14, 2021.

11.     Attached hereto as Exhibit "8" is a true and correct copy of the emails exchanged between Ms. McConnell and Defense counsel on June 15-16, 2021.

12.     Attached hereto as Exhibit "9" is a true and correct copy of the Agreement and Declaration of Trust for the AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund, Amended and Restate July 26, 2012.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed June 21, 2021, at Beverly Hills, California.


    /s/ Nico L. Brancolini
Nico L. Brancolini

# EXHIBIT 1



Fulcrum Financial Inquiry LLP
707 Wilshire Boulevard, Suite 2050
Los Angeles, CA 90017

(213) 787-4100
www.fulcrum.com

March 8, 2021

Andrew J. Thomas, Esq.
Andrew G. Sullivan, Esq.
Jenner & Block LLP
633 West 5th Street, Suite 3600
Los Angeles, CA 90071-2054

Gentlemen:

This report is provided by Fulcrum Financial Inquiry LLP ("Fulcrum") in connection with the class action lawsuit brought by Kevin Risto, (as class representative - "Plaintiff") concerning the operation of the AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund (the "Fund"). The lawsuit is captioned *Risto v. Screen Actors Guild - American Federation of Television and Radio Artists, et al.*, (USDC, Central District of California, Case No. 2:18-cv-07241-CAS).

## I.      DESCRIPTION OF ENGAGEMENT

Fulcrum has been asked to address the reasonableness of the amounts that the Fund pays to the American Federation of Musicians of the United States and Canada ( "AFM") and Screen Actors Guild – American Federation of Television and Radio Artists ("SAG-AFTRA") (collectively, the "Unions") pursuant to the July 22, 2013 Data Purchase and Services Agreement (the "2013 Agreement"). This evaluation is economically and financially based, and does not address legal conclusions.

## II.     INFORMATION RELIED UPON

In addition to my experience and training, I considered the following information in preparing this report, each of which is of a type that is reasonably relied upon by experts in my field:

1.  Background information, as follows:

    a.  The First Amended Complaint in this matter
    b.  Plaintiff's Response to Interrogatories and Requests for Admission (February 12, 2021)
    c.  Filings associated with the Motion to Dismiss (and related Oppositions & Replies)
    d.  Filings associated with the Motion for Class Certification (and related Oppositions & Replies)

2.  The 2013 Agreement

3.  The Unions' interrogatory responses (aka Exhibit 5 to the Kristina Gorbacsov deposition) and the Unions' amended interrogatory responses (March 1, 2021)

4.  The Fund's audited financial statements (aka Annual Reports) as of March 31, 2014, 2015, 2016, 2017, 2018 and 2019, and for the years then ended. These are publicly available at https://www.afmsagaftrafund.org/Our-Annual-Report.php

Messrs. Thomas & Sullivan
March 8, 2021
Page 2 of 28

5. The following depositions taken in this matter, including related deposition exhibits

   a. Stefanie Taub (Fund CEO), in an individual capacity, taken on October 20, 2020
   b. Stefanie Taub as a designee witness for the Fund, taken on January 20, 2021
   c. Kristina Gorbacsov, taken on October 23, 2020, as a designee witness for SAG/AFTRA
   d. John Painting, taken on October 29, 2020, as a designee witness for AFM
   e. Julie Sandell (Fund Assoc. Director, Sound Recordings), taken on December 9, 2020
   f. Dennis Dreith (former Fund Executive Director), taken on February 11, 2021
   g. Duncan Crabtree-Ireland, taken on February 16-17, 2021 (SAG/AFTRA)
   h. Raymond M. Hair, Jr., taken on February 24-25, 2021 (AFM)

6. The Fund's review of a sample of 50 titles, with comparison of the results achieved using the Unions' data vs. using only data available on the Internet and from other non-Union sources, as contained in an MS Excel file.  This file is further described in Sections III.E and Sections IV.B herein.  The version of this spreadsheet provided to me by the Fund has been produced by Defendants as DEFS_00042027.  See Exhibit 2 for a version of this spreadsheet with changes that Fulcrum made to calculate an error rate.

7. Other records produced in this litigation, as specifically referenced herein

8. Publicly available data, as summarized and referenced herein

Fulcrum personnel reviewed and considered additional documents produced in this litigation that are not specifically cited in the conclusions expressed herein, but which provide background information and context.  These additional records do not alter any of the conclusions expressed herein.

## III.   FACTUAL AND LEGAL BASIS FOR THIS REPORT AND THE OPINIONS HEREIN

This section provides background information that is useful in understanding this report.  Although Fulcrum is capable of summarizing information contained in this section and may need to do so as part of a testimony presentation, this report does not otherwise express opinions regarding the contents of this section.

In his response to Interrogatory No. 18 (February 12, 2021), Plaintiff states the following:

> "Facts: …
> the Unions are unable to provide information for over 70% of the Fund's
> requests, which themselves only represent a fraction of the recordings tracked by the
> Fund. The time and cost to the Unions in providing this information to the Fund is de
> minimis.  In addition, since the Fund has been compiling the information provided by
> the Unions at its own expense and effort, the Fund no longer has any use for the Unions'
> limited information for the vast majority of Fund beneficiaries."

The information in this Section III contradicts the preceding quote from Plaintiff.

## A.  Plaintiff's description of the statutory basis for collections and the 2013 Agreement

The First Amended Complaint describes the background of this dispute as follows:

Messrs. Thomas & Sullivan
March 8, 2021
Page 3 of 28

"2.   Under 17 U.S.C. § 114(g), 50% of digital performance royalties are payable to the copyright owners of the sound records, 45% are payable to the featured artists, 2.5% are payable to the non-featured musicians (also known as session musicians) and 2.5% are payable to the non-featured vocalists (also known as session vocalists) (collectively referred to herein as "non-featured performers") …

4.   The statute requires payment of the Royalties to non-featured performers regardless of their union membership in any or all of the three major unions: the American Federation of Musicians of the United States and Canada ("AFM"), or SAG-AFTRA (the surviving entity after the 2012 merger of the Screen Actors Guild ("SAG") and the American Federation of Television and Radio Artists ("AFTRA").

5.   The AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund (the "Fund") is the name given to the I.R.C. § 501(c)(6) nonprofit organization which oversees a trust fund created to receive and distribute Royalties or other remuneration to artists from SoundExchange and other relevant collecting societies, rights organizations and other appropriate entities in order to comply with the statutory scheme.

6.   Pursuant to the statutes, the Fund is obligated to perform its duties without regard to union membership. …

11.   The Fund entered into a Data Purchase and Services Agreement dated July 22, 2013 (the "Services Agreement") with the Unions. Pursuant to the Services Agreement, "the Fund shall pay each Union, within 30 days after the conclusion of each of the Fund's distribution cycles, 3% of the amount distributed by the Fund in such distribution cycle…. Such payment shall constitute complete compensation of the Unions and their personnel for providing the data and services contemplated by this Agreement. There shall be no additional charges or expense reimbursement associated with the Unions' provision of the data and services contemplated by this Agreement."

12.   This 3% service fee shall be referred to herein as the "Service Fee." …

23.   Plaintiff and the Class seek equitable, declaratory, and injunctive relief against the Trustees requiring them to: (1) revert back to the Fund the 3% Service Fee for the distribution cycles following July 22, 2013; (2) cease the collection of the 3% Service Fee on all future distribution cycles; and (3) declare the Data Purchase and Services Agreement void and unenforceable."

## B.  Defendants' description of the fee paid to the Unions

Each of the Defendants provided information regarding the reasonableness of the Service fee in a response to Plaintiff's Interrogatory No. 10, as follows:[1]

"INTERROGATORY NO. 10:
If YOU contend that the SERVICE FEE is a reasonable charge for the services provided by the UNIONS, state ALL facts that support that contention.

RESPONSE TO INTERROGATORY NO. 10:

---

[1] Amended responses, dated March 1, 2021

Messrs. Thomas & Sullivan
March 8, 2021
Page 4 of 28

*[Objections omitted]*

*Pursuant to the Data Purchase and Services Agreement, the Unions are required to provide the Fund with information in their possession that is necessary to enable the Fund to identify and pay the non-featured performers (both Union members and nonmembers) to whom Royalty payments have been allocated in a given distribution cycle. This valuable data is derived from records developed and maintained by the Unions at considerable expense, including forms obtained by the Unions from producers and/or other individuals or entities involved in the creation of a given sound recording. Specifically, the information provided by the Unions to the Fund is derived from session reports and "B-forms" which contain information necessary to identify and locate some or all of the non-featured musicians and vocalists who performed on a given sound recording. These session reports and B-forms compile information related to both Union members and nonmembers who served as non-featured performers on a given sound recording. These records maintained by the Unions are housed across various local affiliates of each Union, for the most part based on where the relevant sound recording took place. Much of this information exists in records that are maintained locally by the Unions only in hard copy form.*

*Pursuant to the Data Purchase and Services Agreement, the Unions must coordinate with the Fund to provide the information necessary for the Fund to identify and pay non-featured performers. The information provided by the Unions pursuant to the Data Purchase and Services Agreement is essential to the Fund's administration. This information has been collected, compiled, and maintained as part of a large-scale effort by the Unions over the course of decades, and such efforts continue on an ongoing basis. There is no other repository of information documenting the identities, work histories, and payment information associated with non-featured performers that is nearly as exhaustive as the repositories maintained by the Unions. Without this data and the services expended by the Unions to provide this data, the Fund would be significantly constrained in its ability to perform the fundamental task of identifying and locating the non-featured performers for whom Royalty distributions are to be paid, or in the alternative would need to expend substantial efforts and incur substantial costs to compile independently the information provided by the Unions. Accordingly, the data has substantial intrinsic value and is highly valuable to the Fund in the performance of its work.*

*In addition, Union representatives expend considerable effort supplying the valuable data the Unions are obligated to provide under the Data Purchase and Services Agreement. Researchers at the Fund have worked extensively with Union representatives in an effort to build and grow a database compiling the identities of the non-featured performers who performed on a given sound recording, as well as the information necessary to locate and pay such individuals. This database serves as the Fund's central resource used to identify, locate, and pay Royalties to nonfeatured performers. As this database has grown, the Fund has been able more efficiently to identify and locate the non-featured performers who performed on eligible sound recordings. Currently, this database compiles information related to the non-featured performers associated with approximately 136,000 song titles.*

*Because the records maintained by the Unions exist in decentralized repositories dispersed across the Unions' local affiliates, the Unions satisfy their obligations under the Agreement by making numerous representatives available in these locations in order to field requests from the Fund. The Fund's research team—currently staffed with ten full-time research associates and supervisors—works extensively with representatives located in various local affiliates of*

Messrs. Thomas & Sullivan
March 8, 2021
Page 5 of 28

*the Unions on a year-round basis to obtain information regarding the non-featured performers associated with thousands of song titles. Except with respect to two local affiliates of the AFM (located in New York and Los Angeles) that maintain electronic records on a platform that Fund researchers may directly log into, in all other cases Union representatives handle individual requests from Fund researchers to locate and provide information related to specific song titles and/or to verify the recent contact information for non-featured performers associated with such song title. In locations where such records exist in hard copy form, Union representatives must locate the requested document within their hard copy filing system before scanning and sending a digital copy of the record to the requestor at the Fund. The quantity of the requests made to the Unions by the Fund vary across the respective Unions' locations and fluctuate on a day-to-day and week-to-week basis. It is not uncommon for a Union representative at one location to field dozens of requests from the Fund over the course of a week. Fulfilling each such request may take a Union representative anywhere from a few minutes to thirty minutes or longer.*

*In addition to providing the information necessary to locate and pay nonfeatured performers, the Unions also provide advocacy services both domestically and internationally that benefit non-featured performers (both Union members and nonmembers). These activities include meeting with members of Congress, negotiating with domestic performing rights organizations (PROs), as well as engaging with international PROs to negotiate better terms for the collection and distribution of international royalties. In addition to advocating with the federal government for more expansive rights that would benefit all non-featured performers, the Unions have negotiated and interacted with the World Intellectual Property Organization (WIPO), the Societies' Council for the Collective Management of Performers' Rights (SCAPR), Phonographic Performance Limited (PPL), and the Musicians' Rights Organization Canada (MROC), among other international organizations. This includes efforts to expand the performance right in the United States to apply to non-digital platforms (e.g., terrestrial radio), a cause which the Unions have furthered through their participation in the musicFIRST coalition. The Unions also engage in advocacy efforts with foreign governments for more stringent distribution requirements for collected royalties. These activities all inure to the benefit of non-featured performers, regardless of union affiliation, as they are aimed in part at increasing the scope and overall amount of the royalties paid for recordings on which non-featured musicians and vocalists have performed.*

*In consideration of the inherent value of the data the Unions provide to the Fund, as well as the services provided by the Unions as described above, the Trustees of the Fund agreed in 2013 that each Union should be paid a fee in the amount of 1.5% of the receipts distributed by the Fund in a given distribution cycle. This was an entirely reasonable exercise of the Trustees' broad discretion in determining the value of the information and services provided by the Unions. "*

The depositions of the Fund's and Unions' designee witnesses provided explanations that were consistent with above interrogatory response.

## C.  Amounts received, paid, and payable by the Fund

The following table shows the total royalties received by the Fund, which is the starting point for the Fund's distribution activities:

Messrs. Thomas & Sullivan
March 8, 2021
Page 6 of 28

Table 1: Royalties received by the Fund[2]

| FY ended 3/31 | Royalties received |
|---|---|
| 2013 | $ 27,561,164 |
| 2014 | 41,699,519 |
| 2015 | 49,322,129 |
| 2016 | 46,051,587 |
| 2017 | 52,001,911 |
| 2018 | 65,339,258 |
| 2019 | 61,369,239 |
| 2020 | 71,723,181 |
| Total | $415,067,988 |

The following table summarizes the amounts reported in response to Plaintiff's Interrogatory Nos. 6, 7 and 8.  This information for years FY2013-FY2019 is also available in the Fund's audited financial statements:

Table 2: Fund's payments to Unions under the 2013 Agreement[3]

| FY 3/31 | Fees paid to: | | Total | Fund's Administrative costs | |
|---|---|---|---|---|---|
| | SAG-AFTRA (#7) | AFM (#8) | | $ (#6) | Union Fee % |
| 2013 | 0 | 0 | 0 | $ 2,820,342 | 0% |
| 2014 | $ 193,814 | $ 193,814 | $ 387,628 | 3,538,442 | 11% |
| 2015 | 272,845 | 272,845 | 545,690 | 6,129,420 | 9% |
| 2016 | 420,454 | 420,454 | 840,908 | 6,918,166 | 13% |
| 2017 | 872,894 | 872,894 | 1,745,788 | 11,887,748 | 15% |
| 2018 | 864,759 | 864,759 | 1,729,518 | 12,936,211 | 13% |
| 2019 | 782,462 | 782,462 | 1,564,924 | 11,301,441 | 14% |
| 2020 | 825,404 | 825,404 | 1,650,808 | 11,948,304 | 15% |
| 2013 – 2019 Totals | | | $8,465,264 | $67,480,074 | 12.5% |

Largely because information about individual Fund participants and their involvement in sound recordings is incomplete, the Fund has a growing pool of royalties that are awaiting distribution because of an inability to fully ascertain the required information that allows the payment to be made.  The following amounts are reported in the Fund's audited financial statements as amounts awaiting distribution:

---

[2] The Fund's audited financial statements, available on the Fund's website, for amounts through and including 2019.  2020 amount (as well as the earlier amounts that agree with such financial statements) is per Defendant's March 1, 2021 responses to Interrogatory No. 4
[3] Exhibit 2 to the October 20, 2020 deposition of Stefanie Taub (aka DEFS_00041811), as well as the Defendants' March 1, 2021 amended interrogatory responses

Messrs. Thomas & Sullivan
March 8, 2021
Page 7 of 28

Table 3: The Fund's royalties paid and payable to participants[4]

| Year ended March 31 | Distributions payable at year-end | Distributions paid during the year |
|---|---|---|
| 2013 | $ 13,718,039 | $ 10,188,961 |
| 2014 | 17,624,115 | 13,010,637 |
| 2015 | 17,797,626 | 18,288,789 |
| 2016 | 25,074,898 | 28,248,731 |
| 2017 | 36,586,662 | 52,001,911 |
| 2018 | 52,654,323 | 55,847,132 |
| 2019 | 61,785,117 | 52,345,932 |
| Total | | $229,932,093 |

In the preceding table, the amounts shown as distributions paid are different than what the Fund reported in response to Plaintiff's Interrogatory No. 5. The response to Plaintiff's Interrogatory No. 5 reports all amounts allocated to participants, including both amounts actually paid to Fund participants and those allocated for payment but not yet paid. Amounts allocated may be awaiting payment because:

1. Complete payee information may not yet have been obtained that would allow a payment to be processed; and/or

2. The Fund holds amounts allocated to participants in accordance with the Fund's stated (publicly reported) policies, so the timing of payment allocations and actual payments are different.

When the Fund lacks sufficient information for make a payment to a participant, the Fund calls such amounts and participants "unclaimed". The following table shows the number of unclaimed participants. In the following table, 2014 was the first year with reliable information, and 2019/2020 amounts are not yet available (because research efforts are continuing).

Table 4: "Unclaimed" participants[5]

| Year | "Unclaimed" participants |
|---|---|
| 2011 | 8,932 |
| 2012 | 8,582 |
| 2013 | 8,268 |
| 2014 | 8,471 |
| 2015 | 10,324 |
| 2016 | 17,297 |
| 2017 | 15,901 |
| 2018 | 15,065 |

Without the Unions' data, the number of unclaimed participants and the amount of unclaimed royalties would be much higher.

---

[4] All amounts in the table are from the relevant year's audited financial statements, which the Fund makes available publicly on its website at https://www.afmsagaftrafund.org/Our-Annual-Report.php.
[5] For 2014 through 2018, January 20, 2011 deposition of Stefanie Taub, page 211 – 212. All amounts appear on DEFS_00041813 (notes to Stefanie Taub's January 20, 2021 deposition).

Messrs. Thomas & Sullivan
March 8, 2021
Page 8 of 28

### D.  The Union's involvement in sound recordings

The Union's data covers a substantial number of performers.  The Unions collect and maintain session reports on recordings for which the record label is a signatory to that Union's collective bargaining agreement, including  both Union and non-Union performers who performed at such recording sessions.  The major record labels are all signatories to the Unions´ collective bargaining agreement and report record information regarding both Union and non-Union performers who performed at such recording sessions.  The following chart shows the three largest record labels (Sony Music Entertainment, Warner Music Group and Universal Music Group) who together have **around a two-thirds market share**.[6]  Because some of the other labels (the remaining approximate one-third market share) also are signatories to the Unions' collective bargaining agreement, it is clear that the Unions´ data is more complete than any other source.



---

[6] https://www.statista.com/statistics/317632/market-share-record-companies-label-ownership-usa/

Messrs. Thomas & Sullivan
March 8, 2021
Page 9 of 28

The Fund's data presented below is generally consistent with the approximate two-thirds amount that can be obtained from simply observing the importance of the three largest music companies.  The following tables summarize the count of Fund participants, sorted by Union vs. non-Union membership who have been the subject of royalty distributions in each of the years listed.  The non-Union members have a greater percentage of "uncashed" checks.  In this context, "uncashed" means that an amount is known to be payable to the participant, but no check is prepared because the Fund lacks a valid address and/or taxpayer identification number.

Table 5: Counts of union vs. non-union participants[7]

| Year | Union Member Cashed | Union Member Uncashed | Union Member Total | Non-Member Cashed | Non-Member Uncashed | Non-Member Total |
|---|---|---|---|---|---|---|
| 2013 | 6,673 | 495 | 7,168 | 649 | 19 | 668 |
| 2014 | 9,952 | 9,933 | 19,885 | 1,872 | 32,418 | 34,290 |
| 2015 | 7,807 | 2,360 | 10,167 | 1,037 | 4,326 | 5,363 |
| 2016 | 12,114 | 4,321 | 16,435 | 3,930 | 7,862 | 11,792 |
| 2017 | 12,105 | 4,414 | 16,519 | 4,130 | 6,865 | 10,995 |
| 2018 | 16,114 | 6,640 | 22,754 | 4,002 | 10,860 | 14,862 |
| 2019 | 17,868 | 9,318 | 27,186 | 5,347 | 14,703 | 20,050 |
| 2020 | 16,244 | 10,434 | 26,678 | 7,436 | 13,603 | 21,039 |
| Totals[8] | 98,877 | 47,915 | 146,792 | 28,403 | 90,656 | 119,059 |
| % cashed vs. uncashed | 67% | 33% | 100% | 24% | 76% | 100% |
| % of total | | | **55%** | | | 45% |

The following table summarizes count information regarding participant royalty allocations that comes from a data base maintained by the Fund. This information shows how frequently the royalty allocations to Fund participants are supported by information found in Union session reports (aka B-forms in AFM's parlance).[9]  The data in following table is based on allocations made in distribution cycles for the years listed, based on individual tracks.

[7] DEFS_00041812 (notes from Stefanie Taub's January 20, 2021 deposition)
[8] The counts shown in the "Totals" row do not refer to the total number of individual participants that have received any royalties during the years listed because the same performer may have been allocated royalties in multiple distribution cycles in the years listed, and would therefore be counted multiple times in the "Totals" row.
[9] The Unions provided digital copies of session reports upon request by the Fund and/or access to computerized data that summarize the physical session reports.  In the Fund's efforts (and throughout this report), no distinction is made (because it is immaterial) whether the Unions provide the session report information though a piece of paper, or through access of computerized information.

Messrs. Thomas & Sullivan
March 8, 2021
Page 10 of 28

Table 6: Participants' royalty allocations supported and not supported by Union data[10]

| Distribution year | Royalty allocations ($) | | | Count of participant allocations[11] | | |
|---|---|---|---|---|---|---|
| | Supported by Union Data | Not Supported by Union Data | Total | Supported by Union Data | Not Supported by Union Data | Total |
| 2015 | 7,061,560 | 6,532,870 | 13,594,431 | 65,631 | 54,818 | 120,449 |
| 2016 | 11,315,957 | 10,501,107 | 21,817,063 | 163,652 | 34,628 | 198,280 |
| 2017 | 28,232,735 | 23,882,669 | 52,115,404 | 255,345 | 62,440 | 317,785 |
| 2018 | 22,600,518 | 30,342,433 | 52,942,951 | 356,705 | 99,478 | 456,183 |
| 2019 | 20,137,367 | 23,236,395 | 43,373,762 | 715,678 | 101,244 | 816,922 |
| 2020 | 27,827,087 | 21,864,239 | 49,691,326 | 473,320 | 168,119 | 641,439 |
| Total | 117,175,224 | 116,359,713 | 233,534,937 | 2,030,331 | 520,727 | 2,551,058 |
| % | **50%** | 50% | 100% | **80%** | 20% | 100% |

As shown in the preceding table, approximately 50% of royalty amounts allocated during this period were allocated with the support of data provided by the Unions. Viewing this data from another angle, approximately 80% of all allocations to participants during this period were implemented with the support of Union data.

In the preceding table, the count of participant royalty allocations shown is considerably higher than the percentages of Union members shown in Table 5. This occurs at least in part because the session reports include performers who are not union members but who performed on a recording at a signatory company to the Union agreements. See Section IV.B for additional information.

**E. The Fund's analysis of the information provided by the Unions, and the alternative information sources**

The Unions' data includes both who is involved with the performance, and the performers' other identifying information. The Unions provide the following information when available:

1. Who performed on each individual track; and

2. Each performer's personal identifying information, consisting of:

    a. Name,
    b. Last known address: and
    c. Social Security information, which assists in confirming the performer in subsequent communications.

---

[10] Data base summary from the Funds AS400 system, produced as DEFS_00042028
[11] The participant allocation columns do not track the count of individual participants to whom royalties were allocated in each year, because a single participant may be allocated royalties on multiple song titles within a given year, and therefore would count multiple times within the participant allocations count listed for that year. Likewise, a participant may be allocated royalties in connection with the same song title in multiple years, and each such allocation would be counted in the "Total" participant allocation rows.

Messrs. Thomas & Sullivan
March 8, 2021
Page 11 of 28

Absent having all such information, the Fund is unable to make a proper, fully accurate, assumption-free allocation of royalties.  When information is incomplete, the result is that some participant(s) are underpaid and other participant(s) are overpaid.

In order to quantify the extent to which this would occur without the Unions' information, in January 2021 in connection with the formulation of this report, the Fund selected 50 titles that had session reports from the Unions.  The purpose of the exercise was to ascertain what outcome would result if the Fund did not have the Unions' data available.  The Fund's personnel attempted to locate the same information independently (i.e., without using the Unions' information).

The Fund selected 50 titles in a manner that the Fund described as random.[12]  All 50 selections had session reports from the Unions.  With this sample, the Fund's personnel spent 930 minutes[13] (15.5 hours) time researching the information from non-Union sources.

The results of this test are summarized as follows:

1. Of critical importance, **there was no title in which the additional research using Internet resources provided a more accurate answer**.  In all cases, had the Unions' data not been available, the researched answer would have been inferior/wrong.   Details in this regard include:

   a. The Unions' session reports provide information by track, which is the greatest level of detail and supports the most accurate allocation of royalties.  Absent having information by track, publicly-available information could be available for the entire album and/or might provide detail that omits certain performers.  For the sample that the Fund selected, research details and sources are provided.[14]

   b. When public data is available, the additional names obtained for an entire album is generally not preferable because this causes a poor assumption that everyone credited to the entire album performed on each track.  In this situation, the larger number of participants attributed to each song introduces inaccuracy, leading some artists to receive more than appropriate, with such overpayments reducing payments owed to other participants.

2. **Without the Unions' data, none of the participants had a readily-available address and Social Security information** that would allow the Fund to make a payment to the participant.

3. Using publicly available, non-Union sources of information, the Fund's researchers were able to locate the same credits information (i.e., who performed) for 20[15] out of the fifty tracks in the sample (i.e., 40%).

---

[12] The Fund's selection process started with a list of 5,992 titles that (i) had distributions in 2020 and (ii) had Union session reports.  Starting approximately halfway through this list, the largest fifty of the next one hundred sequential titles were selected.
[13] DEFS_00042026, tab "50 Titles-M-V-B Splits -2.19.21", column V
[14] DEFS_00042026, tab "50 Titles-M-V-B Splits -2.19.21", column W and X provides details of what was locatable with independent research.
[15] Sum of the "Yes" responses in Column E of DEFS_00042026, tab "50 Titles-M-V-B Splits -2.19.21". Columns F, W and X provides explanatory detail.

Messrs. Thomas & Sullivan
March 8, 2021
Page 12 of 28

In Section IV.B below, Fulcrum calculates a misallocation rate based on the details of the Fund's sample.  The following table summarizes participant attributes of the 50 sample that served as the starting point for Fulcrum's calculation:

Table 7: Summary results from the Fund's comparison of research efforts with the support of Union data vs. Non-Union data only

| Attribute | Musicians | Vocalists | Both Musician & Vocalist | Total |
|---|---|---|---|---|
| Number of non-featured artists using Unions' data[16] | 584[17] | 78[18] | 7[19] | 669[20] |
| Number of non-featured artists using non-union data and album credits | 465[21] | 113[22] | 13[23] | 591[24] |
| $ Amount distributed on the 50 selected recordings from the inception of the Fund to the participants using Unions' data[25] | $1,678,056[26] | $1,942,771[27] | $51,511[28] | $3,672,338[29] |

## F.  The Fund´s costs of maintaining the participant data base

As noted above, the Fund's actual costs are less than they would otherwise be because the Fund has the benefit of the Unions´ data.  The information in this section provides statistics regarding the large number of transactions that the Fund is processing with the benefit of having the Unions´ data.

In her deposition on January 20, 2021 as the Fund's designee witness, Stefanie Taub presented her estimates of the amount spent by Fund personnel on research and data base maintenance for the Fund's participants.[30]  Ms. Taub estimated that the Fund spends approximately $3,415,000 annually

---

[16] This information (DEFS_00042026, tab "50 Titles-M-V-B Splits -2.19.21", columns G through O) is https://www.youtube.com/watch?v=ASO_zypdnsQmaintained in the Fund's ASA 400 computer system.
[17] Digitally referenced as the sum of column D in Exhibit 2
[18] Digitally referenced as the sum of column F in Exhibit 2
[19] Digitally referenced as the sum of column H in Exhibit 2
[20] Digitally referenced as cell Z in Exhibit 2
[21] Digitally referenced as the sum of column J in Exhibit 2
[22] Digitally referenced as the sum of column L in Exhibit 2
[23] Digitally referenced as the sum of column N in Exhibit 2
[24] Digitally referenced as cell AA in Exhibit 2
[25] This information (DEFS_00042026, tab "50 Titles-M-V-B Splits -2.19.21", columns G through O) is maintained in the Fund's ASA 400 computer system.
[26] Digitally referenced as the sum of column A in Exhibit 2
[27] Digitally referenced as the sum of column B in Exhibit 2
[28] Digitally referenced as the sum of column C in Exhibit 2
[29] Digitally referenced as cell Y in Exhibit 2
[30] January 20, 2011 deposition of Stefanie Taub - (30(b)(6) topic 15) - pages 199 - 204

Messrs. Thomas & Sullivan
March 8, 2021
Page 13 of 28

on this function.[31]  This cost number does not include the required indirect costs for this function, so management and other administration costs are not part of this total that Ms. Taub presented.

Comparing this $3,415,000 of direct costs to what is paid to the Unions under the 2013 Agreement, the Fund's direct internal costs are roughly twice what the Unions are paid.  Yet, as noted in the prior Section III.E, the Unions are the first, and the most reliably accurate source used for track title credit and participant data.[32]

The following table shows the number of new titles created and researched by year:

Table 8: New titles created in the Fund's database[33]

| Year | Count of Titles |
|---|---|
| 2013 | 3,255 |
| 2014 | 2,149 |
| 2015 | 4,867 |
| 2016 | 7,243 |
| 2017 | 8,971 |
| 2018 | 7,730 |
| 2019 | 8,656 |
| 2020, as of 11/10/2020 | 8,034 |
| Total | 50,905 |

## IV.   SUMMARY OF CONCLUSIONS

The combined 3% fee paid to the Unions for the use of the Unions' information and related assistance is reasonable.  Absent access to this information, the Fund would not be able to make payments that are as accurate as is now occurring and would not be able to make accurate payments to as many participants as are now receiving royalties from the Fund.  In support of this:

1.  There are numerous businesses that charge significant sums for the use of information, which provides a precedent for the amounts being paid to the Unions.  See Section A below.

2.  If the 2013 Agreement (and related payments to the Unions) did not exist, the Fund would not be able to make payments to participants that are as accurate and complete as what is now occurring.  Except for the participants contacting the Fund to provide address and tax reporting information, the Fund has no alternative source for address and tax reporting information.  See Section B below.

3.  Multiple economic factors relating to the attributes and use of the Unions' data support the reasonableness of the 3% fee.  See Section C below.

---

[31] January 20, 2011 deposition of Stefanie Taub - (30(b)(6) topic 15) – page 204; DEFS_00041814
[32] Participants can call the Fund to provide information.  The Fund's current practice is to have the performer complete and return a "Performer Information Form" (aka PIF) to verify that person's information prior to sending payment.  Nevertheless, the Social Security information and address obtained from the Unions provides the Fund initial contact information for the performer and an identifier (Social Security information) to help identify the individual.
[33] DEFS_00042020

Messrs. Thomas & Sullivan
March 8, 2021
Page 14 of 28

4. Plaintiff's assertions regarding (i) the incremental cost of providing the Union's information, and (ii) how the timing of payments should be evaluated are based on descriptions of the payments that are inconsistent with the 2013 Agreement, and the nature of royalties generally.  See Section D below.

**A.  Numerous businesses are based on the accepted axiom that information is valuable and can be sold in market-based transactions.**

Plaintiff's complaint is based on the incorrect premise that the Unions must give away (for free) information that the Unions have accumulated over decades.  Because of this, Plaintiff contends that the Unions might be reimbursed for only the incremental costs of work initiated in response to the Fund's needs.  Under this incorrect notion, the Unions should not be compensated for either their past efforts, or for a proportionate current cost of the Unions' operations that are required for the incremental efforts to be incurred.

Numerous compensation arrangements are based on a percentage of an underlying transaction value.  For example, (i) commission sales arrangements, (ii) the majority of royalties, (iii) investment fees for money managers, and (iv) numerous representation agreements (e.g., contingency lawyers and talent agents) are all based on a percentage of the related transactions.  In none of these arrangements is the cost (and particularly the incremental cost) of providing the service typically part of the compensation formula.

Numerous businesses exist because the economics of information is different than what Plaintiff imagines.  Information has value, and those with valuable information are able to charge for its use.  The incremental cost of providing access to information is never a valid or intelligent basis for determining a price.  A sample of businesses that are based on selling information include:[34]

1. The mailing list industry has been around for decades, initially using physical addresses, and more recently using email addresses.  The mailing list industry obtains revenues for the use of information (specifically contact information) which has already been compiled.  The incremental cost of distributing the list to each buyer has never been the basis for valuing the lists.

2. In terms of its revenues, Google and Facebook are information and marketing companies whose profits are largely attributed to the sale and use of their users' information.  Anyone using Google or Facebook realizes that advertisements appear based on a user's past browsing/input history.  Google and Facebook obtain a premium for advertising because they capture this information and match advertisers with potential customers.  Despite the fact that many of its services are free, Google (NASD: GOOGL) and Facebook (NASD: FB) are highly profitable and valuable, with market capitalizations of $1.4 trillion, and $760 billion, respectively.  Obviously, Google and Facebook do not sell their information for the almost non-existent incremental cost of running software and algorithms.

3. Fair Isaac Corporation (aka, FICO - NYSE: FICO) sells the use of its industry-standard credit scoring algorithm.  At the time of this writing FICO has a market capitalization of approximately $14 billion.  FICO describes its business and revenues and customers as follows:

---

[34] The market capitalization values presented in this section are as of February 6, 2021.

Messrs. Thomas & Sullivan
March 8, 2021
Page 15 of 28

> *"Our FICO® Scores are used in the majority of U.S. credit decisions, by nearly all of the major banks, credit card organizations, mortgage lenders and auto loan originators. These credit scores, developed based on third-party data, provide a consistent and objective measure of an individual's credit risk. Credit grantors use our FICO® Scores in a variety of ways: to prescreen candidates for marketing programs; to evaluate applicants for new credit; and to manage existing customer accounts. FICO® Score is a three-digit score ranging from 300-850. They are calculated by running data from the three U.S. national credit reporting agencies, Experian, TransUnion and Equifax, through one of several proprietary scoring models developed by FICO. Lenders generally pay the credit reporting agencies scoring fees based on usage, and the credit reporting agencies pay an associated fee to us. …[35]*

> *Our products and services serve clients in multiple industries, including primarily banking, insurance, retail, healthcare and public agencies. End users of our products include 96 of the 100 largest financial institutions in the U.S., and two-thirds of the largest 100 banks in the world. Our clients also include more than 600 insurers, including nine of the top ten U.S. property and casualty insurers; more than 300 retailers and general merchandisers; more than 200 government or public agencies; and more than 200 healthcare and pharmaceuticals companies, including nine of the world's top ten pharmaceuticals companies. Eight of the top ten companies on the 2020 Fortune 500 list use one or more of our solutions. In addition, our consumer services are marketed to an estimated 200 million U.S. consumers whose credit relationships are reported to the three major U.S. credit reporting agencies."[36]*

Generally, FICO does not store or have the underlying data that its algorithms use.  FICO incurs no incremental cost or effort each time its credit scoring algorithm is used, but FICO's customers willingly pay significantly for the information and insight that FICO provides.  In the fiscal year ending September 30 2020, FICO had $1.3 billion of revenues.

4.  Nielsen Holdings (NYSE: NLSN) sells information that it collects regarding consumer behavior.  At the time of this writing NLSN has a market capitalization of approximately $8.1 billion.  The price Neilson's customers pay for its ratings has little to do with the cost of running a report, but is instead based on the value of the information.  Neilson describes itself as follows:

> *"We are a leading global measurement and data analytics company. We provide clients with a comprehensive understanding of what consumers watch and what they buy and how those choices intersect.  We deliver critical media and marketing information, analytics and manufacturer and retailer expertise about what and where consumers buy and what consumers read, watch and listen to (consumer interaction across the television, radio, print, online, digital, mobile viewing and listening platforms) on a local and global basis. Our measurement and analytical services help our clients maintain and strengthen their market positions and identify opportunities for profitable growth. …"[37]*

5.  TransUnion (NYSE: TRU) and Equifax (NYSE: EFX) have market capitalizations as of this writing of $17.7 billion and $22.0 billion, respectively (Experion is privately held, so does not

---

[35] FICO Form 10K as of September 30, 2020, page 7
[36] FICO Form 10K as of September 30, 2020, page 10
[37] NLSN Form 10K as of December 31, 2019, page 3

Messrs. Thomas & Sullivan
March 8, 2021
Page 16 of 28

have a publicly-traded value). All of these personal credit rating agencies sell information that they have accumulated over time. Even though the three companies provide services that are highly competitive, the information these companies have is extremely valuable. The incremental cost of these companies running a computer report on already-existing data is virtually nil, but no competent business person or appraiser would thereby suggest that this means the information provided by these companies is worthless.

6. RELX PLC (fka Reed Elsevier) has a market capitalization as of this writing of $47.0 billion, with 2019 revenue of approximately $9.7 billion. RELX provides information, analytics and decision tools for professional and business customers. It operations/units include (i) Scientific, Technical & Medical, (ii) Risk & Business Analytics, and (iii) Legal. The Legal unit consists primarily of market-leader LexisNexis, which is a staple of legal research in the United States.

7. In the United States, there are four real estate title companies serving the entire country (plus additional local competitors). These four companies are described below. In this entire industry, the companies use data bases in which they have made substantial past investments (called title plants). The revenues charged by these companies have almost nothing to do with running another computer report using this title plant, and no one knowledgeable in this industry would suggest otherwise. Information regarding the four largest companies in this industry in the U.S. follow:

   a. Fidelity National Financial (NYSE: FNF) has an $11.5 billion market capitalization. FNF's description of its business includes:

   > "Most real estate transactions consummated in the U.S. require the use of title insurance by a lending institution before the transaction can be completed. Generally, revenues from title insurance policies are directly correlated with the value of the property underlying the title policy.[38] …

   > A title insurance company's predominant expense relates to such searches and examinations, the preparation of preliminary title reports, policies or commitments, the maintenance of "title plants," which are indexed compilations of public records, maps and other relevant historical documents, and the facilitation and closing of real estate transactions. Claim losses generally result from errors made in the title search and examination process…"[39]

   b. First American Financial (NYSE: FAF) has a $6.1 billion market capitalization. FAF describes it business and underlying data bases as follows:

   > "The Company, through its subsidiaries, is engaged in the business of providing financial services through its title insurance and services segment and its specialty insurance segment. The title insurance and services segment provides title insurance, closing and/or escrow services and similar or related services domestically and internationally in connection with residential and commercial real estate transactions. It also provides products, services and solutions that are designed to mitigate risk in, or otherwise facilitate real estate transactions. Many of

---

[38] FNF Form 10K as of December 31, 2019, page 4
[39] FNF Form 10K as of December 31, 2019, page 5

Messrs. Thomas & Sullivan
March 8, 2021
Page 17 of 28

*these products, services and solutions involve the use of real property-related data, including data derived from its proprietary databases.  It maintains, manages and provides access to title plant data and records …"[40]*

*Title insurance policies insure the interests of owners or lenders against defects in the title to real property.  These defects include adverse ownership claims, liens, encumbrances or other matters affecting title.  Title insurance policies generally are issued on the basis of a preliminary title report or commitment, which is typically prepared after a search of one or more of public records, maps, documents and prior title policies to ascertain the existence of easements, restrictions, rights of way, conditions, encumbrances or other matters affecting the title to, or use of, real property. … To facilitate the preparation of preliminary title reports and commitments, copies and/or abstracts of public records, maps, documents and prior title policies may be compiled and indexed to specific properties in an area.  This compilation is known as a "title plant."[41]*

   c.  Stewart Information Services (NYSE: STC) has a $1.3 billion market capitalization.  Stewart's description of itself and its competitors[42] is generally consistent with the first two title companies described above, and is not provided here in the interest of brevity.

   d.  Old Republic International (NYSE: ORI) has a $5.8 billion market capitalization.  ORI is a more diversified insurance company with a separate division offering title products.  Currently, ORI's title business comprises a bit more than a third of ORI.  Again, ORI's description of itself and its competitors[43] is generally consistent with the first two title companies described above, and is not provided here in the interest of brevity.

**B.  If the Fund did not have access to the information made available by the 2013 Agreement, the Fund would not be able to make accurate payments to the participants, both Union members and non-Union members.**

As summarized in Section III.E above, the Fund has no good (complete) alternative to the data provided by the Unions.  To the extent the Fund now has its own database with participant information, the information exists in large part from data provided by the Unions.  For over half of the titles in the 50 title sample prepared by the Fund, material misallocations of royalties occurred when the Unions' data was not available.  The misallocations include having too few participants identified, to have too many participants credited because of assumptions made for all tracks based on album-wide  information.  Examples of each follow:

   1.  For an example of fewer participants being paid than actually performed on the relevant song title, consider the example of the song "My Heart Will Go On" by Celine Dion.  Without Union session report information, the Fund's researchers were able to identify a total of seven performers credited on this title, whereas the session report revealed a total of 65 performers.  In this instance, the total royalties distributed on this title would have been incorrectly divided among seven performers, resulting in improperly large payments to each

---

[40] FAF Form 10K as of December 31, 2019, page 5
[41] FAF Form 10K as of December 31, 2019, page 6
[42] STC Form 10K as of December 31, 2019
[43] ORI Form 10K as of December 31, 2019

Messrs. Thomas & Sullivan
March 8, 2021
Page 18 of 28

of these seven performers, and the omission of payments to 58 otherwise unidentified performers.  If the Fund had incorrectly distributed these larger royalty payments to just seven performers, this would have resulted in a total of $27,116.24 in misallocated royalties, which represents 45% of the total royalties allocated on this title.

2.  For an example of too many participants being paid than actually performed on the relevant song title, consider the example of the song "Get Me Some of That" by Rhett Thomas. Without Union session report information, the Fund's researchers would need to rely on album-wide credits to identify the performers on this song title, which would result in a total of 46 performers being credited as having performed on this song title.  However, the session report for this song title shows that in fact only 12 of these performers were on this track. This means that, absent Union session report information, a total of 34 performers would have been incorrectly paid for a track on which they did not perform, whereas the 12 performers that were actually on the track would receive significantly smaller royalty payments than they should have properly been allocated had the Fund had the benefit of Union session report information.  In this instance, the lack of session report information would have resulted in a total of $108,053.81 in misallocated royalties, which represents 83% of the total royalties allocated on this title during the relevant time period.

The following table summarizes the misallocations from not having the Unions' information:

Table 9: Allocation error rate in the Fund's sample of 50 titles

|  | Participant count | Participant distributions |
|---|---|---|
| Total existing allocations using Union data (from Table 7) | 669[44] | $ 3,672,338[45] |
| Allocation errors from not using the Unions' data | 404[46] | $ 1,099,100[47] |
| % error | 60%[48] | 30%[49] |

As shown in Section III.D, data provided by the Unions cover from around 50 to 80 percent[50] of the Fund's activities (see bolded percentages), depending upon how one wishes to make such measurement, or whether one wants to rely on the Fund's database at all on this specific point. Applying this range of percentages to the error rate shown in Table 9, the Union's data improves the overall accuracy of the Fund's work in the range of approximately 15% to 50%.   All such amounts are obviously higher than the 3% paid to the Unions.

If one wants to instead look at the misallocations in terms of dollars, the percentages in the preceding paragraph (i.e., 15% to 50%) can be applied to the distributions made, which are reported in Table 3 above.  15% to 50% of roughly $230 million (through the end of 2019) equals from $34.5 million to $115 million.  These amounts will continue to increase as the Fund makes distributions after 2019.

---

[44] Digitally referenced as cell Z in Exhibit 2
[45] Digitally referenced as the sum of column and cell Y in Exhibit 2
[46] Digitally referenced as the sum of column W in Exhibit 2
[47] Digitally referenced as the sum of column X in Exhibit 2
[48] Digitally referenced as cell AB in Exhibit 2
[49] Digitally referenced as cell AC in Exhibit 2
[50] See Table 6

Messrs. Thomas & Sullivan
March 8, 2021
Page 19 of 28

The information held by the Unions is valuable because the session reports have the following attributes:

1. Accuracy & Reliability – Information that is not accurate is obviously worth less.  Historical information is generally more reliable if it was recorded contemporaneously.  In this situation, the session reports are original business records that were contemporaneously recorded, and are required to support payroll.  As a class of accounting record, payroll records tend to be accurate because, in addition to whatever controls exist by the payor of the payroll, the payroll recipient is motivated to be paid correctly.[51]

2. Availability - Information loses value as the information becomes more widespread or commonly known.  Stated otherwise, as more people have the information, the information loses its value.  For example, information that is obtained easily on the internet is not as valuable as information known to only a small group.  In this situation, the Union-maintained information is generally not otherwise available.

3. Relevant - Anything that is not relevant will hold small or immaterial value to the target audience.  This means that information is more valuable to different group(s) based on each group's activities and interests.  This is important in understanding past transactions, or the lack thereof.  Information will have value to a group to whom it is relevant (such as the Fund), even though the information has not previously been sold.

4. Completeness – For large data collections, a complete collection will be more valuable than incomplete sets.  If the same type of data can be obtained from multiple sources, the more complete data collection will be more valuable.  In this situation, the Unions' information is more complete than any alternatives, and covers the vast majority of distributions that the Fund is required to make.

5. Ease of use – Data that the buyer finds easy to use will be more valuable; stated otherwise, the cost of using the data is an offset to the value that the data would otherwise have.  Applied to this situation, data that (ii) is contained in an electronic data base or (ii) is based on a standard form containing the needed data (as the majority of the Unions' data is), is faster and easier to use.

For these reasons, the Unions are asked for session reports for nearly every title.[52]  The Unions are able to respond a high percentage of the time in certain locations, and in certain music genres.  This was explained by Julie Sandell as follows:[53]

> Q.  *So just going back to my question, though, whatever the number is of new research that the Fund is doing, that doesn't mean that the unions are providing information for that same number of titles, right?*
> A.  *Right. It depends on the genre. I would say in Nashville, probably 95 percent. Broadway, big band, movie soundtracks, underscore, huge. It's critical.*

---

[51] This comment does not require that the session reports to be infallible.  Mistakes occur in all types of business records.  This factor addresses the accuracy of the subject information when compared to the alternatives.
[52] December 9, 2020 deposition of Julie Sandell , pages 47 - 48
[53] December 9, 2020 deposition of Julie Sandell , pages 67 - 68

Messrs. Thomas & Sullivan
March 8, 2021
Page 20 of 28

> Q.  And in your opinion is Nashville 95 percent because they've undertaken the effort to
> digitize their records?
> A.  No, because the music that's produced there is produced by the session musicians and
> background vocalists that are union members.
>
> Q.  Why is that specific to Nashville? Maybe I'm just not understanding.
> A.  It's just the way their music production historically has been. The way their music has
> been created there. And LA too."

See Section III.E above.  When the Unions do not have session reports, the Fund is left to obtain the
necessary information itself.  For recently-produced digital music, there are fewer artists to discover.
Additionally, the names of participants for newer music could be available on Pandora[54] or Discogs[55]
(but not such participants' addresses and tax identification numbers).[56]

When the music is not recently produced and/or is not easily researched using public sources, the
Unions' session reports are a critical means of obtaining information on artists to whom royalties have
been allocated by the Fund.  The Session reports also provide contact information and taxpayer
identification information.  All of this data is required before an artist can be paid.  As an example,
Ms. Gorbacsov testified:[57]

> "Q.  Does anyone besides SAG-AFTRA have access to these session reports?
> A. No.
>
> Q.  It's not possible for the Fund to contact any particular individual or entity other than
> SAG-AFTRA to maintain these reports?
> A.  No, there's no one else who would be able to provide these reports and we don't provide
> these reports to anyone else."

If the Unions did not provide session reports, the Fund would not be able to identify performers in
many circumstances, or would mis-identify performers, always to some musicians' detriment.  Julie
Sandell summarized the efforts and challenges involved when the Unions do not provide session
reports, and the Fund is forced to address its requirements on its own, as follows:

> "Q. Okay. If the union wasn't able to provide a session report for a given album or track
> back in 2009, what would you do next?
>
> A.  You have to make a choice of using the credits that you found on the Internet. Sometimes I
> would get books from the library, or my own library, my own albums trying to track down the
> liner notes from the album. But that still didn't help because there's a lot of cases where the
> session musicians were not listed on the liner notes.  So we had another option where we

---

[54] https://www.pandora.com/ - Pandora is an American subscription-based music streaming service owned
by Sirius XM Holdings.
[55] https://www.discogs.com/ - Discogs is a crowdsourced databased about audio recordings, including off-
label releases.
[56] December 9, 2020 deposition of Julie Sandell , pages 126 - 127
[57] December 9, 2020 deposition of Julie Sandell , pages 39, 41-42ctober 23, 2020 deposition of Kristina
Gorbacsov , page 128

Messrs. Thomas & Sullivan
March 8, 2021
Page 21 of 28

> *could put no credits found and hope that musicians would make a claim and provide the*
> *session reports; maybe they kept a copy.*
>
> *… The problem with that is, just like in the old days, they're more concerned with the*
> *featured artist, the songwriters, the producers, the engineers, all the Grammy-nominated*
> *credits. The session musicians tend to be an afterthought.  And that is the beauty of the old*
> *union-style session reports is that it was a document, a historical document that could be*
> *used.  And now if a song is created and nobody is in charge of compiling the credits, then*
> *they can get lost.  Someone might not have been at the first session where the guitar player*
> *played, and then when they remix it, they overdub somebody else, and then it goes to the*
> *record label and nobody knows that they were there."* [58]

and

> *"[T]he titles would be incomplete and a lot of musicians would not receive their royalties…*
>
> *Artists that have good liner notes and track breakdowns might be able to -- we might be able*
> *to find.  But what happens if we don't find a track breakdown. So we can use album credits,*
> *right? So I wonder if you have an album and one song has an orchestra or a choir or a big*
> *horn section, but if we can't find a track breakdown, we're going to add all of those musicians*
> *to every track.  So let's say there's one track where it's just a guitar player and a keyboard*
> *player, their shares will now be diluted by all those extra players. And they're not -- they're*
> *not winning.*
>
> *Or we put nobody in, and because we can't decide and we don't want to pay a whole choir*
> *for a track, so now we put nobody in and so those guitar players are now getting zero. So*
> *they're either getting their shares diluted or they're getting zero."* [59]

## C.  The attributes and use of the Unions' data cause the 3% fee to be reasonable.

The landmark case, Georgia-Pacific Corp. v. United States Plywood Corp., 318 F. Supp 1116, 6 USPQ
235 (SD NY 1970) provides a 15-factor test that lists relevant economic factors when determining a
reasonable royalty.  Although the Georgia-Pacific case is more commonly applied to patents (as this
was the case's initial application), the Georgia-Pacific rationale is used by analysts to address
reasonable royalties with other forms of intellectual property.  Although not required in the instant
litigation, the decision does provide a useful list of helpful considerations when determining a
reasonable royalty rate.  Therefore, I consider the fifteen Georgia Pacific factors below, after
modifying them for the non-patent situation at issue here.  The fifteen (paraphrased) factors, and
their application to this matter, are as follows:

1.  *The royalties received by the licensor for licensing the [intellectual property], proving or tending*
    *to prove an established royalty.*

Georgia-Pacific factor #1 involves consideration of the existence of an established royalty for the
intellectual property at issue.  Other than under the 2013 Agreement, the Unions have not sold or

---

[58] December 9, 2020 deposition of Julie Sandell , pages 39, 41 - 42
[59] December 9, 2020 deposition of Julie Sandell , pages 125 and 127

Messrs. Thomas & Sullivan
March 8, 2021
Page 22 of 28

licensed the information being provided to the Fund.[60]  The Fund has not been able to identify any alternative sources of information for the number of tracks that the Union data covers.

Although not pertaining to the Union's past activities, Section A above provides substantial authority for the premise that information is quite valuable in market transactions.

2.  _The rates paid by the licensee for the use of other similar [intellectual property]._

The Fund has no similar licenses or agreements.  There is no alternative source of the Unions´ information.

3.  _The nature and scope of the license, such as whether it is exclusive or nonexclusive, restricted or non-restricted in terms of territory or customers._

An exclusive license is more valuable (expensive) than a non-exclusive license.  Although the Unions are not prohibited from licensing the same information to others, there are no other licensees that currently have access to the Unions' information (other than the Unions' affiliated organizations, such as health and pension plans, that are provided information under the Unions' respective collective bargaining agreements).

4.  _The licensor's policy of maintaining its [intellectual property] monopoly by licensing the use of the [intellectual property] only under special conditions designed to preserve the monopoly._

The Unions have not sold or used the information at issue with others (except as already noted for affiliate transactions for benefits), and I understand they would not do so outside of the 2013 Agreement.

5.  _The commercial relationship between the licensor and licensees, such as whether they are competitors in the same territory in the same line of business or whether they are inventor and promoter._

The Unions and the Fund are not competitors and have complementary purposes.  This is the only reason that the 2013 Agreement exists.  Absent this factor (i.e., if the information was being shared with an entity that was competitive to, or otherwise a threat to, the Unions), the royalty rate would need to be considerably higher than the 2013 Agreement's price.

6.  _The effect of selling the [intellectual property] in promoting sales of other licensor's products; the existing value of the invention to the licensor as a generator of sales of other items; and the extent of such derivative or "convoyed" sales._

This factor involves so-called "convoyed" sales.  Examples of convoyed sales are repair or extended warranty contracts, or supplies/consumables that are uniquely fitted to the product at issue.  There are no such additional sales or transactions with the Unions' information.

7.  _The duration of the [intellectual property] and the term of the license._

---

[60] The Unions share some membership data with related pension and health funds pursuant to collective bargaining agreements.

Messrs. Thomas & Sullivan
March 8, 2021
Page 23 of 28

Unlike a patent which is published publicly and provides exclusivity for a discrete time period, the information provided under the 2013 Agreement can remain confidential without expiration.  This makes the information more valuable when compared to protections with a known expiration.

8.  _The established profitability of the [intellectual property], its commercial success and its current popularity._

The information provided by the Unions is used to make payments on royalties that have already been received.  The Fund has an obligation to distribute the payments to the artists, which the Fund could not do without either having the Unions' information or somehow recreating such information itself.  There is no question that the information is needed, because the Fund has already received the royalties, and is assured of receiving future royalties.  The lack of risk-taking makes the Unions' information more valuable than would otherwise be the case.

Deposition testimony in this matter indicates that the Fund trustees and executive director gave consideration in 2013 to comparable fees that were being charged by others.  For example, Duncan Crabtree Ireland testified:[61]

> "[A]s far as I know, pretty much all of those organizations charge a similar or a higher administrative fee than the Fund does. With the possible exception of PPL, their fee might be a little lower because of the volume of payments that they handle. But that was the kind of thing that we were looking at in terms of what's -- you know, what's a reasonable administrative fee to charge in an environment where there's not a subsidy going on by a union, which is -- you know, in none of those -- in none of those organizations would there be a union subsidizing the operations of those CMOs. And so that was a data point, I think, to help us evaluate the overall reasonableness of the cost structure. …
>
> an appropriate data point or metric to consider is because those institutions, ultimately, have to do the same function.  So whether they can acquire the data from someone else who already has it or whether they have to generate that data themselves, either way it's an indication of what the cost and value of that data might be and something to take into account."

Consistent with this, Dennis Dreith testified:

> "The norm of the foreign societies have requirements in their EU law how much we can charge in administrative expenses, and our bilateral agreements had to be matched to theirs for collection of foreign royalties so. I did point out that to have a higher administrative fee would put us above the allowable amount. …[62]
>
> [S]omebody asked me on the board, possibly Duncan, I think, asked me well, what would be a percentage that would keep us at or below the threshold to not trigger a problem with the foreign CMOs. And I had said at that point, I believe 3 percent would keep us at the threshold at or below that point".[63]

---

[61] February 16, 2021 deposition of Duncan Crabtree-Ireland, pages 243 - 244
[62] February 11, 2021 deposition of Dennis Dreith, page 164
[63] February 11, 2021 deposition of Dennis Dreith, page 166

Messrs. Thomas & Sullivan
March 8, 2021
Page 24 of 28

9. _The utility and advantages of the [intellectual property] over any old modes or devices that had_
_been used._

10. _The nature of the [intellectual property], its character in the commercial embodiment owned and_
_produced by the licensor, and the benefits to those who used it_.

Factors 9 and 10 are often considered together, as I do here.

See Sections III and IV.B above.  The Unions' information is critical to the Fund in complying with the
Fund's obligations.  Other than attempting to research the data independently, there is no alternative
to having the Unions' data.  However, the Fund is unable to independently research the full scope of
recordings that the Unions´ data covers, and such independent efforts provide results that are less
accurate than occurs when using the Unions data.

The following considerations described in Section III.D are important in addressing the benefit that
non-union participants receive from having use of the Unions' information:

   a.  The session reports include information on performers who are not union members who play
       at recording sessions that are covered by Union collective bargaining agreements.

   b.  The Unions' information covers between 50% to 80%[64] of the Fund's royalty allocations,
       depending how one wishes to measure this.  For this large portion of the research that needs
       to be done, the Fund's costs are less because the Unions provide their information.  The non-
       Union participants benefit from having this less-expensive information available because the
       overall costs of the Fund are deducted from all distributions.  Stated otherwise, by having
       information regarding Union recording sessions and the Union members, additional resources
       are available to research tracks that did not result from a Union recording session.  When the
       overall cost to the Fund is lessened, all participants benefit, both Union and non-Union.

The Unions provide other services described in the 2013 Agreement that are in addition to providing
the information needed to make distributions to artists.

11. _The extent to which the [licensee] used the invention and any evidence probative of the value of_
_that use_.

See Sections III.E and IV.B above for information regarding the payments made to participants, and
how the data provided by the Unions makes such payment more accurate.  The Fund uses the
Unions' information as a critical and integral part of the Fund's mission.  The Fund has no alternative
to the use of the Unions' information without materially sacrificing the accuracy of the payments that
are made to the participants.  The Unions' data is critical to the Fund's ability to comply with its
mission and purpose.

As shown in Table 9 and the related commentary thereto, the Unions' data provides a substantial
increase in the accuracy of the payments being made.  When expressed as a percentage of the
Fund's overall distributions, the 3% fee paid to the Unions is small relative to the much larger
increase in accuracy.

---

[64] See Table 6

Messrs. Thomas & Sullivan
March 8, 2021
Page 25 of 28

There are a large number of artists receiving payments from the Fund, with some of the individual payments being modest.  The large number of participants increases the Fund's challenge in paying only a cost for each artist that is proportionate to what is owed.  The 3% fee to the Unions for their information used in Fund distributions accomplishes this objective.

12. _The portion of the profit or selling price that is customary in the particular business or in comparable businesses._

I am not aware of any industry standard rates that are applicable in this situation.

13. _The portion of the realizable profit that should be credited to the [intellectual property]as distinguished from any other elements, manufacturing process, business risks or significant features or improvements added by the [licensee]._

The payment of a 3% fee allows the payments to be considerably more complete and accurate than would occur otherwise.  Under the 2013 Agreement, the amounts paid to the Unions are a modest portion of the Fund's administrative costs.[65] As shown in Table 1, the fees paid to the Unions[66] range from 9% to 15% of the Fund's total General and Administrative costs (with an overall average of 12%).  Because the information provided by the Unions is central to the Fund's ability to meet its mission and purpose, and there are no alternatives to find the needed information (particularly for older performances), the 3% fee being paid to the Unions is sensible economically.

14. _The opinion testimony of qualified experts._

I do not have the reports from other experts in this matter, or in other matters involving the parties in this case.

15. _The amount that the licensor and a licensee would have agreed upon at the time the [use] began if they had reasonably and voluntarily tried to reach an agreement._

This Georgia Pacific Factor is a reconciliation and conclusion of the preceding factors to arrive at a reasonable royalty conclusion.  The following facts and circumstances bear most heavily on the correct reasonable royalty rate:

1. The information is critical to the Fund's mission and purpose. The Fund has no economically viable alternative in terms of obtaining the information from a source other than the Unions that would allow the same level of completeness and accuracy that is achieved using the Unions´ data.

2. The 3% fee paid to the Unions is small relative to the much larger increase in accuracy occurring by using the Unions' information.

---

[65] See the supplemental Schedule of Expenses that is part of most of the Fund's audited financial statements available on the Fund's website.  Contrary to the Plaintiff's contentions, the description and amount paid to the Unions consistently appears in these publicly-available audited financial statements.

[66] See the Unions' answers to Interrogatory Nosx 7 and 8 (March 1, 2021).

Messrs. Thomas & Sullivan
March 8, 2021
Page 26 of 28

3. The Fund incurs no risk of losing money, as the percentage amounts paid to the Unions are calculated only based on successful distributions of amounts already received. This "no-risk" situation is unusual in business activities.

4. Some of the potential payment recipients are owed individually modest amounts. This underscores the requirement that the needed information be obtained inexpensively relative to the individual amounts being distributed. A 3% fee accomplishes this objective.

5. The Unions provide other services to the Fund in addition to the information needed to make distributions to non-featured artists.

**D. Amounts paid to the Unions for their information need not occur (and should not be expected to occur) based on when the underlying information was obtained, or the underlying work occurred.**

Plaintiff incorrectly contends that the percentage-based payments made by the Fund to the Unions need to correspond to work performed by the Unions in the same time period as the payment. For example, Plaintiff's response to Interrogatory No. 11 (February 12, 2021) includes:

> "... The membership data is simply copied to the Fund, without regard to whether the Fund actually needs the information. The data is also duplicated from prior years, leaving the Fund to sort through the data dump to pick out the information that it requires for the distribution before verifying it for accuracy. The Fund has been accumulating its own, up to date, verified data since its creation. The data for prior years' tracks and identified performers have already been accumulated. The delta between the information already known by the Fund and new information sought is small, if not non-existent. Unlike music production of days past, the likelihood of a Union session is rare. If the track was not a Union session, the Unions would have no chance of obtaining any relevant information that would assist the Fund."

The preceding quote contains multiple errors and omissions that explain why Plaintiff's contentions are incorrect. For example:

1. In contrast to the Plaintiff's contention, payments for the use of information or other intellectual property are almost never received in the same period in which the underlying work was performed. Plaintiff's proposed timing requirement almost never occurs with such payments, and need not be a requirement for the 2013 Agreement to be economically reasonable.

2. As previously discussed, Plaintiff is incorrect that the Unions have no information regarding non-Union performers, because all labels that are signatories to the Union agreements are required to include all performers in their session reports, including non-Union performers.

3. As previously discussed, the Unions have current members who perform new music, for which the Fund receives and will continue to receive royalties that need to be distributed.

4. Information that the Fund continues to use has ongoing value. Plaintiff admits that the Fund has possession of Union historical information, which the Fund continues to need and use. Plaintiff's position quoted above is based on the position that the Fund should be entitled in perpetuity to make ongoing use of the Unions' data without paying any compensation.

Messrs. Thomas & Sullivan
March 8, 2021
Page 27 of 28

While the parties have sometimes described the fee paid to the Unions as a "Service Fee", this name is a misnomer when applied to the "data" and "information" that repeatedly is identified as being a central aspect of the 2013 Agreement.  The 2013 Agreement's description of the arrangement includes:

> "*WHEREAS, the Agreement and Declaration of Trust authorizes the Trustees of the Fund to purchase relevant data from the Unions (and others) and to employ assistants; and*
>
> *WHEREAS, the Trustees of the Fund have determined that it is reasonable and appropriate at this time to memorialize arrangements for the provision by the Unions to the Fund of certain data and assistance in exchange for reasonable compensation to the Unions from the Fund;*
>
> *NOW, THEREFORE, the Parties, intending to be legally bound, hereby agree as follows:*
>
> *3.  Provision of Data. From and after the Effective Date, each Union shall provide the Fund the following data, in a manner comparable to the way such data has been provided immediately prior to the Effective Date:*
>
> - *Access to member databases to enable the Fund to obtain identifying and contact information for members.*
> - *Access to session reports and "B-forms," or databases containing information derived therefrom, that in either case, identify the recordings made at recording sessions and provide identifying and contact information for performers (Union members and nonmembers) who performed at the session.*
>
> *Each Union retains all its ownership rights in its data, and all such data shall be considered Confidential Information of the relevant Union subject to the provisions of Section 7. The Fund is authorized to, and shall, access, reproduce and use such data solely for purposes of distribution of royalties collected by the Fund to the relevant persons. In its use of such data, the Fund further shall comply with the provisions of any applicable Union privacy policy of which such Union advises the Fund in writing from time to time. …*
>
> *6.  Payment. In consideration of the foregoing, the Fund shall pay each Union, within 30 days after the conclusion of each of the Fund's distribution cycles, 3% of the amount distributed by the Fund in such distribution cycle.  Each such payment shall be accompanied by a statement setting forth the computation of the payment amount. Such payment shall constitute complete compensation of the Unions and their personnel for providing the data and services contemplated by this Agreement. There shall be no additional charges or expense reimbursement associated with the Unions' provision of the data and services contemplated by this Agreement.*"

A "royalty" is a payment made to an asset's owner for the use of that asset.  Royalties are typically expressed (as occurs under the 2013 Agreement) as a percentage of gross or net revenues derived from the use of an asset. The payment to the Unions under the 2013 Agreement is a percentage royalty.  Similarly, the dispute at issue involves the administration of music royalties, in which music performers are compensated with percentage royalties.  Simply put, it should surprise no one that a percentage fee is used for the use of information needed to administer percentage-based music royalties.

Messrs. Thomas & Sullivan
March 8, 2021
Page 28 of 28

Music royalties are not earned or paid when the underlying work occurs; instead, the work precedes the payment, sometimes by years.  The same is true for all of the payments to the companies described in Section A above.  Yet, in this matter, Plaintiff asserts (incorrectly) that the payments made to the Unions for the use of their information are unreasonable because the amount paid in any particular year (or, the increase in the payment over the prior year's payment) is not reasonably calculated based on work uniquely performed in that year.  The Plaintiff's contentions in this regard are improper as the time-based work vs. payment relationship almost never exists in royalty agreements.


**V.      OTHER INFORMATION**


A.  QUALIFICATIONS FOR OFFERING OPINIONS

Attached as Exhibit 1 is a copy of my curriculum vitae summarizing my education, experience and qualifications.  Exhibit 1 also includes a listing of the cases in which I have testified as an expert at trial or by deposition within the preceding four years, and publications that I have authored in the last ten years.

B.  COMPENSATION

Fulcrum is being paid at its normal hourly rates for the persons involved in the assignment.  Our compensation is not contingent on the conclusions reached or ultimate resolution of the case.  My personal hourly rate is $625.


Very truly yours,
Fulcrum Financial Inquiry LLP

By: *David Nolte*

       David Nolte

# EXHIBIT 2

| TITLE ID | TITLE | ARTIST | Union Session Reports | Web Credits=/Fund Credits? | Result | Total Musician $ Distributed to Title | Total Vocalist $ Distributed to Title | Total Both M/V $ Distributed to Title | Musician Count w/Union Data | Musician Share w/Union Data | Vocal Count w/Union Data | Vocalist Share w/Union Data | Both M/V Count w/Union Data | Both M/V Share w/Union Data | Musician Count Web Credits | Musician Share Web Credits | Vocalist Count Web Credits | Vocalist Share Web Credits | Both M/V Count Web Credits | Both M/V Share Web Credits | Time Spent finding credits w/o Union Data | Web Credits Source(s) | Album or Track Credits Used | Researcher Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 041624 | MY HEART WILL GO ON (LOVE TI | CION CELINE | Y | No | Orchestra and music prep personnel would not receive their shares; web credit musicians would be overpaid 2 session musicians would not receive their shares; web credit musicians would be overpaid | $30,388.89 | $30,308.35 | $0.00 | 65 | $467.52 | 5 | $6,061.67 | 0 | $0.00 | 7 | $4,341.27 | 5 | $6,061.67 | 0 | $0.00 | 30 minutes | Discogs+liner notes=b/d, Tidal=b/d, allmusic=alb credits | track | Orch conductor and contractor credited on mult online sources (b/d) but not the orch (orch/prep on afm contracts only) |
| 092853 | CRASH MY PARTY | BRYAN LUKE | Y | No | 2 session musicians would be overpaid | $53,605.44 | $89,347.74 | $0.00 | 0 | $5,956.16 | 1 | $89,347.74 | 0 | $0.00 | 7 | $7,657.92 | 1 | $89,347.74 | 0 | $0.00 | 20 minutes | Discogs+liner notes=b/d, Tidal=b/d, allmusic=alb credits | track | Only one source (Tidal) w/ b/d |
| 029948 | RUNNIN' DOWN A DREAM | PETTY TOM | Y | Yes | web credits would receive shares in error diluting the shares; 1 Vocalist would not receive a share resulting in 1 Vocalist being overpaid | $51,561.85 | $0.00 | $0.00 | 3 | $17,187.28 | 0 | $0.00 | 0 | | 3 | $17,187.28 | 0 | | | | 40 minutes | Discogs=b/d on a comp, Tidal=no credits, liner notes=partial b/d, allmusic=alb credits | track | b/d was hidden on a comp but all three musicians were on the liner notes (not attributed to trks but other perf were so it can be assumed these three played on all alb trks) |
| 106915 | HEAD OVER BOOTS | PARDI JON | Y | No | The only 2 Musicians on this trk (afm) would not receive a share and 1 vocalist would not receive a share resulting in 11 vocs being overpaid | $26,296.32 | $44,398.94 | $0.00 | 8 | $3,287.04 | 2 | $22,199.47 | 0 | $0.00 | 10 | $2,629.63 | 1 | $44,398.94 | 0 | $0.00 | 2 minutes | discogs=alb creds, liner notes=no creds, Tidal=alb creds, wiki=alb creds, allmusic=no creds | track | credit discrepancy between web/afm; 3 musicians on Tidal for trk but not on AFM and one musician on AFM but not on web |
| 137357 | SHAKE IT OFF | KROLL NICK/REESE WITHER | Y | No | | $1,379.99 | $6,375.90 | $3,590.75 | 1 | $1,379.99 | 10 | $637.59 | 1 | $3,590.75 | 0 | $0.00 | 11 | $579.63 | 0 | $0.00 | 15 minutes | wiki=no creds, discogs/liner notes=voc creds b/d only/musician=alb creds, Tidal=vocs creds only, allmusic=alb creds | track | no b/d, musicians credited for alb (diff songs/artists), |
| 073070 | I KISSED A GIRL | PERRY KATY | Y | Yes | 30 session musicians would not get a share; web credits would overpay others | $42,087.63 | $73,963.88 | $0.00 | 3 | $14,029.21 | 1 | $73,963.88 | 0 | $0.00 | 3 | $14,029.21 | 1 | $73,963.88 | 0 | $0.00 | 20 minutes | discogs=b/d, liner notes=no creds, wiki=b/d, allmusic=alb credits | track | worked per discogs/liner notes b/d |
| 021162 | BABY, WHAT A BIG SURPRISE | CHICAGO | Y | No | web credits match | $14,938.15 | $24,211.74 | $0.00 | 32 | $466.82 | 2 | $12,105.87 | 0 | $0.00 | 2 | $7,469.08 | 2 | $12,105.87 | 0 | $0.00 | 20 minutes | discogs=b/d, no liner notes, tidal=b/d, allmusic=alb credits | track | worked per discogs/wiki b/d; missing session players |
| 105992 | SORRY | BIEBER JUSTIN | Y | No | 1 perf credited as musician and bgv's on album but can only corroborate musician contribution on trk; as a result, he will not receive a voc share from a credited from an Africa session report | $0.00 | $155,555.94 | $0.00 | 0 | $0.00 | 2 | $77,777.97 | 0 | $0.00 | 0 | $0.00 | 2 | $77,777.97 | 0 | $0.00 | 10 minutes | discogs=b/d, tidal=b/d, wiki=discrepancies(seems incorrect) | track | worked per discogs/tidal b/d |
| 119370 | ROUND HERE BUZZ | CHURCH ERIC | Y | No | | $11,737.82 | $0.00 | $26,477.18 | 3 | $3,912.61 | 0 | $0.00 | 1 | $26,477.18 | 4 | $2,934.46 | 0 | $0.00 | 1 | | 25 minutes | tidal=b/d but still one voc straggler on alb; other sources=partial b/d, artist website=liner notes w/ partial b/d | track | |
| 119679 | I BELIEVE IN YOU | BUBLE MICHAEL | Y | No | 8 Music prep and 1 Musician from union session reports not listed in web credits would not get paid and others would be overpaid | $10,150.64 | $12,630.30 | $3,972.84 | 55 | $184.56 | 2 | $6,315.15 | 1 | $3,972.84 | 46 | $220.67 | 2 | $6,315.15 | 1 | $3,972.84 | 45 minutes | discogs & liner notes=b/d for orchestra only, orch=alb creds, Tidal=b/d, youtube topic=b/d, Discogs=found, no b/d but attached liner notes with b/d, wiki=single b/d, allmusic=album credits | track | Missing Strings- check with KP |
| 134728 | WOMAN, AMEN | BENTLEY DIERKS | Y | No | liner notes match Union | $9,414.84 | $8,683.29 | $10,252.43 | 6 | $1,569.14 | 1 | $8,683.29 | 1 | $10,252.43 | 6 | $1,569.14 | 1 | $8,683.29 | 1 | $10,252.43 | 16 minutes | Discogs=liner notes | track | web per liner notes |
| 092752 | CHILLIN' IT | SWINDELL COLE | Y | No | Album credits dilute Shares | $6,536.99 | $92,457.05 | $0.00 | 6 | $6,536.99 | 1 | $92,457.05 | 0 | $0.00 | 8 | $726.33 | 3 | $23,114.26 | 1 | $23,840.59 | 30 minutes | Discogs=no credits, Allmusic=album credits only, Tidal=producer credits only, Wiki=album credits only, Genius=no credits found | Album | can't confirm wiki as only source indicating producer Jody Stevens played all the instruments on single, worked as c=a per Tidal, Wiki & allmusic album credits |
| 107027 | T-SHIRT | RHETT THOMAS | Y | No | Album credits dilute Shares | $28,986.60 | $49,242.62 | $0.00 | 6 | $4,831.10 | 2 | $24,621.31 | 0 | $0.00 | 13 | $1,932.44 | 2 | $12,310.66 | 2 | $14,243.10 | 15 minutes | Discogs=no credits, Allmusic=alb credits, Tidal=producer credits only, Wiki=album credits only, Genius=no credits found | Album | no b/d, worked as c=a |
| 018050 | UN-BREAK MY HEART | BRAXTON TONI | Y | Yes | liner notes match Union | $24,132.60 | $38,705.33 | $0.00 | 4 | $6,033.15 | 1 | $38,705.33 | 0 | $0.00 | 4 | $6,033.15 | 1 | $38,705.33 | 0 | $0.00 | 12 min | Discogs=trk b/d (+No Topics/Tidal=trk b/d Genius=trk b/d allmusic=alb wiki=trk b/d | track | trk b/ds avail per liner notes and web |
| 016959 | UNWELL | MATCHBOX 20 | Y | Yes | web credits match | $63,861.28 | $0.00 | $0.00 | 4 | $15,965.32 | 0 | $0.00 | 0 | $0.00 | 4 | $15,965.32 | 0 | $0.00 | 0 | $0.00 | 18 min | Discogs=partial b/d (no LNs) Tidal/Topic=partial b/d allMusic=alb creds wiki=partial b/d | track | would want Union to confirm prod and contr(t): partial trk b/d avail per Discogs only, all other web sources leave out the prod+contr(t) entirely |
| 114036 | THINK A LITTLE LESS | RAY MICHAEL | Y | Yes | web credits match session players not on web credits would not get a share and others would be overpaid | $18,392.57 | $30,898.85 | $0.00 | 7 | $2,627.51 | 1 | $30,898.85 | 0 | $0.00 | 7 | $2,627.51 | 1 | $30,898.85 | 0 | $0.00 | 10min | Discogs=partial trk/alb Tidal=partial trk/alb allmusic=album wiki=album genius=nothing | track | b/d on Tidal/Topic only |
| 147447 | READY TO LET GO | CAGE THE ELEPHANT | Y | No | session players not on web credits would not get a share and others would be overpaid | $4,502.60 | $6,590.88 | $0.00 | 1 | $4,502.60 | 1 | $732.32 | 0 | $0.00 | 1 | $4,502.60 | 1 | $6,590.88 | 0 | $0.00 | 15 | Discogs=partial trk/alb Pandora=partial b/d only Pandora=alb but missing some in error - not track specific | track | L.A. & nville; given useless partial b/t, any contracts would be helpful |
| 092857 | THAT'S MY KIND OF NIGHT | BRYAN LUKE | Y | No | Album credits dilute Shares | $49,064.40 | $82,453.38 | $0.00 | 7 | $7,009.20 | 1 | $82,453.38 | 0 | $0.00 | 15 | $3,270.96 | 4 | $20,613.35 | 0 | $0.00 | 13 | allmusic=alb b/d only Pandora=no Pandora=b but missing some in error - not track specific | Album | Need nville contracts for track b/ds |
| 018758 | DOWN ON THE FARM | MCGRAW TIM | Y | No | Album credits dilute Shares | $27,348.54 | $46,397.28 | $0.00 | 6 | $4,558.09 | 2 | $23,198.64 | 0 | $0.00 | 12 | $2,279.05 | 2 | $23,198.64 | 0 | $0.00 | 12 | Prague=alb+album b/d only | Album | Album Credits dilute session credits; Need nville contracts for track b/ds |
| 018061 | BOOTS ON | HOUSER RANDY | Y | No | session players not on web credits would not get a share and others would be overpaid | $32,245.36 | $53,669.02 | $0.00 | 14 | $2,303.24 | 1 | $53,669.02 | 0 | $0.00 | 8 | $4,030.67 | 1 | $53,669.02 | 0 | $0.00 | 15 minutes | Discogs=trk b/d (no LNs) Tidal/Topics=no b/d Musi=alb creds wiki=trk creds | track | new trk b/d found in discogs (only): without discogs this would've been album credits |
| 091614 | RADIOACTIVE | IMAGINE DRAGONS | Y | Yes | web credits match | $159,600.67 | $0.00 | $0.00 | 1 | $159,600.67 | 0 | $0.00 | 0 | $0.00 | 1 | $159,600.67 | 0 | $0.00 | 0 | $0.00 | 15 minutes | Discogs=partial b/d+liner notes Tidal/Topics=partial b/d allmusic & Wiki=partial b/d | track | trk b/ds available across web |
| 025529 | VENTURA HIGHWAY | AMERICA | Y | Yes | liner notes match Union | $41,725.79 | $0.00 | $0.00 | 2 | $20,862.90 | 0 | $0.00 | 0 | $0.00 | 2 | $20,862.90 | 0 | $0.00 | 0 | $0.00 | 18 minutes | Discogs=partial b/d+liner notes Tidal/topics= b/d allmusic=alb credits wiki=trk creds (partial = per au (banjo) per audio (confirmed by wiki) | track | liner notes avail per Discogs b/d, eliminated adding extra musician |

| ID | Song | Artist | A | B | Description | V1 | V2 | V3 | C1 | V4 | C2 | V5 | C3 | V6 | C4 | V7 | C5 | V8 | C6 | V9 | Time | Notes | Type | Comment |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 087286 | JUST A KISS | LADY ANTEBELLUM | Y | No | 1 Musician would get a share in error and dilute other shares | $74,387.52 | $0.00 | $0.00 | 23 | $3,234.24 | 0 | $0.00 | 0 | $0.00 | 24 | $3,099.48 | 0 | $0.00 | | $0.00 | 45 minutes | Discog=no b/d or LNs; Tidal/Topics=nothing AllMusic=Alb creds=24mus wiki=trk b/d=22mus genius=b/d=20mus | album | Could use L257 here: Made c>a after comparing to the two web b/ds found. c>a seemed safer VS using the wiki or genius b/ds, both of which did not match each other. |
| 092690 | GET ME SOME OF THAT | RHETT THOMAS | Y | No | Album credits dilute Shares | $48,701.84 | $82,264.05 | $0.00 | 11 | $4,427.44 | 1 | $82,264.05 | 24 | $1,803.77 | 19 | $3,739.28 | 3 | $5,543.05 | | | 35 minutes | Discog=no b/d or liner notes Tidal/topics=no b/d, AllMusic=album creds, wiki=alb creds Genius=partial b/d? | album | ALBUM CREDITS DILUTE SHARES: need union, esp AFTRA= album credits ONLY (did not use b/d found only on Genius: seemed incomplete w/no source cited) |
| 147411 | WE WERE | URBAN KEITH | Y | Yes | web credits match | $4,430.05 | $6,484.64 | $0.00 | 5 | $886.01 | 1 | $6,484.64 | | | 5 | $886.01 | 1 | $6,484.64 | 0 | $0.00 | 12 minutes | Discog=partial b/d and LNs (no strings just args/comp) Tidal/Topics=b/d trk, allMusic=alb creds wiki=track b/d genius=nothing | track | web b/ds found |
| 017296 | ROCK WITH YOU | JACKSON MICHAEL | Y | No | Session Players would not get a share and others would get overpaid | $56,393.19 | $506.03 | $1,187.03 | 49 | $1,150.88 | 0 | $0.00 | 0 | $0.00 | 15 | $3,759.55 | 0 | $0.00 | | | 20 minutes | Discog=partial b/d and LNs (no strings just args/comp) Tidal/topics=b/d no strings allMusic=alb creds- no strings wiki=trk b/d no strings genius=b/d no strings | (partial - need st args/ conductor) | need L47 for audible strings=n/f (liner notes found with b/d, only partial) |
| 020003 | DON'T TAKE THE GIRL | MCGRAW TIM | Y | No | Album credits dilute Shares | $27,293.60 | $45,947.54 | $0.00 | 8 | $3,411.70 | 2 | $22,973.77 | 0 | $0.00 | 12 | $2,274.47 | 2 | $22,973.77 | 0 | $0.00 | 12 minutes | Discog=no liner notes=alb credits Tidal/topic=album credits pandora=nothing allMusic=album wiki=album genius=nothing; | album | need L257: album credits found only (liner notes) |
| 017565 | CLOSING TIME | SEMISONIC | Y | Yes | web credits match | $66,101.45 | $0.00 | $0.00 | 5 | $13,220.29 | 0 | $0.00 | | | 5 | $13,220.29 | 0 | $0.00 | | | 15 minutes | Discog=no b/d Tidal/topic=no b/d allmusic=album genius=trk b/d (partial + c>a st alt feat +5 strings c>a entered per audio | | could use L47 union here for strings: partial trk breakdown found - |
| 079225 | THE EDGE OF GLORY | LADY GAGA | Y | Yes | web credits match | $42,518.66 | $0.00 | $0.00 | 4 | $10,629.67 | 0 | $0.00 | | | 4 | $10,629.67 | 0 | $0.00 | | | 11 min | Discog=liner notes=n/f Tidal/topics=nothing genius=trk b/d wiki=trk b/d | track | web b/ds found |
| 019048 | THERE GOES MY LIFE | CHESNEY KENNY | Y | Yes | web credits match | $34,517.75 | $58,623.10 | $0.00 | 8 | $4,314.72 | 2 | $29,311.55 | 0 | | 8 | $4,314.72 | 2 | $29,311.55 | 0 | $0.00 | 16 minutes | Discog=Album Credits, Wiki=Album Credits, Allmusic=album credits, Youtube Topic=b/d, Genius=no credits found | Track | only b/d down found was youtube topic, can't confirm secondary source for b/d - used |
| 134585 | DRUNK GIRL | JANSON CHRIS | Y | Yes | web credits match | $10,035.55 | $15,821.83 | $0.00 | 7 | $1,433.65 | 1 | $15,821.83 | 0 | | 7 | $1,433.65 | 1 | $15,821.83 | 0 | $0.00 | 20 minutes | Discog=found=b/d, Wiki=found=b/d, Allmusic=found=no b/d, youtube topic=found=b/d | Track | web b/d found, liner notes=n/f |
| 100973 | KICK THE DUST UP | BRYAN LUKE | Y | No | session players not on web credits; String Players and Orchestra not listed in Web Credits would not get their shares and others would get overpaid | $29,051.82 | $48,899.07 | $0.00 | 11 | $2,641.07 | 1 | $48,899.07 | 0 | | 7 | $3,227.98 | 1 | $16,299.69 | 2 | $19,527.67 | 22 minutes | Discog=found=no credits, Wiki=found=no b/d, youtube topic=found=b/d, Genius=no credits, Tidal=found=b/d | Track | Bass player incorrectly labeled as Bass (vocalist) on youtube topic, expert researcher knows performer as bassist, tidal b/d confirms Skaos as bassist only |
| 018263 | HOME | BUBLE MICHAEL | Y | No | (note) | $41,889.22 | $68,709.96 | $0.00 | 47 | $891.26 | 1 | $68,709.96 | 0 | | 12 | $3,490.77 | 1 | $68,709.96 | 0 | $0.00 | 30 minutes | Discog=partial b/d found, no orch credits, Allmusic=album credits only, no string credits, Youtube topic=partial b/d found, no orch, Tidal=partial found | Track (partial) | Audible strings, no orch credits found, need to verify; discrepancies with musician b/d; Tidal doesn't list Bill Ross as a Arranger, He is clearly listed on liner notes, added; added string contractors per liner notes, need string performers |
| 106963 | YOU SHOULD BE HERE | SWINDELL COLE | Y | Yes | web credits match | $28,911.23 | $49,059.51 | $0.00 | 8 | $3,613.90 | 1 | $49,059.51 | 0 | | 8 | $3,613.90 | 1 | $49,059.51 | 0 | $0.00 | 20 minutes | Discog=found=no credits, Allmusic=found=no b/d credits only, youtube topic=found=b/d, Genius=no credits found, Tidal=b/d found | Track | tidal & youtube topic b/d appear to be c>a, used this per multiple sources |
| 107209 | IT DON'T HURT LIKE IT USED TO | CURRINGTON BILLY | Y | No | Album credits dilute Shares | $23,245.23 | $39,316.89 | $0.00 | 8 | $2,905.65 | 1 | $39,316.89 | 0 | | 12 | $1,937.10 | 2 | $19,658.45 | 0 | $0.00 | 20 minutes | Discog=found=partial b/d, liner notes found=partial b/d, Youtube topic=found=credits appear c>a (2 bass players etc), Tidal=found=appear b/d is c>a (not real b/d), wiki=found=album credits only | Album | Youtube Topic & Tidal "b/d's" appear to be C>A (ex, two bass players, everyone from album credits credited), eventually worked as C>A |
| 018049 | ALRIGHT | RUCKER DARIUS | Y | No | 1 Musician would not receive a share and others would get overpaid | $39,030.50 | $64,939.28 | $0.00 | 10 | $3,903.05 | 1 | $64,939.28 | 0 | | 9 | $4,336.72 | 1 | $64,939.28 | 0 | $0.00 | 16 minutes | Discog=found=b/d & liner notes found, Tidal=found=no credits, Youtube Topic=no credits, Wiki=found=album credits only, Allmusic=found=album credits only | Track Credits | Used liner notes as main source for trk b/d, no other b/d sources found (Discog=b/d=liner notes) |
| 088679 | 5-1-5-0 | BENTLEY DIERKS | Y | No | Web Album credits dilute shares; Web credits are missing session percussionist. He would not receive his share and others would get overpaid | $37,990.28 | $63,190.52 | $0.00 | 8 | $4,748.79 | 1 | $63,190.52 | 0 | | 24 | $1,519.61 | 8 | $7,021.17 | 1 | $8,540.78 | 30 minutes | Discog=found=b/d credits only, Wiki=album credits, Allmusic=album credits, youtube topic=credits only, Tidal=youtube credits only, Genius=no credits found, no trk b/d found | Track | |
| 020269 | BEAT IT | JACKSON MICHAEL | Y | Yes | overpaid | $49,906.42 | $0.00 | $34.46 | 10 | $4,990.64 | 0 | $0.00 | | | 9 | $5,545.16 | 0 | $0.00 | | | 24 minutes | Discog=trk b/d per liner notes, liner notes=found with b/d, Allmusic=album credits, Youtube topic=b/d, wiki=trk b/d | track | worked per liner notes & web sources |
| 039760 | GIMME THAT GIRL | NICHOLS JOE | Y | No | Web credits result in one musician not receiving a share and others would be overpaid | $31,506.03 | $52,809.70 | $0.00 | 9 | $3,500.67 | 2 | $26,404.85 | 0 | | 8 | $3,938.25 | 2 | $26,404.85 | 0 | $0.00 | 15 minutes | Discog=trk b/d & liner notes, Wiki=trk b/d liner notes found, Allmusic=album credits, liner notes=found on Discog | track | worked per liner notes & web sources |
| 119322 | EVERY LITTLE THING | PEARCE CARLY | Y | No | Web Album credits dilute shares; credits would not get their shares and others would get overpaid | $14,794.72 | $24,440.93 | $0.00 | 3 | $4,931.57 | 1 | $24,440.93 | 0 | | 11 | $1,344.97 | 6 | $4,073.49 | 0 | $0.00 | 12 | Discog=track b/d & LNTs Allmusic=alb creds Pandora=no credits Wiki=allmusic Prague=rank=no credits | Album | Likely a nashville title by participants, label, & genre; would benefit from a 257 search and aftra |
| 020476 | I'LL HAVE TO SAY I LOVE YOU IN | CROCE JIM | Y | No | shares diluted; Vocalist would have shares diluted | $25,099.67 | $40,708.45 | $0.00 | 20 | $1,254.98 | 1 | $40,708.45 | 2 | $0.00 | 4 | $5,019.93 | 2 | $13,569.48 | 1 | $18,588.81 | 10 | Discog=track b/d & LNTs Allmusic=alb creds Pandora=no credits Wiki=album credits Vocalist would have | Track | |
| 091507 | WHATEVER SHE'S GOT | NAIL DAVID | Y | No | shares | $52,817.50 | $89,397.24 | $0.00 | 6 | $8,802.92 | 1 | $89,397.24 | 0 | | 11 | $4,801.59 | 13 | $6,876.71 | 0 | $0.00 | 15 | Discog=album credits & LNTs Allmusic=alb credits Pandora=credits (look like alb creds) Prague=rank=alb credits | Album | Nashville title; would benefit from a 257 search and aftra |

| ID | Title | Artist | | | Note | | | | | | | | | | | | | | | | | Web Notes | Type | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 092520 | RUNNIN' OUTTA MOONLIGHT | HOUSER RANDY | Y | No | Web Album credits dilute shares | $57,599.63 | $96,450.21 | $0.00 | 9 | $6,399.96 | 1 | $96,450.21 | 0 | $0.00 | 17 | $3,388.21 | 4 | $24,112.55 | 0 | $0.00 | 11 | Discog=alb credits Allmusic=alb credits Pandora=nothing Prague=rank=alb credits | Album | Nashville title; would benefit from a 257 search and aftra |
| 100612 | LOCKED AWAY | R. CITY FT ADAM LEVINE | Y | No | 2 Vocals on union session reports would not have been paid for song | $8,000.42 | $112,580.11 | $0.00 | 2 | $4,000.21 | 2 | $56,290.06 | 0 | $0.00 | 1 | $8,000.42 | 1 | $112,580.11 | 0 | $0.00 | 13 | Discog=single credits Allmusic=album credits Pandora=track credits Genius=nothing | Track | |
| 134629 | SAY AMEN (SATURDAY NIGHT) | PANIC AT THE DISCO | Y | No | Web Credits dilute shares | $10,221.64 | $11,207.10 | $5,996.69 | 26 | $393.14 | 2 | $5,603.55 | 1 | $5,996.69 | 37 | $268.99 | 2 | $3,735.70 | 1 | $5,996.69 | 16 | Discog=track b/ds & LNTs Allmusic=alb creds Pandora=trk creds | al Track | partial al.A. - AFM for strings would help |
| 119359 | FLATLINER | SWINDELL COLE FT DIERKS | Y | Yes | Web credits match | $14,666.83 | $24,517.34 | $0.00 | 7 | $2,095.26 | 1 | $24,517.34 | 0 | $0.00 | 7 | $2,095.26 | 1 | $24,517.34 | 0 | $0.00 | 13 | Prague=rank=alb creds | Track | Nashville title; would benefit from a 257 search and aftra |
| 088823 | HOLLY JOLLY CHRISTMAS | BUBLE MICHAEL | Y | No | Web credits would cause overpayment of some; 21 musicians to not receive their shares; 8 vocalists would not get their shares | $20,207.65 | $33,497.76 | $0.00 | 29 | $696.82 | 8 | $4,187.22 | 0 | $0.00 | 8 | $2,525.96 | 0 | $0.00 | 0 | $0.00 | 15 | Discog=no Allmusic=alb creds Pandora=trk creds Discog=track + LNTs Pandora=partial Allmusic=no reason | Partial Track | L.A.; can't determine orchestra without a contract |
| 079697 | REMIND ME | PAISLEY BRAD/CARRIE UNC | Y | Yes | Web credits match | $40,362.00 | $67,509.04 | $0.00 | 6 | $6,727.00 | 2 | $33,754.52 | 0 | $0.00 | 6 | $6,727.00 | 2 | $33,754.52 | 0 | $0.00 | 17 | Discog=LNTs Pandora=partial alb? Did not use Allmusic=album | Track | Pandora includes 1 extra musician and vocalist; would check against Nvelle contracts |
| 146827 | CONSEQUENCES | CABELLO CAMILA | Y | Yes | Web credits match | $10,437.75 | $0.00 | $0.00 | 1 | $10,437.75 | 0 | $0.00 | 0 | $0.00 | 1 | $10,437.75 | 0 | $0.00 | 0 | 8 | Discog=track & LNTs Pandora=track Allmusic=album | Track | |
| 079749 | CRAZY GIRL | ELI YOUNG BAND | Y | Yes | Web credits match | $69,978.39 | $0.00 | $0.00 | 6 | $11,663.07 | 0 | $0.00 | 0 | $0.00 | 6 | $11,663.07 | 0 | $0.00 | 0 | 13 | Discog=album credits; Pandora=track; Allmusic=album | Track | |

| TITLE ID | TITLE | ARTIST | Participant Count | # Particpants located from Union Member Directory | # Participants with valid Address/SSN who are not in Union Directory | # Participants without a Valid Address or SSN as of 1/29/21 |
|---|---|---|---|---|---|---|
| 041624 | MY HEART WILL GO ON (LOVE THEME FROM TITANIC) | DION CELINE | 70 | 68 | 2 | 0 |
| 092853 | CRASH MY PARTY | BRYAN LUKE | 10 | 10 | 0 | 0 |
| 023948 | RUNNIN' DOWN A DREAM | PETTY TOM | 3 | 3 | 0 | 0 |
| 106915 | HEAD OVER BOOTS | PARDI JON | 10 | 10 | 0 | 0 |
| 137357 | SHAKE IT OFF | KROLL NICK/REESE WITHERSPOON | 12 | 11 | 0 | 1 |
| 073070 | I KISSED A GIRL | PERRY KATY | 4 | 4 | 0 | 0 |
| 021162 | BABY, WHAT A BIG SURPRISE | CHICAGO | 34 | 25 | 9 | 0 |
| 105992 | SORRY | BIEBER JUSTIN | 2 | 1 | 1 | 0 |
| 119370 | ROUND HERE BUZZ | CHURCH ERIC | 4 | 4 | 0 | 0 |
| 119679 | I BELIEVE IN YOU | BUBLE MICHAEL | 58 | 56 | 1 | 1 |
| 134728 | WOMAN, AMEN | BENTLEY DIERKS | 8 | 8 | 0 | 0 |
| 092752 | CHILLIN' IT | SWINDELL COLE | 2 | 2 | 0 | 0 |
| 107027 | T-SHIRT | RHETT THOMAS | 8 | 8 | 0 | 0 |
| 018050 | UN-BREAK MY HEART | BRAXTON TONI | 5 | 4 | 1 | 0 |
| 016959 | UNWELL | MATCHBOX 20 | 4 | 4 | 0 | 0 |
| 114036 | THINK A LITTLE LESS | RAY MICHAEL | 8 | 8 | 0 | 0 |
| 147447 | READY TO LET GO | CAGE THE ELEPHANT | 10 | 7 | 1 | 2 |
| 092857 | THAT'S MY KIND OF NIGHT | BRYAN LUKE | 8 | 8 | 0 | 0 |
| 018758 | DOWN ON THE FARM | MCGRAW TIM | 8 | 8 | 0 | 0 |
| 018061 | BOOTS ON | HOUSER RANDY | 15 | 15 | 0 | 0 |
| 091614 | RADIOACTIVE | IMAGINE DRAGONS | 1 | 0 | 0 | 1 |
| 021529 | VENTURA HIGHWAY | AMERICA | 2 | 2 | 0 | 0 |
| 087286 | JUST A KISS | LADY ANTEBELLUM | 23 | 23 | 0 | 0 |
| 092690 | GET ME SOME OF THAT | RHETT THOMAS | 12 | 12 | 0 | 0 |
| 147411 | WE WERE | URBAN KEITH | 6 | 6 | 0 | 0 |
| 017296 | ROCK WITH YOU | JACKSON MICHAEL | 49 | 42 | 6 | 1 |
| 020003 | DON'T TAKE THE GIRL | MCGRAW TIM | 10 | 10 | 0 | 0 |
| 017565 | CLOSING TIME | SEMISONIC | 5 | 5 | 0 | 0 |
| 079225 | THE EDGE OF GLORY | LADY GAGA | 4 | 2 | 2 | 0 |
| 019048 | THERE GOES MY LIFE | CHESNEY KENNY | 10 | 10 | 0 | 0 |
| 134585 | DRUNK GIRL | JANSON CHRIS | 8 | 8 | 0 | 0 |
| 100973 | KICK THE DUST UP | BRYAN LUKE | 12 | 12 | 0 | 0 |
| 018263 | HOME | BUBLE MICHAEL | 48 | 46 | 2 | 0 |
| 106963 | YOU SHOULD BE HERE | SWINDELL COLE | 9 | 8 | 1 | 0 |
| 107209 | IT DON'T HURT LIKE IT USED TO | CURRINGTON BILLY | 9 | 9 | 0 | 0 |
| 018049 | ALRIGHT | RUCKER DARIUS | 11 | 11 | 0 | 0 |

| 088679 | 5-1-5-0 | BENTLEY DIERKS | 9 | 9 | 0 | 0 |
|---|---|---|---|---|---|---|
| 020269 | BEAT IT | JACKSON MICHAEL | 10 | 10 | 0 | 0 |
| 039760 | GIMMIE THAT GIRL | NICHOLS JOE | 11 | 11 | 0 | 0 |
| 119322 | EVERY LITTLE THING | PEARCE CARLY | 4 | 4 | 0 | 0 |
| 020476 | I'LL HAVE TO SAY I LOVE YOU IN A SONG | CROCE JIM | 23 | 18 | 5 | 0 |
| 091507 | WHATEVER SHE'S GOT | NAIL DAVID | 7 | 7 | 0 | 0 |
| 092520 | RUNNIN' OUTTA MOONLIGHT | HOUSER RANDY | 10 | 10 | 0 | 0 |
| 100612 | LOCKED AWAY | R. CITY FT ADAM LEVINE | 4 | 4 | 0 | 0 |
| 134629 | SAY AMEN (SATURDAY NIGHT) | PANIC AT THE DISCO | 29 | 28 | 1 | 0 |
| 119359 | FLATLINER | SWINDELL COLE FT DIERKS BENTLEY | 8 | 8 | 0 | 0 |
| 088823 | HOLLY JOLLY CHRISTMAS | BUBLE MICHAEL | 37 | 36 | 1 | 0 |
| 079697 | REMIND ME | PAISLEY BRAD/CARRIE UNDERWOOD | 8 | 8 | 0 | 0 |
| 146827 | CONSEQUENCES | CABELLO CAMILA | 1 | 0 | 1 | 0 |
| 079749 | CRAZY GIRL | ELI YOUNG BAND | 6 | 6 | 0 | 0 |

# EXHIBIT 3

Confidential Pursuant to Protective Order

```
1              IN THE UNITED STATES DISTRICT COURT

2                 CENTRAL DISTRICT OF CALIFORNIA

3

4    KEVIN RISTO, on behalf of      )
     himself and all others        )
5    similarly situated,           )
                                   )
6             Plaintiffs,          )
                                   ) CASE NO.
7        vs.                       ) 2:18-cv-07241-CAS-
                                   )
8    SCREEN ACTORS GUILD-AMERICAN  ) PLA
     FEDERATION OF TELEVISION AND  )
9    RADIO ARTISTS; a Delaware     )
     corporation; AMERICAN         )
10   FEDERATION OF MUSICIANS OF THE )
     UNITED STATES AND CANADA, a   )
11   California nonprofit          )
     corporation; et al.,         )
12                                 )
              Defendants.         )
13   _____ )

14

15         CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

16

17                Tuesday, April 27, 2021

18

19

20         Remote videotaped deposition of DAVID NOLTE,

21   conducted at the location of the witness in

22   Los Angeles, California, commencing at 9:08 a.m. and

23   ending at 4:03 p.m., on the above date, before

24   SHARI BOLTON, CSR 9291.

25
```

Page 2

1
2  REMOTE APPEARANCES:
3      For Plaintiffs:
4          KIESEL LAW LLP
           BY:  MARIANA McCONNELL, ESQ.
               NICHOLAS BRANCOLINI, ESQ.
5          8648 Wilshire Boulevard
           Beverly Hills, California 90211
6          (310) 854-4444
           mcconnell@kiesel.law
7          brancolini@kiesel.law
8          JOHNSON AND JOHNSON, LLP
           BY:  DANIEL B. LIFSCHITZ, ESQ.
9          439 North Canon Drive
           Beverly Hills, California 90210
10         (310) 975-1080
11
12     For Defendants:
13         JENNER & BLOCK
           BY:  ANDREW THOMAS, ESQ.
               ANDREW G. SULLIVAN, ESQ.
14         633 West 5th Street, Suite 3600
           Los Angeles, California 90071
15         (213) 239-5155
16         ajthomas@jenner.com
17         agsullivan@jenner.com
18     Videographer:
19         DAVID KIM
20
21
22
23
24
25

Page 3

1          INDEX TO EXAMINATION
2
3  WITNESS:  DAVID NOLTE
4                              PAGE
5  Examination By Ms. McConnell          6
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1          INDEX TO EXHIBITS
2
3
4  MARKED          DESCRIPTION          PAGE
5  Exhibit 1    Curriculum vitae          14
6  Exhibit 2    Fulcrum Financial Inquiry LLP    39
               invoices
7              Bates Nos. NOLTE00000006 -
               00000009, 00000001 - 00000005,
8              00001228 - 00001229
9  Exhibit 3    Fulcrum Inquiry retention     81
               agreement
10             Bates Nos. NOLTE00000011 -
               00000016, 00000010
11
       Exhibit 4    Fulcrum Inquiry report      87
12             No Bates Nos.
13     Exhibit 5    Article entitled "Steps In    195
               Valuing Intellectual Property"
14             No Bates Nos.
15
16
17
18
19
20
21
22
23
24
25

Page 5

1          LOS ANGELES, CALIFORNIA
2      TUESDAY, APRIL 27, 2021, 9:08 A.M.
3
4      THE VIDEOGRAPHER:  We are now on the record.
5  My name is David Kim.  I'm a videographer for Golkow
6  Litigation Services.
7      Today's date is April 27, 2021, and the time
8  is 9:08 a.m.
9      This remote video deposition is being held in
10 the matter of Risto v. Screen Actors Guild-American
11 Federation of Television and Radio Artists for the
12 Superior Court -- no -- for the U.S. District Court
13 for the Central District of California.
14     The deponent is David Nolte.
15     All parties to this deposition are appearing
16 remotely and have agreed to the witness being sworn in
17 remotely.
18     Due to the nature of remote reporting, please
19 pause briefly before speaking to ensure all parties
20 are heard completely.
21     Will counsel please identify themselves.
22     MS. McCONNELL:  Mariana McConnell from Kiesel
23 Law for plaintiff and the class.
24     MR. BRANCOLINI:  Nico Brancolini from Kiesel
25 Law on behalf of plaintiff and the class.

Confidential Pursuant to Protective Order

1    MR. LIFSCHITZ:  Daniel Lifschitz from Johnson
2  and Johnson on behalf of plaintiff and the class.
3    MR. THOMAS:  A.J. Thomas from Jenner & Block
4  on behalf of the defendants.
5    MR. SULLIVAN:  Andrew Sullivan from Jenner &
6  Block on behalf of the defendants.
7    THE VIDEOGRAPHER:  The court reporter is
8  Shari Bolton, and she will now swear in the witness.
9
10          DAVID NOLTE,
11  having been first duly sworn, was examined and
12          testified as follows:
13
14          EXAMINATION
15  BY MS. McCONNELL:
16    Q  Good morning.  Can you please say and spell
17  your name for the record, please.
18    A  My name is David Nolte.  Nolte is spelled
19  N-o-l-t-e.
20    Q  Okay.  Good morning, Mr. Nolte.  I'm Mariana
21  McConnell.  I'm one of the plaintiff lawyers in this
22  case, and I'm going to be asking you questions this
23  morning.
24      How many times have you had your deposition
25  taken.

1    A  Numerous times.
2    Q  More than 50?
3    A  Yes.
4    Q  More than 100?
5    A  Yes.
6    Q  Okay.  I'm going to assume you're familiar
7  with admonitions and I don't need to go through them
8  for today; is that correct?
9    A  That is your assumption, yes.
10    Q  Okay.  Are you familiar with the admonitions
11  for a deposition?
12    A  I'm not a lawyer.  But -- but I don't have
13  any questions, if that's what you're asking me.
14    Q  Sure.
15      I'll remind you that you're under oath today
16  so you need to give full and complete and truthful
17  testimony, okay?
18    A  Sure.
19    Q  Great.
20      I don't want you to guess at anything, but
21  I'm entitled to your full knowledge, so if you
22  understand my question, even a part of it, then I will
23  expect you to give an answer to it, okay?
24    A  I'll do my best to answer your questions as I
25  understand them.

1    Q  That's great.
2      Have you ever had your deposition taken
3  before Zoom before?
4    A  Yes.
5    Q  Okay.  When was your last deposition?
6    A  Oh, I'd have to look it up.  A couple weeks
7  ago.
8    Q  Okay.  Are you currently at your home?
9    A  Yes.
10    Q  And is that in Los Angeles County?
11    A  Yes.
12    Q  Okay.  I will assume that no other person is
13  in your home office with you currently, correct?
14    A  No one's in this room, that is correct.
15    Q  Perfect.
16      I will ask that you do not have any open
17  means of communication with any of the defense lawyers
18  in this case, by that I mean text message, Slack,
19  Facebook Messenger, anything else.
20      Will you accept that?
21    A  Oh, yeah, I have no intention of doing
22  anything like that.
23    Q  Perfect.
24      Before we get started I want to establish
25  some shorthand for us.

1      I'm going to be asking you questions about
2  the AFM and SAG-AFTRA Intellectual Property Rights
3  Distribution Fund.  I'm going to refer to that as the
4  Fund.  Will you understand what I mean when I say "the
5  Fund"?
6    A  I think so, yes.
7    Q  You're familiar with the AFM and SAG-AFTRA
8  Intellectual Property Rights Distribution Fund,
9  correct?
10    A  Yes.
11    Q  If I say "the unions," will you understand
12  I'm referring to AFM and SAG-AFTRA?
13    A  Sure.
14    Q  And if I say "services agreement," will you
15  understand that I'm referring to the data purchase and
16  service agreement entered in July of 2013?
17    A  I don't have the date memorized.  I could
18  look it up in my report.  But whatever that subject
19  agreement is, sure.
20    Q  And if I say "service fee," will you
21  understand that I'm referring to the 3 percent
22  combined fee paid to the AFM and SAG-AFTRA unions
23  under the terms of the services agreement?
24    A  I do understand that you're -- you're
25  plaintiff and you have referred to it that way, yes.

Confidential - Pursuant to Protective Order

Page 10

1  Q  Are you familiar with the fact that employees
2  of the Fund refer to it that way?
3      A  I'm not a fact witness, and I'm not an
4  employee at the Fund.
5      Q  Have you seen any e-mails between employees
6  of the Fund that refer to it as the service fee?
7      A  I haven't looked with that in mind so I don't
8  know.
9      Q  Okay.  Have you -- have you read any
10 depositions where the trustees of the Fund refer to it
11 as the service fee?
12     A  Well, I know that your firm, or the
13 plaintiff, has consistently referred to it in that
14 fashion so I don't doubt that they have answered your
15 questions that use that term.
16     Q  Okay.  Are -- are you familiar with the fact
17 that the defendant trustees used that term themselves?
18 That's a yes-or-no question.
19     A  I couldn't tell you.  So I -- maybe they do.
20 Maybe they don't.  I -- I haven't studied that.  I
21 don't have any opinions in that regard.
22     Q  Okay.  So you don't know.
23        Okay.  We'll take a five- to ten-minute break
24 every hour, but if you need to take a break sooner
25 just let me know, okay?

Page 11

1      A  Sure.
2      Q  Did you review your notice of deposition and
3  the request for production of documents that
4  accompanied it?
5      A  Yes.
6      Q  Okay.  Did you undertake your best efforts to
7  find all documents relating to the categories of the
8  request and produce them to your counsel?
9      A  Well, I don't have a counsel so I guess the
10 answer would have to be no.
11     Q  Okay.  Are you being represented for your
12 deposition today by Jenner & Block?
13     A  Not to my knowledge.  They don't represent
14 me.  They represent others.
15     Q  Okay.  Are they going to be interposing
16 objections on your behalf during this deposition?
17        MR. THOMAS:  Well, Counsel, we'll definitely
18 be interposing objections because we're a party to the
19 case and if we feel a question's improper, we'll note
20 that for the record.  We'd have that right, you know,
21 regardless of whether we represent the witness or not.
22 BY MS. McCONNELL:
23     Q  Did the firm of Jenner & Block handle the
24 production of documents on your behalf?
25     A  They did.

Page 12

1      Q  Okay.  So did you undertake your best efforts
2  to find all documents relating to our categories of
3  request and produce them to Jenner & Block?
4      A  Yeah, I probably should look at it again just
5  because I get a lot of these production requests so I
6  don't really have this production request in mind.
7        But I did give to Jenner & Block items that I
8  understood would be produced to you.  And I -- from my
9  perspective, the production was complete.  But if you
10 want to ask me more specific questions I should look
11 at it again because I haven't looked at it since it
12 was first received.
13     Q  We didn't receive any handwritten notes in
14 your production.  Is it true that you don't have any
15 handwritten notes in your file?
16     A  I do not have any handwritten notes in my
17 file.
18     Q  Do you have any typed-up notes in your file?
19     A  That can't be answered yes or no without
20 being misleading.  So I can give you a narrative
21 answer.  But I suspect the way you're -- you're
22 expecting the answer to come out the answer would be
23 no.
24     Q  Okay.  How about in a truthful answer from
25 you, do you have any type --

Page 13

1      A  Okay.  I don't understand your question.
2      Q  Okay.
3      A  We'll do it that way.  I don't understand
4  your question.
5      Q  Great.
6        Did you -- you reviewed depositions in this
7  case, right?
8      A  I did.
9      Q  Did you take any notes on the depositions
10 that you reviewed?
11     A  Yes.
12     Q  Did you handwrite them?
13     A  No.
14     Q  Did you type them up?
15     A  Yes.
16     Q  Did you maintain those typed-up notes in your
17 file?
18     A  Yes.
19     Q  Were those typed-up notes given to Jenner &
20 Block?
21     A  Yes.
22     Q  Okay.  Those were not produced to us.  Do you
23 have any reason to know why or why not?
24     A  Oh, I suspect you actually do have them.
25 You're making an assumption in your assertion just a

Confidential - Pursuant to Protective Order

1 moment ago.

2    Q  Okay. You're assuming that I do have your

3 typed-up notes for the depositions?

4    A  I'm not making any assumption at all. Let

5 me -- let me try to help you out.

6      Do you have my report?

7    Q  Yes.

8    A  Do you have my report?

9    Q  I do.

10    A  I -- I suspected you did because you engaged

11 three experts to write a report about it. Whatever

12 notes I had were incorporated into that report.

13    MS. McCONNELL: Okay. Nico, can you send him

14 his CV, please, on Zoom.

15      And we'll mark it as Exhibit 1, please.

16      (Exhibit 1 marked.)

17 BY MS. McCONNELL:

18    Q  Okay. Mr. Nolte, it's in the chat function,

19 and we can share it with you as well. I don't

20 think -- well, whatever, you can open it on your own

21 or you can look on the screen.

22    A  I'm looking on the screen.

23    Q  Great.

24      Is this the most recent version of your CV?

25    A  Well, at first, I can't see all of it, but

1 I'm guessing this is a four-page document that was

2 attached to my report. It is intended to meet the

3 biographical requirements of Federal Rules of Civil

4 Procedure 26(a)(2).

5      It is complete as of the date, at least to

6 the best of my knowledge, as of the date it was

7 produced. Now, since I can't see the whole thing, my

8 assumption could be wrong, but -- but in any event, go

9 ahead.

10    Q  You can open it on your -- on your own

11 computer if that would help you answer the question.

12    A  Well, I -- I can see you're zooming out. It

13 does look like the resume that is intended to comply

14 with Rule 26 in terms of the expert biographical

15 requirements.

16    Q  Okay.

17    A  And I understand it to be complete.

18    Q  Okay. Great. So just to go through this

19 quickly.

20      You have a BA from Whittier College and

21 graduated in 1977, correct?

22    A  Yes.

23    Q  What was your major at Whittier?

24    A  I actually had a double major. I had a major

25 of political science and a major in accounting. The

1 major in accounting also required effectively a major

2 in business so I guess maybe I had three majors. But

3 that's what I -- that's what I ended up taking.

4    Q  Great.

5      You have an MBA from Cal State L.A.?

6    A  I do.

7    Q  And you graduated in 1982?

8    A  Yes.

9    Q  Do you have any -- strike that.

10      You've been a certified public accountant

11 since 1979, correct?

12    A  Right. The board approved my application in

13 January of that year.

14    Q  Is there any sort of recertification process?

15    A  You have to become -- you have to apply for

16 your license if you wish or -- you have to renew your

17 license. That's right. Renew your licence. And that

18 happens every two years.

19    Q  Okay. And what --

20    A  In connection with that renewal, you have to

21 show continuing education requirements and any other

22 requirements that the California State Board of

23 Accountancy requires.

24    Q  Okay. Is your license current to date?

25    A  It is.

1    Q  You're a certified management accountant

2 since 1992?

3    A  It's so long ago, I'm not sure -- hold on.

4 If that's what's in the resume in terms of the year --

5 it does say that. Yeah, I'm sure it's right.

6    Q  Okay. What is a CMA?

7    A  Certified management accountant is a

8 credential issued by the Institute of Management

9 Accountants. It is a credential that is intended to

10 mirror the requirements of the CPA license that you'd

11 asked me about just a moment ago. The difference is

12 the subject matter body of knowledge is different.

13      For a certified public accountant the focus

14 is on auditing taxes, regulatory matters, and

15 basically being a public accountant.

16      In contrast, the certified management

17 accountant has as its focus the skills that would

18 typically be required of a chief financial officer in

19 a company. So it has internal reporting, internal

20 controls, economics, you know, just different subject

21 matters or a different emphasis on the subject

22 matters.

23      But the requirements are -- in terms of

24 experience, testing, recertification, things like

25 that, are -- are similar. And they're purposefully

Confidential Pursuant to Protective Order

Page 18

1 similar.
2     Q   You mentioned recertification.  Is it similar
3 to a CPA where you have to renew your license every
4 two years?
5     A   I suspect they're on a two-year cycle.  I
6 fill out their paperwork whenever they send it to me.
7 But I think it is probably two years.
8     Q   Okay.  And it's current today?
9     A   It is.
10     Q   Okay.  And you've been an accredited senior
11 appraiser since 1995?
12     A   Correct.
13     Q   And what is an accredited senior appraiser?
14     A   That is a difficult-to-get credential in the
15 field of business valuation.  It is a certificate or
16 credential issued by the American Society of
17 Appraisers, which itself is a member of the Appraisal
18 Institute created by Congress.  It is the -- the
19 accredited senior member is the higher -- highest
20 level of membership in that organization.  And as I
21 mentioned before, the requirements are probably the
22 most difficult in the field of business valuation.
23     Q   What are the requirements?
24     A   There's a testing requirement.  There's an
25 additional oral exam that in my case was conducted by

Page 19

1 a panel of three examiners and went for probably
2 around three hours.  There's a peer review of multiple
3 appraisal reports.  There's direct contact of clients
4 who have engaged me as an appraiser to make certain
5 that the engagement was performed professionally and
6 that any real-world transactions that occurred bore a
7 relatively close relationship to the appraisal
8 conclusions that I expressed.
9     There is a five-year full-time experience
10 requirement.  That experience requirement must be
11 logged and verifiable.  And they, in fact, do check
12 it.  There is a test -- a separate test on the Uniform
13 Standards of Professional Appraisal Practice as well
14 as required courses in both that and the ethics field
15 as well as an ethics exam.
16     And then there's recertification requirements
17 that happen every five years.
18     Q   Okay.  And is your certification current as
19 of today?
20     A   My ASA is current, yes.
21     Q   You started your professional accounting
22 employment with Anderson LLP in 1977, correct?
23     A   You had multiple things in your question so
24 some of them would be not correct.  You'll note from
25 my resume that I did have work in a CPA firm for a

Page 20

1 period of time.  And then before that, items that are
2 not in my resume were also accounting work.  Basically
3 I worked my way through school as an accountant.
4     Q   Okay.  And then you started at Anderson in
5 1977?
6     A   I did start at Anderson in 1977 after I
7 graduated.
8     Q   And in your CV it says that you were
9 responsible for forensic accounting and damage
10 analysis practice.
11     Can you just briefly explain to us what your
12 job duties were at Anderson?
13     A   Well, it obviously varied, but generally
14 speaking, my -- I would be considered a line partner,
15 so my primary work was serving clients, but I also
16 served in an advisory function for others who were
17 performing that type of work.
18     I don't know if that answers your question or
19 not.
20     Q   Yeah, when -- when you say "damage analysis
21 practice," are you talking about litigation consulting
22 or something different?
23     A   Litigation -- well, what is commonly thought
24 of as litigation consulting would be part of this
25 practice that -- that I was working in, yes.  So you

Page 21

1 could call it that, yes.
2     Q   Okay.  Was there a different -- was there a
3 different part of what you were doing in damage
4 analysis practice or was it all litigation consulting?
5     A   Well, I -- I -- I had my ASA at the time so I
6 was an independent fee appraiser at the time and could
7 and did accept assignments in that regard.
8     Also, we did take work that had nothing to do
9 with litigation.  So personnel under my direction were
10 doing other types of investigations, you know
11 accounting investigations, due diligence, fraud
12 audits, other compliance audits.  I would consider
13 none of those things to be litigation, yet they all
14 fell within the purview of how I and the people
15 working with me made a living.
16     Q   Yep, I agree.
17     Okay.  And then did you testify in court when
18 you worked at Anderson?
19     A   Yes, quite -- regularly, in fact.
20     Q   Okay.  Approximately how many times?
21     A   I didn't keep track.  You're focusing on
22 in-court testimonies?
23     Q   Yes.
24     A   And -- and only at Anderson?
25     Q   Correct.

Confidential Pursuant to Protective Order

Page 22

1    A  Well, I don't have a good count.  If someone
2  told me it was 200 times, that would not surprise me,
3  but I don't have a count.
4    Q  Okay.  What types of clients did you have at
5  Anderson?
6    A  We would work for both plaintiffs and
7  defendants.  Most of our clients were corporations or
8  very well-heeled individuals.
9    Q  Okay.  You founded Fulcrum Financial Inquiry
10  in -- I'm sorry.  You founded -- hold on.
11       Did you work on -- with IP types of cases
12  when you were at Anderson?
13    A  Yes.
14    Q  What percentage of your client load was IP
15  clients?
16    A  I -- I don't have a percentage in mind.  I
17  can tell you that I -- IP work, and there's different
18  types of IP work, but IP work generally was probably
19  my largest single area and that probably continues to
20  be the case now.
21    Q  Did you have nonprofit clients when you were
22  at Anderson?
23    A  I did.
24    Q  Okay.  Can you give us an estimation of how
25  many?

Page 23

1    A  Not a good one.  I had as -- as one of my
2  clients, a long-term client, a -- probably the largest
3  nonprofit client in the firm in terms of -- of fees
4  generated.
5       Now, just because that happened, I got
6  referred to quite a bit on nonprofits so if someone
7  had an issue on nonprofits, someone might say, oh,
8  call Nolte, he's probably run across this because he's
9  been serving this very large client for -- well, I
10  think I ended up serving him probably 15 years.  So
11  I -- ended up serving as a second partner and
12  advisory partner on a number of nonprofits.
13       I also served as an engagement partner for
14  others, but that was mainly -- that -- that was not as
15  common as me being called and -- and just asked to --
16  to read something or give advice in terms of what was
17  the accounting rules or something like that.
18    Q  Okay.
19    A  So I -- I don't know how you count those
20  clients, in other words.  But I -- I was having to
21  deal with those types of inquiries fairly regularly.
22    Q  Well, that's what I was going to ask you next
23  is, for this large client that you're referring to,
24  what kind of work were you doing for them?
25    A  Initially, which is the reason I was put on

Page 24

1  the assignment, it was an investigation.  And then
2  after that the relationship I would say morphed into a
3  recurring audit.  And so I was -- I basically led --
4  or -- or served on that engagement team and as I got
5  more experience, ended up leading that project for
6  that client.  It was a very long-term client.  So
7  ultimately we were doing audit tax services but it
8  started out as an investigation.
9    Q  Got it.
10       And you were retained by the board of that
11  nonprofit to do an investigation I'm assuming into
12  some area that they were curious about or looking into
13  or was it something else?
14    A  Correct.
15    Q  Okay.
16    A  Correct.
17    Q  Did you -- once it morphed into something
18  more, were you providing services such as working on
19  their annual reports?
20    A  Yes, they -- they -- we -- we -- the
21  deliverable for my firm was annual financial
22  statements of -- there were actually four audited
23  financial statements dealing with different entities
24  which were generally made public.  And then we were
25  also responsible as the tax return preparer for all of

Page 25

1  their entities.
2    Q  Okay.  So 990s?
3    A  990s and the affiliated returns, yes.
4    Q  Okay.  You mentioned four audited financial
5  statements.  What were those?  Are you talking about
6  quarterly financial statements or something different?
7    A  Well, they were annual statements so they
8  were once-a-year financial statements.
9    Q  Okay.  Other than the financial statements
10  and the 990s, what else were you preparing for them?
11    A  Well, we would do whatever other consulting
12  arose based on their needs.  So if they needed
13  assistance that -- involving whatever that came up, we
14  of course would be able to help them and as you would
15  for any full service audit tax client.
16    Q  Have you ever served on the board of a
17  nonprofit?
18    A  Yes.
19    Q  When?
20    A  Oh, it was probably for around 25 years.  It
21  ended maybe, I don't know, around maybe two years ago.
22  So whatever current date minus 25 -- minus two years
23  minus 25 years, whatever that amounts to.  But I was
24  on the board, I believe, for about 25 years.
25    Q  Okay.  What nonprofit?

Page 26

1    A  Public Counsel.  In case you're -- you might
2  be familiar with them because they are locally based.
3  But they're the largest pro bono legal organization in
4  the United States, maybe the world.
5    Q  Did you provide any accounting services to
6  Public Counsel?
7    A  All of the accounting services I provided
8  were on a pro bono basis.  I provided regular --
9  regular accounting services to them, both as a board
10  member, a committee member, a committee chairman and
11  as someone who was assisting in Public Counsel's
12  client work.  So I -- all of my pro bono efforts were
13  done through Public Counsel, and there was a fair
14  amount of that effort.
15    Q  Okay.  Any other nonprofits where you served
16  on the board?
17    A  Well, I don't -- I don't know if you count
18  professional organizations.  They are nonprofits as
19  well.  But I -- I would view them as somewhat
20  different.  But, yes, I have served on boards of -- of
21  professional organizations which are nonprofit
22  organizations.
23    Q  I'm assuming accounting-related professional
24  organizations?
25    A  That would be correct.

Page 27

1    Q  Okay.  So next you founded Fulcrum Financial
2  Inquiry in 2002; is that correct?
3    A  Correct.
4    Q  Approximately how many people does Fulcrum
5  employ?
6    A  We're down considerably at this point.
7  There's probably around, I don't know, a half dozen,
8  maybe a few more, people at this point.
9    Q  Are the six people all accountants or are you
10  including staff?
11    A  No, I'm -- I'm looking at professional people
12  that are, if not accountants, they're economists or
13  appraisers or number -- they're numbers-type guys.
14    Q  Okay.  Got it.  I was going to say numbers
15  people, but I didn't want you to be offended, so I'm
16  glad you said it first.
17    A  No, that's fine.
18    Q  Okay.  Good.
19      What percentage of Fulcrum's business is
20  litigation consulting?
21    A  We don't keep track so I don't know.
22    Q  Okay.  Do you take -- do you accept clients
23  for CPA-type work, preparing filings, IRS filings,
24  reports?
25    A  Okay.  I'm -- I'm going to limit your --

Page 28

1  my -- my answer to preparing tax filings.  We do not
2  prepare compliance tax returns.  We would refer that
3  work out.  I -- I -- we could.  We have a license to
4  do so.  We are a -- a licensed CPA firm.  But we
5  choose not to do compliance tax work.
6    Q  Okay.  And do you do any of the business
7  valuation work currently that you were talking about
8  when we were discussing the ASA credential?
9    A  I lead the business valuation practice at
10  Fulcrum.  I would say that I probably personally am
11  signing, if not a hundred percent, close to a hundred
12  percent of the appraisal reports that go out the door.
13    Q  What percentage of Fulcrum's work is
14  appraisal work?
15    A  I don't know.  We don't keep track.
16    Q  Okay.  Do you have a current caseload now of
17  appraisal work?
18    A  Yes.
19    Q  Okay.  Of the matters that you're handling
20  now, how many are litigation-related and how many are
21  appraisal?
22      MR. THOMAS:  Object to the form.
23      THE WITNESS:  Well, I haven't gone and kept
24  track.  I do know at least one assignment right now
25  that -- that's active that has nothing to do with

Page 29

1  litigation.  The non-litigation assignments tend to be
2  kind of -- they don't last very long.  They're just a
3  couple-week assignments.  So in terms of, you know, a
4  backlog of work, those -- plain appraisal reports get
5  worked through the system fairly quickly.
6      The litigation -- items in which there's a
7  dispute tend to drag on for years.  But I -- at
8  least -- I got at least one assignment where I'm
9  currently doing an appraisal that has nothing to do
10  with litigation.
11  BY MS. McCONNELL:
12    Q  How many litigation matters are you handling
13  currently?
14    A  I -- I don't understand your -- I don't
15  understand your question.  I could give you different
16  answers depending on what you meant by that.
17    Q  Okay.  I'm assuming the word "handling" is
18  what threw you off.
19      So how many litigation matters are you
20  currently working on?
21    A  Well, I'm -- I'm not trying to be obstinate,
22  but if I give you a number there's going to be some
23  assumptions that are not explicit in your question.
24      When you say "currently," I mean, you know,
25  in any two-week period I might have, I don't know, six

Confidential Pursuant to Protective Order

1  different matters, half dozen matters that I might
2  work on in a two-week period.  Some of them might be
3  appraisal, some might not.  Next two-week period,
4  because that's when we do time reports, you'd have a
5  different six matters.
6        But I don't know if that's answering your
7  question or not.
8     Q  I understand.  That's fine.
9        You could be retained on a case or designated
10 on a case but not perform any work on that case in a
11 two-week period; is that true?
12    A  Correct.  I've got matters that are open
13 where we haven't done anything in months.
14    Q  Right.  Right.  Okay.  I get it.
15       And I don't know that you have the answer to
16 this question, but I'll ask you anyway.
17       Since founding Fulcrum approximately how many
18 times have you provided expert testimony?
19    A  That's 19 years.  I couldn't tell you but I'm
20 sure its hundreds, plural, but I don't have a number.
21    Q  Okay.  You submitted with your expert report
22 a list of 31 cases where you provided trial and
23 deposition testimony in the last four years.
24       Is that still an accurate number, 31, or has
25 that changed?

1     A  Well, the list is current as of whatever
2  moment the report's issued.  It's going to change
3  almost all the time so it -- it -- if I issued -- if I
4  issued such a listing today, that list would be
5  different.  Some would drop off and some would be
6  added.
7     Q  And are you able to tell us the percentage
8  breakdown of cases where you testified for a
9  plaintiff's side versus defendant's side?
10    A  My understanding is it's about 50/50.  And
11 that's been the case since I started this work decades
12 ago.  I -- I don't keep track, though.
13    Q  Okay.  On your website you have a longer
14 version of your resume and you have a list of
15 representative testimony experience and that list
16 contains 222 cases.  Of those 222 cases, 81 times you
17 listed plaintiff, that you were a plaintiff expert,
18 and 141 times you were listed as a defendant expert.
19 That breakdown is about 36 percent plaintiff and
20 63 percent defendant.
21       Does that breakdown sound right to you or is
22 that not accurate?
23    A  Well, I've never done the math that you've
24 just done, nor has anyone else, so this is the first
25 time I've ever heard this statistic.

1        It does not change my understanding of what
2  the breakdown between plaintiff and defendant work is.
3  I would suggest it's 50/50.  I suspect if -- if what
4  you're -- I'm just accepting your compilation, which I
5  have not done and never heard anybody else do it.  It
6  wouldn't surprise me if -- if the items that are
7  listed might have more defense work because, candidly,
8  the defense cases tend to be larger and -- and
9  sometimes more interesting.  And the items that I
10 select on that resume, you know, try to be the more
11 interesting ones.
12       So that might be an explanation.  But again,
13 I've never really thought of it -- I've never done
14 what you've done, and it doesn't -- does not change my
15 perception that it's 50/50.
16    Q  Okay.  I hope this case becomes interesting
17 enough to make it to your list one day, Mr. Nolte, but
18 put that aside.
19       So other than this case, how many times have
20 you been retained by Jenner & Block to provide an
21 expert opinion?
22    A  I just -- I have to comment.  I just -- you
23 know, I probably won't put it on my resume because
24 that -- this is another defendant's case and, golly, I
25 wouldn't want to be able to have another defendant

1  matter.  I'll have to add some plaintiff work on that.
2        I'm sorry.  You want to know about Jenner &
3  Block?
4        I've worked with Jenner & Block regularly.
5  They're a large firm and so I've worked with them
6  before.  I -- I suspect that if you went through the
7  listing in the last four years you probably would find
8  a Jenner & Block listing or so.  And -- and you might
9  find the same thing on my other resume as well.  That
10 wouldn't surprise me.
11    Q  Okay.  Have you ever worked specifically with
12 Mr. Thomas or Mr. Sullivan before?
13    A  Not for Mr. Thomas.  Mr. Sullivan, just
14 coincidentally, had another matter where it's
15 currently active where he's involved as well, so I --
16 I think the other matter started first, but I could be
17 wrong.  But in any event, I -- Mr. Sullivan and I
18 worked on more than one matter together.
19    Q  Okay.  Is that either the Big 12 Conference
20 case or the Knickerbocker Films case?
21    A  No.
22    Q  Okay.  Is that a litigated matter in the
23 Central District?
24    A  No.
25    Q  Okay.  Do you know where that case is?

Confidential Pursuant to Protective Order

1   A  Yes, I do.

2   Q  Where?

3   A  It's in Nevada.

4   Q  Okay. And are you -- what kind of -- well,
5 strike that. We'll get to it later.

6     Okay. Have you ever done any -- any work for
7 SAG-AFTRA?

8   A  Other than this assignment, nothing comes to
9 mind.

10   Q  Okay. And have you ever done any work for
11 AFM?

12   A  Other than this assignment, nothing comes to
13 mind.

14   Q  Okay. And then, other than this assignment,
15 have you done any work for the Fund?

16   A  No.

17   Q  Okay. And have you ever worked with the law
18 firm of Bredhoff & Kaiser?

19   A  Not to my recollection.

20   Q  What percentage of Fulcrum's work involves
21 the valuation of patents?

22   A  Oh, I don't keep track. I -- I don't have an
23 idea of that.

24   Q  Okay. You mentioned earlier that a
25 significant amount of Fulcrum's work is in the area of

1 IP; is that correct?

2   A  Well, whether it's significant or not, I did
3 indicate that intellectual property work in one form
4 or another is probably the single largest area. I
5 don't know whether that makes it significant or not.
6 But I -- I have for decades done intellectual property
7 work.

8   Q  Would you be able to tell us how many patent
9 cases you've testified in?

10   A  No. I mean, it's been quite a few, but --
11 but, no, I don't have a number in mind.

12   Q  Okay. While at Fulcrum have you had any
13 nonprofit clients?

14   A  You know, I have to imagine we have, but I --
15 none are coming to mind. Now, I'm excluding from that
16 answer the pro bono work that I've described, which
17 has been a number of assignments, and I view those
18 companies or folks as -- as -- as clients.

19   Q  You're talking about the Public Counsel work?

20   A  It was generally done through Public Counsel,
21 yes.

22   Q  Okay.

23   A  But in -- in some cases they -- the Public
24 Counsel would refer a matter out, I would service that
25 nonprofit and -- and -- but the work came from Public

1 Counsel.

2   Q  Okay.

3   A  I'll say originated from Public Counsel.

4   Q  And when you were doing that work that
5 originated from Public Counsel, were you performing
6 tax-related services or something different?

7   A  Generally -- yeah, there's multiple ways I
8 can answer that question, which is why I'm pausing.

9     I have not signed any tax returns as a paid
10 tax preparer in that. So that's a very technical and
11 narrow answer. But I -- I did not sign any tax
12 returns as a paid preparer. I was not required to do
13 so based on the work I was doing.

14   Q  What was the work that you were doing?

15   A  Well, it would vary. It -- for the --
16 general -- putting aside work for Public Counsel
17 itself, which -- I mean, just put that aside, because
18 I was involved in Public Counsel's tax return.

19     But nevertheless, generally we were setting
20 up accounting systems and advising a nonprofit in
21 terms of the -- I'll call it the business or office
22 portion of -- of their -- of their operation.

23     I mean, maybe just in case, I'm not trying to
24 be oblique, the typical situation was, you had some
25 person who wanted to do good to some group of people

1 that needed help, and they were -- they -- they had
2 their hearts in the right spot and they were very
3 skilled in the areas necessary to provide that
4 assistance, but they were not business people, did not
5 want to be business people and were generally dreadful
6 at anything involving accounting or business or law or
7 anything else involving running the operation of
8 their -- of their nonprofit.

9     So they'd be a disaster in terms of keeping
10 the business and money aspect of their nonprofit
11 together. And so we would help them set that up with
12 the goal of ultimately making them self-sufficient.
13 That sometimes involved helping them hire someone, and
14 we might, in fact, you know, do interviews or help
15 them become self-sufficient. Whatever that took.

16   Q  Got it. Okay.

17     When were you first retained by Jenner &
18 Block to perform work in this case?

19   A  You have my engagement letter. Whatever date
20 is on that engagement letter would be the best date
21 that I could give you. And, in fact, I -- to best
22 answer your question, I'd actually go to the
23 engagement letter and look it up.

24     But if you want something much more
25 approximate, it would be, you know, sometime a little

Confidential Pursuant to Protective Order

1  bit less than a year ago.

2  Q  Okay.

3  A  But again, I'd -- I'd encourage you to look

4  at the engagement letter.

5  Q  The engagement letter is dated June 12, 2020,

6  and it's signed July 7, 2020.

7     Does that sound approximately correct?

8  A  Sure.  That -- that's generally consistent

9  with what I was thinking.  I said a year ago but a

10  little bit less than a year ago and that -- that's in

11  the ballpark.

12  Q  Nailed it.  Okay.

13     According to the listing of trial and

14  deposition testimonies in the last four years that was

15  submitted with your report, you have two Jenner &

16  Block cases on there, which I mentioned earlier, it

17  was the Big 12 Conference case and the Knickerbocker

18  Films case.

19     Were those both intellectual property cases?

20  A  The Big 12 case I would describe as a

21  valuation matter.  We were valuing television rights,

22  so what we were valuing was intellectual property.  I

23  mean, there -- there was nothing physical about --

24  about what we were valuing.  We were valuing broadcast

25  rights.

1     The Knickerbocker case was a participation

2  accounting matter, so that was -- it -- I would view

3  it more as than an accounting issue.  Now -- now, that

4  case ultimately is -- is a vertical integration

5  matter, and so one of the issues involves the pricing

6  of transactions along the vertical channel of

7  distribution.  So in that sense it could be considered

8  an intellectual property case, but that's not -- the

9  underlying formulation of the dispute was a

10  participation interest.

11  Q  Okay.  In the Big 12 Conference case were you

12  retained on behalf of the Big 12 Conference or Fox

13  Broadcasting?

14  A  Fox Broadcasting was my client.

15  Q  Okay.  And then how about in the

16  Knickerbocker Films case?

17  A  Fox was my client there.  I don't remember

18  which entity of Fox.  But ultimately, if you follow

19  the breadcrumbs up to the parent, it was a Fox entity.

20  Q  Okay.  I have it as 21st Century Fox.

21  A  Okay.

22  Q  Okay.

23     MS. McCONNELL:  Okay.  Let's go to Exhibit 2,

24  Nico, if you could send him his invoices, please.

25     (Exhibit 2 marked.)

1  BY MS. McCONNELL:

2  Q  And again, you're free to open them up on

3  your own in the chat, and then we'll share the screen

4  as well.

5  A  Okay.  How can I help you?

6  Q  I don't know.  Give me a second.

7     Okay.  So on page 2 of this first invoice

8  that's dated October 30th, 2020, you are billing for

9  4.4 hours of work.

10     If you recall, is this the first -- strike

11  that.

12     If you recall, is this the initial time that

13  you spent on this case, was in October of 2020 or

14  September and October of 2020?

15  A  I endeavor to number each of my bills in the

16  transmittal.  So I think if you go to the page before

17  that it will say whether it's the first, second,

18  whatever bill.  It does say here first billing.  So

19  this is the first bill and -- so if it isn't the first

20  time I incurred, it was certainly the first time I

21  billed.

22  Q  Okay.  You have here under number 1 some

23  documents that you reviewed, the complaint, the motion

24  to dismiss and related papers, the opposition to class

25  certification, response to first set of

1  interrogatories.

2     Do you typically insert a complete list of

3  everything that you've reviewed into your invoice or

4  are there sometimes documents that you've reviewed

5  that don't make their way into the invoice?

6  A  Well, I'm not purposefully leaving anything

7  out unless it was simply not important.  But I would

8  not represent that those are the only things I -- I

9  received.  I don't know if that's helpful or not.  But

10  I'm -- I'm trying to describe the work but I don't

11  want to -- I'm not being tedious about it either.

12  Q  Okay.  So there might be some materials that

13  you reviewed that don't make their way to invoice?

14  A  Sure.  Particularly if they weren't

15  particularly important for whatever was occurring in

16  the matter at that time.

17  Q  Okay.  If you look at number 3, it says,

18  "Initial review of the cost information accumulated by

19  the Fund pertaining to the Fund's research function."

20     Do you recall what documents or materials you

21  reviewed?

22  A  Well, the -- the best answer is no, I don't.

23  But your admonitions also said, well, golly, I have a

24  right to whatever you can maybe think of without --

25  that isn't guessing and I'm -- I'm on the border of

Confidential Pursuant to Protective Order

1 guessing right now.

2      I know there is cost information that was

3 produced in this matter. It was given -- the results

4 of that were given to you by Ms. Taub in one of her

5 depositions. And I was aware of that information at

6 the time it was being accumulated, so I highly

7 suspect, although I really don't recall, that that's

8 what this is referring to.

9    Q Okay. I'm trying to find your words of how

10 you characterized it. But it was the information to

11 the Fund to perform their research function; is that

12 correct?

13    MR. THOMAS: Object to form.

14    THE WITNESS: I do mention that in -- I think

15 it's mentioned in my report, yeah.

16 BY MS. McCONNELL:

17    Q Yes, I think your -- your heading for that

18 section is, "The Fund's cost of maintaining the

19 participant database."

20    A Okay.

21    Q You mentioned you were aware that Ms. Taub

22 was collecting this information. Did you give her any

23 input on -- on where to find this information or how

24 to calculate this information?

25    A I don't recall anything like that. If -- if

1 they did have questions of me, I certainly would have

2 answered them but I don't have any recollection of

3 that.

4    Q Okay. Your second invoice has the date

5 December 31, and this is for work performed in --

6 when? I think November and December of 2020. Yeah.

7 Perfect.

8    MS. McCONNELL: And, Nico, if you want to go

9 to the next page.

10    Q So again, you have three documents here that

11 you read or scanned. But again, you could have

12 received other ones that were not important to your

13 analysis that aren't included here, right?

14    A You said important to my analysis?

15    Q Yeah, I thought that was your word, but I

16 could have --

17    A No, I -- I'm sorry if -- I -- what I had in

18 mind was unimportant to the analyses. So in other

19 words, if there's something that's central to my

20 analysis, I'm not telling you I'm perfect, but my

21 intention would be to list it.

22    If I had something that was received but it

23 really didn't matter and consequently, I didn't spend

24 much time on it, then I probably would not list it

25 even though I had physically got -- you know, seen a

1 copy of it.

2    Q Okay. On task 3 you have, "Research from

3 public sources regarding the companies that sell

4 information as their primary business."

5    How did you choose the companies that you

6 ended up researching?

7    A This made its way into my report as one of

8 the first numbered or lettered conclusions. I was

9 looking for examples of well-known companies that sell

10 information as their -- if not primary, it's certainly

11 their largest business and -- in -- in order to

12 demonstrate what I believe was demonstrated in the

13 report in that lettered conclusion A, as in apple.

14    So I mean, what was I doing, I was looking

15 for information companies that -- that were well-known

16 and -- and were highly valuable. And at some point I

17 stopped because I didn't want to beat a dead horse

18 with something which I thought should be self-evident

19 by the time you read the examples that I gave. I

20 could have come up with others, but I stopped when I

21 was worried about overdoing a point.

22    Q Why did you -- why did you choose companies

23 that sell information as their primary or largest

24 business as opposed to companies that sell information

25 as their ancillary business?

1    A Something in the transmission was -- was --

2 did not come across clear so someone will need to

3 repeat the question, unfortunately.

4    Q I can do it.

5    Why did you choose companies that sell

6 information as their primary or largest business as

7 opposed to companies that sell information as their

8 ancillary business?

9    A What I was looking for was information

10 about -- that -- that was disclosed publicly. So

11 if -- if it's an ancillary business, then the public

12 disclosures are going to be minimal, short, brief,

13 maybe nonexistent. And so I -- I needed to have

14 companies that had as the primary business in order to

15 demonstrate what value was being generated by the

16 information.

17    So, for example -- I'll just give you an

18 example. Let's say we went to General Motors.

19 General Motors has a licensing program and -- but it's

20 not their primary business. General Motors in their

21 public disclosures might have a paragraph or two about

22 their licensing, but it's not going to -- it's not

23 going to allow you to say that the General Motors

24 licensing is worth X billions of dollars because their

25 primary operation is not licensing.

Confidential Pursuant to Protective Order

Page 46

```
1           You could even go to a company as big as,
2   let's say, Disney.  I've done quite a bit of work for
3   Disney, including their licensing.  Disney has a
4   substantial business in licensing, but it is not their
5   primary business.  And so I could not say with Disney
6   that the substantial market capitalization of -- of
7   Disney is because of their intellectual property
8   involving their characters.
9           Even though no one would dispute that the
10  Lion King and, you know, Mickey Mouse and all of those
11  have -- have huge value, but Disney's also got a huge
12  film library, a huge studio.  They've got everything
13  that makes up Disney.  I mean, you know, the theme
14  parks, everything else.  And as a result you just
15  can't reach any conclusions about the value of
16  Disney's intellectual property even though Disney's
17  got substantial amounts of intellectual property.
18          I'll give you another example.  Nike.  I
19  mean, I've done a substantial amount of work for Nike
20  in -- in their licensing area.  The swoosh is very
21  valuable to Nike.  And they get a lot of money from
22  that swoosh.  But you can't say how much of the
23  substantial market capitalization of Nike is due to
24  the swoosh versus all the stuff they sell.
25          So in order to avoid that problem, I had to
```

Page 47

```
1   do what I did so that I could equate the information
2   to the market cap, which was one of the points that I
3   was trying to make.
4       Q   Were you able to find any nonprofit
5   businesses who were in the business of selling data?
6       A   A nonprofit would never be in the business of
7   selling data.  That does not mean that they cannot
8   and, in fact, might not be required to charge for
9   items of value that -- that they're delivering to
10  others.  But no, I -- I would not expect to see a
11  nonprofit whose primary business was the sale of
12  information.
13      Q   And you mentioned licensing a few times.
14          Were you -- were you focused on locating
15  companies that license information as opposed to the
16  sale of information or did that distinction not matter
17  to you for this exercise?
18      A   As a legal matter, almost all -- I'll call it
19  sales, I'm being a bit imprecise there, but almost all
20  sales of information actually take the form of
21  licenses.  So in other words, the agreements are
22  almost across the board.  Says we're going to let you
23  use this piece of information for this specific
24  purpose both in terms of, you know, number of uses,
25  times of uses, et cetera.
```

Page 48

```
1           And -- and it's legally a license for a
2   specific limited use versus sale.  Because if it was a
3   sale and then someone should resell it, then of course
4   you'd lose the value of the intellectual property.
5           Now -- now, a common person might say, I
6   bought this list, but they really didn't buy the list,
7   they legally licensed it for a specific purpose.
8       Q   Are you aware of any nonprofits that charge
9   for data?
10          MR. THOMAS:  Objection; vague.
11          THE WITNESS:  Nonprofits will sell mailing
12  lists, and I have seen that done, so I guess in that
13  sense the answer would be, yes.  It's -- it's a
14  sensitive area.  But I have seen nonprofits sell or
15  license mailing lists.
16  BY MS. McCONNELL:
17      Q   Were these nonprofits clients of yours?
18      A   Yes.
19      Q   Okay.  And why do you say it was a sensitive
20  area?
21      A   Well, unlike the situation that we have here
22  in this matter where the providing of the names pretty
23  directly would benefit the people who are -- the Fund
24  is trying to send money to, that is not uniformly the
25  case in the sale of -- or -- or licensing of a mailing
```

Page 49

```
1   list.
2           You know, in a -- in a less, you know,
3   charitable or -- or kind way, you could think of that
4   as junk mail, and people when they think of junk mail
5   they don't -- they're not terribly happy about getting
6   more junk mail.  And if -- if they thought that a
7   charity was selling or licensing their information so
8   they'd get more junk mail, that -- that may not be
9   something that a charity wants to highlight.
10      Q   How did these charities that you worked with
11  report the sale or license of the mailing lists on
12  their tax forms?
13      A   It depends on which tax form.  But generally
14  the -- the mailing list licensing would be unrelated
15  business income.
16      Q   Okay.  So on the 990 it would be listed under
17  unrelated business income?
18      A   Well, I think it's actually a separate form,
19  but -- but, yes.  But in -- in most cases I -- I think
20  what I just described would be unrelated business
21  income.
22      Q   Okay.  And that's because the charity's
23  primary purpose isn't the sale or license of data,
24  it's just something that they're doing on the side?
25      A   That would be not a very good explanation of
```

Confidential Pursuant to Protective Order

Page 50

1  it.  I mean, I can appreciate why you'd say that, but
2  that would not be -- the -- the issue of unrelated
3  business income is one of -- of parody with for-profit
4  organizations.
5      So if, for example, there's a for-profit
6  organization that has to fully pay taxes and it is
7  selling mailing lists and a charity says, we got some
8  pretty great mailing lists, how -- you know, buy our
9  list instead, we can charge you less money because
10 after all we don't pay taxes.  That is exactly what
11 the tax rules are trying to avoid.
12      So it is not just what you said.  It -- the
13 underlying intent is to make the charities on an even
14 basis with the nonprofits -- or with -- with the --
15 with the for-profit enterprises.
16     Q   When -- when a charity lists something as
17 unrelated business income, does that mean that they
18 get taxed on that income?
19     A   Yes.
20     Q   Okay.
21     A   Well, yeah -- yes, it's -- it's a little bit
22 different than that, but -- but we'll just call it
23 yes.  I mean, you have to go through a tax
24 calculation.  It might be that there's not much tax
25 actually paid but -- but as a starting point it

Page 51

1  becomes subject to possible taxation.
2      Q   Better way of saying it, yes.
3          Okay.  Have you reviewed any contracts for
4  the sale of mailing lists for these charity clients of
5  yours?
6      A   I don't recall.
7      Q   Okay.  Are you familiar with licensing
8  agreements in general?
9      A   Yes.
10     Q   Okay.  Do licensing agreements say anything
11 typically about returning or destroying the lists upon
12 the license's expiration?
13         MR. THOMAS:  Objection; vague and overbroad.
14         THE WITNESS:  Well, you're not asking about
15 this situation, you're asking about some situation in
16 which there's a license for a one-time use; is that --
17 is that fair?
18 BY MS. McCONNELL:
19     Q   I'm -- I'm talking about licensing agreements
20 in general.  I'm not talking about the services
21 agreement in this case.
22     A   I don't know that I can answer that question.
23 If -- if the -- if the payment is -- is for one use,
24 then you get one use.
25         Frequently the way that's -- that's actually

Page 52

1  managed or monitored is that the person who controls
2  the list actually does the mailing.  So in other
3  words, you -- you provide a mailing service -- you, I
4  say -- I mean the person selling the mailing list does
5  not actually give the list away.  They say, you know,
6  we're going to send out X parcels, it will be to this
7  demographic, you give us the pieces you want mailed
8  and we'll charge you for the postage and -- and we'll
9  mail it.  And so they keep control of the list to make
10 sure it continues to have -- retain its value.
11     Q   I see.
12         Have you seen a situation where the nonprofit
13 organization would give away the mailing list to the
14 party it is contracting with and then say, at the
15 conclusion of this license, return the information to
16 us?
17     A   Assuming I understand your hypo -- no, I've
18 not seen that.  Charities don't -- should -- should
19 not be giving things away.  If they were giving things
20 away of value, I would tell them to stop it.  And --
21 and I don't recall ever seeing that, though.
22     Q   Okay.
23         MS. McCONNELL:  Did you guy want to take a
24 quick break or do you want to keep going?  We've been
25 going for about --

Page 53

1      MR. THOMAS:  Probably a good time.
2      MS. McCONNELL:  Okay.  We'll take maybe
3  five minutes and come back.
4      MR. THOMAS:  Sure.
5      THE VIDEOGRAPHER:  We are now going off the
6  record, and the time is 10:13 a.m.
7      (Recess.)
8      THE VIDEOGRAPHER:  We are now going back on
9  the record, and the time is 10:25 a.m.
10 BY MS. McCONNELL:
11     Q   Mr. Nolte, did the nonprofit status of
12 SAG-AFTRA, AFM or the Fund impact your analysis in
13 this case?
14     MR. THOMAS:  Objection; overbroad, vague.
15     THE WITNESS:  Could you read the question,
16 please?
17     MS. McCONNELL:  Shari, do you mind.
18     (Record read.)
19     THE WITNESS:  In order to answer that
20 question, I have to put myself in a situation of
21 saying it was a different entity that was other than
22 this particular fund and would that alter the
23 conclusion.  And -- and I suspect it would not but
24 I -- but the point is I haven't really done that.
25         So I -- I was aware of the -- of -- of who

Confidential - Pursuant to Protective Order

Page 54

1  these particular entities were from the very beginning
2  of the assignment.  And so in some respects you're
3  asking me to speculate in terms of reinventing the
4  entire assignment with a different set of entities.
5  And I -- I don't know that I'm comfortable agreeing
6  with that.
7  BY MS. McCONNELL:
8      Q  I think what you're saying is, you're talking
9  about the relationship between the AFM, SAG-AFTRA and
10  the Fund as opposed to -- I think my question was
11  just, does the fact that AFM and SAG-AFTRA have
12  nonprofit status affect your opinion?
13      MR. THOMAS:  Same objections.
14      THE WITNESS:  And I'd have to give you the
15  same answer.  I was aware of the relationship between
16  the parties, and I was aware of their tax status.  I
17  wasn't trying to do a second assignment in terms of
18  what the difference would be if they were a for-profit
19  enterprise.
20      Nothing comes to mind in terms of
21  differences, but that does not mean that differences
22  don't exist that would be clear to me if I actually
23  rethought about the entire assignment.  But since I've
24  not rethought the entire assignment, I don't think I
25  can give a complete answer to your question.

Page 55

1  BY MS. McCONNELL:
2      Q  Did you take into consideration the fact that
3  AFM and SAG-AFTRA have fiduciary responsibilities to
4  their membership or was that not an important part of
5  your report?
6      A  Well, to the extent that you're asking me for
7  a legal opinion in terms of the existence of
8  fiduciaries, I'm not expressing any such opinion.  I
9  do know that your folks expressed quite a few opinions
10  about fiduciary duties.  I'm certainly aware of
11  fiduciary duties, but I've not reached any opinions
12  regarding the existence of those duties.
13      And if I did not answer your question, I'm
14  happy to take a follow-up, but that's what came to
15  mind as you -- based on your question.
16      Q  Yeah.  I want you to assume that there are
17  fiduciary duties.  I'm not asking you whether there
18  are or there are not.
19      Assuming that there are fiduciary duties, did
20  you consider what those obligations would be in
21  preparing your report?
22      MR. THOMAS:  Objection.
23      THE WITNESS:  Yes.
24      MR. THOMAS:  Overbroad and vague.
25

Page 56

1  BY MS. McCONNELL:
2      Q  Okay.  And what are --
3      THE WITNESS:  Okay.  Hold on.  Hold on.  I
4  should -- I -- I apologize to Mr. Thomas.  I should
5  have waited and been slower.
6      But the answer is yes, I did consider that.
7  BY MS. McCONNELL:
8      Q  Okay.  How did that factor into your
9  analysis?
10      A  Well, I am aware that each of the parties
11  that are defendants in this matter have multiple
12  persons for which they owe a responsibility, which
13  you've told me to assume is a fiduciary duty versus
14  some other type of duty that might be slightly
15  different legally.
16      With respect to the unions in particular, I
17  am aware that their membership includes primarily
18  people who are not beneficiaries of the Fund.  And the
19  errors made by each of the experts put forth by
20  plaintiffs failed to take that into account.
21      In contrast, because of the fact that there
22  are different groups of beneficiaries, specifically at
23  the unions, the unions are not allowed to do what the
24  various plaintiff experts have alleged.
25      Q  If the entities to the service agreement were

Page 57

1  identical but they were for-profit businesses rather
2  than nonprofits, can you think of any portion of your
3  analysis that you would have -- would have approached
4  differently?
5      A  I think I answered that --
6      MR. THOMAS:  I'm just going to object that
7  it's vague and overbroad.  But I'm sorry to be slow on
8  the draw there.
9      THE WITNESS:  Well, I think it's also asked
10  and answered, but let me try to answer it that way.
11      I think I've answered the -- this
12  substantively, the identical question before.  I've
13  told you that I was aware of their -- the tax status
14  of each of these defendants and that I've not
15  reconstituted or redone my engagement on the fly right
16  now based upon some group of entities that have not
17  been my clients and have not been involved in this
18  situation from the very beginning.
19  BY MS. McCONNELL:
20      Q  I'm asking you to -- I'm -- I'm giving you a
21  hypothetical and asking you to assume that the
22  entities to the service agreement were for-profit
23  businesses rather than nonprofits.
24      And in that situation is there any portion of
25  your analysis that you would have approached

Page 58

1  differently?
2      A   If this question is important to you, I will
3  endeavor to answer it; however, I cannot answer it
4  right now without looking at my report.  I am happy to
5  look at my report.  As you know, my report is lengthy.
6  It is 28 pages long.  I suspect it will take me
7  probably an hour and a half to try to formulate an
8  answer and if your question's important to you, I'll
9  devote that hour and a half to it on the record.
10      But it is a possibility that I might need
11  even more time and I just want to warn you before I
12  start reading a report and thinking about it that you
13  know that you've asked.
14      Do you really want me to start that now?
15      Q   I will tell you that all of my questions are
16  extremely important to me.
17      A   Good.
18      Q   But I do not want --
19      A   Let me take the hour and a half.
20      Q   No.  I do not want you to sit there and read
21  the report.  I was asking you if you could think of
22  anything -- because you obviously spent a lot of time
23  preparing this report, if you could think of anything,
24  sitting here today, that you would have analyzed
25  differently, but if not, that's okay, we'll go through

Page 59

1  the report and when we go through it, if something
2  comes to your mind, you can let me know and I'll ask
3  you again.
4      But if you can't think of anything without
5  spending an hour and a half or more, then that's okay,
6  you can say, I can't think of anything, sitting here
7  today, without spending an hour and a half.  And we'll
8  move on.  Is that fair?
9      A   Well, I'm not sure it's fair.
10      But -- but in any event, I've answered that
11  question two times, at least, already.  I suspect the
12  only reason you're asking me a third time is you're
13  trying to squeeze out of me an answer that's different
14  than the first two that I gave you.
15      And the answer is no, I really don't think
16  that's fair.  If you want me to take the time, I will.
17  Since you don't want me to take the time, I won't.
18      So what's your next question?
19      Q   I'll let you know.
20      MS. McCONNELL:  Let's look at the next
21  invoice, please, Nico.  This is the third invoice for
22  work between -- oh, I'm sorry.  Let's skip the third
23  one and let's go to the fourth invoice for work
24  February 16 through March 15.
25      Q   And in addition to yourself, you have noted

Page 60

1  personnel Brian Nolte.
2      Who is that?
3      A   Brian's a full-time employee at Fulcrum.  He
4  is a CPA.  He's got probably around ten years
5  experience doing this type of work.
6      Q   Do you know which -- which tasks did Brian
7  Nolte perform and which tasks did you perform that are
8  listed here?
9      A   Brian generally was involved in performing
10  the analysis on what we typically called the 50-song
11  sample.  The results of that are attached as -- I
12  believe it's Exhibit 2 to my report.
13      Brian also probably participated in one of
14  the phone calls.  So anything that involves the
15  preparation of those exhibits, the performance of
16  those calculations or the related reporting of that in
17  phone calls, Brian would have been involved in.
18      Q   Okay.  Item 6 on here says, "Initial research
19  regarding the cost percentages of other music royalty
20  reporting organizations."
21      Was that done by you or Brian?
22      A   I did that.
23      Q   Okay.  Why did you do that?
24      A   One of the questions that came up is whether
25  we could find other indications of what the cost or

Page 61

1  value would be or the general cost loads, if you wish,
2  of these other reporting organizations.  And so I
3  offered to perform some initial research to see if
4  there was any way I'll call low-hanging fruit that
5  would be useful one way or the other in terms of
6  addressing this question.
7      Q   When you say --
8      A   And -- and you're probably going to ask,
9  well, why did I say low-hanging fruit.  And I realized
10  once I said that, it's going to get a question.
11      What I meant by low-hanging fruit is, I was
12  not endeavoring to have this be comprehensive.  It was
13  intended as a first pass to see what observations, if
14  any, could be drawn with a research effort that was
15  not exhaustive.
16      Q   When you say "cost loads," are you referring
17  to the total administrative expense of these music
18  royalty reporting organizations or something
19  different?
20      A   It would include that, but it also could
21  include other things that might be useful to the task
22  that was at issue in this litigation.
23      Q   How did you identify which organizations to
24  research?
25      A   It was just based on Internet searches so,

Confidential - Pursuant to Protective Order

**Page 62**

1  you know, Google was my friend. You could pretty
2  quickly find these out through the power of keyword
3  searches.
4      Q   What did you find through this initial
5  research?
6      A   I found that there wasn't anything that was
7  particularly useful, which is why you don't see
8  anything meaningful in the report that is separate.
9  The detail provided by the organizations just didn't
10  allow -- and I say "detail provided," provided
11  publicly, so what I could get from just, you know,
12  doing Internet searches was not sufficient to allow me
13  to reach any conclusions one way or the other
14  regarding the issues at hand.
15      Q   Okay. Did you find that other music royalty
16  reporting organizations incurred costs for the
17  purchase of performer data?
18      A   I didn't find that, although I didn't expect
19  to and therefore I really wasn't looking for that.
20  What I was looking for instead was overall
21  cost percentages and, you know, whether the funds were
22  out of line. And the answer is, the funds were not,
23  the funds cost were not out of line in light of the --
24  the different task, the more challenging task that the
25  Fund has.

**Page 63**

1      But it was not sufficiently clear based on
2  the variations that I was finding that I could draw
3  any statistic conclusions from that, which is why I
4  gave you the answer I did a minute ago.
5      Q   Okay. Why do you think that the Fund has a
6  more challenging task than these other music royalty
7  reporting organizations?
8      A   Most of these organizations have a task that
9  might be equivalent to SoundExchange. For example,
10  they know who the copyright owners are, they know who
11  the featured artists are, these are people and
12  beneficiaries that are more obvious and -- and have a
13  greater payment.
14      So those folks are much more likely to say,
15  hey, I -- I got to be paid and -- and here's my
16  information and -- versus folks that are both more
17  numerous, as well as have much smaller allowance, and,
18  in part, because of those two things, do not have as
19  much public information about it.
20      So it is inappropriate to look at, for
21  example, SoundExchange's costs and equate those to the
22  Fund because the Fund's task is more complicated and
23  more difficult. And the same thing is true for some
24  of these others.
25      Q   Did you look into any music royalty reporting

**Page 64**

1  organizations that were responsible for providing
2  royalty payments to nonfeatured performers?
3      A   I don't recall seeing any that I could find
4  that were publicly available.
5      Q   Okay.
6      MS. McCONNELL: Okay, Nico, the next one,
7  please.
8      Q   This next invoice is for the period March 16
9  through April 15, 2021. And if we look at the --
10  list of tasks on the next page, similar question as
11  before. Which tasks were performed by Brian Nolte as
12  opposed to you?
13      A   Brian does not have much time on this bill.
14  I suspect that the time he has involves the document
15  production. But I -- it's not much time so I couldn't
16  be certain that that was the only thing with which he
17  was involved. But I suspect that's it.
18      Q   Did you scan/read the Bookman book?
19      A   I did.
20      Q   Okay. What inconsistencies did you find
21  between Mr. Bookman's report and his book?
22      A   I don't have any written documents or notes
23  on that that would help me remember. I did have a
24  conversation with legal counsel on that and they're --
25  the stuff I gave them was probably more complete than

**Page 65**

1  I'll be able to give you now. So I'm certainly not
2  going to try to tell you that I've got a sufficiently
3  good photographic memory that I can tell you what that
4  was a month ago.
5      But -- but generally speaking, Mr. Bookman
6  claims that if -- in his two reports, that if you do
7  something that is not required through your exempt
8  purpose, that you're going to ruin your entire tax
9  exempt status and -- and that you'll just be done with
10  it. You'll ruin your organization and so you can't
11  possibly do what -- what these folks have done.
12      In contrast, Mr. Bookman's book spends the
13  majority of its time explaining unrelated business
14  income and mechanics of when unrelated business income
15  would apply, when it would not apply, what are the
16  cases involved. And it's -- the book is, despite its
17  title, largely a book on unrelated business income.
18      So it's kind of hard on one side for
19  Mr. Bookman to say, oh, golly, if you did this you'd
20  have unrelated business income and you're done, you
21  guys might as well throw off your -- you know, tear up
22  your tax exemption because you're -- you're just an
23  evil place, when he writes an entire book on reporting
24  for -- reporting for that.
25      Second, although it's not the focus of the

Confidential Pursuant to Protective Order

Page 66

1 book, although I would suggest it should have been
2 more of a focus than it was, Mr. Bookman does
3 acknowledge and describe inurement. And Mr. Bookman
4 in his report, or reports, plural, fails to address
5 the importance of inurement, that it would exist in
6 this situation if the unions did what he claims they
7 were required to do.
8     Those are the two things that immediately
9 come to mind.
10    Q  Do you --
11    A  Pardon me, I could -- I could look at the
12 book again, maybe I'd come up with a third or fourth
13 thing, but I haven't looked at the book since I first
14 did this and reported to legal counsel.
15    Q  The unions didn't report the service fee
16 income as unrelated business income, did they?
17    A  I have not seen their -- their tax returns so
18 I -- I could not tell you one way or the other.
19    Q  Okay.  If they didn't, if you assume that
20 they did not report the service fee income as their
21 unrelated business income, would they face any sort of
22 repercussion by the IRS?
23    MR. THOMAS:  Object to the form; incomplete
24 hypothetical, calls for speculation.
25    THE WITNESS:  Well, I've not addressed

Page 67

1 their -- the unions' requirements for unrelated
2 business income in this situation.  It is not a
3 foregone conclusion that it -- it would be unrelated
4 income or that there'd be tax.  I've not talked with
5 the unions' various tax preparers or seen their
6 returns so I -- it would be premature for me to reach
7 a conclusion that you've now asked me to jump to.
8 BY MS. McCONNELL:
9    Q  Okay.  You're not planning on providing any
10 opinion at trial about the unions' 990s or their --
11 whether they should have marked this income as
12 unrelated business income?
13    A  I can't answer that yes or no because you're
14 asking me to tell the future.  You're saying my plans.
15 My -- my plans are to tell the truth on questions that
16 someone asks me that the Court wants me -- to hear, to
17 hear an answer from.
18     If Mr. Bookman, for example, wants to show up
19 at trial -- and by the way, his deposition hasn't
20 occurred so I have no idea what his deposition is
21 going to come out of that.  But if Mr. Bookman wants
22 to say, oh, golly, I've looked at this and this is
23 dead wrong and, you know, shame on the unions and
24 everything else, assuming this testimony that I don't
25 know is going -- has even happened or will happen does

Page 68

1 occur, I'd actually be surprised if Jenner & Block
2 didn't ask me to take additional time looking at it
3 that I've not yet done.  But as of this moment, I've
4 told you what I've done.
5    Q  Okay.  You didn't provide a rebuttal report
6 in this case, right?
7    A  I think you're really more saying a
8 surrebuttal report because the three expert reports
9 that -- that talk about much of this would be in their
10 second report.  And Rule 26 in terms of experts do not
11 provide for a surrebuttal report.
12    Q  No.
13    A  But to -- but to answer your question
14 directly, I did not issue a rebuttal report.
15    Q  Your report and Mr. Bookman's report happened
16 on the same day.  They were exchanged on the same day.
17 Mr. Bookman provided a rebuttal report to your report,
18 which you've read and you've mentioned that you've
19 read, but you did not provide a rebuttal report to
20 Mr. Bookman's report, correct?
21    A  That is what I just told you, yes.  Why --
22 I'm not sure I know what additionally you're asking me
23 that I haven't just already told you.
24     But go ahead.
25    Q  Did you review Ms. Kerry Adams' report?

Page 69

1    A  No.  Well, hold on.  Hold on.  Kerry Adams,
2 I'm sorry.  Ms. Adams -- Kerry?  Hold on.  Hold on.
3    Q  Holding.
4    A  No, my apologies.  I have a short report
5 dated March 26, 2021, from Kerry Adams.  So, yes, I've
6 seen that.
7    Q  Did you formulate any opinions on Ms. Adams'
8 report?
9    A  I'll have to look at it.
10     That report has a three-sentence paragraph
11 under opinions and conclusions.  One of those
12 sentences is that, "None of the major CMOs around the
13 word annually pay a percentage of their revenues to
14 purchase data from third parties."
15     So I think that is the total of the opinion
16 that you're asking me about.  And I've not formulated
17 anything or I'm suggesting that I have a list of
18 anyone who is in the same situation as the Fund that
19 would do what that one sentence says.  So in that
20 sense I guess I have no rebuttal other than perhaps
21 say it's irrelevant and -- and doesn't prove anything.
22 But if -- if that's what you -- if that's what you
23 want for rebuttal, then, sure, I guess I have that.
24    Q  I really don't want you to say anything or
25 not say anything.  I'm trying to figure out what your

Page 70

1  opinions are so that when you testify at trial we know
2  what your opinions are.  So if they're -- if you're
3  not planning on providing an opinion on Ms. Adams'
4  report, then that's fine.  But if you're -- now you're
5  saying your opinion on Ms. Adams' report is that it's
6  irrelevant?
7        A  Well, I told you earlier in this deposition
8  that I did not find -- first of all, the publicly
9  available information would typically not disclose
10  what you just asked me about earlier.  What you had
11  asked me about earlier is the same thing that
12  Ms. Adams is reporting in that one single sentence.
13        The fact that -- that someone does not
14  include in their financial statements an explicit
15  disclosure regarding paying a percentage of their
16  royalties does not mean that it doesn't exist.  It
17  simply means that those companies were following the
18  disclosures required under generally accepted
19  accounting principles and that those principles, by
20  and large, do not require what she says they didn't
21  disclose.
22        So the fact that someone did not disclose
23  something that they weren't required to disclose does
24  not prove that it doesn't exist.  It just simply
25  proves that she was looking in the wrong spot or that

Page 71

1  where she was looking because it's the only spot
2  available simply doesn't disclose it.  So it doesn't
3  prove anything.
4        Additionally, for the opinion to be useful
5  for anything, one first has to state or know that the
6  organization to which she's making a comparison is in
7  a comparable situation.  An appraiser might think of
8  that as a guideline firm or a guideline transaction.
9  Absent there being such sufficient similarity, the
10  comparison is ill-advised and should not be done.
11        Now, I -- the legal counsel of Jenner & Block
12  have not asked me about that.  You have.  If you want
13  to ask me that at -- at trial, I'll give you the same
14  answer I just gave you.  I guess given that you just
15  asked the question, Jenner & Block may decide that's a
16  pretty good answer and maybe I should ask Mr. Nolte
17  that at trial.
18        But the answer is, you say what I'm planning
19  to do, I'm not planning to do anything other than show
20  up and answer people's questions.  I don't get to make
21  a presentation.  It's not like I show up and am given
22  a screen and an anvil or an easel and say, here, go
23  put on your presentation.
24        I get to answer questions, and I don't know
25  what questions you're going to have.  I don't know

Page 72

1  what questions Jenner & Block's going to have.  I
2  don't know what questions the Court's going to have.
3  And as a result, I don't have any plans other than to
4  show up and tell the truth.
5        Q  Do you know what Ms. Adams was reviewing in
6  order to prepare her report?
7        A  Well, it looks like she's got this exhibit,
8  and it would appear that she's looking at those
9  things.
10        Q  You think that she's looking at what things?
11        A  I'm simply saying that she's -- she mentions,
12  says, "A spreadsheet reflecting the data collected to
13  date is attached as Exhibit 2."
14        And so I have a copy of a spreadsheet and
15  it's a two-page document and I believe that is the
16  item to which she is referring.
17        Q  Okay.  Did you review Ms. Barry Kessler's
18  report?
19        A  Yes.
20        Q  Okay.
21        A  And -- and just to make sure we're on the
22  same -- there's a March 26, 2021 report on the
23  letterhead of DAS, and I have looked at that.
24        Q  Okay.  Did you formulate any opinions on
25  Ms. Kessler's report?

Page 73

1        A  Certainly I had reactions as I went through
2  it, yes.
3        Q  Okay.  What were your reactions?
4        A  Okay.  This is going to be a long and lengthy
5  answer because I have to reread the whole report in
6  order to figure that out.  I don't have anything
7  prepared, but I'm happy to do what you just asked.
8        Q  That's fine, we'll skip it.
9        Did either Ms. Adams' report or Ms. Kessler's
10  report cause you to reconsider any of your own
11  conclusions from your March 8 report?
12        A  If by "reconsider" you mean carefully think
13  about it, yes, I did carefully think about it.
14        Q  Okay.  Did it cause you to want to change
15  anything in your March 8 report?
16        A  No.  In fact, it confirmed that what I had
17  was correct because the items that, for example,
18  Ms. Kessler said were -- they had problems with them.
19  And so I'm thinking to myself, well, if -- if this is
20  the reasons why my report is wrong and those reasons
21  are not correct, then I guess my report's fine.
22        Q  Have you ever done any work for SoundExchange
23  before?
24        A  Nothing comes to mind.
25        Q  Okay.  Did you speak to anyone at

Confidential Pursuant to Protective Order

Page 74

1 SoundExchange before completing your report?
2 A Not in connection with this assignment.
3 Q Okay. Did Brian assist you in preparing any
4 part of your March 8 report?
5 A Your question's quite broad, so as broad as
6 it is, I'd have to answer yes.
7 Q Did Brian write the March 8 report?
8 A No.
9 Q Okay. You wrote it?
10 A I did.
11 Q Okay. You talked about Brian working on the
12 50-song study, correct?
13 A Well, specifically the calculation that is
14 attached as Exhibit 2 to my report.
15 Q I'm just checking because you said Exhibit 2.
16 I'm not sure if it is Exhibit 2 so I just want to
17 double-check.
18 A Well, my apologies, I thought it was
19 Exhibit 2. But what it is it's -- it's the
20 calculation involving the -- the error rate that
21 exists as a result of using web-based data instead of
22 other data.
23 I would invite your attention to
24 conclusion B, as in boy, that starts on page 17 of my
25 March 8th report.

Page 75

1 Q So Table 9 is the error rate; is that
2 correct?
3 A Correct. But the underlying mathematics are
4 in Exhibit 2. If you look at the footnotes in that
5 section, they're pretty consistently referring to
6 Exhibit 2.
7 Q Okay. Just to wrap up your invoices, to date
8 I think you've billed approximately $70,000 for your
9 work on this case; is that right?
10 A Whatever those bills add up to.
11 Q Is there any unbilled work at this time?
12 A No.
13 Q Have you agreed to --
14 A Well --
15 Q -- perform --
16 A Well, hold on a minute. Never mind. I'm --
17 I'm incorrect.
18 I'm sorry, go ahead, what were you going to
19 say?
20 Q Have you agreed to perform any work on this
21 case before trial?
22 A Well, I haven't been asked to do any work.
23 That may be different than what you've asked.
24 Q Well, that's what I was asking.
25 A I think there's a running agreement that

Page 76

1 pursuant to my engagement letter Mr. Thomas or
2 Mr. Sullivan can call me up and say, hey, Nolte, we
3 want you to do whatever or what do you think about
4 whatever, and I'll -- I think I -- I most certainly
5 will answer their questions pursuant to the engagement
6 letter that I've already issued.
7 Similarly, I'm quite sure that they're going
8 to want me to show up and testify, and I believe I've
9 agreed to do that, too.
10 Q Yeah, you answered my question.
11 There aren't any pending assignments that you
12 know of at this time?
13 A Not that I'm aware of.
14 Q Okay. You reviewed a number of depositions
15 in this case, correct?
16 A I did.
17 Q Did you review Mr. Crabtree-Ireland's
18 deposition testimony from the Blondell v. Bouton case
19 out of New York?
20 A I don't believe so.
21 Q Okay. Were you aware of the Blondell versus
22 Bouton case based in New York?
23 A I was aware of another case by the name of
24 Blondell, so I guess the answer is yes.
25 Q What do you know about that case?

Page 77

1 A If I use -- interpret the word "know" in its
2 common usage which indicates a certain level of
3 certainty, the answer is probably nothing.
4 I do know -- my understanding is that there
5 was a class action lawsuit. Blondell was the class
6 representative. I believe the matter has been
7 resolved or if it's not resolved, it's certainly
8 farther along than -- than the Risto case is.
9 And that there was some overlap in the sense
10 that the -- the Fund or the lawyers indicated that in
11 response to information that I would need that that
12 had already been accumulated as a result of the
13 Blondell case. So that's why it came up. It came up
14 as like, oh, why don't you just give him the stuff
15 from Blondell.
16 Q Okay.
17 A And -- and so I got some stuff and -- and
18 I've kind of given you a brain dump of everything I
19 know, which is not much, about Blondell.
20 Q Okay. But one of the things, you were not
21 given the Duncan Crabtree-Ireland deposition from the
22 Blondell case? You mentioned --
23 A I was not.
24 Q -- other stuff, but...
25 A Yeah, I'm sorry for interrupting. I didn't

Confidential Pursuant to Protective Order

Page 78

1 mean.

2     I was not given that deposition transcript.

3     Q   Okay.  Did you -- it doesn't look like you

4 reviewed any of the trustee depositions in this case

5 other than Mr. Crabtree-Ireland, Mr. Hair or Ms. Taub;

6 is that correct?

7     A   I listed those that I received.  If it's not

8 on the list, it's because I didn't see it and -- and

9 obviously didn't look at it.  So if you have some

10 other depositions and they're not on the list, then I

11 don't have them.

12     Q   Okay.  Do you recall deciding not to review

13 the Mr. Joyce, Mr. Bouton or Mr. Gagliardi

14 transcripts?

15     A   I made no such decision.

16     Q   Okay.  Was it important for your analysis to

17 know what factors the trustees considered when they

18 voted for the service fee?

19     MR. THOMAS:  Objection to the form, vague.

20     THE WITNESS:  Was it important?  Well, I -- I

21 don't think I can answer that without being misleading

22 no matter how I answer it.  So let me try -- if you

23 don't mind, I'll give you a narrative and maybe that

24 will help.  Because I -- if I answer yes or no, no

25 matter what answer I give you, it's going to be a

Page 79

1 mess.

2 BY MS. McCONNELL:

3     Q   Okay.

4     A   Okay.  On -- on one side of the coin, I was

5 asked to reach an independent conclusion.  So the work

6 was not -- read what Crabtree-Ireland said and agree

7 with it.  That wasn't the assignment.  In fact, the

8 assignment was just the opposite.  So in that sense

9 the answer would have to be no, that was not the

10 assignment.  And I did the assignment as an

11 independent person.

12     On the other side of the coin, I was given

13 those transcripts and obviously the questioning in all

14 those transcripts included considerations that the

15 various people had in mind to the best of their

16 recollection.  And I was interested in that.

17     I don't want to tell you that I skimmed past

18 that or said I don't care, and, in fact, you'll see

19 that I've quoted some items from the depositions in my

20 report.  So as a result, I -- it's -- it's -- that's

21 how I considered the information.

22     Q   You didn't review the other three trustees,

23 right, Mr. Joyce, Mr. Bouton or Mr. Gagliardi, so you

24 don't know what factors they might have considered or

25 might not have considered, true?

Page 80

1     A   In the last three minutes or so I've not read

2 those transcripts since you first asked me.

3     Q   Okay.  In the last almost a year that you've

4 been working on this case you haven't reviewed those

5 three transcripts, right?

6     A   Again, I -- you're just asking me stuff I

7 already answered for you.  I'm -- I guess if you want

8 to do that, that's fine.

9     But I have told you that the complete list of

10 the transcripts are on my report.  I've told you if

11 it's not on my report, then I didn't look at them.  I

12 told you I did not make a decision not to look at any.

13 So I'm not sure what else you're asking me.  But

14 that's the situation with those three expert

15 depositions.

16     Q   You mentioned that you were asked to arrive

17 at an independent conclusion about the services

18 agreement; is that accurate?

19     A   I was to arrive at my conclusions

20 independently, yes.

21     Q   Okay.  What were you -- let me put it this

22 way.

23     MS. McCONNELL:  Maybe, Nico, this is a good

24 time for the retention agreement, which we can mark as

25 Exhibit 3.

Page 81

1     (Exhibit 3 marked.)

2 BY MS. McCONNELL:

3     Q   This is your retainer agreement that's dated

4 June 12, 2020, and under "Description of Work" it

5 says, "Fulcrum's work, to be performed under your

6 supervision, will consist of financial, accounting and

7 valuation analysis necessary to evaluate the various

8 contentions arising in this dispute."

9     Is that an accurate recitation of what your

10 assignment was in this case?

11     A   Well, it's not inaccurate, but I would invite

12 your attention to Roman numeral I of my March 8

13 report, which is under this nearly identical heading

14 of description of engagement, and in my report I give

15 you more -- I -- I do that with greater specificity.

16     Q   Yeah.  You specifically say that you've been

17 asked to address the reasonableness of the amounts

18 that the Fund pays to the AFM and SAG-AFTRA, right?

19     A   It does say that.

20     Q   Okay.  So did you end up providing a

21 financial or accounting analysis?

22     A   Well, that's what I do for a living so I

23 guess the answer has to be yes.  The matters included

24 in my March 8th report are financial, accounting,

25 economic and valuation matters.

**Page 82**

1  Q  How do you define the word "cost"?
2  A  Cost would be a synonym for expenditure.
3  Q  How do you define the term "value"?
4  MR. THOMAS:  Objection; overbroad, vague.
5  THE WITNESS:  Yeah, you really have to have a
6  context for that.  Value is an amount.  But I'm not
7  sure that helps you much.
8  Usually in the context of my work I am asked
9  for the value or amount of the some asset
10  or transaction.  So I'm reaching an opinion regarding
11  the fairness of an amount or the fairness of a value.
12  BY MS. McCONNELL:
13  Q  And is that actually what you did in this
14  case?
15  A  Yes.
16  Q  Okay.  Were you looking -- did you approach
17  this assignment by looking at the value from the
18  Fund's perspective?
19  A  In part, yes.
20  Q  Did you approach this assignment by looking
21  at the value from the unions' perspective?
22  A  In part, yes.
23  Q  Did you consider yourself to be providing a
24  neutral evaluation of the value of the data that was
25  being provided?

**Page 83**

1  A  You're asking for my state of mind?
2  Q  Yes.
3  A  Sure.  My state of mind is that I'm doing
4  this with independence and neutrality.
5  Q  Did you approach this assignment by looking
6  at the cost to the unions for providing the data?
7  THE WITNESS:  Ms. Bolton, could you reread
8  the question, please?
9  (Record read.)
10  THE WITNESS:  I considered cost, but I have
11  not used cost as the basis for valuing intellectual
12  property, which would be the typical approach or
13  conclusion reached when addressing intellectual
14  property.
15  BY MS. McCONNELL:
16  Q  Could you tell us what the cost is to the
17  unions for providing the data?
18  A  I have not assembled that --
19  MR. THOMAS:  Objection; vague, overbroad.
20  THE WITNESS:  Yeah.  The answer is, I have
21  not assembled that because I concluded it was not
22  relevant to the value that I was being asked to
23  address.
24  BY MS. McCONNELL:
25  Q  Are you able to assemble the cost to the

**Page 84**

1  unions if you were asked to do that?
2  MR. THOMAS:  Objection; vague.
3  THE WITNESS:  Well, I've not been asked to.
4  If you -- I think what you're asking me is, am I
5  capable of doing so, and the answer is sure, as the
6  accounting portion of my skill base would allow me to
7  address such items.  I have the confidence and
8  capabilities of doing that.
9  BY MS. McCONNELL:
10  Q  Have you been presented with any accounting
11  data that would enable you to do it?  Even though I
12  understand that you could potentially do it given your
13  background, have you been provided with any of the
14  accounting data to enable you to do it?
15  A  No.
16  Q  Okay.
17  MS. McCONNELL:  Okay.  Let's pull up the --
18  well, before you do that.
19  Q  What -- what accounting information would you
20  need to be able to calculate the cost to the unions?
21  MR. THOMAS:  Object to the form.
22  THE WITNESS:  When I've done these sorts of
23  assignments, I do look at the financial statements and
24  underlying general ledgers for whatever period of time
25  is relevant to the analysis.  I speak with the

**Page 85**

1  accounting and management personnel that are
2  responsible for running the organization in order to
3  answer questions or gain context into the physical
4  accounting data that I've been provided.
5  That's very general, I appreciate that,
6  but -- but you -- you asked a general question.
7  BY MS. McCONNELL:
8  Q  What types of accounting data would be
9  relevant to the analysis?
10  A  Your assuming the analysis is even relevant
11  itself, correct?
12  Q  Correct.
13  A  Because I've already told you that a cost is
14  not going to be a relevant analysis to the value of
15  intellectual property.
16  Q  You've told me that, yes.
17  A  So answering a question about this does not
18  suggest at all that anything I'm about to tell you is
19  relevant to anything, in my view.
20  Q  We can stipulate to that, that you do not
21  think it's relevant.
22  A  Okay.  All right.  So with -- with that in
23  mind, what's your question about this irrelevant
24  analysis?
25  Q  What accounting data would you need to

Confidential Pursuant to Protective Order

Page 86

1  calculate the cost for providing the data?
2      A  I told you I would start with the financial
3  statements and the general ledger. I gave you that in
4  response to an earlier answer. I would ask for those
5  documents first.
6      It is likely, based on discussions with
7  management and accounting personnel, that I would need
8  payroll journals associated with people that were
9  performing that work. I would not initially ask for
10  payroll journals because it may not be necessary,
11  although I suspect it is, but I also know that people
12  don't like giving up payroll journals until there's
13  absolutely a need to do so. So I don't ask for that
14  as a first step.
15      To the extent that there are major
16  subcontracts, I do look for -- I will usually get
17  those agreements to make certain I understand what the
18  scope of the services are. There's a good chance that
19  I would be looking at invoices for -- or other
20  supporting documentation for certain expense amounts.
21      Now, I've done a number of those assignments,
22  and I -- I think in those other assignments where the
23  work would be relevant that's the type of information
24  that I -- I typically get.
25      Q  What are you looking for -- what would you be

Page 87

1  looking for in the financial statements and the
2  general ledger?
3      A  The financial statements are a good summary
4  of the results of operations and financial position of
5  an organization as of a point in time, as well as for
6  whatever period is then ended. And so almost any
7  financial analysis would start with the financial
8  statements.
9      Further, I obtain the general ledger because
10  that provides the detailed transactions that build up
11  the balances that are contained in the financial
12  statements.
13      Q  Okay.
14      MS. McCONNELL:  Okay. Nico, can you send the
15  report, please.
16      And I think you probably have it in front of
17  you, but you are free to download it as well.
18      Q  On page 2 of your report before the Roman
19  numeral heading III --
20      MS. McCONNELL:  And, Ms. Bolton, if we could
21  attach this as Exhibit 4, please.
22      (Exhibit 4 marked.)
23  BY MS. McCONNELL:
24      Q  It says, "Fulcrum personnel reviewed and
25  considered additional documents produced in this

Page 88

1  litigation that are not specifically cited in the
2  conclusions expressed herein, but which provide
3  background information and context."
4      Are you able to tell us which additional
5  documents provided background information and context?
6      A  If given the time to do so, sure.
7      Q  How would you do that?
8      A  Well, all the records that I have are kept on
9  a secure server in a spot specifically designated for
10  that client. So I could look at the list of records
11  in that section Roman II, as well as the notes to
12  which -- that are being referred to in Roman II.
13      So, for example, one of the items talks about
14  items as referenced in here so there's -- in the
15  course of this report there are -- looks like 66
16  footnotes. So I could look at the 66 footnotes.
17      I could look at the documents listed in
18  Roman II and then compare that to everything that I've
19  received that I store in the manner that I described
20  at the beginning of this answer and come up with
21  whatever the difference is.
22      I could do that. Nobody wants to pay for
23  that clerical effort, which is why you get a paragraph
24  like this as almost boilerplate in every report like
25  this.

Page 89

1      Q  Okay. And it says, "Fulcrum personnel
2  reviewed."
3      Other than you and David Nolte, was there
4  other Fulcrum personnel involved? I'm sorry, did I
5  say David Nolte?
6      A  You did. Other than -- than Brian and
7  myself, there were no other personnel involved in this
8  matter from my firm. And I was involved with the
9  initial review of all records.
10      Q  Okay. Did you review Section 114 of the
11  Copyright Act?
12      A  I'm aware of it, but, no, I don't -- I mean,
13  I'm sure I've read it. But the assignment was not
14  formulated as reaching conclusions regarding any
15  portion of the Copyright Act.
16      Q  Do you think that you read it in connection
17  with this assignment or are you saying that you've
18  read it at some point in time?
19      A  Well, I think it was in connection with this
20  assignment. I'm sure the complaints or answers or
21  someone else quoted it, and I -- I would have read it
22  as it was presented.
23      Q  Okay. Did you know that the Copyright Act
24  says that Fund is only to deduct reasonable costs?
25      A  I don't doubt that. I've not specifically

Confidential Pursuant to Protective Order

Page 90

1 reached that conclusion.  But I don't doubt that.
2     Q   Were you told to assume at any time that the
3 Copyright Act's language regarding reasonable costs
4 did not apply to the Fund?
5     A   No.
6     Q   Okay.  Are you planning to provide testimony
7 at trial about the Copyright Act?
8        MR. THOMAS:  Object to the form, vague.
9        THE WITNESS:  Well, yeah, you can get
10 different answers depending on what portion of -- of
11 your question you want to focus on.
12        To the extent that you're asking me for a
13 legal opinion, I won't be providing any legal
14 opinions.  So to the extent someone says, hey, hey,
15 Nolte, read this and tell me what that means as a
16 matter of law, no judge is going to let me answer that
17 question, and I probably wouldn't answer it even if I
18 was asked or allowed to.
19        What I am doing is what's described in the
20 description of assign -- engagement.  And I'm pretty
21 sure that relates to the Copyright Act.
22 BY MS. McCONNELL:
23     Q   Do you think that the Copyright Act's
24 language about reasonable cost conflicts with your
25 assignment which was to evaluate the value of the data

Page 91

1 and services being provided?
2        MR. THOMAS:  Object to the form.
3        THE WITNESS:  I don't see any conflict.
4 BY MS. McCONNELL:
5     Q   Do you recall reviewing either version of the
6 Fund's trust agreement?
7     A   I know I've had it available.  But I -- I was
8 not reading it as a necessary predicate to any of my
9 conclusions.
10     Q   Okay.  Did you conduct any interviews with
11 Fund personnel?
12     A   Well, I had conversations.  If you want to
13 call those interviews, I guess the answer would have
14 to be yes.  So, sure, go ahead.
15     Q   Okay.  Who?
16     A   I spoke with Ms. Taub.  I spoke with
17 Ms. Sandell.  And I spoke with the Fund's chief
18 financial officer whose name escapes me at this
19 moment, but I'm sure I have it somewhere.
20     Q   Okay.  And you said you had phone calls with
21 these three people.  Were Jenner & Block attorneys on
22 those calls as well?
23     A   There was no phone call with the Fund
24 personnel during which Jenner & Block lawyers were not
25 there or at least a lawyer was there for 100 percent

Page 92

1 of the conversation.
2     Q   Okay.  There were a lot of nos in your
3 answer, but I think what you're saying is that
4 Jenner & Block lawyers were on every conversation with
5 Fund personnel?
6     A   Yeah, I apologize for any ambiguity.
7        But anytime I spoke with Fund personnel a
8 lawyer from Jenner & Block was present at all times.
9     Q   Okay.
10     A   And I apologize for any confusion.
11     Q   That's okay.
12        Did you conduct any interviews with any union
13 personnel?
14     A   None come to mind.
15     Q   Did you ever speak with Ray Hair?
16     A   I don't believe so.
17     Q   Did you ever speak with Duncan
18 Crabtree-Ireland?
19     A   I don't -- I don't recall any such meetings
20 with anyone from the unions.
21     Q   Okay.  Included in the defendants' document
22 production to the plaintiff there were several
23 thousands e-mail requests from Fund personnel to union
24 personnel asking for session reports.
25        Did you review any of those e-mails or their

Page 93

1 responses?
2     A   I certainly did not study any volume of
3 e-mails.  Whether I saw some or not, they may be part
4 of what I had but I -- that certainly was not the
5 focus of -- of what I was trying to do.
6     Q   Do you know if anyone ever reviewed and
7 counted how many requests were made and how many
8 requests were answered?
9     A   I certainly have not done that.  So -- and
10 I -- and I wouldn't be expressing any opinion about a
11 tabulation that I've not done.
12     Q   Okay.  I think you answered this, forgive me.
13        Did you review any of the Fund's -- excuse
14 me.  Did you review any of the Fund's 990s?
15     A   You did not ask that.  I may -- I may have
16 had some of those.  I'd have to go back and look.  I
17 don't think I've referenced them in my report, but I
18 don't want to tell you I didn't have them.  I might
19 have them.
20     Q   Okay.  Did you review any of the unions'
21 990s?
22     A   No.
23     Q   Okay.  Would you agree with me that the
24 unions are not in the business of selling data?
25     A   I'm happy to answer that question, but it

Confidential Pursuant to Protective Order

Page 94

1 occurs to me I probably gave you a bad answer way long
2 ago and I don't know if it matters, it probably
3 doesn't, but -- but I got distracted by that.
4      I'm currently working on an assignment
5 involving other nonprofits. I don't know if that
6 matters to you. But I -- I think you did ask work my
7 current firm is with working on of nonprofits, and
8 I've actually got one actively going on right now.
9     Q Okay. What is it?
10     A Well, I'm not entirely certain I should be
11 talking too much about it because I -- it's
12 consultation only for settlement purposes. But it
13 does involve the United States Olympic Committee.
14     Q Okay.
15     A And -- and I probably shouldn't say too much
16 more than that. But it is a nonprofit organization
17 and a substantial one. And I -- I believe one of the
18 questions that you asked probably would have had me
19 identify that but I just didn't think of it at the
20 time it was asked.
21     Q Are -- are you providing any sort of like
22 financial valuation services for the Olympic
23 Committee?
24     A I am performing accounting work that relates
25 to a dispute between the United States Olympic

Page 95

1 Committee and a rather substantial donor regarding the
2 use of contributions.
3     Q Okay.
4     A And I've -- I've not given any testimony.
5 I've not given any reports. I've done work only for
6 settlement purposes so I really shouldn't be telling
7 you anything more. If you have follow-up questions, I
8 just want to warn you that I'm -- I may have --
9 there's some line I can't cross over and I'm getting
10 pretty close to it.
11     Q I will take your secret to my grave. Don't
12 worry.
13     Okay. Let's go back to the question that I
14 had asked you.
15     Would you agree with me that the unions are
16 not in the business of selling data?
17     A That is not their primary business.
18     Q This is a quick question.
19     So on page 4 of your report you quote an
20 interrogatory report -- I'm sorry. You quote an
21 interrogatory response. And I have a very discrete
22 question.
23     If you look at the third full paragraph on
24 page 4. The paragraph ends with, "Currently, this
25 database compiles information related to the

Page 96

1 non-featured performers associated with approximately
2 136,000 song titles."
3     Do you see that?
4     A I do.
5     Q First, you didn't help craft this response,
6 did you?
7     A The reason I'm pausing is I realize this is
8 an amended -- or supplemental response that occurred
9 after I was engaged. No one asked me to draft this or
10 make edits to this. And so in that sense the answer
11 to your question is no.
12     However, I can't tell you that I didn't say
13 something that might have assisted the people who were
14 drafting this in writing what they wrote. So in that
15 sense the answer would have to be, I don't know.
16     Q Okay. Do you know whether that 136,000 song
17 title number reflects the number of song titles that
18 have been paid by the Fund or includes song titles
19 that are merely tracked for possible future payment?
20     A Well, the best answer is, I don't know. But
21 you also told me that I should be giving you
22 information as long as it wasn't a guess. And so with
23 that, this is another answer that's almost a guess,
24 maybe a guess, but I -- I suspect this is the number
25 of song titles that are being tracked even if there's

Page 97

1 some missing information that would prevent complete
2 payments. But I -- I can't tell you that as a matter
3 of fact. I -- but I -- that's -- that's what I
4 suspect is the case.
5     Q Okay. On page 7 of your report, if you look
6 at Table 3, you have separated out for the years
7 ending 2013 to 2019, you have, "Distributions payable
8 at year-end," and then, "Distributions paid during the
9 year."
10     Is the services fee calculated from the
11 distributions payable column or the distributions paid
12 column?
13     A It would be based on what is payable. Well,
14 hold on a minute. That -- it's actually neither.
15 Yeah, it's actually neither. But it has two -- since
16 you gave me only two choices, it would be closer to
17 payable.
18     Q Okay. Why -- why is it neither?
19     A Well, because there are some amounts that are
20 going to be payable and then promptly paid and so they
21 don't appear on the balance sheet as of the end of the
22 year, but they would appear in the payment amounts.
23     Q But wouldn't those still be in the
24 distributions payable column?
25     A No. Well, you say "column." If you're

Page 98

1 referring to the column in Table 3, that middle column
2 says, includes in the heading, "at year-end." So if a
3 check is written before year-end it's no longer in
4 that amount.
5 Q Okay. Got it. Okay. Let's try this one.
6     Is it accurate, then, that if we add up
7 distributions paid during the year and distributions
8 payable at year-end and take the 3 percent service fee
9 from that, that that number would be accurate?
10 A No.
11 Q Okay.
12 A Well, hold on a minute. When you say "that
13 number." I'm not suggesting any of these numbers are
14 not accurate. And so to the extent that you're asking
15 me to say, well, which of these numbers are
16 inaccurate, I'm not suggesting any of these numbers
17 are inaccurate. What I'm suggesting is that would be
18 a poor way of calculating the amounts owed to the
19 union, and you'd get a wrong answer.
20 Q I guess let's just go back to the first
21 question, maybe, without looking at these actual
22 numbers.
23     Are you aware that the service fee is
24 taken -- is calculated from distributions payable and
25 not distributions paid?

Page 99

1     A I am aware of that, yes.
2 Q Okay. Knowing that, would you still say that
3 the services agreement is a no-risk situation for the
4 Fund?
5 A Yes.
6 Q Isn't there a risk that the Fund has
7 increasing amounts of distributions payable but fails
8 to have any meaningful information in the unions
9 that allow it to make that distribution?
10 A Well, for an individual transaction, there is
11 a possibility that the union will not have any
12 information. The fee is based on the totality of the
13 amounts received. So to the extent that you're
14 suggesting that there's -- it is the case where the
15 unions don't report on 100 percent of the amounts
16 that -- that would need to be paid, that that is
17 correct, I don't think anybody is disputing that.
18 Q There aren't any benchmarks set forth in the
19 services agreement for the unions to meet, are there?
20     MR. THOMAS: Object to the form, vague.
21     THE WITNESS: Did you say there were
22 benchmarks? I just didn't hear the word.
23 BY MS. McCONNELL:
24 Q Benchmarks.
25 A Well, the agreement does say what the union

Page 100

1 has to do. If the union doesn't do that, I suspect it
2 would have failed to meet a benchmark.
3     Now, it is possible of course to craft an
4 agreement, a different agreement that has additional
5 specificity in that regard. And if that's what you're
6 asking, the answer is, sure, you could do that.
7 Q If you -- if you crafted an agreement that
8 has additional specificity with regard to benchmarks,
9 wouldn't that be more effective at creating a no-risk
10 situation for the Fund?
11     MR. THOMAS: Object to the form. Calls for
12 speculation.
13     THE WITNESS: Well, you're -- you're
14 addressing a different item at this point than what I
15 was initially suggesting. So the connection that
16 you're drawing I have not connected in my original
17 language. So I don't know that any answer I give you
18 is going to provide insight into my report because at
19 this point you're talking about something different.
20 BY MS. McCONNELL:
21 Q Okay. Are you able to answer the question?
22 A I just did.
23 Q Okay. I'll come back to it.
24     On the bottom of page 7, you say, "Without
25 the unions' data, the number of unclaimed participants

Page 101

1 and the amount of unclaimed royalties would be much
2 higher."
3     What is your support for that proposition?
4 A The data that's reported is with the benefit
5 of the union, the union data. If you didn't have the
6 union data, the problems or challenges that the Fund
7 has would be magnified. So the Fund would either need
8 to be spending more money or they'd need to -- well,
9 they'd need to be spending more money, and even then,
10 I'm not sure that they'd get an accurate answer. So
11 that's really what I'm referring to.
12 Q And when you're referring to "unions' data,"
13 are you referring to membership data or session
14 reports or both?
15 A I'm referring to whatever information the
16 unions provide. They generally consist of session
17 reports, also known as B-reports.
18     (Reporter clarification.)
19     THE WITNESS: B, as in boy, so B -- capital
20 B, dash, reports.
21 BY MS. McCONNELL:
22 Q Are you aware that the unions -- well, I
23 guess here, are you referring to membership data,
24 meaning like contact information from the unions as
25 well or are you only referring to session reports and

Confidential Pursuant to Protective Order

1 B-forms?

2    A  I'm referring to whatever the unions want to

3 provide.  My understanding is that there are databases

4 available where the unions, pursuant to this

5 agreement, and as a result of having the agreement,

6 have opened up its electronic files to the Fund.  And

7 so the Fund has information from the unions from those

8 databases.

9    Q  Do you know how a performer, a featured

10 performer gets added to the Fund's database to get

11 paid?

12      MR. THOMAS:  Objection to the form.

13      THE WITNESS:  I think at this point you're

14 probably asking me for the logistics of inputting

15 information into the AS -- A400 system, and I would --

16 I'm not an expert on that.  You should -- well, maybe

17 the fact that depositions are done, but you've had

18 plenty of people to ask about that from the Fund

19 representatives.

20 BY MS. McCONNELL:

21    Q  Do you know what --

22    A  And -- and I wouldn't be able to -- I don't

23 do that job so I'm not -- it's not like I'm not trying

24 to answer it.  It's just that I'm not there to do that

25 job.  I'm not -- I've not done a study of how

1 something gets inputted into the system.  That would

2 be done by Fund personnel.

3    Q  Do you know what work Fund personnel does to

4 update address information and contact information

5 that they receive originally from the unions?

6    A  Yeah, you're asking me for details of

7 specific steps and mechanics, and I have not gotten

8 involved in any of that.

9    Q  Would that be reflected in any of the cost

10 data that you looked at from Ms. Taub?

11      MR. THOMAS:  Object to the form.  Calls for

12 speculation.

13      THE WITNESS:  Well, I believe it does.  So,

14 for example, you know, Ms. Taub said, here -- here's

15 the cost of my researchers and the researchers are the

16 folks that are doing this work.  So if you say to the

17 researchers, you got to do this work without the union

18 data, besides getting a protest or volt or whatever

19 you want to call it from the people who say, well, how

20 am I supposed to do my job, and putting that aside,

21 they would end up working a lot slower and being

22 hampered in getting their job done.

23 BY MS. McCONNELL:

24    Q  That's not exactly my question.  So I'm --

25 I'm referring to the cleanup work that the Fund needs

1 to do once they receive the data from the unions.  Are

2 you aware of the work that they do in that regard?

3      MR. THOMAS:  Objection; vague.

4      THE WITNESS:  I'm not -- I'm sorry,

5 Mr. Thomas, go ahead.

6      MR. THOMAS:  I just objected that it was

7 vague.

8      But go ahead.

9      THE WITNESS:  I have not studied any of the

10 detailed mechanics of the research personnel.  And

11 whatever information they provided in their earlier

12 discovery responses or depositions would be the best

13 answers.  That is not what I've been asked to opine

14 on.

15 BY MS. McCONNELL:

16    Q  Wouldn't that affect the value of the data if

17 the Fund has to go through it and clean it up and make

18 sure it's up to date?

19      MR. THOMAS:  Objection; vague, misstates

20 testimony of the fact witnesses.

21 BY MS. McCONNELL:

22    Q  You can answer.

23    A  Well, I did anticipate that the Fund runs its

24 own systems and would want to put the data they

25 obtained from the unions into their own systems so

1 that the Fund could make its operation as efficient as

2 possible.  I would be shocked if the union was going

3 to give the Fund the data in the precise form that the

4 Fund needed it and/or that the union would volunteer

5 to input the information into the Fund's database.

6 I'd be further shocked, by the way, if -- if

7 the Fund said, oh, sure, go ahead, you know, here's

8 the keys to the kingdom and we want you at the unions

9 to be getting direct access to the database that we've

10 assembled over the years.  So I don't -- I -- I

11 would -- I fully understood that there was additional

12 work that the Fund had to do to use the unions' data.

13    Q  So I'm not talking about just the mechanical

14 inputting of data.  I'm talking about actually going

15 out and updating the data, meaning if the union

16 provides an old address for nonfeatured performer Bob,

17 the Fund then needs to go and find an updated address

18 for nonfeatured performer Bob so they need to undergo

19 additional work to clean up and update the data that's

20 received from the unions.

21    Wouldn't that have an impact on the value of

22 the data that's received?

23      MR. THOMAS:  I'm going to object that

24 misstates the testimony of the fact witnesses and

25 lacks foundation.

Page 106

1    THE WITNESS:  I don't doubt that these tens
2    of thousands of people, maybe even more than that,
3    that they occasionally move and/or they get
4    successor -- you know, there's updates needed to this.
5    Some of that information the union may be able to
6    provide and could be in -- in databases, but if it --
7    whether the union provides it or whether the Fund
8    provides it, there is no question that the Fund has
9    ongoing communications with the beneficiaries of the
10   Fund and that I would expect that to occur.
11   BY MS. McCONNELL:
12       Q   Don't you agree that that has an effect on
13   the value of the information that the union is
14   providing in the first instance?
15       MR. THOMAS:  Same objections; lacks
16   foundation, overbroad, misstates prior testimony.
17       THE WITNESS:  Here's what I think I'm hearing
18   you say.  That there's a session report from, I don't
19   know, 1980, let's say, and since 1980 a nonfeatured
20   performer moves and the union provides data from 1980
21   that is nowhere else available, and you're suggesting
22   that that information is not valuable because in 1980
23   the union didn't know when performer Bob, to use your
24   name, was going to move ten years later.
25       The answer to your question is, no, the data

Page 107

1    is not less valuable because the union was not
2    clairvoyant about a move that was going to happen ten
3    years later.  I would not expect anyone to have such
4    clairvoyance, and I would not modify the price based
5    upon not being able to tell the future.  None of the
6    transactions that I value involve telling the future.
7    BY MS. McCONNELL:
8        Q   So let's try an easier hypothetical because
9    in yours you conflated session data with membership
10   data, which are actually two different things, but we
11   can put that aside.
12       So using your example of the charity that's
13   selling its mailing list, that's an easier one, let's
14   say the mailing list is completely wrong, all of the
15   homes on that list have been demolished in a
16   hurricane.  They don't exist anymore.  The addresses
17   are no good.  Wouldn't you agree that the value of
18   that mailing list is substantially less than before
19   the hurricane?
20       A   I would invite your attention to page 19 of
21   my report in which -- at which point I describe
22   attributes of data and how that data could be worth
23   more or less depending on the data itself.
24       Q   So one of -- your number one is accuracy,
25   right?

Page 108

1        A   It is.
2        Q   Okay.  So if the data is not accurate you
3    would agree that its value is lower?
4        A   That's why I wrote it.  So if -- if -- if
5    someone says actor -- or musician Bob was involved and
6    musician Bob was really not involved, it was instead a
7    bunch of other people, then that's a problem.  Now,
8    what we did in the immediately preceding portion of
9    this report is describe the inaccuracies that exist
10   when we try to use data sources other than the unions.
11       Q   Okay.  So your support for these five factors
12   was the 50-song study.  Is that what you're saying?
13       A   No.
14       Q   Okay.  What is your support for these five
15   factors?
16       A   All of the other information that is
17   contained in this report.  In terms of factual
18   background, I would invite your attention to Section 3
19   of the report, which starts on page 2 and goes through
20   page 13.  So pages 2 through 13 involve factual
21   background that I am referring to in this report.
22       I also, in addition, did my own calculation
23   in this Section B, which is why I referred you to that
24   because this particular list happens to be within that
25   conclusion B, as in boy.

Page 109

1        Q   How does Table 1, "Royalties received by the
2    Fund," on page 6, support your conclusion that the
3    information received by the Fund is accurate and
4    reliable?
5        A   Oh, I'm not suggesting that that particular
6    table relates to that particular subsection of that
7    paragraph,
8        Q   Okay.  Well, that's what I asked you.  I
9    said, what is your factual report for accuracy and
10   reliability, and you directed me to pages 2 through 12
11   of what --
12       A   And that was -- and that was a proper
13   response.  Now, if you want to go through it on a
14   sentence-by-sentence basis, we can do that if -- if
15   that's important to you.  I'm -- I'd be surprised, but
16   I was trying to give you a -- a prompt and quick
17   answer.
18       Q   Yeah, I'm just trying to use common sense.
19   And so I'm asking you how Table 1 applies to your
20   conclusion that the data is accurate and reliable, and
21   I don't think it does, based on my common sense.  But
22   if you disagree with me, let me know.
23       A   Okay.  I'm not going to argue with you.  I
24   realize you just threw down the gauntlet and said, I
25   don't have common sense, but you do have common sense.

Confidential Pursuant to Protective Order

Page 110

```
1  and that my answers weren't any good and that they
2  were silly and -- I'm not going to argue about that.
3  So what is your next question?
4      Q  Okay.  This will be good.
5      Let's look at section -- Section D, which is
6  on page 8.  Heading is "The Union's involvement in
7  sound recordings."
8      Are you there?
9      A  Yes, ma'am.
10     Q  Okay.  You say, "The major record labels are
11 all signatories to the unions' collective bargaining
12 agreements and report record information regarding
13 both union and nonunion performers who performed at
14 such recording sessions.  The following chart shows
15 the three largest record labels (Sony Music
16 Entertainment, Warner MUSIC Group and Universal Music
17 Group) who together have around a two-thirds market
18 share."
19     The footnote here 6 takes us to this
20 statista.com article, which is behind a paywall; is
21 that right?
22     A  It is.
23     Q  Were you able to actually access the data
24 that was behind the paywall?
25     A  If I needed to, certainly.
```

Page 111

```
1      Q  Did you?
2      A  No, I didn't need to here.
3      Q  Okay.  What -- as used in the description in
4  the quote that you have here, what does market share
5  mean?  Market share of what?
6      A  It's the same information that's being
7  reported here by this third party.  It deals with
8  music publishing in the United States.
9      Q  So it's referring to the market share of all
10 songs published in the United States?
11     A  According to this third party, yes.
12     Q  You note that, "Because some of the other
13 labels (the remaining approximate one-third market
14 share) are signatories to the unions' collective
15 bargaining agreement, it is clear that the unions'
16 data is more complete than any other source."
17     Can you name some of the other labels that
18 are union signatories that belong to that one-third?
19     A  Well, I've not endeavored to do that.  Could
20 I, I suppose I could, sure.
21     Q  How do you know that they are signatories to
22 the unions' collective bargaining agreements?
23     A  Well, the unions endeavor to become -- to get
24 as many signatories to their collective agreements as
25 possible.  I did speak specifically with Ms. Taub on
```

Page 112

```
1  that matter and because of her work history she's
2  aware of that.  And she and I -- she indicated that,
3  and -- and I -- it was consistent with what I would
4  have expected.
5      Q  Okay.  So she told you that the approximate
6  one-third market share of labels are also signatories
7  to the unions' collective bargaining agreements?
8      A  Wait, wait.  Hold on.  That's --
9      MR. THOMAS:  Objection; misstates the
10 testimony and the document.
11     THE WITNESS:  Yeah, that -- that misstates
12 what I just told you.  It misstates this document.
13     And so, no, she did not tell me that.
14 BY MS. McCONNELL:
15     Q  Okay.  So the document says, "Because some of
16 the other labels (the remaining approximate one-third
17 market share) also are signatories to the unions'
18 collective bargaining agreement, it is clear that the
19 unions' data is more complete than any other source."
20     And I'm asking you, which portion of the
21 remaining one-third market share are signatories to
22 the unions' collective bargaining agreements?
23     A  I have not accumulated that.
24     Q  Okay.  So what is it that Ms. Taub told you
25 that made you confident enough to include this in your
```

Page 113

```
1  report?
2      A  Okay.  I'm -- I'm trying to understand where
3  you're coming from.  And the best I can come up with
4  is that the quarrel with that sentence is that I
5  should have repeated the word "some" a second time in
6  the sentence and that having failed to do so, there's
7  been some terrible wrong that's occurred.  And I'll
8  apologize for that.
9      I am not suggesting that one hundred percent
10 of the remaining third are union signatories.  I'm
11 suggesting that some amount, more than zero, would be.
12 I do not know how large that amount is; however, my
13 starting point is two-thirds.  So even if my -- the
14 remaining one-third was zero, which is really what
15 this sentence is saying, the remaining one-third is
16 going to have some, some, not all, some, you're going
17 to increase the two-thirds.
18     But even if you don't increase the starting
19 point of two-thirds, it is clear that the unions' data
20 is more complete than any other source.  And I don't
21 know what the problem with that is other than
22 quarreling with the fact that I probably should have
23 repeated the word "some" in that sentence.
24     Q  Let's talk about the two-thirds, then.
25     Are you aware that Sony Music, Warner Music
```

Confidential Pursuant to Protective Order

1 and Universal Music are record companies that are made
2 up of several hundred smaller labels?
3    A  I am.
4    Q  Okay.  I'm going to list a few record labels
5 that are part of those larger distributors, and I want
6 you to tell me if you know if they're a signatory to
7 the union collective bargaining agreements or not,
8 okay.
9        What about Interscope Records, are they a
10 signatory?
11    A  I have not studied each of the labels within
12 those groups.  I highly suspect that Interscope is.
13 However, I -- I -- I'm not providing testimony
14 regarding the level of detail that you're providing.
15 That is not in the report and does not need to be in
16 the report.
17    Q  Do you know what percentage or what fraction
18 of the two-thirds market share labels are union
19 signatories?
20    A  I'm suggesting that they probably -- probably
21 the vast majority are, but in any event, you could get
22 to the two-thirds through other data that is contained
23 in this report.  So even if this paragraph wasn't
24 here, it would not really change anything that's here
25 because we've got other information that is being used

1 for the only time when this information becomes
2 relevant in the report.
3    Q  And by that I think you're also referring to
4 Table 5; is that correct, on page 9?
5    A  Table 5 would be one spot, yes.  I'm -- I'm
6 not saying it's the only spot, but we have information
7 regarding union and nonunion elsewhere.
8    Q  If we look at Table 5 -- I just want to
9 confirm that I understand the chart -- are you saying
10 that 24 percent of nonunion members' checks are cashed
11 as opposed to 67 percent of union members?
12    A  That is the data that's been provided to me
13 as well as to you.
14    Q  Okay.  Do you know why it is that the
15 nonunion members' cashed number is much lower than the
16 union members' cashed number?
17    A  Yes.
18    Q  Why?
19    A  Because of the challenge in finding contact
20 information and other information necessary before one
21 can lawfully cut a check in the United States.
22    Q  Do you agree, then, what the unions don't
23 have that information for the vast majority of
24 nonmembers?
25    A  Well, I'm not sure how you get to "the vast

1 majority."  Well, hold on.  Maybe I didn't -- maybe I
2 probably misunderstood your question.  Would someone
3 like to repeat the question?
4    Q  I can -- I can take out "vast majority" if
5 you like, I can say.
6        Do you agree, then, that the unions don't
7 have information for 76 percent of nonmembers?
8    A  No.
9    Q  Why not?
10    A  That -- that would clearly be a poor
11 interpretation of Table 5.
12    Q  Okay.  Why?
13    A  Well, because you can see that even for the
14 union members there's certain members that you can't
15 send information out.  So this could be, for example,
16 a situation of moving and -- and keeping up with
17 contacts.
18        But in any event, if -- if -- look, I'll try
19 to help you along.  I'm not trying to be quarrelsome
20 in terms of characterizing it.
21        It is clear that the unions have better data
22 on the union members than the nonunion members.  The
23 unions have some information regarding the nonunion
24 members, but the quality or the completeness of the
25 information for nonunion members diminishes when

1 you're dealing with nonunion members and the starting
2 point being the union databases.
3        I don't know that there's any quarrel about
4 that.
5        MS. McCONNELL:  Okay.  Why don't we take a
6 break and come back.  Do you want to take a lunch
7 break or do you want to go for a little bit longer?
8        THE REPORTER:  Do you want to go off the
9 record to discuss that?
10        THE VIDEOGRAPHER:  We are now going off the
11 record, and the time is 12:05 p.m.
12        (Lunch recess.)
13        THE VIDEOGRAPHER:  We are now going back on
14 the record, and the time is 12:44 p.m.
15 BY MS. McCONNELL:
16    Q  Okay.  Mr. Nolte, did you devise the -- did
17 you devise the 50-song study?
18        MR. THOMAS:  Objection; vague.
19        THE WITNESS:  I don't know what you mean by
20 "devise."
21 BY MS. McCONNELL:
22    Q  Did you set the parameters of the 50-song
23 study?
24    A  By parameters, what I have in mind is the
25 sample size of 50.  Is that what you're asking about?

Confidential - Pursuant to Protective Order

Page 118

1    Q  We can start there.

2    A  I did not set the sample size of 50.

3    Q  Okay.  Did you provide any input on any other

4  starting points for the study, including what -- what

5  general group of titles to pull the 50 songs from?

6    A  No.

7    Q  Okay.

8    A  Well, and the no -- well, hold on a minute.

9  Your -- your question was compound.  So the part that

10  I was answering was the last half of your question,

11  not the first half.  So I -- let me say the same thing

12  a different way.

13      I was not involved with the sample selection.

14  That would be a more precise way of answering what I

15  was intending just a second ago.

16    Q  How -- generally speaking, how would you

17  design a statistical study?

18    A  How would I?

19    Q  Yes.

20      MR. THOMAS:  Objection; overbroad, vague,

21  outside the scope.

22      THE WITNESS:  If -- and -- and the sentence

23  starts with "if," so you may not need to do this, but

24  if one decided that they needed to follow the rules of

25  inferential statistics, then one would need to have a

Page 119

1  random sample and the sample size of that random

2  sample would be a function of the confidence level,

3  the precision intervals, and the variance within the

4  population.  And that would mathematically tell you

5  what the sample size needed to be so that you could

6  express conclusions using the science of inferential

7  statistics.

8  BY MS. McCONNELL:

9    Q  Is it correct that when you first set out to

10  do a statistical study you need to identify a

11  hypothesis?

12    A  Okay.  I mean, yeah, you need to know what

13  you're testing, otherwise -- you're right, I mean,

14  I'm -- I'm presuming that that's understood.

15    Q  Okay.  Do you collect data and identify a

16  sample subset?

17    A  You do use a sample which I think you're

18  calling a sample subset.  So sure, a sample is a

19  subset of the entire population.

20    Q  What are the principles of sample selection?

21    A  Perhaps I haven't -- well, I probably don't

22  understand your question.  But I -- but I would refer

23  you to the earlier answer I gave you in terms of how

24  one would go about designing a -- a test if you wanted

25  to follow inferential statistic requirements.

Page 120

1    Q  Okay.  What are the consequences of having a

2  poor sample selection?

3    A  Well, I don't know what "poor" is so I -- so

4  I'm afraid I can't answer the question without knowing

5  what "poor" is.  I could substitute my own definition

6  of "poor," but I don't know what you have in mind.

7    Q  What are the consequences of having a not

8  statistically significant sample selection?

9    A  Then you cannot draw statistical inferences

10  expressed in terms of precisions and confidence

11  levels.

12    Q  What are the consequences of having a sample

13  that is not representative of the whole?

14    A  Well, then -- then you would have what's

15  commonly called a sample error and so the

16  conclusions -- which, by the way, can happen even if

17  you got a statistically valid sample.  In other words,

18  you follow the rules you -- you could have a sample

19  error, and the -- the effect of having a sample error

20  is that your conclusions expressed in terms of

21  inferential statistics are incorrect.

22    Q  In your opinion, is it important for a sample

23  to be representative of the larger dataset from which

24  it's drawn?

25    A  Yes.

Page 121

1    Q  And is it important, in your opinion, to

2  obtain a random sample?

3    A  A random sample is a requirement of -- of --

4  of any -- following any of the requirements of

5  inferential statistics.  So if you're going to express

6  your conclusions in a manner consistent with

7  inferential statistics the sample must be randomly

8  selected.

9    Q  Is it possible to have a sample that is

10  representative if it is not random?

11    A  Yes.

12    Q  How?  How is it possible?

13    A  How?

14    Q  Uh-huh.

15    A  Okay.  Well, I'm -- I'm looking at my screen

16  and in my screen I got four people and then a whole

17  bunch of people that aren't shown.  But you're shown.

18  Mr. Thomas is shown.  The reporter is shown.  And I'm

19  shown.  There's nothing random about those four

20  observations.

21      And by the way, it's also a pretty small

22  sample size.  It's only four.  Nevertheless, there are

23  two women and two men.  And so if we were to look at

24  this sample of -- nonrandom sample of four people and

25  say, hey, what do you think the population of men

Page 122

1   versus women are in the world, I'd say -- looking at
2   this, I'd say, well, it looks like 50/50.
3           Now, there's nothing random about it.
4   There's nothing proper about the sample size, but I
5   arrived at an absolutely correct answer. And that's
6   an example that I just did off the top of my head that
7   illustrates what you were asking.
8       Q   So is it just by luck, then, that it's
9   representative if it's not random?
10      A   No. No. It might be -- my example was
11  probably luck. But when you look at the manner that
12  this -- the 50-title item was -- was selected, I would
13  not say it was luck. I would say -- well, I would not
14  attribute it to luck.
15      Q   Okay. Generally speaking, is it accurate to
16  say that sample selection is important to ensure that
17  data is usable for the intended purpose?
18      A   If you're going to want to express your
19  conclusions inferentially, then, yes. I -- I have not
20  drawn any conclusions using the tools of inferential
21  statistics so in that sense the answer would be no.
22  I'm not quarreling with the fact that someone might
23  have done a sample in a different way, but that does
24  not mean that what you proposed a second ago is
25  correct.

Page 123

1       Q   You're talking specifically about the 50-song
2   sample again, I'm assuming. But if you're saying that
3   you didn't use inferential statistics to come to your
4   conclusions how are you confident that the 50-song
5   sample is representative?
6       A   I've not -- I've not reached any conclusion
7   regarding it being representative. The Fund made the
8   sample. The Fund indicated that in their mind it was
9   random and in their mind it was sufficiently large to
10  accomplish its purpose. And so I did my work with the
11  results of that sample.
12      Q   Are you able to extrapolate results on the
13  larger track list based on the 50-song sample?
14      A   One can extrapolate it. You will lose the
15  opportunity to do so with the precision and confidence
16  parameter. So I've -- I've not expressed anything
17  with the precision and confidence level because of
18  what you just mentioned. But, yeah, you certainly can
19  extrapolate it, yes. You -- you don't need -- you
20  don't need to use inferential statistics to do an
21  extrapolation.
22      Q   Why not?
23      A   It's definitionally you don't. I mean, look,
24  look, look, look. Let me give you an example.
25          Let's say we go back -- and this is not luck.

Page 124

1   I -- you know, we were quarreling about, you know, my
2   luck example with the four people that are on my
3   screen. But let's say instead I say let's do a test.
4           We want to figure out how many fingers each
5   human has. And so I say, okay, everyone put up their
6   fingers and we'll count them and I haven't seen your
7   fingers yet so I don't know what the answers are, but
8   I can tell you I have ten fingers and I'm willing to
9   wager that the other three people I was describing
10  have ten fingers. So then I've got four observations
11  of ten fingers. And I would say, well, based on that,
12  I will extrapolate that humans have ten fingers.
13          Now, there's nothing following inferential
14  statistics, but I don't think anybody is going to
15  doubt the conclusion that humans have ten fingers.
16  And that's an example of what -- how you could do that
17  without using inferential statistics.
18      Q   Who devised the 50-song study?
19      A   You said who devised it?
20      Q   I did.
21      A   That assumes that there was a single person
22  that devised it so I -- I -- the Fund was certainly
23  involved in coming up with that, and I'm sure they
24  would say I had some input.
25      Q   What input did you have?

Page 125

1       A   I had a conversation with Jenner & Block and
2   Fund representatives about what information the Fund
3   had regarding what happens when they don't use the
4   union data. And they -- this is my characterization.
5   I'm not trying to put words in anyone's mouth.
6           But the impression I got back was, golly,
7   that's an awful stupid question, why would we ever
8   waste our time trying to figure out the impact of data
9   that we know to be valuable and that we use every day
10  of the week.
11          I said, well, because -- and I answered and
12  said, well, that's because that's what the plaintiff
13  thinks you should be doing. They think either the
14  union should be giving away the data for free or you
15  should not be using it. And those are the two options
16  that I think the -- the plaintiff is proposing.
17          And my question is, have you ever really
18  contemplated that, that as a possibility, and they
19  said, no, we just told you that was a stupid question.
20  I said, well, okay, but that's the stupid question
21  that the plaintiffs are asking so maybe we should try
22  to answer their question.
23          And so they went off and did the 50-sample
24  test and it was -- I suspect I was the cause of it
25  initially, although they are the ones that -- that

Confidential Pursuant to Protective Order

1  initially did the sample and -- and did the work
2  because that's of course what they do for a living.
3  And then they gave it back to me and I did the work
4  that's reported in my report.
5      So when you say we devised it, I did some of
6  the calculations at the end.  And -- and I think I was
7  probably the guy who caused the thing to come up to
8  begin with and they were the ones that implemented the
9  research because they of course have the researchers
10 on staff and I don't research this and couldn't do it
11 near as fast as they can.
12     Q   You are aware that there's several instances
13 where the unions don't have session reports for tracks
14 and the Fund needs to do all the research by
15 themselves, right?
16     A   I think what you're asking me is, is it true
17 that the 100 percent of the nonfeatured performers are
18 not covered by session reports and -- I think that's
19 what you're asking me.  And I think everybody's
20 acknowledged that that's the case.
21     Q   Okay.  I don't need to know that it's true.
22 I don't need you to answer whether it's true or not
23 because I know that it's true.
24     So my question to you is, were you aware of
25 the fact that the unions don't have session reports

1  for all the nonfeatured performers that the Fund needs
2  to pay?
3      A   I'm sure it's in my report somewhere if --
4  if -- that -- that's a basic starting point for much
5  of this dispute.  So I -- I'm sure I could find
6  something in the report that says just that.  But,
7  yes, I'm -- I was aware of that.
8      Q   Were you consulted at all in the methodology
9  of the study?
10     A   Well, I was not consulted on how to research.
11 The folks at the Fund are very confident they know how
12 to research, and they did not ask me any questions
13 about how to research.
14     Q   If you were going to create an ideal
15 inferential statistic study of these songs, how would
16 you go about doing it?
17     MR. THOMAS:  Object to the form.
18     THE WITNESS:  Well, you said "ideal."  The
19 whole point of inferential statistics is to not do
20 something ideal.  That's the -- so when you say ideal
21 inferential statistics, it's kind of like, well --
22 BY MS. McCONNELL:
23     Q   Okay.  Let me try it again.
24     A   We're not communicating.
25     Q   Thank you.

1      If you were going to create an inferential
2  statistics study of these songs, how would you go
3  about doing that?
4      A   I would do the things that I described in
5  response to the very first question on this line of
6  questioning where I described inferential statistics
7  and how one goes about it.
8      Q   Would you look to a single year or multiple
9  years?
10     A   I have to give that some thought.  What --
11 you probably -- there's more than one acceptable way
12 of doing that.  You could, for example, look at
13 payments in a -- in a particular year and then for
14 purposes of reporting errors, go back and look at
15 life-to-death information.  And there'd be nothing
16 improper about that.
17     You -- you could also look at a database that
18 has everything from the beginning of time and use that
19 as your starting point.  So I'm not sure it's an
20 either/or situation.  The question is whether whatever
21 group you're using from which you select your samples,
22 is that representative of the problem you're trying to
23 solve.
24     Q   Would it be more accurate to look at a
25 sampling of songs over multiple years?

1      A   Not necessarily.  It depends what you were
2  trying to solve.  So let's say, for example, that what
3  you were saying, as -- as the plaintiff has said,
4  that, well, on a going-forward basis this -- this past
5  information is not as important as it used to be, so
6  we -- we think that it's more important to look at it
7  on a going-forward basis.  And plaintiff has certainly
8  said that.  Then if that were the case, then there'd
9  be reason to look at more recent data in making your
10 sample.
11     Q   Can you think of any advantages to using only
12 one year of data?
13     A   I just gave you an advantage.
14     Q   You talked about --
15     A   So I guess the answer's, yes, I just answered
16 that question.
17     Q   Weren't you answering the question based on
18 recent years.  I said how about one year.
19     A   Okay.  You can substitute one year for recent
20 years.
21     Q   Okay.  Footnote 12 on page 11 of your report,
22 you write, "The Fund's selection process started with
23 a list of 5,992 titles that had distributions in 2020
24 and had Union session reports.  Starting approximately
25 halfway through this list, the largest fifty of the

Page 130

1  next one hundred sequential titles were selected."
2      So to start from, the Fund started with a
3  list of tracks that all had session reports from the
4  unions, right?
5      A  That's what it says.
6      Q  Do you know what the total amount of tracks
7  in the pool was that was whittled down to the 5,992?
8      A  I -- I'm -- I don't understand your question.
9  If you're saying that if you went to the beginning of
10  time would you get a larger collection, the answer is
11  most certainly.
12      Q  Thank you.
13      Do you know what that number is?
14      A  No.
15      Q  Okay.
16      A  Although you could probably infer it.  But
17  the answer is, no, I don't know.
18      Q  Okay.  Is it the 136,000 number that was in
19  that interrogatory response that we looked at earlier?
20      A  It could be.  That -- I mean, those --
21  those -- those are titles and, similarly, the titles
22  in footnote 12 are -- they're both expressed in terms
23  of titles.
24      Q  Why didn't the Fund use the entire pool of
25  titles to determine which tracks were researched using

Page 131

1  union data as opposed to other sources?
2      A  I'm sorry, someone's going to need to reread
3  that question.  Or let me give you a better answer.  I
4  can give you an answer.
5      You're asking me some -- about someone else's
6  state of mind, as I understand this question, so upon
7  reflection, even though I do not understand your
8  question and would need to have it reread, the answer
9  to the question, what is the Fund's state of mind, is,
10  I don't know because I'm not the Fund.
11      Q  Well, you were consulted to do the sample,
12  weren't you?
13      A  Yes, as I described before.
14      Q  Right.  Okay.  So I'm asking you why didn't
15  you use the entire pool of songs distributed in 2020
16  as opposed to whittling it down to 5,992 before then
17  doing another sample of just 50?
18      A  Well, first of all, I don't think your
19  question summarizes accurately what was done, but --
20  but the answer, ultimately, to your question is, you
21  said why didn't you, and "you" I think refers to David
22  Nolte.  So why didn't David Nolte do -- and then fill
23  in whatever your question.
24      And the answer is, David Nolte didn't do that
25  so you're asking the wrong fellow.

Page 132

1      Q  Okay.  So what was done, then, by the Fund?
2      A  The Fund did what this footnote 12 says.
3      Q  Okay.  How was the list of 5,992 songs
4  ordered?
5      A  My understanding, and it's not written here
6  so I -- my recollection could be wrong, but my
7  understanding is that it was ordered by size so that
8  the biggest item was first and the smallest item was
9  second and so from the vantage point of the person
10  that was doing this, they wanted songs that were kind
11  of typical.  And typical meant halfway in the middle.
12  And so that's how whoever decided to do this did that.
13      Q  So what do you mean when you say "size"?
14  Size, the number of performers?
15      A  In other words, the -- the titles with the
16  largest -- they were ordered -- the titles were
17  ordered by dollar amounts of -- of -- hold on, I'm
18  sorry, there's something happening here that -- I'm
19  sorry, excuse me.
20      THE WITNESS:  I -- I apologize but there's a
21  problem that just arose.  Can we take even just a
22  minute?
23      MS. McCONNELL:  Sure.  We'll just wait here.
24      THE WITNESS:  Yeah, I -- my apologies.  This
25  is not --

Page 133

1      THE VIDEOGRAPHER:  Should we go off the
2  record, Counsel?
3      MS. McCONNELL:  Sure.
4      THE VIDEOGRAPHER:  We are now going off the
5  record, and the time is 1:06 p.m.
6      (Recess.)
7      THE VIDEOGRAPHER:  We are now going back on
8  the record, and the time is 1:08 p.m.
9  BY MS. McCONNELL:
10      Q  Okay.  Before we took our break, I asked you
11  what did you mean when you said size, and then I don't
12  think you had finished your answer.
13      A  Okay.  My understanding is that the Fund
14  obtained a -- a printout by title that was ordered by
15  royalties to be distributed to nonfeatured performers.
16  So that the largest title obtaining -- was listed
17  first.  I say largest, the largest in terms of the
18  dollars to be distributed was first, and the smallest
19  to be distributed was last.
20      I -- I don't actually have that report, but
21  that was my understanding of what was being described.
22  And so the folks who made the sample wanted something
23  that was typical and so they went roughly to the
24  middle of the list.
25      Q  Was it your suggestion to order the list

Confidential Pursuant to Protective Order

Page 134

1 based on size?
2     A  I made no such suggestion.
3     Q  Okay.  And I think I might have asked you
4 this.  Forgive me.
5         Do you know what fraction of the whole 5,992
6 songs represent?
7         MR. THOMAS:  Objection to the form.
8         THE WITNESS:  Well, my understanding is that
9 the whole is the 5,992, so, in other words, they --
10 for whatever parameters that were identified they said
11 give us all of these.  And that's what the starting
12 point of the list was.  So perhaps I don't understand
13 your question.
14 BY MS. McCONNELL:
15     Q  Yeah.  Isn't the whole the total number of
16 tracks that were distributed on in 2020?
17     A  I -- I understood this to be a recent year.
18 It was probably 2020, but I -- I couldn't even tell
19 you that.
20     Q  Okay.  Isn't the whole the total number of
21 tracks that were distributed on in the year that they
22 were using?
23     A  Where they had unions reports, yes.  They --
24 they were -- see, the -- the whole idea was to figure
25 out what would happen with and without union session

Page 135

1 reports.  So given that definition of the problem, you
2 had to further limit it to -- to titles with -- with
3 session reports.
4     Q  Are you able to assume that the 5,992 songs
5 were representative of the total songs distributed in
6 that year?
7     A  Are you asking me am I able to make that
8 assumption?
9     Q  Yes.
10     A  I make no assumptions.
11     Q  To determine what would happen with or
12 without union session reports, would it matter if the
13 5,992 is out of 10,000 tracks versus 30,000 tracks?
14         MR. THOMAS:  Objection; vague.
15         THE WITNESS:  I -- I maybe don't understand
16 your question.  But here -- here's what I think you're
17 asking me.
18         The Fund reports roughly 6,000.  It's 8 shy
19 of 6,000.  So there's 6,000 titles.  And you're
20 saying, no, they're liars, it really wasn't 6,000, it
21 should have been some other number but I don't -- you
22 gave two numbers in your question.
23         If the Fund folks who were doing this are
24 lying, well, then, I would not condone lying, and then
25 I would -- I'd want to know more about it.  But I've

Page 136

1 not accused anybody of lying and so when they said
2 that the -- they took everything that met their --
3 their sample parameters, I did not require that I --
4 I -- I start from scratch.
5 BY MS. McCONNELL:
6     Q  Honestly, I don't know what you're even
7 referring to about lying because I said nothing about
8 lying and I'm -- and now you're saying, "I did not
9 require that I start from scratch."  So are you saying
10 now that you did a different sample than the Fund?
11 What do you mean when you're saying, "I did not
12 require that I start from scratch"?
13     A  I'm sorry if I misunderstood your question.
14 But I understood your question to say there's 6,000
15 that they -- the Fund used but the real number's not
16 6,000, the real number is whatever -- and then I said,
17 well, okay, I don't know where these new numbers come
18 from, but if someone's lying and there really wasn't
19 6,000, then under your hypothetical question that the
20 real number is more than twice what the Fund
21 representatives told me, then they must be lying.
22     Q  No.
23     A  I didn't -- you're right, I didn't make that
24 assumption.  I didn't test it and -- and I didn't
25 catch them in a lie, if that's what you're accusing

Page 137

1 them of.
2     Q  Yeah, we're obviously talking past each
3 other.  That's okay.
4         Is the utility of this sample data to
5 determine what would happen with or without session
6 reports?
7     A  That is what's being tested, yes.
8     Q  Okay.  So in order -- and was it the point to
9 extrapolate from this sample how it would work for the
10 entire track list of songs in a given year?
11     A  Yes, there's an extrapolation being done.
12     Q  Okay.  So isn't it important, then, to know
13 how many songs were distributed in that given year?
14     A  No, because it's being expressed as a
15 percentage.  So if it's being expressed as a
16 percentage you could apply, or extrapolate, to use the
17 word you were using, the percentage to a larger group
18 and it's still -- the percentage doesn't change.
19     Q  Okay.  So what percentage of the total group
20 is 5,992?
21     A  100 percent of whatever they were selecting
22 from.
23     Q  Okay.  But how does that answer my question?
24 What percentage of the total group of songs
25 distributed in that year is 5,992?

Confidential - Pursuant to Protective Order

Page 138

```
1    A  I don't have the number.  Effectively what
2  you're asking me is, is what -- well, how many
3  nonunion -- or -- or how many tracks do not have union
4  session reports, and the answer is, I don't know.  I
5  could --
6    Q  Okay --
7    A  I could -- I could ask based on the other
8  information that's in here, but I don't -- I don't
9  have that precise figure that I think you're seeking.
10   Q  What was the significance of starting, quote,
11  approximately halfway down that list?
12   A  That was the explanation that was provided to
13  me.  I gave you at least on two prior answers the
14  rationale that was expressed that I understood to
15  be.  But I wasn't the one who did that.
16   Q  Then the footnote, same footnote 12, says
17  that they used, quote, "The largest 50 of the next
18  100."  And does largest mean dollar value, dollar
19  amount of distributions?
20   A  Correct.  So my -- look, and I apologize if
21  it wasn't well expressed.  But my understanding was
22  that this starting point was some current period of
23  distribution and the report had a year-to-date or a
24  life-to-date amount on it.  And -- and that -- that
25  may have been a function of -- of available data in
```

Page 139

```
1  the database.
2    I mean, frequently -- you know, we want to
3  work in an ideal world where everything is available
4  to us and it simply isn't.  So using -- oftentimes
5  using current periods gets you a -- a more desirable
6  or a more accurate answer simply because of the
7  constraints of the data.
8    But in any event, my understanding is that
9  the report that was run included life-to-date
10  amounts, and so they were able to pick the larger of
11  those within the -- the sample, if you wish, the --
12  the first sample.
13   Q  Okay.  So if the -- if the 5,992 was
14  originally ordered in terms of largest to smallest, as
15  you described, and then you go halfway down and then
16  you pick the next 50, why does the note again say
17  picking the largest 50 of the next 100?  Wouldn't it
18  necessarily be numbers 51 to 100 because the list was
19  ordered by largest to smallest to begin with?
20   A  Well, first of all, you really are asking the
21  wrong person.  I -- I was not doing this, and I've
22  told you that in response to probably every single
23  question.  But I can give you my understanding.
24    My understanding is that there were the data
25  reported in this document or file, whatever it was,
```

Page 140

```
1  included a current period, which was the -- the basis
2  for initially looking at this, and then they had a
3  life-to-death or origin-to-current period, or what --
4  however they labeled it, field.  And within the 100
5  they selected another field that had the largest life
6  to death.  And that was their selection process.
7    Now, again, I wasn't doing this, and I wasn't
8  directing it either.  I was -- I was told about it
9  after it was done.
10   Q  Okay.  And you don't know why the year was
11  limited to only 2020, right?
12   A  You used the word "know" and so the answer
13  is, I -- I do not know that because I wasn't the one
14  doing it.
15   Q  Right.  You were told about it after it was
16  done?
17   A  I'm sorry?
18   Q  You said you were told about it after it was
19  done, right?
20   A  Correct.  The -- the sample was created and
21  the research was done and then I was told about the
22  results.
23   Q  Okay.  Do you happen to know approximately
24  how many songs in that 50-song sample were by country
25  artists?
```

Page 141

```
1    A  So as a genre of music, country?
2    Q  Yes.
3    A  I could not tell you.
4    Q  Do you know what percentage of overall --
5  strike that.
6      Do you know what percentage of tracks that
7  the Fund pays are country tracks?
8    A  I could not tell you.
9    Q  Okay.  Do you know whether the number of
10  country songs in the 50-song sample are under or
11  overweighted?
12   A  I have not done anything to address that.
13  I -- I know there's some that aren't country, but, you
14  know, if you are telling me there's a
15  disproportionately high country, I -- I haven't looked
16  at that.
17   Q  Okay.  Are you aware of testimony in this
18  case from Julie Sandell where she said that Nashville
19  tracks skew heavily union?
20   A  Yes.  In fact, I may have even quoted that in
21  my report.  But she said Nashville and I believe it
22  was Los Angeles as well are more lovely union.
23   Q  She said that in her estimation 95 percent of
24  tracks from Nashville were recorded in union sessions.
25    Does that sound familiar?
```

Page 146

1  consulting when they limited themselves from not
2  looking at union data?
3      A  It is recorded in the detail spreadsheets.  I
4  give you references to that in my report.  But if you
5  wanted to see it -- that's why I gave you the
6  references.  So you could actually see what they were
7  look at.
8      Q  Did you look into whether there was an error
9  rate even when the Fund researchers were looking at
10  union data?
11      A  There were no examples of that found.  That's
12  reported in my -- in my report.  So the union data was
13  never found to be unreliable.
14      Q  Okay.  Do you know if the Fund researchers
15  who were taking part in this study did anything to
16  check to see if the union data was reliable or not?
17      A  Well, the details that are contained in that
18  spreadsheet specifically identify that so that is one
19  of the fields that had to be completed and they did
20  complete it.  I had a conversation with Fund
21  representatives after this was done and -- and that
22  was again confirmed.  So it's -- it was both in my
23  conversations, but it's also contained in the written
24  document.
25      Q  Did any of the Fund researchers share with

Page 147

1  you that in the total pool of tracks there are errors
2  that are made even when using union data?
3      A  I -- look, I highlighted in a footnote that,
4  you know, no data source is infallible.  And that
5  infallibility -- something does not have to be
6  infallible to be valuable.  So I don't doubt for a
7  minute that in any information gathering process that
8  a mistake is made.  This is still done by humans.  Can
9  it be done by computers, computers can make mistakes
10  because the programs can make mistakes.
11      But -- so it's -- but, no, no one has told me
12  that the union data is unreliable or should not be
13  used or had any meaningful error rate to them.
14      Q  On page 10 of your report, Table 6, you have
15  heading -- well, most of your headings in this chart
16  have some variation of "supported by union data" or
17  "not supported by union data."
18      As used here, what does "supported by union
19  data" mean?
20      A  It means I'm summarizing the information
21  that's on a production number that is in footnote 10.
22  So whatever is intended by that document is what I'm
23  intending.
24      My understanding is that it's just what those
25  English words are saying, that the union data is

Page 148

1  useful in -- or it has information involving this
2  amount of royalties and -- and participants.
3      Q  Did you ask the Fund to collect that database
4  summary that's referred to in footnote 10?
5      A  I appreciate that's a simple question.  It
6  might frustrate you that I'm not giving you a
7  yes-or-no answer.
8      The -- I had a -- multiple conversations with
9  Fund representatives and I was seeking information
10  regarding union versus not -- nonunion data and I was
11  asking for information that would provide insights in
12  that regard.  In that sense I did ask for it.
13      Now, at the same time, they were responding
14  to your discovery, written discovery, and so there was
15  some things where people said, well, that's kind of
16  like what the plaintiffs want for this, or, it's, oh,
17  that's kind of like what was in the Blondell
18  litigation and we think we can get this, that or the
19  next thing and would that be useful.  And I said,
20  sure, go ahead and give it to me if useful to -- for
21  whatever the issue, you know, the table has to be
22  produced.
23      So I did ask for this data but it doesn't
24  necessarily make that my idea.  It could have been
25  your idea through written discovery.  It could have

Page 149

1  been the -- the idea of the Blondell litigation or it
2  could have been the idea of someone else on the board
3  or whatever that thought that they wanted this information.
4  I was -- basically I was asking a bunch of questions
5  and the Fund was giving back to me the information
6  that they thought they had that was reliable.
7      Q  Okay.  So you don't know one way or another
8  if this spreadsheet was created because you asked the
9  question or not?
10      A  Well, they may have assembled it for that --
11  the short answer is, I don't know.  I -- I got these
12  pieces of information, they were produced with
13  production numbers on them and I've reported them
14  here.
15      Q  Okay.
16      A  I'm not telling you I had nothing to do with
17  it, but I also don't want to claim credit that it was
18  my idea or -- or my invention.
19      Q  We didn't get it until it was produced with
20  your report which is why I'm asking you these
21  questions.  I'm really not trying to trick you.  I'm
22  just trying to figure out why it wasn't produced to us
23  in discovery beforehand.  But that's okay.
24      A  Well, it -- maybe I'm -- maybe I deserve more
25  credit than -- than I'm giving myself.  I don't know.

1  I'm just telling you that the -- the information
2  gathering was an evolving process and I got the
3  information that's summarized in this section of my
4  report.
5      Q  Do you know if -- well, strike that.
6          You mentioned the Fund's AS400 system.  Do
7  you know how the AS400 system tracks whether or not a
8  participant allocation is supported by union data or
9  not?
10     A  I understand there's a field in that database
11  that exists but is not reliable.  And -- and...
12     Q  Yeah.
13     A  So I mean, I -- I know there's been
14  discussion on that topic.  But generally I'm not
15  familiar with the detailed workings of that database.
16     Q  Okay.  And I think that testimony was from
17  Ms. Taub's 30(b)(6) deposition where she said that the
18  AS400 system does have that field but it's not
19  reliable.  Is that what you were referring to?
20     A  She certainly told me the same thing outside
21  of the deposition.
22     Q  Okay.  If the report was made, if -- if the
23  report that's attached -- strike that.
24         If the report that's referenced in
25  footnote 10 is created from unreliable data, doesn't

1  that make your Table Number 6 unreliable?
2      A  Given -- given your "if" statement, sure.
3  You're -- you basically said if -- if -- if Table 6 is
4  unreliable, isn't Table 6 unreliable?  The answer is,
5  sure, it is.  I -- it's -- I don't know how this was
6  created.
7      Q  Okay.
8      A  But I -- I did get the information, and it
9  provides the information that -- that's shown here.
10         The -- the unreliability, however, was that
11  the union involvement or the union data was being
12  significantly understated.  So to the extent that
13  Table 6 is impacted by this unreliable field, assuming
14  we're even talking about the same field, and I'm not
15  sure we are, but if we were then all of these numbers
16  for the unions should, in fact, be higher and which
17  would kind of be going the wrong direction from the
18  position the plaintiffs wish to advocate here.
19     Q  Is that information based on something that
20  Ms. Taub told you?
21     A  No.  I'm just telling you that -- that I'm
22  just responding to your "if" questions.  I was given
23  this information.  I'm not sure how it was compiled.
24  I do know that there was this other piece of data that
25  Ms. Taub described as being unreliable, and I don't

1  know the distinction between this document with the
2  production number and this other field.
3          But I -- I do know that the error, the piece
4  of the data that was unreliable was that the union
5  data was significantly underreported.  And so -- which
6  means that the two bolded numbers on Table 6, assuming
7  we're even starting with the same thing, are similarly
8  underreported.
9      Q  When it says "union data," are you talking
10  about session report data, contact information or
11  both?
12     A  I'm talking about what's -- what is on this
13  production number.  It -- it's a piece of information
14  that the Fund gave me.
15     Q  Yeah, again, this is the first time we got
16  this production number, is through you, so I have no
17  one else to ask these questions of, unfortunately, but
18  you.
19         So do you know one way or another whether the
20  spreadsheet that was DEFS42028 is including
21  information from B-form session reports, contact info
22  or both?
23     A  I couldn't tell you.
24     Q  Okay.  On page 13 of your report -- okay.
25         If you look at, I'm sorry, page 14 under A,

1  you say, "Numerous businesses are based on the
2  accepted axiom that information is valuable and can be
3  sold in market-based transactions."
4          What do you mean here when you say
5  "market-based"?
6      A  I'm referring to transactions that are not
7  between related parties.
8      Q  Okay.  And the basis --
9      A  Let me construe it another way.  I'm using it
10  the same way an appraiser would.  An appraiser looks
11  for market transactions in which to base an opinion
12  regarding fair market value.  And so I'm adopting or
13  using the lingo of an appraiser.
14     Q  Okay.  The businesses that you surveyed in
15  this section, including Facebook, Google, FICO, these
16  are companies that are engaged in market competition;
17  is that correct?
18     A  Well, if you want to look at the Justice
19  Department, they're probably not subject to enough
20  market competition, but I -- I -- I don't know if that
21  really answers the question.
22         I would -- they're clearly for-profit
23  enterprises; whether they are monopolists and
24  operating as monopolists is, I guess, a -- for someone
25  else's litigation.

Confidential Pursuant to Protective Order

Page 154

```
1   Q  Would you agree that market competition is
2   important for market-based transactions?
3       MR. THOMAS:  Objection; vague.
4       THE WITNESS:  The whole notion of a market
5   suggests that -- that there are buyers and sellers for
6   whatever the good or service is.  I don't know if
7   that's answering your question or not.
8   BY MS. McCONNELL:
9   Q  It does.
10      Other than the Fund, what is the market for
11  union data?
12  A  Well, there's not much of a market, which is
13  why this whole study and dispute exists.  If there was
14  a readily available market, then probably I wouldn't
15  have had an assignment and you wouldn't have a
16  lawsuit.
17  Q  So who else are the unions selling this data
18  to?
19  A  No one.
20  Q  Okay.  So they're not competing with anyone
21  else for the sale of the data?
22      MR. THOMAS:  Objection to form.
23      THE WITNESS:  Yeah, I'm not -- when you say
24  they're not competing for -- it's their data so
25  they're not competing for their own data.  But perhaps
```

Page 155

```
1   I misunderstood your question.
2   BY MS. McCONNELL:
3   Q  Are there any other willing buyers for the
4   unions' data?
5   A  Oh, I'm sure if the union wanted to sell it,
6   oh, they -- I don't doubt for a minute that they could
7   sell their contact list.  They've simply chosen not to
8   do so, you know, and I'm not disagreeing with that.
9   But the fact that they have not sold it does not mean
10  that there's not a demand for it.
11  Q  Why have they chosen to sell it to the Fund?
12  A  Well, you're ask -- you're probably asking
13  the wrong person.  I mean, I could -- my understanding
14  is that the union, consistent with some of the
15  positions the plaintiff has taken, is aware of the
16  fact that it would behoove the unions and the union
17  members to have this information available to the
18  Fund, and therefore, they are making an exception to
19  provide the information to the Fund because they --
20  the unions sees their purpose and the Fund's purpose
21  to be somewhat aligned.
22      But I say that not because I'm a percipient
23  witness or a member of the boards of unions or can
24  read anybody's mind.  You should really ask them why
25  they did it.
```

Page 156

```
1   Q  Are you under the impression that the unions
2   have a monopoly over the session report data?
3       MR. THOMAS:  Object to the form.
4       THE WITNESS:  I've not made that assumption.
5   It -- it could be that -- that some of the recording
6   studios may have that data.  The question is whether
7   they've kept it or whether they want to participate in
8   it.  But I'm not aware of any other source.  So
9   they -- they might -- well, I guess the answer is,
10  I -- I don't know whether anybody else has a copy of
11  some of them.  But my understanding is, and what I've
12  reported in my report, is that the unions have the
13  most complete collection and the most long-lasting
14  collection available.
15  BY MS. McCONNELL:
16  Q  Have you researched whether the record labels
17  have a complete collection of this data?
18  A  The testimony in this matter is that they do
19  not have such data available and that the most
20  complete and available collection is from the unions.
21  And that's what the percipient testimony's been, which
22  I've read.
23  Q  Do you recall who testified that way?
24  A  Boy, I think everybody did.  I don't think
25  anybody said otherwise.  I mean, I didn't compile
```

Page 157

```
1   that, but it seemed to be a common theme between all
2   the union representatives and all the Fund
3   representatives.  I don't think anybody said
4   otherwise.
5   Q  Did you look at Dennis Dreith's testimony?
6   It's on your list.
7   A  I'm sorry -- Dennis Dreith -- oh, I'm sorry,
8   I misunderstood.  I've got some background noise.
9   It's a busy day at my house today.
10      Yes, I did look at his testimony, and it's
11  included in the list on paragraph 5 on page 2.
12  Q  Okay.  Didn't he testify that there were
13  other sources of this data?
14  A  I don't recall that, no.
15  Q  Okay.
16  A  And if I'm wrong then -- then so be it.  But,
17  no, I don't -- that's not my recollection.
18  Q  Okay.  Do you -- are you under the impression
19  that the data collected by the unions has intellectual
20  property protection?
21      MR. THOMAS:  Object to the form.  Vague.
22      THE WITNESS:  Well, yeah, I'm not sure I know
23  what you're referring to.  It -- it's not -- look,
24  I'll just go through the types of intellectual
25  property and -- and --
```

Confidential – Pursuant to Protective Order

Page 158

1  BY MS. McCONNELL:
2      Q   Yeah.
3      A   -- maybe that will answer your question.  But
4  I'm not suggesting that it's copyrighted.  It's not --
5  I'm not suggesting it's patented, and I'm not
6  suggesting it's trademarked.
7          Whether it constitutes a trade secret, I
8  guess I'll let the lawyers argue.  But it is
9  confidential and not being shared with others and by
10  virtue of that limited availability, the information
11  has value.
12     Q   Do you know how Facebook's data is protected?
13  Meaning, do you know if Facebook's data has
14  intellectual property protections?
15         MR. THOMAS:  Objection; overbroad, vague.
16         THE WITNESS:  Yeah, you're going quickly have
17  me start expressing legal opinions, which I'm not
18  intending on doing, but my understanding is that
19  there's a specific federal act that involves
20  computerized data that I suspect Facebook would
21  suggest gives that data protection if someone were to
22  steal it.
23         Now, additionally, I'm sure Facebook has
24  internal policies, procedures with anybody having
25  access to that data in which Facebook explains and

Page 159

1  gets written acknowledgments that -- that someone
2  can't go out and start releasing this stuff.  I mean,
3  that's how most companies deal with proprietary
4  information that's internal to their organization.  I
5  don't know that Facebook does that but I'd be shocked
6  if they didn't.
7  BY MS. McCONNELL:
8      Q   Are you --
9      A   So in that sense there's -- yeah, there is
10  some intellectual property protection.
11     Q   Are you aware that Facebook's algorithms are
12  patented?
13     A   Well, algorithms are different than the data.
14  I -- I don't doubt for a second that they're --
15  they're either patents or copyrights on their
16  software.  That -- that I'd -- I'd be surprised if
17  they weren't.
18     Q   Are you under the impression that Facebook
19  sells their data or are you under the impression that
20  Facebook gives access to others to their algorithms?
21     A   You know, I'm not familiar with the mechanics
22  of how they -- they do it.  I -- I do know that the
23  business model allows them to collect fees for running
24  sponsored ads.  I am pretty sure that Facebook
25  controls that, but, you know, I -- whether it's done

Page 160

1  with an algorithm and lookup table, the mechanics of
2  that are beyond my technical desire.
3      Q   You mentioned that the unions don't share the
4  data with anyone else.  Are you aware that the unions
5  share the data with the pension funds?
6          MR. THOMAS:  Objection; I think it misstates
7  his prior testimony.
8          But you can answer.
9          THE WITNESS:  Well, there's at least once,
10  probably multiple times, when I specifically identify
11  that.  So when -- this is not a revelation that is not
12  already in my report.
13         Now, it doesn't bother me at all that in
14  connection with the payroll obligation the unions give
15  to the pension plans the beneficiaries of the amounts
16  that the unions have collected for those -- those same
17  beneficiaries.  I mean, it -- that would be an
18  absolute requirement.  And I identify that in my
19  report.
20  BY MS. McCONNELL:
21     Q   You mentioned that the data is given from the
22  unions to the pension funds pursuant to collective
23  bargaining.  Do you know what the unions receive in
24  return for the provision of the data?
25     A   They are fulfilling their mission to keep

Page 161

1  their members employed and have retirement benefits.
2  What they receive is the member dues that -- and --
3  and the member's permission to run those retirement
4  plans.
5      Q   Okay.  I'll leave that one alone.
6          Do you think -- I think you answered this.
7          Do you think that the session reports are
8  eligible for patent protection?  I think you said no,
9  right?
10     A   I'm not expressing any legal opinions, but
11  I -- I would not expect them to be a patented item,
12  no.
13     Q   Would you need to assume that they are a
14  patented item to use the Georgia-Pacific factors in
15  this case?
16     A   No.
17     Q   Why not?  Let's start there.
18     A   I would invite your attention to the
19  introductory paragraph to conclusion C, as in cat,
20  where this entire Georgia-Pacific analysis exists.  In
21  this introductory paragraph I observe what your
22  question just asked and explain why it is that I'm
23  using the Georgia-Pacific factors.
24     Q   You say it's because its "used by analysts to
25  address reasonable royalties with other forms of

Confidential Pursuant to Protective Order

Page 162

```
1   intellectual property," right?
2        A   I do say that, yes.
3        Q   Okay.  So are you saying that the session
4   reports fall under that umbrella of other forms of
5   intellectual property?
6        A   I'm not sure I know what you're referring to.
7   Look, this information has value.  If you want to
8   debate that, that's a different series of questions,
9   but I don't think that's what you're asking here.
10       The value is for property that is
11  intellectual.  It is not physical, right, it's not
12  like a desk or a chair.  So I'm valuing intellectual
13  property and I'm using Georgia-Pacific in order to
14  gain insights because that landmark case has been used
15  on a wide range of intellectual property matters
16  extending past patents, which was its initial purpose
17  or point.
18       Q   Okay.  So you -- you're aware of courts that
19  have used the Georgia-Pacific factors on other forms
20  of intellectual property?
21       A   I don't have any case cites.  I -- I expect
22  there are.  I can tell you that analysts such as
23  myself will do that.  And it's -- it's just a
24  methodology.
25       I don't know what any courts have said that
```

Page 163

```
1   it's required and so I don't have any opinions or
2   decisions for you that says it's required.  But I -- I
3   myself and a wide range of other people have done it
4   and no one seems to complain that -- or state that
5   Georgia-Pacific factors are irrelevant to other forms
6   of intellectual property.
7        Q   Okay.  Even -- even if other courts haven't
8   said it's required, have you seen or read other courts
9   utilize the Georgia-Pacific factors for other forms of
10  intellectual property?
11       A   I am an appraiser.  I am not a lawyer.  I
12  formulate opinions based on appraisal standards.  And
13  I follow methodologies that are generally accepted by
14  others in my field.  So I do not look for court
15  decisions as the foundation for why something should
16  be done.  I instead look to economic principles and
17  general acceptance within the field that I practice.
18       Q   In your field of practice which has included
19  litigation consulting for many years, have you been
20  involved with or read about a case, nonpatent case
21  which used the Georgia-Pacific factors?
22       A   I've already told you, and I will repeat,
23  that I and others, and the others include opposing
24  witnesses, have used the Georgia-Pacific factors and I
25  don't think I've ever heard anyone who's a competent
```

Page 164

```
1   appraiser say that that was a bad idea.
2        Q   Was it your idea to apply the Georgia-Pacific
3   factors to the facts of this case?
4        A   Yes.
5        Q   And why did it make sense to you to apply
6   Georgia-Pacific to this case that doesn't involve
7   patents or intellectual property patent infringement?
8        A   I would invite your attention to the first
9   paragraph which introduces Section C.  I already
10  referred you to that paragraph, and I believe the
11  answer remains unchanged.
12       Q   And that is?
13       A   What's in that paragraph.
14       Q   What is that?
15       A   Would you like me to read it?
16       Q   I'd like you to answer the question,
17  actually.
18       A   I just have.  I've answered it now at least
19  three times.  I'm happy to read it to you if you'd
20  like me to.
21       Q   Is it because you think that a reasonable
22  royalty rate can be crafted by using the
23  Georgia-Pacific factors?
24       A   I would not agree with that even in a patent
25  context.  A reasonable royalty rate can be crafted.
```

Page 165

```
1   I'm going to avoid the argument argument that's
2   contained in that word, but it could be crafted by
3   using sound appraisal practices and principles.  The
4   Georgia-Pacific case provides considerations that
5   should be used in those appraisal practices and
6   principles.
7        Q   Why do you use the word "royalties" in that
8   first paragraph that you've drawn my attention to
9   three times?
10       A   Because this service fee, to use the term
11  that the plaintiffs like to use, is in substance a
12  royalty.  It's a royalty for use of information.
13       MS. McCONNELL:  Okay.  Why don't we take a
14  quick five- to ten-minute break and then come back.
15       THE WITNESS:  Is it -- is it five minutes or
16  ten minutes?
17       MS. McCONNELL:  Let's say five.
18       THE VIDEOGRAPHER:  Okay.  We are now going
19  off the record.  The time is 2:00 p.m.
20       (Recess.)
21       THE VIDEOGRAPHER:  We are now going back on
22  the record, and the time is 2:10 p.m.
23  BY MS. McCONNELL:
24       Q   Okay.  I want to look at some of your
25  analysis of the Georgia-Pacific factors which start on
```

Confidential Pursuant to Protective Order

Page 166

1    page 21 of your report.

2        For factor number 2, "The rates paid by the

3    licensee for use of other similar [intellectual

4    property]."

5        You note that the Fund has no similar

6    licenses or agreements, right?

7    A   Yes, ma'am.

8    Q   Okay.  So we don't have an example of other

9    rates paid by the Fund for similar intellectual

10   property, right?

11   A   Correct.

12   Q   Okay.  On factor number 3, "The nature and

13   scope of the license, such as whether it is exclusive

14   or nonexclusive, restricted or nonrestricted in terms

15   of territory or customers."

16       Does the service agreement have any language

17   related to whether -- well, A, whether it's a license,

18   and, B, whether it's exclusive or nonexclusive?

19   A   Well, the service agreement, as I recall,

20   does not describe it as a license.  I'm doing that

21   because of what I told you before, which is the

22   economic substance of it is a royalty for the license

23   of information.

24       And as for it being exclusive or

25   nonexclusive, I -- I don't think the union is

Page 167

1    prevented from giving the information to others.  So

2    in that sense it's -- it's a nonexclusive arrangement

3    even if the union chooses not to license the data to

4    others.

5    Q   Would you agree that the services agreement

6    is silent on exclusivity?

7    A   Okay.  We can -- we can express it that way.

8    Q   Great.

9        Factor 4.  "The licensor's policy of

10   maintaining its [intellectual property] monopoly by

11   licensing the use of the [intellectual property] only

12   under special conditions designed to preserve the

13   monopoly."

14       How are you able to apply that factor to this

15   case?

16   A   Well, I will agree that some of these factors

17   translate better than others when you get outside of a

18   patent context.  This particular factor is focused on

19   patents and translates and works better with patents.

20   Nevertheless, I've -- I've answered the question

21   because I didn't want to, you know, say, well, I'm not

22   going to worry about that one or...

23       So I -- I endeavored to go through all

24   factors even if some, as this one is, is less directly

25   applicable to non-patent property.

Page 168

1    Q   And then if you can look at factor 12 on

2    page 25.

3        "The portion of the profit or selling price

4    that is customary in the particular business or in

5    comparable businesses."

6        What are we looking for here typically in a

7    patent case or in other cases?

8    A   Well, this could apply to any sort of

9    property.  What it basically says is if there's a

10   general understanding among industry participants that

11   there's an industry rate, then -- then we can do that.

12   You don't see industry rates very often, although when

13   Georgia-Pacific first came out they -- they were more

14   popular.

15       But if someone said, for example, and this

16   would be more like in a -- in a copyright or trademark

17   situation, well, everybody in this industry pays

18   5 percent for this, and you say why 5 percent, well,

19   that's because there's been so many 5 percent, nobody

20   gets more 95 percent, so too bad, it's 5 percent.

21       And if you have that sort of mentality within

22   an industry then this factor 12 would become

23   controlling.  But you see that less and less.

24   Q   And in this case you're not aware of any

25   industry standard rates that are applicable?

Page 169

1    A   Agreed.  That's what it says.

2    Q   Okay.  Can you -- are you able to give an

3    estimate of how many other cases you've used the

4    Georgia-Pacific factors in?

5    A   I've used the Georgia-Pacific factors in

6    every case involving a reasonable royalty on patents.

7    No exceptions.  I've used reasonable --

8    Georgia-Pacific -- well, let me back up a second.

9        When -- when the question is a royalty rate,

10   and it oftentimes is not, but if I've got a non-patent

11   case where the remedy is a reasonable royalty, I

12   hesitate to say it's a hundred percent, but it's -- if

13   it's not a hundred percent it's pretty close.  But

14   again, I would only do that when the desired

15   conclusion is expressed as a reasonable royalty rate.

16   Q   Do you know how many cases you've used

17   Georgia-Pacific where patent law claims were not at

18   issue?

19   A   Well, boy, the answer -- I guess one answer

20   would be no.  Usually what happens on -- on like

21   trademark cases, or even copyright cases, you end up

22   with lost profits or disgorgement as the primary

23   remedy and so you -- you know, I've done hundreds of

24   those cases.  And you don't normally see reasonable

25   royalty as -- as the -- as the remedy, the monetary

Confidential Pursuant to Protective Order

Page 170

1 remedy that's being sought.
2      So I can't tell you how many of those
3 hundreds have expressed them as reasonable royalty but
4 I'm pretty sure that may be a hundred percent of them
5 when they're expressed in that manner I've used
6 Georgia-Pacific.  I don't have a number of what that
7 is other than it's probably all of them.
8      Q   You mentioned that you use Georgia-Pacific
9 when the desired conclusion is expressed as a
10 reasonable royalty rate.  Wouldn't you agree that
11 there are other alternatives for compensation for the
12 unions instead of what you call a royalty rate?
13      A   I probably don't understand your question.
14 But, for example, plaintiffs' contention is that it's
15 for free and so I guess for free means you don't need
16 a royalty rate or anything else.  So --
17      Q   Couldn't it be --
18      A   -- I'd have to agree -- I'm sorry?
19      Q   Couldn't it be a flat fee?
20      A   You can express royalties as a flat fee.
21 They're not as common, particularly with things that
22 have proven their value.  But if -- I've -- I've done
23 royalty valuations where it's been expressed as a flat
24 fee.
25      Q   Could you have a subscription fee model

Page 171

1 instead of a royalty rate percentage?
2      A   Well, depends on what the -- how the
3 subscription fee is expressed, but I think what you're
4 saying is that if you could say, well, we're going to
5 charge X cents per amount received per artist, or --
6 or per track, because that's how SoundExchange reports
7 it, I suppose you could do that.
8      You can express royalties in any form you
9 want, whether it's a flat fee, a per unit amount or
10 percentage amount.  But ultimately the economics are
11 all the same.  Well, you know what, I --- they're not
12 all the same.  The risk sharing is different if you're
13 dealing with a flat fee.  But if you're dealing with
14 a -- a per unit versus a percentage, you -- you get a
15 kind of -- you could end up in the same direction.
16      Q   Do any of the for-profit businesses that you
17 described in your report use a percentage-based
18 royalty rate?
19      A   Well, some of them don't describe it as a
20 royalty, but clearly there are some fees being paid as
21 a percentage.  I -- I would say all of them are based
22 on quantity of some sort, so whether they express them
23 as a percentage, there's no question that the use of
24 intellectual property or the fee for the use of
25 intellectual property increases as the usage goes up.

Page 172

1 And -- and that's true across the board.
2      Q   Which -- which companies, starting on page 14
3 of your report, charge percentages based on usage?
4      A   Well, I've already told you it really doesn't
5 matter too much whether you do it as a percentage.
6 I'm expressing it as a percentage here because that's
7 the way the agreement was crafted.
8      But in any event, I'll be happy to go through
9 this and give you my -- my reactions.
10      The mailing list industry is not expressed as
11 a percentage because the mailing list industry does --
12 does not wish to risk share with their licensee.  So
13 this is an example of where the risk -- they're --
14 risk sharing's just the opposite of what happens here.
15      And the mailing list gets paid a flat fee for
16 a given size list so you could express that this --
17 the fee is at per unit or as a flat fee.  But
18 generally, if it's a bigger list, it's going to get
19 more money so the per unit fee is going to be more
20 sensible.
21      Q   Can I cut you off and go to number 2, I'm
22 sorry, because you mentioned risk sharing, and I'm
23 wondering what is the risk sharing that you were
24 describing in terms of the mailing list industry?
25      A   Well, the -- the mailing list industry says

Page 173

1 we're not going to charge you less if you don't
2 generate sales, it's your problem to generate sales,
3 so we're going to charge you an amount of money and we
4 get the money whether you're successful or not.
5      Q   Okay.  Sorry, I cut you off.  You were going
6 to give more examples?
7      A   Okay.  Well, the next one is Google and
8 Facebook.  Google, you know, I'm not familiar with --
9 with the details of their pricing, and they're
10 probably evolving, but most of what Google does, I
11 believe, is on a -- a per impression basis.  So you
12 get paid for X number of impressions.
13      I -- I'm not telling you that Google doesn't
14 have other means of contracting.  We probably could
15 read about that in their annual report.
16      Facebook I'm guessing is the same way, but
17 again, I'm not -- it's not important -- I'm trying to
18 answer your question, but it's not important to my
19 conclusions.  But whatever the answer is you could
20 probably get from the annual report.
21      Fair Isaac's has a -- as I understand it, a
22 number of -- of license arrangements, but it's -- it's
23 all going to be based on -- on usage.  So if -- if
24 you're running more reports, you're going to charge --
25 get charged for money.  And I just don't know how

Confidential Pursuant to Protective Order

Page 174

1  their contracts are expressed.  But again, I'm sure
2  that you -- you could probably read a paragraph in the
3  annual report if that was of primary significance to
4  you.  It, by the way, was not a primary significance
5  to me.
6      Nielsen runs most of their contracts unique
7  to a -- a user.  So if you contact Nielsen, they want
8  to know what are you going to use it for and who are
9  you and how many reports are you going to get and then
10  they give you pricing.  Again, though, it's based on
11  anticipated usage and who you are.
12      Q  It's not based on the profits that you are
13  anticipating to get from usage?
14      A  Oh, yeah, absolutely.  One of the things
15  that's interesting about all of these is that none of
16  them do the -- the people who -- who are getting the
17  fee, you know, are -- are they changing the fee based
18  on, you know, whether you're successful or not.  So --
19  and -- and -- and that's -- that's the -- the genesis
20  of the comment that I've got later in the report.
21      So Google doesn't say we're only going to
22  charge you if you're successful in making a sale.  We
23  give you the impression, you pay for it, whether you
24  can make a sale or not is your problem.  And the same
25  thing's true I think for pretty much all of these.

Page 175

1      Nielsen, for example, you know, doesn't talk
2  to you about whether the ad is -- is effective or not.
3  They simply tell you how many viewers there are.
4      Q  Right.
5      A  So the -- the credit union -- I'm sorry, the
6  credit reporting folks, again, they -- they have
7  different ways of coming up with contracts.  I was not
8  summarizing that.  I'm sure it's in their publicly
9  traded items, but I'm -- I'm quite sure that it's a
10  function of -- of volume.
11      LexisNexis, which is effectively number 6, is
12  a usage-based service, by and large.  If you have a
13  very large law firm or very large user, you can come
14  up with a flat fee for the year, but then it's subject
15  to renegotiation every year based on the -- the usage
16  again.
17      The title companies in number 7 are actually
18  percentage-based.  The larger transactions get higher
19  fees.  And that's just the way that industry works.
20      So now I've run through the companies.  I --
21  I hope that was helpful to you.
22      Q  It was.  Thank you.
23      Has your application of the Georgia-Pacific
24  factors been rejected in any case?
25      A  No.  Well, hold on, you know what, I may have

Page 176

1  been too quick on that.  When you said "rejected," I
2  thought I knew what you meant and maybe I didn't.
3  Maybe I was just too quick.
4      When you said "rejected," what I interpreted
5  that question to be was, was it not allowed by the
6  Court to be presented as admissible evidence.  Is that
7  what you meant?
8      Q  Either you were not allowed to testify
9  because the Court found that Georgia-Pacific did not
10  apply or the Court said Georgia-Pacific did not apply?
11      A  None of those circumstances arose.
12      Q  Okay.  We've said it a few times, but you --
13  you compared the provision of data to the Fund to a
14  license, correct?
15      A  Yes.
16      Q  Is there a term for the license?
17      MR. THOMAS:  Object to the form.
18      THE WITNESS:  I -- I'm not aware of a term as
19  I think you're -- you're typically reporting it.  I
20  think the parties are anticipating that the agreement
21  will continue until it's amended.
22  BY MS. McCONNELL:
23      Q  Okay.  If the Fund terminated the services
24  agreement, does the Fund have an obligation to return
25  the data that it has received from the unions?

Page 177

1      A  You know what, I'm going to leave that for
2  the next plaintiff and defendant on that lawsuit.  I
3  mean, it -- it -- it would almost certainly be a -- a
4  lawsuit.  I don't think you can grab someone's
5  information, use it into perpetuity, and say, oh, by
6  the way, we're -- you know, we're not going to pay you
7  anymore.
8      But if -- if -- if someone says that that's
9  the poor drafting of an agreement, then that's fine,
10  I'll leave that for the next lawsuit.
11      Q  Okay.  So if -- if someone says that the
12  provision of the data was actually a sale of data and
13  now the Fund owns the session reports that were
14  transmitted to it, then you would say they don't have
15  an obligation to return it?
16      A  Oh, I -- no, hold it.  I -- I didn't say
17  that.  Well, look, first of all, I think -- I think
18  ultimately you're asking me to interpret a contract.
19  And I'm not doing that.
20      What I'm doing is saying what is a reasonable
21  fee for what's been provided.  And what I'm telling
22  you is a reasonable -- the 3 percent that the parties
23  came up with is a reasonable fee for a continued
24  relationship.
25      Now, if the Fund is able to say we're going

Confidential Pursuant to Protective Order

Page 178

1　to keep your data and not have to pay you because
2　there was an oopsy somewhere, and we're going to hold
3　you to that oopsy, even though that clearly was not
4　the intentions of the parties, that does not change my
5　conclusion.
6　　　　The conclusion under that set was someone
7　meaning the Fund is taking advantage of an oopsy by
8　the part of the unions.  And -- and the fact that --
9　that something -- something may be an oopsy does not
10　change its economic value.  So my conclusions are not
11　oriented to what is legally permissible under a
12　contract.  It is instead what is a reasonable value in
13　consideration for what's been exchanged between the
14　parties.
15　　　Q　Haven't you interpreted the contract by
16　calling it a license?
17　　　A　No.
18　　　Q　There's nowhere in the contract that says
19　that it's a license, right?
20　　　A　I don't have to call it a license.  Look,
21　I'm -- I'm simply saying that there is methodologies
22　available for coming up with an economic answer or a
23　valuation conclusion and -- and we can look at that by
24　realizing that this is expressed as a percentage.
25　　　　I don't know that you would change the answer

Page 179

1　at all if someone said, I'm going to give a ruling
2　that says the word "license" has to be omitted from
3　Nolte's report.  It's just a ruling, says "redacted."
4　Nolte can call it something else, but he can't call it
5　a license.  He can call it a kibitzer bong.  So we're
6　going to call -- you can't call it a license, he can
7　call it whatever he wants, if it's a kibitzer bong,
8　fine.
9　　　　I think I could rewrite the report, take out
10　the word "license," insert the word "kibitzer bong"
11　and I'm not sure any conclusions are going to be
12　changing because my conclusions are economically
13　based, not based upon a legal interpretation of the
14　word "license."
15　　　Q　Doesn't it need to be a license for you to
16　say that the unions are entitled to a royalty for use
17　of it?
18　　　A　Again, you know, I -- I've done numerous
19　assignments where I've looked at the reasonableness of
20　royalties.  I've -- and I'm -- I'm -- that's how these
21　types of agreements are oftentimes expressed.
22　　　　But if someone says, no, no, no, you can't
23　call it a royalty, it has to be a service fee, if you
24　don't call it a service fee, then it can't be right.
25　Fine.  Run through the report, we can take out the

Page 180

1　word "royalty," we can put in the word "service fee"
2　if that's the only thing that's differentiating the
3　parties.  I'm not sure it's going to change anything.
4　　　　I'm -- I'm simply describing it as -- as a
5　royalty and as a license because that is the language
6　of business that is typically used for this type of
7　transaction.  If you or the other parties or the Court
8　decide that they don't want to use that language, I
9　don't think -- I'm quite sure it doesn't matter.
10　　　Q　When you use a patent without a license you
11　can be sued for infringement, right?
12　　　A　You can.
13　　　Q　And that's the same for copyright and
14　trademark?
15　　　A　You can.
16　　　Q　So no matter how you come into possession of
17　those assets you can be restricted by law for using
18　them without permission, right?
19　　　A　That's correct.
20　　　Q　And that's why you need to license the asset?
21　So that you don't get sued?
22　　　A　Well, maybe that's the way a lawyer would
23　express it.  But that's not how I would express it.  I
24　would express it that if you owned someone else's
25　property you should pay fair value for it.  And -- and

Page 181

1　not because you're going to get sued, but because it's
2　the right thing to do.  But whatever.  If -- if -- if
3　you know, if -- if your reason is that don't have to
4　do the right thing, you just have to do what's not --
5　what you have to do to not get sued, then, okay.
6　　　Q　Here we go.
7　　　　Okay.  If the Fund found the unions' data by
8　the side of the road, would any similar restrictions
9　apply?
10　　　A　I don't know what you mean by "similar," but
11　I would tell you this.  If something is a secret, it's
12　someone's personal private property, and they find it
13　by the side of the road, and they don't have the right
14　to use it, it should be returned.
15　　　　Now, this may get back to, oh, well, I can
16　use I and not get sued, it's like, okay, fine, if
17　that's the way you want to conduct your life, that's
18　fine.  But I'm telling you that if you use someone's
19　property and you don't own it and don't have
20　permission to use it the right thing to do is return
21　it.
22　　　Q　If the person who owns the property hasn't
23　done anything to protect it and they've left it on the
24　side of the road or they've posted it on Reddit,
25　wouldn't you agree that there is no protection for

Confidential - Pursuant to Protective Order

Page 182

1 that data and the person can use it without feeling
2 any sort of moral sadness or feeling like they're
3 going to be sued?
4     A  Well, being sued and feeling moral sadness
5 are two different things.
6     Q  I know.  That's why I said "or."
7     A  But in any event, I do understand that as
8 a -- as a legal requirement that someone seeking trade
9 secret protection has to make efforts to keep it a
10 secret.  And so the question comes up of what happens
11 if someone steals it.  A disenfranchised employee, a
12 hacker, someone else.
13        Now, you said left on the side of the road.
14 Well, how did it get left on the side of the road, is
15 because, you know, it was in someone's car and they
16 opened the door and something fell out and it was an
17 accident, does that mean that -- you know, look, I'll
18 let people who want to fight over lawsuits on that.
19        But I'm telling you that the secret has value
20 as long as its use is restricted and if you don't own
21 it, the right thing to do is either pay for it or
22 return it.
23        MS. McCONNELL:  I'm just going to move that
24 strike that response because I have no idea what you
25 were answering.

Page 183

1     Q  But in your report you talk about law firms'
2 arrangements with LexisNexis.  To your knowledge, do
3 law firms license information from LexisNexis or do
4 they have a subscription to use LexisNexis?
5     A  In the context that you just raised it, I
6 would view those two terms as synonymous.  If -- I
7 don't really care whether someone calls it a
8 subscription or a license.  It has the same economic
9 impact.
10     Q  Okay.  Are you aware of other data services
11 companies that are subscription-based?
12     A  Sure.
13     Q  Can you give some examples?
14     A  Subscriptions typically refer to a recurring
15 fee that is paid for, you know, whatever you've got.
16 Subscription businesses are -- are very much in vogue
17 now so you see lots of -- of businesses that are
18 selling products as subscriptions.
19        Subscriptions first started in the print and
20 publishing business where you bought a subscription to
21 a magazine or a subscription to a newspaper and that
22 newspaper or magazine would show up periodically.  But
23 now you can buy almost anything on a monthly or
24 periodic service plan.  So food or -- or almost
25 anything --

Page 184

1     Q  Data?
2     A  -- that you might want to consume.
3     Q  Data?
4     A  What's that?
5     Q  Including data?
6     A  You know, I've already told you that the use
7 of the world "royalty" was not important to me.  If
8 you wanted to call this a subscription and so we have
9 a subscription fee of 3 percent, I wouldn't quarrel
10 with that.  I think I told you before we could call
11 the license a kibitzer bong, so I sure don't care if
12 you call it a royalty subscription.
13        I'm -- I'm -- I'm -- my conclusions don't run
14 to the names.  The names are -- are just there to help
15 communicate.  What -- what matters is -- is the
16 3 percent reasonable.
17     Q  Do you know if LexisNexis has the ability to
18 demand the return or destruction of any information
19 downloaded from its site after a user's subscription
20 expires?
21     A  I'm sure they don't.
22     Q  Okay.  Have you heard of IMDbPro?
23     A  Yes.
24     Q  Are you aware that that is a
25 subscription-based service where you pay a flat fee

Page 185

1 per month?
2     A  Okay.  If you say so.  Yeah, I haven't looked
3 at the pricing of IMDbPro for a while.
4     Q  Okay.  Are you aware of a website called
5 baseball-reference.com?
6     A  Baseball-reference?
7     Q  Yes.
8     A  No.
9     Q  Okay.  I'll represent to you that that's
10 another monthly subscription-based service where you
11 can access statistics from baseball players from the
12 minor leagues to the major leagues.
13        Have you heard of that before?
14     A  Still haven't heard of it, but -- but --
15     Q  Okay.
16     A  So my prior answer stands.
17     Q  Why didn't you look into web sites like
18 IMDbPro or baseball-reference.com when you were
19 creating your report?
20     A  I suppose I could have.  If -- if someone
21 said that instead of looking at these other businesses
22 that I describe in Section A of my report I could
23 include other lesser-known businesses to substantiate
24 the position that information is valuable and can be
25 sold or licensed or subscribed to, whatever word you

Confidential - Pursuant to Protective Order

Page 186

1  want to use, I could do so.
2      I did tell you in response to an earlier
3  question that I stopped conclusion A when I did
4  because I thought the point was made and I didn't want
5  to beat a dead horse.  But there are no doubt hundreds
6  of other businesses that get paid for information that
7  people want.
8      Q   You agree that LexisNexis does not charge
9  more if a law firm is profitable or if a law firm is
10 not profitable, correct?
11     A   Agreed.
12     Q   Okay.  So meaning they don't increase their
13 subscription price because they know that this
14 plaintiff's firm is doing very well this year,
15 correct?
16     A   Well, I don't run LexisNexis, but what you
17 said is my understanding.
18     Q   Perfect.
19     You state that the current service fee
20 structure presents a no-risk situation.  And that's on
21 page 26 of your report.
22     Isn't there a risk that the Fund is
23 overpaying for the data and services that are being
24 provided by the unions?
25     A   If you wish to express it that way, sure.

Page 187

1  That is not what that comment is -- is dealing with.
2  It's dealing with a -- different issue that I've
3  described to you earlier.
4      Q   And what's that?
5      A   Well, it's the subject of -- of whether
6  the -- you know, we're going to charge you a fee
7  regardless of whether SoundExchange gives you any
8  money or not.  So if for whatever reason SoundExchange
9  stops giving you money or the law -- or whatever, the
10 law changes, then you're not -- you, the Fund, are not
11 stuck charging a fee that was calculated or
12 contemplated on a different basis.
13     The percentage fee is less risky than another
14 sort of way of denominating the fee.
15     Q   Okay.  So you're expressing the risk as the
16 Fund not receiving any money, then the unions won't
17 receive any money, right?
18     A   I was looking at it from the Fund's
19 perspective, yes.  The -- the Fund is not in a
20 situation where they've increased fixed overhead that
21 would have to be paid regardless of what monies they
22 get from SoundExchange.
23     Q   But isn't it true that the Fund is obligated
24 to pay the 3 percent fee to the unions regardless if
25 they get any information from the unions?

Page 188

1      MR. THOMAS:  Objection; calls for legal
2  conclusion.
3      THE WITNESS:  Yeah, and I -- I -- I think
4  that's -- that's -- you're -- you're asking me to come
5  up with a hypothetical that -- that I'm not sure is
6  yet described in the records.
7      But the records that I'm aware of indicate
8  that the unions continue to provide information.  The
9  union contracts continue to be important in terms of
10 their position in the creation of music and that the
11 unions are, in fact, continuing to provide value.
12     If -- if they don't provide value, then --
13 you know, you asked me a question about the term of
14 the agreement, then -- then maybe the term would need
15 to be revisited.
16     But I do have tables in my report that
17 suggest that the union data continues to have
18 relevance and importance and -- and a significant
19 volume to indicate that your hypothetical is not
20 realistic in the facts and circumstances that actually
21 exist.
22 BY MS. McCONNELL:
23     Q   On page 14 of your report you say, in the
24 first full paragraph under A, the last sentence under
25 that paragraph, "Under this incorrect notion, the

Page 189

1  unions should not be compensated for either their past
2  efforts, or for proportionate current cost of the
3  unions' operations that are required for the
4  incremental efforts to be incurred."
5      Do you know how much the unions' past efforts
6  cost?
7      A   No.
8      Q   Are you -- are you able to put a dollar value
9  on it?
10     A   If someone wanted me to accept that
11 assignment, I think I have the competence and ability
12 to do so.  But -- but if you're asking me have I done
13 it yet or tried to do it yet, the answer's no.
14     Q   Do you know what the incremental cost of the
15 unions' current efforts are?
16     A   That would not be relevant to a proper answer
17 so I did not do that.
18     Q   In order to figure out what the incremental
19 costs are, you would need to know how much effort the
20 unions were putting in to respond to requests, right?
21     A   Yes.
22     Q   You say in the next paragraph that, "Numerous
23 compensation arrangements are based on a percentage of
24 an underlying transaction."
25     Would you agree that money managers,

Confidential - Pursuant to Protective Order

Page 190

1  contingency lawyers, IntellAgents, are paid a
2  percentage of an underlying transaction because they
3  add value to the transaction?
4      A  Well, that's certainly what those service
5  providers suggest, and their clients and customers
6  must agree.
7      Q  Would you agree that it is a Realtor's goal
8  to increase the amount of money a homeowner will get
9  for selling his house?
10     A  That is a common myth.  But, no, I don't
11  think that's actually correct.
12     Q  Why not?
13     A  Why not what?
14     Q  Why wouldn't a Realtor representing a
15  homeowner want to increase the value a homeowner gets
16  for selling his house?
17     A  Well, what you -- those -- the two statements
18  you've made are not mutually exclusive.  If all other
19  things being equal -- well, you want to shake your
20  head no, you know, that's fine, roll your eyes and
21  shake your head.  What's your next question?  I
22  don't -- I don't need to take this either.  Go ahead.
23     What's your next question?  You don't like
24  this answer, and I'm getting insulted by your
25  appearance and shaking your head and rolling your

Page 191

1  eyes, so go ahead, what's your next question?
2      Q  You actually do have to answer my questions,
3  Mr. Nolte, so we can keep going or we can stop the
4  deposition now.  It's up to you.
5      A  We -- we can keep going, but I don't need the
6  reactions that were just happening.  But I'll tell you
7  what, I'll -- I'll answer the question, but -- but
8  there's some level of decorum would be appreciated.
9      Q  You know what, timeout really quick.
10     MS. McCONNELL:  I just want to put on the
11  record that this witness has been extremely rude to me
12  all day and I've been sitting here and taking it and
13  anyone who wants to read this transcript and -- and
14  hear what has been going on all day, I would very much
15  welcome them to do that.
16     But I'm not going to let you tell me that I
17  am being rude to you.  It's almost 3 o'clock.  I've
18  had it with this deposition.  So let's just finish it
19  and be done because I -- I really don't want to
20  continue this for another day.  So let's do that.
21     Q  Answer my question.
22     A  Your question was, why wouldn't a Realtor
23  want a higher price, and the answer is, they would
24  want a higher price if everything else would be kept
25  alone.  But, in fact, what a Realtor really wants is

Page 192

1  to make certain that the property gets sold before
2  their -- their listing period expires and they lose
3  the transaction to another Realtor.  So the Realtor
4  would much rather have a percentage commission of a
5  slightly smaller price than to try to get the top
6  dollar.
7      Anyone who's worked with experienced Realtors
8  for a long while realizes this.  They would gladly
9  have more money, but they don't want to sacrifice the
10  existence of a commission entirely because they were
11  trying to seek the last extra dollar of sales price.
12     Q  Is it your opinion that the amount of money
13  paid to each Fund beneficiary has increased because
14  the unions are able to send across a session report?
15     MR. THOMAS:  Object to the form.  Vague.
16     THE WITNESS:  You made a statement.  I was
17  waiting for your question.
18  BY MS. McCONNELL:
19     Q  Is it your opinion that the amount of money
20  paid to each Fund beneficiary has increased because
21  the unions are able to send across a session report?
22     A  That is not my primary opinion.  What you
23  said may be true, but that is not the primary opinion.
24     The primary opinion is that the union data
25  allows more accurate payments be made to a larger

Page 193

1  group of people and that that allows the Fund to
2  accomplish its mission in a way that would otherwise
3  not be possible.
4      Now, it is highly likely that what you said
5  is also true, but that is not the primary basis for
6  the -- the conclusions that I've reached.
7      Q  So you do think that the amount of money paid
8  to each Fund beneficiary has increased because of the
9  unions' data?
10     MR. THOMAS:  Objection; vague, overbroad.
11     THE WITNESS:  That is a possibility, but that
12  is not the primary opinion.  The primary opinion
13  involves the accuracy of amounts that have been paid
14  versus the total amount that's paid.
15     Look, look, that's not a complex thing.
16  Let's say someone decides we don't want to pay the --
17  the 3 percent fee but why don't we just take all the
18  money and give it to Mr. Risto.  Nobody gets anything
19  else, Mr. Risto gets everything, and we'll cut out all
20  that research department.  We'll certainly cut out the
21  3 percent legal fee.  We'll cut out all -- all this
22  other stuff and won't the total amount of money paid
23  specifically to Mr. Risto increase.  And the answer
24  is, of course.
25     But that's not the objective and mission of

Confidential - Pursuant to Protective Order

Page 194

1  the Fund.  And, you know, so the fee doesn't have to
2  be reasonable because it increases the -- the amount
3  paid.  It -- it might in fact do that, but that's not
4  the primary reason why the fee is reasonable.
5      MS. McCONNELL:  I'm going to move to strike
6  as nonresponsive.
7      Q  Are the beneficiaries of the Fund entitled to
8  their money from the Copyright Act -- strike that.
9      Fund beneficiaries are entitled to the
10 Copyright Act to their royalty percentages whether or
11 not the unions locate them, right?
12     MR. THOMAS:  Objection to the form.  Calls
13 for a legal conclusion.
14     THE WITNESS:  I do think it calls for a legal
15 conclusion.  The -- the question arises as to what
16 happens if a nonfeatured performer simply cannot be
17 located.  The Fund has recently taken steps to ensure
18 that monies are distributed in some -- what -- what
19 the Fund believes are a fair and equitable manner
20 consistent with the public reporting that they've
21 done.  Maybe that conflicts with what you've just
22 said, maybe it doesn't, but it -- that's outside the
23 scope of my opinion.
24     MS. McCONNELL:  Okay.  Nico, the next one,
25 please, the article.  And I think this is Exhibit 5.

Page 195

1      (Exhibit 5 marked.)
2      MS. McCONNELL:  It's in the chat and then
3  it's going to be shared.
4      MR. BRANCOLINI:  Sorry, Mariana, is this the
5  article you wanted?
6      MS. McCONNELL:  Steps in Evaluating
7  Intellectual Property.
8      MR. BRANCOLINI:  Sorry, I put the wrong
9  article in.
10 BY MS. McCONNELL:
11     Q  Have you seen this article before?
12     A  Yes.
13     Q  Okay.  Do you know who wrote it?
14     A  Well, it may have gone through revisions, but
15 the initial authoring I was involved in.  I don't
16 recall whether I had help or not.
17     Q  Okay.  The first subheading is, "Get Legal
18 Advice."  It goes on to say, "Any transaction must be
19 documented professionally and comprehensively."
20     Did you find that the services agreement
21 transaction was documented professionally and
22 comprehensively?
23     MR. THOMAS:  Object to the form.  Outside the
24 scope of the expert opinion.
25     THE WITNESS:  I have not criticized the

Page 196

1  manner in which the -- the transaction's been
2  documented, but I've not been asked to do that either.
3  BY MS. McCONNELL:
4      Q  Did you find that the services agreement
5  transaction was documented professionally and
6  comprehensively?
7      MR. THOMAS:  Same objections; asked and
8  answered.
9      THE WITNESS:  I gave you my best answer a
10 minute ago.  You must think you want a different
11 answer.  I -- I don't think there's any disagreement
12 regarding what the document says.  If I'm wrong then
13 let me know.  But I -- I haven't read a bunch that --
14 that said we don't understand the meaning of -- of
15 this agreement.
16     So in that sense I'm not aware of anything
17 that says that the document does not comprehensively
18 state what the intentions of the parties were.
19 BY MS. McCONNELL:
20     Q  Do you know whether there was any evaluation
21 of the, your words, intellectual property that was
22 being sold at the time of the services agreement was
23 adopted?
24     A  I've read this -- the deposition testimony on
25 this point, and I -- it's not my testimony.  So I'm

Page 197

1  not sure I know what you're asking me.
2      Q  Do you want me to rephrase the question?
3      A  Well, if -- if my answer was not adequate, by
4  all means, do so.
5      Q  Did you find that there was any evaluation of
6  the intellectual property that was being sold at the
7  time the services agreement was adopted?
8      MR. THOMAS:  Objection; vague.
9      THE WITNESS:  There was quite a bit of
10 discussion about how this was evaluated in the
11 depositions that plaintiffs took.
12 BY MS. McCONNELL:
13     Q  Which deposition are you referring to?
14     A  Well, I think all of them.  I mean, you or
15 your cocounsel were taking the depositions so you've
16 asked and got answers for whatever the process was.
17     I'm well aware that you have at least one
18 expert report that criticizes that process.  I am not
19 criticizing the process, and I'm not saying the
20 process was good either.  My work falls outside the
21 process of the initial evaluation.
22     Q  Okay.  To prepare your report did you consult
23 anyone about the language of the relevant sections of
24 the Copyright Act?
25     A  You'd asked that question before.

Page 198

1     No, I did not.  Now, however, I believe my
2 definition of the assignment was oriented to comply
3 with the Copyright Act, but that's not the way it was
4 articulated.
5     MS. McCONNELL:  I think Nico might be -- oh,
6 here -- oh, you're on it.  Okay.  Great.
7     Q   So the next section of this article is titled
8 "Understand the Markets Being Served."
9         In preparing your report did you undertake an
10 analysis of the markets being served?
11    A   Well, allow me to read this because I haven't
12 read it in a decade.  So hold on.
13    Q   Sure.
14    A   All right.  So I read the paragraph or two,
15 however you want to count it.  It's -- under that
16 heading.  I don't believe anything there conflicts
17 with anything I've done here.  Obviously this is a
18 general article that covers a wide range of
19 intellectual property.  It's not tailored to the
20 situation that exists here.  But nevertheless, I don't
21 see anything that conflicts.
22    Q   In our case what is the nature and size of
23 the market being served?
24    A   As the report identifies, and I can highlight
25 where, if that's valuable to you, I repeatedly state

Page 199

1 that the Fund has a need for this information and that
2 the unions have not provided this information to
3 anyone else save, you know, with the exception of
4 making certain that pension obligations are -- have
5 been handled consistent with -- with what everybody's
6 understanding was from the very beginning.  So that
7 this assessment is not and cannot be based on either
8 industry rates, established royalty rates or other
9 things that would make the assignment easy.
10        Now, just because an assignment is not easy
11 does not mean that it's -- the answer is wrong or that
12 the answer has to be zero.  But the market -- this
13 is -- this is not an assessment that is based on other
14 market participants.
15    Q   Did -- in our case did you consider the price
16 that customers were willing to pay?
17    A   Well, the -- the pricing is certainly
18 important if you're dealing with something that's
19 going to be sold to the marketplace or a general range
20 of customers.  So in this article, for example, if
21 someone says, I want to sell a new type of candy bar
22 with a special, you know, secret menu to it, we can
23 evaluate what the marketplace for candy bars are.
24        But the unions are not offering this to
25 others and the Fund's need for this information is

Page 200

1 unique.  So we don't have any situation of where
2 others were -- where the unions were selling this
3 information.  If the unions were selling this
4 information otherwise, then the assignment would be
5 easy.  And I've just got done telling you it's not
6 easy because you don't have that type of beginning
7 situation.
8     Q   Are you aware that in their testimony Jon
9 Joyce and Bruce Bouton expressed some dissatisfaction
10 that the service fee was getting too high in the most
11 recent years?
12        MR. THOMAS:  Objection; mischaracterizes the
13 testimony in those depositions.  So lacks foundation.
14        THE WITNESS:  I have told you on multiple
15 occasions that the depositions that I've reviewed are
16 listed in my report.  And if they're not listed in my
17 report, I haven't reviewed them.
18        I suspect you've asked me a couple times
19 about these individuals and I've told you that I have
20 not read their depositions.  So as a result, I have no
21 basis for agreeing or disagreeing with your
22 characterization of what they said.
23 BY MS. McCONNELL:
24    Q   Okay.  For purposes of this question, assume
25 that they did say that in their deposition.  Would

Page 201

1 that impact the analysis you provided in your report?
2     A   And what I think you're saying is that they
3 thought the fee was originally fine but it may not be
4 fine in more recent years.
5     Q   Yes.
6     A   Well, we still have to deal with the issue of
7 whether the Fund gets to continue to use the data that
8 they put in a large database.  You had asked me about
9 that earlier and I predicted a possible dispute if the
10 Fund wants to take that position.  But the deal wasn't
11 arranged -- well, look, the answer to that is, I -- I
12 don't know their state of mind.  And if someone wants
13 to renegotiate the deal, they, I suppose, could do
14 that.
15    Q   Did you give any consideration in your report
16 to the potential for new competition in the market?
17    A   Well, you haven't described in your question
18 what this new competition is.  I suspect that you're
19 referring to more digital formulations of music that
20 may not require what has in the past been more
21 traditional approach.  And I -- I am aware of that.
22 You'll note that the data in my tables shows
23 information by year so that one can see the extent, if
24 at all, that trends have changed.
25    Q   And I think you say in your report, on

Confidential - Pursuant to Protective Order

Page 202

1 page 20, "For recently-produced digital music, there
2 are fewer artists to discover."
3       Is that what you are referring to?
4    A  I'm -- I'm sorry, I -- I don't know to which
5 you're referring, but that -- that does not
6 necessarily surprise me.  I probably do say it, but I
7 wasn't following your language.
8    Q  Okay.  If I represent to you that the union
9 pension funds have a more accurate and complete
10 repository of the same information that the unions do,
11 would that alter your analysis?
12    A  If the union pension funds are providing that
13 information to the Fund, sure, I suppose, if you could
14 get the information from another source and it's more
15 reliable or more accurate, then -- and the -- and the
16 pension funds want to act in competition to the
17 unions, you know, that -- that -- I don't know what
18 that impact is.
19       I -- I did not consider the possibility that
20 the pension funds would -- would do what you just
21 suggested.  In fact, you didn't say they'd do it
22 either.  You just gave me a hypothetical, well, if the
23 information exists.
24       Maybe -- maybe another way of answering the
25 question is, the fact that the information exists

Page 203

1 doesn't matter.  The information that matters is, is
2 can you actually get it.  And so what -- what I
3 actually added in the answer I just gave that the
4 pension funds might actually cut a deal to do that and
5 if that were the case, then -- then I'd have a new
6 piece of information to consider.
7    Q  Okay.  So your -- let's find it first.  Hold
8 on.
9       Okay.  If you look on page 13 of your report
10 where you have your "Summary of Conclusions."
11       Conclusion number 3 says, "Multiple economic
12 factors relating to the attributes and use of the
13 unions' data support the reasonableness of the
14 3 percent fee."
15       Based on your analysis of the Georgia-Pacific
16 factors, isn't it more accurate to say that the
17 3 percent fee is not unreasonable?
18    A  Yeah, I don't know -- maybe -- I don't know
19 if it's important or not, but I -- I was not following
20 your starting point for that question.  But -- so
21 putting aside the first part that I didn't follow,
22 your question is, was my conclusion that the fee was
23 not unreasonable.  That is not my conclusion.
24 Although that conclusion would also be true.
25    Q  Okay.  Would a -- why 3 percent?

Page 204

1    A  Are you asking me why the parties agreed to
2 3 percent?
3    Q  No.  Why do you think a 3 percent fee is
4 reasonable as opposed to a different number?
5    A  Well, 3 percent was the fee that I was asked
6 to evaluate the reasonableness of.  The parties had
7 agreed to that 3 percent fee years before I was
8 employed.
9    Q  Would a 4 percent fee be reasonable?
10    A  That was not my assignment and not the deal
11 so I didn't conduct an assignment based on 4 percent.
12 I conducted an assignment based on 3 percent.
13    Q  Okay.  As used here in conclusion number 3,
14 does reasonable refer to reasonable from the Fund's
15 perspective or reasonable from the unions'
16 perspective?
17    A  Okay.  Now I -- I really should follow your
18 question because you've -- you're quoting something
19 specific and I don't know what you're quoting.  I'm
20 not quarreling with it.  I just -- I just don't know
21 where you are.  You say number 3.
22    Q  Yeah.
23    A  What page?
24    Q  Page 13.
25    A  13:

Page 205

1    Q  Summary of conclusions number 3.
2    A  Okay.  I am looking at the fee as to what
3 would occur between a negotiation from the -- between
4 the union and the Fund with both parties acting
5 reasonable.  It is not an amount of money -- by the
6 way, this comes up in every single reasonable royalty
7 engagement.  This is not the fee that anybody wants to
8 pay.  It's not the fee that the Fund would want to pay
9 or the union would want to receive.  It is a fee that
10 would be reasonably negotiated between two parties who
11 are cooperating and willing to do a transaction.  So
12 it's from both of their perspectives.
13    Q  Would it be accurate to say that your
14 analysis in this case would not be transferable to any
15 other percentage figure?
16       MR. THOMAS:  Objection to the form.
17       THE WITNESS:  I -- I think what you're asking
18 me is could you take this same report and replace the
19 3 percent with a different number?
20 BY MS. McCONNELL:
21    Q  Yeah.
22    A  I would not encourage you to do that.  So,
23 for example, I've not concluded that the fee of
24 15 percent would be reasonable.  And that's what I
25 think you just asked me.  Can you -- can you

Confidential Pursuant to Protective Order

Page 206

1 substitute a new number, and the answer is no, you
2 can't substitute a new number. The engagement was
3 done based on 3 percent.
4     Now, if someone said they wanted 2 percent,
5 that would be an easy discussion, nobody would -- you
6 know, nobody on the plaintiff side would disagree with
7 the 3 percent turning into 2 percent. But I certainly
8 would not allow anyone to use my report by increasing
9 that number.
10  Q  Is it your opinion that a percentage-based
11 fee is in the best interest of the beneficiaries of
12 the Fund?
13  A  When you say "best interest," that probably
14 implies some sort of a legal standard and I would want
15 to make sure I understood what that legal standard
16 was. I don't quarrel with the idea that one could
17 change the manner in which this fee were calculated
18 and if you did change the manner in which the fee was
19 calculated, there might be winners and losers.
20     Let's -- let's say someone said that we want
21 you to charge X amount of dollars or cents per
22 participant as a direct deduction from their check.
23 Even if the fee remained identical, the allocation of
24 that fee would change. The people with larger checks
25 would pay a proportionately smaller amount. The

Page 207

1 smaller participants would pay proportionately a
2 greater amount. You have winners and losers. And
3 that -- that's simply a matter of the math.
4     I'm suggesting that 3 percent in total was
5 reasonable. I've put aside the fact that if you
6 denominated a fee in some other way you might -- you
7 would get a different answer perhaps. And I say
8 different answer, I mean different answer when applied
9 to an individual participant.
10  Q  And when you say denominated a fee in some
11 other way, are you including like a flat fee?
12  A  Well, it -- it would include that. And so
13 the example I just gave, in fact, was a flat fee. So
14 if someone says, we want to charge -- I'm going to
15 make up a number. This has nothing to do with
16 reality -- but every check that gets cut takes a
17 deduction of $1 for -- that it's paid to the union for
18 the rights of their -- their information.
19     There'd be winners and losers under that
20 arrangement. And by virtue of there being winners and
21 losers, I'll let someone else figure out if that's in
22 the best interest of the group as a whole. I'm
23 relating the fee in total, not how it's allocated to
24 individual participants. I understand the way it's
25 allocated to individual participants is on a per -- is

Page 208

1 on a percentage basis. And I have no quarrel with
2 that.
3     Q  If you look back on page 13 for number 3, you
4 say, "See Section C below."
5        And then if you look at Section C, those are
6 the Georgia-Pacific factors?
7        Is there anything --
8     A  Yes, ma'am.
9     Q  Is there anything in those Georgia-Pacific
10 factors that specifically looks to 3 percent as
11 opposed to any other percentage?
12        MR. THOMAS:  Objection; vague.
13        THE WITNESS:  Yes, there are. You may not
14 see them directly. I mean, if you want I'll go
15 through this. It will be -- end up being tedious.
16        But every time I refer to earlier sections of
17 the report, what I'm referring to are tables and data
18 assemblages that exist earlier in the report that are
19 being incorporated by reference in the Georgia-Pacific
20 factors. And that's how it occurs.
21 BY MS. McCONNELL:
22     Q  But which tables discuss 3 percent as the
23 appropriate percentage as opposed to a different
24 percentage?
25     A  Well, I don't know that there's any tables

Page 209

1 that -- that say if it's -- in fact, there are no
2 tables that say if it's 4 percent, here's how this
3 would change. I told you that the 3 percent was part
4 of the definition of the assignment. So all of the
5 work was done with that starting definition of the
6 assignment.
7     Q  Can you identify any specific areas of your
8 report that would no longer be accurate if the
9 3 percent figure was changed to a higher figure?
10     A  Well, the actual raw data might not change --
11 actually, that's not true. There are places where --
12 where I do percentage comparisons. So, for example,
13 this is just an example, it's not the entire thing.
14     Table 2, there is a column for the union fee
15 as a percent of total administrative costs. Well, if
16 the fee were larger, those percentages would change.
17 That's -- that's not the only example, but that is an
18 example of a table that is specifically impacted by
19 the 3 percent amount.
20     Q  Are any of the Georgia-Pacific factor
21 analysis tied to 3 percent an opposed to any other
22 percent?
23        MR. THOMAS:  Objection; asked and answered.
24        THE WITNESS:  The entire assignment was tied
25 to 3 percent, so -- I thought I had told you that

Confidential - Pursuant to Protective Order

Page 210

1 before.
2 BY MS. McCONNELL:
3 Q If you were advising the Fund about whether
4 to enter into an agreement with an unrelated third
5 party, how much would you advise them to spend on the
6 data?
7 MR. THOMAS: Objection; calls for
8 speculation, outside the scope.
9 THE WITNESS: You are asking me to speculate
10 because I wasn't there at the time. I wasn't
11 negotiating with the unions. And I don't know --
12 yeah, I -- look, at the risk of being obvious, the
13 Fund would want to pay as little as possible and
14 unions would want to be paid more. That's no
15 different than the existence of the -- how buyers and
16 sellers behave all the time.
17 So in your hypothetical where I'm
18 representing the Fund, the question is, you know,
19 could we try to get the unions down. And I've not
20 done that assignment and I wasn't there at the time
21 and I do think it would be speculating for me -- to
22 ask me to assume that I was, you know, you know, there
23 eight years ago, or whatever it was, when I wasn't.
24 BY MS. McCONNELL:
25 Q After doing the research for this report have

Page 211

1 you been able to put together any sort of advice on
2 how much the Fund should pay for this data?
3 A The Fund is paying 3 percent. If Fund wishes
4 to continue to use that data, the Fund believes that
5 it would be a travesty for them to stop using the
6 data, and my report and the work of the Fund
7 demonstrates aptly that the accuracy of the payments
8 would be disastrously impacted if the unions' data
9 weren't being used.
10 So I think with that background in mind your
11 starting point is, what would I suggest the Fund do,
12 and the answer is, I think you ought to continue with
13 the deal you have because you're apparently pretty
14 happy with it.
15 Q Are you aware of any facts to indicate that
16 the unions would refuse to accept a lower percentage
17 than 3 percent?
18 A I don't know that I have facts one way or the
19 other. I don't know whether that's been attempted
20 recently.
21 Q Have you analyzed -- oh, sorry, were you
22 done?
23 A Yeah, I just -- I -- I -- I don't know. I
24 mean, if -- at some point maybe people want to try to
25 renegotiate the arrangement.

Page 212

1 Q Have you analyzed how much it would cost for
2 the Fund to replicate the unions' data?
3 A Well, that's -- that's the whole problem.
4 They can't. This -- that's why I told you earlier,
5 this is not a cost-based decision, and when you tried
6 to make it a cost-based decision, I twice, in two
7 different questions, told you that that's not the
8 basis for the conclusion.
9 The basis of the conclusion is, the union
10 simply -- I mean, I'm sorry, the Fund simply can't do
11 its job accurately unless it has this data. And until
12 they solve that problem -- you know, this is -- this
13 is not a cost-based problem. It's an accuracy-based
14 problem.
15 Q You told us earlier you're -- you don't know
16 if the record labels would be willing to sell the
17 data, right?
18 A No, I don't know that I told you that. I
19 told you that there's been no evidence in this case,
20 of which I'm aware, that suggests that they would.
21 Now, I am well aware that your experts,
22 multiple experts, have asserted that this information
23 is available free of charge. That has not been
24 supported by any evidence in the record. It's not
25 been supported by any footnotes. There's been no

Page 213

1 details given other than a bald assertion that that
2 was the case. And so I -- I don't know that -- I'm
3 not aware of these labels being willing to do that.
4 If you think they can, or your experts think they can,
5 it would be helpful to provide more details.
6 Q Have you looked into whether the record
7 labels are willing to sell the data or not?
8 A What I did instead, which is maybe a way of
9 saying yes, is that I asked the folks at the Fund
10 whether this is something that they've considered, and
11 they said absolutely, and we cannot get the same sort
12 of information from the record labels. If we could
13 get it cheaper, then we'd have a basis for some
14 alternatives that are currently not in front of us.
15 They specifically said, and this is not
16 surprising, that the labels simply don't have a need
17 to keep this information for the long historical
18 periods that are needed here. And -- and that would
19 not surprise me. For the reason the record labels
20 kept the information, keeping this data for these
21 very, very long periods of time would be out of -- it
22 would be unusual and out of the ordinary.
23 Q You mentioned that you asked the folks at the
24 Fund whether they've looked into whether the record
25 labels sell the data. Who are the folks at the Fund

Confidential - Pursuant to Protective Order

Page 214

```
1    that you spoke to?
2        A  You know, a lot of conversations merge
3    together so I could be wrong on this, but I believe
4    that conversation occurred in one in which Ms. Taub
5    and Ms. Sandell were involved.  But I -- I could be
6    wrong.
7        Q  Have you -- well, strike that.
8            Couldn't the Fund implement an
9    electronic-type system at the type of recording to
10   collect session data for all tracks recorded in 2021
11   and going forward?
12       A  You're asking me whether such a system is
13   technologically feasible?
14       Q  Yeah.
15       A  I suspect it is.
16       Q  In the course of preparing your report did
17   you consider what the cost of doing something like
18   that would be for the Fund?
19       A  I did consider that.
20       Q  Okay.  How much do you think a system like
21   that would cost?
22       A  Well, I don't have a number.  I do know that
23   there's an issue of -- of basically investment
24   capital, that such a system would likely cost
25   millions.  I don't have an exact number.  But it's --
```

Page 215

```
1    it's -- this is not petty cash.  And so who's going to
2    pay for it.
3            The Fund is effectively a passthrough
4    vehicle.  It gets money and it's supposed to pay that
5    money to others.  I don't think there's a provision
6    where the Fund gets to say, you know what we'd like to
7    do, I'm sure you guys won't mind, we're going to take
8    multiple millions of your dollars and we're just not
9    going to give it to you, and the reason we're not
10   going to give it to you is we're going to invest in
11   this really slick computer system, you'll love it, and
12   the guys later who aren't getting -- who aren't
13   participating right now, they're going to like it a
14   lot because it will save money later and you're going
15   to pay for it now.
16           I don't want to be the one responsible for
17   that recommendation because that would -- that would
18   be generating your next lawsuit.  And so I don't know
19   how the Fund's going to do that.  It -- it may be
20   technologically feasible but that does not mean it's
21   practical.
22       Q  Isn't that what the Fund is doing now, giving
23   $1.5 million approximately per year to the unions for
24   maybe data that goes back to 1940 that you've shown us
25   helps some people get their participant --
```

Page 216

```
1    participation and not others?
2        A  That is exactly not what the Fund is doing.
3    The Fund is not taking money from one group of
4    participants to pay for future generations.  They are
5    instead saying a percentage reduction is reasonable
6    and appropriate because it significantly improves the
7    accuracy of the information and is a modest charge
8    relative to the rest of the amounts that are
9    appropriately being charged to these participants.
10           It is a pay-as-you-go system, which is
11   exactly the opposite of, let's invest millions of
12   dollars of someone else's money that -- of the current
13   participants' money so that future generations could
14   impact it.
15           Look, if Mr. Risto wants to personally fund
16   this, I think he should talk to the Fund.  But I'm
17   quite sure that Mr. Risto doesn't want to personally
18   pay for it, and I don't know anybody else that's
19   waiting in that line.
20       Q  I don't know -- I don't know -- know why
21   you're including that in your answer because I'm not
22   sure --
23       A  Because it's relevant.  I'll --
24       Q  No, it's not.
25       A  -- tell you why, because it's absolutely
```

Page 217

```
1    relevant.  You want to know why I'm telling you?
2    Because it is absolutely relevant to this.  You said,
3    isn't this the same, and the answer is, it is nowhere
4    close to the same.  This is night-and-day difference.
5    Night and day are not the same.  They might both
6    involve you, the Earth, but that doesn't make them the
7    same.
8            And the notion of pay-as-you-go now is not
9    the same as taking millions of dollars from people now
10   to benefit future people that haven't yet been
11   identified.  And if you think they're the same, fine,
12   I'm not going to be able to convince you.
13       Q  No, that's fine, I --
14       A  Because they're not the same.  And that
15   was -- and that was the question you asked, aren't
16   these the same.
17       Q  I'm just wondering where you are got into
18   attacking Mr. Risto in that answer.
19       A  I'll tell you why.  Because someone has got
20   to fund this millions of dollars and the guy who is
21   proposing that is you through Mr. Risto.  So if -- you
22   know, if Mr. Risto thinks it's a great idea to spend
23   millions of dollars, go ahead and propose it to the
24   Court, I guess, but I don't know who's going to pay
25   for it.
```

Confidential - Pursuant to Protective Order

1   Q  Don't you agree that the fee continues to get
2  paid to identify future beneficiaries?
3   A  You said -- I think your question misstated,
4  but I think what you meant is the Fund gets paid.
5  And, yes, the Fund continues to get paid, the research
6  efforts continue.  I summarize those efforts in my
7  report.
8   Q  No, I -- I don't think so.
9    So the service fee continues to get paid so
10  that the unions can provide session reports for future
11  payments; isn't that right?
12   A  No.
13   Q  Okay.
14   A  I mean, look, they may benefit the future,
15  too.  I mean, once the information's in the database,
16  the Fund does not have to do it again.  But the
17  research efforts are being done in response to monies
18  being received now that have to be distributed now.
19   Q  Okay.  I'd like to show you a section of
20  Mr. Crabtree-Ireland's deposition that was taken in
21  the Blondell case.
22    MS. McCONNELL:  Nico, if you can put it up.
23  please, on the screen.
24    Okay.  Mr. Crabtree-Ireland was asked, "Was
25  the intent for this to just recoup the unions' cost or

1  for this to actually be a profitable, you know, for
2  the unions to make a profit on this?"
3    And his answer is, "Oh, God, no.  It was to
4  recoup the unions' costs, recognizing that these might
5  fluctuate and, you know, fairly significantly
6  depending upon the demand from the Fund for
7  information and not wanting to spend a whole bunch of
8  time and money on tracking that in a very granular
9  way.
10    "So the intention was to come up with away
11  that would, you know, reasonably track the costs, not
12  generate revenue for the union, but also not have the
13  union subsidizing the operation of the Fund through
14  the services that they were providing to the Fund."
15   Q  Do you think that the service fee as
16  currently structured merely recoups the unions' costs?
17    MR. THOMAS:  Objection; lacks foundation,
18  outside the scope.
19    THE WITNESS:  I have not done such a
20  calculation.  To do that calculation properly, one
21  would need to go back to the very beginning of the
22  earliest session reports that were generated.  One
23  would need to address the storage and archival costs.
24  It would be a very difficult assignment.
25    Now, in terms of the current periods, I've

1  not looked at the unions' financial statements, and I
2  don't know if this information is available but I -- it
3  would not surprise me that the fee being paid to the
4  unions is not necessary to reimburse for current
5  period incremental cost.  And I've never suggested
6  that in my report.
7    However, the only thing I'm adding is that
8  this cost exercise should not be done on a single year
9  even under Mr. Crabtree-Ireland's answer.
10  BY MS. McCONNELL:
11   Q  Do you believe that the services fee as
12  currently structured is profitable for the unions?
13    MR. THOMAS:  Same objections.
14    THE WITNESS:  Well, the -- the word
15  "profitable" -- I'm an accountant and -- and -- by
16  training and so I -- I know that different people use
17  the words "profits" in different ways.  And we would
18  need to clarify what we mean by profits in order to
19  give an appropriate and complete answer to your
20  question.
21    I mean, you know, you'd get a different
22  answer if you address it year by year versus beginning
23  of time.  You'd get a different answer on whether you
24  use incremental versus some fully loaded cost measure.
25  The bottom line, though, is, I haven't done any of

1  those calculations.
2  BY MS. McCONNELL:
3   Q  Other than incremental cost, what other ways
4  of doing a profitability analysis are there?
5   A  Well, look, the only reason I mention
6  incremental cost is because that's what your experts
7  and -- and your -- your motions have suggested.  No
8  one actually does accounting on incremental cost in
9  that fashion.  So if you ask an accountant, was this
10  profitable or not, no one who's -- is -- who's
11  competent is going to say, well, on incremental basis
12  it's profitable.  I mean -- so accountants typically
13  are using fully loaded costs when they answer that
14  question.
15   Q  What does that mean?  What does "fully loaded
16  costs" mean?
17   A  It's what any -- well, just so you
18  understand, if you got -- never mind.  You don't have
19  any experts on accounting.  All right.  Never mind.
20  I'm sorry.  I was going to refer you to your experts,
21  but I guess that won't work.
22   Q  I have you here.
23   A  Never mind.  Never mind.  Never mind.  Forget
24  it.  I'm -- I'm sorry.
25    Here's what it means.  When you're looking at

Confidential Pursuant to Protective Order

Page 222

1 fully absorbed costs, it's the -- the opposite of
2 incremental costs. It is looking at activities and
3 allocating costs to that activity for those costs that
4 benefit those activities. So the issues generally
5 comes up of one of overhead.
6     So to fully absorb -- to -- to produce fully
7 absorbed costs you have to take overhead and allocate
8 it to whatever the underlying production or activity
9 is.
10     You also have an issue of what time periods
11 are involved. If you're dealing with incremental
12 costs, you can narrow that down to a very, very thin
13 sliver of time, but of course nobody who's a real
14 accountant would do that. What they do instead is
15 they would look at the entire period of time that --
16 that generated activities of for which -- or -- or
17 that contributed to whatever it is that you're talking
18 about.
19     So, for example, if you're looking at session
20 reports, you'd say, okay, during what period of time
21 were the session reports being generated. And the
22 answer is, well, they go back to the beginning of the
23 union. And they say, well, okay, then that's the
24 relevant period of time to address the costs. And you
25 have to address the overhead during that entire

Page 223

1 period.
2     So it's a very long-running analysis that
3 looks at total costs, which is the exact opposite of
4 the incremental costs that some of your experts have
5 suggested.
6 Q  How do you take into account the fact that
7 the unions were performing these activities for their
8 own purposes since the beginning of time?
9 A  Well, the way I've accounted for it is by
10 treating it as a piece of information that needs to be
11 reasonably compensated for the value that it delivers.
12 It is not a cost-based analysis. I've never suggested
13 it was. I was answering your questions, but just
14 because I was answering a question didn't mean I was
15 suggesting you do that.
16 Q  So if you were going to do a fully absorbed
17 cost analysis and you said you go back to the
18 beginning of the union, looking at overhead costs, I'm
19 saying, how then do you factor in the fact that the
20 unions have been collecting this information for their
21 own purposes since the beginning of the union?
22 A  Look, look, at some point there's a limit to
23 how far we should go down this rabbit hole. What I
24 really told you is that no one, no one means no one,
25 no one competent uses costs as the basis for valuing

Page 224

1 intellectual property. And I would not -- I have
2 never valued intellectual property -- with only one
3 exception, which I can go through if you want. With
4 that one exception, which I'm happy to discuss with
5 you, I never valued intellectual property based on
6 costs, and I've never seen any competent appraiser
7 value intellectual property based on cost.
8     So when you talk about, well, how do you do
9 this, you make it sound like there's a methodology for
10 something that doesn't happen. No one competent does
11 what your -- what your question presupposes. And so
12 the answer is, you don't do it.
13 Q  We -- we started this, your words, rabbit
14 hole because we were talking about how do you figure
15 out if something is profitable or not, and you said
16 can look at the amount that is brought in for -- for
17 the data as opposed to the fully loaded costs.
18     And what I gathered was fully loaded costs
19 include overhead, right?
20 A  Look, look, the only reason you -- I was
21 talking about fully loaded costs is because it's in
22 contrast to incremental costs. Incremental costs is
23 wrong even if you wanted to base it on cost.
24     Now, I'm not suggesting you base it on cost.
25 I'm suggesting just the opposite. But if for some

Page 225

1 reason someone says no, no, no, you really, really,
2 really got to do it on cost, then you have to do
3 something that no one, including the plaintiffs'
4 experts have done in this matter. You cannot base it
5 on incremental costs. You have to base it on fully
6 loaded costs.
7     I'm not suggesting -- and then you started
8 asking me, you know, how do you get around this
9 problem or that problem on fully loaded costs and how
10 have you done it in the past, I don't do this on past
11 assignments. You're not supposed to do it at all.
12 Q  If we are to assume that the parties to the
13 services agreement are only allowed to incur
14 reasonable incremental costs, does the agreement meet
15 that standard?
16     THE WITNESS: Madam Reporter, would you
17 reread that question again?
18     (Record read.)
19     THE WITNESS: I don't understand your
20 question. I mean, that's not what the agreement says
21 and when you say they're only allowed to incur
22 incremental costs, that states a predicate that is not
23 possible.
24 BY MS. McCONNELL:
25 Q  If the Copyright Act only allows the parties

Confidential - Pursuant to Protective Order

1  to this case to incur reasonable incremental costs,
2  does the services agreement meet that standard?
3      MR. THOMAS:  Objection; that calls for a
4  legal conclusion.
5      THE WITNESS:  Well, that is not my
6  understanding.  But nevertheless, I have not expressed
7  any legal opinions.  My opinions instead are what
8  would be a reasonable cost.  It is not a reasonable
9  incremental cost.  I've told you that that would be
10 wrong.  I can spend as much time as you want
11 explaining why.
12 BY MS. McCONNELL:
13  Q  Well, I just want to clarify --
14  A  And if -- if you're saying that the law says
15 you need to do it wrong, then I'd say, boy, that's
16 surprising because normally people who write laws
17 aren't that stupid.
18  Q  We -- in your answer you said your opinions
19 are what would be a reasonable cost, but your opinions
20 are what would be a reasonable value, right?
21  A  You know what, that -- that's fair.  But --
22 and I -- and I use the word "cost" in probably a
23 shorthand way.  I would invite your attention to the
24 description of the assignment, and it's articulated,
25 is the reasonable amount the funds pay.  And I

1  shorthanded that to a reasonable cost of what the Fund
2  is paying.  And -- and if that was confusing to you,
3  you have my apologies.
4      MS. McCONNELL:  Okay.  Let's take a break.
5  Ten minutes.
6      MR. THOMAS:  Okay.
7      THE VIDEOGRAPHER:  We are now going off the
8  record, and the time is 3:43 p.m.
9      (Recess.)
10     THE VIDEOGRAPHER:  We are now going back on
11 the record, and the time is 3:55 p.m.
12 BY MS. McCONNELL:
13  Q  Have you performed evaluation of the services
14 purportedly provided by the unions to the Fund?
15  A  Ms. McConnell, I want to answer that
16 question, and I promise you I will, but I -- I didn't
17 want to -- there was something I wanted to alert you
18 to and I'm worried that I'm going to forget a second
19 time.
20     There was an answer that I gave that
21 accurately and honestly reflected my state of mind,
22 but Mr. Sullivan said that it was not factually
23 accurate and -- so because it's not factually
24 accurate, even if it was my state of mind, I want to
25 make certain that it is fixed.

1      It involves the footnote 12 involving how the
2  samples were actually selected.  And I gave you my
3  understanding and I -- this footnote comes from
4  Ms. Sandell's description of it.  But I'm told that
5  this may not have been artfully expressed, maybe by
6  me, maybe by Ms. Sandell.
7      But in any event, the -- what Ms. Sandell
8  really did was take the first 50 transactions from
9  what she considered a random starting point.  So my
10 answers involving the existence of the highest 50
11 transactions from a group of 100 is actually not what
12 Ms. Sandell did.  At least that's what Mr. Sullivan
13 told me.  And so I wanted to correct that because I
14 want you to have accurate information.
15  Q  Okay.  And again, you were not directing the
16 step-by-step process for conducting this 50-song
17 sample, right?
18  A  Correct.
19  Q  Okay.  And now you're saying that
20 Ms. Sandell -- strike that.
21     How were the 5,992 titles ordered?
22  A  By dollar amount.  There was no change in
23 that.
24  Q  Okay.
25  A  The only change is that instead of saying

1  I've got this starting point and I'm going to take 50
2  of the next highest 100 -- the 50 highest of the next
3  100, it really should have been, I just took the next
4  50.
5  Q  Okay.  Got it.
6      Okay.  So my question was, have you performed
7  an evaluation of the services purportedly provided by
8  the unions to the Fund?
9  A  I'm not sure I know what you mean.
10     MR. THOMAS:  I'm going to object to the form
11 as vague.
12     But go ahead.
13     MS. McCONNELL:  Okay.
14  Q  So are you aware that in the services
15 agreement there's -- I'll call them two categories of
16 things purportedly being provided by the unions to the
17 Fund.  There's the data, which includes session
18 reports, B-forms and membership date.  And then
19 another classification of services which includes the
20 represent -- quote, representation of fund interests
21 of different performing rights societies.
22     Were you aware of that?
23  A  Okay.  You're asking about the services?
24  Q  Correct.
25  A  I'm aware of the services.  I identify the

Page 230

1 services in my report.  I have not attributed any
2 explicit value to those services.
3    Q   Okay.  We've talked now about the four
4 conclusions that are on page 13.
5       Are there any other conclusions that we
6 haven't talked about today?
7    A   Well, we've talked about my report, and
8 everything I have is in my report.
9    Q   Okay.  And for the bases of your opinions,
10 everything you have is in your report, correct?
11    A   Yes, I believe so.  And -- and specifically
12 the portion of Rule 26 that I think you were referring
13 to is Roman numeral XII -- II, which is on page 1.
14    Q   Just to confirm.
15       If you haven't done a valuation of the
16 services portion of the services agreement, it's your
17 opinion that the data exchange portion of the services
18 agreement is worth the 3 percent; is that correct?
19    A   Yes, I'm not suggesting that the unions don't
20 have to do the services, and I'm not suggesting that
21 the services do not have value.  I am simply saying I
22 had -- I did not explicitly put extra value on the
23 services so that they were kind of like an additional
24 thing that was helpful to the Fund, but the conclusion
25 is not based on those services.

Page 231

1    Q   Understood.
2       MS. McCONNELL:  Okay.  I am finished with
3 your deposition.  I obviously cannot make a big show
4 of handing you a check at the end of deposition like
5 maybe you would have done over a year ago but I have
6 your W9 and I will get a check sent to you for your
7 $625 an hour for 7 hours; is that fair?
8       THE WITNESS:  Yes, that's fine.  Thank you.
9       MR. THOMAS:  Yeah, I think we're right at
10 sort of 7 hours total time and that's -- that's fine
11 and -- and we'll calculate it the same way for yours,
12 Mariana, so that will work fine.
13       MS. McCONNELL:  Perfect.
14       On the record, or whatever, Mr. Nolte, if you
15 wanted to send me wire instructions to pay you, that
16 would be faster obviously than me sticking a check in
17 the mail or FedEx so it's up to you and your counsel
18 but let me know.  You can shoot me an e-mail.
19       THE WITNESS:  You know, First-Class Mail is
20 fine.  I don't want to put you through the extra cost
21 of going through that.  So just -- just go -- go send
22 it via Express mail and -- and I appreciate that.
23       MS. McCONNELL:  Okay.  We've been doing
24 30 days to review and then 10 days for your counsel to
25 notify us of any corrections.  Do you have any issue

Page 232

1 with that?
2       THE WITNESS:  Mr. Thomas, I think that was
3 directed to you because I --
4       MR. THOMAS:  Well, I think it was -- it might
5 have been directed to you in the first instance,
6 whether that's a sufficient amount of time for you.
7 It's acceptable to me.  We've done it on the all the
8 depositions.  If that gives you enough time to review
9 it, then it's fine by me.
10       THE WITNESS:  That's fine.  I'll -- I'll do
11 whatever the -- the circumstances of this case desire.
12       MS. McCONNELL:  All right.
13       THE VIDEOGRAPHER:  Okay.  This concludes the
14 video deposition of David Nolte.  We are now going off
15 the record, and the time is 4:03 p.m.

Page 233

1       DECLARATION UNDER PENALTY OF PERJURY
2
3       I, DAVID NOLTE, do hereby certify under
4 penalty of perjury that I have read the foregoing
5 transcript of my deposition taken on Tuesday,
6 April 27, 2021; that I have made such corrections as
7 appear noted herein in ink, initialed by me; that my
8 testimony as contained herein, as corrected, is true
9 and correct.
10
11       Dated this _____ day of _____, 2021,
12 at _____.
13
14
15
16       _____
17       DAVID NOLTE
18
19
20
21
22
23
24
25

Page 234

```
 1        DEPOSITION ERRATA SHEET

 2

 3  Page No._____ Line No._____

 4  Change:_____

 5  Reason for change:_____

 6  Page No._____ Line No._____

 7  Change:_____

 8  Reason for change:_____

 9  Page No._____ Line No._____

10  Change:_____

11  Reason for change:_____

12  Page No._____ Line No._____

13  Change:_____

14  Reason for change:_____

15  Page No._____ Line No._____

16  Change:_____

17  Reason for change:_____

18  Page No._____ Line No._____

19  Change:_____

20  Reason for change:_____

21

22

23  _____    _____

24  DAVID NOLTE              Dated

25
```

Page 235

```
 1            CERTIFICATE

 2

 3        I, SHARI BOLTON, Certified Shorthand

 4  Reporter, No. 9291, do hereby certify that prior to

 5  the commencement of the examination, the Deponent was

 6  duly remotely sworn by me to testify to the truth, the

 7  whole truth and nothing but the truth.

 8

 9        I DO FURTHER CERTIFY that the foregoing is a

10  verbatim transcript of the testimony as taken

11  stenographically by me at the time, place and on the

12  date hereinbefore set forth, to the best of my

13  ability.

14

15        I DO FURTHER CERTIFY that I am neither a

16  relative nor employee nor attorney nor counsel of any

17  of the parties to this action, and that I am neither a

18  relative nor employee of such attorney or counsel, and

19  that I am not financially interested in the action.

20

21  _____

22  SHARI BOLTON

23  Certified Shorthand Reporter, No. 9291

24

25  Dated:_____
```

# EXHIBIT 4

PAUL R. KIESEL (State Bar No. 119854)
kiesel@kiesel.law
MARIANA A. MCCONNELL (State Bar No. 273225)
mcconnell@kiesel.law
**KIESEL LAW LLP**
8648 Wilshire Boulevard
Beverly Hills, California 90211-2910
Telephone: (310) 854-4444
Facsimile: (310) 854-0812

NEVILLE L. JOHNSON (State Bar No. 66329)
njohnson@jjllplaw.com
JORDANNA G. THIGPEN (State Bar No. 232642)
jthigpen@jjllplaw.com
DANIEL B. LIFSCHITZ (State Bar No. 285068)
dlifschitz@jjllplaw.com
**JOHNSON & JOHNSON LLP**
439 North Canon Drive, Suite 200
Beverly Hills, California 90210
Telephone: (310) 975-1080
Facsimile: (310) 975-1095

*Attorneys for Plaintiff and the Class*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEVIN RISTO, on behalf of himself and all others similarly situated, | **CASE NO. 2:18-CV-07241-CAS-PLA** |
| Plaintiff, | **CLASS ACTION** |
| v. | **PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANTS** |
| SCREEN ACTORS GUILD-AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS, a Delaware corporation; AMERICAN FEDERATION OF MUSICIANS OF THE UNITED STATES AND CANADA, a California nonprofit corporation; RAYMOND M. HAIR, JR, an individual, as Trustee of the AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund; TINO GAGLIARDI, an individual, as Trustee of the AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund; DUNCAN CRABTREE- | |

1

1   IRELAND, an individual, as Trustee of
    the AFM and SAG-AFTRA Intellectual
2   Property Rights Distribution Fund;
    STEFANIE TAUB, an individual, as
3   Trustee of the AFM and SAG-AFTRA
    Intellectual Property Rights Distribution
4   Fund; JON JOYCE, an individual, as
    Trustee of the AFM and SAG-AFTRA
5   Intellectual Property Rights Distribution
    Fund; BRUCE BOUTON, an
6   individual, as Trustee of the AFM and
    SAG-AFTRA Intellectual Property
7   Rights Distribution Fund; and DOE
    DEFENDANTS 1-10,
8
              Defendants.
9

10  **PROPOUNDING PARTY**:   KEVIN RISTO

11  **RESPONDING PARTY**:   SCREEN ACTORS GUILD-AMERICAN

12                          FEDERATION OF TELEVISION AND RADIO

13                          ARTISTS, AMERICAN FEDERATION OF

14                          MUSICIANS OF THE UNITED STATES AND

15                          CANADA, RAYMOND M. HAIR, JR, TINO

16                          GAGLIARDI, DUNCAN CRABTREE-IRELAND,

17                          STEFANIE TAUB, JON JOYCE, and BRUCE

18                          BOUTON

19  **SET NO.**:   ONE

20

21

22

23

24

25

26

27

28

00511648-1                        2                  PLAINTIFF'S FIRST SET OF
                                                     INTERROGATORIES TO DEFENDANTS

**TO DEFENDANTS SCREEN ACTORS GUILD-AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS, AMERICAN FEDERATION OF MUSICIANS OF THE UNITED STATES AND CANADA, RAYMOND M. HAIR, JR, TINO GAGLIARDI, DUNCAN CRABTREE-IRELAND, STEFANIE TAUB, JON JOYCE, and BRUCE BOUTON AND TO THEIR ATTORNEYS OF RECORD:**

You are hereby requested, pursuant to the Federal Rules of Civil Procedure, Rules 33, to respond, under oath, to the following set of interrogatories within 30 days. Pursuant to Federal Rule of Civil Procedure Rule 26(e), Defendants have a duty to supplement or correct any disclosure or response to these Interrogatories in a timely manner if she learns that any disclosure or response is incomplete or incorrect.

## DEFINITIONS

1.    "**ALL**" shall be construed as "any or all" or "each and all," as the context requires, so that each Interrogatory shall be construed broadly, rather than narrowly, to bring within the scope of each Interrogatory that might otherwise be construed to be outside its scope.

2.    "**BETWEEN**" shall be construed as "between or among," as the context requires, so that each Interrogatory shall be construed broadly, rather than narrowly, to bring within the scope of each Interrogatory that might otherwise be construed to be outside its scope.

3.    "**CLASS**" refers to the Class definition set forth in the First Amended Complaint: "All persons and entities, their agents, successors in interest, assigns, heirs, executors, trustees, and administrators who are and/or were non-featured musicians and non-featured vocalists."

4.    "**CLASS MEMBER**" refers to any persons or entities who fall within the scope of the aforementioned **CLASS**.

5.    "**EACH**" and "every" shall both be interpreted in the most inclusive

light and shall include "each and every."

6.   "**FUND**" refers to the AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund.

7.   "**IDENTIFY**" with respect to any Computer System, shall require YOU to provide: (i) the name of the Computer System; (ii) the operating system on which the Computer System runs; (iii) the brand, model, configuration, and location of the server running the Computer System (iv) the dates during which the Computer System was in operation; and (v) whether the Computer System is accessible.

8.   "**IDENTIFY**" with respect to any individual, shall require YOU to provide: (i) the person's full name; (ii) the person's present or last known residential address and telephone number; (iii) the person's present employment position and business affiliation; and, (iv) the person's present or last known business address and telephone number.

9.   "**PLAINTIFF**" as used herein shall refer to Plaintiff Kevin Risto.

10.   "**ROYALTY**" or "**ROYALTIES**" refers to any monies received by the AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund that have been generated by or are attributable to the performances of non-featured musicians and/or vocalists pursuant to 17 U.S.C. § 114(g).

11.   "**SERVICES AGREEMENT**" refers to the Data Purchase and Services Agreement between the American Federation of Musicians of the United States and Canada, AFL-CIO-CLC, the Screen Actors Guild – American Federal of Television and Radio Artists, and the AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund entered into on or about July 24, 2013, including any later amendments or modifications thereto or restatements thereof.

12.   "**SERVICE FEE**" refers to the 3% payment set forth in paragraph 6 of the **SERVICES AGREEMENT**.

13.   "**TRUST AGREEMENT**" refers to the AFM and AFTRA Intellectual

Property Rights Distribution Fund's Agreement and Declaration of Trust entered into on September 16th, 1998, including any later amendments or modifications thereto or restatements thereof

14. "**UNIONS**" as used herein refers collectively to the Screen Actors Guild-American Federation of Television of Radio Artists ("SAG-AFTRA") and American Federation of Musicians of the United States and Canada ("AFM"), including, as applicable, any predecessor unions.

15. "**YOU**" and "**YOUR**" as used herein shall refer to the Defendant responding to the request and any of its parents, predecessors, other affiliates, successors, or subsidiaries, including officers, directors, employees, partners, agents, consultants, or any other person acting or purporting to act on behalf of such entities.

## **INSTRUCTIONS**

1. Whenever appropriate, the singular form of a word shall be interpreted in the plural, or vice versa. All verb tenses shall be interpreted to include past, present and future tenses. The terms "and" as well as "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of these Interrogatories any relevant information that might otherwise be construed to be outside of their scope.

2. **YOU** must provide the factual information responsive to these interrogatories that is available, even if the information is within the knowledge or possession of your attorneys. See, e.g., *Hickman v. Taylor*, 329 U.S. 495, 504 (1947) ("A party clearly cannot refuse to answer interrogatories on the ground that the information sought is solely within the knowledge of his attorney.")

3. If you elect to respond to any of these Interrogatories by producing **DOCUMENTS** pursuant to Federal Rule of Civil Procedure 33(d) and any of the responsive **DOCUMENTS** are available as electronically stored information, such as, but not limited to, e-mails or spreadsheets, then Defendant requests that **YOU**

produce them in a searchable PDF format, or, if spreadsheets, in a Microsoft Excel format. If the electronically stored information is stored in a voice or sound format only, then Defendant requests that **YOU** produce it on a CD-ROM or DVD.

4.     Pursuant to Federal Rules of Civil Procedure Rule 26(e), **YOU** have a duty to supplement or correct any disclosure or response to these Interrogatories in a timely manner if Plaintiff learns that any disclosure or response is incomplete or incorrect.

5.     None of the interrogatories below is intended to be, or shall be construed as, an admission of any fact.

6.     Each Interrogatory shall be answered separately by each **DEFENDANT**.

7.     If any portion of an Interrogatory response is withheld under a claim of privilege or other ground, state that it is being withheld and explain why, including a description of the Information withheld in accordance with Fed. R. Civ. P. 26(b)(5).

8.     If the answer to all or any part of any Interrogatory is not presently known or available, include a statement to that effect and furnish any information presently known or available.

9.     If any Interrogatory or any part of any Interrogatory cannot be answered in full, answer to the fullest extent possible with an explanation of why a complete answer is not provided.

10.     Each Interrogatory herein shall be answered independently and not with reference to any other Interrogatory for purposes of limitation.

11.     These Interrogatories are continuing in nature pursuant to Federal Rule of Civil Procedure 26(e), and therefore require YOU to furnish supplemental responses whenever YOU discover additional facts responsive to the Interrogatories.

## INTERROGATORIES

### INTERROGATORY NO. 1:

**IDENTIFY EACH CLASS MEMBER** by stating their name, mailing address, email address, and telephone number.

1  **INTERROGATORY NO. 2:**

2      **IDENTIFY ALL** persons and entities, their agents, successors in interest,

3  assigns, heirs, executors, trustees, and administrators who are and/or were non-

4  featured musicians and non-featured vocalists **BETWEEN** July 22, 2013 and the

5  present.

6  **INTERROGATORY NO. 3:**

7      **IDENTIFY ALL** persons and entities, their agents, successors in interest,

8  assigns, heirs, executors, trustees, and administrators who have received

9  **ROYALTY** distributions from the **FUND** from July 22, 2013 to the present.

10  **INTERROGATORY NO. 4:**

11      On an annual basis, separately state the total **ROYALTIES** collected or

12  received by the **FUND** since 2013.

13  **INTERROGATORY NO. 5:**

14      On an annual basis, separately state the total **ROYALTIES** paid to members

15  of the **CLASS** from the **FUND** since 2013.

16  **INTERROGATORY NO. 6:**

17      On an annual basis, separately state the total **ROYALTIES** received by the

18  **FUND** and not paid to members of the **CLASS** since 2013.

19  **INTERROGATORY NO. 7:**

20      On an annual basis, separately state the amounts paid from the **FUND** to

21  SAG-AFTRA since 2013.

22  **INTERROGATORY NO. 8:**

23      On an annual basis, separately state the amounts paid from the **FUND** to

24  AFM since 2013.

25  **INTERROGATORY NO. 9:**

26      If **YOU** contend that **ALL ROYALTIES** owed to the **CLASS** have been

27  paid to the beneficiaries of the **FUND**, state **ALL** facts that support that contention.

28

**INTERROGATORY NO. 10:**

If **YOU** contend that the **SERVICE FEE** is a reasonable charge for the services provided by the **UNIONS**, state **ALL** facts that support that contention.

**INTERROGATORY NO. 11:**

Set forth the benefits conferred upon **UNION** members as a result of the **SERVICES AGREEMENT**.

**INTERROGATORY NO. 12:**

Set forth the benefits conferred upon non-**UNION** members as a result of the **SERVICES AGREEMENT**.

**INTERROGATORY NO. 13:**

If **YOU** contend that the **FUND** is entitled to use **ROYALTIES** to pay for the services set forth in the **SERVICES AGREEMENT**, state **ALL** facts that support that contention.

**INTERROGATORY NO. 14:**

If **YOU** contend that the **FUND** was entitled to enter into the **SERVICES AGREEMENT**, set forth all authority that supports that contention.

**INTERROGATORY NO. 15:**

**IDENTIFY ALL** individuals involved in the negotiation of the **TRUST AGREEMENT**.

**INTERROGATORY NO. 16:**

**IDENTIFY ALL** individuals responsible in the negotiation of the **SERVICES AGREEMENT**.

**INTERROGATORY NO. 17:**

Describe **ALL** actions by the **FUND** to avoid conflicts of interest **BETWEEN** the parties to the **SERVICES AGREEMENT**.

**INTERROGATORY NO. 18:**

Set forth **ALL** reasons why the **FUND** decided to cease mailing of the AFM & SAG-AFTRA Annual Report to the **FUND**'s beneficiaries in 2013.

1   **INTERROGATORY NO. 19**:

2       **IDENTIFY ALL** individuals who prepared the **FUND**'s Annual Reports

3   from 2013 to the present.

4   **INTERROGATORY NO. 20**:

5       Set forth how much the **UNIONS** charge other performing rights

6   organizations for the services set forth in the **SERVICES AGREEMENT**.

7   **INTERROGATORY NO. 21**:

8       State **ALL** facts supporting **YOUR** contention that the **CLASS** is not

9   sufficiently numerous to treat this case as a class action.

10  **INTERROGATORY NO. 22**:

11      State **ALL** facts supporting **YOUR** contention that the **CLASS** is not

12  ascertainable.

13  **INTERROGATORY NO. 23**:

14      State **ALL** facts supporting **YOUR** contention that common questions of law

15  or fact do not predominate over any individual questions in this case.

16  **INTERROGATORY NO. 24**:

17      State **ALL** facts supporting **YOUR** contention that **PLAINTIFF**'s claims are

18  not typical of the claims of the **CLASS**.

19  **INTERROGATORY NO. 25**:

20      State **ALL** facts supporting **YOUR** contention that **PLAINTIFF** will not

21  adequately represent the **CLASS.**

22  **INTERROGATORY NO. 26**:

23      State ALL facts supporting **YOUR** contention that **PLAINTIFF**'s counsel

24  will not adequately represent the **CLASS**.

25  **INTERROGATORY NO. 27**:

26      State **ALL** facts supporting **YOUR** contention that a class action is not the

27  superior method of adjudicating this case.

28

1    **INTERROGATORY NO. 28:**

2        State **ALL** facts supporting **YOUR** contention that **CLASS MEMBERS**

3    have or had knowledge of the **SERVICE FEE**.

4    **INTERROGATORY NO. 29:**

5        State **ALL** facts supporting **YOUR** contention that **CLASS MEMBERS**

6    approved of the **SERVICE FEE**.

7    **INTERROGATORY NO. 30:**

8        **IDENTIFY ALL** individuals who decided to implement the **SERVICE**

9    **FEE**.

10

11   DATED:  February 22, 2019            **KIESEL LAW LLP**

12

13                                         By: _____

14                                             PAUL R. KIESEL
                                                MARIANA A. MCCONNELL

15

16                                         **JOHNSON & JOHNSON LLP**
                                               NEVILLE L. JOHNSON

17                                             JORDANNA G. THIGPEN
                                               DANIEL B. LIFSCHITZ

18

19                                         *Attorneys for Plaintiff and the Class*

20

21

22

23

24

25

26

27

28

1

## PROOF OF SERVICE

2

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

3

4

     At the time of service, I was over 18 years of age and **not a party to this action**. I am employed in the County of Los Angeles, State of California. My business address is 8648 Wilshire Boulevard, Beverly Hills, CA 90211-2910.

5

6

     On February 22, 2019, I served true copies of the following document(s) described as **PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANTS** on the interested parties in this action as follows:

7

## SEE ATTACHED SERVICE LIST

8

9

10

11

     **BY MAIL:** I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed in the Service List and placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with Kiesel Law LLP's practice for collecting and processing correspondence for mailing. On the same day that the correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

12

13

     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

14

     Executed on February 22, 2019, at Beverly Hills, California.

15

16

17

_____
Maria Basev

18

19

20

21

22

23

24

25

26

27

28

**SERVICE LIST**
*Kevin Risto, et. al. v. Screen Actors Guild-American Federation Of Television And Radio Artists, et. al.*; Case No. 2:18-cv-07241-CAS-PLA

| | |
|---|---|
| Andrew J. Thomas | *Attorneys for All Defendants* |
| Andrew G. Sullivan | |
| **JENNER & BLOCK LLP** | |
| 633 West 5th Street, Suite 3600 | |
| Los Angeles, CA 90071 | |
| Telephone: (213) 239-5100 | |
| Facsimile:  (213) 239-5199 | |
| Emails: ajthomas@jenner.com | |
|      agsullivan@jenner.com | |

| | |
|---|---|
| Devi M. Rao | *Attorneys for All Defendants* |
| **JENNER & BLOCK LLP** | |
| 1099 New York Ave, NW, Suite 900 | |
| Washington, D.C. 20001 | |
| Telephone: (202) 639-6000 | |
| Facsimile:  (202) 639-6066 | |
| Email: drao@jenner.com | |

| | |
|---|---|
| Neville L. Johnson | *Attorneys for Plaintiff and the Class* |
| Douglas L. Johnson | |
| Jordanna G. Thigpen | |
| **JOHNSON & JOHNSON LLP** | |
| 439 North Canon Drive, Suite 200 | |
| Beverly Hills, California 90210 | |
| Telephone: 310-975-1080 | |
| Facsimile: 310-975-1095 | |
| Emails: njohnson@jjllplaw.com | |
|      djohnson@jjllplaw.com | |
|      jthigpen@jjllplaw.com | |

# EXHIBIT 5

```
 1                 UNITED STATES DISTRICT COURT
 2                CENTRAL DISTRICT OF CALIFORNIA
 3                          ---oOo---
 4    KEVIN RISTO, on behalf of
      himself and all others
 5    similarly situated,
 6                       Plaintiffs,
 7       vs.                        No.
                                    2:18-cv-07241-CAS-PLA
 8
      SCREEN ACTORS GUILD-AMERICAN
 9    FEDERATION OF TELEVISION AND
      RADIO ARTISTS, a Delaware
10    corporation; AMERICAN
      FEDERATION OF MUSICIANS OF THE
11    UNITED STATES AND CANADA, a
      California nonprofit
12    corporation, et al.,
13                       Defendants.
14    _____/
15               Wednesday, December 9, 2020
16                        - - -
17          Remote videotaped deposition of JULIE
18    SANDELL, conducted with the witness located in
19    Studio City, California, commencing at 9:07 a.m.,
20    before me, Gina V. Carbone, a Registered Merit
21    Reporter, California Certified Realtime Reporter,
22    California Certified Shorthand Reporter No. 8249.
23                        - - -
24               GOLKOW TECHNOLOGIES, INC.
            877.370.3377 ph | 971.591.5672 fax
25                    deps@golkow.com
```

Julie Sandell

```
 1                    REMOTE APPEARANCES OF COUNSEL

 2

 3

 4   For the Plaintiff KEVIN RISTO:

 5       KIESEL LAW LLP

 6       By:  NICHOLAS BRANCOLINI, ESQ.

 7            MARIANA A. McCONNELL, ESQ.

 8       8648 Wilshire Boulevard

 9       Beverly Hills, California 90211

10       (310) 854-0812

11       brancolini@kiesel.law

12       mcconnell@kiesel.law

13

14

15   CO-COUNSEL:

16       JOHNSON & JOHNSON

17       By:  DANIEL B. LIFSCHITZ, ESQ.

18       439 N. Canon Drive, Suite 200

19       Beverly Hills, California 90210

20       (310) 975-1095

21       dlifschitz@jjllplaw.com

22

23

24

25   //
```

Julie Sandell

```
 1    REMOTE APPEARANCES (continued)

 2

 3

 4    For the Defendants:

 5        JENNER & BLOCK

 6        By:  ANDREW J. THOMAS, ESQ.

 7             ANDREW G. SULLIVAN, ESQ.

 8             ANNA LYONS, ESQ.

 9        633 W. 5th Street, Suite 3600

10        Los Angeles, California 90071

11        (213) 239-5155

12        ajthomas@jenner.com

13        agsullivan@jenner.com

14        alyons@jenner.com

15

16    ALSO PRESENT:  ALEX KLYUSNER, videographer

17

18                      --oOo--

19

20

21

22

23

24

25
```

1                      - - -

2              THE VIDEOGRAPHER:  We are now on the

3    record.  My name is Alex Klyusner, I'm a

4    videographer for Golkow Litigation Services.

5    Today's date is December 9th, 2020 and the time is

6    9:07 a.m.

7              This remote video deposition is being held

8    in the matter of Kevin Risto versus Screen Actors

9    Guild, et al. for the U.S. District Court, Central

10   District of California.  The deponent is Julie

11   Sandell.

12             All parties to this deposition are

13   appearing remotely and have agreed to the witness

14   being sworn in remotely.  Due to the nature of

15   remote reporting, please pause briefly before

16   speaking to ensure all parties are heard completely.

17             Will counsel please identify themselves.

18             MS. McCONNELL:  Mariana McConnell from

19   Kiesel Law for plaintiff and the class.

20             MR. BRANCOLINI:  Nico Brancolini from

21   Kiesel Law on behalf of plaintiff and the class.

22             MR. LIFSCHITZ:  Daniel Lifschitz on behalf

23   of plaintiff and the class from Johnson & Johnson.

24             MR. THOMAS:  Andrew Thomas from Jenner &

25   Block on behalf of the defendants and the witness.

```
 1                 MR. SULLIVAN:  Andrew Sullivan from Jenner
 2   & Block on behalf of all defendants and the witness.
 3                 THE VIDEOGRAPHER:  Okay.  The court
 4   reporter is Gina Carbone and will now please swear
 5   in the witness.
 6                 THE REPORTER:  I'm sorry.  Ms. Lyons was, I
 7   think, introducing herself but we couldn't hear her.
 8                 And Mr. Sullivan, you're on mute as well.
 9                 MR. SULLIVAN:  Apologies.
10                 If Anna is having difficulty joining, I'll
11   identify her and say that Anna Lyons from Jenner &
12   Block on behalf of all defendants and the witness is
13   also present.
14                         JULIE SANDELL,
15       called as a witness, having been duly sworn,
16                       testified as follows:
17                 EXAMINATION BY MS. McCONNELL
18   BY MS. McCONNELL:
19       Q.   Good morning, Ms. Sandell.
20       A.   Good morning.
21       Q.   Could you please state and spell your full
22   name for the record.
23       A.   Julie Sandell, J-U-L-I-E, S-A-N-D-E-L-L.
24       Q.   Okay.  Thank you.  So before we get started
25   with the substance of questions, I want to go over
```

Julie Sandell

```
 1        Q.  Okay.  That's fine.

 2            You haven't been involved in any of the,

 3    I'll call them, like, budgetary decisions on

 4    updating the AS400 or anything like that?

 5        A.  No.

 6        Q.  Was that a no?  Sorry.

 7        A.  No.

 8        Q.  You told us about collecting the emails and

 9    putting them in folders.  Did you at any time count

10    how many email requests you found from the Fund

11    researchers to the union?

12        A.  No.  It was --

13        Q.  And -- sorry?

14        A.  It was thousands.

15            (Reporter clarification.)

16    BY MS. McCONNELL:

17        Q.  Did you notice whether there were more

18    requests to local AFM chapters or local SAG-AFTRA

19    chapters?

20        A.  No.

21        Q.  Okay.  I think that was all just

22    background, so now I'll get into my deposition

23    questions.

24            Just by way of figuring out your background

25    and expertise, did you attend college?
```

1      A.  Yes.

2      Q.  Where did you go?

3      A.  Cal State Northridge.

4      Q.  And did you obtain a degree?

5      A.  Yes.

6      Q.  And what was that degree in?

7      A.  Radio, TV and film.

8      Q.  Did you go to graduate school?

9      A.  No.

10     Q.  What was your most recent position prior to

11  working for the Fund?

12     A.  I worked for Bonnie Raitt.

13     Q.  What year did you start -- what did you do

14  for Bonnie Raitt?

15     A.  I managed her properties.

16     Q.  When did you start working at the Fund?

17     A.  September of 2009.

18     Q.  What was your first position at the Fund?

19     A.  Research associate.

20     Q.  And generally what were the duties of your

21  position as a research associate?

22     A.  To research the titles, to find the

23  nonfeatured performers, and to answer phones and

24  work with the participants.  And I was the primary

25  person that did the unclaimed and did the outreach

Julie Sandell

1        MS. McCONNELL:  Yeah.  I didn't like how I

2   asked it the first time anyway, so....

3        Q.  At any point in time up until today, were

4   you asked to collect any data showing the number of

5   times a nonfeatured performer was identified due to

6   a union effort as opposed to Fund effort?

7        MR. THOMAS:  Same objections.

8        THE WITNESS:  That's kind of a confusing

9   question to me.

10  BY MS. McCONNELL:

11       Q.  You told us about the different sources

12  that the Fund can look at to identify nonfeatured

13  performers on tracks, and I'm wondering has anyone

14  ever asked you to segregate whether the Fund has

15  identified a performer due to something that the

16  union has provided the Fund, as opposed to an online

17  resource like Discogs or AllMusic?

18       A.  Well, that would be too time consuming.  It

19  wouldn't be worth it.

20       Q.  Why wouldn't it be worth it?

21       A.  Because our objective is to research the

22  title correctly to the best of our ability and get

23  it as right as right can be with all of our sources.

24  We don't really think about it that way.

25       Q.  All right.  You don't -- you don't have --

# EXHIBIT 6



Fulcrum Financial Inquiry LLP
707 Wilshire Boulevard, Suite 2050
Los Angeles, CA 90017

(213) 787-4100
www.fulcrum.com

February 17, 2020

Andrew J. Thomas, Esq.
Andrew Sullivan, Esq.
Jenner & Block LLP
633 West 5th Street, Suite 3600
Los Angeles, CA 90071-2054

Gentlemen:

Enclosed is Fulcrum's third billing in connection with Kevin Risto, (as class representative) vs. Screen Actors Guild - American Federation Of Television And Radio Artists, American Federation of Musicians of the United States and Canada, AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund, et al. (USDC, Central District of California Case No. 2:18-cv-07241-CAS). This billing covers services for one and a half month period from January 1, 2021 through February 15, 2021.  If you or others require additional information, I will be happy to provide it.

In accordance with our engagement letter, this bill is due immediately and is delinquent if not paid by March 17, 2021.  However, in accordance with the engagement letter, I would appreciate the Fund's review and approval (email is OK) of the attached bill before issuance of my expert report, which is currently scheduled for completion on March 8, 2021.  Please contact me if this approval and/or payment commitment cannot be met.

I would appreciate payment through electronic means.  If you prefer to send a physical check, it would be best to send this to my home office (see my August 25 email for the address), as physical mail sent to Fulcrum's downtown office is being forwarded by the USPS, and we are finding this to be both slow and not reliable.  Fulcrum's electronic payment information follows:

    Bank:  Farmers & Merchant Bank
           315 N. Harbor Boulevard, Fullerton, CA 92832
           714-578-1945
    Bank ABA #     122201198
    Account Name: Fulcrum Financial Inquiry LLP
    Account #
    SWIFT #

It is a pleasure to assist you on this matter. Please let me know if we can be of further assistance. My direct telephone number is 213-787-4111.

Very truly yours,
Fulcrum Financial Inquiry LLP

By:     _David Nolte_
        David Nolte

*"Give me a lever long enough and a fulcrum on which to place it and I shall move the world"*

                                                                                    Archimedes

Confidential



FULCRUM
INQUIRY

Fulcrum Financial Inquiry LLP
707 Wilshire Boulevard, Suite 2050
Los Angeles, CA 90017

(213) 787-4100
www.fulcrum.com

February 17, 2020

Andrew J. Thomas, Esq.
Andrew Sullivan, Esq.
Jenner & Block LLP
633 West 5th Street, Suite 3600
Los Angeles, CA 90071-2054

INVOICE

For professional services rendered in connection with *Kevin Risto, (as class representative) vs. Screen Actors Guild - American Federation Of Television And Radio Artists, American Federation of Musicians of the United States and Canada, AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund, et al. (USDC, Central District of California Case No. 2:18-cv-07241-CAS)* incurred from January 1, 2021 through February 15, 2021.  The bill was calculated as follows:

**$18,375**

| Personnel | Hours | Rate | Total |
|-----------|-------|------|-------|
| David Nolte | 29.4 | 625 | $18,375 |

All out-of-pocket costs have been absorbed (not billed)

**Total**                                **$ 18,375**

The above time was incurred on the following tasks:

1.  Read and considered the January 20, 2021 deposition of Stefanie Taub, and the exhibits thereto

2.  Read and addressed the notes prepared by Ms. Taub in connection with her January 20, 2021 deposition

3.  Reviewed and addressed the 50-title sample of information performed by the Fund's research personnel

4.  Read and address Plaintiff's written discovery responses, dated February 12, 2021

5.   Telephone consultations on January 11, January 14, and January 26, and February 1, 2011

6.  Updated Fulcrum's draft report, and provided the same to legal counsel on February 10

If you have any questions regarding this invoice, please contact  David Nolte at 213-787-4111.

**Due and payable immediately.  Delinquent if not paid by March 17, 2021.  However, in accordance with the engagement letter, please review and approve this bill before Fulcrum's current report is finalized (scheduled for March 8, 2021).**

Fulcrum's Taxpayer Identification Number is ████████



Fulcrum Financial Inquiry LLP
707 Wilshire Boulevard, Suite 2050
Los Angeles, CA 90017

(213) 787-4100
www.fulcrum.com

March 17, 2020

Andrew J. Thomas, Esq.
Andrew Sullivan, Esq.
Jenner & Block LLP
633 West 5th Street, Suite 3600
Los Angeles, CA 90071-2054

Gentlemen:

Enclosed is Fulcrum's fourth billing in connection with Kevin Risto, (as class representative) vs. Screen Actors Guild - American Federation of Television and Radio Artists, American Federation of Musicians of the United States and Canada, AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund, et al. (USDC, Central District of California Case No. 2:18-cv-07241-CAS). This billing covers services for the period from February 16 through March 15, 2021.  If you or others require additional information, I will be happy to provide it.

In accordance with our engagement letter, this bill is due immediately and is delinquent if not paid by April 16, 2021.  Please contact me if this approval and/or payment commitment cannot be met.

Consistent with what occurred with Fulcrum's earlier invoices, I would appreciate payment through electronic means.  If you prefer to send a physical check, it would be best to send this to my home office (see my August 25 email for the address), as physical mail sent to Fulcrum's downtown office is being forwarded by the USPS, and we are finding this to be both slow and not reliable.  Fulcrum's electronic payment information follows:

        Bank:   Farmers & Merchant Bank
                315 N. Harbor Boulevard, Fullerton, CA 92832
                714-578-1945
        Bank ABA #     122201198
        Account Name: Fulcrum Financial Inquiry LLP
        Account #      █████████
        SWIFT #

It is a pleasure to assist you on this matter. Please let me know if we can be of further assistance. My direct telephone number is 213-787-4111.

Very truly yours,
Fulcrum Financial Inquiry LLP

By:   *David Nolte*
        David Nolte

*"Give me a lever long enough and a fulcrum on which to place it and I shall move the world"*

                                                                    Archimedes



**FULCRUM INQUIRY**

Fulcrum Financial Inquiry LLP
707 Wilshire Boulevard, Suite 2050
Los Angeles, CA 90017

(213) 787-4100
www.fulcrum.com

March 17, 2020

Andrew J. Thomas, Esq.
Andrew Sullivan, Esq.
Jenner & Block LLP
633 West 5th Street, Suite 3600
Los Angeles, CA 90071-2054

INVOICE

For professional services rendered in connection with *Kevin Risto, (as class representative) vs. Screen Actors Guild - American Federation of Television and Radio Artists, American Federation of Musicians of the United States and Canada, AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund, et al. (USDC, Central District of California Case No. 2:18-cv-07241-CAS)* incurred from  February 16 through February 15, 2021.  The bill was calculated as follows:                                                                                            **$29,750**

| Personnel | Hours | Rate | Total |
|---|---|---|---|
| David Nolte | 32.2 | 625 | $20.125 |
| Brian Nolte | 25.0 | 385 | 9,625 |
| All out-of-pocket costs have been absorbed (not billed) | | | |

**Total**                                                                     **$29,750**

The above time was incurred on the following tasks:

1.  Performed analysis to provide the following tallies of data associated with unique songs (i.e., there is no duplication where data was provided across multiple years):

    a.  Count of performances documented with and without Union session repots
    b.  Count of participants in songs documented with and without Union session repots
    c.  Total contributions from songs documented with and without Union session repots;

2.  Performed analysis on the 50-song sample provided by client to calculate the number of participants and the gross dollar amounts incorrectly distributed without the benefit of Union data;

3.  The Fund provided a new version of the 50-song sample; rechecked Fulcrum's analysis to ensure there were no changes to the underlying data that would alter the earlier conclusion;

4.  Read/scanned the following depositions:

    a.  Crabtree-Ireland (two days)
    b.  Hair (two days)
    c.  Dreith;

5.  Reviewed the amended interrogatory responses submitted by the Fund and the Unions;

Confidential                                                                     NOLTE00000004

6.  Initial research regarding the cost percentages of other music royalty reporting organizations;

7.  Telephone consultations with legal counsel and Fund personnel on March 3, 2021 and March 4, 2021;

8.  Created exhibits that support Fulcrum's conclusions, for inclusion in Fulcrum's report;

9.  Updated Fulcrum's draft report for all of the previously-described steps;

10. Updated report to include production numbers on documents produced;

11. Various additional communications with counsel;

12. Reviewed comments received on Fulcrum's report, and finalized Fulcrum's March 8, 2021 report and associated exhibits;

If you have any questions regarding this invoice, please contact  David Nolte at 213-787-4111.

**Due and payable immediately.  Delinquent if not paid by April 16, 2021.**

Fulcrum's Taxpayer Identification Number is ███████

NOLTE00000005

# EXHIBIT 7

**From:** Mariana A. McConnell <Mcconnell@kiesel.law>
**Sent:** Monday, June 14, 2021 10:53 AM
**To:** A.J. Thomas <ajthomas@jenner.com>; Andrew Sullivan <agsullivan@jenner.com>; Anna Lyons <alyons@jenner.com>
**Cc:** Paul R. Kiesel <kiesel@kiesel.law>; Nicholas Brancolini <Brancolini@kiesel.law>; Daniel Lifschitz <dlifschitz@jjllplaw.com>; Neville Johnson <njohnson@jjllplaw.com>
**Subject:** Risto - Sandell Deposition

Hello,
We would like to get the Sandell deposition scheduled on either Wednesday or Thursday of this week since our MILs are due on Monday. Please let us know asap.

Thanks.
Mariana

# EXHIBIT 8

**From:** Sullivan, Andrew G. <AGSullivan@jenner.com>
**Sent:** Wednesday, June 16, 2021 7:40 AM
**To:** Mariana A. McConnell <Mcconnell@kiesel.law>
**Cc:** Thomas, Andrew J. <AJThomas@jenner.com>; Lyons, Anna K. <ALyons@jenner.com>; Paul R. Kiesel
<kiesel@kiesel.law>; Nicholas Brancolini <Brancolini@kiesel.law>; Daniel Lifschitz <DLifschitz@jjllplaw.com>; Neville
Johnson <njohnson@jjllplaw.com>
**Subject:** Re: Risto - Sandell Deposition

Mariana,

In our view, the Court has rejected Plaintiff's position that the Sandell declaration and related testimony
should be excluded, and has determined that any prejudice Plaintiff has suffered as a result of the timing can
be remedied by a short deposition.  As explained in prior briefing, the final results of the 50 title exercise could
not have been disclosed during the discovery period because they did not exist then.  Defendants' prior
briefing also corrected Plaintiff's inaccurate assertion—repeated in your email below—that Ms. Sandell is
opining on "conclusions" drawn from the 50 title exercise.

Defendants can make Ms. Sandell available for deposition from 1-3pm on either June 25 or June
28.  Defendants will work to identify another mutually agreeable time for Ms. Sandell's deposition if this
timing does not work for Plaintiff.

Regards,

Andrew

On Jun 15, 2021, at 8:42 AM, Mariana A. McConnell <Mcconnell@kiesel.law> wrote:

External Email – Exercise Caution
Andrew,

1

Defendants' failure to disclose the study during discovery is just one reason why it should be excluded. The study is also inherently flawed and not relevant, the study is highly prejudicial, misleading, and a waste of time, and Ms. Sandell is not qualified to architect or perform a study or report on its conclusions, among other deficiencies. So, no, we do not agree that taking her deposition moots any motion in limine.

We have three options:

1. You present Ms. Sandell on Wednesday or Thursday and we file a Motion in Limine on Monday
2. You present Ms. Sandell on a later date and agree to an alternate briefing schedule on this Motion
3. You do not present Ms. Sandell this week and do not agree on an alternate briefing schedule, and we will file a Motion on Monday explaining your failures to the Court and providing another reason to exclude the study.

Let us know as soon as possible which option you decide.

Mariana

**From:** Andrew Sullivan <AGSullivan@jenner.com>
**Date:** Tuesday, June 15, 2021 at 8:25 AM
**To:** "Mariana A. McConnell" <Mcconnell@kiesel.law>
**Cc:** "A.J. Thomas" <AJThomas@jenner.com>, Anna Lyons <ALyons@jenner.com>, "Paul R. Kiesel" <kiesel@kiesel.law>, Nicholas Brancolini <Brancolini@kiesel.law>, Daniel Lifschitz <DLifschitz@jjllplaw.com>, Neville Johnson <njohnson@jjllplaw.com>
**Subject:** Re: Risto - Sandell Deposition

Mariana,

Consistent with Judge Snyder's order on the motion for summary judgment, we will make Ms. Sandell available for a two-hour deposition. In our view, this opportunity to depose Ms. Sandell eliminates any possible prejudice to Plaintiff and thus moots any motion in limine Plaintiff might file to exclude Ms. Sandell from testifying about the 50 title exercise and related documentation. We will reach out to Ms. Sandell regarding her availability for a deposition, but we cannot guarantee that she will be available this week.

Thanks,
Andrew

On Jun 14, 2021, at 10:53 AM, Mariana A. McConnell <Mcconnell@kiesel.law> wrote:

External Email – Exercise Caution
Hello,
We would like to get the Sandell deposition scheduled on either Wednesday or Thursday of this week since our MILs are due on Monday. Please let us know asap.

2

Thanks.
Mariana

---

**Andrew G. Sullivan**

**Jenner & Block LLP**
633 West 5th Street
Suite 3600, Los Angeles, CA 90071  |  jenner.com
+1 213 239 2263 | TEL
+1 213 618 6890 | MOBILE
AGSullivan@jenner.com
Download V-Card

CONFIDENTIALITY WARNING: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

---

# EXHIBIT 9

# AGREEMENT AND DECLARATION OF TRUST

### AFM and SAG-AFTRA
### Intellectual Property Rights Distribution Fund

#### Established
#### September 16, 1998

#### Amended and Restated
#### July 26, 2012

THIS AGREEMENT AND DECLARATION OF TRUST is made and entered into as of the 16th day of September, 1998, and is amended and restated as of July 26, 2012, in the City of New York, State of New York, by and between the American Federation of Musicians of the United States and Canada, AFL-CIO-CLC ("AFM") and the Screen Actors Guild - American Federation of Television and Radio Artists ("SAG-AFTRA"), hereinafter jointly known as the Unions.

## Preamble

WHEREAS, this Agreement and Declaration of Trust was originally established as of the 16th day of September, 1998, in the City of New York, State of New York, by and between the AFM and the American Federation of Television and Radio Artists ("AFTRA"); and

WHEREAS AFTRA merged with the Screen Actors Guild ("SAG") effective March 2012, and the merged unions are now constituted as SAG-AFTRA; and

WHEREAS, the Trustees now desire to amend and restate the Agreement and Declaration of Trust to reflect the merger of AFTRA into the merged union SAG-AFTRA, as well as to incorporate other amendments that the Trustees have made from time to time; and

WHEREAS, the Unions or their designated entities obtain and distribute to artists royalties and remuneration that are created by U.S. or foreign law and that are appropriate for collective administration; and

WHEREAS, the Unions have entered into a Reciprocal Agreement and an Annex for the Distribution of Record Rental Royalties Collected in Japan, pursuant to which they will receive and distribute record rental remuneration payable to non-featured instrumentalists and vocalists under the law of Japan; and

WHEREAS, the Unions have entered into other such agreements for the receipt and distribution of royalties or remuneration for the benefit of their members and other performing artists in the United States and Canada, and will continue to enter into such agreements; and

WHEREAS, to accomplish this purpose the Unions established a trust fund known as the AFM and AFTRA Intellectual Property Rights Distribution Fund for receiving and

1

distributing royalties and remuneration; and

WHEREAS, the trust fund formerly known as the AFM and AFTRA Intellectual Property Rights Distribution Fund shall now be known as the AFM and SAG-AFTRA  Intellectual Property Rights Distribution Fund; and

WHEREAS, the Unions desire to restate the terms and conditions under which the said Fund is to be established and administered;

NOW, THEREFORE, in consideration of the premises, it is mutually understood and agreed as follows:

## Article I
## Definitions

*Section 1.*  UNIONS.  The term "Unions" as used herein shall mean the American Federation of the Musicians of the United States and Canada, AFL-CIO-CLC, and the Screen Actors' Guild – American Federation of Television and Radio Artists.

*Section 2.*  AFM.  The term "AFM" as used herein shall mean the American Federation of Musicians of the United States and Canada, AFL-CIO-CLC.

*Section 3.*  SAG-AFTRA.  The term "SAG-AFTRA" as used herein shall mean the Screen Actors Guild – American Federation of Television and Radio Artists, or, prior to March 2012, the American Federation of Television and Radio Artists.

*Section 4.*  AGREEMENT AND DECLARATION OF TRUST.  The term "Agreement and Declaration of Trust" as used herein shall mean this instrument including any amendments hereto and modifications hereof.

*Section 5.*  FUND.  The term "Fund" as used herein shall mean the AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund.

*Section 6.*  AGREEMENT FOR THE RECEIPT AND DISTRIBUTION OF REMUNERATION.  The term "agreement for the receipt and distribution of remuneration" as used herein shall mean any agreement entered into by the AFM, SAG-AFTRA or the Unions with a collecting society, rights organization or other appropriate entity to receive royalties or remuneration held by that entity and to distribute such royalties and remuneration to eligible artists.

*Section 7.*  ARTISTS.  The term "artists" as used herein shall mean instrumental musicians and vocalists.

## Article II
## Creation of Fund

*Section 1.*  ESTABLISHMENT OF FUND.  The AFM and AFTRA Intellectual Property Rights Distribution Fund, which was established on September 16, 1998. is hereby amended and restated as the AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund, to be used for the

2

purpose set forth in this Agreement and Declaration of Trust.

*Section 2.*  GENERAL PURPOSE.  The Fund shall be a trust fund and shall be used for the purpose of receiving and distributing royalties or remuneration to artists in accordance with such agreements for receipt and distribution of remuneration as are entered into by the Unions with the relevant collecting societies, rights organizations or other appropriate entities. The Fund shall further provide the means for financing the expenses of the Trustees and the operation and administration of the Fund, in accordance with this Agreement and Declaration of Trust. The Fund is intended to satisfy the requirements of section 501(c)(6) of the Internal Revenue Code and shall be construed in all respects consistently with section 501(c)(6).

## Article III
### Trustees

*Section 1.*  AFM AND SAG-AFTRA TRUSTEES.  The operation and administration of the Fund shall be the joint responsibility of six Trustees, three appointed by the AFM, of which no fewer than one shall be a rank-and-file representative, and three appointed by SAG-AFTRA, of which no fewer than one shall be a rank-and-file representative.

*Section 2.*  TERM OF TRUSTEES.  Each Trustee shall continue to serve as such until his or her death, incapacity, resignation, or removal by the appointing Union. Each Union may remove or replace its Trustee at will.

*Section 3.*  SUCCESSOR TRUSTEES.  Each Union shall appoint its successor Trustees.

*Section 4.*  FORM OF NOTIFICATION.  In case any Trustee shall be removed, replaced, or succeeded, a statement in writing by the relevant Union shall be sufficient evidence of its action, when forwarded to the Fund and to the remaining Trustees. Any resignation shall be evidenced in writing and forwarded by registered mail to the Fund and the remaining Trustees, and shall not be effective for two months following the date of mailing unless a successor Trustee has been appointed.

## Article IV
### Powers, Duties and Obligations of Trustees

*Section 1.*  PROPERTY AND ASSISTANCE.  The Trustees are authorized and empowered to lease or purchase such premises, materials, supplies and equipment, and to hire, employ and retain such legal counsel, investment advisor, administrative, accounting, actuarial, clerical and other assistants or employees as in their discretion they may find necessary or appropriate in the performance of their duties.

*Section 2.*  CONSTRUCTION OF AGREEMENT.  The Trustees shall have power to construe the provisions of this Agreement and Declaration of Trust and the terms used herein, and any construction adopted by the Trustees in good faith shall be binding upon the AFM, SAG-AFTRA, and artists claiming benefits under the Fund.

*Section 3.* GENERAL POWERS.  The Trustees are hereby empowered, in addition to other such powers as are set forth herein or conferred by law:

A.   To establish and administer the Fund on behalf of artists who may be entitled to payments pursuant to agreements for the receipt and distribution of remuneration entered into by the AFM, SAG-AFTRA or the Unions and determined by the Trustees to be appropriate for administration by the Fund.

B.   As to each agreement for the receipt and distribution of remuneration recommended by the AFM, SAG-AFTRA or the Unions, to decide whether or not to administer the agreement through the Fund.

C.   As to each agreement for the receipt and distribution of remuneration which is to be administered through the Fund, to establish governing rules and procedures for the distribution that are consistent with the relevant agreement.

D.   As to each agreement for the receipt and distribution of remuneration which is to be administered through the Fund, to pay all expenses necessary to the establishment, administration and operation of the agreement out of the receipts generated by the agreement.

E.   To enter into any and all contracts and agreements for carrying out the terms of this Agreement and Declaration of Trust and for the administration of the Fund and do all acts as they, in their discretion, may deem necessary and advisable.

F.   To compromise, settle, arbitrate, and release claims or demands in favor of or against the Fund or the Trustees on such terms and conditions as the Trustees may deem advisable.

G.   To establish and accumulate as part of the Fund a reserve or reserves, adequate, in the opinion of the Trustees, to carry out the purposes of the Fund.

H.   To pay out of the Fund all real and personal property taxes, income taxes and other taxes of any and all kinds levied or assessed under existing or future laws upon or in respect to the Fund or any money, property, or securities forming a part thereof.

I.   To make appropriate allocations of common administrative expenses and disbursements shared or to be shared with any other Plan or Fund, or among the various agreements for the receipt and distribution of remuneration.

J.   To receive contributions, payments, distributions or transfers from any source whatsoever to the extent permitted by law.

K.   To establish advisory committees composed of AFM and SAG-AFTRA representatives and/or other artists or artists' representatives, and to set forth the duties and functions of the members of such advisory committees.

L.   To do all acts, whether or not expressly authorized herein, which the Trustees may deem necessary or proper for the protection of the property held hereunder.

4

M.     To establish such bank account or accounts as the Trustees deem necessary in
       their discretion, including escrow accounts pending the adoption of distribution
       rules governing the administration of an agreement for the receipt and
       distribution of remuneration.

N.     To do all acts, whether or not expressly authorized herein, which the Trustees may
       deem necessary to accomplish the general objective of distributing remuneration to
       eligible artists in the most efficient and economical manner.

O.     To purchase or obtain from the AFM, SAG-AFTRA, the AFM and Employers'
       Pension Fund, the AFTRA Health and Retirement Funds, the Phonograph
       Manufacturers' Special Payments Fund, the Motion Picture Special Payments
       Fund or any commercial source any data helpful for the identification and
       location of artists eligible for remuneration or the identification of recorded or
       other performances covered by an agreement for the receipt and distribution of
       remuneration.

P.     To invest the assets of the Fund with care, skill, prudence and diligence under
       circumstances then prevailing that a prudent person, acting in a like capacity and
       familiar with such matters, would use in the conduct of an enterprise of a like
       character and with such aims, without regard to state law restrictions on
       investments.

*Section 4.*  COMPENSATION.  The Trustees shall not receive compensation for the
performance of their duties.

*Section 5.*  PERSONAL LIABILITY.  Neither the Trustees nor any individual or successor
Trustee shall be personally answerable or personally liable for any liabilities or debts of the
Fund contracted by them as Trustees, or for the non-fulfillment of contracts, but the same
shall be paid out of the Fund and the Fund is hereby charged with a first lien in favor of such
Trustee for indemnification for any amounts paid out by any such Trustee for any such liability
and for indemnification against any liability of any kind which the Trustees or any of them may
incur hereunder; provided, however, that nothing herein shall exempt any Trustee from liability
arising out of his own willful misconduct, bad faith or gross negligence, or entitle such Trustee to
indemnification for any amounts paid or incurred as a result thereof.

       The Trustees and each individual Trustee shall not be liable for any error of judgment
or for any loss arising out of any act or omission in the execution of their duties so long as
they act in good faith and without gross negligence; nor shall any Trustee, in the absence of his
own willful misconduct, bad faith or gross negligence, be personally liable for the acts or
omissions (whether performed at the request of the Trustees or not) of any other Trustee, or of
any agent or attorney elected or appointed by or acting for the Trustees.

       The Trustees shall be fully protected in acting upon any instrument, certificate, or paper
believed by them to be genuine and to be signed or presented by the proper person or persons, and shall
be under no duty to make any investigation or inquiry as to any statement contained in any such writing,
but may accept the same as conclusive evidence of the truth and accuracy of the statements contained
therein.

5

Neither the AFM nor SAG-AFTRA shall in any way be liable in any respect for any of the acts, omissions or obligations of the Trustees, individually or collectively.

The Trustees may from time to time consult with legal counsel and shall be fully protected in acting upon such advice of counsel to the Fund as respects legal questions.

*Section 6.* BOOKS OF ACCOUNT. The Trustees shall keep true and accurate books of account and records of all their transactions, which shall be audited at least annually by a certified public accountant selected by the Trustees. Such audits shall be available at all times for inspection by the AFM and SAG-AFTRA.

*Section 7.* EXECUTION OF DOCUMENTS. The Trustees may authorize and designate an employee or agent of the Fund to execute any notice or other instrument in writing.

*Section 8.* DEPOSIT AND WITHDRAWAL OF FUNDS. All moneys received by the Trustees hereunder shall be deposited by them in such bank or banks as the Trustees may designate for that purpose, and all withdrawals of moneys from such account or accounts shall be made only by checks signed by the Trustees, except that the Trustees may, in their discretion, designate and authorize an employee or agent of the Fund to sign checks upon such separate and specific bank account or bank accounts as the Trustees may designate and establish for such purpose.

*Section 9.* SURETY BONDS. The Trustees and any employees of the Trustees who are empowered and authorized to sign checks as aforesaid shall each be bonded by a duly authorized surety company in such amounts as may be determined from time to time by the Trustees. Each such employee employed by the Trustees who may be engaged in handling moneys of the Trust Fund shall also be bonded by a duly authorized surety company in the same manner. The cost of the premium on such bonds shall be paid out of the Fund.

**Article V**
**Selection of Remuneration Systems to Be Administered by the Fund**

*Section I.* ACCEPTANCE FOR ADMINISTRATION THROUGH THE FUND. As to each agreement for the receipt and distribution of remuneration entered into by the AFM, SAG-AFTRA, or the Unions jointly, and referred by one of them to the Trustees for their consideration, the Trustees, in their sole discretion, may decide whether or not the agreement is appropriate for administration through the Fund. An agreement will be accepted for administration through the Fund only if the Trustees, voting in accordance with Article VII, Section 3, agree to accept it. The refusal of the AFM or SAG-AFTRA to accept an agreement for administration by the Fund shall not be subject to arbitration. The acceptance of an agreement for administration by the Fund shall be in writing.

*Section 2.* HOLDING MONEY PENDING ACCEPTANCE FOR ADMINISTRATION. The Fund may hold moneys received pursuant to an agreement for the receipt and distribution of remuneration in an escrow account pending the Trustees' decision whether to accept the agreement for administration through the Fund. If the Trustees refuse acceptance, the moneys will be returned with any interest accumulated thereon and minus any administrative costs incurred to the AFM, SAG-AFTRA or the Unions jointly in accordance with the agreement for the receipt and distribution of remuneration.

6

*Section 3.*  CONTINUATION OF ADMINISTRATION.  Once an agreement for the receipt and distribution of remuneration has been accepted for administration through the Fund, it shall continue to be administered through the Fund until such time as the Trustees, voting in accordance with Article VII, Section 3, agree that such administration is no longer appropriate. If the Trustees, voting in accordance with Article VII, Section 3, disagree over whether continued administration is appropriate, they will attempt to resolve their difference on the matter. If they cannot resolve their difference on the matter, they agree to submit the dispute to mediation administered by the American Arbitration Association. If mediation fails to resolve the dispute, the agreement for the receipt and distribution of remuneration shall be discontinued for administration through the Fund upon the vote of the Trustees for one Union, voting in accordance with Article VII, Section 3.

**Article VI**
**Plan of Payments and Distributions**

*Section 1.*  PAYMENTS.  The Trustees shall have full authority to determine all questions of the nature and amount of payments to be provided to artists consistent with the relevant agreements for the receipt and distribution of remuneration.

*Section 2.*  ELIGIBILITY FOR PAYMENTS.  The Trustees shall have full authority to determine eligibility requirements for payments, consistent with the relevant agreements for the receipt and distribution of remuneration, and to adopt rules and regulations setting forth the same, which shall be binding on the artists.

*Section 3.*  METHOD OF PROVIDING PAYMENTS.  The payments shall be provided and maintained by such means as the Trustees in their sole discretion shall determine.

*Section 4.*  WRITTEN PLAN OF PAYMENTS AND DISTRIBUTIONS.  The detailed basis upon which payments are to be made pursuant to each agreement for the receipt and distribution of remuneration shall be specified in writing by appropriate action of the Trustees subject, however, to such changes or modifications by the Trustees from time to time as they in their discretion may determine. All such changes or modifications shall similarly be specified in writing by appropriate resolution of the Trustees.

*Section 5.*  DETERMINING CLAIMS FOR PAYMENTS.  The Trustees shall have full authority to determine all claims for payments, provided that they may delegate to the duly designated administrators of the Fund authority to determine such claims initially. The administrators' initial determination shall be submitted to the Trustees for final determination. An individual who believes that he or she has been adversely affected by the administrators' or Trustees' determinations regarding payment of benefits may submit a written appeal to the Trustees. The decision of the Trustees shall be final.

**Article VII**
**Meetings and Decision of Trustees**

*Section 1.*  MEETING OF TRUSTEES.  Meetings of the Trustees shall be held at such place or places as may be agreed upon by the Trustees.

7

*Section 2.*  ACTION BY TRUSTEES WITHOUT MEETING.  The Trustees may also take action in writing without a meeting.

*Section 3.*  AGREEMENT OF THE TRUSTEES.   All actions of the Trustees shall be by agreement, with the AFM Trustees casting one vote, and the SAG-AFTRA Trustees casting one vote. In the event that any matter presented for decision cannot be decided because of a failure of agreement, the matter may be submitted for arbitration in accordance with Article VIII.

*Section 4.*  MINUTES OF MEETINGS.  The Trustees shall keep minutes of all meetings but such minutes need not be verbatim.

### Article VIII
### Arbitration

*Section 1.*  APPLICATION OF THIS ARTICLE.  A Trustee may apply to the American Arbitration Association in the area where the Fund maintains its principal office for the designation of an arbitrator who will decide any disputes between the Trustees or any other matter submitted to arbitration in accordance with the provisions of Article VII, Section 3. The decision of the arbitrator shall be final and binding. Decisions to accept an agreement for the receipt and distribution of remuneration for administration through the Fund, pursuant to Article V, Section 1, shall not be subject to arbitration.

*Section 2.*  EXPENSES OF ARBITRATION.  The cost and expense incidental to any arbitration proceeding, including the fee, if any, of the impartial arbitrator, shall be a proper charge against the Fund and the Trustees are authorized and directed to pay such charges.

### Article IX
### Execution of Trust Agreement

*Section 1.*   COUNTERPARTS.   This Trust Agreement may be execute in counterparts.

### Article X
### Amendment to Trust Agreement

*Section 1.*  AMENDMENT BY TRUSTEES.  This Agreement and Declaration of Trust may be amended in any respect from time to time by the Trustees, provided that each amendment shall be duly executed in writing by the Trustees and annexed hereto. The Trustees shall have full discretion to fix the effective date of any amendment.

### Article XI
### Termination of Trust

*Section 1.*  BY THE TRUSTEES.  This Agreement and Declaration of Trust may be terminated by an instrument in writing executed by the Trustees when there is no longer in force and effect an agreement for the receipt and distribution of remuneration which is accepted for administration by the Fund.

*Section 2.*  PROCEDURE ON TERMINATION.  In the event of the termination of this Agreement and Declaration of Trust, the Trustees shall apply the Fund to pay or to provide for the payment

8

of any and all obligations of the Fund and shall distribute and apply any remaining surplus in such a manner as will in their opinion best effectuate the purpose of the Fund; provided, however, that no part of the corpus or income of said Fund shall be used for or diverted to purposes other than for the benefit of the artists eligible for benefits under the agreements for the receipt and distribution of remuneration administered by the Fund, or the administrative expenses of the Fund or other payments in accordance with the provisions of the Fund.

*Section 3.* NOTIFICATION OF TERMINATION. Upon termination of the Fund, the Trustees shall notify each necessary party, and the Trustees shall continue as Trustees for the purpose of winding up the affairs of the Trust.

## Article XII
### Miscellaneous Provisions

*Section 1.* GOVERNING LAW. This Agreement and Declaration of Trust shall be construed under the laws of the State of New York applicable to contracts made and to be performed within the County and State of New York (without regard to any conflict of laws provision), and venue for any dispute arising under this Agreement and Declaration of Trust shall be in New York.

*Section 2.* NOTIFICATION TO TRUSTEES. The address of each of the Trustees shall be that stated on the signature page of this Agreement and Declaration of Trust. Any change of address shall be effected by written notice to the Trustees.

*Section 3.* SEVERABILITY. Should any provision in this Trust Agreement or in the rules and regulations adopted thereunder be deemed or held to be unlawful or invalid for any reason, such fact shall not adversely affect the provisions contained therein unless such illegality shall make impossible or impractical the functioning of the Trust and the Plan, and in such case the appropriate parties shall immediately adopt a new provision to take the place of the illegal or invalid provision.

*Section 4.* VESTED RIGHTS. No artist or any person claiming by or through such artist, including the artist's family, dependents, beneficiary and/or legal representative, shall have any right, title or interest in or to the Fund or any property of the Fund or any part thereof except as may be specifically determined by the Trustees.

*Section 5.* ENCUMBRANCE OF PAYMENTS. No moneys, property or equity, of any nature whatsoever, in the Fund, or policies or benefits or moneys payable therefrom, shall be subject in any manner by any artist or person claiming through such artist to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, garnishment, mortgage, lien or charge, and any attempt to cause the same to be subject thereto shall be null and void.

*Section 6.* EXPENSES OF THE TRUSTEES. All expenses of the Trustees incurred in the performance of their duties may be chargeable to the Fund at the discretion of the Trustees. All other expenses incurred pursuant to Article IV hereof shall be paid by the Fund.

*Section 7.* NO EMPLOYER CONTRIBUTIONS PERMITTED. The Fund shall not accept contributions from any employer or association of employers who employ artists represented by the AFM or SAG-AFTRA, and shall not enter into agreements for the receipt and distribution of remuneration with

9

such employers or associations of employers.

IN WITNESS HEREOF, in accordance with Article X, the Trustees sign this Agreement and
Declaration of Trust, which amends and restates the original agreement and declaration of trust. The
Trustees, by affixing their signatures at the end of this Agreement and Declaration of Trust, agree to
accept the trusteeship and act in their capacity strictly in accordance with the provisions of this
Agreement and Declaration of Trust.

_____     _____
Raymond M. Hair, Jr., AFM      Date      Duncan Crabtree-Ireland, SAG-AFTRA   Date
1501 Broadway, Suite 600            5757 Wilshire Boulevard, 7th Floor
New York, NY  10036               Los Angeles, CA  90036

_____     _____
Sam Folio, AFM          Date      Stefanie Taub, SAG-AFTRA        Date
1501 Broadway, Suite 600            5757 Wilshire Boulevard, 7th Floor
New York, NY  10036               Los Angeles, CA  90036

_____     _____
Bruce Bouton, AFM        Date      Jon Joyce, SAG-AFTRA          Date
1501 Broadway, Suite 600            5757 Wilshire Boulevard, 7th Floor
New York, NY  10036               Los Angeles, CA  90036

10

such employers or associations of employers.


IN WITNESS HEREOF, in accordance with Article X, the Trustees sign this Agreement and Declaration of Trust, which amends and restates the original agreement and declaration of trust. The Trustees, by affixing their signatures at the end of this Agreement and Declaration of Trust, agree to accept the trusteeship and act in their capacity strictly in accordance with the provisions of this Agreement and Declaration of Trust.


Raymond M. Hair, Jr., AFM          Date
1501 Broadway, Suite 600
New York, NY  10036

Duncan Crabtree-Ireland, SAG-AFTRA   Date
5757 Wilshire Boulevard, 7th Floor
Los Angeles, CA  90036


11/13/12

Sam Folio, AFM          Date
1501 Broadway, Suite 600
New York, NY  10036

Stefanie Taub, SAG-AFTRA          Date
5757 Wilshire Boulevard, 7th Floor
Los Angeles, CA  90036


Bruce Bouton, AFM          Date
1501 Broadway, Suite 600
New York, NY  10036

Jon Joyce, SAG-AFTRA          Date
5757 Wilshire Boulevard, 7th Floor
Los Angeles, CA  90036


10

such employers or associations of employers.

IN WITNESS HEREOF, in accordance with Article X, the Trustees sign this Agreement and Declaration of Trust, which amends and restates the original agreement and declaration of trust. The Trustees, by affixing their signatures at the end of this Agreement and Declaration of Trust, agree to accept the trusteeship and act in their capacity strictly in accordance with the provisions of this Agreement and Declaration of Trust.

Raymond M. Hair, Jr., AFM          Date
1501 Broadway, Suite 600
New York, NY 10036

Duncan Crabtree-Ireland, SAG-AFTRA  Date   1/18/13
5757 Wilshire Boulevard, 7th Floor
Los Angeles, CA 90036

Sam Folio, AFM          Date
1501 Broadway, Suite 600
New York, NY 10036

Stefanie Taub, SAG-AFTRA          Date
5757 Wilshire Boulevard, 7th Floor
Los Angeles, CA 90036

Bruce Bouton, AFM          Date
1501 Broadway, Suite 600
New York, NY 10036

Jon Joyce, SAG-AFTRA          Date
5757 Wilshire Boulevard, 7th Floor
Los Angeles, CA 90036

10

## RESOLUTION TO AMEND AGREEMENT AND DECLARATION OF TRUST TO PROVIDE FOR ALTERNATE TRUSTEES

WHEREAS, the Agreement and Declaration of Trust of the AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund, as Amended and Restated  on July 26, 2012, ("Agreement and Declaration of Trust") does not provide for Alternate Trustees; and

WHEREAS, an expansion of the Board of Trustees to include the option to appoint Alternate Trustees will be beneficial for the efficient operation of the Board of Trustees; and

WHEREAS, Article X, Section 1 authorizes the Trustees to amend the Agreement and Declaration of Trust and to fix the effective date of the amendment;

NOW BE IT THEREFORE RESOLVED that, effective July 27, 2015, Article III of the Agreement and Declaration of Trust shall be amended to read as follows:

### Article III
### Trustees

*Section 1.*  AFM AND SAG-AFTRA TRUSTEES.  The operation and administration of the Fund shall be the joint responsibility of six Trustees, three appointed by the AFM, of which no fewer than one shall be a rank-and-file representative, and three appointed by SAG-AFTRA, of which no fewer than one shall be a rank-and-file representative.

*Section 2.*  AFM AND SAG-AFTRA ALTERNATE TRUSTEES.  The AFM and SAG-AFTRA shall each have the option of appointing up to two Alternate Trustees.  Alternate Trustees shall not be empowered to vote on any matter except in the event that one or more Trustees (i) abstain from voting on any matter before the Board of Trustees due to a conflict of interest or (ii) are absent from a meeting.  In such a case, the Alternate Trustee shall be entitled to the vote otherwise exercised by the abstaining or absent Trustee(s) and shall be entitled to take any other discretionary action on the matter without the involvement of the conflicted or absent Trustee(s).  When acting in the place of a Trustee, the powers, duties, responsibilities and protections of a Trustee described in this Agreement and Declaration of Trust shall apply to the Alternate Trustee.  An Alternate Trustee's expenses may be chargeable to the Fund in accordance with Article XII, Section 6 only when the Alternate Trustee attends a meeting or otherwise acts in the place of a Trustee.

*Section 2.*  TERM OF TRUSTEES.  Each Trustee or Alternate Trustee shall continue to serve as such until his or her death, incapacity, resignation, or removal by the appointing Union. Each Union may remove or replace its Trustee or Alternate Trustee at will.

*Section 3.*  SUCCESSOR TRUSTEES.  Each Union shall appoint its successor Trustees or Alternate Trustees.

*Section 4.*  FORM OF NOTIFICATION.  In case any Trustee or Alternate Trustee shall be removed, replaced, or succeeded, a statement in writing by the relevant Union shall be sufficient evidence of its action, when forwarded to the Fund and to the remaining Trustees and Alternate

Trustees. Any resignation shall be evidenced in writing and forwarded by registered mail to the
Fund and the remaining Trustees and Alternate Trustees, and in the case of a Trustee, shall not be
effective for two months following the date of mailing unless a successor Trustee has been
appointed.

Approved and executed this 27th day of July 2015.

_____
Raymond M. Hair, Jr., AFM             Date
1501 Broadway, Suite 600
New York, NY 10036

_____
Sam Folio, AFM                        Date
1501 Broadway, Suite 600
New York, NY 10036

_____
Bruce Bouton, AFM                     Date
1501 Broadway, Suite 600
New York, NY 10036

_____
Duncan Crabtree-Ireland, SAG-AFTRA   Date
5757 Wilshire Boulevard, 7th Floor
Los Angeles, CA 90036

_____
Stefanie Taub, SAG-AFTRA              Date
5757 Wilshire Boulevard, 7th Floor
Los Angeles, CA 90036

_____
Jon Joyce, SAG-AFTRA                  Date
5757 Wilshire Boulevard, 7th Floor
Los Angeles, CA 90036