JENNER & BLOCK LLP
Andrew J. Thomas (Cal. Bar No. 159533)
ajthomas@jenner.com
Alexander M. Smith (Cal. Bar No. 295187)
asmith@jenner.com
Andrew G. Sullivan (Cal. Bar No. 301122)
agsullivan@jenner.com
Anna K. Lyons (Cal Bar No. 324090)
alyons@jenner.com
633 West 5th Street, Suite 3600
Los Angeles, CA 90071
Telephone: (213) 239-5100
Facsimile:  (213) 239-5199

*Attorneys for All Defendants*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEVIN RISTO, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>SCREEN ACTORS GUILD-AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS, a Delaware corporation, et al.,<br><br>Defendants. | Case No. 2:18-cv-07241-CAS-PLA<br><br>Class Action<br><br>**DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW**<br><br>Hearing Date:   July 19, 2021<br>Hearing Time:   11:00 a.m.<br>Courtroom:       8D (Telephonic) |

# **TABLE OF CONTENTS**

I.  INTRODUCTORY STATEMENT .............................................................1

II.  LEGAL AND FACTUAL BACKGROUND ..................................................2

    A.  The Statutory and Regulatory Framework............................................2

    B.  The Trust Agreement ......................................................................3

    C.  The Data Agreement .......................................................................4

    D.  Data and Services Provided by the Unions............................................5

III.  SUMMARY OF PLAINTIFF'S CLAIMS .....................................................7

    A.  The Approval of the Service Fee Was Entirely Reasonable..............8

    B.  Plaintiff's Attacks on the Service Fee Are Factually Baseless..........11

        1.  Plaintiff's "No Value" Claim Is Objectively False ................11

        2.  The Union Data Benefits All Fund Participants.....................12

        3.  The Unions Owe No Duty to Provide Their Data for Free .....12

    C.  Federal Law Does Not Limit the Amount of the Service Fee to the Incremental Costs Incurred by the Unions in Providing Data..........13

    D.  The Process Whereby the Trustees Approved the Service Fee Did Not Constitute a Breach of Fiduciary Duty .............................................14

    E.  Plaintiff's Secondary Claims Also Fail as A Matter Of Law ...........17

IV.  SUMMARY OF DEFENSES, THE ELEMENTS THEREOF, AND DEFENDANTS' SUPPORT FOR EACH DEFENSE ...............................20

    A.  First Defense: Failure to State a Claim...............................................20

    B.  Second Defense: Compliance with Applicable Laws........................20

    C.  Third Defense: Punitive Damages – Cal. Civil Code § 3294............20

    D.  Fourth Defense: Punitive Damages – Due Process ..........................20

V.  EVIDENTIARY ISSUES ..........................................................................21

VI.   ISSUES OF LAW ..........................................................................25

VII.  ATTORNEY'S FEES ....................................................................25

VIII. ABANDONMENT OF ISSUES ...................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Andrews v. Sirius XM Radio Inc.*,
932 F.3d 1253 (9th Cir. 2019)..................................................................19

*Avidor v. Sutter's Place, Inc.*,
212 Cal. App. 4th 1439 (2013)....................................................................8

*Aydin Corp. v. Union of India*,
940 F.2d 527 (9th Cir. 1991)................................................................8, 13

*Bourget v. Allstate Ins. Co.*,
2007 WL 9705900 (C.D. Cal. Jan. 4, 2007)............................................25

*Crow Tribe of Indians v. Racicot*,
87 F.3d 1039 (9th Cir. 1996).....................................................................21

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) ..................................................................................21

*In re Estate of Janes*,
681 N.E.2d 332 (N.Y. 1997) .......................................................................9

*In re First Alliance Mortg. Co.*,
471 F.3d 977 (9th Cir. 2006)......................................................................25

*Gen. Elec. Co. v. Joiner*,
552 U.S. 136 (1997) ..................................................................................21

*Home Indem. Co. v. Lane Powell Moss & Miller*,
43 F.3d 1322 (9th Cir. 1995)......................................................................24

*Jacobson v. Hannifin*,
627 F.2d 177 (9th Cir. 1980)......................................................................19

*Lee v. Hanley*,
61 Cal. 4th 1225 (2015)........................................................................8, 17

*Mains v. City Title Ins. Co.*,
34 Cal. 2d 580 (1949)................................................................................17

*Royal Park Invs. SA/NV v. HSBC Bank USA, Nat. Ass'n,*
   109 F. Supp. 3d 587 (S.D.N.Y. 2015) ........................................................15, 16

*Shaterian v. Wells Fargo Bank, N.A.,*
   829 F. Supp. 2d 873 (N.D. Cal. 2011) ...............................................................17

*Tovar v. Sessions,*
   882 F.3d 895 (9th Cir. 2018) ............................................................................19

*Town of Castle Rock v. Gonzales,*
   545 U.S. 748 (2005) ..........................................................................................19

*United States v. Bilzerian,*
   926 F.2d 1285 (2d Cir. 1991) .....................................................................24, 25

*In re Walt Disney Co. Derivative Litig.,*
   907 A.2d 693 (Del. Ch. 2005) ..........................................................................16

*In re Wellington Trusts,*
   85 N.Y.S.3d 497 (2018) ......................................................................................9

*Wolf v. Superior Court,*
   107 Cal. App. 4th 25 (2003) ...............................................................................8

**Constitutions**

California Constitution Article I, § 7 ........................................................................21

United States Constitution Fifth and Fourteenth Amendments Due Process Clause
   ...........................................................................................................................20

**Statutes**

17 U.S.C. § 114 .................................................................................................*passim*

28 U.S.C. 2201 ........................................................................................................8

Cal. Civil Code § 3294 ....................................................................................20, 25

Copyright Act ....................................................................................................*passim*

Independent Offices Appropriation Act, 31 U.S.C. § 9701 ...................................13

**Court Rules**

Federal Rule of Evidence 702 .................................................................................21

1

Local Rule 16-4 ............................................................................................1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Pursuant to Local Rule 16-4, Defendants submit this Memorandum of Contentions of Fact and Law in advance of the Final Pretrial Conference currently scheduled for July 19, 2021.

## I.    INTRODUCTORY STATEMENT

The AFM & SAG-AFTRA Intellectual Property Rights Distribution Fund (the "Fund") is a trust established to collect, allocate, and distribute royalties to session musicians and background vocalists (together, "non-featured performers") who contributed to sound recordings played by certain digital music services.  In 2013, the Fund entered into a Data Purchase and Services Agreement (the "Data Agreement") with the American Federation of Musicians ("AFM") and the Screen Actors Guild-American Federation of Television and Radio Artists ("SAG-AFTRA") (together, the "Unions").  The Data Agreement requires the Fund to pay an annual fee (the "Service Fee") to compensate the Unions for providing critical information the Fund uses to locate and pay royalties to non-featured performers.

