JENNER & BLOCK LLP
Andrew J. Thomas (Cal. Bar No. 159533)
ajthomas@jenner.com
Alexander M. Smith (Cal. Bar No. 295187)
asmith@jenner.com
Andrew G. Sullivan (Cal. Bar No. 301122)
agsullivan@jenner.com
Anna K. Lyons (Cal Bar No. 324090)
alyons@jenner.com
633 West 5th Street, Suite 3600
Los Angeles, CA 90071
Telephone: (213) 239-5100
Facsimile:  (213) 239-5199

*Attorneys for All Defendants*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEVIN RISTO, on behalf of himself and all others similarly situated, <br><br> Plaintiff, <br><br> vs. <br><br> SCREEN ACTORS GUILD-AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS, a Delaware corporation, et al., <br><br> Defendants. | Case No. 2:18-cv-07241-CAS-PLA <br><br> Class Action <br><br> **OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE NO. 1 TO EXCLUDE THE TESTIMONY AND OPINIONS OF DAVID NOLTE** <br><br> Hearing Date:   July 19, 2021 <br> Hearing Time :   11:00 a.m. <br> Courtroom:   8D (Telephonic) <br><br> [Declaration of Andrew G. Sullivan, with Exhibits 1-14, filed concurrently] |

**TABLE OF CONTENTS**

I.  INTRODUCTION ..................................................................................................1

II. BACKGROUND ....................................................................................................1

III. ARGUMENT .........................................................................................................3

  A. Mr. Nolte is a Highly Qualified Appraiser and Economics Expert. ...................................................................................................3

  B. Plaintiff's Criticism of Mr. Nolte's Conclusions Regarding the Market for the Sale of Data Does Not Merit Exclusion ......................4

  C. The 50-Song Exercise Amply Illustrates the Value of Union Data ....5

    1. The Basis and the Results of the 50-song exercise are Clear....6

    2. Mr. Nolte's Understanding of the Underlying Data is Correct ..........................................................................................8

  D. Mr. Nolte Properly Applied the *Georgia-Pacific* Factors ...................9

IV. CONCLUSION ....................................................................................................10

# I. INTRODUCTION

Plaintiff's motion fails to meet the threshold for exclusion of expert opinion established by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny. The motion rests on a myopic view of the qualifications of Defendants' expert David Nolte, fundamentally mischaracterizes Mr. Nolte's testimony, and grossly misstates the law. *See* Dkt. 122, Plaintiff's MIL No. 1. None of Plaintiff's arguments provides a basis to exclude or limit Mr. Nolte's testimony at the upcoming bench trial.

# II. BACKGROUND

As the Court is aware, the AFM & SAG-AFTRA Intellectual Property Rights Distribution Fund (the "Fund"), the American Foundation of Musicians ("AFM"), and the Screen Actors Guild-American Federation of Radio and Television Artists ("SAG-AFTRA") entered into the Data Purchase and Services Agreement ("Data Agreement") in 2013.[1] In exchange for the Unions' provision of data the Fund uses to locate and pay non-featured performers, the Agreement requires the Fund to pay the Unions a "Service Fee" equivalent to 3% of the amount allocated for distribution to non-featured performers.

Mr. Nolte assessed the reasonableness of the 3% Service Fee in light of the utility of the Unions' data to the Fund. Declaration of Andrew G. Sullivan ("Sullivan Decl."), Ex. 1 (Nolte Report at 1). Mr. Nolte has more than 40 years of experience as an appraiser, accountant, and auditor; he specializes in valuing businesses, intangible business assets, and intellectual property. He has testified as an economic and valuation expert in hundreds of cases. *See id.*, Ex. 14.

Mr. Nolte concluded that without access to the Unions' data, the Fund would not be able to make as many or as accurate distributions to non-featured performers as it currently does. He also concluded that, as an economic matter, the 3% Service

---

[1] This brief refers to AFM and SAG-AFTRA collectively as the "Unions." It refers to the Fund, the Fund's Trustees, and the Unions collectively as "Defendants."

