# EXHIBIT 1



Fulcrum Financial Inquiry LLP
707 Wilshire Boulevard, Suite 2050
Los Angeles, CA 90017

(213) 787-4100
www.fulcrum.com

March 8, 2021

Andrew J. Thomas, Esq.
Andrew G. Sullivan, Esq.
Jenner & Block LLP
633 West 5th Street, Suite 3600
Los Angeles, CA 90071-2054

Gentlemen:

This report is provided by Fulcrum Financial Inquiry LLP ("Fulcrum") in connection with the class action lawsuit brought by Kevin Risto, (as class representative - "Plaintiff") concerning the operation of the AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund (the "Fund"). The lawsuit is captioned *Risto v. Screen Actors Guild - American Federation of Television and Radio Artists, et al.*, (USDC, Central District of California, Case No. 2:18-cv-07241-CAS).

## I.  DESCRIPTION OF ENGAGEMENT

Fulcrum has been asked to address the reasonableness of the amounts that the Fund pays to the American Federation of Musicians of the United States and Canada ( "AFM") and Screen Actors Guild – American Federation of Television and Radio Artists ("SAG-AFTRA") (collectively, the "Unions") pursuant to the July 22, 2013 Data Purchase and Services Agreement (the "2013 Agreement"). This evaluation is economically and financially based, and does not address legal conclusions.

## II.  INFORMATION RELIED UPON

In addition to my experience and training, I considered the following information in preparing this report, each of which is of a type that is reasonably relied upon by experts in my field:

1.  Background information, as follows:

    a.  The First Amended Complaint in this matter
    b.  Plaintiff's Response to Interrogatories and Requests for Admission (February 12, 2021)
    c.  Filings associated with the Motion to Dismiss (and related Oppositions & Replies)
    d.  Filings associated with the Motion for Class Certification (and related Oppositions & Replies)

2.  The 2013 Agreement

3.  The Unions' interrogatory responses (aka Exhibit 5 to the Kristina Gorbacsov deposition) and the Unions' amended interrogatory responses (March 1, 2021)

4.  The Fund's audited financial statements (aka Annual Reports) as of March 31, 2014, 2015, 2016, 2017, 2018 and 2019, and for the years then ended. These are publicly available at https://www.afmsagaftrafund.org/Our-Annual-Report.php

Exhibit 1
Page 4

Messrs. Thomas & Sullivan
March 8, 2021
Page 2 of 28

5.  The following depositions taken in this matter, including related deposition exhibits

    a.  Stefanie Taub (Fund CEO), in an individual capacity, taken on October 20, 2020
    b.  Stefanie Taub as a designee witness for the Fund, taken on January 20, 2021
    c.  Kristina Gorbacsov, taken on October 23, 2020, as a designee witness for SAG/AFTRA
    d.  John Painting, taken on October 29, 2020, as a designee witness for AFM
    e.  Julie Sandell (Fund Assoc. Director, Sound Recordings), taken on December 9, 2020
    f.  Dennis Dreith (former Fund Executive Director), taken on February 11, 2021
    g.  Duncan Crabtree-Ireland, taken on February 16-17, 2021 (SAG/AFTRA)
    h.  Raymond M. Hair, Jr., taken on February 24-25, 2021 (AFM)

6.  The Fund's review of a sample of 50 titles, with comparison of the results achieved using the Unions' data vs. using only data available on the Internet and from other non-Union sources, as contained in an MS Excel file.  This file is further described in Sections III.E and Sections IV.B herein.  The version of this spreadsheet provided to me by the Fund has been produced by Defendants as DEFS_00042027.  See Exhibit 2 for a version of this spreadsheet with changes that Fulcrum made to calculate an error rate.

7.  Other records produced in this litigation, as specifically referenced herein

8.  Publicly available data, as summarized and referenced herein

Fulcrum personnel reviewed and considered additional documents produced in this litigation that are not specifically cited in the conclusions expressed herein, but which provide background information and context.  These additional records do not alter any of the conclusions expressed herein.

## III.   FACTUAL AND LEGAL BASIS FOR THIS REPORT AND THE OPINIONS HEREIN

This section provides background information that is useful in understanding this report.  Although Fulcrum is capable of summarizing information contained in this section and may need to do so as part of a testimony presentation, this report does not otherwise express opinions regarding the contents of this section.

In his response to Interrogatory No. 18 (February 12, 2021), Plaintiff states the following:

> "Facts: …
> the Unions are unable to provide information for over 70% of the Fund's requests, which themselves only represent a fraction of the recordings tracked by the Fund. The time and cost to the Unions in providing this information to the Fund is de minimis.  In addition, since the Fund has been compiling the information provided by the Unions at its own expense and effort, the Fund no longer has any use for the Unions' limited information for the vast majority of Fund beneficiaries."

The information in this Section III contradicts the preceding quote from Plaintiff.

## A.  Plaintiff's description of the statutory basis for collections and the 2013 Agreement

The First Amended Complaint describes the background of this dispute as follows:

Exhibit 1
Page 5

Messrs. Thomas & Sullivan
March 8, 2021
Page 3 of 28

"2.   Under 17 U.S.C. § 114(g), 50% of digital performance royalties are payable to the copyright owners of the sound records, 45% are payable to the featured artists, 2.5% are payable to the non-featured musicians (also known as session musicians) and 2.5% are payable to the non-featured vocalists (also known as session vocalists) (collectively referred to herein as "non-featured performers") ...

4.   The statute requires payment of the Royalties to non-featured performers regardless of their union membership in any or all of the three major unions: the American Federation of Musicians of the United States and Canada ("AFM"), or SAG-AFTRA (the surviving entity after the 2012 merger of the Screen Actors Guild ("SAG") and the American Federation of Television and Radio Artists ("AFTRA").

5.   The AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund (the "Fund") is the name given to the I.R.C. § 501(c)(6) nonprofit organization which oversees a trust fund created to receive and distribute Royalties or other remuneration to artists from SoundExchange and other relevant collecting societies, rights organizations and other appropriate entities in order to comply with the statutory scheme.

6.   Pursuant to the statutes, the Fund is obligated to perform its duties without regard to union membership. ...

11.   The Fund entered into a Data Purchase and Services Agreement dated July 22, 2013 (the "Services Agreement") with the Unions. Pursuant to the Services Agreement, "the Fund shall pay each Union, within 30 days after the conclusion of each of the Fund's distribution cycles, 3% of the amount distributed by the Fund in such distribution cycle.... Such payment shall constitute complete compensation of the Unions and their personnel for providing the data and services contemplated by this Agreement. There shall be no additional charges or expense reimbursement associated with the Unions' provision of the data and services contemplated by this Agreement."

12.   This 3% service fee shall be referred to herein as the "Service Fee." ...

23.   Plaintiff and the Class seek equitable, declaratory, and injunctive relief against the Trustees requiring them to: (1) revert back to the Fund the 3% Service Fee for the distribution cycles following July 22, 2013; (2) cease the collection of the 3% Service Fee on all future distribution cycles; and (3) declare the Data Purchase and Services Agreement void and unenforceable."

## B.  Defendants' description of the fee paid to the Unions

Each of the Defendants provided information regarding the reasonableness of the Service fee in a response to Plaintiff's Interrogatory No. 10, as follows:[1]

"INTERROGATORY NO. 10:
If YOU contend that the SERVICE FEE is a reasonable charge for the services provided by the UNIONS, state ALL facts that support that contention.

