# EXHIBIT 2

David Nolte

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                CENTRAL DISTRICT OF CALIFORNIA
 3
 4   KEVIN RISTO, on behalf of      )
     himself and all others        )
 5   similarly situated,           )
                                   )
 6           Plaintiffs,           )
                                   ) CASE NO.
 7      vs.                        ) 2:18-cv-07241-CAS-
                                   )
 8   SCREEN ACTORS GUILD-AMERICAN  ) PLA
     FEDERATION OF TELEVISION AND  )
 9   RADIO ARTISTS; a Delaware     )
     corporation; AMERICAN         )
10   FEDERATION OF MUSICIANS OF THE )
     UNITED STATES AND CANADA, a   )
11   California nonprofit          )
     corporation; et al.,          )
12                                 )
             Defendants.           )
13   _____ )
14
15
16
17                Tuesday, April 27, 2021
18
19
20        Remote videotaped deposition of DAVID NOLTE,
21   conducted at the location of the witness in
22   Los Angeles, California, commencing at 9:08 a.m. and
23   ending at 4:03 p.m., on the above date, before
24   SHARI BOLTON, CSR 9291.
25
```

Exhibit 2
Page 32

David Nolte

```
 1    REMOTE APPEARANCES:
 2
         For Plaintiffs:
 3
             KIESEL LAW LLP
 4           BY:  MARIANA McCONNELL, ESQ.
                  NICHOLAS BRANCOLINI, ESQ.
 5           8648 Wilshire Boulevard
             Beverly Hills, California 90211
 6           (310) 854-4444
             mcconnell@kiesel.law
 7           brancolini@kiesel.law
 8           JOHNSON AND JOHNSON, LLP
             BY:   DANIEL B. LIFSCHITZ, ESQ.
 9           439 North Canon Drive
             Beverly Hills, California 90210
10           (310) 975-1080
11
         For Defendants:
12
             JENNER & BLOCK
13           BY:  ANDREW THOMAS, ESQ.
                  ANDREW G. SULLIVAN, ESQ.
14           633 West 5th Street, Suite 3600
             Los Angeles, California 90071
15           (213) 239-5155
             ajthomas@jenner.com
16           agsullivan@jenner.com
17
         Videographer:
18
             DAVID KIM
19
20
21
22
23
24
25
```

Exhibit 2
Page 33

David Nolte

```
 1        A   Well, I don't have a good count.  If someone
 2   told me it was 200 times, that would not surprise me,
 3   but I don't have a count.
 4        Q   Okay.  What types of clients did you have at
 5   Anderson?
 6        A   We would work for both plaintiffs and
 7   defendants.  Most of our clients were corporations or
 8   very well-heeled individuals.
 9        Q   Okay.  You founded Fulcrum Financial Inquiry
10   in -- I'm sorry.  You founded -- hold on.
11            Did you work on -- with IP types of cases
12   when you were at Anderson?
13        A   Yes.
14        Q   What percentage of your client load was IP
15   clients?
16        A   I -- I don't have a percentage in mind.  I
17   can tell you that I -- IP work, and there's different
18   types of IP work, but IP work generally was probably
19   my largest single area and that probably continues to
20   be the case now.
21        Q   Did you have nonprofit clients when you were
22   at Anderson?
23        A   I did.
24        Q   Okay.  Can you give us an estimation of how
25   many?
```

David Nolte

```
 1        Q    Okay.  What are the consequences of having a

 2   poor sample selection?

 3        A    Well, I don't know what "poor" is so I -- so

 4   I'm afraid I can't answer the question without knowing

 5   what "poor" is.  I could substitute my own definition

 6   of "poor," but I don't know what you have in mind.

 7        Q    What are the consequences of having a not

 8   statistically significant sample selection?

 9        A    Then you cannot draw statistical inferences

10   expressed in terms of precisions and confidence

11   levels.

12        Q    What are the consequences of having a sample

13   that is not representative of the whole?

14        A    Well, then -- then you would have what's

15   commonly called a sample error and so the

16   conclusions -- which, by the way, can happen even if

17   you got a statistically valid sample.  In other words,

18   you follow the rules you -- you could have a sample

19   error, and the -- the effect of having a sample error

20   is that your conclusions expressed in terms of

21   inferential statistics are incorrect.

