# EXHIBIT 5

JENNER & BLOCK LLP
Andrew J. Thomas (Cal. Bar No. 159533)
ajthomas@jenner.com
Andrew G. Sullivan (Cal. Bar No. 301122)
agsullivan@jenner.com
Anna K. Lyons (Cal. Bar No. 324090)
alyons@jenner.com
633 West 5th Street, Suite 3600
Los Angeles, CA 90071
Telephone: (213) 239-5100
Facsimile:  (213) 239-5199

*Attorneys for All Defendants*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEVIN RISTO, on behalf of himself and all others similarly situated, | Case No. 2:18-cv-07241-CAS-PLA |
| Plaintiff, | Class Action |
| vs. | **AMENDED RESPONSES OF DEFENDANT STEFANIE TAUB TO PLAINTIFF'S FIRST SET OF INTERROGATORIES** |
| SCREEN ACTORS GUILD-AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS, a Delaware corporation; AMERICAN FEDERATION OF MUSICIANS OF THE UNITED STATES AND CANADA, a California nonprofit corporation; RAYMOND M. HAIR, JR., an individual, as Trustee of the AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund; TINO GAGLIARDI, an individual, as Trustee of the AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund; DUNCAN CRABTREE-IRELAND, an individual, as Trustee of the AFM and SAG-AFTRA Intellectual Property Rights Distribution Fund; STEFANIE TAUB, | |

Exhibit 5
Page 78

1  an individual, as Trustee of the AFM
2  and SAG-AFTRA Intellectual Property
   Rights Distribution Fund; JON JOYCE,
3  an individual, as Trustee of the AFM
4  and SAG-AFTRA Intellectual Property
   Rights Distribution Fund; BRUCE
5  BOUTON, an individual, as Trustee
6  of the AFM and SAG-AFTRA
   Intellectual Property Rights
7  Distribution Fund; and DOE
8  RESPONDING PARTY 1-10,

9                  Responding Party.

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit 5
Page 79

whom Royalty payments have been allocated.  Given that the Fund's administration necessarily requires assistance from the Unions—which house the most exhaustive existing repository of information to identify and locate Fund recipients— reimbursement of the Unions for the valuable data and services they provide is fully consonant with the statutory framework established by Congress.   To contend otherwise would require showing that Congress intended to task the Unions with time-consuming and labor-intensive duties that the Unions were expected to perform in perpetuity at no cost.

**INTERROGATORY NO. 10:**

If **YOU** contend that the **SERVICE FEE** is a reasonable charge for the services provided by the **UNIONS,** state **ALL** facts that support that contention.

**AMENDED RESPONSE TO INTERROGATORY NO. 10:**

Responding Party objects to this interrogatory to the extent it calls for Responding Party to make a legal conclusion.

Without waiving and subject to the foregoing objections, Responding Party responds as follows: Pursuant to the Data Purchase and Services Agreement, the Unions are required to provide the Fund with information in their possession that is necessary to enable the Fund to identify and pay the non-featured performers (both Union members and nonmembers) to whom Royalty payments have been allocated in a given distribution cycle.  This valuable data is derived from records developed and maintained by the Unions at considerable expense, including forms obtained by the Unions from producers and/or other individuals or entities involved in the creation of a given sound recording.  Specifically, the information provided by the Unions to the Fund is derived from session reports and "B-forms" which contain information necessary to identify and locate some or all of the non-featured musicians and vocalists who performed on a given sound recording.  These session reports and B-forms compile information related to both Union members and nonmembers who served as non-featured performers on a given sound recording.

11

1    These records maintained by the Unions are housed across various local affiliates of
2    each Union, for the most part based on where the relevant sound recording took
3    place.  Much of this information exists in records that are maintained locally by the
4    Unions only in hard copy form.