At issue in this suit is whether the Fund Trustees acted reasonably and within their authority when they approved the Data Agreement.  They did.  The Copyright Act expressly empowers royalty distribution entities, like the Fund, to incur "reasonable costs" associated with distributing statutory royalties and to deduct such costs from the funds disbursed.  17 U.S.C. § 114(g)(3).  Moreover, the Fund's Declaration of Trust expressly authorizes the Fund to incur necessary administrative expenses, and it specifically permits it to purchase from the Unions "any data helpful for the identification and location of artists eligible for remuneration."

Plaintiff disputes whether the information the Unions provide pursuant to the Data Agreement—including "session reports" that document which non-featured musicians or vocalists performed on a particular recording—is essential for the Fund to locate and pay royalties to non-featured performers.  Plaintiff cannot, however, point to any other source of information that is as comprehensive and accurate as the Unions' data.  As a practical matter, the data is simply not available

from any other source.  This data continues to have value long after the time the Unions provide it to the Fund, as a particular recording may generate substantial royalties from services like Sirius XM radio for many years.  The Unions have collected and maintained this data at great effort and expense over decades of time.

Plaintiff cannot point to any facts that would suggest that the data provided by the Unions is unnecessary, has no value, or could be obtained elsewhere at a lower price.  Rather, he asserts that the Trustees breached their fiduciary duties by agreeing to pay *anything at all* to the Unions.  This claim rests on the false premise that—by virtue of their respective Union affiliations—the Trustees' decision to pay anything in exchange for essential information and services provided by the Unions was based on a conflict of interest and therefore constitutes fiduciary breach.

But there is no evidence the Trustees acted based on a conflict of interest or personally benefited from the Service Fee.  The reality is that it was in the Fund's long-term best interest to secure access to a mission-critical source of information so it could distribute more royalties more accurately to Fund participants.  Relying on alternative, less reliable, sources of information likely would have resulted in the misallocation of millions of dollars in royalties to the wrong performers.

Nor has Plaintiff mustered any evidence that would establish that the Trustees' purportedly conflicted decision-making resulted in a Service Fee determination that was unreasonable.  To the contrary, the Trustees—all of whom were fully aware of the importance of the data in the Union session reports, based on their long careers in the music business or the entertainment industry— acted reasonably, within their authority, and in the interest of Fund participants when they entered into the Data Agreement and agreed to pay the Service Fee.

## II.    LEGAL AND FACTUAL BACKGROUND

### A.    <u>The Statutory and Regulatory Framework</u>

In 1995, Congress created a statutory license for certain services, such as satellite radio, webcasters, and cable TV music channels, to broadcast certain sound

recordings owned by copyright holders in exchange for a payment of royalties.  *See generally* 17 U.S.C. § 114.  The royalty collection organization SoundExchange is charged with collecting royalties due under the statutory license, distributing 50% of the receipts to the copyright owner and distributing another 45% to the featured recording artists.  *Id.* § 114(g)(2).  The remaining 5% is allocated to the non-featured artists, to be split equally between session musicians and background vocalists.  *Id.* Each 2.5% share is to be placed in "an escrow account managed by an independent administrator" appointed by the copyright owners and the relevant union.  *Id.*

The statute expressly designates AFM with overseeing the independent administrator's royalty distribution with respect to non-featured musicians, and SAG-AFTRA with respect to non-featured vocalists.  *Id.*  The Fund has been designated as the "independent administrator" to receive from SoundExchange and distribute to the non-featured performers their respective share of the royalties. Declaration of Andrew G. Sullivan ("Sullivan Decl."), Ex. 1 (DEFS_00042019). While the Copyright Act requires the Fund to distribute royalties to both union and non-union performers alike, it otherwise places no limits on the Fund's operations. 17 U.S.C. § 114(g)(2)(B), (C).  It also authorizes the Fund to "deduct from any of its receipts, prior to the distribution of such receipts to any person or entity entitled thereto … [its] reasonable costs."  17 U.S.C. § 114(g)(3).

### B.   The Trust Agreement

In 1998, the Unions and the Trustees executed the Agreement and Declaration of Trust that formed the Fund.  Sullivan Decl., Ex. 2 ("1998 Trust Agreement").  The Declaration of Trust was amended and restated as of July 26, 2012.  *Id.*, Ex. 3 ("Trust Agreement").  As explained in the Trust Agreement, the purpose of the Fund is to receive and distribute "royalties and remuneration" to eligible artists, including by receiving and distributing funds collected by SoundExchange for the non-featured performers under the statutory license.  *Id.*, Art. II, § 2.

The Trust Agreement vests the Trustees with broad discretion regarding the distribution of royalty receipts collected by the Fund.  For example, it provides that "[t]he Trustees shall have power to construe the provisions of this Agreement and Declaration of Trust and the terms used herein, and any construction adopted by the Trustees in good faith shall be binding upon the AFM, SAG-AFTRA, and artists claiming benefits under the Fund."  *Id.*, Art. IV, § 2.  Similarly, the Trustees are empowered "[t]o do all acts … which the Trustees may deem necessary to accomplish the general objective of distributing remuneration to eligible artists in the most efficient and economical manner."  *Id.*, Art. IV, § 3(N).  Of particular relevance, the Trust Agreement specifically empowers the Trustees "[t]o purchase or obtain from the AFM [and/or] SAG-AFTRA ... any data helpful for the identification and location of artists eligible for remuneration or the identification of recorded or other performances covered by an agreement for the receipt and distribution of remuneration."  *Id.*, Art. IV, § 3(O).

## C.   **The Data Agreement**

Since the Fund's inception, the Unions have provided information and other services necessary to identify and compensate the non-featured performers entitled to royalties.  For the first 15 years of the Fund's operation, the Unions provided this information and these services at no charge.  *Id.*, Ex. 4 (February 16, 2021 Crabtree-Ireland Tr. 92:13-93:18).  During this time, the amount of royalties flowing through the Fund was so small that the Fund effectively operated on a shoe-string.  It started with an uncompensated Administrator and one full-time employee, was housed in cubicles set up in the break room of another organization called the Film Musicians Secondary Markets Fund, and, in the words of its Administrator at the time, operated with a used fax machine, a taped-together computer, and a crude database.  *Id.*, Ex. 5 (Dreith Tr. 54:14-55:3).