1   Fee was reasonable based on the value to the Fund of the information that the
2   Unions provided.  *Id.*, Ex. 1 at 13.  <u>First</u>, Mr. Nolte explained that licensing
3   arrangements for the use of information, like the Data Agreement here, are not
4   uncommon and are structured in a variety of ways – none of which correspond to
5   the incremental cost incurred by the vendor in providing data to the licensee.  *Id.*
6   <u>Second</u>, based on data gathered in a project conducted by the Fund's research team,
7   Mr. Nolte observed a wide margin of error when researchers lacked access to the
8   Unions' session reports when analyzing a sample of 50 song titles.  *Id.* at 17-18.
9   Among the 50 titles examined, the Fund would have misallocated royalties in 60%
10  of cases without access to session reports – results that Mr. Nolte has extrapolated
11  to determine the rate of misallocation that would occur if this same error rate
12  occurred across a larger scale of royalty distributions.  *Id.*  <u>Third</u>, Mr. Nolte applied
13  the factors established in *Georgia-Pacific Corp. v. United States Plywood Corp.*,
14  318 F. Supp. 1116 (S.D.N.Y 1970) to conclude that the 3% Service Fee is a
15  reasonable royalty for the Union data.  Sullivan Decl., Ex. 1 at 21.

16        Plaintiff objects to Mr. Nolte's testimony on several grounds:  <u>First</u>, he argues
17  that Mr. Nolte is merely "an accountant" who is unqualified to opine on any subjects
18  other than the Fund's financial statements.  Mot. at 4.  <u>Second</u>, he argues that Mr.
19  Nolte's conclusion that there is precedent for the Data Agreement and Service Fee
20  based on a canvass of the data licensing market should be excluded because Mr.
21  Nolte did not consider the licensing models of online movie and baseball
22  sabermetrics databases.  *See id.*  <u>Third</u>, he asserts that the Court should exclude Mr.
23  Nolte's conclusion about the value of the Union data to the accuracy of Fund
24  distributions because Mr. Nolte (1) did not personally conduct the research exercise
25  underlying his analysis; (2) declined to testify to the details of a document created
26  by the Fund; and (3) allegedly did not review the material underlying his
27  conclusions.  *See id.* at 6.  <u>Fourth</u>, he argues that Mr. Nolte's use of the *Georgia-*
28

*Pacific* factors to assess whether the 3% Service Fee is reasonable is unjustified because this is not a patent case nor is the Service Fee a license. *See id.* at 8-9.

Plaintiff's scattershot critiques all go to the weight of the evidence, not admissibility. They provide no basis to exclude Mr. Nolte's testimony at trial.

### III.  ARGUMENT

Expert testimony is admissible under Federal Rule of Evidence 702 if it "rests on reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597.  Courts have broad latitude in determining both *whether* an expert's testimony is reliable and *how* to assess its reliability.  *United States v. Hankey*, 203 F.3d 1160, 1167 (9th Cir. 2000).  "Disputes as to the strength of [an expert's] credentials, faults in his use of [a particular] methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony."  *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1231 (9th Cir. 1998).[2]  The second prong of the *Daubert* analysis—relevancy or "fit"—is satisfied if the proposed expert testimony "logically advances a material aspect of the proposing party's case."  *Redfoot v. B.F. Ascher & Co.*, 2007 WL 1593239, at *4 (N.D. Cal. June 1, 2007).