RESPONSE TO INTERROGATORY NO. 10:

---

[1] Amended responses, dated March 1, 2021

Exhibit 1
Page 6

Messrs. Thomas & Sullivan
March 8, 2021
Page 4 of 28

*[Objections omitted]*

*Pursuant to the Data Purchase and Services Agreement, the Unions are required to provide the Fund with information in their possession that is necessary to enable the Fund to identify and pay the non-featured performers (both Union members and nonmembers) to whom Royalty payments have been allocated in a given distribution cycle. This valuable data is derived from records developed and maintained by the Unions at considerable expense, including forms obtained by the Unions from producers and/or other individuals or entities involved in the creation of a given sound recording. Specifically, the information provided by the Unions to the Fund is derived from session reports and "B-forms" which contain information necessary to identify and locate some or all of the non-featured musicians and vocalists who performed on a given sound recording. These session reports and B-forms compile information related to both Union members and nonmembers who served as non-featured performers on a given sound recording. These records maintained by the Unions are housed across various local affiliates of each Union, for the most part based on where the relevant sound recording took place. Much of this information exists in records that are maintained locally by the Unions only in hard copy form.*

*Pursuant to the Data Purchase and Services Agreement, the Unions must coordinate with the Fund to provide the information necessary for the Fund to identify and pay non-featured performers. The information provided by the Unions pursuant to the Data Purchase and Services Agreement is essential to the Fund's administration. This information has been collected, compiled, and maintained as part of a large-scale effort by the Unions over the course of decades, and such efforts continue on an ongoing basis. There is no other repository of information documenting the identities, work histories, and payment information associated with non-featured performers that is nearly as exhaustive as the repositories maintained by the Unions. Without this data and the services expended by the Unions to provide this data, the Fund would be significantly constrained in its ability to perform the fundamental task of identifying and locating the non-featured performers for whom Royalty distributions are to be paid, or in the alternative would need to expend substantial efforts and incur substantial costs to compile independently the information provided by the Unions. Accordingly, the data has substantial intrinsic value and is highly valuable to the Fund in the performance of its work.*

*In addition, Union representatives expend considerable effort supplying the valuable data the Unions are obligated to provide under the Data Purchase and Services Agreement. Researchers at the Fund have worked extensively with Union representatives in an effort to build and grow a database compiling the identities of the non-featured performers who performed on a given sound recording, as well as the information necessary to locate and pay such individuals. This database serves as the Fund's central resource used to identify, locate, and pay Royalties to nonfeatured performers. As this database has grown, the Fund has been able more efficiently to identify and locate the non-featured performers who performed on eligible sound recordings. Currently, this database compiles information related to the non-featured performers associated with approximately 136,000 song titles.*

*Because the records maintained by the Unions exist in decentralized repositories dispersed across the Unions' local affiliates, the Unions satisfy their obligations under the Agreement by making numerous representatives available in these locations in order to field requests from the Fund. The Fund's research team—currently staffed with ten full-time research associates and supervisors—works extensively with representatives located in various local affiliates of*

Exhibit 1
Page 7

Messrs. Thomas & Sullivan
March 8, 2021
Page 5 of 28

> the Unions on a year-round basis to obtain information regarding the non-featured performers associated with thousands of song titles. Except with respect to two local affiliates of the AFM (located in New York and Los Angeles) that maintain electronic records on a platform that Fund researchers may directly log into, in all other cases Union representatives handle individual requests from Fund researchers to locate and provide information related to specific song titles and/or to verify the recent contact information for non-featured performers associated with such song title. In locations where such records exist in hard copy form, Union representatives must locate the requested document within their hard copy filing system before scanning and sending a digital copy of the record to the requestor at the Fund. The quantity of the requests made to the Unions by the Fund vary across the respective Unions' locations and fluctuate on a day-to-day and week-to-week basis. It is not uncommon for a Union representative at one location to field dozens of requests from the Fund over the course of a week. Fulfilling each such request may take a Union representative anywhere from a few minutes to thirty minutes or longer.

> In addition to providing the information necessary to locate and pay nonfeatured performers, the Unions also provide advocacy services both domestically and internationally that benefit non-featured performers (both Union members and nonmembers). These activities include meeting with members of Congress, negotiating with domestic performing rights organizations (PROs), as well as engaging with international PROs to negotiate better terms for the collection and distribution of international royalties. In addition to advocating with the federal government for more expansive rights that would benefit all non-featured performers, the Unions have negotiated and interacted with the World Intellectual Property Organization (WIPO), the Societies' Council for the Collective Management of Performers' Rights (SCAPR), Phonographic Performance Limited (PPL), and the Musicians' Rights Organization Canada (MROC), among other international organizations. This includes efforts to expand the performance right in the United States to apply to non-digital platforms (e.g., terrestrial radio), a cause which the Unions have furthered through their participation in the musicFIRST coalition. The Unions also engage in advocacy efforts with foreign governments for more stringent distribution requirements for collected royalties. These activities all inure to the benefit of non-featured performers, regardless of union affiliation, as they are aimed in part at increasing the scope and overall amount of the royalties paid for recordings on which non-featured musicians and vocalists have performed.

> In consideration of the inherent value of the data the Unions provide to the Fund, as well as the services provided by the Unions as described above, the Trustees of the Fund agreed in 2013 that each Union should be paid a fee in the amount of 1.5% of the receipts distributed by the Fund in a given distribution cycle. This was an entirely reasonable exercise of the Trustees' broad discretion in determining the value of the information and services provided by the Unions. "

The depositions of the Fund's and Unions' designee witnesses provided explanations that were consistent with above interrogatory response.

## C.  Amounts received, paid, and payable by the Fund

The following table shows the total royalties received by the Fund, which is the starting point for the Fund's distribution activities:

Exhibit 1
Page 8

Messrs. Thomas & Sullivan
March 8, 2021
Page 6 of 28

Table 1: Royalties received by the Fund[2]

| FY ended 3/31 | Royalties received |
|---|---|
| 2013 | $ 27,561,164 |
| 2014 | 41,699,519 |
| 2015 | 49,322,129 |
| 2016 | 46,051,587 |
| 2017 | 52,001,911 |
| 2018 | 65,339,258 |
| 2019 | 61,369,239 |
| 2020 | 71,723,181 |
| Total | $415,067,988 |

The following table summarizes the amounts reported in response to Plaintiff's Interrogatory Nos. 6, 7 and 8.  This information for years FY2013-FY2019 is also available in the Fund's audited financial statements:

Table 2: Fund's payments to Unions under the 2013 Agreement[3]

| FY 3/31 | Fees paid to: | | Total | Fund's Administrative costs | |
|---|---|---|---|---|---|
| | SAG-AFTRA (#7) | AFM (#8) | | $ (#6) | Union Fee % |
| 2013 | 0 | 0 | 0 | $ 2,820,342 | 0% |
| 2014 | $ 193,814 | $ 193,814 | $ 387,628 | 3,538,442 | 11% |
| 2015 | 272,845 | 272,845 | 545,690 | 6,129,420 | 9% |
| 2016 | 420,454 | 420,454 | 840,908 | 6,918,166 | 13% |
| 2017 | 872,894 | 872,894 | 1,745,788 | 11,887,748 | 15% |
| 2018 | 864,759 | 864,759 | 1,729,518 | 12,936,211 | 13% |
| 2019 | 782,462 | 782,462 | 1,564,924 | 11,301,441 | 14% |
| 2020 | 825,404 | 825,404 | 1,650,808 | 11,948,304 | 15% |
| 2013 – 2019 Totals | | | $8,465,264 | $67,480,074 | 12.5% |

Largely because information about individual Fund participants and their involvement in sound recordings is incomplete, the Fund has a growing pool of royalties that are awaiting distribution because of an inability to fully ascertain the required information that allows the payment to be made.  The following amounts are reported in the Fund's audited financial statements as amounts awaiting distribution:

---

[2] The Fund's audited financial statements, available on the Fund's website, for amounts through and including 2019.  2020 amount (as well as the earlier amounts that agree with such financial statements) is per Defendant's March 1, 2021 responses to Interrogatory No. 4
[3] Exhibit 2 to the October 20, 2020 deposition of Stefanie Taub (aka DEFS_00041811), as well as the Defendants' March 1, 2021 amended interrogatory responses

Exhibit 1
Page 9

Messrs. Thomas & Sullivan
March 8, 2021
Page 7 of 28

Table 3: The Fund's royalties paid and payable to participants[4]

| Year ended March 31 | Distributions payable at year-end | Distributions paid during the year |
|---|---|---|
| 2013 | $ 13,718,039 | $ 10,188,961 |
| 2014 | 17,624,115 | 13,010,637 |
| 2015 | 17,797,626 | 18,288,789 |
| 2016 | 25,074,898 | 28,248,731 |
| 2017 | 36,586,662 | 52,001,911 |
| 2018 | 52,654,323 | 55,847,132 |
| 2019 | 61,785,117 | 52,345,932 |
| Total | | $229,932,093 |

In the preceding table, the amounts shown as distributions paid are different than what the Fund reported in response to Plaintiff's Interrogatory No. 5. The response to Plaintiff's Interrogatory No. 5 reports all amounts allocated to participants, including both amounts actually paid to Fund participants and those allocated for payment but not yet paid. Amounts allocated may be awaiting payment because:

1. Complete payee information may not yet have been obtained that would allow a payment to be processed; and/or

2. The Fund holds amounts allocated to participants in accordance with the Fund's stated (publicly reported) policies, so the timing of payment allocations and actual payments are different.

When the Fund lacks sufficient information for make a payment to a participant, the Fund calls such amounts and participants "unclaimed". The following table shows the number of unclaimed participants. In the following table, 2014 was the first year with reliable information, and 2019/2020 amounts are not yet available (because research efforts are continuing).