22        Q    In your opinion, is it important for a sample

23   to be representative of the larger dataset from which

24   it's drawn?

25        A    Yes.
```

David Nolte

```
 1   you're dealing with nonunion members and the starting

 2   point being the union databases.

 3           I don't know that there's any quarrel about

 4   that.

 5           MS. McCONNELL:  Okay.  Why don't we take a

 6   break and come back.  Do you want to take a lunch

 7   break or do you want to go for a little bit longer?

 8           THE REPORTER:  Do you want to go off the

 9   record to discuss that?

10           THE VIDEOGRAPHER:  We are now going off the

11   record, and the time is 12:05 p.m.

12           (Lunch recess.)

13           THE VIDEOGRAPHER:  We are now going back on

14   the record, and the time is 12:44 p.m.

15   BY MS. McCONNELL:

16      Q   Okay.  Mr. Nolte, did you devise the -- did

17   you devise the 50-song study?

18           MR. THOMAS:  Objection; vague.

19           THE WITNESS:  I don't know what you mean by

20   "devise."

21   BY MS. McCONNELL:

22      Q   Did you set the parameters of the 50-song

23   study?

24      A   By parameters, what I have in mind is the

25   sample size of 50.  Is that what you're asking about?
```

David Nolte

1       Q    We can start there.

2       A    I did not set the sample size of 50.

3       Q    Okay.  Did you provide any input on any other

4   starting points for the study, including what -- what

5   general group of titles to pull the 50 songs from?

6       A    No.

7       Q    Okay.

8       A    Well, and the no -- well, hold on a minute.

9   Your -- your question was compound.  So the part that

10  I was answering was the last half of your question,

11  not the first half.  So I -- let me say the same thing

12  a different way.

13          I was not involved with the sample selection.

14  That would be a more precise way of answering what I

15  was intending just a second ago.

16      Q    How -- generally speaking, how would you

17  design a statistical study?

18      A    How would I?

19      Q    Yes.

20          MR. THOMAS:  Objection; overbroad, vague,

21  outside the scope.

22          THE WITNESS:  If -- and -- and the sentence

23  starts with "if," so you may not need to do this, but

24  if one decided that they needed to follow the rules of

25  inferential statistics, then one would need to have a

David Nolte

```
 1    versus women are in the world, I'd say -- looking at

 2    this, I'd say, well, it looks like 50/50.

 3            Now, there's nothing random about it.

 4    There's nothing proper about the sample size, but I

 5    arrived at an absolutely correct answer.  And that's

 6    an example that I just did off the top of my head that

 7    illustrates what you were asking.

 8      Q   So is it just by luck, then, that it's

 9    representative if it's not random?

10      A   No.  No.  It might be -- my example was

11    probably luck.  But when you look at the manner that

12    this -- the 50-title item was -- was selected, I would

13    not say it was luck.  I would say -- well, I would not

14    attribute it to luck.

15      Q   Okay.  Generally speaking, is it accurate to

16    say that sample selection is important to ensure that

17    data is usable for the intended purpose?

18      A   If you're going to want to express your

19    conclusions inferentially, then, yes.  I -- I have not

20    drawn any conclusions using the tools of inferential

21    statistics so in that sense the answer would be no.

22    I'm not quarreling with the fact that someone might

23    have done a sample in a different way, but that does

24    not mean that what you proposed a second ago is

25    correct.
```

David Nolte

1       Q    You're talking specifically about the 50-song

2    sample again, I'm assuming.  But if you're saying that

3    you didn't use inferential statistics to come to your

4    conclusions how are you confident that the 50-song

5    sample is representative?

6       A    I've not -- I've not reached any conclusion

7    regarding it being representative.  The Fund made the

8    sample.  The Fund indicated that in their mind it was

9    random and in their mind it was sufficiently large to

10   accomplish its purpose.  And so I did my work with the

11   results of that sample.

12      Q    Are you able to extrapolate results on the

13   larger track list based on the 50-song sample?

14      A    One can extrapolate it.  You will lose the

15   opportunity to do so with the precision and confidence

16   parameter.  So I've -- I've not expressed anything

17   with the precision and confidence level because of

18   what you just mentioned.  But, yeah, you certainly can

19   extrapolate it, yes.  You -- you don't need -- you

20   don't need to use inferential statistics to do an

21   extrapolation.

22      Q    Why not?

23      A    It's definitionally you don't.  I mean, look,

24   look, look, look.  Let me give you an example.

25           Let's say we go back -- and this is not luck.

David Nolte