5         Pursuant to the Data Purchase and Services Agreement, the Unions must
6    coordinate with the Fund to provide the information necessary for the Fund to
7    identify and pay non-featured performers.  The information provided by the Unions
8    pursuant to the Data Purchase and Services Agreement is essential to the Fund's
9    administration.  This information has been collected, compiled, and maintained as
10   part of a large-scale effort by the Unions over the course of decades, and such efforts
11   continue on an ongoing basis.  There is no other repository of information
12   documenting the identities, work histories, and payment information associated with
13   non-featured performers that is nearly as exhaustive as the repositories maintained
14   by the Unions.  Without this data and the services expended by the Unions to provide
15   this data, the Fund would be significantly constrained in its ability to perform the
16   fundamental task of identifying and locating the non-featured performers for whom
17   Royalty distributions are to be paid, or in the alternative would need to expend
18   substantial efforts and incur substantial costs to compile independently the
19   information provided by the Unions.  Accordingly, the data has substantial intrinsic
20   value and is highly valuable to the Fund in the performance of its work.

21        In addition, Union representatives expend considerable effort supplying the
22   valuable data the Unions are obligated to provide under the Data Purchase and
23   Services Agreement.  Researchers at the Fund have worked extensively with Union
24   representatives in an effort to build and grow a database compiling the identities of
25   the non-featured performers who performed on a given sound recording, as well as
26   the information necessary to locate and pay such individuals.  This database serves
27   as the Fund's central resource used to identify, locate, and pay Royalties to non-
28   featured performers.  As this database has grown, the Fund has been able more

12

DEFENDANT STEFANIE TAUB'S AMENDED RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

Exhibit 5
Page 81

1  efficiently to identify and locate the non-featured performers who performed on
2  eligible sound recordings.  Currently, this database compiles information related to
3  the non-featured performers associated with approximately 136,000 song titles.

4      Because the records maintained by the Unions exist in decentralized
5  repositories dispersed across the Unions' local affiliates, the Unions satisfy their
6  obligations under the Agreement by making numerous representatives available in
7  these locations in order to field requests from the Fund.  The Fund's research team—
8  currently staffed with ten full-time research associates and supervisors—works
9  extensively with representatives located in various local affiliates of the Unions on
10 a year-round basis to obtain information regarding the non-featured performers
11 associated with thousands of song titles.  Except with respect to two local affiliates
12 of the AFM (located in New York and Los Angeles) that maintain electronic records
13 on a platform that Fund researchers may directly log into, in all other cases Union
14 representatives handle individual requests from Fund researchers to locate and
15 provide information related to specific song titles and/or to verify the recent contact
16 information for non-featured performers associated with such song title.  In locations
17 where such records exist in hard copy form, Union representatives must locate the
18 requested document within their hard copy filing system before scanning and
19 sending a digital copy of the record to the requestor at the Fund.  The quantity of the
20 requests made to the Unions by the Fund vary across the respective Unions'
21 locations and fluctuate on a day-to-day and week-to-week basis.  It is not uncommon
22 for a Union representative at one location to field dozens of requests from the Fund
23 over the course of a week.  Fulfilling each such request may take a Union
24 representative anywhere from a few minutes to thirty minutes or longer.

25     In addition to providing the information necessary to locate and pay non-
26 featured performers, the Unions also provide advocacy services both domestically
27 and internationally that benefit non-featured performers (both Union members and
28 nonmembers).  These activities include meeting with members of Congress,

13

negotiating with domestic performing rights organizations (PROs), as well as engaging with international PROs to negotiate better terms for the collection and distribution of international royalties.  In addition to advocating with the federal government for more expansive rights that would benefit all non-featured performers, the Unions have negotiated and interacted with the World Intellectual Property Organization (WIPO), the Societies' Council for the Collective Management of Performers' Rights (SCAPR), Phonographic Performance Limited (PPL), and the Musicians' Rights Organization Canada (MROC), among other international organizations. This includes efforts to expand the performance right in the United States to apply to non-digital platforms (e.g., terrestrial radio), a cause which the Unions have furthered through their participation in the musicFIRST coalition. The Unions also engage in advocacy efforts with foreign governments for more stringent distribution requirements for collected royalties.  These activities all inure to the benefit of non-featured performers, regardless of union affiliation, as they are aimed in part at increasing the scope and overall amount of the royalties paid for recordings on which non-featured musicians and vocalists have performed.