As the use of digital streaming services such as Sirius XM Satellite Radio and Pandora became more widespread, the number of digital performances—and

the amount of royalties to be distributed by the Fund—also increased substantially. Dkt. 107, Declaration of Stephanie Taub ("Taub Decl."), ¶ 15.  Today, more than 6 million sound recordings a year generate statutory royalties; the Fund is able to research and make distributions on the top 40,000 recordings; and in 2021 the Fund was able to distribute $70 million in royalties to non-featured performers.

Between 2010 and 2013, the Fund took a number of steps to become a mature, free-standing organization:  it acquired separate office space, eventually purchasing an office building of its own; increased the number of staff; established an independent database of non-featured performers; and caused its Executive Director to give up his duties as the administrator of the Secondary Markets Fund and become a full-time employee of the Fund.  Sullivan Decl., Ex.  (Dreith, Tr., , 62:14-62:21, 78:12-78:15, 257:8- 257:13).

Based on the growth of digital streaming—and the corresponding increase in royalties to be distributed by the Fund—the Trustees concluded that it was no longer sensible for the information and administrative services to be provided *gratis* by the Unions.  Consequently, on July 22, 2013, the Trustees entered into the Data Agreement with the Unions.  *Id.*, Ex. 6 ("Data Agreement").  Pursuant to this Agreement, the Unions agreed to provide the Fund with information from their member databases, as well as access to session reports, all of which enabled the Fund to accurately identify and contact both Union members and non-members entitled to receive royalties.  *Id.*  In exchange for this information and other specified services, the Agreement provides that the Unions are each to receive an annual fee equal to 1.5% of the royalty receipts allocated for distribution by the Fund to non-featured artists each year.  *Id.* at DEFS_00040573.

**D.** **Data and Services Provided by the Unions**

The Data Agreement requires the Unions to continue providing the Fund with information—which they compiled over many decades and continue to collect— regarding the non-featured performers to whom royalty payments have been

allocated in a given distribution cycle.  Id., Ex. 7 (Taub Interrogatories Resp. to ROG 10.  This information is derived from session reports (also referred to as "B-forms") which contain information regarding the non-featured musicians and vocalists who performed on a given sound recording—including both Union and non-Union members.  Id.

This valuable data is essential to the Fund's administration.  There is no other source of information documenting the identities, work histories, and payment information associated with non-featured performers that is nearly as exhaustive as the repositories maintained by the Unions.  Id.  Without this data, the Fund would be significantly constrained in its ability to perform its central task of identifying and locating the non-featured performer(s) to whom royalties are to be distributed—and, at a minimum, would need to expend significant resources to attempt to collect information that the Unions already compile.  Id.

In addition, Union representatives expend considerable effort supplying the data the Unions are obligated to provide under the Data Agreement.  This data is housed across the various local affiliates of each Union, for the most part based on where the relevant recording session took place.  Id., Ex. 8 (Gorbacsov Tr., 88:4-90:16, 121:16-121:21).  Much of this information exists in records that are maintained by the local affiliates only in hard copy form.  Id.  Because the records maintained by the Unions exist in decentralized repositories dispersed across the Unions' various locations, the Unions satisfy their obligations under the Agreement by making numerous representatives available across these locations in order to field requests from the Fund.  Id., Ex. 8 (Gorbacsov Tr., 88:4-91:20).[1]  Between

---

[1] The Fund's research team—currently staffed with ten full-time employees—works extensively with representatives in various Union locations on a year-round basis to obtain information regarding the non-featured performers associated with thousands of song titles.  At local affiliates where such records exist in hard copy form, Union representatives must locate the requested document within their hard copy filing system before scanning and sending a digital copy to the requestor at the Fund.  It

2013 and the present, the number of requests from the Fund to the Unions, and the corresponding level of effort required to respond by investigating and providing session reports, has indisputably increased.  *Id.*, (Gorbacsov Tr., 48:9-50:15, 153:5-154:25).[2]

### III.   SUMMARY OF PLAINTIFF'S CLAIMS

On November 20, 2018, Plaintiff filed his First Amended Class Action Complaint against defendants Screen Actors Guild-American Federation of Television and Radio Artists, American Federation of Musicians of the United States and Canada, Raymond M. Hair Jr., Tino Gagliardi, Duncan Crabtree-Ireland, Stephanie Taub, Jon Joyce, and Bruce Bouton (collectively, "Defendants").

Plaintiff asserts the following claims against Defendants:

    1.   <u>Claim 1</u>:  Breach of Fiduciary Duty for Implementing Service Fee

    2.   <u>Claim 2</u>:  Money Had and Received

    3.   <u>Claim 3</u>:  Declaratory Relief

    4.   <u>Claim 4</u>:  Conversion

<u>Elements Required to Establish Plaintiff's Claim for Breach of Fiduciary Duty</u>

    1.   The existence of a fiduciary relationship

    2.   Defendant knowingly acted against the interests of plaintiff;

    3.   Plaintiff did not give informed consent to defendant's conduct;

    4.   Plaintiff was harmed; and

---

is not uncommon for a Union representative at one local affiliate to field dozens of requests from the Fund in any given week.

[2] The Data Agreement also requires the Unions to provide other valuable services to the Fund.  Those services include legislative advocacy—both domestically and internationally—that benefits non-featured performers, whether or not they are Union members.  The Unions also meet with and negotiate with foreign performing rights organizations ("PROs") to secure better terms for the collection and distribution of international royalties.

5.    Defendant's conduct was a substantial factor in causing plaintiff's harm.

CACI No. 4102; *Wolf v. Superior Court*, 107 Cal. App. 4th 25 (2003).

<u>Elements Required to Establish Plaintiff's Claim for Money Had and Received</u>

1.    Defendant received money that was intended to be used for plaintiff's benefit;

2.    The money was not used for plaintiff's benefit; and

3.    Defendant has not given the money to Plaintiff.

CACI No. 370; *Avidor v. Sutter's Place, Inc.*, 212 Cal. App. 4th 1439, 1454 (2013).

<u>Elements Required to Establish Plaintiff's Claim for Declaratory Relief</u>

1.    The action is a proper subject of declaratory relief, and

2.    An actual controversy involving justiciable questions relating to the plaintiff's rights or obligations.

28 U.S.C. § 2201; *Aydin Corp. v. Union of India*, 940 F.2d 527, 527-28 (9th Cir. 1991).

<u>Elements Required to Establish Plaintiff's Claim for Conversion</u>

1.    Plaintiff's ownership or right to possession of the property at the time of the conversion;

2.    Defendant substantially interfered with plaintiff's property by knowingly or intentionally taking possession of the property;

3.    Plaintiff did not consent;

4.    Plaintiff was harmed; and

5.    Defendant's conduct was a substantial factor in causing plaintiff's harm.

CACI No. 2100; *Lee v. Hanley*, 61 Cal. 4th 1225, 1240 (2015).