**A.    Mr. Nolte is a Highly Qualified Appraiser and Economics Expert.**

At the outset of his Motion, Plaintiff acknowledges that Mr. Nolte's company is "a financial and economics consulting firm specializing in complex litigation, investigation and appraisal issues," and that "[s]ince 1977, Mr. Nolte's single largest area of practice is intellectual property." Mot. at 1. Nevertheless, Plaintiff then asserts that Mr. Nolte is only an "accountant" who is not qualified to offer testimony that extends beyond an analysis of the Fund's financial statements. *Id.* Plaintiff is wrong. Mr. Nolte has more than 40 years of experience as an appraiser,

---

[2] *See also Fresenius Med. Care Holdings, Inc. v. Baxter Int'l, Inc.*, 2006 WL 1390416, *3 (N.D. Cal. May 18, 2006) ("Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded.").

accountant, and auditor, with a specialty in valuing businesses and intellectual property. *See* Sullivan Decl., Ex. 14. Plaintiff's motion ultimately, albeit grudgingly, notes Mr. Nolte's specialty in intellectual property appraisals. Mot. at 9. In fact, Mr. Nolte has testified in more than 100 cases in this area. *See* Sullivan Decl., Ex. 14.[3] Intellectual property valuation and damages cases have made up the largest part of his work for the past 40 years. *See id.*, Ex. 2 (Nolte Tr., 22:11-20).

Plaintiff also attempts to question Mr. Nolte's qualifications as an expert by claiming he has failed to survive *Daubert* challenges in two cases, *In re POM Wonderful LLC*, 2014 U.S. Dist. LEXIS 40415 (C.D. Cal. Mar. 25, 2014) and *F.O.B. Instruments, Ltd v. Krown Mfg.*, 2008 U.S. Dist. LEXIS 105158, at 5-6 (D. Md. May 19, 2008). Unlike here, in *F.O.B.* the Court found that Mr. Nolte was not provided with information from his client's adversary that was necessary to conduct his analysis. 2008 U.S. Dist. LEXIS 105158, at *5, 7. *POM Wonderful* is inapposite because it involved de-certification of a class for failure to meet the then-newly established stringent predominance standard, not a *Daubert* challenge. 2014 U.S. Dist. LEXIS 40415, at *14, 21-22.[4] Plaintiff's strained attempt to cast doubt on Mr. Nolte's credentials, based on two inapposite cases involving procedural peculiarities rather than the quality of his expert analysis, should be disregarded.

### B. Plaintiff's Criticism of Mr. Nolte's Conclusions Regarding the Market for the Sale of Data Does Not Merit Exclusion.

Plaintiff next attempts to manufacture a *Daubert* issue out of his unfounded criticism of Mr. Nolte's conclusion that the payment of the Service Fee to the Unions is consistent with the practices of many businesses that charge for the use

---

[3] The attached resume lists only representative engagements, and is not a comprehensive list of all past testimony provided by Mr. Nolte.

[4] *Cf. Mednick v. Precor, Inc.*, 2017 WL 2619139, at *9 (N.D. Ill. June 16, 2017) (finding *POM Wonderful* court "incorrect[ly]" applied "exacting scrutiny").

of information by claiming that Mr. Nolte used "an inadequate, flawed methodology." Mot. at 4. Plaintiff's argument falls flat for several reasons:

<u>First</u>, expert testimony contextualizing a party's actions, like Mr. Nolte's testimony contextualizing the Unions' license of data to the Fund within the data licensing market, is admissible. *United States v. Garcia*, 635 F.3d 472, 476-77 (10th Cir. 2011) (expert testimony admissible in order to provide jurors a context for defendants' actions). <u>Second</u>, Plaintiff's criticism is inapposite because the Unions are non-profits, and their primary business is improving their members' working conditions – not the sale of data. Plaintiff faults Mr. Nolte for failing to consider the "pricing models of relevant businesses" like IMDbPro, an online movie database, and baseball-reference.com, a sports statistics database. But under Plaintiff's theory, these databases—which charge a flat monthly fee—are also not "relevant," because they are for-profit companies. Mot. at 4. More important, the examples Plaintiff proposes involve nonexclusive licenses to provide *public information* (not private data) to thousands of subscribers (not a single user).