Table 4: "Unclaimed" participants[5]

| Year | "Unclaimed" participants |
|---|---|
| 2011 | 8,932 |
| 2012 | 8,582 |
| 2013 | 8,268 |
| 2014 | 8,471 |
| 2015 | 10,324 |
| 2016 | 17,297 |
| 2017 | 15,901 |
| 2018 | 15,065 |

Without the Unions' data, the number of unclaimed participants and the amount of unclaimed royalties would be much higher.

---

[4] All amounts in the table are from the relevant year's audited financial statements, which the Fund makes available publicly on its website at https://www.afmsagaftrafund.org/Our-Annual-Report.php.
[5] For 2014 through 2018, January 20, 2011 deposition of Stefanie Taub, page 211 – 212. All amounts appear on DEFS_00041813 (notes to Stefanie Taub's January 20, 2021 deposition).

Exhibit 1
Page 10

Messrs. Thomas & Sullivan
March 8, 2021
Page 8 of 28

### D.  The Union's involvement in sound recordings

The Union's data covers a substantial number of performers.  The Unions collect and maintain session reports on recordings for which the record label is a signatory to that Union's collective bargaining agreement, including  both Union and non-Union performers who performed at such recording sessions.  The major record labels are all signatories to the Unions´ collective bargaining agreement and report record information regarding both Union and non-Union performers who performed at such recording sessions.  The following chart shows the three largest record labels (Sony Music Entertainment, Warner Music Group and Universal Music Group) who together have **around a two-thirds market share**.[6]  Because some of the other labels (the remaining approximate one-third market share) also are signatories to the Unions' collective bargaining agreement, it is clear that the Unions´ data is more complete than any other source.



---

[6] https://www.statista.com/statistics/317632/market-share-record-companies-label-ownership-usa/

Exhibit 1
Page 11

Messrs. Thomas & Sullivan
March 8, 2021
Page 9 of 28

The Fund's data presented below is generally consistent with the approximate two-thirds amount that can be obtained from simply observing the importance of the three largest music companies.  The following tables summarize the count of Fund participants, sorted by Union vs. non-Union membership who have been the subject of royalty distributions in each of the years listed.  The non-Union members have a greater percentage of "uncashed" checks.  In this context, "uncashed" means that an amount is known to be payable to the participant, but no check is prepared because the Fund lacks a valid address and/or taxpayer identification number.

Table 5: Counts of union vs. non-union participants[7]

| Year | Union Member Cashed | Union Member Uncashed | Union Member Total | Non-Member Cashed | Non-Member Uncashed | Non-Member Total |
|---|---|---|---|---|---|---|
| 2013 | 6,673 | 495 | 7,168 | 649 | 19 | 668 |
| 2014 | 9,952 | 9,933 | 19,885 | 1,872 | 32,418 | 34,290 |
| 2015 | 7,807 | 2,360 | 10,167 | 1,037 | 4,326 | 5,363 |
| 2016 | 12,114 | 4,321 | 16,435 | 3,930 | 7,862 | 11,792 |
| 2017 | 12,105 | 4,414 | 16,519 | 4,130 | 6,865 | 10,995 |
| 2018 | 16,114 | 6,640 | 22,754 | 4,002 | 10,860 | 14,862 |
| 2019 | 17,868 | 9,318 | 27,186 | 5,347 | 14,703 | 20,050 |
| 2020 | 16,244 | 10,434 | 26,678 | 7,436 | 13,603 | 21,039 |
| Totals[8] | 98,877 | 47,915 | 146,792 | 28,403 | 90,656 | 119,059 |
| % cashed vs. uncashed | 67% | 33% | 100% | 24% | 76% | 100% |
| % of total | | | **55%** | | | 45% |

The following table summarizes count information regarding participant royalty allocations that comes from a data base maintained by the Fund. This information shows how frequently the royalty allocations to Fund participants are supported by information found in Union session reports (aka B-forms in AFM's parlance).[9]  The data in following table is based on allocations made in distribution cycles for the years listed, based on individual tracks.

---

[7] DEFS_00041812 (notes from Stefanie Taub's January 20, 2021 deposition)
[8] The counts shown in the "Totals" row do not refer to the total number of individual participants that have received any royalties during the years listed because the same performer may have been allocated royalties in multiple distribution cycles in the years listed, and would therefore be counted multiple times in the "Totals" row.
[9] The Unions provided digital copies of session reports upon request by the Fund and/or access to computerized data that summarize the physical session reports.  In the Fund's efforts (and throughout this report), no distinction is made (because it is immaterial) whether the Unions provide the session report information though a piece of paper, or through access of computerized information.

Exhibit 1
Page 12

Messrs. Thomas & Sullivan
March 8, 2021
Page 10 of 28

Table 6: Participants' royalty allocations supported and not supported by Union data[10]

| Distribution year | Royalty allocations ($) | | | Count of participant allocations[11] | | |
|---|---|---|---|---|---|---|
| | Supported by Union Data | Not Supported by Union Data | Total | Supported by Union Data | Not Supported by Union Data | Total |
| 2015 | 7,061,560 | 6,532,870 | 13,594,431 | 65,631 | 54,818 | 120,449 |
| 2016 | 11,315,957 | 10,501,107 | 21,817,063 | 163,652 | 34,628 | 198,280 |
| 2017 | 28,232,735 | 23,882,669 | 52,115,404 | 255,345 | 62,440 | 317,785 |
| 2018 | 22,600,518 | 30,342,433 | 52,942,951 | 356,705 | 99,478 | 456,183 |
| 2019 | 20,137,367 | 23,236,395 | 43,373,762 | 715,678 | 101,244 | 816,922 |
| 2020 | 27,827,087 | 21,864,239 | 49,691,326 | 473,320 | 168,119 | 641,439 |
| Total | 117,175,224 | 116,359,713 | 233,534,937 | 2,030,331 | 520,727 | 2,551,058 |
| % | **50%** | 50% | 100% | **80%** | 20% | 100% |

As shown in the preceding table, approximately 50% of royalty amounts allocated during this period
were allocated with the support of data provided by the Unions.  Viewing this data from another
angle, approximately 80% of all allocations to participants during this period were implemented with
the support of Union data.

In the preceding table, the count of participant royalty allocations shown is considerably higher than
the percentages of Union members shown in Table 5.  This occurs at least in part because the
session reports include performers who are not union members but who performed on a recording at
a signatory company to the Union agreements.  See Section IV.B for additional information.

**E.  The Fund's analysis of the information provided by the Unions, and the alternative
information sources**

The Unions' data includes both who is involved with the performance, and the performers' other
identifying information.  The Unions provide the following information when available:

1.  Who performed on each individual track; and

2.  Each performer's personal identifying information, consisting of:

     a.  Name,
     b.  Last known address: and
     c.  Social Security information, which assists in confirming the performer in subsequent
         communications.

---

[10] Data base summary from the Funds AS400 system, produced as DEFS_00042028
[11] The participant allocation columns do not track the count of individual participants to whom royalties
were allocated in each year, because a single participant may be allocated royalties on multiple song titles
within a given year, and therefore would count multiple times within the participant allocations count listed
for that year.  Likewise, a participant may be allocated royalties in connection with the same song title in
multiple years, and each such allocation would be counted in the "Total" participant allocation rows.

Exhibit 1
Page 13

Messrs. Thomas & Sullivan
March 8, 2021
Page 11 of 28

Absent having all such information, the Fund is unable to make a proper, fully accurate, assumption-free allocation of royalties.  When information is incomplete, the result is that some participant(s) are underpaid and other participant(s) are overpaid.

In order to quantify the extent to which this would occur without the Unions' information, in January 2021 in connection with the formulation of this report, the Fund selected 50 titles that had session reports from the Unions.  The purpose of the exercise was to ascertain what outcome would result if the Fund did not have the Unions' data available.  The Fund's personnel attempted to locate the same information independently (i.e., without using the Unions' information).

The Fund selected 50 titles in a manner that the Fund described as random.[12]  All 50 selections had session reports from the Unions.  With this sample, the Fund's personnel spent 930 minutes[13] (15.5 hours) time researching the information from non-Union sources.

The results of this test are summarized as follows:

1. Of critical importance, **there was no title in which the additional research using Internet resources provided a more accurate answer**.  In all cases, had the Unions' data not been available, the researched answer would have been inferior/wrong.   Details in this regard include:

   a. The Unions' session reports provide information by track, which is the greatest level of detail and supports the most accurate allocation of royalties.  Absent having information by track, publicly-available information could be available for the entire album and/or might provide detail that omits certain performers.  For the sample that the Fund selected, research details and sources are provided.[14]

   b. When public data is available, the additional names obtained for an entire album is generally not preferable because this causes a poor assumption that everyone credited to the entire album performed on each track.  In this situation, the larger number of participants attributed to each song introduces inaccuracy, leading some artists to receive more than appropriate, with such overpayments reducing payments owed to other participants.