```
 1    I -- you know, we were quarreling about, you know, my
 2    luck example with the four people that are on my
 3    screen.  But let's say instead I say let's do a test.
 4            We want to figure out how many fingers each
 5    human has.  And so I say, okay, everyone put up their
 6    fingers and we'll count them and I haven't seen your
 7    fingers yet so I don't know what the answers are, but
 8    I can tell you I have ten fingers and I'm willing to
 9    wager that the other three people I was describing
10    have ten fingers.  So then I've got four observations
11    of ten fingers.  And I would say, well, based on that,
12    I will extrapolate that humans have ten fingers.
13            Now, there's nothing following inferential
14    statistics, but I don't think anybody is going to
15    doubt the conclusion that humans have ten fingers.
16    And that's an example of what -- how you could do that
17    without using inferential statistics.
18       Q   Who devised the 50-song study?
19       A   You said who devised it?
20       Q   I did.
21       A   That assumes that there was a single person
22    that devised it so I -- I -- the Fund was certainly
23    involved in coming up with that, and I'm sure they
24    would say I had some input.
25       Q   What input did you have?
```

Exhibit 2
Page 40

David Nolte

1          A    I had a conversation with Jenner & Block and

2    Fund representatives about what information the Fund

3    had regarding what happens when they don't use the

4    union data.   And they -- this is my characterization.

5    I'm not trying to put words in anyone's mouth.

6               But the impression I got back was, golly,

7    that's an awful stupid question, why would we ever

8    waste our time trying to figure out the impact of data

9    that we know to be valuable and that we use every day

10   of the week.

11              I said, well, because -- and I answered and

12   said, well, that's because that's what the plaintiff

13   thinks you should be doing.   They think either the

14   union should be giving away the data for free or you

15   should not be using it.   And those are the two options

16   that I think the -- the plaintiff is proposing.

17              And my question is, have you ever really

18   contemplated that, that as a possibility, and they

19   said, no, we just told you that was a stupid question.

20   I said, well, okay, but that's the stupid question

21   that the plaintiffs are asking so maybe we should try

22   to answer their question.

23              And so they went off and did the 50-sample

24   test and it was -- I suspect I was the cause of it

25   initially, although they are the ones that -- that

David Nolte

1    initially did the sample and -- and did the work

2    because that's of course what they do for a living.

3    And then they gave it back to me and I did the work

4    that's reported in my report.

5            So when you say who devised it, I did some of

6    the calculations at the end.  And -- and I think I was

7    probably the guy who caused the thing to come up to

8    begin with and they were the ones that implemented the

9    research because they of course have the researchers

10   on staff and I don't research this and couldn't do it

11   near as fast as they can.

12       Q   You are aware that there's several instances

13   where the unions don't have session reports for tracks

14   and the Fund needs to do all the research by

15   themselves, right?

16       A   I think what you're asking me is, is it true

17   that the 100 percent of the nonfeatured performers are

18   not covered by session reports and -- I think that's

19   what you're asking me.  And I think everybody's

20   acknowledged that that's the case.

21       Q   Okay.  I don't need to know that it's true.

22   I don't need you to answer whether it's true or not

23   because I know that it's true.

24           So my question to you is, were you aware of

25   the fact that the unions don't have session reports

David Nolte