In consideration of the inherent value of the data the Unions provide to the Fund, as well as the services provided by the Unions as described above, the Trustees of the Fund agreed in 2013 that each Union should be paid a fee in the amount of 1.5% of the receipts distributed by the Fund in a given distribution cycle.  This was an entirely reasonable exercise of the Trustees' broad discretion in determining the value of the information and services provided by the Unions.

**INTERROGATORY NO. 15:**

**IDENTIFY ALL** individuals involved in the negotiation of the **TRUST AGREEMENT**.

**AMENDED RESPONSE TO INTERROGATORY NO. 15:**

Responding Party objects to this interrogatory on the grounds that it is vague and ambiguous as to the phrase "involved in the negotiation of."  Plaintiff's request

14

subsequent Annual Reports published by the Fund have included similar information.  In addition, the Fund has properly disclosed the payment of the Service Fee where applicable in all public tax documents filed since the implementation of the Service Fee.

Responding Party refers Plaintiff to the disclosures regarding the Service Fee contained in the Fund's Annual Reports for years 2013, 2014, 2015, 2016, 2017, 2018, AND 2019.  These reports are accessible on the Fund's website and have been produced by the Responding Party in response to Plaintiff's Requests for Production Nos. 2 and 3.

**INTERROGATORY NO. 30:**

**IDENTIFY ALL** individuals who decided to implement the **SERVICE FEE**.

**AMENDED RESPONSE TO INTERROGATORY NO. 30:**

Responding Party objects to this interrogatory on the ground that it is vague and ambiguous as to the term "decided to implement."  Plaintiff's request is unduly burdensome to the extent it requests contact information for individuals with no current affiliation to the Responding Party.  Plaintiff's interrogatory is improper to the extent it requests confidential information belonging to a third party, and also to the extent it seeks the contact information of Defendants in this litigation who are represented by counsel and may only be contacted in regard to this litigation through such counsel.  Additionally, Responding Party objects to this interrogatory to the extent it requests facts outside the personal knowledge of defendant Tino Gagliardi, who became a Trustee of the Fund in 2016 and therefore lacks first-hand knowledge regarding the authorization and implementation of the Data Purchase and Services Agreement executed by the Trustees in 2013.

Without waiving and subject to the foregoing objections, Responding Party refers Plaintiff to the Trustee Defendants' production in response to Plaintiff's Request for Production No. 12, pursuant to which the Trustee Defendants will produce the minutes of the duly-constituted meeting of the Fund's Trustees which

21

Exhibit 5
Page 84

occurred on June 4, 2013 and which records the attending Trustees' vote approving the Data Purchase and Services Agreement.  The meeting minutes reflect that Trustees Bruce Bouton, Duncan Crabtree-Ireland, Sam Folio, Ray Hair, and Stefanie Taub were present at the June 4, 2013 meeting.  David White was involved in discussions with Mr. Crabtree-Ireland prior to the implementation of the Service Fee and approved of the Service Fee implementation.

Dated:   March 1, 2021                    JENNER & BLOCK LLP


                                          /s/ Andrew J. Thomas
                                          Andrew J. Thomas
                                          Andrew G. Sullivan
                                          Anna K. Lyons
                                          *Attorneys for All Responding Party*

22

Exhibit 5
Page 85

## **VERIFICATION**

I, Stefanie Taub, was formerly a trustee of the AFM & SAG-AFTRA Intellectual

Property Fund. No one person at the Fund knows all of the information requested by Plaintiff's

First Set of Interrogatories.  The foregoing amended response to Plaintiff's First Set of

Interrogatories has been prepared from information known to me, from information assembled

by others, including counsel, and information gleaned from documents and records.  I have

reviewed the foregoing Amended Responses and Objections, and I declare under penalty of

perjury under the laws of the United States that the foregoing Amended Responses and

Objections are true and correct to the best of my knowledge and belief.

Executed this _26 ᵀᴴ_ day of February, 2021, at Los Angeles, California.


_____
Stefanie Taub

Exhibit 5
Page 86