**A.    <u>The Approval of the Service Fee Was Entirely Reasonable.</u>**

The Trustees' implementation of the Service Fee was completely proper—under general trusteeship principles, under the statutory scheme that gave rise to the

8

Fund, and pursuant to the Fund's governing documents.  The Fund's Trustees have a "duty to administer the trust as a prudent person would, in light of the purposes, terms, and other circumstances of the trust," and this duty "requires the exercise of reasonable care, skill, and caution."  *See* Restatement (Third) of Trusts ("Restatement") § 77(1)–(2) (2007); *In re Wellington Trusts*, 85 N.Y.S.3d 497, 501 (2018).[3]  The Trustees also have a duty "to administer the trust, diligently and in good faith, in accordance with the terms of the trust and applicable law." Restatement § 76; *In re Estate of Janes*, 681 N.E.2d 332, 336 (N.Y. 1997).  And it is well-settled that "[a] trustee can properly incur and pay expenses that are reasonable in amount and appropriate to the purposes and circumstances of the trust," where such expenses are incurred "in accordance with *the terms of the trust and applicable law*."  Restatement §§ 76, 88 (emphasis added).

Here, the statutory scheme that gave rise to the Fund allows nonprofit entities in charge of distributing royalties to "deduct from any of its receipts, prior to the distribution of such receipts to any person or entity entitled thereto … the reasonable costs" incurred in distributing those royalties.  17 U.S.C. § 114(g)(3).  The Service Fee likewise was expressly authorized by the Fund's governing Trust Agreement, which empowers the Trustees to "purchase or obtain from the AFM [and/or] SAG-AFTRA ... any data helpful for the identification and location of artists eligible for remuneration ...."  Sullivan Decl., Ex. 3, Art. IV, § 3(O).  That language—which has appeared in the Trust Agreement since the Fund's inception—expressly authorizes the Fund to implement the precise fee Plaintiff challenges here.

At trial, Defendants expect to present testimony that the Data Agreement and its Service Fee were the result of numerous discussions among the Trustees, the Fund's Executive Administrator (Dennis Dreith), and the Fund's legal counsel.  All of the current defendants who were Trustees at the time —including Duncan

---

[3] The Fund's Agreement and Declaration of Trust is governed by New York law. Sullivan Decl., Exs. 3, 6.

Crabtree-Ireland, Ray Hair, Stefanie Taub, Bruce Bouton, and Jon Joyce—concluded that the amount of the Fee was reasonable based on the value of the information and services the Unions provided to the Fund, which could not be obtained from any other source.  Indeed, Defendants anticipate the Trustees to further testify that in the succeeding years, they continued to reasonably believe, based on their experience and familiarity with the data provided by the Unions, that the 3% Service Fee was reasonable and justifiable.

Among other things, the Trustees and Mr. Dreith, the Fund's Executive Director, carefully considered whether the 3% fee would cause the Fund's overall expense ratio to increase to a level that was out of step with administrative fees charged by similar royalty distribution organizations (which in some cases charge fees in excess of 25%), and thus might inhibit the Fund's ability to enter into bilateral agreements with such organizations.  They concluded that the 3% fee did not pose that risk.  The Trustees also considered whether to conduct a study of the time and effort expended by Union personnel in providing information to the Fund, but decided that such an analysis would not be an appropriate use of Fund resources.

The fee was proposed to the Trustees during a Board meeting and discussed thoroughly before the Board unanimously voted to implement it.  Mr. Dreith, the Executive Director of the Fund and a man with decades of experience in the music industry—who had essentially set up the Fund, invented its procedures and guidelines, and run it day-to-day since 1998— spoke in favor of a 3% fee, opining that it would not impede the Fund's ability to reach bilateral agreements with other performing rights organizations.  The Fund's Trustees all were well aware of the value of the data provided by the Unions pursuant to the Data Agreement and the essential role this data plays in allowing the Fund to achieve its goal of efficiently and accurately allocating royalties.

No one at the Board meeting where the Service Fee was approved, including Mr. Dreith, questioned its legality, propriety, or reasonableness.  Mr. Dreith

repeatedly expressed in contemporaneous emails that he "fully supported" the concept of a service fee, at one point describing it as "a completely justifiable expense." And at the June 2013 board meeting, Mr. Dreith did not object that the 3% fee was too high, did not object to the percentage structure of the fee, and did not raise any concerns regarding any alleged conflict of interest. To the contrary, following the meeting, he proposed explaining to Fund participants that the Service Fee was "highly warranted" given the "valuable service" provided by the Unions. The individual Trustees who approved the Service Fee did not act recklessly or imprudently in relying on their own first-hand knowledge of session reports and on the expertise and recommendation of the Fund's seasoned Executive Director.

### B. Plaintiff's Attacks on the Service Fee Are Factually Baseless.

While the Fund and its Trustees made a considered, reasonable, good-faith decision to approve the 3% Service Fee, Plaintiff invites the Court to second-guess that decision by making sweeping factual claims that are demonstrably false and by raising legal arguments that are without support. We begin with two of Plaintiff's factual arguments: (1) that the data provided by the Unions purportedly has no value; and (2) that the data provided by the Unions only benefits performers who are Union members. Both are without factual support.

### 1. Plaintiff's "No Value" Claim Is Objectively False.

Throughout this litigation, Plaintiff has taken the position—despite mountains of evidence to the contrary—that the data the Unions provide to the Fund has "no value." That is false. Defendants will continue to present evidence that the Unions have gathered and maintain the information they provide to the Fund— which is not maintained in a systematic way by any other entity—at tremendous effort and expense. Specifically, Defendants anticipate numerous witnesses to explain how the Unions expend great effort in responding to thousands of requests for information from the Fund each year. The evidence at trial will show that the session report data provided by the Unions has essential value in allowing the Fund

to accurately allocate royalties to the correct artists who performed on a given song. It will also confirm that, separate and apart from their provision of session report data, the Unions also provide the Fund with information from their respective member databases that is critical in identifying and locating performers.

To illustrate and quantify the importance of the session report data provided by the Unions, the Fund recently analyzed a sample of 50 song titles for which session report data was made available from the Unions.  As part of this exercise, the Fund directed its researchers to locate accurate song title information *without* using the data provided by the Unions.  The Fund found that when its researchers had access only to publicly available, non-Union sources of information, they were able to locate the accurate credits information (*i.e.*, who performed on a given song title) for just 20 out of the 50 tracks in the sample (*i.e.*, 40%).  This rate of inaccuracy would have profound consequences if the Union were forced to rely solely on public, non-Union sources of information when allocating royalties.