Perplexingly, Plaintiff also asserts that the "Services Agreement is not a license." *See id.* at 4-5. But—as Mr. Nolte explained at deposition—the structure of the economic transaction at the heart of the Data Agreement does not change based on whether one labels it as a "licensing fee," a "royalty," a "Service Fee," or any other moniker Plaintiff wishes to employ. *See id.* (Nolte Tr. 166:16-23; 178:15-180:9). Mr. Nolte also explained that such fee arrangements can be by percentage, by unit, or based on a flat fee. Drawing on the examples in his report, Mr. Nolte explained "there's no question that … the fee for the usage of intellectual property increases as usage goes up." *Id.*, (Nolte Tr. 170:8-172:1; 173:5-174:11).

### C. The 50-Song Exercise Amply Illustrates the Value of Union Data.

Plaintiff claims Mr. Nolte's conclusion that the Fund would not be able to make as accurate distributions without Union data should be excluded on three grounds: (1) the methodology of the Fund's 50-song exercise, (2) Mr. Nolte's

understanding of the underlying data, and (3) Mr. Nolte's access to documents underlying his conclusion. *See* Mot. at 6. Plaintiff is mistaken on all counts.

### 1. The Basis and the Results of the 50-Song Exercise are Clear.

Rule 702 was *not* intended to address "issues of methodology, survey design, reliability … [and] critique of conclusions." *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1038 (9th Cir. 2010). Rather, such evidence is properly tested through "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Id.*

Plaintiff contends that the Fund's 50-song exercise and the underlying data, as well as the summary of the Fund's AS400 database, should be excluded because Mr. Nolte did not personally conduct the sampling or research. Mot. at 6. Plaintiff's contention is contrary to the law and mischaracterizes Mr. Nolte's testimony. An expert need not have percipient knowledge of the facts underlying his conclusion. Rather, it is well-established that he can rely on factual investigations conducted by others. *See Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1142 (9th Cir. 1997) (affirming admission of expert opinion based on research by others, although expert "did not personally do any of the work upon which his opinions are based").

Moreover, Mr. Nolte testified that Fund personnel completed the 50-song exercise following a discussion with him regarding the project's objectives, how to report, and the impact of Union data on the accuracy of royalty allocations. Sullivan Decl., Ex. 2 (Nolte Tr., 124:18-126:11). Mr. Nolte also clarified that the Fund conducted the research to carry out the project and that this was appropriate. *Id.* at 124:25-126:11. Mr. Nolte was clear that he was "not involved in the sample selection" and that "[t]he Fund made the sample. The Fund indicated that in their mind it was random and it was sufficiently large to accomplish its purpose." *Id.* at 117:22-118:15. In any event, Mr. Nolte explained that the only consequence of a small or technically non-random sample is that "statistical inferences cannot be expressed in terms of precision and confidence levels." *Id.* at 120:7-11.

6
DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE NO. 1

Plaintiff seizes on this statement to argue that Mr. Nolte's conclusions are statistically invalid. *See* Mot. at 6. But Mr. Nolte does not purport to express his opinions in terms of statistical precision and confidence intervals, and he made clear he "did not draw[] any conclusions using the tools of inferential statistics." *Id.*, Sullivan Decl., Ex. 2 (Nolte Tr. 122:15-25). Rather, Mr. Nolte explained it is appropriate to extrapolate from small, technically non-random samples when a high rate of consistency appears across the data set – such as the 60% misallocation that occurred when the 50 titles were researched without session reports.[5] In any event, the size or composition of a sample is not a basis to exclude expert testimony; such criticisms go to the weight, not the admissibility, of expert opinion evidence.[6]

Plaintiff raises another factual issue in criticizing Mr. Nolte for failing to consider whether the Fund "could have implemented an electronic system at the time of recording which would provide an alternative, more cost-effective method of capturing data." Mot. at 5. This is not a basis to exclude Mr. Nolte's testimony. *See Obrey v. Johnson*, 400 F.3d 691, 695 (9th Cir. 2005) ("[O]bjections to a study's completeness generally go to 'the weight, not the admissibility of the statistical evidence,' and should be addressed by rebuttal, not exclusion.").