2. **Without the Unions' data, none of the participants had a readily-available address and Social Security information** that would allow the Fund to make a payment to the participant.

3. Using publicly available, non-Union sources of information, the Fund's researchers were able to locate the same credits information (i.e., who performed) for 20[15] out of the fifty tracks in the sample (i.e., 40%).

---

[12] The Fund's selection process started with a list of 5,992 titles that (i) had distributions in 2020 and (ii) had Union session reports.  Starting approximately halfway through this list, the largest fifty of the next one hundred sequential titles were selected.
[13] DEFS_00042026, tab "50 Titles-M-V-B Splits -2.19.21", column V
[14] DEFS_00042026, tab "50 Titles-M-V-B Splits -2.19.21", column W and X provides details of what was locatable with independent research.
[15] Sum of the "Yes" responses in Column E of DEFS_00042026, tab "50 Titles-M-V-B Splits -2.19.21". Columns F, W and X provides explanatory detail.

Exhibit 1
Page 14

Messrs. Thomas & Sullivan
March 8, 2021
Page 12 of 28

In Section IV.B below, Fulcrum calculates a misallocation rate based on the details of the Fund's sample.  The following table summarizes participant attributes of the 50 sample that served as the starting point for Fulcrum's calculation:

Table 7: Summary results from the Fund's comparison of research efforts with the support of Union data vs. Non-Union data only

| Attribute | Musicians | Vocalists | Both Musician & Vocalist | Total |
|---|---|---|---|---|
| Number of non-featured artists using Unions' data[16] | 584[17] | 78[18] | 7[19] | 669[20] |
| Number of non-featured artists using non-union data and album credits | 465[21] | 113[22] | 13[23] | 591[24] |
| $ Amount distributed on the 50 selected recordings from the inception of the Fund to the participants using Unions' data[25] | $1,678,056[26] | $1,942,771[27] | $51,511[28] | $3,672,338[29] |

**F.  The Fund´s costs of maintaining the participant data base**

As noted above, the Fund's actual costs are less than they would otherwise be because the Fund has the benefit of the Unions´ data.  The information in this section provides statistics regarding the large number of transactions that the Fund is processing with the benefit of having the Unions´ data.

In her deposition on January 20, 2021 as the Fund's designee witness, Stefanie Taub presented her estimates of the amount spent by Fund personnel on research and data base maintenance for the Fund's participants.[30]  Ms. Taub estimated that the Fund spends approximately $3,415,000 annually

---

[16] This information (DEFS_00042026, tab "50 Titles-M-V-B Splits -2.19.21", columns G through O) is https://www.youtube.com/watch?v=ASO_zypdnsQ maintained in the Fund's ASA 400 computer system.
[17] Digitally referenced as the sum of column D in Exhibit 2
[18] Digitally referenced as the sum of column F in Exhibit 2
[19] Digitally referenced as the sum of column H in Exhibit 2
[20] Digitally referenced as cell Z in Exhibit 2
[21] Digitally referenced as the sum of column J in Exhibit 2
[22] Digitally referenced as the sum of column L in Exhibit 2
[23] Digitally referenced as the sum of column N in Exhibit 2
[24] Digitally referenced as cell AA in Exhibit 2
[25] This information (DEFS_00042026, tab "50 Titles-M-V-B Splits -2.19.21", columns G through O) is maintained in the Fund's ASA 400 computer system.
[26] Digitally referenced as the sum of column A in Exhibit 2
[27] Digitally referenced as the sum of column B in Exhibit 2
[28] Digitally referenced as the sum of column C in Exhibit 2
[29] Digitally referenced as cell Y in Exhibit 2
[30] January 20, 2011 deposition of Stefanie Taub - (30(b)(6) topic 15) - pages 199 - 204

Exhibit 1
Page 15

Messrs. Thomas & Sullivan
March 8, 2021
Page 13 of 28

on this function.[31]  This cost number does not include the required indirect costs for this function, so management and other administration costs are not part of this total that Ms. Taub presented.

Comparing this $3,415,000 of direct costs to what is paid to the Unions under the 2013 Agreement, the Fund's direct internal costs are roughly twice what the Unions are paid.  Yet, as noted in the prior Section III.E, the Unions are the first, and the most reliably accurate source used for track title credit and participant data.[32]

The following table shows the number of new titles created and researched by year:

Table 8: New titles created in the Fund's database[33]

| Year | Count of Titles |
|------|-----------------|
| 2013 | 3,255 |
| 2014 | 2,149 |
| 2015 | 4,867 |
| 2016 | 7,243 |
| 2017 | 8,971 |
| 2018 | 7,730 |
| 2019 | 8,656 |
| 2020, as of 11/10/2020 | 8,034 |
| Total | 50,905 |

## IV.   SUMMARY OF CONCLUSIONS

The combined 3% fee paid to the Unions for the use of the Unions' information and related assistance is reasonable.  Absent access to this information, the Fund would not be able to make payments that are as accurate as is now occurring and would not be able to make accurate payments to as many participants as are now receiving royalties from the Fund.  In support of this:

1. There are numerous businesses that charge significant sums for the use of information, which provides a precedent for the amounts being paid to the Unions.  See Section A below.

2. If the 2013 Agreement (and related payments to the Unions) did not exist, the Fund would not be able to make payments to participants that are as accurate and complete as what is now occurring.  Except for the participants contacting the Fund to provide address and tax reporting information, the Fund has no alternative source for address and tax reporting information.  See Section B below.

3. Multiple economic factors relating to the attributes and use of the Unions' data support the reasonableness of the 3% fee.  See Section C below.

---

[31] January 20, 2011 deposition of Stefanie Taub - (30(b)(6) topic 15) – page 204; DEFS_00041814
[32] Participants can call the Fund to provide information.  The Fund's current practice is to have the performer complete and return a "Performer Information Form" (aka PIF) to verify that person's information prior to sending payment.  Nevertheless, the Social Security information and address obtained from the Unions provides the Fund initial contact information for the performer and an identifier (Social Security information) to help identify the individual.
[33] DEFS_00042020

Exhibit 1
Page 16

Messrs. Thomas & Sullivan
March 8, 2021
Page 14 of 28

  4. Plaintiff's assertions regarding (i) the incremental cost of providing the Union's information, and (ii) how the timing of payments should be evaluated are based on descriptions of the payments that are inconsistent with the 2013 Agreement, and the nature of royalties generally.  See Section D below.

**A.  Numerous businesses are based on the accepted axiom that information is valuable and can be sold in market-based transactions.**

Plaintiff's complaint is based on the incorrect premise that the Unions must give away (for free) information that the Unions have accumulated over decades.  Because of this, Plaintiff contends that the Unions might be reimbursed for only the incremental costs of work initiated in response to the Fund's needs.  Under this incorrect notion, the Unions should not be compensated for either their past efforts, or for a proportionate current cost of the Unions' operations that are required for the incremental efforts to be incurred.

Numerous compensation arrangements are based on a percentage of an underlying transaction value.  For example, (i) commission sales arrangements, (ii) the majority of royalties, (iii) investment fees for money managers, and (iv) numerous representation agreements (e.g., contingency lawyers and talent agents) are all based on a percentage of the related transactions.  In none of these arrangements is the cost (and particularly the incremental cost) of providing the service typically part of the compensation formula.

Numerous businesses exist because the economics of information is different than what Plaintiff imagines.  Information has value, and those with valuable information are able to charge for its use.  The incremental cost of providing access to information is never a valid or intelligent basis for determining a price.  A sample of businesses that are based on selling information include:[34]

  1. The mailing list industry has been around for decades, initially using physical addresses, and more recently using email addresses.  The mailing list industry obtains revenues for the use of information (specifically contact information) which has already been compiled.  The incremental cost of distributing the list to each buyer has never been the basis for valuing the lists.

  2. In terms of its revenues, Google and Facebook are information and marketing companies whose profits are largely attributed to the sale and use of their users' information.  Anyone using Google or Facebook realizes that advertisements appear based on a user's past browsing/input history.  Google and Facebook obtain a premium for advertising because they capture this information and match advertisers with potential customers.  Despite the fact that many of its services are free, Google (NASD: GOOGL) and Facebook (NASD: FB) are highly profitable and valuable, with market capitalizations of $1.4 trillion, and $760 billion, respectively.  Obviously, Google and Facebook do not sell their information for the almost non-existent incremental cost of running software and algorithms.

  3. Fair Isaac Corporation (aka, FICO - NYSE: FICO) sells the use of its industry-standard credit scoring algorithm.  At the time of this writing FICO has a market capitalization of approximately $14 billion.  FICO describes its business and revenues and customers as follows:

---

[34] The market capitalization values presented in this section are as of February 6, 2021.