```
 1   you that in the total pool of tracks there are errors
 2   that are made even when using union data?
 3        A    I -- look, I highlighted in a footnote that,
 4   you know, no data source is infallible.  And that
 5   infallibility -- something does not have to be
 6   infallible to be valuable.  So I don't doubt for a
 7   minute that in any information gathering process that
 8   a mistake is made.  This is still done by humans.  Can
 9   it be done by computers, computers can make mistakes
10   because the programs can make mistakes.
11            But -- so it's -- but, no, no one has told me
12   that the union data is unreliable or should not be
13   used or had any meaningful error rate to them.
14        Q    On page 10 of your report, Table 6, you have
15   heading -- well, most of your headings in this chart
16   have some variation of "supported by union data" or
17   "not supported by union data."
18            As used here, what does "supported by union
19   data" mean?
20        A    It means I'm summarizing the information
21   that's on a production number that is in footnote 10.
22   So whatever is intended by that document is what I'm
23   intending.
24            My understanding is that it's just what those
25   English words are saying, that the union data is
```

Exhibit 2
Page 43

David Nolte

1    useful in -- or it has information involving this

2    amount of royalties and -- and participants.

3        Q   Did you ask the Fund to collect that database

4    summary that's referred to in footnote 10?

5        A   I appreciate that's a simple question.  It

6    might frustrate you that I'm not giving you a

7    yes-or-no answer.

8            The -- I had a -- multiple conversations with

9    Fund representatives and I was seeking information

10   regarding union versus not -- nonunion data and I was

11   asking for information that would provide insights in

12   that regard.  In that sense I did ask for it.

13           Now, at the same time, they were responding

14   to your discovery, written discovery, and so there was

15   some things where people said, well, that's kind of

16   like what the plaintiffs want for this, or, it's, oh,

17   that's kind of like what was in the Blondell

18   litigation and we think we can get this, that or the

19   next thing and would that be useful.  And I said,

20   sure, go ahead and give it to me if useful to -- for

21   whatever the issue, you know, the table has to be

22   produced.

23           So I did ask for this data but it doesn't

24   necessarily make that my idea.  It could have been

25   your idea through written discovery.  It could have

David Nolte

1    I'm just telling you that the -- the information

2    gathering was an evolving process and I got the

3    information that's summarized in this section of my

4    report.

5         Q    Do you know if -- well, strike that.

6              You mentioned the Fund's AS400 system.  Do

7    you know how the AS400 system tracks whether or not a

8    participant allocation is supported by union data or

9    not?

10        A    I understand there's a field in that database

11   that exists but is not reliable.  And -- and...

12        Q    Yeah.

13        A    So I mean, I -- I know there's been

14   discussion on that topic.  But generally I'm not

15   familiar with the detailed workings of that database.

16        Q    Okay.  And I think that testimony was from

17   Ms. Taub's 30(b)(6) deposition where she said that the

18   AS400 system does have that field but it's not

19   reliable.  Is that what you were referring to?

20        A    She certainly told me the same thing outside

21   of the deposition.

22        Q    Okay.  If the report was made, if -- if the

23   report that's attached -- strike that.

24              If the report that's referenced in

25   footnote 10 is created from unreliable data, doesn't

David Nolte

1    that make your Table Number 6 unreliable?

2         A    Given -- given your "if" statement, sure.

3    You're -- you basically said if -- if -- if Table 6 is

4    unreliable, isn't Table 6 unreliable?   The answer is,

5    sure, it is.   I -- it's -- I don't know how this was

6    created.

7         Q    Okay.

8         A    But I -- I did get the information, and it

9    provides the information that -- that's shown here.

10             The -- the unreliability, however, was that

11   the union involvement or the union data was being

12   significantly understated.   So to the extent that

13   Table 6 is impacted by this unreliable field, assuming

14   we're even talking about the same field, and I'm not

15   sure we are, but if we were then all of these numbers

16   for the unions should, in fact, be higher and which

17   would kind of be going the wrong direction from the

18   position the plaintiffs wish to advocate here.

19        Q    Is that information based on something that

20   Ms. Taub told you?

21        A    No.   I'm just telling you that -- that I'm

22   just responding to your "if" questions.   I was given

23   this information.   I'm not sure how it was compiled.

24   I do know that there was this other piece of data that

25   Ms. Taub described as being unreliable, and I don't

David Nolte

```
 1    their members employed and have retirement benefits.

 2    What they receive is the member dues that -- and --

 3    and the member's permission to run those retirement

 4    plans.

 5         Q    Okay.  I'll leave that one alone.

 6              Do you think -- I think you answered this.

 7              Do you think that the session reports are

 8    eligible for patent protection?  I think you said no,

 9    right?

10         A    I'm not expressing any legal opinions, but

11    I -- I would not expect them to be a patented item,

12    no.

13         Q    Would you need to assume that they are a

14    patented item to use the Georgia-Pacific factors in

15    this case?