**2.     The Union Data Benefits All Fund Participants.**

Plaintiff also asserts that the data and services provided by the Unions do not benefit non-Union members—and that, as a result, the Service Fee effectively transfers money from non-Union performers to the Unions without justification. That claim also is demonstrably false.  Defendants expect numerous witnesses to testify to how the Fund (1) uses session reports provided by the Unions to identify Union and non-Union performers alike and (2) engages in advocacy efforts for the benefit of Fund participants, who include both Union members and non-members. Indeed, roughly half of the Fund participants are not Union members.

**3.     The Unions Owe No Duty to Provide Their Data for Free.**

Plaintiff also has argued that, even if the Unions' data has some value, the Fund should not have paid for it.  He reasons that, because the Unions' services under the Data Agreement also benefit Union members, the Unions had an independent obligation to provide that data without compensation.

This argument is untenable.  Roughly half of the Fund's royalty participants are *not* members of AFM or SAG-AFTRA, and the Unions have no obligation to expend their members' dues to support the Fund's distribution of royalties to non-members.  Furthermore, most *Union* members have no connection with the Fund.  Only a small fraction of SAG-AFTRA's roughly 160,000 members are background vocalists on sound recordings; most are film and TV actors.  And only a small subset of AFM's approximately 70,000 members work as session musicians on sound recordings; the vast majority of AFM members are musicians who perform live in orchestral, theatrical and concert venues, restaurants, nightclubs and bars, or in other media production, such as live television.   The Service Fee ensures that the Union members who actually benefit from the Fund's activities are the ones who bear the reasonable costs of the Fund's operations.[4]

## C.  Federal Law Does Not Limit the Amount of the Service Fee to the Incremental Costs Incurred by the Unions in Providing Data.

Plaintiff also argues that the Trustees' decision to approve the Service Fee constituted a breach of fiduciary duty because the "reasonable costs" permitted by the Copyright Act are limited to the incremental costs incurred *by the Unions* in providing session report and database information to the Fund.  This argument fundamentally misreads the statute and makes no sense.[5]

---

[4] Plaintiff also asserts that, because the Trustees did not elect to compensate the Unions for their data and services prior to 2013, the Trustees breached their fiduciary duties by deciding to implement the Service Fee—and pay the Unions on a going forward basis—in 2013.  But the mere fact that the Unions provided information and services to the Fund without charge for the first decade of the Fund's existence, when royalty distributions were minimal and the Fund had limited resources,  does not mean it was reasonable to expect that the Unions would continue to do so indefinitely.   There is no fiduciary duty to insist on receiving valuable data and services for free, and Plaintiff's argument that the Fund acted unlawfully or unreasonably by doing so is meritless.

[5] Plaintiff previously asserted that the decision to approve the Service Fee also violated the Independent Offices Appropriation Act ("IOAA"), 31 U.S.C. § 9701.

The Copyright Act permits nonprofit entities that distribute royalties, like the Fund, to "deduct from any of its receipts, prior to the distribution of such receipts to any person or entity entitled thereto … [its] reasonable costs."   17 U.S.C. § 114(g)(3).  Plaintiff asserts that the term "reasonable costs" in Section 114(g)(3) somehow requires the Fund to purchase all of the goods and services it requires at cost.   In other words, he contends that the Unions must give away information accumulated over decades and may only be reimbursed for the incremental costs of work initiated in response to the Fund's needs.[6]

There can be no dispute that many compensation arrangements are based on a percentage of the value of an underlying transaction—including those involving real estate agents, investment managers, and contingency fee lawyers.  Indeed, that is precisely how the royalties due to the non-featured performers Plaintiff purports to represent are computed.  The sale of data—for instance, through Lexis/Nexis or Westlaw subscriptions—is also commonly based on the value of the information to the purchaser rather than the (near-zero) incremental cost of providing the data electronically to one additional user.  Plaintiff does not and cannot establish that agreeing to pay a percentage-based Service Fee is *per se* a breach of fiduciary duty.

## D.   The Process Whereby the Trustees Approved the Service Fee Did Not Constitute a Breach of Fiduciary Duty.

Unable to establish that the amount of the Service Fee is unreasonable,

---

But this Court made clear in its ruling on Defendants' motion for summary judgment that the Fund's conduct does not implicate the IOAA because "the Fund is not a federal agency" and because "the statute applies to charges assessed by the subject agency, not fees paid by that agency."  Dkt. 113 at 13 n.11.

[6] Plaintiff's argument ignores the language of the Copyright Act.   The term "reasonable costs" in Section 114(g)(3) plainly refers to the expenses incurred *by the royalty distributing body*—in this case, the Fund.  It does not say the Fund can purchase goods or services from a third party (such as computer equipment, a office supplies, or electricity) only if they are priced at the seller's marginal cost.  Such a restriction would make it impossible for the Fund to operate.

Plaintiff has pivoted to alleging that the *process* of enacting the Service Fee—and agreeing to pay *any* amount for the data provided by the Unions—constituted a breach of fiduciary duty.  Plaintiff asserts that the Fee's implementation constitutes a *per se* breach of fiduciary duty because the Trustees, by virtue of their dual roles with the Unions, had a conflict of interest.  Plaintiff is mistaken.

The core flaw in Plaintiff's argument is that the Fund's Trust Agreement *expressly authorizes* the Trustees to "*purchase* or obtain from the AFM [and/or] SAG-AFTRA … any data helpful for the identification and location of artists eligible for remuneration."  Sullivan Decl., Art. IV, 3(O) (emphasis added).  That language is fatal to Plaintiff's conflict-of-interest theory, as "[a] fee arrangement expressly authorized by the trust's governing documents generally cannot create a conflict of interest."  *Royal Park Invs. SA/NV v. HSBC Bank USA, Nat. Ass'n*, 109 F. Supp. 3d 587, 598 (S.D.N.Y. 2015); *see also, e.g.*, Restatement § 78 (2005) cmt. c(1)-c(3) (where a "trust instrument contemplates, creates, or sanctions [a] conflict of interest," it is not a breach of a trustee's duty of loyalty to abide by the terms of the trust instrument) (internal citation omitted).  The Trustees did not breach their fiduciary duties by engaging in the precise conduct—purchasing data from the Unions—that the Trust Agreement expressly authorized.