---

[5] Mr. Nolte offered the example of the number of fingers the average person has: if Mr. Nolte asked the participants present at his deposition to hold up their fingers and each participant had ten fingers, he could extrapolate that humans have ten fingers. This extrapolation would be valid even based on the handful of people present at his deposition, which was clearly a small, non-random sample. *See id.*, Ex. 2 (Nolte Tr. 123:12-124:17).

[6] *See, e.g.*, *Alaska Rent-A-Car, Inc. v. Avis Budget Group, Inc.*, 738 F.3d 960, 970 (9th Cir. 2013) (objections to expert's extrapolations based on a small and non-representative sample went to weight not admissibility); *Nucci v. Rite Aid Corp.*, 2020 WL 3187335, at *8 (N.D. Cal. June 14, 2020) (arguments that "survey responses were not randomly selected, the sample size was too small, and responses were possibly tainted by self-interest bias" went to weight, not admissibility); *Abu-Lughod v. Calis*, 2015 WL 12731921, at *4 (C.D. Cal. July 1, 2015) (finding that argument about insufficient sample size went to weight, not admissibility).

This argument from Plaintiff—in which he suggests the Fund's creation of some massive new computer system—is unavailing for multiple reasons. <u>First</u>, there is no evidence in this case that such a system is even feasible, would be adopted by recording studios and record labels, or ultimately would be "more cost effective" than the Service Fee. <u>Second</u>, the Fund has no practical means or authority to incur the substantial cost of developing such a system, even if the potential savings might be beneficial to non-featured performers in the future. Mr. Nolte explained that establishing such a system would be outside the Fund's mandate – *i.e.*, the Fund operates as a "pass-through vehicle," receiving royalties and distributing royalties to beneficiaries, and Plaintiff's suggestion that Fund should invest millions of dollars otherwise payable to *current* beneficiaries for the possible benefit of *future* beneficiaries is antithetical to this "pay-as-you-go" system. Sullivan Decl., Ex. 2 (Nolte Tr. 214:16-216:19).[7]

### 2. Mr. Nolte's Understanding of the Underlying Data is Correct.

Plaintiff claims that Mr. Nolte's conclusion that without the Unions' data the Fund would be unable to distribute royalties as accurately should be rejected because Mr. Nolte declined to testify about the creation of a document prepared by the Fund. *See* Mot. at 7. When asked about the meaning of the phrase "supported by Union data" in the AS400 database summary prepared by the Fund, Mr. Nolte said that he understood the phrase to mean the Unions had data regarding the participants in those instances. *Id.*, Ex. 2 (Nolte Tr. 147:14-148:2). Julie Sandell testified in her recent deposition that this understanding is correct.[8]

---

[7] Specifically, Plaintiff's suggestion that the Fund establish such a system is contradictory to his claim that each non-featured performer has a property right in the royalties payable to them. Under Plaintiff's own theory, the Fund would not be justified in using participants' royalties to pay the start-up costs of such a system.

[8] As Ms. Sandell explained at her recent deposition, "Supported by Union Data" either means that a session report was provided by a Union, or else that a symphonic "roster" was produced by AFM subsidiary ICSOM. A symphonic roster is the analog to a session report in the symphonic space; the Fund uses

Plaintiff also claims it is "suspicious" that the AS400 summary shows that a high percentage of distributed royalties are supported by Union data when Stefanie Taub testified that the Unions provide session reports in response to approximately 25% of requests. *See* Mot. at 7-8. This argument grossly mischaracterizes Ms. Taub's testimony. As Defendants have now repeatedly explained, Ms. Taub testified that these figures—based on the Fund's researchers remembering to click a "radio button" when inputting research data—were a "floor" of instances in which Unions provided session reports, due to researchers' inconsistent use of the radio button. There is no conflict between Ms. Taub's testimony and the AS400 spreadsheet. Mr. Nolte said as much during his deposition, in which he explained that the "unreliability" of the Fund's data stems from "the Union involvement or the Union data [] being significantly understated … [so] all of these numbers for the Unions should, in fact, be higher." *Id.*, Ex. 2 (Nolte Tr. 150:6-151:18).[9]