Exhibit 1
Page 17

Messrs. Thomas & Sullivan
March 8, 2021
Page 15 of 28

> "Our FICO® Scores are used in the majority of U.S. credit decisions, by nearly all of the
> major banks, credit card organizations, mortgage lenders and auto loan originators.
> These credit scores, developed based on third-party data, provide a consistent and
> objective measure of an individual's credit risk. Credit grantors use our FICO® Scores in a
> variety of ways: to prescreen candidates for marketing programs; to evaluate applicants
> for new credit; and to manage existing customer accounts. FICO® Score is a three-digit
> score ranging from 300-850. They are calculated by running data from the three U.S.
> national credit reporting agencies, Experian, TransUnion and Equifax, through one of
> several proprietary scoring models developed by FICO. Lenders generally pay the credit
> reporting agencies scoring fees based on usage, and the credit reporting agencies pay an
> associated fee to us. ...[35]

> Our products and services serve clients in multiple industries, including primarily banking,
> insurance, retail, healthcare and public agencies. End users of our products include 96 of
> the 100 largest financial institutions in the U.S., and two-thirds of the largest 100 banks in
> the world. Our clients also include more than 600 insurers, including nine of the top ten
> U.S. property and casualty insurers; more than 300 retailers and general merchandisers;
> more than 200 government or public agencies; and more than 200 healthcare and
> pharmaceuticals companies, including nine of the world's top ten pharmaceuticals
> companies. Eight of the top ten companies on the 2020 Fortune 500 list use one or more
> of our solutions. In addition, our consumer services are marketed to an estimated 200
> million U.S. consumers whose credit relationships are reported to the three major U.S.
> credit reporting agencies."[36]

Generally, FICO does not store or have the underlying data that its algorithms use.  FICO
incurs no incremental cost or effort each time its credit scoring algorithm is used, but FICO's
customers willingly pay significantly for the information and insight that FICO provides.  In
the fiscal year ending September 30 2020, FICO had $1.3 billion of revenues.

4.   Nielsen Holdings (NYSE: NLSN) sells information that it collects regarding consumer behavior.
At the time of this writing NLSN has a market capitalization of approximately $8.1 billion.  The
price Neilson's customers pay for its ratings has little to do with the cost of running a report,
but is instead based on the value of the information.  Neilson describes itself as follows:

> "We are a leading global measurement and data analytics company. We provide clients
> with a comprehensive understanding of what consumers watch and what they buy and
> how those choices intersect.  We deliver critical media and marketing information,
> analytics and manufacturer and retailer expertise about what and where consumers buy
> and what consumers read, watch and listen to (consumer interaction across the
> television, radio, print, online, digital, mobile viewing and listening platforms) on a local
> and global basis. Our measurement and analytical services help our clients maintain and
> strengthen their market positions and identify opportunities for profitable growth. ..."[37]

5.   TransUnion (NYSE: TRU) and Equifax (NYSE: EFX) have market capitalizations as of this
writing of $17.7 billion and $22.0 billion, respectively (Experion is privately held, so does not

---

[35] FICO Form 10K as of September 30, 2020, page 7
[36] FICO Form 10K as of September 30, 2020, page 10
[37] NLSN Form 10K as of December 31, 2019, page 3

Exhibit 1
Page 18

Messrs. Thomas & Sullivan
March 8, 2021
Page 16 of 28

have a publicly-traded value).  All of these personal credit rating agencies sell information that they have accumulated over time.  Even though the three companies provide services that are highly competitive, the information these companies have is extremely valuable.  The incremental cost of these companies running a computer report on already-existing data is virtually nil, but no competent business person or appraiser would thereby suggest that this means the information provided by these companies is worthless.

6.  RELX PLC (fka Reed Elsevier) has a market capitalization as of this writing of $47.0 billion, with 2019 revenue of approximately $9.7 billion.  RELX provides information, analytics and decision tools for professional and business customers. It operations/units include (i) Scientific, Technical & Medical, (ii) Risk & Business Analytics, and (iii) Legal.  The Legal unit consists primarily of market-leader LexisNexis, which is a staple of legal research in the United States.

7.  In the United States, there are four real estate title companies serving the entire country (plus additional local competitors).  These four companies are described below.  In this entire industry, the companies use data bases in which they have made substantial past investments (called title plants).  The revenues charged by these companies have almost nothing to do with running another computer report using this title plant, and no one knowledgeable in this industry would suggest otherwise.  Information regarding the four largest companies in this industry in the U.S. follow:

a.  Fidelity National Financial (NYSE: FNF) has an $11.5 billion market capitalization.  FNF's description of its business includes:

> "Most real estate transactions consummated in the U.S. require the use of title insurance by a lending institution before the transaction can be completed. Generally, revenues from title insurance policies are directly correlated with the value of the property underlying the title policy.[38] …
>
> A title insurance company's predominant expense relates to such searches and examinations, the preparation of preliminary title reports, policies or commitments, the maintenance of "title plants," which are indexed compilations of public records, maps and other relevant historical documents, and the facilitation and closing of real estate transactions. Claim losses generally result from errors made in the title search and examination process…"[39]

b.  First American Financial (NYSE: FAF) has a $6.1 billion market capitalization.  FAF describes it business and underlying data bases as follows:

> "The Company, through its subsidiaries, is engaged in the business of providing financial services through its title insurance and services segment and its specialty insurance segment. The title insurance and services segment provides title insurance, closing and/or escrow services and similar or related services domestically and internationally in connection with residential and commercial real estate transactions.  It also provides products, services and solutions that are designed to mitigate risk in, or otherwise facilitate real estate transactions.  Many of

[38] FNF Form 10K as of December 31, 2019, page 4
[39] FNF Form 10K as of December 31, 2019, page 5

Exhibit 1
Page 19

*these products, services and solutions involve the use of real property-related data, including data derived from its proprietary databases.  It maintains, manages and provides access to title plant data and records …"[40]*

*Title insurance policies insure the interests of owners or lenders against defects in the title to real property.  These defects include adverse ownership claims, liens, encumbrances or other matters affecting title.  Title insurance policies generally are issued on the basis of a preliminary title report or commitment, which is typically prepared after a search of one or more of public records, maps, documents and prior title policies to ascertain the existence of easements, restrictions, rights of way, conditions, encumbrances or other matters affecting the title to, or use of, real property. … To facilitate the preparation of preliminary title reports and commitments, copies and/or abstracts of public records, maps, documents and prior title policies may be compiled and indexed to specific properties in an area.  This compilation is known as a "title plant."[41]*

   c.  Stewart Information Services (NYSE: STC) has a $1.3 billion market capitalization.  Stewart's description of itself and its competitors[42] is generally consistent with the first two title companies described above, and is not provided here in the interest of brevity.

   d.  Old Republic International (NYSE: ORI) has a $5.8 billion market capitalization.  ORI is a more diversified insurance company with a separate division offering title products.  Currently, ORI's title business comprises a bit more than a third of ORI.  Again, ORI's description of itself and its competitors[43] is generally consistent with the first two title companies described above, and is not provided here in the interest of brevity.

**B.  If the Fund did not have access to the information made available by the 2013 Agreement, the Fund would not be able to make accurate payments to the participants, both Union members and non-Union members.**

As summarized in Section III.E above, the Fund has no good (complete) alternative to the data provided by the Unions.  To the extent the Fund now has its own database with participant information, the information exists in large part from data provided by the Unions.  For over half of the titles in the 50 title sample prepared by the Fund, material misallocations of royalties occurred when the Unions' data was not available.  The misallocations include having too few participants identified, to have too many participants credited because of assumptions made for all tracks based on album-wide  information.  Examples of each follow:

   1.  For an example of fewer participants being paid than actually performed on the relevant song title, consider the example of the song "My Heart Will Go On" by Celine Dion.  Without Union session report information, the Fund's researchers were able to identify a total of seven performers credited on this title, whereas the session report revealed a total of 65 performers.  In this instance, the total royalties distributed on this title would have been incorrectly divided among seven performers, resulting in improperly large payments to each

---

[40] FAF Form 10K as of December 31, 2019, page 5
[41] FAF Form 10K as of December 31, 2019, page 6
[42] STC Form 10K as of December 31, 2019
[43] ORI Form 10K as of December 31, 2019

Exhibit 1
Page 20

Messrs. Thomas & Sullivan
March 8, 2021
Page 18 of 28

of these seven performers, and the omission of payments to 58 otherwise unidentified performers.  If the Fund had incorrectly distributed these larger royalty payments to just seven performers, this would have resulted in a total of $27,116.24 in misallocated royalties, which represents 45% of the total royalties allocated on this title.