16         A    No.

17         Q    Why not?  Let's start there.

18         A    I would invite your attention to the

19    introductory paragraph to conclusion C, as in cat,

20    where this entire Georgia-Pacific analysis exists.  In

21    this introductory paragraph I observe what your

22    question just asked and explain why it is that I'm

23    using the Georgia-Pacific factors.

24         Q    You say it's because its "used by analysts to

25    address reasonable royalties with other forms of
```

David Nolte

1    intellectual property," right?

2         A   I do say that, yes.

3         Q   Okay.  So are you saying that the session

4    reports fall under that umbrella of other forms of

5    intellectual property?

6         A   I'm not sure I know what you're referring to.

7    Look, this information has value.  If you want to

8    debate that, that's a different series of questions,

9    but I don't think that's what you're asking here.

10             The value is for property that is

11   intellectual.  It is not physical, right, it's not

12   like a desk or a chair.  So I'm valuing intellectual

13   property and I'm using Georgia-Pacific in order to

14   gain insights because that landmark case has been used

15   on a wide range of intellectual property matters

16   extending past patents, which was its initial purpose

17   or point.

18        Q   Okay.  So you -- you're aware of courts that

19   have used the Georgia-Pacific factors on other forms

20   of intellectual property?

21        A   I don't have any case cites.  I -- I expect

22   there are.  I can tell you that analysts such as

23   myself will do that.  And it's -- it's just a

24   methodology.

25             I don't know what any courts have said that

David Nolte

```
 1   page 21 of your report.

 2           For factor number 2, "The rates paid by the

 3   licensee for use of other similar [intellectual

 4   property]."

 5           You note that the Fund has no similar

 6   licenses or agreements, right?

 7       A   Yes, ma'am.

 8       Q   Okay.  So we don't have an example of other

 9   rates paid by the Fund for similar intellectual

10   property, right?

11       A   Correct.

12       Q   Okay.  On factor number 3, "The nature and

13   scope of the license, such as whether it is exclusive

14   or nonexclusive, restricted or nonrestricted in terms

15   of territory or customers."

16           Does the service agreement have any language

17   related to whether -- well, A, whether it's a license,

18   and, B, whether it's exclusive or nonexclusive?

19       A   Well, the service agreement, as I recall,

20   does not describe it as a license.  I'm doing that

21   because of what I told you before, which is the

22   economic substance of it is a royalty for the license

23   of information.

24           And as for it being exclusive or

25   nonexclusive, I -- I don't think the union is
```

David Nolte

```
 1    remedy that's being sought.

 2            So I can't tell you how many of those

 3    hundreds have expressed them as reasonable royalty but

 4    I'm pretty sure that may be a hundred percent of them

 5    when they're expressed in that manner I've used

 6    Georgia-Pacific.  I don't have a number of what that

 7    is other than it's probably all of them.

 8        Q   You mentioned that you use Georgia-Pacific

 9    when the desired conclusion is expressed as a

10    reasonable royalty rate.  Wouldn't you agree that

11    there are other alternatives for compensation for the

12    unions instead of what you call a royalty rate?

13        A   I probably don't understand your question.

14    But, for example, plaintiffs' contention is that it's

15    for free and so I guess for free means you don't need

16    a royalty rate or anything else.  So --

17        Q   Couldn't it be --

18        A   -- I'd have to agree -- I'm sorry?

19        Q   Couldn't it be a flat fee?

20        A   You can express royalties as a flat fee.

21    They're not as common, particularly with things that

22    have proven their value.  But if -- I've -- I've done

23    royalty valuations where it's been expressed as a flat

24    fee.