Plaintiff's conflict-of-interest theory also fails because Plaintiff has not mustered a shred of evidence that the Trustees failed to act reasonably in determining whether and how much to compensate the Unions for the essential data and services provided under the Data Agreement.  He continues to rely on the *ipse dixit* assertion that—because the Trustees have Union affiliations—they necessarily must have acted with "deep" and "significant conflicts of interest" when they implemented the Service Fee.  Compl. ¶¶ 13, 20, 56.  This assertion has not been borne out in discovery, and Defendants have provided extensive evidence showing the opposite – *i.e.*, that it was in the interest of both the Fund and the Unions to ensure that the mission-critical information in the Unions' possession was available

1    for the Fund going forward, at a reasonable cost.

2        Plaintiff's "bald assertions of conflict" cannot establish a breach of fiduciary

3 duty absent evidence that any of the Trustees "personally benefited" from the

4 implementation of the Service Fee. *See Royal Park*, 109 F. Supp. 3d at 598; *see*

5 *also* Restatement § 78(2) (fiduciary breach claim requires showing that trustee

6 "personal[ly]" benefited from the transaction at issue). There is zero evidence that

7 the Trustees benefited from the Service Fee in their personal capacities, or that they

8 set the Service Fee at a rate that unfairly favors the Unions at the expense of Fund

9 beneficiaries. Plaintiff's baseless speculation that the Trustees engaged in self-

10 dealing is woefully insufficient to establish a breach of fiduciary duty.

11        Moreover, any testimony as to the Fund's noncompliance with "best

12 practices" of corporate governance is totally beside the point. As a matter of law,

13 conduct does not constitute a breach of fiduciary duty simply because it "fell

14 significantly short of the best practices of ideal corporate governance." *In re Walt*

15 *Disney Co. Derivative Litig.*, 907 A.2d 693, 697 (Del. Ch. 2005). The fact that the

16 Fund may not have conducted robust training programs for new Trustees does not

17 say anything about whether the decision to pay a 3% fee for mission-critical data

18 was reasonable. A purported defect in the process corporate (or non-profit)

19 fiduciaries use to arrive at a decision does not, standing alone, amount to a breach

20 of fiduciary duty. Absent any evidence that the amount of the Service Fee was

21 unreasonable or that the Trustees engaged in self-dealing, Plaintiff cannot establish

22 a breach of fiduciary duty by attacking the process the Trustees used in

23 implementing that fee.

24        In sum, at the time the Fund approved the 2013 Data Agreement, its Board

25 of Trustees was constituted in precisely the manner specified in the operative

26 Declaration of Trust, and the purchase of data from the Unions was a transaction

27 expressly contemplated by and authorized by the Declaration of Trust. As a matter

28 of trust law, the transaction was proper so long as the amount of the Service Fee

payable under the Agreement was reasonable.  Despite 18 months of discovery, Plaintiff has adduced no facts to show that the 3% Service Fee was inherently unreasonable – i.e., that *no prudent Trustee* could have voted to pay that amount to the Unions in exchange for the important data provided by the Unions to the Fund.

Plaintiff will not be able to offer *any* factual evidence or expert opinion testimony at trial that the amount of the service fee is unreasonably high, relative to the value that the Fund derives from the Union information in carrying out its mission of locating and paying non-featured performers.

### E.   Plaintiff's Secondary Claims Also Fail as A Matter Of Law.

If Plaintiff cannot establish that the decision to approve the Service Fee constituted a breach of fiduciary duty, his other claims must also fail.  For example, if Defendants did not breach their fiduciary duties by implementing the Service Fee, Plaintiff cannot establish a "wrongful" taking of property—as is necessary to prevail on a claim for conversion.  *See Lee*, 61 Cal. 4th at 1240 (2015).  Nor could he establish that "equity and good conscience" requires the return of the Service Fee, which is fatal to his claim for money had and received.  *See Mains v. City Title Ins. Co.*, 34 Cal. 2d 580, 586 (1949).  And if Plaintiff lacks any "viable underlying claim" against Defendants, he cannot be entitled to declaratory relief.  *Shaterian v. Wells Fargo Bank, N.A.*, 829 F. Supp. 2d 873, 888 (N.D. Cal. 2011).

Plaintiff's claim for conversion independently fails because the evidence at trial will not establish that Plaintiff or other non-featured performers had a protected property interest in their royalties.[7]  Plaintiff asserts that, because the Copyright Act requires the Fund to collect and distribute royalties to non-featured performers, those performers necessarily have a property interest in those royalties—and, by

---

[7] While the court declined to grant summary judgment on this issue, Judge Snyder expressly acknowledged at the hearing that she was not making a definitive determination that Plaintiff or other non-featured performers had a property interest in the royalties.  Instead, the Court stated that she would wait until the development of a full evidentiary record at trial before making a final determination.

extension, the Service Fee.  But even if the Copyright Act requires the Fund to collect and distribute royalties to non-featured performers as a class, that does not establish a cognizable property interest sufficient to sustain a claim for conversion.

The premise of Plaintiff's conversion claim is that, because the Copyright Act specifies the amount of royalties the Fund must collect and distribute, it gives each non-featured performer a property interest in her share of those royalties.  But even if the Copyright Act specifies the *aggregate* amount of royalties the Fund must collect and distribute, subject to the deduction or reasonable costs—that is, the 5% of royalties generated by the Section 114 statutory license that are no being paid to copyright owners or featured artists—it does not follow that each performer has a property interest in his or her pro rata share of those royalties—regardless of how small that theoretical share might be, or how disproportionately large the costs the Fund would have to incur to research and distribute a *de minimis* payment.  To the contrary, the statute requires only that the royalties be distributed to "nonfeatured vocalists" and "nonfeatured musicians."  17 U.S.C. § 114(g)(2)(B)-(C).  Absent any textual basis for Plaintiff's claim that *each individual performer* is entitled to a distribution of royalties, there is no basis for Plaintiff's assumption that the Copyright Act gives each performer a property interest in those royalties.

It would be particularly absurd to read the Copyright Act to give each non-featured performer a property interest in his or her royalties because, as a practical matter, many of those royalties amount to mere pennies.  In those cases, the costs associated with identifying each such performer and distributing his or her pro rata share of royalties would greatly outstrip the *de minimis* royalties to which he or she is entitled.  If the Copyright Act gave each performer a property interest in his or her pro rata share of the royalties, no matter how large or small, the Fund would be forced to incur tremendous administrative costs—which, in turn, would greatly reduce the total royalty pool available for distribution.