### D. Mr. Nolte Properly Applied the *Georgia-Pacific* Factors.

Finally, Plaintiff seeks to exclude Mr. Nolte's opinions by arguing that the *Georgia-Pacific* framework is inapplicable to this case. *See* Mot. at 8-9. But the *Georgia-Pacific* framework supplies a widely accepted methodology to value intellectual property of all types based on a hypothetical negotiation.[10]

---

rosters to identify the non-featured performers on a symhponic recording, as they do with session reports on other recordings. *Id.*, Ex. 7 (Sandell Rough Tr. 54:5-54:10, 57:21-58:8).

[9] Plaintiff also attempts to exclude the portion of Mr. Nolte's report regarding the market share of record companies to support his finding that the Unions' data covers a substantial portion of performers and sound recordings. Plaintiff claims Mr. Nolte never accessed or reviewed the article to which he cites. Mot. at 8. This is obviously incorrect, as Mr. Nolte *reproduced the relevant chart* from the underlying article in the body of his report. *Id.*, Ex. 1 at 8.

[10] Although the *Georgia-Pacific* factors arose in a patent context, courts have applied the factors in a variety of other contexts as well *See, e.g., Vermont Microsystems, Inc. v. Autodesk, Inc.*, 88 F.3d 142, 151 (2d Cir. 1996) (holding the *Georgia-Pacific* factors should have been applied to a trade secret claim);

Courts recognize that the precise factors that apply in any particular reasonable royalty exercise will vary. The *Georgia-Pacific* factors are probative on the issue of the royalty rate to which reasonable business people would agree, but the factors are not mandatory or exclusive. *Lucent Technologies, Inc. v. Multimedia Patent Trust*, 580 F.Supp.2d 1016, 1042 (2008) (instructing jury it could "consider factors including, but not limited to, commonly applied *Georgia-Pacific* factors"); *Micro Motion, Inc. v. Exac Corp.*, 761 F. Supp. 1420, 1434 (N.D. Cal. 1991) (determining the terms to which willing parties would agree can involve "any other economic factor that normally prudent businessmen would, under similar circumstances, take into consideration in negotiating the hypothetical license").

Plaintiff asserts that none of the factors Mr. Nolte considered are tied to a 3% Service Fee. *See* Mot. at 9. Mr. Nolte rightly acknowledged that because this is not a patent case, not all of the *Georgia-Pacific* factors are equally applicable, but he explained in detail that many of the *Georgia Pacific* factors are nonetheless useful in the assessment of a reasonable royalty. *Id.*, Ex. 1 at 21; Ex. 2 (Nolte Tr. 161:13-162:17). Mr. Nolte also explained that he did not address what the highest correct percentage fee could be, or whether it could be a number other than 3 percent. Instead, he confined his inquiry to the central issue of whether the 3 percent Service Fee is *economically reasonable*, and he concluded that it was, based on the utility of the Union data in making the most accurate distributions possible. *Id.*, Ex. 1 at 1; Ex. 2 (Nolte Tr., 204:3-8).

## IV. <u>CONCLUSION</u>

This Court should permit Mr. Nolte's testimony at trial.

---

*Marketquest Group, Inc. v. BIC Corporation*, 2018 WL 1756117, at *4 (S.D. Cal. 2018) (permitting testimony applying the *Georgia-Pacific* factors to trademark infringement claim); *LinkCo, Inc. v. Fujitsu Ltd.*, 232 F. Supp. 2d 182, 187 (S.D.N.Y. 2002) (applying *Georgia Pacific* factors to trade secret claim).

Dated: July 2, 2021                                    JENNER & BLOCK LLP

/s/ Andrew J. Thomas
Andrew J. Thomas
Alexander M. Smith
Andrew G. Sullivan
Anna K. Lyons

*Attorneys for All Defendants*