2. For an example of too many participants being paid than actually performed on the relevant song title, consider the example of the song "Get Me Some of That" by Rhett Thomas. Without Union session report information, the Fund's researchers would need to rely on album-wide credits to identify the performers on this song title, which would result in a total of 46 performers being credited as having performed on this song title.  However, the session report for this song title shows that in fact only 12 of these performers were on this track. This means that, absent Union session report information, a total of 34 performers would have been incorrectly paid for a track on which they did not perform, whereas the 12 performers that were actually on the track would receive significantly smaller royalty payments than they should have properly been allocated had the Fund had the benefit of Union session report information.  In this instance, the lack of session report information would have resulted in a total of $108,053.81 in misallocated royalties, which represents 83% of the total royalties allocated on this title during the relevant time period.

The following table summarizes the misallocations from not having the Unions' information:

Table 9: Allocation error rate in the Fund's sample of 50 titles

|  | Participant count | Participant distributions |
|---|---|---|
| Total existing allocations using Union data (from Table 7) | 669[44] | $ 3,672,338[45] |
| Allocation errors from not using the Unions' data | 404[46] | $ 1,099,100[47] |
| % error | 60%[48] | 30%[49] |

As shown in Section III.D, data provided by the Unions cover from around 50 to 80 percent[50] of the Fund's activities (see bolded percentages), depending upon how one wishes to make such measurement, or whether one wants to rely on the Fund's database at all on this specific point. Applying this range of percentages to the error rate shown in Table 9, the Union's data improves the overall accuracy of the Fund's work in the range of approximately 15% to 50%.   All such amounts are obviously higher than the 3% paid to the Unions.

If one wants to instead look at the misallocations in terms of dollars, the percentages in the preceding paragraph (i.e., 15% to 50%) can be applied to the distributions made, which are reported in Table 3 above.  15% to 50% of roughly $230 million (through the end of 2019) equals from $34.5 million to $115 million.  These amounts will continue to increase as the Fund makes distributions after 2019.

---

[44] Digitally referenced as cell Z in Exhibit 2
[45] Digitally referenced as the sum of column and cell Y in Exhibit 2
[46] Digitally referenced as the sum of column W in Exhibit 2
[47] Digitally referenced as the sum of column X in Exhibit 2
[48] Digitally referenced as cell AB in Exhibit 2
[49] Digitally referenced as cell AC in Exhibit 2
[50] See Table 6

Exhibit 1
Page 21

Messrs. Thomas & Sullivan
March 8, 2021
Page 19 of 28

The information held by the Unions is valuable because the session reports have the following attributes:

1. Accuracy & Reliability – Information that is not accurate is obviously worth less.  Historical information is generally more reliable if it was recorded contemporaneously.  In this situation, the session reports are original business records that were contemporaneously recorded, and are required to support payroll.  As a class of accounting record, payroll records tend to be accurate because, in addition to whatever controls exist by the payor of the payroll, the payroll recipient is motivated to be paid correctly.[51]

2. Availability - Information loses value as the information becomes more widespread or commonly known.  Stated otherwise, as more people have the information, the information loses its value.  For example, information that is obtained easily on the internet is not as valuable as information known to only a small group.  In this situation, the Union-maintained information is generally not otherwise available.

3. Relevant - Anything that is not relevant will hold small or immaterial value to the target audience.  This means that information is more valuable to different group(s) based on each group's activities and interests.  This is important in understanding past transactions, or the lack thereof.  Information will have value to a group to whom it is relevant (such as the Fund), even though the information has not previously been sold.

4. Completeness – For large data collections, a complete collection will be more valuable than incomplete sets.  If the same type of data can be obtained from multiple sources, the more complete data collection will be more valuable.  In this situation, the Unions' information is more complete than any alternatives, and covers the vast majority of distributions that the Fund is required to make.

5. Ease of use – Data that the buyer finds easy to use will be more valuable; stated otherwise, the cost of using the data is an offset to the value that the data would otherwise have.  Applied to this situation, data that (ii) is contained in an electronic data base or (ii) is based on a standard form containing the needed data (as the majority of the Unions' data is), is faster and easier to use.

For these reasons, the Unions are asked for session reports for nearly every title.[52]  The Unions are able to respond a high percentage of the time in certain locations, and in certain music genres.  This was explained by Julie Sandell as follows:[53]

> Q.  *So just going back to my question, though, whatever the number is of new research that the Fund is doing, that doesn't mean that the unions are providing information for that same number of titles, right?*
> A.  *Right. It depends on the genre. I would say in Nashville, probably 95 percent. Broadway, big band, movie soundtracks, underscore, huge. It's critical.*

---

[51] This comment does not require that the session reports to be infallible.  Mistakes occur in all types of business records.  This factor addresses the accuracy of the subject information when compared to the alternatives.
[52] December 9, 2020 deposition of Julie Sandell , pages 47 - 48
[53] December 9, 2020 deposition of Julie Sandell , pages 67 - 68

Exhibit 1
Page 22

Messrs. Thomas & Sullivan
March 8, 2021
Page 20 of 28

> *Q. And in your opinion is Nashville 95 percent because they've undertaken the effort to digitize their records?*
> *A. No, because the music that's produced there is produced by the session musicians and background vocalists that are union members.*
>
> *Q. Why is that specific to Nashville? Maybe I'm just not understanding.*
> *A. It's just the way their music production historically has been. The way their music has been created there. And LA too."*

See Section III.E above.  When the Unions do not have session reports, the Fund is left to obtain the necessary information itself.  For recently-produced digital music, there are fewer artists to discover.  Additionally, the names of participants for newer music could be available on Pandora[54] or Discogs[55] (but not such participants' addresses and tax identification numbers).[56]

When the music is not recently produced and/or is not easily researched using public sources, the Unions' session reports are a critical means of obtaining information on artists to whom royalties have been allocated by the Fund.  The Session reports also provide contact information and taxpayer identification information.  All of this data is required before an artist can be paid.  As an example, Ms. Gorbacsov testified:[57]

> *"Q. Does anyone besides SAG-AFTRA have access to these session reports?*
> *A. No.*
>
> *Q. It's not possible for the Fund to contact any particular individual or entity other than SAG-AFTRA to maintain these reports?*
> *A. No, there's no one else who would be able to provide these reports and we don't provide these reports to anyone else."*

If the Unions did not provide session reports, the Fund would not be able to identify performers in many circumstances, or would mis-identify performers, always to some musicians' detriment.  Julie Sandell summarized the efforts and challenges involved when the Unions do not provide session reports, and the Fund is forced to address its requirements on its own, as follows:

> *"Q. Okay. If the union wasn't able to provide a session report for a given album or track back in 2009, what would you do next?*
>
> *A. You have to make a choice of using the credits that you found on the Internet. Sometimes I would get books from the library, or my own library, my own albums trying to track down the liner notes from the album. But that still didn't help because there's a lot of cases where the session musicians were not listed on the liner notes.  So we had another option where we*

---

[54] https://www.pandora.com/ - Pandora is an American subscription-based music streaming service owned by Sirius XM Holdings.
[55] https://www.discogs.com/ - Discogs is a crowdsourced databased about audio recordings, including off-label releases.
[56] December 9, 2020 deposition of Julie Sandell , pages 126 - 127
[57] December 9, 2020 deposition of Julie Sandell , pages 39, 41-42ctober 23, 2020 deposition of Kristina Gorbacsov , page 128

Exhibit 1
Page 23

Messrs. Thomas & Sullivan
March 8, 2021
Page 21 of 28

> could put no credits found and hope that musicians would make a claim and provide the
> session reports; maybe they kept a copy.
>
> … The problem with that is, just like in the old days, they're more concerned with the
> featured artist, the songwriters, the producers, the engineers, all the Grammy-nominated
> credits. The session musicians tend to be an afterthought.  And that is the beauty of the old
> union-style session reports is that it was a document, a historical document that could be
> used.  And now if a song is created and nobody is in charge of compiling the credits, then
> they can get lost.  Someone might not have been at the first session where the guitar player
> played, and then when they remix it, they overdub somebody else, and then it goes to the
> record label and nobody knows that they were there." [58]

and

> "[T]he titles would be incomplete and a lot of musicians would not receive their royalties…
>
> Artists that have good liner notes and track breakdowns might be able to -- we might be able
> to find.  But what happens if we don't find a track breakdown. So we can use album credits,
> right? So I wonder if you have an album and one song has an orchestra or a choir or a big
> horn section, but if we can't find a track breakdown, we're going to add all of those musicians
> to every track.  So let's say there's one track where it's just a guitar player and a keyboard
> player, their shares will now be diluted by all those extra players. And they're not -- they're
> not winning.
>
> Or we put nobody in, and because we can't decide and we don't want to pay a whole choir
> for a track, so now we put nobody in and so those guitar players are now getting zero. So
> they're either getting their shares diluted or they're getting zero." [59]

## C.  The attributes and use of the Unions' data cause the 3% fee to be reasonable.

The landmark case, Georgia-Pacific Corp. v. United States Plywood Corp., 318 F. Supp 1116, 6 USPQ
235 (SD NY 1970) provides a 15-factor test that lists relevant economic factors when determining a
reasonable royalty.  Although the Georgia-Pacific case is more commonly applied to patents (as this
was the case's initial application), the Georgia-Pacific rationale is used by analysts to address
reasonable royalties with other forms of intellectual property.  Although not required in the instant
litigation, the decision does provide a useful list of helpful considerations when determining a
reasonable royalty rate.  Therefore, I consider the fifteen Georgia Pacific factors below, after
modifying them for the non-patent situation at issue here.  The fifteen (paraphrased) factors, and
their application to this matter, are as follows:

> 1.  *The royalties received by the licensor for licensing the [intellectual property], proving or tending
>     to prove an established royalty*.