25        Q   Could you have a subscription fee model
```

David Nolte

1    instead of a royalty rate percentage?

2        A    Well, depends on what the -- how the

3    subscription fee is expressed, but I think what you're

4    saying is that if you could say, well, we're going to

5    charge X cents per amount received per artist, or --

6    or per track, because that's how SoundExchange reports

7    it, I suppose you could do that.

8            You can express royalties in any form you

9    want, whether it's a flat fee, a per unit amount or

10   percentage amount.  But ultimately the economics are

11   all the same.  Well, you know what, I -- they're not

12   all the same.  The risk sharing is different if you're

13   dealing with a flat fee.  But if you're dealing with

14   a -- a per unit versus a percentage, you -- you get a

15   kind of -- you could end up in the same direction.

16       Q    Do any of the for-profit businesses that you

17   described in your report use a percentage-based

18   royalty rate?

19       A    Well, some of them don't describe it as a

20   royalty, but clearly there are some fees being paid as

21   a percentage.  I -- I would say all of them are based

22   on quantity of some sort, so whether they express them

23   as a percentage, there's no question that the use of

24   intellectual property or the fee for the use of

25   intellectual property increases as the usage goes up.

David Nolte

1   And -- and that's true across the board.

2       Q   Which -- which companies, starting on page 14

3   of your report, charge percentages based on usage?

4       A   Well, I've already told you it really doesn't

5   matter too much whether you do it as a percentage.

6   I'm expressing it as a percentage here because that's

7   the way the agreement was crafted.

8           But in any event, I'll be happy to go through

9   this and give you my -- my reactions.

10          The mailing list industry is not expressed as

11  a percentage because the mailing list industry does --

12  does not wish to risk share with their licensee.  So

13  this is an example of where the risk -- they're --

14  risk sharing's just the opposite of what happens here.

15          And the mailing list gets paid a flat fee for

16  a given size list so you could express that this --

17  the fee is at per unit or as a flat fee.  But

18  generally, if it's a bigger list, it's going to get

19  more money so the per unit fee is going to be more

20  sensible.

21      Q   Can I cut you off and go to number 2, I'm

22  sorry, because you mentioned risk sharing, and I'm

23  wondering what is the risk sharing that you were

24  describing in terms of the mailing list industry?

25      A   Well, the -- the mailing list industry says

Exhibit 2
Page 52

David Nolte

1   we're not going to charge you less if you don't

2   generate sales, it's your problem to generate sales,

3   so we're going to charge you an amount of money and we

4   get the money whether you're successful or not.

5       Q    Okay.  Sorry, I cut you off.  You were going

6   to give more examples?

7       A    Okay.  Well, the next one is Google and

8   Facebook.  Google, you know, I'm not familiar with --

9   with the details of their pricing, and they're

10  probably evolving, but most of what Google does, I

11  believe, is on a -- a per impression basis.  So you

12  get paid for X number of impressions.

13          I -- I'm not telling you that Google doesn't

14  have other means of contracting.  We probably could

15  read about that in their annual report.

16          Facebook I'm guessing is the same way, but

17  again, I'm not -- it's not important -- I'm trying to

18  answer your question, but it's not important to my

19  conclusions.  But whatever the answer is you could

20  probably get from the annual report.

21          Fair Isaac's has a -- as I understand it, a

22  number of -- of license arrangements, but it's -- it's

23  all going to be based on -- on usage.  So if -- if

24  you're running more reports, you're going to charge --

25  get charged for money.  And I just don't know how

David Nolte

1   their contracts are expressed.  But again, I'm sure

2   that you -- you could probably read a paragraph in the

3   annual report if that was of primary significance to

4   you.  It, by the way, was not a primary significance

5   to me.

6          Nielsen runs most of their contracts unique

7   to a -- a user.  So if you contact Nielsen, they want

8   to know what are you going to use it for and who are

9   you and how many reports are you going to get and then

10  they give you pricing.  Again, though, it's based on