The practical impossibility of complying with that interpretation of the Act

DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW

*necessarily informs* the statutory interpretation question.   Adopting Plaintiff's reading of the Copyright Act would accordingly "thwart the purpose of the overall statutory scheme" and "lead to an absurd result"—both of which counsel against concluding that the Copyright Act grants each individual performer a property interest in his or her share of the royalties.  *Andrews v. Sirius XM Radio Inc.*, 932 F.3d 1253, 1260 (9th Cir. 2019) (citations and internal quotation marks omitted); *see Tovar v. Sessions*, 882 F.3d 895, 904 (9th Cir. 2018).

The degree of discretion inherent at every step of the royalty distribution process is fatal to Plaintiff's claim that he had a property interest in the Service Fee. Consistent with this view, the Trust Agreement expressly provides that "[n]o artist or any person claiming by or through such artist … shall have any right, title, or interest in or to the Fund or any property of the Fund or any part thereof except as may be specifically determined by the Trustees."  Sullivan Decl., Art. XII, § 4.

Moreover, even assuming *arguendo* that the Copyright Act did not give the Fund discretion as to the allocation of royalties, it assuredly gave the Fund discretion to deduct "reasonable costs," including those associated with the "collection, distribution and administration of the royalties."  17 U.S.C. § 114(g)(3). The use of the phrase "reasonable costs"—particularly when contrasted with the fixed 2.5% royalties provided by Section 114(g)(2)—makes clear that the statute gives the Fund considerable discretion to set the *amount* of the Service Fee.  Indeed, many courts, including the Supreme Court, have held that the use of the term "reasonable" in a statute or regulation suggests a degree of discretion inconsistent with the existence of an enforceable property right.[8]

That reasoning applies with equal force here.  As explained above, the

---

[8] *See, e.g.*, *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 763 (2005) (holding that statute requiring police to use "every reasonable means" to enforce a restraining order did not give rise to a protected property right, as "[s]uch indeterminacy is not the hallmark of a duty that is mandatory"); *Jacobson v. Hannifin*, 627 F.2d 177, 180 (9th Cir. 1980).

Copyright Act's use of the phrase "reasonable costs" does not restrict the Fund's discretion as to the *amount* of the Service Fee with the degree of precision necessary to create a legally cognizable property interest in that fee. Because the Copyright Act does not give Plaintiff a cognizable property interest in either his share of the royalties or in the Service Fee, his claim for conversion necessarily fails.

## IV.   SUMMARY OF DEFENSES, THE ELEMENTS THEREOF, AND DEFENDANTS' SUPPORT FOR EACH DEFENSE

### A.   <u>First Defense</u>: Failure to State a Claim

Plaintiff's Complaint, and each cause of action therein, fails to state a claim upon which relief can be granted. *See* Section IV, *supra*.

### B.   <u>Second Defense</u>: Compliance with Applicable Laws

Plaintiff's claims are barred, in whole or in part, because implementation of the Service Fee complies with 17 U.S.C. § 114(g) and other applicable laws.

<u>Support</u>: The Copyright Act expressly empowers royalty distribution entities, like the Fund, to incur "reasonable costs" associated with distributing statutory royalties and to deduct such costs from the funds disbursed. 17 U.S.C. § 114(g)(3). This would include compensating the Unions for the invaluable services and information on non-featured performers that they provide to the Fund. *See* Section IV.C, *supra*.

### C.   <u>Third Defense</u>: Punitive Damages – Cal. Civil Code § 3294

Neither Plaintiff nor the putative class is entitled to recover punitive or exemplary damages because Plaintiff has failed to allege and cannot establish facts sufficient to show that Defendants are guilty of oppression, fraud or malice within the meaning of Section 3294 of the California Civil Code.

<u>Support</u>: *See* Section VI, *infra*.

### D.   <u>Fourth Defense</u>: Punitive Damages – Due Process

Any award of punitive or exemplary damages to Plaintiff or the putative class would violate the constitutional rights of Defendants under the United States and

California Constitutions, including but not limited to the Due Process Clause of the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 7 of the California Constitution.

Support:  *See* Section VI, *infra*.

## V.   EVIDENTIARY ISSUES

The parties have filed a total of five motions in limine.  Three of those motions seek to exclude expert testimony pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  Plaintiffs have also filed motions in limine to preclude Defendants from introducing evidence of their "50-song survey" and their state of mind in approving the Data Agreement. Defendants have addressed these motions at length in their briefing, but they set forth a brief summary of their position on these evidentiary issues below:

Plaintiff's Expert Mark Bookman: While Plaintiff's expert Mark Bookman purports to opine on "prevailing standards of good governance in the nonprofit sector," his report consists of improper legal conclusions—which warrants the exclusion of his testimony.  *See generally Crow Tribe of Indians v. Racicot*, 87 F.3d 1039, 1045 (9th Cir. 1996) ("Expert testimony is not proper for issues of law."). Mr. Bookman's testimony is separately inadmissible because he purports to opine on the reasonableness of the Data Agreement, but made no sustained effort to measure the value of the data the Fund agreed to purchase from the Unions—as would be required to opine that the amount of money the Fund agreed to pay was unreasonable.  And Mr. Bookman *could not* competently opine about the value of this data, as he lacks key experience —including experience in finance, accounting, and economics, as well as meaningful experience with the entertainment industry— that he would require to do so.  His general expertise in non-profit governance does not permit him to opine on the reasonableness of the Service Fee—particularly absent any attempt to quantify its economic value.  Mr. Bookman's testimony

regarding the reasonableness of the Service Fee amounts to improper and inadmissible *ipse dixit.  See Gen. Elec. Co. v. Joiner*, 552 U.S. 136, 146 (1997).

<u>Plaintiff's Expert Barrie Kessler</u>:  Ms. Kessler is the former Chief Operating Officer of SoundExchange, Inc., a performance rights organization responsible for distributing certain statutory royalties to copyright owners and featured performers. Because SoundExchange purportedly never paid for the provision of data concerning royalty-bearing recordings or associated performers, Ms. Kessler opines that such a fee arrangement from the Fund to the Unions is unreasonable.

But that testimony is entirely irrelevant, as SoundExchange does not perform the same research functions as the Fund and is responsible for distributing royalties to copyright owners and featured performers—who, unlike *nonfeatured* performers, are readily identifiable based on public information.  In contrast, the Fund is charged with conducting research to identify the non-featured performers who can frequently only be identified with reliable accuracy from session reports that are collected, maintained, and provided to the Fund by the Unions.  Ms. Kessler's comparison between the Fund and SoundExchange is akin to comparing apples and oranges. And her testimony is also inadmissible for other reasons: she lacks any relevant expertise in economics, appraisal, or accounting (as would be required to offer an opinion about whether the amount the Fund agreed to pay is reasonable), and she agreed that Plaintiff's counsel essentially ghost-wrote her report.