Georgia-Pacific factor #1 involves consideration of the existence of an established royalty for the
intellectual property at issue.  Other than under the 2013 Agreement, the Unions have not sold or

---

[58] December 9, 2020 deposition of Julie Sandell , pages 39, 41 - 42
[59] December 9, 2020 deposition of Julie Sandell , pages 125 and 127

Exhibit 1
Page 24

Messrs. Thomas & Sullivan
March 8, 2021
Page 22 of 28

licensed the information being provided to the Fund.[60]  The Fund has not been able to identify any alternative sources of information for the number of tracks that the Union data covers.

Although not pertaining to the Union's past activities, Section A above provides substantial authority for the premise that information is quite valuable in market transactions.

2.   *The rates paid by the licensee for the use of other similar [intellectual property].*

The Fund has no similar licenses or agreements.  There is no alternative source of the Unions´ information.

3.   *The nature and scope of the license, such as whether it is exclusive or nonexclusive, restricted or non-restricted in terms of territory or customers.*

An exclusive license is more valuable (expensive) than a non-exclusive license.  Although the Unions are not prohibited from licensing the same information to others, there are no other licensees that currently have access to the Unions' information (other than the Unions' affiliated organizations, such as health and pension plans, that are provided information under the Unions' respective collective bargaining agreements).

4.   *The licensor's policy of maintaining its [intellectual property] monopoly by licensing the use of the [intellectual property] only under special conditions designed to preserve the monopoly.*

The Unions have not sold or used the information at issue with others (except as already noted for affiliate transactions for benefits), and I understand they would not do so outside of the 2013 Agreement.

5.   *The commercial relationship between the licensor and licensees, such as whether they are competitors in the same territory in the same line of business or whether they are inventor and promoter.*

The Unions and the Fund are not competitors and have complementary purposes.  This is the only reason that the 2013 Agreement exists.  Absent this factor (i.e., if the information was being shared with an entity that was competitive to, or otherwise a threat to, the Unions), the royalty rate would need to be considerably higher than the 2013 Agreement's price.

6.   *The effect of selling the [intellectual property] in promoting sales of other licensor's products; the existing value of the invention to the licensor as a generator of sales of other items; and the extent of such derivative or "convoyed" sales.*

This factor involves so-called "convoyed" sales.  Examples of convoyed sales are repair or extended warranty contracts, or supplies/consumables that are uniquely fitted to the product at issue.  There are no such additional sales or transactions with the Unions' information.

7.   *The duration of the [intellectual property] and the term of the license.*

---

[60] The Unions share some membership data with related pension and health funds pursuant to collective bargaining agreements.

Exhibit 1
Page 25

Messrs. Thomas & Sullivan
March 8, 2021
Page 23 of 28

Unlike a patent which is published publicly and provides exclusivity for a discrete time period, the information provided under the 2013 Agreement can remain confidential without expiration. This makes the information more valuable when compared to protections with a known expiration.

8. _The established profitability of the [intellectual property], its commercial success and its current popularity_.

The information provided by the Unions is used to make payments on royalties that have already been received. The Fund has an obligation to distribute the payments to the artists, which the Fund could not do without either having the Unions' information or somehow recreating such information itself. There is no question that the information is needed, because the Fund has already received the royalties, and is assured of receiving future royalties. The lack of risk-taking makes the Unions' information more valuable than would otherwise be the case.

Deposition testimony in this matter indicates that the Fund trustees and executive director gave consideration in 2013 to comparable fees that were being charged by others. For example, Duncan Crabtree Ireland testified:[61]

> "[A]s far as I know, pretty much all of those organizations charge a similar or a higher administrative fee than the Fund does. With the possible exception of PPL, their fee might be a little lower because of the volume of payments that they handle. But that was the kind of thing that we were looking at in terms of what's -- you know, what's a reasonable administrative fee to charge in an environment where there's not a subsidy going on by a union, which is -- you know, in none of those -- in none of those organizations would there be a union subsidizing the operations of those CMOs. And so that was a data point, I think, to help us evaluate the overall reasonableness of the cost structure. …
>
> an appropriate data point or metric to consider is because those institutions, ultimately, have to do the same function. So whether they can acquire the data from someone else who already has it or whether they have to generate that data themselves, either way it's an indication of what the cost and value of that data might be and something to take into account."

Consistent with this, Dennis Dreith testified:

> "The norm of the foreign societies have requirements in their EU law how much we can charge in administrative expenses, and our bilateral agreements had to be matched to theirs for collection of foreign royalties so. I did point out that to have a higher administrative fee would put us above the allowable amount. …[62]
>
> [S]omebody asked me on the board, possibly Duncan, I think, asked me well, what would be a percentage that would keep us at or below the threshold to not trigger a problem with the foreign CMOs. And I had said at that point, I believe 3 percent would keep us at the threshold at or below that point".[63]

---

[61] February 16, 2021 deposition of Duncan Crabtree-Ireland, pages 243 - 244
[62] February 11, 2021 deposition of Dennis Dreith, page 164
[63] February 11, 2021 deposition of Dennis Dreith, page 166

Exhibit 1
Page 26

Messrs. Thomas & Sullivan
March 8, 2021
Page 24 of 28

9. _The utility and advantages of the [intellectual property] over any old modes or devices that had been used._

10. _The nature of the [intellectual property], its character in the commercial embodiment owned and produced by the licensor, and the benefits to those who used it_.

Factors 9 and 10 are often considered together, as I do here.

See Sections III and IV.B above.  The Unions' information is critical to the Fund in complying with the Fund's obligations.  Other than attempting to research the data independently, there is no alternative to having the Unions' data.  However, the Fund is unable to independently research the full scope of recordings that the Unions´ data covers, and such independent efforts provide results that are less accurate than occurs when using the Unions data.

The following considerations described in Section III.D are important in addressing the benefit that non-union participants receive from having use of the Unions' information:

a. The session reports include information on performers who are not union members who play at recording sessions that are covered by Union collective bargaining agreements.

b. The Unions' information covers between 50% to 80%[64] of the Fund's royalty allocations, depending how one wishes to measure this.  For this large portion of the research that needs to be done, the Fund's costs are less because the Unions provide their information.  The non-Union participants benefit from having this less-expensive information available because the overall costs of the Fund are deducted from all distributions.  Stated otherwise, by having information regarding Union recording sessions and the Union members, additional resources are available to research tracks that did not result from a Union recording session.  When the overall cost to the Fund is lessened, all participants benefit, both Union and non-Union.

The Unions provide other services described in the 2013 Agreement that are in addition to providing the information needed to make distributions to artists.

11. _The extent to which the [licensee] used the invention and any evidence probative of the value of that use_.

See Sections III.E and IV.B above for information regarding the payments made to participants, and how the data provided by the Unions makes such payment more accurate.  The Fund uses the Unions' information as a critical and integral part of the Fund's mission.  The Fund has no alternative to the use of the Unions' information without materially sacrificing the accuracy of the payments that are made to the participants.  The Unions' data is critical to the Fund's ability to comply with its mission and purpose.

As shown in Table 9 and the related commentary thereto, the Unions' data provides a substantial increase in the accuracy of the payments being made.  When expressed as a percentage of the Fund's overall distributions, the 3% fee paid to the Unions is small relative to the much larger increase in accuracy.

---

[64] See Table 6

Exhibit 1
Page 27

Messrs. Thomas & Sullivan
March 8, 2021
Page 25 of 28

There are a large number of artists receiving payments from the Fund, with some of the individual payments being modest. The large number of participants increases the Fund's challenge in paying only a cost for each artist that is proportionate to what is owed. The 3% fee to the Unions for their information used in Fund distributions accomplishes this objective.

12. _The portion of the profit or selling price that is customary in the particular business or in comparable businesses._

I am not aware of any industry standard rates that are applicable in this situation.

13. _The portion of the realizable profit that should be credited to the [intellectual property]as distinguished from any other elements, manufacturing process, business risks or significant features or improvements added by the [licensee]._

The payment of a 3% fee allows the payments to be considerably more complete and accurate than would occur otherwise. Under the 2013 Agreement, the amounts paid to the Unions are a modest portion of the Fund's administrative costs.[65] As shown in Table 1, the fees paid to the Unions[66] range from 9% to 15% of the Fund's total General and Administrative costs (with an overall average of 12%). Because the information provided by the Unions is central to the Fund's ability to meet its mission and purpose, and there are no alternatives to find the needed information (particularly for older performances), the 3% fee being paid to the Unions is sensible economically.

14. _The opinion testimony of qualified experts._

I do not have the reports from other experts in this matter, or in other matters involving the parties in this case.

15. _The amount that the licensor and a licensee would have agreed upon at the time the [use] began if they had reasonably and voluntarily tried to reach an agreement._

This Georgia Pacific Factor is a reconciliation and conclusion of the preceding factors to arrive at a reasonable royalty conclusion. The following facts and circumstances bear most heavily on the correct reasonable royalty rate:

1. The information is critical to the Fund's mission and purpose. The Fund has no economically viable alternative in terms of obtaining the information from a source other than the Unions that would allow the same level of completeness and accuracy that is achieved using the Unions´ data.

2. The 3% fee paid to the Unions is small relative to the much larger increase in accuracy occurring by using the Unions' information.

---

[65] See the supplemental Schedule of Expenses that is part of most of the Fund's audited financial statements available on the Fund's website. Contrary to the Plaintiff's contentions, the description and amount paid to the Unions consistently appears in these publicly-available audited financial statements.

[66] See the Unions' answers to Interrogatory Nosx 7 and 8 (March 1, 2021).

Exhibit 1
Page 28

Messrs. Thomas & Sullivan
March 8, 2021
Page 26 of 28

3. The Fund incurs no risk of losing money, as the percentage amounts paid to the Unions are calculated only based on successful distributions of amounts already received.  This "no-risk" situation is unusual in business activities.

4. Some of the potential payment recipients are owed individually modest amounts.  This underscores the requirement that the needed information be obtained inexpensively relative to the individual amounts being distributed.  A 3% fee accomplishes this objective.

5. The Unions provide other services to the Fund in addition to the information needed to make distributions to non-featured artists.

**D. Amounts paid to the Unions for their information need not occur (and should not be expected to occur) based on when the underlying information was obtained, or the underlying work occurred.**

Plaintiff incorrectly contends that the percentage-based payments made by the Fund to the Unions need to correspond to work performed by the Unions in the same time period as the payment.  For example, Plaintiff's response to Interrogatory No. 11 (February 12, 2021) includes:

> "… The membership data is simply copied to the Fund, without regard to whether the Fund actually needs the information. The data is also duplicated from prior years, leaving the Fund to sort through the data dump to pick out the information that it requires for the distribution before verifying it for accuracy. The Fund has been accumulating its own, up to date, verified data since its creation. The data for prior years' tracks and identified performers have already been accumulated. The delta between the information already known by the Fund and new information sought is small, if not non-existent. Unlike music production of days past, the likelihood of a Union session is rare. If the track was not a Union session, the Unions would have no chance of obtaining any relevant information that would assist the Fund."

The preceding quote contains multiple errors and omissions that explain why Plaintiff's contentions are incorrect.  For example:

1. In contrast to the Plaintiff's contention, payments for the use of information or other intellectual property are almost never received in the same period in which the underlying work was performed.  Plaintiff's proposed timing requirement almost never occurs with such payments, and need not be a requirement for the 2013 Agreement to be economically reasonable.

2. As previously discussed, Plaintiff is incorrect that the Unions have no information regarding non-Union performers, because all labels that are signatories to the Union agreements are required to include all performers in their session reports, including non-Union performers.

3. As previously discussed, the Unions have current members who perform new music, for which the Fund receives and will continue to receive royalties that need to be distributed.

4. Information that the Fund continues to use has ongoing value.  Plaintiff admits that the Fund has possession of Union historical information, which the Fund continues to need and use.  Plaintiff's position quoted above is based on the position that the Fund should be entitled in perpetuity to make ongoing use of the Unions' data without paying any compensation.

Exhibit 1
Page 29

Messrs. Thomas & Sullivan
March 8, 2021
Page 27 of 28

While the parties have sometimes described the fee paid to the Unions as a "Service Fee", this name is a misnomer when applied to the "data" and "information" that repeatedly is identified as being a central aspect of the 2013 Agreement.  The 2013 Agreement's description of the arrangement includes:

> "*WHEREAS, the Agreement and Declaration of Trust authorizes the Trustees of the Fund to purchase relevant data from the Unions (and others) and to employ assistants; and*
>
> *WHEREAS, the Trustees of the Fund have determined that it is reasonable and appropriate at this time to memorialize arrangements for the provision by the Unions to the Fund of certain data and assistance in exchange for reasonable compensation to the Unions from the Fund;*
>
> *NOW, THEREFORE, the Parties, intending to be legally bound, hereby agree as follows:*
>
> *3.   Provision of Data. From and after the Effective Date, each Union shall provide the Fund the following data, in a manner comparable to the way such data has been provided immediately prior to the Effective Date:*
>
> > ï   *Access to member databases to enable the Fund to obtain identifying and contact information for members.*
> > ï   *Access to session reports and "B-forms," or databases containing information derived therefrom, that in either case, identify the recordings made at recording sessions and provide identifying and contact information for performers (Union members and nonmembers) who performed at the session.*
>
> > *Each Union retains all its ownership rights in its data, and all such data shall be considered Confidential Information of the relevant Union subject to the provisions of Section 7. The Fund is authorized to, and shall, access, reproduce and use such data solely for purposes of distribution of royalties collected by the Fund to the relevant persons. In its use of such data, the Fund further shall comply with the provisions of any applicable Union privacy policy of which such Union advises the Fund in writing from time to time. …*
>
> > *6.   Payment. In consideration of the foregoing, the Fund shall pay each Union, within 30 days after the conclusion of each of the Fund's distribution cycles, 3% of the amount distributed by the Fund in such distribution cycle.  Each such payment shall be accompanied by a statement setting forth the computation of the payment amount. Such payment shall constitute complete compensation of the Unions and their personnel for providing the data and services contemplated by this Agreement. There shall be no additional charges or expense reimbursement associated with the Unions' provision of the data and services contemplated by this Agreement.*"

A "royalty" is a payment made to an asset's owner for the use of that asset.  Royalties are typically expressed (as occurs under the 2013 Agreement) as a percentage of gross or net revenues derived from the use of an asset. The payment to the Unions under the 2013 Agreement is a percentage royalty.  Similarly, the dispute at issue involves the administration of music royalties, in which music performers are compensated with percentage royalties.  Simply put, it should surprise no one that a percentage fee is used for the use of information needed to administer percentage-based music royalties.

Exhibit 1
Page 30

Messrs. Thomas & Sullivan
March 8, 2021
Page 28 of 28

Music royalties are not earned or paid when the underlying work occurs; instead, the work precedes the payment, sometimes by years.  The same is true for all of the payments to the companies described in Section A above.  Yet, in this matter, Plaintiff asserts (incorrectly) that the payments made to the Unions for the use of their information are unreasonable because the amount paid in any particular year (or, the increase in the payment over the prior year's payment) is not reasonably calculated based on work uniquely performed in that year.  The Plaintiff's contentions in this regard are improper as the time-based work vs. payment relationship almost never exists in royalty agreements.

## V.   OTHER INFORMATION

A.  QUALIFICATIONS FOR OFFERING OPINIONS

Attached as Exhibit 1 is a copy of my curriculum vitae summarizing my education, experience and qualifications.  Exhibit 1 also includes a listing of the cases in which I have testified as an expert at trial or by deposition within the preceding four years, and publications that I have authored in the last ten years.

B.  COMPENSATION

Fulcrum is being paid at its normal hourly rates for the persons involved in the assignment.  Our compensation is not contingent on the conclusions reached or ultimate resolution of the case.  My personal hourly rate is $625.

Very truly yours,
Fulcrum Financial Inquiry LLP

By:    _David Nolte_

      David Nolte

Exhibit 1
Page 31