11  anticipated usage and who you are.

12      Q   It's not based on the profits that you are

13  anticipating to get from usage?

14      A   Oh, yeah, absolutely.  One of the things

15  that's interesting about all of these is that none of

16  them do the -- the people who -- who are getting the

17  fee, you know, are -- are they changing the fee based

18  on, you know, whether you're successful or not.  So --

19  and -- and -- and that's -- that's the -- the genesis

20  of the comment that I've got later in the report.

21          So Google doesn't say we're only going to

22  charge you if you're successful in making a sale.  We

23  give you the impression, you pay for it, whether you

24  can make a sale or not is your problem.  And the same

25  thing's true I think for pretty much all of these.

Exhibit 2
Page 54

David Nolte

1   to keep your data and not have to pay you because

2   there was an oopsy somewhere, and we're going to hold

3   you to that oopsy, even though that clearly was not

4   the intentions of the parties, that does not change my

5   conclusion.

6          The conclusion under that set was someone

7   meaning the Fund is taking advantage of an oopsy by

8   the part of the unions.  And -- and the fact that --

9   that something -- something may be an oopsy does not

10  change its economic value.  So my conclusions are not

11  oriented to what is legally permissible under a

12  contract.  It is instead what is a reasonable value in

13  consideration for what's been exchanged between the

14  parties.

15      Q   Haven't you interpreted the contract by

16  calling it a license?

17      A   No.

18      Q   There's nowhere in the contract that says

19  that it's a license, right?

20      A   I don't have to call it a license.  Look,

21  I'm -- I'm simply saying that there is methodologies

22  available for coming up with an economic answer or a

23  valuation conclusion and -- and we can look at that by

24  realizing that this is expressed as a percentage.

25          I don't know that you would change the answer

David Nolte

1   at all if someone said, I'm going to give a ruling

2   that says the word "license" has to be omitted from

3   Nolte's report.  It's just a ruling, says "redacted."

4   Nolte can call it something else, but he can't call it

5   a license.  He can call it a kibitzer bong.  So we're

6   going to call -- you can't call it a license, he can

7   call it whatever he wants, if it's a kibitzer bong,

8   fine.

9           I think I could rewrite the report, take out

10  the word "license," insert the word "kibitzer bong"

11  and I'm not sure any conclusions are going to be

12  changing because my conclusions are economically

13  based, not based upon on a legal interpretation of the

14  word "license."

15      Q    Doesn't it need to be a license for you to

16  say that the unions are entitled to a royalty for use

17  of it?

18      A    Again, you know, I -- I've done numerous

19  assignments where I've looked at the reasonableness of

20  royalties.  I've -- and I'm -- I'm -- that's how these

21  types of agreements are oftentimes expressed.

22          But if someone says, no, no, no, you can't

23  call it a royalty, it has to be a service fee, if you

24  don't call it a service fee, then it can't be right.

25  Fine.  Run through the report, we can take out the

David Nolte

1    word "royalty," we can put in the word "service fee,"

2    if that's the only thing that's differentiating the

3    parties.  I'm not sure it's going to change anything.

4            I'm -- I'm simply describing it as -- as a

5    royalty and as a license because that is the language

6    of business that is typically used for this type of

7    transaction.  If you or the other parties or the Court

8    decide that they don't want to use that language, I

9    don't think -- I'm quite sure it doesn't matter.

10       Q   When you use a patent without a license you

11   can be sued for infringement, right?

12       A   You can.

13       Q   And that's the same for copyright and

14   trademark?

15       A   You can.

16       Q   So no matter how you come into possession of

17   those assets you can be restricted by law for using

18   them without permission, right?

19       A   That's correct.

20       Q   And that's why you need to license the asset?

21   So that you don't get sued?

22       A   Well, maybe that's the way a lawyer would

23   express it.  But that's not how I would express it.  I

24   would express it that if you owned someone else's

25   property you should pay fair value for it.  And -- and

David Nolte

```
1        A    Are you asking me why the parties agreed to
2    3 percent?
3        Q    No.  Why do you think a 3 percent fee is
4    reasonable as opposed to a different number?
5        A    Well, 3 percent was the fee that I was asked
6    to evaluate the reasonableness of.  The parties had
7    agreed to that 3 percent fee years before I was
8    employed.
9        Q    Would a 4 percent fee be reasonable?
10       A    That was not my assignment and not the deal
11   so I didn't conduct an assignment based on 4 percent.
12   I conducted an assignment based on 3 percent.
13       Q    Okay.  As used here in conclusion number 3,
14   does reasonable refer to reasonable from the Fund's
15   perspective or reasonable from the unions'
16   perspective?
17       A    Okay.  Now I -- I really should follow your
18   question because you've -- you're quoting something
19   specific and I don't know what you're quoting.  I'm
20   not quarreling with it.  I just -- I just don't know
21   where you are.  You say number 3.
22       Q    Yeah.
23       A    What page?
24       Q    Page 13.
25       A    13:
```

David Nolte

1   that you spoke to?

2       A   You know, a lot of conversations merge

3   together so I could be wrong on this, but I believe

4   that conversation occurred in one in which Ms. Taub

5   and Ms. Sandell were involved.  But I -- I could be

6   wrong.

7       Q   Have you -- well, strike that.

8           Couldn't the Fund implement an

9   electronic-type system at the type of recording to

10  collect session data for all tracks recorded in 2021

11  and going forward?

12      A   You're asking me whether such a system is

13  technologically feasible?

14      Q   Yeah.

15      A   I suspect it is.

16      Q   In the course of preparing your report did

17  you consider what the cost of doing something like

18  that would be for the Fund?

19      A   I did consider that.

20      Q   Okay.  How much do you think a system like

21  that would cost?

22      A   Well, I don't have a number.  I do know that

23  there's an issue of -- of basically investment

24  capital, that such a system would likely cost

25  millions.  I don't have an exact number.  But it's --

David Nolte

1   it's -- this is not petty cash.   And so who's going to

2   pay for it.

3            The Fund is effectively a passthrough

4   vehicle.   It gets money and it's supposed to pay that

5   money to others.   I don't think there's a provision

6   where the Fund gets to say, you know what we'd like to

7   do, I'm sure you guys won't mind, we're going to take

8   multiple millions of your dollars and we're just not

9   going to give it to you, and the reason we're not

10  going to give it to you is we're going to invest in

11  this really slick computer system, you'll love it, and

12  the guys later who aren't getting -- who aren't

13  participating right now, they're going to like it a

14  lot because it will save money later and you're going

15  to pay for it now.

16           I don't want to be the one responsible for

17  that recommendation because that would -- that would

18  be generating your next lawsuit.   And so I don't know

19  how the Fund's going to do that.   It -- it may be

20  technologically feasible but that does not mean it's

21  practical.

22      Q   Isn't that what the Fund is doing now, giving

23  $1.5 million approximately per year to the unions for

24  maybe data that goes back to 1940 that you've shown us

25  helps some people get their participant --

David Nolte

1    participation and not others?

2         A    That is exactly not what the Fund is doing.

3    The Fund is not taking money from one group of

4    participants to pay for future generations.   They are

5    instead saying a percentage reduction is reasonable

6    and appropriate because it significantly improves the

7    accuracy of the information and is a modest charge

8    relative to the rest of the amounts that are

9    appropriately being charged to these participants.

10            It is a pay-as-you-go system, which is

11   exactly the opposite of, let's invest millions of

12   dollars of someone else's money that -- of the current

13   participants' money so that future generations could

14   impact it.

15            Look, if Mr. Risto wants to personally fund

16   this, I think he should talk to the Fund.   But I'm

17   quite sure that Mr. Risto doesn't want to personally

18   pay for it, and I don't know anybody else that's

19   waiting in that line.

20       Q    I don't know -- I don't know -- know why

21   you're including that in your answer because I'm not

22   sure --

23       A    Because it's relevant.   I'll --

24       Q    No, it's not.

25       A    -- tell you why, because it's absolutely

David Nolte

1                    DECLARATION UNDER PENALTY OF PERJURY

2

3            I, DAVID NOLTE, do hereby certify under

4    penalty of perjury that I have read the foregoing

5    transcript of my deposition taken on Tuesday,

6    April 27, 2021; that I have made such corrections as

7    appear noted herein in ink, initialed by me; that my

8    testimony as contained herein, as corrected, is true

9    and correct.

10

11           Dated this _____ day of _____, 2021,

12   at _____.

13

14

15

16                         _____

17                         DAVID NOLTE

18

19

20

21

22

23

24

25

David Nolte

```
 1                      CERTIFICATE

 2

 3          I, SHARI BOLTON, Certified Shorthand

 4   Reporter, No. 9291, do hereby certify that prior to

 5   the commencement of the examination, the Deponent was

 6   duly remotely sworn by me to testify to the truth, the

 7   whole truth and nothing but the truth.

 8

 9          I DO FURTHER CERTIFY that the foregoing is a

10   verbatim transcript of the testimony as taken

11   stenographically by me at the time, place and on the

12   date hereinbefore set forth, to the best of my

13   ability.

14

15          I DO FURTHER CERTIFY that I am neither a

16   relative nor employee nor attorney nor counsel of any

17   of the parties to this action, and that I am neither a

18   relative nor employee of such attorney or counsel, and

19   that I am not financially interested in the action.

20

21   _____

22   SHARI BOLTON

23   Certified Shorthand Reporter, No. 9291

24

25          Dated:_____
```