<u>Defendants' Expert David Nolte</u>: Plaintiff seeks to exclude Defendant's expert, David Nolte, based on purported flaws in the methodology Mr. Nolte used to conclude that the 3% Service Fee was reasonable.  Plaintiff's claims are baseless. Mr. Nolte has over 40 years of experience valuing businesses and business assets, with a particular focus on intellectual property and royalties.  Mr. Nolte brought that experience to bear in assessing the "50 song exercise"—a study conducted by Fund researchers to determine the accuracy of performer information without Union data.  The 50 song exercise demonstrates that, absent Union data, there is a 60%

error rate in performer information.  Mr. Nolte correctly opined that the sheer magnitude of the error rate—60%—highlights the value of the data the Fund agreed to purchase and illustrates that the Fund's decision to purchase it was reasonable. And while Plaintiff nitpicks at both the 50 song exercise and Mr. Nolte's interpretation of the data, those quibbles are meritless.  At most, they go to the weight accorded to Mr. Nolte's testimony—not its admissibility.

The 50 Song Exercise: Plaintiff has also attempted to exclude the results of the 50 song exercise and accompanying information compiled at the direction of Julie Sandell, the manager of the Fund's Sound Recording Division.  Plaintiff's arguments are uniformly meritless.  For example, Plaintiff asserts that Ms. Sandell lacked the statistical expertise necessary to develop the "statistical model" for the 50 song exercise.  But he mischaracterizes her role in the project, which entailed selecting the 50 song titles used in the exercise and then supervising a team of Fund researchers as they attempted to locate non-featured performers on those titles without the assistance of session reports provided by the Unions.  Ms. Sandell's selection of song titles did not require any statistical expertise, and Plaintiff's criticisms of her methodology go, at most, to the weight accorded to her testimony.

And while Plaintiff claims that Defendants failed to disclose all pertinent information about this exercise, that is false: Defendants have produced all documents relating to the 50 song exercise, and Plaintiff will have an opportunity to depose Ms. Sandell on June 29—just as the Court directed.  Sullivan Decl., ¶ 10.

In addition to criticizing the 50 song exercise on methodological grounds, Plaintiff argues that it is irrelevant because the rate at which the Fund misallocates royalties in the absence of Union data (60%) does not bear on the ultimate question of whether the Fund's Trustees breached their fiduciary duties.  But Plaintiff has repeatedly insisted that the session report data provided by the Unions in exchange for the Service Fee has little or no value.  The 50 song survey shows how specious

that contention is, and it is plainly relevant to rebut Plaintiff's incorrect assertion that

the Union session reports have little to no value.

    <u>Defendants' State of Mind</u>.   Defendants appropriately withheld their

privileged communications with Patricia Polach, an attorney for the Fund, in

discovery.   Plaintiff now seeks a broad order precluding Defendants from testifying

as to their state of mind, and he asserts that such an order is appropriate because

Defendants did not "open up discovery to everything that informed that state of

mind, including privileged matters."   Defendants agree that they cannot assert an

advice-of-counsel defense or offer previously-withheld evidence of their

communications with Ms. Polach at trial.[9]   But Plaintiff is simply incorrect that

Defendants' assertion of the privilege precludes them from offering *any* evidence

at all as to their state of mind.

    It is well-established that a party can seek to establish its *own* good faith or

state of mind "without resort to its attorneys' communications."   *Home Indem. Co.

v. Lane Powell Moss & Miller*, 43 F.3d 1322, 1327 (9th Cir. 1995).   That is precisely

what Defendants have done so far and will do at trial.   While Plaintiff speculates

that Defendants' state of mind necessarily reflects the advice they received from

Ms. Polach, California law makes clear that a party does not place its attorneys'

advice at issue by invoking its own state of mind as a defense.   Plaintiff asserts that

a party cannot use the privilege as a sword and a shield, but that rule does not apply

here because Defendants have not sought to rely on any attorney-client

communications and have not used the privilege as a metaphorical sword.

    Plaintiff relies heavily on the Second Circuit's decision in *United States v.

Bilzerian*, 926 F.2d 1285 (2d Cir. 1991), but that case does not assist him. *Bilzerian*

---

[9]   For the same reasons, Defendants will object to any attempt by Plaintiff to
introduce testimony from Dennis Dreith, former trustee Thomas Lee, or other former
Fund personnel or trustees regarding communications with Ms. Polach containing
legal advice.   The attorney-client privilege is held by the Fund and has not been
waived, and neither Mr. Dreith nor Mr. Lee is authorized to waive it.

does not apply California privilege law.  It also conflicts with the holdings of other courts, which have agreed that a party does not place his attorney's advice at issue by asserting that it acted in good faith or with a proper state of mind.  And despite Plaintiff's insistence of the contrary, courts have limited *Bilzerian* to cases in which a party asserts that he relied on the advice of counsel.  This Court should not extend *Bilzerian* to preclude Defendants from testifying as to their *own* state of mind.

## VI.   ISSUES OF LAW

Under section 3294(a) of the California Civil Code, "punitive damages are only available 'where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice.'"  *Bourget v. Allstate Ins. Co.*, 2007 WL 9705900, at *6 (C.D. Cal. Jan. 4, 2007) (quoting Cal. Civ. Code § 3294(a)).  Although the definitions of "oppression," "fraud," and "malice" differ in certain particulars, all three prongs require a showing of "despicable" conduct— *i.e.*, "conduct that is so vile, base, contemptible, miserable, wretched or loathsome that it would be looked down upon and despised by ordinary decent people."  *In re First Alliance Mortg. Co*., 471 F.3d 977, 998 (9th Cir. 2006).

At trial, there will be no evidence—let alone clear and convincing evidence— that the Fund or its Trustees engaged in "despicable" conduct.  Even if the Plaintiff's quibbles with the amount of the Service Fee or the process whereby it was implemented had merit (which they do not), his conclusory allegations of wrongful motive do not come close to establishing that any Defendant acted with fraud, oppression, or malice.

## VII.   ATTORNEY'S FEES

Defendants do not seek attorney's fees in this action.

## VIII.  ABANDONMENT OF ISSUES

Defendants asserted in their Answer that Plaintiff's claims are barred by the statute of limitations and by a failure to pursue administrative remedies, but they do not intend to pursue those defenses at trial.

Dated:    June 28, 2021                    JENNER & BLOCK LLP


/s/ Andrew J. Thomas
Andrew J. Thomas
Alexander M. Smith
Andrew G. Sullivan
Anna K. Lyons

*Attorneys for All Defendants*

DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW